**ORAL ARGUMENT NOT YET SCHEDULED**
No. 26-1037 (and consolidated cases)

_____

# In the United States Court of Appeals
# For the District of Columbia Circuit

_____

**AMERICAN PUBLIC HEALTH ASSOCIATION, ET AL.,**
*Petitioners,*

**v.**

**U.S. ENVIRONMENTAL PROTECTION AGENCY and
LEE ZELDIN, in his official capacity as Administrator of the
U.S. Environmental Protection Agency,**
*Respondents,*

_____

On Petitions for Review of Final Action by the
U.S. Environmental Protection Agency

_____

**PRIVATE RESPONDENT-INTERVENORS' OPPOSITION TO
MOTION TO STAY THE FINAL RULE**

_____

Daniel J. Feith
Justin A. Savage
Kathleen Mueller
SIDLEY AUSTIN LLP
1501 K Street, NW
Washington, D.C. 20005
Tel.: (202) 736-8000

*Additional counsel listed inside*

Michael Buschbacher
James R. Conde
Laura B. Ruppalt
BOYDEN GRAY PLLC
800 Connecticut Avenue, NW
 Suite 900
Washington, D.C. 20006
Tel.: (202) 955-0620

Paul D. Clement
Danielle Sassoon
Nicholas A. Aquart
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
Tel.: (202) 742-8900

Andrew Michael Grossman
Mark W. DeLaquil
BAKER & HOSTETLER LLP
Washington Square
  Suite 1100
1050 Connecticut Avenue, NW
Washington, D.C. 20036
Tel.: (202) 861-1697

Robert Henneke
Chance Weldon
Theodore Hadzi-Antich
Eric Heigis
Laura Beth Latimer
TEXAS PUBLIC POLICY FOUNDATION
901 Congress Avenue
Austin, TX 78701
Tel.: (512) 472-2700

Brinton Lucas
JONES DAY
51 Louisiana Avenue, NW
Washington, D.C. 20001
Tel.: (202) 626-1700

S. Matthew Krsacok
JONES DAY
150 West Jefferson
  Suite 2100
Detroit, MI 48226
Tel.: (313) 230-7923
mkrsacok@jonesday.com

Jeffery D. Ubersax
KUSHNER & HAMED CO., LPA
1375 East Ninth Street
  Suite 1930
Cleveland, OH 44114
Tel.: (216) 696-6700

Timothy A. French
CHICAGO LAW PARTNERS, LLC
333 West Wacker Drive
  Suite 810
Chicago, IL 60606
Tel.: (312) 929-1954

William L. Wehrum, Jr.
ENVIRONMENTAL LAW, LLC
1629 K Street, NW
  Suite 300
Washington, D.C. 20006
Tel.: (302) 300-0388

Frank Garrison
Tyler Fry
PACIFIC LEGAL FOUNDATION
3100 Clarendon Boulevard
  Suite 1000
Arlington, VA 22201
Tel.: (202) 888-6881

Marin Murdock
Ondray T. Harris
Soriya R. Chhe
COMPETITIVE ENTERPRISE INSTITUTE
200 Massachusetts Avenue, NW
  Suite 700
Washington, DC 20001
Tel.: (512) 693-8350

# TABLE OF CONTENTS

TABLE OF AUTHORITIES....................................................................iii

GLOSSARY ........................................................................................vii

INTRODUCTION.................................................................................. 1

BACKGROUND .................................................................................... 3

    I.     Regulatory Background ......................................................... 3

          A.    The Clean Air Act............................................... 3

          B.    The Greenhouse-Gas Standards.................................. 4

          C.    The Electric-Vehicle Mandates..................................... 6

    II.    The Repeal Rule ..................................................................... 8

    III.    Youth Petitioners' Move to Stay the Repeal Rule .................. 9

ARGUMENT ....................................................................................... 9

    I.     Youth Petitioners Lack Standing ....................................... 10

    II.    Youth Petitioners Are Unlikely to Prevail on the Merits .... 13

          A.    Youth Petitioners Waive the Statutory Merits ........... 13

          B.    The Repeal Rule Does Not Substantially Burden Religious Exercise ....................................................... 16

          C.    The Repeal Rule Does Not Violate Youth Petitioners' Right to Life or Liberty ............................ 19

          D.    EPA Did Not Ignore Significant Comments................. 21

    III.    Youth Petitioners Are Not Irreparably Injured ................... 22

i

IV.    The Balance of Equities and Public Interest Do Not
Support a Stay......................................................................24

CONCLUSION ...................................................................................26

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Am. Elec. Power Co. v. Connecticut,*
564 U.S. 410 (2011)................................................................20

*Bowen v. Georgetown Univ. Hosp.,*
488 U.S. 204 (1988)................................................................15

*Brown v. Board of Education,*
347 U.S. 483 (1954)................................................................22

*Burwell v. Hobby Lobby Stores, Inc.,*
573 U.S. 682 (2014)................................................................18

*California v. EPA,*
72 F.4th 308 (D.C. Cir. 2023)..................................................4

*City of Portland v. EPA,*
507 F.3d 706 (D.C. Cir. 2007) .........................................21, 22

*Clapper v. Amnesty Int'l USA,*
568 U.S. 398 (2013)................................................................12

*Coal. for Responsible Regul., Inc. v. EPA,*
684 F.3d 102 (D.C. Cir. 2012) ...............................................12

*Delta Constr. Co. v. EPA,*
783 F.3d 1291 (D.C. Cir. 2015) ...............................................5

*Dobbs v. Jackson Women's Health Org.,*
597 U.S. 215 (2022)...........................................................19, 20

*FDA v. All. for Hippocratic Med.,*
602 U.S. 367 (2024)........................................... 11, 12, 13, 23

*Fund for Animals v. Frizzell,*
530 F.2d 982 (D.C. Cir. 1975) ...............................................24

iii

*Growth Energy v. EPA,*
  5 F.4th 1 (D.C. Cir. 2021) ................................................................ 16

*Lyng v. Nw. Indian Cemetery Protective Ass'n,*
  485 U.S. 439 (1988)................................................................... 17, 18

*Mahmoud v. Taylor,*
  606 U.S. 522 (2025)................................................................... 18, 22

*Massachusetts v. EPA,*
  549 U.S. 497 (2007)........................................................................ 5

*Me. Lobstermen's Ass'n v. NMFS,*
  70 F.4th 582 (D.C. Cir. 2023)...................................................... 26

*Mullin v. Doe,*
  No. 25-1083, 2026 WL 1825840 (U.S. June 25, 2026)........................ 10

*Munaf v. Geren,*
  553 U.S. 674 (2008)...................................................................... 11

*Nat. Res. Def. Council v. EPA,*
  464 F.3d 1 (D.C. Cir. 2006) .......................................................... 12

*Nken v. Holder,*
  556 U.S. 418 (2009)...................................................................... 10

*Ohio v. EPA,*
  603 U.S. 279 (2024)............................................................ 10, 16, 24

*Plyler v. Doe,*
  457 U.S. 202 (1982)...................................................................... 22

*Rucho v. Common Cause,*
  588 U.S. 684 (2019)...................................................................... 20

*West Virginia v. EPA,*
  597 U.S. 697 (2022)........................................................ 1, 14, 15, 16

## Statutes

5 U.S.C. § 705 .......................................................................... 10, 23, 24

iv

5 U.S.C. § 706 ...................................................................................22

42 U.S.C. § 2000bb-1 .......................................................................17

42 U.S.C. § 7521(a)(1).................................................................. 3, 15

42 U.S.C. § 7522(a)(1)......................................................................25

42 U.S.C. § 7524(a), (b)....................................................................25

42 U.S.C. § 7543(a) ..........................................................................21

42 U.S.C. § 7607(d)(7)(B).................................................................16

49 U.S.C. § 32901(a)(1), (8) ...............................................................5

49 U.S.C. § 32902(a), (b), (f), (k)........................................................5

49 U.S.C. § 32902(h)(1), (2) ...............................................................5

## Other Authorities

40 C.F.R. pts. 86, 1037 ................................................................. 4, 13

40 C.F.R. § 19.4 ...............................................................................25

75 Fed. Reg. 25,324 (May 7, 2010) .....................................................5

76 Fed. Reg. 57,106 (Sept. 15, 2011)..................................................6

77 Fed. Reg. 62,624 (Oct. 15, 2012).....................................................5

81 Fed. Reg. 73,478 (Oct. 25, 2016).....................................................6

85 Fed. Reg. 24,174 (Apr. 30, 2020) ...................................................5

88 Fed. Reg. 4,296 (Jan. 24, 2023) .....................................................4

89 Fed. Reg. 27,842 (Apr. 18, 2024) ...................................................7

89 Fed. Reg. 29,440 (Apr. 22, 2024) ...................................................7

Exec. Order No. 14,037, 86 Fed. Reg. 43,583 (Aug. 10, 2021).................6

Press Release, The White House, *FACT SHEET: Biden-Harris Administration Proposes New Standards* (Apr. 12, 2023), https://perma.cc/8DJG-X7QS.....................................................6

William Nordhaus, *The Climate Casino* (2012).......................................18

WIRED Brand Lab, *How Cars Got 99% Cleaner in 50 Years*, WIRED (Sept. 23, 2019), https://www.wired.com/video/watch/how-cars-got-99-cleaner-in-50-years .........................................4

## GLOSSARY

$CO_2$ .................................................................. Carbon dioxide

DOT ................................................... U.S. Department of Transportation

EPA ............................................ U.S. Environmental Protection Agency

RFRA ................................................ Religious Freedom Restoration Act

## INTRODUCTION

In the final rule at issue, the U.S. Environmental Protection Agency ("EPA") repealed the most far-reaching and expensive regulations in EPA's history: greenhouse-gas standards that would compel widespread electrification of the Nation's vehicle fleet, from sedans to long-haul tractors and everything in between.

As EPA has now concluded, mandating electrification of the vehicle fleet implicates the major-questions doctrine and exceeds EPA's authority under Section 202(a), which does not clearly authorize such a mandate. Yet EPA's prior greenhouse-gas standards did just that. Much as in the "Clean Power Plan" rule restructuring the electricity sector struck down in *West Virginia v. EPA,* EPA's repealed standards effectively "announc[ed] what the market share of" electric vehicles "must be, and then requir[ed]" manufacturers to meet that target "or subsidize their competitors to get there." 597 U.S. 697, 731 n.4 (2022). And because the standards were infeasible, they would have wreaked havoc on the American economy. No petitioner sought a stay for months following EPA's action.

The "Youth Petitioners," however, now belatedly seek that extraordinary relief. *See* Doc. No. 2174285 ("Stay Motion"). The basis for Youth

1

Petitioners' extraordinary request is itself extraordinary. They do not challenge EPA's "statutory" rationales for repeal. *See* Stay Motion at 7 n.3. Rather, they claim that the Constitution entitles them to federal rules compelling mass production of electric vehicles, regardless whether Congress authorized EPA to mandate such a fundamental restructuring of the U.S. economy. None of their theories is remotely plausible, let alone likely to succeed.

Youth Petitioners also fail to show standing or irreparable harm. EPA concluded that the electric-vehicle mandates have no discernable effect on the downstream climate effects alleged by Youth Petitioners. Youth Petitioners do not argue that EPA's conclusion was arbitrary, so this Court must defer to EPA's unchallenged conclusion. Further, any purported harms from worse local air quality are addressed by the many EPA regulations that govern motor vehicle emissions that contribute to local air pollution. And in all events, Youth Petitioners' request is fatally undermined by their late filing: the effective date of the final rule was April 20, 2026, but Youth Petitioners waited for months and past the effective date to seek a judicial stay.

Finally, a stay is not in the public interest. Reinstating infeasible mandates while the litigation proceeds would create chaos throughout the U.S. economy. Further, the record contains evidence that reinstatement would likely depress sales of new vehicles and reduce the turnover rate of the fleet, exacerbating air pollution by keeping older, more polluting vehicles on the road longer.

The Court should deny the motion.

## BACKGROUND

### I.    Regulatory Background

#### A.    The Clean Air Act

Title II of the Clean Air Act creates a comprehensive scheme for regulating harmful emissions from new motor vehicles. Section 202(a) directs the EPA Administrator to

> by regulation prescribe (and from time to time revise) … standards applicable to the emission of any air pollutant from any class or classes of new motor vehicles or new motor vehicle engines, which in his judgment cause, or contribute to, air pollution which may reasonably be anticipated to endanger public health or welfare.

42 U.S.C. § 7521(a)(1). This text "does not mandate any sort of technology-forcing approach." *California v. EPA*, 72 F.4th 308, 315 (D.C. Cir. 2023) (discussing similar language in Section 231 of the Clean Air Act).

3

### B.    The Greenhouse-Gas Standards

Since the 1970s, EPA has promulgated many Title II standards for new motor vehicles limiting emissions of "criteria" air pollutants and precursors that cause smog or similar regional ambient air problems. *See* Stay Motion, Ex. 4, 91 Fed. Reg. 7,686, 7,697 n.44 (Feb. 18, 2026) ("Repeal Rule"); *see generally* 40 C.F.R. pts. 86, 1037. Nearly sixty years later, smog-forming emissions from new motor vehicles have dropped by 99%. *See* WIRED Brand Lab, *How Cars Got 99% Cleaner in 50 Years*, WIRED, (Sept. 23, 2019), https://www.wired.com/video/watch/how-cars-got-99-cleaner-in-50-years. EPA's stringent regulations governing criteria air pollutants from new motor vehicles, *see, e.g.*, 88 Fed. Reg. 4,296 (Jan. 24, 2023), are not at issue in this case.

What is at issue are EPA's standards for greenhouse-gas emissions from motor vehicles. EPA has regulated greenhouse-gas emissions, primarily carbon dioxide ("$CO_2$"), because of the concern that over decades and even centuries, global emissions of greenhouse gases will accumulate in the troposphere and trap heat from the sun, leading to rising global temperatures and other downstream effects. Repeal Rule, 91 Fed. Reg. at 7,689.

Following *Massachusetts v. EPA*, 549 U.S. 497 (2007), EPA published an "endangerment finding" under Section 202(a) determining that "well-mixed" greenhouse gases could threaten public health. Repeal Rule, 91 Fed. Reg. at 7,689. EPA then promulgated $CO_2$ emissions standards for light-duty vehicles in a joint rulemaking with the U.S. Department of Transportation ("DOT"), which administers fuel-efficiency standards for motor vehicles. 75 Fed. Reg. 25,324 (May 7, 2010); *see also* 49 U.S.C. § 32902(a), (b), (f), (k).[1]

After that initial rulemaking, EPA continued to jointly promulgate $CO_2$ standards with DOT. *See* 85 Fed. Reg. 24,174 (Apr. 30, 2020); 77 Fed. Reg. 62,624 (Oct. 15, 2012). Because Congress prohibited DOT from even considering the fuel economy of electric vehicles when setting standards, *see* 49 U.S.C. §§ 32901(a)(1), (8), 32902(h)(1), (2), the agencies' joint standards could not effectively require automakers to produce electric vehicles.

---

[1] $CO_2$ is the natural byproduct of combusting carbon-based fuels, so "[a]ny rule that limits tailpipe $CO_2$ emissions is effectively identical to a rule that limits fuel consumption." *Delta Constr. Co. v. EPA*, 783 F.3d 1291, 1294 (D.C. Cir. 2015) (per curiam).

EPA and DOT also jointly promulgated $CO_2$ and fuel-efficiency standards for medium- and heavy-duty vehicles. *See* 76 Fed. Reg. 57,106 (Sept. 15, 2011); 81 Fed. Reg. 73,478 (Oct. 25, 2016). The joint standards for medium- and heavy-duty vehicles also could be met without electric vehicles. *See* 76 Fed. Reg. at 57,133; 81 Fed. Reg. at 73,500, 73,639, 73,704.

### C.     The Electric-Vehicle Mandates

In his first year in office, President Biden announced a "goal that 50 percent of all new passenger cars and light trucks sold in 2030 be" electric. Exec. Order No. 14,037, 86 Fed. Reg. 43,583, 43,583 (Aug. 10, 2021). President Biden also set a goal that "100 percent of all new … heavy-duty vehicles sold in 2040 be" electric. Press Release, The White House, *FACT SHEET: Biden-Harris Administration Proposes New Standards* (Apr. 12, 2023), https://perma.cc/8DJG-X7QS. To further that goal, EPA began promulgating greenhouse-gas standards without DOT, in a series of rulemakings that imposed electric-vehicle mandates—the most expensive rules in American history. *See* Repeal Rule, 91 Fed. Reg. at 7,755 ("$1.14 trillion").

EPA set $CO_2$ emissions standards for light- and medium-duty vehicles that were designed to drive automakers to "deploy an increasing number" of electric vehicles. 89 Fed. Reg. 27,842, 27,898 (Apr. 18, 2024). By model year 2032, EPA projected that the standards would result in about two-thirds of light-duty vehicles being electric. *Id.* at 28,057. For medium-duty vehicles, EPA predicted an increase from near zero in model year 2024 to a 43% market share by model year 2032. *Id.* at 28,060. Around the same time, EPA promulgated its first-ever solo $CO_2$ standards for new heavy-duty vehicles. Those standards were "more stringent than" prior standards and were designed to rapidly increase the share of electric heavy-duty vehicles to 45% of new vehicles by model year 2032, up from near zero. 89 Fed. Reg. 29,440, 29,443, 29,452 (Table ES-3), 29,567–68 (Apr. 22, 2024).

Although the greenhouse-gas regulations were nominally about $CO_2$, they were designed to compel electrification. EPA set fleetwide average $CO_2$ standards so low that it was impossible for manufacturers to practically comply, on average, without substantial electrification of the fleet. *See* Comment submitted by Prime Mover Inst., Exs. A & B (Decls. of Reginald Modlin in *Kentucky v. EPA*, No. 24-1087 (D.C. Cir.) & Mandy

7

Garrahan in *Nebraska v. EPA*, No. 24-1129 (D.C. Cir.)), EPA-HQ-OAR-2025-0194-7549 (Oct. 15, 2025).

The electric-vehicle mandates were challenged in this Court. *Texas v. EPA*, No. 22-1031 (D.C. Cir.); *Kentucky v. EPA*, No. 24-1087 (D.C. Cir.); *Nebraska v. EPA*, No. 24-1129 (D.C. Cir.). Those challenges remain pending.

## II.    The Repeal Rule

On February 18, 2026, EPA published the Repeal Rule, which repeals all greenhouse-gas standards for motor vehicles for model years 2012 and beyond. Repeal Rule, 91 Fed. Reg. at 7,688. EPA cited several independent bases for the repeal. First, EPA concluded that it lacks authority to regulate greenhouse gases as "air pollution" under the best reading of Section 202(a) because greenhouse gases "do not endanger public health or welfare through local or regional exposure" and lack a sufficiently close causal connection to the alleged harms from climate change. *Id.* at 7,714. Second, EPA concluded that regulating greenhouse gases raises questions of major economic and political significance by, among other things, compelling increased electrification of the U.S. motor vehicle fleet, and EPA lacks the clear authority required to mandate

8

such a shift. *Id.* at 7,723–26. Third, EPA concluded that, in any event, the avoided greenhouse-gas emissions from new U.S. motor vehicle emissions would have no discernable effect on global-mean-surface temperatures or sea-level rise, let alone other downstream effects. *Id.* at 7,729–34.

## III.    Youth Petitioners' Move to Stay the Repeal Rule

On the day the Repeal Rule was published, Youth Petitioners and other parties petitioned for judicial review. *See* Doc. No. 2159916 (filed Feb. 18, 2026).

Youth Petitioners then waited over eight weeks, until the Repeal Rule's effective date of April 20, 2026, Repeal Rule, 91 Fed. Reg. at 7,686, to ask EPA for a stay. Stay Motion, Ex. 3. EPA denied the request four days later. Stay Motion, Ex. 2. Youth Petitioners chose to wait approximately one additional month before seeking a stay in this Court. Stay Motion at 2, 7–24. No other petitioner supports the motion.

### ARGUMENT

A court may "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705. A stay is

9

"'not a matter of right'" but a matter of "'judicial discretion,'" and a movant "bears the burden of showing that the circumstances justify an exercise of that discretion." *Nken v. Holder*, 556 U.S. 418, 433–34 (2009) (citations omitted). A movant seeking a stay must show that (1) it "is likely to succeed on the merits," (2) "it will suffer irreparable injury without a stay," and (3) the equities and the "public interest" support a stay. *Ohio v. EPA*, 603 U.S. 279, 291 (2024).

Youth Petitioners do not meet this burden.

## I.    Youth Petitioners Lack Standing

"[I]n evaluating the likelihood-of-success question for the purpose of ruling on a request for interim relief, courts may consider both the likelihood that they have jurisdiction and the likelihood that the claim will succeed on the merits." *Mullin v. Doe*, No. 25-1083, 2026 WL 1825840, at *11 (U.S. June 25, 2026) (plurality opinion). Here, the Court lacks jurisdiction over Youth Petitioners' petition for review because their alleged downstream injuries are speculative, making success on the merits unlikely "due to potential impediments to even reaching the merits." *Munaf v. Geren*, 553 U.S. 674, 690 (2008).

"To establish standing … a plaintiff must demonstrate (i) that she has suffered or likely will suffer an injury in fact, (ii) that the injury likely was caused or will be caused by the defendant, and (iii) that the injury likely would be redressed by the requested judicial relief." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 380 (2024). "When (as here) a [petitioner] challenges the government's [allegedly] unlawful regulation (or lack of regulation) of *someone else*, standing is ordinarily substantially more difficult to establish." *Id.* at 382 (cleaned up). In such cases, "[t]he causation requirement precludes speculative links" and "attenuated links." *Id.* at 383.

The speculative and attenuated nature of Youth Petitioners' harms forecloses standing here.

First, Youth Petitioners lack a plausible basis to challenge the repeal of standards preceding model year 2028. They claim the effects of those prior model years are "irretrievably locked in." Stay Motion, Ex. 12, Sperling Decl. at 10. So any effects are concededly not redressable.

Second, for future model years, Youth Petitioners' alleged future harms from future increased greenhouse-gas emissions, which include such items as costs for "tick testing and treatment," Stay Motion at 6–7,

11

are too speculative and attenuated, *All. for Hippocratic Med.*, 602 U.S. at 391–93. Youth Petitioners have not shown that their harms will be "fairly traceable" to the Repeal Rule. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 401–02 (2013).

Youth Petitioners rely upon "[e]xperts" to predict downstream harms from increased greenhouse-gas emissions. Stay Motion at 7. But the expert conclusions this Court must follow are EPA's. *See Coal. for Responsible Regul., Inc. v. EPA*, 684 F.3d 102, 120–21 (D.C. Cir. 2012) ("extreme degree of deference"). And EPA has concluded—in modeling that Youth Petitioners do not challenge on the merits, *cf.* Stay Motion at 5 & n.1—that the Repeal Rule will not discernibly contribute to the downstream consequences that Youth Petitioners allege. Repeal Rule, 91 Fed. Reg. at 7,729–34. The purported "increased risk posed by EPA's rule" to Youth Petitioners is thus speculative. *Nat. Res. Def. Council v. EPA*, 464 F.3d 1, 6 (D.C. Cir. 2006). Because the alleged injuries, including alleged injuries to putative fundamental rights, all flow from this same speculative increased risk, Youth Petitioners lack standing.

To the extent Youth Petitioners complain about "co-pollutants," those alleged injuries are not fairly traceable to the Repeal Rule. *See, e.g.*,

Stay Motion at 26–27. EPA has promulgated stringent emission limits for smog-forming emissions from motor vehicles, which are not at issue here. *See generally* 40 C.F.R. pts. 86, 1037. "[G]iven the broad and comprehensive [air quality] protections guaranteed by federal law, the plaintiffs have not shown—and cannot show—that [EPA's] actions will cause them to suffer any conscience," environmental, or health injury in the future. *All. for Hippocratic Med.*, 602 U.S. at 390.

Youth Petitioners lack standing.

## II.    Youth Petitioners Are Unlikely to Prevail on the Merits

Youth Petitioners claim that the Repeal Rule violates various "fundamental rights," specifically, (1) free exercise rights under the Religious Freedom Restoration Act ("RFRA"), and (2) substantive due process rights to life and liberty under the Fifth Amendment. Stay Motion at 8–21. Youth Petitioners also argue that EPA did not sufficiently address their comments. *Id.* at 21–24.

These arguments are meritless.

### A.    Youth Petitioners Waive the Statutory Merits

As a preliminary matter, Youth Petitioners do not raise "statutory claims" under the Clean Air Act, leaving those arguments to "other

13

petitioners." *See* Stay Motion at 7 n.3. For purposes of resolving this stay motion, then, any statutory arguments are waived by the Youth Petitioners. This Court must therefore assume that EPA "lack[s] statutory authority" under Section 202(a) to promulgate the repealed mandates. Repeal Rule, 91 Fed. Reg. at 7,704.

In any event, EPA's conclusion is correct, at least because the repealed electric-vehicle mandates violate the major-questions doctrine. *Id.* at 7,723–26.[2] That conclusion follows *a fortiori* from *West Virginia v. EPA*, 597 U.S. 697 (2022). In the rule at issue in *West Virginia*, EPA "announc[ed] what the market share of coal, natural gas, wind, and solar must be, and then requir[ed] plants to reduce operations or subsidize their competitors to get there." *Id.* at 731 n.4. In the repealed greenhouse-gas standards, EPA similarly "announc[ed] what the market share of" electric vehicles "must be, and then requir[ed]" manufacturers to meet that target for their fleets "or subsidize their competitors to get there," *id.*, imposing the most expensive rule in American history. *See* Repeal Rule, 91 Fed. Reg. at 7,755 ("$1.14 trillion"). EPA's claim of

---

[2] *See also* Opening Br. of Private Petitioners 20–32, *Nebraska v. EPA*, No. 24-1129 (filed. Oct. 16, 2024); Opening Br. of Private Petitioners 23–40, *Kentucky v. EPA*, No. 24-1129 (filed. Sept. 6, 2024).

"unprecedented power over American industry" required "clear congressional authorization." *West Virginia*, 597 U.S. at 728, 732.

Because of the significance and novelty of EPA's claimed authority, the major-questions doctrine requires "clear congressional authorization." *Id.* at 732. EPA's now-repealed regulations did not come close. The statutory authority upon which EPA relied was a decades-old 1960s standard-setting authority for emissions. 42 U.S.C. § 7521(a)(1). That standard-setting authority does not afford EPA clear authorization to force a shift from internal-combustion vehicles to electric vehicles, any more than EPA's parallel authority to set emission standards for power plants afforded it clear congressional authorization to force a transition from coal to renewable energy.

"It is axiomatic that an administrative agency's power to promulgate legislative regulations is limited to the authority delegated by Congress." *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988); *see also West Virginia*, 597 U.S. at 723 ("Agencies have only those powers given to them by Congress"). If Congress did not delegate authority to EPA in the first place, then it cannot violate RFRA or the Constitution for EPA to repeal unlawful mandates.

15

### B.    The Repeal Rule Does Not Substantially Burden Religious Exercise

Youth Petitioners argue that EPA's repeal rule violates RFRA because the incremental emissions resulting from the repeal will make it "too hot … to walk safely to synagogue," too hot to "fast and wear a hijab," and too dangerous to "procreate." Stay Motion at 8–12. These arguments fail.

First, Youth Petitioners failed to raise a RFRA objection "with reasonable specificity" in their comments, 42 U.S.C. § 7607(d)(7)(B), flouting an issue-exhaustion requirement that must be "strictly enforced." *Growth Energy v. EPA*, 5 F.4th 1, 24 (D.C. Cir. 2021). Their comment fails to mention RFRA and contains only an oblique reference to "cultural and religious traditions" in a long list of grievances. Stay Motion, Ex. 6 at 2. That did not give EPA reasonable notice of a RFRA objection. *See Ohio*, 603 U.S. at 296.

On the merits, RFRA only prohibits "Government" from imposing a "substantial burden" on a person's exercise of religion. 42 U.S.C. § 2000bb-1. But the Repeal Rule alleviates burdens; it does not impose them. At bottom, Youth Petitioners complain about the incidental effects of alleviating restrictions on private parties.

The Supreme Court rejected the same kind of complaint in *Lyng v. Northwest Indian Cemetery Protective Ass'n*, 485 U.S. 439, 449 (1988). There, Native Americans argued that road construction and timber harvesting permitted by the government would interfere with their spiritual practices. *Id.* at 443, 450. The Supreme Court held there was no cognizable *government* burden on religious exercise. As the Court explained, the "incidental effects of government programs, which may make it more difficult to practice certain religions but which have no tendency to coerce individuals into acting contrary to their religious beliefs," do not "require government to bring forward a compelling justification." *Lyng*, 485 U.S. at 450–51.

As in *Lyng*, even assuming the claimed incidental effects are not speculative, *see supra* Part I, the incidental effects of allowing manufacturers to sell more internal-combustion vehicles are not government burdens. They are the result of private demand for vehicles powered by energy-dense liquid fuels. *Cf.* William Nordhaus, *The Climate Casino* 20 (2012) ("Why in the world do we use this vast quantity of fossil fuels? We use it to drive … and for everything we do.").

17

Youth Petitioners' comparisons to *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014), and *Mahmoud v. Taylor*, 606 U.S. 522 (2025), are similarly misplaced. Stay Motion at 10. Those cases involved *government*-threatened penalties on religious employers and religious parents, respectively. *Hobby Lobby*, 573 U.S. at 720 ("If the companies continue to offer group health plans that do not cover the [mandated] contraceptives … they will be taxed $100 per day for each affected individual"); *Mahmoud*, 606 U.S. at 531–32 ("Parents who cause their children to be absent unlawfully from school can face fines, mandatory community service, and even imprisonment."). Here, EPA does not regulate or coerce Youth Petitioners at all.

As the Supreme Court recognized in *Lyng*, "government simply could not operate if it were required to satisfy every citizen's religious needs and desires." 485 U.S. at 452. "[RFRA] must apply to all citizens alike, and it can give to none of them a veto over public programs that do not prohibit the free exercise of religion." *Id.*

18

### C. The Repeal Rule Does Not Violate Youth Petitioners' Right to Life or Liberty

Equally meritless is Youth Petitioners' argument that the Court should recognize a substantive due process right to a particular climate system. Stay Motion at 13–20.

The Due Process Clause does not entitle Youth Petitioners to their preferred concentration of greenhouse gases on Earth. Such a claim is "entirely unknown in American law," and invites "freewheeling judicial policymaking." *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 231, 240 (2022).

Substantive due process rights must be "deeply rooted in the Nation's history and traditions." *Id.* at 250. But Youth Petitioners point to no history or precedent recognizing an individual right to a particular mix of atmospheric gases. Youth Petitioners quote Blackstone's Commentaries and dictionaries out-of-context and misrepresent an 1818 address by James Madison observing that the "atmosphere is the breath of life." Stay Motion at 13–14. None of those sources say anything about an individual right to a particular mixture of atmospheric gases. For precedent, Youth Petitioners principally rely upon an inapposite Eighth Amendment case in which prison guards intentionally subjected a prisoner to

19

second-hand smoke, and similar custody cases. *Id.* at 13, 16–17 (citing *Helling v. McKinney*, 509 U.S. 25 (1993)). Youth Petitioners' analogy to cases about the treatment of prisoners in government custody improperly frames their asserted right "at a high level of generality." *Dobbs*, 597 U.S. at 257.

The lack of historical or precedential support is unsurprising, because climate policy requires an "informed assessment of competing interests" reserved to the political branches: "Along with the environmental benefit potentially achievable, our Nation's energy needs and the possibility of economic disruption must weigh in the balance." *Am. Elec. Power Co. v. Connecticut*, 564 U.S. 410, 427 (2011). Without a statute to fall back on, there are no judicially manageable standards to adjudicate just "how much [$CO_2$] is too much." *Rucho v. Common Cause*, 588 U.S. 684, 701 (2019). So the claim also raises "a nonjusticiable political question." *Id.* at 700.

Last, the Repeal Rule does not deprive Youth Petitioners of a liberty interest created by state law. *Contra* Stay Motion at 18–21. Hawaii's settlement with Youth Petitioners is irrelevant: Hawaii cannot amend the U.S. Constitution or the Clean Air Act in a private settlement. As Youth

20

Petitioners admit, the settlement is "subject to the scope of Hawaiʻi's authority under federal law." Stay Motion at 19. And the Clean Air Act gives EPA, not Hawaii, the authority to set emission standards for new motor vehicles. 42 U.S.C. § 7543(a).

### D.    EPA Did Not Ignore Significant Comments

Youth Petitioners also argue that EPA failed to respond to "significant" comments. Stay Motion at 21–23. Specifically, they argue that EPA ignored comments (1) opposing the repeal on religious grounds, (2) presenting data about the repeal's effect on "children's mental health," and (3) claiming that children's health and safety "require special consideration." *Id.* at 22–23.

"Significant comments are those which, if true, raise points relevant to the agency's decision and which, if adopted, would require a change in an agency's proposed rule." *City of Portland v. EPA*, 507 F.3d 706, 715 (D.C. Cir. 2007) (cleaned up). The comments cited by Youth Petitioners are not "significant" because they have no bearing on EPA's conclusion that it lacked statutory authority. Thus, EPA was not obligated to provide a written response, *id.*, and ignoring them would not be "prejudicial error," 5 U.S.C. § 706. Nevertheless, EPA did acknowledge the comments

21

and explained why it disagreed with them or found them irrelevant. *See* Stay Motion, Ex. 5 at 3–5.

Youth Petitioners further complain that EPA did not embrace their mischaracterization of "precedents referenced in [their] comments," including such inapposite cases as *Brown v. Board of Education*, 347 U.S. 483 (1954), *Plyler v. Doe*, 457 U.S. 202 (1982), and *Mahmoud*, 606 U.S. 522. *See* Stay Motion at 23–24. These cases are irrelevant to the Clean Air Act questions addressed by EPA and thus require no response. *City of Portland*, 507 F.3d at 715.

## III.  Youth Petitioners Are Not Irreparably Injured

Because Youth Petitioners lack standing, *supra* Part I, *a fortiori* they fail to show irreparable injury. As Youth Petitioners concede, showing irreparable injury requires a more demanding showing: the harm must be "certain and great" and "imminent." Stay Motion at 25 (quoting *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 8 (D.C. Cir. 2016)). EPA has concluded that the incremental downstream harms that Youth Petitioners complain about are anything but "certain." *Supra* Part I. Youth Petitioners cannot circumvent the required showing by alleging

meritless "fundamental rights." *Cf. All. for Hippocratic Med.*, 602 U.S. at 382.

Indeed, the greenhouse-gas emissions at stake in this stay motion are the far smaller "locked-in" emissions that would occur while this litigation is pending, Even taking Youth Petitioners' estimates of those emissions at face value, the "locked-in" emissions have no discernable effect: "The modeled change in temperature is more than 100 times smaller than the uncertainty in the estimate of global mean surface temperature." Ex. C, Johnston Decl. ¶ 14. Such a modeled change "does not establish a measurable change in any local physical condition relevant to Petitioners' alleged injuries." *Id.* ¶ 15. An immeasurable purely theoretical change does not qualify as "certain and great" and "imminent" harm sufficient to show irreparable injury.

Last, Youth Petitioners' delay underscores the lack of irreparable harm. "[T]he final action [was] effective on April 20, 2026." Repeal Rule, 91 Fed. Reg. at 7,686. Youth Petitioners could have sought a timely judicial stay to "postpone" the effective date, but they failed to do so. 5 U.S.C. § 705; Stay Motion, Ex. 2, EPA Stay Denial at 1 (noting the request to stay the effective date is tardy).

Youth Petitioners appear to assume that a tardy "stay" now would be equivalent to interim vacatur and judicial reinstatement of the repealed rules. Such a stay would not be "appropriate," 5 U.S.C. § 705, given Youth Petitioners' "inexcusable" delay. *Fund for Animals v. Frizzell*, 530 F.2d 982, 987 (D.C. Cir. 1975).

## IV.  The Balance of Equities and Public Interest Do Not Support a Stay

Last, the balance of harms and the public interest do not support a stay. A stay would impose enormous compliance costs on industry. *See* Repeal Rule, 91 Fed. Reg. at 7,755 ("$1.14 trillion"). As heavy-duty vehicle manufacturers explain in attached declarations, a stay would further require motor vehicle manufacturers to abruptly upend their production plans, requiring significant capital investments during the course of this litigation. Ex. D, Potter Decl. ¶ 12; Ex. E, Noonan Decl. ¶¶ 8–12. Those "nonrecoverable" capital costs weigh heavily in the balance. *Ohio*, 603 U.S. at 292.

The harms would extend beyond these costs. EPA's original assumptions about federal incentives, market demand, and recharging infrastructure have not been borne out, and its greenhouse-gas targets therefore are infeasible. Potter Decl. ¶¶ 8–11; Noonan Decl. ¶¶ 8–12;

24

Ex. F, Brandis Decl. ¶¶ 3–7, Ex. G, Comment submitted by Truck and Engine Manufacturers Ass'n 17–29 (Sept. 22, 2025), EPA-HQ-OAR-2025-0194-0888. EPA's own modeling shows that, following the legislative repeal of federal tax credits for electric vehicles, compliance with the standards is now infeasible.[3] Manufacturers have *already* written off billions of dollars in investments in electric vehicles *See* Stay Motion at 30 ("$50 billion"); *see also* Ex. I, 91 Fed. Reg. 28,463, 28,470–72 (May 18, 2026) (documenting write offs and explaining that EPA's prior electrification predictions are badly wrong). Manufacturers cannot abruptly shift now, and demand for electric trucks and charging infrastructure is not there in any event. Potter Decl. ¶¶ 8–11; Noonan Decl. ¶ 8; Brandis Decl. ¶¶ 3–7.

If the infeasible standards are judicially reimposed, manufacturers may have to curtail sales of new vehicles to avoid civil monetary penalties—up to $60,000 per non-conforming vehicle. 42 U.S.C. §§ 7522(a)(1), 7524(a), (b); 40 C.F.R. § 19.4. The result would be "great physical and

---

[3] Ex. H, EPA, EPA-420-R-26-002, Final Regulatory Impact Analysis 29 (Feb. 2026) (without the repealed tax credits, EPA's model projects "*the HD industry would not be in compliance with the existing MY 2027 through MY 2032 and later standards*" (emphasis in original)).

25

human capital destroyed, and thousands of jobs lost, with all the degradation that attends such dislocations." *Me. Lobstermen's Ass'n v. NMFS*, 70 F.4th 582, 599–600 (D.C. Cir. 2023) (citing Stephen Breyer, *Breaking the Vicious Circle: Toward Effective Risk Regulation* 23 (1993) ("[D]eprivation of real income itself has adverse health effects, in the form of poorer diet, more heart attacks, more suicides.")). Indeed, the result of requiring compliance with infeasible standards may well be *more* air pollution, as reduced supply for new, clean trucks delays the turnover of the fleet and encourage drivers to keep older, more polluting trucks on the road.

On the other side, Youth Petitioners largely raise political grievances cloaked as legal arguments. *See supra* Parts I, III. The balance of harms and the public interest therefore weighs strongly against a stay.

## CONCLUSION

For the foregoing reasons, the Court should deny the motion to stay.

Dated: June 29, 2026                    Respectfully Submitted,

*/s/ Daniel J. Feith*                   */s/ James R. Conde*
Daniel J. Feith                         Michael Buschbacher
Justin A. Savage                        James R. Conde
Kathleen Mueller                        Laura B. Ruppalt
SIDLEY AUSTIN LLP                       BOYDEN GRAY PLLC
1501 K Street, NW                       800 Connecticut Avenue, NW
Washington, D.C. 20005                    Suite 900
Tel.: (202) 736-8000                    Washington, D.C. 20006
Facsimile: (202) 736-8711               Tel.: (202) 955-0620
dfeith@sidley.com                       mbuschbacher@boydengray.com
jsavage@sidley.com                      jconde@boydengray.com
kmueller@sidley.com                     lruppalt@boydengray.com

*Counsel for American Fuel*             *Counsel for American Free*
*and Petrochemical Manufacturers*       *Enterprise Chamber of Commerce,*
*and Energy Marketers of America*       *National Federation of Independent*
                                        *Business, Inc., and the Illinois,*
                                        *Iowa, Kentucky, Missouri, North Da-*
*/s/ Paul D. Clement*                   *kota, and Tennessee Corn Growers*
Paul D. Clement                         *Associations*
Danielle Sassoon
Nicholas A. Aquart
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
Tel.: (202) 742-8900
paul.clement@clementmurphy.com

*Counsel for American Petroleum*
*Institute*

27

*/s/ Andrew M. Grossman*
Andrew M. Grossman
Mark W. DeLaquil
BAKER & HOSTETLER LLP
Washington Square
  Suite 1100
1050 Connecticut Avenue, NW
Washington, D.C. 20036
Tel.: (202) 861-1697
agrossman@bakerlaw.com

*Counsel for CO₂ Coalition*

*/s/ Theodore Hadzi-Antich*
Robert Henneke
rhenneke@texaspolicy.com
Chance Weldon
cweldon@texaspolicy.com
Theodore Hadzi-Antich
tha@texaspolicy.com
Eric Heigis
eheigis@texaspolicy.com
Laura Elizabeth King Latimer
lblatimer@texaspolicy.com
TEXAS PUBLIC POLICY FOUNDATION
901 Congress Avenue
Austin, Texas 78701
Tel.: (512) 472-2700

*Counsel for Construction Industry Air Quality Coalition, Inc.; Liberty Packing Company, LLC.; Nuckles Oil Company, Inc.; and Western States Trucking Association, Inc.*

*/s/ Brinton Lucas*
Brinton Lucas
JONES DAY
51 Louisiana Avenue, NW
Washington, D.C. 20001
Tel.: (202) 879-3686
blucas@jonesday.com

S. Matthew Krsacok
JONES DAY
150 West Jefferson
  Suite 2100
Detroit, MI 48226
Tel.: (313) 230-7923
mkrsacok@jonesday.com

Jeffery D. Ubersax
KUSHNER & HAMED CO., LPA
1375 East Ninth Street
  Suite 1930
Cleveland, OH 44114
Tel.: (216) 696-6700
jdubersax@kushnerhamed.com

*Counsel for NACCO Natural Resources Corporation*

28

/s/ *Frank D. Garrison*
Frank D. Garrison
fgarrison@pacificlegal.org
Tyler S. Fry
tfry@pacificlegal.org
PACIFIC LEGAL FOUNDATION
3100 Clarendon Boulevard,
  Suite 1000
Arlington, VA 22201
Tel.: (202) 888-6881


/s/ *Ondray T. Harris*
Ondray T. Harris
ondray.harris@cei.org
Soriya R. Chhe
soriya.chhe@cei.org
Marin Murdock
marin.murdock@cei.org
COMPETITIVE ENTERPRISE
INSTITUTE
1310 L Street NW,
  7th FL
Washington, D.C. 20005
Tel.: (202) 331-1010


*Counsel for Domestic Energy
Producers Alliance*

/s/ *William L. Wehrum*
William L. Wehrum, Jr.
ENVIRONMENTAL LAW, LLC
1629 K Street, NW
  Suite 300
Washington, D.C. 20006
Tel.: (302) 300-0388


/s/ *Timothy A. French*
Timothy A. French
CHICAGO LAW PARTNERS, LLC
333 West Wacker Drive
  Suite 810
Chicago, IL 60606
Tel.: (312) 929-1954
tfrench@clpchicago.com


*Counsel for Truck and Engine
Manufacturers Association*

29

## CERTIFICATE OF COMPLIANCE

The undersigned hereby certifies that:

1. The motion complies with the type-volume limitation of Federal Rule of Appellate Procedure 27(d)(2)(A) and D.C. Circuit Rule 27(a)(2) because it contains 4,908 words, excluding the exempted portions.

2. This motion complies with the typeface and type style requirements of Federal Rules of Appellate Procedure 27(d)(1)(E) and 32(a)(5) and (6) and D.C. Circuit Rule 27(a)(2) as it was prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

*/s/James R. Conde*
James R. Conde

## CERTIFICATE OF SERVICE

I hereby certify that on the 29th day of June, 2026, I electronically filed the foregoing document with the Clerk of this Court by using the CM/ECF system, which will serve all parties automatically.

/s/James R. Conde
James R. Conde

31