ORAL ARGUMENT NOT YET SCHEDULED

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

ELENA VENNER, *et al.*,

*Petitioners*,

v.

UNITED STATES
ENVIRONMENTAL PROTECTION
AGENCY, *et al.*,

*Respondents*.

Case No. 26-1038
Lead Case No. 26-1037
(and consolidated cases)

## PETITIONERS' MOTION TO STAY
## THE REPEAL RULE PENDING REVIEW

**TABLE OF CONTENTS**

TABLE OF EXHIBITS ................................................................................................ iii

TABLE OF AUTHORITIES ..................................................................................... vii

GLOSSARY ............................................................................................................... xii

INTRODUCTION .........................................................................................................1

STATEMENT OF THE CASE ......................................................................................2

I.      EPA Issued the Endangerment Finding Based on Long-Settled Science
        and Supreme Court Precedent. ........................................................................2

II.     EPA Proposes Rescission of All GHG Emission Standards. ..........................4

III.    EPA Finalizes the Repeal Rule. ......................................................................5

STANDARD OF REVIEW ...........................................................................................6

STANDING ...................................................................................................................6

ARGUMENT .................................................................................................................7

I.      Petitioners are Likely to Succeed on the Merits.............................................7

   A.   The Repeal Rule Violates Petitioners' Fundamental Free Exercise
        Rights Under the Religious Freedom Restoration Act..............................8

   B.   The Repeal Rule Violates Petitioners' Rights to Life and Liberties
        Under the Fifth Amendment. ..................................................................13

      1.  Life ................................................................................................13

      2.  Liberty: Bodily Integrity and Personal Security .................................15

      3.  Liberty: State-Law-Derived Liberty Interest .......................................18

   C.   EPA Deprived Petitioners of Required Process and Has No Record
        Basis to Meet its Strict Scrutiny Burden. ...............................................21

i

      1.      EPA Did Not Respond to Significant Comments. ...............................22

      2.      EPA Did Not State Major Legal Interpretations Regarding Constitutionally Protected Fundamental Rights. ...................................23

II.     Petitioners Will Suffer Immediate, Irreparable Harm Absent a Stay............25

III.    The Balance of Harms and the Public Interest Favor a Stay. .......................28

IV.    Bond is Not Warranted. ..............................................................................31

CONCLUSION ...........................................................................................................31

**TABLE OF EXHIBITS**

Addendum Pursuant to Circuit Rule 18(a)(4)

Exhibit 1    Party positions on motion

Exhibit 2    EPA denial of Venner et al. stay request (Apr. 24, 2026) ("EPA Denial")

Exhibit 3    Venner et al. stay request pending judicial review to EPA (Apr. 20, 2026)

Exhibit 4    EPA, *Rescission of the Greenhouse Gas Endangerment Finding and Motor Vehicle Greenhouse Gas Emission Standards Under the Clean Air Act*, Final Rule, 91 Fed. Reg. 7686 (Feb. 18, 2026), EPA-HQ-OAR-2025-0194-31029 ("Repeal Rule")

Exhibit 5    EPA, *Response to Comments, Reconsideration of 2009 Endangerment Finding and Greenhouse Gas Vehicle Standards* (Feb. 2026), EPA-HQ-OAR-2025-0194-31089, excerpts ("EPA Response to Comments")

Exhibit 6    Our Children's Trust, *Comment for Unlawful Reconsideration of 2009 Endangerment Finding and Greenhouse Gas Emission Vehicle Standards Proposed Rule (Docket No. EPA-HQ- OAR-2025-0194)* (Sep. 22, 2025), EPA-HQ-OAR-2025-0194-7017 ("OCT Comment")

    Attachment 23 – Declaration of Lise Van Susteren, MD, *Lighthiser v. Trump*, No. 2:25-cv-00054 (D. Mont. June 13, 2025)

    Attachment 32 – Declaration of Elizabeth Pinsky, MD, *Genesis B. v. EPA*, No. 2:23-cv-10345 (C.D. Cal. Aug. 12, 2024)

    Attachment 36 – Declaration of Plaintiff Maryam D., *Genesis B. v. EPA*, No. 2:23-cv-10345 (C.D. Cal. Aug. 12, 2024)

Exhibit 7    EPA, *Reconsideration of 2009 Endangerment Finding and Greenhouse Gas Vehicle Standards*, Proposed Rule, 90 Fed. Reg. 36288 (Aug. 1, 2025), EPA-HQ-OAR-2025-0194-0093 ("Proposed Rule")

Exhibit 8    Jeffrey Bossert Clark, Sr., *M-25-27: Guidance Implementing Section 6 of Executive Order 14154, Entitled "Unleashing American Energy"* (May 5, 2025), EPA-HQ-OAR-2025-0194-0005

Exhibit 9    Maxine Joselow, *Trump's E.P.A. Has Put a Value on Human Life: Zero Dollars*, N.Y. Times (Jan. 21, 2026), https://www.nytimes.com/2026/01/21/climate/epa-human-life-value.html

Exhibit 10   EPA, *Endangerment and Cause or Contribute Findings for Greenhouse Gases Under Section 202(a) of the Clean Air Act*, Final Rule, 74 Fed. Reg. 66496, 66496-98, 66517, 66525-26, 66530 (Dec. 15, 2009) ("EF")

Exhibit 11   Additional Public Comments

(A)   Comment submitted by Emma Weibel, EPA-HQ-OAR-2025-0194-19126

(B)   Comment submitted by Jewish Youth Climate Movement, EPA-HQ-OAR-2025-0194-6533

(C)   Comment submitted by United States Conference of Catholic Bishops (USCCB), EPA-HQ-OAR-2025-0194-0866

(D)   Comment submitted by Massachusetts Interfaith Power and Light, EPA-HQ-OAR-2025-0194-0593

(E)   Mass Comment Campaign sponsored by National Religious Partnership for the Environment, EPA-HQ-OAR-2025-0194-0465

(F)   Comment submitted by Climate Psychiatry Alliance, EPA-HQ-OAR-2025-0194-1189

(G)   Comment submitted by Tesla (Sep. 22, 2025), EPA-HQ-OAR-2025-0194-1009

(H)   Comment submitted by Rivian (Sep. 22, 2025), EPA-HQ-OAR-2025-0194-0922

(I)   Comment submitted by Ford Motor Company (Sep. 22, 2025), EPA-HQ-OAR-2025-0194-1393

   (J)  Comment submitted by Alliance for Automotive Innovation (Sep. 22, 2025), EPA-HQ-OAR-2025-0194-7547

Exhibit 12 Declaration of Dan Sperling, PhD, Founding Director and Professor Emeritus, Institute of Transportation Studies, University of California, Davis ("Sperling")

Exhibit 13 Declaration of Andrew Wilson, PhD, Assistant Professor, University of Virginia ("Wilson")

Exhibit 14 Declaration of Steven Running, PhD, Professor Emeritus, University of Montana ("Running")

Exhibit 15 Declaration of Mark Jacobson, PhD, Professor, Stanford University ("Jacobson")

Exhibit 16 Declaration of Elizabeth Pinsky, MD, Psychiatrist and Pediatrician, Massachusetts General Hospital ("Pinsky")

Exhibit 17 Declaration of James Gustave Speth, JD, Former Chair, Council on Environmental Quality in the Executive Office of the President ("Speth")

Exhibit 18 Declaration of Elena Venner ("Elena")

Exhibit 19 Declaration of E.S. ("E.S.")

Exhibit 20 Declaration of L.K. ("L.K.")

Exhibit 21 Declaration of J.K. ("J.K.")

Exhibit 22 Declaration of S.A. ("S.A.")

Exhibit 23 Declaration of M.D. ("M.D.")

Exhibit 24 Declaration of Maya Williams ("Maya")

Exhibit 25 Declaration of A.F. ("A.F.")

Exhibit 26 Declaration of B.K. ("B.K.")

Exhibit 27 Declaration of C.E. ("C.E.")

Exhibit 28    Declaration of N.N. ("N.N.")

Exhibit 29    Declaration of Taylin Nishida ("Taylin")

Exhibit 30    Additional Materials

(A)    Complaint, *United States v. Minnesota*, No. 26-cv-02456, ¶¶1-10, 85-87 (D. Minn. May 4, 2026)

(B)    Federal Defendants Memorandum of Points and Authorities in Support of their Motion to Dismiss, *Juliana v. United States*, No. 6:15-cv-01517, at 19 (Nov. 17, 2015)

(C)    Rebuttal Closing Argument by Mr. Sawyer, Volume 2 Transcript of Hearing on Plaintiffs' Motion for Preliminary Injunction, Federal Defendants' Motion to Dismiss, and Defendant-Intervenors' Motion to Dismiss, *Lighthiser v. Trump*, No. 2:25-cv-00054, at 537 (D. Mont. Sept. 28, 2025)

(D)    Federal Defendants' Answering Brief, *G.B. v. EPA*, No. 25-2473, at 52 (9th Cir. Dec. 4, 2025)

(E)    James Madison, *Address to the Agricultural Society of Albemarle* (May 12, 1818)

# TABLE OF AUTHORITIES

**Cases**

*Am. Elec. Power Co. v. Connecticut,*
564 U.S. 410 (2011) ......................................................................3, 24, 29

*Am. Gateways v. U.S. Dep't of Just.,*
No. 25-01370, 2025 WL 2029764 (D.D.C. July 21, 2025)................................31

*Appalachian Power Co. v. EPA,*
249 F.3d 1032 (D.C. Cir. 2001) ...................................................................23

*Archdiocese of Washington v. Washington Metro. Area Transit Auth.,*
897 F.3d 314 (D.C. Cir. 2018) .....................................................................8

*Armstrong v. Exceptional Child Ctr., Inc.,*
575 U.S. 320 (2015) ...................................................................................24

*Atherton v. D.C. Off. of Mayor,*
567 F.3d 672 (D.C. Cir. 2009) .....................................................................18

*Bd. of Cnty. Comm'rs of Boulder Cnty. v. Suncor Energy (U.S.A.) Inc.,*
405 F. Supp. 3d 947 (D. Colo. 2019) ............................................................4

*Beckett v. Air Line Pilots Ass'n,*
995 F.2d 280 (D.C. Cir. 1993) .....................................................................20

*Brown v. Bd. of Educ.,*
347 U.S. 483 (1954) ...................................................................................23

*Burwell v. Hobby Lobby Stores, Inc.,*
573 U.S. 682 (2014) ....................................................................8, 9, 10, 12

*Certain Named & Unnamed Non-Citizen Child. & Their Parents v. Texas,*
448 U.S. 1327 (1980) .................................................................................27

*Ching v. Case,*
449 P.3d 1146 (Haw. 2019)..........................................................................18

*Diamond Alternative Energy, LLC v. EPA,*
606 U.S. 100 (2025) ....................................................................................7

*Env't Def. Fund, Inc. v. Ruckelshaus*,
439 F.2d 584 (D.C. Cir. 1971) ...................................................13, 29

*Ethyl Corp. v. Env't Prot. Agency*,
541 F.2d 1 (D.C. Cir. 1976) ...................................................13

*Fed. Prescription Serv., Inc. v. Am. Pharm. Ass'n*,
636 F.2d 755 (D.C. Cir. 1980) ...................................................31

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*,
546 U.S. 418 (2006) ...................................................10, 12

*Gordon v. Holder*,
721 F.3d 638 (D.C. Cir. 2013) ...................................................29

*Guertin v. State*,
912 F.3d 907 (6th Cir. 2019)...................................................16

*Harris By & Through Harris v. Maynard*,
843 F.2d 414 (10th Cir. 1988)...................................................13

*Helling v. McKinney*,
509 U.S. 25 (1993) ...................................................13, 16

*Holt v. Hobbs*,
574 U.S. 352 (2015) ...................................................8

*Illinois Cent. R.R. Co. v. Illinois*,
146 U.S. 387 (1892) ...................................................18

*In re Hawai'i Elec. Light Co., Inc.*,
526 P.3d 329 (Haw. 2023)...................................................19

*In re Maui Elec. Co., Ltd.*,
506 P.3d 192 (Haw. 2022)...................................................19

*In re NTE Connecticut, LLC*,
26 F.4th 980 (D.C. Cir. 2022) ...................................................26

*Ingraham v. Wright*,
430 U.S. 651 (1977) ...................................................16

*League of Women Voters of United States v. Newby*,
   838 F.3d 1 (D.C. Cir. 2016) ........................................25, 26, 29, 30

*Loper Bright Enters. v. Raimondo*,
   603 U.S. 369 (2024) ........................................................24

*Mahmoud v. Taylor*,
   606 U.S. 522 (2025) ..............................10, 21, 22, 23, 25, 27

*Massachusetts v. EPA*,
   549 U.S. 497 (2007) ................................................3, 24, 29

*Mathews v. Eldridge*,
   424 U.S. 319 (1976) ........................................................22

*Mills v. District of Columbia*,
   571 F.3d 1304 (D.C. Cir. 2009) ..................................27

*Mirabelli v. Bonta*,
   146 S. Ct. 797 (2026) ........................................6, 27, 29

*Mozilla Corp. v. FCC*,
   940 F.3d 1 (D.C. Cir. 2019) ......................................29

*Nat'l Ass'n of Farmworkers Orgs. v. Marshall*,
   628 F.2d 604 (D.C. Cir. 1980) ............................27, 28, 30

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
   567 U.S. 519 (2012) ........................................................24

*Nken v. Holder*,
   556 U.S. 418 (2009) ..........................................................6

*Ohio v. Env't Prot. Agency*,
   603 U.S. 279 (2024) ........................................................18

*Plyler v. Doe*,
   457 U.S. 202 (1982) ........................................................24

*PPL Montana v. Montana*,
   565 U.S. 576 (2012) ........................................................18

*Reno v. Flores*,
   507 U.S. 292 (1993) ......................................................21

*Rivera Lujan v. Fed. Motor Carrier Safety Admin.*,
   No. 25-1215, 2025 WL 3182504 (D.C. Cir. Nov. 13, 2025) ............................28

*Rochin v. California*,
   342 U.S. 165 (1952) ......................................................16

*San Antonio Indep. Sch. Dist. v. Rodriguez*,
   411 U.S. 1 (1973) ......................................................21

*United States v. Windsor*,
   570 U.S. 744 (2013) ......................................................18, 19, 20

*Washington v. Glucksberg*,
   521 U.S. 702 (1997) ......................................................15, 16

*Weber v. Aetna Cas. & Sur. Co.*,
   406 U.S. 164 (1972) ......................................................24

*Wilkinson v. Austin*,
   545 U.S. 209 (2005) ......................................................18

*Wisconsin v. Yoder*,
   406 U.S. 205 (1972) ......................................................11

*Yates v. Collier*,
   868 F.3d 354 (5th Cir. 2017)......................................................17

*Youngberg v. Romeo*,
   457 U.S. 307 (1982) ......................................................16

## U.S. Constitutional Authorities

Declaration of Independence (U.S. 1776) ......................................................14, 16

U.S. Const. amend. I......................................................8, 10

U.S. Const. amend. V ......................................................13, 15, 18, 20, 21

**State Constitutional Authorities**

Haw. Const. art. XI, § 1.................................................................19

Haw. Const. art. XI, § 9.................................................................19

**U.S. Statutes**

42 U.S.C. § 2000bb-1.................................................................8, 12

42 U.S.C. § 7401 .........................................................................18

42 U.S.C. § 7607(d)(3)(C)..........................................................21, 22

42 U.S.C. § 7607(d)(6)(B)...............................................................21

42 U.S.C. § 7607(d)(8)...................................................................24

42 U.S.C. § 7607(d)(9)(B)............................................................7, 22

42 U.S.C. § 7607(d)(9)(D) ...........................................................7, 24

**State Statutes**

Haw. Rev. Stat. § 225P-5 .................................................................4

Haw. Rev. Stat. § 225P-8 ................................................................19

Mont. Code Ann. § 75-2-203(2)(a) .....................................................4

**Other Authorities**

1 William Blackstone, Commentaries on the Laws of England.......................13, 16

Andrea Wulf, *Founding Gardeners* (2012)............................................14

Exec. Order No. 14154, 90 Fed. Reg. 8353 (Jan. 29, 2025) ...........................4

John Locke, Second Treatise of Government (1690)..................................14

Samuel Johnson, A Dictionary of the English Language (1755)........................14

Samuel Johnson, A Dictionary of the English Language (1773)........................16

# GLOSSARY

| | |
|---|---|
| APA | Administrative Procedure Act |
| CAA | Clean Air Act |
| $CO_2$ | Carbon Dioxide |
| DOE | United States Department of Energy |
| EF | EPA, *Endangerment and Cause or Contribute Findings for Greenhouse Gases Under Section 202(a) of the Clean Air Act*, Final Rule, 74 Fed. Reg. 66496 (Dec. 15, 2009) ("Endangerment Finding") |
| EPA | United States Environmental Protection Agency |
| EPA Denial | EPA denial of Venner et al. stay request (Apr. 24, 2026) |
| GHG | Greenhouse Gas |
| ICE | Internal Combustion Engine-GHG Emission Vehicle |
| MMT | Million Metric Tons |
| MY | Model Year |
| Proposed Rule | EPA, *Reconsideration of 2009 Endangerment Finding and Greenhouse Gas Vehicle Standards*, Proposed Rule, 90 Fed. Reg. 36288 (Aug. 1, 2025) |
| Repeal Rule | EPA, *Rescission of the Greenhouse Gas Endangerment Finding and Motor Vehicle Greenhouse Gas Emission Standards Under the Clean Air Act*, Final Rule, 91 Fed. Reg. 7686 (Feb. 18, 2026) |
| RFRA | Religious Freedom Restoration Act |
| ZEV | Zero Emission Vehicle |

**INTRODUCTION**

On February 18, 2026, EPA violated youth Petitioners' fundamental rights by repealing the Endangerment Finding and greenhouse gas ("GHG") emission standards for vehicles ("Repeal Rule" (Ex. 4)). Having petitioned this Court to reverse the Repeal Rule, youth Petitioners respectfully request the Court take the protective step of maintaining the legal paradigm that existed from 2009 to 2026 and issue a stay to prevent irreparable harm to youth.

In issuing the Endangerment Finding ("EF") in 2009, EPA found "that six greenhouse gases taken in combination endanger both the public health and the public welfare[.]." EF at 66496 (Ex. 10). These pollutants "constitute the largest anthropogenic driver of climate change[,]" and cause dangerous local air pollution in part because "[c]limate change is expected to increase regional ozone pollution, with associated risks in respiratory illnesses and premature death" and an "increase [in] serious adverse health effects in large population areas that are and may continue to be in nonattainment." *Id*. at 66517, 66525-26. EPA placed "weight on the fact that certain groups, including children . . . are most vulnerable to these climate-related health effects," and found that, in sum, "[t]he evidence concerning adverse air quality impacts provides strong and clear support for an endangerment finding." *Id.* at 66526.

In the last seventeen years, the scientific support for EPA's findings has only grown. GHG pollutants still harm public health. They are causing increased localized air pollution and heat in American cities. And they remain especially dangerous for the health and wellbeing of children and youth Petitioners. Nevertheless, this administration's EPA now denies what all prior administrations since the 1960s have known—fossil fuel pollution, predominantly $CO_2$, causes rising temperatures, climate harms, and threatens human life and freedom.

As Petitioners' experts explain, the Repeal Rule, if not stayed, will cause an unavoidable increase of approximately 942.2 million metric tons ("MMT") of $CO_2$ emissions in the United States, along with increases in particulate matter, nitrogen dioxide, ozone, and other pollutants. Such increased air pollution threatens Petitioners' lives, infringes their liberties, and substantially burdens their religious freedoms. The balance of equities and public interest are in Petitioners' favor, as their irreparable harm outweighs the government's interest in deregulation. Maintaining the status quo is justified, and Petitioners respectfully request the Court stay the Repeal Rule.

**STATEMENT OF THE CASE**

**I.      EPA Issued the Endangerment Finding Based on Long-Settled Science and Supreme Court Precedent.**

The federal government has known since at least 1965 of the harms from $CO_2$ and GHGs from the burning of fossil fuels—harms that precipitated the formation

of EPA. Speth ¶¶4-14 (Ex. 17). Since that time, across every administration but this one, EPA has consistently recognized that increasing GHG emissions worsens climate change and harms human health. Speth ¶¶15-44. Decades ago, these harms prompted a petition to EPA to regulate GHGs from motor vehicles under the Clean Air Act ("CAA"), eventually leading to the Supreme Court's decision in *Massachusetts v. EPA*. 549 U.S. 497, 513 (2007). There, the Court had "little trouble" concluding that the CAA "authorizes EPA to regulate greenhouse gas emissions from new motor vehicles [if] it forms a 'judgment' that such emissions contribute to climate change." *Id.* at 528. EPA issued the Endangerment Finding consistent with that decision, expressing concern about the harms GHG-driven air pollution and climate change pose to children's health and well-being. EF at 66498, 66526, 66530.

The federal government's longstanding leadership and investment in studying the threats of GHG pollution, Nixon's creation of EPA, Congress' consolidation of pollution control in EPA in part through amendments to the CAA, Supreme Court precedent, and the Endangerment Finding constitute a legal paradigm guiding decisions regarding fossil fuel pollution. *See generally* Ex. 17. For example, the Supreme Court determined the CAA displaces federal nuisance law. *See, e.g.*, *Am. Elec. Power Co. v. Connecticut*, 564 U.S. 410, 424 (2011). States, like Hawai'i, have set GHG reduction targets based on their authority preserved by the CAA. *See, e.g.*,

3

Haw. Rev. Stat. § 225P-5. States, like Montana, have passed laws claiming they cannot regulate GHG emissions unless EPA does. Mont. Code Ann. § 75-2-203(2)(a). The United States has told youth seeking to protect their constitutional rights from fossil fuel GHG pollution that EPA will regulate it. *See, e.g.*, Ex. 30-B. And in courts around the country, fossil fuel companies and the federal government argue that the CAA's "comprehensive framework" for regulating GHGs conflict- and field-preempts states from suing fossil fuel companies for the harm caused by their pollution. *See, e.g.*, Ex. 30-A; *Bd. of Cnty. Comm'rs of Boulder Cnty. v. Suncor Energy (U.S.A.) Inc.*, 405 F. Supp. 3d 947, 969 (D. Colo. 2019) (summarizing companies' argument). At the heart of this legal paradigm is EPA.

## II.  EPA Proposes Rescission of All GHG Emission Standards.

On January 20, 2025, President Trump ordered EPA to reevaluate the Endangerment Finding to eliminate "undue burdens" on expanding fossil fuel use. Exec. Order No. 14154, 90 Fed. Reg. 8353 (Jan. 29, 2025). EPA then issued the Proposed Rule, asserting the Endangerment Finding was outside its statutory authority, violated the "major questions" doctrine, and rested on flawed science ("Proposed Rule" (Ex. 7)).

Petitioners are children and youth ranging from one to 22 years old, whose developing bodies are especially vulnerable to air pollution and climate change impacts. Our Children's Trust submitted comments on their behalf, as did others.

*See, e.g.*, Ex. 6; Exs. 11-A to 11-F. These youth live in unsafe air quality and climate conditions that will be made materially worse by the increased motor vehicle air pollution wrought by the Proposed Rule.

**III.    EPA Finalizes the Repeal Rule.**

On February 18, EPA published the final Repeal Rule. 91 Fed. Reg. 7686 (Ex. 4). EPA said the Endangerment Finding exceeded its statutory authority under CAA Section 202(a)(1) but abandoned the Proposed Rule's scientific rationale. *Id.* at 7710-28; *see* Running ¶¶52-55 (Ex. 14). EPA also claimed it lacked statutory authority because regulating vehicle GHG emissions would be futile given their purported "de minimis" effect on climate change.[1] Repeal Rule at 7728-34.

The Repeal Rule reshapes America's motor vehicle landscape by promoting internal combustion engine-GHG emission ("ICE") vehicles and demoting low- and zero- emission vehicles ("ZEVs"), resulting in predictably greater emissions of GHG pollutants that EPA previously found endanger public health. *Id*. at 7759. In an astounding about-face, EPA also stated that the increased air pollution created by the Repeal Rule would not have any effect on children and youth. *Id.* at 7758-59. In reaching this conclusion, EPA ignored Petitioners' comments focused on their religious freedom and failed to consider how significant amounts of additional air

---

[1] Several petitioners filed Petitions for Reconsideration on the administrative docket to address this unfounded conclusion.

pollution would injure Petitioners' physical and mental health and violate their constitutional rights. Ex. 5, 309-10.

On April 20, 2026, Petitioners requested EPA stay the rule pending judicial review. Ex. 3. EPA denied that request on April 24, dismissing Petitioners' harms and asserting that a stay would cause regulatory whiplash and economically harm regulated parties ("EPA Denial" (Ex. 2)).

EPA and Intervenor-Respondents oppose this motion. Other party positions are included in Ex. 1.

## STANDARD OF REVIEW

A final rule may be stayed if an applicant demonstrates (1) likelihood of success; (2) irreparable injury; (3) no substantial injury to other parties; and (4) a stay is in the public interest. *Nken v. Holder*, 556 U.S. 418, 434 (2009). The third and fourth factors merge when, as here, the government is the opposing party. *Id*. at 436. Preventing irreparable constitutional injuries and harm to children is the highest of priorities. *See Mirabelli v. Bonta*, 146 S. Ct. 797, 803 (2026) (per curiam).

## STANDING

Petitioners face concrete, particularized, and imminent constitutional injury from increased pollution caused by the Repeal Rule, including pecuniary losses. *See, e.g.*, *infra* Argument I (religious practice, health harms); Pinsky ¶¶8-9, 17-24, 43-48, 60-62 (Ex. 16); Elena ¶6 (Ex. 18) (costs for medication and medical equipment);

A.F. ¶17 (Ex. 25) (costs for tick testing and treatment). Experts calculate the health and death costs of the Repeal Rule are significant, a portion of which will be borne by Petitioners. Wilson ¶¶16-22, 33 (Ex. 13); Jacobson ¶12 (Ex. 15); *infra* Argument III. These injuries are fairly traceable to the Repeal Rule because the Rule's removal of limits on GHG emissions will predictably increase those emissions, which worsen Petitioners' injuries from air pollution and climate change. *See Diamond Alternative Energy, LLC v. EPA*, 606 U.S. 100, 112, 116-17 (2025); Sperling ¶¶11-43 (Ex. 12); Wilson ¶¶4-35; Jacobson ¶¶9-22; Running ¶¶5-50; Pinsky ¶¶9-62. Vacating the Repeal Rule will avoid the increased pollution and its associated harms—religious, bodily, liberty, and economic—thereby redressing Petitioners' injuries. 42 U.S.C. § 7607(d)(9)(B), (D). Stopping "one dollar" of injury to Petitioners is enough for standing. *Diamond*, 606 U.S. at 114.[2]

## ARGUMENT

### I. Petitioners are Likely to Succeed on the Merits.

Petitioners seek a stay to protect their fundamental rights.[3] The Repeal Rule constitutes a seismic shift in the regulatory paradigm that protects citizens from

---

[2] EPA previously conceded youth could seek appropriate redress by challenging agency action using statutory procedures such as this petition to reverse the Repeal Rule. *See, e.g.*, Ex. 30-C; Ex. 30-D.

[3] While other petitioners' statutory claims deserve full briefing by all parties on the merits, after their reconsideration and record motions are resolved, youth Petitioners' particularized constitutional injuries independently warrant an immediate stay.

pollution, and does so in a manner that infringes on Petitioners' fundamental rights. The Repeal Rule will, according to EPA, cause a total of 8.81 additional gigatons of $CO_2$ pollution and other pollutants to be emitted, pollution that is deleterious to Petitioners' lives, liberties, and religious freedom. Wilson ¶20; *see infra* I.A.

### A. The Repeal Rule Violates Petitioners' Fundamental Free Exercise Rights Under the Religious Freedom Restoration Act.

The Repeal Rule substantially burdens Petitioners Elena, J.K., M.D., and E.S.'s sincerely held religious beliefs. "Government shall not substantially burden a person's exercise of religion" unless it can demonstrate the burden furthers "a compelling governmental interest" and "is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1. RFRA offers "broad protection for religious liberty" beyond that afforded by the First Amendment. *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 706 (2014); *Holt v. Hobbs*, 574 U.S. 352, 356 (2015). Thus, Petitioners' showing of substantial burden under the First Amendment also satisfies RFRA. *See id.*

Under RFRA, a substantial burden exists when government action puts "substantial pressure on an adherent to modify his behavior and to violate his beliefs[.]" *Archdiocese of Washington v. Washington Metro. Area Transit Auth.*, 897 F.3d 314, 333 (D.C. Cir. 2018) (citations omitted). For example, in *Hobby Lobby*, a fine penalizing employers' failure to furnish contraceptive coverage to employees substantially burdened a corporation's religious exercise by pressuring it to "engage

in conduct that seriously violates [its] religious beliefs" that life begins at conception, forcing a choice between obeying its religious beliefs and avoiding a fine. 573 U.S. at 720.

The Repeal Rule pressures E.S., J.K., and M.D. to modify their behavior in a way that seriously violates their sincerely held religious beliefs by forcing a choice between adherence to their religious tenets, and protecting their health and safety. Petitioners E.S. and J.K. are observant Jews whose religion requires them to walk to synagogue on the Sabbath. Declarations of L.K. ¶10 (Ex. 20); J.K. ¶¶5-6 (Ex. 21); E.S. ¶¶16-18 (Ex. 19). M.D. is an observant Muslim whose religion requires her to fast during Ramadan. M.D. ¶¶4-7 (Ex. 23); S.A. ¶¶12-13 (Ex. 22). Each Sabbath that is made too hot for E.S. and J.K. to walk safely to synagogue, and each day of Ramadan that is made too hot for M.D. to safely fast and wear hijab, is a day they are prevented from observing important requirements of their religions. E.S. ¶¶12, 22-24; L.K. ¶19; J.K. ¶¶7-9; M.D. ¶¶4-7; S.A. ¶14; Pinsky ¶¶41, 44-46, 58-59; *see also* L.K. ¶¶25-34 (Sukkot practice harmed); J.K. ¶¶12-14 (same). The Repeal Rule forces E.S., J.K., and M.D. to choose between religious practice and physical safety more frequently than they would otherwise because the Repeal Rule will cause an additional 8.81 gigatons of $CO_2$ pollution to be emitted. Wilson ¶20. This staggering quantity is 1.85 times the United States' *total* $CO_2$ emissions in 2024. Running ¶11. This quantity worsens local heat surrounding E.S.'s, J.K.'s, and M.D.'s homes,

increasing the number of days that they are prevented from exercising their religious beliefs. Running ¶¶15-34; Wilson ¶¶6-13; Jacobson ¶9; E.S. ¶¶24, 22 ("If I'm not in a minyan, there are some prayers I can't say."); J.K. ¶11; M.D. ¶7. The burden is more substantial here than in *Hobby Lobby* because the pressure for youth to disobey their religion's requirements comes not from a fine that can be paid, but from physical hazards to bodily health and safety, other inalienable rights. E.S. ¶12; Pinsky ¶¶41-45.

The Supreme Court's decision[4] in *Mahmoud v. Taylor* confirms that the Repeal Rule substantially burdens E.S., J.K., and M.D.'s religious exercise because it poses "a very real threat of undermining the religious beliefs and practices that the parents wish to instill in their children" and thus is an "objective danger to the free exercise of religion." 606 U.S. 522, 543, 565 (2025) (holding requiring LGBTQ+-inclusive storybooks in school curriculum substantially burdens parents wishing to instill contrary religious beliefs in children) (citation modified). The burden imposed here is more severe than in *Mahmoud* because the Repeal Rule hinders E.S.'s, J.K.'s, and M.D.'s religious development by preventing their ability to safely engage in core religious practices with their family in community. E.S. is "a young person who is actively trying to develop [his] religious practice[,]" and "losing a Shabbos

---

[4] Because RFRA must be at least as protective as the First Amendment, courts may consider First Amendment precedent for RFRA claims. *See, e.g.*, *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 431 (2006).

[Sabbath] service" makes him "less capable of internalizing Jewish Law and integrating it into [his] life." E.S. ¶23. In J.K.'s family, "[e]ach additional hot Saturday diminishes the habit of attending synagogue regularly, thereby diminishing our closeness to God, our sense of community, and our ability to inspire our children to lead Jewish lives." L.K. ¶21. This "profoundly distress[es]" J.K.'s mother because it "could impact both [J.K.'s] ability to enjoy the service as well as his ability to transmit this essential knowledge to his future children." *Id.* ¶22. M.D.'s mother confirms that extreme heat and climate events have disrupted their religious rituals, and she worries about her daughter's safety wearing hijab in dangerous heat. S.A. ¶¶9-16. As a parent, she must weigh her children's immediate health against her obligation to pass down religious traditions and practices "at a crucial time in my children's religious development as they are entering adulthood." S.A. ¶¶8-17. The increased localized heat from the GHG emissions from the Repeal Rule will thus "substantially interfer[e] with [Petitioners'] religious development" during their "crucial adolescent stage of development" by limiting meaningful opportunities to learn, practice, and internalize their parents' religious values. *Wisconsin v. Yoder*, 406 U.S. 205, 218 (1972).

The Repeal Rule also imposes a substantial burden on Petitioner Elena, a Catholic youth, by forcing her to choose between two sincerely held beliefs: the obligation to procreate, and the obligation to protect the lives of children. Elena ¶¶9-

14. Elena cannot do both because the worsening, rather than improving, air pollution and climate conditions created by the Repeal Rule limit the conditions which Elena sincerely believes are necessary for nurturing and protecting children. Elena ¶¶13-14; Pinsky ¶¶10-16, 28, 37, 60-62; Wilson ¶¶4-34; Running ¶¶16, 25-50. "It violates my beliefs to bring someone into this world whose life would be burdened with hazardous air quality and increasing extreme and dangerous heat," because such conditions undermine "life, in utero, for newborns, for growing children, and for mothers[.]" Elena ¶¶13-14; Pinsky ¶¶61-62 ("More babies will be born early or at low weight . . . [a] small number of these babies will also die."); Wilson ¶¶4-34; Running ¶¶16, 25-50. The Repeal Rule thus substantially burdens Elena's exercise of her Catholic faith by forcing her to "engage in conduct that seriously violates" her beliefs by making it impossible for her personally to safely practice her faith's call to procreate and protect life. *See Hobby Lobby*, 573 U.S. at 720.

Because Petitioners show that the Repeal Rule "substantially burden[s] [Petitioners'] exercise of religion," the burden shifts to EPA to demonstrate "a compelling governmental interest" that "is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1. Petitioners, as the movants for a stay, "must be deemed likely to prevail [on the merits of their RFRA claim] unless the Government" meets its burden of surviving strict scrutiny, which it has not and cannot. *Gonzales*, 546 U.S. at 429; *infra* I.C.1.

**B.     The Repeal Rule Violates Petitioners' Rights to Life and Liberties Under the Fifth Amendment.**

**1.     Life**

Petitioners may not be "deprived of life . . . without due process of law." U.S. Const. amend. V. "[F]undamental personal interests in life, health, and liberty . . . have always had a special claim to judicial protection," and "strict judicial scrutiny of administrative action" is "necessary, but not sufficient" to "protect these interests from administrative arbitrariness[.]" *Env't Def. Fund, Inc. v. Ruckelshaus*, 439 F.2d 584, 598 (D.C. Cir. 1971). "[A]ction that endangers health has been held to endanger life on the theory that the former cannot be endangered without threatening the latter." *Ethyl Corp. v. Env't Prot. Agency*, 541 F.2d 1, 13 n.17 (D.C. Cir. 1976) (danger to "life" under the CAA encompasses danger to health). For example, government-created exposure to secondhand tobacco smoke constitutes an unconstitutionally "unsafe, life-threatening condition" due to the "risk of serious damage to [] future health[.]" *Helling v. McKinney*, 509 U.S. 25, 33, 35 (1993); *see also Harris By & Through Harris v. Maynard*, 843 F.2d 414, 416 (10th Cir. 1988) (due process right to life encompasses government-created conditions that threaten "preservation of [] life").

The Framers understood life as a right to enjoy "terrestrial existence" in health. *See, e.g.*, 1 William Blackstone, Commentaries on the Laws of England 123, 125 ("absolute rights" include "a person's legal and uninterrupted enjoyment of his

life, his limbs, his body, his health"); John Locke, Second Treatise of Government §2.6 (1690) (inalienable rights: "no one ought to harm another in his life, health, liberty, or possessions."); Samuel Johnson, A Dictionary of the English Language (1755) (defining "life" as "[e]njoyment, or possession of terrestrial existence"). "[T]o secure these rights" to life and liberty, the Framers knew the "foundation" would include principles and powers necessary to "effect their Safety and Happiness" including against the "plunder[ing of] our seas, ravag[ing of] our Coasts, burn[ing of] our towns, and destroy[ing] the lives of our people." Declaration of Independence (U.S. 1776).

The Framers also understood the critical importance of an atmosphere that supports life. *See* Andrea Wulf, *Founding Gardeners* 10-11 (2012). For example, James Madison, the father of the Bill of Rights, warned that to "animals, including man", "the atmosphere is the breath of life. Deprived of it, they all equally perish." *Address to the Agricultural Society of Albemarle* (May 12, 1818) (Ex. 30-E). He noted that if the atmosphere's "composition" "were substituted, as would result from" man exceeding his natural balance with plants' capacity to absorb carbon dioxide, "the change might essentially affect the aptitude of the atmosphere for the functions required of it[.]" *Id.*

GHG emissions from the Repeal Rule further disrupt Earth's energy imbalance in a way that increases heat, wildfires, and wildfire smoke that injures

Petitioners' lives and health. Declarations of Running ¶¶20-23, 39, 42-50; Wilson ¶¶23-28; Pinsky ¶¶35-40. More wildfire smoke exposure exacerbates Elena's and Maya's asthma and Elena's serious infections, which are life-threatening conditions. Elena ¶¶3-6; Maya ¶¶3-7 (Ex. 24); Pinsky ¶¶21, 36, 48, 62. More pollution from the Repeal Rule will also create more local ozone. Jacobson ¶9. Petitioners Elena, Maya, M.D., Emma, and J.K. already live in nonattainment areas for ozone pollution. Pinsky ¶33; Elena ¶2; Maya ¶2; M.D. ¶2; J.K. ¶2. The additional ozone formation the Repeal Rule will cause will have a major and deleterious impact on Petitioners' health and lives. Pinsky ¶¶31-34; Jacobson ¶9. GHGs from the Repeal Rule will also increase heat for Petitioners, increasing their risk of new bouts of heat illness, which is especially life-threatening for young Petitioners like L.R.F. (one) and C.E. (eight). Maya ¶5; C.E. ¶¶7-8 (Ex. 27); E.S. ¶12; A.F. ¶11; Running ¶¶15-34; Wilson ¶¶6-7, 22; Pinsky ¶¶41-46. The compounding harms of more heat, wildfire smoke, $PM_{2.5}$, and ozone pollution from the Repeal Rule makes it likely that Petitioners will succeed in demonstrating the rule infringes their fundamental right to life under the Fifth Amendment. Pinsky ¶¶31, 47-48.

### 2. Liberty: Bodily Integrity and Personal Security

"[T]he 'liberty' specially protected by the Due Process Clause includes the right[] . . . to bodily integrity[.]" *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997). The related "right . . . to personal security is not only sacred in the estimation

of the common law, but it is inalienable[.]" *Id.* at 714; Declaration of Independence (focus on Safety of Life). Personal security encompasses freedom from government-induced "[c]orporal insults of menaces, assaults, beating, and wounding." *Ingraham v. Wright*, 430 U.S. 651, 661, 672-73 (1977) (quoting 1 W. Blackstone, Commentaries 134); *see also Rochin v. California*, 342 U.S. 165, 172 (1952). From the founding era, "safe" has been defined as "free from danger" and "free from hurt." *Safe*, Samuel Johnson, A Dictionary of the English Language (1773). "Security" was defined as "freedom from fear," "protection," "the act of giving caution." *Security*, Samuel Johnson, A Dictionary of the English Language (1773).

The Supreme Court has repeatedly held that government may not subject persons to unsafe conditions, including smoky air, that they cannot escape. *See, e.g.*, *Helling*, 509 U.S. at 33, 35 (government may not expose convicted prisoner to secondhand tobacco smoke); *Youngberg v. Romeo*, 457 U.S. 307, 315-16 (1982) ("If it is cruel and unusual punishment to hold convicted criminals in unsafe conditions, it must be unconstitutional to confine [non-convicted persons]—who may not be punished at all—in unsafe conditions."); *see also Guertin v. State*, 912 F.3d 907, 933 (6th Cir. 2019) ("[T]aking affirmative steps to systematically contaminate a community['s] public water supply with deliberate indifference [to the health risks] is a government invasion of the highest magnitude."); *Yates v. Collier*, 868 F.3d 354,

360-61 (5th Cir. 2017) (confining persons within a heat index above 90ºF poses a "serious risk of harm" that violates fundamental rights).

EPA exerts exclusive federal control over air pollution, and the Repeal Rule increases harmful air pollution from GHGs, wildfire smoke, ozone, and non-GHG tailpipe emissions. *See supra* I.B.1 (Life); *infra* II. L.R.F., a one-year-old, is too small to wear an N-95 mask and is uniquely vulnerable to air pollution. Pinsky ¶¶15, 36. The additional pollution from the Repeal Rule "is a direct threat to the development of" L.R.F., and "[i]t is critical to limit [her] exposure to these pollutants now, while her brain is actively maturing." Pinsky ¶15. The Repeal Rule will also increase the emission of non-GHG tailpipe pollution, which "will increase the chance that C.E. develops childhood asthma." Pinsky ¶20; Wilson ¶20; B.K. ¶¶3-7 (Ex. 26). Petitioner N.N.'s school and athletic fields are located immediately adjacent to his state's biggest highway. N.N. ¶¶10-11 (Ex. 28). His respiratory health—already impaired—is threatened if the Rule is not stayed. *See* Pinsky ¶¶17-24. The Repeal Rule's increase in GHG emissions will also intensify Petitioners' exposure to increasing extreme weather (J.K., N.N., Taylin) and heat and wildfires (Maya, Elena, C.E., E.S., J.K.), thereby endangering their bodily integrity and personal security in ways they cannot escape. *See supra* I.B.1; Running ¶¶3, 5-9, 15-20; Pinsky ¶¶35-46; J.K. ¶¶13-14; L.K. ¶28; N.N. ¶¶14-17; Taylin ¶¶11-14 (Ex. 29).

For these reasons, the Repeal Rule infringes on Petitioners' rights to bodily integrity and personal security.

### 3. Liberty: State-Law-Derived Liberty Interest

Under the Due Process Clause, "[a] liberty interest may arise from the Constitution itself, by reason of guarantees implicit in the word 'liberty,' or it may arise from an expectation or interest created by state laws or policies[.]" *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005) (citation modified); *Atherton v. D.C. Off. of Mayor*, 567 F.3d 672, 689 (D.C. Cir. 2009). For example, in *United States v. Windsor*, marriage was "within the authority and realm of the separate States," and New York law recognized same-sex marriages. 570 U.S. 744, 764 (2013). Because the federal Defense of Marriage Act (DOMA)'s definition of marriage as between a man and woman "injure[d] the very class" New York "sought to give further protection and dignity" to, DOMA violated the Fifth Amendment's liberty protection. *Id.* at 766, 769.

Like marriage, protecting state citizens' trust-beneficiary rights to use and enjoy state public trust resources is traditionally within states authority. *See, e.g.*, *Illinois Cent. R.R. Co. v. Illinois*, 146 U.S. 387, 453 (1892); *PPL Montana v. Montana*, 565 U.S. 576, 603-04 (2012); *Ching v. Case*, 449 P.3d 1146, 1175 (Haw. 2019). The CAA recognizes states have "primary responsibility" for controlling air pollution. 42 U.S.C. § 7401; *Ohio v. Env't Prot. Agency*, 603 U.S. 279, 283 (2024).

As New York exercised its police power in *Windsor* to provide robust recognition of marriages, Hawaiʻi exercises its police power and constitutional duty as public trustee to protect Hawaiʻi's beneficiaries and trust resources from GHG pollution. *See* Haw. Const. art. XI, § 1 ("For the benefit of present and future generations, the State . . . shall conserve and protect Hawaii's natural beauty and all natural resources"); Haw. Const. art. XI, § 9 ("Each person has the right to a clean and healthful environment"); *In re Maui Elec. Co., Ltd.*, 506 P.3d 192, 202 & n.15 (Haw. 2022) (the right is an "affirmative constitutional obligation[]" that "subsumes a right to a life-sustaining climate system," including "[t]he need to mitigate the catastrophic effects of anthropogenic climate change"); *In re Hawaiʻi Elec. Light Co., Inc.*, 526 P.3d 329, 336 (Haw. 2023); Haw. Rev. Stat. § 225P-8 (requiring state to reduce GHG emissions from transportation). As Hawaiʻi citizens, N.N. and Taylin are trust-beneficiaries of Hawaiʻi's GHG-reduction trustee obligation. *See* N.N. ¶¶2-3; Taylin ¶¶2-3.

In 2024, Hawaiʻi entered into a court-approved settlement with Hawaiian youth with the goal of achieving the emissions reductions target set by the State legislature to sequester more carbon than emitted within the State by 2045, subject to the scope of Hawaiʻi's authority under federal law, the constitution and further Hawaiʻi state legislative actions. N.N., Ex.A: *Navahine v. Dep't of Transp.*, No. 1CCV-22-0000631, Joint Stipulation and Order re: Settlement (Haw. 1st Cir. Ct.

19

June 20, 2024). Because the agreement was intended to benefit Hawaiʻi's "present and future generations," and was found to be "in the best interest of and fair to the Youth Plaintiffs," Petitioners N.N. and Taylin are intended third-party beneficiaries of the agreement. N.N. ¶¶3-7; Taylin ¶¶4-5; *Beckett v. Air Line Pilots Ass'n*, 995 F.2d 280, 286 (D.C. Cir. 1993). When Hawaiʻi entered the settlement in 2024, the 2045 goal was achievable "because EPA's GHG emission standards . . . required manufacturers to . . . increase their EV production year after year[.]" N.N. ¶8; Jacobson ¶8; Sperling ¶15. The Repeal Rule, as in *Windsor*, is a "far [] reach[ing] . . . directive applicable to . . . [a] whole realm of federal regulations," thereby eviscerating the very interests that Hawaiʻi "sought to protect." 570 U.S. at 765. The Repeal Rule harms, and makes more costly, Hawaiʻi's compliance with its affirmative constitutional, state-law, and court-ordered obligations to reduce GHG emissions from transportation to zero by 2045. N.N. ¶9. N.N. and Taylin will experience more climate harm from floods and fires on their islands and threats to their homes from the GHG pollution the Repeal Rule will cause, and Taylin, who is Native Hawaiian, will lose important Native Hawaiian traditional cultural practices, food, and resources. N.N. ¶¶14-17; Taylin ¶¶11-14; Running ¶¶23, 30, 43, 46. For these reasons, Petitioners are likely to succeed in showing that the Repeal Rule violates N.N. and Taylin's state-law-derived Fifth Amendment liberty interest.

Government acts that infringe a fundamental right are subject to strict scrutiny. *Reno v. Flores*, 507 U.S. 292, 301 (1993). Because Petitioners have met their burden showing that the Repeal Rule likely infringes on their Fifth Amendment rights to life and liberty, the government bears the "heavy burden" to show that the Repeal Rule survives strict scrutiny. *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 16 (1973). EPA cannot meet its heavy burden to clearly show that the Repeal Rule is necessary and narrowly tailored to meet a compelling government interest of the highest order. *Mahmoud*, 606 U.S. at 565. Defendants fail to meet this heavy burden here. *See infra* C. Petitioners are thus likely to succeed on the merits.

### C.     EPA Deprived Petitioners of Required Process and Has No Record Basis to Meet its Strict Scrutiny Burden.

Petitioners are likely to prevail because EPA ignored their fundamental rights, which were raised with reasonable specificity and supported by data in comments on the Proposed Rule. EPA must follow procedures to safeguard substantive legal rights. 42 U.S.C. § 7607(d)(6)(B) ("The promulgated rule shall also be accompanied by a response to each of the significant comments, criticisms, and new data submitted in written or oral presentations during the comment period."). Section 307(d)(3) of the CAA requires EPA's "statement of basis and purpose" to address "the major legal interpretations and policy considerations underlying the proposed rule." 42 U.S.C. § 7607(d)(3)(C). Constitutional limits on the Repeal Rule qualify as "major legal interpretations and policy considerations" that EPA was required to

address. *See, e.g.*, *id.*, § 7607(d)(9)(B) (rule can be reversed as contrary to constitutional right). "Procedural due process imposes [these] constraints on governmental decisions which deprive individuals of 'liberty' . . . interests within the meaning of the Due Process Clause of the Fifth [ ] Amendment." *Mathews v. Eldridge*, 424 U.S. 319, 332-33 (1976). EPA's failure to follow its own procedure, which resulted in infringements of Petitioners' fundamental rights, is a procedural due process and CAA violation.

### 1. EPA Did Not Respond to Significant Comments.

EPA failed to respond substantively to significant comments. First, Petitioners and other commenters raised specific religious freedom issues. Petitioners asserted harms to their religious practices and cited *Mahmoud* as a case requiring EPA's consideration. Ex. 6 at 2, Attachment 36. Jewish commenters described how their religious practices "compel us to care for people and the planet in a manner diametrically opposed to actions such as repealing this landmark environmental precedent." *See, e.g.*, Ex. 11-B. Catholic Faith leaders affirmed their religious beliefs that "[i]n a world where the most vulnerable of our brothers and sisters are the first to suffer the devastating effects of climate change . . . care for creation becomes an expression of our faith and humanity." *See, e.g.*, Ex. 11-C. A review of EPA's response to comments shows the agency completely ignored the substantial burdens the Repeal Rule inflicts on religious freedoms.

Second, Petitioners presented facts, data and peer-reviewed research about the Repeal Rule's impact on children's mental health. *See, e.g.*, Ex. 6 at 5, 8, Attachments 23, 32, 36; Ex. 11-F at 1-11, 10 ("There is substantial evidence of a serious and grave direct impact on mental health and brain function caused by GHG and associated fine particulate matter and air pollution."). A review of EPA's response to comments shows the agency completely ignored the comments on the proposed rule's impact to children's mental health.

Third, EPA ignored Petitioners' voluminous information about the "children's health emergency" and the law that courts require special consideration of children when their rights, and health and safety, are infringed. Ex. 6 at 5, 8; Ex. 11-A. EPA's responses to comments ignore "the central question[s]" raised by these commentors, violating the Petitioners' process rights protected by the CAA. *Appalachian Power Co. v. EPA*, 249 F.3d 1032, 1062-63 (D.C. Cir. 2001).

> **2. EPA Did Not State Major Legal Interpretations Regarding Constitutionally Protected Fundamental Rights.**

That EPA stated no legal or constitutional authority justifying infringement of children's fundamental rights to life, liberty, and religious practice is a procedural failure and further reason to stay the rule. Specifically, EPA did not provide "major legal interpretations and policy considerations" of significant Supreme Court precedents referenced in Petitioners' comments, including *Mahmoud*, 606 U.S. 522; *Brown v. Bd. of Educ.*, 347 U.S. 483, 494 (1954); *Plyler v. Doe*, 457 U.S. 202, 226

(1982); *Weber v. Aetna Cas. & Sur. Co.*, 406 U.S. 164, 175 (1972); *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 325 (2015) or *Am. Elec. Power Co.*, 564 U.S. at 426. Ex. 6 at 2, 5-7.

A proper "major legal interpretation" and "policy consideration" by EPA would mean "every reasonable construction must be resorted to, in order to save a statute from unconstitutionality." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 563 (2012) (citation modified). EPA did not state how its proposal was narrowly tailored and necessary to achieve any compelling interest considering the Supreme Court's prior construction of the CAA that avoided constitutional injuries by affirming EPA's authority to prevent the exact harms now caused by the Repeal Rule. *Massachusetts*, 549 U.S. at 528. EPA has no lawful basis for effectively ignoring Petitioners' comments and its constitutional burden while simultaneously reconstructing its statutory authority anew in an unconstitutional manner that upends the legal paradigm. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 385 (2024). EPA's action is an error "so serious and related to matters of such central relevance to the rule that there is a substantial likelihood that the rule would have been significantly changed if such errors had not been made." 42 U.S.C. § 7607(d)(8), (9)(D).

**II.     Petitioners Will Suffer Immediate, Irreparable Harm Absent a Stay.**

Harm is irreparable if "there can be no do over and no redress." *League of Women Voters of United States v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016) (citation modified). To be irreparable, harm must be "certain and great" and "imminent" such that there is a clear need for equitable relief. Additionally, the harm must be beyond remediation. *Id.* at 7-8. The Repeal Rule harms youth Petitioners' constitutional rights—their health, religious practices, and state-protected liberty interests—which by their nature are irreparable. *Mahmoud*, 606 U.S. at 569.

EPA's own data and methodology leave no doubt that, absent a stay, even if Petitioners prevail at the end of this litigation, the Repeal Rule will unavoidably cause 942.2 MMT of $CO_2$ emissions in the United States—nearly a gigaton—due to more ICE vehicles on the road. Sperling ¶¶48-49; Wilson ¶¶15-20; Repeal Rule at 7759. This staggering amount is comparable to the entire 2024 annual emissions of Japan, the world's fifth largest emitter. Running ¶18. The nature of auto manufacturing requires years of lead time to design and build new model year ("MY") vehicles. If this case is fully resolved in two years, MY 2031 will already be planned. Sperling ¶¶16-21. Because the average American vehicle is driven for 15 years, 15 years of avoidable emissions are "locked in" with each ICE vehicle produced. Sperling ¶17, 48.

The Repeal Rule also abruptly eliminates the GHG emission credit trading program for MY 2027 after 14 years of continuous operation, putting pressure on manufacturers to scale back ZEV production immediately, harming ZEV manufacturers, and greatly reducing ZEV production and sales. Sperling ¶¶36, 41-43; *see also* Ex. 11-G at 24; Ex. 11-H at 2. With limited availability of ZEVs, private sector light-, medium-, and heavy-duty fleets will not transition to ZEVs beginning in 2027. Sperling ¶¶14, 19, 25. Once fleet decisions are made and ICE vehicles are manufactured and placed into commerce, "there can be no do over and no redress." *Newby*, 838 F.3d at 9; Sperling ¶19.

The health effects caused by the Repeal Rule are certain and great, especially for youth Petitioners already living in contaminated air. Pinsky ¶¶29-40; Sperling ¶¶17-26. The harm is beyond remediation because once emitted, $CO_2$ remains in the atmosphere for centuries. Running ¶¶3, 17, 50; Pinsky ¶48; Sperling ¶¶17-26, 28, 48-49; Wilson ¶19; Jacobson ¶16. These additional emissions will be irretrievably and unavoidably "locked in." Sperling ¶¶17-26, 48-49; Running ¶50; *see also In re NTE Connecticut, LLC*, 26 F.4th 980, 991 (D.C. Cir. 2022) (the benefit lost "could not later be clawed back"). If it were technically feasible, *which it is not*, it would cost hundreds of billions of dollars to remove all of the $CO_2$ the Repeal Rule will cause, and even that would not remove the localized harm from other pollutants that increase with more ICE vehicles on the road. Wilson ¶19; Jacobson ¶12; Pinsky

26

¶¶47-48 (particulates, ozone, smoke, and heat "act multiplicatively" starting in utero through adulthood).

Increasing GHG emissions by 942.2 MMT $CO_2$ if the Rule is not stayed will trap more heat than otherwise would occur. Running ¶¶3, 16-18, 24; Wilson ¶¶8-13. The increased heat directly harms Petitioners, burdening their health, lives, and religious freedoms and placing them at risk. Wilson ¶¶6-7, 13; *see supra* I. Loss of these constitutional freedoms, even for short periods, "unquestionably constitutes irreparable injury." *Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009); *Mahmoud*, 606 U.S. at 569; *Mirabelli*, 146 S. Ct. at 803.

Courts exercise particular concern with irreparable harm involving children, even if the full extent of harm may not manifest until years in the future. *See, e.g.*, *Certain Named & Unnamed Non-Citizen Child. & Their Parents v. Texas*, 448 U.S. 1327, 1333 (1980). For instance, this Court preliminarily enjoined operation of an agency rule that permitted children to work in pesticide-treated agricultural fields, even though the complex nature of pesticide degradation made it difficult to predict the precise health impacts of pesticides on such children. *Nat'l Ass'n of Farmworkers Orgs. v. Marshall*, 628 F.2d 604, 606, 613-14 (D.C. Cir. 1980). After the government acknowledged that children had "heightened susceptibility" to harms from pesticide exposure, the Court found that "[t]he hazards [to health from

exposure] exist, and children's exposure to them constitutes the kind of irreparable departure from the status quo that necessitates interlocutory relief." *Id.* at 614.

Petitioners present an even stronger showing of irreparable harm here. Since 2009, the evidence of harm to children has only gotten stronger. Running ¶52; Pinsky ¶53. Unlike in the *Farmworkers* case, EPA fully understood the risks to human health and knows children bear the brunt of harm from this deregulation effort and nonetheless chose to burden children's health and un-burden fossil fuel industries' profits. EF at 66498. This Court should thus find that "the [air pollution] hazards exist, and children's exposure to them constitutes" irreparable harm. *Farmworkers*, 628 F.2d at 614.

### III. The Balance of Harms and the Public Interest Favor a Stay.

The imminent irreparable harm youth Petitioners face and the broader harm to the public tips the balance of harms and the public interest in favor of a stay. Petitioners and the public face imminent health injuries, increased risk of death, and deprivations of their constitutional rights. *See* Ex. 1 (petitioner-governments affirm the Repeal Rule's "significant harms to our nation's children."); Wilson ¶¶16, 21; Pinsky ¶60 (Repeal Rule will "cause or exacerbate various diseases, increase the risk of premature death, and cause significant mental health injuries."). *See supra* I; *Rivera Lujan v. Fed. Motor Carrier Safety Admin.*, No. 25-1215, 2025 WL 3182504, at *2 (D.C. Cir. Nov. 13, 2025) (citing *Mozilla Corp. v. FCC*, 940 F.3d 1, 62 (D.C.

Cir. 2019)) (weighing risk of death to petitioners in finding a stay of agency rule was warranted); *see also Env't Def. Fund, Inc.*, 439 F.2d at 598. "[C]hildren's safety is the overriding equity." *Mirabelli*, 146 S. Ct. at 803. "There is generally no public interest in the perpetuation of unlawful agency action," and "there is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations.'" *Newby*, 838 F.3d at 12 (citation modified); *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013) (government actions which contravene the Constitution are "always contrary to the public interest").

Conversely, there is no possibility of substantial and imminent harm to the public or EPA if a stay is granted. In denying Petitioners' requested stay, EPA gave two reasons relevant to this balancing analysis: (1) the need for regulatory certainty and (2) the costs to regulated entities weigh against a stay. EPA Denial at 2. The regulatory certainty argument is backwards and supports Petitioners. For 15 years, there was regulatory certainty based on Supreme Court precedents including *Massachusetts* and *American Electric Power*, the Endangerment Finding, and over a decade of GHG emissions standards for vehicles. *Supra* Statement of the Case, I. The newfound regulatory uncertainty from the Repeal Rule will continue for years. *See* Sperling ¶24 (vehicle manufacturers acknowledge litigation risks); *see also* Ex. 11-I at 2 (Ford: "eliminating standards altogether is not likely to provide the industry with the long-term stability we need to make historic investments in America and

29

compete globally."); Ex. 11-J at 2-3. "An agency should not be allowed to claim that the confusion resulting from its own improper action weighs against [equitable relief] against that action." *Newby*, 838 F.3d at 14.

Even assuming regulated industries would incur costs in complying with the GHG standards, "the balance must be struck in favor of the protection of children." *Farmworkers*, 628 F.2d at 616. Any costs to manufacturers "would be only short-term, and would never approach the value of the children's health to the nation." *Id.* Moreover, EPA does not appropriately limit its cost concerns to the stay period and does not acknowledge the severe economic disadvantage vehicle manufacturers will be at globally because of the repeal. Sperling ¶¶36-37; *see also id.* ¶¶29-32, 37-41 (manufacturers' support of emissions standards); Jacobson ¶¶20-22. The cost to the public and domestic EV manufacturers is enormous. Wilson ¶16 (100,000 additional deaths), ¶19 ("Remediating additional $CO_2$ from the Repeal Rule . . . would cost at least hundreds of billions of dollars."); Jacobson ¶12 (hundreds of millions of dollars in lost human life); Sperling ¶25 ($50 billion in manufacturer write-offs to date). EPA also never analyzed actual costs to the public and children because it was unlawfully directed to *not* consider the costs of GHG pollution in regulatory actions and changed the value of human life to *zero*. *See generally* Jeffrey Clark Memo (Ex. 8); Ex. 9. Thus, EPA's Repeal Rule cost analysis cannot be trusted.

## IV. Bond is Not Warranted.

Petitioners respectfully request that this Court exercise its discretion to not require Petitioners to post a bond, which would effectively deny their right to judicial review and protection of their fundamental rights. *See Fed. Prescription Serv., Inc. v. Am. Pharm. Ass'n*, 636 F.2d 755, 759 (D.C. Cir. 1980); *Am. Gateways v. U.S. Dep't of Just.*, No. 25-01370, 2025 WL 2029764, at *11 (D.D.C. July 21, 2025) (collecting cases refusing bond where it "would have the effect of denying the plaintiffs their right to judicial review of administrative action").

## CONCLUSION

For the foregoing reasons, this Court should grant Petitioners' motion for a stay.

DATED: May 20, 2026    Respectfully submitted,

        /s/ *Julia A. Olson*
        Julia A. Olson (D.C. Cir. Bar 54969)
        Andrea Rodgers (D.C. Cir. Bar 66983)
        Brianna Rosier Kabwika
        Nathan Bellinger
        Laura Mebert
        OUR CHILDREN'S TRUST
        1216 Lincoln Street
        Eugene, OR 97401
        (415) 786-4825
        julia@ourchildrenstrust.org
        andrea@ourchildrenstrust.org
        brianna_k@ourchildrenstrust.org

nate@ourchildrenstrust.org
laura_m@ourchildrenstrust.org

Daniel C. Snyder (D.C. Cir. Bar 66846)
Haley Nicholson (D.C. Cir. Bar 65084)
PUBLIC JUSTICE
1620 L Street NW, Suite 630
Washington, DC 20036
(202) 797-8600
dsnyder@publicjustice.net
hnicholson@publicjustice.net

*Counsel for Petitioners*

**CERTIFICATE OF COMPLIANCE**

Pursuant to Fed. R. App. P. 32(g), I certify that this filing contains 7200 words, excluding the parts exempted by Fed. R. App. P. 32(f). A timely motion to exceed length limit was filed on May 14, 2026, requesting to exceed the limit in Fed. R. App. P. 27(d)(2)(A) by 2,000 words. ECF 2173467. As the motion was not acted upon by the filing date, pursuant to Circuit Rule 27(g)(4), this overlength motion is being timely filed pending the Court's ruling on Petitioners' motion at ECF 2173467.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. 32(a)(6) because this document has been prepared in a monospaced typeface using Microsoft Word with 14-point Times New Roman font.

*/s/ Julia A. Olson*
Julia A. Olson (D.C. Cir. Bar No. 54969)
OUR CHILDREN'S TRUST
1216 Lincoln Street
Eugene, OR 97401
(415) 786-4825
julia@ourchildrenstrust.org

*Counsel for Petitioners*

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the D.C. Circuit by using the appellate CM/ECF system on May 20, 2026. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ Julia A. Olson
Julia A. Olson (D.C. Cir. Bar No. 54969)
OUR CHILDREN'S TRUST
1216 Lincoln Street
Eugene, OR 97401
(415) 786-4825
julia@ourchildrenstrust.org

*Counsel for Petitioners*

34

# ADDENDUM

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

| | |
|---|---|
| ELENA VENNER, *et al.*,<br>             *Petitioners*,<br><br>      v.<br><br>UNITED STATES<br>ENVIRONMENTAL PROTECTION<br>AGENCY, *et al.*,<br>             *Respondents*. | Case No. 26-1038<br>Lead Case No. 26-1037<br>(and consolidated cases) |

**CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES**

The following information is provided pursuant to D.C. Circuit Rules 18(a)(4) and 28(a)(1):

**A. PARTIES**

**Petitioners**

**26-1037**: American Public Health Association; Alliance of Nurses for Healthy Environments; American Lung Association; Center for Biological Diversity; Center for Community Action and Environmental Justice; Clean Air Council; Clean Wisconsin; Conservation Law Foundation; Environmental Defense Fund; Environmental Law & Policy Center; Friends of the Earth; Natural Resources

1

Defense Council, Inc.; Physicians for Social Responsibility; Public Citizen; Rio Grande International Study Center; Sierra Club; Union of Concerned Scientists.

**26-1038:** Elena Venner; Ariela Lara; Emma Weibel; Katherine McIntosh; Linnea Lentfer; Maya Williams; Taylin Nishida; C.E., a minor, by and through her guardian B.K.; E.S., a minor, by and through his guardian K.S.; J.K., a minor, by and through his guardian L.K.; J.G., a minor, by and through her guardian T.L.; L.R.F., a minor, by and through her guardian A.F.; L.D. and R.D., minors, by and through their guardian S.D.; M.B., a minor, by and through her guardian G.M.; M.D, a minor, by and through her guardian S.A.; N.N., a minor, by and through his guardian K.S.N.; N.G., a minor, by and through her guardian E.G.

**26-1039:** Business Climate Initiative d/b/a Zero Emission Transportation Association.

**26-1043:** Metropolitan Congregations United for St. Louis; Missouri Coalition for the Environment.

**26-1051:** Service Employees International Union.

**26-1061:** The Commonwealths of Massachusetts and Virginia; Josh Shapiro, in his official capacity as Governor of the Commonwealth of Pennsylvania; and the States of Arizona, California, Colorado, Connecticut, Delaware, Hawai'i, Illinois, Maine, Maryland, Michigan, Minnesota, Nevada, New Jersey, New Mexico, New York, North Carolina, Oregon, Rhode Island, Vermont, Washington, and Wisconsin;

2

the District of Columbia; the United States Virgin Islands; the Cities of Albuquerque, New Mexico; Boston, Massachusetts; Chicago, Illinois; Cleveland, Ohio; Columbus, Ohio; Los Angeles, California; and New York, New York; the Counties of Harris, Texas; Martin Luther King, Jr., Washington; and Santa Clara, California; and the Cities and Counties of Denver, Colorado, and San Francisco, California

**26-1083:** Alaska Institute for Justice, Chesapeake Bay Foundation, Chinik Eskimo Community, Food & Water Watch, Hoosier Environmental Council, Illinois Environmental Council, Iowa Environmental Council, Minnesota Environmental Partnership, the Native Village of Kwinhagak, the Native Village of Nunapitchuk, Northeast Organic Farming Association of New York (NOFA-NY), Ohio Environmental Council, WE ACT, West Virginia Highlands Conservancy, and Wyoming Outdoor Council.

**26-1090:** The Bay Area Air Quality Management District

## Respondents

Environmental Protection Agency.

Lee M. Zeldin, in his official capacity as Administrator, U.S. Environmental Protection Agency.

**<u>Intervenors for Respondents</u>**

State of West Virginia; Commonwealth of Kentucky; State of Alabama; State of Alaska; State of Arkansas; State of Florida; State of Georgia; State of Idaho; State of Indiana; State of Iowa; State of Kansas; State of Louisiana; State of Mississippi; State of Missouri; State of Montana; State of Nebraska; State of North Dakota; State of Ohio; State of Oklahoma; State of South Carolina; State of South Dakota; State of Tennessee; State of Texas; State of Utah; State of Wyoming.

Domestic Energy Producers Alliance.

Western States Trucking Association, Inc.; Construction Industry Air Quality Coalition, Inc.; Liberty Packing Company, LLC; and Nuckles Oil Company, Inc. d/b/a Merit Oil Company.

Truck and Engine Manufacturers Association

National Federation of Independent Business (NFIB); American Free Enterprise Chamber of Commerce (AmFree); the Illinois, Iowa, Kentucky, Missouri, North Dakota, and Tennessee Corn Growers Associations

NACCO Natural Resources Corporation

American Petroleum Institute (API)

CO2 Coalition

American Fuel & Petrochemical Manufacturers (AFPM) and Energy Marketers of America (EMA) (motion for leave to intervene pending)

**<u>Amici</u>**

Government Accountability & Oversight and Government Oversight & Education, D/B/A Protect the Public's Trust.

Senators Ted Cruz and Cynthia Lummis

## B. RULINGS UNDER REVIEW

Petitioners in each consolidated case seek review of the U.S. Environmental Protection Agency's Repeal Rule entitled "Rescission of the Greenhouse Gas Endangerment Finding and Motor Vehicle Greenhouse Gas Emission Standards Under the Clean Air Act," published at 91 Fed. Reg. 7686 (Feb. 18, 2026).

## C. RELATED CASES

The above-captioned cases were never previously before this Court or another court. Counsel is aware of no other related cases within the meaning of Circuit Rule 28(a)(1)(C) that are currently pending in this or any other court.

# EXHIBIT 1

**PARTY POSITIONS**

Petitioners in Case No. 26-1061: "State and Local Government Petitioners take no position on the motion. The motion seeks relief for significant harms to our nation's children, but it presents distinct constitutional and other issues not raised in the State and Local Government Petitioners' petition."

Petitioners in Case No. 26-1090, Bay Area Air Quality District: "the Air District adopts the same position as the other state and local agency petitioners. The motion seeks relief for significant harms to our nation's children, but it presents distinct constitutional and other issues not raised in the Air District's petition."

Petitioners in Case Nos. 26-1037, 26-1043, and 26-1083: "take no position on the motion and the constitutional questions presented."

Petitioners in Case Nos. 26-1039 and 26-1051: take no position on this motion.

Respondent EPA and Intervenor Respondents: oppose this motion.

1

# EXHIBIT 2



# ASSISTANT ADMINISTRATOR FOR AIR AND RADIATION

WASHINGTON, D.C. 20460

April 24, 2026

Julia Olson
Co-executive Director and Chief Legal Counsel
Our Children's Trust
P.O. Box 5181
Eugene, OR 97405

Ms. Olson,

The U.S. Environmental Protection Agency (EPA) is in receipt of your April 20, 2026, letter regarding the final rule entitled "Rescission of the Greenhouse Gas Endangerment Finding and Motor Vehicle Greenhouse Gas Emission Standards Under the Clean Air Act," 91 Fed. Reg. 7686 (Feb. 18, 2026). In the letter, you request on behalf of named individual petitioners that the EPA stay the effective date of the final rule pending judicial review pursuant to 5 U.S.C. § 705. Specifically, you argue that these petitioners are likely to succeed on the merits of three constitutional claims and would be irreparably harmed absent a stay of the effective date. Further, you note that if the EPA does not grant the requested stay of the effective date, petitioners intend to seek a stay in the U.S. Court of Appeals for the D.C. Circuit in connection for the already-filed petition for review in *Venner, et al. v. EPA, et al.*, No. 26-1038.

The EPA hereby denies your request for a stay of the effective date of the above-referenced final rule. As an initial matter, we note that such relief is not available pursuant to 5 U.S.C. § 705. First, we received your request for a stay on the day the final rule went into effect and sixty days after publication of the final rule in the *Federal Register*,[1] and the EPA generally does not stay the effective date of a final rule that has already gone into effect.[2] Second, the EPA promulgated the final rule pursuant to Clean Air Act (CAA) section 202(a), meaning that the procedures in CAA section 307(d) apply to this rulemaking and provide for a distinct pathway to seek and obtain a stay of final rules under certain circumstances.[3] The EPA is not evaluating your request as arising under CAA section 307(d) because you did not invoke the provision and appear not to have intended to make the distinct showing required for either mandatory reconsideration or a temporary stay under that provision.

The EPA is also denying your request as inconsistent with the equitable requirements for a stay pending judicial review. The constitutional claims raised in your letter do not demonstrate a likelihood of success on the merits of your pending challenge to the final rule in *Venner, et al. v. EPA, et al.*, D.C. Cir. No. 26-

---

[1] *See* 91 Fed. Reg. 7686, 7686 ("This final action is effective on April 20, 2026.").
[2] *See, e.g.*, *Safety-Kleen Corp. v. EPA*, 1996 U.S. App. LEXIS 2324, at *2 (D.C. Cir. Jan. 19, 1996) (per curiam) ("[5 U.S.C. § 705] permits an agency to postpone the effective date of a not yet effective rule, pending judicial review.").
[3] 42 U.S.C. § 7607(d).

1038. As you acknowledge in your letter, Our Children's Trust raised these claims in comments submitted during the rulemaking, and we responded to these claims in the response to comments (RTC) document accompanying the final rule.[4] For the reasons set out in the RTC, these claims are not founded in law or supported by the record.

Nor do the purported harms alleged in your letter demonstrate that petitioners would experience irreparable harm absent a stay pending judicial review. Rather, the allegations in your letter demonstrate that the balance of the equities tips decisively in favor of denying a stay because of the immediate and irreversible harm that a stay would inflict on regulated parties, consumers, and the economy at large. As you state in your letter, "EPA received comments from many vehicle and vehicle parts manufacturers demonstrating that fleet and model-year decisions are being made now and will be based on the regulatory landscape in the immediate future." In this critical period for implementing the remainder of model year (MY) 2025 and finalizing plans for MY 2026 and MY 2027, manufacturers currently have regulatory certainty that new motor vehicles and engines are not subject to federal greenhouse gas emission standards. The final rule published on February 12, 2026, and went effective on April 20, 2026. In contrast to the speculative future harm you allege on behalf of petitioners, the harm of regulatory whiplash to manufacturers—and therefore to consumers and other participants across impacted sectors of the Nation's economy—would be felt immediately and cannot be remedied or mitigated after the conclusion of judicial review.

The extent of the harm to regulated parties is well-documented in the record for the final rule and relevant public reporting. For example, multiple vehicle companies have announced that they are experiencing significant financial hardships from making investments that were, at least in part, due to the regulations that this stay would put back in place. This includes companies taking billions of dollars in impairment charges related to battery electric vehicle investments and shifting research and development back to internal combustion engines over the past few years.[5] Further exacerbating these difficulties by granting a stay pending judicial review is neither in the public interest nor supported by the balance of the equities.

The EPA appreciates the robust public engagement that went into and informed this rulemaking and looks forward to continuing to fulfill its core mission of providing clean air, water, and land for every American consistent with the best reading of its statutory authorities.

Sincerely,

Aaron Szabo
Assistant Administrator

---

[4] *See, e.g.*, RTC section 7.6, "Children's Constitutional Claims," available on the regulations.gov docket for this rulemaking as Document ID No. EPA-HQ-OAR-2025-0194-31089.

[5] *See e.g.*, K. Hall & D. Shepardson, *GM to take $6 billion writedown on EV pullback*, Reuters (Jan. 9, 2026), https://www.reuters.com/business/autos-transportation/gm-take-6-billion-writedown-ev-pullback-2026-01-08/; M. Wayland, *Stellantis scraps Jeep, Chrysler plug-in hybrid vehicles amid EV slowdown, recall*, CNBC (Jan. 9, 2026), https://www.cnbc.com/2026/01/09/stellantis-scraps-jeep-chrysler-phevs-amid-ev-slowdown-recall.html; Z. Palmer, *Honda Cancels 0 Series EVs, Acura RSX Just Months Before Production*, Road & Track (Mar. 12, 2016), https://www.roadandtrack.com/news/a70722811/honda-cancels-0-series-acura-rsx-electric-vehicles/.

# EXHIBIT 3



April 20, 2026

*Via Electronic and U.S. Mail*

Lee Zeldin, Administrator
U.S. Environmental Protection Agency
Mail Code 1101A
1200 Pennsylvania Avenue, NW
Washington, DC 20460
Zeldin.Lee@epa.gov

Aaron Szabo, Assistant Administrator
Office of Air and Radiation
U.S. Environmental Protection Agency
Mail Code 6103A
1200 Pennsylvania Ave., NW
Washington, DC 20460
Szabo.Aaron@epa.gov

Alan Stout
Transportation Sector Impacts & Standards Division
Office of Transportation and Air Quality
U.S. Environmental Protection Agency
2000 Traverwood Drive
Ann Arbor, MI 48105
Stout.Alan@epa.gov

STAY REQUEST PENDING JUDICIAL REVIEW

Youth Petitioners[1] request that the U.S. Environmental Protection Agency immediately stay the effective date of the Agency's Repeal Rule, "Rescission of the Greenhouse Gas Endangerment Finding and Motor Vehicle Greenhouse Gas Emission Standards Under the Clean Air Act," 91 Fed. Reg. 7686 (Feb. 18, 2026). EPA may stay the effective date of a rule pending judicial review if it finds that "justice so requires."[2] Youth Petitioners have already filed a petition for review in the D.C. Circuit, *Venner, et al. v. EPA, et al.*, D.C. Cir. No. 26-1038, and this request satisfies Federal Rule of Appellate Procedure 18(a)(1)'s requirement that a party first seek a stay from the agency. If EPA does not grant the stay, Youth Petitioners intend to seek a stay in the D.C. Circuit.

---

[1] Elena Venner, Ariela Lara; Emma Weibel; Katherine McIntosh; Linnea Lentfer; Maya Williams; Taylin Nishida; C.E., a minor, by and through her guardian B.K.; E.S., a minor, by and through his guardian K.S.; J.K., a minor, by and through his guardian L.K.; J.G., a minor, by and through her guardian T.L.; L.R.F., a minor, by and through her guardian A.F.; L.D. and R.D., minors, by and through their guardian S.D.; M.B., a minor, by and through her guardian G.M.; M.D, a minor, by and through her guardian S.A.; N.N., a minor, by and through his guardian K.S.N.; and N.G., a minor, by and through her guardian E.G.

[2] 5 U.S.C. § 705; *see, e.g.*, *Postponement of Effectiveness for Certain Provisions of Trichloroethylene (TCE); Regulation Under the Toxic Substances Control Act (TSCA)*, 90 Fed. Reg. 14415 (Apr. 2, 2025) (EPA stayed rule pending judicial review).

The Repeal Rule rescinds the 2009 Endangerment Finding as well as motor vehicle greenhouse gas (GHG) emission standards. Even though EPA recognizes this deregulatory action will predictably "impact consumer surplus, producer profits, and net societal welfare,"[3] it dismisses the rule's effects on federalism and the Youth Petitioners' constitutional rights to life, liberty, and religious exercise.[4] The Repeal Rule immediately changes vehicle manufacturer behavior by favoring increased production of internal combustion engine (ICE) vehicles, which emit GHGs and other air pollution, rather than electric vehicles, which do not.[5]

Youth Petitioners, ranging in age from one to twenty-two, have developing bodies that are particularly vulnerable to air pollution and the localized effects of climate change. Many have pre-existing health conditions that make them even more at risk to physical harm. Yet, EPA explicitly declined to consider the special characteristics of children,[6] ignoring its own findings that children are uniquely vulnerable to localized effects of GHG emissions and air pollution from ICE vehicles.[7] EPA erroneously asserts, without any evidentiary support, that eliminating vehicle GHG emissions has a "de minimis" impact on public health and welfare, including on youth and children.[8] EPA's position is an about-face from its 2009 Endangerment Finding, which was supported by decades of science—science that has continued to grow and warn of the life-threatening harm of fossil fuel pollution, especially to children.[9] The Repeal Rule not only causes physical harm to the Petitioners, but the resulting GHG emissions burden the practice of their religious beliefs. Despite commenters raising those burdens EPA failed to respond to the Repeal Rule's effect on the free exercise of religion.[10]

---

[3] EPA, *Rescission of the Greenhouse Gas Endangerment Finding and Motor Vehicle Greenhouse Gas Emission Standards Under the Clean Air Act Regulatory Impact Analysis* 2 (2026).

[4] EPA, *Reconsideration of 2009 Endangerment Finding and Greenhouse Gas Vehicle Standards Response to Comments* 309-10 (2026).

[5] *Rescission of the Greenhouse Gas Endangerment Finding and Motor Vehicle Greenhouse Gas Emission Standards Under the Clean Air Act*, 91 Fed. Reg. 7686, 7759 (Feb. 18, 2026) ("This action will result in fewer electric vehicles and more ICE vehicles produced, as discussed in the RIA, and therefore an estimated increase in the consumption of petroleum and an estimated reduction in the consumption of electricity"); *see also, Comments of the Truck and Engine Manufacturers Association*, EPA-HQ-OAR-2025-0194-0888, at 1 (Sept. 22, 2025) (seeking certainty whether they must manufacture more ZEV trucks or not).

[6] *Rescission of the Greenhouse Gas Endangerment Finding and Motor Vehicle Greenhouse Gas Emission Standards Under the Clean Air Act*, 91 Fed. Reg. 7686, 7758-59 (Feb. 18, 2026) (only noting that "[c]hildren are not expected to experience greater ambient concentrations of air pollutants than the general population").

[7] *See generally*, EPA, *Climate Change and Children's Health and Well- Being in the United States*, EPA 430-R-23-001 (2023).

[8] *Id*.

[9] *Endangerment and Cause or Contribute Findings for Greenhouse Gases Under Section 202(a) of the Clean Air Act*, 74 Fed. Reg. 66496 (Dec. 15, 2009).

[10] *See, e.g.*, *Comment of National Religious Partnership for the Environment (NRPE) et al.*, EPA-HQ-OAR-2025-0194-0364 (Aug. 15, 2025); *Mass Comment Campaign by National Religious Partnership for the Environment*, EPA-HQ-OAR-2025-0194-0465 (Sept. 2, 2025); *Comment of Jewish Youth Climate Movement*, EPA-HQ-OAR-2025-0194-6533 (Sept. 22, 2025); *Comment of Massachusetts Interfaith Power and Light*, EPA-HQ-OAR-2025-0194-0593 (Sept. 3, 2025); *Comment of Our Children's Trust*, EPA-HQ-OAR-2025-0194-7017, at 1-2 (Sept. 22, 2025).

While litigation is pending, Youth Petitioners will face years of increased exposure to the effects of localized vehicle pollution, as manufacturers make near-term decisions about vehicle models that will remain on the road long after this case is resolved. These locked-in effects create imminent and irreparable harm that cannot be undone by a favorable court decision alone. Justice therefore requires EPA to stay the effective date of the Repeal Rule to prevent increased vehicle pollution and the resulting localized harms to Youth Petitioners.

## I.  Youth Petitioners' claims have a high likelihood of success on the merits.

The Repeal Rule infringes Youth Petitioners' fundamental constitutional rights[11] by adopting an agency "best reading" of Section 202 of the Clean Air Act that is contrary to their rights.[12] It further infringes on the Youth Petitioners' rights by characterizing the health and welfare impacts of vehicle GHG emission standards as "de minimis," despite record evidence demonstrating substantial and youth-specific harms.[13] Because EPA lacks a compelling interest in construing statutes in a way that results in constitutional injury, and because its economic bases for rescinding the vehicle standards are not necessary or narrowly tailored to achieve any compelling government interest, Youth Petitioners are likely to succeed on the merits.

First, Youth Petitioners' Fifth Amendment rights to life and liberty are infringed by the Repeal Rule's "best reading" of Section 202 and its unsupported "de minimis" conclusion. EPA infringes on their right to life when it exposes these children and youth to unnecessary and unsafe levels of pollution and when it lies about its dangers.[14] Moreover, Youth Petitioners have a fundamental liberty interest in being free from government endangerment of their health and personal security.[15] The Repeal Rule recognizes that GHG emissions from vehicles affect global climate change,[16] yet EPA's statutory reading disregards localized and cumulative effects of vehicle emissions, including co-pollutants, that produce concrete constitutional injuries. All Youth Petitioners face irreparable health and safety risks from the Repeal Rule.[17] For example, Petitioners Maya, Emma, and Elena have asthma, and more ICE vehicles under the Repeal Rule in the

---

[11] *Comment of Our Children's Trust*, EPA-HQ-OAR-2025-0194-7017, at 1-2 (Sept. 22, 2025) ("life; liberty; property; personal security; family autonomy; bodily integrity; the practice and transmission of cultural and religious traditions").

[12] *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 563 (2012) ("every reasonable construction must be resorted to, in order to save a statute from unconstitutionality" (quoting *Hooper v. California*, 155 U.S. 648, 657 (1895))).

[13] *See generally*, *id.*

[14] *See Guertin v. State*, 912 F.3d 907, 921 (6th Cir. 2019) (Knowingly or intentionally introducing life-threatening substances to individuals without their consent and then deceiving them about it violates due process.).

[15] *See, e.g.*, *Youngberg v. Romeo*, 457 U.S. 307, 315, 321, 324 (1982) (The Due Process Clause substantively protects the right to personal security as a "historic liberty interest."); *Helling v. McKinney*, 509 U.S. 25, 33-35 (1993) (risk to prisoners' future health from exposure to tobacco smoke); *see also Caetano v. Massachusetts*, 577 U.S. 411, 421 (2016) (Alito & Thomas, JJ., concurring) ("A State's most basic responsibility is to keep its people safe.").

[16] *Rescission of the Greenhouse Gas Endangerment Finding and Motor Vehicle Greenhouse Gas Emission Standards Under the Clean Air Act*, 91 Fed. Reg. 7686, 7730-31 (Feb. 18, 2026).

[17] All petitioners, or their guardians on their behalf, could testify to the harm they have experience because of GHG emissions, and localized harm they face in their respective communities.

3

metropolitan areas with dense traffic patterns they call home exacerbate their asthmatic symptoms to the detriment of their health and lives. Petitioner C.E., an eight-year-old, experiences daily spikes in air pollution near her school during heavy traffic, increasing her risk of developing asthma.[18] Vehicle-driven GHG emissions also contribute to dangerous local heat conditions, which have caused her to experience heat exhaustion when riding her bike in the summer.

Second, the Repeal Rule substantially burdens[19] Youth Petitioners Elena, J.K, M.D, R.D, and L.D.'s First Amendment free exercise of religion and interferes with their religious development and deeply held beliefs.[20] The Children Petitioners, in particular, seek to develop and follow the faith traditions of their parents, but increased vehicle GHG emissions will make it even more difficult to practice their religious traditions. For example, J.K., a Jewish youth, is unable to observe the Sabbath by walking to synagogue in extreme heat exacerbated by vehicle pollution. In his White Plains, New York community, increased ICE vehicle emissions contribute to ground-level ozone and heat entrapment, forcing him to choose between his health and the exercise of his religious beliefs. Likewise, M.D., a Muslim youth, also faces elevated ground-level ozone and heat entrapment in a worsening climate in Orange County, California, forcing her to choose between observing religious practices—including wearing hijab and fasting during Ramadan and other sacred times—and protecting her health.

Third, the Repeal Rule violates Tenth Amendment principles of federalism[21] harming Youth Petitioners Taylin and N.N.[22] These Petitioners enjoy a state-protected liberty interest of a "right to a clean and healthful environment" that "subsumes a right to a life-sustaining climate system" under Hawai'i's Constitution.[23] Hawai'i has adopted binding statutory[24] and judicial mandates[25] to eliminate GHG emissions from its transportation sector, including commitments that explicitly protect youth. The Clean Air Act reflects cooperative federalism.[26] Yet the Repeal Rule's "best reading" of Section 202 strips EPA of its authority to regulate GHGs under the 2009 Endangerment Finding, while simultaneously constraining states' ability to protect their citizens, which would be an unconstitutional interpretation of the Act. This interpretation, along with the rescinding of vehicle standards, alters the vehicle markets available to Hawai'i, undermining the

---

[18] EPA, *Climate Change and Children's Health and Well- Being in the United States*, EPA 430-R-23-001, at 36-38 (2023).

[19] *See* 42 U.S.C. § 2000bb-1; *Emp. Div., Dep't of Hum. Res. of Oregon v. Smith*, 494 U.S. 872, 878 (1990).

[20] *See Mahmoud v. Taylor*, 606 U.S. 522, 550 (2025).

[21] *Bond v. United States*, 572 U.S. 844, 862 (2014) (When interpreting a statute "the background assumption [is] that Congress normally preserves 'the constitutional balance between the National Government and the States.'").

[22] *Comment of Our Children's Trust*, EPA-HQ-OAR-2025-0194-7017, at 7 (Sept. 22, 2025) ("Many states have constitutions that require protection for human health and the environment and EPA's proposed approach also interferes with our constitutional structure under the Tenth Amendment.").

[23] *Matter of Maui Elec. Co., Ltd*., 506 P.3d 192, 202 n.15 (Haw. 2022).

[24] Haw. Rev. Stat. § 225P-5.

[25] *Navahine v. Dep't of Transp*., No. 1CCV-22-0000631, Joint Stipulation and Order re: Settlement (Haw. 1st Cir. Ct. June 20, 2024).

[26] 42 U.S.C.A. § 7543 (creating mechanism for states to create more restrictive vehicle standards to protect the health and safety of its citizen).

state's constitutional, statutory, and court-ordered obligations to protect Taylin and N.N. from climate-related harm.

Finally, the Repeal Rule cannot survive strict scrutiny. EPA's reliance on intervening case law and its asserted "lack of statutory authority" does not constitute a compelling governmental interest, particularly where constitutional violations result. Congress is presumed to intend statutory interpretations that avoid constitutional harm.[27] Nor does a compelling interest justify the rescission of the vehicle GHG emission standards. Even if economic impacts on certain regulated parties could qualify as compelling, EPA failed to narrowly tailor its response by eliminating the standards entirely rather than adjusting them based on a complete analysis that includes public health and welfare impacts and the constitutional rights of children and youth.[28]

## II. Youth Petitioners will suffer irreparable injury if the Repeal Rule goes into effect.

Youth Petitioners will suffer irreparable injury through both irreversible decision-making harms, false statements to the public about the dangers of GHGs and vehicle emissions, and through immediate and ongoing physical and constitutional harms. As the Repeal Rule reflects, EPA received comments from many vehicle and vehicle parts manufacturers demonstrating that fleet and model-year decisions are being made now and will be based on the regulatory landscape in the immediate future.[29] Absent the 2024 GHG Emission Standards Rules, manufacturers will build and sell more ICE vehicles while litigation is pending. This will not only lock in ICE vehicles sold while the litigation is pending but also extend past the litigation as future fleets are determined under the unlawful Repeal Rule. Those decisions will lock in increased emissions for the lifetime of those vehicles, which EPA measures as 15 years, extending well beyond the resolution of this case. Even a favorable court decision cannot unwind these reliance-based market shifts or eliminate the pollution from vehicles already placed on the road. In parallel, Youth Petitioners suffer immediate and ongoing harm to their constitutional rights as they experience increased localized pollution, heat, and associated health risks resulting from vehicle emissions. These harms are irreparable[30] and cannot be remedied after the Repeal Rule is vacated.

---

[27] *See Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Const. Trades Council*, 485 U.S. 568, 575 (1988).
[28] *Rescission of the Greenhouse Gas Endangerment Finding and Motor Vehicle Greenhouse Gas Emission Standards Under the Clean Air Act*, 91 Fed. Reg. 7686, 7732 (Feb. 18, 2026) (Repeal Rule only considered rescinded standards' effects on global mean surface temperature and global sea level rise).
[29] *See, e.g.*, *Comments of the Truck and Engine Manufacturers Association*, EPA-HQ-OAR-2025-0194-0888, at 1-2 (Sept. 22, 2025); *Comment of Tesla*, EPA-HQ-OAR-2025-0194-1009, at 4-5 (Sept. 22, 2025).
[30] *See Mills v. D.C.*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) ("It has long been established that the loss of constitutional freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.") (quotations omitted).

### III. The balance of equities favors the Youth Petitioners.

"There is generally no public interest in the perpetuation of unlawful agency action."[31] Thus, the balance of equities here strongly favors maintaining the status quo while judicial review proceeds. A stay imposes no new burdens on regulated parties beyond what the regulatory framework already requires. Nor does EPA suffer any harm. When it promulgated the 2009 Endangerment Finding, EPA took two years to compile scientific evidence in support of the finding, another eight months to issue a final rule after responding to comments, and the last 15 years to build a regulatory safety scheme. By contrast, EPA promulgated the Repeal Rule in less than six months,[32] not based on scientific information, but based on the President's policy preferences stated in his Executive Order 14154, which prefers ICE vehicles over electric vehicles.[33] Having elected to expedite a process that historically spans multiple years, EPA cannot plausibly claim prejudice from a delay necessary to permit meaningful judicial review.

Meaningful judicial review to protect the separation of powers is essential here as EPA is attempting to step into the shoes of both Congress and the Court by making new law and a judicial determination that its prior rule is legally infirm. Despite the Supreme Court's holding that such an Endangerment Finding was statutorily permissible, EPA relies on an application of the "major questions doctrine," which purportedly predates *Massachusetts v. EPA*.[34] The Repeal Rule thus invokes an unprecedented assertion of agency authority, well beyond its role in our tripartite system of government, by revising statutory interpretations in a manner that is "exclusively a judicial function."[35]

The public interest favors granting a stay because it prevents manufacturers from relying on the Repeal Rule to make irreversible decisions about vehicle models that will remain on the road for decades. Granting a stay preserves regulatory stability and prevents avoidable increases in air pollution while this case is pending. Critically, the public interest in protecting public health and welfare—particularly the health of young people, which includes the health of their organs and bodies and their religious practices, beliefs, and development—outweighs any speculative interest in immediate deregulation. Maintaining the existing standards during judicial review benefits Youth Petitioners and the public at large by avoiding increased localized pollution, heat, and related health harms nationwide.

---

[31] *Shawnee Tribe v. Mnuchin*, 984 F.3d 94, 102 (D.C. Cir. 2021).

[32] *See* Jeffrey Bossert Clark, Sr., Memorandum for Regulatory Policy Officers at Departments and Agencies and Managing and Executive Directors of Commissions and Boards, Executive Office of the President, Office of Management and Budget (May 5, 2025), https://www.whitehouse.gov/wp-content/uploads/2025/02/M-25-27-Guidance-Implementing-Section-6-of-Executive-Order-14154-Entitled-Unleashing-American-Energy.pdf.

[33] *Remarks on the Environmental Protection Agency's Rescission of the "Endangerment Finding" With Respect to Greenhouse Gas Emissions and an Exchange With Reporters*, 2026 DAILY COMP. PRES. DOC. (Feb. 12, 2026), https://www.presidency.ucsb.edu/documents/remarks-the-environmental-protection-agencys-rescission-the-endangerment-finding-with (characterizing Endangerment Finding as "one of the greatest scams in history" that was used to impose electric vehicles "that nobody wanted").

[34] *See W. Virginia v. Env't Prot. Agency*, 597 U.S. 697, 740 (2022) (Gorsuch, J., concurring).

[35] *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 387 (2024).

**IV.     Conclusion**

The Repeal Rule is unconstitutional and likely will be set aside after judicial review. Because Youth Petitioners will face irreparable harm if the Repeal Rule takes effect, they request a stay of the rule as justice so requires. Youth Petitioners request a prompt response to this request.

*/s/ Julia A. Olson*
Julia A. Olson (D.C. Cir. Bar 54969)
Andrea Rodgers (D.C. Cir. Bar 66983)
Brianna Rosier Kabwika
Nathan Bellinger
Laura Mebert
OUR CHILDREN'S TRUST
1216 Lincoln Street
Eugene, OR 97401
(415) 786-4825
julia@ourchildrenstrust.org
andrea@ourchildrenstrust.org
brianna_k@ourchildrenstrust.org
nate@ourchildrenstrust.org
laura_m@ourchildrenstrust.org

Daniel C. Snyder (D.C. Cir. Bar 66846)
Haley Nicholson (D.C. Cir. Bar 65084)
PUBLIC JUSTICE
1620 L Street NW, Suite 630
Washington, DC 20036
(202) 797-8600
dsnyder@publicjustice.net
hnicholson@publicjustice.net

# EXHIBIT 4



# ENVIRONMENTAL PROTECTION AGENCY

## 40 CFR Parts 85, 86, 600, 1036, 1037, and 1039

[EPA–HQ–OAR–2025–0194; FRL–12715–02–OAR]

**RIN 2060–AW71**

## Rescission of the Greenhouse Gas Endangerment Finding and Motor Vehicle Greenhouse Gas Emission Standards Under the Clean Air Act

**AGENCY:** Environmental Protection Agency (EPA)

**ACTION:** Final rule.

**SUMMARY:** In this action, the U.S. Environmental Protection Agency (EPA) is rescinding the Administrator's 2009 findings of contribution and endangerment and repealing all greenhouse gas (GHG) emission standards for light-duty, medium-duty, and heavy-duty vehicles and engines to effectuate the best reading of Clean Air Act (CAA) section 202(a)(1). The EPA determines that CAA section 202(a)(1) does not authorize the Agency to prescribe emission standards in response to global climate change concerns for multiple reasons, including the best reading of the statutory terms "air pollution," "cause," "contribute," and "reasonably be anticipated to endanger." This statutory interpretation is corroborated by application of the major questions doctrine. The EPA further determines that GHG emission standards for new motor vehicles and engines do not impact in any material way the public health and welfare concerns identified in the Administrator's prior findings in 2009. On these multiple and independent bases, the EPA concludes that it lacks statutory authority to regulate GHG emissions in response to global climate change concerns under CAA section 202(a)(1), and is not finalizing the additional bases for repeal set out in the proposed rule.

**DATES:** This final action is effective on April 20, 2026. The incorporation by reference of certain material listed in the action was approved by the Director of the Federal Register as of March 27, 2023, June 17, 2024, and June 21, 2024.

**ADDRESSES:**

*Docket:* The EPA has established a docket for this action under Docket ID No. EPA–HQ–OAR–2025–0194. Publicly available docket materials are available either electronically at *www.regulations.gov* or in hard copy at Air and Radiation Docket and Information Center, EPA Docket Center,

EPA/DC, EPA WJC West Building, 1301 Constitution Ave. NW, Room 3334, Washington, DC. For further information on EPA Docket Center services and the current status, please visit us online at *www.epa.gov/dockets.*

*Public Participation:* Docket: All documents in the docket are listed on the *www.regulations.gov* website. Although listed in the index, some information is not publicly available, *e.g.,* confidential business information (CBI) or other information whose disclosure is restricted by statute. Certain other material, such as copyrighted material, is not placed on the internet and will be publicly available only in hard copy form through the EPA Docket Center at the location listed in the **ADDRESSES** section of this document.

**FOR FURTHER INFORMATION CONTACT:** For information about this final action, contact Alan Stout, Transportation Sector Impacts and Standards Division, Office of Transportation and Air Quality, Environmental Protection Agency, 2000 Traverwood Drive, Ann Arbor, MI 48105; telephone number: (734) 214–4805; email address: *stout.alan@epa.gov.*

**SUPPLEMENTARY INFORMATION:**

*Preamble acronyms and abbreviations.* Throughout this document the use of "we," "us," or "our" is intended to refer to the EPA. We use multiple acronyms and terms in this preamble. While this list may not be exhaustive, to ease the reading of this preamble and for reference purposes, the EPA defines the following terms and acronyms here:

°C Degree Celsius
ABT Averaging, banking, and trading
ACC Advanced Clean Cars
ACT Advanced Clean Trucks
AEO Annual Energy Outlook
ANPRM Advanced notice of proposed rulemaking
APA Administrative Procedure Act
ASTM American Society for Testing and Materials
BEV Battery electric vehicle
BRICK Building Blocks for Relevant Ice and Climate Knowledge
CAA Clean Air Act
CAFE Corporate Average Fuel Economy
CBI Confidential Business Information
CFR Code of Federal Regulations
$CH_4$ Methane
CI Confidence interval
cm Centimeter
CO Carbon monoxide
$CO_2$ Carbon dioxide
$CO_2e$ Carbon dioxide equivalent
Cong. Rec. Congressional Record
CRA Congressional Review Act
CWG Climate Working Group
CY Calendar year
D.C. Circuit U.S. Court of Appeals for the District of Columbia Circuit

DHS U.S. Department of Homeland Security
DRIA Draft Regulatory Impact Analysis
EIA Energy Information Administration
EISA Energy Independence and Security Act
EPA U.S. Environmental Protection Agency
EPCA Energy Policy and Conservation Act of 1975
EV Electric vehicle
EVSE Electric vehicle supply equipment
E.O. Executive Order
FaIR Model Finite amplitude Impulse Response (v2.2.3) climate emulator model
FCEV Fuel cell electric vehicles
FEL Family emission limit
FIP Federal Implementation Plan
FR Federal Register
GHG Greenhouse gas
GMST Global mean surface temperature
GSLR Global sea level rise
GVWR Gross vehicle weight rating
H.R. Rep. House of Representative Report
HC Hydrocarbons
HD Heavy-duty
HDV Heavy-duty vehicle
HFC Hydrofluorocarbon
ICE Internal-combustion engine
ICEV Internal-combustion engine vehicles
ICR Information collection request
IPCC United Nations Intergovernmental Panel on Climate Change
IRA Inflation Reduction Act
LD Light-duty
LDV Light-duty vehicle
MAGICC Model for the Assessment of Greenhouse Gas Induced Climate Change
MD Medium-duty
MDV Medium-duty vehicle
MMT Million metric tons
MOVES EPA's MOtor Vehicle Emission Simulator
Mt Megatonnes
MY Model year
$N_2O$ Nitrous oxide
NAAQS National Ambient Air Quality Standards
NAS National Academy of Sciences
NASEM National Academies of Sciences, Engineering, and Medicine
NCA5 Fifth National Climate Assessment
NHTSA National Highway Traffic Safety Administration
$NMOG + NO_X$ Nonmethane organic gases and oxides of nitrogen
$NO_2$ Nitrogen dioxide
$NO_X$ Oxides of nitrogen
NTTAA National Technology Transfer and Advancement Act
$O_3$ Ozone
OBBB One Big Beautiful Bill Act
OBD Onboard diagnostics
OMB Office of Management and Budget
OMEGA Model Optimization Model for reducing Emissions of GHGs from Automobiles
PHEV Plug-in Hybrid Electric Vehicles
PFCs Perfluorocarbons
PM Particulate Matter
$PM_{2.5}$ Fine particulate matter
ppmv Parts per million by volume
PRA Paperwork Reduction Act
PSD Prevention of Significant Deterioration
Pub. L. Public Law
RESS Renewable Energy Storage System
RFA Regulatory Flexibility Act

RFS    Renewable Fuel Standard
RIA    Regulatory Impact Analysis
S. Rep.    Senate Report
SAB    Science Advisory Board
SCC    Social Cost of Carbon
SDWA    Safe Drinking Water Act
SF$_6$    Sulfur hexafluoride
SIP    State Implementation Plan
SO$_2$    Sulfur dioxide
SOx    Sulfur oxides
SSP2–4.5    Shared socioeconomic pathway 2 with a radiative forcing of 4.5 watts per square meter by 2100
Stat.    Statutes at Large
U.S.    United States
U.S.C.    U.S. Code
UMRA    Unfunded Mandates Reform Act
USGCRP    U.S. Global Change Research Program
VOCs    Volatile Organic Compounds
yr    Year

## Table of Contents

I. General Information
    A. Does this action apply to me?
    B. Where can I get a copy of this document and other related information?
    C. Judicial Review and Administrative Review
II. Executive Summary
    A. Introduction
    B. Need for Regulatory Action
    C. Summary of Comments and Updates From the Proposal in This Final Action
    1. Issues Raised Regarding the Rulemaking Process
    2. Updates From the Proposal in This Final Action
III. Background
    A. The EPA's Historical Approach to CAA Section 202(a)(1)
    B. Petitions for Rulemaking and Massachusetts v. EPA
    C. The 2009 Endangerment Finding
    D. Implementation of the 2009 Endangerment Finding
    E. Reconsideration of the 2009 Endangerment Finding
IV. Legal Framework for Action
    A. Rescission of the Endangerment Finding
    1. Issues Raised Regarding Rescission Authority

    2. Issues Raised Regarding Reliance Interests
    B. Repeal of New Motor Vehicle and Engine GHG Emission Standards
V. Rescission of the Endangerment Finding
    A. Best Reading of CAA Section 202(a)(1)
    1. Final Rationale
    2. Summary of Comments and Updates Since Proposal
    B. Lack of Clear Congressional Authorization
    1. Final Rationale
    2. Summary of Comments and Updates Since Proposal
    C. Eliminating GHG Emissions From Motor Vehicles and Engines Would Be Futile
    1. Final Rationale
    2. Summary of Comments and Responses and Updates to the Final Action
VI. Additional Proposed Bases for Rescission of the Endangerment Finding and Repeal of GHG Emission Standards the Agency Is Not Finalizing at This Time
    A. Climate Science Alternative Basis
    B. There Is No Requisite Technology for Light- and Medium-Duty Vehicles That Meaningfully Addresses the Identified Dangers of the Six "Well-Mixed" GHGs
    C. There Is No Requisite Technology for Heavy-Duty Vehicles That Addresses the Identified Dangers of the Six "Well-Mixed" GHGs
    D. More Expensive New Vehicles Prevent Americans From Purchasing New Vehicles That Are More Efficient, Safer, and Emit Fewer GHGs
VII. Repeal of New Motor Vehicle and Engine GHG Emission Standards
    A. Scope and Impacts of Repealing the GHG Emission Standards
    B. Light- and Medium-Duty Vehicle GHG Program
    1. Background on the Light- and Medium-Duty Vehicle GHG Program
    2. Summary of Comments and Updates to the Light- and Medium-Duty Programs
    3. Changes to the Light- and Medium-Duty Vehicle GHG Regulations
    C. Heavy-Duty Engine and Vehicle GHG Program
    1. Background on the Heavy-Duty Engine and Vehicle GHG Program

    2. Summary of Comments and Updates to the Heavy-Duty Engine and Vehicle Programs
    3. Changes to the Heavy-Duty Engine and Vehicle GHG Regulations
VIII. Statutory and Executive Order Reviews
    A. Executive Order 12866: Regulatory Planning and Review and Executive Order 14094: Modernizing Regulatory Review
    B. Executive Order 14192: Unleashing Prosperity Through Deregulation
    C. Paperwork Reduction Act (PRA)
    1. 2024 LD and MD Multi-Pollutant Emission Standards Rule
    2. 2024 HD GHG Emission Standards Rule
    3. Nonroad Compression-Ignition Engines and On-Highway Heavy-Duty Engines, Supporting Statement for Information Collection Request (March 2023 Revision)
    D. Regulatory Flexibility Act (RFA)
    E. Unfunded Mandates Reform Act (UMRA)
    F. Executive Order 13132: Federalism
    G. Executive Order 13175: Consultation and Coordination With Indian Tribal Governments
    H. Executive Order 13045: Protection of Children From Environmental Health Risks and Safety Risks
    I. Executive Order 13211: Actions Concerning Regulations That Significantly Affect Energy Supply, Distribution, or Use
    J. National Technology Transfer and Advancement Act (NTTAA) and 1 CFR Part 51
    K. Congressional Review Act (CRA)

## I. General Information

### A. Does this action apply to me?

This action relates to companies that manufacture, sell, or import into the United States light-, medium-, or heavy-duty motor vehicles and engines. Potentially affected categories and entities include the following:

| NAICS Code[a] | NAICS Title |
|---|---|
| 336110 | Automobile and Light Duty Motor Vehicle Manufacturing |
| 336120 | Heavy Duty Truck Manufacturing |
| 336211 | Motor Vehicle Body Manufacturing |
| 336213 | Motor Home Manufacturing |
| 336310 | Motor Vehicle Gasoline Engine and Engine Parts Manufacturing |
| 336390 | Other Motor Vehicle Parts Manufacturing |
| 333618 | Other Engine Equipment Manufacturing |
| 423110 | Automobile and Other Motor Vehicle Merchant Wholesalers |
| 811198 | All Other Automotive Repair and Maintenance |

[a] NAICS Association. NAICS & SIC Identification Tools. Available online: *https://www.naics.com/search.*

This table is not intended to be exhaustive but rather provides a guide for readers regarding entities potentially affected by this action. This table lists the types of entities that the EPA is presently aware could potentially be affected by this action. Other types of entities not listed in the table could also be affected. To determine whether your entity is regulated by this action, you should carefully examine the applicability criteria found in Code of

Federal Regulations (CFR) Title 40, parts 85, 86, 600, 1036, and 1037. If you have questions regarding the applicability of this action to a particular entity, consult the person listed in the **FOR FURTHER INFORMATION CONTACT** section.

*B. Where can I get a copy of this document and other related information?*

In addition to being available in the docket, an electronic copy of this final action is available on the internet at *https://www.epa.gov/regulations-emissions-vehicles-and-engines/final-rule-rescission-greenhouse-gas-endangerment.* Following publication in the **Federal Register**, the EPA will post the **Federal Register** version of the final action and key technical documents at this same website.

*C. Judicial Review and Administrative Review*

Under CAA section 307(b)(1), judicial review of this final action is available only by filing a petition for review in the United States Court of Appeals for the District of Columbia Circuit (D.C. Circuit) by April 20, 2026. Under CAA section 307(b)(2), the requirements established by this final action may not be challenged separately in any civil or criminal proceedings brought by the EPA to enforce the requirements.

CAA section 307(d)(7)(B) further provides that "[o]nly an objection to a rule or procedure which was raised with reasonable specificity during the period for public comment (including any public hearing) may be raised during judicial review." This section also provides a mechanism for the EPA to convene a proceeding for reconsideration "[i]f the person raising an objection can demonstrate to the EPA that it was impracticable to raise such objection within [the period for public comment] or if the grounds for such objection arose after the period for public comment, (but within the time specified for judicial review) and if such objection is of central relevance to the outcome of the rule." Any person seeking to make such a demonstration to us should submit a Petition for Reconsideration to the Office of the Administrator, U.S. Environmental Protection Agency, Room 3000, WJC South Building, 1200 Pennsylvania Ave. NW, Washington, DC 20460, with a copy to both the person(s) listed in the preceding **FOR FURTHER INFORMATION CONTACT** section, and the Associate General Counsel for the Air and Radiation Law Office, Office of General Counsel (Mail Code 2344A), U.S. Environmental Protection Agency, 1200 Pennsylvania Ave. NW, Washington, DC 20460.

## II. Executive Summary

*A. Introduction*

In this final action, the EPA rescinds the Administrator's 2009 standalone decision entitled "Endangerment and Cause or Contribute Findings for Greenhouse Gases Under Section 202(a) of the Clean Air Act," 74 FR 66496 (Dec. 15, 2009) ("Endangerment Finding") and repeals all GHG emission standards for light-duty (LD), medium-duty (MD), and heavy-duty (HD) vehicles and engines manufactured or imported into the United States (U.S.) for model years (MY) 2012 to 2027 and beyond. Upon review of the underlying actions, recent decisions by the U.S. Supreme Court, and the robust public response to the proposal, the EPA concludes that we lack statutory authority to maintain this novel and transformative regulatory program. The appropriate policy response to global climate change concerns is a decision vested in Congress, and Congress did not decide the Nation's policy response to these concerns when it enacted CAA section 202(a)(1) to address domestic air pollution problems nearly sixty years ago, or in any subsequent amendment thereto. Relatedly, the EPA concludes that regulating GHG emissions from new motor vehicles and engines under CAA section 202(a)(1) has no material impact on global climate change concerns animating the Agency's regulatory efforts since 2009, much less the adverse public health or welfare impacts attributed to such global climate trends. Climate impact modeling submitted during the public comment period, and confirmed by our own analysis, demonstrates that even the complete elimination of all GHG emissions from all new and existing vehicles in the U.S. would have only *de minimis* impacts that fall well within the standard margin of error for global temperature and sea level measurement. This evidence further supports our conclusion that the regulation of GHG emissions falls outside the scope of air pollution problems Congress addressed when enacting CAA section 202(a)(1) and, separately, leads us to conclude that maintaining GHG emission standards under CAA section 202(a)(1) would be unreasonable given their futility and the immense burdens they place on regulated parties, consumers, and the economy.

The EPA recognizes the gravity of this decision to the many stakeholders who submitted comments for and against to the proposal, including with respect to global climate change concerns and the burdens of our GHG regulatory program on manufacturers, auto workers, and American consumer choice and affordability. We closely reviewed the diverse array of scientific and technical information submitted in response to the proposal. The Administrator continues to harbor concerns regarding the scientific analysis contained in the Endangerment Finding, including because the decision severed the statutory analysis in multiple respects to assert the power to regulate GHG emissions in response to global climate change concerns. However, the Administrator is not basing this action on a new finding under CAA section 202(a)(1). Rather, we conclude that the EPA lacks statutory authority to resolve these questions under CAA section 202(a)(1). As recently as 2008, the Agency correctly understood that the statute was enacted to control air pollution that threatens health and welfare through local and regional exposure, and that launching a GHG emissions program under this authority would result in an unprecedented expansion of regulatory power with profound adverse effects on the economy and American households. With this final action, we return to fundamental principles governing decision-making within our democratic system: "Agencies have only those powers given to them by Congress," *West Virginia* v. *EPA,* 597 U.S. 697, 723 (2022), and "the scope of an agency's own power" is determined not by deference to asserted expertise, but by "the best reading of the statute," which is fixed at the time of enactment. *Loper Bright Enters.* v. *Raimondo,* 603 U.S. 369, 400–01 (2024).

In 2009, the EPA took the unprecedented step of asserting authority to regulate GHG emissions in a standalone action that broke new ground and launched the Agency into a course of regulation that fundamentally reshaped many aspects of the Nation's economic and social life.[1] In the Endangerment Finding, we interpreted CAA section 202(a)(1) for the first time to authorize regulation of domestic emissions from new motor vehicles and engines based on global climate change concerns rather than air pollution that endangers public health or welfare

---

[1] *See also* "Endangerment and Cause or Contribute Findings for Greenhouse Gases Under Section 202(a) of the Clean Air Act: EPA's Response to Public Comments" ("EF RTC"), available in a Memorandum to Docket entitled "EPA's Response to Public Comments on the 2009 Endangerment and Cause or Contribute Findings for Greenhouse Gases: Volumes 1–11," Document ID EPA–HQ–OAR–2025–0149.

through local or regional exposure. 74 FR 66526–27. We relied on that interpretation to define both the relevant ''air pollution'' and the relevant ''air pollutant'' as the combination of six ''well-mixed GHGs''—carbon dioxide ($CO_2$), methane, nitrous oxide ($N_2O$), hydrofluorocarbons (HFCs), perfluorocarbons (PFCs), and sulfur hexafluoride ($SF_6$)—while reserving the right to include additional ''climate forcers'' in these definitions in the future. 74 FR 66516–17, 66536–37. We also asserted that because the statute is ''silent on [the] issue,'' CAA section 202(a)(1) grants ''procedural discretion'' to issue standalone findings that trigger a duty to regulate without considering the standards that must be issued in response. 74 FR 66501–02. The Administrator exercised this newfound discretion to make separate findings, without analyzing or promulgating any emission standards, that elevated global concentrations in the upper atmosphere of the six ''well-mixed GHGs'' constitute ''air pollution'' that may reasonably be anticipated to endanger public health and welfare, 74 FR 66516–36, and that GHG emissions from all potential classes of motor vehicles and engines contribute to such elevated global concentrations of GHGs in the upper atmosphere and therefore to air pollution that endangers public health and welfare, 74 FR 66536–45.

With respect to endangerment, the Administrator found that global concentrations of six ''well-mixed'' GHGs from all foreign and domestic sources ''constitute the largest anthropogenic driver of climate change'' and attributed climate change impacts to global GHG concentrations. 74 FR 66517. Next, the Administrator summarized literature reviews finding that climate change ''can increase the risk of morbidity and mortality'' indirectly through increased global temperature, air quality effects, and effects on extreme weather events and can impact welfare indirectly through impacts on sea level rise and coastal areas, food production and agriculture, forestry, water resources, energy, infrastructure, and settlements, and ecosystems and wildlife. 74 FR 66523–35. On that basis, the Administrator found that global concentrations of six ''well-mixed'' GHGs constitute ''air pollution'' that endangers public health and welfare. 74 FR 66516. For purposes of this preamble, we use the phrase ''global climate change concerns'' to refer to the public health and welfare risks the Administrator associated with global climate change in the

Endangerment Finding and subsequent actions since 2009.

With respect to causation or contribution, the Administrator used annual emissions data for existing motor vehicles and engines from 2005 to project that all potential classes of new motor vehicles and engines would emit four GHGs—$CO_2$, methane, $N_2O$, and HFCs—that collectively amounted to 4.3 percent of annual global GHG emissions and implicitly would continue in future years. 74 FR 66543. The Administrator acknowledged that a greater degree of contribution would usually be required to meet the statute's contribution element ''when addressing a more typical local or regional air pollution problem.'' 74 FR 66539. Nevertheless, asserting discretion to interpret the ambiguous term ''contribute,'' the Administrator found that the ''unique'' nature of global climate change meant that ''contributors must do their part even if their contributions to the global climate change problem, measured in terms of percentage, are smaller than typically encountered when tackling solely regional or local environmental issues.'' 74 FR 66542–43. In other words, the Administrator justified the Endangerment Finding on the theory that although the situation was ''unique'' and the ''contribution'' of domestic new motor vehicles and engines was not in line with the Agency's prior course of regulation under CAA section 202(a)(1), action was needed because all source categories and all other nations must ''do their part'' to avoid ''a tragedy of the commons.'' *Id.* On that basis, the Administrator found that annual emissions from new motor vehicles and engines ''contributed'' to the ''air pollution,'' defined anew for those purposes as the accumulated global concentrations of the six ''well-mixed'' GHGs, that endangered public health and welfare by giving rise to global climate change concerns. 74 FR 66537.

The EPA subsequently relied on the Endangerment Finding to impose increasingly stringent GHG emission standards for new motor vehicles and engines and to attempt, largely without success, to extend the GHG initiative into additional CAA programs. In *Utility Air Regulatory Group* v. *EPA,* 573 U.S. 302 (2014) (*UARG*), the Supreme Court largely rejected our attempt to extend GHG emission standards to stationary sources subject to Title I and Title V requirements as exceeding our authority under the CAA, including because we admitted that applying the statutory scheme as written to GHG emissions from most covered stationary sources would be unworkable and attempted to

rewrite the statute by regulation. And in *West Virginia* v. *EPA,* 597 U.S. 697 (2022), the Court vacated our attempt to shift the power grid away from using fossil fuels through GHG standards for existing power plants under CAA section 111(d). The Court held in both cases that the agency actions at issue implicated the major questions doctrine and that Congress must clearly authorize agencies to take actions that decide major questions of policy. Nevertheless, the EPA continued to retain and expand GHG emission standards for new motor vehicles and engines that impose billions of dollars in annual compliance costs on American businesses and consumers and reflect an increasing trend toward forcing a transition to the use of electric vehicles (EVs) rather than gasoline- or diesel-fueled motor vehicles and engines.[2] Meanwhile, global GHG concentrations in the upper atmosphere have continued to rise, driven primarily by increased emissions from foreign sources,[3] all without producing the degree of adverse impacts to public health and welfare in the U.S. anticipated in the 2009 Endangerment Finding.[4]

Upon reconsideration, the EPA now acknowledges that the Endangerment Finding and subsequent regulations exceeded the Agency's statutory authority under CAA section 202(a)(1). These actions rested on a profound misreading of the Supreme Court's decision in *Massachusetts* v. *EPA,* 549 U.S. 497 (2007), which vacated the denial of a petition for rulemaking in

[2] The EPA is not relying on the Regulatory Impact Analysis (RIA) prepared pursuant to Executive Order (E.O.) 12866 in any of the bases for this final action. Except where expressly stated, none of the legal bases for repeal in section V of this preamble reflect cost considerations, which are not relevant for purposes of this final action in determining the best reading of CAA section 202(a)(1). For the limited instances in which cost is relevant as a general consideration, we discuss cost separately from, and do not rely upon, the RIA prepared pursuant to E.O. 12866.

[3] Crippa, M. et al. (2023). GHG emissions of all world countries. *Publications Office of the European Union: https://doi.org/10.2760/953322.*

[4] The EPA is not relying on new findings by the Administrator with respect to global climate change concerns under CAA section 202(a)(1) as a basis for the rescission or repeals and is not finalizing the alternative basis set out in section IV.B of the preamble to the proposed rule. We are rescinding the Endangerment Finding and repealing all associated GHG emission standards for the reasons discussed in this preamble, which make it unnecessary and inappropriate to resolve outstanding scientific questions regarding global climate change concerns in the regulatory context of CAA section 202(a)(1). Nevertheless, the bases for this final action should not be understood as an additional endorsement or ratification of the scientific analysis in the Endangerment Finding. *See* section VI.A of this preamble for further discussion.

which we concluded that $CO_2$ and three other GHGs fell outside the statutory definition of ''air pollutant'' in CAA section 302(g) and should not be regulated for additional policy reasons. As we later explained in a 2008 advance notice of proposed rulemaking entitled ''Regulating Greenhouse Gas Emissions Under the Clean Air Act,'' the statute was ''enacted to control regional pollutants that cause direct health effects,'' and regulating GHG emissions under its provisions ''could result in an unprecedented expansion of EPA authority that would have a profound effect on virtually every sector of the economy and touch every household in the land.'' 73 FR 44354, 44355 (July 30, 2008) (''2008 ANPRM''). Intervening legal developments reinforce our conclusion that Congress did not decide the Nation's policy response to global climate change concerns in CAA section 202(a)(1), let alone clearly authorize the EPA to make that policy choice by prescribing emission standards that force a transition to EVs. Nor does climate impact modeling suggest that the EPA's initiative has been anything but futile, which further supports the conclusion that CAA section 202(a)(1) was not designed with such a problem in mind. The inability of the EPA's GHG emission standards to materially impact the identified risks both corroborates the interpretation of CAA section 202(a)(1) adopted in this final action and serves as an independent basis to revoke those standards, separate and apart from the question of statutory interpretation and of the nature of the EPA's authority under this provision.

The remainder of this section describes the need for regulatory action and the scope of this final action, the repeal of new motor vehicle and engine GHG emission standards for MYs 2012 to 2032 and beyond, and minor conforming adjustments to unrelated emission standards for new motor vehicles and engines that we are not altering as part of this rulemaking. We acknowledge that the EPA's decision to regulate new motor vehicle and engine GHG emissions has caused significant expenditure of resources by, and an imposition of burdens on, Federal, State, local, and private-sector entities, and consider those interests to the extent possible consistent with limits on our statutory authority. These interests emphasize the need for urgent action to avoid further expenditures in reliance on an unlawful regulatory framework that does not further public health or welfare in any material respect relevant to the global climate change concerns

identified and relied upon in the 2009 Endangerment Finding.

Section III of this preamble sets out relevant background, including the EPA's prior positions on regulating GHGs, the Supreme Court's decision in *Massachusetts,* the EPA's response in the 2008 ANPRM and events leading up to the Endangerment Finding, the approach taken in the Endangerment Finding, and the regulations issued by the EPA since 2009 as a result of the Endangerment Finding. We also summarize the premises, assumptions, and conclusions in the Endangerment Finding and the developments since 2009 that led the Administrator to develop concerns sufficient to initiate reconsideration of the ongoing validity and reliability of the Endangerment Finding in early 2025.

Section IV of this preamble describes our legal authority to rescind the Endangerment Finding and repeal the resulting GHG emission standards issued under CAA section 202(a)(1). Because this final action does not impact fuel economy standards or emission standards for criteria pollutants and hazardous air pollutants regulated under the CAA, we explain the relationship between these regulations to set the outer bounds of the amendments at issue in this rulemaking. We summarize comments received on our authority for this final action, which largely acknowledged that the EPA may reconsider the prior actions covered by this rulemaking provided that we offer an adequate basis for the rescission and repeals, along with our responses to these comments.

Section V.A of this preamble finalizes the rescission and repeals of these prior actions on the basis that the Endangerment Finding exceeded our statutory authority under CAA section 202(a)(1). First, we conclude that the term ''air pollution'' as used in CAA section 202(a)(1) is best read in context as pollution that threatens health or welfare through local or regional exposure, consistent with the ordinary meaning of the term at the time of enactment, the statute's structure and history, and the EPA's longstanding practice before 2009. Second, we conclude that CAA section 202(a)(1) does not grant the Administrator ''procedural discretion'' to issue standalone findings that trigger a duty to regulate without analyzing and promulgating the required emission standards, or, conversely, to prescribe standards without making the requisite findings for the air pollutant emissions and class or classes of new motor vehicles or engines at issue. Third, we conclude that CAA section 202(a)(1)

does not authorize the Administrator to sever the finding of endangerment from the finding of causation or contribution such that there is no nexus between the emissions at issue and the identified dangers to public health or welfare. Rather, CAA section 202(a)(1) requires the Administrator to find that the relevant air pollutant emissions from the class or classes of new motor vehicles or engines at issue cause, or contribute to, the same air pollution that the Administrator finds endangers public health or welfare, without relying on international emissions not covered by the statute. As the Supreme Court made clear in *Loper Bright,* we can no longer rely on statutory silence or ambiguity to expand our regulatory power. We also explain that the EPA reached contrary conclusions in the Endangerment Finding by redefining key statutory terms and misconstruing the Supreme Court's decision in *Massachusetts,* which, even on its own terms, did not purport to require the Agency to launch a GHG regulatory program under CAA section 202(a)(1). We briefly summarize the public comments received for and against this interpretation, including with respect to the meaning of ''air pollution'' in context and the scope of *Massachusetts,* as well as our general responses to these comments.

Section V.B of this preamble finalizes the rescission and repeals on the additional basis that the Nation's potential response to global climate change concerns is an issue that has significant economic and policy impacts, including to Americans' basic way of life, that Congress did not clearly authorize the EPA to decide by invoking authority to prescribe emission standards under CAA section 202(a)(1). We conclude, consistent with *West Virginia, UARG,* and other relevant precedents, that the Nation's policy response to global climate change concerns is a question for Congress to decide in the first instance. Because nothing in the statute clearly authorizes the Administrator to assert the power to resolve this major question by prescribing emission standards, let alone by mandating a shift toward EVs, we conclude that CAA section 202(a)(1) does not authorize the Endangerment Finding or subsequent regulations. We briefly summarize public comments received for and against this invocation of the major questions doctrine, including the assertion by some commenters that *Massachusetts* shields CAA section 202(a)(1) from this analysis, and our general responses to these comments.

Section V.C of this preamble sets out the robust public response to our request for comments on the efficacy of new motor vehicle and engine GHG emission standards in addressing the global climate change concerns animating the Endangerment Finding and subsequent regulations. We summarize the climate impact modeling submitted by commenters and the updated modeling we performed to evaluate the competing data and conclusions received. As explained below, we conclude that even the complete elimination of all GHG emissions from all new and existing LD, MD, and HD vehicles in the U.S. would not alter predicted trends in global mean surface temperature (GMST) [5] or global mean sea level rise (GSLR) [6] beyond *de minimis* levels that are below the accepted variability in GMST and GSLR measurement. Assuming for purposes of this final action the validity and the uncertainties inherent in the relevant models, the EPA estimates that the elimination of all U.S. vehicle and engine GHG emissions would result in an approximately 0.013 degree Celsius (°C) difference in GMST increase by 2050 compared to the baseline and an approximately 0.037 °C difference by 2100 compared to the baseline. Using similar methods, we estimate that this scenario would result in an approximately 0.09-centimeter (cm) difference in GSLR by 2050 compared to the baseline and an approximately 1.40 cm difference by 2100 compared to the baseline. For context, variability in GMST measurement from 2016 to 2025 was 0.14 °C, which is almost four times greater than the modeled GMST impact by 2100 of eliminating all U.S. vehicle and engine GHG emissions.[7]

Importantly, this scenario is a dramatic overestimation of the potential impacts of GHG emission standards, which apply only to new vehicles and engines and do not eliminate emissions from existing vehicles. Taking this reality into account, the anticipated impact of GHG emission standards under CAA section 202(a)(1) is a further fraction of the modeled impacts of

eliminating all U.S. vehicle and engine GHG emissions. Under an illustrative scenario in which the modeled impacts are discounted by 50 percent, which generally reflects the emission reductions requirements of the EPA's most recent 2024 LD and MD Multi-Pollutant Emission Standards Rule and 2024 HD GHG Emission Standards Rule (together, 2024 GHG Emission Standards Rules) that further restricted GHG emissions from MY 2027 levels for MY 2032 and beyond, we estimate an approximately 0.007 °C difference in GMST increase by 2050 and 0.019 °C by 2100 and an approximately 0.005 cm difference in GSLR by 2050 and 0.7 cm by 2100, all of which amount to one percent or less of the total projected change from the baseline. We conclude that these impacts are *de minimis* and that the futility of GHG emission standards under CAA section 202(a)(1) further supports the understanding that Congress did not design that provision to authorize or require the Administrator to prescribe standards in response to global climate change concerns. In addition, we conclude that the futility of the GHG emission standards renders maintaining such regulations unreasonable, separate and apart from the validity of the Endangerment Finding, because the enormous costs imposed do not materially further public health or welfare. Under any legal standard, it is unreasonable for the EPA to impose trillions of dollars in costs on manufacturers and American consumers in exchange for results that do not materially further congressional objectives—at least absent an extraordinarily clear indication in the statutory text. We briefly summarize public comments received on these aspects of the proposal and set out our general responses, including the assertion by some commenters that *Massachusetts* requires EPA to ignore the practical effect of its regulations when making findings under CAA section 202(a)(1) and when promulgating the regulations required by such findings.

Section VI of this preamble describes the additional bases in the proposal that we are not finalizing in this action, including the alternative basis in section IV.B of the preamble to the proposed rule that the Administrator exercise discretion under CAA section 202(a)(1) to rescind the Endangerment Finding and repeal associated regulations by making a superseding finding. We received comments in support of this alternative basis, including from commenters asserting that the EPA

compiled and analyzed the scientific record unreasonably in 2009 by severing the analysis of endangerment and contribution and issuing findings separately from emission standards and from commenters asserting that the scientific record did not then, or does not now, provide the certainty necessary to make such findings. We also received comments in opposition to this alternative basis, including from commenters asserting that the scientific record supporting the findings is ''overwhelming'' and has been strengthened in the intervening years. Although the Administrator continues to harbor concerns regarding many of the scientific inputs and analyses underlying the Endangerment Finding, we are not finalizing this alternative given our conclusion that the EPA lacks statutory authority to regulate in response to global climate change concerns under CAA section 202(a)(1). The legal interpretation finalized in this action means that we cannot resolve remaining scientific controversies in this regulatory context and renders it unnecessary and inappropriate to invoke the Administrator's authority to exercise judgment on these questions under that provision.[8] Furthermore, we explain that we are not finalizing several of the additional bases for repealing GHG emission standards set out in section V of the preamble to the proposed rule, which are similarly unnecessary given the predicate conclusion on the scope of our authority under CAA section 202(a)(1). We briefly summarize the input received on these alternatives in the interests of transparency and public engagement but are not responding to comments on these specific issues, which are outside the scope of the bases for this final action.

Section VIII of this preamble details the scope of the repeals, including its relationship to distinct regulatory programs and Federal preemption, the revisions to 40 CFR parts 85, 86, 600, 1036, 1037, and 1039 required to effectuate repeal of all new motor vehicle and engine GHG emission standards, and conforming adjustments to regulatory provisions that we did not reopen or propose to substantively revise. Specifically, we are not changing

---

[5] As GMST is a widely used metric for tracking temperature changes related to global climate change concerns, we use the term interchangeably with ''global temperature'' within this preamble and supporting documentation.

[6] As GSLR is a widely used metric for tracking sea level rise related to global climate change concerns, we use the term interchangeably with ''global sea level,'' ''sea level,'' and ''sea level rise'' within this preamble and supporting documentation.

[7] NOAA National Centers for Environmental Information, *Climate at a Glance: Global Time Series,* NOAAGlobalTemp, (Jan. 2026) *available at https://ncei.noaa.gov/access/monitoring/climate-at-a-glance/global/time-series/globe/land_ocean/tavg/ytd/12/1950-2025.*

[8] For similar reasons, and in light of concerns raised by some commenters about the draft report authored by the U.S. Department of Energy's Climate Working Group (CWG), the EPA is not relying on the May 27, 2025 CWG draft report entitled ''Impact of Carbon Dioxide Emissions on the U.S. Climate'' or the July 23, 2025 CWG report entitled ''A Critical Review of Impacts of Greenhouse Gas Emissions on the U.S. Climate'' for any aspect of this final action.

elements of the regulations that are necessary for programs unrelated to the GHG emission standards, including emission standards for criteria pollutants, emission standards for hazardous air pollutants, or regulatory provisions related to the EPA's statutory role in vehicle fuel-economy standards administered by the National Highway Traffic Safety Administration (NHTSA).

As explained in detail below, the conclusions presented in sections V.A, V.B, and V.C of this preamble provide independent grounds for rescinding the 2009 Endangerment Finding and repealing the GHG emission standards. Moreover, the conclusions in section V.A of this preamble—that ''air pollution'' as used in CAA section 202(a)(1) is best read as pollution that threatens public health or welfare through local or regional exposure; that the Administrator cannot trigger the duty to regulate without analyzing and promulgating standards; and that the finding of endangerment cannot be severed from the finding of causation of contribution—are all also independent conclusions that stand on their own. Each basis for this final action presented in section V of this preamble is severable, and each basis alone provides sufficient justification to rescind the Endangerment Finding and repeal the GHG emission standards for new motor vehicles and engines. If any basis is determined in the course of judicial review to be invalid, that partial invalidation will not affect the other bases, and the EPA intends the remainder of this final action stand on the remaining basis or bases.

This preamble includes an overview of the EPA's rationale, including several technical documents developed in support of this final action, as well as summaries of comments received during the public hearing on the proposal, additional consultation and listening sessions, and via the rulemaking docket. For a full summary of comments received and our complete responses thereto, please see the ''Response to Comments'' document available in the docket for this rulemaking.[9] The final Regulatory Impact Analysis (RIA) for this rulemaking, on which we did not rely for any aspect of this final action, is also available in the docket for this rulemaking.[10]

### B. Need for Regulatory Action

Immediately upon taking office in 2025, President Trump established as the policy of the United States new Executive Branch priorities for energy, transportation, and consumer choice and committed agencies to ensuring regulations remain within constitutional and statutory bounds. On January 20, 2025, the President issued E.O. 14154, entitled ''Unleashing American Energy,'' to address the burdens placed by unnecessary regulations on energy affordability, job creation, and national security.[11] The President directed the Administrator to submit recommendations to the Director of the Office of Management and Budget (OMB) on the legality and continuing applicability of the 2009 Endangerment Finding.[12] On February 19, 2025, the President issued E.O. 14219, entitled ''Ensuring Lawful Governance and Implementing the President's 'Department of Government Efficiency' Deregulatory Initiative,'' which further instructed agencies, including the EPA, to review existing regulations for consistency with the Constitution and the best reading of the authorizing statute.[13]

Upon confirmation by the Senate, Administrator Lee Zeldin committed the EPA to prioritizing its core statutory missions and ensuring that all regulatory actions are clearly grounded in statutory authority and the best reading of the law. As part of these efforts, and consistent with E.O. 14154, the Administrator initiated a review of the legality and applicability of the Endangerment Finding. On February 19, 2025, the Administrator submitted a memorandum to the OMB Director recommending that the EPA reconsider the Endangerment Finding to address legal and scientific developments that appeared to undermine the bases for that action and subsequent regulations.[14] The Administrator noted that recent Supreme Court decisions, including *Loper Bright, West Virginia, UARG,* and *Michigan* v. *EPA,* 576 U.S. 743 (2015), provided further instruction as to how we should interpret and apply the statutes Congress entrusted us to

administer.[15] The Administrator further noted that the Endangerment Finding recognized significant uncertainties in its conclusions and assumptions that should be evaluated in light of more recent empirical data and scientific evidence.[16] Accordingly, the Administrator announced on March 12, 2025, that the EPA would reconsider the Endangerment Finding and subsequent actions to determine whether our GHG regulations have an adequate statutory basis and to seek public input on developments since 2009.[17]

On July 29, 2025, the Administrator signed a proposed rule setting out the results of the EPA's reconsideration to date and proposing to rescind the Endangerment Finding and repeal all GHG emission standards for LD, MD, and HD new motor vehicles and engines promulgated since 2009 under CAA section 202(a)(1). ''Reconsideration of 2009 Endangerment Finding and Greenhouse Gas Vehicle Standards,'' 90 FR 36288 (Aug. 1, 2025). We proposed that the term ''air pollution'' in CAA section 202(a)(1) is best read in context as referring to pollution that threatens public welfare through local or regional exposure, consistent with historical practice and principles of proximate cause, such that the EPA's regulatory authority does not extend to global climate change concerns. Relatedly, we proposed that the major questions doctrine applies to the question whether the EPA may decide the Nation's policy response to global climate change concerns and that Congress did not clearly delegate that decision when it authorized the Agency to prescribe emission standards for new motor vehicles and engines. We also proposed that the Endangerment Finding departed from the statute in additional ways by asserting ''procedural discretion'' to issue findings separately from the required standards and severing the question whether GHG emissions from motor vehicles and engines contribute to increases in global GHG concentrations from the question whether cumulative global GHG concentrations endanger public health and welfare.

In the alternative, we proposed that the Administrator exercise discretion under CAA section 202(a)(1) to issue a new finding that the conclusions reached in the Endangerment Finding

[9] ''Rescission of the Greenhouse Gas Endangerment Finding and Motor Vehicle Greenhouse Gas Emission Standards Under the Clean Air Act: Response to Comments.'' EPA 420–R–26–003. February 2026.

[10] ''Rescission of the Greenhouse Gas Endangerment Finding and Motor Vehicle Greenhouse Gas Emission Standards Under the

Clean Air Act: Regulatory Impact Analysis.'' EPA–420–R–26–002. February 2026.

[11] Executive Order 14154, 90 FR 8353 (Jan. 29, 2025).

[12] *Id.* section 6(f).

[13] Executive Order 14219, 90 FR 10583 (Feb. 25, 2025).

[14] Memorandum from Lee Zeldin, Administrator, U.S. Environmental Protection Agency, to Russell Vought, Director, Office of Management and Budget (Feb. 19, 2025) (Feb. 19, 2025 Memo), available in the docket for this rulemaking.

[15] *Id.* at 1.

[16] *Id.* at 8.

[17] ''Trump EPA Kicks Off Formal Reconsideration of Endangerment Finding with Agency Partners'' (Mar. 12, 2025), *available at https://www.epa.gov/newsreleases/trump-epa-kicks-formal-reconsideration-endangerment-finding-agency-partners.*

are not supported by the scientific record, including because the EPA unreasonably compiled and analyzed the record in 2009 and because intervening developments have cast significant doubt on the Endangerment Finding's core premises and assumptions. For example, we proposed that data from 2009–2024 demonstrate that many of the predictive analyses relied upon in the Endangerment Finding were overly pessimistic and underestimated the ability of natural processes to compensate for the identified trends.

Finally, we proposed three alternative bases to repeal the GHG emission standards separate and apart from the proposed rescission of the Endangerment Finding. First, we proposed that there is no "requisite technology," as required for emission standards to go into effect under CAA section 202(a)(2), that is capable of having a measurable impact on the global climate change concerns that were the basis of the Endangerment Finding. Second, we proposed that the Agency's GHG regulatory program is futile because emissions from covered vehicles have a *de minimis* impact on global climate change concerns and that this consideration bears on the proper interpretation and implementation of CAA section 202(a)(1). Third, we proposed that the GHG emission standards harm public health and welfare on balance by increasing prices and decreasing consumer choice, thereby slowing the replacement of older vehicles that are less safe and emit a greater volume and variety of air pollutants. We sought comment on these and additional issues throughout the proposal, including the EPA's authority to reconsider and rescind the Endangerment Finding, relevant data and information bearing on the efficacy of the GHG emission standards, and any additional reasons we should consider for repealing or retaining the Endangerment Finding and associated regulations.

## C. Summary of Comments and Updates From the Proposal in This Final Action

This final action is informed by the significant public input received from a diverse array of stakeholders since publication of the proposal in the **Federal Register** on August 1, 2025. The EPA extended the original comment deadline of September 15, 2025, to September 22, 2025.[18] To facilitate participation, we held four days of virtual public hearings on August 19 through August 22, 2025, during which

we heard oral testimony from more than 600 speakers. Consistent with the EPA's Tribal Consultation Policy, we also invited all federally recognized Tribes to participate in consultation, which resulted in four consultation sessions in addition to oral testimony and written submissions from several federally recognized Tribes and tribal organizations. For more information on public participation, see the public hearing, tribal consultation, and meeting summaries available in the docket for this rulemaking.

The EPA received approximately 572,000 written comments from more than 31,000 unique entities and 169 mass letter writing campaigns during the public comment period, including written submissions received in connection with the public hearing and Tribal consultation sessions. The EPA considered all input received during the public comment period in evaluating this final action, and all written comments, as well as a transcript of the public hearing, are available in the docket for this rulemaking.[19] Given the significant volume of comments received, this preamble includes summaries of relevant comments in the appropriate subsection, along with summaries of the EPA's responses. For more detailed descriptions of comments received and our responses, see the Response to Comments document available in the docket for this rulemaking.[20]

### 1. Issues Raised Regarding the Rulemaking Process

The EPA received comments on rulemaking process, including with respect to the length of the comment period and the content of the proposed rule. The EPA notes that most commenters did not raise concerns with these aspects of the rulemaking process and believes that the large volume of comments received and extensive participation in the public hearing demonstrate that interested stakeholders were able to submit views, data, and information for consideration. Below, we summarize comments received on the rulemaking process along with our responses.

*Comment:* Many commenters appreciated the chance to weigh in on

the underlying science relevant to the Endangerment Finding and regulations under CAA section 202(a)(1) for the first time since 2009 and asserted that the rulemaking process allowed ample public participation and was consistent with statutory requirements.

*Response:* The EPA appreciates and agrees with these comments. As discussed in the proposed rule, we believe that public participation on regulatory issues of this magnitude is essential to good government. Because we are not finalizing many of the alternative bases for the proposed rescission and repeals, this final action does not resolve or substantively respond in full to issues raised in public comments that are outside the scope of the bases finalized in this action. We look forward to further engagement on these additional topics in the future. For further discussion of the alternative bases we are not finalizing, please see section VI of this preamble and the Response to Comments document.

*Comment:* Other commenters argued that we should have provided a longer comment period, including a comment period of up to six months, given the scope of this rulemaking and significant public interest in the underlying issues. Some of these commenters suggested that the statute requires providing a "reasonable" period for public comment. Others pointed to language in E.O. 12866 providing that "a meaningful opportunity to comment on any proposed regulation . . . should include a comment period of not less than 60 days."

*Response:* The EPA disagrees with these comments. The significant volume of comments received during the comment period, as well as the number of participants in the four-day public hearing, demonstrate that the interested public had a reasonable opportunity to participate in this rulemaking by engaging with the EPA. The public comment period fully satisfied the CAA's detailed requirements for public participation. For example, CAA section 307(d)(5) requires that the Administrator allow "thirty days after completion of the [public hearing] to provide an opportunity for submission of rebuttal and supplementary information," [21] and CAA section 307(h) states the intent of Congress that the Administrator "ensure a reasonable period for public participation of at least 30 days." [22] With respect to E.O. 12866, we note that the language cited generally tracks the less detailed rulemaking provisions of the

---

[18] 90 FR 39345 (Aug. 15, 2025).

[19] *See* 42 U.S.C. 7607(d)(1)(C), (d)(4)(B)(i), (d)(5)–(6). Note that although all public comments are posted in the docket, the EPA has not considered or responded separately to comments received after the close of the comment period on September 22, 2025.

[20] "Rescission of the Greenhouse Gas Endangerment Finding and Motor Vehicle Greenhouse Gas Emission Standards Under the Clean Air Act: Response to Comments." EPA 420–R–26–003. February 2026.

[21] *See* 42 U.S.C. 7607(d)(5).

[22] *See* 42 U.S.C. 7607(h).

Administrative Procedure Act (APA) rather than the specific processes Congress established as applicable to this rulemaking in CAA section 307(d), and is intended as non-binding, general guidance for agency rulemakings that yields to more specific statutes and circumstances.[23]

*Comment:* Some commenters asserted that the proposed rule was procedurally flawed under CAA section 307(d)(3) for various reasons, including the assertion that we should have directly referenced, summarized, and included in the docket pertinent findings by the National Academy of Sciences (NAS). These commenters asserted that we should repropose with additional discussion of NAS materials, which, they assert, are central to the rulemaking.

*Response:* The EPA disagrees that the proposal was procedurally flawed in any manner that impacts this final action. The statement of basis and purpose included in the proposal satisfied the requirements of CAA section 307(d)(3)(A)–(C) by including not only the factual data, methodology, and major legal interpretations and policy considerations relevant to the proposal, but also a detailed discussion of relevant factual and legal developments since 2009 impacting the EPA's reconsideration.[24] With respect to the NAS, the statute references only "pertinent findings, recommendations, and comments" by the NAS and discussion of differences from the proposal only when it "differs in any important respect."[25] In section IV.B of the preamble to the proposed rule, we explained that the Administrator had considered the most recently available scientific information, including assessments by the U.S. Global Change Research Program (USGCRP) and United Nations Intergovernmental Panel on Climate Change (IPCC). With respect to discussion of global climate change concerns, the NAS findings cited by these commenters or in previous EPA rulemakings rely upon, and are duplicative of, these assessments.[26] In

other respects, the NAS findings deal with matters that were not pertinent to the substance of the proposal, including particular emissions-reduction technologies,[27] matters pertaining to criteria pollutant standards,[28] and how to utilize Social Cost of Carbon (SCC) methodologies in an RIA or similar analysis.[29]

In any event, commenters did not identify NAS materials pertinent to the bases on which we are relying in this final action. Whether CAA section 202(a)(1) authorizes the EPA to regulate in response to global climate change concerns by prescribing emission standards is a matter of statutory interpretation, not scientific analysis within the NAS's purview. As explained in section VI of this preamble, we are not finalizing the alternative proposal to base the rescission and repeals on a new finding by the Administrator under CAA section 202(a)(1). We note that the NAS developed and submitted during the public comment period for this rulemaking a new report responding to the concerns underlying the alternative proposal.[30] This submission and additional NAS materials regarding the science of climate change are not pertinent to the bases for this final action, which are legal in nature and rest on statutory interpretation,

application of judicial precedent, and legal conclusions drawn from modeling generally accepted for purposes of predicting impacts within the causal framework endorsed by the Endangerment Finding. As discussed in section V.C of this preamble, the NAS has expressed approval for and encouraged the development of the underlying models the EPA is using in this action to evaluate comments received on futility and reach conclusions about the impact of futility on the legality of the Endangerment Finding and associated GHG emission standards.

*Comment:* Additionally, some commenters asserted that the proposed rule should have been made available to the Science Advisory Board (SAB) before publication. These commenters asserted that SAB input is centrally relevant to the rulemaking but generally acknowledged that the EPA did not submit the Endangerment Finding or subsequent reconsideration denials in 2010 and 2022 to the SAB for prior review.

*Response:* By statute, the Administrator is to make available to the SAB "any proposed criteria document, standard, limitation, or regulation" when such material "is provided to any other Federal agency for formal review and comment."[31] The proposal for this rulemaking, which sought comment on rescinding the Endangerment Finding and related GHG emission standards, was not a "criteria document, standard, limitation, or regulation" that would impose obligations on the EPA or any regulated entities if finalized. We note that the EPA used the same interpretation to propose and finalize the Endangerment Finding, as well as issue the 2010 and 2022 denials of petitions for reconsideration, without prior SAB review. Whereas those actions obligated and maintained the obligation for the EPA to issue GHG emission standards that are subject to SAB review, the actions contemplated in the proposal would relieve the Agency of the obligation to maintain and issue regulations with SAB input as well as ongoing obligations for regulated parties. Nor did we submit the proposal to "any other Federal agency for formal review and comment." The EPA has previously taken the position that "formal" consultation is not required for CAA section 202(a)(1) actions and that informal interagency review as part of the non-statutory E.O. 12866 process is

---

[23] *See* 58 FR 51735, 51740 (Oct. 4, 1993) (providing that "each agency *should* afford the public a meaningful opportunity to comment on any proposed regulation, which *in most cases should* include a comment period of not less than 60 days") (emphases added).

[24] 42 U.S.C. 7607(d)(3)(A)–(C).

[25] 42 U.S.C. 7607(d)(3).

[26] *See, e.g.,* 88 FR 29184, 29208, 29394 (May 5, 2023) (proposed HD GHG emission standards) (briefly citing NAS findings together with USGCRP and IPCC reports). To the extent commenters cited or intended to reference the September 2025 report developed, published, and submitted by the NAS during the comment period for the purposes of informing this rulemaking, we note that the Administrator could not have considered the

September 2025 report when signing the proposal in July 2025.

[27] *See, e.g.,* 88 FR 29284–86 (discussing NAS findings on challenges and advantages associated with particular technologies for reducing vehicle emissions). The EPA notes that none of the bases finalized in this action, including the futility basis discussed in section V of this preamble, turn on the relative advantages of particular technologies in reducing GHG emissions from vehicles and engines. Rather, we are finalizing that GHG emission standards under CAA section 202(a)(1) do not have more than a *de minimis* impact on the health and welfare dangers identified in the Endangerment Finding because even the complete elimination of GHG emissions from new and existing LD, MD, and HD vehicles would not materially impact GMST or GSLR as a proxy for adverse impacts to public health and welfare.

[28] *See, e.g.,* 88 FR 29224 (discussing NAS materials related to particulate matter, ozone, $NO_X$, sulfur oxides ($SO_X$), and hazardous air pollutants). As noted at proposal, the EPA is not addressing criteria emission standards in this rulemaking, and incidental co-benefits of GHG emission standards are not pertinent to the legal bases on which we are relying in this final action.

[29] *See, e.g.,* 88 FR 29370–72 (discussing methodologies for estimating and utilizing SCC). As noted at proposal, the EPA has consistently viewed criticisms of the SCC methodology as out of scope because it played no role in the Endangerment Finding and is not relevant to the statutory standard for regulation under CAA section 202(a). Moreover, the U.S. Government is no longer using the SCC methodology for purposes of estimating costs and benefits.

[30] *See* Comment ID EPA–HQ–OAR–2025–0194–0756, NAS 2025, "Effects of Human-Caused Greenhouse Gas Emissions on U.S. Climate, Health, and Welfare." Washington, DC: The National Academies Press.

[31] 42 U.S.C. 4365(c)(1).

not encompassed within the statutory term ''formal review and comment.'' [32]

Given the nature of the proposal and the legal bases on which the EPA relies in this final action, the possibility of SAB review is not material to the outcome of this rulemaking. Because we conclude that CAA section 202(a)(1) does not authorize the EPA to regulate in response to global climate change concerns, this final action does not turn on scientific findings made with respect to the validity, certainty, or extent of global climate change. We note that the D.C. Circuit has previously determined that failing to secure SAB review of the Endangerment Finding was not ''of such central relevance'' that there is a ''substantial likelihood'' the action ''would have been significantly changed'' absent such failure.[33] Commenters provided no reason to conclude that SAB review of this rulemaking to rescind the Endangerment Finding would be of central relevance for the first time, particularly given the ample recommendations already provided on previously promulgated GHG emission standards and the legal nature of the rationales being finalized.

*Comment:* Finally, commenters offered competing positions on the EPA's proposal to rescind the 2022 and 2010 denials of petitions for reconsideration entitled ''Endangerment and Cause or Contribute Findings for Greenhouse Gases Under Section 202(a) of the Clean Air Act; Final Action on Petitions,'' 87 FR 25412 (Apr. 29, 2022), and ''EPA's Denial of the Petitions to Reconsider the Endangerment and Cause or Contribute Finding for Greenhouse Gases Under Section 202(a) of the Clean Air Act,'' 75 FR 49556 (Aug. 13, 2010).[34] Supportive commenters argued that the 2022 and 2010 petitions raised a variety of valid procedural, legal, scientific, and

transparency-related issues with the Endangerment Finding. Conversely, adverse commenters asserted that the EPA erred in proposing to rescind the petition denials at the same time as proposing to rescind the Endangerment Finding, which was the subject of the petitions for reconsideration. These commenters argued that we lack authority to rescind a petition denial and provided insufficient rationale in the proposal to support such a rescission.

*Response:* The EPA appreciates the comments received on this issue and is taking the opportunity to clarify that the 2022 and 2010 reconsideration petition denials no longer represent the Agency's views and should not be relied upon for any statements inconsistent with this final action. As explained at proposal, the petition denials already had no prospective legal effect and were not binding on the EPA or interested parties. We proposed to rescind the petition denials along with the Endangerment Finding and associated GHG emission standards to promote consistency and avoid confusion, as the petition denials relied in large part on the prior positions in those actions that we proposed to abandon. In this final action, we are repudiating the EPA's positions since 2009 to the extent and for the reasons set out in section V of this preamble. We are also finalizing rescission of the petition denials because those decisions affirmed the same legal positions and, moreover, decided scientific questions that are unnecessary and inappropriate for the Agency to address under CAA section 202(a)(1). For discussion of the EPA's authority to reconsider prior actions unless provided otherwise by the governing statute, see section IV of this preamble.

### 2. Updates From the Proposal in This Final Action

The EPA received supportive and adverse comments on virtually all substantive aspects of the proposal from a wide variety of stakeholders, including vehicle and engine manufacturers and suppliers, nearly all 50 States and the District of Columbia, elected representatives at the local, State, and Federal levels (including many members of the U.S House of Representatives and the U.S. Senate), consumer and labor groups, EV advocates, manufacturers, and suppliers, educational institutions, environmental groups, and individual citizens. With respect to the primary basis for the proposed repeal, we received detailed comments offering legal arguments for and against our

proposed interpretation of the statute and the applicability and impact of the major questions doctrine. With respect to the alternative bases for the proposed repeal, we received extensive data, models, and arguments on virtually every aspect of climate science and climate impacts discussed at proposal. Submissions related to the alternative climate science basis for rescission and repeal in section IV.B of the preamble to the proposed rule constituted the largest share of public comments received. Commenters also submitted substantial information in response to our request for comment on the alternative rationales in section V of the preamble to the proposed rule, including data and modeling addressing the historical and potential impacts of GHG emission standards under CAA section 202(a)(1) on the global climate change concerns animating the Endangerment Finding, such as trends in GMST and GSLR.

The EPA is finalizing the primary basis for the rescission and repeals as proposed for the reasons stated in section V of this preamble. We conclude that the best reading of the statute does not authorize the EPA to prescribe GHG emission standards based on global climate change concerns and, moreover, that EPA erred in issuing the Endangerment Finding as a standalone action that severed the consideration of endangerment from the consideration of contribution and failed to engage with the standards that must issue when making such a finding. We further conclude, as proposed, that the major questions doctrine applies and bars the EPA from asserting the authority to decide the Nation's policy response to global climate change concerns, including by attempting to force a shift to EVs, based on language authorizing the Agency to prescribe emission standards. Finally, we conclude that the inability of GHG emission standards under CAA section 202(a)(1) to measurably impact the global climate change concerns identified in the Endangerment Finding further supports our interpretation of the statute and provides an additional reason to repeal the GHG emission standards.

In light of these conclusions, and as discussed further in section VI of this preamble, the EPA is not finalizing the alternative proposed bases for rescission and repeal. The robust public response to the alternative climate science basis revealed ongoing disagreement among commenters with respect to aspects of the scientific analysis underpinning the Endangerment Finding, including the certainty of the causal chain, the extent of endangerment attributable to U.S. new motor vehicle and engine

[32] *See* Resp. Br. 75–79, *Delta Constr. Co.* v. *EPA, No. 11–1428* (filed Nov. 24, 2014); *Coal. for Responsible Regulation, Inc.* v. *EPA,* 684 F.3d 102, 124 (D.C. Cir. 2012), reversed in part in *UARG,* 573 U.S. 302 (noting ''it is not clear that EPA provided the Endangerment Finding'' to any other agency and that petitioners failed to respond to the argument).

[33] *Coal. for Responsible Regulation,* 684 F.3d at 124 (quoting 42 U.S.C. 7607(d)(8)); *see also Am. Petrol. Inst.* v. *Costle,* 665 F.2d 1176, 1188–89 (D.C. Cir. 1981) (similar with respect to ozone standard not submitted for SAB review).

[34] As noted at proposal, the 2022 petition denials included a notice of decision in the **Federal Register**, brief letters communicating the denials to the petitioners, and a decision document entitled ''EPA's Denial of Petitions Relating to the Endangerment and Cause or Contribute Findings for Greenhouse Gases Under Section 202(a) of the Clean Air Act'' (Apr. 21, 2022) (''2022 Denials''), available online at *https://www.epa.gov/system/files/documents/2022-04/decision_document.pdf.*

emissions, the countervailing domestic benefits of global climate change, and the capacity of natural and human systems to adapt and mitigate potential adverse impacts and the relevance of such topics to the analysis. However, we conclude that the EPA lacks statutory authority to regulate GHG emissions from new motor vehicles and engines in the first instance under CAA section 202(a)(1). Accordingly, although the Administrator continues to harbor concerns regarding the scientific determinations underlying the 2009 Endangerment Finding, we cannot resolve these questions under our regulatory authority in CAA section 202(a)(1), and comments received on these subjects are outside the scope of this final action. Similarly, the EPA's lack of authority to regulate GHG emissions from new motor vehicles and engines places comments on the alternative bases for repealing the standards—including the ''requisite technology'' requirement in CAA section 202(a)(2) and additional factors relative to standards-setting—outside the scope of this final action.

This final action removes all existing regulations that require new motor vehicle and engine manufacturers to measure, report, or comply with GHG emission standards. Specifically, the EPA is removing regulations in 40 CFR parts 85, 86, 600, 1036, and 1037 pertaining to the control of GHG emissions from LD, MD, and HD new motor vehicles and engines, including emission standards; test procedures; averaging, banking, and trading (ABT) requirements; reporting requirements; and fleet-average emission requirements.[35] As a result of these changes, motor vehicle and engine manufacturers no longer have future or current obligations for the measurement, control, or reporting of GHG emissions

for any vehicle or engine, including for previously manufactured MYs. However, we did not reopen or modify any regulations necessary for criteria pollutant and air toxic measurement and standards, Corporate Average Fuel Economy (CAFE) testing, and associated fuel economy labeling requirements.

The EPA received comments from stakeholders related to the proposed revisions to the engine and vehicle GHG regulations. In general, we are finalizing the vast majority of the proposed regulatory changes for LD and MD engines and vehicles. For HD engines and vehicles, we are removing the GHG emission standards and related certification and compliance procedures, as proposed. However, in a change from the proposal, we are retaining the test procedures and compliance regulatory elements in the EPA regulations referenced by NHTSA in their regulatory program such that NHTSA can continue to implement its HD fuel efficiency program. Relevant comments and our responses are summarized in section VII of this preamble and the Response to Comments document accompanying this final action.

The EPA also received comments on our analyses included in the Draft Regulatory Impact Analysis (DRIA). A summary of these comments and the EPA's responses is included in the Response to Comments document accompanying this final action. The EPA made a number of updates to the analyses included in the final RIA, which is available in the docket for this rulemaking.

### III. Background

#### A. The EPA's Historical Approach to CAA Section 202(a)(1)

Congress originally enacted the language that became CAA section 202(a)(1) as part of the Motor Vehicle Pollution Control Act of 1965, which required the Secretary of Health, Education, and Welfare to ''prescribe . . . standards, applicable to the emission of any kind of substance, from any class or classes of new motor vehicles or new motor vehicle engines, which in his judgment cause or contribute to, or are likely to cause or contribute to, air pollution which endangers the health or welfare of any persons.'' [36] Congress retained this language, while adding additional requirements for the content of emission standards, in the Air Quality Act of

1967,[37] and, later, incorporated it into the Clean Air Act of 1970, which transferred the Secretary's regulatory authority to the newly created EPA and directed the Agency to issue standards that achieved significant reductions in certain criteria pollutants in the near-term.[38] Separately, the 1970 CAA addressed emissions from existing vehicles and engines, stationary sources, and aircraft engines.[39] In the following decades, Congress repeatedly amended CAA section 202 to specify particular regulatory goals and to require the EPA to regulate certain pollutants. Some of these provisions instructed the EPA to use CAA section 202(a)(1) in particular ways, while others separately directed the regulation of specified classes of vehicles or engines or specified air pollutants. As subsequently amended,[40] CAA section 202 has remained a critical part of the comprehensive national framework for regulating air pollution, with Title II authorities for mobile sources working in tandem with the National Ambient Air Quality Standards (NAAQS) program and Title I authorities for stationary sources.[41] Emission standards issued under CAA section 202 trigger requirements and enforcement mechanisms that can impose substantial liabilities on manufacturers and other regulated parties. Additional provisions in Title II prohibit selling, importing, or marketing vehicles and engines not in compliance with applicable emission standards, with violations subject to injunctive relief and significant monetary penalties.[42]

In its first four decades administering the statute, the EPA invoked CAA section 202(a)(1) relatively infrequently and, in each case, to address local and regional air pollution problems through rulemakings that both prescribed

---

[35] ''Light-Duty Vehicle Greenhouse Gas Emission Standards and Corporate Average Fuel Economy Standards,'' 75 FR 25324 (May 7, 2010); ''Greenhouse Gas Emissions Standards and Fuel Efficiency Standards for Medium- and Heavy-Duty Engines and Vehicles,'' 76 FR 57106 (Sept. 15, 2011); ''2017 and Later Model Year Light-Duty Vehicle Greenhouse Gas Emissions and Corporate Average Fuel Economy Standards,'' 77 FR 62624 (Oct. 15, 2012); ''Greenhouse Gas Emissions and Fuel Efficiency Standards for Medium- and Heavy-Duty Engines and Vehicles-Phase 2,'' 81 FR 73478 (Oct. 25, 2016); ''The Safer Affordable Fuel-Efficient (SAFE) Vehicles Rule for Model Years 2021–2026 Passenger Cars and Light Trucks,'' 85 FR 24174 (Apr. 30, 2020); ''Revised 2023 and Later Model Year Light-Duty Vehicle Greenhouse Gas Emissions Standards,'' 86 FR 74434 (Dec. 30, 2021); ''Multi-Pollutant Emissions Standards for Model Years 2027 and Later Light-Duty and Medium-Duty Vehicles,'' 89 FR 27842 (Apr. 18, 2024) (2024 LD and MD Multi-Pollutant Emission Standards Rule); ''Greenhouse Gas Emissions Standards for Heavy-Duty Vehicles-Phase 3,'' 89 FR 29440 (Apr. 22, 2024) (2024 HD GHG Emission Standards Rule).

[36] Public Law 89–272, section 202(a), 79 Stat. 992, 992–93 (1965).

[37] Public Law 90–148, section 202(a), 81 Stat. 485, 499 (1967).

[38] Public Law 91–604, 84 Stat. 1690 (1970).

[39] *Id.*

[40] In the CAA Amendments of 1977, Congress replaced the phrase ''which endangers the public health or welfare'' with ''which may reasonably be anticipated to endanger public health or welfare.'' Public Law 95–95, section 401(d)(1), 91 Stat. 685, 791 (1977); Public Law 101–549, section 203, 104 Stat. 2399, 2474 (1990).

[41] *See West Virginia,* 597 U.S. at 707–11 (describing the relationship among the CAA's Title I programs).

[42] 42 U.S.C. 7522–24. By regulation, the EPA has established a number of compliance and enforcement mechanisms specific to particular emission standards regimes, including GHG emission standards. For example, we have adopted a credit system whereby regulated parties that do not achieve the standards for a particular MY may carry forward a deficit for a certain number of years, provided that the entity overcomply in future years or purchase credits to make up for the prior shortfall. 40 CFR 86.1865–12.

standards and set forth the Administrator's findings that the relevant air pollutant emissions cause, or contribute to, air pollution which may reasonably be anticipated to endanger public health or welfare.[43] From 1965 to 2009, we invoked CAA section 202(a)(1) in at least fifteen final rules governing LD, MD, and HD vehicle and engine and motorcycle emissions of hydrocarbons (HC) and other volatile organic compounds (VOCs), carbon monoxide (CO), oxides of nitrogen ($NO_X$), particulate matter (PM), and certain air toxics.[44] Where possible, we relied in these final rules on more specific authorities provided elsewhere in CAA section 202, including subsections (a)(3)(B)–(D) for HD vehicles, (a)(3)(E) for motorcycles, and (*l*) for air toxics. Each of these regulations involved criteria pollutants or compounds that Congress expressly enumerated in CAA section 202 through iterative statutory amendments and addressed in additional provisions throughout the statute.[45] We hewed closely to the vehicle and engine emission air pollution problems that Congress itself identified and did not use CAA section 202(a)(1) to expand into new regulatory arenas. As further explained in the following subsections, the EPA maintained this approach until 2009 and never invoked CAA section 202(a)(1) to regulate in response to global climate change concerns during this period.

## B. Petitions for Rulemaking and Massachusetts v. EPA

In October 1999, a coalition of 19 environmental organizations petitioned the EPA to regulate the emission of four GHGs—$CO_2$, methane, $N_2O$, and HFCs—from new motor vehicles and engines under CAA section 202(a)(1). Petitioners claimed that these four GHGs were "air pollutant[s]" under CAA section 302(g), significantly contributed to global climate change, and met the statutory standard for regulation under CAA section 202(a)(1). Thus, petitioners claimed that the EPA had the authority and obligation to find that GHG emissions from new motor vehicles and

engines cause, or contribute to, air pollution which may reasonably be anticipated to endanger public health or welfare and to prescribe standards in response.

In September 2003, after receiving and responding to nearly 50,000 public comments on the relevant issues, the EPA denied the 1999 petitions in a final action titled "Control of Emissions from New Highway Vehicles and Engines," 68 FR 52922 (Sept. 8, 2003) ("2003 Denial"). The 2003 Denial asserted three primary reasons for denying the petitions. First, after "examin[ing] the fundamental issue of whether the CAA authorizes the imposition of control requirements" to "reduce the risk of global climate change," we concluded that "$CO_2$ and other GHGs cannot be considered 'air pollutants' subject to the CAA's regulatory provisions for any contribution they may make to global climate change." 68 FR 52925. Citing the Supreme Court's decision in *FDA* v. *Brown & Williamson Tobacco Corp.,* 529 U.S. 120 (2000), we noted that the CAA does not address GHGs as a regulatory matter, including in then-recent amendments, and that the "EPA has used these provisions to address air pollution problems that occur primarily at ground level or near the surface of the earth." 68 FR 52926. On this basis, we concluded that GHGs "are not air pollutants under the CAA's regulatory provisions, including sections 108, 109, 111, 112, and 202" because they categorically are not "air pollutant[s]" under the Act-wide definition in CAA section 302(g). 68 FR 52928. Second, we raised in the alternative several policy reasons for declining to regulate GHGs, including that regulating GHG emissions from motor vehicles and engines under the CAA would interfere with NHTSA's authority to implement fuel economy standards. 68 FR 52929. We also asserted that regulating GHG emissions from motor vehicle engines under the CAA would undermine then-President Bush's policy approach of addressing global climate change concerns comprehensively through voluntary actions and incentives, the promotion of research and technologies, and international negotiations. 68 FR 52930–31. That is, we reasoned that establishing GHG emission standards through unilateral action would "result in an inefficient, piecemeal approach to addressing the climate change issue" because "all significant sources and sinks of GHG emissions" should be considered in deciding the best way to achieve emissions reductions. 68 FR 52931.

In *Massachusetts,* the Supreme Court narrowly reversed the D.C. Circuit's

decision upholding the EPA's denial of the 1999 petitions for rulemaking.[46] The Court took particular issue with the EPA's reading of the Act-wide definition in CAA section 302(g), ruling that "[t]he Clean Air Act's sweeping definition of 'air pollutant' . . . embraces all airborne compounds of whatever stripe" and provided no textual basis for excluding $CO_2$ or the three other GHGs raised in the petitions for rulemaking. 549 U.S. at 528–29. The Court also addressed the EPA's reliance on *Brown & Williamson,* which the majority construed as having found no congressional intent to ban the sale of tobacco products outright because such an application of the relevant statute would have been highly unlikely and because the Food and Drug Administration (FDA) had expressly refused to assert such authority in the past. *Id.* at 530–31. In contrast, in *Massachusetts,* the Court found that the CAA did not reflect a congressional intent to categorically exclude GHGs and, citing several EPA memoranda, that we had not similarly foresworn all authority to regulate GHGs as a categorical matter. *Id.*

Notably, the Court expressly declined to decide whether the EPA was required to issue an endangerment finding as to GHG emissions under the standard set out in CAA section 202(a)(1). *Id.* at 534 ("We need not and do not reach the question whether on remand EPA must make an endangerment finding."). Nor did the Court address "whether policy concerns can inform EPA's actions in the event that it makes such a finding." *Id.* at 534–35. Rather, the Court emphasized that the scope of its review of the denial of a rulemaking petition was "extremely limited," *id.* at 527–28 (citation omitted), and held that we must respond to the petitions by deciding whether GHG emissions from new motor vehicles and engines meet the standard for regulation in CAA section 202(a)(1) or whether the science was too uncertain to make any determination, and that, in doing so, we must "ground [our] reasons for action or inaction in the statute," *id.* at 535.[47]

---

[43] *See* 74 FR 66501, 66527, 66538, 66543 (Dec. 15, 2009) (acknowledging this regulatory history).

[44] *See* 72 FR 8428 (Feb. 26, 2007); 69 FR 2398 (Jan. 15, 2004); 66 FR 5002 (Jan. 18, 2001); 65 FR 59896 (Oct. 6, 2000); 65 FR 6698 (Feb. 10, 2000); 62 FR 54694 (Oct. 21, 1997); 62 FR 31192 (June 6, 1997); 60 FR 34326 (June 30, 1995); 60 FR 4712 (Jan. 24, 1995); 59 FR 48472 (Sept. 21, 1994); 59 FR 16262 (Apr. 6, 1994); 53 FR 43870 (Oct. 31, 1988); 49 FR 3010 (Jan. 24, 1984); 48 FR 48598 (Oct. 19, 1983); 45 FR 63734 (Sept. 25, 1980).

[45] *See* Public Law 101–549, section 203, 104 Stat. 2399, 2474 (1990); Public Law 91–604, section 6, 84 Stat. 1676, 1690 (1970).

[46] The D.C. Circuit majority had upheld the denial on the merits because "the EPA Administrator properly exercised his discretion under section 202(a)(1) in denying the petition for rulemaking." Massachusetts v. EPA, 415 F.3d 50, 58 (D.C. Cir. 2005). The dissent argued that CAA section 202(a)'s breadth provided the EPA sufficient authority to regulate GHGs, that more specific authorization was not required, and that the EPA's policy justifications were inadequate reasons to deny the petitions. *Id.* at 67–82 (Tatel, J., dissenting).

[47] Writing for four members of the Court, Chief Justice Roberts would have dismissed the petitions for review for lack of Article III standing. 549 U.S. at 535 (Roberts, C.J., joined by Scalia, Thomas, and Alito, J.J., dissenting). Writing for the same four

Continued

*C. The 2009 Endangerment Finding*

The EPA responded to the Supreme Court's decision in *Massachusetts* by issuing the 2008 ANPRM. In the 2008 ANPRM, the Administrator began by noting it was "clear that if EPA were to regulate [GHG] emissions from motor vehicles under the Clean Air Act," the interplay between CAA section 202(a)(1) and similarly worded statutory provisions "could result in an unprecedented expansion of EPA authority that would have a profound effect on virtually every sector of the economy and touch every household in the land." 73 FR 44355. The Administrator cautioned that because the CAA was "originally enacted to control regional pollutants that cause direct health effects," invoking authority to regulate GHG emissions "would inevitably result in a very complicated, time-consuming, and, likely, convoluted set of regulations" that "would be relatively ineffective at reducing [GHG] concentrations" and have a "potentially damaging effect on jobs and the U.S. economy." *Id.*

The 2008 ANPRM echoed the Administrator's concerns by seeking public comment on invoking CAA section 202(a)(1) to regulate new motor vehicle and engine emissions in response to global climate change concerns. We acknowledged that the CAA "was not specifically designed to address GHGs," 73 FR 44397, and that the EPA had historically interpreted and applied its CAA regulatory authorities as extending to local and regional air pollution problems, 73 FR 44408. We further noted that Congress was considering legislation to address the Nation's response to global climate change concerns and that, since *Massachusetts,* Congress had passed and the President had signed into law the Energy Independence and Security Act (EISA),[48] which amended provisions applicable to the EPA's Renewable Fuels Standard (RFS) program and NHTSA's CAFE standards program. 73 FR 44398. Finally, we noted that the EPA received additional petitions to regulate stationary sources and additional GHGs, including water vapor, all of which suggested that GHG emission regulations could not readily

be limited to new motor vehicles and engines. 73 FR 44399 & n.26.

As to CAA section 202(a)(1), the 2008 ANPRM set out a framework for determining whether "GHG emissions from new motor vehicles cause or contribute to air pollution that may reasonably be anticipated to endanger public welfare" under CAA section 202(a)(1) or for "explain[ing] why scientific uncertainty is so profound that it prevents making a reasoned judgment on such a determination." 73 FR 44398, 44421. We reviewed available information for $CO_2$, methane, and $N_2O$ emissions and noted that HFCs, PFCs, and $SF_6$ are "often grouped together" and separately from the rest "because they contain fluorine, typically have large global warming potentials, and are produced only through human activities." 73 FR 44401–02.[49] With respect to endangerment, we sought comment on whether GHGs could properly be considered air pollution that endangers public health or welfare because the potential health effects are indirect and the potential welfare effects may be positive on balance. 73 FR 44427. In addition, we sought comment on whether "the unique characteristics and properties of each GHG . . . as well as current and projected emissions" meant that each GHG should be analyzed individually or whether certain GHGs other than $CO_2$ were amenable to grouping. 73 FR 44428. With respect to causation or contribution, we presented motor vehicle and engine emissions data for each GHG separately and noted that emission trends had diverged between pollutants, with $CO_2$ emissions, for example, generally increasing since 1990 and $N_2O$ emissions, for example, increasing from 1990 to 1995 and then falling substantially from 1995 to 2006 because of fuel and technology changes. 73 FR 44430. We also presented extensive information on potential regulatory approaches that could be triggered by a positive finding under CAA section 202(a)(1), including approaches specific to particular GHGs. 73 FR 44438–63.

Following a change in administration, however, the EPA proposed in April 2009 and finalized in December 2009 a much different approach to analyzing GHG emissions from new motor vehicles and engines under CAA section 202(a)(1). In the Endangerment Finding,

the Administrator found that "the science [was] sufficiently certain" to compel a determination and interpreted *Massachusetts* as "allow[ing] for the consideration only of science." 74 FR 66501. The Administrator interpreted *Massachusetts* as holding not only that "GHGs fall within the definition of 'air pollutant' under the CAA," but also as standing for the proposition "that EPA may regulate GHGs if required findings were made." EF RTC 11:5. While expressing a "preference for comprehensive climate change legislation over the use of the current CAA to tackle climate change," the Administrator understood the Endangerment Finding as satisfying the EPA's "duty" and "responsibility to respond to the Supreme Court's decision and to fulfill its obligations under current law." EF RTC 11:19.[50] In addition, the Administrator declined to consider any of the implementation challenges or options discussed in the 2008 ANPRM, asserting instead that CAA section 202(a) confers "procedural discretion" to issue standalone findings without considering a regulatory response because the statute "is silent on this issue," 74 FR 66501, and interpreting *Massachusetts* as forbidding the EPA from considering in any respect the regulations that will result from an affirmative finding, 74 FR 66515.

The Administrator defined the relevant "air pollution" as "the combined mix of six key directly-emitted, long-lived and well-mixed [GHGs] . . . which together, constitute the root cause of human-induced climate change and the resulting impacts on public health and welfare." 74 FR 66517. At times, the Administrator referred to the "air pollution" as the total concentration of GHGs in the atmosphere, *e.g., id.,* and at times as only the "elevated atmospheric concentrations" of GHGs in the atmosphere as compared to pre-industrial levels, *e.g.,* 74 FR 66523. In defining "air pollution" in this manner, the Administrator rejected arguments that the term as used in CAA section 202(a)(1) is limited to domestic concerns and airborne materials that cause direct human health effects, such as through inhalation. EF RTC 9:1–2. The Administrator reasoned that the treatment of "air pollutant" in

---

members of the Court, Justice Scalia would have denied the petitions on the grounds that the Administrator reasonably exercised judgment in declining to regulate and that CAA section 302(g)'s definition of "air pollutant" does not clearly encompass $CO_2$ and other GHGs that naturally occur in the ambient air. 549 U.S. at 549 (Scalia, J., joined by Roberts, C.J., and Thomas and Alito, J.J., dissenting).

[48] Public Law 110–140, 121 Stat. 1492 (2007).

[49] In the 2008 ANPRM, the EPA noted that the most recently available IPCC analysis concluded that "[t]he anthropogenic combined heating effect (referred to as forcing) of [methane], $N_2O$, HFCs, PFCs and $SF_6$ is about 40% as large as the $CO_2$ cumulative heating effect since pre-industrial times." 73 FR 44423.

[50] Specifically, a variety of commenters on the proposed Endangerment Finding asserted that the Clean Air Act is ill-suited to address global climate change concerns, and that the EPA should await the results of ongoing debates and development of responsive legislation in Congress, for which both the President and the Administrator had expressed support. EF RTC 11:18–19.

*Massachusetts* extended to the term "air pollution" directly, without the need for analysis of the difference in terminology and statutory context, and did not specifically grapple with the EPA's prior practice. *Id.* Notably, the Administrator excluded other "climate forcers" from this definition, including black carbon, ozone-depleting substances, nitrogen trifluoride, water vapor, and ground-level ozone. 74 FR 66520. While maintaining that these "climate forcers" could be regulated in response to global climate change concerns, the Administrator found that these substances were sufficiently different from the six "well-mixed" GHGs to warrant separate consideration. *Id.* As to water vapor, the Administrator reasoned that "the level of understanding is low" and that the EPA "plans to further evaluate the issues of emissions of water." *Id.* And as to ground-level ozone, the Administrator reasoned that although "tropospheric ozone concentrations have exerted a significant anthropogenic warming effect since pre-industrial times," ozone was unlike the six directly emitted, "well-mixed" GHGs because it "forms in the atmosphere from emission of pre-cursor gases." *Id.*

The Administrator also defined the relevant "air pollutant" as "a single air pollutant" comprised of "the same six long-lived and directly-emitted [GHGs]," meaning the Endangerment Finding did not need to address the different characteristics or emission trends of any of the six selected GHGs individually. 74 FR 66536–37. The Administrator stated that "if in the future other substances are shown to meet the same criteria they may be added to the definition of this single air pollutant" for regulatory purposes. 74 FR 66537. Although new motor vehicles and engines "do not emit all of the substances meeting the definition of well-mixed [GHGs]"—specifically, PFCs and $SF_6$—the Administrator found that "the reasonableness of this grouping does not turn on the particular source category being evaluated in a contribution finding." *Id.*

With respect to endangerment, the Administrator began by excluding adaptation—human responses that reduce potential adverse impacts—and mitigation—independent measures that reduce the causes of potential adverse impacts—from the analysis of global climate change concerns. 74 FR 66513. The Administrator acknowledged that "some level of autonomous adaptation will occur" and that "this separation means this approach may not reflect the actual conditions in the real world in the future, because adaptation and/or

mitigation may occur and change the risks." *Id.* Nevertheless, the Administrator reasoned that "it would be extremely hard to make a reasoned projection of human and societal adaptation and mitigation responses" because they are "largely political" or "individual personal judgments." *Id.* Next, the Administrator relied on IPCC Assessment Report 4 (AR4) projections to find that GMST would likely increase between 1.8 to 4 °C by 2100, with an uncertainty range of 1.1 to 6.4 °C. 74 FR 66519. Operating within this analytical framework, the Administrator found that elevated global concentrations of GHGs from all foreign and domestic sources were responsible for increased GMST that were responsible in turn for indirect health risks driven by (1) more frequent heat waves; (2) air quality effects, including increased formation of ozone, and (3) broader societal impacts related to increased frequency and severity of certain extreme weather events. 74 FR 66525.[51] The Administrator also found that GHG emissions could lead to welfare effects related to GSLR and other downstream impacts, including (1) food production and agriculture; (2) forestry; (3) water resources; and (4) energy infrastructure and settlements, although the evidence was uncertain for several categories that may see near-term benefits. 74 FR 66531–35.[52] Importantly, the Administrator acknowledged that the understanding of public health and welfare in the Endangerment Finding was atypical, particularly with respect to considering indirect effects and because "[n]one of th[e] human health effects are associated with direct exposure to [GHGs]," but asserted the approach was necessary given the "unique" challenge presented by global climate change. 74 FR 66527. The Administrator reasoned that many of the identified welfare impacts could be considered health impacts and that all such impacts could result indirectly from GHG "air pollution," 74 FR 66528–29, and noted that the identified welfare impact pathways involved multiple causal steps, 74 FR 66531.[53] In reaching

these conclusions, the Administrator rejected arguments that the endangerment analysis should focus on domestic emissions and impacts on domestic ambient air and that Congress expressly provided authority when it intended the EPA to consider non-domestic air pollution. EF RTC 9:1.[54]

With respect to contribution, the Administrator asserted broad authority to interpret the statutory standard because "[t]he language of CAA section 202(a) is silent regarding how the Administrator is to make her contribution analysis." 74 FR 66544. Exercising that putative interpretive authority, the Administrator concluded that "it is reasonable to consider that lower percentages contribute than one may consider when looking at a local or regional problem involving fewer sources of emissions," 74 FR 66545, because "all contributors must do their part" to avoid "a tragedy of the commons, whereby no country or source category would be accountable for contributing to the global problem of climate change," 74 FR 66543. Next, the Administrator relied on data showing that existing motor vehicles and engines emitted four GHGs—$CO_2$, methane, and $N_2O$ from engines, as well as HFCs from air conditioning units—that accounted for 4.3 percent of annual global GHG emissions at the time. On that basis, the Administrator found that annual GHG emissions from new motor vehicles and engines "contribute to the air pollution" consisting of the total global concentrations of the six "well-mixed" GHGs previously identified as a danger to public health or welfare. 74 FR 66537–39.

Crucially, the Endangerment Finding made clear that the EPA was acting independently from any new congressional mandate. Rather, the Administrator interpreted CAA section 202(a)(1) as setting out a standalone authority to issue findings that establish an obligation to regulate without considering implementation and purported to rest the Endangerment Finding solely on a scientific judgment

---

[51] The Administrator also noted that increased GMST could lead to changes in certain food- and water-borne pathogens and allergens (including increases in pollen resulting from increased plant growth at higher concentrations of $CO_2$) but did "not plac[e] primary weight on these factors." 74 FR 66498, 66526.

[52] The Administrator relied on welfare impacts to water resources and sea level rise as providing "the clearest and strongest support for an endangerment finding." 74 FR 66534.

[53] The Administrator noted that "[a]s with public health," the analysis of "welfare" in the Endangerment Finding "considered the multiple pathways" through which "the GHG air pollution"

could result in "climate change" that "affects climate-sensitive sectors," which then leads to potential "impact . . . on public welfare." 74 FR 66531.

[54] For example, commenters on the proposed Endangerment Finding pointed to CAA sections 115 (authorizing the EPA to require controls when domestic emissions cause or contribute to air pollution that endangers public health or welfare in another country that has adopted reciprocal protections for emissions into the United States), 179B (authorizing the EPA to account for the impact of international emissions on State attainment of the NAAQS under certain conditions), and Title VI (providing for various authorities and obligations to address emissions that damage the ozone layer). EF RTC 9:1; *see* 42 U.S.C. 7415, 7509a, 7671 *et seq.*

informed by the record as assembled by the Agency in 2009.

*D. Implementation of the 2009 Endangerment Finding*

In the years since issuing the Endangerment Finding, the EPA has promulgated GHG emission standards for various classes of new motor vehicles and engines in reliance on the Endangerment Finding and, as anticipated in the 2008 ANPRM, sought to expand the same analytical framework to regulatory provisions governing existing vehicles, stationary sources, aircraft, and oil and gas operations. For a full accounting of GHG emission standards adopted since 2009 under CAA section 202(a)(1), see sections VII.B and VII.C of this preamble.

In the Endangerment Finding, the EPA treated as out of scope the impacts of extending CAA section 202(a)(1) to address global climate change concerns on other CAA provisions with similar endangerment provisions. See, *e.g.,* EF RTC 11:20–23. However, the EPA soon finalized the first set of GHG emission standards for new motor vehicles and engines [55] alongside related rules establishing GHG emission thresholds for stationary source permitting under the Prevention of Significant Deterioration (PSD) program and Title V.[56] Several years later, the EPA again relied on the Endangerment Finding to extend the GHG regulatory program to new and existing stationary source performance standards and guidelines for power plants under CAA section 111.[57]

In *Coalition for Responsible Regulation,* the D.C. Circuit rejected petitions for review of the Tailpipe Rule, Triggering Rule, Tailoring Rule, and the underlying Endangerment Finding. As relevant here, the court read *Massachusetts* as precluding us from declining to regulate for policy reasons that "were not part of the calculus" and, citing generally to the entirety of the *Massachusetts* decision, as holding that the "EPA indeed wields the authority to regulate greenhouse gases under the CAA." 684 F.3d at 118. Applying this reading, the court rejected petitioners' arguments that we should have considered the "'absurd'" results for stationary source permitting when issuing the Endangerment Finding. *Id.* The court understood the interpretation of the statutory definition of "air pollutant" in *Massachusetts* to apply anywhere that term is used in the substantive provisions of the CAA. *Id.* at 134–44. The court acknowledged that "nothing in the CAA requires regulation of a substance simply because it qualifies as an 'air pollutant' under this broad definition." *Id.* at 135. Applying its understanding of *Massachusetts,* however, the court held that reading "air pollutant" as "any regulated air pollutant" was "compelled by the statute" and rejected petitioners' arguments that the PSD provisions should be read in context as focusing on localized "air pollution" problems. *Id.* at 134, 138.[58]

In *UARG,* the Supreme Court held that the EPA exceeded its authority under the CAA in its approach to extending stationary source permitting to cover GHG emissions. The Court rejected the D.C. Circuit's application of *Massachusetts* in this context as a "flawed syllogism," 573 U.S. at 316, holding that "while *Massachusetts* rejected EPA's categorical contention that greenhouse gases *could not* be 'air pollutants' for any purposes of the Act, it did not embrace EPA's current, equally categorical position that greenhouse gases *must* be air pollutants for all purposes regardless of the statutory context," *id.* at 319 (cleaned up). Rather, "*Massachusetts* does not foreclose the Agency's use of statutory context to infer that certain of the Act's provisions use 'air pollutant' to denote not every conceivable airborne substance, but only those that may sensibly be encompassed within the particular regulatory program." *Id.* The Court went on to reject our interpretation that required a permit based on GHG emissions as "'incompatible' with 'the substance of Congress' regulatory scheme'" and inconsistent with the principle that "Congress . . . speak[s] clearly if it wishes to assign to an agency decisions of vast 'economic and political significance.'" *Id.* at 322–24 (quoting *Brown & Williamson,* 529 U.S. at 156, 159).[59]

Soon thereafter, both courts weighed in on the extension of the GHG regulatory program to power plants under CAA section 111. The Supreme Court stayed the 2015 Clean Power Plan pending review by the D.C. Circuit, which had denied a stay.[60] The D.C. Circuit subsequently reviewed a later rulemaking that repealed the Clean Power Plan and replaced it in part.[61] In *American Lung Association* v. *EPA,* 985 F.3d 914 (D.C. Cir. 2021), a divided panel reinstated the 2015 Clean Power Plan and vacated the 2019 ACE Rule. Among other things, the panel majority held that the major questions doctrine has no application to the scope of our CAA section 111 authority, *id.* at 959–61, and rejected the argument that generation shifting was an impermissible use of our regulatory authority, *id.* at 966–68. The panel majority also rejected challenges to the endangerment and significant contribution bases for regulating GHGs under CAA section 111, citing *Coalition for Responsible Regulation* and stating that if "greenhouse gas emissions by fossil-fuel-fired power plants" do not "significantly contribute" to global climate change, it would be "nigh impossible for any source of greenhouse gas pollution to cross that statutory threshold." *Id.* at 977.[62]

---

[55] 75 FR 25324 (May 7, 2010).

[56] "Reconsideration of Interpretation of Regulations That Determine Pollutants Covered by Clean Air Act Permitting Programs," 75 FR 17004 (Apr. 2, 2010) ("Triggering Rule"); "Prevention of Significant Deterioration and Title V Greenhouse Gas Tailoring Rule," 75 FR 31514 (June 3, 2010) ("Tailoring Rule").

[57] "Standards of Performance for Greenhouse Gas Emissions From New, Modified, and Reconstructed Stationary Sources: Electric Utility Generating Units," 80 FR 64510 (Oct. 23, 2015) ("2015 NSPS"); "Carbon Pollution Emission Guidelines for Existing Stationary Sources: Electric Utility Generating Units," 80 FR 64662 (Oct. 23, 2015) ("Clean Power Plan"). The EPA also cited the Endangerment Finding to reach a similar conclusion for aircraft under CAA section 231. "Finding That Greenhouse Gas Emissions From Aircraft Cause or Contribute to Air Pollution That May Reasonably Be Anticipated To Endanger Public Health and Welfare," 81 FR 54422 (Aug. 15, 2016).

[58] The D.C. Circuit subsequently denied rehearing en banc. See Coal. for *Responsible Regulation* v. *EPA,* 2012 U.S. App. LEXIS 25997 (Dec. 20, 2012). Judge Brown dissented, arguing that the CAA was designed to address "the harmful effects of poisoned air on human beings and their local environs," that such important policy decisions were for Congress to decide, and that the panel had overread "dicta" in *Massachusetts. Id.* at * 29–62. Then-Judge Kavanaugh also dissented, arguing that we exceeded our statutory authority in regulating GHG emissions under the PSD program by failing to read the term "air pollutant" in context and that the issue was "plainly one of exceptional importance" that Congress should decide. *Id.* at * 62–93.

[59] Writing for four Justices in a partial dissent, Justice Breyer argued that the statute could be interpreted to encompass certain stationary sources based on their volume of GHG emissions. 573 U.S. at 334–43 (Breyer, J., joined by Ginsburg, Sotomayor, and Kagan, J.J.). Writing for two Justices in a partial dissent from a different holding, Justice Alito argued that the case demonstrated that *Massachusetts* was wrongly decided and that the majority erred in holding that permitted sources that emit conventional pollutants could be required to install control technologies for GHGs. *Id.* at 343–50 (Alito, J., joined by Thomas, J.).

[60] *West Virginia* v. *EPA,* 136 S Ct. 1000 (2016).

[61] "Affordable Clean Energy Rule," 84 FR 32520 (July 8, 2019) ("2019 ACE Rule").

[62] In a partial dissent, Judge Walker argued that the 2015 Clean Power Plan (and aspects retained in the 2019 ACE Rule) violated the major questions doctrine because CAA section 111 does not include a clear statement of authority to regulate GHG emissions from power plants. *Am. Lung Ass'n,* 985 F.3d at 995–1003 (pointing to failed legislation in 2009 that would have provided the requisite authority to regulate GHG emissions from power plants).

In *West Virginia,* the Supreme Court reversed the D.C. Circuit's treatment of the major questions doctrine and held that the 2015 Clean Power Plan exceeded our authority to regulate existing sources under CAA section 111(d). The Court surveyed *UARG, Brown & Williamson,* and additional precedents to confirm that an agency must have more than "a colorable textual basis" to assert " 'unheralded' regulatory power over 'a significant portion of the American economy.' " 597 U.S. at 721–23 (quoting *UARG,* 573 U.S. at 324). In such cases, "both separation of power principles and a practical understanding of legislative intent" require the agency to "point to 'clear congressional authorization' for the power it claims." *Id.* at 723 (quoting *UARG,* 573 U.S. at 324). The Court held that our reliance on CAA section 111(d) to regulate GHG emissions was "a major questions case" because we had asserted the power "to substantially restructure the American energy market." *Id.* at 724. That provision "had rarely been used in the preceding decades," and we had used it in an "unprecedented" manner "to adopt a regulatory program that Congress had conspicuously and repeatedly declined to enact itself." *Id.* at 724–28. Since we lacked express authorization, the Court concluded that we lacked statutory authority for the 2015 Clean Power Plan. *Id.* at 732–35.[63]

Following the Endangerment Finding, the EPA also received multiple petitions for reconsideration from industry groups, States, and various organizations arguing that our approach in 2009 was legally and scientifically flawed and that external assessments by the IPCC, among others, had not adequately addressed recent criticisms of climate change science. The EPA denied these consolidated petitions in 2010 without notice and comment ("2010 Denials"). Reiterating the scientific assertions from the technical support document (TSD) used in 2009, we emphasized that we had conducted an independent review of outside assessments in issuing the Endangerment Finding and asserted that the core conclusions of the Endangerment Finding remained valid notwithstanding the flaws raised by the petitioners. The EPA also issued a

volume of response documents defending the methodologies and experts relied upon and concluded that no new information warranted reconsideration. 75 FR 49556.[64]

In April 2022, the EPA denied, again without notice and comment, a new round of petitions for reconsideration and rulemaking asserting that the Endangerment Finding was legally and scientifically flawed and undermined by more recent scientific assessments ("2022 Denials"). We acknowledged that several recent studies contradicted assessments by the USGCRP and IPCC but reaffirmed our earlier position that such assessment reports are entitled to greater weight than dissenting views.[65] We also considered criticisms of the EPA's SCC methodology out of scope because "the social cost of carbon played no role in the 2009 Endangerment Finding." [66] We further acknowledged that severing the endangerment and cause or contribute analysis from the development of subsequent regulations had impacted the EPA's approach to GHG emission standards, including because the SAB did not have the opportunity to review the Endangerment Finding as would otherwise have been required by the CAA.[67] Nevertheless, we reaffirmed our position that CAA section 202(a) grants "procedural discretion" to issue findings and emission standards separately and "decline[d] to exercise that discretion" differently.[68]

*E. Reconsideration of the 2009 Endangerment Finding*

Since the EPA published the 2009 Endangerment Finding, there have been developments in innovation, science, economics, and mitigation, as well as significant Supreme Court decisions that provide new guidance on how Federal agencies should interpret the statutory provisions that Congress has tasked them with administering.[69] Accordingly, the Administrator determined that the Endangerment Finding should be reconsidered to address legal and scientific developments that present reason to question the ongoing validity and reliability of its conclusions and to

subject these important issues to public comment for the first time since 2009.

In initiating reconsideration, the Administrator explored all findings, support, questions, and ambiguities contained within the science relied upon by the Endangerment Finding. On July 29, 2025, the Administrator signed a proposed rule setting out the results of the EPA's reconsideration to date and proposing to rescind the Endangerment Finding and all GHG emission standards for LD, MD, and HD motor vehicles and engines promulgated since 2009 under CAA section 202(a)(1). At proposal, we noted that the Endangerment Finding itself and subsequent reports, studies, and analyses had acknowledged significant questions and ambiguities presented by the observable realities of the past nearly two decades and the recent findings of the scientific community. We also noted that there may be as-yet-unidentified issues or discrepancies present in the underlying technical analysis and scientific justifications offered in the Endangerment Finding. Finally, we noted that when confronted with science offering a diverse array of conclusions, methodologies, and explanations, the Administrator strove to inform his judgment to the most impartial extent possible.

In reviewing the public response to the proposal, the Administrator appreciated the wide variety of perspectives and significant interest in the issues raised for further consideration. In particular, the Administrator carefully examined the additional data, modeling, and information submitted in connection with our request for comment on the impact of the EPA's GHG emission standards for new motor vehicles and engines to date and the efficacy of such regulations in addressing the risks identified in the Endangerment Finding. The EPA has conducted further analysis to evaluate the competing perspectives on the ability of GHG emission standards to have a material (*i.e.,* non-*de minimis*) impact on global climate change concerns, with a particular focus on trends in GMST and GSLR—key metrics commonly derived from climate models and primary drivers of the Agency's causal analysis of endangerment in the 2009 Endangerment Finding.

As discussed in section IV of this preamble, the EPA concludes that it lacks statutory authority to resolve these questions through regulatory findings and emission standards under CAA section 202(a)(1). That conclusion led the Administrator to rest this final action on the legal bases proposed as the

---

[63] In dissent, Justice Kagan argued that the Court had obstructed the EPA's efforts to regulate GHG emissions: "Today, the Court strips the [EPA] of the power Congress gave it to respond to 'the most pressing environmental challenge of our time.' " *West Virginia,* 597 U.S. at 753 (Kagan, J., joined by Breyer and Sotomayor, J.J., dissenting) (quoting *Massachusetts,* 549 U.S. at 505); *see also id.* at 755 ("This Court has obstructed EPA's effort from the beginning.").

[64] The D.C. Circuit rejected several petitions for review of the 2010 Denials as part of the *Coalition for Responsible Regulation* decision. 684 F.3d at 124–26.

[65] 2022 Denials at 15–17.

[66] *Id.* at 30.

[67] *Id.* at 36 (noting that 42 U.S.C. 4365(c)(1) requires SAB consultation for a "standard" promulgated under CAA section 202(a) but asserting that requirement does not extend to "findings" issued under the same provision).

[68] *Id.* at 39.

[69] *See* Feb. 19, 2025 Memo at 1.

primary rationale for rescission of the Endangerment Finding and repeal of associated GHG emission standards, as explained in sections V.A and V.B of this preamble. As a separate but complementary basis for rescission and repeal, the Administrator finds that the available evidence indicates GHG emission standards under CAA section 202(a)(1) do not impact trends in GMST or GSLR in any material way, let alone the health and welfare impacts attributed to such trends in the Endangerment Finding. As discussed in section V.C of this preamble, this conclusion further indicates that the best reading of CAA section 202(a)(1) does not encompass the regulation of "air pollution" in the form of global climate change concerns and serves as an independent basis for repealing the GHG emission standards. For discussion of public comments received on the alternative climate science basis and the Administrator's decision not to finalize on that ground in favor of future opportunities for fact finding and public engagement, see section VI of this preamble.

## IV. Legal Framework for Action

### A. Rescission of the Endangerment Finding

The statutory authority for this final action is the same as that relied upon in the prior actions at issue: CAA section 202(a)(1), which requires the Administrator to "prescribe" and "from time to time revise . . . standards" for certain air pollutants emitted by new motor vehicles and new motor vehicle engines "in accordance with the provisions of this section." [70] In addition, unless provided otherwise by statute, an agency may revise or rescind prior actions so long as it acknowledges the change in position, provides a reasonable explanation for the new position, and considers legitimate reliance interests in the prior position. [71]

Nothing in the language of the relevant statutory provision prohibits or conditions our general authority to rescind prior actions through rulemaking. CAA section 202(a)(1) grants the Administrator discretion to "revise" standards prescribed "in accordance with the provisions of this section" and does not require retaining the same level of stringency when revising or rescinding existing standards. Moreover, the statute neither

authorizes the Administrator to issue standalone findings that trigger a duty to regulate nor prohibits the Administrator from rescinding such findings. Rather, CAA section 202(a)(1) requires the Administrator to prescribe standards for emissions of any air pollutant by classes of new motor vehicles or engines when, in his judgment, emissions of such air pollutant by such classes of new motor vehicles or engines "cause, or contribute to, air pollution which may reasonably be anticipated to endanger public health or welfare." Notably, the EPA has consistently assumed that it has the statutory authority to rescind the Endangerment Finding in reviewing the merits of petitions for reconsideration since 2009 and did not state that we lack such reconsideration authority.[72]

The EPA acknowledges that rescinding the Endangerment Finding involves significant changes to the legal interpretations adopted in the Endangerment Finding and retained in subsequent actions. For example, the interpretation of CAA section 202(a) that we are finalizing precludes the EPA from issuing standalone endangerment and contribution findings and instead requires the Agency to make findings for particular air pollutant emissions and classes of new motor vehicles and engines as an integral step in a rulemaking to prescribe standards for such emissions and classes, consistent with our decades-long practice prior to 2009 in regulating non-GHG air pollutants. Furthermore, the interpretation of CAA section 202(a)(1) that we are finalizing in this action reverses the basis for the Endangerment Finding by concluding that global climate change concerns cannot satisfy the statutory standard for regulation under CAA section 202(a)(1). This interpretation is the best reading of the statute, and it is different from the final actions taken by the Agency since 2009 with respect to GHG emission standards under CAA section 202(a).[73] For example, we acknowledge that the EPA changed its position in 2009 and argued in actions finalized since that time and in briefs filed in defense of those actions

that CAA section 202(a) authorizes us to regulate in response to global climate change concerns.[74] We also acknowledge that the EPA argued in actions finalized since 2009 and in briefs filed in defense of those actions that the major questions doctrine has no application to CAA section 202(a)(1).[75] However, intervening legal developments must be considered when evaluating these statements as they developed over time. We initially developed those novel positions without the benefit of the Supreme Court's decisions in *UARG, Michigan,* and *West Virginia,* which explained and applied the major questions doctrine to related GHG emission regulations. Moreover, we note that each of these major actions and rules predated the Supreme Court's decision in *Loper Bright,* which overruled *Chevron* deference to agency statutory interpretation and clarified that statutes have a single, best meaning.[76] In light of these decisions and upon further review of the EPA's prior statements on the applicability and impact of the major questions doctrine, we are finalizing, as proposed, a new position that more faithfully adheres to precedent and governing legal principles. For discussion of CAA section 202(a)(1) and related statutory provisions interpreted in this final action, see section V of this preamble.

The EPA is also finalizing that GHG emission standards for new motor vehicles and engines are futile because they have no material (*i.e.,* non-*de minimis*) impact on the global climate change concerns animating this regulatory program and is reaching two separate and independent conclusions as a result. First, we conclude that futility lends further support to the understanding that CAA section 202(a)(1) is best read to encompass "air pollution" that endangers human health and the environment through local and regional exposure and that domestic regulation can impact without requiring

---

[70] 42 U.S.C. 7521(a)(1).

[71] *See FDA* v. *Wages & White Lion Invs., L.L.C.,* 604 U.S. 542, 568–70 (2025); *FCC* v. *Fox Television Stations, Inc.,* 556 U.S. 502 (2009); *Motor Vehicle Mfrs. Ass'n* v. *State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29 (1983).

[72] *See, e.g.,* 2022 Denials at 7–10 (denying mandatory reconsideration under CAA section 307(d) and reviewing the petitions on the merits as rulemaking petitions under APA section 553(e)); 75 FR 49556, 49560–63 (Aug. 13, 2010) (denying mandatory reconsideration under CAA section 307(d) without asserting that the EPA lacked statutory authority to rescind or revise the Endangerment Finding).

[73] *See, e.g.,* 74 FR 66496 (Dec. 15, 2009); 75 FR 25324 (May 7, 2010); 76 FR 57106 (Sept. 15, 2011); 77 FR 62624 (Oct. 15, 2012); 81 FR 73478 (Oct. 25, 2016); 85 FR 24174 (Apr. 30, 2020); 86 FR 74434 (Dec. 30, 2021); 89 FR 27842 (Apr. 18, 2024); 89 FR 29440 (Apr. 22, 2024).

[74] *See, e.g.,* 74 FR 66496, 66524 (Dec. 15, 2009) (Endangerment Finding); 2022 Denials at 1; 75 FR 49556 (Aug. 13, 2010) (2010 Denials).

[75] *See, e.g.,* 89 FR 29440, 29468–70 (Apr. 22, 2024) (2024 HD GHG Emission Standards Rule) (arguing that regulation of GHG emissions under CAA section 202(a) in response to global climate change concerns is not a question of significant importance, that the EPA has clear congressional authorization, and that use of this authority since 2009 is not novel); 89 FR 27842, 27897 (Apr. 18, 2024) (2024 LD and MD Multi-Pollutant Emission Standards Rule) (same). In these final rules, the EPA also took the position—repudiated in this final action—that it is permissible to expect manufacturers to comply with GHG emission standards by shifting to EVs.

[76] 603 U.S. at 412–13 (overruling Chevron U.S.A., Inc. v. NRDC, Inc., 467 U.S. 837 (1984)).

international emissions reductions. Second, we conclude that futility warrants repeal of the GHG emission standards independent from the Endangerment Finding because they impose immense burdens without furthering any statutory objective. These additional bases for this final action represent a change from the novel position taken in actions and rulemakings since 2009 to prescribe and revise GHG emission standards under CAA section 202(a)(1).[77] For example, we asserted in the Endangerment Finding that the ability of GHG emission standards to impact global climate change concerns was outside the scope of the CAA section 202(a)(1) endangerment and contribution analysis, 74 FR 66501–02, that we could not consider the degree of emissions reductions that could be achieved by regulations issued as a result of the findings, 74 FR 66507–08, and that the "unique" nature of global climate change concerns justified accepting a different analysis than that traditionally applied to mobile-source air pollution problems, 74 FR 66538, 66543. In GHG emission standard rulemakings since 2009, we analyzed the impact of potential standards in terms of contribution, *i.e.,* tons of emissions, rather than impact on endangerment, *i.e.,* from trends in GMST and GSLR that lead in turn to the health and welfare impacts predicted in the Endangerment Finding. That is, we generally evaluated potential GHG emissions reductions (in tons of $CO_2$ equivalent)[78] and used SCC methodologies to attach a dollar value to such emissions reductions.[79] See section V.C of this preamble for further discussion of these additional rationales and the EPA's prior positions.

The EPA further acknowledges that repealing the GHG emission standards based on the proposed rescission of the Endangerment Finding is a departure from our position in rulemakings since 2009 that prescribed and revised GHG emission standards for LD, MD, and HD vehicles and engines under CAA section 202(a)(1). This rescission eliminates the statutory basis for those standards because we relied on the Endangerment Finding in each rulemaking to invoke our authority under CAA section 202(a)(1) without making the required findings for GHGs emitted by the class or classes of new motor vehicles or engines at issue in each rulemaking. To the extent we reaffirmed the Endangerment Finding in subsequent standard rulemakings, the conclusions we are finalizing in this action eliminate the improperly claimed statutory basis for such reaffirmations, all of which relied on the same underlying interpretation of CAA section 202(a)(1) as encompassing the regulation of GHG emissions based on global climate change concerns. See section VII of this preamble for further discussion of each prior rulemaking and the regulatory changes we are making to repeal all GHG emission standards currently in effect for new motor vehicles and engines on bases finalized in this action.

As discussed throughout this preamble, the EPA is finalizing these changes to comply with limits on our statutory authority under the best reading of CAA section 202(a)(1), adhere to the legal limits on our power to set national policy within our constitutional system of democratic government, and realign Agency resources to prioritize core statutory responsibilities that protect human health and the environment. Importantly, the Nation's policy response to global climate change concerns was a major issue in the 2024 presidential election, in which voters were presented with distinct legal and policy approaches and elected a candidate promising a change in policy. Under these circumstances, the election of a new Administration is an independent and sufficient basis for reassessing and revising legal interpretations to faithfully adhere to the best reading of the statute.[80] Democratic accountability is essential to the exercise of delegated authority by administrative agencies,[81] and retaining the Endangerment Finding and associated GHG emission standards without clear statutory authority would frustrate, not promote, constitutional values and the rule of law. The EPA lacks authority to retain the Endangerment Finding under the best reading of CAA section 202(a)(1), and the statute controls regardless of policy preferences.[82]

1. Issues Raised Regarding Rescission Authority

The EPA received substantial comments on the proposed bases for rescinding the Endangerment Finding but relatively few specifically addressing the separate question whether we have the authority to rescind, provided that the rescission is supported by adequate grounds. Most comments received on that issue agreed that the EPA may reconsider prior actions unless the relevant statute provides otherwise and further agreed that nothing in CAA section 202(a)(1) conditions or limits our ability to reconsider prior actions. We appreciate these comments and, as noted above, are finalizing this action based on the statutory authority conferred in CAA section 202(a)(1) and the background principle that agencies may reconsider, revise, and rescind prior actions unless provided otherwise by the relevant statute. Several commenters raised contrary arguments that did not change our view from proposal. For more detailed comment summaries and responses, see the Response to Comments document.

*Comment:* A few adverse commenters argued that rescinding the Endangerment Finding would not support repealing the associated GHG emission standards because the standards-setting rulemakings reaffirmed and reinforced the Endangerment Finding with additional evidence. Some of these commenters also argued that CAA section 202(a)(1) is a precautionary provision, which, they asserted, means that we cannot rescind the Endangerment Finding based on a lack of confidence in the assumptions made and conclusions stated in that action.

*Response:* The EPA disagrees that rescinding the Endangerment Finding would not impact subsequently issued GHG emission standards and notes that these commenters misunderstand the impact of our proposal that CAA section 202(a)(1) does not authorize regulating GHG emissions in response to global climate change concerns. The Agency has consistently maintained that, at

[77] *See, e.g.,* 74 FR 66496, 66524 (Dec. 15, 2009); 75 FR 25324 (May 7, 2010); 76 FR 57106 (Sept. 15, 2011); 77 FR 62624 (Oct. 15, 2012); 81 FR 73478 (Oct. 25, 2016); 85 FR 24174 (Apr. 30, 2020); 86 FR 74434 (Dec. 30, 2021); 89 FR 27842 (Apr. 18, 2024); 89 FR 29440 (Apr. 22, 2024).

[78] *See, e.g.,* 75 FR 25324 (May 7, 2010).

[79] *See, e.g.,* 89 FR 29440, 29675 (Apr. 22, 2024) (2024 HD GHG Emission Standards Rule) ("While the EPA did not conduct modeling to specifically quantify changes in climate impacts resulting from this rule in terms of avoided temperature change or sea-level rise, the Agency did quantify climate benefits by monetizing the emission reductions through the application of estimates of the social cost of greenhouse gases (SC–GHGs)."); 89 FR 27842, 28099 (Apr. 18, 2024) (2024 LD and MD Multi-Pollutant Emission Standards Rule) (same).

[80] *See State Farm,* 463 U.S. at 59 (Rehnquist, J., concurring in part and dissenting in part); PETA v. USDA, 918 F.3d 151, 158 (D.C. Cir. 2019) ("new administrations are entitled to reevaluate and modify agency practices, even longstanding ones"); Nat'l Ass'n of Home Builders v. EPA, 682 F.3d 1032, 1043 (D.C. Cir. 2012) ("the inauguration of a new President and the confirmation of a new EPA Administrator" went "a long way toward explaining why EPA" changed policy).

[81] *See, e.g.,* U.S. Telecom Ass'n v. FCC, 855 F.3d 381 (D.C. Cir. 2017) (Brown, J., dissenting from denial of rehearing en banc); Elena Kagan, Presidential Administration, 114 Harv. L. Rev. 2245, 2252–53, 2332–34 (2001).

[82] *Loper Bright,* 603 U.S. at 403; *West Virginia,* 597 U.S. at 735; *UARG,* 573 U.S. at 325.

minimum, a finding that the relevant air pollutant emissions cause or contribute to air pollution that endangers public health or welfare is a prerequisite to prescribing emission standards. In the Endangerment Finding, we asserted that the statute's "lack of specific direction" with respect to the timing of findings and of associated regulations granted "procedural discretion" to issue the actions separately. 74 FR 66501. But we maintained that the findings created the predicate authority and obligation to issue associated emission standards and acknowledged that it was at least permissible to issue the findings and standards in a single action. 74 FR 66501–02.

Finalizing the rescission of the Endangerment Finding for lack of authority under CAA section 202(a)(1) necessarily means that we lack statutory authority to prescribe or maintain GHG emission standards for new motor vehicles and engines. Whether we cited to additional evidence "reinforcing" the Endangerment Finding in subsequent rulemakings—and whether that additional evidence would itself have been sufficient to satisfy CAA section 202(a)(1) absent the Endangerment Finding—is irrelevant, as each of these actions rested on the novel statutory interpretation adopted for the first time in the Endangerment Finding. The best reading of the statute identified and applied in this final action necessarily overrides the contrary interpretation relied upon in these prior actions and therefore eliminates the legal basis for those prior actions. See section V.A and V.B of this preamble for further discussion of CAA section 202 and the legal position taken by the EPA in actions since 2009. With respect to commenters' precautionary arguments, the EPA is not finalizing the proposed alternative basis for rescission and repeal based on a new climate science finding by the Administrator. See section VI of this preamble for further discussion of the bases we are not finalizing at this time.

*Comment:* Some commenters argued that the CAA limits our authority to rescind prior actions, quoting *NRDC* v. *Regan,* 67 F.4th 397, 401 (D.C. Cir. 2023), for the proposition that the EPA "has no inherent authority" to reconsider its decisions. These commenters asserted that CAA section 202(a)(1) is best read as limiting our rescission authority to reconsideration under CAA section 307 or extraordinary circumstances, such as mistake or fraud, and that Congress authorized us only to update emission standards based on developments in science, technology, and economics by providing that we

must "from time to time revise" emission standards "in accordance with the provisions of this section." According to these commenters, rescinding the Endangerment Finding and associated regulations exceeds that authority.

*Response:* The EPA disagrees with these comments, which misconstrue the statute and misapply relevant case law. The D.C. Circuit's divided opinion in *NRDC* addressed our withdrawal of a regulatory determination for a drinking water contaminant under the Safe Drinking Water Act (SDWA) in lieu of issuing a national primary drinking water regulation. The panel majority and separate opinion agreed that "the power to decide is normally accompanied by the power to reconsider" unless Congress has "'limit[ed] [the] agency's discretion to reverse itself.'" 67 F.4th at 401 (quoting *New Jersey* v. *EPA,* 517 F.3d 574, 582–83 (D.C. Cir. 2008)). Interpreting the statutory language at issue, the panel majority concluded that SDWA section 1412 imposed such a limitation by mandating a sequential, two-step process under which the EPA "shall" propose a regulation within 24 months "[f]or each contaminant that the Administrator determines to regulate" in a final regulatory determination. *Id.* (quoting 42 U.S.C. 300g-1(b)(1)(A), (b)(1)(E)); but see *id.* at 408 (Pan, J., concurring in the judgment) (arguing that "nothing in the [SDWA] forbids the EPA from withdrawing a determination to regulate" because the "statute is silent on that issue"). *NRDC* did not challenge the established background principle that agencies may reconsider prior actions taken under a statutory authority absent statutory indicia to the contrary, and the language of CAA section 202(a)(1) is different in virtually every respect from the content, sequence, and timing requirements in SDWA section 1412.

CAA section 202(a)(1) sets out authority to regulate under certain conditions and provides that such regulations should be revised over time. The statutory language "from time to time revise" refers to the emission standards promulgated when the Administrator exercises "judgment" to determine that an air pollutant emitted from new motor vehicles or engines causes or contributes to air pollution which may reasonably be anticipated to endanger public health or welfare. Beyond reference to the Administrator's "judgment," the statute contains no language constraining or limiting the power to reconsider a finding. Nor does CAA section 202(a)(1) require the EPA to establish regulations by a certain date

or for certain pollutants, unlike many other provisions in CAA section 202 and throughout the CAA.[83] Had Congress intended to restrict the repeal of CAA section 202(a)(1) emission standards based on the Administrator's findings of endangerment and contribution, it knew how to do so, as evidenced by provisions elsewhere in the statute imposing such restrictions.[84] Additional statutory language providing that emission standards must be revised "in accordance with the provisions of this section" merely clarifies that revised standards are subject to the same conditions as the original standards (*i.e.,* an applicable endangerment finding and the various substantive requirements for standards set out in CAA section 202(a)(2), (a)(3), *et seq.*). Finally, we note that this understanding of our reconsideration authority is rooted in consistent practice; as noted above, we assumed that we had such authority when denying reconsideration petitions on the merits in 2010 and 2022.

With respect to CAA section 307 and commenters' asserted mistake or fraud limitation, the EPA assumes commenters meant to suggest that we may only reconsider prior actions through mandatory reconsideration under CAA section 307(d) or by meeting common law standards originally developed for voiding a contract. We are not aware of any precedent establishing a mistake or fraud limitation and cannot agree that there is a plausible basis for doing so given the well-established principle that agencies may reconsider prior actions unless Congress provides otherwise. As to CAA section 307, this rulemaking followed the applicable procedural requirements set out in that provision. The mandatory reconsideration procedure in CAA

---

[83] *Compare* 42 U.S.C. 7409 (mandating NAAQS for criteria pollutants by a date certain), 7412 (mandating regulation of hazardous air pollutants from listed source categories by a date certain), 7429 (same for waste combustors), 7521(a)(3)(B)(ii) (mandating minimum emission standards for HD vehicles for certain pollutants by a date certain), 7521(a)(6) (mandating certain control devices for LD vehicles after a date certain), 7521(b), (g)–(*l*) (mandating various emission standards for enumerated pollutants by dates certain).

[84] Notably, Congress provided in CAA section 202(b)(1)(C) that the EPA cannot relax the pollutant-specific emission standards required "under [CAA section 202(b)]" when revising such standards "under [section 202(a)(1)]." 42 U.S.C. 7521(b)(1)(C). That limitation on revision authority does not apply to emission standards promulgated solely under CAA section 202(a) as an exercise of the Administrator's judgment. Comparable provisions appear elsewhere in the statute as well. *See, e.g.,* 42 U.S.C. 7502(e) (providing that if the EPA "relaxes" a NAAQS, it must within 12 months require "controls which are not less stringent than the controls applicable to areas designated nonattainment before such relaxation").

section 307(d)(7)(B) applies when a petitioner was unable to raise a centrally relevant objection during a public comment period, not to an EPA-initiated reconsideration.

*Comment:* A few commenters raised retroactivity concerns with the rescission and repeals, arguing that Congress must expressly authorize rules with retroactive effect and that repealing GHG emission standards for MY 2026 and earlier vehicles would be impermissibly retroactive. Some of these commenters cited *Bowen* v. *Georgetown University Hospital,* 488 U.S. 204 (1988), as setting out a clear statement rule for authority to issue retroactive rules.

*Response:* The EPA disagrees that repealing GHG emission standards for MY 2026 and earlier vehicles would have retroactive effect, as nothing in this final action "attaches new legal consequences to events completed before its enactment." *Landgraf* v. *USI Film Prods.,* 511 U.S. 244, 270 (1994). As a practical matter, manufacturers have already completed virtually all of the activities necessary to comply with the GHG emission standards for prior MY vehicles. Motor vehicles and engines have been designed and sold with compliant control mechanisms, the proverbial eggs are, in that sense, already scrambled. Repealing the GHG emission standards for prior MYs relieves only a limited set of compliance obligations, including certain ongoing reporting requirements, and does not impose any new or additional obligations on regulated parties.[85] We conclude that repeal of the GHG emission standards for prior MYs is necessary notwithstanding the limited practical effect to ensure that our regulations are squarely grounded in statutory authority and avoid the inconsistency that would be created by retaining these regulations while repealing standards for future MY vehicles and engines. For further explanation of the impacts of the rescission and repeals, see section VII of this preamble and the Response to Comments document. For discussion of the distinct subject of reliance interests, see section IV.A.2 of this preamble.

2. Issues Raised Regarding Reliance Interests

To better assess potential reliance interests, the EPA sought comment on whether regulated parties or other stakeholders have relied in a significant

and legally cognizable manner on our assertion of authority to regulate GHG emissions from new motor vehicles and engines and the requirements imposed pursuant to that asserted authority. We noted that such reliance may be relevant considerations to be weighed against competing rationales when deciding whether to change the Agency's position under relevant case law, including *DHS* v. *Regents of University of California,* 591 U.S. 1 (2020). Specifically, we sought comment on potential reliance interests by regulated parties that have expended resources complying with existing standards, including by pricing compliance into costs for consumers, and on potential reliance interests by other stakeholders on the Endangerment Finding and GHG emission standards.

With respect to regulated parties, we noted that because many compliance costs are incurred as part of research and development and during manufacturing, with the exception of the need to purchase compliance credits, this final action would have small to no impacts on MYs 2012–2024, limited impacts for MYs 2024–2026, and entirely relieve future regulatory obligations for MY 2027 and beyond. We also noted that the rescission and repeals would not mandate any particular response by regulated parties and would instead provide additional flexibility by relieving obligations. For discussion of regulatory tools available to address transitional compliance concerns, see sections III.A, VI.B, and VI.C of the preamble to the proposed rule. We also noted that regulated parties may have an interest in national uniformity and preemption and discussed the continued applicability of CAA section 209(a) and other sources of Federal preemption in sections III.A and VI.A of the preamble to the proposed rule.

With respect to other potential interests held by regulated parties and additional stakeholders, we noted that the rescission and repeals would have no impact on existing regulatory provisions for criteria pollutant and air toxics emission standards or for the separate economy and fuel-efficiency standards administered by NHTSA. We explained that general interests in regulating GHG emissions based on global climate change concerns would not justify retaining the GHG regulatory program for new motor vehicles and engines in the absence of statutory authority, and that potential dangers from exposure to the six gases combined in the Endangerment Finding would continue to be regulated when appropriate under other, more specific grants of statutory authority. For further

discussion, see sections III.A and IV.A.2 of the preamble to the proposed rule. Finally, we recognized that the EPA has since relied on the Endangerment Finding as authority for GHG regulatory actions under other provisions of the CAA, including several vacated by the Supreme Court,[86] and noted that we would address those actions as appropriate in separate rulemaking proceedings.

The EPA received significant comments on reliance interests from a variety of regulated parties and interested stakeholders that reflected diverging views on whether we should consider reliance interests, what reliance interests we should consider, and how such interests should be addressed in this rulemaking. We agree with commenters' suggestion that under *Loper Bright,* it is unclear how reliance interests could justify retaining or prolonging a regulatory action that is inconsistent with the best reading of the statute. Nevertheless, we carefully reviewed public comments to assess whether any aspects of this final action should be adjusted to account for reliance interests where possible to do so consistent with our statutory authority. Ultimately, we are finalizing the primary legal basis for the rescission and repeals as proposed along with the additional futility conclusions discussed above. Reliance interests raised by adverse commenters did not change our proposed view that a lack of statutory authority necessitates rescinding the Endangerment Finding and repealing the GHG emission standards and deprives us of discretion to issue revised regulations establishing a phase-out or wind-down approach. For more detailed comment summaries and responses, see the Response to Comments document.

*Comment:* Commenters argued that reliance interests are irrelevant when an agency proposes to rescind a prior action that exceeded its statutory authority. These commenters argued that because the EPA lacked statutory authority to issue the Endangerment Finding and associated GHG regulations, no amount of reliance could justify continuing a program that wields a power neither Congress nor the Constitution granted to the Agency. At least one commenter also cited Justice Thomas's dissenting opinion in *Regents,* which argued that reliance interests are irrelevant when an agency rescinds an unlawful prior action. 591 U.S. at 60.

*Response:* The EPA appreciates these comments and agrees that reliance

---

[85] For example, any contractual provisions between the seller (*e.g.,* dealership) and a vehicle purchaser would not be changed or disrupted solely by operation of this final action.

[86] *See West Virginia,* 597 U.S. 697; *UARG,* 573 U.S. 302.

interests alone could not justify retaining or extending a regulation that exceeds our statutory authority. Particularly after *Loper Bright,* the relevance of reliance interests under such circumstances is unclear.[87] On one hand, courts have consistently held that agencies must consider significant reliance interests when exercising their authority to change positions. On the other, these cases typically addressed reliance interests in contexts where the agency faced a choice between competing policy options. Under *Chevron,* that included the choice between permissible interpretations of the relevant statute. Now that *Chevron* has been overruled, however, the range of agency discretion is considerably narrowed because the best reading of the statute controls. *Loper Bright,* 603 U.S. at 401–04. When the statute is best read as conferring discretion, courts use ordinary tools of interpretation to "fix the boundaries of the delegated authority" and ensure the agency reasonably exercises its discretion within those boundaries. *Id.* at 395.[88]

Relevant precedents decided before *Loper Bright* do not resolve the question whether the illegality of a prior agency action is a sufficient explanation for rescission under the change-in-position doctrine. In *Encino Motorcars, LLC* v. *Navarro,* 579 U.S. 211 (2016), for example, the Supreme Court applied the *Chevron* framework to an agency's decision to alter a longstanding statutory interpretation that applied an exemption to a class of employees. The Court found the change arbitrary and capricious because the agency failed to consider industry's legitimate reliance on the applicability of the exemption. *Id.* at 221–22. The decision appeared to assume for purposes of deciding the case that either interpretation could be permissible under *Chevron* and did not address whether, had the prior interpretation been unlawful, that

determination would have been a sufficient explanation for the new interpretation.

In *Regents,* the Court found the rescission of a deferred action memorandum arbitrary and capricious for failing to consider legitimate reliance interests, even where the memorandum had provided that the deferred action program "conferred no substantive rights." 591 U.S. at 30. That holding was informed by the Court's decision not to address whether the agency lacked statutory authority to issue the original memorandum. *Compare id.* at 25–28, 32, *with id.* at 40, 60 (Thomas, J., dissenting) (arguing that reliance interests were irrelevant because the agency was rescinding an unlawful action). Rather, the Court noted that the agency had taken the view that it retained discretion in deciding how to wind down the program, *id.* at 25, and assumed on that basis that the agency could have accommodated reliance interests given its "considerable flexibility in carrying out its statutory responsibility," *id.* at 32.

The conclusion that we lack statutory authority under CAA section 202(a)(1) to regulate GHG emissions in response to global climate change concerns leaves us without discretion to issue revised regulations. There is no "water under the bridge" exception for unlawful agency action, and the change-in-position doctrine does not expand an agency's statutory authority for the purpose of addressing reliance interests. The Supreme Court previously rejected our efforts to reduce compliance burdens triggered by our GHG regulatory program in *UARG,* holding that the Tailoring Rule exceeded our statutory authority and demonstrated that the underlying Triggering Rule was itself unlawful. 573 U.S. at 328. Here, retaining or altering the GHG emission standards because of reliance interests would similarly require rewriting the statute to confer "power that neither Congress nor the Constitution" gave us. *Regents,* 591 U.S. at 60 (Thomas, J., dissenting). Adopting regulatory provisions to phase out or winddown the Endangerment Finding and GHG emission standards would be inconsistent with the conclusion that we lack statutory authority for the program, potentially rendering both aspects of the action arbitrary and capricious. CAA section 202(a)(1) is binary in this respect. Our authority to delay or adjust standards under additional provisions of CAA section 202 cannot be accessed without first passing through the narrow gate of CAA section 202(a)(1).

Nevertheless, as discussed below and further detailed in the Response to Comments document, we reviewed and considered reliance interests raised by stakeholders in the interest of transparency and public engagement. This discussion is not and should not be understood as a concession that such consideration is legally required, or that any disagreement with our consideration of particular reliance interests undermines this final action.

*Comment:* Many commenters supportive of the proposal argued that stakeholders could not have significant reliance interests warranting retention of the Endangerment Finding and GHG emission standards given the nature of the rescissions and repeals. These commenters noted that the rescission and repeals would relieve rather than impose obligations, and that manufacturers and others remain free to move forward with current plans and designs.

*Response:* The EPA agrees that this final action relieves compliance obligations under the CAA and does not require anything further of regulated parties with respect to GHGs. As noted at proposal, unlike the GHG emission standards, this final rescission and repeal action increases flexibility and does not require manufacturers to change plans if doing so would raise timing concerns within the MY structure of the new motor vehicle and engine market. With respect to informational labels and warranties, manufacturers may elect to proceed with implementation or not, and nothing in this final action invalidates existing labels or contracts entered into between or among manufacturers, suppliers, and purchasers. We acknowledge that regulated parties have already incurred compliance costs because of the GHG emission standards and, particularly with respect to MY 2026 and beyond vehicles, have yet to recoup such costs through sales. However, those costs were incurred because of the GHG emission standards rather than this final action and cannot legitimately be attributed to this final action. Nor is it the case that this final action deprives regulated parties of a benefit to which they would have been entitled by complying with the GHG emission standards. The "benefit" of compliance is the avoidance of enforcement actions and potential penalties under the CAA. This final action does not subject regulated parties to increased risk of enforcement.

The evaluation of reliance interests is a context-specific inquiry that turns on the structure of the regulatory program and the nature of related private

---

[87] Since *Loper Bright,* the Supreme Court has returned to the reliance interest prong of the change-in-position doctrine only in a case involving arbitrary and capricious claims that did not turn on questions of statutory interpretation. *See Wages & White Lion,* 604 U.S. at 567.

[88] In *Loper Bright,* the Supreme Court also stated that *Chevron*'s overruling is not a sufficient reason to invalidate "specific agency actions" upheld under the *Chevron* framework. 603 U.S. at 412. That *stare decisis* limitation does not apply to the rescission and repeals in this final action, which is a separate and subsequent decision in which the EPA is changing its interpretation of CAA section 202(a)(1) and repudiating our prior actions as exceeding our statutory authority. *See, e.g., Ohio Telecom Ass'n* v. *FCC,* 124 F.4th 993, 1002 (6th Cir. 2025) (courts are not bound by prior holdings applying the Chevron framework in the same statutory context when the agency action on review "is not the 'specific agency action'" upheld in the prior decision).

arrangements. Courts have recognized that asserted reliance interests may be unreasonable in light of the statutory scheme, *Am. Fuel & Petrochemical Mfrs.* v. *EPA,* 937 F.3d 559, 578 (D.C. Cir. 2019), and that the duty to consider reliance interests "exists in tandem with the nature of the reliance interests at issue," *Am. Petrol. Inst.* v. *DOI,* 81 F.4th 1048, 1060 (10th Cir. 2023). CAA section 202 recognizes the MY structure of the vehicle market in various ways, including by distinguishing between "new" and existing vehicles, and we have prescribed emission standards on an MY basis for decades. Regulated parties are aware that emission standards may be changed and updated for future MYs, and, as explained above, face minimal ongoing regulatory obligations with respect to past MYs. Cases involving legally significant reliance interests by regulated parties have almost always involved agency actions that increase regulatory obligations. See, *e.g., Encino Motorcars,* 579 U.S. at 223. Where, as here, the agency action relieves regulatory obligations, regulated parties are not harmed by the additional flexibility of choosing between maintaining their existing plans or altering them as they see fit. See, *e.g., Arizona* v. *EPA,* 77 F.4th 1126, 1130 (D.C. Cir. 2023) (finding no standing to challenge compliance deadline extension because the rule "in no way prevented primacy states from proceeding on the original schedule").

For these reasons, we do not believe that existing compliance investments by regulated parties are the type of significant reliance interests that warrant special consideration in the context of this rulemaking. Even taking them into account, however, such reliance interests do not expand the EPA's statutory authority under CAA section 202(a)(1). As explained above, the best reading of the statute precludes us from maintaining a GHG emission standard program for vehicles and engines. For further discussion of the bases for this final action, see section V of this preamble. For discussion of more specific compliance-related concerns, including facility investments and compliance credits, see the comment and response summaries below and the Response to Comments document.

*Comment:* Some commenters asserted that regulated parties have invested substantially in complying with the GHG emission standards, including by operating, constructing, and announcing facilities to manufacture EVs, and that such investments by various actors in the supply chain since 2007 amount to $211 billion. These commenters also asserted that American manufacturers have been at the forefront of developing and deploying responsive technologies, many of which are already in production and use. Several of these commenters argued that we have not justified proceeding with the rescission and repeals given these investments, while others suggested that we should consider a more limited repeal of the most recent GHG emission standards rather than a broader rescission of the Endangerment Finding.

A different set of commenters contested the relevance of such reliance interests, arguing that many of these investments predate the EPA's most recent GHG emission standards, that the most recent GHG emission standards improperly bail out automakers' bad EV investments, and that automakers are already retreating from EV production for independent reasons.

*Response:* The EPA acknowledges that certain regulated parties have invested significantly in EV production and technologies that have been or could be used to comply with the GHG emission standards. We also acknowledge that those companies have already reaped significant value from this program by selling credits to other companies over the years. As discussed above, however, nothing in this final action precludes market participants from continuing to make such investments or removes any benefit capable of engendering cognizable reliance interests. Nor are such investments capable of expanding the EPA's statutory authority under CAA section 202(a)(1).

In general, we do not believe that the investments in EVs and related technologies raised by commenters should be attributed exclusively to the EPA's current GHG emission standard requirements. The new motor vehicle and engine market is complex and informed by a wide variety of economic and regulatory considerations. As several commenters recognized, some of these investments predate our most recent GHG emission standards rulemakings in 2024 for MYs 2027 and beyond, and some predate the Endangerment Finding. With respect to economic influences, we note that EV demand has been subject to significant fluctuation and declines unrelated to this rulemaking. The decline in demand is attributable in part to Congress, which recently repealed certain tax credits and subsidies for EVs and disapproved three prior EPA preemption waivers for EV-forcing California vehicle and engine regulations. Changes in consumer preferences are also relevant factors. The ability of market participants to earn a return on EV and related investments thus turns on a variety of factors that ultimately fall outside the Agency's regulatory wheelhouse. The CAA requires us to take cost into account in various ways, but it does not require the EPA to ensure that EV investments turn a profit.

*Comment:* Several commenters asserted that automakers have relied on the EPA's GHG emission standards to export vehicles and engines overseas on the understanding that products meeting our standards will generally also meet international emission standards. These commenters argued that the rescission and repeal of U.S. GHG emission standards will create uncertainty and raise costs for regulated parties based on this additional export market concern.

*Response:* The EPA disagrees that possible challenges facing automakers in complying with international emission standards are legitimate reliance interests that counsel against the rescission and repeals. We question the premise that automakers assume their products will comply with applicable emission standards in export markets, as GHG emission standards are not in place for new vehicles and engines (or the same classes of new vehicles and engines) in all export markets and vary significantly among nations where such GHG emission standards are in place and applicable to imports. We also note that many automakers structure design, marketing, and production strategies to account for differing emission standards across various markets, both for GHG emissions and for emissions of criteria pollutants and air toxics. Regardless, as discussed above, nothing in this final action prevents regulated parties from maintaining current plans to the extent that they believe doing so is a convenient way to more easily participate in export markets.

*Comment:* Several commenters raised concerns about the GHG compliance credit regime that some regulated parties have used to comply with the existing regulations. These commenters argued that companies have accumulated credits over the past 15 years and, in some cases, already booked those credits as assets. Several of these commenters presented this as a reason not to finalize the rescission and repeals, while others requested a wind-down period.

*Response:* The EPA has consistently maintained that regulated parties lack a property right in compliance credits or

their use to demonstrate compliance.[89] We note that the relevant universe of compliance credits potentially impacted by this final action is much smaller than some commenters suggest, as credits are specific to compliance years and expire after five years.[90] Credits for MY 2020 and previous vehicles are expired, and potential credits for MY 2026 and beyond vehicles are not yet in place. These considerations lead us to conclude that the impact on stakeholders arising from compliance credit issues will be relatively small and temporary. Additionally, as discussed within the Response to Comments document, the EPA has reduced the value of emission credits within trading programs previously.

More fundamentally, our lack of statutory authority to retain the GHG emission standards means that we lack discretion to issue revised regulations that incorporate a phase-out or wind-down approach to address concerns related to this compliance mechanism.

*Comment:* Some commenters asserted that State and local governments have relied on the EPA's GHG regulatory program as a baseline to craft climate policy and invested substantial resources in EV manufacture and development, EV infrastructure, including charging stations, and transportation electrification more generally. Several of these commenters also asserted that States have relied on co-pollutant reductions from the GHG emission standards to satisfy their compliance obligations under the NAAQS for criteria pollutants. These commenters argued that, given such reliance interests, the EPA should first conclude its rescission of the Endangerment Finding, including any subsequent litigation, before repealing the associated GHG emission standards.

*Response:* The EPA acknowledges the comments and information received from many States and local governmental entities, including both the comments summarized above and comments from States urging us to finalize the proposed rescission and repeals. We are aware that State and local governments have, at various times, encouraged and supported the

EPA's GHG regulatory program and undertaken initiatives to address perceived global climate change concerns. We disagree that this final action disrupts State and local policy initiatives that have used the Endangerment Finding or subsequent actions as a baseline, however. So long as such policy initiatives are consistent with applicable Federal law, they may continue, and nothing in this final action changes the status quo for such initiatives. To the extent commenters refer more generally to a practice of supporting and imitating aspects of the EPA's GHG regulatory program, that practice does not depend upon our continuing to maintain the program. To the extent commenters refer to information, funding, or technical support that has been integrated into such programs, we note that any such provisions are not part of the Endangerment Finding or GHG emission standards subject to rescission and repeal and that commenters did not point to a specific counterexample that should be considered in this rulemaking. Nothing in this final action addresses any separate statutory obligation the EPA may have to provide information, make grants, or provide technical support.

With respect to commenters' assertions about State and local government investments in EV technology and infrastructure, we disagree that such reliance interests counsel against the rescission and repeals for substantially the same reasons discussed above regarding regulated parties. Nothing in this final action precludes such investments, and nothing in the prior actions and rules subject to this final action entitled States or local governments to any particular benefits or return on their investments. The extent to which such investments end up supporting these entities' policy goals turns on a complex combination of unrelated regulatory and economic factors.

Finally, with respect to the NAAQS program, we note that the EPA has not established air quality criteria or NAAQS for GHGs under CAA sections 108 and 109, either individually or under the Endangerment Finding's definitional grouping of the six "well-mixed" GHGs. As explained in section VI of this preamble, this final action does not impact any of the EPA's criteria pollutant emission standards that are more directly relevant to NAAQS attainment or NHTSA's separate fuel-economy and fuel-efficiency regulations that also may result in co-benefits. We acknowledge that many regulated parties elected to

comply with the GHG emission standards using technologies that also produce reductions in criteria pollutant emissions, including by shifting toward EVs or otherwise installing control equipment with co-benefits. Nevertheless, we disagree that such co-benefits engender significant reliance interests relevant to this rulemaking or that such considerations justify retaining the GHG regulatory program in the absence of statutory authority, particularly because the EPA has additional, express statutory authorities to address criteria pollutant emissions relevant to NAAQS attainment.

As a practical matter, criteria pollutant emission reductions attributable to the GHG emission standards are small in absolute terms and unlikely to materially impact States' attainment of the NAAQS. In recent GHG emission standard rulemakings, we stated our expectation that manufacturers would comply with the standards by shifting to EV production, which we predicted would lower criteria pollutant emissions from new motor vehicles, increase emissions from the power sector to accommodate additional electricity demand, and marginally decrease emissions attributed to fossil-fuel refineries given decreased demand for diesel and gasoline. For the 2024 HD GHG Emission Standards Rule, for example, we estimated small net decreases in $NO_X$, VOCs, and sulfur dioxide ($SO_2$) emissions and a small net *increase* in fine particulate matter ($PM_{2.5}$) emissions.[91] For context, the emission decreases projected for HD vehicles amount to less than 1 percent of national $NO_X$ emissions and less than 0.01 percent of VOC and $SO_2$ emissions for 2024.[92] As discussed above, this final action has the potential to alter vehicle emissions on a prospective basis given the MY-by-MY nature of the market and the applicability of CAA section 202(a) emission standards to "new" motor vehicles and engines. Thus, any criteria pollutant emission reductions realized in practice as a co-benefit of GHG emission standards for

---

[89] *See* 40 CFR 86.1865–12(k)(2) ("There are no property rights associated with $CO_2$ credits generated under this subpart. Credits are a limited authorization to emit the designated amount of emissions. Nothing in this part or any other provision of law shall be construed to limit EPA's authority to terminate or limit this authorization through a rulemaking.").

[90] *See* 73 FR 25692 (May 7, 2010) and 40 CFR 86.1865–12(k)(2). Relatedly, see 40 CFR 86.1861–17(b)(3) (LD and MD vehicle credits); 40 CFR 1036.740(d) (HD engine credits), and 1037.740(c) (HD vehicle credits).

[91] *See, e.g.,* 89 FR 29440, 29455 (Apr. 22, 2024).

[92] *Compare id.* (estimating $NO_X$ emission reductions of 53,051 tons, VOC emission reductions of 7,272 tons, and $SO_2$ emission reductions of 295 tons), *with* U.S. Environmental Protection Agency: Air Pollutant Emissions Trends Data (Apr. 2025) (estimating $NO_X$ emissions of 6,940,000 tons, VOC emissions of 12,783,000 tons, and $SO_2$ emissions of 1,675,000 tons). National emissions are the appropriate comparator because NAAQS attainment is evaluated by criteria pollutant levels from all sources. Estimates in the 2024 HD GHG Emission Standards Rule evaluated emissions from all HD vehicles MY 2027 and beyond regardless of in-use location.

MY 2025 and earlier are not impacted by this final action. Moreover, this final action does not require regulated parties to change existing plans, but rather, provides additional flexibility moving forward, meaning whether any and by how much anticipated reductions occur in practice turns on decisions by multiple independent actors.

For these reasons, we cannot agree that States have significant reliance interests in the permanence of GHG emission standards in connection with NAAQS attainment. Potential impacts are limited to marginal foregone emissions reductions in future years. The co-benefits estimated in prior rulemakings are necessarily speculative because they turn on compliance decisions by manufacturers in future years and purchasing decisions by consumers (*i.e.,* whether manufacturers comply as expected by shifting to EVs or adopting different technologies, and whether consumer demand for vehicles and engines, including relative demand for traditional vehicles versus EVs, plays out as expected). Reductions in such co-benefits are also uncertain because they depend on how regulated parties choose to proceed in future years in light of this final action. Separate and apart from this rulemaking, CAA section 202(a) makes clear that the content of the EPA's vehicle and engine emission standards are subject to revision at any time, and we have repeatedly revised the GHG emission standards for future MYs since 2010.[93] See, *e.g., Am. Fuel & Petrochemical Mfrs.,* 937 F.3d at 578 (finding reliance on particular biofuel volume decisions unreasonable given the EPA's express discretion to revise requirements).

The appropriate mechanisms for addressing these concerns are the EPA's express statutory authorities bearing on criteria pollutant emissions and the NAAQS. We encourage States to participate in future rulemakings for criteria pollutant emission standards under CAA section 202 and other rulemakings impacting criteria pollutant emissions from stationary sources. NAAQS attainment is evaluated based on measured levels in the ambient air, and the statute provides a number of regulatory tools to the EPA and States to promote attainment. For example, the EPA may account for the impact of exceptional events and international

emissions under certain circumstances and require States to adopt additional controls when their emissions contribute to nonattainment in another State. And States have discretion in formulating plans to attain the NAAQS, which may include certain mobile-source compliance programs, additional controls for new and existing stationary sources, and other emissions-reduction strategies. For additional discussion of our efforts to assist States in attaining the NAAQS, see the authorities, programs, and guidance documents referenced in the Response to Comments document.

*Comment:* Commenters with a variety of perspectives asserted that we failed to consider the interests of vehicle purchasers, including those with future commitments to purchase clean vehicles and past purchasers of vehicles with battery warranties and certain in-use performance requirements. Several of these commenters also stated that current GHG emission standards were projected to save consumers thousands of dollars per vehicle in fuel costs over the life of the car given continued improvements in efficiency and the availability of cleaner vehicle models, including from increased EV market penetration.

*Response:* The EPA disagrees that such interests counsel against finalizing the rescission and repeal and notes that commenters misconstrue the impact of this final action and the requirements in the GHG emission standards. Nothing in this final action requires regulated parties to change existing plans, and that logic applies to future purchase commitments as well. If States, municipalities, or businesses wish to fulfill existing purchase requirements or choose to purchase such vehicles in the future, they remain free to do so. Commenters provided no reason to believe that these voluntary purchase agreements were entered into to facilitate compliance with the GHG emission standards, and we are not aware of any reason that States, municipalities, or businesses not subject to the standards (*i.e.,* not manufacturers or suppliers) would be involved in the design or production of compliance vehicles or engines. To the extent commenters meant to assert that the purchases were intended to satisfy local emission-reduction targets, many such targets are voluntary, and nothing in this final action prevents entities from proceeding with or adjusting existing strategies. With respect to past purchases, the battery warranty and in-use performance requirements cited by commenters are not set to begin until MY 2027. For this reason, purchasers

cannot reasonably have relied on these requirements for past purchases, and any battery warranties or performance guarantees were entered into on a voluntary basis separately from regulatory requirements. See the Response to Comments document for additional discussion of emissions warranties and limited additional ongoing obligations for certain MY 2025 and earlier vehicles.

As to estimated fuel cost savings arising from the predicted impacts of increased market penetration of EVs, we note that fuel costs savings per vehicle for the consumer were not a substantive justification for the Endangerment Finding. Rather, we included the discussion cited by commenters in the RIAs completed for more recent standards rulemakings. Commenters did not support their contention that existing purchasers reasonably relied on the estimated fuel costs savings per vehicle from the GHG emission standards in purchasing a vehicle. Moreover, as discussed in the DRIA and RIA for this final action, we significantly adjusted prior estimates of the cost savings attributable to GHG emission standards. Our prior estimates were based on interdependent assumptions and predictions regarding future choices by unrelated actors and global fluctuations in fossil-fuel and energy supply and demand. Intervening events since our estimates in 2024, including legislative, policy, and global market changes, have already demonstrated the significant range of uncertainty inherent in the analysis. See the RIA for this final action and subsequent sections of this preamble for further discussion.

*Comment:* Finally, several commenters argued generally that we failed to consider reliance interests involving the U.S. economy, national security, global geopolitics, and global trade. These commenters argued that we must consider these interests to finalize a valid rule.

*Response:* The EPA does not believe these general assertions raise specific and legitimate reliance interests that could or must be taken into account in this rulemaking as *reliance* interests. Case law provides that such generalized concerns are not the type of reliance interests that require special consideration.[94] We endeavored to take

---

[93] Unlike CAA sections 109, 111, 112, and 129, for example, CAA section 202(a)(1) requires the EPA to revise new motor vehicle and engine emission standards "from time to time" without mandating a particular review timeline or date-certain deadline for periodic revisions. *Compare* 42 U.S.C. 7521(a)(1), *with id.* 7409(d)(1), 7411(b)(1)(B), 7412(d)(6), (f)(2), 7429(a)(5).

[94] *See, e.g., Am. Petrol. Inst.,* 81 F.4th at 1061 ("general assertions of reliance simply do not rise to the level of ongoing and serious reliance interests necessary to trigger a duty . . . to provide a more detailed explanation"); *Am. Hosp. Ass'n* v. *Azar,* 983 F.3d 528, 540 (D.C. Cir. 2020) (rejecting general assertion of reliance interests where party

Continued

these general concerns into account in this rulemaking when appropriate, including by carefully reviewing and considering the ways in which Congress addressed international emissions issues in the CAA. However, as discussed in section V of this preamble, the controlling statutory language in CAA section 202(a) does not authorize the Agency to regulate GHG emissions in response to such global concerns. The possibility that interpreting CAA section 202(a) to authorize regulation in response to global climate change concerns would render the statute broad enough to encompass global political and economic relations reinforces our view of the best reading of the statute.

## B. Repeal of New Motor Vehicle and Engine GHG Emission Standards

As noted above, CAA section 202(a)(1) directs the Administrator to prescribe ''standards applicable to the emission of any air pollutant from any class or classes of new motor vehicles or new motor vehicle engines, which in his judgment cause, or contribute to, air pollution which may reasonably be anticipated to endanger public health or welfare.'' This core directive has remained substantially the same since Congress enacted the Motor Vehicle Pollution Control Act of 1965.[95] Thus, a necessary condition to regulating emissions from new motor vehicles and engines is a finding—an ''endangerment finding''—that emissions of an air pollutant from a class or classes of new motor vehicles or engines cause or contribute to air pollution which may reasonably be anticipated to endanger public health or welfare.

For the reasons discussed in sections V.A and V.B of this preamble, we are rescinding the Endangerment Finding for GHG emissions from new motor vehicles and new motor vehicle engines and, on that basis, repealing all existing GHG emission standards for passenger cars, light-duty trucks, motorcycles, buses, medium-duty vehicles, and heavy-duty vehicles and engines. The Endangerment Finding has served as the EPA's basis for regulating GHG emissions from new motor vehicles and new motor vehicle engines since 2009. Absent findings of endangerment and causation or contribution, the EPA lacks statutory authority to prescribe standards for those emissions under CAA section 202(a)(1). Thus, we must cease prescribing and enforcing standards applicable to the emission of that pollutant from new motor vehicles

or new motor vehicle engines and are rescinding existing standards no longer authorized by statute.

For the reasons discussed in section V.C of this preamble, we also find that the futility of GHG emission standards for new motor vehicles and engines warrants repealing the standards separate and apart from the rescission of the Endangerment Finding. Courts have long recognized the background principle that Congress does not intend agencies to expend resources on fruitless efforts, particularly when those efforts come at the expense of express statutory obligations for which material progress is more readily achievable. Given the immense costs to manufacturers, auto workers, and American consumers, as well as the burden of administration placed on the EPA and other relevant Federal and State entities, it would be unreasonable to retain a regulatory program that does not materially further any statutory objective relevant to the global climate change concerns relied upon by the Agency in the 2009 Endangerment Finding. This conclusion is consistent with the precautionary nature ascribed by relevant court decisions to the statutory language of CAA section 202(a)(1), which we recognize does not require showing that emission standards entirely or even substantially address the identified dangers. Rather, the available information indicates that GHG emission standards have no impact at all on the adverse impacts identified in the Endangerment Finding beyond a *de minimis* level that falls well below inherent variability in measurements of GMST and GSLR.

Accordingly, the EPA is repealing all standards and associated test procedures adopted to limit the emission of GHGs under CAA section 202(a)(1) for highway LD, MD, and HD vehicles and engines. The EPA notes that, for LD vehicles, the Energy Policy and Conservation Act of 1975 (EPCA)[96] and the 2007 EISA authorize NHTSA to administer the CAFE program and fuel economy labeling program. These statutes also direct the EPA to determine compliance values for manufacturers subject to the CAFE program and the fuel economy labeling program. Importantly, these statutory obligations are distinct from the EPA's authority under CAA section 202(a) and from the EPA's decisions since 2009 to regulate GHG emissions under CAA section 202(a). As explained in section VII of this preamble, we did not propose to reopen and are not finalizing in this rulemaking any changes to regulatory

provisions related to our statutory roles in these NHTSA programs. Likewise, we did not propose to reopen and are not finalizing in this rulemaking any changes to criteria pollutant and air toxics standards for highway LD, MD, and HD vehicles and engines under CAA section 202(a).

## V. Rescission of the Endangerment Finding

In this section, the EPA provides its bases for rescinding the 2009 Endangerment Finding that initiated the Agency's unprecedented assertion of authority to regulate GHG emissions in response to global climate change concerns. Upon careful review of the text, structure, and history of CAA section 202(a)(1) and related provisions and consideration of comments received on the rationales set out in sections IV.A and V.C of the preamble to the proposed rule, we are finalizing that the Endangerment Finding and GHG regulatory program for new motor vehicles and engines exceeds the EPA's statutory authority for multiple, independent reasons. This conclusion leads us to finalize the proposed repeal of the GHG emission standards in the relevant provisions of Title 40 of the CFR as detailed in section VII of this preamble.

Section V.A of this preamble sets out our determination that CAA section 202(a) does not authorize the EPA to prescribe standards for GHG emissions based on global climate change concerns. Consistent with the Agency's practice before 2009, we conclude that this provision contains important limitations on what would otherwise be a boundless authority. First, CAA section 202(a)(1) is best read as authorizing the EPA to identify and regulate ''air pollution'' that threatens to endanger health and welfare through local and regional exposure. Second, CAA section 202(a)(1) is best read as requiring the EPA to apply the statutory standard for regulation as a whole by issuing findings as an integral predicate step of an emission standards rulemaking and, in doing so, evaluating whether new motor vehicle and engine emissions cause or contribute to the danger posed by the relevant air pollution. We apply the traditional tools of statutory interpretation to CAA section 202(a)(1) and related provisions, as informed by the Supreme Court's decisions in *Loper Bright* and *UARG.* We also explain how the inability of GHG emission standards to have a material (*i.e.,* non-*de minimis*) impact on the dangers attributed to global climate change in the Endangerment

---

''identified no reliance interests the action might be upending'').

[95] Public Law 89–272, 79 Stat. 992, 992–93.

[96] Public Law 94–163, 89 Stat. 871 (1975).

Finding informs our statutory interpretation.

Section V.B of this preamble explains our determination that CAA section 202(a)(1) lacks the clear congressional authorization required for the EPA to assert authority to regulate GHG emissions in response to global climate change concerns. We review the Supreme Court's precedents applying the major questions doctrine, including *UARG* and *West Virginia,* to conclude that the Nation's policy response to global climate change concerns is a question of significant economic and political importance and that Congress did not clearly empower the EPA to decide by authorizing the Administrator to "prescribe . . . standards" for emissions from new motor vehicles and engines. We further explain that a limiting construction of CAA section 202(a)(1) is necessary to avoid serious constitutional concerns with the breadth of the provision required by the logic adopted in the Endangerment Finding.

Section V.C of this preamble explains our determination, informed by comments and supporting data received in response to the proposed rule, that GHG emission standards have not and cannot materially diminish the health and welfare impacts attributed to global climate change by the Endangerment Finding in any non-*de minimis* way. As presented below, the results of our modeling indicate that even the elimination of all GHG emissions from vehicles in the United States (both new and existing, and inclusive of LD, MD, and HD vehicles) would not yield impacts beyond a level that is well below the range of inherent variability in measurement for trends in GMST and GSLR. We conclude that these findings lend further support to the basis for rescission in section V.A of this preamble given the language of CAA section 202(a)(1) and the background principles that Congress does not require futile efforts or include *de minimis* concerns in general statutory terms. We further conclude that these findings support repealing the GHG emission standards separate and apart from the rescission of the Endangerment Finding because it is unreasonable to impose immense costs that do not further any legitimate statutory purpose.

Each of the legal bases finalized in this action is separate and independent from the others, and the EPA would rescind the Endangerment Finding and repeal the GHG emission standards on any one of these bases standing alone. The EPA's lack of statutory authority for the Endangerment Finding and related regulations would require rescission and repeal even if the major questions

doctrine did not apply. Similarly, the major questions doctrine would require finalizing this action even if the EPA had a plausible textual basis for asserting the authority to regulate GHG emissions in response to global climate change concerns. Each of these bases would require finalizing this action even if the futility of the GHG emission standards program were not established in the record or were not an adequate basis for this final action. Conversely, the futility of the GHG emission standards program would support repealing the GHG emission standards even if there were an adequate legal basis to retain the Endangerment Finding.

"Wisdom too often never comes, and so one ought not to reject it merely because it comes late." *Henslee* v. *Union Planters Nat'l Bank & Tr. Co.,* 335 U.S. 595, 600 (1949) (Frankfurter, J., dissenting). Because the Endangerment Finding and the regulations that rely upon it exceed the EPA's authority in multiple respects, fundamental legal principles underpinning our constitutional system compel corrective action. The Endangerment Finding must be rescinded, and the regulatory program it initiated must be, repealed.

### A. Best Reading of CAA Section 202(a)(1)

The Endangerment Finding announced an interpretation of CAA section 202(a)(1) that permitted the EPA to prescribe standards in response to global climate change concerns rather than air pollution that threatens public health or welfare through local or regional exposures. We asserted that the statute's "silence" granted us "procedural discretion" to issue standalone findings without considering the regulatory response required by those findings. In setting out our standalone findings, we severed the endangerment analysis (based on health and welfare harms attributed primarily to trends in GMST and GSLR) from the cause or contribution analysis (based on the estimated share of domestic GHG emissions from all new and existing motor vehicles and engines in global GHG emissions from all anthropogenic sources). In the endangerment analysis, we acknowledged that none of the health effects of concern were associated with direct exposure to GHGs, and in the contribution analysis, we acknowledged that combatting the identified risks would require all contributors—both domestic and international and from all anthropogenic sources—to "do their part." Throughout, we assumed that the Supreme Court's decision in

*Massachusetts* compelled us to read the statute as authorizing the regulation of GHG emissions under CAA section 202(a)(1).

In important respects, the Endangerment Finding and the Supreme Court's decision in *Massachusetts* straddled a transitional period regarding the standards for statutory interpretation and understandings of agency authority. The breadth of agency discretion, and the question whether Congress reserves major policy questions for itself, were sharply disputed. Judicial decisions in the intervening fifteen years have significantly clarified the law. In *Loper Bright,* the Supreme Court overruled the *Chevron* doctrine of deference to agency statutory interpretation, ruling that statutes "have a single, best meaning" that is "'fixed at the time of enactment'" and informed, but not dictated, by Executive Branch practice. 603 U.S. at 400–01 (quoting *Wis. Cent. Ltd.* v. *United States,* 585 U.S. 274, 284 (2018)). And in *West Virginia,* the Supreme Court built upon its decisions in *UARG* and *Brown & Williamson,* among others, by confirming that an agency must have more than "a colorable textual basis" to claim authority to decide major questions of policy that Congress generally reserves for itself. 597 U.S. at 723.

In this subsection, we explain that the best reading of CAA section 202(a)(1), as informed by *Loper Bright* and principles of statutory interpretation, does not authorize the EPA to assert jurisdiction over GHG emissions based on global climate change concerns in a standalone endangerment finding. Scientific understanding of environmental issues may be continuously evolving, but the scope of the EPA's authority under CAA section 202(a)(1) is fixed by the terms Congress used when enacting and amending the language of CAA section 202(a)(1) from 1965 to 1977. Regardless whether GHGs are "agents of air pollution" under the Act-wide definition of "air pollutant" in CAA section 302(g), we cannot regulate under CAA section 202(a) unless emissions of the air pollutant by new motor vehicles and engines "cause, or contribute to, air pollution which may reasonably be anticipated to endanger public health or welfare." Because the ordinary meaning, structure, and history of CAA section 202(a)(1) and related provisions demonstrate that this language targets "air pollution" that threatens public health or welfare through local or regional exposure, the "six well-mixed" GHGs defined by reference to global climate change concerns cannot satisfy this standard. The futility of GHG emission standards in addressing the

health and welfare impacts attributed to global climate change further reinforces this interpretation. For these reasons, and on account of the additional procedural and analytical errors discussed below, we are rescinding the Endangerment Finding.

1. Final Rationale

Congress originally enacted the language of CAA section 202(a) in the Motor Vehicle Pollution Control Act of 1965 and retained it, with minor revisions, in 1967, the 1970 CAA, and the 1977 amendments. The key language in CAA section 202(a)(1) provides:

The Administrator shall by regulation prescribe (and from time to time revise) in accordance with the provisions of this section, standards applicable to the emission of any air pollutant from any class or classes of new motor vehicles or new motor vehicle engines, which in his judgment cause, or contribute to, air pollution which may reasonably be anticipated to endanger public health or welfare.[97]

Since 1977, CAA section 302(g) has defined the term ''air pollutant'' throughout the statute as ''any air pollution agent or combination of such agents . . . which is emitted into or otherwise enters the ambient air.''[98] CAA section 302(h) also provides that any reference to ''effects on welfare includes, but is not limited to, effects on'' the environment, property, transportation hazards, and ''on economic values and on personal comfort and well-being.''[99]

The EPA concludes that this statutory language is best read as authorizing the Agency to identify and regulate, as an integral part of a rulemaking prescribing emission standards, emissions that cause or contribute to air pollution that endangers public health and welfare through local or regional exposure. This reading is consistent with the ordinary meaning of key terms and the statutory structure, our decades-long implementation of the statute prior to 2009, and background principles of statutory interpretation, including default rules for proximate cause. This

reading is also consistent with the Supreme Court's decision in *Massachusetts,* which addressed distinct issues arising out of the denial of a petition for rulemaking and must, as a matter of *stare decisis,* be read in harmony with subsequent decisions bearing on the EPA's authority and statutory interpretation, including *UARG, West Virginia,* and *Loper Bright.*

*Air Pollution.* The EPA is finalizing as proposed that CAA section 202(a)(1) is best read as authorizing the Agency to regulate emissions that cause or contribute to air pollution that endangers public health or welfare through local or regional exposure. For the purposes of this final action, we use the phrase local or regional exposure to distinguish air pollution that impacts public health and welfare by its presence in the ambient air from ''air pollution'' consisting of six ''well-mixed'' GHGs that, as conceptualized in the Endangerment Finding, impacts public health and welfare only indirectly and not by its mere presence in the ambient air. As discussed below, this aspect of the final action effectively returns the EPA to its interpretation of CAA section 202(a)(1) prior to 2009 and the ordinary meaning of the terms Congress selected.

In CAA section 202(a)(1), Congress identified the object of the regulatory authority conferred in the remainder of the section—''air pollution which may reasonably be anticipated to endanger public health or welfare.'' The EPA's emission standards for new motor vehicles and engines were a key part of the congressional design for combatting air pollution problems impacting the Nation throughout the 1960s and 1970s, particularly in high-population areas. Congress debated these issues extensively in advance of the 1970 CAA by reference to the air pollution impacting Americans every day, with smog, criteria pollutants, and air toxics taking center stage.[100] To address the

perceived need for a rapid response, Congress paired the preexisting language imported into CAA section 202(a)(1)[101] with new language in CAA section 202(b)(1) requiring that emission standards contain significant, short-term reductions in CO, HC, and $NO_X$ emissions from new LD vehicles and engines.[102] As discussed elsewhere in this preamble, Congress repeatedly returned to this strategy in the subsequent decades by adding language to CAA section 202 requiring that emission standards achieve further reductions for additional pollutants and classes of new motor vehicles and engines.

Particularly in light of this history, the term ''air pollution'' as used in CAA section 202(a)(1) must be construed in context with the specific air pollutants and air pollution concerns identified in the remainder of CAA section 202. Each of these listed pollution control targets share the common quality of causing or contributing to air pollution that adversely impacts public health or welfare through local or regional exposure to the air pollution itself. CAA section 202 specifically requires the EPA to prescribe emission standards with various minimum content for HCs, CO, $NO_X$, and PM, all of which harm human health and the environment through exposure (*e.g.,* inhalation and dermal contact) or by causing or contributing to air pollution that harms health and the environment through exposure (*e.g.,* smog and acid rain).[103] CAA section 202(*l*) also requires prescribing emission standards under CAA section 202(a)(1) for certain air pollutants that qualify as ''toxic'' or ''hazardous'' air pollutants, including benzene and formaldehyde.[104] Neither GHGs nor any of the individual ''six well-mixed'' GHGs defined in the Endangerment Finding by reference to global climate change concerns appear

[97] 42 U.S.C. 7521(a)(1). The key terms ''cause, or contribute,'' ''air pollution,'' ''endanger,'' and ''health or welfare'' were introduced in 1965. Public Law 89–271, section 101, 79 Stat. 992, 992–93. The phrase ''may reasonably be anticipated to'' was added to the earlier phrase ''which endangers the public health or welfare'' in 1977. Public Law 95–95, section 401(d)(1), 91 Stat. 685, 791.

[98] 42 U.S.C. 7602(g). Notably, the statute does not separately define ''air pollution.''

[99] 42 U.S.C. 7602(h). This definition took its current form in the 1970 CAA and was amended in part in the 1990 CAA Amendments to add the final clause ''whether caused by transformation, conversion, or combination with other air pollutants.'' *See* Public Law 91–604, 84 Stat. 1676, 1710; Public Law 101–549, 104 Stat. 2399, 2470.

[100] *See, e.g.,* S. Rep. 91–1196, at 1, 7 (1970) (expressing ''concern with direct adverse effects upon public health'' and the need for ''definitive knowledge of the causal relationships between exposure to air pollution agents . . . and health or welfare under varying environmental conditions,'' particularly by reference to $SO_X$, PM, CO, HC, and oxidants and the role of mobile sources in urban pollution); *id.* at 18 (describing the three general categories of air pollution as criteria pollutants, hazardous air pollutants, and certain emissions unique to stationary sources); H.R. Rep. 91–1146, at 6 (1970) (explaining that mobile-source air pollution ''is particularly dangerous in the highly urbanized areas of our country''); 116 Cong. Rec. 32902 (1970) (statement of Sen. Muskie) (explaining that the draft legislation targeted mobile-source contribution to urban pollution, including by requiring ''emission standards for carbon monoxide, hydrocarbons, and nitrogen oxides''); *see also* 111 Cong. Rec. 10782 (1965) (statement of Sen. Muskie)

(similarly emphasizing in advance of the original 1965 legislation that mobile sources accounted for ''50 percent of our national air pollution problem'' and focusing in particular on ''carbon monoxide,'' ''hydrocarbons,'' and ''nitrogen oxides'').

[101] *See, e.g.,* S. Rep. 91–1196, at 24 (''The regulatory authority in section 202(a) would be essentially the same as existing law . . . .''); H.R. Rep. 91–1783 (1970) (conf. report) (explaining that the House largely acceded to the Senate bill in relevant part).

[102] Public Law 91–604, section 6(a), 84 Stat. 1676, 1690. In subsequent amendments, Congress modified and expanded upon the provisions in CAA section 202(b)(1) to require that emission standards achieve further reductions for later model years. *See* 42 U.S.C. 7521(b)(1).

[103] *See, e.g.,* 42 U.S.C. 7521(a)(3)(A)(i), (b), (g), (h), (j), (k).

[104] 42 U.S.C. 7521(*l*). Such regulations may include fuel standards under issued under the EPA's fuel and fuel additive authority in CAA section 211.

anywhere in CAA section 202.[105] That pattern holds for the criteria pollutants identified in the CAA—CO, lead, ozone ($O_3$), nitrogen dioxide ($NO_2$), PM, and $SO_2$—as well as the initial list of hazardous air pollutants in CAA section 112(b)(1).[106]

We find it significant that in subjecting a number of air pollutants emitted by new motor vehicles and engines to regulation under CAA section 202, Congress did not include substances that are potentially indirectly harmful to public health or welfare based on elevated global concentrations in the upper atmosphere. That conspicuous omission supports the conclusion that emissions subject to regulation under CAA section 202(a) are those that cause or contribute to air pollution which itself endangers public health or welfare through local or regional exposure.[107] For certain regulated air pollutants, the emissions themselves are the air pollution that endangers public health or welfare, *i.e.,* emissions are the air pollution with adverse health and welfare impacts. An example is CO, which can be harmful, and even fatal, to humans at sufficient localized concentrations.[108] For other regulated air pollutants, emissions contribute to air pollution that endangers public health or welfare by interacting with other airborne chemicals or environmental factors such as sunlight to create the air pollution that endangers public health or welfare, *i.e.,* the emitted air pollutants are ingredients that create the air pollution that endangers public health or welfare in combination. An example is acid rain, in which air pollutants such as $SO_2$ interact locally and regionally with additional airborne chemicals to form acidic precipitation.[109] Another example is $NO_X$, which reacts with VOCs in the presence of heat and sunlight to create ground-level ozone as the airborne chemicals are carried by wind over geological features amenable to ground-level ozone formation.[110]

We also emphasize that expanding CAA section 202(a)(1) to encompass global climate change concerns required the EPA to take the admittedly "unique" approach of finding endangerment and contribution where the overwhelming majority of relevant emissions hails from international sources. Although we justified this approach by concluding as a policy matter that all sources must "do their part" to avoid a collective action problem, Congress has specifically provided in the CAA when and how the EPA may consider international emissions. For example, CAA section 115 authorizes the EPA to require controls for domestic emissions that contribute to air pollution that endangers public health or welfare in another country only when, among other things, that country has adopted reciprocal protections for emissions into the United States.[111] CAA section 179B authorizes the EPA to account for the impact of international emissions on NAAQS attainment under certain conditions.[112] Most importantly, Congress adopted a new regulatory regime in 1990—Title VI—in response to global concerns about depletion of the ozone layer, which contains its own findings, policies, and regulatory authorities that required the EPA to phase out domestic use of ozone-depleting substances.[113] None of these provisions encompass GHG emissions, and all support the conclusion that Congress does not presume that general authorities in the CAA encompass international emissions. Rather, Congress knows how to provide for the consideration of and regulation in response to international emissions, and has not done so for GHG emissions in the CAA section 202 provisions governing new motor vehicle and engine emissions.

The definition of "air pollutant" in CAA section 302(g) and the ordinary meaning of the undefined terms pollutant, pollution, and air pollution support this reading. At the time Congress added these terms to CAA section 202(a)(1), the term "pollutant" was defined as "[a]nything that pollutes; especially, any gaseous, chemical, or organic waste that contaminates air, soil, or water," [114] and "pollution" was defined as "[t]he contamination of soil, water or the atmosphere by the discharge of noxious substances." [115] The definition of the root word "pollute"—"[t]o dirty, contaminate," confirms the relationship of these terms to concepts of contamination and toxicity.[116] The central concept is the addition of a contaminant, something that "make[s] impure by contact or mixture." [117] CAA section 302(g) defines "air pollutant" is any "air pollution agent or combination of such agents" that "is emitted into or otherwise enters the ambient air." [118] Read together with CAA section 202(a)—as the Supreme Court held we must in *UARG*—the underlying concept of dangerousness and contamination reinforces the conclusion that air pollution which endangers public health or welfare is air pollution (caused or contributed to by air pollutants) that itself endangers public health or welfare through local or regional exposures.

Contemporaneous usage of the term "air pollution" in the 1960s and 1970s further indicate the term was understood in this way when Congress adopted it into Title II of the CAA. Judicial decisions issued close in time to the public debates and enactment of the CAA Amendments of 1970 used the term exclusively in reference to local and regional exposure.[119] News reports

---

[105] Notably, in the last major amendments to the Clean Air Act in 1990, Congress specified "*nonmethane* hydrocarbons (NMHC)" when adding additional minimum requirements for HC, CO, $NO_X$, and PM emission standards at CAA section 202(g) and (h). Public Law 101–549, section 203, 104 Stat. 2399, 2474 (emphasis added) (codified at 42 U.S.C. 7521(g), (h)).

[106] 42 U.S.C. 7412(b)(1).

[107] As discussed herein, the references to GHGs in the CAA are in *non*-regulatory contexts in which Congress authorized funding for various forms of research and grant programs and the Renewable Fuel Standard (RFS) program. The choice to limit such references to non-regulatory solutions and the RFS program, which applies to refiners and importers, further supports the conclusion that the CAA section 202(a) regulatory authority for responding to endangerment does not encompass GHG emissions in connection with global climate change concerns.

[108] U.S. Environmental Protection Agency. (Last updated Oct. 7, 2025). Carbon Monoxide's Impact on Indoor Air Quality: *https://www.epa.gov/indoor-air-quality-iaq/carbon-monoxides-impact-indoor-air-quality.*

[109] U.S. Environmental Protection Agency. (Last updated Mar. 4, 2025). What is Acid Rain?: *https://www.epa.gov/acidrain/what-acid-rain.*

[110] U.S. Environmental Protection Agency. (Last updated Mar. 11, 2025). Ground-level Ozone Basics: *https://www.epa.gov/ground-level-ozone-pollution/ground-level-ozone-basics.*

[111] 42 U.S.C. 7415.

[112] 42 U.S.C. 7509a.

[113] 42 U.S.C. 7671 *et seq.*

[114] *Pollutant,* Am. Heritage Dictionary 1015 (1970); *see also Pollutant,* 3 Webster's Third Int'l Dictionary 1756 (1966) ("something that pollutes: a polluting substance, medium or agent").

[115] *Pollution,* Am. Heritage Dictionary 1015 (1970); *see also Pollution,* 3 Webster's Third Int'l Dictionary 1756 (1966) ("the action of polluting or the state of being polluted: defilement, desecration, impurity, uncleanness").

[116] *Pollute,* Am. Heritage Dictionary 1015 (1970); *see also Pollute,* Black's Law Dictionary 1043 (5th ed 1979) ("To corrupt or defile. The contamination of soil, air and water by noxious substances and noises."); *Pollute,* 3 Webster's Third New Int'l Dictionary 1756 (1966) ("to make physically impure or unclean: befoul, dirty, taint").

[117] *Contaminate,* Am. Heritage Dictionary 156 (1970); *see also Contaminate,* 1 Webster's Third New Int'l Dictionary 491 (1966) ("to soil, stain, corrupt, or infect by contact or association").

[118] 42 U.S.C. 7602(g).

[119] *See, e.g., Washington* v. *GM Corp.,* 406 U.S. 109, 115–16 (1972) (declining to exercise original jurisdiction over complaint alleging conspiracy to restrain the development of air pollution control devices for motor vehicles because, although "Congress has largely preempted the field with regard to 'emissions from new motor vehicles,' . . . geophysical characteristics which define local and regional airsheds are often significant considerations in determining the steps necessary
Continued

and legislative debates leading up to the 1970 Amendments similarly attacked air pollution problems arising from local and regional exposure, including smog and health and welfare impacts related to inhalation and physical contact.[120] This pattern of usage is consistent with subsequent legislative amendments to CAA section 202, which added provisions specific to criteria pollutants and air toxics fitting this profile, and with the EPA's course of mobile-source regulation until 2009. In reviewing the relevant history, including materials received during the public comment period, we have not identified an authoritative source suggesting that the ordinary meaning of "air pollution" would have included, without additional modifying language, gases that may endanger public health or welfare only on a global scale and through an attenuated and indirect causal chain.

The "air pollution" addressed in the Endangerment Finding is different in kind. In that decision, the Administrator defined the relevant "air pollutant" as six "well-mixed GHGs" and the relevant "air pollution" as total global concentrations of "the combined mix of" these GHGs "which together, constitute the root cause of human-induced climate change and the resulting impacts on public health and welfare." 74 FR 66516. In contrast to the air pollution addressed expressly in CAA section 202 and elsewhere in the statute, GHGs do not endanger public health or welfare through local or regional exposure. Rather, the Endangerment Finding asserted that GHG "air pollution" would *lead to* increases in global temperature and change to ocean pH that, in turn, would *lead to* environmental phenomena, in combination with an open-ended universe of additional factors, which would potentially have adverse health and welfare impacts of varying severity in certain regions. Indeed, the Administrator expressly admitted at the time that the circumstances were "unique" because "[n]one of th[e] human health effects" identified in the Endangerment Finding "are associated with direct exposure to greenhouse gases." 74 FR 66527. With respect to welfare effects, the Administrator

acknowledged that the primary effects of concern could be considered health *or* welfare impacts[121] and that certain welfare impacts were "effects on people that do not rise to the level of health effects" but utilize the same causal chain. 74 FR 66527; see 74 FR 66531 (explaining that the Endangerment Finding considered the same causal "pathways" in analyzing "public health" and "public welfare").[122] Regulating GHG emissions based on global climate change concerns requires reading an additional instance of "cause, or contribute" into the statute, such that CAA section 202(a) encompasses the 'emission of air pollutants that cause, or contribute to, air pollution that causes, or contributes to, endangerment of public health or welfare.'

This interpretation is also supported by the best reading of the terms "cause," "contribute," and "reasonably be anticipated to endanger." In enacting and amending CAA section 202(a)(1), Congress legislated against background legal principles, including principles of causation and proximate cause.[123] These "default rules" are "presumed to have [been] incorporated, absent an indication to the contrary in the statute itself,"[124] and nothing in the text of CAA section 202(a)(1) indicates that Congress intended to depart from ordinary legal meaning. Indeed, Congress affirmatively incorporated proximate cause principles when it added the phrase "may reasonably be anticipated" to the statute in 1977 amendments to the CAA. That phrasing is another way of saying "reasonably foreseeable," a longstanding touchstone of proximate cause.[125] As a general

matter, there is a point at which harm no longer has a sufficiently close connection to the relevant conduct to reasonably draw a causal link. Emissions from new motor vehicles and new motor vehicle engines in the United States do not have a sufficiently close connection to the adverse impacts identified in the Endangerment Finding to fit within the legal meaning of "cause" or "contribute." This reading is complemented by the term "reasonably" in the phrase "air pollution which may reasonably be anticipated to endanger public health or welfare." Like the terms "cause" and "contribute," the term "reasonably" places an outer legal limit on the authority to anticipate dangers to public health and welfare from air pollution. The greater the number of causal links involved in anticipating such endangerment, the more difficult it is to qualify that anticipation as "reasonable."

Notably, contemporary understandings of terms used in the CAA section 302(h) definition of "welfare" also support the understanding that CAA section 202(a)(1) encompasses air pollution with adverse impacts from local or regional exposure. The statute provides that references to "effects on welfare" include "effects on soils, water, crops, vegetation, manmade materials, animals, wildlife, weather, visibility, and climate," damage to property, transportation hazards, and effects on economic values and personal comfort and well-being. The ordinary meaning of "climate," an undefined term, was "[t]he prevailing weather in a particular region" or "[a] region manifesting particular meteorological conditions."[126] Similarly, "weather" meant "[t]he state of the atmosphere at a given time and place, described by temperature, moisture, wind velocity, and pressure."[127] Both terms must also be read together in context, including by reference to the other terms enumerated in the list.[128] Each of the other terms in

---

to abate air pollution'"); *Friends of Earth* v. *FCC,* 449 F.2d 1164, 1165–66 (D.C. Cir. 1971) (addressing challenge to the FCC's treatment of automobile advertisements that petitioners alleged took a position on motor vehicle air pollution worsening local conditions in New York City, including "dangerous hydrocarbons in the air").

[120] *See, e.g., Coal. for Responsible Regulation,* 2012 U.S. App. LEXIS 25997, at *32–37 (Brown, J., dissenting from denial of rh'g en banc) (summarizing relevant history).

[121] For example, the EPA in the Endangerment Finding understood impacts on "well-being" as used in the CAA section 302(h) definition of "welfare" to be relevant "whether [the impacts] resul[t] directly or indirectly from the pollution in the air." 74 FR 66528.

[122] The Agency acknowledged that difficult questions about the distinction between health and welfare impacts was something the "EPA has not had to resolve" in the past, "as it has been clear whether the effects relate to public health or relate to public welfare, with no confusion over what category was at issue." 74 FR 66527. Rather than take this analytical difficulty as a sign that the causal chain was different in kind from the type of "air pollution" addressed by CAA section 202(a)(1), however, we proceeded to finalize a novel invocation of authority to regulate in response to global climate change concerns.

[123] *See, e.g., Bank of Am. Corp.* v. *City of Miami,* 581 U.S. 189, 201 (2017); *Lexmark Int'l, Inc.* v. *Static Control Components, Inc.,* 572 U.S. 118, 132 (2014); *Univ. of Tex. Sw. Med. Ctr.* v. *Nassar,* 570 U.S. 338, 347 (2013); *City of Oakland* v. *Wells Fargo & Co.,* 14 F.4th 1030 (9th Cir. 2021) (en banc).

[124] *Nassar,* 570 U.S. at 347.

[125] *Foreseeable,* 1 Webster's Third New Int'l Dictionary 890 (1966) ("being such as may reasonably be anticipated"); *see, e.g., Hicks* v.

*United States,* 511 F.2d 407, 421 (D.C. Cir. 1975) (finding "proximate cause" satisfied because it was "foreseeable" that a hospital's release without warning of an alcoholic patient with a history of abusing his wife could result in harm to the patient's wife).

[126] *Climate,* Am. Heritage Dictionary 136 (1970); *see, e.g., Alameda Cons. Ass'n* v. *California,* 437 F.2d 1087, 1096 (9th Cir. 1971) (using "climate" to discuss local environmental conditions in San Francisco Bay); Levenson's Case, 194 N.E.2d 103, 105 (Mass. 1963) (using "climate" to address whether moving to another state with a different climate is a covered medical expense).

[127] *Weather,* Am. Heritage Dictionary 785 (1970).

[128] *See Fischer* v. *United States,* 603 U.S. 480, 487 (2024) ("[T]he canon of *noscitur a sociis* teaches that a word is 'given more precise content by the neighboring words with which it is associated.'

the definition refers to things and mechanisms of action that occur in a particular place or under regionally bounded conditions. The terms Congress used to define ''welfare'' speak to air pollution with adverse impacts from local and regional exposure, not global climate change concerns that require a very different and much longer causal chain. The definition is broad enough to encompass the various air pollutants and air pollution of concern, each of which interacts differently with the environment—smog, particulate matter, and the like. Congress understood that air pollution challenges varied from State-to-State and region to region, while, at the same time, recognizing that the most acute challenges—smog in highly populated urban areas, for example—had similarities that would benefit from national standards.[129] But none of the many terms listed in the definition of welfare would have been understood, absent modifying terms, to refer to global considerations. Nor has Congress added terms like ''global'' or ''change'' that would have expanded the scope of the effects on welfare encompassed within the definition.[130]

The Endangerment Finding largely avoided addressing these interpretive problems by severing the question whether GHG emissions from new motor vehicle engines contribute to GHG concentrations in the atmosphere from the question whether GHG concentrations in the atmosphere endanger public health and welfare. As discussed in further detail below, there

is no basis in the statute for severing the inquiry in that way. Nevertheless, even with respect to endangerment and contribution in isolation, global climate change concerns involve causal relationships that are too uncertain, conjectural, remote, and convoluted by intervening and confounding factors to fit within the terms ''cause,'' ''contribute,'' and ''reasonably be anticipated to endanger'' as used in CAA section 202(a)(1). This understanding follows from the position discussed above that CAA section 202(a)(1) and the statute more generally were designed to address air pollution with harmful impacts from local and regional exposure and that are amenable to analysis using ordinary causation standards. In specifying that emissions may ''cause, *or* contribute to'' air pollution, and that air pollution need only ''be reasonably anticipated to endanger public health or welfare,'' Congress signaled that regulation may be appropriate when harm is not yet occurring or is not certain to occur. But that language bearing on the degree of certainty required does not override ordinary background principles governing the limits of an attenuated causal chain.

Ultimately, the Endangerment Finding did not reflect consideration of the interpretive principles or ordinary meaning of the relevant terms discussed above. With respect to ''air pollution,'' the Administrator in 2009 asserted an unlimited discretion to decide what the EPA may target through regulation by defining ''air pollution'' without reference to the best reading of the statutory term. 74 FR 66516–17. Neither the factors used to select the six GHGs— that they are (a) ''directly-emitted,'' (b) ''long-lived,'' and (c) ''well-mixed''—nor the reasons used to support this definition—that they (1) ''share common properties,'' (2) are ''estimated to be the primary cause of human-induced climate change,'' (3) are ''the common focus of climate change science research and policy analyses,'' (4) have not been ''assessed on an individual gas approach,'' and (5) that the Agency had combined certain pollutants in the past—are rooted in the ordinary meaning of ''air pollution'' or any other statutory term in CAA section 202(a)(1). *Id.* Instead, the Administrator extended discussion in *Massachusetts* of the CAA section 302(g) definition of ''air pollutant'' to the undefined term ''air pollution,'' reasoning that because the EPA could group multiple air pollutants into a ''combination of such agents,'' there was no relevant statutory limit to the Agency's discretion to identify

subjects for regulation. 74 FR 66537. Nor did the Administrator in 2009 grapple with the ordinary meaning of the terms used in the CAA section 302(h) definition of welfare, including ''climate,'' consider the full range of evidence bearing on the ordinary meaning of ''reasonably be anticipated to endanger,'' or appropriately evaluate the full context and structure relevant to CAA section 202(a)(1). In short, we now conclude that the legal analysis conducted in the Endangerment Finding, as well the resulting interpretation, cannot be squared with the longstanding principles that now trump deference to agency statutory interpretation under *Loper Bright.*

In finalizing a different interpretation, we note that a limiting construction is necessary to avoid absurd results and potential conflict with the nondelegation doctrine. Because Congress cannot delegate legislative powers to the Executive Branch, statutes granting an agency regulatory authority must provide an intelligible principle to guide its exercise.[131] Our authority under CAA section 202(a)(1) to ''prescribe . . . standards'' for emissions by any class or classes of new motor vehicles and engines is limited by the requirement that the Administrator find such emissions cause or contribute to air pollution that may reasonably be anticipated to endanger public health and welfare. The best reading of the statute recognized in this final action circumscribes this authority to air pollution that itself endangers health or welfare through local or regional exposure. Under the interpretation adopted in the Endangerment Finding, however, our authority under CAA section 202(a)(1) would have no readily discernible limiting principle, particularly in combination with the authority asserted to sever the analysis of endangerment and causation or contribution. Any ''air pollutant'' emitted by new motor vehicles or engines at more than *de minimis* volumes would trigger our authority and obligation to prescribe standards so long as emissions from any and all sources globally contributes to ''air pollution'' that, in turn, can be said to have any causal relationship to adverse impacts on public health and welfare, broadly defined.[132] Put another way, the

---

That 'avoid[s] ascribing to one word a meaning so broad that it is inconsistent with' 'the company it keeps' '' (citations omitted)); *Gustafson* v. *Alloyd Co.,* 513 U.S. 561, 575 (1995) (applying canon to interpret the broad term ''communication,'' as used in a statutory definition of ''prospectus,'' to mean only public-facing communications that offer securities).

[129] *See, e.g.,* S. Rep. 91–1196, at 1–8, 24 (1970) (discussing need for and intent of Senate bill that would eventually form much of the 1970 CAA by reference to urban pollution problems and areas in proximity to stationary and mobile sources and recognizing that ''protection of the public health and welfare requires definitive knowledge of the causal relationships between exposure to air pollution agents . . . under varying environmental conditions''); H.R. Rep. 91–1146, at 6 (1970) (similar for House bill that informed aspects of the 1970 CAA).

[130] As discussed further in this section of the preamble and the Response to Comments document, Congress has used such language to specify the relevance of global climate change concerns in more recent amendments to different programs. CAA section 211(o)(2)(B)(ii), for example, provides that the EPA must consider the impact of the production and use of renewable fuels on ''climate *change*'' when setting renewable fuel volumes under the RFS program. 42 U.S.C. 7545(o)(2)(B)(ii) (emphasis added); *see id.* 7545(o)(1) (defining various renewable fuels in part by reference to GHG emissions).

[131] *See, e.g., Gundy* v. *United States,* 588 U.S. 128 (2019).

[132] The consequences of this interpretation are not limited to mobile sources. When issuing the Endangerment Finding, the EPA understood that stationary sources would be subject to a variety of PSD and Title V permitting obligations related to GHG emissions.

Administrator in 2009 asserted authority to define the relevant "air pollution" without reference to any statutory limiting principle, leaving the EPA free to redefine the objectives of the regulatory scheme.

That limitless construction of CAA section 202(a)(1) cannot be reconciled with the Supreme Court's instructions regarding the scope of agency authority in *Loper Bright.* Statutes have a single, best meaning that may include "a degree of discretion." 603 U.S. at 369. But that discretion does not extend to redefining statutory terms in a manner inconsistent with ordinary meaning. Although "Congress has often enacted" statutes that "'expressly delegate[]' to an agency the authority to give meaning to a particular statutory term," *Loper Bright,* 603 U.S. at 394–95 (quoting *Batterton* v. *Francis,* 432 U.S. 416, 425 (1977)), there is no such express delegation in CAA section 202.[133] Nor can extending CAA section 202(a)(1) to the regulation of GHGs in response to global climate change concerns plausibly be understood as "'fill[ing] up the details' of a statutory scheme." *Id.* (quoting *Wayman* v. *Southard,* 23 U.S. (10 Wheat.) 1, 43 (1825)). And "air pollution" is not a discretion-conferring "term or phrase that 'leaves agencies with flexibility, such as 'appropriate' or 'reasonable.''" *Id.* (quoting *Michigan,* 576 U.S. at 752). Under these circumstances the ordinary meaning of "air pollution" controls. The EPA has a degree of discretion in identifying and regulating emissions that cause or contribute to air pollution that may reasonably be anticipated to endanger public health or welfare. But that discretion does not extend to redefining "air pollution" from the local and regional exposure problems understood at the time of enactment and addressed throughout the statute to global climate change concerns.[134]

Indeed, the Endangerment Finding did not even limit the definitions selected for "air pollutant" or "air pollution" to gases emitted by new motor vehicles or engines. Rather, the Administrator defined the terms to include any "climate forcer" that met the identified criteria and expressly reserved the right to add to the six "well-mixed" GHGs in future actions. 74 FR 66520–21. Nor were the identified criteria—that GHGs are long-lived, directly emitted, and well-mixed—tied to any statutory language that requires the EPA to retain them or prevents the Agency from further expanding the category. Instead, the Administrator asserted "broad discretion to determine appropriate combinations of compounds that should be treated as a single air pollutant." 74 FR 66537. In other words, under this interpretation of CAA section 202(a)(1), the only limit on our authority to regulate in response to global climate change is the exercise of reasonable discretion.[135] The best reading of the statute, and the reading we restore in this final action, avoids this concern by giving the terms Congress selected their full and ordinary meaning.[136]

Under the logic of the Endangerment Finding, water vapor ($H_2O$) emissions from vehicles and engines could meet the standard for regulation because the presence of additional water from all human activities around the world can be said to contribute to water-based disasters. See 74 FR 66520. The EPA would have the authority, and statutory duty, to prescribe standards for water vapor that would then trigger various permitting obligations—indeed, water is a recognized GHG, albeit one the EPA

declined to regulate on a discretionary basis in 2009. Nor does this logic recognize any statutory limits to regulating pollutants under the global climate change concerns reading of CAA section 202(a)(1) that are addressed more specifically by other provisions of the statute, including black carbon (a form of the criteria pollutant PM), ground-level ozone (formed by the criteria pollutant $NO_x$), and ozone-depleting substances (including those specifically addressed by Title VI and the Montreal Protocol). The Administrator declined to include these matters in the six "well-mixed" GHGs encompassed within the Endangerment Finding but remained open to future actions treating them as a climate issue. Because that reading effectively converts CAA section 202(a)(1) into a roaming license to "prescribe . . . standards," the reading finalized in this action is more faithful to the governing principles of statutory interpretation.

The EPA is also finalizing that the futility of GHG emission standards in addressing the adverse health and welfare impacts predicted in the Endangerment Finding support this interpretation of CAA section 202(a)(1). At proposal, we sought comment on whether the EPA must consider the potential impact of regulation when applying CAA section 202(a)(1) and, if so, how this interpretation should inform any final action. We received significant comments on the efficacy of the EPA's GHG emission standards to date, particularly with respect to their limited impact on projected trends in GMST and GSLR and the relevance of the impacts of regulation on the interpretation of CAA section 202(a)(1). As discussed further in section V.C of this preamble, we conclude that even the complete elimination of GHG emissions from all new and existing LD, MD, and HD vehicles would have a *de minimis* impact on these values as a proxy for adverse health and welfare impacts. When accounting for new emissions reduction potential of GHG emission standards and their application only to new vehicles and engines, the *de minimis* nature of these impacts becomes even clearer. The trivial impacts of eliminating GHG emissions on trends in GMST and GSLR—which are less than one percent of the projected changes through 2050 and 2100 once the nature of the GHG emission standards are taken into account—are squarely in line with regulatory and judicial precedents treating values of approximately one percent or more as *de minimis.*

Courts have long recognized the "background" legal principle "against

---

[133] *See, e.g., Batterton,* 432 U.S. at 417 n.2 (interpreting statutory phrase "by reason of new unemployment (as determined in accordance with standards prescribed by the Secretary)"); 42 U.S.C. 7410(m) (authorizing the application of sanctions under certain conditions "in relation to any plan or plan item (*as that term is defined by the Administrator*)") (emphasis added), 7411(i) (excluding from certain stationary source regulations "country elevators (*as defined by the Administrator*)") (emphasis added); 33 U.S.C. 1311(b)(1)(A) (requiring application of "the best practicable control technology currently available *as defined by the Administrator*") (emphasis added).

[134] In reaching this conclusion, we are mindful that the Sixth Circuit recently applied *Loper Bright* to hold that the FCC exceeded its statutory authority in a 2024 order that subjected broadband internet service providers to "net-neutrality principles." *Ohio Telecom Ass'n,* 124 F.4th at 997. With respect to mobile broadband, the FCC had interpreted "the public switched network" to

include not only the traditional telephone numbers comprising the network at the time the statute was enacted, but also public internet protocol ("IP") addresses. *Id.* at 1011. The court rejected this approach, holding as a matter of statutory interpretation that "delegation is not unfettered" and that "nothing in the statute . . . permits the FCC to effectively change the statute's original meaning of 'the public switched network' . . . by adding 'public IP addresses' to adapt to new technology." *Id.* at 1012 (citing *Loper Bright,* 603 U.S. at 395).

[135] *See Whitman* v. *Am. Trucking Ass'ns,* 531 U.S. 457, 474 (2001) ("The idea that an agency can cure an unconstitutionally standardless delegation of power by declining to exercise some of that power seems to us internally contradictory. The very choice of which portion of the power to exercise—that is to say, the prescription of the standard that Congress had omitted—would *itself* be an exercise of the forbidden legislative authority.").

[136] *See Feliciano* v. *DOT*, 605 U.S. 38, 55 n.6 (2025) (recognizing that "considerations of constitutional avoidance might counsel in favor of a narrowing construction of certain laws"); Crowell v. Benson, 285 U.S. 22, 62 (1932) (summarizing constitutional avoidance principles); *Hignell-Start* v. *City of New Orleans,* 154 F.4th 353, 360 (5th Cir. 2025) (accepting city's interpretation of an ordinance that avoided constitutional problems).

which all enactments are adopted'' that general language does not encompass *de minimis* concerns. *Wis. Dep't of Rev.* v. *William Wrigley Jr., Co.,* 505 U.S. 214, 231 (1992); see *UARG,* 573 U.S. at 309 n.1. Unless the statute provides otherwise, agencies have implied authority to exempt *de minimis* concerns ''when the burdens of regulation yield a gain of trivial or no value.'' *Ala. Power Co.* v. *Costle,* 636 F.2d 323, 360–61 (D.C. Cir. 1979). This conclusion informs our interpretation of CAA section 202(a)(1) by suggesting that the provision does not encompass the attenuated chain of causation required to invoke the authority to regulate GHG emissions where regulations cannot have more than a trivial impact on the identified dangers to health and welfare. Nothing in the statutory language suggests that Congress intended to overcome this background principle, and the both the Supreme Court and the D.C. Circuit have recognized its applicability in comparable environmental contexts.[137] Put another way, the inability of new motor vehicle and engine GHG emission standards to have any material impact on the global climate change concerns relied upon by the Agency in the 2009 Endangerment Finding suggests that it is unreasonable to conclude that GHG emissions from new motor vehicles and engines cause or contribute to air pollution which may reasonably be anticipated to endanger public health or welfare. For further discussion, see section V.C of this preamble and the Response to Comments document.

Finalizing this interpretation effectively returns the EPA to its longstanding practice prior to 2009 of applying CAA section 202(a)(1) and related statutory endangerment provisions to air pollution that adversely impacts public health and welfare through local or regional exposure. As discussed further in sections III.A and V.B of this preamble, we historically utilized this authority on a relatively infrequent basis to prescribe standards for pollutants identified in the CAA itself, including NO$_X$, PM, HCs and other VOCs, and CO, and then only as a backstop when more specific CAA section 202 authorities were unavailable. The distinction between air

pollution that harms public health and welfare through local and regional exposure and global ''air pollution'' consisting of GHG concentrations without any such direct impacts also played a role in our evaluation of waiver requests under CAA section 209.[138] Even in the Endangerment Finding, the Administrator recognized that ''*[n]one*'' of the identified health impacts were ''associated with direct exposure'' and that we had previously applied CAA section 202(a)(1) to the ''*more typical* local or regional air pollution problem.'' 74 FR 66527, 66538 (emphases added); see 74 FR 66531 (explaining that the Agency considered the same causal ''pathways'' in assessing public health and welfare impacts). In adopting a novel analytical approach in the Endangerment Finding, we failed to adequately address this prior practice and improperly relied on the Supreme Court's decision in *Massachusetts* for the proposition that CAA section 202(a)(1) authorizes emission standards in response to air pollution raising global climate change concerns. As discussed below, *Massachusetts* did not separately construe the scope of the EPA's authority to regulate under CAA section 202(a)(1), and the Court has since made clear in *UARG* and *West Virginia* that our authority to regulate an ''air pollutant'' encompassed within the Act-wide definition must be evaluated in the context of the particular statutory provision that confers authority to regulate.

In *Massachusetts,* the Supreme Court rejected the argument that GHGs are not ''air pollutants'' under the Act-wide definition, reasoning that CAA section 302(g)'s use of the word ''any'' in connection with ''air pollutant agent or combination of such agents, including any physical [or] chemical . . . substance'' was sufficiently broad to encapsulate the combination of GHGs at issue. 549 U.S. at 530. On this basis, the Court stated that the EPA ''has the statutory authority to regulate the emission of such gases from new motor vehicles.'' *Id.* at 532. The Court did not, however, separately decide whether including GHGs within the definition of

''air pollutant'' meant that we must find that GHGs meet the statutory standard for regulation under CAA section 202(a) because they cause or contribute to air pollution which endangers the public health or welfare. Rather, the Court emphasized that its review of the denial of the rulemaking petition was ''extremely limited'' and concluded its opinion by clarifying that it ''need not and do[es] not reach the question whether on remand EPA must make an endangerment finding.'' *Id.* at 527, 534.

Consistent with *Massachusetts,* and reading that decision in harmony with *UARG,* we interpret the CAA as setting out a broad, threshold definition of ''air pollutant'' on an Act-wide basis that must be interpreted in the context of each applicable, particular provision granting regulatory authority in order to determine whether that provision authorizes the EPA to regulate an air pollutant under that particular authority. For purposes of CAA section 202(a)(1), that means that even if GHGs are ''air pollutant[s]'' as defined on an Act-wide basis, they must meet the statutory standard for regulating emissions from new motor vehicles and engines before we may invoke our regulatory authority. Put simply, regardless whether GHGs are ''air pollutants'' as defined in CAA section 302(g), they must satisfy the same standard as any other emitted ''air pollutant'' by causing or contributing to ''air pollution which may reasonably be anticipated to endanger public health or welfare.''

This understanding is necessary to account for *UARG,* in which the Supreme Court distinguished between ''the Act-wide definition'' of air pollutant and the application of that definition to the Act's regulatory provisions. 573 U.S. at 320. The Court specifically addressed the holding in *Massachusetts,* adopting the argument that ''while *Massachusetts* rejected EPA's categorical contention that [GHGs] could not be air pollutants for any purposes of the Act, it did not embrace EPA's [then] current, equally categorical position that [GHGs] must be air pollutants for all purposes regardless of the statutory context.'' *Id.* (cleaned up).

In sum, CAA section 202(a)(1) does not provide authority to regulate GHGs based on global climate change concerns because that provision authorizes regulating only emissions that ''cause, or contribute to, air pollution which may reasonably be anticipated to endanger public health or welfare.'' The EPA must ''ground its reasons for action or inaction in the statute,'' *Massachusetts,* 549 U.S. at 535, and

[137] *See UARG,* 573 U.S. at 309 n.1; *Ala. Power,* 636 F.2d at 360–61; *see also EPA* v. *EME Homer City Generation, L.P.,* 572 U.S. 489 (2014) (approving of approach that did not require additional emissions reductions from States that contributed trivially to nonattainment in other States); *Ohio* v. *EPA,* 997 F.2d 1520, 1534–35 (D.C. Cir. 1993) (accepting *de minimis* approach to CERCLA five-year risk reviews because the statute did not clearly prohibit the approach and anything less would be contrary to legislative design).

[138] *See, e.g.,* ''California State Motor Vehicle Pollution Control Standards; Notice of Decision Denying a Waiver of Clean Air Act Preemption for California's 2009 and Subsequent Model Year Greenhouse Gas Emission Standards for New Motor Vehicles,'' 73 FR 12156, 12161 (Mar. 6, 2008) (denying California's waiver request for GHG emission standards on the ground that ''the different, and global, nature of the pollution at issue'' requires a different conceptual approach); *see also* ''The Safer Affordable Fuel-Efficient (SAFE) Vehicles Rule Part One: One National Program,'' 84 FR 51310, 51328–52 (Sept. 27, 2019) (summarizing and applying this interpretation).

"possess[es] only the authority that Congress has provided," *NFIB* v. *DOL,* 595 U.S. 109, 117 (2022). In finalizing this interpretation, we note that our actions must be consistent with "the single, best meaning" of the statute, "'fixed at the time of enactment'" and resolved through application of "all relevant interpretive tools," and cannot expand our authority in response to pressing concerns based on statutory silence or ambiguity. *Loper Bright,* 603 U.S. at 400, 411 (quoting *Wis. Cent.,* 585 U.S. at 284). Properly interpreted, the statute confers "regulatory flexibility" to respond to "changing circumstances and scientific developments," *Massachusetts,* 549 U.S. at 532, while bounding the scope of the EPA's authority to "air pollution" as that term was understood at the time of enactment.

*Findings and Standards.* The EPA is also finalizing as proposed that CAA section 202(a)(1) requires issuing emission standards together with the findings necessary to invoke our regulatory authority, rather than severing the regulatory action into separate endangerment and standards-setting proceedings. The statute begins by providing that the Administrator "shall prescribe . . . standards applicable to the emission of any air pollutant from any class or classes of new motor vehicles or new motor vehicle engines," and follows this requirement by describing the scope of the duty to regulate air pollutant emissions "which, in his judgment cause, or contribute to, air pollution which may reasonably be anticipated to endanger public health or welfare." The best reading of the statute requires the Administrator, when prescribing any emission standard for new motor vehicles or engines, to find that the air pollutant or air pollutants emitted by the class or classes of new motor vehicles or engines subject to the standard cause or contribute to air pollution that may reasonably be anticipated to endanger public health or welfare.

The Endangerment Finding severed this statutory language by finding endangerment and contribution in the abstract for all potential CAA section 202 sources with respect to GHGs. In so doing, the Administrator vastly increased the Agency's authority by removing the restrictions Congress placed on the issuance of emission standards. As a result of this new conception of authority, the EPA may issue a single endangerment finding in the abstract with respect to emissions from all sources potentially subject to CAA section 202 (and their existing-source counterparts) without addressing the danger posed by any particular source category or the causal role of that particular source category in any identified danger. The EPA relied on the Endangerment Finding to prescribe emission standards for various classes of new motor vehicles and engines, as well as a variety of other sources under distinct statutory authorities, without making the requisite findings or assessment of factors necessary to regulate the sources in question.[139] Congress enacted CAA section 202(a)(1) as an integrated regulatory provision for a reason, and giving effect to the language of the statute requires the issuance of emission standards only when the Administrator has made an integrated finding of both endangerment and cause or contribution. Put another way, it is impermissible for the Administrator to make findings that trigger a duty to regulate without prescribing the emission standards required in response to such a finding, just as the Administrator may not prescribe emission standards without making the findings required by the statute.

This interpretation is consistent with the EPA's implementation of CAA section 202(a)(1) and similar provisions of the CAA prior to 2009. In the Endangerment Finding, the Administrator acknowledged that "typically endangerment and cause or contribute findings have been proposed concurrently with proposed standards under various sections of the CAA, including CAA section 201(a)." 74 FR 66501. That has also been our approach to other similarly worded provisions in the statute, including in response to petitions seeking findings and action under CAA section 115.[140] We believe that our historical practice under CAA section 202(a)(1) reflects the better reading of the statute and is entitled to greater weight. As the Supreme Court explained in *Loper Bright,* such weight is "especially warranted when an Executive Branch interpretation was issued roughly contemporaneously with enactment of the statute and remained consistent over time." 603 U.S. at 386.

In departing from the EPA's historical practice in the Endangerment Finding, the Administrator reasoned that "[t]he text of CAA section 202(a) is silent on this issue" and "invoked the procedural discretion that is provided by CAA section 202(a)'s lack of specific direction." 74 FR 66501. We no longer maintain that CAA section 202(a)(1) is silent on the issue, as the statute sets out an integrated process that requires the EPA to prescribe standards when the Administrator finds certain conditions are met. When Congress intends a multi-step inquiry in the environmental context, it typically says so expressly. In the NAAQS program, for example, the CAA separates our authority to establish air quality criteria under CAA section 108 from our obligation to promulgate and revise NAAQS based on the criteria under CAA section 109, in addition to separating both of these regulatory steps from our duties to implement the NAAQS by reviewing State Implementation Plans (SIPs) or promulgating Federal Implementation Plans (FIPs) under CAA section 110 and related statutory provisions.[141] A particularly relevant analogy is Clean Water Act section 303(c)(4), which pairs the Administrator's authority to "determin[e] that a revised or new [water quality standard] is necessary to meet the requirements of this chapter" with the requirement that the Administrator "shall promptly prepare and publish proposed regulations" after making such a determination and "promulgate any revised or new standard . . . not later than ninety days after he publishes such proposed standards." [142] Even if CAA section 202(a)(1) were ambiguous or silent in this respect, agencies may no longer assert delegated discretionary authority when the statute is amenable to a single, best reading under ordinary tools of statutory interpretation. As the Supreme Court held in *Loper Bright,* "statutory ambiguity . . . is not a reliable indicator of actual delegation of discretionary authority to agencies." 603 U.S. at 411.

Severing the EPA's standards-setting authority from the findings that trigger a duty to exercise that authority shaped the analysis in the Endangerment Finding in a manner that ran counter to the statute. The Endangerment Finding first projected adverse public health and welfare impacts of global climate change and attributed those adverse impacts to

---

[139] *See* sections III.D and VII of this preamble for a summary of the EPA's rulemaking activities in response to the Endangerment Finding.

[140] 42 U.S.C. 7415(a); *see* Her Majesty the Queen v. EPA, 912 F.2d 1525, 1533–34 (D.C. Cir. 1990) (deferring to the EPA's interpretation of CAA section 115(a) as requiring an integrated action because the statute's text and structure "creates a specific linkage between the endangerment finding and the remedial procedures").

[141] *See* 42 U.S.C. 7408, 7409, 7410.

[142] 33 U.S.C. 1313(c)(4), (c)(4)(B). Various provisions of the SDWA and the Toxic Substances Control Act (TSCA) similarly articulate multi-step processes for determining risk and addressing risk through regulation using language that Congress did not include in CAA section 202. *See, e.g., NRDC,* 67 F.4th at 398–402 (discussing the two-step process for promulgating national primary drinking water regulations under SDWA section 1412).

all manmade sources of GHG emission around the world and then, separately, used data from existing CAA section 202(a) sources in the United States to find that new motor vehicles and engines in the United States contributed to global GHG air pollution. The Administrator treated adaptation (adjustments to the effect of climate change that lessen impacts) and mitigation (reductions in emissions and global GHG concentrations unrelated to CAA section 202(a)(1) regulation) as outside the scope. 74 FR 66512. Moreover, the Administrator declined to consider cost, asserting that the Endangerment Finding imposed no regulatory requirements as a standalone action and relying on the Supreme Court's decision in *Whitman* v. *American Trucking Associations,* 531 U.S. 457 (2001), that the EPA cannot consider cost in setting the NAAQS under CAA section 109(b)(1). 74 FR 66515. Nor did the Administrator consider potential beneficial impacts from climate change with respect to whether and which standards would be appropriate. See 74 FR 66524 (purporting to compare "risks and benefits" only with respect to endangerment).

Severance also shaped all subsequent standards prescribed and revised in reliance on the Endangerment Finding in a manner we now conclude was unlawful. The EPA asserted in subsequent rulemakings that there was no need to make particularized findings for the relevant source category because the Endangerment Finding identified public health and welfare dangers and contribution for all CAA section 202 source categories. Nor did we consider the impacts of adaptation or mitigation when prescribing standards—considerations that the Endangerment Finding also treated as out of scope. As a result, the decision to sever meant that the EPA has never meaningfully considered or invited public comments on the cost, effectiveness, and continued propriety of its GHG regulatory program.

These considerations should have been taken into account when the EPA triggered a duty to regulate in the Endangerment Finding by invoking our CAA section 202(a)(1) authority. CAA section 202(a)(2) expressly provides that "[a]ny regulation prescribed under paragraph (1) of this subsection . . . shall" provide adequate time for "the development and application of the requisite technology, giving appropriate consideration to the cost of compliance within such period." [143] CAA section 202(a)(1) authorizes the Administrator

[143] 42 U.S.C. 7521(a)(2).

to "by regulation prescribe" standards "in accordance with the provisions of this section" and does not separately authorize standalone findings, meaning any action taken "under paragraph (1) of this subsection" is subject to the considerations in paragraph (2). In addition, the Supreme Court explained in *Michigan* that "agency action is lawful only if it rests 'on a consideration of the relevant factors,' " 576 U.S. at 750 (quoting *State Farm,* 463 U.S. at 43), including "at least some attention to cost," *id.* at 752.

Accordingly, we now conclude that the Administrator erred in analogizing the NAAQS program and the Supreme Court's decision in *Whitman* to avoid considering costs in the Endangerment Finding. Unlike CAA section 202(a)(1), the language in CAA section 109(b)(1) makes no reference to cost or implementation and focuses solely on the protection of public health. Nor does CAA section 109(b) include the lead time and technical feasibility concepts embedded in CAA section 202(a). And whereas CAA section 202(a)(1) sets out an integrated authority to prescribe emission standards when the provision's triggering condition is satisfied, CAA section 109(b)(1) uses mandatory language requiring the EPA to establish certain standards, the content and implementation of which are specified in various provisions throughout Title I of the Act. We further note that the Supreme Court's decision in *Massachusetts* did not address the question whether the EPA could issue standalone findings or bar the Administrator from taking cost and implementation concerns into account when exercising CAA section 202(a) authority. Rather, *Massachusetts* must be read together with *Michigan,* and the language of CAA section 202(a)(1) must be read in context to "produc[e] a substantive effect that is compatible with the rest of the law." *UARG,* 573 U.S. at 321 (quoting *United Sav. Ass'n of Tex.* v. *Timbers of Inwood Forest Assocs.,* 484 U.S. 365, 371 (1988)).

*Endangerment and Cause or Contribute.* The EPA is also finalizing as proposed that CAA section 202(a)(1) requires the Agency to evaluate whether source emissions cause or contribute to air pollution and whether that air pollution poses endangerment in a single causal chain, rather than considering these issues in isolation by severing the inquiries. The relevant inquiry is whether "the emission of any air pollutant from any class or classes of new motor vehicles or new motor vehicle engines," in the judgment of the Administrator, "cause, or contribute to, air pollution which may reasonably be

anticipated to endanger public health or welfare." As explained in this section, the emission must cause or contribute to the danger posed by the air pollution to a sufficient extent to satisfy the standard for regulation.

In the Endangerment Finding, the Administrator made two distinct findings based on two distinct sets of assumptions. In the first, the Administrator found that the "air pollution," defined as the combined global concentrations in the upper atmosphere of six "well-mixed GHGs," $CO_2$, methane, $N_2O$, HFCs, PFCs, and $SF_6$, endangered public health or welfare by playing a causal role in global temperature increases, sea level rise, and other phenomena (including ocean pH changes), which, in turn, were then asserted to play a causal role in environmental phenomena with adverse impacts on public health and welfare. 74 FR 66516. In the second, the Administrator found that the quantity of the "air pollutant" (defined as the combination of same six "well-mixed GHGs") emitted by new motor vehicles and engines annually contributed to the "air pollution." 74 FR 66536. The Administrator did not consider the extent to which emissions from CAA section 202(a)(1) sources have a more than *de minimis* effect on the *danger* identified with respect to elevated concentrations of GHGs in the upper atmosphere—let alone whether emissions from any particular class or classes of sources that the EPA intended to regulate had such an effect. Nor did the Administrator recognize the mismatch between "air pollution" consisting of global concentrations formed by GHG emissions past, present, and future and "air pollutant" emissions from new motor vehicles and engines on an annual basis, or the problems associated with measuring domestic contribution against an air pollution problem that necessarily requires global emissions to result in the identified danger.

Upon review, we no longer believe that the approach taken in the Endangerment Finding was consistent with the language of CAA section 202(a)(1) and the structure of the CAA, which requires making distinct findings for regulating distinct types of emission sources and authorizing different regulatory tools when such standards are met. For example, CAA section 111(b)(1)(A) authorizes the EPA to regulate emissions from listed categories of stationary sources if the Administrator determines those sources emit air pollutants that "significantly contribute" to air pollution that

endangers public health or welfare.[144] When that standard is met, CAA section 111(b)(1)(B) requires the EPA to regulate such emissions from such sources by setting standards of performance that, among other things, reflect the best system of emission reduction that has been adequately demonstrated in practice.[145] The CAA similarly sets out distinct standards for regulating and distinct modes of regulation for additional major source categories, including vehicles in use, aircraft engines, and separately addresses when and how to respond to international emissions that impact the United States. The Endangerment Finding effectively attributed the total GHG emissions coming from all of these various distinct sources within the United States, as well as from all international sources, to the mobile sources regulated under CAA section 202 without having made the requisite determinations for any of those sources and without considering the different regulatory tools Congress authorized for those sources as compared to CAA section 202(a) sources. Although the statute anticipates that "air pollution" may reflect contributions from multiple source categories, application of the global climate change concerns reading of CAA section 202(a)(1) leads to impermissible gaps between the contribution and endangerment analyses that the Endangerment Finding failed to address.

Whereas the identified "air pollution" leads to endangerment because of the sum total of all emissions, past, current, and projected, from all source categories foreign and domestic, the identified contribution of "air pollutant emissions" from new motor vehicles and engines was measured in annual terms. In other words, the Endangerment Finding compared the wrong figures in tying contribution to endangerment. The Administrator found contribution based on the conclusion that existing vehicles and engines constituted 4.3 percent of annual global GHG emissions. But the Administrator found endangerment based on the theory that "air pollution" consisting of total global concentrations of the six "well-mixed" GHGs endangered public health and welfare. This mismatch is not presented when analyzing the air pollution addressed expressly by the CAA because the mechanism of harm does not depend on centuries-long time

horizons. Annual emissions of airborne lead, for example, are readily measurable against the total annual concentrations of airborne lead in areas of concern, and the health and welfare impacts of air pollution in the form of airborne lead can be analyzed on the same scale. By completely severing the contribution and endangerment analyses for the six "well-mixed" GHGs, the Endangerment Finding avoided grappling with this disconnect. The difficulties in analyzing the nexus between contribution and endangerment was not a problem to be avoided, but a further reason to conclude that CAA section 202(a)(1) was not designed to address global climate change concerns.

The Administrator also defined the relevant "air pollution" as the combined global concentration of six "well-mixed GHGs" but found that CAA section 202(a) sources emitted only four of them: $CO_2$, methane, $NO_X$, and HFCs. 74 FR 66538. As a result, the "air pollution" identified as endangering public health or welfare included PFCs and $SF_6$, and the "air pollution" used to conclude that CAA section 202(a) sources satisfy the regulatory standard did not. Contrary to the EPA's conclusion at the time, 74 FR 66541, that difference is material, as PFCs and $SF_6$ are asserted to have many times the global warming potential of $CO_2$.[146] Severing the endangerment and cause-or-contribute analysis allowed the Agency to compare apples and oranges in a manner inconsistent with the best reading of the statute.

The Endangerment Finding also did not limit the analysis of contribution to "*new* motor vehicles or *new* motor vehicle engines" in the United States, which are the only sources covered by the EPA's CAA section 202(a) authority.[147] Because the Administrator considered all sources in analyzing the danger posed by elevated concentrations of GHGs in the upper atmosphere, the endangerment analysis necessarily included emissions from foreign and domestic vehicles that had been in use for years or decades and were not "new." Even when analyzing

contribution, the Administrator used emission estimates from "the entire fleet of motor vehicles in the United States for a certain calendar year" rather than projecting emissions from new motor vehicles and engines over time. 74 FR 66543. That decision increased the absolute contribution figure by orders of magnitude, including because newer vehicles and engines tend to be more efficient and emit less.[148] Difficulties in disaggregating emission data from emission sources, however reasonable, do not license us to read the term "new" out of the statutory text.

We further conclude that severing the endangerment and cause or contribution findings leads to untenable results and lacks any limiting principle. To illustrate the problem, the same logic would allow the EPA to issue emission standards for water vapor ($H_2O$), another substance emitted by new motor vehicles and engines that is also considered a GHG. Considered in isolation, increased $H_2O$ concentrations in the atmosphere from all human activities can be said to endanger public health or welfare by resulting in rain that leads to slip-and-fall injuries, drownings, and damage to crops, livestock, and property, including through pools, rivers, and floodwater, although water vapor is not itself harmful and is necessary to sustain life. Also considered in isolation, CAA section 202 sources can be said to "contribute" to elevated $H_2O$ concentrations in the atmosphere from all anthropogenic sources, and these emissions of water vapor would thereby assertedly "contribute" to global climate effects similar to those attributed to other GHGs. CAA section 202(a)(1) does not contemplate prescribing emission standards for such an omnipresent, naturally occurring, and essential component of the ambient air because the text requires a unified analysis that ensures a nexus between the extent of contribution and the resulting danger. The logic of regulating water vapor appears absurd, but it is the same logic required to regulate GHGs under CAA section 202(a)(1). And the Administrator acknowledged in the Endangerment Finding that the statutory interpretation adopted in that action could support adding water vapor to the defined regulatory for "climate forcing" GHGs.

The decision to sever the analysis of endangerment from the analysis of contribution, combined with the decision to sever the Administrator's

---

[144] 42 U.S.C. 7411(b)(1)(A).

[145] 42 U.S.C. 7411(a)(1), (b)(1)(B). CAA section 111 also differentiates between new and existing stationary sources in a listed source category and limits the EPA's role with respect to existing sources by authorizing only emission guidelines implemented by the States. *See id.* 7411(d).

[146] U.S. Environmental Protection Agency. (Last updated Jan. 16, 2025). Understanding Global Warming Potentials: *https://www.epa.gov/ghgemissions/understanding-global-warming-potentials.*

[147] 42 U.S.C. 7521(a)(1) (emphases added); *see, e.g., City of New York* v. *Chevron Corp.*, 993 F.3d 81, 101 (2d Cir. 2021) ("Together, the statute's silence on the issue of extraterritorial reach, the fact that the Act contemplates the need for reciprocal protections from foreign nations, and the State Department's lead role in setting foreign policy on environmental matters, all plainly demonstrate that the Clean Air Act regulates only domestic emissions.").

[148] For additional discussion of improvements in new motor vehicles and engines relative to older vehicles and engines, see section VI.D of the preamble to the proposed rule.

findings from any standards prescribed as a result, produced an analysis that is incompatible with the statute. In the Endangerment Finding, the Administrator concluded that anything more than a trivial or *de minimis* contribution to elevated global GHG concentrations by CAA section 202(a) sources was sufficient to trigger regulation because the ''unique, global aspects of the climate change problem tend to support contribution at lower percentage levels of emissions than might otherwise be considered appropriate when addressing a more typical local or regional air pollution problem.'' 74 FR 66538. Because the Endangerment Finding did not consider the standards that the statute requires when the Administrator makes such a finding, we did not consider whether emission standards for new motor vehicles would be futile as a means to address the identified dangers of GHG emissions from all anthropogenic sources. As discussed in section V.C of this preamble, available modeling indicates that reducing GHG emissions from all vehicles and engines in the United States to zero would not have a measurable, material impact on trends in global temperature or sea level. Because our GHG emission standards apply only to new vehicles and engines and have not, to date, mandated the elimination of all emissions, their impact is only a fraction of the already *de minimis* impacts identified in the modelled scenario. It was foreseeable at the time that issuing the Endangerment Finding would trigger a duty to regulate and that stringent measures would be necessary under *all* of the EPA's separate statutory authorities, and not just CAA section 202(a), to have *any* potentially material impact on the identified harm. Refusing to consider these foreseeable consequences was inconsistent with the statutory scheme and, as explained further below, an unreasonable exercise of the authority we asserted.

Finally, the Administrator did not adequately consider the meaning in context of the statutory term ''endanger'' and failed to identify with sufficient rigor the purported danger linked to GHG emissions from new motor vehicles and engines. As used in CAA section 202(a)(1), ''endanger'' is not best read as meaning any predicted negative impact to any public health or welfare value, as that interpretation would render the constraint placed on the EPA's authority to prescribe standards essentially meaningless, thereby violating ordinary principles of statutory interpretation and raising

constitutional nondelegation concerns. Severing the endangerment and contribution inquiries improperly allowed the Administrator to avoid this concern by concluding that new motor vehicle and engine emissions included more than *de minimis* GHG emissions, even if those emissions did not themselves contribute to a danger in any meaningful sense. See 74 FR 66543 (asserting that ''contributors must do their part even if their contributions to the global problem, measured in terms of percentage, are smaller than typically encountered'').

2. Summary of Comments and Updates Since Proposal

The EPA received comments from a variety of stakeholders supporting and criticizing the legal rationale set out in the proposed rule. Commenters supporting the rescission and repeals pointed to the Supreme Court's decisions in *West Virginia, UARG,* and *Loper Bright* as strongly supportive of what we proposed to be the best reading of CAA section 202(a)(1) and generally agreed that the Endangerment Finding erred in severing the statutory analysis in various ways. Commenters opposing the rescission and repeals generally argued that the Supreme Court's decision in *Massachusetts* and several subsequent precedents must be read as requiring the EPA to regulate GHG emissions and that the statute must be interpreted broadly to accomplish what they described as the preventative purposes of the statute. The final rationale set out in the preceding section of this preamble reflects this input by including certain interpretive evidence identified by commenters and additional analysis developed in response to arguments raised during the public comment period. In this subsection, we summarize major themes presented in the comments received along with our high-level responses. For detailed comment summaries and our full responses thereto, please see the Response to Comments document in the docket for this rulemaking.

*Comment:* Commenters supportive of the proposal generally agreed that the EPA exceeded its statutory authority under CAA section 202(a)(1) by issuing the Endangerment Finding and resulting standards. Some of these commenters emphasized agreement with our proposed interpretation of the term ''air pollution'' and the role that term plays in the provision, while others further agreed with our proposed understanding of the nature of the statutory analysis and the ways in which the Endangerment Finding erred in severing the analysis.

With respect to ''air pollution,'' commenters offered additional legislative history, regulatory history, or other support for interpreting the term as referring to pollution that adversely impacts health or welfare through local or regional exposure, such as smog. Several commenters recounted the air pollution concerns leading up to the 1965, 1970, and 1977 enactments in particular and emphasized that Congress and the public understood the problem in terms of increased urbanization, including in cities that crossed over State lines and made pollution control strategies by individual States and localities difficult with respect to mobile sources. These commenters provided further evidence in contemporary legislative history and other public materials that Congress understood the national air pollution problem being addressed in legislation as one related to criteria pollutants that lead to smog, primarily in urban areas, as well as air toxics. Several also pointed to additional provisions of the CAA, including general statements of purpose and the structure of the statute as a whole, to argue that Congress designed a regulatory scheme for regulating domestic emissions and domestic impacts in a manner that does not contemplate or authorize regulation in response to global climate change concerns. Several commenters also cited case law to argue that the CAA does not regulate extraterritorially. With respect to the ways in which the Endangerment Finding severed the statutory analysis, several commenters agreed that these considerations were relevant to statutory interpretation and authority as well as the quality or validity of the underlying analysis in the Endangerment Finding.

*Response:* The EPA agrees with these comments and is finalizing, as proposed, that the Endangerment Finding exceeded the Agency's statutory authority under CAA section 202(a)(1) in multiple respects. In addition to the further discussion incorporated into section V.A.1 of this preamble, we agree that viewed as a whole, the legislative history and other materials contemporary to the 1965, 1970, and 1977 enactments most relevant to interpreting the key statutory language in CAA section 202(a)(1) tend to undermine the interpretation adopted in the Endangerment Finding and support the interpretation we are finalizing in this action. While legislative history cannot trump the statutory text, widely publicized materials and evidence of common understanding at the time of enactment can be relevant to the

ordinary meaning of undefined terms. Here, that material supports the conclusion that ''air pollution'' as used in CAA section 202(a)(1) meant pollution that harms public health or welfare through local or regional exposure, rather than gases that are not harmful in that sense but may contribute to global phenomena on a far more attenuated chain of causation. We further agree that other provisions of the statute, including the findings and declarations of purpose in CAA section 101, support the interpretation finalized in this action by indicating that while Congress referenced and addressed local and regional problems, it did not reference global climate change concerns at all through the 1970s and even today uses express terms in the relatively few provisions that address GHGs, such as in the RFS and provisions authorizing certain grants and financial or technical assistance.

*Comment:* Adverse commenters argued that the EPA's proposed interpretation of CAA section 202(a)(1) is foreclosed in whole or in part by precedent. Many of those commenters argued that the Supreme Court's decision in *Massachusetts* unambiguously held that the EPA has authority to prescribe GHG emission standards for new motor vehicles and engines in response to global climate change concerns. Others also cited to subsequent cases, including the Supreme Court's decisions in *American Electric Power Co.* v. *Connecticut,* 564 U.S. 410, 426 (2011), *UARG,* and *West Virginia,* as well as the D.C. Circuit's decisions in *Coalition for Responsible Regulation* and *American Lung Association,* as individually or collectively precluding the EPA from evaluating and applying the best reading of CAA section 202(a)(1) and related provisions.

*Response:* The EPA disagrees with these comments, many of which significantly overread relevant precedent and misunderstand principles governing the scope of judicial decisions and statutory interpretation. Fundamentally, commenters' arguments stem from the flawed proposition that the Supreme Court held in *Massachusetts* that the EPA can or must regulate GHG emissions from new motor vehicles and engines in response to global climate change concerns. As detailed in section V.A.1 of this preamble, we no longer believe that this reading is accurate on its own terms, nor does it reflect the Court's subsequent holdings and rationale in *UARG, West Virginia,* and, more generally, *Michigan* and *Loper Bright.* The Court in *Massachusetts* rejected the policy

reasons the Agency offered for declining to regulate and the interpretation of the statutory definition of ''air pollutant'' in CAA section 302(g) that the Agency relied upon to deny petitions for rulemaking in 2003. Contrary to the framing presented by some commenters, the Court found that the statute ''foreclose[d]'' the Agency's reading and is ''unambiguous'' only with respect to the ''air pollutant'' definition, holding that ''the definition embraces all airborne compounds of whatever stripe.'' 549 U.S. at 529 (citing 42 U.S.C. 7602(g)). Nor do commenters offer persuasive reasons to conclude that the Court's subsequent decision in *UARG,* which held that the term ''air pollutant'' as defined in the statute and construed in *Massachusetts* must be read in context of the regulatory provision in which it appears, applies to the entirety of the CAA *except* for CAA section 202(a)(1). 573 U.S. at 318–20 (''[*Massachusetts*] did not hold that EPA must always regulate [GHGs] as an 'air pollutant' everywhere that term appears in the statute, but only that EPA must 'ground its reasons for action or inaction in the statute,' rather than on 'reasoning divorced from the statutory text.' '' (quoting 549 U.S. at 532, 535)).

Similarly, we disagree with commenters' suggestions that additional precedents since *Massachusetts* purported to decide the interpretive issues addressed in this final action. In *American Electric Power,* for example, the Supreme Court held that federal common law was not the appropriate avenue for deciding ''whether and how to regulate carbon-dioxide emissions from powerplants.'' 564 U.S. at 426. Indeed, the Court has since confirmed in *West Virginia* that it ''said nothing about the ways in which Congress intended EPA to exercise its power'' under the CAA, particularly with respect to the regulation of stationary sources under CAA section 111(d). 597 U.S. at 730. Commenters' attempt to repeat similar arguments for *UARG* and *West Virginia* lack credibility given the questions presented in those cases and the reasoning adopted by the Court with respect to the questions presented. These comments largely did not engage with the interpretation of ''air pollution'' presented at proposal and finalized in this action, and the relatively small number that did failed to offer persuasive evidence that rebuts the ordinary meaning of the term or relevant contextual or structural indicators in the statutory text. For additional discussion of these cases, the D.C. Circuit's decisions in *Coalition for Responsible Regulation* and *American*

*Lung Association,* and other issues bearing on statutory interpretation, see the Response to Comments document.

In this final action, the EPA is acting consistently with *Massachusetts* by ''ground[ing] its reasons for action or inaction in the statute'' and concluding that, given the best reading of the language in CAA section 202(a)(1), we lack authority to issue an affirmative finding that triggers our regulatory authority in response to global climate change concerns. 549 U.S. at 535.

*Comment:* Adverse commenters also asserted that the EPA's proposed interpretation gave inadequate weight to the statutory terms ''public health'' and ''welfare.'' These commenters generally argued that Congress delegated broad authority to the EPA to regulate any air pollutant emissions in response to any air pollution that may arise in the future, so long as we conclude such regulation further public health or welfare. Several of these commenters focused particularly on the statutory definition of welfare in CAA section 302(g), and particularly on the term ''climate,'' to argue that Congress wrote these concepts into the statute to give the Agency such broad authority.

*Response:* The EPA disagrees that the references in CAA section 202(a)(1) to ''public health'' and ''welfare'' confer discretion broad enough to identify and regulate any form of air pollution, including in the form of global climate change concerns. As discussed in section V.A.1 of this preamble, that interpretation, which we acknowledge is consistent with the interpretation adopted in the Endangerment Finding, is inconsistent with ordinary principles of statutory interpretation and would needlessly give rise to absurdity and nondelegation concerns that the statute itself does not create, properly interpreted. With respect to the statutory definition of ''welfare,'' we note that the ordinary meaning of the term ''climate'' at the time of enactment is nowhere near as broad as commenters suggest and that the term, as well as additional terms in the definition such as ''weather'' and ''visibility,'' must be read in the context of a much broader list that consists of terms having the physical property of being local or regional. For additional discussion, see the detailed explanation of the term ''welfare'' and additional statutory terms informed by proximate cause principles, including ''cause,'' ''contribute,'' and ''reasonably be anticipated to endanger,'' in the Response to Comments document.

*B. Lack of Clear Congressional Authorization*

The EPA is also finalizing as proposed that, in addition to the basis set out above, we lack the "clear congressional authorization" required under the major questions doctrine to decide the Nation's response to global climate change concerns. *West Virginia,* 597 U.S. at 723 (quoting *UARG,* 573 U.S. at 324). In this subsection, we conclude that the major questions doctrine applies to the Endangerment Finding because the global climate change concerns addressed in that action, and the mandatory duty to regulate triggered by that action, present a major question of undeniable political and economic significance. Until 2009, we had never used CAA section 202(a)(1) to assert authority over an entirely new subject, instead hewing closely to the air pollution problems that Congress identified in CAA section 202. To break with this longstanding practice, we developed a "unique" framework that broadened our statutory authority to prescribe emission standards in response to air pollution far enough to encompass global climate change concerns. The result was a new policy direction for the United States—one that Congress had repeatedly and recently declined to adopt—in which the EPA declared that every source and every nation must be required to "do their part" to combat global climate change. Implementation of the Endangerment Finding since 2009 has shown the extraordinary consequences of this assertion of authority, including an increasing trend toward forcing a shift from internal combustion engine (ICE) vehicles to EVs for virtually all classes of LD, MD, and HD vehicles.

Next, we conclude that Congress did not clearly authorize the EPA to decide this question when it empowered the Administrator to "prescribe . . . standards" for new motor vehicle and engine emissions under CAA section 202(a)(1). The general nature of the statutory text and the more specific authorities and commands throughout CAA section 202, as well as additional provisions throughout the CAA, leave no room for doubt that Congress knew how to, and did not, expressly authorize the regulation of vehicle and engine GHG emissions. On that basis, we determine that the Endangerment Finding and resulting GHG emission standards exceeded our statutory authority and must be rescinded. That conclusion follows from the Supreme Court's decisions in *UARG* and *West Virginia* and is consistent with *Massachusetts,* which held that GHGs

fell within the definition of "air pollutant" but did not interpret the scope of our authority to regulate air pollutants that cause, or contribute to, air pollution which may reasonably be anticipated to endanger public health or welfare.

1. Final Rationale

*Applicability of the Major Questions Doctrine.* In recent decisions construing the scope of the EPA's statutory authority to regulate GHGs, the Supreme Court has emphasized that the " 'history and breadth of the authority' " asserted by an agency and "the 'economic and political significance' of that assertion" provide " 'a reason to hesitate before concluding that Congress' meant to confer such authority." *West Virginia,* 597 U.S. at 721 (quoting *Brown & Williamson,* 529 U.S. at 159–60); *accord UARG,* 573 U.S. at 324. Whether viewed as an ordinary tool of statutory interpretation that looks to the structure of the regulatory scheme [149] or a clear statement rule that implements nondelegation and separation of power principles,[150] the major questions doctrine requires us to identify "more than a merely plausible textual basis" when asserting authority to decide a significant policy issue on Congress' behalf. *Id.* at 723.

In *UARG,* the Supreme Court applied the major questions doctrine to reject our attempt to expand the number of stationary sources subject to the CAA's PSD and Title V permitting requirements based on their GHG emissions. 573 U.S. at 310–13.[151] The Court held that the EPA had "exceeded its statutory authority when it interpreted the Clean Air Act to require PSD and Title V permitting for stationary sources based on their greenhouse gas emissions" and "may not treat greenhouse gases as a pollutant" in this PSD and Title V contexts. *Id.* at 333. In reaching this conclusion, the Court found that our interpretation of the statute and related "tailoring rule" that exempted many sources to address workability concerns was "unreasonable because it would bring about an enormous and transformative expansion in EPA's regulatory authority without clear congressional authorization." *Id.* at 324. Citing earlier major questions doctrine precedents, the Court noted that "a measure of skepticism" is required when "an agency claims to discover in

a long-extant statute an unheralded power to regulate 'a significant portion of the American economy,' " *id.* (quoting *Brown & Williamson,* 529 U.S. at 159), and that "[w]e expect Congress to speak clearly if it wishes to assign to an agency decisions of vast 'economic and political significance,' " *id.* (quoting *Brown & Williamson,* 529 U.S. at 160).

In *West Virginia,* the Supreme Court again applied the major questions doctrine to reject our attempt to shift the power grid away from using fossil fuels through GHG emission guidelines for existing power plants under CAA section 111(d). 597 U.S. at 711–15.[152] The Court noted that when interpreting a grant of regulatory authority, the inquiry includes the question "whether Congress in fact meant to confer the power the agency has asserted." *Id.* at 721. The Court explained that the major questions doctrine applies when "the 'history and breadth of the authority that [the agency] has asserted,' and the 'economic and political significance' of that assertion, provide 'a reason to hesitate before concluding that Congress' meant to confer such authority." *Id.* (quoting *Brown & Williamson,* 529 U.S. at 159–60). In such cases, "both separation of powers principles and a practical understanding of legislative intent make us 'reluctant to read into ambiguous statutory text' the delegation claimed to be lurking there," and "[t]he agency instead must point to 'clear congressional authorization' for the power it claims." *Id.* at 723 (quoting *UARG,* 573 U.S. at 324). Applying that standard, the Court held that our statutory authority to establish emission limits under CAA section 111(a)(1) and (d) "is not close to the sort of clear authorization required by our precedents." *Id.* at 732.

The Endangerment Finding implicates the major questions doctrine for many of the same reasons the Supreme Court applied it in *UARG* and *West Virginia.* By asserting authority to regulate in response to global climate change concerns, the EPA " 'claim[ed] to discover in a long-extant statute an unheralded power' representing a 'transformative expansion in [its] regulatory authority.' " *West Virginia,* 597 U.S. at 724 (quoting *UARG,* 573 U.S. at 324). From 1965 to 2009, we invoked CAA section 202(a)(1) consistent with the more specific direction provided elsewhere in section 202 regarding the

---

[149] Biden v. Nebraska, 600 U.S. 477, 507–21 (2023) (Barrett, J., concurring).

[150] *West Virginia,* 597 U.S. at 735–51 (Gorsuch, J., concurring).

[151] *See* 42 U.S.C. 7470–92, 7661 *et seq.*

[152] *See* 42 U.S.C. 7411(d). The EPA had also issued GHG performance standards for new and modified fossil fuel-fired power plants under CAA section 111(b) that triggered the Agency's authority to issue guidelines for existing sources under CAA section 111(d). The new source standards were not before the Supreme Court in *West Virginia.*

air pollution Congress intended the EPA to address under this authority. As noted in section III.A of this preamble, the 15 final rules we identified as invoking CAA section 202(a)(1) prescribed standards for air pollution problems enumerated in the statute, including HC and other VOCs, NO$_X$, PM, and certain air toxics. Critically, Congress repeatedly amended the statute to instruct the EPA what, when, and how to regulate with respect to vehicle and engine emissions. For example, the 1970 CAA included instructions to regulate CO, HCs, and NO$_X$ under CAA section 202(a) now codified as amended in CAA section 202(b).[153] The 1990 CAA amendments included additional instructions to regulate CO, certain HCs, NO$_X$, and PM.[154] These final rules carried out Congress' instruction to use CAA section 202 in particular ways and did not purport to use CAA section 202(a)(1) as a blanket authorization to explore new vistas on a discretionary basis.

Given this history, the novel use of CAA section 202(a)(1) in the Endangerment Finding is similar to the use of CAA section 111(d) addressed in *West Virginia.* There, the Supreme Court found that the EPA's use of the provision in a more limited fashion prior to the Clean Power Plan counseled in favor of applying the major questions doctrine, noting that " 'just as established practice may shed light on the extent of power conveyed by general statutory language, so the want of assertion of power by those who presumably would be alert to exercise it, is equally significant in determining whether such power was actually conferred.' " 597 U.S. at 725 (quoting *FTC* v. *Bunte Bros., Inc.,* 312 U.S. 349, 352 (1941)). We further note that the regulatory actions reviewed in *UARG* and *West Virginia* were predicated in part on the Endangerment Finding, and the PSD and Title V rules in *UARG* and existing source emission guidelines in *West Virginia* are similar in scope, approach, and economic impact as the GHG emission standards for new motor vehicles and engines promulgated to fulfill the mandatory duty triggered by the Endangerment Finding.

Moreover, as a consequence of the novel approach taken in the Endangerment Finding to endangerment and contribution, our GHG emission standards reflect an increasing trend toward mandating a shift from gasoline- and diesel-fueled vehicles to EVs on the

theory that a substantial reduction in GHG emissions is necessary to address global climate change concerns.[155] This trend was evident in our earliest GHG emission standards rulemakings and became increasingly clear over time as the standards increased in stringency to the point where alternative compliance options were increasingly infeasible or unattractive for regulated parties. The underlying policy of forcing such a transition is also evident from the Agency's statements and actions on related issues. For further discussion of relevant regulatory history and implementation details, both of which generated significant public input during the comment period, see the Response to Comments document in the docket for this rulemaking.

Mandating a shift in the national vehicle fleet from one type of vehicle to another is indistinguishable from the emission guidelines at issue in *West Virginia,* which were calculated to force a shift from one means of electricity generation to another. This increasing regulatory trend has borne out over time given the limits of using GHG emission control technologies applicable to new motor vehicles and engines that comport with the magnitude of the problem identified in the Endangerment Finding. As discussed later in this preamble, even eliminating all GHG emissions from all U.S. vehicles and engines would have only a *de minimis* impact on GMST and GSLR trends as a proxy for adverse health and welfare impacts. See section V.C of this preamble and the Response to Comments document for further discussion.

It is " 'highly unlikely that Congress would leave' to 'agency discretion' the decision" whether and how many consumers and manufacturers in the United States may use the ICE in their vehicles. *West Virginia,* 597 U.S. at 729 (quoting *MCI Telecomms. Corp.* v. *AT&T Co.,* 512 U.S. 218, 231 (1994)). As the Supreme Court noted with respect to coal-based electricity generation, such a policy decision involves "basic and consequential tradeoffs," and "Congress certainly has not conferred a like authority upon EPA anywhere else in the Clean Air Act." *Id.* Until the Endangerment Finding, we had never invoked CAA section 202(a)(1) to regulate in response to global climate change concerns, whether through a fuel-shifting strategy or any other means. That history is telling because although CAA section 202(a)(1) has existed in substantially similar form since 1967, "the EPA had never

regulated in that manner, despite having issued many prior rules governing" vehicle and engine emissions. *Id.* When Congress intended the EPA to regulate the type of fuels that propel vehicles, it provided express and detailed authority to do so in other provisions. CAA section 211 authorizes the Agency to regulate fuel and fuel additives, including by requiring registration and controlling or prohibiting the manufacture, distribution, or sale of fuel or fuel additives if the Administrator determines that "any emission product of such fuel or fuel additive causes, or contributes, to air pollution or water pollution . . . that may reasonably be anticipated to endanger the public health or welfare" or significantly impair the performance of any generally used emission control device.[156] Moreover, CAA section 211(o) sets out detailed requirements for the Agency's RFS program, which involves setting annual renewable fuel volume requirements applicable to refiners, blenders, distributors, and importers of transportation fuel.[157] Both of these provisions, with respect to the Nation's policy approach to GHGs generally and transportation fuel specifically, indicate that Congress knows how to establish policy on the subject and has declined to empower the EPA to decide for itself whether and how to respond to global climate change concerns.

Both before and since the Endangerment Finding, " 'Congress considered and rejected' multiple times" legislation that would have authorized or required the EPA to regulate GHG emissions from vehicles, engines, and additional sources. *West Virginia,* 597 U.S. at 731 (quoting *Brown & Williamson,* 529 U.S. at 144). This history is particularly relevant because of the established pattern through the 1990 CAA amendments of Congress adding additional emissions control authority and obligations to CAA section 202. From 2007 to 2009, Congress considered legislation— supported by the President and Administrator in office at the time of the Endangerment Finding—that would have authorized or required the EPA to prescribe emissions regulations for GHGs. For example, the Safe Climate Act of 2007 would have adopted findings and policies with respect to limiting global temperature increase, required various forms of international cooperation, and added a new Title VII to the CAA instructing the EPA to achieve phased GHG emission reduction targets and regulate GHG emissions

[153] Public Law 91–604, section 6, 84 Stat. 1676, 1691.

[154] Public Law 101–549, section 203, 104 Stat. 2399, 2474.

[155] 89 FR 27842, 27844 (Apr. 18, 2024).

[156] 42 U.S.C. 7545(a)–(c).

[157] 42 U.S.C. 7545(o).

under CAA section 202.[158] Similarly, the American Clean Energy and Security Act of 2009 would have required international cooperation and added new titles to the CAA requiring the EPA to, among other things, regulate GHG emissions under CAA section 202.[159] Neither bill was enacted through the legislative process, and Congress has since declined to adopt similar legislation.[160]

When Congress has addressed GHGs individually or collectively, it has not granted the EPA broad regulatory authority to "prescribe . . . standards" under CAA section 202(a)(1). As noted above, Congress enacted the RFS program to promote energy independence while reducing GHG emissions through a detailed regulatory scheme. With respect to HFCs, Congress enacted a comprehensive phaseout scheme in the 2020 American Innovation and Manufacturing (AIM) Act, which includes detailed instructions, timelines, and requirements for implementation and allows some uses to continue under certain conditions.[161] With respect to $CO_2$, Congress opted for a carrot rather than a stick by authorizing a tax credit to incentivize underground sequestration that mitigates emissions.[162] With respect to methane, Congress amended the CAA in 2021 through the Inflation Reduction Act of 2022 (IRA) to require us to establish a waste emissions charge for certain sources structured to incentivize emissions reductions over time.[163]

When addressing GHGs and global climate change concerns more generally, Congress has used non-regulatory tools that incentivize, rather than mandate, changes in manufacturing and consumer choice, including through additional funding provisions in the IRA.[164] Multiple instances of recent legislation addressing GHGs individually and through distinct regulatory approaches suggests that Congress views such policy decisions as economically and politically significant and not adequately addressed by general statutory authorities enacted in response to different problems.

The EPA notes that Congress has continued to revise these air pollutant-specific measures and nonregulatory tools as part of an ongoing national debate over the appropriate response to global climate change concerns. On July 4, 2025, President Trump signed into law significant new legislation enacted by Congress, the One Big Beautiful Bill Act (OBBB),[165] which repealed several relevant measures adopted in the IRA and rescinded the EPA's appropriations to carry out several funding programs related to GHG emissions. Among other things, Congress prohibited the Agency from collecting the waste emission charge for methane for ten years beyond the original statutory collection date, rescinded funding to administer grant programs in CAA sections 132 and 135–38, and repealed CAA section 134, which had included a section-specific definition of "greenhouse gas" applicable to the grant program set out in that section.[166] This legislation, which was the product of substantial national debate and revised and rescinding funding for provisions of the IRA that were themselves the product of substantial national debate, indicates that the EPA erred in attempting to resolve significant policy issues on its own accord in the Endangerment Finding.

Congress has also recently disapproved several actions taken by the EPA with respect to GHG emissions. On May 19, 2025, President Trump signed into law a resolution adopted by Congress under the Congressional Review Act (CRA) to void our final rule implementing the waste emission charge added to the CAA in 2021.[167] And on June 12, 2025, President Trump signed into law three resolutions

adopted by Congress under the CRA[168] to void waivers we granted under CAA section 209 that allowed California and participating States to enforce GHG emission regulations for motor vehicles and engines, up to and including zero-emission standards that mandated a shift to electric vehicles.[169] These disapproval resolutions further demonstrate the economic and political significance of the EPA's GHG emission regulations and reinforce the understanding that Congress intends to reserve such major questions of policy for itself. See *West Virginia,* 597 U.S. at 731–32.

*Conclusion.* Under the major questions doctrine, we conclude that the EPA lacks the "clear congressional authorization" required for the novel approach taken in the Endangerment Finding and resulting GHG emission standards and must rescind these actions. *West Virginia,* 597 U.S. at 723 (quoting *UARG,* 573 U.S. at 324). Our statutory authority under CAA section 202(a)(1) to "prescribe . . . standards" does not clearly authorize the EPA to regulate in response to global climate change concerns or, in issuing such regulations, to trend toward mandating a shift from gas- and diesel-fueled vehicles to EVs. This conclusion follows whether the major questions doctrine is viewed as an ordinary interpretive principle or a protection against violations of the separation of powers. As discussed previously in section V.A.1 of this preamble, an interpretation of CAA section 202(a)(1) that permits the EPA to define and regulate *any* "air pollution" the Agency believes may harm public health or welfare, broadly defined, would raise serious absurdity and nondelegation concerns. Properly interpreted, the statute does not and need not raise such concerns given the best reading of the statute or application of the major questions doctrine.

In *West Virginia,* the Supreme Court held that our authority under CAA section 111 "to establish emission caps at a level reflecting 'the application of the best system of emission reduction . . . adequately demonstrated'" did not

---

[158] H.R. 1590, 110th Cong. (2007). This bill was presented in the House of Representatives and never received a vote.

[159] H.R. 2454, 111th Cong. (2009). This bill, introduced on May 15, 2009—a month after the EPA proposed the Endangerment Finding—passed the House of Representatives on June 26, 2009, by a 219–212 margin but never received a vote in the Senate. The President and Administrator at the time expressed a strong preference for legislation but also a willingness to resolve legislative inaction by administrative means, and the Agency ultimately finalized the Endangerment Finding on December 7, 2009.

[160] Congress's pattern of not providing the EPA such authority extends long before the 2009 Endangerment Finding as well. *See Coal. for Responsible Regulation,* 2012 U.S. App. LEXIS 25997, at * 36–37 (Brown, J., dissenting from denial of rh'g en banc) (noting Congress expressly rejected proposals offered during the drafting of the 1990 CAA Amendments that would have authorized the EPA to regulate GHGs).

[161] Public Law 116–260, Div. S, 134 Stat. 1182, 2255–71 (codified at 42 U.S.C. 7675 *et seq.*).

[162] 26 U.S.C. 45Q. In 2020, Congress also instructed us to recommend improvements to SDWA permitting procedures for injection wells used in carbon sequestration and appropriated additional fundings for the "Class VI" permitting process. Public Law 116–260, Div. G, Title II, 134 Stat. 1182, 1507–16.

[163] Public Law 117–169, section 60113, 136 Stat. 1818, 2074 (codified at 42 U.S.C. 7436).

[164] *See, e.g.,* Public Law 117–169, sections 60101–03, 60107, 60114, 60201, 136 Stat. 1818, 2063–66, 2069, 2076, 2078 (codified at 42 U.S.C. 7432–35, 7437–38).

[165] Public Law 119–21.

[166] 42 U.S.C. 7434(c)(2) (2022).

[167] Public Law 119–2; *see* 90 FR 21225 (May 19, 2025).

[168] H.J. Res. 87; H.J. Res. 88; H.J. Res. 89; *see also* Diamond Alt. Energy, LLC v. *EPA, 606 U.S. 100, 107 n.1 (2025); Statement by the President (June 12, 2025): https://www.whitehouse.gov/briefings-statements/2025/06/statement-by-the-president/.*

[169] For example, California's Advanced Clean Cars II required an increasing amount of EVs to be sold so that by 2035 100 percent of new cars and light trucks sold in California would be zero-emission vehicles, including PHEV. *See* California Air Resources Board, California moves to accelerate to 100% new zero-emission vehicle sales by 2035, *available at https://ww2.arb.ca.gov/news/california-moves-accelerate-100-new-zero-emission-vehicle-sales-2035.*

clearly authorize the EPA to issue emission guidelines that addressed global climate change concerns by mandating a shift away from coal-generated electricity. 597 U.S. at 732. Similarly, in *UARG,* the Court held that our PSD and Title V authorities could not fully be extended to GHG emissions because those provisions "are designed to apply to, and cannot rationally be extended beyond, a relative handful of large sources capable of shouldering heavy substantive and procedural burdens." 573 U.S. at 303. In these and other recent precedents, the Court has made clear that the express statutory authority required by major questions doctrine requires more than general language conferring "a merely plausible textual basis for the agency action." *West Virginia,* 597 U.S. at 723.[170]

These cases control the analysis of our authority under CAA section 202(a). As in *West Virginia,* our statutory authority and the findings required to invoke that authority do not clearly authorize the approach taken in the Endangerment Finding and subsequent regulations. And as in *UARG,* our statutory authority to "prescribe . . . standards" for emissions of certain air pollutants does not clearly authorize using the CAA's vehicle-emission control scheme to address global climate change concerns. As discussed above, the Endangerment Finding did not limit itself to considering the impacts of GHG emissions from new motor vehicles and engines. Rather, the Endangerment Finding reviewed the totality of adverse impacts from climate change attributed to all anthropogenic sources of GHG emissions worldwide and asserted jurisdiction over CAA section 202(a) sources by finding they contributed to such impacts by emitting more than *de minimis* quantities of GHGs. That understanding has permeated our GHG emission rulemakings since 2009, and we have attempted to apply that framework to our distinct regulatory authorities across the rest of the CAA.

In *Massachusetts,* the Supreme Court disagreed with the EPA's argument that GHGs were not "air pollutants" because Congress had not revisited CAA section

202(a) in amending the CAA in 1990. 549 U.S. at 512–13. The Court found that our reliance on *Brown & Williamson* to support that argument was misplaced because unlike the ban on tobacco products at issue in that case, "EPA jurisdiction would lead to no such extreme measures." *Id.* at 531. The Court also found that unlike the FDA's earlier statements on tobacco products, the "EPA had never disavowed the authority to regulate greenhouse gases" and had issued a memorandum in 1998 suggesting that we had such authority. *Id.*

*Massachusetts* did not consider or have reason to interpret the scope of the EPA's authority under CAA section 202(a) given our position in the 2003 Denial that GHGs are not "air pollutant[s]" under any provision of the statute. Rather, *Massachusetts* rejected our position that GHGs are "categorically" excluded from the CAA and remanded for the Administrator to determine whether four GHGs met the standard in CAA section 202(a). *UARG,* 573 U.S. at 320. Further, *Massachusetts* must be read together with the Supreme Court's decisions in *West Virginia* and *UARG,* which applied the major questions doctrine to statutory provisions similar to CAA section 202(a), as well as other relevant precedents decided since 2007.[171] The decision in *Massachusetts* necessarily does not reflect consideration of these precedents or additional legislative and regulatory developments since that time. As noted above, the EPA's rulemakings have not been limited to emission standards as anticipated in *Massachusetts,* but instead reflect an increasing trend toward mandating a transition toward EVs for virtually all classes of LD, MD, and HD vehicles.

2. Summary of Comments and Updates Since Proposal

The EPA received comments from a variety of stakeholders supporting and criticizing the legal rationale set out in the proposed rule. Commenters supporting the rescission and repeals pointed to *West Virginia* as virtually conclusive with respect to the applicability and outcome of the major questions doctrine analysis. These commenters generally agreed that the Endangerment Finding itself runs afoul of the doctrine by launching the EPA into a policy field that Congress has not decided whether and how to enter as a regulatory matter and, separately, that

the EPA's increasing trend in GHG emission standard rulemakings toward forcing a shift toward EVs also runs afoul of the doctrine. Some commenters argued that the doctrine applied to the GHG emission standards but not the Endangerment Finding, including because the standards have increasingly trended toward forcing a shift to EVs. Commenters opposing the rescission and repeals generally argued that the Supreme Court's decision in *Massachusetts* must be read as shielding CAA section 202(a) from the major questions analysis. Some of these commenters also insisted that the regulation of GHG emissions from new motor vehicles and engines is not economically or politically significant, or that CAA section 202(a)(1) expressly authorizes the EPA to assert such authority by using broad language intended to achieve what they assert is the statute's precautionary purpose. The final rationale set out in the preceding section of the preamble reflects this input by including certain contentions raised by commenters and additional analysis developed in response to criticisms raised during the public comment period. In this subsection, we summarize major themes presented in the comments received along with our high-level responses. For detailed comment summaries and our full responses thereto, please see the Response to Comments document in the docket for this rulemaking.

*Comment:* Commenters supportive of the proposal agreed that prescribing GHG emission standards in response to global climate change concerns is a major question of social, economic, and political importance and that the EPA lacked clear congressional authorization to issue the Endangerment Finding and associated GHG emission standards authorized by that invocation of authority. These commenters argued that by purporting to resolve significant aspects of the climate change debate by deciding the Nation's policy response for itself in the first instance, the EPA asserted an unheralded authority that infringed on Congress's prerogatives. Several of these commenters argued that the Endangerment Finding preempted Congress by purporting to resolve an issue that was being actively debated and negotiated on the House and Senate floors in 2009 and identified additional instances in which Congress considered but declined to adopt legislation that would have granted the very authority that the EPA asserted in the Endangerment Finding. Such commenters also argued that congressional inaction means that we

---

[170] *See, e.g., Nebraska,* 600 U.S. at 506–07 (Department of Education lacked clear authority to forgive student loans under statutory language authorizing the Secretary to "waive or modify any statutory or regulatory provision applicable to the student financial assistance programs . . . deem[ed] necessary in connection with a war or other military operation or national emergency"); Ala. Ass'n of Realtors v. HHS, 594 U.S. 758 (2021) (CDC lacked clear authority to impose eviction moratorium during the COVID–19 pandemic under language permitting "such regulations as in [the Surgeon General's] judgment are necessary to prevent the introduction, transmission, or spread of communicable diseases").

[171] We note that recent Supreme Court decisions have not cited *Massachusetts* as a precedent applying, or declining to apply, the major questions doctrine. *See, e.g., Nebraska,* 600 U.S. 477; *West Virginia,* 597 U.S. 697.

never had authority to regulate GHGs in this manner, and that authority cannot be manufactured by placing the burden on Congress in the aftermath of the Endangerment Finding to affirmatively intervene to override the Agency's actions.

*Response:* The EPA agrees with the commenters that the major questions doctrine applies to the authority we asserted under CAA section 202(a)(1) for the first time in the 2009 Endangerment Finding. In that standalone action, the EPA established the legal foundation to regulate GHG emissions under CAA section 202(a)(1) and knowingly triggered a statutory obligation to regulate GHG emissions not only in the transportation sector, but in other respects as well, including the stationary source permitting context. The importance and extraordinary consequences of that decision were both foreseeable and foreseen by the EPA at the time, as evidenced by the 2008 ANPRM and statements made and actions taken by the EPA in 2009 and 2010. See, *e.g.,* 73 FR 44355 ("[I]f EPA were to regulate [GHG] emissions from motor vehicles under the Clean Air Act, then regulation of smaller stationary sources that also emit GHGs—such as apartment buildings, large homes, schools, and hospitals—could also be triggered. . . . The potential regulation of greenhouse gases under any portion of the [CAA] could result in an unprecedented expansion of EPA authority that would have a profound effect on virtually every sector of the economy and touch every household in the land."); 74 FR 66502 ("Once the final affirmative contribution and endangerment findings are made, EPA has the authority to issue the final emission standards for new light-duty motor vehicles."). Intervening events, including those addressed in *UARG* and *West Virginia,* have further demonstrated what was widely understood in 2009—the Endangerment Finding launched an entirely new field of regulation in which the EPA has applied, or attempted to apply, significant and costly regulations on virtually all major sectors of the American economy.

In this way, the EPA's invocation of authority in the Endangerment Finding followed by the mandatory issuance of regulations operates similarly to the assertion of authority to which the Supreme Court applied the major questions doctrine in *West Virginia.* The Agency's emission guidelines for existing power plants under CAA section 111(d) also imposed costs and forced generation shifting in an indirect manner. First, we issued regulations determining the amount of pollution reduction to be achieved; second, States were required to submit plans containing the emissions restrictions they intended to implement and enforce to achieve those reductions; and third, we would review those State plans for consistency with CAA requirements and allow them to enter into force through an approval or substitute State plans for a Federal plan in the event of disapproval. Similarly here, the EPA asserted authority in the Endangerment Finding that, by operation of law, triggered an obligation to prescribe GHG emission standards under CAA section 202(a)(1), triggered stationary source permitting requirements, and served as the basis for extending the reach of GHG emission regulations to additional sources, all as predicted in the 2008 ANPRM.

Further, the new motor vehicle standards issued by the EPA separately and independently trigger the major questions doctrine by forcing a transition toward the use of EVs rather than the ICE in a manner similar to the generation shifting at issue in *West Virginia.* As early as the EPA's first light-duty vehicle rule in 2010, the Agency relied on and knew its regulations would lead to increased EV production. *See* 75 FR 25324, 25332 (May 7, 2010) (noting that the "commercialization of [EVs] and plug-in hybrids," as well as "increased use of start-stop technology," were available avenues for compliance).

*Comment:* Adverse commenters asserted that the major questions doctrine does not apply to CAA section 202(a)(1) because of what they describe as a holding in *Massachusetts* that the regulation of GHGs under that provision is permissible and/or not a major question. These commenters cited to the Supreme Court's discussion of *Brown & Williamson* in that decision, along with statements made by the Agency in prior GHG emission standards rulemakings, to support the contention that the major questions analysis is inapplicable or that precedent establishes the requisite clear authorization.

*Response:* The EPA disagrees with these comments. As explained in section V.B.1 of this preamble and discussed further in the Response to Comments document, the Supreme Court drew no such distinctions in *West Virginia* when it held that the major questions doctrine applies to "all corners of the administrative state," even if the "regulatory assertions had a colorable textual basis." 597 U.S. at 721–23 (citation omitted). The Court did not appear to understand itself to be applying the major questions doctrine in *Massachusetts,* and has not, in subsequent cases, treated *Massachusetts* as an example of applying or declining to apply the doctrine. Rather, the Court in *Massachusetts* distinguished *Brown & Williamson* on its facts. That discussion does not stand for the proposition that CAA section 202(a)(1) is immune from major questions scrutiny, and many of the distinctions drawn in *Massachusetts* as to *Brown & Williamson* are now themselves distinguishable given the EPA's subsequent reasoning in the Endangerment Finding and actions taken to implement the Endangerment Finding since 2009.

*Comment:* Adverse commenters asserted that if major questions doctrine is relevant here, its principles cut against what they described as the EPA's novel interpretation of CAA section 202(a)(1). These commenters argued that for nearly 20 years, Congress has declined to overturn what commenters described as the judicial decisions upholding the EPA's authority to regulate GHG emissions or to amend CAA section 202 to restrict the Agency's authority in this respect. Commenters asserted that rescinding the Endangerment Finding would itself create an abrupt reordering in an area of economic and political significance and is an assertion of authority that would be both novel and dubious and potentially threaten the separation of powers.

Commenters asserted that under the major questions doctrine, the EPA is not able to reverse what they described as the Agency's longstanding interpretation dating back to the Endangerment Finding without being given authority by Congress to do so. Commenters stated that Congress has enacted numerous laws that have recognized GHGs are air pollutants subject to regulation under the CAA. Commenters argued that *Massachusetts* and the Endangerment Finding have been established law since 2009 and that Congress has known about and enacted legislation on numerous occasions that recognize and affirm the legal interpretations made by the Supreme Court in *Massachusetts* and by the Agency in the Endangerment Finding.

*Response:* The EPA disagrees with commenters and concludes the major questions doctrine supports the rescission of the Endangerment Finding and repeal of associated GHG emission standards. The EPA's interpretation of CAA section 202(a)(1) is not novel. As explained in sections III.A and IV.A of this preamble, it reflects the Agency's longstanding practice in applying CAA section 202(a)(1) for the four decades

prior to 2009. Moreover, rescinding the Endangerment Finding and repealing the associated GHG emission standards does not trigger the major questions doctrine because an agency's ability to reconsider, revise, and repeal prior actions is not an unheralded assertion of authority. As explained in section IV.A of this preamble, it is well established that an agency may reconsider, revise, and repeal prior actions unless the relevant statute provides otherwise, which is not the case here.

In addition, the EPA disagrees with commenters' representations of the scope of the Supreme Court's decision in *Massachusetts* and characterizations of congressional actions since 2009. Tellingly, commenters point to no occasion in which Congress has adopted legislation that expands the scope of the EPA's authority to regulate GHG emissions from mobile or stationary sources. As noted elsewhere in this preamble, Congress considered between 2007 and 2009 draft legislation— emphatically supported by President Obama and the Administrator who issued the Endangerment Finding—that would have substantially revised the CAA to give the EPA express authority to regulate GHG emissions, including under Title II. That legislation failed to pass, and the relatively limited number of non-regulatory provisions Congress has enacted since that time relate either to non-regulatory contexts or support our conclusion with respect to CAA section 202(a)(1) by indicating that Congress has adopted more detailed, particular solutions when it sought to address global problems, as with amendments to the RFS program and the AIM Act. This history falls well short of the standard courts have applied for inferring legislative acquiescence to either commenters' reading of *Massachusetts* or the EPA's assertion of authority in the 2009 Endangerment Finding. Ultimately, commenters appear to be asserting what is more properly understood as reliance interests on prior actions taken by the Agency. Because the EPA concludes that we lack statutory authority to regulate in response to global climate change concerns under CAA section 202(a)(1), we cannot respond to such asserted reliance interests by retaining the Endangerment Finding and associated GHG emission standards on that basis.

Indeed, commenters inadvertently reinforce why the major questions doctrine applies to the Endangerment Finding and necessitates its rescission. If rescission of the Endangerment Finding is significant enough to trigger the major questions doctrine, there is no

persuasive reason to conclude that issuing the Endangerment Finding to initiate the resulting GHG regulatory program does not similarly trigger major questions scrutiny. Were commenters correct that only rescission triggers the doctrine, the result would be an untenable rule by which an Agency can expand its statutory authority through attrition even if application of the doctrine would otherwise require a different result.

*Comment:* Some commenters said that they support the EPA's application of the major questions doctrine to the vehicle standards that effectively mandated EVs as a purported emissions control measure for motor vehicles powered by ICEs. They stated that as the EPA points out in the proposed rule, effectively mandating a shift away from ICE vehicles under CAA section 202(a)(1) is conceptually indistinguishable from the EPA's failed attempt to mandate generation shifting by reduced utilization of coal-fired power plants under CAA section 111(d). Commenters argued that both actions involve claims of novel and expansive regulatory authority under longstanding law, both have fundamental effects on key national industries and on the national economy, Congress has grappled repeatedly over time with whether and how GHG emissions from these industries should be regulated, and neither action is grounded in a clear statutory mandate.

Commenters also said that the EPA's 2024 HD GHG Emission Standards Rule, without question, meet all the criteria for rescission under the major questions doctrine. These commenters argued that the Supreme Court in *West Virginia* held open the door for the rescission of what commenters described as sweeping EV truck mandates that impact broad segments of the national economy. Commenters argued that these standards are a direct analogue to the regulations invalidated in *West Virginia.*

Conversely, other commenters argued that the major questions doctrine does not apply to the 2024 GHG Emission Standards Rules and that the EPA did not explain or show awareness of its change in position from what these commenters described as the Agency's detailed consideration and rejection of major questions doctrine arguments in responding to comments on the 2024 GHG Emission Standards Rules.

*Response:* The EPA concludes that the major questions doctrine applies to the GHG emissions standards for LD, MD, and HD vehicles that the Agency promulgated in 2024, as discussed in the final rule preamble and with the Response to Comments document. We

acknowledge that the Agency previously asserted that the 2024 GHG Emission Standards Rules did not violate the major questions doctrine. As explained in this final action, however, we now conclude that the arc of regulation since 2009 evinces a clear march toward requiring widespread adoption of EVs by manufactures and American consumers, such that the major questions doctrine applies in this respect as well. Accelerating the transition to EVs is realistically the only way for many regulated parties to comply with the stringent emission standards adopted in 2024. At least two auto manufacturers noted the compliance challenges with the current standards and cast doubt on their attainability, particularly in light of reduced EV demand. As demonstrated by the manufacturers' comments, the EPA's GHG emissions standards are difficult to achieve without increasing EV production.

Further, certain events have overtaken aspects of the EPA's analysis in its prior rulemakings. For example, the IRA was largely overtaken by the OBBB, and Congress has disapproved of the EPA's approval of the California waiver under the CRA. The market has also changed since the 2024 GHG Emission Standards Rules: EV demand is down, gas prices are generally down, and EV prices are generally higher than the EPA anticipated.

In effect, the main compliance option for the 2024 GHG Emission Standards Rules was for manufacturers to increase EV production. As discussed in greater detail in the Response to Comments document, the EPA first incentivized EV production in 2010 and projected that compliance with many of its standards in the years since then would include surpassing the amount of EVs that manufacturers would have produced based on market forces alone. The totality of the EPA's actions, when viewed holistically, show a clear path towards a changed reality on the ground of more EVs.

## C. Eliminating GHG Emissions From Motor Vehicles and Engines Would Be Futile

The EPA is also finalizing as proposed that the Agency should not and need not make an endangerment finding under CAA section 202(a)(1) when exercising the regulatory authority conferred by that provision would have no meaningful impact on the identified dangers. The comments and data received in response to the proposed rule, as well as the modeling analysis we performed to evaluate these submissions, indicates that GHG

emission standards under CAA section 202(a)(1) have no more than a trivial effect on the key changes that the Endangerment Finding identified as causing adverse health and welfare impacts. The Endangerment Finding avoided confronting this question by severing the findings from consideration of the resulting regulations, and we focused in subsequent rulemakings on the emissions reductions potential of the standards rather than the impacts on health and welfare. Upon further review, we conclude that this approach is not consistent with the best reading of the statute or the requirement that regulations be reasonable and reasonably explained. CAA section 202(a)(1) instructs the EPA to regulate in furtherance of public health and welfare, not to reduce emissions regardless whether such reductions have any material health and welfare impact.

Specifically, we are finalizing that the potential for emission standards to yield more than *de minimis* gains for health or welfare are relevant and should be considered when applying CAA section 202(a)(1). We recognized in the Endangerment Finding that the relative contribution of GHG emissions to global concentrations from new motor vehicles and engines in the U.S. must be more than *de minimis* to invoke our authority but failed to carry this logic through to the remainder of the analysis. Background legal principles instruct that *de minimis* concerns are not encompassed within the scope of general statutory language, and the ability of regulation to address identified dangers is relevant to whether it can be said that that the emissions contribute to air pollution that endangers public health or welfare in the first instance. As discussed in this subsection, comments and our own analysis in response to comments provides that any potential impact is *de minimis.* Even a complete elimination of all GHG emissions from new motor vehicles and engines would not address the risks attributed to elevated global concentrations of GHGs. We are finalizing that this futility further demonstrates that CAA section 202(a)(1) does not, as a matter of text and structure, authorize or require the EPA to prescribe emission standards for GHG emissions from new motor vehicles and engines.

1. Final Rationale

As discussed in section VI.A of this preamble, the EPA recognizes that there are significant uncertainties related to climate modeling and recognizes that there is still significant dispute regarding climate science and modeling. However, the EPA is utilizing the climate modeling provided within this section to help illustrate that, even applying the assumptions of these climate models and uncertainties contained therein, that removing all GHG emissions from new and existing LD, MD, and HD vehicles and engines would not materially address the health and welfare dangers attributed to global climate change concerns in the Endangerment Finding.

The EPA utilized the EPA Optimization Model for reducing Emissions of GHGs from Automobiles (OMEGA model) to estimate the global GHG contributions from U.S. light- and medium duty vehicle engines, and the EPA's MOtor Vehicle Emission Simulator (MOVES model) to estimate the global contribution from U.S. heavy-duty vehicle engines (Table 1).[172] The baseline global emission scenario used for this analysis was Shared socioeconomic pathway 2 with a radiative forcing of 4.5 watts per square meter by 2100 (SSP2–4.5) (Table 1).

The EPA used the Finite amplitude Impulse Response (v2.2.3) climate emulator model (FaIR model) to quantify changes in global $CO_2$ concentration and global surface temperature associated with the marginal change in emissions from each vehicle scenario relative to the baseline. The FaIR model is an open-source emulator that reasonably reflects the best available information and science but does not include all possible Earth system processes. In FaIR, greenhouse gas lifetimes are based on a four-box decay model that is also a function of atmospheric and ocean temperatures and emissions of other gases. The model accounts for radiative forcing from greenhouse gases, aerosols, albedo changes due to land use, solar cycles, and volcanic eruptions, given an externally defined time path for each. FaIR uses three layers for the ocean component, as heat uptake by the ocean controls how fast atmospheric temperature changes after a change in radiative forcing. FaIRv2 includes uncertainty estimates that are based on a calibration to global climate models, historical observations, and parameter uncertainty ranges from the Intergovernmental Panel on Climate

Change. Uncertainties in climate model parameters considered in FaIR, include the sensitivity of climate to increases in atmospheric $CO_2$ concentrations, forcing from aerosol interactions with radiation and clouds, forcing from black carbon on snow, and carbon cycle parameters. All simulations were run with historical volcanic and solar cycle forcing, with values held constant (solar) after 2022.

The EPA also used the Building Blocks for Relevant Ice and Climate Knowledge (BRICK) model to quantify changes in GSLR associated with the marginal temperature changes from each vehicle emissions scenario. BRICK is a semi-empirical, open-source model, with four sub-components that each model the physical changes in the four major contributors to GSLR—glaciers and ice caps, land water storage, and ice sheets, and thermal expansion—in response to changes in temperature. Similar to FaIR, the BRICK model is also designed with uncertain parameters intended to encompass the range of possible GSLR responses to a given input of temperature and ocean heat content. Uncertainties in GSLR parameters considered in BRICK include contributions from glaciers and ice caps and the Antarctic and Greenland ice sheets, as well as ocean thermal expansion, and were calibrated through a coupled physical-statistical framework, using an adaptive Markov chain Monte Carlo approach. Reduced complexity models like BRICK and FaIR allow for the flexibility to analyze custom scenarios, quantitatively discern changes between any scenarios, and characterize uncertainties surrounding global change. The National Academies of Sciences, Engineering and Medicine (NASEM) in a 2017 report endorsed the use of the FaIR model in a 2017 report, and the BRICK model was developed in response to recommendation 4–3 from the 2017 NASEM report.[173]

The EPA modeling described above projects that global atmospheric concentrations of $CO_2$ will be 420.5 parts per million by volume (ppmv) (with an associated 95 percent confidence interval (95 percent CI) of 419.1–422.1 ppmv) in 2027 and are projected to increase in the baseline scenario to a median of 475.4 ppmv by 2050 and 533.6 ppmv by 2100. The 95 percent CI reflects the uncertainty in the FaIR model input parameters and ranges from 461.8–484.3 ppmv in 2050 to

---

[172] Note that these scenarios did not include additional GHG emissions from upstream refinery or energy generation processes, nor additional emissions of hydrofluorocarbons (HFCs) from vehicle air conditioners. The EPA separately regulates emissions from stationary sources under statutory authorities outside the scope of this rulemaking and, pursuant to separately enacted legislation requiring a phase out of HFCs, regulates permissible uses of HFCs.

[173] National Academies of Sciences, Engineering, and Medicine. 2017. Valuing Climate Damages: Updating Estimation of the Social Cost of Carbon Dioxide. Washington, DC: The National Academies Press. A copy of this report is available in the docket for the rulemaking. Available online: *https://doi.org/10.17226/24651.*

482.5–565.4 ppmv in the year 2100. Relative to 2027, concentrations of $CO_2$ are projected to increase in 2050 and 2100, by 55.0 ppmv and 113.3 ppmv, respectively (Table 3). GHG emissions from on-road vehicle exhaust in the United States are projected to contribute 2.8 ppmv (or 5 percent) and 7.4 ppmv (or 7 percent) to this global increase by 2050 and 2100, respectively (Table 3).

The modeled GMST in 2027 is projected to be 1.35 °C above pre-industrial temperatures, defined as the average between 1850 and 1900 (Table 4). GMST in the baseline scenario is estimated to increase to 1.89 °C (95 percent CI: 1.44–2.37 °C) and 2.66 °C (95 percent CI: 1.86–3.87 °C) above preindustrial temperatures by the years 2050 and 2100, respectively. These changes are +0.53 °C (95 percent CI: 0.32–0.84 °C) and +1.28 °C (95 percent CI: 0.67–2.42 °C) above 2027 temperatures (Table 5). GHG emissions from on-road vehicle exhaust in the United States are projected to contribute to 0.013 °C (95 percent CI: 0.009–0.017 °C) (or 2 percent) of this increase in GMST by 2050 and 0.037 °C (95 percent CI: 0.024–0.054 °C) (or 3 percent) of this increase by 2100.

The modeled GSLR is estimated to be 25.8 cm higher in 2027 than during the preindustrial era (1850–1900). GSLR in the baseline scenario is projected to be 38.9 cm (95 percent CI: 28.0–49.1 cm) by 2050 and 94.3 cm (95 percent CI: 59.9–157.9 cm) by 2100 relative to preindustrial (Table 6). These increases are roughly 12.4 cm (95 percent CI: 9.4–20.3 cm) and 69.5 cm (95 percent CI: 35.2–132.7 cm) higher than 2027 levels (Table 7). GHG emissions from on-road vehicle exhaust in the United States contribute to roughly 0.09 cm (0.06–1.06 cm) (or ~1 percent) of this global increase in 2050 and 1.4 cm (0.39–4.77 cm) (or 2 percent) of this global increase by 2100.

**BILLING CODE 6560–50–P**

*Table 1: Global CO₂ emissions (megatonnes (Mt) CO₂/year (yr)) (absolute and change relative to 2027) and contribution from U.S. on-road vehicles by scenario*

| Scenario | 2027 | 2050 | 2100 |
|---|---|---|---|
| #1 Baseline (SSP2-4.5)[a] | 39,630 | 42,960 (+3,330) | 14,480 (-25,150) |
| #2 All On-Road | 1630 | 1390 | 1380 |
| *#2a. LD, MD Contribution* | *1180* | *840* | *810* |
| *#2b. HD Contribution* | *450* | *550* | *560* |

[a] Absolute emissions from the baseline scenario (SSP2-4.5) and the absolute change (Mt) in fossil $CO_2$ emissions relative to 2025.

*Table 2: Absolute global CO₂ concentrations (ppmv), by scenario\**

| Scenario | Estimated Median (95% Confidence Interval) (ppmv) | | |
|---|---|---|---|
| | 2027 | 2050 | 2100 |
| #1 Baseline (SSP2-4.5) | 420.5 (419.1-422.1)[174,175] | 475.4 (461.8-484.3) | 533.6 (482.5-565.4) |
| #2 Baseline without All On-Road Contribution | - | 472.7 (459.4-481.3) | 526.1 (477.7-556.8) |
| *#2a. Baseline without LD, MD Contribution* | *-* | *473.6 (460.3-482.3)* | *529.0 (479.6-560.2)* |
| *#2b. Baseline without HD Contribution* | *-* | *474.4 (461.0-483.2)* | *530.7 (480.6-562.1)* |

*Contributions may not sum due to rounding.

*Table 3: Changes in global CO₂ concentrations (ppmv) relative to 2027, by scenario\**

| Scenario | Median concentration change (ppmv) and contribution from U.S. on-road vehicles[a] | |
|---|---|---|
| | 2050 | 2100 |
| #1 Baseline (SSP2-4.5) | +55.0 (41.9-63.6) ppmv | +113.3 (62.3-144.7) ppmv |
| #2 All On-Road | 2.8 (2.3-3.0) ppmv (5%) | 7.4 (4.8-8.8) ppmv (7%) |
| *#2a. LD, MD Contribution* | *1.8 (1.5-2.0) ppmv (3%)* | *4.5 (2.9-5.4) ppmv (4%)* |
| *#2b. HD Contribution* | *1.0 (0.8-1.1) ppmv (2%)* | *2.9 (1.9-3.5) ppmv (3%)* |

[a] Percent change calculated as the absolute contribution in each year divided by the absolute increase in the baseline in that year relative to 2027.

*Contributions may not sum due to rounding.

*Table 4: GMST relative to pre-industrial (1850-1900), by scenario\**

| Scenario | Estimated Median (95% Confidence Interval) (°C) | | |
| --- | --- | --- | --- |
| | 2027 | 2050 | 2100 |
| #1 Baseline (SSP2-4.5) | 1.35 (1.06-1.64)[176,177] | 1.89 (1.44-2.37) | 2.66 (1.86-3.87) |
| #2 Baseline without All On-Road Contribution | - | 1.88 (1.43-2.36) | 2.62 (1.83-3.82) |
| *#2a. Baseline without LD, MD Contribution* | *-* | *1.88 (1.44-2.36)* | *2.63 (1.84-3.84)* |
| *#2b. Baseline without HD Contribution* | *-* | *1.88 (1.44-2.37)* | *2.64 (1.85-3.85)* |

\*Contributions may not sum due to rounding.

*Table 5: Change in GMST relative to 2027, by scenario\**

| Scenario | Median temperature change and contribution from U.S. on-road vehicles | |
| --- | --- | --- |
| | 2050 | 2100 |
| #1 Baseline (SSP2-4.5) | +0.53 (0.32-0.84) °C | +1.28 (0.67-2.42) °C |
| #2 All On-Road | 0.013 (0.009-0.017) °C (2%) | 0.037 (0.024-0.054) °C (3%) |
| *#2a. LD, MD Contribution* | *0.008 (0.006-0.011) °C (2%)* | *0.022 (0.014-0.033) °C (2%)* |
| *#2b. HD Contribution* | *0.005 (0.003-0.006) °C (1%)* | *0.015 (0.009-0.021) °C (1%)* |

\*Contributions may not sum due to rounding.

*Table 6: GSLR (cm) relative to pre-industrial (1850-1900), by scenario\**

| Scenario | Estimated Median (95% Confidence Interval) (cm) | | |
| --- | --- | --- | --- |
| | 2027 | 2050 | 2100 |
| #1 Baseline (SSP2-4.5) | 25.8 (16.7-32.4)[176,178] | 38.9 (28.0-49.1) | 94.3 (59.9-157.9) |
| #2 Baseline without All On-Road Contribution | - | 38.8 (27.9-48.9) | 92.4 (59.4-156.3) |
| *#2a. Baseline without LD, MD Contribution* | *-* | *38.8 (28.0-49.0)* | *93.1 (59.6-157.2)* |
| *#2b. Baseline without HD Contribution* | *-* | *38.9 (28.0-49.1)* | *93.6 (59.7-157.5)* |

\*Contributions may not sum due to rounding.

*Table 7: Change in GSLR (cm) relative to 2027, by scenario\**

| Scenario | Median sea level change and contribution from U.S. on-road vehicles | |
| --- | --- | --- |
| | 2050 | 2100 |
| #1 Baseline (SSP2-4.5) | +12.4 (9.4-20.3) cm | +69.5 (35.2-132.7) cm |
| #2 All On-Road | 0.09 (0.06-1.06) cm (~1%) | 1. 40 (0.39-4.77) cm (2%) |
| *#2a. LD, MD Contribution* | *0.06 (0.04-0.72) cm (<1%)* | *0.64 (0.24-2.89) cm (1%)* |
| *#2b. HD Contribution* | *0.03 (0.02-0.04) cm (<1%)* | *0.31 (0.15-2.06) cm (<1%)* |

\*Contributions may not sum due to rounding.

**BILLING CODE 6560–50–C**

As shown above, the changes in GHG emissions and global GHG concentrations by 2050 and 2100 resulting from the complete elimination of all GHG emissions from new and existing LD, MD, and HD vehicles in the United States would be relatively minor. Importantly, however, changes in global emissions rates and global concentrations are not the focus of the statutory standard for regulation in CAA section 202(a)(1). Rather, the statute instructs that the ultimate regulatory concern is impacts from air pollution on "health or welfare." The appropriate indicator of impact is not emissions or concentrations, but health and welfare impacts. Given the speculative, multi-faceted, and multi-causal nature of the impacts cited in the Endangerment Finding (e.g., hurricanes, floods, heat waves, ocean acidification, etc.), we used for purposes of this analysis the projected impacts of the elimination of U.S. LD, MD, and HD vehicle emissions on trends in GMST and GSLR.

In this analysis, we reviewed the projected impact on GMST and GSLR by applying two important qualifications. First, the projected impacts on GMST and GSLR are not themselves the adverse impacts on health and welfare relevant for purposes of the analysis. Rather, they are imperfect proxies for such adverse impacts, which we are assuming without accepting play a causal role in such adverse impacts. We did not apply a quantitative discount when analyzing the modeling performed for purposes of this final action. Nevertheless, it bears emphasis that the projected impacts on GMST and GSLR

trends do not translate directly to adverse health and welfare impacts and do not account for additional factors, including adaptation and mitigation factors, that would necessarily inform such impacts. As discussed in section V.A of this preamble, the analytical difficulties, uncertainties, and multiple causal leaps involved in this exercise are themselves a reason to conclude that CAA section 202(a)(1) does not encompass emissions that can be said to lead to adverse health and welfare impacts only by constructing a global air pollution framework.

Second, the elimination of GHG emissions from all new and existing U.S. LD, MD, and HD vehicles substantially overestimates the impacts of the EPA's GHG emission standards. The standards apply only to "new" vehicles and engines, and fleet turnover (i.e., the transition from existing vehicles to new vehicles covered by the standards) generally takes more than 20 years.[179] The most recent GHG emission standards finalized in 2024 phased in beginning in MY 2026 and increased in stringency through MY 2032 and beyond, meaning the full emissions reductions attributable to the standards would not be expected until well after 2052. Moreover, despite being the most stringent to date, the 2024 standards were projected to reduce GHG emissions by approximately 50 percent as compared to the preexisting standards for MY 2026 and beyond.[180] The appropriate discount between the modeled scenario (the elimination of all GHG emissions from vehicles) and the reductions achieved in practice by EPA GHG emission standards (i.e., the difference between the scenario and the likely real-world scenario) turns on a variety of factors that are difficult to predict, including our regulatory decisions for MY 2032 and beyond, separate regulatory influences, and changes to the underlying economics, technologies, and consumer preferences. For illustrative purposes, we present below a scenario in which EPA GHG emission standards would eliminate an additional 50 percent of GHG emissions

from LD, MD, and HD vehicles as compared to the baseline.

Under the 50 percent reduction scenario, retaining a GHG emission standards program for vehicles and engines would result in a 0.007 (0.005–0.009) °C impact on projected GMST through 2050 and 0.019 (0.012–0.027) °C impact on projected GMST through 2100. Retention would result in a 0.05 (0.03–0.053) cm impact on projected GSLR from 2027 to 2050 and 0.7 (0.20–2.39) cm impact on projected GSLR from 2027 to 2100. Again, this is an illustrative scenario and a rough estimate that pairs some analytic tools not intended for this purpose with other tools in the literature. As such, it cannot be assumed to translate with precision directly to specific adverse health or welfare impacts. Note, however, that these figures are themselves likely an overestimation of the actual predicted impact of GHG emission standards over the relevant time horizon because this illustrative 50 percent reduction scenario does not reflect what such standards would realistically achieve given technical and statutory constraints.

Whether viewed in terms of the complete elimination scenario or the illustrative 50 percent reduction scenario, these projections lead the EPA to determine that GHG emission standards under CAA section 202(a)(1) have no material impact (i.e., beyond a de minimis level) on the global climate change concerns relied upon in the Endangerment Finding to justify regulation. This determination leads us to two independent conclusions. First, as discussed in section V.A of this preamble, the futility of GHG emission standards under CAA section 202(a)(1) further supports that the best reading of the statute does not encompass global climate change concerns within the scope of the "air pollution" that Congress authorized and required the EPA to address. And second, as discussed in this section below, the futility of GHG emission standards under CAA section 202(a)(1) renders retaining such standards unreasonable given the certain and immense costs and other direct adverse impacts of the standards.

Under any reasonable understanding, the predicted impacts of eliminating all U.S. GHG emissions from vehicles and engines on GMST and GSLR are de minimis. Even without accounting for the difference between total elimination under the modeled scenario and emission control using GHG standards under the discounted scenario, the predicted impacts through 2100 (0.013 °C as shown in Table 5) are below the

[174] Average annual observed $CO_2$ concentrations in 2024 were 423 ppmv. Source: Trends in Atmospheric Carbon Dioxide ($CO_2$) from: https://gml.noaa.gov/ccgg/trends/global.html.

[175] Note that observed data do not exactly correspond with that modeled estimates, as the FaIR and BRICK modeling start in 1750 (or 1850) for estimation of both historical and future projected GHG concentrations, temperatures, and GSLR.

[176] Uncertainties in GSLR parameters considered in BRICK, include but are not limited to sea level rise contributions from glaciers and ice caps and the Antarctica and Greenland ice sheets, as well as ocean thermal expansion. The calibration of the 10,000 parameter sets is described in: Rennert, K., Errickson, F., Prest, B.C. et al. Comprehensive evidence implies a higher social cost of $CO_2$. Nature 610, 687–692 (2022). https://doi.org/10.1038/s41586-022-05224-9.

[177] GMST observations in 2024 were 1.55 (1.42–1.68) °C relative to 1850–1900 to present from https://wmo.int/publication-series/state-of-global-climate-2024. The uncertainty in observed temperatures is due to the uncertainty in temperature before 1900, due to the sparsity of observations during that period.

[178] Observations of GSLR in 2024 are 22.5 cm relative to pre-industrial. Source: https://www.climate.gov/news-features/understanding-climate/climate-change-global-sea-level.

[179] U.S. EPA. "Population and Activity of Onroad Vehicles in MOVES5" EPA–420–R–24–019, November 2024.

[180] For MY 2032 and beyond new motor vehicles, the EPA projected that the 2024 GHG emission standards final rules would result in a 50 percent reduction in new LD vehicle $CO_2$ emissions, a 41 percent reduction in new MD vehicle $CO_2$ emissions, and a 25–60 percent reduction in new HD vehicle $CO_2$ emissions (dependent on vehicle category). See 89 FR 27842, 27908–09 (Apr. 18, 2024); 89 FR 29440, 29451–52 (Apr. 22, 2024); 89 CFR 27914–915.

range of measurability for GMST and likewise for GSLR (1.4 cm as shown in Table 7).[181] Additionally, as stated previously, GMST variability from 2016–2025 was 0.14 °C, which is almost four times greater than the GMST change estimated in 2100 from eliminating all U.S. vehicle and engine GHG emissions.[182]

Once the figures are reduced to reflect the potential impact of EPA GHG emission standards, which only reduce, rather than eliminate, all GHG emissions from vehicles and engines for the reasons discussed above, the *de minimis* nature of the impact is even clearer. The reduced impact is approximately one percent of the model-projected change in GMST for 2050 and 2100.[183] The reduced impact is much less than one percent of the change in GSLR modeled for 2050 and 2100. As discussed in section V.A of this preamble, Congress does not include *de minimis* concerns in general statutory language, and agencies need not address *de minimis* concerns where doing so would yield trivial value under the statutory scheme.[184] The general instruction in CAA section 202(a)(1) to "prescribe . . . standards" for emissions that contribute to air pollution which may reasonably be anticipated to endanger public health or welfare does not override this background principle, and regulatory agencies and courts have consistently viewed impacts of one percent as *de minimis* and therefore not encompassed within general statutory language.[185]

*Relevance to the best reading of CAA section 202(a)(1).* In reaching this determination, we recognize that CAA section 202(a)(1) authorizes preventative regulation that need not fully ameliorate the identified harms. But in discussing the statute's preventative nature, the EPA and reviewing courts consistently understood that regulation must be capable of having *at least a material impact* on the identified danger.[186] The background legal principles discussed in section V.A of this preamble support this reading of the statutory standard.

The futility determination reached in this final action is different in kind from the policy arguments previously addressed in *Massachusetts* and *Coalition for Responsible Regulation,* which focused on the cost-benefit balance of potential regulatory responses and general concerns about the most efficient way to regulate in response to global climate change concerns. Rather, we conclude that CAA section 202(a)(1) requires that emission standards be capable of having a material impact on the identified danger for the Administrator to conclude that the emissions "contribute" to air pollution that may "reasonably be anticipated" to endanger public health and welfare. If controlling or eliminating the emissions would not materially impact the identified danger, the emissions do not "contribute" to the air pollution. And because the emitted "air pollutant" and the "air pollution" are defined in this context as the "six well-mixed GHGs," the air pollution cannot "*reasonably* be anticipated" as endangering health or welfare in the CAA section 202(a) context if controlling or eliminating all vehicle and engine emissions would have no impact. Put another way, the inability of GHG emission standards to have any material impact demonstrates that GHG emissions from new vehicles and engines do not contribute to air pollution that endangers public health or welfare. That determination is relevant to the findings required by CAA section 202(a)(1).

The EPA recognized in the Endangerment Finding that CAA section 202(a) incorporates *de minimis*

principles, stating that the contribution of motor vehicle and engine GHG emissions to the "air pollution" must be more than trivial. See 74 FR 66506, 66509, 66542–43. But we avoided consideration of this limitation in the remainder of the analysis by severing the endangerment and contribution findings from the analysis of responsive regulation. We asserted that requiring the Agency to show that control measures "would prevent at least a substantial part of the danger" would "be an unworkable interpretation, calling for EPA to project out the result of perhaps not one, but even several, future rulemakings stretching over perhaps a decade or decades." 74 FR 66507–08. We further asserted that effectiveness would turn not only on CAA section 202(a) regulations, but also on "the larger context of the CAA and perhaps even the global context" based on our belief that all sources must "do their part" to avoid a collective action problem. 74 FR 66508. In this way, we deferred to future agency action any consideration whether regulation would have more than a *de minimis* impact. Upon reviewing multiple rounds of CAA section 202(a)(1) GHG emission standard rulemakings predicated on the Endangerment Finding, however, we acknowledge that the EPA never meaningfully returned to the question. Rather, we focused on estimates of GHG emission reductions and, in RIAs not relied upon to justify the standards, attempts to monetize such reductions using SCC methodology.[187] That was not consistent with the best reading of the statute, which provides that the proper focus is not on the emissions themselves, but on the possible dangers to health or welfare.

Emission standards for criteria pollutants and air toxics have markedly different impacts, and a comparison to the GHG emission standards is illustrative.[188] Unlike the GHG emission standards, the EPA's criteria pollutant and air toxic standards protect health and welfare by reducing emissions of air pollutants that have direct effects from local and regional exposure. Moreover, the standards achieve health and welfare benefits without relying on further action with respect to other sources (*i.e.,* stationary sources) or

---

[181] *See* National Oceanic and Atmospheric Administration (NOAA), National Centers for Environmental Information, *Global Surface Temperature Anomalies-Methodology and Uncertainty,* estimating uncertainty in annual global mean surface temperature of approximately ±0.05 °C since 1950, increasing to ±0.1–0.2 °C in the late 19th Century. Available at *https://www.ncei.noaa.gov/access/monitoring/global-temperature-anomalies.*

[182] National Centers for Environmental Information, *Climate at a Glance.* NOAAGlobalTemp. Available at *https://ncei.noaa.gov/access/monitoring/climate-at-a-glance/global/time-series/globe/land_ocean/tavg/ytd/12/1950-2025.*

[183] For context, the Administrator relied in the Endangerment Finding on predictions that global temperature would increase from 1990 to 2100 between 1.8 to 4.0 °C. 74 FR 66519.

[184] *See, e.g., UARG,* 573 U.S. at 333; *Ala. Power,* 636 F.2d at 360–61.

[185] *See, e.g., UARG,* 573 U.S. at 333 (suggesting that an appropriate *de minimis* level of stationary source GHG emissions could be substantial in an absolute sense); *EME Homer,* 572 U.S. 489 (approving rule that did not require additional emissions reductions from States that contributed less than one percent to nonattainment in other States); In re Rail Freight Fuel Surcharge Antitrust Litig., 934 F.3d 619, 625 (D.C. Cir. 2019) (applying benchmark of five-to-six percent for the number of uninjured class members that destroy predominance in class certification context);

*CareFirst of Md., Inc.* v. *First Care, P.C.*, 434 F.3d 263, 268 (4th Cir. 2006) (survey showing two percent consumer confusion *de minimis* in the trademark context); Arent v. Shalala, 70 F.3d 610, 617 (D.C. Cir. 1995) (accepting 10 percent *de minimis* threshold in FDA compliance regulation).

[186] *See, e.g., Ethyl Corp.* v. *EPA,* 541 F.2d 1, 29–32 (D.C. Cir. 1976) (en banc) (approving standards for lead content in gasoline supported by finding that lead emissions from gasoline were a "significant source" of total environmental exposure "that was particularly suited to ready reduction").

[187] *See, e.g.,* 89 FR 29440, 29675 (Apr. 22, 2024) (2024 HD GHG Emission Standards Rule); 75 FR 25324 (May 7, 2010) (Tailpipe Rule).

[188] For example, approximately 45 percent of $NO_X$, less than 10 percent of VOCs, and less than 10 percent of $PM_{2.5}$ and $PM_{10}$ in the United States come from the transportation sector. *See https://www.epa.gov/transportation-air-pollution-and-climate-change/smog-soot-and-other-air-pollution-transportation.*

actions by other countries. Whether the EPA regulates criteria pollutant and air toxic emissions from power plants, for example, the CAA section 202(a) standards materially reduce the health and welfare impacts. Importantly, the risk-reduction benefits of those standards are *material* regardless whether other countries reduce emissions of the same pollutants.[189]

*Independent basis for repealing GHG emission standards.* Separate from the rescission of the Endangerment Finding, the EPA is finalizing the futility rationale as a standalone basis for repealing the GHG emission standards. Even if the CAA section 202(a)(1) authorized the Endangerment Finding as a standalone decision, it would be unreasonable and impermissible to retain a regulatory program that imposes immense costs while providing no material value in furtherance of a legitimate statutory objective. This alternative basis turns on the statutory language in CAA section 202(a) more generally, including the cost consideration requirements of CAA section 202(a)(2). As the Supreme Court explained in *Michigan,* agencies are bound to consider cost unless the statute expressly provides otherwise. Here, where the costs or regulation are certain and immense but the health and welfare value of regulation are uncertain and *de minimis,* it is unreasonable to maintain the GHG emissions program. For further discussion, see additional discussion in the sections of the preamble that follow and the Response to Comments document.

2. Summary of Comments and Responses and Updates to the Final Action

In response to the proposal, the Agency received a number of technical comments regarding the proposed futility basis, including comments on the impacts of total U.S. GHG emissions and U.S. motor vehicle GHG emissions to climate change effects. Multiple commenters provided projected changes in global $CO_2$ concentrations and global surface temperature changes for the years 2050 and 2100 for a range of modeled scenarios. These scenarios included modeled changes from the elimination of all U.S. $CO_2$, or elimination of all U.S. power sector $CO_2$ emissions (which the commenter indicated was of similar magnitude to the emissions from motor vehicles), or the elimination of all U.S. motor vehicle

GHG emissions. Other commenters cited to climate modeling the EPA included in the light-duty vehicle GHG 2010 standard setting final rule. In general, the commenters utilized the Model for the Assessment of Greenhouse Gas Induced Climate Change (MAGICC) model, a model the EPA has used in the past. While the scenarios were not identical to the modeling described in section V.C.1 of this preamble which the EPA performed for this final action,[190] the EPA finds that in general commenters who performed climate modeling projected changes in global surface temperature impacts similar to the EPA's modeling. As discussed in detail in section V.C.1 of this preamble, the EPA finds the modeled projected impacts from the complete elimination of GHG emissions from US on-road vehicles to be *de minimis,* and the impacts from potential EPA GHG standards for U.S on-road vehicles, which would not result in a complete elimination of GHG emissions, to be even smaller and thus also *de minimis.* The Response to Comments document summarizes the comments we received regarding climate modeling projections and our detailed responses.

## VI. Additional Proposed Bases for Rescission of the Endangerment Finding and Repeal of GHG Emission Standards the Agency Is Not Finalizing at This Time

In this section, the EPA discusses the alternative bases for rescinding the 2009 Endangerment Finding and repealing associated new motor vehicle and engine GHG emission standards that we presented for comment at proposal but are not finalizing at this time. The discussion below is provided in the interests of transparency and public engagement and should not be understood as presenting any views or conclusions related to the bases for this final action set out in section V of this preamble. As explained below and noted where appropriate in the Response to Comments document, the comments received on these alternative proposed bases are out of scope of this final action given our predicate conclusions that we lacked statutory authority to issue the Endangerment Finding and cannot retain or prescribe GHG emission standards for new motor vehicles and engines in response to global climate change concerns under CAA section 202(a)(1) and, separately, that the futility of GHG emission

standards in addressing global climate change concerns renders it unreasonable to retain the standards.

### A. Climate Science Alternative Basis

In the proposal, the EPA described an alternative rationale for rescinding the 2009 Endangerment Finding and repealing associated GHG emission standards for new motor vehicles and engines. Under that alternative proposed basis, the EPA stated that even if CAA section 202(a)(1) could be read to authorize regulation of GHG emissions from new motor vehicles and engines in response to global climate change concerns, the Administrator would exercise his judgement differently today in light of intervening scientific developments and limitations and uncertainties in the record for the Endangerment Finding. Although the Administrator continues to harbor concerns regarding the scientific determinations underlying the Endangerment Finding, the EPA has decided not to finalize this scientific alternative rationale at this time. As explained in section V of this preamble, the EPA is rescinding the Endangerment Finding based on the best reading of CAA section 202(a)(1), under which the EPA concludes that Congress did not authorize the Agency to regulate GHG emissions from new motor vehicles and engines in response to global climate change, and, separately, is repealing the GHG emission standards for the additional reason that futility renders it unreasonable to retain the standards. These legal conclusions are sufficient to support rescission of the Endangerment Finding and repeal of the related GHG emission standards without the additional scientific basis set out at proposal.

As the EPA does not adopt or rely on the proposed scientific alternative rationale in this final action, the Agency does not need to, and is not legally required to, respond to comments that address that unfinalized alternative. Nevertheless, in the interest of transparency and to assist the public in understanding the outcome of this rulemaking, the EPA provides the following summary of major themes raised by commenters regarding the proposed scientific alternative rationale. The EPA offers this summary for informational purposes only. The EPA does not (and, given the bases on which it finalizes this action, cannot) in this rulemaking resolve the underlying scientific debates described below, does not issue a new or revised scientific determination under CAA section 202(a)(1), and does not adopt or endorse any particular assessment, study, or

---

[189] To note, we acknowledge that criteria air pollution does come from other countries into the United States and the CAA allows for discounting those emissions when determining compliance with the NAAQS.

[190] *See* Memorandum to Docket EPA–HQ–OAR–2025–0194. ''Technical Memo on: Temperature, $CO_2$ Concentration, and Sea Level Rise Impacts of Greenhouse Gas Emissions from U.S. Motor Vehicles.''

comment as a statement of the Administrator's scientific judgement. The descriptions and responses that follow explain how the EPA has considered the comments in deciding not to finalize the scientific alternative rationale, but they are not necessary to, and do not form an independent basis for, the legal conclusions on which this final action rests. In light of the conclusions adopted in this final action with respect to the best reading of CAA section 202(a)(1) and the EPA's authority thereunder, we cannot resolve remaining uncertainty regarding these issues in this regulatory context.

*Comments Asking the EPA to Characterize Whether the Science of Climate Change is "Settled":* Several commenters asked the EPA to state more clearly whether the Agency views the science of climate change as settled or unsettled. Some commenters urged the EPA to state that climate science remains unsettled, and that significant disagreement persists on key issues related to climate sensitivity, extreme events, and projected impacts. Others urged the EPA to state that the science is settled to the extent relevant to the Endangerment Finding and pointed to statements by scientific organizations and assessments that describe strong or "overwhelming" consensus regarding the reality of climate change and the influence of human activities.

*Response:* The Administrator continues to harbor concerns regarding the scientific analysis underpinning the Endangerment Finding. A core tenet of empirical science is that it is falsifiable—that it can always be updated or changed in light of new evidence. The scientific record contains analyses that regularly reveal new uncertainties, challenge old assumptions, propose new interpretations of evidence, and reach differing conclusions. Analyses also explicitly question the weight that policymakers should place on particular projections or impact estimates, due in part to this uncertainty. Commenters generally recognized that relevant data is being collected on a continuing basis and analyzed against prior projections but drew very different conclusions from such data. Similarly, commenters drew very different conclusions from statements by scientific organizations that the consensus on these issues is strong or "overwhelming," which certain commenters took as evidence of certainty and others took as reason to question the underlying data and analyses. We recognize the importance of these issues and the importance placed on them by many commenters. In light of the bases adopted for this

final action, however, the EPA lacks authority to resolve these issues here for regulatory purposes under CAA section 202(a)(1).

*Comments Asserting That Intervening Science No Longer Supports the 2009 Endangerment Finding:* Some commenters supported the proposal's description of scientific uncertainty and agreed that the current record does not support the assumptions and conclusions of the Endangerment Finding. These commenters argued that experience since 2009 revealed limitations in global and regional climate models, including differences between model projections and certain observational records and reanalysis in specific regions or time periods. These commenters stated that projections of temperature change, sea level rise, and some categories of extreme events span wide ranges, and they contend that those ranges reduce confidence in the magnitude and timing of risks that the Endangerment Finding associated with anthropogenic GHG emissions.

Additionally, one commenter, for example, provides that there is significant bias in climate methodology that was relied upon in the Endangerment Finding. That commenter specifically provides that "mainstream climate research" has relied on a triply biased methodology that runs overheated models with inflated emission scenarios and ignores or minimized adaptation. The result, according to that commenter, is exaggerating the physical impacts of GHG emissions and harmfulness of such impacts.

Commenters also focused on causation and scale. These commenters emphasized that climate change is a global phenomenon and argued that GHG emissions from U.S. mobile sources represent a *de minimis* share of global GHG emissions. In their view, the available science does not support a sufficiently direct and quantifiable link between incremental changes in GHG emissions from U.S. vehicles and specific public health or welfare harms in the U.S. These commenters claimed that the Endangerment Finding relied too heavily on modeled scenarios and synthesis reports and did not fully account for natural variability, observational uncertainty, and adaptive capacity.

*Response:* The EPA acknowledges that some commenters view intervening scientific literature and observational experience as weakening the basis they believe underlay the Endangerment Finding. We also acknowledge that questions related to model performance, regional patterns of change, internal

variability, and the magnitude of projected impacts will continue to be examined. As provided in this section, the existence of these differing approaches and viewpoints confirms that climate science, including climate-impact assessments, remains an active field of research and assessment rather than a closed or static record. Researchers continue to refine observational datasets, develop and evaluate models, improve methods for detecting and attributing observed changes, and explore alternative ways to characterize uncertainty and risk. Assessment bodies periodically revisit and synthesize this evolving literature, and authors continue to publish analyses that emphasize different aspects of the evidence. The EPA therefore views the scientific record as dynamic and subject to ongoing refinement, and the Agency does not, in this final action, attempt to resolve the scientific or methodological debates reflected in that record. In light of the bases adopted for this final action, the EPA lacks authority to resolve these issues here for regulatory purposes under CAA section 202(a)(1).

*Comments Asserting That Scientific Assessments Since 2009 Have Strengthened the Basis for the 2009 Endangerment Finding:* Other commenters disagreed with the scientific discussion in the proposal and with the claim that intervening science no longer supports the Endangerment Finding. These commenters emphasized that, in their view, major assessment reports completed since 2009, including the Intergovernmental Panel on Climate Change (IPCC) Sixth Assessment Report and the Fifth National Climate Assessment (NCA5), describe that the climate system has warmed; that human activities, particularly GHG emissions, have contributed substantially to observed warming since the mid-twentieth century; and that climate change already affects a wide range of physical, ecological, social, and economic outcomes. Commenters pointed to NCA5's finding that climate change is affecting every U.S. region and multiple sectors, including health, agriculture, infrastructure, and ecosystems, and that risks increase with additional emissions. Commenters also cited reports from the National Academies of Sciences (NAS), such as Climate Change: Evidence and Causes, and a 2025 review of GHG emissions and U.S. climate, health, and welfare which they describe as concluding that multiple lines of evidence link anthropogenic GHG emissions to observed warming and associated risks.

These commenters argued that, taken together, these assessments indicate that the scientific basis for concluding that GHG emissions may reasonably be anticipated to endanger public health and welfare has strengthened since 2009, not weakened. These commenters contended that the proposal downplayed or mischaracterized these assessments by emphasizing selected uncertainties without giving sufficient weight to their central conclusions.

*Response:* The EPA acknowledges that many commenters relied on IPCC, NCA5, and NAS reports to argue that mainstream scientific assessments continue to support and, in their view, reinforce the types of conclusions that informed the Endangerment Finding. The EPA further acknowledges that these assessments describe several conclusions, including that human influence has warmed the climate system and that climate change poses a range of risks to people and the environment.

At the same time, the EPA recognizes that the scientific record does not consist of a single set of results, but instead reflects a range of analyses that place different weight on particular datasets, models, and impact estimates. Some studies and assessments rely more heavily on global climate model ensembles and long-term series of surface temperature, ocean heat content, and sea level, while others emphasize satellite records, reanalysis products, and shorter-term regional observations. Different authors make different methodological choices about how to treat internal climate variability, combine observational datasets, and evaluate model performance at global, regional, or local scales.

The literature includes a range of results with varied degrees of confidence regarding probabilistic outcomes, which in turn may affect the weight decision makers should place in particular projections and in the quantification of specific climate-related risks. Similarly, impact analyses and integrated assessments apply different assumptions when translating projected physical changes into estimates of effects on health, agriculture, infrastructure, ecosystems, and the broader economy. Those analyses vary in their assumptions about population, economic growth, land use, technical change, adaptation, and behavioral responses. Some studies emphasize the potential for adaptation and innovation to reduce harms; others highlight the potential for compounding effects, distributional consequences, or low-probability, high-impact outcomes. These choices can lead to different

estimates of the magnitude, timing, and regional distribution of impacts, even when starting from similar underlying physical projections.

*Comments on Scientific Uncertainty, Assumptions, and What Remains Unknown:* Commenters on both sides discussed the nature and implications of scientific uncertainty. Commenters who supported rescission on scientific grounds highlighted uncertainty in estimates of climate sensitivity, the representation of cloud and aerosol processes, regional precipitation changes, and how the frequency and intensity of specific extreme events may change in particular locations. These commenters argued that differences among observational datasets and model ensembles at certain scales make it difficult, in their view, to quantify reliably the magnitude of future climate change and associated impacts.

Other commenters agreed that uncertainties exist but emphasized that major assessments explicitly acknowledge and characterize these uncertainties while still reaching robust conclusions about several aspects of climate change. These commenters noted that the Global Change Research Act directs national assessments to discuss both scientific findings and scientific uncertainties, and argued that uncertainty often relates to the size, timing, or regional distribution of projected changes rather than the direction of change or the fundamental influence of GHG emissions on the climate system.

Commenters from multiple perspectives also discussed uncertainties and assumptions in the translation of physical climate changes to quantified health and welfare outcomes. These commenters observed that impact assessments must make assumptions about future population and economic growth, land use, technology, adaptation measures, and human behavior. Some commenters argued that such assumptions may overstate risks by underestimated adaptation and innovation. Others argued that the same assumptions may understate risks because they may not fully capture low-probability, high-impact outcomes, compounding effects, or distributional consequences.

*Response:* The EPA agrees that significant uncertain assumptions remain in the scientific record related to climate change and its impacts. Climate and impact modeling necessarily involve choices about emissions scenarios, socioeconomic pathways, and adaptation responses, as well as assumptions about processes within the climate system itself. The EPA also

recognizes that different scientific bodies and authors may draw different inferences from the same underlying data when weighing these uncertainties. Major assessments, such as IPCC and NCA5, describe many of these uncertainties and present ranges of projected outcomes, while still expressing confidence in certain broad findings. Other analyses highlighted by commenters place relatively greater emphasis on the limits of current models and on the difficulty of quantifying net impacts.

*Comments on Ongoing Scientific Debate and Future Assessments, Including a Possible 6th National Climate Assessment (NCA6):* Several commenters asked the EPA to recognize explicitly that scientific research and debate about climate change will continue, regardless of the outcome of this rulemaking. These commenters pointed to ongoing work in universities, Federal and state agencies, and international institutions, and noted that the U.S. has historically produced periodic NCAs under the Global Change Research Act.

Some commenters referenced recent developments affecting Federal climate assessment activities, including actions that have affected contributors and online access to materials related to a future NCA6. These commenters argued that even if institutional arrangements change, scientific work on climate change will continue in peer reviewed literature and independent synthesis efforts. Some commenters urged the EPA to defer any change to the Endangerment Finding until after any new national or international assessment, while others argued that the existence of continuing debate and evolving research supports a decision not to rely on the Endangerment Finding.

In response, the EPA understands that scientific research and debate about climate change will continue during and after this Administration. Researchers will continue to publish new observations, attribution studies, model evaluations, and impact assessments. Domestic and international bodies may undertake additional synthesis efforts, including any future work related to a NCA6 or comparable report.

*Comments on the EPA's use of the Proposed Scientific Alternative:* Some commenters who opposed the proposed scientific alternative requested that if the EPA decides not to finalize that rationale, the Agency should make clear that the Agency is not relying on specific scientific critiques as a necessary or independent basis for rescinding the Endangerment Finding or

repealing vehicle GHG standards. These commenters expressed concern that references in the proposal could be misinterpreted as a new negative scientific judgement about climate change and its impacts. These commenters asked the EPA to clarify that the Agency is not issuing a new scientific determination under CAA section 202(a). Other commenters, including some who supported rescission on scientific grounds, urged the EPA to retain a version of the scientific alternative rationale in the final action to signal ongoing concerns about the treatment of uncertainty, model performance, and global versus domestic contributions to climate risk. These commenters argued that such a discussion would provide context for any future Agency considerations of climate-related issues, even if the EPA based this particular decision primarily on legal grounds.

*Response:* The EPA has considered these comments and, in this final action, is not finalizing the alternative climate science rationale and is not finalizing new findings by the Administrator with respect to global climate change concerns under CAA section 202(a)(1). The EPA does not rely on any specific critique of climate science as a necessary justification for this action. Given our conclusion that we lack legal authority to regulate in response to global climate change concerns under CAA section 202(a)(1), it would be unnecessary and inappropriate to resolve such questions in this regulatory context. The EPA includes this section to summarize major scientific themes commenters raised and to acknowledge that scientific research and debate about climate change will continue. This discussion does not endorse or reject any particular assessment, study, or comment letter in the docket with respect to assertions regarding global climate change science and has limited its responses to the bases being finalized in this final action. The EPA's conclusion in this final action is limited to the legal determination that CAA section 202(a) does not provide the authority to regulate GHG emissions from new motor vehicles or new motor vehicle engines for the purpose of addressing global climate change concerns, irrespective of how ongoing scientific debates are ultimately resolved.

*B. There Is No Requisite Technology for Light- and Medium-Duty Vehicles That Meaningfully Addresses the Identified Dangers of the Six ''Well-Mixed'' GHGs*

As stated in section V.C of this preamble, even if all GHG emissions were eliminated from all LD, MD and HD vehicles and engines, it would have a *de minimis* impact on public health or welfare. Therefore, there is no requisite control technology for LD and MD vehicles and engines that would meaningfully address the potential public health or welfare impacts since there is no technology that would completely eliminate all GHG emissions from vehicles.

However, due to the EPA's lack of authority under CAA section 202(a), the EPA does not believe that it is necessary to finalize this alternative basis for repeal. To note, as it relates to setting standards under CAA section 202(a)(2), the EPA must take into account requisite technology, giving appropriate consideration to the cost of compliance.

We therefore believe it is more appropriate to consider whether there is any ''requisite technology'' that could meet the statutory requirements when establishing standards than under this regulatory action.

*C. There Is No Requisite Technology for Heavy-Duty Vehicles That Addresses the Identified Dangers of the Six ''Well-Mixed'' GHGs*

As stated in section V.C of this preamble, even if all GHG emissions were eliminated from all LD, MD and HD vehicles and engines, it would have a *de minimis* impact on public health or welfare. Therefore, there is no requisite control technology for HD vehicles and engines that would meaningfully address the potential public health or welfare impacts since there is no technology that would completely eliminate all GHG emissions from vehicles.

However, due to the EPA's lack of authority under CAA section 202(a), the EPA does not believe that it is necessary to finalize this alternative basis for repeal. We therefore believe it is more appropriate to consider whether there is any ''requisite technology'' that could meet the statutory requirements when establishing standards than under this regulatory action.

*D. More Expensive New Vehicles Prevent Americans From Purchasing New Vehicles That Are More Efficient, Safer, and Emit Fewer GHGs*

In the proposal, the Agency described alternative bases that the Administrator could consider as rationale for the proposed repeal of the GHG standards. One of them was the negative impact that higher vehicle prices (from the GHG standards) may have on delaying the purchase of safer and lower emitting vehicles. In the proposal, the Agency noted that complying with GHG

emission standards often requires manufacturers to design and install new and more expensive technologies, thereby increasing the price of new vehicles and reducing consumer demand. More expensive new vehicles are cost prohibitive for some consumers, and those consumers are likely to turn to the used vehicle market or continue using an older vehicle rather than purchase a new vehicle. The Agency stated in the proposal that all other things being equal, an increase in the price of new vehicles can result in consumers keeping their vehicles for longer periods, delaying the purchase of new vehicles, and decreasing the rate at which old vehicles in the national fleet are replaced by new vehicles (*i.e.,* fleet turnover). Contrary to the goals of the EPA's GHG emission standards and the intended purpose of CAA section 202(a), a delay in fleet turnover can negatively impact air quality because older vehicles tend to emit higher levels of air pollutants, including criteria pollutants and hazardous air pollutants, regulated by the EPA.[191] Slowing fleet turnover is of particular concern with respect to the EPA's 2024 GHG Emission Standards Rules because of the large increase in vehicle technology costs which will likely lead to large increases in purchase prices, and the impact battery electric and fuel cell vehicle technologies will have on purchasing decisions of consumers (for light-, medium-, and heavy-duty vehicle buyers). Increased prices and some consumers rejecting battery electric and fuel cell vehicle technologies may lead consumers to hold on to their existing vehicles longer. Vehicles are more likely to emit less air pollution with each subsequent model year because of improvements in technology, ordinary wear and tear that decreases the effectiveness of installed technology, and greater stringency in more recent regulations for criteria pollutants and hazardous air pollutants.[192] The Agency requested comment on this proposed alternative basis for the repeal of the vehicle and engine GHG standards.

The Agency notes that since the publication of the EPA proposal, NHTSA issued a proposal to change the CAFE standards for certain model years of vehicles after determining that previous rulemakings inappropriately considered alternative fuel technologies and the availability of compliance credits, which is prohibited pursuant to 49 U.S.C. 32902(h). In their proposal,

---

[191] A discussion of the impact of higher vehicle prices on slowing fleet turnover and thus increasing emissions can be found at 85 FR 24186 and 25039.
[192] *See* 90 FR 36313.

NHTSA evaluated its statutory factors in light of current circumstances and tentatively concluded that the existing standards exceed those that are maximum feasible. In addition, NHTSA conducted detailed modeling of the impact of various levels of fuel economy standards on new vehicle purchases and the impact on the in-use vehicle fleet.[193] NHTSA's proposal finds that more stringent fuel economy standards lead to higher vehicle prices, which in turn reduce vehicle fleet turnover.[194] NHTSA also finds that newer vehicles are safer than older vehicles (both for the driver/occupants of the newer vehicles and for safety of the in-use fleet overall). NHTSA also finds that newer vehicles generally emit lower emissions of certain criteria pollutants, depending upon the model year of the vehicle. In addition, in their proposal, NHTSA evaluated its statutory factors in light of current circumstances and tentatively concluded that the existing standards exceed those that are maximum feasible. The Agency received substantial supportive and adverse comments on this proposed alternative rationale for repeal of the GHG standards. Several comments included technical assessments and modeling to support the commenters' views.

As discussed elsewhere in this preamble, the Agency is repealing the GHG standards because we do not have authority to establish such standards under the CAA. The EPA is not basing the repeal on the proposed alternative rationale described in this section (section VI.D of this preamble). For this reason, the Agency has not responded to the comments received on this alternative rationale from the proposal.

Nevertheless, the Agency does believe that when establishing or revising emission standards under CAA section 202(a), the Administrator may consider the impacts of emission standards on safety, and in some cases is required to do so, such as standards established under CAA section 202(a)(3)(A).

## VII. Repeal of New Motor Vehicle and Engine GHG Emission Standards

As discussed in sections III, IV, and VI of this preamble, the EPA is repealing all GHG emission standards for LD vehicles, MD vehicles, HD vehicles, and HD engines. This includes emission standards for the subset of four of the six "well-mixed GHGs" whose elevated concentrations in the upper atmosphere the Endangerment Finding identified as the "air pollution" in question that are actually emitted by such vehicles and engines—$CO_2$, $N_2O$, methane, and HFCs—as well as the compliance provisions for the GHG standards. These changes apply to all MYs of vehicles and engines, including MYs that have completed manufacture prior to the effective date of the final action.

This final action increases flexibility for vehicle manufacturers. Manufacturers will have no vehicle technology-mix constraints that arise from the EPA GHG standards and will be free to produce a range of technologies, including gasoline, diesel, alternative fuels, and plug-in electric vehicles. Thus, we do not anticipate material compliance difficulties on the part of manufacturers in response to this final action.

In section VII.A of this preamble, we discuss the anticipated impacts of repealing GHG emission standards under CAA section 202(a)(1) on the overall regulatory scheme for parties currently subject to the standards. As explained in this preamble section and elsewhere in this preamble, we did not reopen for comment or substantively revise any emission standards for criteria pollutants or hazardous air pollutants, nor did we reopen or substantively revise any regulatory provisions related to NHTSA's CAFE standards or the EPA's role in administering EPCA and EISA. This final action also does not impact Federal preemption for motor vehicle and engine emission standards under CAA section 209(a) or under EPCA and EISA, including with respect to GHGs. Regardless, whether we prescribe standards for GHG emissions from new motor vehicles or engines, CAA section 209(a) continues to apply by its own force to preempt State laws, regulations, and causes of action that adopt or attempt to enforce any standard relating to the control of emissions from new motor vehicles or engines.

In section VII.B of this preamble, we describe regulatory amendments related to the LD and MD vehicle program. In section VII.C of this preamble, we describe regulatory amendments related to the HD engine and vehicle program. A memorandum submitted to the docket includes redline text highlighting changes to the regulations.[195]

The EPA's engine and vehicle programs are codified in Title 40 of the CFR. Specifically, the standard-setting parts for light- and medium-duty vehicles are located in 40 CFR part 85 and 86. The standard-setting part for HD engines is located in 40 CFR part 1036 and the standard-setting part for HD vehicles is 40 CFR part 1037. Each standard-setting part includes regulations describing emission standards and related requirements and compliance provisions for certifying engines or vehicles. Consistent with the proposed rule and explained in this preamble section and elsewhere in this preamble, the EPA is retaining measurement procedures, reporting requirements, and credit provisions for the LD program necessary for demonstrating compliance with NHTSA's CAFE standards and the EPA's fuel economy labeling program to meet our statutory obligations under EPCA and EISA. In response to comments on the proposed rule, we are revising the proposed approach for HD engines and vehicles subject to NHTSA's fuel-consumption standards to similarly retain measurement procedures and reporting requirements that are necessary for demonstrating compliance with NHTSA's standards.

Further, as explained in this section and elsewhere in this preamble, we did not reopen for comment and are not substantively revising emission standards or compliance provisions related to criteria pollutant exhaust emissions (*i.e.,* $NO_X$, HC, PM, and CO), air toxic emissions, or evaporative and refueling emissions.[196] We may consider those issues, as appropriate, in future rulemakings.

### A. Scope and Impacts of Repealing the GHG Emission Standards

The repeal in this final action is limited to the regulatory provisions for GHG emission standards found in 40 CFR parts 85, 86, 1036, and 1037, with minor conforming adjustments to unrelated emission standards for new motor vehicles and engines in 40 CFR parts 600 and 1039. As detailed in sections VII.B and VII.C of this preamble, this final action does not revise emission standards for criteria pollutants or air toxics. The EPA may reconsider and propose to revise the regulatory provisions for those programs in a separate rulemaking action.

[193] National Highway Traffic Safety Administration. "Draft Technical Support Document The Safer Affordable Fuel-Efficient (SAFE) Vehicles Rule III for Model Years 2022 to 2031 Passenger Cars and Light Trucks." December 2025. Chapter 4.3.

[194] A discussion of the impact of higher vehicle prices on slowing fleet turnover can be found at 85 FR 24626 (Apr. 30, 2020).

[195] Memorandum to Docket EPA–HQ–OAR–2025–0194, "Redline Version of EPA's Final Regulations for the Rescission of the Greenhouse Gas Endangerment Finding and Motor Vehicle

Greenhouse Gas Emission Standards Under the Clean Air Act." February 2026.

[196] In this rulemaking, $NO_X$, HC, PM, and CO are sometimes described collectively as "criteria pollutants" because they are either criteria pollutants under the CAA or precursors to the criteria pollutants ozone and PM.

Similarly, we did not reopen for comment or propose to revise regulatory provisions necessary for NHTSA's CAFE standards or the EPA's co-administration of EPCA and EISA.

For this reason, the repealed provisions in this final action do not impact Federal preemption under EPCA, as amended by EISA, related to fuel economy standards. EPCA provides that when "an average fuel economy standard prescribed under this chapter is in effect, a state or a political subdivision of a state may not adopt or enforce a law or regulation related to fuel economy standards or average fuel economy standards for automobiles covered by an average fuel economy standard under this chapter" [197] unless the standards are identical or apply only to vehicles obtained for the use of the state or political subdivision.[198] We reiterate that the EPA did not reopen this issue in this rulemaking, as we did not propose to revise regulatory provisions necessary for NHTSA's CAFE standards or the EPA's co-administration of EPCA and EISA. In providing this information for better clarity on the scope of the final action, the EPA notes that we are not here "undertak[ing] a serious, substantive reconsideration of the existing" position. *Growth Energy* v. *EPA,* 5 F.4th 1, 21 (D.C. Cir. 2021).

The repealed provisions in this final action also do not impact Federal preemption under CAA section 209(a), which provides that "[n]o State or any political subdivision thereof shall adopt or attempt to enforce any standard relating to the control of emissions from new motor vehicles or new motor vehicle engines subject to this part," including "certification," "inspection" or "approval" requirements "relating to the control of emissions from" such vehicles or engines.[199] Because new motor vehicles and engines that have been subject to GHG emission standards remain subject to Title II of the CAA, the statute would by its own force continue to preempt "any" State or local law, regulation, or cause of action that adopts or attempts to enforce "any standard relating to the control of emissions." Relatedly, the CAA continues to preempt Federal common-law claims for vehicle and engine emissions because Congress adopted a standard for when such emissions rise to the level of regulatory concern and "delegated to EPA the decision whether and how to regulate" such emissions. *Am. Elec. Power,* 564 U.S. at 426. The CAA also

continues to preempt state common-law claims and statutes that seek to regulate out-of-state emissions, independently of CAA section 209(a)'s express preemption provision for mobile-source emissions. See *City of New York* v. *Chevron Corp.,* 993 F.3d 81, 98–100 (2d Cir. 2021); *cf. Int'l Paper Co.* v. *Ouellette,* 479 U.S. 481, 492 (1987). We retain our authority to prescribe emission standards for any air pollutant that, in the Administrator's judgment, causes or contributes to air pollution that may reasonably be anticipated to endanger public health or welfare. See the Response to Comments document for more detailed comment summaries and responses.

The EPA's engine and vehicle programs are codified in Title 40 of the CFR. Specifically, the standard-setting parts for light- and medium-duty vehicles are located in 40 CFR parts 85 and 86. The standard-setting part for HD engines is located in 40 CFR part 1036 and the standard-setting part for HD vehicles is 40 CFR part 1037. Each standard-setting part includes regulations describing emission standards and related requirements and compliance provisions for certifying engines or vehicles.

### B. Light- and Medium-Duty Vehicle GHG Program

Section VII.B.1 of this preamble provides background on the EPA's LD and MD vehicle GHG emission programs. In general, through a series of rulemakings beginning with MY 2010 for LD vehicles and MY 2014 for MD vehicles, the EPA increased the stringency of the GHG standards for these vehicles over time, in particular the $CO_2$ standard. The remainder of section VII.B of this preamble summarizes the comments received, and describes the changes to the LD and MD vehicle GHG regulations after considering those comments.

### 1. Background on the Light- and Medium-Duty Vehicle GHG Program

In 2010, the EPA relied on the Endangerment Finding to adopt the first GHG emission standards for passenger cars and light trucks for MYs 2012 through 2016 in a joint rulemaking with NHTSA.[200] In 2012, the EPA and NHTSA adopted another set of GHG standards (issued by the EPA) and fuel economy standards (issued by NHTSA) for passenger cars and light trucks for MYs 2017 and later in a joint rulemaking.[201] In 2020, the EPA and NHTSA revised the standards that had

previously been adopted and extended them for MYs 2021 through 2026.[202] In 2021, we further revised GHG standards for passenger cars and light trucks for MYs 2023 through 2026.[203] For MD vehicles, we initially adopted GHG standards as part of the Phase 1 and Phase 2 HD GHG standards. In 2024, we adopted new standards for passenger cars, light trucks, and MD vehicles starting in MY 2027, effectively combining standards that had previously been maintained separately.[204]

The EPA has also taken various actions to comply with statutory obligations under EPCA and EISA. Enacted in 1975, EPCA requires NHTSA to establish a regulatory program for motor vehicle fuel economy (now known as CAFE standards) and requires the EPA to establish measurement procedures, data collection procedures, and rules for calculating average fuel economy values in support of NHTSA's CAFE standards. In 2007, Congress amended EPCA by enacting EISA, which required continuing increases in the stringency of CAFE standards for passenger cars and light trucks through MY 2020. EISA also authorized new fuel consumption standards for MD vehicles and HD engines and vehicles.[205] Those standards, and the EPA's HD engine and vehicle GHG programs, are detailed in section VII.C of this preamble.

To comply with EPCA and EISA, the EPA adopted regulations for fuel economy measurements, calculations, and reporting under 40 CFR part 600. The regulation at 40 CFR part 600 now includes additional provisions for measuring, calculating, and reporting fuel consumption values for MD vehicles. This regulatory structure was designed to maximize efficiency within the Federal government and minimize the burden on the engine and vehicle manufacturers by centralizing data submission. We share information with NHTSA as needed to support implementation of NHTSA's fuel economy and consumption standards.

### 2. Summary of Comments and Updates to the Light- and Medium-Duty Programs

Most comments related to GHG standards for LD and MD vehicles were focused on the proposed rescission of the Endangerment Finding and repeal of the GHG standards. Manufacturers suggested in comments that the EPA establish or determine that the model

---

[197] 49 U.S.C. 32919(a).

[198] 49 U.S.C. 32919(b)–(c).

[199] 42 U.S.C. 7543(a).

[200] 75 FR 25324 (May 7, 2010).

[201] 77 FR 62624 (Oct. 15, 2012).

[202] 85 FR 24174 (Apr. 30, 2020).

[203] 86 FR 74434 (Dec. 30, 2021).

[204] 89 FR 27842 (Apr. 18, 2024).

[205] 49 U.S.C. 32902(k).

year 2027 and later GHG standards in 40 CFR 86.1818–12 and 86.1819–14 are not appropriate, even if those standards are removed in this final action. The commenters suggested making such a determination to prevent future rulemaking action that would simply restore the standards as originally adopted. The EPA is removing the GHG emission standards for the reasons described in sections II, IV, and VI of this preamble. Because we are finalizing the conclusion that the EPA lacks authority to prescribe GHG emission standards in response to global climate change concerns under CAA section 202(a)(1), we are not putting in place alternative GHG emission standards.

Commenters also correctly identified several additional amendments to remove detailed regulatory provisions that become obsolete in the absence of GHG standards. We have amended the regulation to incorporate the suggested amendments as noted in the following section VII.B.3 of this preamble. See the Response to Comments document for more detailed summaries of and responses to comments related to specific LD and MD vehicle GHG regulations.

3. Changes to the Light- and Medium-Duty Vehicle GHG Regulations

The EPA's LD and MD vehicle emission regulations are spread across three CFR parts. 40 CFR part 85 includes various general compliance provisions for both criteria pollutant and GHG emissions. Many of those criteria pollutant provisions apply equally to highway motorcycles (but not for GHG emissions, as there are no EPA GHG requirements under 40 CFR part 85 for motorcycles). 40 CFR part 86 includes emission standards and certification provisions for both criteria pollutant and GHG emissions. 40 CFR part 600 includes measurement and reporting procedures related to fuel economy and GHG standards and to fuel economy labeling.

In the following preamble subsections, we describe the changes in this final action to remove and amend specific portions of each of these regulatory parts. The general approach is to remove the MY 2012 and later GHG emission standards for passenger cars and light trucks and the MY 2014 and later GHG emission standards for MD vehicles. We are also removing the

testing and reporting requirements associated with the GHG emission standards. In keeping with our obligations under EPCA, as noted in section VII.B.1 of this preamble, we are not removing the testing and reporting requirements related to CAFE standards for passenger cars and light trucks. We are similarly preserving the testing and reporting provisions related to NHTSA's fuel-consumption standards for MD vehicles.

a. 40 CFR Part 85—Compliance Provisions for Light- and Medium-Duty Vehicles

This final action amends 40 CFR part 85 to remove all references to GHG emission standards and related provisions while retaining provisions that support our criteria pollutant emission program. In this preamble subsection, we describe several amendments that are necessary to remove GHG-related provisions from 40 CFR part 85 while ensuring that criteria pollutant emission standards are not substantively impacted. Table 8 provides a summary of amendments to 40 CFR part 85.

*Table 8: Summary of changes to light-duty and medium-duty highway engine regulations under 40 CFR part 85*

| 40 CFR Part 85 | Amended sections |
|---|---|
| Subpart F—Exemption of Clean Alternative Fuel Conversions From Tampering Prohibition | 85.525 |
| Subpart P—Importation of Motor Vehicles and Motor Vehicle Engines | 85.1515 |
| Subpart S—Recall Regulations | 85.1803, 85.1805 |
| Subpart T—Emission Defect Reporting Requirements | 85.1902 |
| Subpart V—Warranty Regulations and Voluntary Aftermarket Part Certification Program | 85.2103 |

The regulations at 40 CFR part 85, subpart F, provide an exemption from the general tampering prohibition for clean alternative fuel conversions. Specifically, the regulations describe how anyone modifying an in-use vehicle to run a different fuel can demonstrate that the fuel conversion maintains a level of emission control that qualifies them for an exemption from the tampering prohibition. This exemption generally allows for modifying vehicles already certified to emission standards in a way that does not cause the modified vehicle to exceed the emission standards that apply for the certified vehicle. The demonstration applies for both criteria and GHG emissions. We are amending 40 CFR 85.525 by removing the requirement to demonstrate compliance

with GHG emissions. Program requirements related to criteria exhaust, evaporative, and refueling emissions and onboard diagnostics remain unchanged.

The regulation at 40 CFR 85.1515 describes the standards that apply for Independent Commercial Importers in their practice of importing used vehicles. We are only removing the provision that disallowed generation and use of GHG emission credits. We note further that the regulation requires Independent Commercial Importers to meet all the standards that apply under 40 CFR part 86. With the other changes described in this action, the removal of GHG standards from 40 CFR part 86, subpart S, applies equally to imported vehicles. Imported vehicles continue to be subject to criteria exhaust,

evaporative, and refueling emission standards and requirements for onboard diagnostics as specified in 40 CFR part 86, subpart S.

We are revising the recall-related instructions for remedial plans and consumer notification in 40 CFR 85.1803 and 85.1805 to remove a reference to 40 CFR 86.1865–12(j)(3), which we are removing in this action. The referenced paragraph relates to recall provisions for vehicles that do not comply with GHG standards. We are also revising definitions of "Emission-related defect" and "Voluntary emissions recall" in 40 CFR 85.1902 where those definitions describe how manufacturers must report GHG-related defects differently than defects related to criteria pollutant emission standards.

Finally, we proposed to amend the warranty provisions for specified major emission control components in 40 CFR 85.2103 by removing the reference to batteries serving as a Renewable Energy Storage System (RESS) for electric vehicles and plug-in hybrid electric vehicles, along with all components needed to charge the system, store energy, and transmit power to move the vehicle. Some commenters supported this proposed change. Other commenters noted that RESS provisions are not limited to greenhouse gas emissions and that the Agency specifically connected the warranty provisions to its nonmethane organic gases and oxides of nitrogen (NMOG+NO$_X$) standards in the 2024 LD and MD Multi-Pollutant Emission Standards Rule.[206] Considering the connection to the EPA criteria pollutant program, which is out of scope of this rulemaking, we are not taking final action at this time on the proposal to remove batteries serving as a RESS for electric vehicles and plug-in hybrid electric vehicles from the list of specified major emission control components in 40 CFR 85.2103(d)(1). We may consider revisions in a future criteria pollutant rule. Note that we are nevertheless finalizing the proposed change to remove 40 CFR 85.2103(d)(3), which established the newly required battery monitor as the basis for making battery-related warranty claims; since we are removing the requirement to install these dashboard-mounted battery monitors in this rulemaking, warranty implementation will necessarily proceed without the benefit of information from the battery monitor.

b. 40 CFR Part 86—Emission Standards and Certification Requirements for Light- and Medium-Duty Vehicles

In general, we are amending 40 CFR part 86 to remove all GHG emission standards, references to such standards, and related provisions while retaining provisions that support our criteria pollutant emission program. In this preamble subsection, we describe several amendments that are necessary to remove GHG-related provisions from 40 CFR part 86 while ensuring that criteria pollutant emission standards are not substantively impacted. Table 9 provides a summary of the amendments to 40 CFR part 86.

*Table 9: Summary of changes to light-duty and medium-duty highway engine regulations under 40 CFR part 86*

| 40 CFR Part 86 | Removed sections | Amended sections |
| --- | --- | --- |
| — | | 86.1 |
| Subpart S—General Compliance Provisions for Control of Air Pollution From New and In-Use Light-Duty Vehicles, Light-Duty Trucks, and Heavy-Duty Vehicles | 86.1815-27, 86.1818-12, 86.1819-14, 86.1865-12, 86.1866-12, 86.1867-12, 86.1870-12 | 86.1801-12, 86.1803-01, 86.1805-12, 86.1805-17, 86.1806-27, 86.1807-01, 86.1809-12, 86.1810-09, 86.1810-17, 86.1811-17, 86.1811-27, 86.1816-18, 86.1822-01, 86.1823-08, 86.1827-01, 86.1828-01, 86.1829-15, 86.1830-01, 86.1835-01, 86.1838-01, 86.1839-01, 86.1841-01, 86.1844-01, 86.1845-04, 86.1846-01, 86.1848-10, 86.1854-12, 86.1861-17, 86.1868-12, 86.1869-12 |

We are amending the list of materials incorporated by reference in 40 CFR 86.1 by removing material that is referenced only in regulations that we are removing in this final action.

We are amending the applicability statements in 40 CFR 86.1801–12 by removing references to GHG standards and related compliance provisions. We are also removing the instruction related to work factor for vehicles above 14,000 pounds gross vehicle weight rating (GVWR) at 40 CFR 86.1801–12(a)(3) since that is meaningful only in the context of GHG standards. We adopted the work-factor provision in a 2016 final rule as a means of limiting the extent to which manufacturers would certify those larger HD vehicles in test groups along with chassis-certified MD vehicles.[207] Removing the instruction to calculate GHG standards based on a work factor appropriate for MD vehicles, without other compensating changes, could lead to a greater number of HD vehicles certified as MD vehicles. The work-factor provision was adopted as a means of addressing competing concerns from different manufacturers. As a result, we are limiting this provision to HD vehicles with a maximum value of 19,500 pounds GVWR. We believe this limitation is the best way to maintain a consistent approach for certifying affected vehicles.

We are amending the definitions in 40 CFR 86.1803–01 by removing several defined terms that are used only in regulatory provisions that we are removing in this final action. This includes removing the definition of "configuration"; while this definition is no longer needed, we are retaining the slightly different definition of "vehicle configuration," since that definition is needed to support standards related to criteria pollutants. We are accordingly amending several references across 40 CFR part 86, subpart S, to change from a generic reference to "configuration" and replace it with the specific reference to "vehicle configuration." We are also amending 40 CFR 86.1803–01 by adding a definition for "work factor" that is consistent with the definition that is embedded in 40 CFR 86.1819–14. We adopted the definition of "work factor" in 40 CFR 86.1819–14 primarily as a means of accounting for specific vehicle characteristics in establishing GHG emission standards for MD vehicles. We are removing all of 40 CFR 86.1819–14 as described below. However, we are keeping the definition of work factor to support the definition

[206] 89 FR 27965 (Apr. 18, 2024).

[207] 81 FR 73478 (Oct. 25, 2016).

of ''medium-duty passenger vehicle,'' which relies on the work factor concept to categorize vehicles for applying criteria pollutant emission standards.

We are amending 40 CFR 86.1803–01 and 86.1809–12 by removing references to the air conditioning efficiency test as part of the consideration for determining what is a defeat device. We are eliminating the air conditioning efficiency test from the EPA certification program because it has been used only to generate GHG credits. Note that we are not removing the air conditioning efficiency credit provisions and measurement procedures from 40 CFR 86.1868–12 and 1066.845, which are used by manufacturers for compliance with fuel economy standards as described in 40 CFR 600.510–12(c)(3). If in the future NHTSA changes the fuel economy standards to no longer reference air conditioning efficiency credits, we intend to remove those provisions from 40 CFR 600.513 if they become obsolete.

We are amending useful life specifications in 40 CFR 86.1805–12 and 86.1805–17 by removing references to useful life for GHG standards. Useful life for all criteria exhaust, evaporative, and refueling emission standards and onboard diagnostics remain unchanged.

In response to public comments, we are amending 40 CFR 86.1806–27 to clarify we are excluding certain information items identified in 13 CCR 1968.2 because they are related to GHG emission standards.

We are amending labeling requirements in 40 CFR 86.1807–01 by removing the requirement for battery electric vehicles (BEVs) and plug-in hybrid electric vehicles (PHEVs) to identify monitor family and battery durability family on the vehicle emission control information label. We are removing the battery monitoring and battery durability requirements in 40 CFR 86.1815–27 and therefore no longer need to include this family information as part of the certification process.

We are amending 40 CFR 86.1810–09(f)(2) by removing references to GHG emission standards. Manufacturer requirements to comply with altitude-related demonstration requirements for vehicles subject to the cold temperature standards for nonmethane hydrocarbon emissions remain unchanged.

We are amending 40 CFR 86.1810–17(j) by removing references to GHG emission standards. Small-volume manufacturers that modify a vehicle already certified by a different company must continue to meet other requirements as specified, such as those related to criteria exhaust, evaporative,

and refueling emissions and onboard diagnostics.

We are amending 40 CFR 86.1811–17, 86.1811–27, and 86.1816–18 by removing references to GHG emission standards. We are not otherwise changing these sections, which establish criteria exhaust emission standards for LD and MD vehicles.

We are removing 40 CFR 86.1815–27, as proposed. We adopted this section to establish battery monitoring and battery durability requirements for BEVs and PHEVs. Since the earliest battery monitoring and battery durability requirements were scheduled to start in MY 2027, removing those requirements involves no immediate transition to discontinue compliance for certified vehicles.

We are removing 40 CFR 86.1818–12 and 86.1819–14. These sections described the GHG standards and implementing provisions for MY 2010 and later LD vehicles and for MY 2014 and later MD vehicles. We are discontinuing the requirement to demonstrate compliance with these GHG standards and note that this discontinuation applies as of the effective date of the final action. Manufacturers need not amend existing certificates for ongoing production for the current MY. Manufacturers will in any case not need to submit credit reports at the end of the current MY to demonstrate compliance with the fleet average $CO_2$ standards.

We are amending test group specifications in 40 CFR 86.1823–08 by removing durability demonstration requirements related to GHG emission standards.

We are amending the provisions for establishing test groups in 40 CFR 86.1827–01 by removing the reference to $CO_2$ emission standards.

We are amending testing specifications in 40 CFR 86.1829–15 by removing references to battery durability requirements and GHG emission standards, except where needed to account for emission measurements related to fuel economy labeling.

We are amending the compliance provisions 40 CFR 86.1835–01, 86.1838–01, 86.1841–01, 86.1848–10, and 86.1854–12 by removing references to GHG emission standards.

We are removing the description of battery monitor families and battery durability families and other GHG-related items from the reporting requirements in 40 CFR 86.1844–01.

We are amending carryover testing provisions in 40 CFR 86.1839–01 by removing references to accuracy requirements for battery monitoring for

electric vehicles (EVs), which included battery electric vehicles and fuel cell electric vehicles, and PHEVs.

We are amending instructions for the application for certification in 40 CFR 86.1844–01 by removing references to refrigerant leakage rates and GHG emission standards.

We are amending in-use testing requirements in 40 CFR 86.1845–04 and 86.1846–01 by removing references to testing GHG emissions and testing related to battery monitor accuracy and battery durability for EVs and PHEVs. We are also amending 40 CFR 86.1845–04 by changing the nomenclature for the reference brake-specific $CO_2$ emission rate needed to perform calculations related to in-use testing for engines certified under 40 CFR 1036.635 for use in vehicles with high towing capacity.

We are removing requirements for battery durability testing and other GHG-related provisions in 40 CFR 86.1847–01 and 86.1848–10.

We are amending the credit provisions for criteria exhaust and evaporative emissions in 40 CFR 86.1861–17 by referencing the credit provisions in 40 CFR part 1036, subpart H, instead of 40 CFR part 1037, subpart H. We are removing several credit provisions in 40 CFR part 1037, subpart H, in this rule because they were needed only in relation to the GHG standards in 40 CFR part 1037, which we are removing in this rule. The referenced credit provisions in 40 CFR part 1037, subpart H, are equivalent to the analogous credit provisions in 40 CFR part 1036, subpart H. While the final action preserves some credit-related provisions in 40 CFR part 1037 in support of NHTSA's fuel consumption standards, we are finalizing as proposed the updated references to 40 CFR part 1036 to ensure the complete subpart of the EPA averaging, banking, and trading provisions can continue to apply under 40 CFR 86.1861–17. We are also amending 40 CFR 86.1861–17 by removing a reference to 40 CFR 86.1865–12(j)(3), which we are removing in this action.

We are removing 40 CFR 86.1865–12, which described the emission credit provisions related to the fleet average GHG standards. See the discussion related to 40 CFR 86.1818–12 and 86.1819–14 for the transition to discontinued GHG standards for the MY currently in production for the year when the final action is effective. More specifically, we will no longer recognize manufacturers' positive or negative GHG credit balances as of the effective date of the final action. Note also that we are removing 40 CFR 86.1865–12(j)(3), which describes recall provisions for

vehicles that do not comply with GHG standards. We recognize that a credit-based approach to recall is no longer appropriate without a GHG credit program. In the context of NMOG+NO$_X$ standards, recall would involve identifying and correcting a vehicle defect to bring vehicles into compliance with standards. Accordingly, we are removing the provisions describing a credit-based remedy for noncompliance.

We are removing 40 CFR 86.1866–12, 86.1867–12, and 86.1867–31. These sections describe GHG credit programs for advanced technology and air conditioning leakage that served only in relation to the GHG standards that we are removing in this action.

We are amending the credit provisions for air conditioning efficiency and for off-cycle technologies in 40 CFR 86.1868–12 and 86.1869–12 by removing references to the fleet average GHG standards and adjusting the description to clarify that these credit provisions continue to serve as

inputs for calculating fuel consumption improvement values and average fuel economy for LD program vehicles under 40 CFR 600.510–12. Note that the 2024 LD and MD Multi-Pollutant Emission Standards Rule included several changes to narrow the availability of air conditioning efficiency and off-cycle credits; those changes continue to apply in the context of fuel consumption improvement values and average fuel economy.[208]

We are removing 40 CFR 86.1870–12, which described a GHG credit program for full-size pickup trucks with hybrid technology. Those GHG credits were also used for calculating fuel consumption improvement values and average fuel economy for LD program vehicles under 40 CFR 600.510–12. However, we amended those credit provisions in the 2021 final rule to establish MY 2024 as the last year that manufacturers could generate those credits.[209] Because those credits are already discontinued for purposes of

demonstrating compliance with EPA emission standards, manufacturers can no longer use those provisions to create fuel consumption improvement values under 40 CFR part 600.

c. 40 CFR part 600—Requirements Related to Fuel Economy for Light- and Medium-Duty Vehicles

In general, we are amending 40 CFR part 600 to remove all references to GHG emission standards and related provisions while retaining provisions that support compliance with CAFE standards and fuel economy labeling for passenger cars and light trucks. In the remainder of this preamble subsection, we describe several amendments needed to remove GHG-related provisions from 40 CFR part 600 without affecting provisions related to CAFE standards and fuel economy labeling. Table 10 provides a summary of the regulations we are either removing from or amending in 40 CFR part 600.

### Table 10: Summary of changes to light-duty and medium-duty highway engine regulations under 40 CFR part 600

| 40 CFR Part 600 | Removed sections | Amended sections |
|---|---|---|
| Subpart A—General Provisions | | 600.001, 600.002, 600.006, 600.007, 600.008, 600.010 |
| Subpart B—Fuel Economy and Exhaust Emission Test Procedures | | 600.101, 600.111-08, 600.113-12, 600.114-12, 600.116-12, 600.117 |
| Subpart C—Procedures for Calculating Fuel Economy and Carbon-related Exhaust Emission Values | | 600.206-12, 600.207-12, 600.210-12 |
| Subpart F—Procedures for Determining Manufacturer's Average Fuel Economy | 600.514-12 | 600.507-12, 600.509-12, 600.510-12, 600.512-12 |

We are amending the applicability statements in 40 CFR 600.001 by removing references to carbon-related exhaust emissions and fleet average CO$_2$ standards. We are also revising the reference in 40 CFR 600.001(a) to MD vehicles because the testing and reporting provisions remain only to support fuel-consumption standards that apply under 49 CFR part 535. Testing provisions will remain to describe (1) how passenger automobiles and light trucks (including MD passenger vehicles) must meet fuel economy standards, (2) how manufacturers must prepare fuel economy labels for those vehicles, and

(3) how MD vehicles must meet fuel-consumption standards.

We are amending the definitions in 40 CFR 600.002 by removing the reference to fleet average CO$_2$ standards. We are also amending several definitions related to MD vehicles to preserve content referenced in 40 CFR 86.1819–14, which we are removing in this final action. We are amending these definitions to support NHTSA's implementation of fuel-consumption standards for MD vehicles.

We are amending the definition of Medium-Duty Passenger Vehicle (MDPV$_{FE}$) for purposes of fuel economy testing and reporting in 40 CFR 600.002 to align with the clarified definition

published by NHTSA at 49 CFR 523.2 (89 FR 52945, June 24, 2024). Aligning these definitions is necessary to ensure the EPA's test procedures are properly applied to vehicles covered by fuel economy standards and labeling requirements.

As described for 40 CFR 86.1803–01, we are amending several references across 40 CFR part 600 to change from a generic reference to "configuration" and replace it with the specific reference to "vehicle configuration."

We are amending the information requirements in 40 CFR 600.006 through 600.010 by removing references to carbon-related exhaust emissions, GHG

---

[208] 89 FR 27842 (Apr. 18, 2024).

[209] 86 FR 74434 (Dec. 30, 2021).

emission standards, and reporting GHG-related information generally.

We are amending the testing overview in 40 CFR 600.101 and 600.111–08 by removing references to carbon-related exhaust emissions and fleet average $CO_2$ emissions.

We are amending the emission calculations in 40 CFR 600.113–12 by removing references to carbon-related exhaust emissions and other GHG emissions.

We are amending the interim testing provisions in 40 CFR 600.117 by removing paragraph (a)(5) since we are discontinuing GHG testing with in-use vehicles under 40 CFR 86.1845–04. We are also revising paragraphs (a)(6) and (b) to clarify that manufacturers do not adjust measured fuel economy values to account for fuel effects, whether they test with E0 or E10 gasoline.

We are amending the testing, calculation, and reporting specifications in 40 CFR 600.116–12, 600.507–12, 600.509–12, and 600.510–12 by removing references to carbon-related exhaust emissions. We are also removing GHG-specific utility factors in 40 CFR 600.116–12. We note that calculations related to off-cycle credits in 40 CFR 600.510–12(c)(3)(ii) continue to rely on carbon-related exhaust emissions as specified in 40 CFR 86.1869–12.

We are amending the reporting requirements in 40 CFR 600.512–12 by removing references to carbon-related exhaust emissions. This includes amending 40 CFR 600.512–12(c)(5)(i) to explain that the purpose for performing the calculations in 40 CFR 600.510–12(c)(3) is to support credit calculations for fuel economy improvement factors, rather than demonstrating compliance with the fleet average standard for carbon-related exhaust emissions. We are moving the existing reporting requirement for emission credits related to fuel consumption improvement values from 40 CFR 86.1865–12(l)(2)(iii), which we are removing in this final action, to 40 CFR 600.512–12(c)(3) to preserve the existing provisions needed for fuel economy reporting. We are also removing the reporting requirements in 40 CFR 600.514–12, which are solely related to GHG emissions.

*C. Heavy-Duty Engine and Vehicle GHG Program*

This section VII.C includes background on the EPA's HD GHG emission program and describes changes to the engine-based GHG regulations and the vehicle-based GHG regulations we are finalizing after considering comments.

1. Background on the Heavy-Duty Engine and Vehicle GHG Program

The EPA promulgated new GHG emission standards for HD engines and vehicles in three separate rulemakings. In 2011, the EPA established the first GHG standards for MY 2014 and later HD engines and vehicles in an action titled "Greenhouse Gas Emissions and Fuel Efficiency Standards for Medium- and Heavy-Duty Engines and Vehicles" (HD GHG Phase 1).[210] In 2016, the EPA set new GHG standards for MY 2021 and later HD engines and vehicles in an action titled "Greenhouse Gas Emissions and Fuel Efficiency Standards for Medium- and Heavy-Duty Engines and Vehicles—Phase 2" (HD GHG Phase 2).[211] Most recently, in 2024, the EPA finalized the 2024 HD GHG Emission Standards Rule, which set new $CO_2$ emission standards for MY 2032 and later HD vehicles that phase in starting as early MY 2027 for certain vehicle categories.[212] The phase-in revises MY 2027 GHG standards that were established previously under the EPA's HD GHG Phase 2 rulemaking.[213]

The EPA and NHTSA jointly issued the HD GHG Phase 1 and HD GHG Phase 2 rulemakings covering HD GHG emission and fuel efficiency standards. The EPA set GHG emission standards under CAA section 202(a), and NHTSA set fuel consumption standards under EISA.[214] The EPA and NHTSA programs were harmonized through MY 2026; however, NHTSA did not adopt changes in fuel consumption standards corresponding to the EPA's HD GHG Phase 3 standards. As a result, the $CO_2$ emission and fuel consumption standards diverged in MY 2027 and later.

The EPA's regulations include the test procedures along with a certification and compliance program, which is led by the EPA. As noted previously, this regulatory structure was designed to maximize efficiency within the Federal government and minimize the burden on the engine and vehicle manufacturers by centralizing data submission. Manufacturers submit data and information to the EPA and the EPA, in turn, shares information with NHTSA as needed to support NHTSA's implementation of its fuel consumption standards.[215]

2. Summary of Comments and Updates to the Heavy-Duty Engine and Vehicle Programs

Engine and vehicle manufacturers, trade associations for the manufacturers and suppliers, and other special interest groups commented specifically on the regulatory updates the EPA proposed for the HD engine and vehicle GHG programs. Many of these commenters raised a common concern that informed the approach we are finalizing for our HD engine and vehicle regulations: the HD industry's request to ensure no disruption to NHTSA's fuel efficiency program. Section VII.C.2 of this preamble summarizes comments related to that concern and describes the approach we are broadly applying to the regulations after considering those comments. We note that several commenters suggested more specific changes to regulatory sections we proposed to revise or remove, and some commenters identified additional regulatory sections we should consider revising or removing. In section VII.C.3 of this preamble, we summarize the comments related to specific regulatory text and changes we are finalizing after considering those comments. See the Response to Comments document for more detailed summaries of and responses to comments related to specific HD engine and vehicle GHG regulations.

Commenters responded to the EPA's request for comment on the relationship between the EPA's and NHTSA's regulations. As stated at proposal, NHTSA's medium- and heavy-duty fuel efficiency regulations in 49 CFR part 535 refer to several sections in the EPA's 40 CFR parts 1036 and 1037 that the EPA proposed to modify or remove. In the proposal, we also noted that NHTSA's reporting and recordkeeping regulation in 49 CFR 535.8(a)(6) directs manufacturers to submit information to the EPA, and 49 CFR 535.8(a)(6) also provides direction to manufacturers to send the information directly to NHTSA in instances where the EPA does not have an electronic pathway to receive the information.[216] We requested comment on whether any of the EPA's GHG test procedure, certification, and compliance program regulations should be retained with a CFR notation explaining that they only apply to NHTSA's HD fuel efficiency program. Regarding reporting, we also requested comment on the time required to transition from manufacturers supplying

---

[210] 76 FR 57106 (Sept. 15, 2011).

[211] 81 FR 73478 (Oct. 25, 2016).

[212] *See* 89 FR 29559–61 (Apr. 22, 2024).

[213] 89 FR 29440 (Apr. 22, 2024).

[214] 49 U.S.C. 32902(k).

[215] *See* 49 CFR 535.8; 40 CFR 1036.755 and 1037.755.

[216] *See* 49 CFR 535.8(a)(6).

data to the EPA to supplying the data directly to NHTSA.

Engine and vehicle trade organizations, individual manufacturers, and other organizations that commented on this topic expressed concern about the proposal to remove the EPA's GHG regulations, indicating that it would disrupt near-term certification for engine and vehicle manufacturers who would continue to be subject to fuel consumption standards under the NHTSA's fuel efficiency program. These commenters suggested that the EPA retain some or all of its GHG regulations until NHTSA is able to revise 49 CFR part 535 to independently implement their fuel efficiency program. In general, we agree with commenters that manufacturers should continue to have access to the regulations needed for NHTSA to effectively implement their program. At this time, NHTSA has not finalized regulations to update their HD fuel efficiency program under 49 CFR part 535. Therefore, after considering comments, and consistent with our request for comment on whether any of these provisions should be retained to support NHTSA's HD fuel efficiency program, we are only removing as proposed the EPA GHG standards in 40 CFR 1036.108, 1037.105, and 1037.106 and other provisions in 40 CFR parts 1036 and 1037 that only apply for the EPA. Relatedly, as discussed in more detail in section VII.C.3.c of this preamble, we are retaining regulatory provisions so that manufacturers will continue to submit their data and information to the EPA until NHTSA has updated their regulations and is prepared to accept the manufacturers' data and information directly.

To ensure NHTSA's fuel efficiency program remains implementable in the near-term, we are retaining the EPA regulations in 40 CFR parts 1036 and 1037 that NHTSA references. The Response to Comments document for this final action describes specific changes we are finalizing to remove the EPA's GHG standards and retain the necessary provisions for NHTSA's fuel efficiency program. We note here that we have generally replaced references to "CO₂ standards" with "fuel consumption standards" throughout 40 CFR parts 1036 and 1037. However, we have not removed all references to CO₂ *emissions* throughout these parts. CO₂ emissions remain the basis of many of the test procedures and compliance provisions used in NHTSA's fuel efficiency program. As such, we are retaining many of the requirements to measure and report CO₂ emissions in 40 CFR parts 1036 and 1037 to support the

NHTSA's fuel efficiency program. To avoid extensive revisions throughout the parts, we are also amending the 40 CFR 1036.801 and 1037.801 definitions of "we (us, our)" to mean the EPA for issues related to criteria pollutant standards and to include NHTSA for testing, compliance, and approvals related to fuel consumption standards.

Another commenter expressed a preference that the EPA also retain its current responsibility for certification, noting that the Environment and Climate Change Canada (ECCC) currently accepts EPA certification and labeling for their greenhouse gas program, which simplifies the certification process for manufacturers exporting their vehicles to Canada. We will not be continuing to provide EPA certifications for GHG emissions because we are removing the GHG emission standards in this final action.

While some manufacturers expressed support for the broad rescission of all of the EPA's GHG regulations, other industry commenters focused their comments specifically on the HD GHG Phase 3 program, noting that the Phase 3 standards are infeasible and that the rule was an "EV mandate" in violation of the major questions doctrine. More consistently, commenters from the HD industry noted their urgent need for regulatory certainty regarding the HD GHG Phase 3 standards that are currently set to apply for MY 2027. These commenters indicated that this final action is likely to be challenged, which could lead to the possibility that the final action would be stayed and the existing GHG regulations would remain in place, including the more stringent standards beginning in MY 2027. One approach suggested by commenters to provide near-term certainty was that the EPA rescind the Phase 3 program separate from the Endangerment Finding rescission and allow industry to continue to meet the MY 2024 standards that are currently in place under the HD GHG Phase 2 program. Another suggested approach was that the EPA add a severability clause to the final action to allow for canceling or revising the GHG standards as originally adopted for MY 2027 and later vehicles and engines even if the Endangerment Finding or the broader GHG emission standards are not rescinded. The EPA is removing all GHG emission standards as noted in this preamble because we lack authority to set these standards. Therefore, we are not putting in place alternative GHG emission standards and are not committing to alternative GHG emission standards in a separate action. As stated previously, companies are still able to continue producing HD vehicles

that meet the now non-existent HD engine and vehicle requirements if they so choose.

3. Changes to the Heavy-Duty Engine and Vehicle GHG Regulations

The EPA's HD engine and vehicle emission regulations are contained in two standard-setting parts. 40 CFR part 1036 includes the engine-based emissions regulations for both criteria pollutant and GHG emissions.[217] 40 CFR part 1037 includes the vehicle-based emission regulations for criteria pollutant exhaust emissions, evaporative and refueling emissions, and GHG emissions.

In the following preamble subsections, we describe the removal and amendment of specific portions of each of these regulatory parts. This action removes the MY 2014 and later HD GHG emission standards promulgated in HD GHG Phase 1, Phase 2, and Phase 3, collectively. As noted in section VII.C.2 of this preamble, in general we are retaining many provisions for NHTSA's fuel efficiency program under 49 CFR part 535. If NHTSA updates their regulations, then the EPA would consider a separate rulemaking to remove the remaining provisions related to the NHTSA fuel efficiency program, including the EPA's data collection responsibilities.

a. 40 CFR Part 1036—Emission Standards and Compliance Provisions for Heavy-Duty Engines

40 CFR part 1036 contains regulations related to the final action titled "Control of Emissions from New and In-Use Heavy-Duty Highway Engines." 40 CFR part 1036 continues to include emission standards and compliance provisions for criteria pollutant emissions and evaporative and refueling emissions that remain unchanged, but we are removing emission standards and compliance provisions for GHG exhaust emissions (*i.e.,* CO₂, nitrous oxide (N₂O), and methane (CH₄) for HD engines) in this final action, consistent with our proposal. 40 CFR part 1036 is divided into nine subparts with three appendices. Subpart A defines the applicability of part 1036 and gives an overview of regulatory requirements. Subpart B describes the emission standards and other requirements that must be met to certify engines under

---

[217] Note that HD engine manufacturers are subject to criteria pollutant standards in 40 CFR part 86, subpart A, through MY 2026. In a recent rulemaking (88 FR 4296, Jan. 24, 2023), the EPA migrated criteria pollutant regulations from 40 CFR part 86, subpart A, to 40 CFR part 1036 with new requirements that apply to MY 2027 and later HD engines. *See* 88 FR 4326.

this part. Subpart C describes how to apply for a certificate of conformity for HD engines. Subpart D addresses testing of production engines and hybrid powertrains. Subpart E addresses in-use testing, while Subpart F describes how to test engines to demonstrate compliance with the emission standards. Subpart G describes requirements, prohibitions, and other provisions that apply to engine manufacturers, vehicle manufacturers, owners, operators, rebuilders, and all others. Subpart H describes how manufacturers can optionally generate, bank, trade, and use emission credits to certify HD engines. Subpart I includes definitions and other reference material. Appendix A includes a summary of

previous emission standards. Appendix B includes the transient duty cycles. Appendix C includes engine fuel maps used in the certification of specific vehicles to meet the HD vehicle emission standards.

This preamble subsection includes an overview of the regulations related to the HD engine program we are removing or revising. In general, we are amending 40 CFR part 1036 to remove all GHG emission standards, references to such standards, and certain related provisions; however, most of 40 CFR part 1036 is retained as it is for the EPA's HD engine criteria pollutant emission program. As described in section VII.C.2 of this preamble, after considering comments, we are also

retaining provisions to which NHTSA specifically refers in their fuel efficiency regulations of 49 CFR part 535. In this preamble subsection we describe the amendments we are finalizing for 40 CFR part 1036, which include revising or removing GHG-related provisions and clarifying when a provision is retained specifically for NHTSA's fuel efficiency program; some amendments are also needed to retain the efficacy of the EPA's criteria pollutant emission standards. Table 11 provides a summary of the regulations we are removing or amending in 40 CFR part 1036 or have retained specifically for NHTSA's fuel efficiency program.

**BILLING CODE 6560–50–P**

*Table 11: Summary of changes to heavy-duty highway engine regulations under 40 CFR part 1036*

| 40 CFR Part 1036 | Sections removed as proposed | Amended sections | Provisions proposed to be deleted but retained for NHTSA programs[a] |
|---|---|---|---|
| Subpart A—Overview and Applicability | | 1036.1, 1036.5, 1036.15 | |
| Subpart B—Emission Standards and Related Requirements | 1036.108 | 1036.101, 1036.110, 1036.130, 1036.135, 1036.150 | 1036.115(b), 1036.130(c) |
| Subpart C—Certifying Engine Families | 1036.241 | 1036.205,1036.231[b], 1036.235, 1036.245 | 1036.225(a) and (f), 1036.230(f), 1036.235(a) |
| Subpart D— Testing Production Engines and Hybrid Powertrains | | 1036.301 | 1036.301(b)-(d) |
| Subpart E—In-Use Testing | | 1036.415 | |
| Subpart F—Test Procedures | | 1036.501, 1036.503[c], 1036.510, 1036.512, 1036.514, 1036.520, 1036.530, 1036.535, 1036.540, 1036.545, 1036.550, 1036.580 | 1036.505, 1036.510(e), 1036.512(e), 1036.535, 1036.540, 1036.543, 1036.550 |
| Subpart G—Special Compliance Provisions | 1036.625, 1036.635 | 1036.605[d], 1036.610 | 1036.610, 1036.615, 1036.620, 1036.630 |
| Subpart H— Averaging, Banking, and Trading for Certification | | 1036.701, 1036.705, 1036.710, 1036.720, 1036.725, 1036.730, 1036.735, 1036.740, 1036.750 | 1036.745, 1036.755 |
| Subpart I—Definitions and Other Reference Information | | 1036.815 | Some definitions in 1036.801 and 1036.805, 1036.810(a)(2) and (3) |
| Appendices | | | Appendix C |

[a] Many of these provisions are retained with revisions to clarify that they only apply for the NHTSA fuel efficiency program.

[b] We are moving 40 CFR 1037.231 to a new 40 CFR 1036.231, as proposed.

[c] We are adding a new 40 CFR 1036.503 to direct readers to the correct 40 CFR 1036.505. This change is intended to align with 49 CFR 535.6, which references 40 CFR 1036.503 for a description of engine data and information to support vehicle certification.

[d] We are finalizing similar revisions in 40 CFR 86.007-11(g) and 86.008-10(g) for MY 2026 and earlier engines for specialty vehicles.

BILLING CODE 6560–50–C

In 40 CFR part 1036, subpart A, we added clarification in a new 40 CFR 1036.1(e) noting that the test procedure and compliance elements that previously applied to GHG emission standards, now only apply to implement NHTSA's HD fuel efficiency standards in 49 CFR part 535. We are finalizing minor changes to 40 CFR 1036.5(a) to differentiate more clearly the certification requirements for MD vehicles from those for HD engines.

Within 40 CFR part 1036, subpart B, we are removing as proposed 40 CFR 1036.108, which included the GHG emission standards for $CO_2$, $N_2O$, and $CH_4$. We are retaining for NHTSA 40 CFR 1036.115(b) and 1036.130(c), which refer to fuel maps. As proposed, we are removing, and reserving to otherwise retain the existing section numbering,

several paragraphs from 40 CFR 1036.150 that described interim provisions that have equivalent provisions in 49 CFR part 535 or only applied for the EPA's GHG program, including: 40 CFR 1036.150(b), (e), (g)–(j), (l), (p), (w) and (aa). While we did propose to remove paragraphs (d), (m), (n), and (q)–(s), these interim provisions apply for NHTSA's program, and we are

retaining them with revisions to remove references to GHG emission standards.

We did not propose changes to the onboard diagnostic (OBD) regulations in 40 CFR part 1036, subpart B but we received comments that GHG-related requirements are embedded within California's 2022 OBD–II regulations that the EPA incorporates by reference. Commenters requested that the EPA exclude active technology, $CO_2$ parameters, and reporting $CO_2$ results during an OBD demonstration in the same manner as we previously excluded other specific California OBD requirements that did not apply for meeting the EPA regulations. Since we are removing GHG standards and related requirements in this final action, we agree that it is appropriate to also remove the requirement to monitor GHG parameters as part of OBD. For the final action, to conform with our removal of the EPA GHG standards, we are adding new paragraphs 40 CFR 1036.110(b)(14) through (18) to exclude the definition of "Active Technology" and related standardization, data storage, certification documentation, and monitoring system demonstration requirements from the EPA OBD provisions under 40 CFR 1036.101.

In 40 CFR part 1036, subpart C, we are retaining for NHTSA references to family emission limit (FEL) and family certification limit (FCL) that we proposed to remove, and are generally replacing references to $CO_2$ FCLs or standards with more generalized text to apply for NHTSA. Also, for NHTSA, we are retaining with revisions 40 CFR 1036.230(f) and (g) that we proposed to remove. The revised 40 CFR 1036.230(f) and (g) now refer to 49 CFR part 535 and remove references to GHG standards in the description of how manufacturers divide their product lines into engine families. In 40 CFR 1036.230(f)(5) and throughout 40 CFR part 1036, we remove reference to EPA approvals related to GHG emissions. Therefore, under this final action, manufacturers would only need to obtain approval from NHTSA for elements related to their fuel efficiency program. We are also finalizing several revisions in 40 CFR 1036.235 to refer to 49 CFR part 535 and remove references to GHG emission testing requirements. In 40 CFR 1036.235(a), we are migrating text from 40 CFR 1037.235(a) that provides direction on how manufacturers select the test powertrain to replace GHG-related testing requirements in 40 CFR 1036.235(a)(4). We are retaining for NHTSA 40 CFR 1036.241 that we proposed to remove but are finalizing revisions to refer to 49 CFR part 535 and removing references to GHG standards

in the description of how to demonstrate compliance.

Also in 40 CFR part 1036, subpart C, we are migrating as proposed the provisions that relate to powertrain families from the vehicle standard-setting part in 40 CFR 1037.231 to the engine standard-setting part as a new 40 CFR 1036.231 and are finalizing revisions described in this section VII.C.3.a of the preamble. In a previous rule (89 FR 29616, Apr. 22, 2024), we migrated the powertrain test procedure from the HD vehicle procedures (formerly 40 CFR 1037.550) to the HD engine procedures in 40 CFR 1036.545 because we expected powertrain testing to be primarily used by engine manufacturers. Similarly, we proposed to migrate the related provisions manufacturers would use to divide their product line into powertrain families by migrating the text from the vehicle program in 40 CFR 1037.231 to a newly created section in the engine program under 40 CFR 1036.231. We are finalizing that migration and modifying as proposed the text previously under 40 CFR 1037.231(b)(1), such that the new 40 CFR 1036.231(b)(1) no longer requires powertrains to share the same engine families described in 40 CFR 1036.230 but requires the engine share the same design aspects specified in 40 CFR 1036.230. Since a manufacturer may choose to certify the whole powertrain to the standards in 40 CFR part 1036, there would only be a powertrain family, not a certified engine family that contains just the engine. Similarly, and consistent with our approach for defining engine families in existing 40 CFR 1036.230, we see no need to limit the powertrain family based on the vehicle service class the powertrain goes into and therefore did not migrate the existing 40 CFR 1037.231(b)(2) that requires powertrain families to share vehicle service class groupings. We are also not migrating "energy capacity" as an example attribute in the new 40 CFR 1036.231(b)(10), since it is not needed for the criteria pollutant standards. Similarly, we are not migrating existing 40 CFR 1037.231(b)(11) since rated output of hybrid mechanical power technology is also not needed for a criteria pollutant family definition.

In 40 CFR part 1036, subpart D, we are retaining for NHTSA 40 CFR 1036.301 with revisions to refer to 49 CFR part 535 and remove references to $CO_2$ in the description of the requirements for selective enforcement audits.

As previously noted, we retained and did not reopen the in-use testing procedures in 40 CFR part 1036, subpart

E, which apply for the criteria pollutant emission standards. More specifically, within the in-use test procedures, we are retaining references to measuring $CO_2$ for use in required chemical balance test procedures and to calculate the criteria pollutant emissions values for in-use testing. Also, in 40 CFR 1036.415(g), we are retaining the existing text requiring manufacturers to override any adjustable idle-reduction features on vehicles used for in-use testing; we are not taking action at this time on the proposed more general statement describing what it means to be adjustable.

In 40 CFR part 1036, subpart F, we are retaining for NHTSA test procedures related to developing engine data to support NHTSA's HD vehicle fuel efficiency program. We are retaining 40 CFR 1036.505, 1036.535, 1036.540, 1036.543, and 1036.550 and the fuel map duty cycle in Appendix C to part 1036 that we proposed to remove. In 40 CFR 1036.510, we are finalizing several revisions to paragraph (b), including replacing a reference to 40 CFR 1036.540(c)(2) with a reference to a new table we are including in that section as proposed that provides the same gear ratios based on engine service class from 40 CFR 1036.540. We are retaining 40 CFR 1036.510(e) and 1036.512(e), which described how to determine $CO_2$ emissions for plug-in hybrid powertrains using the HD engine Federal Test Procedure (FTP) and engine Supplemental Emissions Test (SET) and duty cycles, respectively, to support NHTSA's HD fuel efficiency program. In 40 CFR 1036.530(e), we are retaining the existing requirement that manufacturers measure $CO_2$ emissions for in-use testing, including the variable $e_{CO2FTPFCL}$. We are not taking action at this time on the revised variable $e_{CO2FTP}$ that we proposed would represent the engine's brake-specific $CO_2$ over the FTP or SET duty cycle.

Powertrain testing, also described in 40 CFR part 1036, subpart F, is an option that manufacturers may use for certifying hybrid powertrains to the engine criteria pollutant standards in 40 CFR 1036.104 and the GHG emission standards in 40 CFR 1036.108. The powertrain test procedure in 40 CFR 1036.545 describes testing a powertrain that includes an engine coupled with a transmission, drive axle, and hybrid components, or a subset of these components. We retained and did not reopen most of 40 CFR 1036.545 related to the powertrain testing for criteria pollutants. We proposed to remove the portions related to the GHG program and revise several paragraphs to account for the removed GHG content; however,

we are retaining these provisions for NHTSA's fuel efficiency program with targeted revisions to replace references to the EPA's standards with NHTSA's standards. While we are retaining vehicle test procedures from 40 CFR part 1037, we are finalizing as proposed the revisions in 40 CFR 1036.545(d) to replace references to the 40 CFR 1037.565 vehicle test procedure with the relevant text from that procedure.

Throughout 40 CFR 1036.545, we are retaining existing requirements to create inputs for the Greenhouse gas Emission Model (GEM) tool that manufacturers use for compliance with NHTSA's fuel efficiency program. Vehicle manufacturers will continue to have access to GEM Phase 2, Version 4.0, including the hardware-in-the-loop (HIL) model within that version of GEM, that is incorporated by reference in 40 CFR 1037.810 and currently available on the EPA's website.[218] We also are retaining references to the use of utility factors, vehicle configurations, and vehicle-based duty cycles and test procedures that do not apply for the criteria pollutant program but apply to NHTSA's fuel efficiency program. We are removing as proposed 40 CFR 1036.545(p) which described the procedure to determine usable battery energy for plug-in hybrid powertrains that was added in the EPA's HD Phase 3 rule.

In 40 CFR part 1036, subpart G, we are revising 40 CFR 1036.605 to remove the EPA $N_2O$ requirements for engines installed in specialty vehicles and the ability to generate or use credits and are finalizing similar changes in 40 CFR 86.007–11(g) and 86.008–10(g) for MY 2026 and earlier specialty vehicle engines. We are retaining 40 CFR 1036.610 with a revised section heading to remove reference to GHG emissions, because NHTSA's regulations in 49 CFR part 535 refer to these off-cycle technology test procedures. We are also retaining for NHTSA 40 CFR 1036.615 and 1036.620, with revisions to 40 CFR 1036.620 to remove references to $CO_2$ standards and banked credits, and the labeling requirement of paragraph (d). We are removing as proposed 40 CFR 1036.625, which described how to adjust $CO_2$ FEL values; the NHTSA regulations contain their own provisions for manufacturers to make adjustments to their compliance values and they do not refer to 40 CFR 1036.625.

We also are removing as proposed 40 CFR 1036.635, which described how manufacturers that certify engines for use in high-gross combined vehicle weight (GCWR) MD vehicles under 40 CFR part 1036 could comply with GHG standards under 40 CFR part 86, subpart S. With no need to describe the GHG-related flexibilities in 40 CFR 1036.635, the existing applicability provisions in 40 CFR 1036.1 and 1036.5 already cover the certification provisions for high-GCWR vehicles as they relate to criteria pollutants. Specifically, 40 CFR 1036.1 sets up the default of applying the standards and certification requirements from 40 CFR part 1036 to all engines installed in HD vehicles (generally vehicles above 8,500 pounds GVWR), while 40 CFR 1036.5 allows manufacturers to certify MD vehicles to the chassis-based program as described in 40 CFR 86.1801–12.

The NHTSA regulations under 49 CFR part 535 contain their own ABT provisions for calculating and using fuel consumption credits. In 40 CFR part 1036, subpart H, we are generally removing references to the EPA's $CO_2$ standards and are amending the calculation provisions to clarify they only apply for the EPA criteria pollutant credit calculations. We are retaining the ABT reporting provisions of 40 CFR 1036.730, since the EPA will continue to collect the information as described in 40 CFR 1036.755 for NHTSA's fuel efficiency program. The allowance for manufacturers to generate credit deficits under 40 CFR 1036.745 is required for NHTSA's ABT program for its fuel consumption standards. We are retaining for NHTSA 40 CFR 1036.745 and references to that section within subpart H, but are replacing the content of 40 CFR 1036.745 with a reference to NHTSA's fuel consumption credits provisions under 49 CFR 535.7.

In 40 CFR part 1036, subpart I, we proposed to remove GHG-specific symbols, abbreviations, and acronyms from 40 CFR 1036.805, and materials from 40 CFR 1036.810 that were only incorporated by reference in the test procedures we proposed to remove. Similarly, in 40 CFR 1036.801, we proposed to remove several GHG-specific definitions, and move transmission- and other powertrain-related definitions from the HD vehicle definitions in 40 CFR 1037.801 to the engine definitions in 40 CFR 1036.801, so they can be available to engine manufacturers using the powertrain test procedures in 40 CFR 1036.545. For the final action, we are retaining the provisions in 40 CFR 1036.801, 1036.805, 1036.810, and 1036.815 to provide for the implementation of NHTSA's fuel efficiency program. We are finalizing as proposed the new transmission- and other powertrain-related definitions in 40 CFR 1036.801 since the powertrain test procedures are now in 40 CFR part 1036, but note that we are also retaining the same definitions in 40 CFR 1037.801.

We proposed to remove Appendix C to part 1036, which contains the default engine fuel maps that are used by 40 CFR 1036.540. In this final action, we are retaining Appendix C, consistent with our decision to retain 40 CFR 1036.540 and the other provisions needed by NHTSA for their fuel efficiency program.

b. 40 CFR Part 1037—Emission Standards and Compliance Provisions for Heavy-Duty Vehicles

40 CFR part 1037 contains regulations related to the final action titled "Control of Emissions from New Heavy-Duty Motor Vehicles." 40 CFR part 1037 continues to include criteria pollutant emission standards that apply for all HD vehicles, and evaporative and refueling emission standards that apply for certain HD vehicles, but we are removing GHG emission standards, consistent with the proposal. 40 CFR part 1037 is divided into nine subparts with five appendices. Subpart A defines the applicability of part 1037 and gives an overview of regulatory requirements. Subpart B describes the emission standards and other requirements that must be met to certify vehicles under this part. Subpart C describes how to apply for a certificate of conformity. Subpart D and E address testing of production and in-use vehicles, respectively. Subpart F describes how to test vehicles and perform emission modeling for vehicles subject to the $CO_2$ emission standards. Subpart G, along with 40 CFR part 1068, describe requirements, prohibitions, and other provisions that apply to manufacturers, owners, operators, rebuilders, and all others. Subpart H describes how manufacturers can optionally generate and use emission credits to certify vehicles. Subpart I includes definitions and other reference material. Finally, Appendix A, B, and D include test cycles, Appendix C presents emission control identifiers for emissions labels, and Appendix E presents power take-off utility factors.

This preamble subsection includes an overview of the regulations related to the HD vehicle program we are removing or revising. In general, we are amending 40 CFR part 1037 to remove all GHG emission standards (i.e., $CO_2$ and HFC standards for vehicles), references to such standards, and certain related provisions without revising provisions necessary to support criteria pollutant standards, including

---

[218] GEM Phase 2, Version 4.0 is incorporated by reference in 40 CFR 1036.545. See also 40 CFR 1036.810.

evaporative and refueling emission standards. As described in section VII.C.2 of this preamble, after considering comments, we are retaining provisions to which NHTSA specifically refers in their fuel efficiency regulations of 49 CFR part 535. In this preamble subsection, we describe the amendments to revise the GHG-related provisions from 40 CFR part 1037, which include some amendments needed to retain the efficacy of the criteria pollutant emission standards or clarify when a provision is retained specifically for NHTSA's fuel efficiency program. Table 12 provides a summary of the regulations we are removing or amending in 40 CFR part 1037 or have retained specifically for NHTSA's fuel efficiency program.

BILLING CODE 6560–50–P

*Table 12: Summary of changes to heavy-duty highway vehicle regulations under 40 CFR part 1037*

| 40 CFR Part 1037 | Sections removed as proposed | Amended sections | Provisions proposed to be deleted but retained for NHTSA programs[a] |
|---|---|---|---|
| Subpart A—Overview and Applicability | | 1037.1, 1037.5, 1037.15 | |
| Subpart B—Emission Standards and Related Requirements | 1037.105, 1037.106 | 1037.101, 1037.102, 1037.115, 1037.120, 1037.125, 1037.135 | 1037.140, 1037.150 |
| Subpart C—Certifying Vehicle Families | | 1037.201, 1037.205 | 1037.225, 1037.230, 1037.231[b], 1037.232, 1037.235, 1037.241, 1037.250 |
| Subpart D— Testing Production Vehicles and Engines | | | 1037.301, 1037.305, 1037.315, 1037.320 |
| Subpart E—In-Use Testing | | | 1037.401 |
| Subpart F—Test and Modeling Procedures | | | 1037.501, 1037.510, 1037.520, 1037.525, 1037.527, 1037.528, 1037.530, 1037.532, 1037.534, 1037.540, 1037.551, 1037.555, 1037.560, 1037.565, 1037.570 |
| Subpart G—Special Compliance Provisions | 1037.645, 1037.665, 1037.670 | 1037.635, 1037.655 | 1037.601, 1037.605, 1037.610, 1037.615, 1037.620, 1037.621, 1037.622, 1037.630, 1037.631, 1037.640, 1037.660, |
| Subpart H—Averaging, Banking, and Trading for Certification | 1037.705, 1037.710, 1037.715, 1037.720, 1037.750 | 1037.701 | 1037.725, 1037.730, 1037.735, 1037.740, 1037.745, 1037.755 |
| Subpart I—Definitions and Other Reference Information | | | 1037.801, 1037.805, 1037.810, 1037.825 |
| Appendices | | | Appendices A, B, C, D, E |

[a] Many of these provisions are retained with revisions to clarify that they only apply for the NHTSA fuel efficiency program.

[b] We are moving 40 CFR 1037.231 to a new 40 CFR 1036.231 as proposed.

BILLING CODE 6560–50–C

In 40 CFR part 1037, subpart A, we retained and did not reopen the existing applicability of 40 CFR part 1037. Specifically, as described in existing 40 CFR 1037.1, the part continues to apply for BEVs, fuel cell electric vehicles (FCEVs), and vehicles fueled by conventional and alternative fuels. We added clarification in a new 40 CFR 1037.1(c) noting that the test procedure and compliance elements that previously applied to GHG emission standards, now only apply to implement NHTSA's HD fuel efficiency program in 49 CFR part 535. We note that the revised 40 CFR part 1037 continues to contain provisions that apply to HD vehicles under NHTSA's fuel efficiency program; however, it applies for fewer vehicles under the EPA's criteria pollutant program. Without EPA GHG standards, there are no vehicle-level emission standards for vehicles (including glider vehicles) with engines certified to other parts. Under this final action, the only HD vehicles that would continue to require a vehicle-level certificate of conformity from the EPA are those with no installed propulsion engine, such as BEVs and FCEVs, certifying to the criteria pollutant standards of 40 CFR 1037.102. Tailpipe emissions of criteria pollutants from BEVs and FCEVs would continue to be deemed to be zero with no testing

requirements, but the EPA will require that BEV and FCEV manufacturers apply for a certificate of conformity to meet the requirements of CAA section 202(a).

In 40 CFR part 1037, subpart B, we are removing the MY 2014 and later HD vehicle $CO_2$ emission standards promulgated in HD GHG Phase 1, Phase 2, and Phase 3, which included the vocational vehicle standards in 40 CFR 1037.105 and the tractor standards in 40 CFR 1037.106. While we are removing GHG standards and related requirements, we retained and did not reopen criteria pollutant exhaust emission standards in 40 CFR 1037.102 and the evaporative and refueling emission standards in 40 CFR 1037.103.

We proposed to revise 40 CFR 1037.102(a) to describe how vehicles can be deemed to meet the criteria pollutant exhaust emission standards without testing under 40 CFR part 1037. Commenters raised concerns with the proposed approach to adopt new vehicle family definitions citing an associated need for new labeling, tracking systems, and reporting systems that would require additional time to implement. The commenters requested to keep today's vehicle family definitions, as they are required by NHTSA. After considering these comments, we note that the EPA did not intend for the new vehicle family definitions to increase burden on certifying manufacturers. Since vehicles with a propulsion engine are already covered under EPA engine certificates for criteria pollutants, we do not need to require a separate vehicle certificate for criteria pollutants. Therefore, we are retaining the current language in 40 CFR 1037.102(a) and (b) such that only vehicles without a propulsion engine will continue to be subject to the criteria pollutant standards in 40 CFR part 1037.

In the HD GHG Phase 2 rulemaking, we adopted PM emission standards that apply for APUs installed on new tractors. Since PM emissions are criteria pollutant emissions, we retained and did not reopen the PM emission standards for APUs but proposed to migrate the standards from 40 CFR 1037.106(g) to a new 40 CFR 1037.102(c) because we proposed to remove 40 CFR 1037.106. We are finalizing our proposed migration from 40 CFR 1037.106 and are modifying as proposed 40 CFR 1039.699(a) and (n) to refer to the new 40 CFR 1037.102 instead of 40 CFR 1037.106.

Also in 40 CFR part 1037, subpart B, we are amending 40 CFR 1037.115 to remove the HFC emission (*i.e.,* air conditioning leakage) standards and the battery durability monitor requirements.

We are revising as proposed the list of components covered under 40 CFR 1037.120(c). Under this final action, we are removing many HD vehicle GHG-reducing technologies but emission-related warranty would continue to apply for fuel cell stacks, RESS, and other components used with BEVs or FCEVs certified to the EPA's criteria pollutant standards or evaporative and refueling emission controls on vehicles subject to the EPA's evaporative and refueling standards. We are finalizing as proposed the removal of warranty requirements from 40 CFR part 1037 for RESS and other components used in *hybrid* vehicles. We note that manufacturers certifying hybrids to the EPA's criteria pollutant program would be doing so under the engine standards of part 1036 and would warrant the RESS and other components from those systems under 40 CFR part 1036. We did not reopen or propose to remove the warranty requirements for hybrid system components in 40 CFR part 1036.

We acknowledge commenters' suggestion that warranty should not apply for vehicles with no propulsion engine and no tailpipe emissions; however, these components are covered under the EPA's criteria pollutant program and the related warranty comments are out of scope for this action. We did not reopen the requirement that the basic emission-related warranty applies for fuel cell stacks and RESS as they continue to qualify as an emission-related component related to criteria pollutant emission standards. Therefore, we are retaining these provisions for the final action. Similarly, we retained and did not reopen the emission control components covering a vehicle's evaporative and refueling emissions.

Under this final action, we are finalizing a revision to replace the content of existing maintenance provisions of 40 CFR 1037.125 with a single sentence requiring manufacturers to provide written instructions for properly maintaining the emission control system.[219] In the labeling provisions of 40 CFR 1037.135(c) we are removing as proposed paragraphs (c)(6) and (7) that relate to identifying the EPA-specific emission control system and fuel sulfur levels on the label, respectively. We proposed to remove 40 CFR 1037.140 and 1037.150, which included the vehicle classifications and interim provisions related directly to

NHTSA's HD vehicle fuel efficiency program. In this final action, we are retaining 40 CFR 1037.140 with revisions to remove reference to the EPA's standards and we are retaining the NHTSA-referenced paragraphs of 40 CFR 1037.150 to assist in the continued implementation of NHTSA's program.

In 40 CFR part 1037, subpart C, we proposed to remove 40 CFR 1037.201(g) that describes confirmatory testing; however, in this final action, we are retaining paragraph (g) for NHTSA's fuel efficiency program. We proposed to remove several provisions in 40 CFR 1037.205, which defines what manufacturers would include in their application for certification, because they would no longer be needed for GHG certification. However, in this final action we are instead revising 40 CFR 1037.205 to reflect the information that is required for NHTSA's fuel efficiency program.

We are retaining for NHTSA the existing 40 CFR 1037.225 and 1037.230 with minor revisions to remove reference to GHG and $CO_2$ standards. After considering comments, we are not finalizing the streamlined vehicle families we proposed for 40 CFR 1037.230 to avoid additional burden for manufacturers certifying to NHTSA's fuel consumption standards using the original vehicle families. We are finalizing as proposed the migration of the powertrain families provision from 40 CFR 1037.231 to the HD engine regulations under a new 40 CFR 1036.231. We are retaining 40 CFR 1037.231 but replacing the content of that section with a reference to the new location of the provision in 40 CFR 1036.231. We proposed to remove 40 CFR 1037.232 and 1037.241 and revise 40 CFR 1037.235 and 1037.250, but are retaining them for NHTSA in this final action, with targeted revisions to remove references to GHG and $CO_2$ standards.

We proposed to remove 40 CFR part 1037, subparts D and E in their entirety because they describe the testing of production and in-use vehicles to demonstrate compliance with the EPA's HD $CO_2$ emission standards. However, we are retaining these provisions in this final action for NHTSA's fuel efficiency program. While the EPA would not be administering any production or in-use testing for GHG emissions, NHTSA references 40 CFR 1037.301 through 1037.320 which include audit procedures for inputs to the GEM, tractor aerodynamic testing, powertrain testing, and axle and transmission testing, and also references 40 CFR 1037.401 for in-use testing provisions.

---

[219] We are not aware of any scheduled maintenance for evaporative and refueling emission control components, or BEV or FCEV components, but if there was then the maintenance provisions of 40 CFR 1037.125 would apply.

We proposed to remove 40 CFR part 1037, subpart F, in its entirety because it included the testing and modeling provisions necessary to certify HD vehicles to the $CO_2$ emission standards. The provisions in 40 CFR 1037.501 through 1037.570 include procedures for vehicle-based duty cycles for measuring $CO_2$ emissions, aerodynamic testing, powertrain component testing, testing with hybrid power take-off units, and the use of GEM. We are retaining all of 40 CFR part 1037, subpart F because these test procedures are referred to by NHTSA in 49 CFR part 535. We are retaining the existing text for most sections of 40 CFR part 1037, subpart F, but we are finalizing some targeted revisions to 40 CFR 1037.501, 1037.520, 1037.540, 1037.551, and 1037.555 to replace references to $CO_2$ standards with references to NHTSA's fuel consumptions standards. In 40 CFR 1037.560, 1037.565, and 1037.570, we are removing references to "critical emission-related maintenance" which only applies for the EPA. Since the NHTSA regulations currently refer to 40 CFR 1037.550, which the EPA removed in a previous rule when the powertrain test procedure was migrated to 40 CFR 1036.545 (89 FR 29616 April 22, 2024), we are restoring 40 CFR 1037.550 for NHTSA with a single sentence that directs readers to the correct 40 CFR 1036.545 for the powertrain test procedure.

We proposed to remove several sections of 40 CFR part 1037, subpart G, relating to special compliance provisions for the HD vehicle GHG emission standards. However, we are retaining all of the provisions required for the implementation of NHTSA's fuel efficiency program in 49 CFR part 535. These sections include provisions related to off-cycle technologies, advanced technologies, special purpose tractors, variable vehicle speed limiters, and idle reduction technologies. We are removing as proposed 1037.645, 1037.665, and 1037.670, which are not referenced by NHTSA.

We received a comment on 40 CFR 1037.605, in 40 CFR part 1037, subpart G, which allows manufacturers to use nonroad-certified engines in certain specialty highway vehicles. While we proposed to remove the vehicle labeling requirements in 40 CFR 1037.605(d), we did not propose any changes to paragraphs (a) through (c), which specify how the provisions apply for vehicle manufacturers using this allowance. The existing provisions apply for up to 200 all-terrain vehicles with specific axles, amphibious vehicles, and low speed vehicles. Through MY 2027, the provisions also

apply for up to 1,000 vehicles with a hybrid powertrain where the engine provides energy only for the RESS. The commenter suggested that the EPA extend the hybrid provision beyond MY 2027 to allow the manufacturer to make a small number of hybrid fire trucks per year. The commenter cited compliance challenges associated with obtaining a highway-certified hybrid and that the existing hybrid sunset date was based on an expected increasing prevalence of HD hybrid powertrains, which is not occurring. As noted, we did not propose changes to the general provisions of 40 CFR 1037.605, and, therefore, this request is outside of the scope of this action. We may consider changes to this provision in a future rulemaking.

We proposed to remove 40 CFR part 1037, subpart H in its entirety. The provisions of 40 CFR 1037.701 through 1037.750 describe the averaging, banking, and trading of $CO_2$ emission credits, along with associated recordkeeping and reporting requirements. We are retaining the regulatory provisions that are required by NHTSA for implementation of the fuel efficiency program. These include 40 CFR 1037.725, 1037.730, 1037.735, 1037.740, 1037.745, and 1037.755. We are removing as proposed 40 CFR 1037.705, 1037.710, 1037.715, 1037.720, and 1037.750. Throughout subpart H, we replace references to $CO_2$ standards with references to NHTSA's fuel consumption standards, replace the term "emission credits" with a more generic "credits" term. Since the NHTSA regulations refer to 40 CFR 1037.745, we are retaining that section but are replacing the content with a sentence that points the reader to the equivalent credit deficit provision for NHTSA's fuel consumption credits under 49 CFR 535.7.

We proposed several revisions in 40 CFR part 1037, subpart I, to remove the GHG-specific definitions from 40 CFR 1037.801, and symbols, abbreviations, and acronyms from 40 CFR 1037.805. We also proposed to remove 40 CFR 1037.810, which includes materials incorporated by reference to support testing to demonstrate compliance with the HD vehicle GHG standards. This includes, but is not limited to, the GEM model and test procedures for measuring the rolling resistance of tires, tire revolutions per mile, and aerodynamics using coastdown, wind tunnel, and computational fluid dynamics. We are, however, retaining nearly all of subpart I in 40 CFR part 1037 because they are required to support NHTSA's 49 CFR part 535 regulations. We are removing the definition of "Phase 3" and revising the

definitions of "Phase 1" and "Phase 2" to replace references to EPA standards with NHTSA's fuel consumption standards. As noted in section VII.C.2 of this preamble, we are also revising the definition of "we (us, our)" to include NHTSA for any regulations we are retaining related to fuel consumption standards. In Table 1 to paragraph (a) of 40 CFR 1037.805, we are removing the chemical species methane and nitrous oxide, which are GHG emissions used only by EPA regulations. In 40 CFR 1037.810, we are updating as needed references to regulatory sections or paragraphs that have been removed or changed in this final action.

Lastly, we proposed to remove all appendices to 40 CFR part 1037. Appendices A, B, and D include the test cycles related to HD vehicle GHG standards. Appendix C includes the emission control identifiers for GHG emission labels. Appendix E includes the power take-off unit utility factors applied in GHG-specific test procedures. We are retaining all of the existing appendices in 40 CFR part 1037 because they are required to support NHTSA's 49 CFR part 535 regulations.

c. Relationship Between the EPA's GHG and NHTSA's Fuel Efficiency Medium- and Heavy-Duty Programs

The current certification and compliance process as relevant for NHTSA is as follows, separately for HD engines and HD vehicles:

1. Manufacturers submit fuel consumption data to the EPA using the EPA's electronic certification system following EPA test procedures included in 40 CFR parts 1036 and 1037;

2. The EPA issues certificates of conformity to the manufacturers;

3. Before and during the MY, the EPA sends the fuel consumption data and associated information to NHTSA;

4. After the MY, the EPA analyzes end-of-year reports submitted to the EPA by manufacturers for compliance and shares the fuel consumption data with NHTSA; and

5. NHTSA manages its compliance process related to the fuel consumption standards.

We proposed to remove 40 CFR 1036.755 and 1037.755, which describe the information the EPA provides to the Department of Transportation related to HD engine and vehicle fuel consumption. We noted that NHTSA's reporting and recordkeeping regulation in 49 CFR 535.8(a)(6) directs manufacturers to submit information to the EPA. 49 CFR 535.8(a)(6) also provides direction to manufacturers in instances where the EPA does not have an electronic pathway to receive the

information, to send it through an electronic portal identified by NHTSA, through the NHTSA CAFE database, or to send hardcopy documents to the address provided in the regulations. We requested comment on the time required to transition from manufacturers supplying data to the EPA to supplying the data directly to NHTSA.

Manufacturers and other commenters suggested that the EPA retain some or all of its GHG regulations until NHTSA is able to revise 49 CFR part 535 to independently implement their fuel efficiency program. After considering comments, we are removing as proposed the EPA GHG *standards* in 40 CFR 1036.108, 1037.105, and 1037.106 and other provisions in 40 CFR parts 1036 and 1037 that only apply for the EPA. However, to ensure NHTSA's fuel efficiency program remains implementable in the near-term, we are retaining the EPA regulations in 40 CFR parts 1036 and 1037 that NHTSA references, including the provisions where manufacturers submit data to the EPA.

Therefore, much of the current certification and compliance process outlined above will remain the same. At this time, the EPA intends to continue to maintain its Engines and Vehicles Compliance Information System (EV–CIS) and manufacturers will continue to have an EPA Designated Compliance Officer for submitting information regarding NHTSA's fuel efficiency program. However, we note that the EPA would not grant approvals related to special compliance provisions, issue EPA certificates of conformity for GHG emissions, or analyze end of year reports for compliance with the GHG emission standards. Furthermore, the EPA will perform confirmatory testing, in-use testing, or selective enforcement audits only in relation to the EPA criteria pollutant program. We note that vehicle manufacturers will continue to have access to the GEM Phase 2, Version 4.0 that is incorporated by reference in 40 CFR 1037.810 and currently available on the EPA's website. If NHTSA updates their regulations and is prepared to accept the manufacturers' data and information directly, then the EPA would consider a separate rulemaking to remove the remaining provisions related to the NHTSA fuel efficiency program, including the EPA's data collection responsibilities.

## VIII. Statutory and Executive Order Reviews

Additional information about these statutes and Executive Orders can be found at *http://www.epa.gov/laws-regulations/laws-and-executive-orders.*

### A. Executive Order 12866: Regulatory Planning and Review and Executive Order 14094: Modernizing Regulatory Review

This is an economically significant regulatory action that was submitted to OMB for review. Any changes made have been documented in the docket. The EPA has prepared an RIA for this action to project impacts as required by E.O. 12866, and it can be found in the docket.[220]

As we stated in the proposal, the EPA has not relied upon any aspect of the draft RIA or this final RIA as justification for this rulemaking. Some commenters suggested that the benefit-cost assessments provided in the draft RIA do not justify repealing the prior standards. However, the EPA is repealing the GHG emission standards for LD vehicles, MD vehicles, HD vehicles, and HD engines consistent with the discussion of legal authority in this preamble, and the EPA is not relying upon the CAA section 202(a) factors for standard-setting in this final action. For this final action, we have conducted benefit-cost assessments pursuant to E.O. 12866, but we recognize that there are costs and benefits that we are currently unable to fully quantify and monetize.

Commenters also stated that the EPA should have included an assessment of air quality and climate impacts from removing the motor vehicle and engine GHG standards. For this final action, the EPA performed modeling to estimate changes in criteria pollutants, air toxics, and GHG emissions. The projected emissions changes can be found in a memorandum in the docket for this action.[221] The EPA also performed climate impacts modeling for this final action, which is documented in a memorandum in the docket for this action.[222]

The analyses provided in the RIA have been revised since the rule was proposed to reflect a number of considerations, including some elements highlighted by commenters. The analyses rely on updated versions of the models used to analyze the impacts of the proposal, which were based on the models and tools used to estimate impacts of the light- and medium-duty, and the heavy-duty rules finalized by the EPA in 2024.[223] A number of the updates made to the analysis, including in response to comments, are discussed below. For more information on updates to the analyses, see the RIA. For more information on the comments we received on the analysis in the proposal, as well as our responses, see the Response to Comments document. In addition to the changes noted in the following paragraphs, we updated the costs and benefits from 2022 dollars to 2024 dollars.

We received comments that the approach used in the EPA's OMEGA modeling of GHG standards for the proposed rule did not appropriately capture removing all GHG standards for LD and MD vehicles. Commenters stated that instead of extending the MY 2026 GHG standards into MYs 2027 and beyond, a more appropriate modeling approach would be to model no GHG standards at all, and to allow the OMEGA model to apply less emissions control technology to vehicles in each MY than in the prior MY (backsliding). For the analysis of this final action, we revised the OMEGA modeling assumptions to simulate the removal of all GHG standards for LD and MD vehicles, and revised the OMEGA model's run settings to allow backsliding.

Some commenters raised concerns that the 2024 GHG Emission Standards Rules relied on IRA tax credits and noted that Congress subsequently eliminated or modified these tax credits in the OBBB. We agree that our modeling should reflect the actions signed into law in the OBBB. For the proposal, our modeling assumed all pertinent tax credits were removed. For this final analysis, we revised our analyses to align with the OBBB by removing the credits for purchasing (26 U.S.C. 30D) and leasing (26 U.S.C. 45W) LD and MD BEVs; removing the vehicle purchase tax credits (26 U.S.C. 45W) for HD BEVs and HD FCEVs; removing the tax credit for electric vehicle supply equipment (EVSE) installation (26 U.S.C. 30C) for HD BEVs; and adjusting the phase-out of the advanced manufacturing production credit (26 U.S.C. 45X).

[220] "Rescission of the Greenhouse Gas Endangerment Finding and Motor Vehicle Greenhouse Gas Emission Standards Under the Clean Air Act: Regulatory Impact Analysis." EPA–420–R–26–002. February 2026.

[221] See Memorandum to Docket EPA–HQ–OAR–2025–0194. "Projected Criteria, Air Toxics, and GHG Emissions Impacts for the "Rescission of the Greenhouse Gas Endangerment Finding and Motor Vehicle Greenhouse Gas Emission Standards Under the Clean Air Act" Final Rule."

[222] See Memorandum to Docket EPA–HQ–OAR–2025–0194. "Temperature, $CO_2$ Concentration, and Sea Level Rise Impacts of Greenhouse Gas Emissions from U.S. Motor Vehicles."

[223] See "Multi-Pollutant Emissions Standards for Model Years 2027 and Later Light-Duty and Medium-Duty Vehicles: Regulatory Impact Analysis", EPA–420–R–24–004, March 2024; and "Greenhouse Gas Emissions Standards for Heavy-Duty Vehicles: Phase 3: Regulatory Impact Analysis, EPA–420–R–24–06, March 2024.

We received comments suggesting that the Agency's baseline assumptions for future HD EV market penetration were inflated due to California's Advanced Clean Truck (ACT) regulation. Congress disapproved the EPA's waiver for the ACT rule under the CRA. We agree with the commenters that our modeling should reflect Congress' decision regarding the EPA waiver for the ACT regulation and therefore we have completely removed California's ACT regulation from the modeling for the final action analysis.

We received conflicting comments related to consumer interest in EVs. Some stated that EV market share is and will be lower in the future than the EPA estimated in the 2024 GHG Emission Standards Rules and in the proposal. The main reasons cited by commenters were the passage of the OBBB and subsequent removal of IRA purchase and leasing tax credits leading to higher cost for consumers, the CRA resolution nullifying California's CAA preemption waiver for the Advanced Clean Cars (ACC) II regulation leading to decreased demand, and slower charging infrastructure development than estimated in the 2024 GHG Emission Standards Rules. On the other hand, some commenters stated that consumer demand for EVs is strong and growing, that states continue to provide incentives for EV purchases, and that there are continued strong investments in EV charging networks. After consideration of the comments, our assessment is that there is a reduced consumer interest in purchasing EVs overall. Therefore, we lowered the BEV acceptance parameter values in our modeling of this final action from those presented in the proposal.

Some commenters criticized the EPA's analysis in the DRIA for including a scenario that they characterized as using arbitrarily low fuel prices, citing the scenario with gasoline prices set at $1 and $0.25 per gallon less than the Energy Information Administration's (EIA) Annual Energy Outlook (AEO) 2023 Reference case for gasoline and diesel, respectively. Commenters stated that EIA's AEO 2025 projections included an Alternative Transportation case that reflects many of the changes that are occurring in the transportation sector, including the removal of California's ACT, the EPA's 2024 GHG Emission Standards Rules, and NHTSA's 2024 final rule for CAFE standards for MYs 2027–2032, as well as assuming a slower growth for IRA credit eligibility than assumed in the AEO 2025 Reference case. We agree that the Alternative Transportation case energy prices are appropriate to use in our modeling for the case where the standards are removed, and we included it in our modeling for the final action. We also have revised the low gasoline and diesel price scenario; instead of using a $1 or $0.25 per gallon across-the-board decrease, we use prices from the Low Oil Price case presented in AEO 2025. In summary, the modeling we conducted for the final action includes future gasoline, diesel, electricity, and hydrogen prices that reflect EIA's AEO 2025 projections of the Reference, Alternative Transportation, and Low Oil Price cases.

In the RIA, the EPA presents results from four scenarios using the same analytical methods the EPA used in the 2024 GHG Emission Standards Rules that project the costs and benefits from removing the GHG standards for LD, MD and HD vehicles and HD engines. The results of these scenarios are summarized in Table 13 and Table 14. Except as noted this section VIII.A, and as discussed in the RIA, the models, assumptions and inputs are the same as those used in the 2024 RIAs.

The first scenario (A1) includes the revisions noted above, including the use of AEO 2025 Reference case fuel prices for the modeling of the no action case where the GHG standards remain in place, and the AEO 2025 Alternative Transportation fuel prices for modeling the action case where the GHG standards are removed. Recognizing the uncertainties related to projecting future gasoline and diesel prices, the second scenario (A2) considers the impacts under lower fuel prices, and uses AEO 2025's Low Oil Price case.

In the NPRM, the EPA presented two scenarios accounting for only the first two and a half years of fuel savings in estimating the net monetized impact of removing the GHG emission standards. Commenters suggested the Agency's adjustment was arbitrary and unsupported. Some commenters stated that the savings that accrue after the first two and a half years are a real-world benefit to consumers and society and therefore should be included in the benefit-cost assessment. Other commenters stated that the EPA should account for more than the first two and a half years of fuel savings but should not account for the full lifetime of fuel savings. The Agency also received comments that the approach of only including the first two and a half years of fuel savings was specifically not appropriate to apply to HD vehicles because they are for-profit businesses that account for fuel and maintenance savings when making purchasing decisions. For the final action, we continue to present results representing both a full lifetime of fuel savings (scenarios A1 and A2) and only the first two and a half years of fuel savings. The third (A3) and fourth (A4) scenarios build on the first and second scenarios respectively, accounting for only the first two and a half years of fuel savings in estimating the net monetized impacts of this action. The EPA believes the presented results provide reasonable bounds for the impact of fuel savings on the net monetized impacts of this action. Table 13 and Table 14 show the net present value of the monetized savings, costs, and net savings of the four scenarios presented at 7 and 3 percent discount rates, respectively.

*Table 13: Monetized Savings, Costs, and Net Savings at 7 Percent Net Present Value (billions of 2024 dollars)\**

| | **Scenario A1** AEO 2025 Reference & Alternative Transportation case energy prices | **Scenario A2** AEO 2025 Low Oil Price case energy prices | **Scenario A3** AEO 2025 Reference & Alternative Transportation case energy prices, 2.5-year fuel cost valuation | **Scenario A4** AEO 2025 Low Oil Price case energy prices, 2.5-year fuel cost valuation |
|---|---|---|---|---|
| **Savings** | $850 | $870 | $850 | $870 |
| **Costs** | $760 | $550 | $240 | $200 |
| **Net Savings** | $89 | $320 | $600 | $680 |

\*Results may not sum due to rounding.

*Table 14: Monetized Savings, Costs and Net Savings at 3 Percent Net Present Value (billions of 2024 dollars)\**

| | **Scenario A1** AEO 2025 Reference & Alternative Transportation case energy prices | **Scenario A2** AEO 2025 Low Oil Price case energy prices | **Scenario A3** AEO 2025 Reference & Alternative Transportation case energy prices, 2.5-year fuel cost valuation | **Scenario A4** AEO 2025 Low Oil Price case energy prices, 2.5-year fuel cost valuation |
|---|---|---|---|---|
| **Savings** | $1,290 | $1,340 | $1,290 | $1,340 |
| **Costs** | $1,470 | $1,090 | $500 | $420 |
| **Net Savings** | ($180) | $250 | $790 | $920 |

\*Results may not sum due to rounding.

In Tables 15 and 16 we provide the estimated cost savings per vehicle at a seven percent net present value and a three percent net present value. As shown in the tables, the EPA's modeling projects this rule to result in about 469 million new combined LD, MD, and HD vehicle sales over the 2027 to 2055 time period under Scenarios A1 and A3, and about 472 million new combined LD, MD, and HD vehicle sales under Scenarios A2 and A4. With the estimated $730 billion reduction in vehicle technology cost at a seven percent discount rate, we estimate this action will result in an average cost reduction of $1,550 per vehicle under Scenarios A1 and A3. Under Scenarios A2 and A4 at a seven percent discount rate, the reduction in vehicle technology cost of about $750 billion are estimated to result in an average cost reduction of $1,600 per vehicle. With the estimated $1.09 trillion reduction in vehicle technology cost at a three percent discount rate for Scenarios A1 and A3, we estimate this action will result in an average cost reduction of $2,330 per vehicle. Under Scenarios A2 and A4 at a seven percent discount rate, the reduction in vehicle technology cost of about $1.14 trillion at a three percent discount rate are estimated to result in an average cost reduction of $2,420 per vehicle.

*Table 15: Monetized Savings per vehicle at 7 Percent Net Present Value (2024 dollars)\**

| | **Scenario A1** AEO 2025 Reference & Alternative Transportation case energy prices | **Scenario A2** AEO 2025 Low Oil Price case energy prices | **Scenario A3** AEO 2025 Reference & Alternative Transportation case energy prices, 2.5-year fuel cost valuation | **Scenario A4** AEO 2025 Low Oil Price case energy prices, 2.5-year fuel cost valuation |
|---|---|---|---|---|
| **Vehicle Technology Cost** | $730 billion | $750 billion | $730 billion | $750 billion |
| **Total New Vehicles from 2027 – 2055** | 469 million | 472 million | 469 million | 472 million |
| **Total Savings per Vehicle** | $1,550 | $1,600 | $1,550 | $1,600 |

*Results may not sum due to rounding.

*Table 16:Monetized Savings per vehicle at 3 Percent Net Present Value (2024 dollars)\**

| | **Scenario A1** AEO 2025 Reference & Alternative Transportation case energy prices | **Scenario A2** AEO 2025 Low Oil Price case energy prices | **Scenario A3** AEO 2025 Reference & Alternative Transportation case energy prices, 2.5-year fuel cost valuation | **Scenario A4** AEO 2025 Low Oil Price case energy prices, 2.5-year fuel cost valuation |
|---|---|---|---|---|
| **Vehicle Technology Cost** | $1,090 billion | $1,140 billion | $1,090 billion | $1,140 billion |
| **Total New Vehicles from 2027 – 2055** | 469 million | 472 million | 469 million | 472 million |
| **Total Savings per Vehicle** | $2,330 | $2,420 | $2,330 | $2,420 |

*Results may not sum due to rounding.

Table 17 provides the GHG emission impacts in calendar year (CY) 2055 by emission source due to this action. For motor vehicles, total GHG emissions increase by 410 million metric tons (MMT) in carbon dioxide equivalent ($CO_2e$). Table 18 provides the cumulative GHG emissions impact from CY 2027 through CY 2055. The total GHG emissions are estimated to increase by 8,300 MMT $CO_2e$.

*Table 17: Impact on emissions by source in CY 2055*

| Pollutant | Vehicles | Electric Generating Units | Refineries | Total |
|---|---|---|---|---|
| Total GHG ($CO_2e$, MMT) | 440 | -39 | 15 | 410 |

* Values show two significant digits; positive values reflect an increase in emissions while negative values reflect decreases.

*Table 18: Impact on net GHG emissions by type of emission*

|  | Methane (CH$_4$) | Nitrous Oxide (N$_2$O) | Carbon Dioxide (CO$_2$) | Total GHG (CO$_2$e) |
|---|---|---|---|---|
| Total (in MMT) | 0.90 | 0.38 | 8,200 | 8,300 |

\* Values show two significant digits; positive values reflect an increase in emissions while negative values reflect decreases.

The EPA discussed air pollutants not being directly impacted by this rule (*i.e.,* criteria pollutants and hazardous air pollutants) within other documents within the docket. The EPA is obligated to ensure the public is not misled regarding the level of scientific understanding and the implications of that science when developing policies and regulations. Historically, however, the EPA's analytical practices often provided the public with false precision and confidence regarding the monetized impacts of fine particulate matter (PM$_{2.5}$) and ozone than the underlying science could fully support, especially as overall emissions have significantly decreased and impacts have become more uncertain. The EPA's use of benefit per ton (BPT) monetized values introduces additional uncertainty. Although intended as a screening tool when full-form photochemical modeling was not feasible, the BPT approach reduces complex spatial and atmospheric relationships into an average value per ton, which magnifies uncertainty in the resulting monetized estimates. Examples of uncertainties include but are not limited to epidemiological uncertainty (*e.g.,* concentration-response functions); economic factors (*e.g.,* discount rates, income growth, willingness-to-pay to avoid mortality risk); and methodological assumptions (*e.g.,* health thresholds, linear relationships, spatial relationships).

Despite these uncertainties, the EPA historically provided point estimates instead of just ranges or only quantifying emissions, which leads the public to believe the Agency has a better understanding of the monetized impacts of exposure to PM$_{2.5}$ and ozone than it does in reality. Therefore, to rectify this error, the EPA is no longer monetizing benefits from PM$_{2.5}$ and ozone but will continue to quantify the emissions until the Agency is confident enough in the modeling to properly monetize those impacts.

*B. Executive Order 14192: Unleashing Prosperity Through Deregulation*

This action is an E.O. 14192 deregulatory action. For E.O. 14192 regulatory accounting, the estimated present value and annualized value of the cost savings of this action are $769 billion and $54 billion, respectively (7 percent discount rate, 2024 dollars, 2024 present value year, perpetuity time horizon).[224] OMB's guidance on implementing E.O. 14192 (M–25–20) requires that estimates of costs or cost savings cover the full duration of the expected effects of the action. In some cases, that may require projecting costs or cost savings beyond the standard analytic time horizon. For this action, the EPA extrapolates the stream of cost savings based on the final year of the modeling as a proxy for the long-run effects of this action on the vehicle fleet. A summary of the projected cost savings can be found in the RIA.

*C. Paperwork Reduction Act (PRA)*

The information collection activities in this action have been submitted for approval OMB under the PRA. The Information Collection Requests (ICR) that the EPA prepared have been assigned numbers as indicated below. You can find a copy of the Supporting Statements in the docket for this action, and they are briefly summarized here.

An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a currently valid OMB control number. The OMB control numbers for the EPA's regulations in Title 40 of the CFR are listed in 40 CFR part 9. When OMB approves this ICR, the Agency will announce that approval in the **Federal Register** and publish a technical amendment to 40 CFR part 9 to display the OMB control number for the approved information collection activities contained in this final action.

1. 2024 LD and MD Multi-Pollutant Emission Standards Rule

The ICR document prepared by the EPA for removal of the light- and medium-duty vehicle GHG requirements has been assigned EPA ICR 2750.03, revising EPA ICR 2750.02 (OMB 2060–0764). You can find a copy

---

[224] The supporting documentation on how these values were estimates can be found in the Vehicle Rule FRM E.O. 14192 Workbook.xlsx file found in the docket for this action.

of the ICR in the docket for this action and it is briefly summarized here. The information collection requirements are not enforceable until OMB approves them.

The EPA is removing all regulations that require light- and medium-duty vehicle manufacturers to measure, report, or comply with standards for GHG emissions. Information collected to assure compliance with those requirements is no longer needed under this final action. All other requirements covered by 2750.02 remain in effect.

*Respondents/affected entities:* Light- and medium-duty vehicle manufacturers, alternative fuel converters, and independent commercial importers.

*Respondent's obligation to respond:* This action relieves manufacturers of the burden to provide certain information to the EPA as part of their annual MY vehicle certification under CAA section 208(a), which is required prior to entering vehicles into commerce. Participation in some programs is voluntary; but once a manufacturer has elected to participate, it must submit the required information.

*Estimated number of respondents:* 35 affected entities.

*Frequency of response:* Annually or on occasion, depending on the type of response.

*Revised total estimated burden:* 138,443 hours (per year) for remaining regulatory requirements covered by this ICR. Burden is defined at 5 CFR 1320.3(b).

*Revised total estimated cost:* $26.3 million per year for remaining regulatory requirements covered by this ICR, which includes an estimated $14.2 million annualized capital or operation and maintenance costs.

2. 2024 HD GHG Emission Standards Rule

The ICR document prepared by the EPA for removal of the 2024 HD GHG Emission Standards Rule requirements has been assigned EPA ICR 2734.03, revising EPA ICR 2734.02 (OMB 2060–0753). You can find a copy of the ICR in the docket for this action and it is briefly summarized here. The information collection requirements are

not enforceable until OMB approves them.

The EPA is removing all regulations that require HD motor vehicle and HD motor vehicle engine manufacturers to measure, report, or comply with the 2024 HD GHG Emission Standards Rule standards. Information collected to assure compliance with those requirements is no longer needed under this final action.

*Respondents/affected entities:* Manufacturers of HD onroad vehicles.

*Respondent's obligation to respond:* This action relieves manufacturers of the burden to provide certain information to the EPA as part of their annual MY engine and vehicle certification under CAA section 203(a), which is required prior to entering vehicles into commerce.

*Estimated number of respondents:* 77 affected entities.

*Frequency of response:* Originally expected to be one-time burden; now, no requirement to report.

*Revised total estimated burden:* 0 hours. Burden is defined at 5 CFR 1320.03(b).

*Revised total estimated cost:* $0.

3. Nonroad Compression-Ignition Engines and On-Highway Heavy-Duty Engines, Supporting Statement for Information Collection Request (March 2023 Revision)

We are not acting on the proposed changes to this ICR document to ensure this ICR will continue to cover the information collection necessary to implement NHTSA's MD and HD fuel efficiency program. The proposed changes to the ICR document can be found at EPA ICR 1684.22, revising EPA ICR 1684.21 (OMB 2060–0287).

The EPA is not acting on these revisions as they are no longer needed. As explained elsewhere in this preamble, in this final action we are not changing elements of the regulations that are necessary for programs unrelated to the GHG emission standards, including emission standards for criteria pollutants. We also are retaining most of the regulatory provisions cited by NHTSA for the administration of their fuel efficiency standards included in 49 CFR part 535. This includes the provisions that require manufacturers to submit their compliance data and information to the EPA and we will then issue a report to NHTSA with the information. However, we note that the EPA would no longer issue EPA certificates of conformity for GHG emissions.

*D. Regulatory Flexibility Act (RFA)*

I certify that this action will not have a significant economic impact on a substantial number of small entities under the RFA. In making this determination, the EPA concludes that the impact of concern for this action is any significant adverse economic impact on small entities, and that the Agency is certifying that this action will not have a significant economic impact on a substantial number of small entities because the action relieves regulatory burden on the small entities subject to the action.

The regulated entities that are subject to the regulations we are removing in this action are engine and vehicle manufacturers, alternative fuel converters, and independent commercial importers subject to GHG emission standards for vehicles. The Agency is certifying that this action will not have a significant economic impact on a substantial number of small entities because the action will relieve regulatory burden on all entities, including all small entities, subject to the current rules. This action removes portions of the regulations of the standard-setting parts directly related to GHG emission standards and compliance provisions for implementing the EPA's GHG engine and vehicle programs. We do not anticipate that there will be any significant adverse economic impact on directly regulated small entities as a result of these revisions. We have therefore concluded that this action will relieve regulatory burden for all directly regulated small entities. The EPA provides additional information on the RFA in chapter 7 of the RIA and in the Response to Comments for this final action.

*E. Unfunded Mandates Reform Act (UMRA)*

This action does not contain an unfunded mandate of $100 million (adjusted annually for inflation) or more (in 1995 dollars) as described in UMRA, 2 U.S.C. 1531–38, and does not significantly or uniquely affect small governments. The action imposes no enforceable duty on any state, local, or Tribal governments, and relieves duties with respect to the private sector.

*F. Executive Order 13132: Federalism*

This action does not have federalism implications as specified in E.O. 13132. It does not have substantial direct effects on the states, on the relationship between the national government and the states, or on the distribution of power and responsibilities among the various levels of government.

*G. Executive Order 13175: Consultation and Coordination With Indian Tribal Governments*

This action does not have Tribal implications as specified in E.O. 13175, entitled "Consultation and Coordination with Indian Tribal Governments" (65 FR 67249, Nov. 9, 2000). It does not have substantial direct effects on Tribal governments, on the relationship between the Federal government and Indian Tribes, or on the distribution of power and responsibilities between the Federal government and Indian Tribes, as specified in E.O. 13175. Thus, E.O. 13175 does not apply to this action.

However, consistent with the EPA Policy on Consultation with Indian Tribes, the EPA initiated a Tribal consultation and coordination process after proposing this action by sending a "Notification of Consultation and Coordination" letter, dated July 29, 2025, to all 574 Federally recognized Tribes. The letter invited Tribal leaders and designated consultation representatives to participate in the Tribal consultation and coordination process. The Nez Perce Nation, Confederated Tribes of Grand Ronde, Snoqualmie Tribe, and Pueblo of San Felipe requested to consult with the EPA. The EPA consulted with officials of these Tribes to permit meaningful and timely input during the development of this action. A summary of that consultation is provided in the Response to Comments document for this final action.

*H. Executive Order 13045: Protection of Children From Environmental Health Risks and Safety Risks*

E.O. 13045 directs Federal agencies to include an evaluation of the health and safety effects of the planned regulation on children in Federal health and safety standards and explain why the regulation is preferable to potentially effective and reasonably feasible alternatives. This action is subject to the E.O. because it is an economically significant regulatory action under E.O. 12866, and the EPA believes the environmental health or safety risks may have a disproportionate effect on children, although as explained in the preamble eliminating all GHG emissions from all vehicles would have a *de minimis* impact on public health or welfare. The 2021 Policy on Children's Health also applies to this action.[225]

---

[225] U.S. Environmental Protection Agency. (2021). 2021 Policy on Children's Health: *https://www.epa.gov/system/files/documents/2021-10/2021-policy-on-childrens-health.pdf.*

Although the GHG emissions at issue in this rulemaking do not have direct impacts on human health, we acknowledge the possibility that this action could impact emissions of criteria pollutants and air toxics. Children are not expected to experience greater ambient concentrations of air pollutants than the general population. Additionally, as discussed in the preamble, there are safety benefits from this final action that would benefit children as they are more susceptible to grievous injuries from less safe motor vehicles.

We note that, as explained above, this action would not impact separate emission standards for criteria pollutants by the EPA or separate standards set by NHTSA. At this time, the EPA does not believe that the action would have a material adverse impact on the health of individuals with respect to non-GHG air pollutants, including on children, because the EPA anticipates that the impacts of repealing GHG emission regulations would have only marginal and incidental impacts on the emission of non-GHG air pollutants. Potential health impacts of such air pollutants will continue to be controlled through direct emissions limits and several other programs that target regional and national air quality, including the NAAQS program.

### I. Executive Order 13211: Actions Concerning Regulations That Significantly Affect Energy Supply, Distribution, or Use

This action, which is a significant regulatory action under E.O. 12866, would have a significant effect on the supply, distribution or use of energy. The EPA has prepared a Statement of Energy Effects for this action as follows.

This action removes the GHG emission standards and related compliance provisions for light-, medium-, and heavy-duty engines and vehicles. This action will result in fewer electric vehicles and more ICE vehicles produced, as discussed in the RIA, and therefore an estimated increase in the consumption of petroleum and an estimated reduction in the consumption of electricity.

### J. National Technology Transfer and Advancement Act (NTTAA) and 1 CFR Part 51

This action involves technical standards. However, the changes to the regulation include removing GHG emission standards and the corresponding measurement and compliance procedures, some of which also involve removing existing references to voluntary consensus

standards and other technical standards. This action does not include any new requirements or new references to technical standards.

The following standards appear in the amendatory text of this document and were previously approved for the locations in which they appear: 13 CCR 1968.2, 13 CCR 1971.1, ASTM D1945, SAE J1711 FEB2023, SAE J1979–2, GEM version 2.0.1, GEM Phase 2, Version 3.0, GEM Phase 2, Version 3.5.1, GEM Phase 2, Version 4.0, GEM HIL model 3.8.

### K. Congressional Review Act (CRA)

This action is subject to the CRA, and the EPA will submit a rule report to each House of the Congress and to the Comptroller General of the United States. This action meets the criteria set forth in 5 U.S.C. 804(2).

### List of Subjects

#### 40 CFR Part 85

Confidential business information, Greenhouse gases, Imports, Labeling, Motor vehicle pollution, Reporting and recordkeeping requirements, Research warranties.

#### 40 CFR Part 86

Environmental protection, Administrative practice and procedure, Confidential business information, Incorporation by reference, Labeling, Motor vehicle pollution, Reporting and recordkeeping requirements.

#### 40 CFR Part 600

Environmental protection, Administrative practice and procedure, Electric power, Fuel economy, Greenhouse gases, Incorporation by reference, Labeling, Reporting and recordkeeping requirements.

#### 40 CFR Part 1036

Environmental protection, Administrative practice and procedure, Air pollution control, Confidential business information, Greenhouse gases, Incorporation by reference, Labeling, Motor vehicle pollution, Reporting and recordkeeping requirements, Warranties.

#### 40 CFR Part 1037

Environmental protection, Administrative practice and procedure, Air pollution control, Confidential business information, Incorporation by reference, Labeling, Motor vehicle pollution, Reporting and recordkeeping requirements, Warranties.

#### 40 CFR Part 1039

Administrative practice and procedure, Air pollution control, Confidential business information,

Imports, Labeling, Penalties, Reporting and recordkeeping requirements, Warranties.

**Lee Zeldin,**
*Administrator.*

For the reasons set out in the preamble, we are amending title 40, chapter I of the Code of Federal Regulations as set forth below.

## PART 85—CONTROL OF AIR POLLUTION FROM MOBILE SOURCES

■ 1. The authority citation for part 85 continues to read as follows:

**Authority:** 42 U.S.C. 7401–7671q.

### § 85.525   [Amended]

■ 2. Amend § 85.525 by removing and reserving paragraph (b).
■ 3. Amend § 85.1515 by revising paragraph (d) to read as follows:

### § 85.1515   Emission standards and test procedures applicable to imported nonconforming motor vehicles and motor vehicle engines.

\*   \*   \*   \*   \*

(d) An ICI may not certify using nonconformance penalties.

### § 85.1803   [Amended]

■ 4. Amend § 85.1803 by removing paragraph (e).

### § 85.1805   [Amended]

■ 5. Amend § 85.1805 by removing and reserving paragraph (b).
■ 6. Amend § 86.1902 by removing and reserving paragraph (b)(2) and revising paragraph (d). The revision reads as follows:

### § 85.1902   Definitions.

\*   \*   \*   \*   \*

(d) *Voluntary emissions recall* means a repair, adjustment, or modification program voluntarily initiated and conducted by a manufacturer to remedy any emission-related defect for which direct notification of vehicle or engine owners has been provided.

\*   \*   \*   \*   \*

■ 7. Amend § 85.2103 by revising paragraph (d)(1)(v) and removing paragraph (d)(3). The revision reads as follows:

### § 85.2103   Emission warranty.

\*   \*   \*   \*   \*

(d) \* \* \*
(1) \* \* \*
(v) Batteries serving as a Renewable Energy Storage System for electric vehicles and plug-in hybrid electric vehicles, along with all components needed to charge the system, store energy, and transmit power to move the

vehicle. This paragraph (d)(1)(v) is optional before model year 2027 for light-duty vehicles and light-duty trucks at or below 6,000 pounds GVWR. This paragraph (d)(1)(v) is optional for vehicles above 6,000 pounds GVWR until they are first certified to Tier 4 NMOG+$NO_X$ bin standards under 40 CFR 86.1811–27(b), not later than model year 2031.

\* \* \* \* \*

## PART 86—CONTROL OF EMISSIONS FROM NEW AND IN–USE HIGHWAY VEHICLES AND ENGINES

■ 8. The authority citation for part 86 continues to read as follows:

**Authority:** 42 U.S.C. 7401–7671q.

### § 86.1 [Amended]

■ 9. Amend § 86.1 by removing and reserving paragraphs (c)(2) and (3) and (f)(3), (17), (21), and (22) and removing paragraph (h).

■ 10. Amend § 86.007–11 by revising paragraphs (g)(1) and (6) to read as follows:

### § 86.007–11 Emission standards and supplemental requirements for 2007 and later model year diesel heavy-duty engines and vehicles.

\* \* \* \* \*

(g) \* \* \*

(1) The engines must be of a configuration that is identical to one that is certified under 40 CFR part 1039, and must be certified with a Family Emission Limit for PM of 0.020 g/kW-hr using the same duty cycles that apply under 40 CFR part 1039.

\* \* \* \* \*

(6) Engines certified under this paragraph (g) may not generate or use emission credits under this part or under 40 CFR part 1039.

\* \* \* \* \*

■ 11. Amend § 86.008–10 by revising paragraph (g)(6) to read as follows:

### § 86.008–10 Emission standards for 2008 and later model year Otto-cycle heavy-duty engines and vehicles.

\* \* \* \* \*

(g) \* \* \*

(6) Engines certified under this paragraph (g) may not generate or use emission credits under this part.

\* \* \* \* \*

■ 12. Amend § 86.1801–12 by:
■ a. Removing and reserving paragraph (a)(2)(ii)(B);
■ b. Revising paragraphs (a)(3), (b), and (i); and
■ c. Removing paragraphs (j) and (k). The revisions read as follows:

### § 86.1801–12 Applicability.

(a) \* \* \*

(3) The provisions of this subpart do not apply to heavy-duty vehicles above 14,000 pounds GVWR (see § 86.016–1 and 40 CFR parts 1036 and 1037), except as follows:

(i) Heavy-duty vehicles above 14,000 pounds GVWR and at or below 19,500 pounds GVWR may be optionally certified to the exhaust emission standards in this subpart if they are properly included in a test group with similar vehicles at or below 14,000 pounds GVWR. Emission standards apply to these vehicles as if they were Class 3 medium-duty vehicles.

(ii) [Reserved]

(iii) Evaporative and refueling emission standards apply for heavy-duty vehicles above 14,000 pounds GVWR as specified in 40 CFR 1037.103.

(4) If you optionally certify vehicles to standards under this subpart, those vehicles are subject to all the regulatory requirements as if the standards were mandatory.

(b) *Relationship to 40 CFR parts 1036 and 1037.* If any heavy-duty vehicle is not subject to standards and certification requirements under this subpart, the vehicle and its installed engine are instead subject to standards and certification requirements under 40 CFR parts 1036 and 1037, as applicable. If you optionally certify engines or vehicles to standards under 40 CFR part 1036 or 40 CFR part 1037, respectively, those engines or vehicles are subject to all the regulatory requirements in 40 CFR parts 1036 and 1037 as if they were mandatory.

\* \* \* \* \*

(i) *Types of pollutants.* Criteria pollutant standards apply for $NO_X$, NMOG, HC, formaldehyde, PM, and CO, including exhaust, evaporative, and refueling emission standards. These pollutants are sometimes described collectively as ''criteria pollutants'' because they are either criteria pollutants under the Clean Air Act or precursors to the criteria pollutants ozone and PM.

■ 13. Amend § 86.1803–01 by:
■ a. Removing the definitions of ''AC1'', ''AC2'', ''Air Conditioning Idle Test'', ''Base level'', ''Base tire'', ''Base vehicle'', ''Combined $CO_2$'', ''Combined CREE'', and ''Configuration'';
■ b. Revising the definition of ''Defeat device'';
■ c. Removing and reserving paragraph (1) of the definition of ''Emergency vehicle'';
■ d. Revising the definition of ''Engine code'';
■ e. Removing the definition of ''Footprint'', ''Full size pickup truck'',

''Mild hybrid electric vehicle'', ''Strong hybrid electric vehicle'', ''Subconfiguration'', ''Track width'', and ''Transmission class''; and
■ f. Adding a definition of ''Work factor'' in alphabetical order.

The revisions and addition read as follows:

### § 86.1803–01 Definitions.

\* \* \* \* \*

*Defeat device* means an auxiliary emission control device (AECD) that reduces the effectiveness of the emission control system under conditions which may reasonably be expected to be encountered in normal vehicle operation and use, unless:

(1) Such conditions are substantially included in driving cycles specified in this subpart or the fuel economy test procedures in 40 CFR part 600;

(2) The need for the AECD is justified in terms of protecting the vehicle against damage or accident;

(3) The AECD does not go beyond the requirements of engine starting; or

(4) The AECD applies only for emergency vehicles and the need is justified in terms of preventing the vehicle from losing speed, torque, or power due to abnormal conditions of the emission control system, or in terms of preventing such abnormal conditions from occurring, during operation related to emergency response. Examples of such abnormal conditions may include excessive exhaust backpressure from an overloaded particulate trap, and running out of diesel exhaust fluid for engines that rely on urea-based selective catalytic reduction.

\* \* \* \* \*

*Engine code* means a unique combination within a test group of displacement, fuel injection (or carburetor) calibration, choke calibration, distributor calibration, auxiliary emission control devices, and other engine and emission control system components specified by the Administrator. For electric vehicles, engine code means a unique combination of manufacturer, electric traction motor, motor configuration, motor controller, and energy storage device.

\* \* \* \* \*

*Work factor, WF,* means the characteristic value representing a vehicle's work potential, calculated to the nearest pound using the following equation:

$$WF = 0.75 \times (GVWR - Curb\ Weight + xwd) + 0.25 \times (GCWR - GVWR)$$

*Where:*

*xwd = 500 pounds if the vehicle has four-wheel drive or all-wheel drive; xwd = 0 pounds for all other vehicles.*

\* \* \* \* \*

■ 14. Amend § 86.1805–12 by revising paragraph (a) to read as follows:

### § 86.1805–12   Useful life.

(a) Except as permitted under paragraph (b) of this section or required under paragraphs (c) and (d) of this section, the full useful life for all LDVs and LLDTs is a period of use of 10 years or 120,000 miles, whichever occurs first. The full useful life for all HLDTs, MDPVs, and complete heavy-duty vehicles is a period of 11 years or 120,000 miles, whichever occurs first. These full useful life values apply to all exhaust, evaporative and refueling emission requirements except for standards which are specified to only be applicable at the time of certification.

\* \* \* \* \*

■ 15. Revise § 86.1805–17 to read as follows:

### § 86.1805–17   Useful life.

(a) *General provisions.* The useful life values specified in this section apply for all exhaust, evaporative, refueling, and OBD emission requirements described in this subpart, except for standards that are specified to apply only at certification. Useful life values are specified as a given number of calendar years or miles of driving, whichever comes first.

(b) [Reserved]

(c) *Cold temperature emission standards.* The cold temperature NMHC emission standards in § 86.1811–17 apply for a useful life of 10 years or 120,000 miles for LDV and LLDT, and 11 years or 120,000 miles for HLDT and HDV. The cold temperature CO emission standards in § 86.1811–17 apply for a useful life of 5 years or 50,000 miles.

(d) *Criteria pollutants.* The useful life provisions of this paragraph (d) apply for all emission standards not covered by paragraph (c) of this section. This paragraph (d) applies for the cold temperature emission standards in § 86.1811–27(c). Except as specified in paragraph (f) of this section and in §§ 86.1811, 86.1813, and 86.1816, the useful life for LDT2, HLDT, MDPV, and HDV is 15 years or 150,000 miles. The useful life for LDV and LDT1 is 10 years or 120,000 miles. Manufacturers may optionally certify LDV and LDT1 to a useful life of 15 years or 150,000 miles, in which case the longer useful life would apply for all the standards and requirements covered by this paragraph (d).

(e) *Intermediate useful life.* Where exhaust emission standards are specified for an intermediate useful life, these standards apply for five years or 50,000 miles.

■ 16. Amend § 86.1806–27 by adding paragraphs (a)(9) through (13) to read as follows:

### § 86.1806–27   Onboard diagnostics.

\* \* \* \* \*

(a) \* \* \*

(9) The definition of "Active Off-Cycle Credit Technology" in 13 CCR 1968.2(c) does not apply.

(10) The vehicle operations and control strategies standardization requirements in 13 CCR 1968.2 (g)(6.3), (6.4), (6.5), (6.8), (6.9), (6.10), and (6.11) do not apply.

(11) The data reporting and storage requirements in 13 CCR 1968.2(h)(6.1) related to the standardization requirements in 13 CCR 1968.2(g)(8.1) do not apply.

(12) The certification documentation requirement related to "Active Off-Cycle Credit Technologies" in 13 CCR 1968.2(i)(2.28) does not apply.

(13) The monitoring system demonstration requirements in 13 CCR 1968.2(h)(5.3.1)(D) and (5.3.2)(A)(iii) related to $CO_2$ emission data does not apply.

\* \* \* \* \*

### § 86.1807–01   [Amended]

■ 17. Amend § 86.1807–01 By Removing And Reserving Paragraph (A)(3)(IV).

■ 18. Amend § 86.1809–12 by revising paragraph (d)(1) to read as follows:

### § 86.1809–12   Prohibition of defeat devices.

\* \* \* \* \*

(d) \* \* \*

(1) The manufacturer must show to EPA's satisfaction that the vehicle design does not incorporate strategies that unnecessarily reduce emission control effectiveness exhibited over the driving cycles specified in this subpart or the fuel economy test procedures in 40 CFR part 600 when the vehicle is operated under conditions that may reasonably be expected to be encountered in normal operation and use.

\* \* \* \* \*

■ 19. Amend § 86.1810–09 by revising paragraph (f)(2) to read as follows:

### § 86.1810–09   General standards; increase in emissions; unsafe condition; waivers.

\* \* \* \* \*

(f) \* \* \*

(2) For vehicles that comply with the cold temperature NMHC standards described in § 86.1811–10(g), manufacturers must submit an engineering evaluation indicating that common calibration approaches are utilized at high altitudes (except when there are specific high altitude calibration needs to deviate from low altitude emission control practices). Any deviation from low altitude emission control practices must be included in the auxiliary emission control device (AECD) descriptions submitted at certification. Any AECD specific to high altitude must require engineering emission data for EPA evaluation to quantify any emission impact and validity of the AECD.

\* \* \* \* \*

■ 20. Amend § 86.1810–17 by revising paragraph (j) to read as follows:

### § 86.1810–17   General requirements.

\* \* \* \* \*

(j) Small-volume manufacturers that modify a vehicle already certified by a different company may recertify that vehicle under this subpart S based on the vehicle supplier's compliance with fleet average standards for criteria exhaust emissions and evaporative emissions as follows:

(1) The recertifying manufacturer must certify the vehicle at bin levels and family emission limits that are the same as or more stringent than the corresponding bin levels and family emission limits for the vehicle supplier.

(2) The recertifying manufacturer must meet all the standards and requirements described in this subpart S, except for the fleet average standards for criteria exhaust emissions and evaporative emissions.

(3) The vehicle supplier must send the small-volume manufacturer a written statement accepting responsibility to include the subject vehicles in the vehicle supplier's exhaust and evaporative fleet average calculations in §§ 86.1860–17 and 86.1864–10.

(4) The small-volume manufacturer must describe in the application for certification how the two companies are working together to demonstrate compliance for the subject vehicles. The application must include the statement from the vehicle supplier described in paragraph (j)(3) of this section.

(5) The vehicle supplier must include a statement that the vehicle supplier is including the small volume manufacturer's sales volume and emissions levels in the vehicle supplier's fleet average reports under §§ 86.1860–17 and 86.1864–10.

\* \* \* \* \*

■ 21. Amend § 86.1811–17 by revising paragraph (a) to read as follows:

### § 86.1811–17 Exhaust emission standards for light-duty vehicles, light-duty trucks and medium-duty passenger vehicles.

(a) *Applicability and general provisions.* This section describes exhaust emission standards that apply for model year 2017 and later light-duty vehicles, light-duty trucks, and medium-duty passenger vehicles. MDPVs are subject to all the same emission standards and certification provisions that apply to LDT4. Some of the provisions of this section also apply to heavy-duty vehicles as specified in § 86.1816. See § 86.1813 for evaporative and refueling emission standards. This section may apply to vehicles from model years earlier than 2017 as specified in paragraph (b)(11) of this section.

\* \* \* \* \*

### § 86.1811–27 [AMENDED]

■ 22. Amend § 86.1811–27 by removing paragraph (a)(4).

### § 86.1815–27 [Removed]

■ 23. Remove § 86.1815–27.

■ 24. Amend § 86.1816–18 by revising paragraph (a) to read as follows:

### § 86.1816–18 Emission standards for heavy-duty vehicles.

(a) *Applicability and general provisions.* This section describes Tier 3 exhaust emission standards for complete heavy-duty vehicles. These standards are optional for incomplete heavy-duty vehicles and for heavy-duty vehicles above 14,000 pounds GVWR as described in § 86.1801. See § 86.1813 for evaporative and refueling emission standards. This section starts to apply in model year 2018, except that the provisions may apply to vehicles before model year 2018 as specified in paragraph (b)(11) of this section. This section applies for model year 2027 and later vehicles only as specified in § 86.1811–27. Separate requirements apply for MDPV as specified in § 86.1811. See subpart A of this part for requirements that apply for incomplete heavy-duty vehicles and for heavy-duty engines certified independent of the chassis. The following general provisions apply:

(1) Test all vehicles as described in this section using a chassis dynamometer; establish appropriate load settings based on adjusted loaded vehicle weight (see § 86.1803).

(2) Some provisions apply differently depending on the vehicle's power-to-weight ratio. Determine a vehicle's power-to-weight ratio by dividing the engine's rated power by the vehicle's GVWR (in hp/pound). For purposes of this section, if a test group includes multiple vehicle configurations, use the vehicle with the highest power-to-weight ratio to characterize the test group.

(3) Use E10 test fuel as required in § 86.113, except as specified in this section.

(4) Measure emissions from hybrid electric vehicles (including plug-in hybrid electric vehicles) as described in 40 CFR part 1066, subpart F, except that these procedures do not apply for plug-in hybrid electric vehicles during charge-depleting operation.

\* \* \* \* \*

### § § 86.1818–12 And 86.1819–14 [Removed]

■ 25. Remove § § 86.1818–12 And 86.1819–14.

■ 26. Amend § 86.1822–01 by revising paragraph (b) to read as follows:

### § 86.1822–-01 Durability data vehicle selection.

\* \* \* \* \*

(b) The manufacturer may select, using good engineering judgment, an equivalent or worst-case vehicle configuration in lieu of testing the vehicle selected in paragraph (a) of this section. Carryover data satisfying the provisions of § 86.1839–01 may also be used in lieu of testing the vehicle configuration selected in paragraph (a) of this section.

### § 86.1823–08 [Amended]

■ 27. Amend § 86.1823–08 by removing and reserving paragraph (M).

■ 28. Amend § 86.1827–01 by revising paragraph (a)(5) to read as follows:

### § 86.1827–01 Test group determination.

\* \* \* \* \*

(a) \* \* \*

(5) Subject to the same emission standards, or FEL in the case of cold temperature NMHC or NMOG+NO$_X$ standards, except that a manufacturer may request to group vehicles into the same test group as vehicles subject to more stringent standards, so long as all the vehicles within the test group are certified to the most stringent standards applicable to any vehicle within that test group. For example, manufacturers may include medium-duty vehicles at or below 22,000 pounds GCWR in the same test group with medium-duty vehicles above 22,000 pounds GCWR, but all vehicles included in the test group are then subject to the off-cycle emission standards and testing requirements described in § 86.1811–27(e). Light-duty trucks and light-duty vehicles may be included in the same test group if all vehicles in the test group are subject to the same criteria exhaust emission standards.

\* \* \* \* \*

■ 29. Amend § 86.1828–01 by revising paragraph (e) to read as follows:

### § 86.1828–01 Emission data vehicle selection.

\* \* \* \* \*

(e) *Alternative vehicle configurations.* The manufacturer may use good engineering judgment to select an equivalent or worst-case vehicle configuration in lieu of testing the vehicle selected in paragraphs (a) through (c) of this section. Carryover data satisfying the provisions of § 86.1839 may also be used in lieu of testing the vehicle configuration selected in paragraphs (a) through (c) of this section.

\* \* \* \* \*

■ 30. Amend § 86.1829–15 by:
■ a. Removing and reserving paragraph (a)(2).
■ b. Revising paragraph (d)(3); and
■ c. Removing and reserving paragraph (d)(6).
The revisions read as follows:

### § 86.1829–15 Durability and emission testing requirements; waivers.

\* \* \* \* \*

(d) \* \* \*

(3) Manufacturers may omit PM measurements for fuel economy testing conducted in addition to the testing needed to demonstrate compliance with the PM emission standards.

\* \* \* \* \*

■ 31. Amend § 86.1830–01 by revising paragraphs (a)(3) and (c)(2) to read as follows:

### § 86.1830–01 Acceptance of vehicles for emission testing.

(a) \* \* \*

(3) Test vehicles must have air conditioning installed and operational if that vehicle configuration is available with air conditioning. Optional equipment must be installed or represented on test vehicles according to the provisions of § 86.1832–01.

\* \* \* \* \*

(c) \* \* \*

(2) Within a durability group, the manufacturer may alter any emission data vehicle (or other vehicles such as current or previous model year emission data vehicles, running change vehicles, fuel economy data vehicles, and development vehicles) in lieu of building a new test vehicle providing that the modification will not impact the representativeness of the vehicle's test results. Manufacturers shall use good engineering judgment in making

such determinations. Development vehicles which were used to develop the calibration selected for emission data testing may not be used as the EDV for that vehicle configuration. Vehicles from outside the durability group may be altered with advance approval of the Administrator.

\* \* \* \* \*

■ 32. Amend § 86.1835–01 by revising paragraphs (a)(4), (b)(3), and (c) to read as follows:

### § 86.1835–01 Confirmatory certification testing.

(a) \* \* \*

(4) Retesting for fuel economy may be conducted under the provisions of 40 CFR 600.008–08.

(b) \* \* \*

(3) For light-duty vehicles, light-duty trucks, and medium-duty passenger vehicles the manufacturer shall conduct a retest of the FTP or highway test if the difference between the fuel economy of the confirmatory test and the original manufacturer's test equals or exceeds three percent (or such lower percentage to be applied consistently to all manufacturer conducted confirmatory testing as requested by the manufacturer and approved by the Administrator).

(i) For use in the fuel economy program described in 40 CFR part 600, the manufacturer may, in lieu of conducting a retest, accept as official the lower of the original and confirmatory test fuel economy results.

(ii) The manufacturer shall conduct a second retest of the FTP or highway test if the fuel economy difference between the second confirmatory test and the original manufacturer test equals or exceeds three percent (or such lower percentage as requested by the manufacturer and approved by the Administrator) and the fuel economy difference between the second confirmatory test and the first confirmatory test equals or exceeds three percent (or such lower percentage as requested by the manufacturer and approved by the Administrator). In lieu of conducting a second retest, the manufacturer may accept as official (for use in the fuel economy program) the lowest fuel economy of the original test, the first confirmatory test, and the second confirmatory test fuel economy results.

(c) *Official test determination.* (1) Whenever the Administrator or the manufacturer conducts a confirmatory test segment on a test vehicle, the results of that test segment, unless subsequently invalidated by the Administrator, shall comprise the official data for that test segment for the vehicle at the prescribed test point and

the manufacturer's original test data for that test segment for that prescribed test point shall not be used in determining compliance with emission standards.

(i) If the Administrator or the manufacturer conducts more than one passing, valid, confirmatory test, the results from the first passing, valid confirmatory test shall be considered official and used in determining compliance with emission standards.

(ii) Official test results for fuel economy are determined in accordance with the provisions of § 600.008–08 of this chapter.

(iii) The Administrator may stop a test after any evaporative test segment and use as official data any valid results obtained up to that point in the test, as described in subpart B of this part.

(2) Whenever the Administrator or the manufacturer does not conduct a confirmatory test on a test vehicle at a test point, the manufacturer's original test data will be accepted as the official data for that point.

(i) If the Administrator makes a determination based on testing under paragraph (a) of this section (or other appropriate correlation test data), that there is a lack of correlation between the manufacturer's test equipment or procedures and the test equipment or procedures used by the Administrator, no manufacturer's test data will be accepted for purposes of certification until the reasons for the lack of correlation are determined and the validity of the data is established by the manufacturer.

(ii) If the Administrator has reasonable basis to believe that any test data submitted by the manufacturer is not accurate or has been obtained in violation of any provisions of this subpart, the Administrator may refuse to accept that data as the official data pending retesting or submission of further information.

(iii) If the manufacturer conducts more than one test on an emission data vehicle in the same vehicle configuration (excluding confirmatory tests run under paragraph (b) of this section), the data from the last test in that series of tests on that vehicle, will constitute the official data.

\* \* \* \* \*

### § 86.1838–01 [Amended]

■ 33. Amend § 86.1838–01 by removing and reserving paragraph (B)(1)(I)(B).

■ 34. Revise § 86.1839–01 to read as follows:

### § 86.1839–01 Carryover of certification data.

(a) In lieu of testing an emission-data or durability vehicle selected under

§ 86.1822, § 86.1828, or § 86.1829, and submitting data therefrom, a manufacturer may submit exhaust emission data, evaporative emission data and/or refueling emission data, as applicable, on a similar vehicle for which certification has been obtained or for which all applicable data required under § 86.1845 has previously been submitted. To be eligible for this provision, the manufacturer must use good engineering judgment and meet the following criteria:

(1) In the case of durability data, the manufacturer must determine that the previously generated durability data represent a worst case or equivalent rate of deterioration for all applicable emission constituents compared to the vehicle configuration selected for durability demonstration. Prior to certification, the Administrator may require the manufacturer to provide data showing that the distribution of catalyst temperatures of the selected durability vehicle configuration is effectively equivalent or lower than the distribution of catalyst temperatures of the vehicle configuration which is the source of the previously generated data.

(2) In the case of emission data, the manufacturer must determine that the previously generated emissions data represent a worst case or equivalent level of emissions for all applicable emission constituents compared to the vehicle configuration selected for emission compliance demonstration.

(b) In lieu of using newly aged hardware on an EDV as allowed under the provisions of § 86.1823–08(f)(2), a manufacturer may use similar hardware aged for an EDV previously submitted, provided that the manufacturer determines that the previously aged hardware represents a worst case or equivalent rate of deterioration for all applicable emission constituents for durability demonstration.

### § 86.1841–01 [Amended]

■ 35. Amend § 86.1841–01 by removing and reserving paragraph (A)(3).

■ 36. Amend § 86.1844–01 by:

■ a. Removing and reserving paragraph (d)(7)(iv);

■ b. Revising paragraph (d)(15);

■ c. Removing and reserving paragraphs (d)(19) and (20); and

■ d. Revising paragraphs (e)(1) and (3).

The revisions read as follows:

### § 86.1844–01 Information requirements: Application for certification and submittal of information upon request.

\* \* \* \* \*

(d) \* \* \*

(15) For vehicles with fuel-fired heaters, describe the control system

logic of the fuel-fired heater, including an evaluation of the conditions under which it can be operated and an evaluation of the possible operational modes and conditions under which evaporative emissions can exist. Use good engineering judgment to establish an estimated exhaust emission rate from the fuel-fired heater in grams per mile for each pollutant subject to a fleet average standard. Adjust fleet average compliance calculations in §§ 86.1861 and 86.1864 as appropriate to account for emissions from fuel-fired heaters. Describe the testing used to establish the exhaust emission rate.

*   *   *   *   *

(e) * * *

(1) Identify all emission-related components. Also identify software, AECDs, and other elements of design that are used to control criteria, exhaust or evaporative/refueling emissions. Identify the emission-related components by part number. Identify software by part number or other convention, as appropriate. Organize part numbers by engine code or other similar classification scheme.

*   *   *   *   *

(3) Identification and description of all vehicles covered by each certificate of conformity to be produced and sold within the U.S. The description must be sufficient to identify whether any given in-use vehicle is, or is not, covered by a given certificate of conformity, the test group and the evaporative/refueling family to which it belongs and the standards that are applicable to it, by matching readily observable vehicle characteristics and information given in the emission control information label (and other permanently attached labels) to indicators in the Part 1 Application. For example, the description must include any components or features that contribute to measured or demonstrated control of emissions for meeting criteria exhaust or evaporative/refueling standards under this subpart. In addition, the description must be sufficient to determine for each vehicle covered by the certificate, all appropriate test parameters and any special test procedures necessary to conduct an official certification exhaust or evaporative emission test as was required by this subpart to demonstrate compliance with applicable emission standards. The description shall include, but is not limited to, information such as model name, vehicle classification (light-duty vehicle, light-duty truck, or complete heavy-duty vehicle), sales area, engine displacement, engine code, transmission type, tire size and parameters necessary

to conduct exhaust emission tests such as equivalent test weight, curb and gross vehicle weight, test horsepower (with and without air conditioning adjustment), coast down time, shift schedules, cooling fan configuration, etc. and evaporative tests such as canister working capacity, canister bed volume, and fuel temperature profile. Actual values must be provided for all parameters.

*   *   *   *   *

■ 37. Amend § 86.1845–04 by:
■ a. Revising paragraphs (b)(5)(i) and (c)(5)(i);
■ b. Removing and reserving paragraph (g); and
■ c. Revising paragraph (h)(6) introductory text.
The revisions read as follows:

### § 86.1845–04 Manufacturer in-use verification testing requirements.

*   *   *   *   *

(b) * * *

(5) *Testing.* (i) Each test vehicle of a test group shall be tested in accordance with the FTP and the US06 as described in subpart B of this part, when such test vehicle is tested for compliance with applicable exhaust emission standards under this subpart.

*   *   *   *   *

(c) * * *

(5) *Testing.* (i) Each test vehicle shall be tested in accordance with the FTP and the US06 as described in subpart B of this part when such test vehicle is tested for compliance with applicable exhaust emission standards under this subpart. One test vehicle from each test group shall be tested over the FTP at high altitude. The test vehicle tested at high altitude is not required to be one of the same test vehicles tested at low altitude. The test vehicle tested at high altitude is counted when determining the compliance with the requirements shown in Table S04–06 and Table S04–07 (tables 1 and 2 to paragraph (b)(3) of this section) or the expanded sample size as provided for in this paragraph (c).

*   *   *   *   *

(h) * * *

(6) Determine a reference $CO_2$ emission rate, $e_{CO2FTPFCL}$ as described in 40 CFR 1036.530 or based on measured values from any chassis FTP driving cycles under 40 CFR part 1066, subpart I, that is used for reporting data from an emission data vehicle or a fuel economy data vehicle, as follows:

*   *   *   *   *

■ 38. Amend § 86.1846–01 by:
■ a. Revising paragraph (a); and
■ b. Removing and reserving paragraph (b)(2).

The revision reads as follows:

### § 86.1846–01 Manufacturer in-use confirmatory testing requirements.

(a) *General requirements.* (1) Manufacturers must test, or cause testing to be conducted, under this section when the emission levels shown by a test group sample from testing under § 86.1845 exceeds the criteria specified in paragraph (b) of this section. The testing required under this section applies separately to each test group and at each test point (low and high mileage) that meets the specified criteria. The testing requirements apply separately for each model year.

(2) The provisions of § 86.1845–04(a)(3) regarding fuel sulfur effects apply equally to testing under this section.

*   *   *   *   *

### § 86.1847–01 [Amended]

■ 39. Amend § 86.1847–01 by removing and reserving paragraph (G).
■ 40. Amend § 86.1848–10 by:
■ a. Revising paragraphs (c)(2) and (5); and
■ b. Removing paragraphs (c)(9) and (10).
The revisions read as follows:

### § 86.1848–10 Compliance with emission standards for the purpose of certification.

*   *   *   *   *

(c) * * *

(2) The manufacturer must comply with all certification and in-use emission standards contained in this subpart both during and after model year production.

*   *   *   *   *

(5) The manufacturer must meet the in-use testing and reporting requirements contained in §§ 86.1845, 86.1846, and 86.1847, as applicable.

*   *   *   *   *

■ 41. Amend § 86.1854–12 by revising paragraph (a)(2)(iv) to read as follows:

### § 86.1854–12 Prohibited acts.

(a) * * *
(2) * * *
(iv) For a person to fail to establish or maintain records as required under §§ 86.1844, 86.1862, and 86.1864 with regard to vehicles.

*   *   *   *   *

■ 42. Revise and republish § 86.1861–17 to read as follows:

### § 86.1861–17 How do the NMOG + NO$_X$ and evaporative emission credit programs work?

You may use emission credits for purposes of certification to show compliance with the applicable fleet

average NMOG+NO$_X$ standards from §thnsp;§ 86.1811 and 86.1816 and the fleet average evaporative emission standards from § 86.1813 as described in 40 CFR part 1036, subpart H, with certain exceptions and clarifications as specified in this section. MDPVs are subject to the same provisions of this section that apply to LDT4.

(a) Calculate emission credits as described in this paragraph (a) instead of using the provisions of 40 CFR 1036.705. Calculate positive or negative emission credits relative to the applicable fleet average standard. Calculate positive emission credits if your fleet average level is below the standard. Calculate negative emission credits if your fleet average value is above the standard. Calculate credits separately for each applicable fleet average standard and calculate total credits for each averaging set as specified in paragraph (b) of this section. Convert units from mg/mile to g/mile as needed for performing calculations. Calculate emission credits using the following equation, rounded to the nearest whole number:

Equation 1 to Paragraph (a)

$$\text{Emission credit} = \text{Volume} \cdot [\text{Fleet average standard} - \text{Fleet average value}]$$

Where:

*Emission credit* = The positive or negative credit for each discrete fleet average standard, in units of vehicle-grams per mile for NMOG+NO$_x$ and vehicle-grams per test for evaporative emissions.

*Volume* = Sales volume in a given model year from the collection of test groups or evaporative families covered by the fleet average value, as described in § 86.1860.

(b) The following restrictions apply instead of those specified in 40 CFR 1036.740:

(1) Except as specified in paragraph (b)(2) of this section, emission credits may be exchanged only within an averaging set, as follows:

(i) HDV represent a separate averaging set with respect to all emission standards.

(ii) Except as specified in paragraph (b)(1)(iii) of this section, light-duty program vehicles represent a single averaging set with respect to all emission standards. Note that FTP and SFTP credits for Tier 3 vehicles are not interchangeable.

(iii) LDV and LDT1 certified to standards based on a useful life of 120,000 miles and 10 years together represent a single averaging set with respect to NMOG+NO$_X$ emission standards. Note that FTP and SFTP credits for Tier 3 vehicles are not interchangeable.

(iv) The following separate averaging sets apply for evaporative emission standards:

(A) LDV and LDT1 together represent a single averaging set.

(B) LDT2 represents a single averaging set.

(C) HLDT represents a single averaging set.

(D) HDV represents a single averaging set.

(2) You may exchange evaporative emission credits across averaging sets as follows if you need additional credits to offset a deficit after the final year of maintaining deficit credits as allowed under paragraph (c) of this section:

(i) You may exchange LDV/LDT1 and LDT2 emission credits.

(ii) You may exchange HLDT and HDV emission credits.

(3) Except as specified in paragraph (b)(4) of this section, credits expire after five years. For example, credits you generate in model year 2018 may be used only through model year 2023.

(4) For the Tier 3 declining fleet average FTP and SFTP emission standards for NMOG+NO$_X$ described in § 86.1811–17(b)(8), credits generated in model years 2017 through 2024 expire after eight years, or after model year 2030, whichever comes first; however, these credits may not be traded after five years. This extended credit life also applies for small-volume manufacturers generating credits under § 86.1811–17(h)(1) in model years 2022 through 2024. Note that the longer credit life does not apply for heavy-duty vehicles, for vehicles certified under the alternate phase-in described in § 86.1811–17(b)(9), or for vehicles generating early Tier 3 credits under § 86.1811–17(b)(11) in model year 2017.

(5) Tier 3 credits for NMOG+NO$_X$ may be used to demonstrate compliance with Tier 4 standards without adjustment, except as specified in § 86.1811–27(b)(6)(ii).

(6) A manufacturer may generate NMOG+NO$_X$ credits from model year 2027 through 2032 electric vehicles that qualify as MDPV and use those credits for certifying medium-duty vehicles, as follows:

(i) Calculate generated credits separately for qualifying vehicles. Calculate generated credits by multiplying the applicable standard for light-duty program vehicles by the sales volume of qualifying vehicles in a given model year.

(ii) Apply generated credits to eliminate any deficit for light-duty program vehicles before using them to certify medium-duty vehicles.

(iii) Apply the credit provisions of this section as specified, except that you

may not buy or sell credits generated under this paragraph (b)(6).

(iv) Describe in annual credit reports how you are generating certain credit quantities under this paragraph (b)(6). Also describe in your end of year credit report how you will use those credits for certifying light-duty program vehicles or medium-duty vehicles in a given model year.

(c) The credit-deficit provisions 40 CFR 1036.745 apply to the NMOG+NO$_X$ and evaporative emission standards for Tier 3 and Tier 4 vehicles. Credit-deficit provisions are not affected by the transition from Tier 3 to Tier 4 standards.

(d) The reporting and recordkeeping provisions of § 86.1862 apply instead of those specified in 40 CFR 1036.730 and 1036.735.

(e) The provisions of 40 CFR 1036.625 do not apply.

### §§ 86.1865–12, 86.1866–12, 86.1867–12, and 86.1867–31  [Removed]

■ 43. Remove §§ 86.1865–12, 86.1866–12, 86.1867–12, and 86.1867–31.

■ 44. Amend § 86.1868–12 by:
■ a. Revising the introductory text and paragraph (c);
■ b. Removing and reserving paragraph (d); and
■ c. Revising paragraphs (g) introductory text and (g)(3) introductory text.

The revisions read as follows:

### § 86.1868–12   CO$_2$ credits for improving the efficiency of air conditioning systems.

The regulation at 40 CFR 600.510 describes how manufacturers may calculate fuel consumption improvement values based on improvements to air conditioning efficiency. This section describes how to calculate credits to determine the average fuel economy for comparing to the Corporate Average Fuel Economy standard. The provisions of this section do not apply for medium-duty vehicles. Credits shall be calculated according to this section for each air conditioning system that the manufacturer is using to generate credits. Manufacturers must validate credits under this section based on testing as described in paragraph (g) of this section. Starting in model year 2027, manufacturers may generate credits under this section only for vehicles propelled by internal combustion engines.

\*     \*     \*     \*     \*

(c) The total efficiency credits generated by an air conditioning system shall be calculated in megagrams separately for passenger automobiles and light trucks according to the following formula:

Equation 1 to Paragraph (c)

$$Total\ Credits = \frac{Credit \cdot Production \cdot VLM}{1,000,000}$$

Where:

*Credit* = the air conditioning efficiency credit in grams per mile determined in paragraph (b) of this section. Starting in model year 2027, multiply the credit value for PHEV by (1–UF), where *UF* = the fleet utility factor established under 40 CFR 600.116–12(c)(1) or (c)(10)(iii) (weighted 55 percent city, 45 percent highway.

*Production* = The total number of passenger automobiles or light trucks, whichever is applicable, produced with the air conditioning system to which to the efficiency credit value from paragraph (b) of this section applies.

*VLM* = vehicle lifetime miles, which for passenger automobiles shall be 195,264 and for light trucks shall be 225,865.

\*    \*    \*    \*    \*

(g) For AC17 validation testing and reporting requirements, manufacturers must validate air conditioning efficiency credits by using the AC17 Test Procedure in 40 CFR 1066.845 as follows:

\*    \*    \*    \*    \*

(3) For the first model year for which an air conditioning system is expected to generate credits, the manufacturer must select for testing the projected highest-selling vehicle configuration within each combination of vehicle platform and air conditioning system (as those terms are defined in § 86.1803). The manufacturer must test at least one unique air conditioning system within each vehicle platform in a model year, unless all unique air conditioning systems within a vehicle platform have been previously tested. A unique air conditioning system design is a system with unique or substantially different component designs or types and/or system control strategies (*e.g.,* fixed-displacement vs. variable displacement compressors, orifice tube vs. thermostatic expansion valve, single vs. dual evaporator, etc.). In the first year of such testing, the tested vehicle configuration shall be the highest production vehicle configuration within each platform. In subsequent model years the manufacturer must test other unique air conditioning systems within the vehicle platform, proceeding from the highest production untested system until all unique air conditioning systems within the platform have been tested, or until the vehicle platform experiences a major redesign. Whenever

a new unique air conditioning system is tested, the highest production vehicle configuration using that system shall be the vehicle selected for testing. Credits may continue to be generated by the air conditioning system installed in a vehicle platform provided that:

\*    \*    \*    \*    \*

■ 45. Amend § 86.1869–12 by revising the introductory text and paragraphs (a), (b)(1) introductory text, (b)(2) introductory text, (b)(2)(v), (c) introductory text, and (e)(2)(i) to read as follows:

### § 86.1869–12    $CO_2$ credits for off-cycle $CO_2$ reducing technologies.

The regulation at 40 CFR 600.510 describes how manufacturers may calculate fuel consumption improvement values based on vehicle improvements that are not reflected in testing to demonstrate compliance with exhaust emission standards. This section describes how to calculate credits to determine the average fuel economy for comparing to the Corporate Average Fuel Economy standard through model year 2032. The provisions of this section do not apply for medium-duty vehicles. Manufacturers may no longer generate credits under this section starting in model year 2027 for vehicles deemed to have zero tailpipe emissions and in model year 2033 for all other vehicles. Manufacturers may no longer generate credits under paragraphs (c) and (d) of this section for any type of vehicle starting in model year 2027.

(a) Manufacturers may generate credits for $CO_2$-reducing technologies where the $CO_2$ reduction benefit of the technology is not adequately captured on the Federal Test Procedure and/or the Highway Fuel Economy Test such that the technology would not be otherwise installed for purposes of meeting Corporate Average Fuel Economy standards. These technologies must have a measurable, demonstrable, and verifiable real-world $CO_2$ reduction that occurs outside the conditions of the Federal Test Procedure and the Highway Fuel Economy Test. These optional credits are referred to as "off-cycle" credits. The technologies must not be integral or inherent to the basic vehicle design, such as engine,

transmission, mass reduction, passive aerodynamic design, and tire technologies. Technologies installed for non-off-cycle emissions related reasons are also not eligible as they would be considered part of the baseline vehicle design. The technology must not be inherent to the design of occupant comfort and entertainment features except for technologies related to reducing passenger air conditioning demand and improving air conditioning system efficiency. Notwithstanding the provisions of this paragraph (a), off-cycle menu technologies included in paragraph (b) of this section remain eligible for credits. Off-cycle technologies used to generate emission credits are considered emission-related components subject to applicable requirements and must be demonstrated to be effective for the full useful life of the vehicle. Unless the manufacturer demonstrates that the technology is not subject to in-use deterioration, the manufacturer must account for the deterioration in their analysis. Durability evaluations of off-cycle technologies may occur at any time throughout a model year, provided that the results can be factored into the data provided in the model year report. Off-cycle credits may not be approved for crash-avoidance technologies, safety critical systems or systems affecting safety-critical functions, or technologies designed for the purpose of reducing the frequency of vehicle crashes. Off-cycle credits may not be earned for technologies installed on a motor vehicle to attain compliance with any vehicle safety standard or any regulation set forth in Title 49 of the Code of Federal Regulations. The manufacturer must use one of the three options specified in this section to establish off-cycle credits under this section.

(b) \* \* \*

(1) The manufacturer may generate off-cycle credits for certain technologies as specified in this paragraph (b)(1). Technology definitions are in paragraph (b)(4) of this section. Calculated credit values shall be rounded to the nearest 0.1 grams/mile.

\*    \*    \*    \*    \*

(2) The maximum allowable off-cycle credit for the combined passenger automobile and light truck fleet

attributable to use of the default credit values in paragraph (b)(1) of this section is specified in paragraph (b)(2)(v) of this section. If the total of the off-cycle credit values from paragraph (b)(1) of this section does not exceed the specified off-cycle credit cap for any passenger automobile or light truck in a manufacturer's fleet, then the total off-cycle credits may be calculated according to paragraph (f) of this section. If the total of the off-cycle credit values from paragraph (b)(1) of this section exceeds the specified off-cycle credit cap for any passenger automobile or light truck in a manufacturer's fleet, then the gram per mile decrease for the combined passenger automobile and light truck fleet must be determined according to paragraph (b)(2)(ii) of this section to determine whether the applicable limitation has been exceeded.

*    *    *    *    *

(v) The manufacturer's combined passenger automobile and light truck fleet average off-cycle credits attributable to use of the default credit values in paragraph (b)(1) of this section may not exceed the following specific values:

| Model year | Off-cycle credit cap (g/mile) |
|---|---|
| (A) 2023–2026 ........................... | 15 |
| (B) 2027–2030 ........................... | 10 |
| (C) 2031 .................................... | 8.0 |
| (D) 2032 .................................... | 6.0 |

*    *    *    *    *

(c) *Technology demonstration using EPA 5-cycle methodology.* To demonstrate an off-cycle technology and to determine off-cycle credits using the EPA 5-cycle methodology, the manufacturer shall determine the off-cycle city/highway combined carbon-related exhaust emissions benefit by using the EPA 5-cycle methodology described in 40 CFR part 600. This method may not be used for technologies that include elements (*e.g.,* driver-selectable systems) that require additional analyses, data collection, projections, or modeling, or other assessments to determine a national average benefit of the technology. Testing shall be performed on a representative vehicle, selected using good engineering judgment, for each model type for which the credit is being demonstrated. The emission benefit of a technology is determined by testing both with and without the off-cycle technology operating. If a specific technology is not expected to change emissions on one of the five test

procedures, the manufacturer may submit an engineering analysis to the EPA that demonstrates that the technology has no effect. If EPA concurs with the analysis, then multiple tests are not required using that test procedure; instead, only one of that test procedure shall be required—either with or without the technology installed and operating—and that single value will be used for all of the 5-cycle weighting calculations. Multiple off-cycle technologies may be demonstrated on a test vehicle. The manufacturer shall conduct the following steps and submit all test data to the EPA.

*    *    *    *    *

(e) *Review and approval process for off-cycle credits*—(1) *Initial steps required.* (i) A manufacturer requesting off-cycle credits under the provisions of paragraph (c) of this section must conduct the testing and/or simulation described in that paragraph.

(ii) A manufacturer requesting off-cycle credits under the provisions of paragraph (d) of this section must develop a methodology for demonstrating and determining the benefit of the off-cycle technology, and carry out any necessary testing and analysis required to support that methodology.

(iii) A manufacturer requesting off-cycle credits under paragraphs (b), (c), or (d) of this section must conduct testing and/or prepare engineering analyses that demonstrate the in-use durability of the technology for the full useful life of the vehicle.

(2) *Data and information requirements.* The manufacturer seeking off-cycle credits must submit an application for off-cycle credits determined under paragraphs (c) and (d) of this section. The application must contain the following:

(i) A detailed description of the off-cycle technology and how it functions to improve fuel economy under conditions not represented on the FTP and HFET.

(ii) A list of the vehicle model(s) which will be equipped with the technology.

(iii) A detailed description of the test vehicles selected and an engineering analysis that supports the selection of those vehicles for testing.

(iv) All testing and/or simulation data required under paragraph (c) or (d) of this section, as applicable, plus any other data the manufacturer has considered in the analysis.

(v) For credits under paragraph (d) of this section, a complete description of the methodology used to estimate the off-cycle benefit of the technology and

all supporting data, including vehicle testing and in-use activity data.

(vi) An estimate of the off-cycle benefit by vehicle model and the fleetwide benefit based on projected sales of vehicle models equipped with the technology.

(vii) An engineering analysis and/or component durability testing data or whole vehicle testing data demonstrating the in-use durability of the off-cycle technology components.

(3) *EPA review of the off-cycle credit application.* Upon receipt of an application from a manufacturer, EPA will do the following:

(i) Review the application for completeness and notify the manufacturer within 30 days if additional information is required.

(ii) Review the data and information provided in the application to determine if the application supports the level of credits estimated by the manufacturer.

(iii) For credits under paragraph (d) of this section, EPA will make the application available to the public for comment, as described in paragraph (d)(2) of this section, within 60 days of receiving a complete application. The public review period will be specified as 30 days, during which time the public may submit comments. Manufacturers may submit a written rebuttal of comments for EPA consideration or may revise their application in response to comments. A revised application should be submitted after the end of the public review period, and EPA will review the application as if it was a new application submitted under this paragraph (e)(3).

(4) *EPA decision.* (i) For credits under paragraph (c) of this section, EPA will notify the manufacturer of its decision within 60 days of receiving a complete application.

(ii) For credits under paragraph (d) of this section, EPA will notify the manufacturer of its decision after reviewing and evaluating the public comments. EPA will make the decision and rationale available to the public.

(iii) EPA will notify the manufacturer in writing of its decision to approve or deny the application, and will provide the reasons for the decision. EPA will make the decision and rationale available to the public.

*    *    *    *    *

**§ 86.1870–12   [Removed]**

■ 46. Remove § 86.1870–12.

## PART 600—FUEL ECONOMY AND GREENHOUSE GAS EXHAUST EMISSIONS OF MOTOR VEHICLES

■ 47. The authority citation for part 600 continues to read as follows:

**Authority:** 49 U.S.C. 32901—23919Q, Pub. L. 109–58.

■ 48. Amend § 600.001 by revising paragraphs (a) and (c) to read as follows:

### § 600.001 General applicability.

(a) The provisions of this part apply to 2008 and later model year automobiles that are not medium duty passenger vehicles ($MDPV_{FE}$), and to 2011 and later model year automobiles including $MDPV_{FE}$. The test procedures in subpart B of this part also describe how manufacturers can test larger vehicles to meet fuel consumption standards under 49 CFR part 535.

\*    \*    \*    \*    \*

(c) Unless stated otherwise, references to fuel economy or fuel economy data in this part shall also be interpreted to mean the related exhaust emissions of $CO_2$, HC, and CO, and where applicable for alternative fuel vehicles, $CH_3OH$, $C_2H_5OH$, $C_2H_4O$, HCHO, NMHC and $CH_4$.

\*    \*    \*    \*    \*

■ 49. Amend § 600.002 by:
■ a. Revising the definitions of "Carbon-related exhaust emissions (CREE)" and "Engine code";
■ b. Removing the definition of "Footprint"; and
■ c. Revising the definitions of "Medium-duty passenger vehicle ($MDPV_{FE}$)", "Subconfiguration", and "Vehicle configuration".
The revisions read as follows:

### § 600.002 Definitions.

\*    \*    \*    \*    \*

*Carbon-related exhaust emissions (CREE)* means the summation of the carbon-containing constituents of the exhaust emissions, with each constituent adjusted by a coefficient representing the carbon weight fraction of each constituent relative to the $CO_2$ carbon weight fraction, as specified in § 600.113.

\*    \*    \*    \*    \*

*Engine code* means one of the following:

(1) For LDV, LDT, and $MDPV_{FE}$, *engine code* means a unique combination, within a test group (as defined in § 86.1803 of this chapter), of displacement, fuel injection (or carburetion or other fuel delivery system), calibration, distributor calibration, choke calibration, auxiliary emission control devices, and other engine and emission control system components specified by the Administrator. For electric vehicles, *engine code* means a unique combination of manufacturer, electric traction motor, motor configuration, motor controller, and energy storage device.

(2) For MDV, *engine code* means the combination of both "engine code" and "basic engine" as defined for light-duty vehicles in this section.

\*    \*    \*    \*    \*

*Medium-duty passenger vehicle ($MDPV_{FE}$)* means any motor vehicle rated at more than 8,500 pounds GVWR and less than 10,000 pounds GVWR that is designed primarily to transport passengers, but does not include a vehicle that—

(1) Is an "incomplete truck," meaning any truck which does not have the primary load carrying device or container attached when it is first sold as a vehicle; or

(2) Has a seating capacity of more than 12 persons; or

(3) Is designed for more than 9 persons in seating rearward of the driver's seat; or

(4) Is equipped with an open cargo area (for example, a pick-up truck box or bed) of 72.0 inches in interior length or more. A covered box not readily accessible from the passenger compartment will be considered an open cargo area for purposes of this definition. (See paragraph (1) of the definition of medium-duty passenger vehicle at 40 CFR 86.1803–01).

\*    \*    \*    \*    \*

*Subconfiguration* means one of the following:

(1) For LDV, LDT, and $MDPV_{FE}$, *subconfiguration* means a unique combination within a vehicle configuration of equivalent test weight, road-load horsepower, and any other operational characteristics or parameters which the Administrator determines may significantly affect fuel economy or $CO_2$ emissions within a vehicle configuration.

(2) For MDV, *subconfiguration* means a unique combination within a vehicle configuration of equivalent test weight, road-load horsepower, and any other operational characteristics or parameters that may significantly affect $CO_2$ emissions within a vehicle configuration. Note that equivalent test weight is based on a vehicle's Adjusted Loaded Vehicle Weight (rounded to the nearest 500-pound increment for values above 14,000 pounds); see 40 CFR 1066.805.

\*    \*    \*    \*    \*

*Vehicle configuration* means one of the following:

(1) For LDV, LDT, and $MDPV_{FE}$, *vehicle configuration* means a unique combination of basic engine, engine code, inertia weight class, transmission configuration, and axle ratio within a base level.

(2) For MDV, vehicle configuration means a subclassification within a test group based on a unique combination of basic engine, engine code, transmission type and gear ratios, final drive ratio, and other parameters we designate.

\*    \*    \*    \*    \*

■ 50. Amend § 600.006 by revising paragraphs (c)(5), (e), and (g)(3)(ii) to read as follows:

### § 600.006 Data and information requirements for fuel economy data vehicles.

\*    \*    \*    \*    \*

(c) \* \* \*

(5) Starting with the 2012 model year, the data submitted according to paragraphs (c)(1) through (4) of this section shall include total HC, CO, $CO_2$, and, where applicable for alternative fuel vehicles, $CH_3OH$, $C_2H_5OH$, $C_2H_4O$, HCHO, NMHC and $CH_4$.

\*    \*    \*    \*    \*

(e) In lieu of submitting actual data from a test vehicle, a manufacturer may provide fuel economy and $CO_2$ emission values derived from a previously tested vehicle, where the fuel economy and $CO_2$ emissions are expected to be equivalent (or less fuel-efficient and with higher $CO_2$ emissions). Additionally, in lieu of submitting actual data from a test vehicle, a manufacturer may provide fuel economy and $CO_2$ emission values derived from an analytical expression, *e.g.,* regression analysis. In order for fuel economy and $CO_2$ emission values derived from analytical methods to be accepted, the expression (form and coefficients) must have been approved by the Administrator.

\*    \*    \*    \*    \*

(g) \* \* \*
(3) \* \* \*
(ii)(A) The manufacturer shall adjust all $CO_2$ test data generated by vehicles with engine-drive system combinations with more than 6,200 miles by using the following equation:

$$ADJ_{4,000mi} = TEST[0.979 + 5.25 \cdot 10^{-6} \cdot (mi)]$$

Where:

$ADJ_{4,000mi}$ = $CO_2$ emission data adjusted to 4,000-mile test point.
TEST = Tested emissions value of $CO_2$ in grams per mile.
mi = System miles accumulated at the start of the test rounded to the nearest whole mile.

(B) Emissions test values and results used and determined in the calculations in this paragraph (g)(3)(ii) shall be rounded in accordance with § 86.1837 of this chapter as applicable. Round results to the nearest gram per mile.

\* \* \* \* \*

■ 51. Amend § 600.007 by revising paragraphs (b)(5) and (6), (c), and (f) introductory text to read as follows:

### § 600.007 Vehicle acceptability.

\* \* \* \* \*

(b) \* \* \*

(5) The calibration information submitted under § 600.006(b) must be representative of the vehicle configuration for which the fuel economy and $CO_2$ emission data were submitted.

(6) Any vehicle tested for fuel economy or $CO_2$ emissions must be representative of a vehicle which the manufacturer intends to produce under the provisions of a certificate of conformity.

\* \* \* \* \*

(c) If, based on review of the information submitted under § 600.006(b), the Administrator determines that a fuel economy data vehicle meets the requirements of this section, the fuel economy data vehicle will be judged to be acceptable and fuel economy data from that fuel economy data vehicle will be reviewed pursuant to § 600.008.

\* \* \* \* \*

(f) All vehicles used to generate fuel economy data, and for which emission standards apply, must be covered by a certificate of conformity under part 86 of this chapter before:

\* \* \* \* \*

■ 52. Amend § 600.008 by revising the section heading and paragraph (a)(1)(ii) to read as follows:

### § 600.008 Review of fuel economy and $CO_2$ emission data, testing by the Administrator.

(a) \* \* \*

(1) \* \* \*

(ii) The evaluations, testing, and test data described in this section pertaining to fuel economy shall also be performed for $CO_2$ emissions, except that $CO_2$ emissions shall be arithmetically averaged instead of harmonically averaged, and in cases where the manufacturer selects the lowest of several fuel economy results to represent the vehicle, the manufacturer shall select the $CO_2$ emission value from the test results associated with the lowest selected fuel economy results.

\* \* \* \* \*

■ 53. Amend § 600.010 by revising paragraphs (c)(1)(ii) and (d) to read as follows:

### § 600.010 Vehicle test requirements and minimum data requirements.

\* \* \* \* \*

(c) \* \* \*

(1) \* \* \*

(ii)(A) FTP and HFET data from the highest projected model year sales subconfiguration within the highest projected model year sales vehicle configuration for each base level, and

(B) If required under § 600.115, for 2011 and later model year vehicles, US06, SC03 and cold temperature FTP data from the highest projected model year sales subconfiguration within the highest projected model year sales vehicle configuration for each base level. Manufacturers may optionally generate this data for any 2008 through 2010 model years and 2011 and later model year vehicles, if not otherwise required.

\* \* \* \* \*

(d) *Minimum data requirements for the manufacturer's average fuel economy.* For the purpose of calculating the manufacturer's average fuel economy under § 600.510, the manufacturer shall submit FTP (city) and HFET (highway) test data representing at least 90 percent of the manufacturer's actual model year production, by vehicle configuration, for each category identified for calculation under § 600.510–12(a)(1).

### Subpart B—Fuel Economy and Exhaust Emission Test Procedures

■ 54. Revise the heading of subpart B as set forth above.

■ 55. Amend § 600.101 by:

■ a. Revising paragraph (a)(2); and

■ b. Removing and reserving paragraph (b)(2).

The revision reads as follows:

### § 600.101 Testing overview.

\* \* \* \* \*

(a) \* \* \*

(2) Calculate fuel economy values for vehicle subconfigurations, configurations, base levels, and model types as described in §§ 600.206 and 600.208. Calculate fleet average values for fuel economy as described in § 600.510. Note that § 600.510(c) describes how to use CREE to determine fuel consumption improvement values for specific cases.

\* \* \* \* \*

■ 56. Amend § 600.111–08 by revising paragraph (h) to read as follows:

### § 600.111–08 Test procedures.

\* \* \* \* \*

(h) *Special test procedures.* We may allow or require you to use procedures other than those specified in this section as described in 40 CFR 1066.10(c). For example, special test procedures may be used for advanced technology vehicles, including, but not limited to fuel cell vehicles, hybrid electric vehicles using hydraulic energy storage, and vehicles equipped with hydrogen internal combustion engines. Additionally, we may conduct fuel economy and exhaust emission testing using the special test procedures approved for a specific vehicle.

■ 57. Amend § 600.113–12 by:

■ a. Revising the section heading, introductory text, and paragraph (g);

■ b. Removing and reserving paragraphs (h)(2), (i)(2), (j)(2), (k)(2), (l)(2), (m)(2);

■ c. Revising paragraph (n);

■ d. Removing and reserving paragraph (o)(2); and

■ e. Revising paragraph (p).

The revisions read as follows:

### § 600.113–12 Fuel economy and $CO_2$ emission calculations for FTP, HFET, US06, SC03 and cold temperature FTP tests.

The Administrator will use the calculation procedure set forth in this section for all official EPA testing of vehicles fueled with gasoline, diesel, alcohol-based or natural gas fuel. The calculations of the weighted fuel economy values require input of the weighted grams/mile values for total hydrocarbons (HC), carbon monoxide (CO), and carbon dioxide ($CO_2$); and, additionally for methanol-fueled automobiles, methanol ($CH_3OH$) and formaldehyde (HCHO); and, additionally for ethanol-fueled automobiles, methanol ($CH_3OH$), ethanol ($C_2H_5OH$), acetaldehyde ($C_2H_4O$), and formaldehyde (HCHO); and additionally for natural gas-fueled vehicles, non-methane hydrocarbons (NMHC) and methane ($CH_4$). Emissions shall be determined for the FTP, HFET, US06, SC03, and cold temperature FTP tests. Additionally, the specific gravity, carbon weight fraction and net heating value of the test fuel must be determined. The FTP, HFET, US06, SC03, and cold temperature FTP fuel economy values shall be calculated as specified in this section. An example fuel economy calculation appears in appendix II to this part.

\* \* \* \* \*

(g) Calculate separate FTP, highway, US06, SC03 and Cold temperature FTP fuel economy values from the grams/mile values for total HC, CO, $CO_2$ and, where applicable, $CH_3OH$, $C_2H_5OH$, $C_2H_4O$, HCHO, NMHC, $N_2O$, and $CH_4$, and the test fuel's specific gravity, carbon weight fraction, net heating

value, and additionally for natural gas, the test fuel's composition.

(1) *Emission values for fuel economy calculations.* The emission values (obtained per paragraph (a) through (e) of this section, as applicable) used in the calculations of fuel economy in this section shall be rounded in accordance with § 86.1837 of this chapter. The $CO_2$ values (obtained per this section, as applicable) used in each calculation of fuel economy in this section shall be rounded to the nearest gram/mile.

(2) [Reserved]

(3) The specific gravity and the carbon mass fraction (obtained per paragraph (f) of this section) shall be recorded using three places to the right of the decimal point. Net heat of combustion shall be recorded using three places to the right of the decimal point if expressed in MJ/kg, or the nearest whole number if expressed in Btu/lb.

\* \* \* \* \*

(n) Manufacturers may use a value of 0 grams $CO_2$ per mile to represent the emissions of electric vehicles and the electric operation of plug-in hybrid electric vehicles derived from electricity generated from sources that are not onboard the vehicle.

\* \* \* \* \*

(p) Equations for fuels other than those specified in this section may be used with advance EPA approval. Alternate calculation methods for fuel economy may be used in lieu of the methods described in this section if shown to yield equivalent or superior results and if approved in advance by the Administrator.

■ 58. Amend § 600.114–12 by revising the section heading and introductory text to read as follows:

### § 600.114–12 Vehicle-specific 5-cycle fuel economy CO₂ emission calculations.

Paragraphs (a) through (f) of this section apply to data used for fuel economy labeling under subpart D of this part. Paragraphs (d) through (f) of this section are used to calculate 5-cycle carbon-related exhaust emission values for the purpose of determining optional credits for $CO_2$-reducing technologies under § 86.1869–12 of this chapter and to calculate 5-cycle $CO_2$ values for the purpose of fuel economy labeling under subpart D of this part.

\* \* \* \* \*

■ 59. Amend § 600.116–12 by revising paragraphs (a)(11)(iii)(E), (c) introductory text, (c)(1), (c)(2), (c)(5), and (c)(6)(iii) to read as follows:

### § 600.116–12 Special procedures related to electric vehicles and hybrid electric vehicles.

(a) \* \* \*

(11) \* \* \*

(iii) \* \* \*

(E) A description of each test group and vehicle configuration that will use the 5-cycle adjustment factor, including the battery capacity of the vehicle used to generate the 5-cycle adjustment factor and the battery capacity of all the vehicle configurations to which it will be applied.

\* \* \* \* \*

(c) Determine performance values for hybrid electric vehicles that have plug-in capability as specified in §§ 600.210 and 600.311 using the procedures of SAE J1711 (incorporated by reference, see § 600.011), with the following clarifications and modifications:

(1) Calculate fuel economy values representing combined operation during charge-depleting and charge-sustaining operation using the following utility factors, except as otherwise specified in this paragraph (c):

### TABLE 1 TO PARAGRAPH (c)(1)—FLEET UTILITY FACTORS FOR URBAN "CITY" DRIVING

| Schedule range for UDDS phases, miles | Cumulative UF | Sequential UF |
|---|---|---|
| 3.59 | 0.125 | 0.125 |
| 7.45 | 0.243 | 0.117 |
| 11.04 | 0.338 | 0.095 |
| 14.90 | 0.426 | 0.088 |
| 18.49 | 0.497 | 0.071 |
| 22.35 | 0.563 | 0.066 |
| 25.94 | 0.616 | 0.053 |
| 29.80 | 0.666 | 0.049 |
| 33.39 | 0.705 | 0.040 |
| 37.25 | 0.742 | 0.037 |
| 40.84 | 0.772 | 0.030 |
| 44.70 | 0.800 | 0.028 |
| 48.29 | 0.822 | 0.022 |
| 52.15 | 0.843 | 0.021 |
| 55.74 | 0.859 | 0.017 |
| 59.60 | 0.875 | 0.016 |
| 63.19 | 0.888 | 0.013 |
| 67.05 | 0.900 | 0.012 |
| 70.64 | 0.909 | 0.010 |

### TABLE 2 TO PARAGRAPH (c)(1)—FLEET UTILITY FACTORS FOR HIGHWAY DRIVING

| Schedule range for HFET, miles | Cumulative UF | Sequential UF |
|---|---|---|
| 10.3 | 0.123 | 0.123 |
| 20.6 | 0.240 | 0.117 |
| 30.9 | 0.345 | 0.105 |
| 41.2 | 0.437 | 0.092 |
| 51.5 | 0.516 | 0.079 |
| 61.8 | 0.583 | 0.067 |
| 72.1 | 0.639 | 0.056 |

(2) Determine fuel economy values to demonstrate compliance with CAFE standards as follows:

(i) For vehicles that are not dual fueled automobiles, determine fuel economy using the utility factors specified in paragraph (c)(1) of this section. Do not use the petroleum-equivalence factors described in 10 CFR 474.3.

(ii) Except as described in paragraph (c)(2)(iii) of this section, determine fuel economy for dual fueled automobiles from the following equation, separately for city and highway driving:

Equation 2 to Paragraph (c)(2)(ii)

$$MPGe_{CAFE} = \cfrac{1}{\left(\cfrac{0.5}{MPG_{gas}} + \cfrac{0.5}{MPG_{elec}}\right)}$$

Where:

$MPG_{gas}$ = The miles per gallon measured while operating on gasoline during charge-sustaining operation as determined using the procedures of SAE J1711.

$MPGe_{elec}$ = The miles per gallon equivalent measured while operating on electricity. Calculate this value by dividing the equivalent all-electric range determined from the equation in § 86.1866–12(b)(2)(ii) by the corresponding measured Watt-hours of energy consumed; apply the appropriate petroleum-equivalence factor from 10 CFR 474.3 to convert Watt-hours to gallons equivalent. Note that if vehicles use no gasoline during charge-depleting operation, $MPGe_{elec}$ is the same as the charge-depleting fuel economy specified in SAE J1711.

(iii) For 2016 and later model year dual fueled automobiles, you may determine fuel economy based on the following equation, separately for city and highway driving:

Equation 3 to Paragraph (c)(2)(iii)

$$MPGe_{CAFE} = \cfrac{1}{\left(\cfrac{UF}{MPG_{elec}} + \cfrac{(1-UF)}{MPGe_{gas}}\right)}$$

Where:

$UF$ = The appropriate utility factor for city or highway driving specified in paragraph (c)(1) of this section.

\* \* \* \* \*

(5) Instead of the utility factors specified in paragraphs (c)(1) through (3) of this section, calculate utility factors using the following equation for vehicles whose maximum speed is less than the maximum speed specified in the driving schedule, where the vehicle's maximum speed is determined, to the nearest 0.1 mph, from observing the highest speed over the first duty cycle (FTP, HFET, etc.):

Equation 4 to Paragraph (c)(5)

$$UF_i = 1 - \left[ \exp\left( -\sum_{j=1}^{k}\left( \left(\frac{d_i}{ND}\right)^j \times C_j \right) \right) \right] - \sum_{i=1}^{n} UF_{i-1}$$

Where:

$UF_i$ = the utility factor for phase $i$. Let $UF_0$ = 0.

$j$ = a counter to identify the appropriate term in the summation (with terms numbered consecutively).

$k$ = the number of terms in the equation (see Table 5 of this section).

$d_i$ = the distance driven in phase $i$.

$ND$ = the normalized distance. Use $ND$ = 399 for all types of driving, and for both CAFE fleet values and multi-day individual values for labeling.

$C_j$ = the coefficient for term $j$ from the following table:

TABLE 5 TO PARAGRAPH (c)(5)—CITY/HIGHWAY SPECIFIC UTILITY FACTOR COEFFICIENTS

| $j$ | Fleet values for CAFE | | Multi-day individual values for labeling |
|---|---|---|---|
| | City | Highway | City or highway |
| 1 | 14.86 | 4.8 | 13.1 |
| 2 | 2.965 | 13 | −18.7 |
| 3 | −84.05 | −65 | 5.22 |
| 4 | 153.7 | 120 | 8.15 |
| 5 | −43.59 | −100.00 | 3.53 |
| 6 | −96.94 | 31.00 | −1.34 |
| 7 | 14.47 | | −4.01 |
| 8 | 91.70 | | −3.90 |
| 9 | −46.36 | | −1.15 |
| 10 | | | 3.88 |

$n$ = the number of test phases (or bag measurements) before the vehicle reaches the end-of-test criterion.

(6) \* \* \*

(iii) For charge-sustaining tests, we may approve alternate Net Energy Change/Fuel Ratio tolerances as specified in Appendix C of SAE J1711 to correct final fuel economy values and $CO_2$ emissions. For charge-sustaining tests, do not use alternate Net Energy Change/Fuel Ratio tolerances to correct emissions of criteria pollutants. Additionally, if we approve an alternate

End-of-Test criterion or Net Energy Change/Fuel Ratio tolerances for a specific vehicle, we may use the alternate criterion or tolerances for any testing we conduct on that vehicle.

\*    \*    \*    \*    \*

■ 60. Amend § 600.117 by:
■ a. Revising paragraph (a)(1);
■ b. Removing and reserving paragraph (a)(5); and
■ c. Revising paragraphs (a)(6) and (b) to read as follows:
The revisions read as follows:

### § 600.117   Interim provisions.

(a) \* \* \*

(1) Except as specified in paragraphs (a)(5) and (6) of this section, manufacturers must determine fuel economy values using E0 gasoline test fuel as specified in 40 CFR 86.113–04(a)(1), regardless of any testing with E10 test fuel specified in 40 CFR 1065.710(b) under paragraph (a)(2) of this section.

\*    \*    \*    \*    \*

(6) Manufacturers may alternatively determine fuel economy values using E10 gasoline test fuel as specified in 40 CFR 1065.710(b). Calculate fuel economy using the equation specified in § 600.113–12(o)(1) based on measured $CO_2$ results without adjusting to account for fuel effects.

\*    \*    \*    \*    \*

(b) For model years 2027 through 2029, manufacturers may determine fuel economy values using data with E0 test fuel from testing for earlier model years, subject to the carryover provisions of 40 CFR 86.1839 and § 600.006. Calculate fuel economy using the equation specified in § 600.113–12(h)(1) based on measured $CO_2$ results without adjusting to account for fuel effects.

\*    \*    \*    \*    \*

■ 61. Amend § 600.206–12 by revising paragraphs (a) introductory text, (a)(4) introductory text, (b), and (c) to read as follows:

### § 600.206–12   Calculation and use of FTP-based and HFET-based fuel economy, $CO_2$ emissions, and carbon-related exhaust emission values for vehicle configurations.

(a) Fuel economy, $CO_2$ emissions, and carbon-related exhaust emissions values determined for each vehicle under § 600.113–12(a) and (b) and as approved in § 600.008(c), are used to determine FTP-based city, HFET-based highway, and combined FTP/Highway-based fuel economy, $CO_2$ emissions, and carbon-related exhaust emission values for each vehicle configuration for which data are available. Note that fuel economy for some alternative fuel vehicles may mean miles per gasoline gallon equivalent

and/or miles per unit of fuel consumed. For example, electric vehicles will determine miles per kilowatt-hour in addition to miles per gasoline gallon equivalent, and fuel cell vehicles will determine miles per kilogram of hydrogen.

\*    \*    \*    \*    \*

(4) For alcohol dual fuel automobiles and natural gas dual fuel automobiles the procedures of paragraphs (a)(1) or (2) of this section, as applicable, shall be used to calculate two separate sets of FTP-based city, HFET-based highway, and combined values for fuel economy, $CO_2$ emissions, and carbon-related exhaust emissions for each vehicle configuration.

\*    \*    \*    \*    \*

(b) If only one equivalent petroleum-based fuel economy value exists for an electric vehicle configuration, that value, rounded to the nearest tenth of a mile per gallon, will comprise the petroleum-based fuel economy for that vehicle configuration.

(c) If more than one equivalent petroleum-based fuel economy value exists for an electric vehicle configuration, all values for that vehicle configuration are harmonically averaged and rounded to the nearest 0.0001 mile per gallon for that vehicle configuration.

■ 62. Amend § 600.207–12 by revising paragraphs (a)(1), (a)(4) introductory text, (b), and (c) to read as follows:

### § 600.207–12   Calculation and use of vehicle-specific 5-cycle-based fuel economy and $CO_2$ emission values for vehicle configurations.

(a) \* \* \*

(1) If only one set of 5-cycle city and highway fuel economy and $CO_2$ emission values is accepted for a vehicle configuration, these values, where fuel economy is rounded to the nearest 0.0001 of a mile per gallon and the $CO_2$ emission value in grams per mile is rounded to the nearest tenth of a gram per mile, comprise the city and highway fuel economy and $CO_2$ emission values for that vehicle configuration. Note that the appropriate vehicle-specific $CO_2$ values for fuel economy labels based on 5-cycle testing with E10 test fuel are adjusted as described in § 600.114–12.

\*    \*    \*    \*    \*

(4) For alcohol dual fuel automobiles and natural gas dual fuel automobiles, the procedures of paragraphs (a)(1) and (2) of this section shall be used to calculate two separate sets of 5-cycle city and highway fuel economy and $CO_2$ emission values for each vehicle configuration.

\*    \*    \*    \*    \*

(b) If only one equivalent petroleum-based fuel economy value exists for an electric vehicle configuration, that value, rounded to the nearest tenth of a mile per gallon, will comprise the petroleum-based 5-cycle fuel economy for that vehicle configuration.

(c) If more than one equivalent petroleum-based 5-cycle fuel economy value exists for an electric vehicle configuration, all values for that vehicle configuration are harmonically averaged and rounded to the nearest 0.0001 mile per gallon for that vehicle configuration.

■ 63. Amend § 600.210–12 by revising paragraph (b) to read as follows:

### § 600.210–12   Calculation of fuel economy and $CO_2$ emission values for labeling.

\*    \*    \*    \*    \*

(b) *Specific labels.* Except as specified in paragraphs (d) and (e) of this section, fuel economy and $CO_2$ emissions for specific labels may be determined by one of two methods. The first is based on vehicle-specific vehicle configuration 5-cycle data as determined in § 600.207. This method is available for all vehicles and is required for vehicles that do not qualify for the second method as described in § 600.115 (other than electric vehicles). The second method, the derived 5-cycle method, determines fuel economy and $CO_2$ emissions values from the FTP and HFET tests using equations that are derived from vehicle-specific 5-cycle vehicle configuration data, as determined in paragraph (b)(2) of this section. Manufacturers may voluntarily lower fuel economy values and raise $CO_2$ values if they determine that the label values from either method are not representative of the fuel economy or $CO_2$ emissions for that model type.

(1) *Vehicle-specific 5-cycle labels.* The city and highway vehicle configuration fuel economy determined in § 600.207, rounded to the nearest mpg, and the city and highway vehicle configuration $CO_2$ emissions determined in § 600.207, rounded to the nearest gram per mile, comprise the fuel economy and $CO_2$ emission values for specific fuel economy labels, or, alternatively;

(2) *Derived 5-cycle labels.* Specific city and highway label values from derived 5-cycle are determined according to the following method:

(i)(A) Determine the derived five-cycle city fuel economy of the vehicle configuration using the equation below and coefficients determined by the Administrator:

### Derived 5-cycle City Fuel Economy

$$= \frac{1}{(\text{City Intercept}) + \dfrac{(\text{City Slope})}{\text{Config FTP FE}}}$$

Where:

City Intercept = Intercept determined by the Administrator based on historic vehicle-specific 5-cycle city fuel economy data.

City Slope = Slope determined by the Administrator based on historic vehicle-specific 5-cycle city fuel economy data.

Config FTP FE = the vehicle configuration FTP-based city fuel economy determined under § 600.206, rounded to the nearest 0.0001 mpg.

(B) Determine the derived five-cycle city $CO_2$ emissions of the vehicle configuration using the equation below and coefficients determined by the Administrator:

Derived 5-cycle City $CO_2$ = City Intercept + City Slope · Config FTP $CO_2$

Where:

City Intercept = Intercept determined by the Administrator based on historic vehicle-specific 5-cycle city fuel economy data.

City Slope = Slope determined by the Administrator based on historic vehicle-specific 5-cycle city fuel economy data.

Config FTP $CO_2$ = the vehicle configuration FTP-based city $CO_2$ emissions determined under § 600.206, rounded to the nearest 0.1 grams per mile. Note that the appropriate Config FTP $CO_2$ input values for fuel economy labels based on testing with E10 test fuel are adjusted as referenced in § 600.206–12(a)(2)(iii).

(ii)(A) Determine the derived five-cycle highway fuel economy of the vehicle configuration using the equation below and coefficients determined by the Administrator:

### Derived 5-cycle Highway Fuel Economy

$$= \frac{1}{(\text{Highway Intercept}) + \dfrac{(\text{Highway Slope})}{\text{Config HFET FE}}}$$

Where:

Highway Intercept = Intercept determined by the Administrator based on historic vehicle-specific 5-cycle highway fuel economy data.

Highway Slope = Slope determined by the Administrator based on historic vehicle-specific 5-cycle highway fuel economy data.

Config HFET FE = the vehicle configuration highway fuel economy determined under § 600.206, rounded to the nearest tenth.

(B) Determine the derived five-cycle highway $CO_2$ emissions of the vehicle configuration using the equation below and coefficients determined by the Administrator:

*Derived 5-cycle city Highway $CO_2$ = Highway Intercept + Highway Slope · Config HFET $CO_2$*

Where:

*Highway Intercept* = Intercept determined by the Administrator based on historic vehicle-specific 5-cycle highway fuel economy data.

*Highway Slope* = Slope determined by the Administrator based on historic vehicle-specific 5-cycle highway fuel economy data.

*Config HFET $CO_2$* = the vehicle configuration highway fuel economy determined under § 600.206, rounded to the nearest tenth. Note that the appropriate Config HFET $CO_2$ input values for fuel economy labels based on testing with E10 test fuel are

adjusted as referenced in § 600.206–12(a)(2)(iii).

(iii) The slopes and intercepts of paragraph (a)(2)(iii) of this section apply.

(3) *Specific alternative fuel economy and $CO_2$ emissions label values for dual fuel vehicles.* (i) Determine an alternative fuel label value for dual fuel vehicles, rounded to the nearest whole number, as follows:

(A) Specific city and highway fuel economy label values for dual fuel alcohol-based and natural gas vehicles when using the alternative fuel are separately determined by the following calculation:

$$\text{Derived FE}_{\text{alt}} = \text{FE}_{\text{alt}} \times \frac{5 \text{ cycle}_{\text{gas}}}{\text{FE}_{\text{gas}}}$$

Where:

$\text{FE}_{\text{alt}}$ = The unrounded FTP-based vehicle configuration city or HFET-based vehicle configuration highway fuel economy from the alternative fuel, as determined in § 600.206.

5cycle $\text{FE}_{\text{gas}}$ = The unrounded vehicle-specific or derived 5-cycle vehicle

configuration city or highway fuel economy as determined in paragraph (b)(1) or (2) of this section.

$\text{FE}_{\text{gas}}$ = The unrounded FTP-based city or HFET-based vehicle configuration highway fuel economy from gasoline, as determined in § 600.206.

(B) Specific city and highway $CO_2$ emission label values for dual fuel alcohol-based and natural gas vehicles when using the alternative fuel are separately determined by the following calculation:

$$\text{Derived CO2}_{\text{alt}} = \text{CO2}_{\text{alt}} \times \frac{5 \text{ cycle CO2}_{\text{gas}}}{\text{CO2}_{\text{gas}}}$$

Where:

$CO2_{alt}$ = The unrounded FTP-based vehicle configuration city or HFET-based vehicle configuration highway $CO_2$ emissions value from the alternative fuel, as determined in § 600.206.

5cycle $CO2_{gas}$ = The unrounded vehicle-specific or derived 5-cycle vehicle configuration city or highway $CO_2$ emissions value as determined in paragraph (b)(1) or (b)(2) of this section.

$CO2_{gas}$ = The unrounded FTP-based city or HFET-based vehicle configuration highway $CO_2$ emissions value from gasoline, as determined in § 600.206.

(ii) Optionally, if complete 5-cycle testing has been performed using the alternative fuel, the manufacturer may choose to use the alternative fuel label city or highway fuel economy and $CO_2$ emission values determined in § 600.207–12(a)(4)(ii), rounded to the nearest whole number.

(4) *Specific alternative fuel economy and $CO_2$ emissions label values for electric vehicles.* Determine FTP-based city and HFET-based highway fuel economy label values for electric vehicles as described in § 600.116. Determine these values by running the appropriate repeat test cycles. Convert W-hour/mile results to miles per kW-hr and miles per gasoline gallon equivalent. $CO_2$ label information is based on tailpipe emissions only, so $CO_2$ emissions from electric vehicles are assumed to be zero.

(5) *Specific alternate fuel economy and $CO_2$ emissions label values for fuel cell vehicles.* Determine FTP-based city and HFET-based highway fuel economy label values for fuel cell vehicles using procedures specified by the Administrator. Convert kilograms of hydrogen/mile results to miles per kilogram of hydrogen and miles per gasoline gallon equivalent. $CO_2$ label information is based on tailpipe emissions only, so $CO_2$ emissions from fuel cell vehicles are assumed to be zero.

\* \* \* \* \*

## Subpart F—Procedures for Determining Manufacturer's Average Fuel Economy

■ 64. Revise the heading of subpart F as set forth above.

■ 65. Amend § 600.507–12 by revising paragraphs (a) introductory text, (b), and (d) to read as follows:

### § 600.507–12 Running change data requirements.

(a) Except as specified in paragraph (d) of this section, the manufacturer shall submit additional running change fuel economy data as specified in paragraph (b) of this section for any

running change approved or implemented under § 86.1842 of this chapter, which:

\* \* \* \* \*

(b)(1) The additional running change fuel economy data requirement in paragraph (a) of this section will be determined based on the sales of the vehicle configurations in the created or affected base level(s) as updated at the time of running change approval.

(2) Within each newly created base level as specified in paragraph (a)(1) of this section, the manufacturer shall submit data from the highest projected total model year sales subconfiguration within the highest projected total model year sales vehicle configuration in the base level.

(3) Within each base level affected by a running change as specified in paragraph (a)(2) of this section, fuel economy data shall be submitted for the vehicle configuration created or affected by the running change which has the highest total model year projected sales. The test vehicle shall be of the subconfiguration created by the running change which has the highest projected total model year sales within the applicable vehicle configuration.

\* \* \* \* \*

(d) For those model types created under § 600.208–12(a)(2), the manufacturer shall submit fuel economy data for each subconfiguration added by a running change.

■ 66. Revise § 600.509–12 to read as follows:

### § 600.509–12 Voluntary submission of additional data.

(a) The manufacturer may optionally submit data in addition to the data required by the Administrator.

(b) Additional fuel economy data may be submitted by the manufacturer for any vehicle configuration which is to be tested as required in § 600.507 or for which fuel economy data were previously submitted under paragraph (c) of this section.

(c) Within a base level, additional fuel economy data may be submitted by the manufacturer for any vehicle configuration which is not required to be tested by § 600.507.

■ 67. Amend § 600.510–12 by:

■ a. Revising the section heading;

■ b. Removing and reserving paragraph (a)(2);

■ c. Revising paragraphs (b) and (g)(1) introductory text; and

■ d. Removing paragraphs (i), (j), and (k).

The revisions read as follows:

### § 600.510–12 Calculation of average fuel economy.

\* \* \* \* \*

(b) For the purpose of calculating average fuel economy under paragraph (c) of this section:

(1) All fuel economy data submitted in accordance with § 600.006(e) or § 600.512(c) shall be used.

(2) The combined city/highway fuel economy values will be calculated for each model type in accordance with § 600.208, with the following exceptions:

(i) Separate fuel economy values will be calculated for model types and base levels associated with car lines for each category of passenger automobiles and light trucks as determined by the Secretary of Transportation pursuant to paragraph (a)(1) of this section.

(ii) Total model year production data, as required by this subpart, will be used instead of sales projections.

(iii) The fuel economy value will be rounded to the nearest 0.1 mpg; and

(iv) At the manufacturer's option, those vehicle configurations that are self-compensating to altitude changes may be separated by sales into high-altitude sales categories and low-altitude sales categories. These separate sales categories may then be treated (only for the purpose of this section) as separate vehicle configurations in accordance with the procedure of § 600.208–12(a)(4)(ii).

(3) The fuel economy values for each vehicle configuration are the combined fuel economy calculated according to § 600.206–12(a)(3), with the following exceptions:

(i) Separate fuel economy values will be calculated for vehicle configurations associated with car lines for each category of passenger automobiles and light trucks as determined by the Secretary of Transportation pursuant to paragraph (a)(1) of this section; and

(ii) Total model year production data, as required by this subpart will be used instead of sales projections.

\* \* \* \* \*

(g)(1) Dual fuel automobiles must provide equal or greater energy efficiency while operating on the alternative fuel as while operating on gasoline or diesel fuel to obtain the CAFE credit determined in paragraphs (c)(2)(iv) and (v) of this section. The following equation must hold true:

\* \* \* \* \*

■ 68. Amend § 600.512–12 by:

■ a. Revising paragraph (a) introductory text;

■ b. Removing and reserving paragraphs (a)(2), (c)(1)(ii), and (c)(2)(ii);

■ c. Revising paragraph (c)(3);

■ d. Removing and reserving paragraphs (c)(4)(ii) and (c)(5)(ii); and
■ e. Removing paragraph (c)(11).
The revisions read as follows:

### § 600.512–12    Model year report.

(a) For each model year, the manufacturer shall submit to the Administrator a report, known as the model year report, containing all information necessary for the calculation of the manufacturer's average fuel economy.

\*   \*   \*   \*   \*

(c) \* \* \*

(3)(i) For manufacturers calculating air conditioning efficiency credits in support of fuel consumption improvement values under § 600.510(c), a description of the air conditioning system and the total credits earned for each averaging set, model year, and region, as applicable.

(ii) Any additional fuel economy data submitted by the manufacturer under § 600.509;

\*   \*   \*   \*   \*

### § 600.514–12   [Removed]

■ 69. Remove § 600.514–12.

## PART 1036—CONTROL OF EMISSIONS FROM NEW AND IN-USE HEAVY-DUTY HIGHWAY ENGINES

■ 70. The authority citation for part 1036 continues to read as follows:

**Authority:** 42 U.S.C. 7401–7671q.

■ 71. Amend § 1036.1 by revising paragraph (a) introductory text and adding paragraph (e) to read as follows:

### § 1036.1    Applicability.

(a) Except as specified in § 1036.5, the provisions of this part apply for engines that will be installed in heavy-duty vehicles (including glider vehicles). Heavy-duty engines produced before December 20, 2026 are subject to exhaust emission standards for $NO_X$, HC, PM, and CO, and related provisions under 40 CFR part 86, subpart A and subpart N, instead of this part, except as follows:

\*   \*   \*   \*   \*

(e) This part establishes criteria pollutant standards as described in § 1036.101. This part does not establish standards for $CO_2$ or other greenhouse gas emissions, but it includes certification and testing provisions related to $CO_2$ emissions to support the fuel consumption standards for heavy-duty engines adopted by the Department of Transportation's National Highway Traffic and Safety Administration (NHTSA) under 49 CFR part 535.

■ 72. Amend § 1036.5 by:

■ a. Revising paragraph (a); and
■ b. Removing paragraph (e).
The revision reads as follows:

### § 1036.5    Excluded engines.

(a) The provisions of this part do not apply to engines used in medium-duty passenger vehicles or other heavy-duty vehicles that are subject to regulation under 40 CFR part 86, subpart S, except as specified in 40 CFR part 86, subpart S. For example, this exclusion applies for engines used in incomplete vehicles or high-GCWR vehicles certified to vehicle-based standards as described in 40 CFR 86.1801–12.

\*   \*   \*   \*   \*

■ 73. Amend § 1036.15 by revising paragraph (b) to read as follows:

### § 1036.15    Other applicable regulations.

\*   \*   \*   \*   \*

(b) Part 1037 of this chapter describes emission standards and other requirements for heavy-duty vehicles, whether or not they use engines certified under this part.

\*   \*   \*   \*   \*

■ 74. Amend § 1036.101 by revising paragraph (a) to read as follows:

### § 1036.101    Overview of exhaust emission standards.

(a) You must show that engines meet the criteria pollutant standards for $NO_X$, HC, PM, and CO as described in § 1036.104. These pollutants are sometimes described collectively as ''criteria pollutants'' because they are either criteria pollutants under the Clean Air Act or precursors to the criteria pollutants ozone and PM.

\*   \*   \*   \*   \*

### § 1036.108   [Removed]

■ 75. Remove § 1036.108.

■ 76. Amend § 1036.110 by adding paragraphs (b)(14) through (18) to read as follows:

### § 1036.110    Onboard diagnostics.

\*   \*   \*   \*   \*

(b) \* \* \*

(14) The definition of ''Active Technology'' in 13 CCR 1971.1(c) does not apply.

(15) The standardization requirements in 13 CCR 1971.1(h)(5.4) do not apply.

(16) The data storage requirements in 13 CCR 1971.1(h)(6.1) related to the standardization requirements in 13 CCR 1971.1(h)(5.4) do not apply.

(17) The certification documentation requirement related to ''Active Technology'' in 13 CCR 1971.1(j)(2.32) does not apply.

(18) The monitoring system demonstration requirements in 13 CCR

1971.1(i)(4.3.2)(C) related to $CO_2$ emission data does not apply.

\*   \*   \*   \*   \*

■ 77. Amend § 1036.115 by revising paragraph (b) to read as follows:

### § 1036.115    Other requirements.

\*   \*   \*   \*   \*

(b) *Fuel mapping.* Fuel mapping for your engine in support of NHTSA's fuel consumption standards are described in § 1036.505(b).

\*   \*   \*   \*   \*

■ 78. Amend § 1036.130 by revising paragraph (b)(5) to read as follows:

### § 1036.130    Installation instructions for vehicle manufacturers.

\*   \*   \*   \*   \*

(b) \* \* \*

(5) Describe how your certification is limited for any type of application. For example, if you certify engines only for use in emergency vehicles, you must make clear that the engine may only be installed in emergency vehicles.

\*   \*   \*   \*   \*

■ 79. Amend § 1036.135 by revising paragraph (c)(9) to read as follows:

### § 1036.135    Labeling.

\*   \*   \*   \*   \*

(c) \* \* \*

(9) Identify any limitations on your certification. For example, if you certify engines with one or more approved AECDs for emergency vehicle applications under § 1036.115(h)(4), include the statement: ''THIS ENGINE IS FOR INSTALLATION IN EMERGENCY VEHICLES ONLY''.

\*   \*   \*   \*   \*

■ 80. Revise and republish § 1036.150 to read as follows:

### § 1036.150    Interim provisions.

The provisions in this section apply instead of other provisions in this part. This section describes when these interim provisions expire, if applicable.

(a) *Transitional ABT credits for $NO_X$ emissions.* You may generate $NO_X$ credits from model year 2026 and earlier engines and use those as transitional credits for model year 2027 and later engines using any of the following methods:

(1) *Discounted credits.* Generate discounted credits by certifying any model year 2022 through 2026 engine family to meet all the requirements that apply under 40 CFR part 86, subpart A. Calculate discounted credits for certifying engines in model years 2027 through 2029 as described in § 1036.705 relative to a $NO_X$ emission standard of 200 mg/hp·hr and multiply the result by 0.6. You may not use discounted credits

for certifying model year 2030 and later engines.

(2) *Partial credits.* Generate partial credits by certifying any model year 2024 through 2026 compression-ignition engine family as described in this paragraph (a)(2). You may not use partial credits for certifying model year 2033 and later engines. Certify engines for partial credits to meet all the requirements that apply under 40 CFR part 86, subpart A, with the following adjustments:

(i) Calculate credits as described in § 1036.705 relative to a $NO_X$ emission standard of 200 mg/hp·hr using the appropriate useful life mileage from 40 CFR 86.004–2. Your declared $NO_X$ family emission limit applies for the FTP and SET duty cycles.

(ii) Engines must meet a $NO_X$ standard when tested over the Low Load Cycle as described in § 1036.514. Engines must also meet an off-cycle $NO_X$ standard as specified in § 1036.104(a)(3). Calculate the $NO_X$ family emission limits for the Low Load Cycle and for off-cycle testing as described in § 1036.104(c)(3) with $Std_{FTPNOx}$ set to 35 mg/hp·hr and $Std_{[cycle]NOx}$ set to the values specified in § 1036.104(a)(1) or (3), respectively. No standard applies for HC, PM, and CO emissions for the Low Load Cycle or for off-cycle testing, but you must record measured values for those pollutants and include those measured values where you report $NO_X$ emission results.

(iii) For engines selected for in-use testing, we may specify that you perform testing as described in 40 CFR part 86, subpart T, or as described in subpart E of this part.

(iv) Add the statement ''Partial credit'' to the emission control information label.

(3) *Full credits.* Generate full credits by certifying any model year 2024 through 2026 engine family to meet all the requirements that apply under this part. Calculate credits as described in § 1036.705 relative to a $NO_X$ emission standard of 200 mg/hp·hr. You may not use full credits for certifying model year 2033 and later engines.

(4) *2026 service class pull-ahead credits.* Generate credits from diesel-fueled engines under this paragraph (a)(4) by certifying all your model year 2026 diesel-fueled Heavy HDE to meet all the requirements that apply under this part, with a $NO_X$ family emission limit for FTP testing at or below 50 mg/hp·hr. Calculate credits as described in § 1036.705 relative to a $NO_X$ emission standard of 200 mg/hp·hr. You may use credits generated under this paragraph (a)(4) through model year 2034, but not for later model years. Credits generated

by Heavy HDE may be used for certifying Medium HDE after applying a 10 percent discount (multiply credits by 0.9). Engine families using credits generated under this paragraph (a)(4) are subject to a $NO_X$ FEL cap of 50 mg/hp·hr for FTP testing.

(b) [Reserved]

(c) *Engine cycle classification.* Through model year 2020, engines meeting the definition of spark-ignition, but regulated as compression-ignition engines under § 1036.140, must be certified to the requirements applicable to compression-ignition engines under this part. Such engines are deemed to be compression-ignition engines for purposes of this part. Similarly, through model year 2020, engines meeting the definition of compression-ignition, but regulated as Otto-cycle under 40 CFR part 86 must be certified to the requirements applicable to spark-ignition engines under this part. Such engines are deemed to be spark-ignition engines for purposes of this part. See § 1036.140 for provisions that apply for model year 2021 and later.

(d) *Small manufacturers.* The fuel consumption standards under 49 CFR part 535 apply on a delayed schedule for manufacturers meeting the small business criteria specified in 13 CFR 121.201. Apply the small business criteria for NAICS code 336310 for engine manufacturers with respect to gasoline-fueled engines and 333618 for engine manufacturers with respect to other engines; the employee limits apply to the total number employees together for affiliated companies. Qualifying small manufacturers are not subject to the fuel consumption standards for engines with a date of manufacture on or after November 14, 2011, but before January 1, 2022. In addition, qualifying small manufacturers producing engines that run on any fuel other than gasoline, E85, or diesel fuel may delay complying with every later fuel consumption standard under 49 CFR part 535 by one model year; however, small manufacturers may generate credits only by certifying all their engine families within a given averaging set to standards that apply for the current model year. Note that engines not yet subject to standards must nevertheless supply fuel maps to vehicle manufacturers as described in paragraph (n) of this section. Note also that engines produced by small manufacturers are subject to criteria pollutant standards.

(e) [Reserved]

(f) *Testing exemption for hydrogen engines.* Tailpipe HC, and CO emissions from engines fueled with neat hydrogen are deemed to comply with the

applicable standard. Testing for HC or CO is optional under this part for these engines.

(g)–(j) [Reserved]

(k) *Limited production volume allowance under ABT.* You may produce a limited number of Heavy HDE that continue to meet the standards that applied under 40 CFR 86.007–11 in model years 2027 through 2029. The maximum number of engines you may produce under this limited production allowance is 5 percent of the annual average of your actual production volume of Heavy HDE in model years 2023–2025 for calculating emission credits under § 1036.705. Engine certification under this paragraph (k) is subject to the following conditions and requirements:

(1) Engines must meet all the standards and other requirements that apply under 40 CFR part 86 for model year 2026. Engine must be certified in separate engine families that qualify for carryover certification as described in § 1036.235(d).

(2) The $NO_X$ FEL must be at or below 200 mg/hp·hr. Calculate negative credits as described in § 1036.705 by comparing the $NO_X$ FEL to the FTP emission standard specified in § 1036.104(a)(1), with a value for useful life of 650,000 miles. Meet the credit reporting and recordkeeping requirements in §§ 1036.730 and 1036.735.

(3) Label the engine as described in 40 CFR 86.095–35, but include the following alternate compliance statement: ''THIS ENGINE CONFORMS TO U.S. EPA REGULATIONS FOR MODEL YEAR 2026 ENGINES UNDER 40 CFR 1036.150(k).''

(l) [Reserved]

(m) *Infrequent regeneration.* For model year 2020 and earlier, you may invalidate any test interval with respect to $CO_2$ measurements if an infrequent regeneration event occurs during the test interval. Note that § 1036.580 specifies how to apply infrequent regeneration adjustment factors for later model years.

(n) *Supplying fuel maps.* Engine manufacturers not yet subject to fuel consumption standards under 49 CFR part 535 in model year 2021 must supply vehicle manufacturers with fuel maps (or powertrain test results) as described in § 1036.130 for those engines.

(o) *Engines used in glider vehicles.* For purposes of recertifying a used engine for installation in a glider vehicle, we may allow you to include in an existing certified engine family those engines you modify (or otherwise demonstrate) to be identical to engines already covered by the certificate. We

would base such an approval on our review of any appropriate documentation. These engines must have emission control information labels that accurately describe their status.

(p) [Reserved]

(q) *Confirmatory and in-use testing of fuel maps defined in § 1036.505(b).* For model years 2021 and later, where the results from Eq. 1036.235–1 for a confirmatory or in-use test are at or below 2.0%, we will not replace the manufacturer's fuel maps.

(r) *Fuel maps for the transition to updated GEM.* (1) You may use fuel maps from model year 2023 and earlier engines for certifying model year 2024 and later engines using carryover provisions in § 1036.235(d).

(2) Compliance testing will be based on the GEM version you used to generate fuel maps for certification. For example, if you perform a selective enforcement audit with respect to fuel maps, use the same GEM version that you used to generate fuel maps for certification. Similarly, we will use the same GEM version that you used to generate fuel maps for certification if we perform confirmatory testing with one of your engine families.

(s) *Fuel consumption compliance testing.* Select duty cycles and measure emissions to demonstrate compliance with the fuel consumption standards under 49 CFR part 535 before model year 2027 as follows:

(1) For model years 2016 through 2020, measure emissions using the FTP duty cycle specified in § 1036.512 and the SET duty cycle specified in 40 CFR 86.1362, as applicable.

(2) The following provisions apply for model years 2021 through 2026:

(i) [Reserved]

(ii) You may demonstrate compliance with SET-based fuel consumption standards using the SET duty cycle specified in 40 CFR 86.1362 if you collect emissions with continuous sampling. Integrate the test results by mode to establish separate emission rates for each mode (including the transition following each mode, as applicable). Apply the $CO_2$ weighting factors specified in 40 CFR 86.1362 to calculate a composite emission result.

(t) *Model year 2027 compliance date.* The following provisions describe when this part 1036 starts to apply for model year 2027 engines:

(1) *Split model year.* Model year 2027 engines you produce before December 20, 2026 are subject to the criteria standards and related provisions in 40 CFR part 86, subpart A, as described in § 1036.1(a). Model year 2027 engines you produce on or after December 20,

2026 are subject to all the provisions of this part.

(2) *Optional early compliance.* You may optionally certify model year 2027 engines you produce before December 20, 2026 to all the provisions of this part.

(3) *Certification.* If you certify any model year 2027 engines to 40 CFR part 86, subpart A, under paragraph (t)(1) of this section, certify the engine family by dividing the model year into two partial model years. The first portion of the model year starts when it would normally start and ends when you no longer produce engines meeting standards under 40 CFR part 86, subpart A, on or before December 20, 2026. The second portion of the model year starts when you begin producing engines meeting standards under this part 1036, and ends on the day your model year would normally end. The following additional provisions apply for model year 2027 if you split the model year as described in this paragraph (t):

(i) You may generate emission credits only with engines that are certified under this part 1036.

(ii) In your production report under § 1036.250(a), identify production volumes separately for the two parts of the model year.

(iii) OBD testing demonstrations apply singularly for the full model year.

(u) *Crankcase emissions.* The provisions of 40 CFR 86.007–11(c) for crankcase emissions continue to apply through model year 2026.

(v) *OBD communication protocol.* We may approve the alternative communication protocol specified in SAE J1979–2 (incorporated by reference, see § 1036.810) if the protocol is approved by the California Air Resources Board. The alternative protocol would apply instead of SAE J1939 and SAE J1979 as specified in 40 CFR 86.010–18(k)(1). Engines designed to comply with SAE J1979–2 must meet the freeze-frame requirements in § 1036.110(b)(8) and in 13 CCR 1971.1(h)(4.3.2) (incorporated by reference, see § 1036.810). This paragraph (v) also applies for model year 2026 and earlier engines.

(w) [Reserved]

(x) *Powertrain testing for criteria pollutants.* You may apply the powertrain testing provisions of § 1036.101(b) for demonstrating compliance with criteria pollutant emission standards in 40 CFR part 86 before model year 2027.

(y) *$NO_X$ compliance allowance for in-use testing.* A $NO_X$ compliance allowance of 15 mg/hp·hr applies for any in-use testing of Medium HDE and Heavy HDE as described in subpart E of

this part. Add the compliance allowance to the $NO_X$ standard that applies for each duty cycle and for off-cycle testing, with both field testing and laboratory testing. The $NO_X$ compliance allowance does not apply for the bin 1 off-cycle standard. As an example, for manufacturer-run field-testing of a Heavy HDE, add the 15 mg/hp·hr compliance allowance and the 5 mg/hp·hr accuracy margin from § 1036.420 to the 58 mg/hp·hr bin 2 off-cycle standard to calculate a 78 mg/hp·hr $NO_X$ standard.

(z) *Alternate family pass criteria for in-use testing.* The following family pass criteria apply for manufacturer-run in-use testing instead of the pass criteria described in § 1036.425 for model years 2027 and 2028:

(1) Start by measuring emissions from five engines using the procedures described in subpart E of this part and § 1036.530. If four or five engines comply fully with the off-cycle bin standards, the engine family passes and you may stop testing.

(2) If exactly two of the engines tested under paragraph (z)(1) of this section do not comply fully with the off-cycle bin standards, test five more engines. If these additional engines all comply fully with the off-cycle bin standards, the engine family passes and you may stop testing.

(3) If three or more engines tested under paragraphs (z)(1) and (2) of this section do not comply fully with the off-cycle bin standards, test a total of at least 10 but not more than 15 engines. Calculate the arithmetic mean of the bin emissions from all the engine tests as specified in § 1036.530(g) for each pollutant. If the mean values are at or below the off-cycle bin standards, the engine family passes. If the mean value for any pollutant is above an off-cycle bin standard, the engine family fails.

■ 81. Amend § 1036.205 by:

■ a. Revising paragraphs (b) introductory text, (l), (m), (o)(2), and (t); and

■ b. Removing paragraph (aa).

The revisions read as follows:

### § 1036.205 Requirements for an application for certification.

\* \* \* \* \*

(b) Explain how the emission control system operates. Describe in detail all system components for controlling greenhouse gas and criteria pollutant emissions, including all auxiliary emission control devices (AECDs) and all fuel-system components you will install on any production or test engine. Identify the part number of each component you describe. For this paragraph (b), treat as separate AECDs

any devices that modulate or activate differently from each other. Include all the following:

\* \* \* \* \*

(l) Identify the duty-cycle emission standards from § 1036.104(a) and (b) that apply for the engine family. Also identify FELs and FCLs as follows:

(1) Identify the $NO_X$ FEL over the FTP for the engine family.

(2) Identify the $CO_2$ FCLs for the engine family. The actual U.S.-directed production volume of configurations that are at or below the FCL must be at least one percent of your actual (not projected) U.S.-directed production volume for the engine family. Identify configurations within the family that have emission rates at or below the FCL and meet the one percent requirement. For example, if your U.S.-directed production volume for the engine family is 10,583 and the U.S.-directed production volume for the tested rating is 75 engines, then you can comply with this provision by setting your FCL so that one more rating with a U.S.-directed production volume of at least 31 engines meets the FCL. Where applicable, also identify other testable configurations required under § 1036.230(f)(2)(ii).

(m) Identify the engine family's deterioration factors and describe how you developed them (see § 1036.240). Present any test data you used for this. For engines designed to discharge crankcase emissions to the ambient atmosphere, use the deterioration factors for crankcase emission to determine deteriorated crankcase emission levels of $NO_X$, HC, PM, and CO as specified in § 1036.240(e).

\* \* \* \* \*

(o) \* \* \*

(2) Identify the value of $e_{CO2FTPFCL}$ from § 1036.235(b). Show emission figures before and after applying deterioration factors for each engine. In addition to the composite results, show individual measurements for cold-start testing and hot-start testing over the transient test cycle.

\* \* \* \* \*

(t) State whether your certification is limited for certain engines. For example, you might certify engines only for use in emergency vehicles or in vehicles with hybrid powertrains. If this is the case, describe how you will prevent use of these engines in vehicles for which they are not certified.

\* \* \* \* \*

■ 82. Amend § 1036.230 by revising paragraphs (f) introductory text, and (f)(1) and (5) to read as follows:

### § 1036.230 Selecting engine families.

\* \* \* \* \*

(f) The following additional provisions apply with respect to demonstrating compliance with the fuel consumption standards of 49 CFR 535.5:

(1) Use the same engine families you use for criteria pollutants. You may subdivide an engine family into subfamilies that have a different FCL for $CO_2$ emissions. These subfamilies do not apply for demonstrating compliance with criteria standards in § 1036.104.

\* \* \* \* \*

(5) Except as described in this paragraph (f), engine configurations within an engine family must use equivalent controls. Unless we approve it, you may not produce nontested configurations without the same control hardware included on the tested configuration.

\* \* \* \* \*

■ 83. Add § 1036.231 to subpart C to read as follows:

### § 1036.231 Powertrain families.

(a) If you choose to perform powertrain testing as specified in § 1036.545, use good engineering judgment to divide your product line into powertrain families that are expected to have similar criteria emissions throughout the useful life as described in this section. Your powertrain family is limited to a single model year.

(b) Except as specified in paragraph (c) of this section, group powertrains in the same powertrain family if they share all the following attributes:

(1) Have the same engine design aspects as specified in § 1036.230.

(2) [Reserved]

(3) Number of clutches.

(4) Type of clutch (*e.g.,* wet or dry).

(5) Presence and location of a fluid coupling such as a torque converter.

(6) Gear configuration, as follows:

(i) Planetary (*e.g.,* simple, compound, meshed-planet, stepped-planet, multi-stage).

(ii) Countershaft (*e.g.,* single, double, triple).

(iii) Continuously variable (*e.g.,* pulley, magnetic, toroidal).

(7) Number of available forward gears, and transmission gear ratio for each available forward gear, if applicable. Count forward gears as being available only if the vehicle has the hardware and software to allow operation in those gears.

(8) Transmission oil sump configuration (*e.g.,* conventional or dry).

(9) The power transfer configuration of any hybrid technology (*e.g.,* series or parallel).

(10) The type of any RESS (*e.g.,* hydraulic accumulator, Lithium-ion battery pack, ultracapacitor bank).

(c) For powertrains that share all the attributes described in paragraph (b) of this section, divide them further into separate powertrain families based on common calibration attributes. Group powertrains in the same powertrain family to the extent that powertrain test results and corresponding emission levels are expected to be similar throughout the useful life.

(d) You may subdivide a group of powertrains with shared attributes under paragraph (b) of this section into different powertrain families.

(e) In unusual circumstances, you may group powertrains into the same powertrain family even if they do not have shared attributes under in paragraph (b) of this section if you show that their emission characteristics throughout the useful life will be similar.

(f) If you include the axle when performing powertrain testing for the family, you must limit the family to include only those axles represented by the test results. You may include multiple axle ratios in the family if you test with the axle expected to produce the highest emission results.

■ 84. Amend § 1036.235 by revising the introductory text and paragraphs (a), (b), and (c)(5) introductory text to read as follows:

### § 1036.235 Testing requirements for certification.

This section describes the emission testing you must perform to show compliance with the emission standards in § 1036.104 or fuel consumption standards under 49 CFR part 535.

(a) Select and configure one or two emission-data engines from each engine family as follows:

(1) You may use one engine for criteria pollutant testing and a different engine for fuel consumption testing, or you may use the same engine for all testing.

(2) For criteria pollutant emission testing, select the engine configuration with the highest volume of fuel injected per cylinder per combustion cycle at the point of maximum torque—unless good engineering judgment indicates that a different engine configuration is more likely to exceed (or have emissions nearer to) an applicable emission standard or FEL. If two or more engines have the same fueling rate at maximum torque, select the one with the highest fueling rate at rated speed. In making this selection, consider all factors expected to affect emission-control performance and compliance with the

standards, including emission levels of all exhaust constituents, especially $NO_X$ and PM. To the extent we allow it for establishing deterioration factors, select for testing those engine components or subsystems whose deterioration best represents the deterioration of in-use engines.

(3) For fuel consumption testing, the standards of this part apply only with respect to emissions measured from the tested configuration and other configurations identified in § 1036.205(l)(2). Note that configurations identified in § 1036.205(l)(2) are considered to be ''tested configurations'' whether or not you test them for certification. However, you must apply the same (or equivalent) emission controls to all other engine configurations in the engine family. In other contexts, the tested configuration is sometimes referred to as the ''parent configuration'', although the terms are not synonymous.

(4) In the case of powertrain testing under § 1036.545, select a test engine, test hybrid components, test axle and test transmission as applicable, by considering the whole range of vehicle models covered by the powertrain family. If the powertrain has more than one transmission calibration, for example economy vs. performance, you may weight the results from the powertrain testing in § 1036.545 by the percentage of vehicles in the family by prior model year for each configuration. This can be done, for example, through the use of survey data or based on the previous model year's sales volume. Weight the results of $M_{\text{fuel[cycle]},\text{fnpowertrain}}/v_{\text{powertrain}}$, and $W_{\text{[cycle]}}$ from table 5 to paragraph (o)(8)(i) of § 1036.545 according to the percentage of vehicles in the family that use each transmission calibration.

(b) Test your emission-data engines using the procedures and equipment specified in subpart F of this part. In the case of dual-fuel and flexible-fuel engines, measure emissions when operating with each type of fuel for which you intend to certify the engine.

(1) For criteria pollutant emission testing, measure $NO_X$, PM, CO, and NMHC emissions using each duty cycle specified in § 1036.104. Note that off-cycle testing depends on determining the value of $e_{\text{CO2FTPFCL}}$ from § 1036.530.

(2) For fuel consumption testing, measure $CO_2$ emissions; the following provisions apply regarding test cycles for demonstrating compliance with tractor and vocational fuel consumption standards:

(i) For tractors, you must measure $CO_2$ emissions using the SET duty cycle specified in § 1036.510, taking into account the interim provisions in § 1036.150(s).

(ii) For vocational applications, you must measure $CO_2$ emissions using the appropriate FTP transient duty cycle, including cold-start and hot-start testing as specified in § 1036.512.

(iii) For engine families that include both tractor and vocational use, you may submit $CO_2$ emission data and specify FCLs for both SET and FTP transient duty cycles.

(iv) Some of your engines tested for use in tractors may also be used in vocational vehicles, and some of your engines tested for use in vocational may be used in tractors. However, you may not knowingly circumvent the intent of this part by testing engines designed for tractors or vocational vehicles (and rarely used in the other application) to the wrong cycle.

(c) * * *

(5) For fuel consumption testing, we may use our emission test results for steady-state, idle, cycle-average and powertrain fuel maps defined in § 1036.505(b) as the official emission results. We will not replace individual points from your fuel map.

* * * * *

§ 1036.241 [Removed]

■ 85. Remove § 1036.241.

■ 86. Amend § 1036.301 by revising the section heading to read as follows:

§ 1036.301 Selective enforcement audits.

* * * * *

■ 87. Amend § 1036.501 by revising paragraph (a) to read as follows:

§ 1036.501 General testing provisions.

(a) Use the equipment and procedures specified in this subpart and 40 CFR part 1065 to determine whether engines meet the emission standards in § 1036.104 or fuel consumption standards under 49 CFR part 535.

* * * * *

■ 88. Add § 1036.503 to subpart F to read as follows:

§ 1036.503 Engine data and information to support vehicle certification for NHTSA.

See § 1036.505 for engine data and information required to support vehicle certification.

■ 89. Amend § 1036.505 by revising the introductory text and paragraph (a) to read as follows:

§ 1036.505 Engine data and information to support vehicle certification.

You must give vehicle manufacturers information as follows so they can certify their vehicles to fuel consumption standards under 49 CFR part 535:

(a) Identify engine make, model, fuel type, combustion type, engine family name, calibration identification, and engine displacement. Also identify whether the engines will be used in tractors, vocational vehicles, or both. When certifying vehicles with GEM, for any fuel type not identified in table 1 to paragraph (b)(4) of § 1036.550, identify the fuel type as diesel fuel for engines subject to compression-ignition standards, and as gasoline for engines subject to spark-ignition standards.

* * * * *

■ 90. Amend § 1036.510 by revising paragraphs (b)(2) introductory text and (b)(2)(vii) and (viii) to read as follows:

§ 1036.510 Supplemental Emission Test.

* * * * *

(b) * * *

(2) Test hybrid powertrains as described in § 1036.545, except as specified in this paragraph (b)(2). Do not compensate the duty cycle for the distance driven as described in § 1036.545(g)(4). For hybrid engines, select the transmission model parameters as described in § 1036.510(b)(2)(viii), . Disregard duty cycles in § 1036.545(j). For cycles that begin with idle, leave the transmission in neutral or park for the full initial idle segment. Place the transmission into drive no earlier than 5 seconds before the first nonzero vehicle speed setpoint. For SET testing only, place the transmission into park or neutral when the cycle reaches the final idle segment. Use the following vehicle parameters instead of those in § 1036.545 to define the vehicle model in § 1036.545(a)(3):

* * * * *

(vii) Select a combination of drive axle ratio, $k_a$, and a tire radius, $r$, that represents the worst-case combination of top gear ratio, drive axle ratio, and tire size for $CO_2$ emissions expected for vehicles in which the hybrid engine or hybrid powertrain will be installed. This is typically the highest axle ratio and smallest tire radius. Disregard configurations or settings corresponding to a maximum vehicle speed below 60 mi/hr in selecting a drive axle ratio and tire radius, unless you can demonstrate that in-use vehicles will not exceed that speed. You may request preliminary approval for selected drive axle ratio and tire radius consistent with the provisions of § 1036.210. If the hybrid engine or hybrid powertrain is used exclusively in vehicles not capable of reaching 60 mi/hr, you may request that we approve an alternate test cycle and cycle-validation criteria as described in 40 CFR 1066.425(b)(5). Note that hybrid engines rely on a specified transmission

that is different for each duty cycle; the transmission's top gear ratio therefore depends on the duty cycle, which will in turn change the selection of the drive axle ratio and tire size. For example, § 1036.520 prescribes a different top gear ratio than this paragraph (b)(2).

(viii) If you are certifying a hybrid engine, use a default transmission efficiency of 0.95 and create the vehicle model along with its default transmission shift strategy as described in § 1036.545(a)(3)(ii). Specify the transmission type as Automatic Transmission for all engines and for all duty cycles, except that the transmission type is Automated Manual Transmission for Heavy HDE operating over the SET duty cycle. For automatic transmissions set neutral idle to ''Y'' in the vehicle file. Select gear ratios for each gear as shown in the following table:

TABLE 1 TO PARAGRAPH (b)(2)(viii) OF § 1036.510—GEM HIL INPUT FOR GEAR RATIO

| Gear No. | Spark-ignition HDE, Light HDE, and Medium HDE—all duty cycles | Heavy HDE—LLC and FTP duty cycles | Heavy HDE—SET duty cycle |
|---|---|---|---|
| 1 | 3.10 | 3.51 | 12.8 |
| 2 | 1.81 | 1.91 | 9.25 |
| 3 | 1.41 | 1.43 | 6.76 |
| 4 | 1.00 | 1.00 | 4.90 |
| 5 | 0.71 | 0.74 | 3.58 |
| 6 | 0.61 | 0.64 | 2.61 |
| 7 | | | 1.89 |
| 8 | | | 1.38 |
| 9 | | | 1.00 |
| 10 | | | 0.73 |
| Lockup Gear | 3 | 3 | |

\* \* \* \* \*

■ 91. Amend § 1036.512 by revising paragraphs (b)(2)(iv) and (e) to read as follows:

### § 1036.512 Federal Test Procedure.

\* \* \* \* \*

(b) \* \* \*

(2) \* \* \*

(iv) For plug-in hybrid powertrains, test over the FTP in both charge-sustaining and charge-depleting operation for criteria pollutant determination.

\* \* \* \* \*

(e) Determine $CO_2$ emissions for plug-in hybrid engines and powertrains using the emissions results for all the transient duty cycle test intervals described in either paragraph (b) or (c) of appendix B to this part for both charge-depleting and charge-sustaining operation from paragraph (d)(2) of this section. Calculate the utility factor weighted composite mass of emissions from the charge-depleting and charge-sustaining test results, $e_{UF[emission]comp}$, as described in § 1036.510(e), replacing occurrences of ''SET'' with ''transient test interval''. Note this results in composite FTP $CO_2$ emission results for plug-in hybrid engines and powertrains without the use of the cold-start and hot-start test interval weighting factors in Eq. 1036.512–1.

\* \* \* \* \*

■ 92. Amend § 1036.514 by revising paragraph (b)(4) to read as follows:

### § 1036.514 Low Load Cycle.

\* \* \* \* \*

(b) \* \* \*

(4) Adjust procedures in this section as described in § 1036.510(d) for plug-in hybrid powertrains, replacing ''SET'' with ''LLC''. Note that the LLC is therefore the preconditioning duty cycle for plug-in hybrid powertrains.

\* \* \* \* \*

■ 93. Amend § 1036.520 by revising paragraph (b)(1) to read as follows:

### § 1036.520 Determining power and vehicle speed values for powertrain testing.

\* \* \* \* \*

(b) \* \* \*

(1) Use vehicle parameters, other than power, as specified in § 1036.510(b)(2). Use the applicable automatic transmission as specified in § 1036.510(b)(2)(viii).

\* \* \* \* \*

■ 94. Amend § 1036.535 by:

■ a. Revising the introductory text; and

■ b. Removing and reserving paragraph (f).

The revision reads as follows:

### § 1036.535 Determining steady-state engine fuel maps and fuel consumption at idle.

The procedures in this section describe how to determine an engine's steady-state fuel map and fuel consumption at idle for model year 2021 and later vehicles; these procedures apply as described in § 1036.505. Vehicle manufacturers may need these values to demonstrate compliance with standards under 49 CFR part 535.

\* \* \* \* \*

■ 95. Amend § 1036.540 by:

■ a. Revising paragraph (a) introductory text; and

■ b. Removing and reserving paragraph (b)(1).

The revision reads as follows:

### § 1036.540 Determining cycle-average engine fuel maps.

(a) *Overview.* This section describes how to determine an engine's cycle-average fuel maps for model year 2021 and later vehicles. Vehicle manufacturers may need cycle-average fuel maps for transient duty cycles, highway cruise cycles, or both to demonstrate compliance with standards under 49 CFR part 535. Generate cycle-average engine fuel maps as follows:

\* \* \* \* \*

■ 96. Amend § 1036.545 by:

■ a. Revising the introductory text;

■ b. Removing and reserving paragraph (a)(1);

■ c. Revising paragraph (d); and

■ d. Removing paragraph (p).

The revisions read as follows:

### § 1036.545 Powertrain testing.

This section describes the procedure to measure fuel consumption and create engine fuel maps by testing a powertrain that includes an engine coupled with a transmission, drive axle, and hybrid components or any assembly with one or more of those hardware elements. Engine fuel maps are part of demonstrating compliance with standards under 49 CFR part 535; the powertrain test procedure in this section is one option for generating this fuel-mapping information as described in § 1036.505. Additionally, this powertrain test procedure is one option

for certifying hybrid powertrains to the engine standards in § 1036.104.

\* \* \* \* \*

(d) *Powertrain break in.* Break in the powertrain as a complete system using the engine break-in procedure in 40 CFR 1065.405(c), or take the following steps to break in the engine, axle assembly, and transmission separately, as applicable:

(1) Break in the engine according to 40 CFR 1065.405(c).

(2) Break in the axle assembly using good engineering judgment. Maintain gear oil temperature at or below 100 °C throughout the break-in period.

(3) Break in the transmission using good engineering judgment. Maintain transmission oil temperature at (87 to 93) °C for automatic transmissions and transmissions having more than two friction clutches, and at (77 to 83) °C for all other transmissions. You may ask us to approve a different range of transmission oil temperatures if you have data showing that it better represents in-use operation.

\* \* \* \* \*

■ 97. Amend § 1036.550 by revising the section heading and introductory text to read as follows:

### § 1036.550 Calculating $CO_2$ emission rates.

This section describes how to calculate official emission results for $CO_2$.

\* \* \* \* \*

■ 98. Amend § 1036.580 by revising the introductory text and paragraph (c) to read as follows:

### § 1036.580 Infrequently regenerating aftertreatment devices.

For engines using aftertreatment technology with infrequent regeneration events that may occur during testing, take one of the following approaches to account for the emission impact of regeneration:

\* \* \* \* \*

(c) You may choose to make no adjustments to measured emission results if you determine that regeneration does not significantly affect emission levels for an engine family (or configuration) or if it is not practical to identify when regeneration occurs. You may omit adjustment factors under this paragraph (c) for individual pollutants under this paragraph (c) as appropriate. If you choose not to make adjustments under paragraph (a) or (b) of this section, your engines must meet emission standards for all testing, without regard to regeneration.

\* \* \* \* \*

■ 99. Amend § 1036.605 by revising paragraphs (b) and (g) to read as follows:

### § 1036.605 Alternate emission standards for engines used in specialty vehicles.

\* \* \* \* \*

(b) Compression-ignition engines must be of a configuration that is identical to one that is certified under 40 CFR part 1039, and must be certified with a family emission limit for PM of 0.020 g/kW-hr using the same duty cycles that apply under 40 CFR part 1039.

\* \* \* \* \*

(g) Engines certified under this section may not generate or use emission credits under this part or under 40 CFR part 1039.

■ 100. Amend § 1036.610 by revising the section heading to read as follows:

### § 1036.610 Off-cycle technology credits.

\* \* \* \* \*

■ 101. Amend § 1036.620 by:
■ a. Revising the section h·eading, introductory text, and paragraph (a); and
■ b. Removing and reserving paragraphs (d) and (e).

The revisions read as follows:

### § 1036.620 Alternate standards based on model year 2011 compression-ignition engines.

For model years 2014 through 2016, you may certify your compression-ignition engines to alternate fuel consumption standards as described in this section. However, you may not certify engines to these alternate standards if they are part of an averaging set in which you carry a balance of banked credits. For purposes of this section, you are deemed to carry credits in an averaging set if you carry credits from advanced technology that are allowed to be used in that averaging set.

(a) The standards of this section are determined from the measured emission rate of the engine of the applicable baseline 2011 engine family or families as described in paragraphs (b) and (c) of this section. Calculate the $CO_2$ emission rate of the baseline engine using the same equations used for showing compliance with the otherwise applicable fuel consumption standard. The alternate emission rate for light and medium heavy-duty vocational-certified engines (using the transient cycle) is equal to the baseline emission rate multiplied by 0.975. The alternate emission rate for tractor-certified engines (using the SET duty cycle) and all other Heavy HDE is equal to the baseline emission rate multiplied by 0.970. The in-use FEL for these engines

is equal to the alternate standard multiplied by 1.03.

\* \* \* \* \*

### § 1036.625 [Removed]

■ 102. Remove § 1036.625.

■ 103. Revise and republish § 1036.630 to read as follows:

### § 1036.630 Measurement of $CO_2$ emissions for powertrain testing.

For engines included in powertrain families under § 1036.231, you may choose to include the corresponding engine emissions in your engine families under this part instead of (or in addition to) the otherwise applicable engine fuel maps.

(a) If you choose to certify powertrain fuel maps in an engine family for fuel consumption standards, the declared values for powertrain testing become the standards that apply for selective enforcement audits and in-use testing. We may require that you provide to us the engine cycle (not normalized) corresponding to a given powertrain for each of the specified duty cycles.

(b) If you choose to certify only fuel map values for an engine family for fuel consumption standards and to not certify values over powertrain cycles under § 1036.545, we will not presume you are responsible for value over the powertrain cycles. However, where we determine that you are responsible in whole or in part for the emission exceedance in such cases, we may require that you participate in any recall of the affected vehicles.

(c) If you split an engine family into subfamilies based on different fuel-mapping procedures as described in § 1036.230(f)(2), the fuel-mapping procedures you identify for certifying each subfamily also apply for selective enforcement audits and in-use testing.

### § 1036.635 [Removed]

■ 104. Remove § 1036.635.

■ 105. Amend § 1036.701 by:
■ a. Revising paragraph (a); and
■ b. Removing and reserving paragraphs (h) through (j).

The revisions read as follows:

### § 1036.701 General provisions.

(a) You may average, bank, and trade (ABT) emission credits for purposes of certification as described in this subpart and in subpart B of this part to show compliance with the standards of §§ 1036.104. Participation in this program is voluntary. Note that certification to $NO_X$ standards in § 1036.104 is based on a family emission limit (FEL) the NHTSA fuel efficiency program under 49 CFR part 535 is based on a Family Certification Level (FCL).

This part refers to ''FEL/FCL'' to simultaneously refer to FELs for $NO_X$ and FCLs for NHTSA. Note also that subpart B of this part requires you to assign an FCL to all engine families, whether or not they participate in the ABT provisions of this subpart.

\* \* \* \* \*

■ 106. Revise § 1036.705 to read as follows:

#### § 1036.705 Generating and calculating emission credits.

(a) The provisions of this section apply for calculating $NO_X$ emission credits.

(b) For each participating family, calculate positive or negative emission credits relative to the otherwise applicable emission standard. Calculate positive emission credits for a family that has an FEL below the standard. Calculate negative emission credits for a family that has an FEL above the standard. Sum your positive and negative credits for the model year before rounding. Calculate emission credits to the nearest megagram (Mg) for each family using the following equation:

$$Emission\ credits\ (Mg) = (Std - FL) \cdot CF \cdot Volume \cdot UL \cdot c \quad \text{Eq. 1036.705–1}$$

Where:

$Std$ = the emission standard, in (mg $NO_X$)/hp·hr that applies under subpart B of this part for engines not participating in the ABT program of this subpart (the ''otherwise applicable standard'').

$FL$ = the engine family's FEL, in mg/hp·hr, rounded to the same number of decimal places as the emission standard.

$CF$ = a transient cycle conversion factor (hp·hr/mile), calculated by dividing the total (integrated) horsepower-hour over the applicable duty cycle by 6.3 miles for engines subject to spark-ignition standards and 6.5 miles for engines subject to compression-ignition standards. This represents the average work performed over the duty cycle.

$Volume$ = the number of engines eligible to participate in the averaging, banking, and trading program within the given engine family during the model year, as described in paragraph (c) of this section.

$UL$ = the useful life for the standard that applies for a given primary intended service class, in miles.

$c = 10^{-9}$.

*Example for model year 2028 Heavy HDE generating $NO_X$ credits:*

$Std$ = 35 mg/hp·hr
$FEL$ = 20 mg/hp·hr
$CF$ = 9.78 hp·hr/mile
$Volume$ = 15,342
$UL$ = 650,000 miles
$c = 10^{-9}$
$Emission\ credits$ = (35 − 20) · 9.78 · 15,342 · 650,000 · $10^{-9}$
$Emission\ credits$ = 1,463 Mg

(c) Compliance with the requirements of this subpart is determined at the end of the model year by calculating emission credits based on actual production volumes, excluding the following engines:

(1) Engines that you do not certify to the standards of this part because they are permanently exempted under subpart G of this part or under 40 CFR part 1068.

(2) Exported engines.

(3) Engines not subject to the requirements of this part, such as those excluded under § 1036.5.

(4) Engines certified to state emission standards that are different than the emission standards referenced in this section, and intended for sale in a state that has adopted those emission standards.

(5) Any other engines if we indicate elsewhere in this part that they are not to be included in the calculations of this subpart.

■ 107. Amend § 1036.710 by revising paragraph (b) to read as follows:

#### § 1036.710 Averaging.

\* \* \* \* \*

(b) You may certify one or more engine families to an FEL/FCL above the applicable standard, subject to any applicable FEL caps and other the provisions in subpart B of this part, if you show in your application for certification that your projected balance of all emission-credit transactions in that model year is greater than or equal to zero, or that a negative balance is allowed under § 1036.745 for NHTSA's fuel efficiency program.

\* \* \* \* \*

■ 108. Amend § 1036.720 by revising paragraph (c) to read as follows:

#### § 1036.720 Trading.

\* \* \* \* \*

(c) If a negative emission credit balance results from a transaction, both the buyer and seller are liable, except in cases we deem to involve fraud. See § 1036.255(e) for cases involving fraud. We may void the certificates of all engine families participating in a trade that results in a manufacturer having a negative balance of emission credits. See § 1036.745 for NHTSA's fuel efficiency program.

■ 109. Amend § 1036.725 by revising paragraph (b)(1) to read as follows:

#### § 1036.725 Required information for certification.

\* \* \* \* \*

(b) \* \* \*

(1) A statement that, to the best of your belief, you will not have a negative balance of emission credits for any

averaging set when all emission credits are calculated at the end of the year. For NHTSA's fuel efficiency program, you may include a statement that you will have a negative balance of emission credits for one or more averaging sets, but that it is allowed under § 1036.745.

\* \* \* \* \*

■ 110. Amend § 1036.730 by revising paragraphs (c)(1) and (f)(1) to read as follows:

#### § 1036.730 ABT reports.

\* \* \* \* \*

(c) \* \* \*

(1) Show that your net balance of emission credits from all your participating engine families in each averaging set in the applicable model year is not negative, except as allowed under § 1036.745 for NHTSA's fuel efficiency program. Your credit tracking must account for the limitation on credit life under § 1036.740(d).

\* \* \* \* \*

(f) \* \* \*

(1) If you notify us by the deadline for submitting the final report that errors mistakenly decreased your balance of emission credits, you may correct the errors and recalculate the balance of emission credits.

\* \* \* \* \*

■ 111. Amend § 1036.740 by:
■ a. Removing and reserving paragraphs (b) and (c); and
■ b. Revising paragraph (d).
The revision reads as follows:

#### § 1036.740 Restrictions for using emission credits.

\* \* \* \* \*

(d) *Credit life.* $NO_X$ credits may be used only for five model years after the year in which they are generated. For example, credits you generate in model year 2027 may be used to demonstrate compliance with emission standards only through model year 2032.

\* \* \* \* \*

■ 112. Revise § 1036.745 to read as follows:

#### § 1036.745 End-of-year credit deficits.

See 49 CFR 535.7 for provisions related to credit deficits for NHTSA's fuel consumption credits.

■ 113. Amend § 1036.750 by revising paragraph (b) to read as follows:

#### § 1036.750 Consequences for noncompliance.

\* \* \* \* \*

(b) You may certify your engine family to an FEL above an applicable standard based on a projection that you will have enough emission credits to offset the deficit for the engine family.

\* \* \* \* \*

■ 114. Revise § 1036.755 to read as follows:

### § 1036.755 Information provided to the Department of Transportation.

After receipt of each manufacturer's final report as specified in § 1036.730 and completion of any verification testing required to validate the manufacturer's submitted final data, we will issue a report to the Department of Transportation with $CO_2$ emission information and will verify the accuracy of each manufacturer's equivalent fuel consumption data required by NHTSA under 49 CFR 535.8. We will send a report to DOT for each engine manufacturer based on each regulatory category and subcategory, including sufficient information for NHTSA to determine fuel consumption and associated credit values. See 49 CFR 535.8 to determine if NHTSA deems submission of this information to EPA to also be a submission to NHTSA.

■ 115. Revise and republish § 1036.801 to read as follows:

### § 1036.801 Definitions.

The following definitions apply to this part. The definitions apply to all subparts unless we note otherwise. All undefined terms have the meaning the Act gives to them. The definitions follow:

*Act* means the Clean Air Act, as amended, 42 U.S.C. 7401–7671q.

*Adjustable parameter* has the meaning given in 40 CFR 1068.50.

*Advanced technology* means technology certified under 40 CFR 86.1819–14(k)(7), § 1036.615, or 40 CFR 1037.615.

*Aftertreatment* means relating to a catalytic converter, particulate filter, or any other system, component, or technology mounted downstream of the exhaust valve (or exhaust port) whose design function is to decrease emissions in the engine exhaust before it is exhausted to the environment. Exhaust gas recirculation (EGR) and turbochargers are not aftertreatment.

*Aircraft* means any vehicle capable of sustained air travel more than 100 feet above the ground.

*Alcohol-fueled engine* means an engine that is designed to run using an alcohol fuel. For purposes of this definition, alcohol fuels do not include fuels with a nominal alcohol content below 25 percent by volume.

*Automated manual transmission (AMT)* means a transmission that operates mechanically similar to a manual transmission, except that an automated clutch actuator controlled by the onboard computer disengages and engages the drivetrain instead of a human driver. An automated manual transmission does not include a torque converter or a clutch pedal controllable by the driver.

*Automatic transmission (AT)* means a transmission with a torque converter (or equivalent) that uses computerize or other internal controls to shift gears in response to a single driver input for controlling vehicle speed. Note that automatic manual transmissions are not automatic transmissions because they do not include torque converters.

*Auxiliary emission control device* means any element of design that senses temperature, motive speed, engine speed (r/min), transmission gear, or any other parameter for the purpose of activating, modulating, delaying, or deactivating the operation of any part of the emission control system.

*Averaging set* has the meaning given in § 1036.740.

*Axle ratio or Drive axle ratio ($k_a$)* means the dimensionless number representing the angular speed of the transmission output shaft divided by the angular speed of the drive axle.

*Calibration* means the set of specifications and tolerances specific to a particular design, version, or application of a component or assembly capable of functionally describing its operation over its working range.

*Carbon-containing fuel* has the meaning given in 40 CFR 1065.1001.

*Carryover* means relating to certification based on emission data generated from an earlier model year as described in § 1036.235(d).

*Certification* means relating to the process of obtaining a certificate of conformity for an engine family that complies with the emission standards and requirements in this part.

*Certified emission level* means the highest deteriorated emission level in an engine family for a given pollutant from the applicable transient or steady-state testing, rounded to the same number of decimal places as the applicable standard.

*Charge-depleting* has the meaning given in 40 CFR 1066.1001.

*Charge-sustaining* has the meaning given in 40 CFR 1066.1001.

*Complete vehicle* means a vehicle meeting the definition of complete vehicle in 40 CFR 1037.801 when it is first sold as a vehicle. For example, where a vehicle manufacturer sells an incomplete vehicle to a secondary vehicle manufacturer, the vehicle is not a complete vehicle under this part, even after its final assembly.

*Compression-ignition* means relating to a type of reciprocating, internal-combustion engine that is not a spark-ignition engine. Note that § 1036.1 also deems gas turbine engines and other engines to be compression-ignition engines.

*Crankcase emissions* means airborne substances emitted to the atmosphere from any part of the engine crankcase's ventilation or lubrication systems. The crankcase is the housing for the crankshaft and other related internal parts.

*Critical emission-related component* has the meaning given in 40 CFR 1068.30.

*Defeat device* has the meaning given in § 1036.115(h).

*Designated Compliance Officer* means one of the following:

(1) For engines subject to compression-ignition standards, *Designated Compliance Officer* means Director, Diesel Engine Compliance Center, U.S. Environmental Protection Agency, 2000 Traverwood Drive, Ann Arbor, MI 48105; *complianceinfo@ epa.gov; www.epa.gov/ve-certification.*

(2) For engines subject to spark-ignition standards, *Designated Compliance Officer* means Director, Gasoline Engine Compliance Center, U.S. Environmental Protection Agency, 2000 Traverwood Drive, Ann Arbor, MI 48105; *complianceinfo@epa.gov; www.epa.gov/ve-certification.*

*Deteriorated emission level* means the emission level that results from applying the appropriate deterioration factor to the official emission result of the emission-data engine. Note that where no deterioration factor applies, references in this part to the *deteriorated emission level* mean the official emission result.

*Deterioration factor* means the relationship between emissions at the end of useful life (or point of highest emissions if it occurs before the end of useful life) and emissions at the low-hour/low-mileage point, expressed in one of the following ways:

(1) For multiplicative deterioration factors, the ratio of emissions at the end of useful life (or point of highest emissions) to emissions at the low-hour point.

(2) For additive deterioration factors, the difference between emissions at the end of useful life (or point of highest emissions) and emissions at the low-hour point.

*Diesel exhaust fluid (DEF)* means a liquid reducing agent (other than the engine fuel) used in conjunction with selective catalytic reduction to reduce $NO_X$ emissions. *Diesel exhaust fluid* is generally understood to be an aqueous solution of urea conforming to the specifications of ISO 22241.

*Drive idle* means idle operation during which the vehicle operator

remains in the vehicle cab, as evidenced by engaging the brake or clutch pedals, or by other indicators we approve.

*Dual-fuel* means relating to an engine designed for operation on two different types of fuel but not on a continuous mixture of those fuels (see § 1036.601(d)). For purposes of this part, such an engine remains a dual-fuel engine even if it is designed for operation on three or more different fuels.

*Electronic control module (ECM)* means an engine's electronic device that uses data from engine sensors to control engine parameters.

*Emergency vehicle* means a vehicle that meets one of the following criteria:

(1) It is an ambulance or a fire truck.

(2) It is a vehicle that we have determined will likely be used in emergency situations where emission control function or malfunction may cause a significant risk to human life. For example, we would consider a truck that is certain to be retrofitted with a slip-on firefighting module to become an emergency vehicle, even though it was not initially designed to be a fire truck. Also, a mobile command center that is unable to manually regenerate its DPF while on duty could be an emergency vehicle. In making this determination, we may consider any factor that has an effect on the totality of the actual risk to human life. For example, we may consider how frequently a vehicle will be used in emergency situations or how likely it is that the emission controls will cause a significant risk to human life when the vehicle is used in emergency situations. We would not consider the truck in the example above to be an emergency vehicle if there is merely a possibility (rather than a certainty) that it will be retrofitted with a slip-on firefighting module.

*Emission control system* means any device, system, or element of design that controls or reduces the emissions of regulated pollutants from an engine.

*Emission-data engine* means an engine that is tested for certification. This includes engines tested to establish deterioration factors.

*Emission-related component* has the meaning given in 40 CFR part 1068, appendix A.

*Emission-related maintenance* means maintenance that substantially affects emissions or is likely to substantially affect emission deterioration.

*Engine configuration* means a unique combination of engine hardware and calibration (related to the emission standards) within an engine family, which would include hybrid components for engines certified as hybrid engines and hybrid powertrains. Engines within a single engine configuration differ only with respect to normal production variability or factors unrelated to compliance with emission standards.

*Engine family* has the meaning given in § 1036.230.

*Excluded* means relating to engines that are not subject to some or all of the requirements of this part as follows:

(1) An engine that has been determined not to be a heavy-duty engine is excluded from this part.

(2) Certain heavy-duty engines are excluded from the requirements of this part under § 1036.5.

(3) Specific regulatory provisions of this part may exclude a heavy-duty engine generally subject to this part from one or more specific standards or requirements of this part.

*Exempted* has the meaning given in 40 CFR 1068.30.

*Exhaust gas recirculation* means a technology that reduces emissions by routing exhaust gases that had been exhausted from the combustion chamber(s) back into the engine to be mixed with incoming air before or during combustion. The use of valve timing to increase the amount of residual exhaust gas in the combustion chamber(s) that is mixed with incoming air before or during combustion is not considered exhaust gas recirculation for the purposes of this part.

*Family certification level (FCL)* means a $CO_2$ emission level declared by the manufacturer that is at or above emission results for all emission-data engines.

*Family emission limit (FEL)* means one of the following:

(1) For $NO_X$ emissions, *family emission limit* means a $NO_X$ emission level declared by the manufacturer to serve in place of an otherwise applicable emission standard under the ABT program in subpart H of this part. The FEL serves as the emission standard for the engine family with respect to all required testing.

(2) For NHTSA's fuel efficiency program under 49 CFR part 535, *family emission limit* means a fuel consumption level that serves as the standard that applies for testing individual certified engines. The $CO_2$ FEL is equal to the $CO_2$ FCL multiplied by 1.03 and rounded to the same number of decimal places as the standard.

*Federal Test Procedure (FTP)* means the applicable transient duty cycle described in § 1036.512 designed to measure exhaust emissions during urban driving.

*Final drive ratio ($k_d$)* means the dimensionless number representing the angular speed of the transmission input shaft divided by the angular speed of the drive axle when the vehicle is operating in its highest available gear. The *final drive ratio* is the transmission gear ratio (in the highest available gear) multiplied by the drive axle ratio.

*Flexible-fuel* means relating to an engine designed for operation on any mixture of two or more different types of fuels (see § 1036.601(d)).

*Fuel type* means a general category of fuels such as diesel fuel, gasoline, or natural gas. There can be multiple grades within a single fuel type, such as premium gasoline, regular gasoline, or gasoline with 10 percent ethanol.

*Gear ratio or Transmission gear ratio ($k_g$)* means the dimensionless number representing the angular speed of the transmission's input shaft divided by the angular speed of the transmission's output shaft when the transmission is operating in a specific gear.

*Good engineering judgment* has the meaning given in 40 CFR 1068.30. See 40 CFR 1068.5 for the administrative process we use to evaluate good engineering judgment.

*Greenhouse gas Emissions Model (GEM)* means the GEM simulation tool described in 40 CFR 1037.520. Note that an updated version of GEM applies starting in model year 2021.

*Gross vehicle weight rating (GVWR)* means the value specified by the vehicle manufacturer as the maximum design loaded weight of a single vehicle, consistent with good engineering judgment.

*Heavy-duty engine* means any engine which the engine manufacturer could reasonably expect to be used for motive power in a heavy-duty vehicle. For purposes of this definition in this part, the term "engine" includes internal combustion engines and other devices that convert chemical fuel into motive power. For example, a gas turbine used in a heavy-duty vehicle is a heavy-duty engine.

*Heavy-duty vehicle* means any motor vehicle above 8,500 pounds GVWR. An incomplete vehicle is also a heavy-duty vehicle if it has a curb weight above 6,000 pounds or a basic vehicle frontal area greater than 45 square feet. *Curb weight* and *basic vehicle frontal area* have the meaning given in 40 CFR 86.1803–01.

*Hybrid* means relating to an engine or powertrain that includes a Rechargeable Energy Storage System. Hybrid engines store and recover energy in a way that is integral to the engine or otherwise upstream of the vehicle's transmission. Examples of hybrid engines include

engines with hybrid components connected to the front end of the engine (P0), connected to the crankshaft before the clutch (P1), or connected between the clutch and the transmission where the clutch upstream of the hybrid feature is in addition to the transmission clutch or clutches (P2). Engine-based systems that recover kinetic energy to power an electric heater in the aftertreatment are themselves not sufficient to qualify as a hybrid engine. The provisions in this part that apply for hybrid powertrains apply equally for hybrid engines, except as specified. Note that certain provisions in this part treat hybrid powertrains intended for vehicles that include regenerative braking different than those intended for vehicles that do not include regenerative braking. The definition of hybrid includes plug-in hybrid electric powertrains.

*Hydrocarbon (HC)* has the meaning given in 40 CFR 1065.1001.

*Identification number* means a unique specification (for example, a model number/serial number combination) that allows someone to distinguish a particular engine from other similar engines.

*Incomplete vehicle* means a vehicle meeting the definition of incomplete vehicle in 40 CFR 1037.801 when it is first sold (or otherwise delivered to another entity) as a vehicle.

*Innovative technology* means technology certified under § 1036.610 (also described as ''off-cycle technology'').

*Liquefied petroleum gas (LPG)* means a liquid hydrocarbon fuel that is stored under pressure and is composed primarily of nonmethane compounds that are gases at atmospheric conditions. Note that, although this commercial term includes the word ''petroleum'', LPG is not considered to be a petroleum fuel under the definitions of this section.

*Low-hour* means relating to an engine that has stabilized emissions and represents the undeteriorated emission level. This would generally involve less than 300 hours of operation for engines with $NO_X$ aftertreatment and 125 hours of operation for other engines.

*Manual transmission (MT)* means a transmission that requires the driver to shift the gears and manually engage and disengage the clutch.

*Manufacture* means the physical and engineering process of designing, constructing, and/or assembling a heavy-duty engine or a heavy-duty vehicle.

*Manufacturer* has the meaning given in 40 CFR 1068.30.

*Medium-duty passenger vehicle* has the meaning given in 40 CFR 86.1803.

*Model year* means the manufacturer's annual new model production period, except as restricted under this definition. It must include January 1 of the calendar year for which the model year is named, may not begin before January 2 of the previous calendar year, and it must end by December 31 of the named calendar year. Manufacturers may not adjust model years to circumvent or delay compliance with emission standards or to avoid the obligation to certify annually.

*Motorcoach* means a heavy-duty vehicle designed for carrying 30 or more passengers over long distances. Such vehicles are characterized by row seating, rest rooms, and large luggage compartments, and facilities for stowing carry-on luggage.

*Motor vehicle* has the meaning given in 40 CFR 85.1703.

*Natural gas* means a fuel whose primary constituent is methane.

*Neat* has the meaning given in 40 CFR 1065.1001.

*New motor vehicle engine* has the meaning given in the Act. This generally means a motor vehicle engine meeting any of the following:

(1) A motor vehicle engine for which the ultimate purchaser has never received the equitable or legal title is a *new motor vehicle engine.* This kind of engine might commonly be thought of as ''brand new'' although a *new motor vehicle engine* may include previously used parts. Under this definition, the engine is new from the time it is produced until the ultimate purchaser receives the title or places it into service, whichever comes first.

(2) An imported motor vehicle engine is a *new motor vehicle engine* if it was originally built on or after January 1, 1970.

(3) Any motor vehicle engine installed in a new motor vehicle.

*Noncompliant engine* means an engine that was originally covered by a certificate of conformity, but is not in the certified configuration or otherwise does not comply with the conditions of the certificate.

*Nonconforming engine* means an engine not covered by a certificate of conformity that would otherwise be subject to emission standards.

*Nonmethane hydrocarbon (NMHC)* means the sum of all hydrocarbon species except methane, as measured according to 40 CFR part 1065.

*Nonmethane hydrocarbon equivalent (NMHCE)* has the meaning given in 40 CFR 1065.1001.

*Nonmethane nonethane hydrocarbon equivalent (NMNEHC)* has the meaning given in 40 CFR 1065.1001.

*Off-cycle technology* means technology certified under § 1036.610 (also described as ''innovative technology'').

*Official emission result* means the measured emission rate for an emission-data engine on a given duty cycle before the application of any deterioration factor, but after the applicability of any required regeneration or other adjustment factors.

*Owners manual* means a document or collection of documents prepared by the engine or vehicle manufacturer for the owner or operator to describe appropriate engine maintenance, applicable warranties, and any other information related to operating or keeping the engine. The owners manual is typically provided to the ultimate purchaser at the time of sale. The owners manual may be in paper or electronic format.

*Oxides of nitrogen* has the meaning given in 40 CFR 1065.1001.

*Percent* has the meaning given in 40 CFR 1065.1001. Note that this means percentages identified in this part are assumed to be infinitely precise without regard to the number of significant figures. For example, one percent of 1,493 is 14.93.

*Placed into service* means put into initial use for its intended purpose, excluding incidental use by the manufacturer or a dealer.

*Preliminary approval* means approval granted by an authorized EPA representative prior to submission of an application for certification, consistent with the provisions of § 1036.210.

*Primary intended service class* has the meaning given in § 1036.140.

*Rechargeable Energy Storage System (RESS)* has the meaning given in 40 CFR 1065.1001.

*Relating to* as used in this section means relating to something in a specific, direct manner. This expression is used in this section only to define terms as adjectives and not to broaden the meaning of the terms.

*Revoke* has the meaning given in 40 CFR 1068.30.

*Round* has the meaning given in 40 CFR 1065.1001.

*Sample* means the collection of engines selected from the population of an engine family for emission testing. This may include testing for certification, production-line testing, or in-use testing.

*Scheduled maintenance* means adjusting, removing, disassembling, cleaning, or replacing components or systems periodically to keep a part or

system from failing, malfunctioning, or wearing prematurely.

*Small manufacturer* means a manufacturer meeting the criteria specified in 13 CFR 121.201. The employee and revenue limits apply to the total number of employees and total revenue together for all affiliated companies (as defined in 40 CFR 1068.30). Note that manufacturers with low production volumes may or may not be "small manufacturers".

*Spark-ignition* means relating to a gasoline-fueled engine or any other type of engine with a spark plug (or other sparking device) and with operating characteristics significantly similar to the theoretical Otto combustion cycle. Spark-ignition engines usually use a throttle to regulate intake air flow to control power during normal operation.

*Stop-start* means a vehicle technology that automatically turns the engine off when the vehicle is stopped.

*Steady-state* has the meaning given in 40 CFR 1065.1001. This includes idle testing where engine speed and load are held at a finite set of nominally constant values.

*Suspend* has the meaning given in 40 CFR 1068.30.

*Test engine* means an engine in a sample.

*Tractor* means a vehicle meeting the definition of "tractor" in 40 CFR 1037.801, but not classified as a "vocational tractor" under 40 CFR 1037.630, or relating to such a vehicle.

*Ultimate purchaser* means, with respect to any new engine or vehicle, the first person who in good faith purchases such new engine or vehicle for purposes other than resale.

*United States* has the meaning given in 40 CFR 1068.30.

*Upcoming model year* means for an engine family the model year after the one currently in production.

*U.S.-directed production volume* means the number of engines, subject to the requirements of this part, produced by a manufacturer for which the manufacturer has a reasonable assurance that sale was or will be made to ultimate purchasers in the United States.

*Vehicle* has the meaning given in 40 CFR 1037.801.

*Vocational vehicle* means a vehicle meeting the definition of "vocational" vehicle in 40 CFR 1037.801.

*Void* has the meaning given in 40 CFR 1068.30.

*We (us, our)* means the Administrator of the Environmental Protection Agency and any authorized representatives for issues related to criteria pollutant standards. In the case of testing, compliance, and approvals related to

fuel consumption standards, "we (us, our)" includes the Administrator of the National Highway Traffic Safety Administration (NHTSA) and any authorized representatives.

§ 1036.805 [Amended]

■ 116. Amend § 1036.805 in table 1 to paragraph (a) by removing the entries for "CH₄" and "N₂O".

■ 117. Amend § 1036.815 by revising paragraph (b) to read as follows:

§ 1036.815 Confidential information.

\* \* \* \* \*

(b) Emission data or information that is publicly available cannot be treated as confidential business information as described in 40 CFR 1068.11. Data that vehicle manufacturers need for demonstrating compliance with standards, including fuel-consumption data as described in §§ 1036.535 and 1036.545, also qualify as emission data for purposes of confidentiality determinations.

PART 1037—CONTROL OF EMISSIONS FROM NEW HEAVY-DUTY MOTOR VEHICLES

■ 118. The authority citation for part 1037 continues to read as follows:

**Authority:** 42 U.S.C. 7401–7671q.

■ 119. Amend § 1037.1 by adding paragraph (c) to read as follows:

§ 1037.1 Applicability.

\* \* \* \* \*

(c) This part establishes criteria pollutant and evaporative and refueling standards as described in § 1037.101. This part does not establish standards for CO₂ or other greenhouse gas emissions, but it includes certification and testing provisions related to CO₂ emissions to support the fuel consumption standards for heavy-duty vehicles adopted by the Department of Transportation's National Highway Traffic and Safety Administration (NHTSA) under 49 CFR part 535.

§ 1037.5 [Amended]

■ 120. Amend § 1037.5 by removing and reserving paragraphs (c) and (d).

■ 121. Amend § 1037.15 by revising paragraph (a) to read as follows:

§ 1037.15 Do any other regulation parts apply to me?

(a) Parts 1065 and 1066 of this chapter describe procedures and equipment specifications for testing engines and vehicles to measure exhaust emissions. Subpart F of this part 1037 describes how to apply the testing provisions of 40 CFR parts 1065 and 1066.

\* \* \* \* \*

§ 1037.101 [Amended]

■ 122. Amend § 1037.101 by removing and reserving paragraphs (a)(2) and (b)(2).

■ 123. Amend § 1037.102 by revising the section heading and adding paragraph (c) to read as follows:

§ 1037.102 Criteria pollutant exhaust emission standards—NOₓ, HC, PM, and CO.

\* \* \* \* \*

(c) Starting in model year 2024, auxiliary power units installed on new tractors, including tractors that are glider vehicles or tractors with no installed propulsion engine, must be certified to the PM emission standard specified in 40 CFR 1039.699. For model years 2021 through 2023, the APU engine must be certified under 40 CFR part 1039 with a deteriorated emission level for PM at or below 0.15 g/kW-hr. Selling, offering for sale, or introducing or delivering into commerce in the United States or importing into the United States a new tractor subject to this standard is a violation of 40 CFR 1068.101(a)(1) unless the auxiliary power unit has a valid certificate of conformity and the required label showing that it meets the PM standard specified in 40 CFR 1039.699 as described in this paragraph (c).

§§ 1037.105 and 1037.106 [Removed]

■ 124. Remove §§ 1037.105 and 1037.106.

§ 1037.115 [Amended]

■ 125. Amend § 1037.115 by removing paragraphs (e) and (f).

■ 126. Revise and republish § 1037.120 to read as follows:

§ 1037.120 Emission-related warranty requirements.

(a) *General requirements.* You must warrant to the ultimate purchaser and each subsequent purchaser that each new vehicle, including all parts of its emission control system, meets two conditions:

(1) It is designed, built, and equipped so it conforms at the time of sale to the ultimate purchaser with the requirements of this part.

(2) It is free from defects in materials and workmanship that cause the vehicle to fail to conform to the requirements of this part during the applicable warranty period.

(b) *Warranty period.* (1) Your emission-related warranty must be valid for at least:

(i) 5 years or 50,000 miles for Light HDV.

(ii) 5 years or 100,000 miles for heavy-duty vehicles above 19,500 pounds GVWR.

(2) You may offer an emission-related warranty more generous than we require. The emission-related warranty for the vehicle may not be shorter than any basic mechanical warranty you provide to that owner without charge for the vehicle. Similarly, the emission-related warranty for any component may not be shorter than any warranty you provide to that owner without charge for that component. This means that your warranty for a given vehicle may not treat emission-related and nonemission-related defects differently for any component. The warranty period begins when the vehicle is placed into service.

(c) *Components covered.* The emission-related warranty covers fuel cell stacks, RESS, and other components used with battery electric vehicles and fuel cell electric vehicles. The emission-related warranty covers all components whose failure would increase a vehicle's evaporative and refueling emissions (for vehicles subject to evaporative and refueling emission standards). The emission-related warranty covers components that are part of your certified configuration even if another company produces the component.

(d) *Limited applicability.* You may deny warranty claims under this section if the operator caused the problem through improper maintenance or use, as described in 40 CFR 1068.115.

(e) *Owners manual.* Describe in the owners manual the emission-related warranty provisions from this section that apply to the vehicle.

■ 127. Revise § 1037.125 to read as follows:

### § 1037.125 Maintenance instructions and allowable maintenance.

Give the ultimate purchaser of each new vehicle written instructions for properly maintaining and using the emission control system.

### § 1037.135 [Amended]

■ 128. Amend § 1037.135 by removing and reserving paragraphs (c)(6) and (7).
■ 129. Amend § 1037.140 by revising paragraphs (g) introductory text and (g)(6) and (7) to read as follows:

### § 1037.140 Classifying vehicles and determining vehicle parameters.

\* \* \* \* \*

(g) The provisions of this part relating to NHTSA's fuel efficiency program under 49 CFR part 535 apply to specific vehicle service classes as follows:

\* \* \* \* \*

(6) In certain circumstances, you may certify vehicles to standards that apply for a different vehicle service class. If you optionally certify vehicles to

different standards, those vehicles are subject to all the regulatory requirements as if the standards were mandatory.

(7) Custom chassis vehicles are subject to the following vehicle service classes instead of the other provisions in this section:

(i) School buses and motor homes are considered "Medium HDV".

(ii) All other custom-chassis are considered "Heavy HDV".

\* \* \* \* \*

■ 130. Revise and republish § 1037.150 to read as follows:

### § 1037.150 Interim provisions.

The provisions in this section apply instead of other provisions in this part.

(a) *Incentives for early introduction.* The provisions of this paragraph (a) apply with respect to vehicles produced in model years before 2014. Manufacturers may voluntarily certify in model year 2013 (or earlier model years for electric vehicles) to the fuel consumption standards of 49 CFR part 535.

(1) This paragraph (a)(1) applies for regulatory subcategories subject to the standards of 49 CFR part 535. Except as specified in paragraph (a)(3) of this section, to generate early credits under this paragraph (a)(1) for any vehicles other than electric vehicles, you must certify your entire U.S.-directed production volume within the regulatory subcategory to the standards of 49 CFR part 535. Except as specified in paragraph (a)(4) of this section, if some vehicle families within a regulatory subcategory are certified after the start of the model year, you may generate credits only for production that occurs after all families are certified. For example, if you produce three vehicle families in an averaging set and you receive your certificates for those families on January 4, 2013, March 15, 2013, and April 24, 2013, you may not generate credits for model year 2013 production in any of the families that occurs before April 24, 2013. Calculate credits relative to the standard that would apply in model year 2014 using the equations in subpart H of this part. You may bank credits equal to the surplus credits you generate under this paragraph (a) multiplied by 1.50. For example, if you have 1.0 Mg of surplus credits for model year 2013, you may bank 1.5 Mg of credits. Credit deficits for an averaging set prior to model year 2014 do not carry over to model year 2014. These credits may be used to show compliance with the standards of this part for 2014 and later model years. We recommend that you notify us of

your intent to use this paragraph (a)(1) before submitting your applications.

(2) [Reserved]

(3) You may generate credits for the number of additional SmartWay designated tractors (relative to your 2012 production), provided you do not generate credits for those vehicles under paragraph (a)(1) of this section. Calculate credits for each regulatory subcategory relative to the standard that would apply in model year 2014 using the equations in subpart H of this part. Use a production volume equal to the number of designated model year 2013 SmartWay tractors minus the number of designated model year 2012 SmartWay tractors. You may bank credits equal to the surplus credits you generate under this paragraph (a)(3) multiplied by 1.50. Your 2012 and 2013 model years must be equivalent in length.

(4) This paragraph (a)(4) applies where you do not receive your final certificate in a regulatory subcategory within 30 days of submitting your final application for that subcategory. Calculate your credits for all production that occurs 30 days or more after you submit your final application for the subcategory.

(b) *Phase 1 coastdown procedures.* For tractors subject to Phase 1 standards, the default method for measuring drag area ($C_dA$) is the coastdown procedure specified in 40 CFR part 1066, subpart D. This includes preparing the tractor and the standard trailer with wheels meeting specifications of § 1037.528(b) and submitting information related to your coastdown testing under § 1037.528(h).

(c) *Small manufacturers.* The following provisions apply for qualifying small manufacturers:

(1) The fuel consumption standards under 49 CFR part 535 are optional for small manufacturers producing vehicles with a date of manufacture before January 1, 2022. In addition, small manufacturers producing vehicles that run on any fuel other than gasoline, E85, or diesel fuel may delay complying with every later standard under this part by one model year.

(2) Qualifying manufacturers must notify the Designated Compliance Officer each model year before introducing excluded vehicles into U.S. commerce. This notification must include a description of the manufacturer's qualification as a small business under 13 CFR 121.201.

(3) Small manufacturers may meet Phase 1 standards instead of Phase 2 standards in the first year Phase 2 standards apply to them if they voluntarily comply with the Phase 1 standards for the full preceding year.

Specifically, small manufacturers may certify their model year 2022 vehicles to the Phase 1 fuel consumption standards under 49 CFR part 535 if they certify all the vehicles from their annual production volume included in emission credit calculations for the Phase 1 standards starting on or before January 1, 2021.

(4) See paragraphs (r), (t), (u), and (w) of this section for additional allowances for small manufacturers.

(d)–(f) [Reserved]

(g) *Compliance date.* Compliance with the standards of this part was optional prior to January 1, 2014. This means that if your 2014 model year begins before January 1, 2014, you may certify for a partial model year that begins on January 1, 2014, and ends on the day your model year would normally end.

(h) *Off-road vehicle exemption.* (1) Vocational vehicles with a date of manufacture before January 1, 2021, automatically qualify for an exemption under § 1037.631 if the tires installed on the vehicle have a maximum speed rating at or below 55 miles per hour.

(2) In unusual circumstances, vehicle manufacturers may ask us to exempt vehicles under § 1037.631 based on other criteria that are equivalent to those specified in § 1037.631(a); however, we will normally not grant relief in cases where the vehicle manufacturer has credits or can otherwise comply with applicable standards. Request approval for an exemption under this paragraph (h) before you produce the subject vehicles.

(i) *Limited carryover from Phase 1 to Phase 2.* The provisions for carryover data in § 1037.235(d) do not allow you to use aerodynamic test results from Phase 1 to support a compliance demonstration for Phase 2 certification.

(j) *Limited prohibition related to early model year engines.* The provisions of this paragraph (j) apply only for vehicles that have a date of manufacture before January 1, 2018. See § 1037.635 for related provisions that apply in later model years. The prohibition in § 1037.601 against introducing into U.S. commerce a vehicle containing an engine not certified to the standards applicable for the calendar year of installation does not apply for vehicles using model year 2014 or 2015 spark-ignition engines, or any model year 2013 or earlier engines.

(k) *Verifying drag areas from in-use tractors.* This paragraph (k) applies for tractors instead of § 1037.401(b) through model year 2020. We may measure the drag area of your vehicles after they have been placed into service. To account for measurement variability, your vehicle is deemed to conform to

the regulations of this part with respect to aerodynamic performance if we measure its drag area to be at or below the maximum drag area allowed for the bin above the bin to which you certified (for example, Bin II if you certified the vehicle to Bin III), unless we determine that you knowingly produced the vehicle to have a higher drag area than is allowed for the bin to which it was certified.

(l) [Reserved]

(m) *Loose engine sales.* Manufacturers may certify certain spark-ignition engines along with chassis-certified heavy-duty vehicles where they are identical to engines used in those vehicles as described in 40 CFR 86.1819–14(k)(8). Vehicles in which those engines are installed are subject to standards under 49 CFR part 535.

(n) *Transition to engine-based model years.* The following provisions apply for production and ABT reports during the transition to engine-based model year determinations for vehicles in 2020 and 2021:

(1) If you install model year 2020 or earlier engines in your vehicles in calendar year 2020, include all those Phase 1 vehicles in your production and ABT reports related to model year 2020 compliance, although we may require you identify these separately from vehicles produced in calendar year 2019.

(2) If you install model year 2020 engines in your vehicles in calendar year 2021, submit production and ABT reports for those Phase 1 vehicles separate from the reports you submit for Phase 2 vehicles with model year 2021 engines.

(o)–(p) [Reserved]

(q) *Vehicle families for advanced and off-cycle technologies.* Apply the following provisions for grouping vehicles into families if you use off-cycle technologies under § 1037.610 or advanced technologies under § 1037.615:

(1) For Phase 1 vehicles, create separate vehicle families for vehicles that contain advanced or off-cycle technologies; group those vehicles together in a vehicle family if they use the same advanced or off-cycle technologies.

(2) For Phase 2 vehicles, create separate vehicle subfamilies for vehicles that contain advanced or off-cycle technologies; group those vehicles together in a vehicle subfamily if they use the same advanced or off-cycle technologies.

(r) *Conversion to mid-roof and high-roof configurations.* Secondary vehicle manufacturers that qualify as small manufacturers may convert low- and

mid-roof tractors to mid- and high-roof configurations without recertification for the purpose of building a custom sleeper tractor or converting it to run on natural gas, as follows:

(1) The original low- or mid-roof tractor must be covered by a valid certificate of conformity.

(2) The modifications may not increase the frontal area of the tractor beyond the frontal area of the equivalent mid- or high-roof tractor with the corresponding standard trailer. Note that these dimensions have a tolerance of ±2 inches. Use good engineering judgment to achieve aerodynamic performance similar to or better than the certifying manufacturer's corresponding mid- or high-roof tractor.

(3) [Reserved]

(4) We may require that you submit annual production reports as described in § 1037.250.

(5) Modifications made under this paragraph (r) do not violate 40 CFR 1068.101(b)(1).

(s) *Confirmatory testing for $F_{alt\text{-}aero}$.* If we conduct coastdown testing to verify your $F_{\text{alt-aero}}$ value for Phase 2 and later tractors, we will make our determination using the principles of SEA testing in § 1037.305. We will not replace your $F_{\text{alt-aero}}$ value if the tractor passes. If your tractor fails, we will generate a replacement value of $F_{\text{alt-aero}}$ based on at least one $C_dA$ value and corresponding effective yaw angle, $\psi_{\text{eff}}$, from a minimum of 100 valid runs using the procedures of § 1037.528(h). Note that we intend to minimize the differences between our test conditions and those of the manufacturer by testing at similar times of the year where possible and the same location where possible and when appropriate.

(t) *Glider kits and glider vehicles.* (1) Glider vehicles conforming to the requirements in this paragraph (t)(1) are exempt from the Phase 1 emission standards of this part 1037 prior to January 1, 2021. Engines in such vehicles (including vehicles produced after January 1, 2021) remain subject to the requirements of 40 CFR part 86 applicable for the engines' original model year, but not subject to the Phase 1 or Phase 2 standards of 40 CFR part 1036 unless they were originally manufactured in model year 2014 or later.

(i) You are eligible for the exemption in this paragraph (t)(1) if you are a small manufacturer and you sold one or more glider vehicles in 2014 under the provisions of paragraph (c) of this section. You do not qualify if you only produced glider vehicles for your own use. You must notify us of your plans to use this exemption before you

introduce exempt vehicles into U.S. commerce. In your notification, you must identify your annual U.S.-directed production volume (and sales, if different) of such vehicles for calendar years 2010 through 2014. Vehicles you produce before notifying us are not exempt under this section.

(ii) In a given calendar year, you may produce up to 300 exempt vehicles under this section, or up to the highest annual production volume you identify in this paragraph (t)(1), whichever is less.

(iii) Identify the number of exempt vehicles you produced under this exemption for the preceding calendar year in your annual report under § 1037.250.

(iv) Include the appropriate statement on the label required under § 1037.135, as follows:

(A) For Phase 1 vehicles, ''THIS VEHICLE AND ITS ENGINE ARE EXEMPT UNDER 40 CFR 1037.150(t)(1).''

(B) For Phase 2 vehicles, ''THE ENGINE IN THIS VEHICLE IS EXEMPT UNDER 40 CFR 1037.150(t)(1).''

(v) If you produce your glider vehicle by installing remanufactured or previously used components in a glider kit produced by another manufacturer, you must provide the following to the glider kit manufacturer prior to obtaining the glider kit:

(A) Your name, the name of your company, and contact information.

(B) A signed statement that you are a qualifying small manufacturer and that your production will not exceed the production limits of this paragraph (t)(1). This statement is deemed to be a submission to EPA, and we may require the glider kit manufacturer to provide a copy to us at any time.

(vi) The exemption in this paragraph (t)(1) is valid for a given vehicle and engine only if you meet all the requirements and conditions of this paragraph (t)(1) that apply with respect to that vehicle and engine. Introducing such a vehicle into U.S. commerce without meeting all applicable requirements and conditions violates 40 CFR 1068.101(a)(1).

(vii) Companies that are not small manufacturers may sell uncertified incomplete vehicles without engines to small manufacturers for the purpose of producing exempt vehicles under this paragraph (t)(1), subject to the provisions of § 1037.622. However, such companies must take reasonable steps to ensure that their incomplete vehicles will be used in conformance with the requirements of this part.

(2) Glider vehicles produced using engines certified to model year 2010 or

later standards for all pollutants are subject to the same provisions that apply to vehicles using engines within their useful life in § 1037.635.

(3) For calendar year 2017, you may produce a limited number of glider kits and/or glider vehicles subject to the requirements applicable to model year 2016 glider vehicles, instead of the requirements of § 1037.635. The limit applies to your combined 2017 production of glider kits and glider vehicles and is equal to your highest annual production of glider kits and glider vehicles for any year from 2010 to 2014. Any glider kits or glider vehicles produced beyond this cap are subject to the provisions of § 1037.635. Count any glider kits and glider vehicles you produce under paragraph (t)(1) of this section as part of your production with respect to this paragraph (t)(3).

(u) *Transition to Phase 2 standards.* The following provisions allow for enhanced generation and use of emission credits from Phase 1 vehicles for meeting the Phase 2 standards:

(1) For vocational Light HDV and vocational Medium HDV, credits you generate in model years 2018 through 2021 may be used through model year 2027, instead of being limited to a five-year credit life as specified in § 1037.740(c). For Class 8 vocational vehicles with Medium HDE, we will approve your request to generate these credits in and use these credits for the Medium HDV averaging set if you show that these vehicles would qualify as Medium HDV under the Phase 2 program as described in § 1037.140(g)(4).

(2) You may use the off-cycle provisions of § 1037.610 to apply technologies to Phase 1 vehicles as follows:

(i) You may apply an improvement factor of 0.988 for vehicles with automatic tire inflation systems on all axles.

(ii) For vocational vehicles with automatic engine shutdown systems that conform with § 1037.660, you may apply an improvement factor of 0.95.

(iii) For vocational vehicles with stop-start systems that conform with § 1037.660, you may apply an improvement factor of 0.92.

(iv) For vocational vehicles with neutral-idle systems conforming with § 1037.660, you may apply an improvement factor of 0.98. You may adjust this improvement factor if we approve a partial reduction under § 1037.660(a)(2); for example, if your design reduces fuel consumption by half as much as shifting to neutral, you may apply an improvement factor of 0.99.

(3) Small manufacturers may generate credits for natural gas-fueled vocational vehicles as follows:

(i) Small manufacturers may certify their vehicles instead of relying on the exemption of paragraph (c) of this section. The provisions of this part apply for such vehicles, except as specified in this paragraph (u)(3).

(ii) Use GEM version 2.0.1 to determine a fuel consumption level for your vehicle, then multiply this value by the engine's Family Certification Level for $CO_2$ and divide by the engine's applicable fuel consumption standard.

(4) Phase 1 vocational vehicle credits that small manufacturers generate may be used through model year 2027.

(v) [Reserved]

(w) *Custom-chassis standards for small manufacturers.* The following provisions apply uniquely to qualifying small manufacturers under the custom-chassis standards of § 1037.105(h):

(1) You may use emission credits generated under § 1037.105(d), including banked or traded credits from any averaging set. Such credits remain subject to other limitations that apply under subpart H of this part.

(2) You may produce up to 200 drayage tractors in a given model year to the standards described in § 1037.105(h) for ''other buses''. The limit in this paragraph (w)(2) applies with respect to vehicles produced by you and your affiliated companies. Treat these drayage tractors as being in their own averaging set.

(x) *Transition to updated GEM.* (1) Vehicle manufacturers may demonstrate compliance with Phase 2 greenhouse gas standards in model years 2021 through 2023 using GEM Phase 2, Version 3.0, Version 3.5.1, or Version 4.0 (all incorporated by reference, see § 1037.810). Manufacturers may change to a different version of GEM for model years 2022 and 2023 for a given vehicle family after initially submitting an application for certification; such a change must be documented as an amendment under § 1037.225. Manufacturers may submit an end-of-year report for model year 2021 using any of the three regulatory versions of GEM, but only for demonstrating compliance with the custom-chassis standards in § 1037.105(h); such a change must be documented in the report submitted under § 1037.730. Once a manufacturer certifies a vehicle family based on GEM Version 4.0, it may not revert back to using GEM Phase 2, Version 3.0 or Version 3.5.1 for that vehicle family in any model year.

(2) Vehicle manufacturers may certify for model years 2021 through 2023 based on fuel maps from engines or

powertrains that were created using GEM Phase 2, Version 3.0, Version 3.5.1, or Version 4.0 (all incorporated by reference, see § 1037.810). Vehicle manufacturers may alternatively certify in those years based on fuel maps from powertrains that were created using GEM Phase 2, Version 3.0, GEM HIL model 3.8, or GEM Phase 2, Version 4.0 (all incorporated by reference, see § 1037.810). Vehicle manufacturers may continue to certify vehicles in later model years using fuel maps generated with earlier versions of GEM for model year 2024 and later vehicle families that qualify for using carryover provisions in § 1037.235(d).

(y) [Reserved]

(z) *Constraints for vocational regulatory subcategories.* The following provisions apply to determinations of vocational regulatory subcategories as described in § 1037.140:

(1) Select the Regional regulatory subcategory for coach buses and motor homes.

(2) You may not select the Urban regulatory subcategory for any vehicle with a manual or single-clutch automated manual transmission.

(3) Starting in model year 2024, you must select the Regional regulatory subcategory for any vehicle with a manual transmission.

(4) You may select the Multi-purpose regulatory subcategory for any vocational vehicle, except as specified in paragraph (v)(1) of this section.

(5) You may select the Urban regulatory subcategory for a hybrid vehicle equipped with regenerative braking, unless it is equipped with a manual transmission.

(6) You may select the Urban regulatory subcategory for any vehicle with a hydrokinetic torque converter paired with an automatic transmission, or a continuously variable automatic transmission, or a dual-clutch transmission with no more than two consecutive forward gears between which it is normal for both clutches to be momentarily disengaged.

(aa) *Warranty for components used with battery electric vehicles and fuel cell electric vehicles.* The emission-related warranty requirements in § 1037.120 are optional for fuel cell stacks, RESS, and other components used with battery electric vehicles and fuel cell electric vehicles before model year 2027.

■ 131. Amend § 1037.201 by revising paragraph (i) to read as follows:

### § 1037.201 General requirements for obtaining a certificate of conformity.

\*     \*     \*     \*     \*

(i) Vehicles and installed engines must meet exhaust, evaporative, and refueling emission standards and certification requirements as described in §§ 1037.102 and 1037.103, as applicable. Include the information described in 40 CFR part 86, subpart S, or 40 CFR 1036.205 in your application for certification in addition to what we specify in § 1037.205 so we can issue a single certificate of conformity for all the requirements that apply for your vehicle and the installed engine.

■ 132. Amend § 1037.205 by:
■ a. Revising paragraph (b) introductory text and (b)(8);
■ b. Removing and reserving paragraphs (c) and (q); and
■ c. Revising paragraph (t).
The revisions read as follows:

### § 1037.205 What must I include in my application?

\*     \*     \*     \*     \*

(b) Explain how the emission control system operates. As applicable, describe in detail all system components for controlling emissions, including all auxiliary emission control devices (AECDs) and all fuel-system components you will install on any production vehicle. For any vehicle using RESS (such as fuel cell electric vehicles and battery electric vehicles), describe in detail all components needed to charge the system, store energy, and transmit power to move the vehicle. Identify the part number of each component you describe. For this paragraph (b), treat as separate AECDs any devices that modulate or activate differently from each other. Also describe your modeling inputs as described in § 1037.520, with the following additional information if it applies for your vehicles:

\*     \*     \*     \*     \*

(8) If you install auxiliary power units in tractors under § 1037.102(c), identify the family name associated with the engine's certification under 40 CFR part 1039. Starting in model year 2024, also identify the family name associated with the auxiliary power unit's certification to the standards of 40 CFR 1039.699.

\*     \*     \*     \*     \*

(t) Include the information required by other subparts of this part.

\*     \*     \*     \*     \*

■ 133. Amend § 1037.230 by revising paragraphs (a) introductory text, (b), and (d)(2) introductory text to read as follows:

### § 1037.230 Vehicle families, sub-families, and configurations.

(a) Divide your product line into families of vehicles based on regulatory subcategories as specified in this section. Subcategories are specified using terms defined in § 1037.801. Your vehicle family is limited to a single model year.

\*     \*     \*     \*     \*

(b) If the vehicles in your family are being certified to more than one FEL, subdivide your vehicle families into subfamilies that include vehicles with identical FELs. Note that you may add subfamilies at any time during the model year.

\*     \*     \*     \*     \*

(d) \* \* \*

(2) For a Phase 2 or later vehicle model that includes a range of GVWR values that straddle weight classes, you may include all the vehicles in the same vehicle family if you certify the vehicle family to the numerically lower fuel consumption standard from the affected service classes. Vehicles that are optionally certified to a more stringent standard under this paragraph (d)(2) are subject to useful-life and all other provisions corresponding to the weight class with the numerically lower fuel consumption standard. For a Phase 2 or later tractor model that includes a range of roof heights that straddle subcategories, you may include all the vehicles in the same vehicle family if you certify the vehicle family to the appropriate subcategory as follows:

\*     \*     \*     \*     \*

■ 134. Revise § 1037.231 to read as follows:

### § 1037.231 Powertrain families.

See 40 CFR 1036.231 for provisions describing how to divide your product line into powertrain families.

■ 135. Amend § 1037.235 by revising the introductory text to read as follows:

### § 1037.235 Testing requirements for certification.

This section describes the emission testing you must perform to show compliance with NHTSA's fuel efficiency program under 49 CFR part 535, and to determine any input values from § 1037.520 that involve measured quantities.

\*     \*     \*     \*     \*

■ 136. Revise § 1037.241 to read as follows:

### § 1037.241 Demonstrating compliance with fuel consumption standards.

(a) Compliance determinations for purposes of certification depend on whether or not you participate in the ABT program in subpart H of this part.

(1) If none of your vehicle families generate or use credits in a given model year, each of your vehicle families is

considered in compliance if all vehicle configurations in the family have modeled $CO_2$ emission rates from § 1037.520 that are at or below the applicable standards. A vehicle family is deemed not to comply if any vehicle configuration in the family has a modeled fuel consumption value that is above the applicable standard.

(2) If you generate or use credits with one or more vehicle families in a given model year, your vehicle families within an averaging set are considered in compliance if the sum of positive and negative credits for all vehicle configurations in those vehicle families lead to a zero balance or a positive balance of credits, except as allowed by § 1037.745 for NHTSA's fuel efficiency program. Note that the FEL is considered to be the applicable emission standard for an individual configuration.

(b) We may require you to provide an engineering analysis showing that the performance of your controls will not deteriorate during the useful life with proper maintenance. If we determine that your controls are likely to deteriorate during the useful life, we may require you to develop and apply deterioration factors consistent with good engineering judgment. Where the highest useful life fuel consumption occurs between the end of useful life and at the low-hour test point, base deterioration factors for the vehicles on the difference between (or ratio of) the point at which the highest fuel consumption occurs and the low-hour test point.

■ 137. Amend § 1037.501 by revising the introductory text and paragraphs (a), (b), (d)(2), and (f) to read as follows:

### § 1037.501 General testing and modeling provisions.

This subpart specifies how to perform testing and modeling required elsewhere in this part for demonstrating compliance with fuel consumption standards under 49 CFR part 535.

(a) Except as specified in subpart B of this part, you must demonstrate that you meet the applicable standards using modeling as described in § 1037.520. This modeling depends on several measured values as described in this subpart. You may use fuel-mapping information from the engine manufacturer as described in 40 CFR 1036.535 and 1036.540, or you may use powertrain testing as described in 40 CFR 1036.545.

(b) Where testing is required, use equipment and procedures as described in 40 CFR part 1065 and part 1066. Measure $CO_2$ emissions as specified in 40 CFR part 1065 and part 1066. Use the

applicable duty cycles specified in § 1037.510.

\* \* \* \* \*

(d) \* \* \*

(2) For diesel-fueled vehicles, use the appropriate diesel fuel specified for emission testing. Unless specified otherwise, the appropriate diesel test fuel is ultra-low sulfur diesel fuel.

\* \* \* \* \*

(f) This subpart is addressed to you as a manufacturer, but it applies equally to anyone who does testing for you, and to us when we perform testing to determine if your vehicles meet the standards.

\* \* \* \* \*

■ 138. Amend § 1037.520 by revising the section heading and introductory text to read as follows:

### § 1037.520 Modeling $CO_2$ emissions to show that vehicles comply with fuel consumption standards.

This section describes how to use the Greenhouse gas Emissions Model (GEM) to show compliance with NHTSA's fuel consumption standards under 49 CFR part 535. Use GEM version 2.0.1 to demonstrate compliance with Phase 1 standards; use GEM Phase 2, Version 4.0 to demonstrate compliance with Phase 2 standards (both incorporated by reference, see § 1037.810). Use good engineering judgment when demonstrating compliance using GEM.

\* \* \* \* \*

■ 139. Amend § 1037.540 by revising the introductory text and paragraph (a)(1) to read as follows:

### § 1037.540 Special procedures for testing vehicles with hybrid power take-off.

This section describes optional procedures for quantifying the reduction in fuel consumption for vehicles as a result of running power take-off (PTO) devices with a hybrid energy delivery system. See 40 CFR 1036.545 for powertrain testing requirements that apply for drivetrain hybrid systems. The procedures are written to test the PTO by ensuring that the engine produces all of the energy with no net change in stored energy (charge-sustaining), and for plug-in hybrid electric vehicles, also allowing for drawing down the stored energy (charge-depleting). The full charge-sustaining test for the hybrid vehicle is from a fully charged rechargeable energy storage system (RESS) to a depleted RESS and then back to a fully charged RESS. You must include all hardware for the PTO system. You may ask us to modify the provisions of this section to allow testing hybrid vehicles that use a technology other than batteries for

storing energy, consistent with good engineering judgment. For plug-in hybrid electric vehicles, use a utility factor to properly weight charge-sustaining and charge-depleting operation as described in paragraph (f)(3) of this section.

(a) \* \* \*

(1) Select a vehicle with a hybrid energy delivery system to represent the range of PTO configurations that will be covered by the test data. If your test data will represent more than one PTO configuration, use good engineering judgment to select the configuration with the maximum number of PTO circuits that has the smallest potential reduction in fuel consumption.

\* \* \* \* \*

■ 140. Add § 1037.550 to subpart F to read as follows:

### § 1037.550 Powertrain testing.

See 40 CFR 1036.545 for the powertrain test procedure.

■ 141. Amend § 1037.551 by revising paragraph (a) to read as follows:

### § 1037.551 Engine-based simulation of powertrain testing.

\* \* \* \* \*

(a) Use the procedures of 40 CFR part 1065 to set up the engine, measure emissions, and record data. Measure individual parameters and emission constituents as described in this section. For hybrid powertrains, correct for the net energy change of the energy storage device as described in 40 CFR 1066.501(a)(3).

\* \* \* \* \*

■ 142. Amend § 1037.555 by revising paragraph (c) to read as follows:

### § 1037.555 Special procedures for testing Phase 1 hybrid systems.

\* \* \* \* \*

(c) Collect and measure emissions as described in 40 CFR part 1066. Calculate emission rates in grams per ton-mile without rounding. Determine values for *A, B, C,* and *M* for the vehicle being simulated as specified in 40 CFR part 1066. If you will apply an improvement factor or test results to multiple vehicle configurations, use values of *A, B, C, M,* $k_a$, and *r* that represent the vehicle configuration with the smallest potential reduction in greenhouse gas emissions as a result of the hybrid capability.

\* \* \* \* \*

■ 143. Amend § 1037.560 by revising paragraph (b)(4) to read as follows:

### § 1037.560 Axle efficiency test.

\* \* \* \* \*

(b) \* \* \*

(4) Add gear oil according to the axle manufacturer's instructions. If the axle manufacturer specifies multiple gear oils, select the one with the highest viscosity at operating temperature. You may use a lower-viscosity gear oil if we approve it. Fill the gear oil to a level that represents in-use operation. You may use an external gear oil conditioning system, as long as it does not affect measured values.

\* \* \* \* \*

■ 144. Amend § 1037.565 by revising paragraph (b)(3) to read as follows:

### § 1037.565 Transmission efficiency test.

\* \* \* \* \*

(b) \* \* \*

(3) Add transmission oil according to the transmission manufacturer's instructions. If the transmission manufacturer specifies multiple transmission oils, select the one with the highest viscosity at operating temperature. You may use a lower-viscosity transmission oil if we approve it. Fill the transmission oil to a level that represents in-use operation. You may use an external transmission oil conditioning system, as long as it does not affect measured values.

\* \* \* \* \*

■ 145. Amend § 1037.570 by revising paragraph (a)(4)(i) to read as follows:

### § 1037.570 Procedures to characterize torque converters.

\* \* \* \* \*

(a) \* \* \*

(4) \* \* \*

(i) If the torque converter manufacturer specifies multiple transmission oils, select the one with the highest viscosity at operating temperature. You may use a lower-viscosity transmission oil if we approve it.

\* \* \* \* \*

■ 146. Amend § 1037.605 by revising paragraph (d) to read as follows:

### § 1037.605 Installing engines certified to alternate standards for specialty vehicles.

\* \* \* \* \*

(d) *Vehicle standards.* The Vehicle standards apply as follows for these vehicles:

(1) Vehicles qualifying under this section are subject to evaporative emission standards as specified in § 1037.103, but are exempt from the other requirements of this part, except as specified in this section and in § 1037.601.

(2) Hybrid vehicles may need to use GEM in conjunction with powertrain testing to demonstrate compliance with fuel consumption standards.

■ 147. Amend § 1037.610 by revising paragraphs (a) and (d)(1) to read as follows:

### § 1037.610 Vehicles with off-cycle technologies.

(a) You may ask us to apply the provisions of this section for fuel consumption reductions resulting from vehicle technologies that were not in common use with heavy-duty vehicles before model year 2010 that are not reflected in GEM. While you are not required to prove that such technologies were not in common use with heavy-duty vehicles before model year 2010, we will not approve your request if we determine that they do not qualify. These may be described as off-cycle or innovative technologies. You may apply these provisions for fuel consumption reductions reflected in the specified test procedures if they are not reflected in GEM, except as allowed under paragraph (g) of this section. We will apply these provisions only for technologies that will result in measurable, demonstrable, and verifiable real-world fuel consumption reductions.

\* \* \* \* \*

(d) \* \* \*

(1) A detailed description of the off-cycle technology and how it functions to reduce fuel consumption under conditions not represented on the duty cycles required for certification.

\* \* \* \* \*

■ 148. Amend § 1037.615 by:

■ a. Revising paragraphs (a), (b)(4), and (d);

■ b. Removing and reserving paragraph (f); and

■ c. Revising paragraph (g). The revisions read as follows:

### § 1037.615 Advanced technologies.

(a) This section describes how to calculate emission credits for advanced technologies. You may calculate Phase 1 advanced technology credits through model year 2020 for hybrid vehicles with regenerative braking, vehicles equipped with Rankine-cycle engines, battery electric vehicles, and fuel cell electric vehicles. You may calculate Phase 2 advanced technology credits through model year 2026 for plug-in hybrid electric vehicles, battery electric vehicles, and fuel cell electric vehicles. You may not generate credits for Phase 1 engine technologies for which the engines generate $CO_2$ credits under 40 CFR part 1036.

(b) \* \* \*

\* \* \* \* \*

(d) For Phase 2 plug-in hybrid electric vehicles and for fuel cells powered by any fuel other than hydrogen, calculate credits using an FEL based on measurements from powertrain testing. Phase 2 advanced technology credits do not apply for hybrid vehicles that have no plug-in capability.

\* \* \* \* \*

(g) As specified in subpart H of this part, advanced-technology credits generated from Phase 1 vehicles under this section may be used under this part outside of the averaging set in which they were generated. Advanced-technology credits generated from Phase 2 and later vehicles are subject to the averaging-set restrictions that apply to other credits.

(h) You may certify using both provisions of this section and the off-cycle technology provisions of § 1037.610, provided you do not double count benefits.

■ 149. Amend § 1037.620 by revising paragraphs (a)(2) and (e) to read as follows:

### § 1037.620 Responsibilities for multiple manufacturers.

\* \* \* \* \*

(a) \* \* \*

(2) We will apply the requirements of subparts C and D of this part to the manufacturer that certifies the vehicle. Other manufacturers are required to comply with the requirements of subparts C and D of this part only when notified by us. In our notification, we will specify a reasonable time period in which you need to comply with the requirements identified in the notice. See § 1037.601 for the applicability of 40 CFR part 1068 to these other manufacturers and remanufacturers.

\* \* \* \* \*

(e) We may require component manufacturers to provide information or take other actions. For example, we may require component manufacturers to test components they produce.

■ 150. Amend § 1037.622 by:

■ a. Revising the introductory text and paragraph (a)(2); and

■ b. Removing and reserving paragraph (d)(5). The revisions read as follows:

### § 1037.622 Shipment of partially complete vehicles to secondary vehicle manufacturers.

This section specifies how manufacturers may introduce partially complete vehicles into U.S. commerce (or in the case of certain custom vehicles, introduce complete vehicles into U.S. commerce for modification by a small manufacturer). The provisions of this section are intended to accommodate normal business practices without compromising the effectiveness

of certified emission controls. You may not use the provisions of this section to circumvent the intent of this part.

(a) * * *

(2) *Uncertified vehicles that will be certified by secondary vehicle manufacturers.* Manufacturers may introduce into U.S. commerce partially complete vehicles for which they do not hold the required certificate of conformity only as allowed by paragraph (b) of this section; however, the requirements of this section do not apply for tractors or vocational vehicles with a date of manufacture before January 1, 2022, that are produced by a secondary vehicle manufacturer if they are excluded under § 1037.5.

* * * * *

■ 151. Amend § 1037.631 by revising the introductory text and paragraph (a) introductory text to read as follows:

### § 1037.631 Exemption for vocational vehicles intended for off-road use.

This section provides an exemption from the fuel consumption standards under 49 CFR part 535 for certain vocational vehicles (including certain vocational tractors) that are intended to be used extensively in off-road environments such as forests, oil fields, and construction sites. This section does not exempt engines used in vocational vehicles from the standards of 40 CFR part 86 or part 1036. Note that you may not include these exempted vehicles in any credit calculations.

(a) *Qualifying criteria.* Vocational vehicles intended for off-road use are exempt without request, subject to the provisions of this section, if they are primarily designed to perform work off-road (such as in oil fields, mining, forests, or construction sites), and they meet at least one of the criteria of paragraph (a)(1) of this section and at least one of the criteria of paragraph (a)(2) of this section. See § 1037.105(h) for alternate Phase 2 standards that apply for vehicles meeting only one of these sets of criteria.

* * * * *

■ 152. Amend § 1037.635 by:
■ a. Revising paragraphs (a) and (b) introductory text; and
■ b. Removing and reserving paragraph (b)(1).

The revisions read as follows:

### § 1037.635 Glider kits and glider vehicles.

* * * * *

(a) Vehicles produced from glider kits and other glider vehicles are subject to the same standards as other new vehicles. Note that this requirement for the vehicle generally applies even if the engine meets the criteria of paragraph

(c)(1) of this section. For engines originally produced before 2017, if you are unable to obtain a fuel map for an engine you may ask to use a default map, consistent with good engineering judgment.

(b) Section 1037.601(a)(1) disallows the introduction into U.S. commerce of a new vehicle (including a vehicle assembled from a glider kit) unless it has an engine that is certified to the applicable standards in 40 CFR parts 86 and 1036. Except as specified otherwise in this part, the standards apply for engines used in glider vehicles as follows:

* * * * *

### § 1037.645 [Removed]

■ 153. Remove § 1037.645.

■ 154. Amend § 1037.655 by revising paragraph (a) to read as follows:

### § 1037.655 Post-useful life vehicle modifications.

(a) *General.* This section specifies vehicle modifications that may occur in certain circumstances after a vehicle reaches the end of its regulatory useful life. We may require a higher burden of proof with respect to modifications that occur within the useful life period, and the specific examples presented here do not necessarily apply within the useful life. This section also does not apply with respect to engine modifications or recalibrations.

* * * * *

### §§ 1037.665 and 1037.670 [Removed]

■ 155. Remove §§ 1037.665 and 1037.670.

■ 156. Revise § 1037.701 to read as follows:

### § 1037.701 General provisions.

(a) You may average, bank, and trade credits as described in 49 CFR part 535. Participation in this program is voluntary.

(b) The definitions of subpart I of this part apply to this subpart in addition to the following definitions:

(1) *Actual credits* means credits you have generated that we have verified by reviewing your final report.

(2) *Averaging set* means a set of vehicles in which credits may be exchanged. Note that an averaging set may comprise more than one regulatory subcategory. See § 1037.740.

(3) *Broker* means any entity that facilitates a trade of credits between a buyer and seller.

(4) *Buyer* means the entity that receives credits as a result of a trade.

(5) *Reserved credits* means credits you have generated that we have not yet verified by reviewing your final report.

(6) *Seller* means the entity that provides credits during a trade.

(7) *Standard* means the standard that applies under subpart B of this part for vehicles not participating in the ABT program of this subpart.

(8) *Trade* means to exchange credits, either as a buyer or seller.

(c) Credits may be exchanged only within an averaging set, except as specified in § 1037.740.

(d) You may not use credits generated under this subpart to offset any emissions that exceed an FEL or standard.

(e) You may use either of the following approaches to retire or forego credits:

(1) You may trade credits generated from any number of your vehicles to the vehicle purchasers or other parties to retire the credits. Identify any such credits in the reports described in § 1037.730. Vehicles must comply with the applicable FELs even if you donate or sell the corresponding credits under this paragraph (e). Those credits may no longer be used by anyone to demonstrate compliance with any standards.

(2) You may certify a family using an FEL below the standard as described in this part and choose not to generate credits for that family. If you do this, you do not need to calculate credits for those families and you do not need to submit or keep the associated records described in this subpart for that family.

(f) Credits may be used in the model year they are generated. Where allowed, surplus credits may be banked for future model years. Surplus credits may sometimes be used for past model years, as described in § 1037.745. You may not apply banked or traded credits in a given model year until you have used all available credits through averaging to resolve credit balances for that model year.

(g) You may increase or decrease an FEL during the model year by amending your application for certification under § 1037.225. The new FEL may apply only to vehicles you have not already introduced into commerce.

### §§ 1037.705, 1037.710, 1037.715, and 1037.720 [Removed]

■ 157. Remove §§ 1037.705, 1037.710, 1037.715, and 1037.720.

■ 158. Revise § 1037.725 to read as follows:

### § 1037.725 Required information for certification.

(a) You must declare your intent to use the provisions of this subpart for each vehicle family that will be certified using the ABT program before

production. You must also declare the FELs you select for the vehicle family or subfamily for each pollutant for which you are using the ABT program. Your FELs must comply with the specifications of subpart B of this part. FELs must be expressed to the same number of decimal places as the applicable standards.

(b) Your declaration must include the following information:

(1) A statement that, to the best of your belief, you will not have a negative balance of credits for any averaging set when all credits are calculated at the end of the year; or a statement that you will have a negative balance of credits for one or more averaging sets but that it is allowed under § 1037.745 for NHTSA's fuel efficiency program.

(2) Calculations of projected credits (positive or negative) based on projected U.S.-directed production volumes. We may require you to include similar calculations from your other vehicle families to project your net credit balances for the model year. If you project negative credits for a family or subfamily, state the source of positive credits you expect to use to offset the negative credits.

■ 159. Revise and republish § 1037.730 to read as follows:

### § 1037.730 ABT reports.

(a) If you certify any vehicle families using the ABT provisions of this subpart, send us a final report by September 30 following the end of the model year.

(b) Your report must include the following information for each vehicle family participating in the ABT program:

(1) Vehicle-family and subfamily designations, and averaging set.

(2) The regulatory subcategory and standards that would otherwise apply to the vehicle family.

(3) The FEL. If you change the FEL after the start of production, identify the date that you started using the new FEL and/or give the vehicle identification number for the first vehicle covered by the new FEL. In this case, identify each applicable FEL and calculate the positive or negative credits as specified in § 1037.225.

(4) The projected and actual production volumes for the model year for calculating credits. If you changed an FEL during the model year, identify the actual production volume associated with each FEL.

(5) Useful life.

(6) Calculated positive or negative credits for the whole vehicle family. Identify any credits that you traded, as

described in paragraph (d)(1) of this section.

(7) If you have a negative credit balance for the averaging set in the given model year, specify whether the vehicle family (or certain subfamilies with the vehicle family) have a credit deficit for the year. Consider for example, a manufacturer with three vehicle families ("A", "B", and "C") in a given averaging set. If family A generates enough credits to offset the negative credits of family B but not enough to also offset the negative credits of family C (and the manufacturer has no banked credits in the averaging set), the manufacturer may designate families A and B as having no deficit for the model year, provided it designates family C as having a deficit for the model year.

(c) Your report must include the following additional information:

(1) Show that your net balance of credits from all your participating vehicle families in each averaging set in the applicable model year is not negative, except as allowed under § 1037.745 for NHTSA's fuel efficiency program. Your credit tracking must account for the limitation on credit life under § 1037.740(c).

(2) State whether you will retain any credits for banking. If you choose to retire credits that would otherwise be eligible for banking, identify the families that generated the credits, including the number of credits from each family.

(3) State that the report's contents are accurate.

(4) Identify the technologies that make up the certified configuration associated with each vehicle identification number. You may identify this as a range of identification numbers for vehicles involving a single, identical certified configuration.

(d) If you trade credits, you must send us a report within 90 days after the transaction, as follows:

(1) As the seller, you must include the following information in your report:

(i) The corporate names of the buyer and any brokers.

(ii) A copy of any contracts related to the trade.

(iii) The averaging set corresponding to the vehicle families that generated credits for the trade, including the number of credits from each averaging set.

(2) As the buyer, you must include the following information in your report:

(i) The corporate names of the seller and any brokers.

(ii) A copy of any contracts related to the trade.

(iii) How you intend to use the credits, including the number of credits you intend to apply for each averaging set.

(e) Send your reports electronically to the Designated Compliance Officer using an approved information format. If you want to use a different format, send us a written request with justification for a waiver.

(f) Correct errors in your report as follows:

(1) If you notify us by the deadline for submitting the final report that errors mistakenly decreased your balance of credits, you may correct the errors and recalculate the balance of credits. If you notify us that errors mistakenly decreased your balance of credits after the deadline for submitting the final report, you may correct the errors and recalculate the balance of credits after applying a 10 percent discount to the credit correction, but only if you notify us within 24 months after the deadline for submitting the final report. If you report a negative balance of credits, we may disallow corrections under this paragraph (f)(1).

(2) If you or we determine any time that errors mistakenly increased your balance of credits, you must correct the errors and recalculate the balance of credits.

■ 160. Amend § 1037.735 by revising paragraphs (b) and (e) to read as follows:

### § 1037.735 Recordkeeping.

\* \* \* \* \*

(b) Keep the records required by this section for at least eight years after the due date for the final report. You may not use credits for any vehicles if you do not keep all the records required under this section. You must therefore keep these records to continue to bank valid credits.

\* \* \* \* \*

(e) We may require you to keep additional records or to send us relevant information not required by this section.

■ 161. Revise § 1037.740 to read as follows:

### § 1037.740 Restrictions for using credits.

The following restrictions apply for using credits.

(a) *Averaging sets.* Credits may be exchanged only within an averaging set. The following principal averaging sets apply for vehicles certified to the standards of this part involving credits as described in this subpart:

(1) Light HDV.

(2) Medium HDV.

(3) Heavy HDV.

(4) Note that other separate averaging sets also apply for credits not related to

this part. Separate averaging sets also apply for engines under 40 CFR part 1036, including engines used in vehicles subject to this subpart.

(b) [Reserved]

(c) *Credit life.* Banked credits may be used only for five model years after the year in which they are generated.

(d) *Other restrictions.* Other sections of this part specify additional restrictions for using credits under certain special provisions.

■ 162. Revise § 1037.745 to read as follows:

### § 1037.745 End-of-year credit deficits.

See 49 CFR 535.7 for provisions related to credit deficits for NHTSA's fuel consumption credits.

### § 1037.750 [Removed]

■ 163. Remove § 1037.750.

■ 164. Amend § 1037.801 by:

■ a. Revising the definitions of "Model year", "Phase 1", and "Phase 2";

■ b. Removing the definitions of "Phase 3" and "State of certified energy (SOCE)";

■ c. Revising the definition of "Tractor";

■ d. Removing the definition of "Usable battery energy (UBE)"; and

■ e. Revising the definitions of "Vocational vehicle" and "We (us, our)".

The revisions read as follows:

### § 1037.801 Definitions.

\* \* \* \* \*

*Model year* means one of the following for compliance with this part. Note that manufacturers may have other model year designations for the same vehicle for compliance with other requirements or for other purposes:

(1) For vehicles with a date of manufacture on or after January 1, 2021, *model year* means the manufacturer's annual new model production period based on the vehicle's date of manufacture, where the model year is the calendar year corresponding to the date of manufacture, except as follows:

(i) The vehicle's model year may be designated as the year before the calendar year corresponding to the date of manufacture if the engine's model year is also from an earlier year. You may ask us to extend your prior model year certificate to include such vehicles. Note that § 1037.601(a)(2) limits the extent to which vehicle manufacturers may install engines built in earlier calendar years.

(ii) The vehicle's model year may be designated as the year after the calendar year corresponding to the vehicle's date of manufacture. For example, a manufacturer may produce a new vehicle by installing the engine in

December 2023 and designating it as a model year 2024 vehicle.

(2) For vehicles with a date of manufacture before January 1, 2021, *model year* means the manufacturer's annual new model production period, except as restricted under this definition and 40 CFR part 85, subpart X. It must include January 1 of the calendar year for which the model year is named, may not begin before January 2 of the previous calendar year, and it must end by December 31 of the named calendar year. The model year may be set to match the calendar year corresponding to the date of manufacture.

(i) The manufacturer who holds the certificate of conformity for the vehicle must assign the model year based on the date when its manufacturing operations are completed relative to its annual model year period. In unusual circumstances where completion of your assembly is delayed, we may allow you to assign a model year one year earlier, provided it does not affect which regulatory requirements will apply.

(ii) Unless a vehicle is being shipped to a secondary vehicle manufacturer that will hold the certificate of conformity, the model year must be assigned prior to introduction of the vehicle into U.S. commerce. The certifying manufacturer must redesignate the model year if it does not complete its manufacturing operations within the originally identified model year. A vehicle introduced into U.S. commerce without a model year is deemed to have a model year equal to the calendar year of its introduction into U.S. commerce unless the certifying manufacturer assigns a later date.

\* \* \* \* \*

*Phase 1* means relating to the Phase 1 fuel consumption standards.

*Phase 2* means relating to the Phase 2 fuel consumption standards.

\* \* \* \* \*

*Tractor* means a truck designed primarily for drawing other motor vehicles and not so constructed as to carry a load other than a part of the weight of the vehicle and the load so drawn. This includes most heavy-duty vehicles specifically designed for the primary purpose of pulling trailers, but does not include vehicles designed to carry other loads. For purposes of this definition "other loads" would not include loads carried in the cab, sleeper compartment, or toolboxes. Examples of vehicles that are similar to tractors but that are not *tractors* under this part include dromedary tractors, automobile haulers, straight trucks with trailers hitches, and tow trucks. Note that the

provisions of this part that apply for tractors do not apply for tractors that are classified as vocational tractors under § 1037.630.

\* \* \* \* \*

*Vocational vehicle* means a heavy-duty vehicle at or below 26,000 pounds GVWR that is not subject to standards under 40 CFR part 86, subpart S, or a heavy-duty vehicle above 26,000 pounds GVWR that is not a tractor.

\* \* \* \* \*

*We (us, our)* means the Administrator of the Environmental Protection Agency and any authorized representatives for issues related to criteria pollutant standards. In the case of testing, compliance, and approvals related to fuel consumption standards, "we (us, our)" includes the Administrator of the National Highway Traffic Safety Administration (NHTSA) and any authorized representatives.

### § 1037.805 [Amended]

■ 165. Amend § 1037.805 by removing "CH₄" and "N₂O" from table 1 to paragraph (a).

■ 166. Amend § 1037.810 by revising paragraphs (c)(3) and (6) to read as follows:

### § 1037.810 Incorporation by reference.

\* \* \* \* \*

(c) \* \* \*

(3) SAE J1263 MAR2010, Road Load Measurement and Dynamometer Simulation Using Coastdown Techniques, Revised March 2010, ("SAE J1263"); IBR approved for § 1037.528 introductory text, (a), (b), (c), (e), and (h).

\* \* \* \* \*

(6) SAE J2263 MAY2020, (R) Road Load Measurement Using Onboard Anemometry and Coastdown Techniques, Revised May 2020, ("SAE J2263"); IBR approved for § 1037.528 introductory text, (a), (b), (d), and (f).

\* \* \* \* \*

## PART 1039—CONTROL OF EMISSIONS FROM NEW AND IN-USE NONROAD COMPRESSION-IGNITION ENGINES

■ 167. The authority citation for part 1039 continues to read as follows:

**Authority:** 42 U.S.C. 7401–7671q.

■ 168. Amend § 1039.699 by revising paragraphs (a) and (n) to read as follows:

### § 1039.699 Emission standards and certification requirements for auxiliary power units for highway tractors.

(a) This section describes emission standards and certification requirements for auxiliary power units (APU) installed on highway tractors subject to

standards under 40 CFR 1037.102 starting in model year 2024.

\* \* \* \* \*

(n) If a highway tractor manufacturer violates 40 CFR 1037.102 by installing an APU from you that is not properly certified and labeled, you are presumed to have caused the violation (see 40 CFR 1068.101(c)).

[FR Doc. 2026–03157 Filed 2–17–26; 8:45 am]

**BILLING CODE 6560–50–P**

# EXHIBIT 5

# Rescission of the Greenhouse Gas Endangerment Finding and Motor Vehicle Greenhouse Gas Emission Standards Under the Clean Air Act: Response to Comments

U.S. Environmental Protection Agency

(hunting, fishing, foraging), wastewater management from permafrost thaw, infrastructure degradation, and other events that are felt more frequently at higher northern latitudes, including the need for some entire communities to relocate due to severe climate impacts on their communities.

Stakeholder groups expressed concerns with the EPA's Tribal Consultation process and exclusion of meaningful commitment to Tribal sovereignty, trust responsibility, and reserved rights. Comments from stakeholder letters echo many concerns highlighted in Tribal comments, particularly disproportionate impacts on disadvantaged communities, environmental justice concerns, concerns on preserving cultural properties, historical properties, and sacred sites, higher rates of unemployment and poverty, higher risk of developing cancer and other chronic health and reproductive issues due to disproportionate exposure to pollutants, limited access to healthcare, cumulative impacts from historical and ongoing environmental degradation, loss of intangible cultural heritage, indigenous knowledges, and traditional lifeways.

<u>EPA Response</u>

The EPA acknowledges the Tribes' comments on the potential impacts of the proposed Reconsideration of 2009 Endangerment Finding and the Greenhouse Gas Vehicle Standards. The Agency also recognizes that Tribal treaty rights constitute Federal law. However, Tribal treaty rights do not expand Congress's grant of authority to the Agency under the CAA. As described in the Executive Summary of the final action preamble, and throughout the final action preamble, the EPA is finalizing this action based on the proper interpretation of its CAA authority. The EPA finds that the final action is supported by and consistent with the CAA, relevant case law, and the U.S. Constitution

We note that, consistent with the EPA Policy on Consultation with Indian Tribes, the EPA invited Tribal leaders and designated consultation representatives to participate in the Tribal consultation and coordination process. The EPA consulted with Tribal officials from the Nez Perce Nation, Confederated Tribes of Grand Ronde, Snoqualmie Tribe, and Pueblo of San Felipe during the development of this action.

## 6.6 Executive Order 13045: Protection of Children from Environmental Health Risks and Safety Risks

<u>EPA Summary of Comments</u>

Commenters noted that in the EO 13045 section of the preamble for the proposed rule, the EPA states that "At this time, the EPA does not believe that the proposed action would have a material adverse impact on the health of individuals with respect to non-GHG air

pollutants, including on children, because the EPA anticipates that the impacts of repealing GHG emission regulations would have only marginal and incidental impacts on the emission of non-GHG air pollutants. Potential health impacts of such air pollutants will continue to be controlled through direct emissions limits and a number of other programs that target regional and national air quality, including the NAAQS program."

Commenters say that there is no documentation for the analysis of impacts on emissions of non-GHG pollutants; for example, commenters note that in the DRIA the EPA estimates that by increasing PM emissions the proposed action would lead to annual monetized health costs but does not provide documentation for those numbers.

In addition, a commenter states that the allegation that air pollutants will be controlled through direct emission limits and other programs that target regional and national air quality, including the NAAQS program, is unsupported by any analysis and contradicts the agency's previous analyses.

## EPA Response

The EPA acknowledges the comments regarding children's health. However, as described in the Executive Summary of the final action preamble, and throughout the final action preamble, the EPA is finalizing this action based on the proper interpretation of its CAA authority, and the issues raised by commenters are not applicable to the arguments in the final action. Additionally, as stated within the preamble, although the GHG emissions at issue in this rulemaking do not have direct impacts on human health, we acknowledge the possibility that this action could impact emissions of criteria pollutants and air toxics. Children are not expected to experience greater ambient concentrations of air pollutants than the general population. Additionally, as discussed in the preamble, there are safety benefits from this final action that would benefit children as they are more susceptible to grievous injuries from less safe motor vehicles.

We note that, as explained above, this action would not impact separate emission standards for criteria pollutants by the EPA or separate standards set by NHTSA. At this time, the EPA does not believe that the action would have a material adverse impact on the health of individuals with respect to non-GHG air pollutants, including on children, because the EPA anticipates that the impacts of repealing GHG emission regulations would have only marginal and incidental impacts on the emission of non-GHG air pollutants. Potential health impacts of such air pollutants will continue to be controlled through direct emission limits and several other programs that target regional and national air quality, including the NAAQS program.

The final action is based on the EPA's conclusion that it lacks statutory authority to regulate GHG emissions from motor vehicles and engines under CAA section 202(a). The EPA is not making any new findings under CAA section 202(a) and is not finalizing the alternative proposal to base rescission and repeal of the Endangerment Finding on new findings by the Administrator under CAA section 202(a). Thus, comments pertaining to the science of climate change are not pertinent to the bases for this final action and out of scope, which are legal in nature. See section VI of the preamble to the final action for further discussion of the additional proposed bases that the EPA is not finalizing. Because this final action rests on the EPA's reassessment of the Endangerment Finding based on the best reading of CAA section 202(a), we disagree with the commenter's claim that deference should be afforded to the EPA's prior conclusions.

The commenter identifies no statutory support for a claim that the EPA is obligated to analyze the cumulative impacts of multiple EPA actions pertaining to the regulation of GHG emissions and pertaining to federal incentives to reduce GHG emissions. Section 202(a) requires the Administrator to "prescribe" and "from time to time revise … standards" for certain air pollutants emitted by new motor vehicles and new motor vehicle engines "in accordance with the provisions of this section."[58] Unless provided otherwise by statute, an agency may revise or rescind prior actions so long as it acknowledges the change in position, provides a reasonable explanation for the new position, and considers legitimate reliance interests in the prior position.[59] Nothing in the statute conditions the EPA's general factions taken under different statutory authorities, or consideration of the cumulative effect of the rescission together with such other actions.

## 7.6  Children's Constitutional Claims

<u>EPA Summary of Comments</u>

Commenters asserted that the EPA's rulemaking deprives children and youth of fundamental rights to life, personal security, other liberties, and children's equal protection of the law. U.S. Const. amend. V, XIV, § 1. According to commenters, the proposed rule is violative of federal law, the best available science on protecting the health and lives of children, and the legal mandate that agency decision-making does not deprive children of their fundamental constitutional rights. In addition, commenters argued the Proposed Rule relies on faulty scientific bases including the findings in the DOE report *Impacts of Carbon*

---

[58] 42 U.S.C. § 7521(a)(1).

[59] *See FDA v. Wages & White Lion Invs., LLC*, 604 U.S. 542, 568-70 (2025*); FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009); *Motor Vehicle Mfrs. Ass'n v.  State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983); *Clean Air Council v. Pruitt*, 862 F.3d 1, 8 (D.C. Cir. 2017) ("Agencies obviously have broad discretion to reconsider a regulation at any time.").

*Dioxide Emissions on the U.S. Climate*, misapplies the EPA's preemptive authority, encourages more expensive forms of energy sources, misapplies the Supreme Court's interpretation of "any air pollutant" in *Massachusetts v. EPA*, 549 U.S. 497 (2007), and violates the major questions doctrine and separation of powers.

## EPA Response

Commenters raise numerous issues addressed elsewhere in this RTC including: challenging the proposed action on a scientific basis, noting costs of specific energy sources, challenging the findings in the DOE report *Impacts of Carbon Dioxide Emissions on the U.S. Climate,* citing the Supreme Court's interpretation of "any air pollutant" in *Massachusetts v. EPA*, 549 U.S. 497 (2007), and raising the major questions doctrine. As discussed in the preamble, the EPA is not basing this final action on uncertainty about the scientific basis for the Endangerment Finding. As discussed in this RTC, this final action is based on the best reading of section 202(a) of the CAA and controlling legal precedent. The section of the RTC title "Legal Framework for Action" provided more detailed response to the legality of the Action and Commenters assertions.

Commenters' statements regarding this action's constitutionality are conclusory, Commenters assume that the action would violate the constitution with no support, then state why an action that is unconstitutional is not permissible. Commenters provide no analysis or support as to why the actions would be unconstitutional, stating that Commenters "have proven in the September 16-17, 2025, evidentiary hearing in *Lighthiser*, that you are engaged in an unconstitutional rulemaking, to implement the President's unconstitutional Executive Orders 14154, 14156, and 14261, in violation of U.S. Const. amend. V, XIV, § 1, by 'unburdening' fossil fuels so they may be 'unleashed' and 'revitalized'." Commenters are welcome to their opinion of what they "have proven"; however, the case at issue, *Lighthiser v. Trump*, No.: CV-25-54-BU-DLC (D. Mont.) was dismissed with prejudice, and the court did not address Plaintiffs' constitutional claims stating "[p]ursuant to *Juliana*, the relief sought in this case is beyond the bounds of this Court's Article III authority, a fact that cannot be cured by amendment. Therefore, this matter will be dismissed with prejudice." Curiously, Commenters also direct the Agency to *Juliana,* which the *Lighthiser* court read "to mandate" the dismissal. *Juliana v. United States*, No.: 15-cv-01517 (D. Or.) was dismissed following a 9th Circuit Order mandating that the District Court dismiss Plaintiffs' constitutional claims, a decision Plaintiffs appealed to the Supreme Court which denied cert. The other federal case Commenters reference heavily- *Genesis B. v. EPA*, No.: 2:23-CV-10345-MWF (C.D. Cal.) – was likewise dismissed by the District Court in reliance on *Juliana*. The remaining case - *Held v. Montana*, No. CDV-2020-307 (Mont. 1st Jud. Dist. Ct.) - is a state case interpreting the Montana State

Constitution and has no precedential value with regard to federal actions. The same is true of commenters' assertions regarding high courts of other nations (see also section 7.8 of this Response to Comments document regarding International Considerations).

Finally, Commenters listed numerous references to other documents and requested that the Agency "include all referenced evidence above and below in the administrative record." The Administrative Record includes documents which the Agency used for support of the final action, the proposed rule clearly stated that a "written comment is considered an official comment and should include discussion of all points you wish to make. The EPA will generally not consider comments or comment contents located outside of the primary submission (*i.e.,* on the web, cloud, or other file sharing system)." 90 FR 36288, 36288 (Aug. 1, 2025).

## 7.7 International Law Considerations

<u>EPA Summary of Comments</u>

Commenters asserted that the Proposed Rule is inconsistent with the United States' international law obligations as interpreted by international and regional courts. Commenters argued that the United States has binding international legal obligations to reduce GHG emissions, found in multiple sources of treaty-based and customary international law, including longstanding principles that predate the UN climate agreements. Commenters cited three international and regional courts as recently offering what commenters characterize as authoritative opinions clarifying the scope and content of these binding climate obligations. Commenters assert that, taken together, these sources offer a coherent body of obligations for preventing and remedying climate harm, including through climate mitigation measures rooted in the best available science found in the IPCC reports.

Commenters specifically argued that, because the requirements of the UNFCCC and the Paris Agreement are contained in a Senate-ratified treaty and a congressional-executive agreement, they are the law of the land under Article VI, cl. 2 of the Constitution and binding on the United States in international law. Commenters reasoned that, under longstanding precedent applied by both Republican and Democratic administrations, executive agencies must interpret statutes, where fairly possible, in a manner consistent with international law. Commenters asserted that the Supreme Court made this clear over two centuries ago in Murray v. Schooner Charming Betsy.

Commenters quoted Article III, paragraph 3 of the UNFCCC as providing that "[t]he Parties should take precautionary measures to anticipate, prevent or minimize the causes of climate change and mitigate its adverse effects," and that "lack of full scientific certainty

# EXHIBIT 6



September 22, 2025

*Submitted via https://www.regulations.gov/*

Lee Zeldin, Administrator
U.S. Environmental Protection Agency
EPA Docket Center, OAR Docket, Mail Code 28221T
1200 Pennsylvania Avenue NW
Washington, DC 20460

**RE: Comment for Unlawful Reconsideration of 2009 Endangerment Finding and Greenhouse Gas Emission Vehicle Standards Proposed Rule (Docket No. EPA-HQ-OAR-2025-0194)**

Dear Administrator Zeldin,

On behalf of all of our youth clients, including our clients in *Lighthiser v. Trump* and *Genesis v. EPA*, and on behalf of America's children and youth, Our Children's Trust provides these comments on the "Reconsideration of 2009 Endangerment Finding and Greenhouse Gas Emission Vehicle Standards" Proposed Rule which is unjustified by law, science, economic prosperity, energy security, or any other reason. Rescinding the Endangerment Finding will worsen the adverse health effects of fossil fuel pollution our clients are suffering directly through their inhalation and exposure to the localized pollution and the heat-trapping greenhouse gases ("GHGs") from fossil fuels, resulting in further dangerous disruptions of the climate system on which these youths' health and lives depend.

As the Nation's only law firm dedicated to representing children and youth whose constitutional rights are being infringed by government conduct that causes and contributes to climate change, we write to advise you, here, as we have proven in the September 16-17, 2025, evidentiary hearing in *Lighthiser*, that you are engaged in an unconstitutional rulemaking, to implement the President's unconstitutional Executive Orders 14154, 14156, and 14261, in violation of U.S. Const. amend. V, XIV, § 1, by "unburdening" fossil fuels so they may be "unleashed" and "revitalized". Your multiplicity of actions pursuant to those Executive Orders, including this effort to rescind the Endangerment Finding, also violate the separation of powers, by exceeding the authority EPA has been delegated by Congress and by engaging in conduct that has a significant effect on U.S. public health, welfare and the economy, while lacking any scientific integrity as Congress has mandated. EPA has no statutory authority to deprive children and youth of their fundamental rights to life, personal security, other liberties, and children's equal protection of the law. U.S. Const. amend. V, XIV, § 1.

We advise you on behalf of our clients that recission of the Endangerment Finding, and any emission standards or other limits on GHGs that rely on that finding, is violative of federal law, the best available science on protecting the health and lives of children, and the legal mandate

that agency decision-making does not deprive children of their fundamental constitutional rights, including explicit and recognized rights to life; liberty; property; personal security; family autonomy; bodily integrity; the practice and transmission of cultural and religious traditions; and equal protection of the law. The proposal to rescind the Endangerment Finding is also illegal because the agency is knowingly and deliberately relying on false facts contained in non-peer reviewed, cherry-picked, and unreliable reports on climate change that conflict with EPA's consistent and unrefuted scientific reports on climate change for nearly 50 years. It violates multiple mandates of Congress to engage in this farse. The U.S. Supreme Court has recently confirmed that Plaintiffs need not wait for this unconstitutional act to be completed under the U.S. Constitution to protect their rights and seek to enjoin this conscience-shocking conduct that threatens their lives. *Mahmoud v. Taylor*, 145 S. Ct. 2332 (2025) ("But when a deprivation of [fundamental] rights is at stake, a plaintiff need not wait for the damage to occur before filing suit."). The damage to young people's lives and liberties is ongoing, and EPA must refrain from rescinding the Endangerment Finding that would make such damage worse, and potentially irreparable.

Here is a summary of some of the innumerable ways in which this rulemaking is plainly illegal:

1. The fossil fuel air pollution that your proposed rule will enable, from extraction, shipping, and combustion, is demonstrably harmful to the lives, health, and welfare of children. The best available science is clear by more than a preponderance of the evidence or substantial evidentiary standards (>99%) that every ton of greenhouse gas emissions contributes to dangerous climate change and worsens the health and welfare of children. Your unsupported assertion that "[a] combined 2.5 percent reduction in global GHG emissions" would have a *de minimis* impact on climate change trends is simply wrong from a legal and scientific perspective. To put this in the global context, a 2.5% reduction is greenhouse gas emissions is equivalent to removing the total annual fossil $CO_2$ emissions of the combined 139 lowest emitting countries, removing all the emissions of Japan, removing all the emissions from France, United Kingdom, and Italy combined, or Canada and Australia combined. *See* Hannah Ritchie & Max Roser, $CO_2$ Emissions, *Our World in Data* (2020), https://ourworldindata.org/co2-emissions; Int'l Energy Agency, *Global Energy Review 2025* (2025), https://www.iea.org/reports/global-energy-review-2025. In short, a 2.5% reduction in greenhouse gas emissions is hardly *de minimis* and can actually bend the curve of climate change trends. Scientific consensus by the IPCC and all scientific agencies of the federal government through the National Climate Assessment is that EVERY TON OF $CO_2$ MATTERS and causes further harm, and that every ton of $CO_2$ not emitted lessens the harm. We are already well past safe thresholds for $CO_2$ in the atmosphere. The de minimis argument has been rejected by the scientific community and courts around the country and the world, including the United States Supreme Court and Montana Supreme Court which recently held that the rights of young people can be protected by government "without requiring everyone else to stop jumping off bridges or adding fuel to the fire." The United States Constitution prohibits you from "adding fuel to the fire" pursuant to the President's Executive Orders, and Congress has too.

2

2. Measuring a proposed rule's effect on just global emissions, rather than U.S. emissions, misapprehends your role "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population." 42 U.S.C. § 7401. Congress has not defined this obligation as a comparative exercise against other countries. Your decision-making must be focused on what *this* Nation can do, and any reduction of fossil fuel pollution promotes the health and welfare of the population, especially children and youth, whose well-being is most relevant to the Nation's long-term productive capacity. GHGs have immediate climate and health consequences in the communities where our clients live irrespective of the global climate change consequences.

3. The evidence is also crystal clear that wind and solar are the least expensive forms of energy today and the efficiencies gained with electrification lower overall energy demand and cost by 57%. In contrast, fossil fuels are inefficient, depletable, polluting, require continual mining, transport and combustion, create energy security threats, have outsized externalities that far outweigh their economic value to society, and cause innumerable life-threatening dangers to children. Fossil fuel greenhouse gas emissions cause unhealthy local air quality, trap heat, accelerate and elongate wildfire smoke seasons, strengthen storm systems and flooding, and cause exploding train cars, bursting pipelines, contaminated water, oil spills on beaches and dead marine life, to name a few. For example, Dr. Geoffrey Heal testified at the *Lighthiser* hearing that one ton of coal produces 2.5 tons of $CO_2$ pollution and only $125 worth of electricity. Using a low-end social cost of carbon of $200/ton, one ton of coal produces $500 in costs to society, which is $375 more than the electricity it produces is worth. Consumers pay that price. Children pay far more in their bodies, burdens they carry for their lives. But through your unconstitutional conduct, you have also ceased looking at the social cost of carbon or otherwise valuing the externalities involved in GHG pollution. No regulation or deregulation should be adopted that allows for any new sources of fossil fuel greenhouse gas pollution, explicitly or implicitly subsidizes their enormous costs on children and the public, or places barriers to renewable energy and electrification. Any related dismantling of reliable, valid, and peer-reviewed climate science should also cease immediately.

4. This proposed rule, which mainly relies on DOE's recent draft report, *Impacts of Carbon Dioxide Emissions on the U.S. Climate*, does not represent any peer-reviewed science, much less the best available science, nor scientific consensus on climate science. *See, e.g.*, Proposed Rule at 36300, 36305, 36308, 36309, 36311, 36312. Please reference and incorporate into this comment, Our Children's Trust's September 2, 2025 comment for Notice of Availability: A Critical Review of Impacts of Greenhouse Gas Emissions on the U.S. Climate Draft Report (Docket No. DOE-HQ-2025-0207) which flags the serious flaws of that report. As the administration knows, the DOE report is currently being litigated, and plaintiffs in that case challenge the validity of the now "disbanded" working group that prepared this report. Your reliance on this sham and curated report, which distorts and

3

ignores the comprehensive climate science literature, demonstrates that EPA's proposal in rescinding the Endangerment Finding is not made in good faith to comply with constitutional and statutory requirements. Instead, EPA blatantly disregards constitutional limitations on executive power. Scientific support for the Endangerment Finding has only increased since it was issued in 2009. Nat'l Acads. of Scis., Eng'g & Med., *Effects of Human-Caused Greenhouse Gas Emissions on U.S. Climate, Health, and Welfare* (2025), https://doi.org/10.17226/29239. EPA may not rewrite the facts or rewrite the law. Any final rule rescinding the Endangerment Finding will also be deficient because EPA does not have the report authors available any longer to respond to public comments on their non-peer-reviewed "report" and because EPA has eliminated its Office of Research and fired so many scientists, it does not even have the capacity to make science-based response to public comments or render a scientific finding. Moreover, because of the "traumatic" conditions Dr. Vought of the Office of Management and Budget has helped institute at EPA, and the placing on administrative leave of any EPA employee who expresses dissent or disagrees with the sham science of this administration, there is no credible process by which this rulemaking can be conducted, which is evidence in the federal register notice.

5. Rescinding the Endangerment Finding removes what the President has called an "undue burden" on fossil fuels to "unleash" fossil fuels and continued fossil fuel pollution and is violative of the rights of children secured by the U.S. Constitution. This rulemaking is also in furtherance of the eliminating the so-called "Green New Deal" referenced in the President's EOs, even though no such "Green New Deal" exists. It is unnecessary, reckless, harmful to energy security and American Prosperity, and is nonsensical, as we have repeatedly commented and argued to the federal government in public comments and litigation. With respect, and in accordance with your statutory mandate and constitutional obligations, you should be doing everything in your power to prevent new sources of, and eliminate existing, fossil fuel pollution instead of "unleashing it" by eliminating a finding that accurately recognizes the danger of greenhouse gas emissions and fossil fuel pollution. Importantly, to carry out your mission of preventing pollution, you should be clearing the way for a rapid transition towards renewable energy and the electrification of all energy sectors (the least expensive energy and modalities, and the energy of the future).

6. High courts of other nations, the European Court of Human Rights, and the United Nations General Assembly have affirmed the human right to a clean, healthy, and sustainable environment, and the fundamental importance of a life-sustaining climate system as essential to other human rights. Courts across the U.S., the world, and at the International Court of Justice have specifically ruled that governments allowing fossil fuel pollution causes constitutional injuries and human rights violations. International Court of Justice, Advisory Opinion on the Obligations of States in Respect of Climate Change, General List No. 187, July 23, 2025. Every nation has a legal and moral obligation to cease its conduct that perpetuates fossil fuel use and climate change and to take measures (like in these rulemaking processes) to work to substitute renewable energy for fossil fuels. *Id*. (countries, including U.S., have an obligation to "use all means at [their] disposal" to

4

"prevent significant harm to the environment" including the climate system); *see also* Inter-Am. Ct. H.R., Advisory Opinion OC-32/25, Climate Emergency and Human Rights, Requested by the Republic of Chile & the Republic of Colombia (May 29, 2025).

7. As adults implementing federal law, how children and future generations are affected by your methods and actions should be your most important lens, as they are the most vulnerable, the politically powerless, and the least capable of protecting themselves. They bear the burden of fossil fuel pollution and climate change. The U.S. Supreme Court says children require special protection under the law. *See, e.g.*, *Brown v. Bd. of Educ.*, 347 U.S. 483, 494 (1954) (government cannot impose harm to black children through segregated education that "may affect their hearts and minds in a way unlikely ever to be undone."); *Plyler v. Doe*, 457 U.S. 202, 226 (1982) (government-imposed lifetime of hardship on children is an "area of special constitutional sensitivity"); *Weber v. Aetna Cas. & Sur. Co.*, 406 U.S. 164, 175 (1972) (laws "imposing disabilities" on children for choices of parents is "illogical and unjust").

8. In your proposed rule, you took the alarming position that because the President expressed intent to reverse climate change policy in his campaign and won the election, EPA has "an independent and sufficient basis for changing legal interpretation and policy." Proposed Rule at 36297. The President does not make law and cannot repeal, amend, or otherwise change statutes under which EPA operates. That is not how separation of powers and the Constitution works. Adopting such a position would mean the law would become "nothing more than the will of the current President, or, worse yet, the will of unelected officials barely responsive to him." *West Virginia v. EPA*, 597 U.S. 697, 739 (2022). Even more, this position reflects a complete disregard of pursuing rule-making that protects those who cannot vote, that is children, the group the proposed rule will affect the most.

9. Beyond violating the rights of children and youth, this proposed rule attempts to improperly invoke several legal principles. While comments by other parties will address EPA's convoluted statutory interpretation of "any air pollutant" in detail, we will note that the Supreme Court has already settled that, in the title concerning motor vehicles, the definition encompasses greenhouse gas pollutants. *Massachusetts v. EPA*, 549 U.S. 497 (2007). Your proposed rule has not identified any intervening legal precedent that overturns the *Massachusetts* statutory interpretation. In fact, you acknowledge that some recent decisions do not even cite *Massachusetts*. Proposed Rule at 36307 n.86. Where recent case law has cited *Massachusetts*, such as in *Utility Air Regulatory Group v. EPA*, the Court made clear that its holdings were confined to the statutory title at issue, while reaffirming that *Massachusetts* was correctly decided within its own context. *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 318 (2014) ("[N]othing in the Act suggested that regulating greenhouse gases under [the motor vehicle emissions] Title would conflict with the statutory design.") Congress has explicitly defined GHGs as pollutants under recent legislation. *See* 42 U.S.C. §§ 7434 (c)(2), 7432(d)(4), 7433(d)(2), 7435(c), 7436(i), 7437(d)(2), 7438(d).

10. The major questions doctrine actually prevents you from rescinding the Endangerment Finding, rather than allowing it. The proposed rule asserts that *Massachusetts* failed to consider the doctrine, but this overlooks the D.C. Circuit dissent below, which addressed the argument directly. There, Judge Tatel rejected EPA's argument that including greenhouse gas emissions in the definition of pollutants would "be like finding 'an elephant in a mousehole.'" *Massachusetts v. EPA*, 415 F.3d 50, 68 (D.C. Cir. 2005) (Tatel, J., dissenting) (quoting *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001)). Judge Tatel reasoned Congress intentionally and clearly granted EPA authority to regulate all pollutants and chose to not exempt any pollutants. *Id.* at 69. The Supreme Court adopted that reasoning in reversing the D.C. Circuit, and it is implausible to suggest the Court was unaware of, or failed to grapple with, arguments that the proposed rule now attempts to revive, even if the term "major questions doctrine" was not yet adopted by the Court. For EPA to define GHGs as not pollutants would be a stunning arrogation of power dedicated to Congress and scientists. Congress has already defined GHGs as pollutants and you have no authority to alter Congress' mandate or the scientific meaning of pollutant. EPA also confirmed the White House's findings from 1965 that $CO_2$ was a "dangerous" pollutant. U.S. EPA, *Policy Options for Stabilizing Global Climate: Report to Congress*, EPA 21p-2003.1, at I-13 (Daniel A. Lashof & Dennis A. Tirpak eds., 1990).

11. Even so, subsequent case law makes clear the Endangerment Finding, a scientific finding, does not implicate major questions, holding that the Endangerment Finding at most "require[s] EPA to take the modest step of adding greenhouse-gas standards to the roster of new-motor-vehicle emission regulations." *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 318–19, (2014). This analysis was not changed by *West Virginia v. EPA*, 597 U.S. 697 (2022). Notably, the *West Virginia* Court never questioned EPA's authority to regulate greenhouse gas emissions of power plants, it only prohibited the method of regulation EPA employed. *Id.* at 732.

12. The Endangerment Finding on the other hand, explicitly does what Congress requires EPA to do—use its judgment to identify and regulate "any air pollutant" from new motor vehicles that "cause, or contribute to, air pollution which may reasonably be anticipated to endanger public health or welfare." 42 U.S.C. § 7521(a)(1). The crux of the proposed rule's invocation of the major questions doctrine, then, focuses instead on subsequent regulations setting emissions standards. This includes the President's EOs' mischaracterizing Biden-era emission standards as "electric vehicle mandates that require shifting the national vehicle fleet from one type of vehicle and vehicle fuel to another." Proposed Rule at 36307. EPA has made no such mandate. Even so, any concerns EPA finds with emissions standards, for instance that they are not strict enough to protect children's health, can be reviewed separately without rescinding the Endangerment Finding.

13. Another misapplied legal principle lies in the proposed rule's illegal assertion that, while intervening legal authority purportedly restricts EPA's ability to regulate greenhouse gas emissions, as it has done for over a decade, EPA still retains preemptive authority over

6

states seeking to regulate greenhouse gas emissions. Proposed Rule at 36315. It is unclear if you are only claiming preemptive rights if your alternative argument that statutory interpretation does not permit regulation of greenhouse gas emissions fails. Regardless, under both postures, Congress may not establish a preemption framework that leaves children and young people without any meaningful avenue to vindicate their constitutional rights. *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 325 (2015) (constitutional rights are "congressionally unalterable"). And the Clean Air Act did not intend to set an unconstitutional ceiling on protecting human health. Many states have constitutions that require protection for human health and the environment and EPA's proposed approach also interferes with our constitutional structure under the Tenth Amendment. Under your claim that you cannot regulate greenhouse gas emissions, the Supreme Court's recognition of Congressional displacement of federal nuisance claims, relies on the assumption that the EPA may regulate greenhouse gas emissions under the Clean Air Act. *Am. Elec. Power Co. v. Connecticut*, 564 U.S. 410, 426 (2011). You have created a house of cards that will crumble under this illogical and unconscionable "unburdening" of fossil fuels. Your entire mission is to unburden humans from preventable pollution, which includes GHGs, and especially children who you know are most harmed by these efforts, given your many reports on the topic.

14. In support of these comments, we refer you to the docket in *Lighthiser v. Trump*, No. 25-0054 (D. Mont.), which includes numerous expert declarations that we attach here. *See, e.g.*, Declarations of Dr. Jacobson, Dr. Running, Dr. Jenkins, Dr. Heal, Dr. Stiglitz, Dr. Byron, Dr. Balmes, and Dr. Van Susteren. You are already in possession of all of these filings. Please include them in the public comment record. We have also attached a declaration of John Podesta discussing administration's intent of rescinding the Endangerment Finding, which is to "unleash" fossil fuels, rather than update rulemaking based on new scientific findings. Mr. Podesta and Dr. Running testified on the long-lasting harm to young people if the finding were rescinded in a September 16-17 hearing on a motion for preliminary injunction. Mr. Podesta's testimony emphasized that the Endangerment Finding is a scientific finding that should not be distorted by politics, and Dr. Running's testimony outlines the flaws in the DOE report on which you are basing the proposed rule. You are aware of those proceedings and have access to transcripts which should also be incorporated into the public record.

15. We refer you to the declarations of Nicole Hughes, Dr. Heal, Dr. Stiglitz, and Dr. Jacobson that prove how this entire enterprise of unleashing more fossil fuels that you are engaged in, while blocking wind and solar energy, is harming energy reliability, abundance, jobs, the cost of energy, in addition to the health harms.

16. We also refer you to the record in *Genesis v. EPA*, No. 25-2473 (9th Cir.), including the attached amicus briefs. Finally, we refer you to the trial testimony and court findings in *Held v. Montana*, No. CDV-2020-307 (Mont. 1st Jud. Dist. Ct.), where leading scientists testified that fossil fuels endanger children's health and that powering every state in the

nation on 100% clean renewable energy is not only technically feasible right now but is economically beneficial and will save states and consumers billions of dollars in energy bills. *See* Expert Reports of Dr. Jacobson and Dr. Steve Running and Trial Testimony in *Held v. Montana.*

17. Climate change is causing a public health emergency that is *already* adversely impacting the physical and mental health of American children through, among other impacts, extreme weather events, rising temperatures and increased heat exposure, decreased air quality, altered infectious disease patterns, food and water insecurity, and economic hardship. Children are uniquely vulnerable to climate change impacts because of their developing bodies, higher exposure to air, food, and water per unit body weight, unique behavior patterns, dependence on caregivers, political powerlessness, and longevity on the planet. EPA has reported as such. EPA, *Climate Change and Children's Health and Well-Being in the United States*, EPA 430-R-23-001 (2023), https://www.epa.gov/cira/climate-change-and-childrens-health-and-well-being-united-states. The protection of constitutional rights of children, by following the science, is of the utmost importance and must be incorporated in all relevant rulemakings and policies. Children rely on, and their health and safety depend on, EPA fulfilling its core mission to regulate harmful air pollutants including greenhouse gases. 42 U.S.C. § 7401(b)(1). Children have no vote and no political power. Their reliance interests, and that of their families, is entitled to great weight. As Jorja wrote during the preliminary injunction hearing in her case, *Lighthiser v. Trump*: "People get a choice on how fast they go on the highway. We can't choose how much coal is driven through my town" and therefore how much coal dust enters her lungs, and $CO_2$ that enters the atmosphere. The federal government through EPA controls the air space over our nation and how much GHG will enter it. It is obligated under the Constitution and delegation of statutory authority to prevent pollution and protect the health of children.

18. Children and young people, including our clients, are already suffering injury with long-lasting and irreversible consequences at present levels of fossil fuel heating and pollution. The government has already knowingly created a dangerous situation and is knowingly enhancing that danger through these regulatory processes in a manner that shocks the conscience, all in service of implementing the President's Executive Orders, including EO 14154: Unleashing American Energy, EO 14156: Declaring a National Energy Emergency, and EO 14261: Reinvigorating America's Beautiful Clean Coal Industry. Please refer to the attached declarations from the young people who we represent, which detail how climate change has affected their lives, how government action has led to those harms, and in some cases how their attempts to mitigate their harms by appealing to the political branches have been ignored because they lack voting and economic power.

19. On September 17, 2025, in Missoula, Montana, your DOJ attorney, Michael Sawyer, stated that you might not rescind the Endangerment Finding, but Administrator Zeldin, you stated

publicly that you were rescinding it before you even reviewed a single public comment.[1] Pre-determining you are rescinding a scientific finding by EPA with enormous legal consequences prior to even reviewing scientific evidence and public comment, including from hundreds of climate scientists and health experts, is unconscionable and unconstitutional. It also violates the law and your obligation to be candid with the Court and your counsel. We incorporate by reference the transcripts of testimony from witnesses on Sept. 16-17, 2025 in U.S. District Court of Montana in Missoula in *Lighthiser v. Trump*, which your attorneys were present at and which will be in their possession as soon as it's completed.

Please include all referenced evidence above and below in the administrative record. We will provide any of the cited evidence on request. However, it is all in your possession and should be included. Please send us a detailed response to our comments, notification of further comment opportunities, and all analyses and decision documents to the address and email listed below.

Sincerely,

/s/
Julia Olson
Co-executive Director and Chief Legal Counsel
julia@ourchildrenstrust.org

Our Children's Trust
P.O. Box 5181
Eugene, OR 97405

**Attachments:**

*Lighthiser v. Trump*
1. Declaration of Delaney in Support of Motion for Preliminary Injunction, *Lighthiser v. Trump*, No.: CV-25-54-BU-DLC (D. Mont. June 13, 2025), ECF No. 25-1.
2. Declaration of John Balmes in Support of Motion for Preliminary Injunction, *Lighthiser v. Trump*, No.: CV-25-54-BU-DLC (D. Mont. June 13, 2025), ECF No. 25-2.

---

[1] EPA, EPA Releases Proposal to Rescind Obama-Era Endangerment Finding, Regulations that Paved the Way for Electric Vehicle Mandates (July 29, 2025), https://www.epa.gov/newsreleases/epa-releases-proposal-rescind-obama-era-endangerment-finding-regulations-paved-way; CBS News, The Takeover, EPA Chief Lee Zeldin Defends Proposed Repealing of Endangerment Finding Video, You Tube (August 1, 2025), https://www.youtube.com/watch?v=YCM_o0ora2E; Lee Zeldin (@epaleezeldin), X (July 29, 2025 12:51pm), https://x.com/epaleezeldin/status/1950283078691389644.

3. Declaration of Lori Byron in Support of Motion for Preliminary Injunction, *Lighthiser v. Trump*, No.: CV-25-54-BU-DLC (D. Mont. June 13, 2025), ECF No. 25-3.

4. Declaration of Eva in Support of Motion for Preliminary Injunction, *Lighthiser v. Trump*, No.: CV-25-54-BU-DLC (D. Mont. June 13, 2025), ECF No. 25-4.

5. Declaration of Geoffrey Heal in Support of Motion for Preliminary Injunction, *Lighthiser v. Trump*, No.: CV-25-54-BU-DLC (D. Mont. June 13, 2025), ECF No. 25-5.

6. Declaration of Mark Jacobson in Support of Motion for Preliminary Injunction, *Lighthiser v. Trump*, No.: CV-25-54-BU-DLC (D. Mont. June 13, 2025), ECF No. 25-6.

7. Declaration of Craig McLean in Support of Motion for Preliminary Injunction, *Lighthiser v. Trump*, No.: CV-25-54-BU-DLC (D. Mont. June 13, 2025), ECF No. 25-7.

8. Declaration of Cathy Whitlock in Support of Motion for Preliminary Injunction, *Lighthiser v. Trump*, No.: CV-25-54-BU-DLC (D. Mont. June 13, 2025), ECF No. 25-8.

9. Declaration of Avery in Support of Motion for Preliminary Injunction, *Lighthiser v. Trump*, No.: CV-25-54-BU-DLC (D. Mont. June 13, 2025), ECF No. 25-9.

10. Declaration of John Balbus in Support of Motion for Preliminary Injunction, *Lighthiser v. Trump*, No.: CV-25-54-BU-DLC (D. Mont. June 13, 2025), ECF No. 25-10.

11. Declaration of Peter Erickson in Support of Motion for Preliminary Injunction, *Lighthiser v. Trump*, No.: CV-25-54-BU-DLC (D. Mont. June 13, 2025), ECF No. 25-11.

12. Declaration of Grace in Support of Motion for Preliminary Injunction, *Lighthiser v. Trump*, No.: CV-25-54-BU-DLC (D. Mont. June 13, 2025), ECF No. 25-12.

13. Declaration of Joseph in Support of Motion for Preliminary Injunction, *Lighthiser v. Trump*, No.: CV-25-54-BU-DLC (D. Mont. June 13, 2025), ECF No. 25-13.

14. Declaration of Kalālapa in Support of Motion for Preliminary Injunction, *Lighthiser v. Trump*, No.: CV-25-54-BU-DLC (D. Mont. June 13, 2025), ECF No. 25-14.

15. Declaration of Michael MacCracken in Support of Motion for Preliminary Injunction, *Lighthiser v. Trump*, No.: CV-25-54-BU-DLC (D. Mont. June 13, 2025), ECF No. 25-15.

16. Declaration of Olivia in Support of Motion for Preliminary Injunction, *Lighthiser v. Trump*, No.: CV-25-54-BU-DLC (D. Mont. June 13, 2025), ECF No. 25-16.

17. Declaration of Joseph Stiglitz in Support of Motion for Preliminary Injunction, *Lighthiser v. Trump*, No.: CV-25-54-BU-DLC (D. Mont. June 13, 2025), ECF No. 25-17.

18. Declaration of Laura Anderson in Support of Motion for Preliminary Injunction, *Lighthiser v. Trump*, No.: CV-25-54-BU-DLC (D. Mont. June 13, 2025), ECF No. 25-18.

19. Declaration of Tom Di Liberto in Support of Motion for Preliminary Injunction, *Lighthiser v. Trump*, No.: CV-25-54-BU-DLC (D. Mont. June 13, 2025), ECF No. 25-19.

20. Declaration of Jesse Jenkins in Support of Motion for Preliminary Injunction, *Lighthiser v. Trump*, No.: CV-25-54-BU-DLC (D. Mont. June 13, 2025), ECF No. 25-20.

21. Declaration of J.M. in Support of Motion for Preliminary Injunction, *Lighthiser v. Trump*, No.: CV-25-54-BU-DLC (D. Mont. June 13, 2025), ECF No. 25-21.

22. Declaration of Gary Jonesi in Support of Motion for Preliminary Injunction, *Lighthiser v. Trump*, No.: CV-25-54-BU-DLC (D. Mont. June 13, 2025), ECF No. 25-22.

23. Declaration of Lise Van Susteren in Support of Motion for Preliminary Injunction, *Lighthiser v. Trump*, No.: CV-25-54-BU-DLC (D. Mont. June 13, 2025), ECF No. 25-23.

10

24. Declaration of Steven Running in Support of Motion for Preliminary Injunction, *Lighthiser v. Trump*, No.: CV-25-54-BU-DLC (D. Mont. June 13, 2025), ECF No. 25-24.
25. Supplemental Declaration of Mark Jacobson in Support of Motion for Preliminary Injunction, *Lighthiser v. Trump*, No.: CV-25-54-BU-DLC (D. Mont. July 18, 2025), ECF No. 38-1.
26. Supplemental Declaration of Peter Erickson in Support of Motion for Preliminary Injunction, *Lighthiser v. Trump*, No.: CV-25-54-BU-DLC (D. Mont. July 18, 2025), ECF No. 38-2.
27. Supplemental Declaration of Jesse Jenkins in Support of Motion for Preliminary Injunction, *Lighthiser v. Trump*, No.: CV-25-54-BU-DLC (D. Mont. July 18, 2025), ECF No. 38-3.
28. Declaration of John Podesta in Support of Motion for Preliminary Injunction, *Lighthiser v. Trump*, No.: CV-25-54-BU-DLC (D. Mont. September 10, 2025), ECF No. 68-1.
29. Declaration of Nicole Hughes in Support of Motion for Preliminary Injunction, *Lighthiser v. Trump*, No.: CV-25-54-BU-DLC (D. Mont. September 10, 2025), ECF No. 68-2.

### *Genesis v. EPA*

30. Declaration of Avroh in Support of Opposition to Motion to Dismiss, *Genesis B. v. EPA*, No.: 2:23-CV-10345-MWF (C.D. Cal. Aug. 12, 2024), ECF No. 64-1.
31. Declaration of Andrew Bradt in Support of Opposition to Motion to Dismiss, *Genesis B. v. EPA*, No.: 2:23-CV-10345-MWF (C.D. Cal. Aug. 12, 2024), ECF No. 64-2.
32. Declaration of Elizabeth Pinsky in Support of Opposition to Motion to Dismiss, *Genesis B. v. EPA*, No.: 2:23-CV-10345-MWF (C.D. Cal. Aug. 12, 2024), ECF No. 64-3.
33. Declaration of Liliana Doganova in Support of Opposition to Motion to Dismiss, *Genesis B. v. EPA*, No.: 2:23-CV-10345-MWF (C.D. Cal. Aug. 12, 2024), ECF No. 64-4.
34. Declaration of Noah in Support of Opposition to Motion to Dismiss, *Genesis B. v. EPA*, No.: 2:23-CV-10345-MWF (C.D. Cal. Aug. 12, 2024), ECF No. 64-5.
35. Declaration of Joseph Stiglitz in Support of Opposition to Motion to Dismiss, *Genesis B. v. EPA*, No.: 2:23-CV-10345-MWF (C.D. Cal. Aug. 12, 2024), ECF No. 64-6.
36. Declaration of Maryam in Support of Opposition to Motion to Dismiss, *Genesis B. v. EPA*, No.: 2:23-CV-10345-MWF (C.D. Cal. Aug. 12, 2024), ECF No. 64-7.
37. Brief of Amici Curiae Children's Rights Advocates in Support of Appellants' Opening Brief, *Genesis B. v. EPA*, No. 25-2473 (9th Cir. Jul.9, 2025), ECF No. 18.1.
38. Brief of Amici Curiae Medical Professionals and Health Advocacy Organizations in Support of Plaintiffs-Appellants and Reversal, *Genesis B. v. EPA*, No. 25-2473 (9th Cir. Jul. 23, 2025), ECF No. 24.1.

### *Held v. Montana*

39. *Held v. Montana*, No. CDV-2020-307, 2023 WL 5229257 (Mont. 1st Jud. Dist. Aug. 14, 2023)
40. Expert Report of Mark Jacobson, *Held v. Montana*, No. CDV-2020-307 (Mont. 1st Jud. Dist. Ct. Sept. 30, 2022).

41. Expert Report of Steven Running and Cathy Whitlock, *Held v. Montana*, No. CDV-2020-307 (Mont. 1st Jud. Dist. Ct. Sept. 30, 2022).

42. Brief of Amici Curiae Public Health Experts and Doctors in Support of Plaintiffs-Appellees Seeking Affirmance, *Held v. Montana*, No. DA 23-0575 (Mont. Sup. Ct. Mar. 21, 2024).

43. Transcript of Trial Testimony Excerpts of Direct Examinations of Witnesses, *Held v. Montana*, No. CDV-2020-307 (Mont. 1st Jud. Dist. Ct. June 20, 2023), video recording available at https://heldvmontana.ourchildrenstrust.org.

### *Juliana v. United States*

44. Declaration of Aji, *Juliana v. United States*, No.: 18-36082 (9th Cir. Feb. 7, 2019), ECF No. 21-8.

45. Declaration of Alex, *Juliana v. United States*, No.: 15-cv-01517 (D. Or. Jan. 6, 2016), ECF No. 41-1.

46. Declaration of Avery, *Juliana v. United States*, No.: 15-cv-01517 (D. Or. Jan. 6, 2016), ECF No. 41-2.

47. Declaration of Avery, *In re United States*, No.: 24-684 (9th Cir. Feb. 12, 2024), ECF No. 7.9.

48. Declaration of Isaac, *In re United States*, No.: 24-684 (9th Cir. Feb. 12, 2024), ECF No. 7.7.

49. Declaration of Jacob, *In re United States*, No.: 24-684 (9th Cir. Feb. 12, 2024), ECF No. 7.11.

50. Declaration of Jaime, *Juliana v. United States*, No.: 15-cv-01517 (D. Or. Jan. 6, 2016), ECF No. 41-4.

51. Declaration of Jayden, *Juliana v. United States*, No.: 15-cv-01517 (D. Or. Sept. 7, 2016), ECF No. 78.

52. Declaration of Journey, *Juliana v. United States*, No.: 18-36082 (9th Cir. Feb. 7, 2019), ECF No. 21-7.

53. Declaration of Kelsey, *Juliana v. United States*, No.: 15-cv-01517 (D. Or. Jan. 6, 2016), ECF No. 41-6.

54. Declaration of Levi, *Juliana v. United States*, No.: 18-36082 (9th Cir. Feb. 7, 2019), ECF No. 21-5.

55. Declaration of Levi, *In re United States*, No.: 24-684 (9th Cir. Feb. 12, 2024), ECF No. 7.8.

56. Declaration of Miko, *In re United States*, No.: 24-684 (9th Cir. Feb. 12, 2024), ECF No. 7.12.

57. Declaration of Nathan, *In re United States*, No.: 24-684 (9th Cir. Feb. 12, 2024), ECF No. 7.13.

58. Declaration of Nicholas, *Juliana v. United States*, No.: 18-80176 (9th Cir. Feb. 7, 2019), ECF No. 21-6.

59. Declaration of Sahara, *Juliana v. United States*, No.: 15-cv-01517 (D. Or. Jan. 6, 2016), ECF No. 41-8.

60. Declaration of Sahara, *In re United States*, No.: 24-684 (9th Cir. Feb. 12, 2024), ECF No. 7.10.

www.ourchildrenstrust.org

61. Declaration of Victoria, *Juliana v. United States*, No.: 15-cv-01517 (D. Or. Jan. 6, 2016), ECF No. 41-9.

62. Declaration of Xiuhtezcatl, *Juliana v. United States*, No.: 15-cv-01517 (D. Or. Jan. 6, 2016), ECF No. 41-10.

63. Declaration of Zealand, *Juliana v. United States*, No.: 15-cv-01517 (D. Or. Jan. 6, 2016), ECF No. 41-11.

# ATTACHMENT 23

Roger Sullivan
McGARVEY LAW
345 1st Avenue East
Kalispell, MT 59901
(406) 752-5566
rsullivan@mcgarveylaw.com

Philip L. Gregory*
GREGORY LAW GROUP
1250 Godetia Drive
Redwood City, CA 94062
(650) 278-2957
pgregory@gregorylawgroup.com

Julia A. Olson*
Andrea K. Rodgers*
Nathan Bellinger*
OUR CHILDREN'S TRUST
1216 Lincoln St.
Eugene, OR 97401
(415) 786-4825
julia@ourchildrenstrust.org
andrea@ourchildrenstrust.org
nate@ourchildrenstrust.org

Daniel C. Snyder*
Haley Nicholson*
PUBLIC JUSTICE
1620 L Street NW, Suite 630
Washington, DC 20036
(202) 797-8600
dsnyder@publicjustice.net
hnicholson@publicjustice.net

*Attorneys for Plaintiffs*
*Admitted pro hac vice*

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BUTTE DIVISION**

| | |
|---|---|
| **EVA LIGHTHISER**; et al. <br> Plaintiffs, <br><br> v. <br><br> **DONALD J. TRUMP**, in his official capacity as President of the United States; et al. <br> Defendants. | Case No: CV-25-54-BU-DLC <br><br> **DECLARATION OF LISE VAN SUSTEREN, MD, IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** |

I, Lise Van Susteren, hereby declare and if called upon would testify as follows:

1.    I am a board certified general and forensic psychiatrist in practice for 26 years. I am offering this testimony in my personal capacity, and I have personal knowledge of the facts stated herein.

2.    I am submitting this Declaration in support of Plaintiffs' Motion for Preliminary Injunction to prevent Defendants from implementing several sections of Executive Orders Nos. 14154, 14156, and 14261, which are designed to "unleash" fossil fuels, slow or stop the growth of sustainable, renewable energy, and suppress the development and publication of climate change science. I offer my expert opinion about the immediate, severe, and ongoing harm to the physical and psychological health and well-being of Plaintiffs from the Defendants' actions being challenged in this case. These injuries get worse with each day Defendants continue to "unleash" fossil fuels and suppress the development and publication of climate change science.

**Background & Qualifications**

3.    My academic and clinical training took place at the University of Paris, in Togo West Africa, and at St. Elizabeth's Hospital in Washington D.C. I am Clinical Associate Professor of Psychiatry and Behavioral Sciences at George Washington University in Washington D.C. In addition to my private practice, I have worked in community mental health centers. Over the course of my career, I have provided

1

mental health services to people from all walks of life and across the entire socioeconomic spectrum. I have volunteered for the homeless in metropolitan Washington D.C., with displaced persons traumatized by natural disasters, and with Physicians for Human Rights assessing the credibility of torture victims seeking political asylum in the U.S. I have also worked as a psychological profiler of world leaders at the Central Intelligence Agency. As a psychiatrist in private practice, I have evaluated and treated individuals, couples, and families. I am an expert in evaluating and treating individuals who have experienced trauma.

4.      Over the last several years, I have helped develop youth climate anxiety assessment tools, conducted research and reviewed data in assessing the mental health of young people faced with climate change. In 2009, I co-convened the first conference to address climate and mental health. The publication of the proceedings reported that society should expect an escalating emotional toll from climate disruption (including an attendant physical toll) and warned that the U.S. mental health care system was not prepared to meet the expanding crisis.

5.      In 2013, I worked with Dr. James Hansen and other experts on a paper entitled *Assessing "Dangerous Climate Change": Required Reductions of Carbon Emissions to Protect Young People, Future Generations and Nature*.[1] This paper set

---

[1] Hansen, J., et al. (2013). Assessing "dangerous climate change": Required reduction of carbon emissions to protect young people, future generations and nature. PloS one, 8(12), e81648.

the scientific prescription needed to restore Earth's energy imbalance and protect the mental health of young people.

6.    In the Fall of 2021, The Lancet published a global study, of which I am a co-author, documenting climate distress among 10,000 young people aged 16-25 from 42 countries in 26 languages.[2] In the Fall of 2024, The Lancet published a study, of which I am a co-author, further documenting climate distress in 16,000 U.S. youth aged 16-25, by state.[3]

7.    I have received honors and awards recognizing my work. In May 2018, I received the Distinguished Fellow award of the American Psychiatric Association, its highest membership honor. In May of 2022, I was honored by the Washington Psychiatric Society, a district branch of the American Psychiatric Association, for my work on climate and mental health. The American College of Psychiatrists, an honorary invitation-only association of distinguished U.S. psychiatrists, welcomed me as a member in 2022.

---

[2] Hickman, C., Marks, E., Pihkala, P., Clayton, S., Lewandowski, R.E., Mayall, E., Wray, B., Mellor, C., & Van Susteren, L. (2021). Climate anxiety in children and young people and their beliefs about government responses to climate change: a global survey. The Lancet Planetary Health, 5(12), e863-e873.
[3] Lewandowski, R. E., Clayton, S. D., Olbrich, L., Sakshaug, J. W., Wray, B., Schwartz, S. E., ... & Van Susteren, L. (2024). Climate emotions, thoughts, and plans among US adolescents and young adults: a cross-sectional descriptive survey and analysis by political party identification and self-reported exposure to severe weather events. The Lancet Planetary Health, 8(11), e879-e893.

8.    In the last decade, I have given hundreds of presentations on climate change and mental health. I have served on the Maryland Task Force on Energy Policy and The Metropolitan Council of Governments, a multi-state council charged with protecting our climate and environmental health. I have also served on the Advisory Board of the Center for Health and the Global Environment at Harvard University T.H. Chan School of Public Health. I am a co-founder of the Climate Psychiatry Alliance, as well as of the Climate Psychology Alliance – North America – which includes more than 2000 mental health professionals seeking training and work in this field. A true and correct copy of my curriculum vitae is attached hereto as Exhibit A.

9.    I previously served as a testifying expert witness on similar topics addressed in this Declaration for the Youth Plaintiffs in *Rikki Held, et al. v. State of Montana et al.*, tried in June 12-20, 2023 before Judge Kathy Seeley, First Judicial District Court, Lewis and Clark County, in Cause No. CDV-2020-307.

10.    After preparing an expert report in that litigation, as well as a rebuttal expert report, and testifying under oath at a deposition, I appeared in Court on June 16, 2023, to testify under oath on the following topics: the psychological and physical injuries of climate disruption on Montana's youth, including the Youth Plaintiffs, the psychological harms caused by Defendants willfully disregarding the dangers from climate instability when permitting fossil fuel projects, and the

availability of remedies to alleviate Plaintiffs' psychological and attendant physical injuries. My expert report was not admitted as an exhibit into the trial record, but my testimony was recorded and is available at https://heldvmontana. ourchildrenstrust.org/.

11.    The Court issued its Findings of Fact, Conclusions of Law, and Order on August 14, 2023, finding my expert opinions "informative and credible." ¶¶ 89, 102, 104-10, 112-14, 116-17, 119-20, 124, 126, 129, 133-34 (citing LVS [Lise Van Susteren] trial testimony and demonstratives). The paragraphs from the Court's opinion that reference my testimony are attached to this Declaration as Exhibit B.

**Climate Change Harm's Young People's Mental Health, A Vital Aspect of Their Lives, and the Challenged Executive Orders Will Cause Even More Harm**

12.    The science, literature, and government reports show a terrifying array of current and projected injuries to human health from climate disruption. These include injuries to our physical and psychological health, with each, like a two-way street, worsening the impacts to the other. Our children, including the youth Plaintiffs here, are in the bull's eye of the consequences of climate disruption. These findings are well-documented and established. We know that current and surging GHG emissions are primarily driven by the use of fossil fuels. Despite knowing for decades that using fossil fuels are the root cause of climate disruption, the federal

government is "unleashing" the use of fossil fuels, obstructing the use of renewable sources of energy, and silencing the science – none the less.

13.    Nearly a decade ago, the federal government commissioned a review in the scientific literature of the impacts of climate change on mental health. It concluded that climate change causes "serious mental health consequences."[4] This conclusion was reached with "very high confidence." Based on the scale utilized by the authors, "very high confidence" is the maximum level of certainty.[5]

14.    In 2018, the Fourth National Climate Assessment ("NCA4"), stated: "People exposed to weather- or climate-related disasters have been shown to experience mental health impacts including depression, post-traumatic stress disorder, and anxiety, all of which often occur simultaneously; furthermore, among those most likely to suffer these impacts are some of society's most vulnerable populations, including children[.]"[6] Federal government-sponsored research rightly predicted that the mental health impacts of these events will increase as more and more people experience the trauma and anxiety attendant to these disasters. I agree

---

[4] Dodgen, D., et al. (2016). Ch. 8: Mental health and well-being. The impacts of climate change on human health in the United States: A scientific assessment. U.S. Global Change Research Program, Washington, DC, 217–246.
[5] Id.
[6] USSCRP. (2018) Ch. 8 Coastal Effects, Impacts, Risks, and Adaptation in the United States: Fourth National Climate Assessment, Volume II. U.S. Global Change Research Program, 326-327.

and if Defendants are allowed to "unleash" more fossil fuels, the extreme weather events will get worse, and so too will the ensuing traumas.

15.    The federal government has also correctly acknowledged that children are particularly vulnerable to distress, anxiety, and other adverse mental health effects following extreme weather events. According to the NCA4: "Children and youth, in general, will likely experience cumulative physical and mental health effects of climate change over their lifetimes due to increased exposure to extreme weather events (such as heat stress, trauma from injury, or displacement) and increased toxic exposures (such as increased ground-level ozone pollution in urban areas or increased risk of drinking water contamination in rural areas) . . . . Natural disasters, as well as gradual changes (like changing landscapes and livelihoods) caused by climate stressors, increase the risk of anxiety, depression, and post-traumatic stress disorder (PTSD)."[7] I agree and we are already seeing these impacts affecting children today, as many of the Plaintiffs have described in the Complaint and their own declarations being submitted to support this Motion for Preliminary Injunction.

16.    The scientific and public health communities have officially and repeatedly warned that the health of young people is being harmed today, and that

---

[7] USSCRP. (2018) Ch. 24 Northwest, Impacts, Risks, and Adaptation in the United States: Fourth National Climate Assessment, Volume II. U.S. Global Change Research Program, 1059.

the harm will worsen as a result of a range of increasingly frequent and devastating climate-related events that are brought on by the "unleashing" of fossil fuels. These include, but are not limited to, more intense heat waves, an increase in catastrophic wildfires, more extended droughts and water shortages, worsening storms with increased flooding, disaster-based resource scarcity, and the spread of infectious diseases. Extreme heat, for example, reduces the ability for Plaintiffs (including Eva, Avery, Delaney, Joseph, J.H, and J.M.), to engage in outside activities, like recreation and work. Extreme heat affects the learning ability of youth: studies show it is associated with a decline in cognitive functioning, with difficulty concentrating, remembering new information, and with lower test scores.[8] Persistent high

---

[8] Burke, S.E., Sanson, A.V., & Van Hoorn, J. (2018). The Psychological Effects of Climate Change on Children. Current Psychiatry Reports, 20, 35; Park, R.J., Behrer, A.P., & Goodman, J.R. (2021). Learning is inhibited by heat exposure, both internationally and within the United States. Nature Human Behaviour, 5(1), 19-27; Parks, R.M., et al. (2020). Anomalously warm temperatures are associated with increased injury deaths. Nature Medicine, 26(1), 65-70; Callahan, C.W., & Mankin, J.S. (2022). Globally unequal effect of extreme heat on economic growth. Science Advances, 8(43), eadd3726; Bernstein, A.S., et al. (2022). Warm Season and Emergency Department Visits to U.S. Children's Hospitals. Environmental Health Perspectives, 130(1), 017001; Parsons, L.A., et al. (2022). Global labor loss due to humid heat exposure underestimated for outdoor workers. Environmental Research Letters, 17, 014050; Hovdahl, I. (2022). The deadly effect of day-to-day temperature variation in the United States. Environmental Research Letters 17, 104031; Vicedo-Cabrera, A.M., et al. (2021). The burden of heat-related mortality attributable to recent human-induced climate change. Nature Climate Change, 11, 492-500.

temperatures at night impede sleep (Plaintiffs Joseph and Eva), and are associated with decreased productivity and a decline in cognitive functioning[9]

17.    Human life depends on a healthy biosphere. Biodiversity, a key component, is plummeting. We are already seeing the widespread bleaching and death of coral reefs and a resulting decline in marine life dependent on coral reefs. Coral reefs are a major food source for billions of people, economic life blood for others, and a natural protective barrier from storms for Plaintiffs Delaney, Avery, Charlotte, and Kalālapa. We are also seeing declining agricultural productivity with crop failures and dramatically declining wildlife and skyrocketing rates of animal extinction.

18.    With changing conditions leading to unreliable or limited sources of food, shelter and safety, individuals may have no choice but to try to rebuild their lives elsewhere. Beyond their obvious suffering, they are rarely met with open arms. Communities are rarely equipped to meet the needs of a sudden influx of new and needy residents. As the needs – to provide housing, food, medical help and emergency and other services mount, the strain on the communities become more problematic. The ensuing stressors can grow to outright discord and become a major and ongoing source of civic unrest. The capacity to maintain order is threatened.

---

[9] Minor, K., et al. (2022). Rising temperatures erode human sleep globally. One Earth, 5(5), 534-549; Obradovich, N., et al. (2017). Nighttime temperature and human sleep loss in a changing climate. Science Advances, 3(5), e1601555.

9

19.    That the Defendants, despite relentless warnings by scientists over decades, including myself, by some of these very same plaintiffs, and by government reports that acknowledge the dangers are nevertheless seeking to "unleash" an ever more dangerous use of fossil fuels, attests, at best, to a bewildering indifference to suffering – or worse – an intentional willingness to unleash it. Compliance with the "social contract," a cornerstone of a free and ordered society – is predicated upon the principle that in exchange for giving legitimacy to and abiding by its laws, government will protect our health and safety. Failing to deliver on this contract is a fundamental violation of that trust and threatens society, as stress mounts, with lawlessness and chaos.

20.    Institutional betrayal is a state of mind that arises when the public believes that our institutions are no longer protecting us. It occurs when trusted and powerful institutions (e.g., schools, churches, or government) cause harm to individuals who depend upon the institution for their safety and security. Institutional betrayal can occur when the institution affirmatively causes the harm, as well as when the institution fails to take protective, preventative, or responsive actions. It includes actions that involve covering up or destroying information related to the harm being perpetrated. Such is the case with the actions the Defendants are taking here to silence the development and availability of information about climate

change, including but not limited to: dismantling the National Climate Assessment,[10] and blocking funding for climate change research at the National Institutes of Health[11] and at the National Science Foundation.[12] These examples of institutional betrayal that we are seeing from the Defendants' actions here, their furious attempt to "unleash" fossil fuels in tandem with the dangerous censoring and suppression of the information and tools critical to reduce children's climate vulnerability, is doubly unjust: it hits hardest those who need protection the most – such as these vulnerable young Plaintiffs, and others like them.

21.    Many young people, including these Plaintiffs, are experiencing harmful levels of profound anxiety from the Defendants' day-to-day actions – now directed at "unleashing" fossil fuels. Plaintiffs know that clean, renewable, modern sources of energy are not only available but, when government doesn't stand in the way, are manifestly successful in the marketplace. Young people, such as these Plaintiffs, correctly put the responsibility of not only assuring but *speeding up* this critical, life-saving transition firmly at the feet of government. And they ask – "Why aren't you doing this for us? Don't we matter"?

---

[10] https://www.science.org/content/article/trump-administration-fires-staff-flagship-u-s-climate-assessment

[11] https://www.nature.com/articles/d41586-025-01423-2 (describing NIH plans to cut funding for projects related to climate change and health, including projects that study climate anxiety).

[12] https://www.technologyreview.com/2025/06/02/1117653/the-trump-administration-has-shut-down-more-than-100-climate-studies.

22.    Censoring climate science, even blocking the educational material some of these Plaintiffs rely on for their studies, is exceedingly detrimental to their health and wellbeing. It is particularly devastating given the accelerating rate at which Earth's planetary system is reaching irreversible climate tipping points. Plaintiffs know that failing to prevent implementation of these executive orders will cause GHG emissions, at already terrifying levels, to surge. They know that at this point in time it is only the wisdom and courage of the courts that stand between them and what, as Plaintiff Joseph said, is a "death sentence for my generation." For they know, too, that these executive orders are not one-off actions – they set off a cascade of decisions and conditions that bring about the "baked-in" use of fossil fuels: e.g., through infrastructure building, the promotion of business practices, enhancement of profits for a vanishingly few, and the blunting of minds – and of the hearts – of those whose quality of life or even survival is not unaffected, for now. They know that the window of opportunity to stop irreversible climate upheaval is closing. They know that as the overheating planet approaches climate tipping points, action to reduce our reliance on fossil fuels is needed now, *today*. Widely accepted science shows that these Plaintiffs are in a life-threatening emergency, rendering unavoidable the interpretation that government is willing to "unleash" a plan for the increased use of fossil fuels that is consistent, inconceivably, with an act of self-destruction.

23.   Climate disruption, indisputably, causes devastating physical injuries, illnesses, and deaths. But for the magnitude of its impacts, the potential insinuation into every aspect of our lives, the relentlessness of its nature and debilitating effects, it is the emotional toll of climate change that is even more catastrophic. Especially for our children. It has the capacity to destroy them psychologically.

24.   It has the capacity to destroy their belief in our government, in our democracy, and in its institutions.

**The Federal Government's Ongoing Affirmative Actions are Causing Grave Harm to Plaintiffs' Psychological Health and Well-being.**

25.   ***With each passing day***, these Plaintiffs are ***increasingly*** exposed to psychological injury from U.S. government actions that not only expand fossil fuel production and increase GHG emissions, but also hammer home the persistent denial of present day and future threats; along with the devastating question of government that so doggedly pursues them – *don't they care?*

26.   Plaintiffs are seeing that small steps of progress made in previous years are being reversed. They know why United States' greenhouse gas emissions are on the rise, and what is happening as the federal government pushes for more destructive exploration for oil and gas – drilling on and offshore – pushes for the expansion of coal mining, dirtying the air with more pollutants, while shutting down the websites and closing the offices that study climate science and could help warn

– and educate – the public, and Plaintiffs. And this is but a snapshot of the destructive acts already being "unleashed."

27.    Harms that are inflicted intentionally are much more psychologically damaging than those that happen accidentally. The Plaintiffs know that the harm coming to them is being inflicted intentionally by Defendants and that they are a direct result of actions the federal government is taking *today.* The Plaintiffs understand these actions are being taken with full recognition of the consequences.

28.    The federal government's use of the legal system – through the executive orders in this case – to perpetuate and *promote* the use of fossil fuels that are the root cause of climate harms, despite knowing for more than 50 years of the grave threats, is significant. That the federal government would promote the use of fossil fuels – implicitly sanctioning the pollution and climate disruption as lawful, twists the knife that makes the psychological wounds suffered by individuals, including these Plaintiffs, that much more grievous.

29.    The violence the climate crisis is doing to the mental health of children, including Plaintiffs, is known and their anxieties are legitimate. Some of the Plaintiffs have reported excruciating anxieties to me personally; I have been in the courtroom when Plaintiffs from Montana testified about their anguish, and I have read declarations – that in their own words describe the degree of trauma they experience. They know what the scientists are reporting and that government is not

14

only failing to use its vast power to protect them – but is indeed, with its actions, rendering their lives, health, and safety even more vulnerable. The degree of psychological harm these Executive Orders are causing and will continue to cause these Plaintiffs and other young people is medically significant as I explain in more detail below. Defendants know this to be the case.

**The Harm to Plaintiffs' Psychological Health and Well-being Inflicted on Plaintiffs Today by the Federal Government Will Likely Have Life-long Consequences if Not Addressed Immediately.**

30.    Early childhood is critical for brain development and stress from even minor disturbances during childhood can impact brain development in critical ways.[13] Brain development persists in humans until the mid-twenties, especially within the prefrontal cortex. The prefrontal cortex is the part of the brain that "decides" how to act after receiving information from other parts of the brain. Commanding the "executive" functioning of the brain – it governs how we express ourselves, consider moral values and questions, how we regulate ourselves emotionally. The prefrontal cortex is where we make complex decisions and judgments, where we strategize and problem solve using our reason and in consideration of the data coming in from other parts of the brain. Adverse conditions from external stressors – sensory, emotional, social – can ***permanently*** affect the

---

[13] Clayton, S., Manning, C. M., Krygsman, K., & Speiser, M. (2017). Mental health and our changing climate: impacts, implications, and guidance. Washington, D.C.: American Psychological Association, and ecoAmerica.

development of the prefrontal cortex, adversely affecting the manner in which we present ourselves to the outside world – and in turn how the world responds to us.[14] Exposure to climate trauma during this period of development has the potential to create damaging *life-long* consequences.

31.     The American Academy of Pediatrics has described the mental health impacts of acute climate events in children: "Extreme weather events place children at risk for injury, loss of or separation from caregivers, exposure to infectious diseases, and a uniquely high risk of mental health consequences, including posttraumatic stress disorder, depression, and adjustment disorder. Disasters can cause irrevocable harm to children through devastation of their homes, schools, and neighborhoods, all of which contribute to their physiologic and cognitive development."[15]

32.     The federal government has admitted that: "Chronic stress from the acute and ongoing impacts of climate change may alter biological stress response systems and make growing children more at risk for developing mental health

---

[14] Kolb, B., Mychasiuk, R., Muhammad, A., Li, Y., Frost, D. O., & Gibb, R. (2012). Experience and the developing prefrontal cortex. Proceedings of the National Academy of Sciences, 109(Supplement 2), 17186-17193.
[15] AAoP. (2015). Global climate change and children's health: Policy statement. Pediatrics, 136(5), 993.

conditions later in life, such as anxiety, depression, and other clinically diagnosable disorders."[16]

33.    When children are exposed to multiple traumatic events, the impact of these traumas is cumulative. A "strong relationship" is seen between the number of adverse childhood experiences ("ACEs") and the risk factors – both mental and physical – associated with both chronic illness and premature death.[17] As extreme weather events due to climate disruption become more frequent and more intense, which they will if Defendants continue to "unleash" more fossil fuels, the health risks for young people, including Plaintiffs, whose exposure is longer and greater, will become ever more serious. They will spend their lives, literally and figuratively, running for higher ground.

34.    High levels of stress over time have multiple damaging effects on our bodies in ways that negatively affect our lives. Among the potential harms: altering hormone levels causing or leading to infertility, impairing cognitive functioning, inducing maladaptive behaviors, and in children, altering brain development. In addition to the stress of external trauma from climate change, "transgenerational

---

[16] Dodgen, D., et al. (2016). Ch. 8: Mental health and well-being. The impacts of climate change on human health in the United States: A scientific assessment. U.S. Global Change Research Program, 224.

[17] Felitti, V. J., et al. (1998). Relationship of Childhood Abuse and Household Dysfunction to Many of the Leading Causes of Death in Adults: The Adverse Childhood Experiences Study. American Journal of Preventative Medicine, 14(4), 245.

epigenetic inheritance" is a genetically induced cause of climate stress.[18] The trauma that Plaintiffs and other children are now experiencing, and will experience in the future, due to acute and chronic climate change impacts is positioned to be genetically passed down to future generations.

35.    Exposure to air pollution is harmful to our psychological and physical health. Air pollution is overwhelmingly the result of burning fossil fuels. All the emissions from burning fossil fuels are toxic. The longer the exposure and the more concentrated the pollution, the more harmful the consequences. These consequences are both acute and chronic. Short term increases in air pollution are linked to more diagnosed cases of depression and increases in daily hospital admissions for depression and anxiety. Same day increases in air pollution are linked to more emergency department visits related to mental health. On days with poorer air quality, the risk of suicide is higher. Air pollution is linked to impaired cognitive function. Other impacts of exposure to air pollution are linked to neurodevelopmental conditions – including Autism Spectrum Disorder, and to a range of neurodegenerative and chronic psychiatric conditions such as bipolar

---

[18] Gapp, K., et al. (2014). Early Life Epigenetic Programming and Transmission of Stress-induced Traits in Mammals. 36 BioEssays 491; Kellerman, N. (2013). Epigenetic Transmission of Holocaust Trauma: Can Nightmares Be Inherited? 50 Isr. J. Psychiatry Relat. Sci. 33; Reul, J. (2014). Making Memories of Stressful Events: A Journey Along Epigenetic, Gene Transcription, and Signaling Pathways. 5 Frontiers in Psychiatry 1.

disorder, schizophrenia, and attention deficit hyperactivity disorder (ADHD). It is also linked to an increased risk of psychosis in adolescence.[19]

36.    The unfolding mental health crises calls upon the federal government to put the full weight of its powers to help reduce climate instability and with it the associated multi-generational mental health harms that are literally becoming part of our DNA, and the DNA of future generations of our children. Instead, on the contrary, by seeking to unleash fossil fuels it is putting its full weight behind making matters worse.

**Addressing the Harms to Plaintiffs' Mental Health**

37.    The harms unleashed on Plaintiffs' mental health by government actions that cause the climate crisis are, as has been reported, grievous. In signing EO 14155, 14156, and 14261, President Trump is dramatically intensifying the climate crisis, deepening the fear, anger, anxiety, and despair of these Plaintiffs. The Plaintiffs know the warnings of the global community of climate scientists. They know these warnings have reached the ears of federal officials, including the President, and they know that these same people make choices that reflect their belief in the scientific method, with decisions about their safety based on the lessons that science teaches us for themselves and for the people they care about every day.

---

[19] For further info see https://ecopsychepedia.org/glossary/air-pollution-and-climate-mental-health/

Imagine then, the feeling of abandonment – and searing sense of disbelief, when the causes and dangers from the climate crisis confirmed by global scientific consensus are denied or downplayed even as the future grows darker with every action taken to "unleash" more fossil fuels.

38.    The Plaintiffs, and we too, know that there is such a thing in life as being too late. To reduce the harms from climate disruption that are at the root of the injuries to Plaintiffs' mental health and well-being, Defendants must immediately stop "unleashing" fossil fuels and blocking renewable energy projects that increase the risks. These young Plaintiffs are crying out for help, crying out for a reason to hope that common sense and respect for life will ultimately prevail. They are crying out to urge that good people help restore a course of action that brings remedies, and shows that the federal government, frankly, gives a damn.

39.    Knowing that some part of the federal government is taking meaningful action to respond to the threats sends the message to Plaintiffs that government is here to fulfill its primary duty – to work for the benefit of the people. It sends the message that their federal government is fundamentally sound. Injunctive relief here would show the Plaintiffs that the judicial branch of government is, as the framers intended – independent – and that the basis of its role and spirit of its function will be preserved. It would also help to alleviate the sense of doom that an irreversible climate "freefall" has been unleashed with these Executive Orders. Plaintiffs are

20

turning to the courts to plead for the court to have the courage and conscience to look to the science, to correct an executive branch moral compass gone awry. Elated – and relieved – though the Plaintiffs would be with the granting of this injunction – the true victory lies in the capacity of the court to nourish trust in our institutions – the belief that now and in the years to come, reason and common sense will drive common purpose among good people of courage, determination and empathy to correct our course.

40.    Earth's climate systems respond to the laws of physics. They are not moved by requests for last minute clemency, for do-overs in the name of "mistakes were made." The actions we take today will write humankind's stories tomorrow.

**Conclusions**

41.    The Plaintiffs report they are frightened, angry, anxious, and in despair. Riddled with feelings of doom, they struggle to summon a future that encompasses the everyday challenges and opportunities to grow, advance their education, have careers and start families. Under these circumstances developing close, rewarding emotional relationships becomes more difficult, distrust of authority more frequent, and wrestling with a cynical view of the world more common – keeping them from the community engagement that is essential to their health and that of those around them. In my expert opinion, the likelihood that Plaintiffs will live happy and healthy

lives is deeply compromised due to Defendants' actions to "unleash" more harmful fossil fuels, block renewable energy, and censor climate science.

42.    Indisputably, these youth Plaintiffs are being injured by the mental health toll of climate disruption. That the federal government, instead of taking emergency action to protect them from this most grievous of injustices, is instead actively working to make things worse – can only be fully described as an unparalleled degree of betrayal and abandonment of responsibility. Capable of reason and empathy, the human mind and heart create our moral compass. Just as history is replete with examples of heroic degrees of courage and kindness, it is also riven with examples of treachery and cruelty. The future will show that one or the other prevailed here, and that we were either saved or went down.

43.    I have seen children suffer physically and emotionally at the hands of adults; I know abuse when I see it. I see it. The federal government-supported and – perpetuated climate crisis is an intolerable assault on our children. For its scale and permanency, it is unmatched in the annals of history. It is causing and will continue to cause profound psychological damage to children, and to these Plaintiffs.

44.    The only sensible path to ease the psychological suffering of our children and the youth Plaintiffs is clear and available: immediate and effective action to stop "unleashing" fossil fuels and hindering known solutions that reduce

greenhouse gas emissions that are the cause of the climate crisis and the resulting psychological suffering.

In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on June 12, 2025 in Washington, DC.

Lise Van Susteren, M.D.

# EXHIBIT B

FILED

AUG 1 4 2023

ANGIE SPARKS, Clerk of District Court
By_____ Deputy

### MONTANA FIRST JUDICIAL DISTRICT COURT
### LEWIS AND CLARK COUNTY

| | |
|---|---|
| RIKKI HELD, et al., <br><br> Plaintiff, <br><br> v. <br><br> STATE OF MONTANA, et al., <br><br> Defendant. | Cause No. CDV-2020-307 <br><br> **FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER** |

### PROCEDURAL HISTORY

On March 13, 2020, sixteen Montana youth (collectively Plaintiffs or Youth Plaintiffs) filed a Complaint for Declaratory and Injunctive Relief (Doc. 1) against the State of Montana, the Governor, Montana Department of Environmental Quality, Montana Department of Natural Resources and Conservation, Montana Department of Transportation, and Montana Public Service Commission (collectively Defendants or State). Plaintiffs' Complaint challenged the constitutionality of the State's fossil fuel-based state energy system, which they allege causes and contributes to climate change in violation

405

[SR 115:18-22, 116:7-15; SR-20]. This means that fossil fuel use is around 10 times as large as other sources of emissions due to human management. [SR 115:15-21]. In terms of the $CO_2$ humans emit each year, approximately 48% of these emissions end up in the atmosphere, 29% are absorbed in back up in the biosphere, and 26% are absorbed by the oceans. [SR 115:7-117:10; SR-20].

89.    Until atmospheric GHG concentrations are reduced, extreme weather events and other climactic events such as droughts and heatwaves will occur more frequently and in greater magnitude, and Plaintiffs will be unable to live clean and healthy lives in Montana. [SR 128:22-129:5, 131:5-15, 149:2-150:7; SR-45; LVS-44].

90.    There is scientific certainty that if fossil fuel emissions continue, the Earth will continue to warm. [SR 106:15-18, 168:20-24; SR-46, SR-47].

91.    Each additional ton of GHGs emitted into the atmosphere exacerbates impacts to the climate. [SR 106:15-18, 188:3-6; CW 279:14-20, 314:20-315:8, 318:2; P143].

92.    Every ton of fossil fuel emissions contributes to global warming and impacts to the climate and thus increases the exposure of Youth Plaintiffs to harms now and additional harms in the future. [SR 168:17-169:7; CW 279:14-20, 314:20-315:8, 318:2-5; PE-40].

**B.    Climate Change Projections.**

93.    Computer models used by scientists are an important tool for predicting climate change and are reasonably relied upon by members of the scientific community. [SR 90:23-91:9].

/////

Findings of Fact, Conclusions of Law, and Order – page 24
CDV-2020-307

Health in Montana: A Special Report of the Montana Climate Assessment," as well as other climate and health publications.

101.    Dr. Byron provided expert testimony that climate change and the air pollution associated with it are negatively affecting children in Montana, including Youth Plaintiffs, with a strong likelihood that those impacts will worsen in the absence of aggressive actions to mitigate climate change. Dr. Byron outlined ways in which climate change is already creating conditions that are harming the health and well-being of the Youth Plaintiffs. Dr. Byron testified that reducing fossil fuel production and use, and mitigating climate change now, will benefit the health of the Youth Plaintiffs now and for the rest of their lives. Dr. Byron is a well-qualified expert, and the Court found her testimony informative and credible.

102.    Dr. Lise Van Susteren is a board certified general and forensics clinical psychiatrist, in practice for thirty years. She is a Clinical Associate Professor of Psychiatry and Behavioral Sciences at George Washington University in Washington, D.C. In 2009, Dr. Van Susteren co-convened one of the first conferences on the psychological effects of climate change. In 2013, Dr. Van Susteren worked with Dr. James Hansen and other experts on a paper, Assessing "Dangerous Climate Change": Required Reductions of Carbon Emissions to Protect Young People, Future Generations and Nature. (Hansen et al., 2013). In May 2018, Dr. Van Susteren received the Distinguished Fellow award of the American Psychiatric Association, its highest membership honor. Dr. Van Susteren has helped develop youth climate anxiety assessment tools, conducted research and reviewed data in assessing the mental health of young people faced with climate change. Dr. Van Susteren provided

Findings of Fact, Conclusions of Law, and Order – page 27
CDV-2020-307

expert testimony on the physiological harms caused by climate change to Montana's youth, including the Youth Plaintiffs, the psychological harms caused by the MEPA Limitation, and the availability of remedies to alleviate Plaintiffs' psychological injuries. Dr. Van Susteren is a qualified expert, and the Court found her testimony credible.

103.    Michael Durglo, Jr., is a member of the Confederated Salish and Kootenai Tribes (CSKT). He has a Bachelor of Science degree in Environmental Science from Salish Kootenai College. Mr. Durglo has worked in different capacities for the CSKT for over three decades.  In his current role as Head of the Tribal Preservation Department and Chairman of the Climate Change Advisory Committee (CCAC), Mr. Durglo has worked extensively with tribal elders and youth on climate related issues. He has been involved with the Institute for Tribal Environmental Professionals' Climate Change Adaptation Planning Workshop, and he served as the co-chair of the National Tribal Science Council and the chair of the EPA Region 8 Tribal Operations Committee, consisting of EPA tribal environmental directors in Montana, Wyoming, Colorado, Utah, and North and South Dakota. He has taught workshops and seminars on climate adaptation planning throughout North America. Mr. Durglo is a qualified expert and the Court found him informative and credible.

104.    Children are uniquely vulnerable to the consequences of climate change, which harms their physical and psychological health and safety, interferes with family and cultural foundations and integrity, and causes economic deprivations. [LB 473:12-24, 474:12-477:12; LVS 1177:5-8, 1202:6-24, 1215:13-24, 1217:2-1222:11; MDJ 597:9-18, 600:23-604:14, 609:23-610:10; LB-9, LB-15, LB-16; LVS-11, LVS-25].

Findings of Fact, Conclusions of Law, and Order – page 28
CDV-2020-307

105.   Children are at a critical development stage in life, as their capacities evolve, and their physiological and psychological maturity develops more rapidly than at any other time in life. [LB 474:12-477:12, 485:10-486:1; LVS 1177:10-21, 1213:7-23, 1215:13-24].

106.   The brains and lungs of children and youth are not fully developed until around age 25. [LB 474:18-25; LVS 1213:7-16].

107.   All children, even those without pre-existing conditions or illness, are a population sensitive to climate change because their bodies and minds are still developing. [LB 473:12-24, 474:12-477:12; LVS 1177:2-1178:12, 1213:7-23; LB-9; LVS-11].

108.   The physical and psychological harms are both acute and chronic and accrue from impacts to the climate such as heat waves, droughts, wildfires, air pollution, extreme weather events, the loss of wildlife, watching glaciers melt, and the loss of familial and cultural practices and traditions. [LB 498:12-25, 524:11-22; LVS 1178:13-1179:6, 1196:6-11, 1200:7-1201:25, 1202:6-24, 1204:21-1205:19, 1206:19-1209:12, 1218:2-16, 1219:25-1220:11, 1221:19-21; MDJ 595:18-596:2, 597:6-18, 600:23-604:14, 606:11-607:2, 608:1-13, 609:23-610:10].

109.   Climate change can cause increased stress and distress which can impact physical health. [LB 526:8-16; LVS 1188:16-24; LVS-15]. Dr. Van Susteren observed that Youth Plaintiffs testified to specific personal consequences.  For example:

a.   Grace feels fearful due to the glaciers disappearing from a state she loves.

/////

b.      Sariel has suffered significant distress due to the impacts of climate change on culturally important plants, and snow for creation stories. Her cultural connection to the land increases this impact.

c.      Mica has experienced a sense of loss from having to stay inside due to wildfire smoke.

d.      Olivia expressed despair due to climate change.

e.      Claire has been impacted by fear and loss from glaciers melting, and anxiety over whether it is a safe world in which to have children.

110.   Heat waves are associated with significant psychological stress. Increased heat and temperature negatively affect cognition and are linked to increased incidence of aggression and exacerbation of pre-existing mental health disorders. [LVS 1197:1-1198:7, 1200:7-12; LVS-29].

111.   Children have a higher risk of becoming ill or dying due to extreme heat. [LB-15, LB-16].

112.   Drought is associated with anxiety, depression, and chronic despair. [LVS 1200:24-1201:25].

113.   Wildfires, including those witnessed by Badge, are traumatic. Being surrounded by wildfires can make the world feel unsafe and the inability to breathe clean air creates anxiety. [LVS 1202:6-24, 1204:21-1205:19].

114.   The threat of loss can be enough to cause mental health harms, especially when there are no signs the future will be any different. [LVS 1203:15-1204:6].

/////

/////

Findings of Fact, Conclusions of Law, and Order – page 30
CDV-2020-307

115.   As climate disruption transforms communities, some Plaintiffs are experiencing feelings that they are losing a place that is important to them.

116.   The IPCC has found, with *very high confidence*, that climate change has "detrimental impacts" on mental health and the harms to mental health are expected to get worse. [LVS 1185:12-1186:3, 1192:23-1194:9, 1195:6-13; P127; LVS-23, LVS-24].

117.   The 2021 report, Climate Change and Human Health in Montana, found that "[t]he mental health impacts of climate change are profound and varied." [LVS-27]. Extreme weather events, prolonged heat and smoke, and environmental change can all impact mental health and increase feelings of disconnectedness and despair. [LVS 1196:6-11; P31; LVS-28].

118.   Exposure to extreme heat can cause heat rash, muscle cramps, heatstroke, damage to liver and kidney, worsening allergies, worsening asthma, and neurodevelopmental effects. [LB 485:2-9; P31; LB-13, LB-14].

119.   The psychological harms caused by the impacts of climate change can result in a lifetime of hardships for children. [LVS 1194:4-9, 1210:2-1211:2, 1213:24-1215:4; P127; LVS-12].

120.   The physiological features of children make them disproportionately vulnerable to the impacts of climate change and air pollution. [LB 474:14-25, 475:4-10; LVS 1213:7-23; LB-9, LB-10; LVS-11].

121.   Children have a higher basal metabolic rate, which makes it harder for them to dissipate heat from their bodies. [LB 475:14-21].

/////

/////

122. Children breathe in more air per unit of time than adults and consume more food and water proportional to their body weight, making children more susceptible to polluted or contaminated air, water, or food. [LB 476:21-477:12].

123. Typical child behavior and physiology—which involves spending more time recreating outdoors and more difficulty self-regulating body temperature—render children more susceptible to excess heat, poor air quality, and other climate change impacts. [LB 476:21-477:12, 481:9-19].

124. Childhood exposure to climate disruptions and air pollution can result in impaired physical and cognitive development with lifelong consequences. Air pollution can trigger or worsen juvenile idiopathic arthritis, leukemia, and asthma in children. [LB 482:9-21, 502:4-22; LB-25; LVS 1205:20-1206:8, 1207:18-1208:3].

125. The air quality where Plaintiffs live has been negatively impacted by smoke from wildfires contributed to by climate change.

126. Allergies are increasingly prevalent among children and anthropogenic climate change is extending the allergy season and exacerbating allergy symptoms. An increase in these symptoms can affect children's physical and psychological health by interfering with sleep, play, school attendance, and performance. [LB 484:25-485:9, 508:2-16; LVS-30].

127. Climate change is contributing to an increase in the severity and frequency of asthma in children. Six million children in the U.S. ages 0-17 have asthma, which translates to approximately one in every twelve children. [LB 485:7-8, 503:1-14, 505:4-25; LB-26, LB-30].

/////

Findings of Fact, Conclusions of Law, and Order – page 32
CDV-2020-307

128.   Children who have pre-existing respiratory conditions, including asthma, are especially vulnerable to climate impacts, including increasing air pollution and rising temperatures. Wildfire smoke has harmed the health of Plaintiffs Olivia, Jeffrey, and Nate, all who have pre-existing health conditions, and other Plaintiffs, including Badge and Eva. [LB 505:12-506:20, 508:23-509:1; LB-28].

129.   Plaintiffs Olivia and Grace are distressed by feeling forced to consider foregoing a family because they fear the world that their children would grow up in. [LB 497:4-21; LVS 1214:21-1215:1, 1221:19-1222:5; GGS 208:3-22].

130.   Plaintiffs Rikki, Kian, Claire, and Taleah, face economic deprivations, including barriers to keeping family wealth and property intact and decreased future economic opportunities.

131.   Extreme heat threatens the health of competitive athletes, including Kian, Georgi, Claire, and Grace. [LB 490:6-491:15; LB-18].

132.   For indigenous youth, like Ruby, Lilian, and Sariel, extreme weather harms their ability to participate in cultural practices and access traditional food sources, which is particularly harmful to indigenous youth with their place-based cultures and traditions. [LB 491:23-493:9; MDJ 579:19-580:9].

133.   Because of their unique vulnerabilities, their stages of development as youth, and their average longevity on the planet in the future, Plaintiffs face lifelong hardships resulting from climate change. [LB 474:14-25, 475:4-10; LVS 1177:2-1178:12, 1189:1-6,1194:4-9, 1210:2-1211:2, 1213:7-23, 1215:13-24].

/////

Findings of Fact, Conclusions of Law, and Order – page 33
CDV-2020-307

134. Youth are more vulnerable to the mental health impacts of climate change because younger people are more likely to be affected by the cumulative toll of stress and have more adverse childhood experiences (ACEs). ACEs increase the likelihood of cumulative trauma that leads to mental and physical illness, as well as an increased risk of early death. [LB 521:14-16, 5236-15; LVS 1210:2-1211:2; LB-33; LVS-31].

135. ACEs can cause prolonged fear, anxiety, and stress, cognitive impairments, and unhealthy risk behaviors. ACEs can also cause long-term health impacts including increased risk of obesity, diabetes, heart disease, depression, strokes, chronic obstructive pulmonary disease, and broken bones. [LB 516:3-20, 519:16-520:4, 522:17-523:2; LB-34].

136. Children born in 2020 will experience a two to sevenfold increase in extreme events, particularly heatwaves, compared with people born in 1960. [LB 495:1-11, 497:1-3; P45; LB-20].

137. According to the IPCC, "Climate change is a threat to human well-being and planetary health (*very high confidence*)." The IPCC stated, "Without urgent, effective, and equitable mitigation and adaptation actions, climate change increasingly threatens ecosystems, biodiversity, and the livelihoods, health and wellbeing of current and future generations (*high confidence*)." [LB 530:11-533:9; LB-43, LB-44; P143; SR-61].

138. The unrefuted testimony at trial established that climate change is a critical threat to public health. [LB 536:10-537:14].

139. Actions taken by the State to prevent further contributions to climate change will have significant health benefits to Plaintiffs. [LB 534:25-535:9].

Findings of Fact, Conclusions of Law, and Order – page 34
CDV-2020-307

# ATTACHMENT 32

JULIA A. OLSON (CA Bar 192642)
julia@ourchildrenstrust.org
ANDREA K. RODGERS (*pro hac vice*)
andrea@ourchildrenstrust.org
CATHERINE SMITH, Of Counsel (*pro hac vice*)
catherine.smith@ourchildrenstrust.org
**OUR CHILDREN'S TRUST**
1216 Lincoln St.
Eugene, OR 97401
Tel: (415) 786-4825

*Attorneys for Plaintiffs*
*(Additional Counsel Listed on Next Page)*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **GENESIS B.**, a minor, by and through her Guardian, G.P.; et al.<br><br>**Plaintiffs,**<br><br>vs.<br><br>The **UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**; et al.<br><br>**Defendants.** | **Case No.: 2:23-CV-10345-MWF-AGR**<br><br>**DECLARATION OF ELIZABETH PINSKY, MD, IN SUPPORT OF PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS (ECF No. 62)**<br><br>Date: September 30, 2024<br>Time: 10:00 a.m.<br>Judge: Hon. Michael W. Fitzgerald<br>Courtroom: 5A |

**DECLARATION OF ELIZABETH PINSKY, MD, IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

PHILIP L. GREGORY (CA Bar 95217)
pgregory@gregorylawgroup.com
**GREGORY LAW GROUP**
1250 Godetia Drive
Redwood City, CA 94062
Tel: (650) 278-2957

PAUL L. HOFFMAN (CA Bar 71244)
hoffpaul@aol.com
**UNIVERSITY OF CALIFORNIA AT IRVINE
SCHOOL OF LAW
Civil Rights Litigation Clinic**
401 E. Peltason Drive, Suite 1000
Irvine, CA 92697
Tel: (310) 717-7373

JOHN WASHINGTON (CA Bar 315991)
jwashington@sshhzlaw.com
**SCHONBRUN SEPLOW HARRIS
HOFFMAN & ZELDES LLP**
200 Pier Avenue #226
Hermosa Beach, CA 90254
Tel: (424) 424-0166

**DECLARATION OF ELIZABETH PINSKY, MD, IN SUPPORT OF
PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

I, Elizabeth Pinsky, hereby declare and if called upon would testify as follows:

1. I am a child and adolescent psychiatrist and pediatrician at Massachusetts General Hospital and Associate Director at the Massachusetts General Center for Environment and Health. I have personal knowledge of the facts stated herein and, if called to testify, I would and could testify competently thereto. Because of the importance of the issues presented in this case, I am providing this expert opinion on a pro bono basis and am not charging these young plaintiffs for my time in preparing this declaration.

2. I received my medical degree from Harvard Medical School and completed consecutive residencies in pediatrics and psychiatry followed by a child psychiatry fellowship at Massachusetts General Hospital. My clinical interests focus on the intersection of child mental and physical health, including childhood trauma associated with climate change. I am board certified in both pediatric medicine and psychiatry and an Assistant Professor in Psychiatry at Harvard Medical School. I lecture nationally on climate change and mental health, am the author of numerous related journal articles and textbook chapters, and serve as Chair of the Climate Change Committee at the American Academy of Child and Adolescent Psychiatry.

3. Climate change is a mental health emergency for children. Current levels of increased temperatures from greenhouse gas pollution, and the climate consequences of that, are already posing significant threats and harming children's physical and mental well-being. Further pollution and heating will exacerbate that already present harm to children. Conversely, fully accounting for children's lives and accurately incorporating these costs into policy making could begin to alleviate these escalating harms.

1

**DECLARATION OF ELIZABETH PINSKY, MD, IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

4.  Compared to adults, children have disproportionate exposure to many of the pathways through which climate impacts human health. Children spend more time outdoors, and are physically closer to the ground where particulate matter and other pollutants are measurably more concentrated. Children breathe at a faster rate and require more calories and more water per pound of body weight than adults, exposing them to proportionately higher levels of pollutants. Young children are also uniquely vulnerable to severe harm from infectious diseases spreading in range and seasonality as the climate warms, including Zika, malaria, and Dengue.

5.  Children experience direct impacts to their mental health through acute climate events like heat, which has been linked to deterioration in sleep, cognition, mood, and academic achievement. Heat is particularly dangerous for youth with chronic mental illness, who may have impaired temperature regulation due to neuroanatomic abnormalities or to side effects of common psychoactive medication. Likewise, chronic air pollution has been associated with increased rates of anxiety and depression in children, and episodic poor air quality has been associated with increased pediatric crisis presentations.

6.  According to the fifth edition of the Diagnostic and Statistical Manual of Mental Disorders (DSM-5), the initial criterion for the diagnosis of Post Traumatic Stress Disorder (PTSD) is exposure to a traumatic event, described as actual or threatened death, serious injury, or sexual violence. As extreme weather events increase in frequency and intensity, so does exposure to a range of potentially traumatic exposures, including injuries, bereavement, and threats to availability of food, shelter, and medical care. Research has further shown that the aftermath of extreme weather events

2

**DECLARATION OF ELIZABETH PINSKY, MD, IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

is associated with increased risk of other traumatic exposures, including interpersonal violence, child abuse, and community and gender-based violence.

7. Short-term or acute climate events like hurricanes, floods, wildfires and evacuations, and extreme heat have been linked not just to PTSD, but also to a range of additional negative mental health outcomes including anxiety and depression, substance use disorders, and suicide. Recurrent or ongoing exposures, like drought conditions, consistently high temperatures, repeated exposures to wildfire smoke and poor air quality also lead to chronic traumatic stress. Studies have demonstrated that children who experience severe weather events may suffer psychiatric symptoms that are more severe and of longer duration compared to adults.

8. Even children who have not directly experienced climate-related trauma increasingly experience impairing distress in the setting of exposure to climate change through news media, social media, and awareness about how climate change will affect the viability of their futures. This distress can manifest itself as fear, dread, despair, disaffection, rage, or grief and is sometimes referred to as "eco-anxiety." It is important to note that "eco-anxiety" is not a mental illness, but a normative reaction to an imminent threat. Recent studies have shown a high prevalence of climate distress in young people, with related impact on their beliefs and feelings about their futures.

9. Though both adults and children can be affected by climate change, children are distinctly more vulnerable to life-long consequences for their physical and mental health in terms of both severity and duration. Early childhood is critical for brain development. Stress from even minor

3

**DECLARATION OF ELIZABETH PINSKY, MD, IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

disturbances during childhood, including environmental stressors, can irreversibly impact neurodevelopment. Specifically, exposure to products of fossil fuel combustion in childhood has been linked to lower IQ, attention-deficit hyperactivity disorder, and autistic traits.

10. The consequences of adversity experienced in childhood are also both quantitatively and qualitatively different from the consequences for adults. This fact has been firmly established by the robust Adverse Childhood Experiences literature. Adverse Childhood Experiences (ACEs) include both narrowly defined traumatic events (like those meeting PTSD criterion) and, more broadly, circumstances that threaten the safety, stability, and security of the childhood environment. Many of these adverse circumstances – such as housing insecurity, abrupt separation from a caregiver, and parental mental illness – are also more common in aftermath of extreme weather.

11. ACEs are associated with profound consequences in adulthood, including lower mental health, physical health, economic potential and even life expectancy. There is a powerful dose-response relationship between the total number of ACEs experienced and increased likelihood of negative adult outcomes. These outcomes are significant, incur enormous costs, and include lower educational attainment and employment, increased rates of mental illness and suicide, increased rates of cancer, diabetes, and heart disease, and early death.

12. As fossil fuel pollution continues, more heating will result and, thus, more incidences of childhood exposure to traumatic or harmful climate events. Already, a child born in 2020 is expected to be exposed up to a seven-fold

4

**DECLARATION OF ELIZABETH PINSKY, MD, IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

increase in extreme heat waves compared to someone born in 1960.[1] Thus the greater emissions, the greater a child's lifetime exposure to extreme climate events and the resulting ACEs and mental health consequences. The economic burden of health conditions associated with ACEs among current adults in the United States was recently estimated at $14.1 trillion annually.[2]

13.     Compared to adults, children are at still further additional risk from climate change because their psychological and emotional development is in progress. The collective adult abdication of responsibility for their well-being inflicts a unique injury during this period of immaturity. The primary developmental task of early childhood is to establish a sense of security and trust through "attachment," a process that requires predictable adult caretakers who ensure the child's safety. It is from a base of so-called "secure attachment," established in childhood, that adolescents can develop the individuation and independence, motivation, and risk-taking that allow them to form meaningful relationships and become productive, contributing adults.

14.     Children raised with caretakers who do not care for their basic needs and safety, or who do so unpredictably, are at risk for derangements in attachment and a range of negative adult outcomes, including anxiety, depression, and interpersonal difficulties. A similar child/caregiver

---

[1] Wim Thiery et al., *Intergenerational Inequities in Exposure to Climate Extremes*, 374 Science 158 (2021).

[2] Peterson C, Aslam MV, Niolon PH, et al., *Economic Burden of Health Conditions Associated With Adverse Childhood Experiences Among US Adults*. JAMA Netw Open. 2023;6(12):e2346323. doi:10.1001/jamanetworkopen.2023.46323

5

**DECLARATION OF ELIZABETH PINSKY, MD, IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

relationship can be applied on a population level for children and the adults in positions of power whose decision-making could, but does not, safeguard their wellbeing. Knowing that their government is continuing to permit fossil fuel pollution, treating children's lives unequally, with repercussions that will disproportionately impact them, unequally aggravates psychological harm for children. The failure by governments to respond to the climate crisis and to affirmatively contribute to it -- importantly *as perceived* by young people -- has been linked to climate distress in a study of 10,000 youth,[3] suggesting that it is not just fear of climate change, but this fear in combination with the belief that adults collectively will not protect them, that contributes to distress. This collective harm has been referred to as "institutional betrayal."

15. Children are also politically powerless, with no immediate control over the decisions that will impact their futures, contributing to a sense of helplessness in the face of institutional betrayal. These harms are amplified for children of color who are already vulnerable due to systems, or institutions, that have consistently perpetuated inequities in housing, education, health, and political power. Children, including Plaintiffs in this case, experience institutional betrayal by Defendants' knowingly and intentionally abdicating their fundamental role to keep them safe, and instead intentionally value their lives as less than those of adults.

16. Because institutional betrayal is a distinct harm, children reap immediate benefits when government eliminates one source of trauma, like the

---

[3] Caroline Hickman et al., *Climate Anxiety in Children and Young People and Their Beliefs About Government Responses to Climate Change: A Global Survey*, 5 The Lancet Planetary Health E863 (2021).

6

**DECLARATION OF ELIZABETH PINSKY, MD, IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

discriminatory unequal or the mistreatment of children. Thus, based on my research, other published research, and my experience working with children of all ages, it is my expert opinion that Plaintiffs' mental health, and therefore physical and developmental wellbeing, would immediately benefit from Defendants ceasing discriminatory policies and practices that devalue children's lives.

17.    Every child living in the United States today is experiencing some level of harm from fossil fuel pollution and associated warming. These harms will mount as long as pollution and warming continue unabated. Conversely, every avoided fraction of a degree of warming confers benefit.

18.    Similar to the products of fossil fuel combustion, there is no known safe level of exposure to lead: each additional microgram of exposure represents lost cognitive ability and lower academic achievement. Also similar to current exposure to warming, virtually all Americans born before 1980 were exposed to lead levels that would demand urgent action if detected in a child today. With abatement measures, average blood lead level of children in the US has steadily declined over the past 40 years from 15 μg/dL to 0.6 μg/dL, a change that represents millions – and possibly billions – of preserved IQ points and associated savings over time. These then-children also experienced *individual* benefits from abatement measures; failing to fully account for the specifically developmental nature of their vulnerability would have presented a significant hurdle to their protection. Changes in policy that lead to even incremental benefits to children in the short term have profound long-term benefits to those children's lives and to society at large, especially when the real human benefits are not economically discounted.

7

**DECLARATION OF ELIZABETH PINSKY, MD, IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

19.  It is my expert opinion as a child and adolescent psychiatrist and pediatrician, and one of the nation's leading experts in the field of climate anxiety and trauma in our youngest populations, that removing discriminatory barriers to children accessing equal rights under the law, and attempting to secure equal privileges to live safely, to breathe clean air, to be free from extreme heat and other unnatural weather events, and at minimum to seek to prevent their worsening physical and mental health circumstances as climate pollution continues, is unquestionably meaningful for these children. Conversely, having courts deny their right to be heard and their rights and claims of harm to be considered is yet another institutional betrayal for the most politically powerless group of citizens in the country.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on August 8, 2024.

Elizabeth Pinsky, MD

8

**DECLARATION OF ELIZABETH PINSKY, MD, IN SUPPORT OF
PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

# ATTACHMENT 36

JULIA A. OLSON (CA Bar 192642)
julia@ourchildrenstrust.org
ANDREA K. RODGERS (*pro hac vice*)
andrea@ourchildrenstrust.org
CATHERINE SMITH, Of Counsel (*pro hac vice*)
catherine.smith@ourchildrenstrust.org
**OUR CHILDREN'S TRUST**
1216 Lincoln St.
Eugene, OR 97401
Tel: (415) 786-4825

*Attorneys for Plaintiffs*
*(Additional Counsel Listed on Next Page)*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **GENESIS B.**, a minor, by and through her Guardian, G.P.; et al.<br><br>**Plaintiffs,**<br><br>vs.<br><br>The **UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**; et al.<br><br>**Defendants.** | Case No.: **2:23-CV-10345-MWF-AGR**<br><br>**DECLARATION OF PLAINTIFF MARYAM D. IN SUPPORT OF PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS (ECF No. 62)**<br><br>Date: September 30, 2024<br>Time: 10:00 a.m.<br>Judge: Hon. Michael W. Fitzgerald<br>Courtroom: 5A |

**DECLARATION OF PLAINTIFF MARYAM D. IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

PHILIP L. GREGORY (CA Bar 95217)
pgregory@gregorylawgroup.com
**GREGORY LAW GROUP**
1250 Godetia Drive
Redwood City, CA 94062
Tel: (650) 278-2957

PAUL L. HOFFMAN (CA Bar 71244)
hoffpaul@aol.com
**UNIVERSITY OF CALIFORNIA AT IRVINE**
**SCHOOL OF LAW**
**Civil Rights Litigation Clinic**
401 E. Peltason Drive, Suite 1000
Irvine, CA 92697
Tel: (310) 717-7373

JOHN WASHINGTON (CA Bar 315991)
jwashington@sshhzlaw.com
**SCHONBRUN SEPLOW HARRIS**
**HOFFMAN & ZELDES LLP**
200 Pier Avenue #226
Hermosa Beach, CA 90254
Tel: (424) 424-0166

**DECLARATION OF PLAINTIFF MARYAM D. IN SUPPORT OF**
**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

I, Maryam D., hereby declare and if called upon would testify as follows:

1. I am a Plaintiff in the above-entitled action. I make this Declaration in support of Plaintiffs' Opposition to Defendants' Motion to Dismiss. I have personal knowledge of the facts stated herein, and if called to testify, I would and could testify competently thereto.

2. I am 16 years old and a resident of Garden Grove, California. Everything that is in our Amended Complaint about me and the harms I am suffering is true. Along with being a plaintiff in this case, I work with youth climate organizations to try to change government laws and policies that affect my right to a livable climate. My ability to protect myself is limited because I don't have political rights, like voting and running for office, and I don't have all of the privileges and rights that adults have either.

3. My age also limits my ability to be involved in climate activism. For example, prior to December 2023, my parents did not allow me to have my own cell phone so I could not personally use my phone to get involved. I also still am limited because I do not have a driver's license and can't even drive to the library without one of my parents.

4. Even so, I am doing everything I am able to do to stop climate crisis from getting worse and to try to get leaders to stop the pollution causing it. I joined Fridays for Future in 2022 in middle school. Initially, I did sign making events, went to protests, and did other activities with my local group. When there were global climate strikes, I helped plan a strike in Irvine. We also organized marches. Separate from Fridays for Future, I also planned climate strike in Fullerton with a group at my middle school.

3

**DECLARATION OF PLAINTIFF MARYAM D. IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

5. I joined the national Sunrise team in 2022. I helped run phone banks for Sunrise. I ran trainings and hosted phone banks to talk to people about climate policies and candidates who said they would take action on climate crisis. I became local hub coordinator with Sunrise of Orange County in fall of 2022.

6. When I'm asked why I became part of Sunrise or Fridays for Future, two youth climate organizations, I explain that I did not feel like I had a choice but to start climate activism. If I wanted a future, I had to join.

7. As part of my role with Sunrise and Fridays for Future, I have met with politicians and attended city council meetings. I have done a lot of local work.

8. The only times I've seen council members listen to kids is when they are making decisions about murals, or when there are plans for parades like for boy scouts or other more typical "kid activities."

9. On the issues I care about, especially climate crisis, they respect older voices more and discount what we, the youth, have to say. I have seen even more deference to older white men at city council meetings, especially in my own city of Garden Grove where we have a conservative city council.

10. In Garden Grove, we asked our city for legally binding climate action plans to eliminate fossil fuel pollution by a set date, but we were not heard and they have refused to stop fossil fuel pollution.

11. In Irvine, we also asked for legally binding climate action plans to eliminate fossil fuel pollution. Activists had been working towards this since 2016 and I got involved in 2022. Initially, we won some

4

**DECLARATION OF PLAINTIFF MARYAM D. IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

commitments toward a plan, but then they reversed course. There was interest by the Irvine City Council and especially their staffers, but it now appears there will be nothing binding and if they adopt a plan, it will be voluntary and unenforceable.

12. I see Irvine as one of the most liberal city councils. There's only one conservative politician on the council and yet, even with Democrats in control, we can't convince the council to commit in a binding way to climate action and emission reductions.

13. I've also gone to Orange County and the Board of Supervisors to advocate for climate action.

14. I have helped advocate for induction cook tops instead of gas stoves in my community to avoid the use of gas that causes climate change, and we have been told by politicians that certain types of food, like Korean food, could not be cooked on induction stoves. Though this is not accurate, we were told this shift in appliances would upset voters.

15. Politicians often don't respond to our emails. When we give comments during city council meetings, some council members laugh, some just ignore us, and once one council member even fell asleep while we were speaking. Most council members are not responsive or receptive to our concerns about climate change and our request that they take action to protect our future. Sometimes council staff members will meet with us. What I have learned from staffers is that they can't do anything more on climate crisis or to protect our environment because of their voters. The story goes that the voters won't like it and so they can't do anything different.

5

**DECLARATION OF PLAINTIFF MARYAM D. IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

16. In sum, my experience has been that the local officials don't value our equal right to a livable climate and future. Even if they say they care, they are not willing to do anything differently. I have even been spoken to in aggressive tones by politicians who don't like that I am there and think I am too young to understand what is happening.

17. I love my city, but I don't know how much my city loves me. I'm a young person of color and I don't feel seen by leaders. Being Muslim and female already makes it harder to be listened to. Being young and not even of voting age, compounds my ability to make a difference and even be seen or listened to.

18. Joining the Sunrise local hub was the first thing I saw I could do to try to protect my future. I jumped in and put aside my free time and my social life in order to do everything I could when I wasn't doing my studies to try to make a difference. In addition to the local level work, I've worked on national climate issues through phone banking trying to persuade voters. I sign climate petitions that relate to federal or U.S. policy. However, I don't think I have power to influence policy on a national level or that my congressional representatives represent my interests. They don't see me as a voter or someone who has real influence like through money contributions.

19. When I think about how the government's discrimination of young people is affecting my future, it's really sad and scary. Every summer growing up my brother and I would play outside a game called "Calvin Ball" that we learned from the Calvin and Hobbes books. We loved playing that game outside in the summer months. Now, we are a little

6

older and it keeps getting hotter, which keeps us inside more. We've stopped playing Calvin Ball. The fires and smoke are also really scary. I used to think we were safe from fires and big tropical storms, but now we aren't. It's worrisome to think where I live is not going to be even as it is right now for long. It's going to keep getting worse.

20. Until the people who run our government and make decisions about fossil fuel pollution see that we are being treated differently than adults and it is harming my rights, and other kids' rights, politicians will be able to keep doing the same thing, ignore me, and listen to adult voters who want to keep their fossil fuel appliances and cars and other things burning up my planet. I won't feel like I can be free to live my life as a young person as long as this continues. I've already lost so much of my childhood with this fear. I've asked adults and leaders to help. So far, no one has.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on August 12, 2024.



Maryam D.

7

# EXHIBIT 7



# ENVIRONMENTAL PROTECTION AGENCY

## 40 CFR Parts 85, 86, 600, 1036, 1037, and 1039

[EPA–HQ–OAR–2025–0194; FRL–12715–01–OAR]

RIN 2060–AW71

## Reconsideration of 2009 Endangerment Finding and Greenhouse Gas Vehicle Standards

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Proposed rule.

**SUMMARY:** In this action, the U.S. Environmental Protection Agency (EPA) is proposing to repeal all greenhouse gas (GHG) emission standards for light-duty, medium-duty, and heavy-duty vehicles and engines to effectuate the best reading of Clean Air Act (CAA) section 202(a). We propose that CAA section 202(a) does not authorize the EPA to prescribe emission standards to address global climate change concerns and, on that basis, propose to rescind the Administrator's prior findings in 2009 that GHG emissions from new motor vehicles and engines contribute to air pollution which may endanger public health or welfare. We further propose, in the alternative, to rescind the Administrator's prior findings in 2009 because the EPA unreasonably analyzed the scientific record and because developments cast significant doubt on the reliability of the findings. Lastly, we propose to repeal all GHG emission standards on the alternative bases that no requisite technology for vehicle and engine emission control can address the global climate change concerns identified in the findings without risking greater harms to public health and welfare.

**DATES:**

*Comments.* Comments must be received on or before September 15, 2025. Comments on the information collection provisions submitted to the Office of Management and Budget (OMB) under the Paperwork Reduction Act (PRA) are best assured of consideration by OMB if OMB receives a copy of your comments on or before September 2, 2025.

*Public Hearing.* The EPA will announce information regarding the public hearing for this proposal in a supplemental **Federal Register** document. Please refer to the **SUPPLEMENTARY INFORMATION** section for additional information on the public hearing.

**ADDRESSES:** *Comments.* You may send comments, identified by Docket ID No. EPA–HQ–OAR–2025–0194, by any of the following methods:

• *Federal eRulemaking Portal: https://www.regulations.gov/* (our preferred method). Follow the online instructions for submitting comments.

• *Email: a-and-r-Docket@epa.gov.* Include Docket ID No. EPA–HQ–OAR–2025–0194 in the subject line of the message.

• *Mail:* U.S. Environmental Protection Agency, EPA Docket Center, OAR Docket, Mail Code 28221T, 1200 Pennsylvania Avenue NW, Washington, DC 20460.

• *Hand Delivery or Courier:* EPA Docket Center, WJC West Building, Room 3334, 1301 Constitution Avenue NW, Washington, DC 20004. The Docket Center's hours of operations are 8:30 a.m.–4:30 p.m., Monday–Friday (except Federal Holidays).

*Instructions.* All submissions received must include the Docket ID No. for this rulemaking. Comments received may be posted without change to *https://www.regulations.gov/,* including any personal information provided. For detailed instructions on sending comments and additional information on the rulemaking process, see the ''Public Participation'' heading of the **SUPPLEMENTARY INFORMATION** section of this document.

**FOR FURTHER INFORMATION CONTACT:** Alan Stout, Assessment and Standards Division, Office of Transportation and Air Quality, Environmental Protection Agency, 2000 Traverwood Drive, Ann Arbor, MI 48105; telephone number: (734) 214–4805; email address: *stout.alan@epa.gov.*

**SUPPLEMENTARY INFORMATION:**

### A. Public Participation

*Written Comments.* Submit your comments, identified by Docket ID No. EPA–HQ–OAR–2025–0194, at *https://www.regulations.gov* (our preferred method), or the other methods identified in the **ADDRESSES** section. Once submitted, comments cannot be edited or removed from the docket. The EPA may publish any comment received to its public docket. Do not submit to the EPA's docket at *https://www.regulations.gov* any information you consider to be Confidential Business Information (CBI), Proprietary Business Information (PBI), or other information whose disclosure is restricted by statute. If you choose to submit CBI or PBI as a comment to the EPA's docket, please send those materials to the person listed in the **FOR FURTHER INFORMATION CONTACT** section.

Multimedia submissions (audio, video, etc.) must be accompanied by a written comment. The written comment is considered an official comment and should include discussion of all points you wish to make. The EPA will generally not consider comments or comment contents located outside of the primary submission (*i.e.,* on the web, cloud, or other file sharing system). Please visit *https://www.epa.gov/dockets/commenting-epa-dockets* for additional submission methods; the full EPA public comment policy; information about CBI, PBI, or multimedia submissions; and general guidance on making effective comments.

To facilitate comment on the portions of the rule on which the EPA is specifically soliciting comment, the EPA has indexed each comment solicitation with a unique identifier (*e.g.,* ''C–1'', ''C–2'') in section VII of this preamble to provide a consistent framework for effective and efficient provision of comments. Accordingly, we ask that commenters include the corresponding identifier when providing comments relevant to that comment solicitation. We ask that commenters include the identifier either in a heading or within the text of each comment, to make clear which comment solicitation is being addressed. We note that we are not limiting comment to these identified areas.

*Participation in Virtual Public Hearing.* The EPA will announce information regarding the public hearing for this proposal in a supplemental document in the **Federal Register**. The hearing notice, registration information, and any updates to the hearing schedule will also be available at *https://www.epa.gov/regulations-emissions-vehicles-and-engines/proposed-rule-reconsideration-2009-endangerment-finding.* Please refer to this website for any updates regarding the hearings. The EPA does not intend to publish additional documents in the **Federal Register** announcing updates to the hearing schedule.

*Docket.* All documents in the docket are listed on the *www.regulations.gov* website. Although listed in the index, some information is not publicly available, *e.g.,* CBI or other information whose disclosure is restricted by statute. Certain other material, such as copyrighted material, is not placed on the internet and will be publicly available only in hard copy form through the EPA Docket Center at the location listed in the **ADDRESSES** section of this document.

## B. Action Applicability

This action relates to companies that manufacture, sell, or import into the United States light-, medium-, or heavy-duty motor vehicles and engines. Potentially affected categories and entities include the following:

| NAICS code [a] | NAICS title |
|---|---|
| 336110 ............... | Automobile and Light-duty Motor Vehicle Manufacturing. |
| 336120 ............... | Heavy Duty Truck Manufacturing. |
| 336211 ............... | Motor Vehicle Body Manufacturing. |
| 336213 ............... | Motor Home Manufacturing. |
| 336310 ............... | Motor Vehicle Gasoline Engine and Engine Parts Manufacturing. |
| 336390 ............... | Other Motor Vehicle Parts Manufacturing. |
| 333618 ............... | Other Engine Equipment Manufacturing. |
| 423110 ............... | Automobile and Other Motor Vehicle Merchant Wholesalers. |
| 811198 ............... | All Other Automotive Repair and Maintenance. |

[a] NAICS Association. NAICS & SIC Identification Tools. Available online: *https://www.naics.com/search.*

This table is not intended to be exhaustive but rather provides a guide for readers regarding entities potentially affected by this action. This table lists the types of entities that the EPA is presently aware could potentially be affected by this action. Other types of entities not listed in the table could also be affected. To determine whether your entity is regulated by this action, you should carefully examine the applicability criteria found in Code of Federal Regulations (CFR) title 40, parts 85, 86, 600, 1036, and 1037. If you have questions regarding the applicability of this action to a particular entity, consult the person listed in the **FOR FURTHER INFORMATION CONTACT** section.

## Table of Contents

I. Executive Summary
  A. Introduction
  B. Need for Regulatory Action
  C. Summary of the Major Provisions in This Proposed Action
II. Background
  A. The EPA's Historical Approach to CAA Section 202(a)
  B. Petitions for Rulemaking and *Massachusetts* v. *EPA*
  C. The 2009 Endangerment Finding
  D. Implementation of the 2009 Endangerment Finding
  E. Reconsideration of the 2009 Endangerment Finding
III. Legal Framework for Proposed Action
  A. Proposed Rescission of Endangerment Finding
  B. Proposed Amendments to New Motor Vehicle and Engine Regulations
IV. Proposed Rescission of the Endangerment Finding
  A. Primary Rationale for Proposed Rescission
  1. Best Reading of CAA Section 202(a)
  2. Lack of Clear Congressional Authorization
  B. Alternative Rationale for Proposed Rescission
  1. Climate Science Discussion
  2. Proposed Conclusions
V. Separate Bases for Proposed Repeal of GHG Emission Standards
  A. There Is No Requisite Technology for Light- and Medium-Duty Vehicles That Meaningfully Addresses the Identified Dangers of the Six ''Well-Mixed'' GHGs
  B. There Is No Requisite Technology for Heavy-Duty Vehicles That Addresses the Identified Dangers of the Six ''Well-Mixed'' GHGs
  C. Eliminating GHG Emissions From All Motor Vehicles Would Be Futile
  D. More Expensive New Vehicles Prevent Americans From Purchasing New Vehicles That Are More Efficient, Safer, and Emit Fewer GHGs
VI. Proposed Repeal of GHG Emission Standards
  A. Scope and Impacts of Proposed Repeal
  B. Light- and Medium-Duty Vehicle GHG Program
  1. Background on the Light- and Medium-Duty Vehicle GHG Program
  2. Proposed Changes to the Light- and Medium-Duty Vehicle GHG Regulations
  C. Heavy-Duty Engine and Vehicle GHG Program
  1. Background on the Heavy-Duty Engine and Vehicle GHG Program
  2. Proposed Changes to the Heavy-Duty Engine and Vehicle GHG Regulations
VII. Requests for Comment
VIII. Statutory and Executive Order Reviews
  A. Executive Order 12866: Regulatory Planning and Review and Executive Order 14094: Modernizing Regulatory Review
  B. Executive Order 14192: Unleashing Prosperity Through Deregulation
  C. Paperwork Reduction Act (PRA)
  1. Light- and Medium-Duty Vehicle—2024 Final Rule
  2. Heavy-Duty Vehicle GHG Phase 3—2024 Final Rule
  3. Nonroad Compression-Ignition Engines and On-Highway Heavy Duty Engines, Supporting Statement for Information Collection Request (March 2023 Revision)
  D. Regulatory Flexibility Act (RFA)
  E. Unfunded Mandates Reform Act (UMRA)
  F. Executive Order 13132: Federalism
  G. Executive Order 13175: Consultation and Coordination With Indian Tribal Governments
  H. Executive Order 13045: Protection of Children From Environmental Health Risks and Safety Risks
  I. Executive Order 13211: Actions Concerning Regulations That Significantly Affect Energy Supply, Distribution, or Use
  J. National Technology Transfer and Advancement Act (NTTAA) and 1 CFR Part 51

## I. Executive Summary

### A. Introduction

In this action, the EPA proposes to rescind all greenhouse gas (GHG) emission standards for light-duty, medium-duty, and heavy-duty vehicles and engines under CAA section 202(a). Upon review of the underlying actions and intervening legal and scientific developments, including recent decisions by the U.S. Supreme Court and the scientific information summarized in this preamble, the EPA no longer believes that we have the statutory authority and record basis required to maintain this novel and transformative regulatory program. We seek comment on all aspects of this proposal, including on the legal and scientific developments that are being subject to public comment for the first time in this rulemaking.

In 2009, the EPA took the unprecedented step of asserting authority to regulate GHG emissions in a standalone action titled ''Endangerment and Cause or Contribute Finding for Greenhouse Gases Under Section 202(a) of the Clean Air Act,'' 74 FR 66496 (Dec. 15, 2009) (Endangerment Finding). In that action, we interpreted CAA section 202(a) for the first time to authorize regulation of domestic emissions from new motor vehicles and engines based on global climate change concerns rather than air pollution that endangers public health or welfare through local or regional exposure. 74 FR 66526–27. We also asserted that because the statute is ''silent on [the] issue,'' CAA section 202(a) grants ''procedural discretion'' to issue standalone findings that trigger a duty to regulate without considering the standards that must issue in response.

74 FR 66501–02. The Administrator exercised this newfound discretion to make separate findings that elevated global concentrations in the upper atmosphere of six "well-mixed GHGs"— carbon dioxide ($CO_2$), methane, nitrous oxide ($N_2O$), hydrofluorocarbons (HFCs), perfluorocarbons (PFCs), and sulfur hexafluoride ($SF_6$)—constitute "air pollution" that may reasonably be anticipated to endanger public health and welfare, 74 FR 66516–36, and that GHG emissions from all potential classes of motor vehicles and engines contribute to such elevated global concentrations of GHGs in the upper atmosphere and therefore to air pollution that endangers public health and welfare, 74 FR 66536–45.

With respect to endangerment, the Administrator found that global concentrations of GHGs from all foreign and domestic sources "constitute the largest anthropogenic driver of climate change" and attributed climate change impacts to global GHG concentrations. 74 FR 66517. Next, the Administrator summarized literature reviews finding that climate change "can increase the risk of morbidity and mortality" indirectly through increased global temperature, air quality effects, and changes in extreme weather events and can impact welfare indirectly through net impacts on food production, forestry, water resources, sea level rise, energy infrastructure, and ecosystems. 74 FR 66522–35. On that basis, the Administrator found that global concentrations of GHGs constitute "air pollution" that endangers public health and welfare. 74 FR 66516. For purposes of this preamble, we use the phrase global climate change concerns to refer to the risks the Administrator associated with climate change in 2009.

With respect to causation or contribution, the Administrator used emissions data for existing motor vehicles and engines to project that all potential classes of new motor vehicles and engines would emit four GHGs— $CO_2$, methane, $N_2O$, and HFCs—that would collectively amount to 4.3 percent of global GHG emissions. 74 FR 66543. The Administrator acknowledged that more would usually be required to support contribution "when addressing a more typical local or regional air pollution problem." 74 FR 66539. Nevertheless, asserting discretion to interpret the ambiguous term "contribute," the Administrator found that the "unique" nature of global climate change meant that "contributors must do their part even if their contributions to the global climate change problem, measured in terms of percentage, are smaller than typically

encountered when tackling solely regional or local environmental issues." 74 FR 66542–43.

The EPA subsequently relied on the Endangerment Finding to impose increasingly stringent GHG emission standards for new motor vehicles and engines and to attempt, largely without success, to extend its GHG initiative into additional CAA programs. In *Utility Air Regulatory Group* v. *EPA,* 573 U.S. 302 (2014) (*UARG*), the Supreme Court rejected our attempt to extend GHG emission standards to stationary sources subject to Title I and Title V requirements, including after we admitted that applying the statutory scheme as written to GHG emissions from most covered stationary sources would be unworkable. And in *West Virginia* v. *EPA,* 597 U.S. 697 (2022), the Court vacated our attempt to shift the power grid away from using fossil fuels through GHG standards for existing power plants under CAA section 111(d). The Court held in both cases that the agency actions at issue implicated the major questions doctrine, and that Congress must clearly authorize agencies to take actions that decide major questions of policy. Nevertheless, the EPA continued to retain and expand GHG emission standards for new motor vehicles and engines that impose billions of dollars in compliance costs on American businesses and consumers. Meanwhile, global GHG concentrations in the upper atmosphere have continued to rise, driven primarily by increased emissions from foreign sources,[1] all without producing the degree of adverse impacts to public health and welfare in the United States that the EPA anticipated in the 2009 Endangerment Finding.

The EPA now proposes to rescind the Endangerment Finding and all resulting GHG emission standards for new motor vehicles and engines, including the light-duty, medium-duty, and heavy-duty vehicle and engine standards for model years (MY) 2012 to 2027 and beyond. The remainder of this section describes the need for regulatory action and the scope of the proposed action, including rescission of the Endangerment Finding, repeal of related GHG emission standards, and minor conforming adjustments to unrelated emission standards for new motor vehicles and engines that we are not proposing to alter as part of this rulemaking.

Section II of this preamble sets out relevant background, including the

events leading up to the Endangerment Finding, the approach taken in the Endangerment Finding to analyzing the scientific record, and the regulations issued since 2009 in reliance on the Endangerment Finding. We also summarize the premises, assumptions, and conclusions in the Endangerment Finding and the scientific information, including empirical data, peer-reviewed studies, and real-world developments since 2009 that led the Administrator to develop concerns sufficient to initiate reconsideration of the ongoing validity and reliability of the Endangerment Finding.

Section III of this preamble describes our legal authority to rescind the Endangerment Finding and repeal the resulting GHG standards issued under CAA section 202(a). Because this proposed action would not impact fuel economy standards and emission standards for criteria pollutants and hazardous air pollutants regulated under the CAA, we explain the relationship between these regulations to set the outer bounds of amendments at issue in this rulemaking.

Section IV.A of this preamble describes our proposal to rescind these prior actions because the Endangerment Finding exceeded our statutory authority under CAA section 202(a). As explained further below, we propose that the term "air pollution" as used in CAA section 202(a) is best read in context as referring to local or regional exposure to dangerous air pollution, consistent with our longstanding practice before 2009. We further propose that CAA section 202(a) does not grant the Administrator "procedural discretion" to issue standalone findings that trigger a duty to regulate, or, conversely, to prescribe standards, without making the requisite findings for the particular air pollutant emissions and class or classes of new motor vehicles or engines at issue. We also propose that CAA section 202(a) does not authorize the Administrator to make separate findings for endangerment and causation or contribution. Rather, we propose that CAA section 202(a) requires the Administrator to find that the relevant air pollutant emissions from the class or classes of new motor vehicles or engines at issue cause, or contribute to, air pollution which endangers public health or welfare, without relying on emissions from stationary or other sources regulated by distinct CAA provisions. As the Supreme Court made clear in *Loper Bright Enterprises* v. *Raimondo,* 603 U.S. 369 (2024), we can no longer rely on statutory silence or ambiguity to expand our regulatory power. And

[1] Crippa, M. et al. (2023). GHG emissions of all world countries. *Publications Office of the European Union: https://doi.org/10.2760/953322.*

because the Nation's response to global climate change concerns is an issue of significant importance that Congress did not clearly address in CAA section 202(a), we propose that the major questions doctrine further reinforces and provides an additional basis for our proposed interpretations and actions. The Agency did not have the benefit of the Court's decisions in *Loper Bright* and *West Virginia,* among other applicable precedents, when issuing the Endangerment Finding in 2009. Finally, we explain that the EPA reached contrary conclusions in the Endangerment Finding by misconstruing the Supreme Court's decision in *Massachusetts* v. *EPA,* 549 U.S. 497 (2007), which vacated our denial of a petition for rulemaking on distinct grounds. Read on its own terms, *Massachusetts* did not require the Agency to find that GHGs are subject to regulation under CAA section 202(a) and does not support our implementation of the statute since 2009.

Section IV.B of this preamble describes our alternative proposal to rescind these prior actions even if CAA section 202(a) authorizes the EPA to address GHG emissions based on global climate change concerns by concluding that the Administrator exercised that authority unreasonably in the Endangerment Finding. Specifically, we propose that the EPA misapplied the statutory standard for regulation to the scientific record by severing the analysis into separate parts without considering whether all parts of the analysis, taken as a whole, supported the findings and regulatory determinations required by the statute. We further propose that empirical data, peer-reviewed studies, and real-world developments since 2009 have cast significant doubt on many of the critical premises, assumptions, and conclusions in the Endangerment Finding such that it would be unreasonable to retain the decision and the resulting regulatory framework. In proposing this alternative, we note that the Supreme Court has continued to emphasize that agencies have significant discretion when making complex judgments within the bounds of an authorizing statute.[2] We propose that the Administrator may now exercise the discretion expressly delegated to him by Congress in the text of CAA section 202(a) by rescinding the Endangerment Finding.

Section V of this preamble proposes additional bases for repealing the EPA's GHG emission standards for new motor vehicles and engines under CAA section 202(a) even if the Endangerment Finding were to remain in place. We propose that there is no "requisite technology" responsive to the global climate change concerns identified in the Endangerment Finding given evidence that reducing GHG emissions from new motor vehicles and engines to zero would not have a scientifically measurable impact on global GHG concentrations and climate trends. We also propose that, on balance, and contrary to the core objectives of CAA section 202(a), GHG emission standards harm public health and welfare by increasing prices, decreasing consumer choice, and slowing the replacement of older vehicles that are less safe and emit a greater volume and variety of air pollutants than new motor vehicles and engines.

Section VI of this preamble details the scope of the proposed repeal, including its relationship to distinct regulatory programs and federal preemption, the revisions to 40 CFR parts 85, 86, 600, 1036, 1037, and 1039 required to effectuate repeal of all GHG emission standards, and conforming adjustments to regulatory provisions that we are not proposing to reopen or substantively revise. Specifically, in this NPRM we are not proposing to change at this time elements of the regulations that are necessary for programs unrelated to the Endangerment Finding, including emission standards for criteria pollutants and air hazards and the EPA's statutory role in vehicle standards administered by the National Highway Traffic Safety Administration (NHTSA).

Section VII of this preamble specifically requests comment on key aspects of this proposed action and indexes comment solicitation to promote public participation and facilitate our review of public comments. Note that we are not limiting public participation to the issues raised in this section and will respond to all comments within the scope of this proposal. Rather, we are highlighting aspects of the proposal for which public input would be particularly helpful in determining whether and in what respects to finalize this proposed action.

*B. Need for Regulatory Action*

Immediately upon taking office, President Trump established new Executive Branch priorities for energy, transportation, and consumer choice and committed to ensuring regulations remain within constitutional and statutory bounds. On January 20, 2025, the President issued an Executive Order titled "Unleashing American Energy" to address the burdens placed by unnecessary regulations on energy affordability, job creation, and national security.[3] As relevant here, the President directed the EPA Administrator to submit recommendations to the Director of OMB on the legality and continuing applicability of the 2009 Endangerment Finding.[4] On February 19, 2025, the President issued an Executive Order titled "Ensuring Lawful Governance and Implementing the President's 'Department of Government Efficiency' Deregulatory Initiative" that further instructed agencies, including the EPA, to review existing regulations for consistency with the Constitution and the best reading of the authorizing statute.[5]

Upon confirmation by the Senate, Administrator Lee Zeldin committed the EPA to prioritizing its core statutory mission and ensuring that all regulatory actions are clearly grounded in statutory authority and the best reading of the law. As part of these efforts, and consistent with the "Unleashing American Energy" Executive Order, the Administrator initiated a review of the legality and applicability of the Endangerment Finding. On February 19, 2025, the Administrator submitted a memorandum to the OMB Director recommending that the EPA reconsider the Endangerment Finding to address legal and scientific developments that appear to undermine the bases for that action and subsequent regulations.[6] The Administrator noted that recent Supreme Court decisions, including *Loper Bright, West Virginia, UARG,* and *Michigan* v. *EPA,* 576 U.S. 743 (2015), provided new guidance on how we should interpret and apply the statutes Congress entrusted us to administer.[7] The Administrator further noted that the Endangerment Finding recognized significant uncertainties in its conclusions and assumptions that should be evaluated in light of more recent empirical data and scientific

---

[2] *Seven Cnty. Infrastructure Coal.* v. *Eagle Cnty.,* 145 S. Ct. 1497, 1511–15 (2025); *FDA* v. *Wages & White Lion Invs., L.L.C.,* 145 S. Ct. 898, 917 (2025); *Baltimore Gas & Elec. Co.* v. *NRDC, Inc.,* 462 U.S. 87, 103 (1983); *see also Huntsman Petrochemical LLC* v. *EPA,* 114 F.4th 727, 735 (D.C. Cir. 2024) ("In the case of EPA's evaluation of scientific data within its area of expertise, [courts] accord an extreme degree of deference." (quotation marks omitted)).

[3] Executive Order 14154, 90 FR 8353 (Jan. 29, 2025).

[4] *Id.* § 6(f).

[5] Executive Order 14219, 90 FR 10583 (Feb. 25, 2025).

[6] Memorandum from Lee Zeldin, Administrator, Environmental Protection Agency, to Russell Vought, Director, Office of Management and Budget (Feb. 19, 2025) (Feb. 19, 2025 Memo), available in the docket for this rulemaking.

[7] *Id.* at 1.

evidence.[8] Accordingly, the Administrator announced on March 12, 2025, that the EPA would reconsider the Endangerment Finding and subsequent actions to determine whether our GHG regulations have an adequate statutory basis and to seek public input on developments since 2009.[9]

As part of this reconsideration, the EPA closely examined applicable law, including judicial precedents and interpretive aids bearing on the meaning of CAA section 202(a) and related statutory provisions. We also reviewed actions taken to regulate GHG emissions from new motor vehicles and new motor vehicle engines since 2009, assessed the costs and non-cost adverse impacts of these GHG emission standards, and evaluated the effectiveness of these GHG emission standards in reducing the dangers identified in the Endangerment Finding, that is, in mitigating the impacts anticipated to result from elevated global GHG concentrations in the upper atmosphere.

Furthermore, the Administrator reviewed available information, including the most recently available science, bearing on the assumptions and conclusions in the Endangerment Finding, the impacts of global GHG concentrations on public health and welfare in the United States, and the relative contribution of domestic emissions from new motor vehicles and engines to global GHG concentrations. As part of that review, the Administrator received and evaluated the draft report submitted by the U.S. Department of Energy (DOE) Climate Working Group (CWG) to Secretary of Energy Christopher Wright on May 27, 2025, titled ''Impacts of Carbon Dioxide Emissions on the U.S. Climate'' (2025 CWG Draft Report). The 2025 CWG Draft Report analyzes empirical data, peer-reviewed studies, and available scientific information bearing on direct human influence on ecosystems and climate, climate response to $CO_2$ emissions, and impacts on ecosystems and society.[10] The Administrator also

considered available assessments by the U.S. Government and relevant international bodies, including the Third, Fourth, and Fifth National Climate Assessments (NCAs) reported by the U.S. Global Change Research Program (USGCRP) [11] and the Fifth Assessment Report (AR5) and Sixth Assessment Report (AR6) by the United Nations Intergovernmental Panel on Climate Change (IPCC).[12] As discussed in section IV.B of this preamble, the Administrator also considered critiques of the NCAs, and the Fifth NCA in particular, and reviewed these analyses for consistency with OMB information quality guidelines [13] and the transparency and reliability requirements of Executive Order 14303, ''Restoring Gold Standard Science.'' [14]

The Administrator's review of the relevant information, including scientific literature, gave rise to serious concerns that our actions taken to regulate GHG emissions from new motor vehicles and engines exceed our statutory authority under CAA section 202(a) and are otherwise inappropriate. Continuing to impose billions of dollars in regulatory costs on American businesses and consumers without an adequate legal basis would threaten to undermine public confidence in our activities and commitment to fulfilling the Agency's core mission: protecting human health and the environment. The EPA has expended significant resources implementing the GHG regulatory program for mobile sources and attempting to expand its GHG regulatory program to stationary sources with limited success in the courts and no apparent real-world results, often at the expense of programs that fall squarely within our statutory authority. Prompt

action is needed to address these concerns with the benefit of public participation.

Relatedly, the Administrator has serious concerns that many of the scientific underpinnings of the Endangerment Finding are materially weaker than previously believed and contradicted by empirical data, peer-reviewed studies, and scientific developments since 2009. This proposal seeks public comment on these developments for the first time. Prompt action is needed to address these concerns, and the Administrator requests stakeholder input on the continuing vitality of the assumptions, predictions, and conclusions animating the Endangerment Finding.

*C. Summary of the Major Provisions in This Proposed Action*

If finalized, this action would rescind the 2009 Endangerment Finding for GHGs emitted by new motor vehicles and new motor vehicle engines under CAA section 202(a) (74 FR 66496). If finalized, this action would also rescind denials of petitions for reconsideration of the Endangerment Finding in 2022 and 2010 entitled ''Endangerment and Cause or Contribute Findings for Greenhouse Gases Under Section 202(a) of the Clean Air Act; Final Action on Petitions,'' 87 FR 25412 (Apr. 29, 2022), and ''EPA's Denial of the Petitions to Reconsider the Endangerment and Cause or Contribute Finding for Greenhouse Gases Under Section 202(a) of the Clean Air Act,'' 75 FR 49556 (Aug. 13, 2010).[15] Although the 2022 and 2010 petition denials have no prospective legal effect, we propose to rescind them for the sake of consistency and to ameliorate potential confusion regarding the EPA's proposed action. As explained later in this preamble, the denials reflect many of the same legal and scientific flaws we propose to correct by rescinding the Endangerment Finding. We seek comment on the impact of the denials, if any, and on whether the denials were legally flawed for additional reasons not explicitly explored in this proposal. In addition, as a result of these proposed changes, we would no longer have a basis for issuing or retaining GHG emission standards for new motor vehicles and new motor vehicle engines, including

---

[8] *Id.* at 8.

[9] ''Trump EPA Kicks Off Formal Reconsideration of Endangerment Finding with Agency Partners'' (Mar. 12, 2025), available at *https://www.epa.gov/newsreleases/trump-epa-kicks-formal-reconsideration-endangerment-finding-agency-partners.*

[10] The 2025 CWG Draft Report was provided to the EPA on May 27, 2025, and was reviewed and relied upon in formulating this proposal. The EPA understands that DOE is releasing an updated version of the CWG draft report and seeking public comment on the updated report, which includes additional information and typographical corrections that the EPA did not rely upon in formulating this proposal. Interested parties may review and comment on the updated version of the CWG draft report for consideration as part of DOE's

efforts through the docket available at *https://www.energy.gov/topics/climate.*

[11] Created by the Global Change Research Act of 1990, Public Law 101–606, 104 Stat. 3096, the USGCRP reports an NCA at least every four years to Congress and the President that must (1) integrate, evaluate, and interpret the findings of the Program and discuss the scientific uncertainties with such findings; (2) analyze the effects of global change on the natural environment, agriculture, energy production and use, land and water resources, human health and welfare, human social systems, and biological diversity; and (3) analyze current trends in global change, both human-induced and natural, and project major trends for the subsequent 25 to 100 years. *See* 15 U.S.C. 2936.

[12] The IPCC invites participation by members of the United Nations and World Meteorological Organization and summarizes available literature on climate science but does not conduct its own research. *See* United Nations Intergovernmental Panel on Climate Change, About the IPCC, available online at *https://www.ipcc.ch/about/.*

[13] ''Guidelines for Ensuring and Maximizing the Quality, Objectivity, Utility, and Integrity of Information Disseminated by Federal Agencies; Republication,'' 67 FR 8452 (Feb. 22, 2002).

[14] 90 FR 22601 (May 29, 2025).

[15] The 2022 petition denials included a notice of decision in the **Federal Register** (87 FR 25412), brief letters communicating the denials to the petitioners, and a decision document entitled ''EPA's Denial of Petitions Relating to the Endangerment and Cause or Contribute Findings for Greenhouse Gases Under Section 202(a) of the Clean Air Act'' (Apr. 21, 2022) (2022 Denial), available online at *https://www.epa.gov/system/files/documents/2022-04/decision_document.pdf.*

for MYs that have completed manufacture but are subject to ongoing obligations. As discussed elsewhere in this preamble, the EPA is reconsidering additional endangerment findings and GHG emission standards issued under distinct provisions of the CAA in separate rulemakings and is not reopening or proposing to modify those additional findings and standards in this proceeding.

In connection with the proposed rescission of the Endangerment Finding, if finalized, this action would remove all existing regulations that require new motor vehicle and new motor vehicle engine manufacturers to measure, report, or comply with GHG emission standards. Specifically, the EPA proposes to remove regulations in 40 CFR parts 85, 86, 600, 1036, and 1037 pertaining to the control of GHG emissions from light-, medium-, and heavy-duty vehicles and engines, including emission standards, test procedures, averaging, banking, and trading requirements (ABT), reporting requirements, and fleet-average emission requirements.[16] As a result of these proposed changes, motor vehicle and engine manufacturers would no longer have future or current obligations for the measurement, control, or reporting of GHG emissions for any vehicle or engine, including for previously manufactured MYs. However, we are not proposing to reopen or modify any regulations necessary for criteria pollutant and air toxic measurement and standards, Corporate Average Fuel Economy (CAFE) testing, and associated fuel economy labeling requirements. We seek comment on whether any elements of the regulations, test procedures, or GHG emission models that are proposed for removal should remain to support programs unrelated to the GHG

emission standards and why the preservation of such an element is necessary to support the unrelated program or programs.

## II. Background

### A. The EPA's Historical Approach to CAA Section 202(a)

Congress originally enacted the language that became CAA section 202(a) as part of the Motor Vehicle Pollution Control Act of 1965, which required the Secretary of Health, Education, and Welfare to "prescribe . . . standards, applicable to the emission of any kind of substance, from any class or classes of new motor vehicles or new motor vehicle engines, which in his judgment cause or contribute to, or are likely to cause or contribute to, air pollution which endangers the health or welfare of any persons." [17] Congress retained this language, while adding additional requirements for the content of emission standards, in the Air Quality Act of 1967,[18] and, later, incorporated it into the Clean Air Act of 1970, which transferred the Secretary's regulatory authority to the newly created EPA.[19] Separately, the 1970 CAA addressed emissions from existing vehicles and engines, stationary sources, and aircraft engines.[20] As subsequently amended, CAA section 202(a) has remained a critical part of the comprehensive national framework for regulating air pollution from mobile sources, and new motor vehicles and new motor vehicle engines in particular, under Title II of the CAA.[21]

In its first four decades administering the statute, the EPA applied CAA section 202(a) to local and regional air pollution problems through rulemakings that prescribed standards and set forth the Administrator's findings that the relevant air pollutant emissions cause, or contribute to, air pollution which may reasonably be anticipated to endanger public health or welfare.[22] As explained in the following subsections, the EPA maintained this approach through 2008 and never sought to invoke CAA section 202(a) to regulate in

response to global climate change concerns.

### B. Petitions for Rulemaking and Massachusetts v. EPA

In October 1999, a coalition of 19 environmental organizations petitioned the EPA to regulate the emission of four GHGs—$CO_2$, methane, $N_2O$, and HFCs—from new motor vehicles and engines under CAA section 202(a)(1). Petitioners claimed that these four GHGs were "air pollutant[s]" under CAA section 302(g), significantly contributed to global climate change, and met the statutory standard for regulation under CAA section 202(a)(1). Thus, petitioners claimed that the EPA had the authority and obligation to find that GHG emissions from new motor vehicles and engines cause, or contribute to, air pollution which may reasonably be anticipated to endanger public health or welfare and to prescribe standards in response.

In September 2003, after receiving and responding to nearly 50,000 public comments on the relevant issues, the EPA denied the 1999 petitions in a final action titled "Control of Emissions from New Highway Vehicles and Engines," 68 FR 52922 (Sept. 8, 2003) (2003 Denial). The 2003 Denial asserted three primary reasons for denying the petitions. First, after "examin[ing] the fundamental issue of whether the CAA authorizes the imposition of control requirements" to "reduce the risk of global climate change," we concluded that "$CO_2$ and other GHGs cannot be considered 'air pollutants' subject to the CAA's regulatory provisions for any contribution they may make to global climate change." 68 FR 52925. Citing the Supreme Court's decision in *FDA* v. *Brown & Williamson Tobacco Corp.,* 529 U.S. 120 (2000), we noted that the CAA does not address GHGs as a regulatory matter, including in recent amendments, and that "EPA has used these provisions to address air pollution problems that occur primarily at ground level or near the surface of the earth." 68 FR 52926. On this basis, we concluded that GHGs "are not air pollutants under the CAA's regulatory provisions, including sections 108, 109, 111, 112, and 202" because they categorically are not "air pollutant[s]" under the Act-wide definition in CAA section 302(g). 68 FR 52928. Second, we concluded that regulating GHG emissions from motor vehicles and engines under the CAA would interfere with NHTSA's separate authority to implement fuel economy standards. 68 FR 52929. Finally, we asserted that regulating GHG emissions from motor vehicle engines under the CAA would

---

[16] "Light-Duty Vehicle Greenhouse Gas Emission Standards and Corporate Average Fuel Economy Standards," 75 FR 25324 (May 7, 2010); "Greenhouse Gas Emissions Standards and Fuel Efficiency Standards for Medium- and Heavy-Duty Engines and Vehicles," 76 FR 57106 (Sept. 15, 2011); "2017 and Later Model Year Light-Duty Vehicle Greenhouse Gas Emissions and Corporate Average Fuel Economy Standards," 77 FR 62624 (Oct. 15, 2012); "Greenhouse Gas Emissions and Fuel Efficiency Standards for Medium- and Heavy-Duty Engines and Vehicles-Phase 2," 81 FR 73478 (Oct. 25, 2016); "The Safer Affordable Fuel-Efficient (SAFE) Vehicles Rule for Model Years 2021–2026 Passenger Cars and Light Trucks," 85 FR 24174 (Apr. 30, 2020); "Revised 2023 and Later Model Year Light-Duty Vehicle Greenhouse Gas Emissions Standards," 86 FR 74434 (Dec. 30, 2021); "Multi-Pollutant Emissions Standards for Model Years 2027 and Later Light-Duty and Medium-Duty Vehicles," 89 FR 27842 (Apr. 18, 2024); "Greenhouse Gas Emissions Standards for Heavy-Duty Vehicles-Phase 3," 89 FR 29440 (Apr. 22, 2024).

[17] Public Law 89–272, 202(a), 79 Stat. 992, 992–93 (1965).

[18] Public Law 90–148, 202(a), 81 Stat. 485, 499 (1967).

[19] Public Law 91–604, 84 Stat. 1690 (1970).

[20] *Id.*

[21] In the Clean Air Act Amendments of 1977, Congress replaced the phrase "which endangers the public health or welfare" with "which may reasonably be anticipated to endanger public health or welfare." Public Law 95–95, 401(d)(1), 91 Stat. 685, 791 (1977).

[22] *See* 74 FR 66501, 66527, 66538, 66543 (acknowledging this regulatory history).

undermine the President's overall policy approach of addressing global climate change through voluntary actions and incentives, the promotion of further research and technologies, and international negotiations. 68 FR 52930–31.

In *Massachusetts,* the Supreme Court narrowly reversed the D.C. Circuit's decision to uphold the EPA's denial of the 1999 petitions for rulemaking.[23] The Court took particular issue with the EPA's reading of the Act-wide definition in CAA section 302(g), ruling that "[t]he Clean Air Act's sweeping definition of 'air pollutant' . . . embraces all airborne compounds of whatever stripe" and provided no textual basis for excluding $CO_2$ or the three other GHGs raised in the petitions for rulemaking. 549 U.S. at 528–29. The Court also addressed EPA's reliance on *Brown & Williamson,* which the majority construed as having found no congressional intent to ban the sale of tobacco products outright because such an application of the relevant statute would have been highly unlikely and because the Food and Drug Administration (FDA) had expressly refused to assert such authority in the past. *Id.* at 530–31. In contrast, in *Massachusetts,* the Court found that the CAA did not reflect a congressional intent to categorically exclude GHGs and, citing several Agency memoranda, that we had not similarly foresworn all authority to regulate GHGs as a categorical matter. *Id.* Notably, the Court expressly declined to decide whether the EPA was required to issue an affirmative endangerment finding as to GHG emissions under the standard set out in CAA section 202(a). *Id.* at 534 ("We need not and do not reach the question whether on remand EPA must make an endangerment finding."). Nor did the Court address "whether policy concerns can inform EPA's actions in the event that it makes such a finding." *Id.* at 534–35. Rather, the Court held that we must respond to the petitions by deciding whether GHG emissions from new motor vehicles and engines meet the standard for regulation in CAA section 202(a) or whether the science was too uncertain to make any determination, and that, in doing so, we

must "ground [our] reasons for action or inaction in the statute." *Id.* at 535.[24]

## C. The 2009 Endangerment Finding

The EPA responded to the Supreme Court's decision in *Massachusetts* by issuing an advanced notice of proposed rulemaking titled "Regulating Greenhouse Gas Emissions Under the Clean Air Act," 73 FR 44354 (July 30, 2008) (2008 ANPRM). The Administrator began by noting it was "clear that if EPA were to regulate [GHG] emissions from motor vehicles under the Clean Air Act," the interplay between CAA section 202(a) and similarly worded statutory provisions "could result in an unprecedented expansion of EPA authority that would have a profound effect on virtually every sector of the economy and touch every household in the land." 73 FR 44355. The Administrator cautioned that because the CAA was "originally enacted to control regional pollutants that cause direct health effects," invoking authority to regulate GHG emissions "would inevitably result in a very complicated, time-consuming, and, likely, convoluted set of regulations" that "would be relatively ineffective at reducing [GHG] concentrations" and have a "potentially damaging effect on jobs and the U.S. economy." *Id.*

The 2008 ANPRM echoed the Administrator's concerns by seeking public comment on invoking CAA section 202(a) to regulate new motor vehicle and engine emissions in response to global climate change concerns. We acknowledged that the CAA "was not specifically designed to address GHGs," 73 FR 44397, and that the EPA had historically interpreted and applied its CAA regulatory authorities to address local and regional air pollution, 73 FR 44408. We further noted that Congress was considering legislation to address the Nation's response to global climate change concerns and that, since *Massachusetts,* Congress had passed and the President had signed into law the Energy Independence and Security Act (EISA), which amended provisions applicable to the EPA's Renewable Fuels Standard

(RFS) program and NHTSA's CAFE standards program. 73 FR 44398. Finally, we noted that the EPA had received additional petitions to regulate stationary sources and additional GHGs, including water vapor, all of which suggested that GHG emission regulations could not readily be limited to new motor vehicles and engines. 73 FR 44399 & n.26.

As to CAA section 202(a), the 2008 ANPRM set out a framework for determining whether "GHG emissions from new motor vehicles cause or contribute to air pollution that may reasonably be anticipated to endanger public welfare" under CAA section 202(a)(1) or for "explain[ing] why scientific uncertainty is so profound that it prevents making a reasoned judgment on such a determination." 73 FR 44398, 44421. We reviewed available information for $CO_2$, methane, and $N_2O$ emissions and noted that HFCs, PFCs, and $SF_6$ are "often grouped together" and separately from the rest "because they contain fluorine, typically have large global warming potentials, and are produced only through human activities." 73 FR 44401–02.[25] With respect to endangerment, we sought comment on whether GHGs could properly be considered dangerous air pollution because the potential health effects are indirect and the potential welfare effects may be positive on balance. 73 FR 44427. In addition, we sought comment on whether "the unique characteristics and properties of each GHG . . . as well as current and projected emissions" meant that each GHG should be analyzed individually or whether certain GHGs other than $CO_2$ were amenable to grouping. 73 FR 44428. With respect to causation or contribution, we presented motor vehicle and engine emissions data for each GHG separately and noted that emission trends had diverged between pollutants, with $CO_2$ emissions, for example, generally increasing since 1990 and $N_2O$ emissions, for example, increasing from 1990 to 1995 and then falling substantially from 1995 to 2006 because of fuel and technology changes. 73 FR 44430. We also presented extensive information on potential regulatory approaches that could be triggered by a positive finding under CAA section 202(a), including

---

[23] The D.C. Circuit majority had upheld the denial on the merits because "the EPA Administrator properly exercised his discretion under § 202(a)(1) in denying the petition for rulemaking." *Massachusetts* v. *EPA,* 415 F.3d 50, 58 (D.C. Cir. 2005). The dissent argued that CAA section 202(a)'s breadth provided the EPA sufficient authority to regulate GHGs, that more specific authorization was not required, and that the EPA's policy justifications were inadequate reasons to deny the petitions. *Id.* at 67–82 (Tatel, J., dissenting).

[24] Writing for four members of the Court, Chief Justice Roberts would have dismissed the petitions for review for lack of Article III standing. 549 U.S. at 535 (Roberts, C.J., joined by Scalia, Thomas, and Alito, J.J., dissenting). Writing for the same four members of the Court, Justice Scalia would have denied the petitions on the grounds that the Administrator reasonably exercised judgment in declining to regulate and that CAA section 302(g)'s definition of "air pollutant" does not clearly encompass $CO_2$ and other GHGs that naturally occur in the ambient air. 549 U.S. at 549 (Scalia, J., joined by Roberts, C.J., and Thomas and Alito, J.J., dissenting).

[25] In the 2008 ANPRM, the EPA noted that the most recently available IPCC analysis concluded that "[t]he anthropogenic combined heating effect (referred to as forcing) of [methane], $N_2O$, HFCs, PFCs and $SF_6$ is about 40% as large as the $CO_2$ cumulative heating effect since pre-industrial times." 73 FR 44423.

approaches specific to particular GHGs. 73 FR 44438–63.

Following a change in administration, however, the EPA proposed in April 2009 and finalized in December 2009 a much different approach to analyzing GHG emissions from new motor vehicles and engines under CAA section 202(a). In the Endangerment Finding, the Administrator found that ''the science [was] sufficiently certain'' to compel an affirmative determination and interpreted *Massachusetts* as ''allow[ing] for the consideration only of science.'' 74 FR 66501. Relatedly, the Administrator did not consider any of the implementation challenges or options discussed in the 2008 ANPRM, asserting instead that CAA section 202(a) confers ''procedural discretion'' to issue standalone findings without considering a regulatory response because the statute ''is silent on this issue.'' *Id.* The Administrator also defined all six ''well-mixed'' GHGs collectively as the relevant ''air pollutants'' and ''air pollution'' for purposes of endangerment and causation or contribution, meaning the Endangerment Finding did not need to address the different characteristics or emission trends of any particular GHG. 74 FR 66516–21, 66536–57.

With respect to endangerment, the Administrator began by excluding adaptation—human responses that reduce potential adverse impacts—and mitigation—independent measures that reduce the causes of potential adverse impacts—from the analysis of global climate change concerns. 74 FR 66513. The Administrator acknowledged that ''some level of autonomous adaptation will occur'' and that ''this separation means this approach may not reflect the actual conditions in the real world in the future, because adaptation and/or mitigation may occur and change the risks.'' *Id.* Nevertheless, the Administrator reasoned that ''it would be extremely hard to make a reasoned projection of human and societal adaptation and mitigation responses'' because they are ''largely political'' or ''individual personal judgments.'' *Id.* Next, the Administrator relied on IPCC Assessment Report 4 (AR4) projections to find that global temperatures would likely increase between 1.8 to 4 degrees Celsius by 2100, with an uncertainty range of 1.1 to 6.4 degrees Celsius. 74 FR 66519. Operating within this analytical framework, the Administrator found that elevated global concentrations of GHGs from all foreign and domestic sources were responsible for increased global temperatures that were responsible in turn for indirect health risks driven by (1) more frequent

heat waves; (2) air quality effects, including increased formation of ozone, and (3) broader societal impacts related to increased frequency and severity of certain extreme weather events. 74 FR 66525.[26] The Administrator also found that GHG emissions could lead to welfare effects related to (1) food production and agriculture; (2) forestry; (3) water resources; (4) sea level rise; and (5) energy infrastructure and settlements, although the evidence was uncertain for several categories that may see near-term benefits. 74 FR 66531–35.[27] Importantly, the Administrator acknowledged that the understanding of public health and welfare in the Endangerment Finding was atypical, particularly with respect to considering indirect effects, but asserted the approach was necessary given the ''unique'' challenge presented by global climate change. 74 FR 66527.

With respect to contribution, the Administrator asserted broad authority to interpret the statutory standard because ''[t]he language of CAA section 202(a) is silent regarding how the Administrator is to make her contribution analysis.'' 74 FR 66544. Exercising that putative interpretive authority, the Administrator concluded that ''it is reasonable to consider that lower percentages contribute than one may consider when looking at a local or regional problem involving fewer sources of emissions,'' 74 FR 66545, because ''all contributors must do their part'' to avoid ''a tragedy of the commons, whereby no country or source category would be accountable for contributing to the global problem of climate change,'' 74 FR 66543. Next, the Administrator relied on data showing that existing motor vehicles and engines emitted four GHGs—$CO_2$, methane, and $N_2O$ from engines, as well as HFCs from air conditioning units—that accounted for 4.3 percent of global GHG emissions at the time. On that basis, the Administrator found that GHG emissions from new motor vehicles and engines ''contribute to the air pollution'' consisting of the six ''well-mixed'' GHGs previously identified as a danger to public health or welfare. 74 FR 66537–39.

Crucially, the Endangerment Finding made clear that the EPA was acting

independently from any new congressional mandate. Rather, the Administrator interpreted CAA section 202(a) as setting out a standalone authority to issue findings that establish jurisdiction without considering implementation concerns and purported to rest the Endangerment Finding solely on a scientific judgment informed by the record as assembled by the Agency in 2009.

### D. Implementation of the 2009 Endangerment Finding

In the years since issuing the Endangerment Finding, the EPA has promulgated GHG emission standards for various classes of new motor vehicles and engines in reliance on the Endangerment Finding and, as anticipated in the 2008 ANPRM, sought to expand the same analytical framework to regulatory provisions governing existing vehicles, stationary sources, aircraft, and oil and gas operations. For a full accounting of GHG emission standards adopted since 2009 under CAA section 202(a), see sections VI.B and VI.C of this preamble.

Following the Endangerment Finding, the EPA received multiple petitions for reconsideration from industry groups, States, and various organizations arguing that our approach in 2009 was legally and scientifically flawed and that external assessments by the IPCC, among others, had not adequately addressed recent criticisms of climate change science. The EPA denied these consolidated petitions in 2010 without notice and comment. Reiterating the scientific assertions from the technical support document (TSD) used in 2009, we emphasized that we had conducted an independent review of outside assessments in issuing the Endangerment Finding and asserted that the core conclusions of the Endangerment Finding remained valid notwithstanding the flaws raised by the petitioners. The EPA also issued a volume of response documents defending the methodologies and experts relied upon and concluded that no new information warranted reconsideration. 75 FR 49556.

In April 2022, the EPA denied, again without notice and comment, a new round of petitions for reconsideration and rulemaking asserting that the Endangerment Finding was legally and scientifically flawed and undermined by more recent scientific assessments. We acknowledged that several recent studies contradicted assessments by the USGCRP and IPCC but reaffirmed our earlier position that such assessment reports are entitled to greater weight

---

[26] The Administrator also noted that increased global temperatures could lead to changes in certain food- and water-borne pathogens and allergens (including increases in pollen resulting from increased plant growth at higher concentrations of $CO_2$) but did ''not plac[e] primary weight on these factors.'' 74 FR 66498, 66526.

[27] The Administrator relied on welfare impacts to water resources and sea level rise as providing ''the clearest and strongest support for an endangerment finding.'' 74 FR 66534.

than dissenting views.[28] We also considered criticisms of the EPA's Social Cost of Carbon (SCC) methodology out of scope because "the social cost of carbon played no role in the 2009 Endangerment Finding." [29] We further acknowledged that severing the endangerment and cause or contribute analysis from the development of subsequent regulations had impacted the EPA's approach to GHG emission standards, including because the Science Advisory Board (SAB) did not have the opportunity to review the Endangerment Finding as would otherwise have been required by the CAA.[30] Nevertheless, we reaffirmed our position that CAA section 202(a) grants "procedural discretion" to issue findings and emission standards separately and "decline[d] to exercise that discretion" differently.[31]

## E. Reconsideration of the 2009 Endangerment Finding

Since the EPA published the 2009 Endangerment Finding, there have been developments in innovation, science, economics, and mitigation, as well as significant Supreme Court decisions that provide new guidance on how federal agencies should interpret the statutory provisions that Congress has tasked them with administering.[32] Accordingly, the Administrator has now determined that the Endangerment Finding should be reconsidered to address legal and scientific developments that present reason to question the ongoing validity and reliability of its conclusions and to subject these important issues to public comment for the first time since 2009.

In initiating reconsideration, the Administrator explored all findings, support, questions, and ambiguities contained within the science relied upon by the Endangerment Finding. As acknowledged in the Endangerment Finding and recent reports, there are significant questions and ambiguities presented by both the observable realities of the past nearly two decades and the recent findings of the scientific community, including those summarized in the 2025 CWG Draft Report. There may also be as-yet-unidentified issues or discrepancies present in the underlying TSD and scientific justifications offered in the

Endangerment Finding. When confronted with science offering a diverse array of conclusions, methodologies, and explanations, the Administrator strove to inform his judgment to the most impartial extent possible. A more detailed discussion of the available climate science can be found in section IV.B.

## III. Legal Framework for Proposed Action

### A. Proposed Rescission of Endangerment Finding

The statutory authority for this proposed action is the same as that relied upon in the prior actions at issue: CAA section 202(a)(1), which requires the Administrator to "prescribe" and "from time to time revise . . . standards" for certain air pollutants emitted by new motor vehicles and new motor vehicle engines "in accordance with the provisions of this section." [33] Unless provided otherwise by statute, an agency may revise or rescind prior actions so long as it acknowledges the change in position, provides a reasonable explanation for the new position, and considers legitimate reliance interests in the prior position.[34]

The EPA proposes that nothing in the language of the statute prohibits or conditions our general authority to rescind prior actions. CAA section 202(a)(1) grants the Administrator discretion to "revise" standards prescribed "in accordance with the provisions of this section" and does not require retaining the same level of stringency when revising or rescinding existing standards. Moreover, the statute neither authorizes the Administrator to issue standalone findings that trigger a duty to regulate nor prohibits the Administrator from rescinding such findings. Rather, CAA section 202(a)(1) requires the Administrator to prescribe standards for emissions of any air pollutant by classes of new motor vehicles or engines when, in his judgment, emissions of such air pollutant by such classes of new motor vehicles or engines "cause, or contribute to, air pollution which may reasonably be anticipated to endanger public health or welfare." Notably, the EPA has consistently assumed that it has the statutory authority to rescind the Endangerment Finding in reviewing the merits of petitions for reconsideration

since 2009 and did not state that we lack such reconsideration authority.[35]

The EPA acknowledges that rescinding the Endangerment Finding as proposed would involve significant changes to the legal interpretations adopted in the Endangerment Finding and retained in subsequent actions. For example, if finalized, the interpretation of CAA section 202(a) proposed in this action would preclude the EPA from issuing standalone endangerment and contribution findings and would instead require the Agency to make findings for particular air pollutant emissions and classes of new motor vehicles and engines as an integral step in a rulemaking to prescribe standards for such emissions and classes, consistent with our decades-long practice prior to 2009 in regulating non-GHG air pollutants. Furthermore, if finalized, the interpretation of CAA section 202(a) proposed in this action would reverse the basis for the Endangerment Finding by concluding that global climate change concerns cannot satisfy the statutory standard for regulation under CAA section 202(a). For discussion of our proposed interpretation of CAA section 202(a) and related statutory provisions, see section IV.A of this preamble. For discussion of our alternative proposal to rescind the Endangerment Finding because the EPA exercised its authority under CAA section 202(a) unreasonably and because the Administrator no longer has confidence in the assumptions, methodology, and conclusions in the Endangerment Finding in light of the scientific record, see section IV.B of this preamble.

The EPA is also proposing additional statutory and policy rationales for repealing the GHG emission standards currently in effect for new motor vehicles and engines separate and apart from the proposed rescission of the Endangerment Finding. If finalized, these alternative rationales would change the novel position taken in rulemakings since 2009 to prescribe and revise GHG emission standards under CAA section 202(a).[36] For example, if finalized, our proposal to determine that there is no "requisite technology" for

---

[28] 2022 Denial at 15–17.

[29] *Id.* at 30.

[30] *Id.* at 36 (noting that 42 U.S.C. 4365(c)(1) requires SAB consultation for a "standard" promulgated under CAA section 202(a) but asserting that requirement does not extend to "findings" issued under the same provision).

[31] *Id.* at 39.

[32] *See* Feb. 19, 2025 Memo at 1.

[33] 42 U.S.C. 7521(a)(1).

[34] *See Wages & White Lion,* 145 S. Ct. 898; *FCC* v. *Fox Television Stations, Inc.,* 556 U.S. 502 (2009); *Motor Vehicle Mfrs. Ass'n* v. *State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29 (1983); *Clean Air Council* v. *Pruitt,* 862 F.3d 1, 8 (D.C. Cir. 2017) ("Agencies obviously have broad discretion to reconsider a regulation at any time.").

[35] *See, e.g.,* 2022 Denial at 7–10 (denying mandatory reconsideration under CAA section 307(d) and reviewing the petitions on the merits as rulemaking petitions under APA section 553(e)); 75 FR 49560–63 (denying mandatory reconsideration under CAA section 307(d) without asserting that the EPA lacked statutory authority to rescind or revise the Endangerment Finding).

[36] 75 FR 25324 (May 7, 2010); 76 FR 57106 (Sept. 15, 2011); 77 FR 62624 (Oct. 15, 2012); 81 FR 73478 (Oct. 25, 2016); 85 FR 24174 (Apr. 30, 2020); 86 FR 74434 (Dec. 30, 2021); 89 FR 27842 (Apr. 18, 2024); 89 FR 29440 (Apr. 22, 2024).

vehicle emission control capable of having a measurable impact on the dangers identified in the Endangerment Finding would preclude any GHG emission standards from going into effect. Furthermore, if finalized, our proposal to determine that the GHG emission standards harm public health and welfare on balance would make it unreasonable and contrary to the objectives of the statute to issue and retain such standards. See section V of this preamble for further discussion of these additional rationales and the Agency's prior positions.

The EPA acknowledges that repealing the GHG emission standards based on the proposed rescission of the Endangerment Finding would depart from our position in rulemakings since 2009 that prescribed and revised GHG emission standards for light- and medium-duty vehicles and heavy-duty vehicles and engines under CAA section 202(a). If finalized as proposed, the rescission would eliminate the statutory basis for those standards because we relied on the Endangerment Finding in each rulemaking to invoke our authority under CAA section 202(a) without making the required findings for GHGs emitted by the class or classes of new motor vehicles or engines at issue in each rulemaking. See section VI of this preamble for further discussion of each prior rulemaking and the regulatory changes that would be necessary to repeal all GHG emission standards currently in effect for new motor vehicles and engines on any of the bases proposed in this action.

As discussed throughout this preamble, the EPA is proposing these changes to comply with limits on our statutory authority under the best reading of CAA section 202(a), respond to legal and scientific developments that undermine the conclusions and assumptions of the Endangerment Finding, and realign Agency resources to prioritize core statutory responsibilities. Importantly, the Nation's policy response to global climate change concerns was a major issue in the 2024 presidential election, in which voters were presented with distinct legal and policy approaches and elected a candidate promising a change in policy. Under these circumstances, the election of a new Administration is an independent and sufficient basis for changing legal interpretation and policy within the boundaries set by statute.[37]

Democratic accountability is essential to the exercise of delegated authority by administrative agencies,[38] and retaining the Endangerment Finding without clear statutory authority would frustrate, not promote, constitutional values and the rule of law. If the EPA lacks authority to retain the Endangerment Finding under the best reading of CAA section 202(a), the statute controls regardless of policy preferences.

The EPA seeks comment on the nature and extent of any reliance interests that may have arisen from our assertion of regulatory authority over GHG emissions from new motor vehicles and engines and is committed to assessing any such interests, determining whether they are significant, and weighing such interests against competing rationales, as required by law.[39]

Specifically, we seek comment on whether regulated parties have any significant reliance interests in our GHG emission standards for new motor vehicles and new motor vehicle engines. We are aware that manufacturers, importers, and sellers have already expended resources complying with GHG emission standards for MYs 2012 through 2026, and that consumer prices for vehicles in these MYs reflect the costs of such compliance. Because many compliance costs are incurred as part of research and development and during manufacturing, with the notable exception of the need to purchase compliance credits, this proposed action would have limited impacts on MYs 2012 to 2024, greater impacts for MYs 2024–2026, and would entirely relieve future regulatory obligations for MY 2027 and beyond. As discussed in sections VI.B and VI.C of this preamble, we are confident that the Agency has adequate regulatory tools to address transitional compliance concerns and note that this proposed action would not, if finalized, mandate any particular response by regulated parties. We are also aware that regulated parties may have reliance interests in national uniformity and CAA preemption with respect to emission standards for new motor vehicles and engines. As discussed in section VI.A of this preamble, CAA section 209(a) and other applicable sources of federal

preemption would continue to apply, and we would retain our authority to regulate emissions, including emissions of the six "well-mixed" GHGs addressed in the Endangerment Finding, under circumstances that meet the standard for regulation under CAA section 202(a). We seek comment on each of these rationales, including on whether any reliance interests in national uniformity and preemption would support finalizing or not finalizing the proposed action, or adopting certain rationales and not finalizing other rationales. We further seek comment on the continued preemptive effect of the CAA in the event that the EPA finalizes the proposed rescission or any of the alternatives discussed herein (or in the event that the Agency determines that it lacks authority at the present time to regulate GHG emissions under one or more provisions of the CAA for any reason). As a general matter, we also seek comment on how we should repeal the Endangerment Finding and regulations if the decision is made to proceed with the proposed repeals, including under any of the options set out in this proposal or any additional grounds and means.

In addition, the EPA seeks comment on whether regulated parties and other stakeholders have significant reliance interests in GHG emission standards for new motor vehicles and engines. This proposed action would make only minor conforming adjustments to regulatory provisions for criteria pollutants and air toxics, thereby leaving most emission standards for new motor vehicles and engines in place. Nor would this proposed action impact separate economy and fuel-efficiency standards that have the effect of reducing GHG emissions per mile traveled from new motor vehicles and engines, including standards issued by NHTSA. As explained in section IV.A.1 of this preamble, we now believe that regulating GHG emissions based on global climate change concerns exceeds our statutory authority under CAA section 202(a) and, as such, propose that reliance interests alone would not justify retaining the GHG emission standards that we lacked authority to prescribe. As discussed in section IV.A.2 of this preamble, potential dangers from local or regional exposure to the six "well-mixed" GHGs covered by the Endangerment Finding are regulated separately under specific grants of statutory authority. And as discussed in section V of this preamble, we now believe that GHG emission standards for new motor vehicles and engines may harm public health and

---

[37] *See State Farm,* 463 U.S. at 59 (Rehnquist, J., concurring in part and dissenting in part); *PETA* v. *USDA,* 918 F.3d 151, 158 (D.C. Cir. 2019) ("new administrations are entitled to reevaluate and modify agency practices, even longstanding ones"); *Nat'l Ass'n of Home Builders* v. *EPA,* 682 F.3d

1032, 1043 (D.C. Cir. 2012) ("the inauguration of a new President and the confirmation of a new EPA Administrator" went "a long way toward explaining why EPA" changed policy).

[38] *See, e.g., U.S. Telecom Ass'n* v. *FCC,* 855 F.3d 381 (D.C. Cir. 2017) (Brown, J., dissenting from denial of rehearing en banc); Elena Kagan, Presidential Administration, 114 Harv. L. Rev. 2245, 2252–53, 2332–34 (2001).

[39] *See, e.g., DHS* v. *Regents of Univ. of Cal.,* 591 U.S. 1, 33 (2020).

welfare without having any measurable impact on the global climate change concerns identified in the Endangerment Finding. We seek comment on potential reliance interests in GHG emission standards for global climate change concerns under CAA section 202(a), including on whether such reliance justifies retaining standards in the absence of statutory authority and the extent to which potential dangers are addressed, or could be addressed, under more specific authorities.

The EPA recognizes that we have relied in part on the Endangerment Finding in issuing subsequent endangerment findings and GHG regulations under other CAA provisions, including for certain stationary sources and aircraft engines. The Supreme Court has since vacated several of these actions, including GHG regulations for existing sources in the fossil-fuel fired power plant source category under CAA section 111(d) and for permitted sources under CAA Title V.[40] For those actions that remain in effect, we have initiated or intend to initiate separate rulemakings that will address any overlapping issues.

Among other concerns with the Endangerment Finding, we believe that severing consideration of endangerment and causation or contribution from the appropriate regulatory response under CAA section 202(a) resulted in broad statements that did not account for the statutory language in CAA section 202(a)(1) on which the Endangerment Finding purported to rely. Congress used different authorizing language to address distinct issues for stationary sources regulated under CAA section 111 and aircraft engines regulated under CAA section 231. In reconsidering actions taken under these authorities, we intend to address prior findings and standards in light of the particular statutory language, policy concerns, and scientific information relevant to each context. In this proposed action, we seek comment on reliance interests in the Endangerment Finding and GHG emission standards issued under CAA section 202(a) and reserve the right to direct out of scope comments to the appropriate rulemaking docket for the applicable regulatory action.

*B. Proposed Amendments to New Motor Vehicle and Engine Regulations*

As noted above, CAA section 202(a)(1) directs the Administrator to prescribe ''standards applicable to the emission of any air pollutant from any class or classes of new motor vehicles or new motor vehicle engines, which in his judgment cause, or contribute to, air pollution which may reasonably be anticipated to endanger public health or welfare.'' This core directive has remained substantially the same since Congress enacted the Motor Vehicle Pollution Control Act of 1965.[41] Thus, a necessary condition to regulating emissions from new motor vehicles and engines is a finding—an ''endangerment finding''—that emissions of an air pollutant from a class or classes of new motor vehicles or engines cause or contribute to air pollution which may reasonably be anticipated to endanger public health or welfare.

For the reasons discussed in section IV of this preamble, we are proposing to rescind the Endangerment Finding for GHG emissions from new motor vehicles and new motor vehicle engines and, on that basis, to repeal all existing GHG emission standards for passenger cars, light-duty trucks, motorcycles, buses, medium-duty vehicles, and heavy-duty vehicles and engines. The Endangerment Finding has served as the EPA's basis for regulating GHG emissions from new motor vehicles and new motor vehicle engines since 2009. Absent findings of endangerment and causation or contribution, the EPA lacks statutory authority to prescribe standards for those emissions under CAA section 202(a)(1). We propose that when the EPA rescinds an endangerment finding for an air pollutant, it must cease prescribing and enforcing standards applicable to the emission of that pollutant from new motor vehicles or new motor vehicle engines and should rescind existing standards no longer authorized by statute.

For the reasons discussed in section V of this preamble, we are also proposing additional bases to repeal GHG emission standards even if the Endangerment Finding were to remain in place. We propose that regardless of whether GHG emissions trigger the standard for regulation in CAA section 202(a)(1), our authority to prescribe and enforce emission standards for GHGs is limited by the language of CAA section 202(a)(2) and must be exercised in a reasonable manner that furthers, rather than burdens, the health and welfare of all Americans.

Accordingly, the EPA is proposing to repeal all standards and associated test procedures adopted to limit the emission of GHGs under CAA section 202(a) for highway light-, medium-, and heavy-duty vehicles and engines. The EPA notes that, for light-duty vehicles, the Energy Policy and Conservation Act of 1975 (EPCA) and the 2007 EISA authorize NHTSA to administer the CAFE program and fuel economy labeling program. These statutes also direct the EPA to determine compliance values for manufacturers subject to the CAFE program and the fuel economy labeling program. Importantly, these statutory obligations are distinct from the EPA's authority under CAA section 202(a) and from the EPA's decisions since 2009 to regulate GHG emissions under CAA section 202(a). As explained in section VI of this preamble, we are retaining and not proposing to reopen regulatory provisions related to our statutory roles in these NHTSA programs. Likewise, we are retaining and not proposing to reopen any criteria pollutant and air toxics standards for highway light-, medium-, and heavy-duty vehicles and engines under CAA section 202(a).

## IV. Proposed Rescission of the Endangerment Finding

In this section, the EPA proposes to rescind the Endangerment Finding by concluding, based on multiple, independent alternative legal rationales, that the Agency's unprecedented foray into regulating GHG emissions from new motor vehicles and engines is inconsistent with the best reading of CAA section 202(a). Under any proposed alternative, the EPA would lack authority to retain existing GHG emission standards for new motor vehicles and engines and proceed to repeal the relevant provisions of Title 40 of the CFR as proposed in section VI of this preamble.

Section IV.A of this preamble describes our primary proposal to rescind the Endangerment Finding by concluding that CAA section 202(a) does not authorize the EPA to prescribe standards for GHG emissions based on global climate change concerns or to issue standalone findings that do not apply the statutory standard for regulation as a cohesive whole. If finalized, this proposal would require rescinding the Endangerment Finding and resulting regulations because we lacked statutory authority to issue them in the first instance. We begin by proposing the best reading of CAA section 202(a) and related provisions, as informed by the Supreme Court's decisions in *Loper Bright* and *UARG.* Next, we propose that the Nation's response to global climate change concerns generally, and specifically whether that response should include regulating GHG emissions from new motor vehicles and engines, is an

---

[40] *See West Virginia,* 597 U.S. 697; *UARG,* 573 U.S. 302.

[41] Public Law 89–272, 79 Stat. 992–93.

economically and politically significant issue that triggers the major questions doctrine under *UARG* and *West Virginia,* and that Congress did not clearly authorize the EPA to decide it by empowering the Administrator to "prescribe . . . standards" under CAA section 202(a). Throughout this section, we propose that the Endangerment Finding relied on various forms of *Chevron* deference[42] to depart from the best reading of the statute and exceeded the EPA's authority in several fundamental respects, any one of which would independently require rescission to conform to the best reading of the law.

Section IV.B of this preamble describes the EPA's alternative proposal that regardless of whether CAA section 202(a) authorizes regulating GHG emissions based on global climate change concerns, we would rescind the Endangerment Finding by concluding that the Administrator analyzed endangerment and contribution in an unreasonable manner. We begin by recounting the interpretation of CAA section 202(a) adopted in the Endangerment Finding, which asserted "procedural discretion" to issue standalone findings without prescribing the standards required by such findings and to sever the analysis of endangerment from the analysis of contribution. Next, we propose that the Administrator exercised that discretion unreasonably by adopting an approach that papered over substantial uncertainties in the scientific record and failed to draw the required connection between GHG emissions from a class or classes of new motor vehicles and global climate change concerns. We further propose that developments since 2009 demonstrate the uncertainties acknowledged in the Endangerment Finding are more significant than previously believed, including because many of its predictive judgments involve ranges of assumptions that largely fail to satisfy the statutory standard for regulation and because the more pessimistic assumptions have not been borne out in empirical data and peer-reviewed studies through 2025. Finally, we propose that the Administrator would exercise any discretion conferred by CAA section 202(a) differently to ensure a legally and scientifically sound approach and that, under that approach, the Endangerment

Finding and resulting GHG emission standards must be rescinded.

We seek comment on every aspect of the primary and alternative proposal, including the key issues on which we specifically request comment as set out in section VII of this preamble.

*A. Primary Rationale for Proposed Rescission*

The Endangerment Finding announced an interpretation of CAA section 202(a) that permitted the EPA to prescribe standards in response to global climate change concerns rather than local or regional exposures, granted "procedural discretion" to issue standalone findings without considering regulatory response, and severed the finding of endangerment from the finding of contribution to that endangerment. At the time, we assumed that statutory silence granted discretion to construe the scope of our authority and asserted or implied that the Supreme Court's decision in *Massachusetts* required us to read the statute as authorizing the regulation of GHG emissions in response to global climate change concerns.

In important respects, the Endangerment Finding and the Supreme Court's decision in *Massachusetts* straddled a transitional period regarding the standards for statutory interpretation and understandings of agency authority. The breadth of agency discretion, and the question whether Congress reserves major policy questions for itself, were sharply disputed. Judicial decisions in the intervening fifteen years have significantly clarified the law in both respects. In *Loper Bright,* the Supreme Court expressly overturned the doctrine of deference to agency statutory interpretation, ruling that statutes "have a single, best meaning" that is informed, but not dictated, by Executive Branch practice. 603 U.S. at 400–01. And in *West Virginia,* the Supreme Court built upon its decisions in *UARG* and *Brown & Williamson,* among others, by confirming that an agency must have more than "a colorable textual basis" to claim authority to decide major questions of policy that Congress would generally reserve for itself in the first instance. 597 U.S. at 723.

In this subsection, we propose that the best reading of CAA section 202(a), as informed by *Loper Bright* and principles of statutory interpretation, does not authorize the EPA to assert jurisdiction over GHG emissions based on global climate change concerns in a standalone endangerment finding. Regardless whether GHGs are properly considered "agents of air pollution" under the general, Act-wide definition

of "air pollutant" at CAA section 302(g), the EPA cannot regulate under CAA section 202(a) unless the emissions of the air pollutant by a class or classes of new motor vehicles "cause, or contribute to, air pollution which may reasonably be anticipated to endanger public health or welfare." Because the text, structure, and history of CAA section 202(a) and related provisions demonstrate that this language targets air pollution that threatens public health or welfare through local or regional exposure, "air pollution" defined as six "well-mixed" GHGs raising global climate change concerns that adversely impact a subset of regions globally cannot satisfy this standard. We further propose that this reading is independently confirmed and strengthened by the major questions doctrine. Specifically, we propose that the major questions doctrine applies and precludes the EPA from asserting authority to regulate in response to global climate change concerns under CAA section 202(a). At a minimum, Congress did not *clearly* authorize the EPA to decide the Nation's response to global climate change concerns by empowering the Agency to "prescribe . . . standards" for certain air pollutants emitted by new motor vehicles and engines. On these bases, and on account of the additional procedural and analytical errors set out below, we propose that the Endangerment Finding exceeded the EPA's authority and must be rescinded.

1. Best Reading of CAA Section 202(a)

Congress originally enacted the language of CAA section 202(a) in the Motor Vehicle Pollution Control Act of 1965 and retained it, with minor revisions, in the 1970 CAA and all subsequent statutory amendments. The key language in CAA section 202(a)(1) provides:

The Administrator shall by regulation prescribe (and from time to time revise) in accordance with the provisions of this section, standards applicable to the emission of any air pollutant from any class or classes of new motor vehicles or new motor vehicle engines, which in his judgment cause, or contribute to, air pollution which may reasonably be anticipated to endanger public health or welfare.[43]

Since 1977, CAA section 302(g) has defined the term "air pollutant" throughout the statute as "any air pollution agent or combination of such agents . . . which is emitted into or otherwise enters the ambient air."[44]

---

[42] *Chevron U.S.A., Inc.* v. *NRDC, Inc.,* 467 U.S. 837 (1984), *overruled by Loper Bright,* 603 U.S. 369; *see* 74 FR 66501, 66502, 66544 (asserting discretion based on statutory ambiguity, including that created by silence); 74 FR 66528, 66542, 66543 (asserting discretion based on statutory ambiguity).

[43] 42 U.S.C. 7521(a)(1).

[44] 42 U.S.C. 7602(g). Notably, the statute does not separately define "air pollution."

CAA section 302(h) also provides that any reference to "effects on welfare includes, but is not limited to, effects on" the environment, property, transportation hazards, and "on economic values and on personal comfort and well-being." [45]

The EPA proposes that this statutory language is best read as authorizing the Agency to identify and regulate, as an integral part of a rulemaking prescribing emissions standards, air pollutants that cause or contribute to air pollution that itself endangers public health and welfare through local or regional exposures. This proposed interpretation is consistent with the text and structure of the statute, our decades-long implementation of the statute prior to 2009, and background principles of statutory interpretation, including default rules for proximate cause. This proposed interpretation is also consistent with the Supreme Court's decision in *Massachusetts,* which addressed distinct issues and must, as a matter of *stare decisis,* be read in harmony with the Supreme Court's subsequent decisions bearing on the EPA's authority and statutory interpretation in *UARG, West Virginia,* and *Loper Bright.*[46]

*Dangerous Air Pollution.* The EPA proposes that CAA section 202(a) is best read as authorizing the Agency to regulate air pollutant emissions that cause or contribute to air pollution that endangers public health or welfare through local or regional exposure. For the purposes of this proposed action, we use the phrase local or regional exposure to distinguish air pollution that impacts public health and welfare by its presence in the ambient air from "air pollution" consisting of six "well-mixed" GHGs that, as conceptualized in the Endangerment Finding, impacts public health and welfare only indirectly and not by its mere presence in the ambient air. As discussed below, this proposal would effectively return the EPA to its interpretation of CAA section 202(a) prior to 2009.

We propose that the terms "air pollutant" and "air pollution" as used in CAA section 202(a)(1) should be construed in accordance with the specific air pollutants identified for other purposes in the remainder of CAA section 202. Each of these listed air pollutants share the common quality of causing or contributing to air pollution that adversely impacts public health or welfare through local or regional exposure to the air pollution itself. CAA section 202 specifically addresses hydrocarbons (HCs), carbon monoxide (CO), oxides of nitrogen ($NO_X$), and particulate matter (PM), all of which harm health and the environment through exposure (*e.g.,* inhalation and dermal contact) or by causing or contributing to air pollution that harms health and the environment through exposure (*e.g.,* smog and acid rain).[47] That pattern holds for the criteria pollutants identified in the CAA—CO, lead, ground-level ozone ($O_3$), nitrogen dioxide ($NO_2$), PM, and sulfur dioxide ($SO_2$)—as well as the initial list of hazardous air pollutants in CAA section 112(b)(1).[48] We find it significant that in subjecting a number of air pollutants emitted by new motor vehicles and engines to regulation under CAA section 202, Congress did not include substances that are potentially indirectly harmful to public health or welfare based on elevated global concentrations in the upper atmosphere. That conspicuous omission supports the conclusion that the air pollutants subject to regulation under CAA section 202(a) are those that cause or contribute to air pollution which itself endangers public health or welfare through local or regional exposure.[49]

Put another way, we propose that the air pollutants identified in CAA section 202 and throughout relevant provisions of the CAA are those that cause or contribute to air pollution for which the air pollution *itself,* through local or regional exposure to humans and the environment, endangers public health or welfare.[50] For certain regulated air pollutants, the air pollutants are themselves the dangerous air pollution, *i.e.,* the air pollutants are the air pollution with adverse health and welfare impacts. An example is CO, which can be harmful, and even fatal, to humans at sufficient localized concentrations.[51] For other regulated air pollutants, the air pollutants contribute to dangerous air pollution by interacting with other airborne chemicals or environmental factors such as sunlight to create the dangerous air pollution, *i.e.,* the air pollutants are ingredients that create the dangerous air pollution in combination. An example is acid rain, in which air pollutants such as $SO_2$ interact locally and regionally with additional airborne chemicals to form acidic precipitation.[52]

The definition of "air pollutant" in CAA section 302(g) and the meaning of the undefined terms pollutant, pollution, and air pollution support this reading. As a matter of ordinary language, a pollutant is "[a] poisonous or noxious substance that contaminates the environment," and pollution is "[t]he harmful addition of a substance or thing into an environment."[53] Definitions of air pollution similarly emphasize the emission of "[c]ontaminants into the atmosphere."[54] The central concept is the addition of a contaminant, something, that "make[s] impure or unclean by contact or mixture."[55] CAA section 302(g) is consistent with these definitions, adding only that an "air pollutant" is any "air pollution agent or combination of such agents" that "is emitted into or otherwise enters the ambient air."[56] Read together with CAA section 202(a)—as the Supreme Court held we must in *UARG*—the underlying concept of dangerousness and contamination reinforces the conclusion that air pollution which endangers public health or welfare is air pollution (caused or contributed to by air pollutants) that itself endangers public health or welfare through local or regional exposures.

The "air pollution" addressed in the Endangerment Finding is different in kind. In that decision, the Administrator defined the relevant "air pollutants" as six "well-mixed GHGs" and the relevant "air pollution" as "the combined mix of" these GHGs "which together,

---

[45] 42 U.S.C. 7602(h).

[46] *See Hohn* v. *United States,* 524 U.S. 236, 252–53 (1998) (Supreme Court decisions "remain binding precedent until [the Supreme Court] see[s] fit to reconsider them, regardless of whether subsequent cases have raised doubts about their continuing vitality."); *Rodriguez de Quijas* v. *Shearson/Am. Exp., Inc.,* 490 U.S. 477, 484 (1989) (similar).

[47] *See, e.g.,* 42 U.S.C. 7521(a)(3)(A)(i), (b), (g), (h), (j), (k).

[48] 42 U.S.C. 7412(b)(1).

[49] As discussed in section IV.A.2 of this preamble, the only references to GHGs in the CAA are in *non*-regulatory contexts in which Congress authorized funding for various forms of research and grant programs. The choice to limit such references to non-regulatory solutions further supports the conclusion that the CAA section 202(a) regulatory authority for responding to endangerment does not encompass GHG emissions on the basis of global climate change concerns.

[50] For example, unlike other regulated air pollutants, "$CO_2$ is odorless, does not affect visibility and has no toxicological effects at ambient levels," Additionally, the Permissible Exposure Limit established by the U.S. Occupational Safety and Health Administration or which diminished performance on cognitive tasks are "far larger than any plausible ambient outdoor value through the end of the 22nd century." Add 2025 CWG Draft Report at 2.

[51] U.S. Environmental Protection Agency. (Last updated Apr. 11, 2025). Carbon Monoxide's Impact on Indoor Air Quality: *https://www.epa.gov/indoor-air-quality-iaq/carbon-monoxides-impact-indoor-air-quality.*

[52] U.S. Environmental Protection Agency. (Last updated Mar. 4, 2025). What is Acid Rain?: *https://www.epa.gov/acidrain/what-acid-rain.*

[53] Black's Law Dictionary 1403 (11th ed. 2019).

[54] *Id.*

[55] Am. Heritage Dictionary (5th ed. 2022).

[56] 42 U.S.C. 7602(g).

constitute the root cause of human-induced climate change and the resulting impacts on public health and welfare.'' 74 FR 66516. In contrast to the air pollution addressed expressly in CAA section 202 and elsewhere in the statute, GHGs do not endanger public health or welfare through local or regional exposure. Rather, the Endangerment Finding asserted that GHG ''air pollution'' would *lead to* increases in global temperature and change to ocean pH that, in turn, would *lead to* environmental phenomena, in combination with an open-ended universe of additional factors, which would potentially have adverse public health and welfare impacts of varying severity in certain regions. Regulating GHG emissions based on global climate change concerns requires reading an additional instance of ''cause, or contribute'' into the statute, such that CAA section 202(a) encompasses the 'emission of air pollutants that cause, or contribute to, dangerous air pollution that causes, or contributes to, endangerment of public health or welfare.'

This proposed interpretation is also supported by the best reading of the terms ''cause'' and ''contribute.'' In enacting and amending CAA section 202(a), Congress legislated against background legal principles, including principles of causation and proximate cause.[57] These ''default rules'' are ''presumed to have [been] incorporated, absent an indication to the contrary in the statute itself,'' [58] and nothing in the text of CAA section 202(a) indicates that Congress intended to depart from ordinary legal meaning. As a general matter, there is a point at which harm no longer has a sufficiently close connection to the relevant conduct to reasonably draw a causal link. We propose that emissions from new motor vehicles and new motor vehicle engines in the United States do not have a sufficiently close connection to the adverse impacts identified in the Endangerment Finding to fit within the legal meaning of ''cause'' or ''contribute.'' The Endangerment Finding largely avoided addressing this problem by severing the question whether GHG emissions from new motor vehicle engines contribute to GHG concentrations in the atmosphere from the question whether GHG concentrations in the atmosphere

endanger public health and welfare. As discussed in further detail in section IV.A.1 of this preamble, we propose that there is no basis in the statute for severing the inquiry in that way. Nevertheless, even with respect to endangerment and contribution in isolation, we propose that global climate change concerns involve analyzing causal relationships that are too uncertain, too remote, and too confounded by intervening and confounding factors to fit within the terms ''cause'' and ''contribute'' as used in CAA section 202(a). This understanding follows from the position discussed above that CAA section 202(a) and the statute more generally were designed to regulate air pollution with harmful impacts from local and regional exposure that are analyzable by ordinary causation standards.

In proposing this interpretation, we note that a limiting construction is necessary to avoid absurd results and potential conflict with the nondelegation doctrine. Because Congress cannot delegate legislative powers to the Executive Branch, statutes granting an agency regulatory authority must provide an intelligible principle to guide its exercise.[59] Our authority under CAA section 202(a) to ''prescribe . . . standards'' for air pollutant emissions by a class or classes of new motor vehicles and engines is limited by the requirement that the Administrator find such air pollutants cause or contribute to air pollution that may reasonably be anticipated to endanger public health and welfare. We propose that the best reading of the statute circumscribes this authority to air pollution that itself causes or contributes to endangerment of public health or welfare. Under the interpretation adopted in the Endangerment Finding, however, our authority under CAA section 202(a) would have no readily discernible limiting principle, particularly in combination with the authority asserted to sever the analysis of endangerment and causation or contribution. Following the logic of the Endangerment Finding, any ''air pollutant'' emitted at more than *de minimis* volumes would trigger our authority, and the statutory obligation, to prescribe standards so long as the emission contributes to ''air pollution'' that, in turn, potentially contributes to phenomena with predicted adverse impacts on public health and welfare broadly defined. As discussed further below, under this logic, the release of water vapor ($H_2O$) would meet the

standard for regulation because water can be said to result in significant harms and because motor vehicles and engines can be said to ''contribute'' to that harm by emitting non-*de minimis* quantities of water vapor into the upper atmosphere. The EPA would have the authority, and statutory duty, to prescribe standards for water vapor emissions because water vapor is a recognized GHG emitted by motor vehicles and engines as well as the vast majority of other mobile and stationary sources. Because that reading effectively converts CAA section 202(a)(1) into a roaming license to ''prescribe . . . standards,'' we believe the reading proposed herein is more faithful to the governing principles of statutory interpretation.

We further emphasize that this proposed interpretation would effectively return the EPA to its longstanding practice prior to 2009 of applying CAA section 202(a) and related statutory endangerment provisions to air pollution that adversely impacts public health and welfare through local or regional exposure. As noted above, we historically utilized this authority to prescribe standards for pollutants identified in the CAA itself, including $NO_X$, PM, HC, and CO. The distinction between air pollution that harms public health and welfare through local and regional exposure and global ''air pollution'' consisting of GHG concentrations without any such direct impacts has also played a role in our evaluation of waiver requests under CAA section 209.[60] Even in the Endangerment Finding, the Administrator recognized that we had previously applied CAA section 202(a) to ''a *more typical* local or regional air pollution problem.'' 74 FR 66538 (emphasis added). We propose that in adopting a novel analytical approach in the Endangerment Finding, the EPA failed adequately to address its prior practice and improperly relied on the Supreme Court's decision in *Massachusetts* for the proposition that CAA section 202(a) authorizes emission standards in response to air pollution raising global climate change concerns. As discussed below, *Massachusetts* did not construe the scope of the EPA's authority to regulate under CAA section

---

[57] *See, e.g., Bank of Am. Corp.* v. *City of Miami,* 581 U.S. 189, 201 (2017); *Lexmark Int'l, Inc.* v. *Static Control Components, Inc.,* 572 U.S. 118, 132 (2014); *Univ. of Tex. Sw. Med. Ctr.* v. *Nassar,* 570 U.S. 338, 347 (2013); *City of Oakland* v. *Wells Fargo & Co.,* 14 F.4th 1030 (9th Cir. 2021) (en banc).

[58] *Nassar,* 570 U.S. at 347.

[59] *See, e.g., Gundy* v. *United States,* 588 U.S. 128 (2019).

[60] *See, e.g.,* ''California State Motor Vehicle Pollution Control Standards; Notice of Decision Denying a Waiver of Clean Air Act Preemption for California's 2009 and Subsequent Model Year Greenhouse Gas Emission Standards for New Motor Vehicles,'' 73 FR 12156, 12161 (Mar. 6, 2008) (denying California's waiver request for GHG emission standards on the ground that ''the different, and global, nature of the pollution at issue'' requires a different conceptual approach).

202(a), and the Court has since made clear in *UARG* and *West Virginia* that our authority to regulate air pollutants that fit within the Act-wide definition turns on the particular statutory provision that confers authority to regulate.

In *Massachusetts,* the Supreme Court rejected the argument that GHGs are not ''air pollutants'' under the Act-wide definition, reasoning that CAA section 302(g)'s use of the word ''any'' in connection with ''air pollutant agent or combination of such agents, including any physical [or] chemical . . . substance'' was sufficiently broad to encapsulate the combination of GHGs at issue. 549 U.S. at 530. On this basis, the Court stated that the EPA ''has the statutory authority to regulate the emission of such gases from new motor vehicles.'' *Id.* at 532. The Court did not, however, decide whether including GHGs within the definition of ''air pollutant'' meant that we must find that GHGs meet the statutory standard for regulation under CAA section 202(a) because they cause or contribute to air pollution which endangers the public health or welfare. Rather the Court concluded its opinion by clarifying that it ''need not and do[es] not reach the question whether on remand EPA must make an endangerment finding.'' *Id.* at 534.

Consistent with *Massachusetts,* we propose to interpret the CAA as setting out a broad, threshold definition of ''air pollutant'' on an Act-wide basis that must be interpreted in the context of each applicable, particular provision granting regulatory authority in order to determine whether that provision authorizes the EPA to regulate an air pollutant under that particular authority. For purposes of CAA section 202(a), that means that even if GHGs are ''air pollutant[s]'' as defined on an Act-wide basis, they must meet the statutory standard for regulating emissions from new motor vehicles and engines before we may invoke our regulatory authority. Put simply, regardless whether GHGs are ''air pollutants'' as defined in CAA section 302(g), they must still satisfy the same standard as any other ''air pollutant'' by causing or contributing to air pollution which may reasonably be anticipated to endanger public health or welfare.

This understanding is confirmed by *UARG,* in which the Supreme Court distinguished between ''the Act-wide definition'' of air pollutant and the application of that definition to the Act's regulatory provisions. 573 U.S. at 320. The Court specifically addressed the holding in *Massachusetts,* adopting the argument that ''while *Massachusetts*

rejected EPA's categorical contention that [GHGs] could not be air pollutants for any purposes of the Act, it did not embrace EPA's [then] current, equally categorical position that [GHGs] must be air pollutants for all purposes regardless of the statutory context.'' *Id.* (cleaned up).

In sum, we propose that CAA section 202(a) does not provide authority to regulate GHGs based on global climate change concerns because that provision authorizes regulating only air pollutants that ''cause, or contribute to, air pollution which may reasonably be anticipated to endanger public health or welfare.'' The EPA must ''ground its reasons for action or inaction in the statute,'' *Massachusetts,* 549 U.S. at 535, and ''possess[es] only the authority that Congress has provided,'' *NFIB* v. *DOL,* 595 U.S. 109, 117 (2022). In proposing this interpretation, we note that our actions must be consistent with ''the single, best meaning'' of the statute and cannot expand our authority in response to pressing concerns based on statutory silence or ambiguity. *Loper Bright,* 603 U.S. at 400, 411. We seek comment on this proposed interpretation, including the rationales articulated above and any further rationales that commenters believe support, or detract from, this interpretation.

*Findings and Standards.* The EPA further proposes that CAA section 202(a) requires issuing emission standards together with the findings necessary to invoke our regulatory authority, rather than severing the regulatory action into separate endangerment and standards-setting proceedings. The statute begins by providing that the Administrator ''shall prescribe . . . standards applicable to the emission of any air pollutant from any class or classes of new motor vehicles or new motor vehicle engines,'' and follows this requirement by describing the scope of the duty to regulate air pollutant emissions ''which, in his judgment cause, or contribute to, air pollution which may reasonably be anticipated to endanger public health or welfare.'' We propose that the best reading of the statute requires the Administrator, when prescribing any emission standard for new motor vehicles or engines, to find that the air pollutant or air pollutants emitted by the class or classes of new motor vehicles or engines subject to the standard cause or contribute to air pollution that may reasonably be anticipated to endanger public health or welfare.

The Endangerment Finding severed this statutory language by finding endangerment and contribution in the

abstract for all potential CAA section 202(a) sources with respect to GHGs. In so doing, the Administrator vastly increased the Agency's authority by removing the restrictions Congress placed on the issuance of emission standards. As a result of this new conception of authority, the EPA may issue a single endangerment finding in the abstract with respect to emissions from all sources potentially subject to CAA section 202(a) (and their existing-source counterparts) without addressing the danger posed by any particular source category or the causal role of that particular source category in any identified danger. The EPA has since relied on the Endangerment Finding to prescribe emission standards for various classes of new motor vehicles and engines, as well as a variety of other sources under distinct statutory authorities, without making the requisite findings or assessment of factors necessary to regulate the sources in question.[61] We propose that Congress enacted CAA section 202(a) as an integrated regulatory provision for a reason, and that giving effect to the language of the statute requires the issuance of emission standards only when the Administrator has made an integrated finding of both endangerment and cause or contribution. Put another way, we propose that it is impermissible for the Administrator to make an endangerment finding without prescribing the emission standards required in response to such a finding, and conversely, that it is impermissible to prescribe emission standards without making the source- and air-pollutant specific findings required by the statute.

This proposed interpretation is consistent with the EPA's implementation of CAA section 202(a) and similar provisions of the CAA prior to 2009. In the Endangerment Finding, the Administrator acknowledged that ''typically endangerment and cause or contribute findings have been proposed concurrently with proposed standards under various sections of the CAA, including CAA section 201(a).'' 74 FR 66501. We propose that our historical practice under CAA section 202(a) reflects the better reading of the statute and is entitled to greater weight. As the Supreme Court recently explained, such weight is ''especially warranted when an Executive Branch interpretation was issued roughly contemporaneously with enactment of the statute and remained consistent over time.'' *Loper Bright,* 603 U.S. at 386.

---

[61] *See* sections II.C, VI.B, and VI.C of this preamble for a summary of the EPA's rulemaking activities in response to the Endangerment Finding.

In departing from the EPA's historical practice in the Endangerment Finding, the Administrator reasoned that "[t]he text of CAA section 202(a) is silent on this issue" and "invoked the procedural discretion that is provided by CAA section 202(a)'s lack of specific direction." 74 FR 66501. We propose that CAA section 202(a) is not silent on the issue because the statute sets out an integrated process that requires the EPA to prescribe standards when the Administrator finds certain conditions are met. When Congress intends a multi-step inquiry in the environmental context, it typically says so expressly. In the National Ambient Air Quality Standards (NAAQS) program, for example, the CAA separates our authority to establish and revise the NAAQS under CAA section 108 and 109 from our duties to implement the NAAQS by reviewing State Implementation Plans (SIPs) or promulgating Federal Implementation Plans (FIPs) under CAA section 110 and related statutory provisions.[62] A particularly relevant analogy is Clean Water Act section 303(c)(4), which pairs the Administrator's authority to "determin[e] that a revised or new [water quality standard] is necessary to meet the requirements of this chapter" with the requirement that the Administrator "shall promptly prepare and publish proposed regulations" after making such a determination and "promulgate any revised or new standard . . . not later than ninety days after he publishes such proposed standards." [63] We further propose that even if CAA section 202(a) were ambiguous or silent in this respect, the Supreme Court recently held in no uncertain terms that "statutory ambiguity . . . is not a reliable indicator of actual delegation of discretionary authority to agencies." *Loper Bright,* 603 U.S. at 411.

Severing the EPA's standards-setting authority from the findings that trigger a duty to exercise that authority shaped the analysis in the Endangerment Finding in a manner that we propose ran counter to the statute. Recall that the Endangerment Finding first projected adverse public health and welfare impacts of global climate change and attributed those adverse impacts to all manmade sources of GHG emission around the world and then, separately,

used data from existing CAA section 202(a) sources in the United States to find that new motor vehicles and engines in the United States contributed to global GHG air pollution. The Administrator treated adaptation (adjustments to the effect of climate change that lessen impacts) and mitigation (reductions in emissions and global GHG concentrations unrelated to CAA section 202(a) regulation) as outside the scope. 74 FR 66512. Moreover, the Administrator declined to consider cost, asserting that the Endangerment Finding imposed no regulatory requirements as a standalone action and relying on the Supreme Court's decision in *Whitman* v. *American Trucking Association,* 531 U.S. 457 (2001), that the EPA cannot consider cost in setting and revising the NAAQS under CAA section 109. 74 FR 66515. Nor did the Administrator consider potential beneficial impacts from climate change with respect to whether and which standards would be appropriate. *See* 74 FR 66524 (purporting to compare "risks and benefits" only with respect to endangerment).

Severance also shaped all subsequent standards prescribed and revised in reliance on the Endangerment Finding in a manner we propose to conclude was unlawful. The EPA asserted in subsequent rulemakings that there was no need to make particularized findings for the relevant source category because the Endangerment Finding identified public health and welfare dangers and contribution for all CAA section 202(a) source categories. Nor did we consider the impacts of adaptation or mitigation or consider when prescribing standards whether, in light of more recent empirical data, the Endangerment Finding's analysis of endangerment and contribution remained accurate with respect to the source category at issue. As a result, the decision to sever meant that the EPA has never meaningfully considered or invited public comment on the cost, effectiveness, and continued propriety of its GHG regulatory program.

We propose that these considerations should have been taken into account when the 2009 Endangerment Finding intentionally triggered a duty to regulate by invoking our CAA section 202(a) authority. CAA section 202(a)(2) expressly provides that "[a]ny regulation prescribed under paragraph (1) of this subsection . . . shall" provide adequate time for "the development and application of the requisite technology, giving appropriate consideration to the cost of compliance within such

period." [64] CAA section 202(a)(1) authorizes the Administrator to "by regulation prescribe" standards "in accordance with the provisions of this section" and does not separately authorize standalone findings, meaning any action taken "under paragraph (1) of this subsection" is subject to the considerations in paragraph (2). That statutory language aside, the Supreme Court explained in *Michigan* that "agency action is lawful only if it rests 'on a consideration of the relevant factors,'" 576 U.S. at 750 (quoting *State Farm,* 463 U.S. at 43), including "at least some attention to cost," *id.* at 752. We propose that the Administrator erred in analogizing to the NAAQS program and the Supreme Court's decision in *Whitman* to avoid considering costs in the Endangerment Finding. Unlike CAA section 202(a), the language in CAA section 109(b) makes no reference to cost or implementation and focuses solely on safety and an adequate margin to protect public health. Nor does CAA section 109(b) include the lead time and technical feasibility concepts embedded in CAA section 202(a). And whereas CAA section 202(a) sets out an integrated authority to prescribe emission standards when the provision's triggering condition is satisfied, CAA section 109(b) uses mandatory language requiring the EPA to establish certain standards, the content and implementation of which are specified in various provisions throughout Title I of the Act. We further propose that the Supreme Court's decision in *Massachusetts* did not address the question whether the EPA could issue standalone findings or bar the Administrator from taking cost and implementation concerns into account when exercising CAA section 202(a) authority. Rather, *Massachusetts* must be read together with *Michigan,* and the language of CAA section 202(a)(1) must be read in context to "produc[e] a substantive effect that is compatible with the rest of the law." *UARG,* 573 U.S. at 321 (quoting *United Sav. Ass'n of Tex.* v. *Timbers of Inwood Forest Assocs.,* 484 U.S. 365, 371 (1988)).

*Endangerment and Cause or Contribute.* The EPA also proposes that CAA section 202(a) requires the Agency to evaluate whether source emissions cause or contribution to air pollution and whether that air pollution poses endangerment in a single causal chain, rather than considering these issues in isolation by severing the inquiries. The relevant inquiry is whether "the emission of any air pollutant from any class or classes of new motor vehicles or

---

[62] *See* 42 U.S.C. 7408, 7409, 7410.

[63] 33 U.S.C. 1313(c)(4), (c)(4)(B). Various provisions of the Safe Drinking Water Act (SDWA) and Toxic Substances Control Act (TSCA) similarly articulate multi-step processes for determining risk and addressing risk through regulation using language that Congress did not include in CAA section 202.

[64] 42 U.S.C. 7521(a)(2).

new motor vehicle engines,'' in the judgment of the Administrator, ''cause, or contribute to, air pollution which may reasonably be anticipated to endanger public health or welfare.'' As explained in this section, the emission must cause or contribute to the danger posed by the air pollution to a sufficient extent to satisfy the standard for regulation.

In the Endangerment Finding, the Administrator made two distinct findings based on two distinct sets of assumptions. In the first, the Administrator found that the ''air pollution,'' defined as the combined elevated global concentrations in the upper atmosphere of six ''well-mixed GHGs,'' $CO_2$, methane, $NO_X$, HFCs, PFCs, and $SF_6$, endangered public health or welfare by playing a causal role in global temperature increases and ocean pH changes, which, in turn, were then asserted to play a causal role in environmental phenomena with adverse impacts on public health and welfare. 74 FR 66516. In the second, the Administrator found that the ''air pollutant'' (defined as the combination of same six ''well-mixed GHGs'') emitted by new motor vehicles and engines contributed to the ''air pollution.'' 74 FR 66536. Nowhere in the Endangerment Finding did the Administrator consider the extent to which emissions from CAA section 202(a) sources have a more than *de minimis* effect on the *danger* identified with respect to elevated concentrations of GHGs in the upper atmosphere—let alone whether emissions from any particular class or classes of sources that EPA intended to regulate had such an effect.

Upon review, we no longer believe that the approach taken in the Endangerment Finding was consistent with the language of CAA section 202(a) and the structure of the CAA, which requires making distinct findings for regulating distinct types of emission sources and authorizes different regulatory tools when such standards are met. For example, CAA section 111(b)(1)(A) authorizes the EPA to regulate emissions from listed categories of stationary sources if the Administrator determines those sources emit air pollutants that ''significantly contribute'' to dangerous air pollution.[65] When that standard is met, CAA section 111(b)(1)(B) requires the EPA to regulate such emissions from such sources by setting standards of performance that, among other things, reflect the best system of emission reduction that has been adequately demonstrated in

practice.[66] The CAA similarly sets out distinct standards for regulating and distinct modes of regulation for additional major source categories, including vehicles in use, aircraft engines, and separately addresses when and how to respond to international emissions that impact the United States. The Endangerment Finding effectively attributed the total GHG emissions coming from all of these various distinct sources within the United States, as well as from all international sources, to the mobile sources regulated under CAA section 202(a) without having made the requisite determinations for any of those sources and without considering the different regulatory tools Congress authorizes for those sources as compared to CAA section 202(a) sources. The Administrator defined the relevant ''air pollution'' as the combination of six ''well-mixed GHGs'' but found that CAA section 202(a) sources emitted only four of them: $CO_2$, methane, $NO_X$, and HFCs. 74 FR 66538. As a result, the ''air pollution'' identified as endangering public health or welfare included PFCs and $SF_6$, and the ''air pollution'' used to conclude that CAA section 202(a) sources satisfy the regulatory standard did not. Contrary to the EPA's conclusion at the time, 74 FR 66541, that difference is material, as PFCs and $SF_6$ are asserted to have many times the global warming potential of $CO_2$.[67] Severing the endangerment and cause-or-contribute analysis allowed the Agency to compare apples and oranges in a manner the statute does not authorize.

The Endangerment Finding also did not limit its analysis of contribution to ''*new* motor vehicles or *new* motor vehicle engines'' in the United States, which are the only sources covered by the EPA's CAA section 202(a) authority.[68] Because the Administrator considered all sources in analyzing the danger posed by elevated concentrations of GHGs in the upper atmosphere, the endangerment analysis necessarily included emissions from foreign and domestic vehicles that had been in use for years or decades and were not ''new.'' Even when analyzing contribution, the Administrator used emission estimates from ''the entire fleet

of motor vehicles in the United States for a certain calendar year'' rather than projecting emissions from new motor vehicles and engines over time. 74 FR 66543. That decision increased the absolute contribution figure by orders of magnitude, including because newer vehicles and engines tend to be more efficient and emit less.[69] Difficulties in disaggregating emission data from emission sources, however reasonable, do not license us to read the term ''new'' out of the statutory text.

We are also concerned that severing the endangerment and cause or contribution findings leads to untenable results and lacks any limiting principle. To illustrate the problem, the same logic would allow the EPA to issue emission standards for water vapor ($H_2O$), another substance emitted by new motor vehicles and engines that is also considered a powerful GHG. Considered in isolation, $H_2O$ concentrations in the atmosphere can be said to endanger public health or welfare by resulting in rain that leads to slip-and-fall injuries, drownings, and damage to crops, livestock, and property, including through pools, rivers, and floodwater, although water vapor is not itself harmful and is necessary to sustain life. Also considered in isolation, CAA section 202(a) sources can be said to ''contribute'' to elevated $H_2O$ concentrations in the atmosphere from all anthropogenic sources, and these emissions of water vapor would thereby assertedly ''contribute'' to global climate effects similar to those attributed to other GHGs. CAA section 202(a) does not contemplate prescribing emission standards for such an omnipresent, naturally occurring, and essential component of the ambient air, and stakeholders have not petitioned for such regulation, because the text requires analyzing the extent to which emissions contribute to the danger. The logic of regulating water vapor would appear to be absurd, but it is the same logic required to regulate GHGs under CAA section 202(a).

We further propose that the decision to sever the analysis of endangerment from the analysis of contribution, combined with the decision to sever the Administrator's findings from any standards prescribed as a result, produced an analysis that is incompatible with the statute. In the Endangerment Finding, the Administrator concluded that anything more than a trivial or *de minimis*

---

[65] 42 U.S.C. 7411(b)(1)(A).

[66] 42 U.S.C. 7411(a)(1), (b)(1)(B). CAA section 111 also differentiates between new and existing stationary sources in a listed source category and limits the EPA's role with respect to existing sources by authorizing only emission guidelines implemented by the States. 42 U.S.C. 7411(d).

[67] U.S. Environmental Protection Agency. (Last updated Jan. 16, 2025). Understanding Global Warming Potentials: *https://www.epa.gov/ ghgemissions/understanding-global-warming- potentials*.

[68] 42 U.S.C. 7521(a)(1) (emphases added).

[69] For additional discussion of improvements in new motor vehicles and engines relative to older vehicles and engines, see section V of this preamble.

contribution to elevated global GHG concentrations by CAA section 202(a) sources was sufficient to trigger regulation because the ''unique, global aspects of the climate change problem tend to support contribution at lower percentage levels of emissions than might otherwise be considered appropriate when addressing a more typical local or regional air pollution problem.'' 74 FR 66538. Because the Endangerment Finding did not consider the standards that the statute requires when the Administrator makes such a finding, we did not consider whether emission standards for new motor vehicles would be futile as a means to address the identified dangers of GHG emissions from all anthropogenic sources. As discussed in sections IV.A and IV.B of this preamble, reducing GHG emissions from all vehicles and engines in the United States to zero would not have a scientifically measurable impact on GHG emission concentrations or global warming potential (2025 CWG Draft Report at 130).[70] It was foreseeable at the time that issuing the Endangerment Finding would trigger a duty to regulate, and that extraordinarily stringent measures would be necessary under *all* of the EPA's separate statutory authorities, and not just CAA section 202(a), to have *any* potentially measurable impact on the identified harm. Additionally, the EPA did not consider ''carbon leakage,'' which ''refers to the situation that may occur if, for reasons of costs related to climate policies, businesses were to transfer production to other countries with laxer emission constraints . . . [and] could lead to an increase in their total emissions.'' [71] Foreign governments have recognized that carbon leakage can mitigate or even lead to an increase in total emissions which would significantly impact the claimed benefits of the regulatory actions.[72] Accordingly, we propose that refusing to consider these foreseeable consequences was inconsistent with the statutory scheme and, as explained further below, arbitrary and capricious and an abuse of discretion.

Finally, we propose that the Administrator did not adequately consider the meaning in context of the statutory term ''endanger'' and failed to identify with sufficient rigor the purported danger linked to GHG emissions from new motor vehicles and engines. We propose that ''endanger'' as used in CAA section 202(a) cannot mean merely any predicted negative impact to any public health or welfare value, as that interpretation would render the constraint placed on the EPA's authority to prescribe standards essentially meaningless, thereby violating ordinary principles of statutory interpretation and raising constitutional nondelegation concerns. We further propose that severing the endangerment and contribution inquiries improperly allowed the Administrator to avoid this concern by concluding that new motor vehicle and engine emissions included more than *de minimis* GHG emissions, even if those emissions did not themselves contribute to a danger in any meaningful sense. *See* 74 FR 66543 (asserting that ''contributors must do their part even if their contributions to the global problem, measured in terms of percentage, are smaller than typically encountered''). We therefore seek comment on whether this aspect of EPA's interpretation and application of the statutory provision in 2009 was defective and whether, either on its own or in combination with the other bases and rationales presented here, this issue provides additional grounds for rescinding the Endangerment Finding and resulting GHG emission standards for new motor vehicles and engines.

2. Lack of Clear Congressional Authorization

The EPA further proposes that, at a minimum and in addition to the interpretation set out above, we lack the ''clear congressional authorization'' required under the major questions doctrine to decide the Nation's response to global climate change concerns. *West Virginia,* 597 U.S. at 723 (quoting *UARG,* 573 U.S. at 324). In this subsection, we propose that the major questions doctrine applies to the Endangerment Finding because the global climate change concerns addressed in that action, and the mandatory duty to regulate triggered by that action, present a major question of undeniable political and economic significance. Next, we propose that Congress did not clearly authorize the EPA to decide this question when it empowered the Administrator to ''prescribe . . . standards'' for new motor vehicle and engine emissions under CAA section 202(a). On that basis, we propose to conclude that the Endangerment Finding and resulting GHG emission standards exceeded our statutory authority and should be rescinded. That conclusion follows from the Supreme Court's decisions in *UARG* and *West Virginia* and is consistent with *Massachusetts,* which held that GHGs fell within the definition of ''air pollutant'' but did not interpret the scope of our authority to regulate air pollutants that cause, or contribute to, air pollution which may reasonably be anticipated to endanger public health or welfare.

*Applicability of the Major Questions Doctrine.* In recent decisions construing the scope of the EPA's statutory authority to regulate GHGs, the Supreme Court has emphasized that the '' 'history and breadth of the authority' '' asserted by an agency and ''the 'economic and political significance' of that assertion'' provide '''a reason to hesitate before concluding that Congress' meant to confer such authority.'' *West Virginia,* 597 U.S. at 721 (quoting *Brown & Williamson,* 529 U.S. at 159–60); *accord UARG,* 573 U.S. at 324. Whether viewed as an ordinary tool of statutory interpretation that looks to the structure of the regulatory scheme [73] or a clear statement rule that implements nondelegation and separation of power principles,[74] the major questions doctrine requires us to identify ''more than a merely plausible textual basis'' when asserting authority to decide a significant policy issue on Congress' behalf. *Id.* at 723.

In *UARG,* the Supreme Court applied the major questions doctrine to reject our attempt to regulate GHG emissions from stationary sources subject to the CAA's prevention of significant deterioration (PSD) and Title V permitting requirements based on the global climate change concerns identified in the Endangerment Finding. 573 U.S. at 311–13.[75] The Court held that the EPA had ''exceeded its statutory authority when it interpreted the Clean Air Act to require PSD and Title V permitting for stationary sources based on their greenhouse gas emissions'' and ''may not treat greenhouse gases as a pollutant'' in the PSD and Title V contexts. *Id.* at 333. In reaching this conclusion, the Court found that our interpretation of the statute and related ''tailoring rule'' that exempted many sources to address workability concerns was ''unreasonable because it would bring about an enormous and transformative expansion in EPA's regulatory authority without clear congressional authorization.'' *Id.* at 324. Citing earlier major questions doctrine

---

[70] *See* Lomborg, B. (2016). Impact of Current Climate Proposals. *Global Policy,* 7(1) 109–118: *https://doi.org/10.1111/1758-5899.12295.*

[71] Carbon leakage. (2019). *European Commission: https://climate.ec.europa.eu/eu-action/eu-emissions-trading-system-eu-ets/free-allocation/carbon-leakage_en.*

[72] *See, e.g., id.*

[73] Biden v. Nebraska, 600 U.S. 477, 507–21 (2023) (Barrett, J., concurring).

[74] *West Virginia,* 597 U.S. at 735–51 (Gorsuch, J., concurring).

[75] *See* 42 U.S.C. 7470–92, 7661 *et seq.*

precedents, the Court noted that "a measure of skepticism" is required when "an agency claims to discover in a long-extant statute an unheralded power to regulate 'a significant portion of the American economy,'" *id.* (quoting *Brown & Williamson,* 529 U.S. at 159), and that "[w]e expect Congress to speak clearly if it wishes to assign to an agency decisions of vast 'economic and political significance,'" *id.* (quoting *Brown & Williamson,* 529 U.S. at 160).

In *West Virginia,* the Supreme Court again applied the major questions doctrine to reject our attempt to shift the power grid away from using fossil fuels through GHG emission guidelines for existing power plants under CAA section 111(d). 597 U.S. at 711–15.[76] The Court noted that when interpreting a grant of regulatory authority, the inquiry includes the question "whether Congress in fact meant to confer the power the agency has asserted." *Id.* at 721. The Court explained that the major questions doctrine applies when "the 'history and breadth of the authority that [the agency] has asserted,' and the 'economic and political significance' of that assertion, provide 'a reason to hesitate before concluding that Congress' meant to confer such authority." *Id.* (quoting *Brown & Williamson,* 529 U.S. at 159–60). In such cases, "both separation of powers principles and a practical understanding of legislative intent make us 'reluctant to read into ambiguous statutory text' the delegation claimed to be lurking there," and "[t]he agency instead must point to 'clear congressional authorization' for the power it claims." *Id.* at 723 (quoting *UARG,* 573 U.S. at 324). Applying that standard, the Court held that our statutory authority to establish emission limits under CAA section 111(a)(1) and (d) "is not close to the sort of clear authorization required by our precedents." *Id.* at 732.

We propose that the Endangerment Finding implicates the major questions doctrine for the same reasons the Supreme Court applied it in *UARG* and *West Virginia.* By asserting jurisdiction to regulate in response to global climate change concerns, the EPA "'claim[ed] to discover in a long-extant statute an unheralded power' representing a 'transformative expansion in [its] regulatory authority.'" *West Virginia,* 597 U.S. at 724 (quoting *UARG,* 573 U.S. at 324). We note that the regulatory

actions reviewed in *UARG* and *West Virginia* were predicated in part on the Endangerment Finding and propose that the PSD and Title V rules in *UARG* and existing source emission guidelines in *West Virginia* are similar in scope, approach, and economic impact as the GHG emission standards for new motor vehicles and engines promulgated to fulfill the mandatory duty triggered by the Endangerment Finding. As a consequence of the novel approach taken in the Endangerment Finding to endangerment and contribution, our GHG emission standards mandate an increased and faster shift from gasoline-fueled vehicles to electric vehicles on the theory that a substantial reduction in GHG emissions is necessary to address global climate change concerns.[77] We propose that mandating a shift in the national vehicle fleet from one type of vehicle to another is indistinguishable from the emission guidelines at issue in *West Virginia,* which were calculated to force a shift from one means of electricity generation to another.

We further propose it is "'highly unlikely that Congress would leave' to 'agency discretion' the decision" of how much gasoline should be used by vehicles and engines in the United States. *West Virginia,* 597 U.S. at 729 (quoting *MCI Telecomms. Corp.* v. *AT&T Co.,* 512 U.S. 218, 231 (1994)). As the Supreme Court noted with respect to coal-based electricity generation, such a policy decision involves "basic and consequential tradeoffs," and "Congress certainly has not conferred a like authority upon EPA anywhere else in the Clean Air Act." *Id.* Until the Endangerment Finding, moreover, we had never invoked CAA section 202(a) or any other CAA authority to regulate in response to global climate change concerns, whether through a fuel-shifting strategy or any other means. That history is telling because although CAA section 202(a) has existed in substantially similar form since 1967, "the EPA had never regulated in that manner, despite having issued many prior rules governing" vehicle and engine emissions. *Id.*

When Congress has addressed GHGs individually or collectively, it has not granted the EPA broad regulatory authority comparable to our authority to "prescribe . . . standards" under CAA section 202(a). With respect to HFCs, Congress enacted a comprehensive phaseout scheme in the 2020 American Innovation and Manufacturing (AIM) Act, which includes detailed instructions, timelines, and

requirements for implementation and allows some uses to continue under certain conditions.[78] With respect to $CO_2$, Congress opted for a carrot rather than a stick by authorizing a tax credit to incentivize underground sequestration that mitigates emissions.[79] With respect to methane, Congress amended the CAA in 2021 through the Inflation Reduction Act of 2022 (IRA) to require us to establish a waste emissions charge for certain sources structured to incentivize emissions reductions over time.[80] When addressing GHGs more generally, Congress has used non-regulatory tools that incentivize, rather than mandate, changes in private ordering, including through additional funding provisions in the IRA.[81] We propose that multiple instances of recent legislation addressing GHGs individually and through distinct regulatory approaches suggests that Congress views such policy decisions as economically and politically significant and not adequately addressed by general statutory authorities enacted in response to different problems.

The EPA notes that Congress has continued to revise these air pollutant-specific measures and nonregulatory tools as part of an ongoing national debate over the appropriate response to global climate change concerns. On July 4, 2025, President Trump signed into law significant new legislation enacted by Congress, the One Big Beautiful Bill Act (OBBB),[82] which repealed a number of relevant measures adopted in the IRA and rescinded the EPA's appropriations to carry out a number of funding programs related to GHG emissions. Among other things, Congress prohibited the Agency from collecting the waste emission charge for methane for ten years beyond the original statutory collection date, rescinded funding to administer grant programs in CAA sections 132 and 135–38, and repealed CAA section 134, which had included a section-specific definition of "greenhouse gas" applicable to the grant

[76] *See* 42 U.S.C. 7411(d). The EPA had also issued GHG performance standards for new and modified fossil fuel-fired power plants under CAA section 111(b) that triggered the Agency's authority to issue guidelines for existing sources under CAA section 111(d). The new source standards were not before the Supreme Court in *West Virginia.*

[77] 89 FR 27842, 27844.

[78] Public Law 116–260, Div. S, codified at 42 U.S.C. 7675 *et seq.*

[79] 26 U.S.C. 45Q. In 2020, Congress also instructed us to recommend improvements to SDWA permitting procedures for injection wells used in carbon sequestration and appropriated additional fundings for the "Class VI" permitting process. Public Law 116–260, Div. G, Title II.

[80] Public Law 117–169, codified at 42 U.S.C. 7436.

[81] *See, e.g.,* Public Law 117–169, codified at 42 U.S.C. 7432–7438. We also note that CAA section 211(o)(2)(B)(ii) requires the EPA to consider "the impact of the production and use of renewable fuels on the environment, including on . . . climate change," among many other factors, in setting volumes under the RFS program. 42 U.S.C. 7545(o)(2)(B)(ii).

[82] Public Law 119–21.

program set out in that section.[83] We propose that this legislation, which was the product of substantial national debate and revised and rescinding funding for provisions of the IRA that were themselves the product of substantial national debate, indicates that the EPA erred in attempting to resolve significant policy issues on its own accord in the Endangerment Finding.

Congress has also recently disapproved several actions taken by the EPA with respect to GHG emissions. On May 19, 2025, President Trump signed into law a resolution adopted by Congress under the Congressional Review Act (CRA) to void our final rule implementing the waste emission charge added to the CAA in 2021.[84] And on June 12, 2025, President Trump signed into law three resolutions adopted by Congress under the CRA to void waivers we granted under CAA section 209 that allowed California and participating States to enforce GHG emission regulations for motor vehicles and engines, up to and including zero-emissions standards that mandated a shift to electric vehicles.[85] We propose that these disapproval resolutions further demonstrate the economic and political significance of the EPA's GHG emission regulations and reinforce the understanding that Congress intends to reserve such major questions of policy for itself. *See West Virginia,* 597 U.S. at 731–32.

*Proposed Conclusion.* Under our proposal that the major questions doctrine applies, we propose to conclude that the EPA lacks the "clear congressional authorization" required for the novel approach taken in the Endangerment Finding and resulting GHG emission standards and must rescind these actions. *West Virginia,* 597 U.S. at 723 (quoting *UARG,* 573 U.S. at 324). We propose that our statutory authority under CAA section 202(a) to "prescribe . . . standards" does not clearly authorize the EPA to regulate in response to global climate change concerns or, in issuing such regulations, to mandate a shift from gasoline-powered vehicles to electric vehicles.

In *West Virginia,* the Supreme Court held that our authority "to establish emission caps at a level reflecting 'the application of the best system of

emission reduction . . . adequately demonstrated' " did not clearly authorize the EPA to issue emission guidelines that addressed global climate change concerns by mandating a shift away from coal-generated electricity. 597 U.S. at 732. Similarly, in *UARG,* the Court held that our PSD and Title V authorities could not be extended to GHG emissions because those provisions "are designed to apply to, and cannot rationally be extended beyond, a relative handful of large sources capable of shouldering heavy substantive and procedural burdens." 573 U.S. at 303.

We propose that these cases control the analysis of our authority under CAA section 202(a). As in *West Virginia,* our statutory authority and the findings required to invoke that authority do not clearly authorize the approach taken in the Endangerment Finding and subsequent regulations. And as in *UARG,* our statutory authority to "prescribe . . . standards" for emissions of certain air pollutants does not clearly authorize using the CAA's vehicle-emission control scheme to address global climate change. As discussed above, the Endangerment Finding did not limit itself to considering the impacts of GHG emissions from new motor vehicles and engines. Rather, the Endangerment Finding reviewed the totality of adverse impacts from climate change attributed to all anthropogenic sources of GHG emissions worldwide and asserted jurisdiction over CAA section 202(a) sources by finding they contributed to such impacts by emitting more than *de minimis* quantities of GHGs. That understanding has permeated our GHG emission rulemakings since 2009, and we have attempted to apply that framework to our distinct regulatory authorities for stationary sources and aircraft.

In *Massachusetts,* the Supreme Court disagreed with the EPA's argument that GHGs were not "air pollutants" because Congress had not revisited CAA section 202(a) in amending the CAA in 1990. 549 U.S. at 512–13. The Court found that our reliance on *Brown & Williamson* to support that argument was misplaced because unlike the ban on tobacco products at issue in that case, "EPA jurisdiction would lead to no such extreme measures." *Id.* at 531. The Court also found that unlike the Food and Drug Administration's earlier statements on tobacco products, "EPA had never disavowed the authority to regulate greenhouse gases" and had issued a memorandum in 1998 suggesting that we had such authority. *Id.*

We propose that *Massachusetts* did not consider or have reason to interpret the scope of the EPA's authority under CAA section 202(a) given our position in the 2003 Denial that GHGs are not "air pollutant[s]" under any provision of the statute. Rather, we propose *Massachusetts* rejected our position that GHGs are "categorically" excluded from the CAA and remanded for the Administrator to determine whether four GHGs met the standard in CAA section 202(a). *UARG,* 573 U.S. at 320. We further propose that *Massachusetts* must be read together with the Supreme Court's decisions in *West Virginia* and *UARG,* which applied the major questions doctrine to statutory provisions similar to CAA section 202(a). To that end, we seek comment on whether *Massachusetts* applied the major questions doctrine in the first instance,[86] and, if it did, whether that analysis informs the meaning of CAA section 202(a) on its own terms and in light of *UARG* and *West Virginia.* Finally, we propose that the EPA's course of rulemaking has not been limited to emission standards as anticipated in *Massachusetts.* We seek comment on whether a new major questions doctrine analysis is required because the EPA's rulemakings in response to the Endangerment Finding have included electric vehicle mandates that require shifting the national vehicle fleet from one type of vehicle and vehicle fuel to another.

### B. Alternative Rationale for Proposed Rescission

In the alternative, the EPA proposes that even if CAA section 202(a) could be read to authorize prescribing GHG emission standards for new motor vehicles and engines, the Endangerment Finding unreasonably applied the statutory standard for regulation to the scientific record and should be rescinded on that basis. This subsection proposes several reasons that the Administrator would exercise his discretionary judgment differently today in light of intervening legal and scientific developments that appear to undermine the assumptions, methodologies, and conclusions of the Endangerment Finding.

#### 1. Climate Science Discussion

The Administrator reviewed available information, including the most recently available scientific information, bearing on the assumptions and conclusions in

---

[83] 42 U.S.C. 7434(c)(2) (2022).

[84] Public Law 119–2; *see* 90 FR 21225 (May 19, 2025).

[85] H.J. Res. 87; H.J. Res. 88; H.J. Res. 89; *see also Diamond Alt. Energy, LLC* v. *EPA,* No. 24–7, slip op. at 4 n.1 (U.S. June 20, 2025); Statement by the President (June 12, 2025): *https://www.whitehouse.gov/briefings-statements/2025/06/statement-by-the-president/.*

[86] We note that recent Supreme Court decisions have not cited *Massachusetts* as a precedent applying, or declining to apply, the major questions doctrine. *See, e.g., Nebraska,* 600 U.S. 477; *West Virginia,* 597 U.S. 697.

the Endangerment Finding, the impacts of global GHG concentrations on public health and welfare in the United States, and the relative contribution of domestic emissions from new motor vehicles and engines to global GHG concentrations. As previously explained, this review included the 2025 CWG Draft Report, which analyzes empirical data, peer-reviewed studies, and available scientific information bearing on direct human influence on ecosystems and climate, climate response to $CO_2$ emissions, and impacts on ecosystems and society.[87] The Administrator also considered available assessments by the U.S. Government and relevant international bodies, including the Third, Fourth, and Fifth NCAs reported by the USGCRP and AR5 and AR6 by the United Nations IPCC. The Administrator also considered critiques of the NCAs, and the Fifth NCA in particular, and reviewed these analyses for consistency with OMB information quality guidelines[88] and the transparency and reliability requirements of Executive Order 14303, ''Restoring Gold Standard Science.''[89]

The Endangerment Finding itself acknowledged significant uncertainties related to climate change and its potential impacts when it stated that the ''inherent uncertainty in the direction, magnitude and/or rate of certain future climate change impacts opens up the possibility that some changes could be more or less than expected, and the possibility of unanticipated outcomes.'' 74 FR 66524. Specifically, the Endangerment Finding identified uncertainties including, but not limited to: the net health impacts of a temperature increase due to decreases in cold-related mortality, 74 FR 66497, 66526; increases in allergenic illnesses and pathogen borne disease vectors, 74 FR 66498; food production and crop yields, including the scope of potential beneficial impacts from climate change, 74 FR 66498, 66535; temperature at the end of the 21st Century, 74 FR 66519; records of temperature before 1600 A.D., 74 FR 66523; estimates and future projections of anthropogenic aerosols

and their respective heating or cooling effects, 74 FR 66519; the extent to which human-induced climate change affects the intensity and frequency of extreme weather events, 74 FR 66531; and emissions from future fleet motor vehicles, which could be impacted by a number of technological, economic, and independent regulatory factors, 74 FR 66543.

With respect to projected increases in GHG concentrations and global temperatures, the projections relied upon in the Endangerment Finding appear unduly pessimistic in light of empirical observations made after it was finalized in 2009 through 2024. The Endangerment Finding relied primarily on IPCC AR4 to predict global temperature increases between 1.8 and 4 degrees Celsius by 2100, an extremely wide and variable range that necessarily impacts the existence, extent, and severity of anticipated dangers to public health and welfare. 74 FR 66519. However, as previously noted, IPCC scenarios depicting worst-case, ''business as usual'' assessments have been criticized as misleading (2025 CWG Draft Report at 16),[90] and empirical data suggest that actual GHG emission concentration increase and corresponding warming trends through 2025 have tracked the IPCC's more optimistic scenarios (2025 CWG Draft Report at 18).[91] Recent scientific analyses propose that this divergence may be explained by greater capacity for the climate to reuptake GHGs in the atmosphere through natural processes. Terrestrial ecosystems have demonstrated a greater than anticipated sensitivity to elevated $CO_2$ concentrations in the form of enhanced plant growth, which results in greater

removal of $CO_2$ from the atmosphere as plants take up $CO_2$ and return it to the soil through natural life cycles. Similarly, the oceans have demonstrated a greater capacity to take up and process $CO_2$ (including through aquatic plant life) without resulting in the anticipated negative impacts on pH and ocean ecosystems, including coral reefs (2025 CWG Draft Report at 6–9, 18–20).[92]

Relatedly, recent empirical data and analyses suggest that the Endangerment Finding was unduly pessimistic in attributing health risks from heat waves to increases in global temperature. Notwithstanding increased public attention to heat waves, the data suggest that domestic temperatures peaked in the 1930s and have remained more or less stable, in relative terms, since those highs (2025 CWG Draft Report at 57–60). Moreover, increased urbanization trends contribute to localized changes in temperature, including because an urban footprint traps heat and frustrates natural heat-cycling capacity at a localized and low-atmospheric level (2025 CWG Draft Report at 21–22). Contrary to the Endangerment Finding's assumptions, data continue to suggest that mortality risk from cold temperatures remains by far the greater threat to public health in the United States and around the world at the aggregate level (2025 CWG Draft Report at 112).[93] Although the risk of heat waves featured prominently in the Endangerment Finding, the Administrator acknowledged at the time that significant uncertainties existed about the relative benefits and risks in the United States, and the data since 2009 suggest that the balance of climate change as a whole appears to skew

---

[87] As stated earlier, the 2025 CWG Draft Report was provided to the EPA on May 27, 2025, and was reviewed and relied upon in formulating this proposal. The EPA understands that DOE is releasing an updated version of the CWG draft report and seeking public comment on the updated report, which includes additional information and typographical corrections that the EPA did not rely upon in formulating this proposal. Interested parties may review and comment on the updated version of the CWG draft report for consideration as part of DOE's efforts at *https://www.energy.gov/topics/climate.*

[88] 67 FR 8452 (Feb. 22, 2002).

[89] Executive Order 14303, 90 FR 22601 (May 29, 2025).

[90] *See also* Hausfather, Z. & Peters, G.P. (2020). Emissions—the 'business as usual' story is misleading. *Nature,* 577, 618–620: *https://doi.org/10.1038/d41586-020-00177-3;* Burgess, M.G. et al. (2021). IPCC baseline scenarios have over-projected $CO_2$ emissions and economic growth. *Environmental Research Letters,* 16, 014016: *https://doi.org/10.1088/1748-9326/abcdd2;* Pielke, R., & Ritchie, J. (2020). Systemic Misuse of Scenarios in Climate Research and Assessment Social Sciences Research Network. *SSRN: http://doi.org/10.2139/ssrn.3581777.*

[91] *See also* Hausfather, Z. et al. (2019). Evaluating the Performance of Past Climate Model Projections. *Geophysical Research Letters,* 47(1): *https://doi.org/10.1029/2019GL085378;* Scaffeta, N. (2023). CMIP6 GCM ensemble members versus global surface temperatures. *Climate Dynamics,* 60, 3091–3120: *https://doi.org/10.1007/s00382-022-06493-w;* McKitrick, R. & Christy, J. (2020). Pervasive Warming Bias in CMIP6 Tropospheric Layers. *Earth and Space Science,* 7(9), e2020EA001281: *https://doi.org/10.1029/2020EA001281;* Karl, T.R. et al. (2006). *Temperature Trends in the Lower Atmosphere: Steps for Understanding and Reconciling Differences.* U.S. Climate Change Science Program, Subcommittee on Global Change Research.

[92] *See also* Browman, H.I. (2016). Applying organized skepticism to ocean acidification research. *ICES Journal of Marine Science,* 73(3), 529.1–536: *https://doi.org/10.1093/icesjms/fsw010;* Clements, J.C. et al. (2022). Meta-analysis reveals an extreme ''decline effect'' in the impacts of ocean acidification on fish behavior. *PLOS Biology,* 20(2), e3001511: *https://doi.org/10.1371/journal.pbio.3001511;* Friedlingstein, P. et al. (2024). Global Carbon Budget 2024. *Earth System Science Data,* 14(4): *https://essd.copernicus.org/preprints/essd-2024-519;* Haverd, V. et al. (2020). Higher than expected $CO_2$ fertilization inferred from leaf to global observations. *Global Change Biology,* 26, 2390–2402: *https://doi.org/10.1111/gcb.14950;* Zeng, Z. et al. (2017). Climate mitigation from vegetation biophysical feedbacks during the past three decades. *Nature Climate Change,* 7, 432–436: *https://doi.org/10.1038/nclimate3299.*

[93] *See also* Zhao, Q. et al. (2021). Global, regional, and national burden of mortality associated with non-optimal ambient temperatures from 2000 to 2019: a three-stage modelling study. *The Lancet Planetary Health,* 5(7): *https://doi.org/10.1016/s2542-5196(21)00081-4;* Gasparini, A. et al. (2015). Mortality risk attributable to high and low ambient temperature: a multicounty observational study. *The Lancet,* 386(9991), 369–375: *https://doi.org/10.1016/S0140-6736(14)62114-0.*

substantially more than previously recognized by the EPA in the direction of net benefits, or is at least too uncertain to establish a credible and reliable finding of actionable risk, as discussed further below.

With respect to extreme weather events, the Endangerment Finding projected adverse health impacts from increased frequency and severity of hurricanes, flooding, and wildfires. *E.g.,* 74 FR 66498. Recent data and analyses suggest, however, that despite increased public attention and concern, such extreme weather events have not demonstrably increased relative to historical highs (2025 CWG Draft Report at 65–72, 111).[94] In reviewing the assumptions and conclusions regarding extreme weather events in the Endangerment Finding, the empirical bases asserted appear to be more generalized and unsupported than previously believed and no longer inspire the same degree of confidence. The Administrator further notes that the risks anticipated in the Endangerment Finding resulted, in part, from the Agency's decision at the time to categorically exclude consideration of adaptation and mitigation that should have been incorporated into the analysis as credible and relevant information. We propose that the data on weather events, coupled with the Agency's decision to exclude mitigation and adaptation information from the analysis, fatally undermines the Endangerment Finding's conclusions in this respect.

The Endangerment Finding also identified public health and welfare impacts from projected increases in sea level and related weather and climactic events. However, on this issue, too, recent data and analyses suggest that aggregate sea level rise has been minimal, at least with respect to impacts on the United States, and that sea level has risen in some domestic localities while falling in others (2025 CWG Draft Report at 75–80). The Administrator also questions whether it was appropriate for the Endangerment Finding to exclude any analysis of adaptation with respect to sea level rise in particular. Population growth, infrastructure development, and local and regional planning decisions have been dynamic in coastal areas since 2009, with different trends in different coastal areas and different choices made independently of the EPA's regulatory actions by state and local governments and private entities. The lack of analysis of adaptation generally, and particularly with respect to sea level rise, reduces confidence in the reasonableness, accuracy, and reliability of the assumptions and conclusions in the Endangerment Finding.

The difficulties with parsing the scientific record continue, and they go to the root of what methodologies should be given most credence in making any scientific determinations. The Endangerment Finding consistently cites climate models as showing or predicting warming trends, melting ice, anthropogenic droughts, shrinking snowpack, damage to aquatic systems of life, and increased ocean temperature and acidity. *E.g.,* 74 FR 66523, 66532. However, the data relied upon as inputs to these models may be based on inaccurate assumptions. (2025 CWG Draft Report at 14–22).[95] To name but a few instances: the Northern hemispheric winter snow cover has not decreased in line with the models used in the Endangerment Finding; aquatic life is largely adapted for and has undergone oceanic pH changes throughout the Earth's history, and the data used by the Endangerment Findings and predictions of coral decline has not been supported by empirical data showing an unexpected growth in coral reef ecosystems (2025 CWG Draft Report at 7–12, 40–41).[96] In addition, the models relied upon by the Endangerment Finding may be incorrect with regard to warming in the U.S. Corn Belt given the divergence of recent empirical data from projected trends (2025 CWG Draft Report at 32–47).

The Administrator is also troubled by the Endangerment Finding's seemingly inconsistent treatment of the nature and extent of the role human action with respect to climate change. The Endangerment Finding attributes the entirety of adverse impacts from climate change to increased GHG concentrations, and it attributes virtually the entirety of increased GHG concentrations to anthropogenic emissions from all sources. But the causal role of anthropogenic emissions is not the exclusive source of these phenomena, and any projections and conclusions bearing on the issue should be appropriately discounted to reflect additional factors. Moreover, recent data and analyses suggest that attributing adverse impacts from climate change to anthropogenic emissions in a reliable manner is more difficult than previously believed and demand additional analysis of the role of natural factors and other anthropogenic factors such as urbanization and localized population growth (2025 CWG Draft Report at 14–22, 82–92).[97]

In addition, and as noted in particular contexts above, the Administrator is concerned that the Endangerment Finding did not adequately balance the projected adverse impacts attributed to global climate change with the potential benefits to the United States of increased GHG concentrations, and increased $CO_2$ concentrations in particular. Unlike virtually every other gas regulated under the CAA, $CO_2$ is necessary for human, animal, and plant life, and advances public health and welfare by directly impacting plant growth and therefore the price and availability of food, the success of American agricultural and related

---

[94] *See also* Masson-Delmotte, V. et al. (2021) Climate Change 2021: The Physical Science Basis. Contribution of Working Group I to the Sixth Assessment Report of the Intergovernmental Panel on Climate Change. *Cambridge University Press: https://doi.org/10.1017/9781009157896;* Klotzbach, P.J. et al. (2018). Continental U.S. Hurricane Landfall Frequency and Associated Damage: Observations and Future Risks. *Bulletin of the American Meteorological Society,* 99(7), 1359–1376: *https://doi.org/10.1175/BAMS-D-17-0184.1;* Hodgkins, G.A. et al. (2017). Climate-driven variability in the occurrence of major floods across North America and Europe. *Journal of Hydrology,* 552, 704–717: *https://doi.org/10.1016/j.jhydrol.2017.07.027;* Wuebbles, D.J. et al. (2017). Climate Science Special Report: Fourth National Climate Assessment, Volume I. *U.S. Global Change Research Program: http://doi.org/10.7930/J0J964J6;* Hodgkins, G.A. et al. (2017). Climate-driven variability in the occurrence of major floods across North America and Europe. *Journal of Hydrology,* 552, 704–717: *https://doi.org/10.1016/j.jhydrol.2017.07.027: https://doi.org/10.1016/j.jhydrol.2017.07.027.*

[95] *See also* McKitrick, R. et al. (2012). Long-Term Forecasting of Global Carbon Dioxide Emissions: Reducing Uncertainties Using a Per Capita Approach. *Journal of Forecasting,* 32(5), 435–451: *https://doi.org/10.1002/for.2248.*

[96] *See also* Connolly, R. et al. (2019). Northern Hemisphere Snow-Cover Trends (1967–2018): A Comparison between Climate Models and Observations. *Geosciences,* 9(3), 135: *https://doi.org/10.3390/geosciences9030135;* Annual Summary Report of Coral Reef Condition 2021/22. Continued coral recovery leads to 36-year highs across two-thirds of the Great Barrier Reef. (2022). *Australian Institute of Marine Science: https://www.aims.gov.au/monitoring-great-barrier-reef/gbr-condition-summary-2021-22.*

[97] McKitrick, R. (2013). Encompassing tests of socioeconomic signals in surface climate data. *Climatic Change,* 120(1–2), 95–107: *https://doi.org/10.1007/s10584-013-0793-5;* McKitrick, R. & Nierenberg, N. (2010). Socioeconomic Patterns in Climate Data. *Journal of Economic and Social Measurement,* 35(3–4), 149–175: *https://doi.org/10.3233/JEM-2010-0336;* McKitrick, R. (2021). Checking for model consistency in optimal fingerprinting: a comment. *Climate Dynamics,* 58(1–2), 405–411: *https://doi.org/10.1007/s00382-021-05913-7;* McKitrick, R. (2023). Total least squares bias in climate fingerprinting regressions with heterogeneous noise variances and correlated explanatory variables. *Environmetrics,* 35(2), e2835: *https://doi.org/10.1002/env.2835;* McKitrick, R. (2022). On the choice of TLS versus OLS in climate signal detection regression. *Climate Dynamics,* 60, 359–374: *https://doi.org/10.1007/s00382-022-06315-z;* Connolly, R. et al. (2021). How much has the sun influenced Northern Hemisphere temperature trends? An ongoing debate. *Research in Astronomy and Astrophysics,* 21(6), 131: *https://doi.org/10.1088/1674-4527/21/6/131.*

industries, and the traditional capacity of the United States to export significant food supplies around the world for economic and humanitarian purposes. Recent data and analysis show that even marginal increases in $CO_2$ concentrations have substantial beneficial impacts on plant growth and agricultural productivity, and that this benefit has been significantly greater than previously believed (2025 CWG Draft Report at 6–7, 104–09).

The Administrator also questions the decision in the Endangerment Finding to consider together all six "well-mixed" GHGs rather than analyzing the properties and impacts of each on an individual basis. 74 FR 66537. As noted in the 2008 ANPRM, new motor vehicle and engine emissions of the four GHGs they actually emit have fluctuated and diverged over time, and each has different interactions with the climate and natural environment. Nevertheless, the Endangerment Finding did not undertake individual analyses of these four GHGs and, in fact, aggregated them together along with two additional GHGs not emitted by motor vehicles or motor vehicle engines, thereby undermining the transparency, reliability, and usefulness of the findings. We propose that each of the collectively treated GHGs demonstrates different chemical properties, exhibits different interactions with the natural environment, and present different emissions profiles. The Agency did not analyze, for example, whether the three GHGs other than $CO_2$ emitted by new motor vehicles and engines could be addressed separately in a manner that would impact the ultimate conclusions of endangerment and contribution. Nor did the Agency analyze whether HFCs, which are emitted not by engines but by air conditioning units, could be addressed separately under CAA section 202(a) or another authority in a manner that would impact the ultimate conclusions of endangerment and contribution.

Finally, the Administrator notes that the analyses relied upon in the Endangerment Finding, including the assessment reports of the IPCC and USGCRP that were available at the time and the subsequent iterations of those reports that have been published since 2009, have been criticized on process and quality grounds. Recently, several public watchdog organizations have raised concerns related to the process and quality of the Fifth NCA, which shares the underlying assumptions and conclusions of prior NCAs and IPCC reports. The groups state that NCA5 does not meet the requirements under Executive Order 14303 and deviated

from OMB guidelines on quality, objectivity, utility, and integrity of information disseminated by Federal agencies.

The Administrator takes each of these concerns seriously and seeks public comment on the validity of these concerns and how they should be taken into account when determining whether to finalize any of the alternatives proposed in this action.

### 2. Proposed Conclusions

Based on this review of the Endangerment Finding and the most recently available scientific information, data, and studies, the Administrator proposes to find, in an exercise in discretionary judgment, that there is insufficient reliable information to retain the conclusion that GHG emissions from new motor vehicles and engines in the United States cause or contribute to endangerment to public health and welfare in the form of global climate change. This proposed conclusion is animated both by the Administrator's commitment to analyzing the statutory standard as a cohesive whole and by the scientific record, which includes too many analytical gaps, uncertainties, and speculative predictions to reach an affirmative endangerment finding and promulgate corresponding emission standards based on such a finding.

As explained above, the Administrator previously asserted in the Endangerment Finding that CAA section 202(a) grants "procedural discretion" to sever the findings that trigger regulation from consideration of the resulting regulations and to sever the endangerment analysis from the causation or contribution analysis. We propose that the Administrator would now exercise such discretion differently to ensure greater reliability, transparency, and public accountability in the EPA's invocation of regulatory authority. We note that as a result of the approach taken in the Endangerment Finding, the Administrator's conclusions with respect to new motor vehicles and engines were never subject to SAB review as required by the CAA, and that the public never had the opportunity to participate in a rulemaking that paired the consideration of risk with discussion of the regulatory response, including the effectiveness and cost of potential regulatory approaches. We propose that CAA section 202(a) operates as an integrated whole, and that the EPA's administration of that provision should reflect a reasoned consideration of all relevant factors that is not artificially

severed into distinct findings and rulemakings across time.

In addition, we propose that even if intervening legal developments have not foreclosed the regulation of GHG emissions from new motor vehicles and engines under CAA section 202(a), they provide a reasonable basis for the Administrator to approach the inquiry with greater caution today than was applied in the Endangerment Finding. At a minimum, *Loper Bright* confirms that the EPA can no longer rely on statutory silence or ambiguity to imply authorities and discretion not expressly conferred by statute. In exercising the judgment required by CAA section 202(a), the Administrator would choose to adhere as closely as possible to the statutory language, prior Agency implementation of that language, and the initial approach set out in the 2008 ANPRM. We propose that the Administrator's new approach requires rescinding the Endangerment Finding as fundamentally inconsistent with the framework set out in this proposed alternative.

Moreover, we propose that the Administrator would not now find, in light of the ongoing uncertainties in relevant scientific data and analyses bearing on the question, that the evidence is sufficiently reliable to determine that GHG emissions from new motor vehicles and engines meet the standard for regulation in CAA section 202(a). As discussed in the preamble, the Administrator reviewed the scientific record as part of the reconsideration process and no longer has the degree of confidence previously expressed in the analyses relied upon in the Endangerment Finding, the attribution decisions made in the Endangerment Finding, and the balance of projected adverse impacts and beneficial impacts of climate change struck in the Endangerment Finding.

The EPA seeks comment, for the first time since the 2009 Endangerment Finding was proposed, on whether, due to new scientific information and developments since the 2009 Endangerment Finding, there is a strong enough scientific record to support an affirmative finding that GHG emissions from section 202(a) sources cause or contribute to air pollution which may reasonably be anticipated to endanger public health or welfare. Prompt action is needed to address these concerns, and the Administrator looks forward to stakeholder input on the continuing vitality of the assumptions, predictions, and conclusions animating the 2009 Endangerment Finding.

Additionally, the EPA seeks comment on, if the EPA were to make such a

finding, whether a new comment period would be required and what information would be necessary to provide such a finding. To aid in the EPA's decision making, we also seek comment on the breadth of the Administrator's discretion to exercise judgment by rejecting the approach taken in the Endangerment Finding and the results of adopting a different approach. We also seek comment on any additional aspects of the Endangerment Finding that may have fallen short of the administrative law requirement that agency action be reasonable and reasonably explained. Conversely, we seek comment on why the approach taken in the Endangerment Finding remains reasonable given the legal and scientific developments discussed in this proposal, and the impact, if any, of the EPA's denial of rulemaking petitions in 2022 and 2010 on this alternative proposal. As previously noted, we are also seeking comment on whether the denials in 2022 and 2010 were unlawful for any additional reasons not explored explicitly in this proposal.

## V. Separate Bases for Proposed Repeal of GHG Emission Standards

In this section, the EPA proposes repealing existing GHG emission standards for reasons unrelated to the decision to rescind or retain the Endangerment Finding. CAA section 202(a) requires us to consider additional factors before emission standards issued in response to an endangerment finding may go into effect, including cost, the useful life of the vehicles or engines, and the availability of "requisite technology." [98] Consistent with the language and structure of the statute and the Supreme Court's express reservation of this question in *Massachusetts,* we propose to conclude that policy considerations may be taken into account, at a minimum, when setting standards in response to an endangerment finding or, as here, when determining whether to maintain standards already established.[99]

Specifically, we are proposing that there is no "requisite technology" for emission control for light- and medium-duty vehicles because reducing GHG emissions from such vehicles to zero would not measurably impact GHG concentrations in the atmosphere or the rate of global climate change. Relatedly, we are proposing that there is no "requisite technology" for emission

control for heavy-duty vehicles and engines, even if considered in combination with light- and medium-duty vehicle standards. Finally, we are proposing that GHG emission standards may harm, rather than advance, public welfare as defined in the CAA by reducing fleet turnover that improves air quality, safety, consumer choice, and economic opportunity.

Each of these proposals would, if finalized, serve as an independent and sufficient basis for repealing the relevant GHG emission standards as proposed in section VI of this preamble. The EPA seeks comment on all aspects of these alternative proposed bases for repeal of the GHG emission standards as indicated in the remainder of this section.

### A. There Is No Requisite Technology for Light- and Medium-Duty Vehicles That Meaningfully Addresses the Identified Dangers of the Six "Well-Mixed" GHGs

The EPA proposes to repeal GHG emission standards for light- and medium-duty vehicles because no technology for this source category is capable of preventing or controlling the "air pollution" identified as a danger to public health and welfare in the Endangerment Finding, *i.e.,* global concentrations of GHGs in the upper atmosphere. CAA section 202(a)(1) provides that new motor vehicles and engines may comply with emission standards "as complete systems" or by "incorporat[ing] devices to prevent or control" the air pollution that endangers public health or welfare.[100] CAA section 202(a)(2) further provides that emission standards cannot go into effect until "after such period as the Administrator finds necessary to permit the development and application of the requisite technology, giving appropriate consideration to the cost of compliance within such period." [101]

As noted elsewhere in this preamble, GHG emissions from the United States were 11 percent of global GHG emissions in 2022,[102] down from 23.5 percent in 2005.[103] The U.S. transportation sector accounted for 28 percent of domestic GHG emissions in 2022, and light- and medium-duty vehicles accounted for 57 percent of U.S. transportation sector GHG emissions.[104] Taken together, the best

available data indicate that GHG emissions from light- and medium-duty vehicles in the United States amounted to approximately 1.8 percent of global GHG emissions in 2022. Reducing GHG emissions from light- and medium-duty vehicles in the United States to zero would result in a 1.8 percent decrease in global GHG emissions, which corresponds to an approximate 3 percent reduction in predicted warming trends (2025 CWG Draft Report at 130).[105] To note, these percentages do not account for trends demonstrating that the United States has been decreasing absolute GHG emissions while other countries like China are significantly increasing their GHG emissions.[106]

Global warming trends from 1979 to 2023, the period with the best available data, were determined to a precision (or margin of error) of plus or minus 15 percent total (*id.*). An estimated 3 percent reduction in global warming trends is well below the scientific threshold for measurability and is not a reliable measure for regulatory purposes.

By defining global GHG concentrations in the upper atmosphere as the relevant threat to public health and welfare in the United States, the Endangerment Finding identified a problem that the regulatory tools Congress provided under CAA section 202(a) are simply unable to meaningfully address. Notably, that action defined the relevant "air pollution" as six "well-mixed" GHGs, meaning the combination of GHGs rather than an individual air pollutant that could be emitted by certain sources at greater or lesser levels and would be more amenable to effective prevention and control. 74 FR 66537. To qualify as a "requisite technology" with any measurable impact on the identified danger, an engine design or device would need to *remove* GHGs already present in the atmosphere and would no longer qualify as an *emission* standard for the new motor vehicle or motor vehicle engine.

Additionally, the "requisite technology" to meet the identified danger would, at minimum, require a complete change from internal

---

[98] *See* 42 U.S.C. 7521(a)(1)–(2), (a)(3)(B).

[99] *See Massachusetts,* 549 U.S. at 534–35 ("We need not and do not reach the question whether on remand EPA must make an endangerment finding, or whether policy concerns can inform EPA's actions in the event that it makes such a finding.").

[100] 42 U.S.C. 7521(a)(1).

[101] 42 U.S.C. 7521(a)(2).

[102] U.S. Environmental Protection Agency. (Last updated Mar. 31, 2025). Global Greenhouse Gas Overview: *https://www.epa.gov/ghgemissions/global-greenhouse-gas-overview.*

[103] 74 FR 66539.

[104] U.S. Environmental Protection Agency. (Last updated July 1, 2025). Inventory of U.S. Greenhouse

Gas Emissions and Sinks: *https://www.epa.gov/ghgemissions/inventory-us-greenhouse-gas-emissions-and-sinks.*

[105] *See also* U.S. Transportation Sector Greenhouse Gas Emissions 1990–2022. (2024). United States Environmental Protection Agency 89 FR 11275 (Feb. 14, 2024); Statistical Review of World Energy. (2024). *Energy Institute: https://www.energyinst.org/statistical-review.*

[106] Crippa, M. et al. (2023). GHG emissions of all world countries. *Publications Office of the European Union: https://doi.org/10.2760/953322.*

combustion engines to EVs or another zero-emissions technology. We propose that this form of fuel switching is analogous to the generation-shifting approach we attempted to take for existing stationary sources and that was held to be illegal in *West Virginia.* As explained further below, even a complete shift toward EVs or other zero-emission vehicle and engine technologies in the United States would not reliably and meaningfully reduce elevated global concentrations of GHGs and, therefore, not reliably and meaningfully reduce the risks of climate change asserted in the Endangerment Finding. Given the relatively low share of total global anthropogenic emissions, new motor vehicles and engines in the United States would need to remove GHGs from the atmosphere to have the potential for a reliable impact on GHG concentrations and potential impacts, particularly when viewed in light of increased growth in foreign emissions sources.

The EPA seeks comment on this proposed rationale, including on the proper interpretation of "requisite technology," the appropriate standard for measuring pollution prevention and control, and the scientific threshold for determining measurable impacts on trends in climate change.

*B. There Is No Requisite Technology for Heavy-Duty Vehicles That Addresses the Identified Dangers of the Six "Well-Mixed" GHGs*

For similar reasons, the EPA also proposes to repeal GHG emission standards for heavy-duty vehicles because there is no requisite technology capable of preventing or controlling the "air pollution" identified in the Endangerment Finding. Heavy-duty vehicles account for an even lower percentage of GHG emissions in the U.S. transportation sector than light- and medium-duty vehicles: 23 percent, as compared to 57 percent.[107] Therefore, of the global GHG emissions in 2022, heavy-duty vehicles contributed approximately 0.7 percent. If all heavy-duty vehicles in the U.S. no longer emitted GHGs, that would only result in a decrease of 0.7 percent of all worldwide GHG emissions. As noted in the previous subsection, that low figure corresponds to a predicted warming impact well below the measurability threshold because warming trends are determined at a precision of plus or

minus 15 percent (2025 CWG Draft Report at 130).

The EPA establishes light- and medium-duty vehicle and heavy-duty vehicles separately under distinct grants of authority in CAA section 202(a) and must justify actions taken with respect to each source category separately. We note, however, that even when considered together, the impact of reducing all GHG emissions from motor vehicles and motor vehicle engines to zero would not result in a measurable impact on trends in climate change. A combined 2.5 percent reduction in global GHG emissions would not result in a more than *de minimis* impact on trends in climate change and would not demonstrate a requisite technology for regulatory purposes.

*C. Eliminating GHG Emissions From All Motor Vehicles Would Be Futile*

The EPA is proposing that the Agency must consider the impacts of making an Endangerment Finding and cannot arbitrarily separate parts of a sentence within different regulations. Here, we propose that this interpretation means the Agency should not and need not make an endangerment finding under CAA section 202(a)(1) when the regulatory authority conferred by that provision would have no meaningful impact on the identified dangers. As discussed in subparts A and B of this section, we propose that there is no requisite technology that would result in meaningful changes to the impacts of climate change. Whereas the determination in subparts A and B was based on the statutory language within CAA section 202(a)(2), this subpart is based on the statutory language in CAA section 202(a)(1).

Specifically, we propose that when considering whether to make an endangerment finding, the Administrator should consider the ability of the EPA's CAA section 202(a)(1) authority to meaningfully address the identified risks. As noted above, the Endangerment Finding itself recognized that the relative contribution of GHG emissions to global concentrations from new motor vehicles and engines in the United States is small, and recent data and analyses demonstrate that the share has significantly decreased since 2009. Under the circumstances, even a complete elimination of all GHG emissions from new motor vehicles and engines would not address the risks attributed to elevated global concentrations of GHGs. We propose that this futility further demonstrates that CAA section 202(a) does not, as a matter of text and structure, authorize or

require the EPA to prescribe emission standards for GHG emissions from new motor vehicles and engines. We further propose that it was improper for the Agency to attempt to get around this problem in the Endangerment Finding by asserting that parties regulated under CAA section 202(a) must "do their part" when, in reality, only dramatic reduction in foreign emissions, as well as reductions from domestic sources regulated under other provisions of the CAA, would have any meaningful impact on the global climate change concerns asserted in the Endangerment Finding. The CAA does not authorize the EPA to regulate international sources of emissions, and the statute provides distinct regulatory authority, subject to distinct requirements and standards, for other domestic sources.

*D. More Expensive New Vehicles Prevent Americans From Purchasing New Vehicles That Are More Efficient, Safer, and Emit Fewer GHGs*

The EPA also proposes to repeal GHG emission regulations for new motor vehicle and motor vehicle engines because the resulting increase in price disincentivizes consumers from purchasing new vehicles and keeps less efficient vehicles on the road for longer.[108] Complying with our GHG emission standards often requires manufacturers to design and install new and more expensive technologies, thereby increasing the price of new vehicles and reducing consumer demand. More expensive new vehicles are cost prohibitive for some consumers, and those consumers are likely to turn to the used vehicle market or continue using an older vehicle.[109]

With respect to commercial vehicles, it is widely understood that many commercial vehicle owners and commercial fleet operators consider the total cost of ownership in determining when to purchase new commercial vehicles. The total cost of ownership involves many factors, including, for example, not only vehicle price, but also owning and operating costs (*e.g.,* service and maintenance costs and fuel costs). Depending on the impacts of the GHG regulations on the specific vehicle category and the considerations relevant to the commercial vehicle purchaser, the impacts of GHG regulations may result in a decrease in new commercial vehicle sales. We also note that commercial vehicle owners and fleet operators may incur additional costs

---

[107] U.S. Environmental Protection Agency. (Last updated July 1, 2025). Inventory of U.S. Greenhouse Gas Emissions and Sinks: *https://www.epa.gov/ghgemissions/inventory-us-greenhouse-gas-emissions-and-sinks.*

[108] For additional discussion on this topic, *see* 85 FR 24174 (Apr. 30, 2020).

[109] A discussion of the impact of higher vehicle prices on slowing fleet turnover can be found at 85 FR 24626 (Apr. 30, 2020).

associated with ongoing compliance obligations under the GHG standards for an applicable model year, including testing and reporting requirements that are reflected in the total cost of ownership but not necessarily the vehicle price.[110]

All other things being equal, an increase in the price of new vehicles can result in consumers keeping their vehicles for longer periods, delaying the purchase of new vehicles, and decreasing fleet turnover. Contrary to the goals of the EPA's GHG emission standards and the intended purpose of CAA section 202(a), a delay in fleet turnover can negatively impact air quality because older vehicles tend to emit higher levels of air pollutants, including criteria pollutants and hazardous air pollutants, regulated by the EPA.[111] Slowing fleet turnover is of particular concern with respect to the EPA's 2024 vehicle GHG rules because of the large increase in vehicle technology costs which will likely lead to large increases in purchase prices, and the impact battery electric and fuel cell vehicle technologies will have on purchasing decisions of consumers (for light-, medium-, and heavy-duty vehicle buyers). Increased prices and some consumers rejecting battery electric and fuel cell vehicle technologies may lead consumers to hold on to their existing vehicles longer. Vehicles are more likely to emit less air pollution with each subsequent model year because of improvements in technology, ordinary wear and tear that decreases the effectiveness of installed technology, and greater stringency in more recent regulations for criteria pollutants and hazardous air pollutants.

For these reasons, the EPA has serious concerns that its GHG standards may be harming air quality by raising prices and reducing fleet turnover. We seek comment on this proposed basis for repeal, including on the economics of fleet turnover, the relative efficiency and emission reductions achieved by newer vehicles, modeling of the changes vehicle criteria pollutant and air toxic emissions as well as changes in upstream emissions, modeling of potential changes in air quality (including ozone and particulate matter) and the potential costs to air quality of retaining standards that may slow fleet turnover as compared to the potential

benefits of retaining GHG emission standards in response to global climate change concerns.

In addition, the EPA notes that greater availability of new vehicles at lower prices furthers public welfare by promoting vehicle safety and consumer choice. New vehicles must meet all Federal Motor Vehicle Safety Standards (FMVSS), which NHTSA continually updates over time to respond to new concerns and to incorporate improvements in safety technology. Manufacturers install technologies to meet these safety requirements and may also include newer safety features not required by regulation. NHTSA has found that newer vehicles offer improved safety features and designs, leading to reduced fatalities and injuries in crashes relative to older vehicles.[112] A delay in the turnover of the fleet also could lead to a higher risk to drivers and passengers and delay the safety benefits provided by new vehicles, thereby harming the public welfare in a more direct way than the global climate change impacts animating the EPA's GHG standards.

Moreover, the EPA notes that the ability to own a vehicle is an important means to unlock economic freedom and participate in society as an employee, consumer, and community member. Transportation mobility is essential to economic and social mobility, and there are no readily available substitutes for passenger vehicles in many urban and virtually all non-urban communities throughout the United States. By increasing the price of new vehicles and existing vehicles subject to the standards at manufacture, our GHG emission standards may prevent some people from accessing the benefits of vehicle ownership. For example, in EPA's 2024 vehicle GHG rules, the EPA projected significant increases in vehicle technology costs which we estimated would be passed on to consumers as price increases.[113] In addition, the 2025 OBBB ended the IRA's 30D new clean vehicle tax credit before the end of 2025 (while the IRA allowed for this tax credit through

2032). This significant change will increase the effective price of many new battery electric, plug-in hybrid electric, and fuel cell vehicles, including leased vehicles.

The EPA seeks comment on these additional rationales, including on whether such public welfare considerations can and should be considered when prescribing and revising emission standards under CAA section 202(a). As noted earlier in this preamble, Congress defined "effects on welfare" broadly in CAA section 302(h) to include, but not be limited to, "hazards to transportation, as well as effects on economic values and on personal comfort and well-being." 42 U.S.C. 7602(h). We seek comment on how to give effect to this statutory language as incorporated into the reference in CAA section 202(a) to effects on "public health or welfare." We further seek comment as a general matter on whether the Endangerment Finding and resulting regulations have resulted in disbenefits, that is, on any public health and welfare harms that may flow from the Endangerment Finding and resulting regulations themselves.

## VI. Proposed Repeal of GHG Emission Standards

Consistent with the proposed rescission of the Endangerment Finding in section IV.A and IV.B of this preamble, the additional considerations in section V of this preamble, and the discussion of legal authority in section III of this preamble, the EPA is proposing to repeal all GHG emission standards for light-duty vehicles, medium-duty vehicles, heavy-duty vehicles, and heavy-duty engines. This includes emission standards for the subset of four of the six "well-mixed GHGs" whose elevated concentrations in the upper atmosphere the 2009 endangerment finding identified as the "air pollution" in question that are actually emitted by such vehicles and engines—$CO_2$, $N_2O$, methane, and HFCs—as well as the compliance provisions for the GHG standards. These proposed changes would apply to all MYs of vehicles and engines, including MYs that have completed manufacture prior to the effective date of any final rule.

Under the proposed revisions, manufacturers may in some cases already be changing their production processes to apply updated emission control information labels for vehicles and engines. Manufacturers may also already be revising warranty statements provided with their engines and vehicles. We also note that this

---

[110] *See* section VI.C of this preamble for a discussion of the heavy-duty vehicle and engine GHG regulatory requirements and compliance obligations.

[111] A discussion of the impact of higher vehicle prices on slowing fleet turnover and thus increasing emissions can be found at 85 FR 24186 and 25039 (Apr. 30, 2020).

[112] U.S. Department of Transportation, National Highway Traffic Safety Administration. How Vehicle Safety Has Improved Over the Decades: *https://www.nhtsa.gov/how-vehicle-safety-has-improved-over-decades.*

[113] For a discussion of this topic, see chapter 4.2 of the Multi-Pollutant Emissions Standards for Model Years 2027 and Later Light-Duty and Medium-Duty Vehicles final rule RIA, *https://nepis.epa.gov/Exe/ZyPDF.cgi?Dockey= P1019VPM.pdf,* and Chapter 3 of the Greenhouse Gas Emissions Standards for Heavy-Duty Vehicles: Phase 3 final rule RIA, *https://nepis.epa.gov/Exe/ ZyPDF.cgi/P101ABVT.PDF?Dockey=P101ABVT. PDF.*

proposed action would not, if finalized, require manufacturers to adapt immediately if doing so would raise timing concerns. Unlike the GHG emission standards we propose to repeal, this proposed action would increase flexibility and not mandate any particular technology response. Manufacturers will have no vehicle technology mix constraints which arise from the EPA GHG standards and will be free to produce a range of technologies, including gasoline, diesel, alternative fuels, and plug-in electric vehicles. Furthermore, we have adequate statutory authority to approve manufacturers' requests to continue to offer a warranty that is more generous than required under regulations, and to include information on emission control information labels that is more than required under the proposed regulations. Thus, we do not anticipate material compliance difficulties on the part of manufacturers if this repeal action is finalized as proposed.

In section VI.A of this preamble, we discuss the anticipated impacts of the proposed repeal of GHG emission standards under CAA section 202(a) on the overall regulatory scheme for parties currently subject to the standards. As explained in this section and elsewhere in this preamble, we are not proposing to reopen or substantively revise any emission standards for criteria pollutants or hazardous air pollutants or to reopen or substantively revise any regulatory provisions related to NHTSA's CAFE standards or the EPA's role in administering EPCA and EISA. Moreover, this proposed action would not impact Federal preemption for motor vehicle and engine emission standards under CAA section 209(a) or under EPCA and EISA, including with respect to GHGs.

In section VI.B of this preamble, we describe the light-duty (LD) and medium-duty (MD) vehicle program and the proposed changes to the GHG regulations for that program. In section VI.C of this preamble, we describe the heavy-duty (HD) engine and vehicle program and proposed regulatory changes. We request comment on all proposed changes described in this section, including on any additional regulatory provisions for engines and vehicles that should be removed as part of repealing the GHG standards or should be retained to effectuate unrelated standards that we are not proposing to repeal or revise. To aid in public participation, we have submitted a memorandum to the docket that includes redline text highlighting all proposed changes to the regulations.[114]

The EPA's engine and vehicle programs are codified in Title 40 of the CFR. Specifically, the standard-setting parts for light- and medium-duty vehicles are located in 40 CFR part 85 and 86. The standard-setting part for heavy-duty engines is located in 40 CFR part 1036 and the standard-setting part for heavy-duty vehicles is 40 CFR part 1037. Each standard-setting part includes regulations describing emission standards and related requirements and compliance provisions for certifying engines or vehicles. As explained in this section and elsewhere in this preamble, the EPA is proposing to retain measurement procedures, reporting requirements, and credit provisions for the light-duty program necessary for demonstrating compliance with NHTSA's CAFE standards and fuel economy labeling to meet our statutory obligations under EPCA and EISA. We consider any changes to those requirements as outside the scope of this rulemaking and may consider changes to these provisions, as appropriate, in a future rulemaking. Further, as explained in this section and elsewhere in this preamble, we are not proposing to reopen or substantively revise emission standards or compliance provisions related to criteria pollutant exhaust emissions (*i.e.,* oxides of nitrogen (NO$_X$), hydrocarbons (HC), particular matter (PM), and carbon monoxide (CO)), air toxic emissions, or evaporative and refueling emissions.[115] We may consider those issues, as appropriate, in future rulemakings.

A. Scope and Impacts of Proposed Repeal

The EPA is proposing to repeal all regulatory provisions relating to our GHG emission programs for light- and medium-duty vehicles and heavy-duty vehicles and engines on the bases set forth in sections III.A, III.B, and IV of this preamble. If finalized, any one of these alternative proposals would provide a sufficient basis for repealing our existing GHG regulations for new motor vehicles and new motor vehicle engines. Finalizing the proposed rescission of the Endangerment Finding as set out in section IV.A would provide

sufficient basis for repeal because the EPA would lack statutory authority to regulate emissions based on global climate change concerns under CAA section 202(a). Finalizing the proposed rescission of the Endangerment Finding as set out in section IV.B would provide sufficient basis for repeal because the Administrator would conclude that the scientific evidence of endangerment and contribution is too uncertain to satisfy the standard for regulation under CAA section 202(a). And finalizing the proposed rationales set out in section V would provide sufficient basis for repeal, separately or in combination, because the EPA would conclude that our GHG emission standards do not further public health and welfare and cannot go into effect.

The repeal proposed in this NPRM is limited to the regulatory provisions for GHG emission standards found in 40 CFR parts 85, 86, 1036, and 1037, with minor conforming adjustments to unrelated emission standards for new motor vehicles and engines in 40 CFR parts 600 and 1039. As detailed in subparts B and C of this section, this NPRM is not proposing to revise emission standards for criteria pollutants or air toxics. The EPA may reconsider and propose to revise the regulatory provisions for those programs in a separate rulemaking action. Similarly, this NPRM is not reopening or proposing to revise regulatory provisions necessary for NHTSA's CAFE standards or the EPA's co-administration of EPCA and EISA. Accordingly, we are not seeking public comment on the substance of these distinct regulatory programs and will consider such comments outside the scope of this rulemaking.

For this reason, the proposed repeal would not impact Federal preemption under EPCA, as amended by EISA, related to fuel economy standards. EPCA provides that when ''an average fuel economy standard prescribed under this chapter is in effect, a State or a political subdivision of a State may not adopt or enforce a law or regulation related to fuel economy standards or average fuel economy standards for automobiles covered by an average fuel economy standard under this chapter'' [116] unless the standards are identical or apply only to vehicles obtained for the use of the State or political subdivision.[117] If finalized, this action would not reopen or revise any fuel economy standards or alter the EPA's statutory role in co-administering

---

[114] Memorandum to Docket EPA–HQ–OAR–2025–0194, ''Redline Version of EPA's Proposed Regulations for the Reconsideration of 2009 Endangerment Finding and Greenhouse Gas Vehicle Standards.'' August 2025.

[115] In this proposed rulemaking, NO$_X$, HC, PM, and CO are sometimes described collectively as ''criteria pollutants'' because they are either criteria pollutants under the CAA or precursors to the criteria pollutants ozone (O$_3$) and PM.

[116] 49 U.S.C. 32919(a).

[117] 49 U.S.C. 32919(b)–(c).

any such standards, including NHTSA's CAFE standards.

The proposed repeal also would not impact Federal preemption of emission standards for new motor vehicle and engine emission standards. CAA section 209(a) provides that ''[n]o State or any political subdivision thereof shall adopt or attempt to enforce any standard relating to the control of emissions from new motor vehicles or new motor vehicle engines subject to this part,'' including ''certification,'' ''inspection'' or ''approval'' requirements ''relating to the control of emissions from'' such vehicles or engines.[118] Because new motor vehicles and engines currently subject to GHG emission standards would remain subject to Title II of the CAA, the statute would continue to preempt ''any'' State or local ''standard relating to the control of emissions.'' Relatedly, the CAA would continue to preempt Federal common-law claims for GHG emissions because ''Congress delegated to EPA the decision whether and how to regulate'' such emissions. *Am. Elec. Power Co.* v. *Connecticut,* 564 U.S. 410, 426 (2011). We would retain our authority to prescribe emission standards for any air pollutant that, in the Administrator's judgment, causes or contributes to air pollution that may reasonably be anticipated to endanger public health or welfare. The bases for repeal proposed in this action would not foreclose us from regulating $CO_2$, methane, $NO_X$, HFCs, PFCs, or $SF_6$ emissions from new motor vehicles or engines if the Administrator determines that one or more of those gases meet the requirements for regulation under CAA section 202(a), as discussed herein. As noted above, we seek comment on the continued preemptive effect of the CAA in the event that the EPA finalizes the proposed rescission or otherwise concludes that it lacks authority to regulate GHG emissions under CAA section 202(a) or any other specific regulatory provision of the CAA.

The EPA's engine and vehicle programs are codified in Title 40 of the CFR. Specifically, the standard-setting parts for light- and medium-duty vehicles are located in 40 CFR parts 85 and 86. The standard-setting part for heavy-duty engines is located in 40 CFR part 1036 and the standard-setting part for heavy-duty vehicles is 40 CFR part 1037. Each standard-setting part includes regulations describing emission standards and related requirements and compliance provisions for certifying engines or vehicles.

## *B. Light- and Medium-Duty Vehicle GHG Program*

This subpart provides background on the EPA's light-duty and medium-duty vehicle GHG emission programs. In general, through a series of rulemakings beginning with Model Year 2010 for light-duty vehicles and Model Year 2014 for medium-duty vehicles, the EPA increased the stringency of the GHG standards for these vehicles over time, in particular the $CO_2$ standard. Section VI.A.2 of this preamble describes the proposed changes to the light-duty and medium-duty vehicle GHG regulations.

### 1. Background on the Light- and Medium-Duty Vehicle GHG Program

In 2010, the EPA relied on the Endangerment Finding to adopt the first GHG emission standards for passenger cars and light trucks for MYs 2012 through 2016 in a joint rulemaking with NHTSA.[119] In 2012, the EPA and NHTSA adopted another set of GHG standards (issued by EPA) and fuel economy standards (issued by NHTSA) for passenger cars and light trucks for MYs 2017 and later in a joint rulemaking.[120] In 2020, the EPA and NHTSA revised the standards that had previously been adopted and extended them for MYs 2021 through 2026.[121] In 2021, we further revised GHG standards for passenger cars and light trucks for MYs 2023 through 2026.[122] For medium-duty vehicles, we initially adopted GHG standards as part of the Phase 1 and Phase 2 heavy-duty GHG standards, as described in section VI.B.1 of this preamble. In 2024, we adopted new standards for passenger cars, light trucks, and medium-duty vehicles starting in MY 2027, effectively combining standards that had previously been maintained separately.[123]

The EPA has also taken various actions to comply with statutory obligations under EPCA and EISA. Enacted in 1975, EPCA requires NHTSA to establish a regulatory program for motor vehicle fuel economy (now known as CAFE standards) and requires the EPA to establish measurement procedures, data collection procedures, and rules for calculating average fuel economy values in support of NHTSA's CAFE standards. In 2007, Congress amended EPCA by enacting EISA, which required continuing increases in the stringency of CAFE standards for passenger cars and light trucks through

MY 2020. EISA also authorized new fuel consumption standards for medium-duty vehicles and heavy-duty engines and vehicles.[124] Those standards, and the EPA's heavy-duty engine and vehicle GHG programs, are detailed in section VI.B of this preamble.

To comply with EPCA and EISA, the EPA has adopted regulations for fuel economy measurements, calculations, and reporting under 40 CFR part 600. The regulation at 40 CFR part 600 now includes additional provisions for measuring, calculating, and reporting fuel consumption values for medium-duty vehicles. This regulatory structure was designed to maximize efficiency within the Federal government and minimize the burden on the engine and vehicle manufacturers by centralizing data submission. We share information with NHTSA as needed to support implementation of NHTSA's fuel economy and consumption standards.

### 2. Proposed Changes to the Light- and Medium-Duty Vehicle GHG Regulations

The EPA's light-duty and medium-duty vehicle emission regulations are spread across three CFR parts. 40 CFR part 85 includes various general compliance provisions for both criteria pollutant and GHG emissions. Many of those provisions apply equally to highway motorcycles. 40 CFR part 86 includes emission standards and certification provisions for both criteria pollutant and GHG emissions. 40 CFR part 600 includes measurement and reporting procedures related to fuel economy and GHG standards and to fuel economy labeling.

In the following subsections, we describe our proposed removal and amendment of specific portions of each of these regulatory parts. In general, the approach taken in this proposal is to remove the MY 2012 and later GHG emission standards for passenger cars and light trucks and the MY 2014 and later GHG emission standards for medium-duty vehicles. We also propose to remove the testing and reporting requirements associated with the GHG emission standards. In keeping with our obligations under EPCA, as noted in section VI.A.1 of this preamble, we are not proposing to remove the testing and reporting requirements related to CAFE standards for passenger cars and light trucks and are not reopening those requirements. We request comment on the proposed regulatory changes and whether additional changes should be considered.

---

[118] 42 U.S.C. 7543(a).

[119] 75 FR 25324 (May 7, 2010).
[120] 77 FR 62624 (Oct. 15, 2012).
[121] 85 FR 24174 (Apr. 30, 2020).
[122] 86 FR 74434 (Dec. 30, 2021).
[123] 89 FR 27842 (Apr. 18, 2024).

[124] 49 U.S.C. 32902(k).

a. 40 CFR Part 85—Compliance Provisions for Light- and Medium-Duty Vehicles

In general, we propose to amend 40 CFR part 85 to remove all references to GHG emission standards and related provisions while retaining provisions that support our criteria pollutant emission program. In this subsection, we describe several proposed amendments that are necessary to remove GHG-related provisions from 40 CFR part 85 while ensuring that criteria pollutant emission standards are not substantively impacted. Table 1 provides a summary of the proposed amendments to 40 CFR part 85.

TABLE 1—SUMMARY OF PROPOSED CHANGES TO LIGHT-DUTY AND MEDIUM-DUTY HIGHWAY ENGINE REGULATIONS UNDER 40 CFR PART 85

| 40 CFR part 85 | Sections proposed to amend |
|---|---|
| Subpart F—Exemption of Clean Alternative Fuel Conversions From Tampering Prohibition | 85.525. |
| Subpart P—Importation of Motor Vehicles and Motor Vehicle Engines | 85.1515. |
| Subpart S—Recall Regulations | 85.1803, 85.1805. |
| Subpart T—Emission Defect Reporting Requirements | 85.1902. |
| Subpart V—Warranty Regulations and Voluntary Aftermarket Part Certification Program | 85.2103. |

The regulations at 40 CFR part 85, subpart F, provide an exemption from the general tampering prohibition for clean alternative fuel conversions. Specifically, the regulations describe how anyone modifying an in-use vehicle to run a different fuel can demonstrate that the fuel conversion maintains a level of emission control that qualifies them for an exemption from the tampering prohibition. This exemption generally allows for the modifying of vehicles already certified to emission standards in a way that does not cause the modified vehicle to exceed the emission standards that apply for the certified vehicle. The demonstration applies for both criteria and GHG emissions. We are proposing to revise 40 CFR 85.525 by removing the requirement to demonstrate compliance with GHG emissions. Program requirements related to criteria exhaust, evaporative, and refueling emissions and onboard diagnostics would remain unchanged.

The regulation at 40 CFR 85.1515 describes the standards that apply for Independent Commercial Importers in their practice of importing used vehicles. We are proposing only to remove text disallowing generation and use of GHG emission credits. We note further that the regulation requires Independent Commercial Importers to meet all the standards that apply under 40 CFR part 86. With the proposed changes described in this action, the removal of GHG standards from 40 CFR part 86, subpart S, would apply equally to imported vehicles. Imported vehicles would continue to be subject to criteria exhaust, evaporative, and refueling emission standards and requirements for onboard diagnostics as specified in 40 CFR part 86, subpart S.

We are proposing to revise the recall-related instructions for remedial plans and consumer notification in 40 CFR 85.1803 and 85.1805 to remove a reference to 40 CFR 86.1865(j)(3), which we are proposing to remove in this action. The referenced paragraph relates to recall provisions for vehicles that do not comply with GHG standards. We are also proposing to revise definitions of "Emission-related defect" and "Voluntary emissions recall" in 40 CFR 85.1902 where those definitions describe how manufacturers must report GHG-related defects differently than defects related to criteria pollutant emission standards. Finally, we are proposing to amend the warranty provisions for specified major emission control components in 40 CFR 85.2103 by removing the reference to batteries serving as a Renewable Energy Storage System for electric vehicles and plug-in hybrid electric vehicles, along with all components needed to charge the system, store energy, and transmit power to move the vehicle. We would continue to apply the basic emission-related warranty requirement for a period of two years or 24,000 miles where such batteries qualify as an emission-related component.

b. 40 CFR Part 86—Emission Standards and Certification Requirements for Light- and Medium-Duty Vehicles

In general, we propose to amend 40 CFR part 86 to remove all GHG emission standards, references to such standards, and related provisions while retaining provisions that support our criteria pollutant emission program. In this subsection, we describe several proposed amendments that are necessary to remove GHG-related provisions from 40 CFR part 86 while ensuring that criteria pollutant emission standards are not substantively impacted. Table 2 provides a summary of the regulations we propose either to remove or to amend in 40 CFR part 86.

TABLE 2—SUMMARY OF PROPOSED CHANGES TO LIGHT-DUTY AND MEDIUM-DUTY HIGHWAY ENGINE REGULATIONS UNDER 40 CFR PART 86

| 40 CFR part 86 | Sections proposed to remove | Sections proposed to amend |
|---|---|---|
| Subpart S—General Compliance Provisions for Control of Air Pollution From New and In-Use Light-Duty Vehicles, Light-Duty Trucks, and Heavy-Duty Vehicles. | 86.1815–27, 86.1818–12, 86.1819–14, 86.1865–12, 86.1866–12, 86.1867–12, 86.1870–12. | 86.1. 86.1801–12, 86.1803–01, 86.1805–12, 86.1805–17, 86.1807–01, 86.1809–12, 86.1810–09, 86.1810–17, 86.1811–17, 86.1811–27, 86.1816–18, 86.1822–01, 86.1823–08, 86.1827–01, 86.1828–01, 86.1829–15, 86.1830–01, 86.1835–01, 86.1838–01, 86.1839–01, 86.1841–01, 86.1844–01, 86.1845–04, 86.1846–01, 86.1848–10, 86.1854–12, 86.1861–17, 86.1868–12, 86.1869–12. |

We are proposing to amend the list of reference documents in 40 CFR 86.1 by removing documents that are referenced only in regulations that we are proposing to remove.

We are proposing to amend the applicability statements in 40 CFR 86.1801–12 by removing references to GHG standards and related compliance provisions. We are also proposing to remove the instruction related to work factor for vehicles above 14,000 pounds gross vehicle weight rating (GVWR) at 40 CFR 86.1801–12(a)(3) since that is meaningful only in the context of GHG standards. We adopted the work-factor provision in a 2016 final rule as a means of limiting the extent to which manufacturers would certify those larger heavy-duty vehicles in test groups along with chassis-certified medium-duty vehicles.[125] Removing the instruction to calculate GHG standards based on a work factor appropriate for medium-duty vehicles, without other compensating changes, could lead to a greater number of heavy-duty vehicles certified as medium-duty vehicles. The work-factor provision was adopted as a means of addressing competing concerns from different manufacturers. As a result, we are proposing to limit the use of this provision to heavy-duty vehicles with a maximum value of 19,500 pounds GVWR. We believe this limitation is the best way to maintain a consistent approach for certifying affected vehicles.

We are proposing to amend the definitions in 40 CFR 86.1803–01 by removing several defined terms that are used only in regulatory provisions that we are proposing to remove. This includes proposing to remove the definition of ''configuration''; while this definition is no longer needed, we are proposing to retain the slightly different definition of ''vehicle configuration,'' since that definition is needed to support standards related to criteria pollutants. We are accordingly proposing to amend several references across 40 CFR part 86, subpart S, to change from a generic reference to ''configuration'' and replace it with the specific reference to ''vehicle configuration.'' We are also proposing to amend 40 CFR 86.1803–01 by adding a definition for ''work factor'' that is consistent with the definition that is embedded in 40 CFR 86.1819–14. We adopted the definition of ''work factor'' in 40 CFR 86.1819–14 primarily as a means of accounting for specific vehicle characteristics in establishing GHG emission standards for medium-duty vehicles. We are proposing to remove all

[125] 81 FR 73478 (Oct. 25, 2016).

of 40 CFR 86.1819–14 as described below. However, we are keeping the definition of work factor to support the definition of ''medium-duty passenger vehicle,'' which relies on the work factor concept to categorize vehicles for applying criteria pollutant emission standards.

We are proposing to amend 40 CFR 86.1803–01 and 86.1809–12 by removing references to the air conditioning efficiency test as part of the consideration for determining what is a defeat device. We are proposing to eliminate the air conditioning efficiency test from the EPA certification program because it was only used to generate GHG credits. Note that we are not proposing in this NPRM to remove the air conditioning efficiency credit provisions and measurement procedures from 40 CFR 86.1868–12 and 1066.845, which are used by manufacturers for compliance with fuel economy standards as described in 40 CFR 600.510(c)(3).

We are proposing to amend useful life specifications in 40 CFR 86.1805–12 and 86.1805–17 by removing references to useful life for GHG standards. Useful life for all criteria exhaust, evaporative, and refueling emission standards and onboard diagnostics would remain unchanged.

We are proposing to amend labeling requirements in 40 CFR 86.1807–01 by removing the requirement for battery electric vehicles and plug-in hybrid electric vehicles to identify monitor family and battery durability family on the vehicle emission control information label. We are proposing to remove the battery monitoring and battery durability requirements in 40 CFR 86.1815–27 and therefore no longer to include this family information as part of the certification process.

We are proposing to amend 40 CFR 86.1810–09(f)(2) by removing references to GHG emission standards. Manufacturers must continue to comply with altitude-related demonstration requirements for vehicles subject to the cold temperature standards for nonmethane hydrocarbon emissions.

We are proposing to amend 40 CFR 86.1810–17(j) by removing references to GHG emission standards. Small-volume manufacturers that modify a vehicle already certified by a different company must continue to meet other requirements as specified, such as those related to criteria exhaust, evaporative, and refueling emissions and onboard diagnostics.

We are proposing to amend 40 CFR 86.1811–17, 86.1811–27, and 86.1816–18 by removing references to GHG emission standards. We are not

otherwise proposing to change these sections, which establish criteria exhaust emission standards for light-duty and medium-duty vehicles.

We are proposing to remove 40 CFR 86.1815. We adopted this section to establish battery monitoring and battery durability requirements for battery electric vehicles and plug-in hybrid electric vehicles. Those battery-related requirements were adopted as part of the overall program for controlling GHG emissions. Since the earliest battery monitoring and battery durability requirements were scheduled to start in MY 2027, removing those requirements involves no immediate transition to discontinue compliance for certified vehicles.

We are proposing to remove 40 CFR 86.1818–12 and 86.1819–14. These sections describe the GHG standards and implementing provisions for MY 2010 and later light-duty vehicles and for MY 2014 and later medium-duty vehicles. We propose to discontinue the requirement to demonstrate compliance with these GHG standards and further propose that this discontinuation would apply as of the effective date of the final rule. Manufacturers need not amend existing certificates for ongoing production for the current model year. Manufacturers would in any case not need to submit credit reports at the end of the current model year to demonstrate compliance with the fleet average $CO_2$ standards.

We are proposing to amend test group specifications in 40 CFR 86.1823–08 by removing durability demonstration requirements related to GHG emission standards.

We are proposing to amend the provisions for establishing test groups in 40 CFR 86.1827–01 by removing the reference to $CO_2$ emission standards.

We are proposing to amend testing specifications in 40 CFR 86.1829–15 by removing references to GHG emission standards, except where needed to account for emission measurements related to fuel economy labeling. We are also proposing to change the nomenclature for the reference brake-specific $CO_2$ emission rate needed to perform calculations related to in-use testing for engines certified under 40 CFR 1036.635 for use in vehicles with high towing capacity.

We are proposing to amend the compliance provisions 40 CFR 86.1835–01, 86.1838–01, 86.1841–01, 86.1848–10, and 86.1854–12 by removing references to GHG emission standards.

We are proposing to amend carryover testing provisions in 40 CFR 86.1839–01 by removing references to accuracy requirements for battery monitoring for

electric vehicles and plug-in hybrid electric vehicles.

We are proposing to amend instructions for the application for certification in 40 CFR 86.1844–01 by removing references to refrigerant leakage rates and GHG emission standards.

We are proposing to amend in-use testing requirements in 40 CFR 86.1845–04 and 86.1846–01 by removing references to testing GHG emissions and testing related to battery monitor accuracy and battery durability for electric vehicles and plug-in hybrid electric vehicles. We are also proposing to amend 40 CFR 86.1845–04 by changing the nomenclature for the reference brake-specific $CO_2$ emission rate needed to perform calculations related to in-use testing for engines certified under 40 CFR 1036.635 for use in vehicles with high towing capacity.

We are proposing to amend the credit provisions for criteria exhaust and evaporative emissions in 40 CFR 86.1861–17 by referencing the credit provisions in 40 CFR part 1036, subpart H, instead of 40 CFR part 1037, subpart H. We are proposing to remove the credit provisions in 40 CFR part 1037, subpart H, in this rule because they are needed only in relation to the GHG standards in 40 CFR part 1037, which we are proposing to remove in this rule. The referenced credit provisions in 40 CFR part 1037, subpart H, are equivalent to the analogous credit provisions in 40 CFR part 1036, subpart H. We are also proposing to amend 40 CFR 86.1861–17 by removing a reference to 40 CFR 86.1865(j)(3), which we are proposing to remove in this action.

We are proposing to remove 40 CFR 86.1865–12. This section describes the emission credit provisions related to the fleet average GHG standards. See the discussion related to 40 CFR 86.1818–12 and 86.1819–14 for the transition to discontinued GHG standards for the model year currently in production for the year when the final rule is effective. More specifically, we are proposing no longer to recognize manufacturers' positive or negative GHG credit balances as of the effective date of the final rule. Note also that we are proposing to remove 40 CFR 86.1865–12(j)(3), which describes recall provisions for vehicles that do not comply with GHG standards. We recognize that a credit-based approach to recall is no longer appropriate without a GHG credit program. Accordingly, we are proposing to remove the provisions describing a credit-based remedy for noncompliance that does not involve a vehicle defect that can be repaired to bring vehicles into compliance with standards.

We are proposing to remove 40 CFR 86.1866–12, 86.1867–12, and 86.1867–31. These sections describe GHG credit programs for advanced technology and air conditioning leakage that serve only in relation to the GHG standards that we are proposing to remove in this rule.

We are proposing to amend the credit provisions for air conditioning efficiency and for off-cycle technologies in 40 CFR 86.1868–12 and 86.1869–12 by removing references to the fleet average GHG standards and adjusting the description to clarify that these credit provisions continue to serve as inputs for calculating fuel consumption improvement values and average fuel economy for light-duty program vehicles under 40 CFR 600.510. The 2024 final rule included new standards for light-duty program vehicles and several changes related to these credit programs, and we are not reopening those decisions.[126] First, we adopted a change for both air conditioning efficiency credits and off-cycle credits to not allow vehicles without engines to generate those credits starting in model year 2027. Second, we created a schedule to phase down off-cycle credits for vehicles with engines by establishing a declining value of the cap on off-cycle credits through model year 2032, with off-cycle credits fully discontinued for all vehicles starting in model year 2033. Third, we removed the option for manufacturers to generate off-cycle credits according to the provisions of 40 CFR 86.1869–12(c) and (d) starting in model year 2027.

We are proposing to remove 40 CFR 86.1870–12. This section describes a GHG credit program for full-size pickup trucks with hybrid technology. Those GHG credits were also used for calculating fuel consumption improvement values and average fuel economy for light-duty program vehicles under 40 CFR 600.510. However, we amended those credit provisions in the 2021 final rule to establish model year 2024 as the last year that manufacturers could generate those credits.[127] Because those credits are already discontinued for purposes of demonstrating compliance with EPA emission standards, manufacturers can no longer use those provisions to create fuel consumption improvement values under 40 CFR part 600.

c. 40 CFR Part 600—Requirements Related to Fuel Economy for Light- and Medium-Duty Vehicles

In general, we propose to amend 40 CFR part 600 to remove all references to GHG emission standards and related provisions while retaining provisions that support compliance with CAFE standards and fuel economy labeling for passenger cars and light trucks. In the remainder of this subsection, we describe several proposed amendments that are needed to remove GHG-related provisions from 40 CFR part 600 without affecting provisions related to CAFE standards and fuel economy labeling. Table 3 provides a summary of the regulations we propose either to remove or to amend in 40 CFR part 600.

TABLE 3—SUMMARY OF PROPOSED CHANGES TO LIGHT-DUTY AND MEDIUM-DUTY HIGHWAY ENGINE REGULATIONS UNDER 40 CFR PART 600

| 40 CFR part 600 | Sections proposed to remove | Sections proposed to amend |
|---|---|---|
| Subpart A—General Provisions | | 600.001, 600.002, 600.006, 600.007, 600.008, 600.010. |
| Subpart B—Fuel Economy and Exhaust Emission Test Procedures. | | 600.101, 600.111–08, 600.113–12, 600.114–12, 600.116–12, 600.117. |
| Subpart C—Procedures for Calculating Fuel Economy and Carbon-related Exhaust Emission Values. | | 600.206–12, 600.207–12, 600.210–12. |
| Subpart F—Procedures for Determining Manufacturer's Average Fuel Economy. | 600.514–12 | 600.507–12, 600.509–12, 600.510–12, 600.512–12. |

---

[126] 89 FR 27842 (Apr. 18, 2024).

[127] 86 FR 74434 (Dec. 30, 2021).

We are proposing to amend the applicability statements in 40 CFR 600.001 by removing references to carbon-related exhaust emissions and fleet average $CO_2$ standards. We are also proposing to remove the reference in 40 CFR 600.001(a) to medium-duty vehicles because we are proposing to revise 40 CFR part 600 such that those vehicles would no longer be subject to regulation under 40 CFR part 600. In contrast, the testing provisions would remain to describe how passenger automobiles and light trucks (including medium-duty passenger vehicles) must meet fuel economy standards and how manufacturers must prepare fuel economy labels.

We are proposing to amend the definitions in 40 CFR 600.002 by removing the reference to fleet average $CO_2$ standards. We are also proposing to remove the portions of several definitions that relate to medium-duty vehicles (also described as heavy-duty vehicles in the regulation).

We are proposing to amend the definition of Medium-Duty Passenger Vehicle ($MDPV_{FE}$) for purposes of fuel economy testing and reporting in 40 CFR 600.002 to align with the clarified definition published by NHTSA at 49 CFR 523.2 (89 FR 52945, June 24, 2024). Aligning these definitions is necessary to ensure EPA's test procedures are properly applied to vehicles covered by fuel economy standards and labeling requirements.

As described for 40 CFR 86.1803–01, we are proposing to amend several references across 40 CFR part 600 to change from a generic reference to ''configuration'' and replace it with the specific reference to ''vehicle configuration.''

We are proposing to amend the information requirements in 40 CFR 600.006 through 600.010 by removing references to carbon-related exhaust emissions, GHG emission standards, and reporting GHG-related information generally.

We are proposing to amend the testing overview in 40 CFR 600.101 and 600.111–08 by removing references to carbon-related exhaust emissions and fleet average $CO_2$ emissions.

We are proposing to amend the emission calculations in 40 CFR 600.113–12 by removing references to carbon-related exhaust emissions and other GHG emissions.

We are proposing to amend the interim testing provisions in 40 CFR 600.117 by removing paragraph (a)(5) since we are proposing to discontinue GHG testing with in-use vehicles under 40 CFR 86.1845–04. We are also proposing to revise paragraphs (a)(6)

and (b) to clarify that manufacturers do not adjust measured fuel economy values to account for fuel effects, whether they test with E0 or E10 gasoline.

We are proposing to amend the testing, calculation, and reporting specifications in 40 CFR 600.116–12, 600.507–12, 600.509–12, and 600.510–12 by removing references to carbon-related exhaust emissions. We note that calculations related to off-cycle credits in 40 CFR 600.510(c)(3)(ii) continue to rely on carbon-related exhaust emissions as specified in 40 CFR 86.1869–12.

We are proposing to amend the reporting requirements in 40 CFR 600.512–12 by removing references to carbon-related exhaust emissions. This includes amending 40 CFR 600.512–12(c)(5)(i) to explain that the purpose for performing the calculations in 40 CFR 600.510–12(c)(3) is to support credit calculations for fuel economy improvement factors, rather than demonstrating compliance with the fleet average standard for carbon-related exhaust emissions. We are proposing to move the existing reporting requirement for emission credits related to fuel consumption improvement values from 40 CFR 86.1865–12(l)(2)(iii), which we are proposing to remove, to 40 CFR 600.512–12(c)(3) to preserve the existing provisions needed for fuel economy reporting. We are also proposing to remove the reporting requirements in 40 CFR 600.514–12, which are solely related to GHG emissions.

## C. Heavy-Duty Engine and Vehicle GHG Program

This subpart includes background on EPA's heavy-duty GHG emission program and describes our proposed changes to the engine-based GHG regulations and our proposed changes to the vehicle-based GHG regulations.

### 1. Background on the Heavy-Duty Engine and Vehicle GHG Program

The EPA promulgated new GHG emission standards for heavy-duty engines and vehicles in three separate rulemakings. In 2011, the EPA established the first GHG standards for model year 2014 and later heavy-duty engines and vehicles in an action titled ''Greenhouse Gas Emissions and Fuel Efficiency Standards for Medium- and Heavy-Duty Engines and Vehicles'' (HD GHG Phase 1).[128] In 2016, the EPA set new GHG standards for model year 2021 and later heavy-duty engines and vehicles in an action titled ''Greenhouse Gas Emissions and Fuel Efficiency

Standards for Medium- and Heavy-Duty Engines and Vehicles—Phase 2'' (HD GHG Phase 2).[129] Most recently, in 2024, the EPA finalized an action titled ''Greenhouse Gas Emissions Standards for Heavy-Duty Vehicles—Phase 3'' (HD GHG Phase 3), which set new $CO_2$ emission standards for model year 2032 and later heavy-duty vehicles that phase in starting as early MY 2027 for certain vehicle categories.[130] The phase-in revises MY 2027 GHG standards that were established previously under the EPA's HD GHG Phase 2 rulemaking.[131]

The EPA and NHTSA jointly issued the HD GHG Phase 1 and HD GHG Phase 2 rulemakings covering heavy-duty GHG emission and fuel efficiency standards. The EPA set GHG emission standards under CAA section 202(a), and NHTSA set fuel consumption standards under EISA.[132] The EPA and NHTSA programs are harmonized through MY 2026; however, NHTSA has not adopted changes in fuel consumption standards corresponding to the EPA's HD GHG Phase 3 standards. As a result, the $CO_2$ emission and fuel consumption standards currently diverge in MY 2027 and later.

The EPA's regulations include the test procedures along with a certification and compliance program, which is led by the EPA. As noted previously, this regulatory structure was designed to maximize efficiency within the Federal government and minimize the burden on the engine and vehicle manufacturers by centralizing data submission. Manufacturers submit data and information to the EPA and the EPA, in turn, shares information with NHTSA as needed to support NHTSA's implementation of its fuel consumption standards.[133]

### 2. Proposed Changes to the Heavy-Duty Engine and Vehicle GHG Regulations

The EPA's heavy-duty engine and vehicle emission regulations are contained in two standard-setting parts. 40 CFR part 1036 includes the engine-based emissions regulations for both criteria pollutant and GHG emissions.[134] 40 CFR part 1037 includes the vehicle-based emission regulations for criteria pollutant exhaust emissions,

---

[128] 76 FR 57106 (Sept. 15, 2011).

[129] 81 FR 73478 (Oct. 25, 2016).

[130] *See* 89 FR 29559–29561 (Apr. 22, 2024).

[131] 89 FR 29440 (Apr. 22, 2024).

[132] 49 U.S.C. 32902(k).

[133] *See* 49 CFR 535.8, 1036.755, 1037.755.

[134] Note that heavy-duty engine manufacturers are subject to criteria pollutant standards in 40 CFR part 86, subpart A, through 2026. In a recent rulemaking (88 FR 4296, Jan. 24, 2023), the EPA migrated criteria pollutant regulations from 40 CFR part 86, subpart A, to 40 CFR part 1036 with new requirements that apply to 2027 and later heavy-duty engines. *See* 88 FR 4326.

evaporative and refueling emissions, and GHG emissions.

In the following subsections, we describe our proposed removal and amendment of specific portions of each of these regulatory parts. In general, the approach taken in this proposal is to remove the MY 2014 and later heavy-duty GHG emission standards promulgated in HD GHG Phase 1, Phase 2, and Phase 3, collectively, along with the testing and reporting requirements associated with the GHG emission standards. We request comment on the proposed regulatory changes and whether additional changes are necessary to remove GHG regulations.

a. 40 CFR Part 1036—Emission Standards and Compliance Provisions for Heavy-Duty Engines

40 CFR part 1036 contains regulations related to the final rule titled ''Control of Emissions from New and In-Use Heavy-Duty Highway Engines,'' including emission standards and compliance provisions for criteria pollutant emissions, evaporative and refueling emissions, and GHG exhaust emissions (*i.e.,* $CO_2$, $N_2O$, and methane). 40 CFR part 1036 is divided into nine subparts with three appendices. Subpart A defines the applicability of part 1036 and gives an overview of regulatory requirements. Subpart B describes the emission standards and other requirements that must be met to certify engines under this part. Subpart C describes how to apply for a certificate of conformity for heavy-duty engines. Subpart D addresses testing of production engines and hybrid powertrains. Subpart E addresses in-use testing, while Subpart F describes how to test engines to demonstrate compliance with the criteria pollutant and GHG emission standards. Subpart G describes requirements, prohibitions, and other provisions that apply to engine manufacturers, vehicle manufacturers, owners, operators, rebuilders, and all others. Subpart H describes how manufacturers can optionally generate, bank, trade, and use emission credits to certify heavy-duty engines. Subpart I includes definitions and other reference material. Appendix A includes a summary of previous emissions standards. Appendix B includes the transient duty cycles. Appendix C includes engine fuel maps used in the certification of specific vehicles to meet the heavy-duty vehicle $CO_2$ emission standards.

This subsection includes an overview of the regulations related to the heavy-duty engine program we propose to remove or revise. In general, we propose to amend 40 CFR part 1036 to remove all GHG emission standards, references to such standards, and related provisions; however, most of 40 CFR part 1036 is retained for EPA's heavy-duty engine criteria pollutant emission program. In this subsection, we describe the proposed amendments to remove GHG-related provisions from 40 CFR part 1036, which include some amendments needed to retain, without reopening, the efficacy of the criteria pollutant emission standards. Table 4 provides a summary of the regulations we propose either to remove or to amend in 40 CFR part 1036.

TABLE 4—SUMMARY OF PROPOSED CHANGES TO HEAVY-DUTY HIGHWAY ENGINE REGULATIONS UNDER 40 CFR PART 1036

| 40 CFR part 1036 | Sections proposed to remove | Sections proposed to amend |
|---|---|---|
| Subpart A—Overview and Applicability ............ | ........................................................................... | 1036.1, 1036.5, 1036.15. |
| Subpart B—Emission Standards and Related Requirements. | 1036.108 ........................................................... | 1036.101, 1036.115, 1036.130, 1036.135, 1036.150. |
| Subpart C—Certifying Engine Families ............ | 1036.241 ........................................................... | 1036.205, 1036.225, 1036.230, 1036.231,[a] 1036.235, 1036.245. |
| Subpart D—Testing Production Engines and Hybrid Powertrains. | ........................................................................... | 1036.301. |
| Subpart E—In-Use Testing ................................ | ........................................................................... | 1036.415. |
| Subpart F—Test Procedures ............................. | 1036.505, 1036.535, 1036.540, 1036.543, 1036.550. | 1036.501, 1036.510, 1036.512, 1036.514, 1036.520, 1036.530, 1036.545, 1036.580. |
| Subpart G—Special Compliance Provisions ..... | 1036.610, 1036.615, 1036.620, 1036.625, 1036.630, 1036.635. | 1036.605.[b] |
| Subpart H—Averaging, Banking, and Trading for Certification. | 1036.745, 1036.755 ......................................... | 1036.701, 1036.705, 1036.710, 1036.720, 1036.725, 1036.730, 1036.740, 1036.750. |
| Subpart I—Definitions and Other Reference Information. | ........................................................................... | 1036.801, 1036.805, 1036.810, 1036.815. |
| Appendices ....................................................... | Appendix C. | |

[a] We are proposing to move 40 CFR 1037.231 to a new 40 CFR 1036.231.
[b] We are proposing similar revisions in 40 CFR 86.007–11(g) and 86.008–10(g) for model year 2026 and earlier engines for specialty vehicles.

Within 40 CFR part 1036, subpart B, we propose to remove 40 CFR 1036.108, which includes the GHG emission standards for $CO_2$, $N_2O$, and methane. We also propose to remove several paragraphs from 40 CFR 1036.150 that describe interim provisions related to the heavy-duty engine or vehicle GHG programs. We propose to remove and reserve 40 CFR 1036.150(b), (d), (e), (g)–(j), (l)–(n), (p)–(s), and (w) and otherwise to retain the existing section numbering. We propose to remove 40 CFR 1036.150(aa) at the end of the section.

In 40 CFR part 1036, subpart C, we propose to remove 40 CFR 1036.230(f) and (g), which describe how manufacturers divide their product lines into engine families for certifying to the GHG emission standards. We propose several revisions in 40 CFR 1036.235 to remove GHG emission testing requirements. In 40 CFR 1036.235(a), we propose to migrate text from 40 CFR 1037.235(a) that provides direction on how manufacturers select the test powertrain to replace GHG-related testing requirements in 40 CFR 1036.235(a)(2). We propose to remove in its entirety 40 CFR 1036.241, which describes how to demonstrate compliance with the heavy-duty engine GHG emission standards. In 40 CFR 1036.245, existing provisions allow manufacturers to use vehicle-based duty cycles for engine service accumulation in the laboratory to determine deterioration factors. As described in section VI.C.2.b of this preamble, we are proposing to remove the referenced vehicle-based duty cycles from 40 CFR part 1037, so we are proposing to revise 40 CFR 1036.245(c)(3)(ii) to allow manufacturers to request approval of a

different test sequence, without requiring specific duty cycles.

Also in 40 CFR part 1036, subpart C, we propose to migrate the provisions that relate to powertrain families from the vehicle standard-setting part in 40 CFR 1037.231 to the engine standard-setting part as a new 40 CFR 1036.231 with proposed revisions described in this section. In a previous rule (89 FR 29616), we migrated the powertrain test procedure from the heavy-duty vehicle procedures (formerly 40 CFR 1037.550) to the heavy-duty engine procedures in 40 CFR 1036.545 because we expected powertrain testing to be primarily used by engine manufacturers in certifying engines to criteria pollutant standards or in place of engine-based procedures for GHG standards. Similarly, we are proposing to migrate the related provisions manufacturers would use to divide their product line into powertrain families. In general, we propose to migrate the text from the vehicle program in 40 CFR 1037.231 to a newly created section in the engine program under 40 CFR 1036.231. We propose to modify the text previously under 40 CFR 1037.231(b)(1), such that the new 40 CFR 1036.231(b)(1) would no longer require powertrains to share the same engine families described in 40 CFR 1036.230 but would require the engine share the same design aspects specified in 40 CFR 1036.230. Since a manufacturer may choose to certify the whole powertrain to the standards in 40 CFR part 1036, there would only be a powertrain family, not a certified engine family that contains just the engine. Similarly, and consistent with our approach for defining engine families in 40 CFR 1036.230, we see no need to limit the powertrain family based on the vehicle service class the powertrain goes into and propose not to migrate the existing 40 CFR 1037.231(b)(2) that requires powertrain families to share vehicle service class groupings. We are also proposing not to migrate ''energy capacity'' as an example attribute in the proposed new 40 CFR 1036.231(b)(10), since it is not needed for the criteria pollutant standards. Similarly, we are proposing not to migrate existing 40 CFR 1037.231(b)(11) since rated output of hybrid mechanical power technology is also not needed for a criteria pollutant family definition.

In 40 CFR part 1036, subpart D, we propose to revise 40 CFR 1036.301 to remove paragraphs (a) through (d) describing how the EPA would conduct selective enforcement audits related to heavy-duty $CO_2$ engine emissions. We propose to revise the existing statement that selective enforcement audits apply for engines as specified in 40 CFR part

1068, subpart E, by adding that they apply for powertrains, consistent with 40 CFR 1036.301(c) which we are proposing to remove.

As previously noted, we are retaining and not reopening the in-use testing procedures in 40 CFR part 1036, subpart E, which apply for the criteria pollutant emission standards. More specifically, within the in-use test procedures, we are retaining references to measuring $CO_2$ for use in required chemical balance test procedures and to calculate the criteria pollutant emissions values for in-use testing. Also, in 40 CFR 1036.415(g), we continue to require that manufacturers override any adjustable idle-reduction features on vehicles used for in-use testing; however, we propose to revise the text to include a more general statement describing what it means to be adjustable.

In 40 CFR part 1036, subpart F, we propose to remove test procedures related to developing engine data to support heavy-duty vehicle GHG emissions certification, which include 40 CFR 1036.505, 1036.535, 1036.540, 1036.543, and 1036.550. Relatedly, we propose to remove the fuel map duty cycle in Appendix C to part 1036. In 40 CFR 1036.510, we propose several revisions to paragraph (b), including replacing a reference to 40 CFR 1036.540(c)(2) with a new table that provides the gear ratios based on engine service class from 40 CFR 1036.540. We also propose to remove and reserve 40 CFR 1036.510(e) and 1036.512(e), which describe how to determine GHG emissions for plug-in hybrid powertrains using the heavy-duty engine Federal Test Procedure (FTP) and engine Supplemental Emissions Test (SET) and duty cycles, respectively. In 40 CFR 1036.530(e), we are retaining and not reopening the requirement that manufacturers measure $CO_2$ emissions for in-use testing, but we propose to revise the related variable $e_{CO2FTPFCL}$ to remove reference to ''family certification limit (FCL)'' that would no longer apply. The proposed new variable, $e_{CO2FTP}$, would represent the engine's brake-specific $CO_2$ over the FTP or SET duty cycle. Relatedly, we are proposing to replace references to $e_{CO2FTPFCL}$ with $e_{CO2FTP}$ throughout 40 CFR parts 1036 and 1037.

Powertrain testing, also described in 40 CFR part 1036, subpart F, is an option that manufacturers may use for certifying hybrid powertrains to the engine criteria pollutant standards in 40 CFR 1036.104 and the GHG emission standards in 40 CFR 1036.108. The powertrain test procedure in 40 CFR 1036.545 describes testing a powertrain that includes an engine coupled with a

transmission, drive axle, and hybrid components, or a subset of these components. We are retaining without reopening most of 40 CFR 1036.545 related to the powertrain testing for criteria pollutants, but we propose to remove the portions related to the GHG program and revise several paragraphs to account for the removed GHG content. Throughout 40 CFR 1036.545, we propose to remove existing requirements to create inputs for EPA's Greenhouse gas Emission Model (GEM) tool that manufacturers use for compliance with the $CO_2$ standards. We also propose to remove references to the use of utility factors, vehicle configurations, and vehicle-based duty cycles and test procedures. In 40 CFR 1036.545(b), (d), and (j) we propose to replace 40 CFR part 1037 references with relevant text from the procedures. We also propose to remove paragraph (p) which describes the procedure to determine usable battery energy for plug-in hybrid powertrains.

As noted in 40 CFR 1036.545(a), powertrain testing depends on vehicle and component models to test the powertrain using the engine-based duty cycles and the existing 40 CFR 1036.545(a), (f), and (g), and allow manufacturers to use the hardware-in-the-loop (HIL) model included in GEM. As described in section VI.C.2.b of this preamble, we propose to remove GHG vehicle testing requirements for most vehicles, including any requirements to use GEM to demonstrate compliance. However, we propose to retain the use of the HIL model within GEM Phase 2, Version 4.0 for the powertrain test procedure.[135]

In 40 CFR part 1036, subpart G, we propose revisions to 40 CFR 1037.605 to remove the GHG requirements for engines installed in specialty vehicles and are proposing to make similar changes in 40 CFR 86.007–11(g) and 86.008–10(g) for model year 2026 and earlier specialty vehicle engines. We propose to remove 40 CFR 1036.610 through 1036.630, which include compliance provisions related to heavy-duty engine GHG emissions compliance. We propose also to remove 40 CFR 1036.635, which describes how manufacturers that certify engines for use in high-gross combined vehicle weight (GCWR) medium-duty vehicles under 40 CFR part 1036 could comply with GHG standards under 40 CFR part 86, subpart S. With no need to describe the GHG-related flexibilities in 40 CFR 1036.635, the existing applicability

---

[135] GEM Phase 2, Version 4.0 is incorporated by reference in 40 CFR 1036.545. *See also* 40 CFR 1036.810.

provisions in 40 CFR 1036.1 and 1036.5 already cover the certification provisions for high-GCWR vehicles as they relate to criteria pollutants. Specifically, 40 CFR 1036.1 sets up the default of applying the standards and certification requirements from 40 CFR part 1036 to all engines installed in heavy-duty vehicles (generally vehicles above 8,500 pounds GVWR), while 40 CFR 1036.5 allows manufacturers to certify medium-duty vehicles to the chassis-based program as described in 40 CFR 86.1801–12. We are proposing to make minor changes to 40 CFR 1036.5(a) to differentiate more clearly the certification requirements for medium-duty vehicles from those for heavy-duty engines.

In 40 CFR part 1036, subpart H, we propose to remove 40 CFR 1036.745, which describes $CO_2$ emission credit deficits.

In 40 CFR part 1036, subpart I, we propose to remove GHG-specific symbols, abbreviations, and acronyms from 40 CFR 1036.805, and propose to remove materials from 40 CFR 1036.810 that are only incorporated by reference in the test procedures we propose to remove. In 40 CFR 1036.801, we propose to remove several GHG-specific definitions, and are moving transmission- and other powertrain-related definitions from the heavy-duty

vehicle definitions in 40 CFR 1037.801 to the engine definitions in 40 CFR 1036.801, so they can be available to engine manufacturers using the powertrain test procedures in 40 CFR 1036.545.

b. 40 CFR Part 1037—Emission Standards and Compliance Provisions for Heavy-Duty Vehicles

40 CFR part 1037 contains regulations related to the final rule titled "Control of Emissions from New Heavy-Duty Motor Vehicles," including GHG emission standards for $CO_2$ and HFC, criteria pollutant emission standards that apply for all heavy-duty vehicles, and evaporative and refueling emission standards that apply for certain heavy-duty vehicles. 40 CFR part 1037 is divided into nine subparts with five appendices. Subpart A defines the applicability of part 1037 and gives an overview of regulatory requirements. Subpart B describes the emission standards and other requirements that must be met to certify vehicles under this part. Subpart C describes how to apply for a certificate of conformity. Subpart D and E address testing of production and in-use vehicles, respectively. Subpart F describes how to test vehicles and perform emission modeling for vehicles subject to the $CO_2$ emission standards. Subpart G, along

with 40 CFR part 1068, describe requirements, prohibitions, and other provisions that apply to manufacturers, owners, operators, rebuilders, and all others. Subpart H describes how manufacturers can optionally generate and use emission credits to certify vehicles. Subpart I includes definitions and other reference material. Finally, Appendix A, B, and D include test cycles, Appendix C presents emission control identifiers for emissions labels, and Appendix E presents power take-off utility factors.

This subsection includes an overview of the regulations related to the heavy-duty vehicle program we propose to remove or revise. In general, we propose to amend 40 CFR part 1037 to remove all GHG emission standards, references to such standards, and related provisions without revising or reopening provisions necessary to support criteria pollutant standards, including evaporative and refueling emissions standards. Below we describe the proposed amendments to remove GHG-related provisions from 40 CFR part 1037, which include some amendments needed to retain the efficacy of the criteria pollutant emission standards. Table 5 provides a summary of the regulations we propose either to remove or to amend in 40 CFR part 1037.

TABLE 5—SUMMARY OF PROPOSED CHANGES TO HEAVY-DUTY HIGHWAY VEHICLE REGULATIONS UNDER 40 CFR PART 1037

| 40 CFR part 1037 | Sections proposed to remove | Sections proposed to amend |
|---|---|---|
| Subpart A—Overview and Applicability ............ | ..................................................................... | 1037.5, 1037.10, 1037.15. |
| Subpart B—Emission Standards and Related Requirements. | 1037.105, 1037.106, 1037.140, 1037.150 ....... | 1037.101, 1037.102, 1037.115, 1037.120, 1037.125, 1037.135. |
| Subpart C—Certifying Vehicle Families ............ | 1037.231,[a] 1037.232 ........................................ | 1037.201, 1037.205, 1037.225, 1037.230, 1037.235, 1037.250. |
| Subpart D—Testing Production Vehicles and Engines. | 1037.301, 1037.305, 1037.315, 1037.320. | |
| Subpart E—In-Use Testing ................................ | 1037.401. | |
| Subpart F—Test and Modeling Procedures ...... | 1037.501, 1037.510, 1037.520, 1037.525, 1037.527, 1037.528, 1037.530, 1037.532, 1037.534, 1037.540, 1037.551, 1037.555, 1037.560, 1037.565, 1037.570. | |
| Subpart G—Special Compliance Provisions ..... | 1037.610, 1037.615, 1037.630, 1037.631, 1037.640, 1037.645, 1037.655, 1037.660, 1037.665, 1037.670. | 1037.601, 1037.605, 1037.620, 1037.621, 1037.622, 1037.635. |
| Subpart H—Averaging, Banking, and Trading for Certification. | 1037.701, 1037.705, 1037.710, 1037.715, 1037.720, 1037.725, 1037.730, 1037.735, 1037.740, 1037.745, 1037.750, 1037.755. | |
| Subpart I—Definitions and Other Reference Information. | 1037.810 ........................................................ | 1037.801, 1037.825. |
| Appendices ........................................................ | Appendices A, B, C, D, E. | |

[a] We are proposing to move 40 CFR 1037.231 to a new 40 CFR 1036.231.

In 40 CFR part 1037, subpart A, we are retaining and not proposing to reopen the existing applicability of 40 CFR part 1037. Specifically, as described in existing 40 CFR 1037.1, the

part would continue to apply for battery electric vehicles, fuel cell electric vehicles, and vehicles fueled by conventional and alternative fuels.

Existing 40 CFR part 1037, subpart B, includes criteria pollutant exhaust emission standards, evaporative and refueling emission standards, and GHG emission standards that apply at the

vehicle level. In 40 CFR part 1037, subpart B, we propose to remove the MY 2014 and later heavy-duty vehicle $CO_2$ emission standards promulgated in HD GHG Phase 1, Phase 2, and Phase 3. This includes the vocational vehicle standards in 40 CFR 1037.105 and the tractor standards in 40 CFR 1037.106. We also propose to amend 40 CFR 1037.115 to remove the HFC emission standards. We propose to amend 40 CFR 1037.120 to remove the emission control components related to heavy-duty vehicle GHG-reducing technologies. We are retaining and not proposing to reopen the requirement that the basic emission-related warranty applies for fuel cell stacks and rechargeable energy storage systems (RESS) as they continue to qualify as an emission-related component related to criteria pollutant emission standards. Similarly, we are retaining and not proposing to reopen the emission control components covering a vehicle's evaporative and refueling emissions. Also in Subpart B, we propose to remove 40 CFR 1037.140 and 1037.150, which include the vehicle classifications and interim provisions related directly to the heavy-duty vehicle GHG emission standards.

While we propose to remove GHG standards and related requirements, we would retain without reopening criteria pollutant exhaust emission standards in 40 CFR 1037.102 and the evaporative and refueling emission standards in 40 CFR 1037.103. We propose to revise 40 CFR 1037.102(a) to describe how vehicles can be deemed to meet the criteria pollutant exhaust emission standards without testing under 40 CFR part 1037. As proposed, vehicle manufacturers would continue to submit an application for certification meeting the applicable requirements in 40 CFR 1037.205, affix an appropriate label to their vehicles as specified in 40 CFR 1037.135, and meet the applicable reporting and recordkeeping requirements in 40 CFR 1037.250. Under this proposed approach, most heavy-duty vehicles would be deemed to meet the criteria pollutant exhaust emissions standards if manufacturers state in their applications for certification that the installed engines are certified to the standards of 40 CFR part 86 or 1036, as applicable. We similarly propose specialty vehicles meeting the requirements in 40 CFR 1037.605 and heavy-duty glider vehicles meeting the requirements 40 CFR 1037.635 would also be deemed to meet the criteria pollutant exhaust emission

standards.[136] Existing 40 CFR part 1037 includes other requirements that would continue to apply for certain vehicles, and we propose to revise 40 CFR 1037.102(a) to also refer to the requirements we are retaining and not reopening for auxiliary power units (APUs) installed on new tractors, now specified in proposed new 40 CFR 1037.102(c), and for the vehicles subject to the existing evaporative and refueling emission standards that apply as specified in 40 CFR 1037.103.

In the HD GHG Phase 2 rulemaking, we adopted PM emission standards that apply for APUs installed on new tractors.[137] The APU requirements are currently specified in 40 CFR 1037.106 with the other tractor standards, including the GHG emission standards we are proposing to remove. Since PM emissions are criteria pollutant emissions, we are retaining and not reopening the PM emission standards for APUs, and we propose to migrate 40 CFR 1037.106(g) to a new 40 CFR 1037.102(c). We note that the APUs under this specific proposed revision are certified under the nonroad compression-ignition engine regulations in 40 CFR part 1039, and existing 40 CFR 1039.699 includes references to the APU standards in 40 CFR part 1037. We propose to modify 40 CFR 1039.699(a) and (n) to refer to the proposed new 40 CFR 1037.102 instead of 40 CFR 1037.106, which we propose to remove.

In 40 CFR part 1037, subpart C, we propose to remove 40 CFR 1037.231, 1037.232, and 1037.241 that only apply for certifying heavy-duty vehicles to the GHG emission standards. We are retaining 40 CFR 1037.235, which remains applicable for evaporative and refueling testing that we are not reopening, with proposed revisions to remove GHG-related testing requirements. Existing 40 CFR 1037.230 directs manufacturers to divide their product lines into vehicle families based on regulatory subcategories; however, with the proposed removal of GHG standards, we also propose to remove the range of GHG-based vehicle regulatory subcategories. Therefore, for the purpose of defining vehicle families, we propose to amend 40 CFR 1037.230 to reflect the vehicle types outlined in the proposed 40 CFR 1037.102. Specifically, we propose that manufacturers would create a single vehicle family for all vehicles with propulsion engines that are certified to the criteria pollutant standards of 40

CFR 86.007–11 or 86.008–10, or 40 CFR part 1036, except that new tractors with auxiliary power units would be in a separate family, and vehicles subject to evaporative or refueling standards would be in families as described in existing 40 CFR 86.1812. We propose all specialty vehicles would be a single vehicle family, and all glider vehicles would be in a single vehicle family. Finally, we propose that all vehicles with no propulsion engine, such as battery electric vehicles and fuel cell electric vehicles, would be in a single vehicle family.

With the updated vehicle families, we propose to revise 40 CFR 1037.205, which defines what manufacturers would include in their application for certification. The proposed 40 CFR 1037.205 includes existing information required for all applications for certification, and more clearly defines what specific information would be required for each of the vehicle families proposed in 40 CFR 1037.230.

We propose to remove 40 CFR part 1037, subpart D, in its entirety because it describes the testing of production vehicles to be certified to the heavy-duty $CO_2$ emission standards. The provisions in 40 CFR 1037.301 through 1037.320 include audit procedures for inputs to the Greenhouse gas Emissions Model (GEM), tractor aerodynamic testing, powertrain testing, and axle and transmission testing.

We propose to remove 40 CFR part 1037, subpart E, in its entirety because it includes the requirements for testing of in-use vehicles and applies only to GHG emission standards.

We propose to remove 40 CFR part 1037, subpart F, in its entirety because it includes the testing and modeling provisions necessary to certify heavy-duty vehicles to the $CO_2$ emission standards. The provisions in 40 CFR 1037.501 through 1037.570 include procedures for vehicle-based duty cycles for measuring GHG emissions, aerodynamic testing, powertrain component testing, testing with hybrid power take-off units, and the use of GEM.

We propose to remove several sections of 40 CFR part 1037, subpart G, relating to special compliance provisions for the heavy-duty vehicle GHG emission standards. Specifically, we propose to remove 40 CFR 1037.610 through 1037.615, 1037.630, 1037.631, and 1037.640 through 1037.670. These sections include provisions related to off-cycle technologies, advanced technologies, special purpose tractors, variable vehicle speed limiters, idle reduction technologies, in-use tractor

---

[136] See the discussion of 40 CFR part 1037, subpart G, for the revisions we propose related to the specialty vehicle and glider vehicle provisions.

[137] See 81 FR 73576–73580.

testing, and optional tractor $CO_2$ emission standards.

We propose to remove 40 CFR part 1037, subpart H in its entirety. The provisions of 40 CFR 1037.701 through 1037.750 describe the averaging, banking, and trading of $CO_2$ emission credits, along with associated recordkeeping and reporting requirements.

We propose several revisions in 40 CFR part 1037, subpart I, to remove GHG-specific definitions from 40 CFR 1037.801, and symbols, abbreviations, and acronyms from 40 CFR 1037.805. We also propose to remove 40 CFR 1037.810, which includes materials incorporated by reference to support testing to demonstrate compliance with the heavy-duty vehicle GHG standards. This includes, but is not limited to, the GEM model and test procedures for measuring the rolling resistance of tires, tire revolutions per mile, and aerodynamics using coastdown, wind tunnel, and computational fluid dynamics.

Lastly, we propose to remove all appendices to 40 CFR part 1037. Appendices A, B, and D include the test cycles related to heavy-duty vehicle GHG standards. Appendix C includes the emission control identifiers for GHG emission labels. Appendix E includes the power take-off unit utility factors applied in GHG-specific test procedures.

c. Relationship Between the EPA's GHG and NHTSA's Fuel Efficiency Medium- and Heavy-Duty Programs

The current certification and compliance process as relevant for NHTSA is as follows, separately for heavy-duty engines and heavy-duty vehicles:

1. Manufacturers submit fuel consumption data to the EPA using the EPA's electronic certification system following EPA test procedures included in 40 CFR parts 1036 and 1037;

2. The EPA issues certificates of conformity to the manufacturers;

3. Before and during the model year, the EPA sends the fuel consumption data and associated information to NHTSA;

4. After the model year, the EPA analyzes end-of-year reports submitted to the EPA by manufacturers for compliance and shares the fuel consumption data with NHTSA; and

5. NHTSA manages its compliance process related to the fuel consumption standards.

NHTSA's medium- and heavy-duty fuel efficiency regulations in 49 CFR part 535 refer to several sections in EPA's 40 CFR parts 1036 and 1037 that we are proposing to modify or remove.

The provisions NHTSA's regulations reference from EPA's heavy-duty engine regulations include 40 CFR 1036.1, 1036.108, 1036.150, 1036.205, 1036.225, 1036.230, 1036.235, 1036.250, 1036.255, 1036.301, 1036.501, 1036.505, 1036.510, 1036.512, 1036.525, 1036.535, 1036.540, 1036.545, 1036.620, 1036.725, 1036.730, 1036.740, 1036.745, and some definitions in 1036.801. The provisions NHTSA's regulations reference from EPA's heavy-duty vehicle regulations include 40 CFR 1037.105, 1037.106, 1037.140, 1037.150, 1037.205, 1037.210, 1037.225, 1037.230, 1037.232, 1037.250, 1037.255, 1037.301, 1037.305, 1037.320, 1037 subpart F broadly, 1037.510, 1037.520, 1037.525, 1037.527, 1037.528, 1037.530, 1037.532, 1037.534, 1037.540, 1037.560, 1037.565, 1037.570, 1037.601, 1037.605, 1037.610, 1037.615, 1037.620, 1037.621, 1037.622, 1037.631, 1037.660, 1037.725, 1037.730, 1037.740, 1037.745, 1037.755, and some definitions in 1037.801. We request comment on whether any of these provisions should be retained with a CFR notation throughout 40 CFR parts 1036 and 1037 explaining that these sections only apply to NHTSA's heavy-duty fuel efficiency program.

We propose to remove 40 CFR 1036.755 and 1037.755, which describe the information the EPA would provide to the Department of Transportation related to heavy-duty engine and vehicle fuel consumption. We note that NHTSA's reporting and recordkeeping regulation in 49 CFR 535.8(a)(6) directs manufacturers to submit information to EPA. 49 CFR 535.8(a)(6) also provides direction to manufacturers in instances where the EPA does not have an electronic pathway to receive the information, to send it through an electronic portal identified by NHTSA, through the NHTSA CAFE database, or to send hardcopy documents to the address provided in the regulations.[138] We request comment on the time required to transition from manufacturers supplying data to the EPA to supplying the data directly to NHTSA.

## VII. Requests for Comment

The EPA is specifically soliciting comment on key aspects of the proposed rule. To facilitate comment on those portions of the rule, the EPA has indexed each comment solicitation with a unique identifier below (*e.g.,* "C–1", "C–2") to provide a consistent framework for effective and efficient provision of comments. Accordingly, we ask that commenters include the corresponding identifier when

providing comments relevant to that comment solicitation. We ask that commenters include the identifier either in a heading or within the text of each comment, to make clear which comment solicitation is being addressed. We note that we are not limiting comment to these identified areas. Specifically, we are soliciting comment on the following:

1. All aspects of this proposal, including legal and scientific developments that are being subject to public comment for the first time (C–1).

2. The scientific underpinnings of the Endangerment Finding are weaker than previously believed and contradicted by empirical data, peer-reviewed studies, and scientific developments since 2009 (C–2).

3. The EPA is not proposing to reopen or substantively modify at this time any regulations necessary for criteria pollutant and air toxic measurement and standards, CAFE testing, and associated fuel economy labeling requirements. If there are any elements of our regulations, test procedures, or GHG emission models proposed for removal that should remain to support other programs outside of the EPA's GHG standards, we are seeking comment on what those elements are and why their preservation in the CFR is necessary (C–3).

4. We seek comment on the nature and extent of any reliance interests that may have arisen from our assertion of regulatory authority over GHG emissions from new motor vehicles and engines and are committed to assessing any such interests, determining whether they are significant, and weighing such interests against competing rationales, as required by law (C–4).

5. We seek comment on whether regulated parties have any significant reliance interests in our GHG emission standards for new motor vehicles and new motor vehicle engines (C–5).

6. We seek comment on whether any reliance interests in national uniformity and preemption would support adopting certain rationales and not finalizing other rationales (C–6).

7. We seek comment on whether additional stakeholders have reliance interests in GHG emission standards for new motor vehicles and engines (C–7).

8. We seek comment on potential reliance interests in GHG emission standards for global climate change concerns under CAA section 202(a), including on whether such reliance justifies retaining such standards and the extent to which potential dangers are addressed, or could be addressed, under more specific authorities (C–8).

9. We seek comment on reliance interests in the Endangerment Finding

---

[138] *See* 49 CFR 535.8(a)(6).

and GHG emission standards issued under CAA section 202(a) and reserve the right to direct out of scope comments to the appropriate rulemaking docket for the applicable regulatory action (C–9).

10. We seek comment on the continued preemptive effect of the CAA in the event that the EPA finalizes the proposed rescission or otherwise concludes that it lacks authority to regulate GHG emissions under CAA section 202(a) or any other specific regulatory provision of the CAA (C–10).

11. We seek comment on the proposed interpretation of CAA 202(a) as discussed in section III.A.1 of this preamble, including the rationales presented in that section and any further rationales that commenters believe support, or detract from, this interpretation (C–11).

12. We seek comment on the rationale presented in section V of this preamble, including on the proper interpretation of ''requisite technology,'' the appropriate standard for measuring pollution prevention and control, and the scientific threshold for determining measurable impacts on trends in climate change (C–12).

13. We seek comment on the proposed bases for repeal presented in section V of this preamble, including on the economics of fleet turnover, the relative efficiency and emission reductions achieved by newer vehicles, and the potential costs to air quality of retaining standards that may slow fleet turnover as compared to the potential benefits of retaining GHG emission standards in response to global climate change concerns (C–13).

14. We seek comment on the rationales presented in section V of this preamble, including on whether such public welfare considerations can and should be considered when prescribing and revising emission standards under CAA section 202(a) (C–14).

15. We seek comment on how to give effect to the statutory language discussed in section V of this preamble as incorporated into the reference in CAA section 202(a) to effects on ''public health or welfare'' (C–15).

16. We request comment on all proposed changes described in section VI of this preamble, including on any additional regulatory provisions for engines and vehicles that should be removed as part of repealing the GHG standards or should be retained to effectuate unrelated standards that we are not proposing to repeal or revise (C–16).

17. NHTSA's medium- and heavy-duty fuel efficiency regulations in 49 CFR part 535 refer to several sections in

the EPA's 40 CFR parts 1036 and 1037 that we are proposing to modify or remove. We request comment on whether any of these provisions should be retained for the final rule with a CFR notation throughout 40 CFR parts 1036 and 1037 explaining that these sections only apply to NHTSA's heavy-duty fuel efficiency program (C–17).

18. We request comment on the time required to transition from requiring manufacturers to supply relevant data to the EPA to requiring that they supply the data directly to NHTSA (C–18).

19. We request comment on all proposed changes described in preamble section VI, including suggestions to remove additional regulatory provisions for such engines and vehicles for purposes of GHG regulation or to retain provisions we propose to remove. Specifically, we request comment on the proposed regulatory changes for the light- and medium-duty vehicle programs under 40 CFR parts 85, 86, and 600, and whether additional changes should be considered for purposes of GHG regulation (C–19).

20. We request comment on all proposed changes described in preamble section VI, including suggestions to remove additional regulatory provisions for such engines and vehicles for purposes of GHG regulation or to retain provisions we propose to remove. Specifically, we request comment on the proposed regulatory changes for the heavy-duty engine and vehicle programs under 40 CFR parts 1036 and 1037 and whether we should consider additional changes for purposes of GHG regulation (C–20).

21. We request comment on the analysis provided within section VIII related to the benefits and costs of the proposed action and whether benefit cost analysis is an appropriate and lawful basis for repealing the Endangerment Finding and/or resulting vehicle standards (C–21).

22. The information collection activities in this proposed rule have been submitted for approval to OMB under the Paperwork Reduction Act (PRA), as described in section VIII.C of this preamble. Submit your comments on the Agency's description of the information that would no longer be required to be provided, the accuracy of the provided burden savings estimates, and any suggested methods for minimizing respondent burden to the EPA using the docket identified at the beginning of this rule (C–22).

23. Stakeholders state that NCA5 does not meet the requirements under Executive Order 14303 and deviated from OMB guidelines on quality,

objectivity, utility, and integrity of information disseminated by Federal agencies. The Administrator takes these concerns seriously and seeks public comment on the validity of these concerns and how they should be taken into account when determining whether to finalize any of the alternatives proposed in this action (C–23).

24. We further propose that Massachusetts must be read together with the Supreme Court's decisions in *West Virginia* and *UARG,* which applied the major questions doctrine to statutory provisions similar to CAA section 202(a). To that end, we seek comment on whether *Massachusetts* applied the major questions doctrine in the first instance, and, if it did, whether that analysis informs the meaning of CAA section 202(a) on its own terms and in light of *UARG* and *West Virginia* (C–24).

25. We propose that the EPA's course of rulemaking has not been limited to emission standards as anticipated in *Massachusetts.* To that end, we seek comment on whether a new analysis is required because the EPA's rulemakings in response to the Endangerment Finding have included electric vehicle mandates that require shifting the national vehicle fleet from one type of vehicle and vehicle fuel to another (C–25).

26. We propose that even if intervening legal developments have not foreclosed the regulation of GHG emissions from new motor vehicles and engines under CAA section 202(a), they provide a reasonable basis for the Administrator to approach the inquiry with greater caution today than was applied in the Endangerment Finding. We propose that the Administrator's new approach requires rescinding the Endangerment Finding as fundamentally inconsistent with the framework set out in this proposed alternative. We seek comment on this alternative proposal, including on the breadth of the Administrator's discretion to exercise judgment by rejecting the approach taken in the Endangerment Finding and the results of adopting a different approach (C–26).

27. We seek comment on any additional aspects of the Endangerment Finding that may have fallen short of the administrative law requirement that agency action be reasonable and reasonably explained. Conversely, we seek comment on why the approach taken in the Endangerment Finding remains reasonable given the legal and scientific developments discussed in this proposal, and the impact, if any, of the EPA's denial of rulemaking petitions in 2022 and 2010 on this alternative proposal (C–27).

## VIII. Statutory and Executive Order Reviews

Additional information about these statutes and Executive Orders can be found at *http://www.epa.gov/laws-regulations/laws-and-executive-orders.*

### A. Executive Order 12866: Regulatory Planning and Review and Executive Order 14094: Modernizing Regulatory Review

This proposed action is an economically significant regulatory action that was submitted to the Office of Management and Budget (OMB) for review. Any changes made have been documented in the docket. The EPA has prepared a draft Regulatory Impact Analysis (RIA) for this proposed action to project impacts as required by E.O. 12866, and it can be found in the docket.[139] The EPA has not relied upon any aspect of the draft RIA as justification for this proposed rulemaking.

The EPA considered relying on our most recent RIAs from 2024 relating to GHG standards for motor vehicles [140] (2024 GHG Vehicle RIAs) for projecting impacts of this action. However, the 2024 GHG Vehicle RIAs significantly relied upon assumptions that we no longer believe are appropriate and that would significantly impact the costs and benefits of this proposed rule. Those assumptions include, but are not limited to:

1. The impact and existence of EV-related tax credits and other subsidies from the 2022 IRA, which have been repealed in part by the 2025 OBBB and were incorporated into the RIA baseline;

2. The impact of Congress' disapproval under the CRA of the EPA's waiver rule for California's Advanced Clean Truck regulation, which was incorporated into the RIA baseline but is no longer in force in California or any other State;

3. Changes in consumers' interest in purchasing EVs;

4. Future gasoline and diesel prices due to changes in Administration policy since 2024;

5. Changes in the power generation sector as a result of recent projections for data center demands and legislative amendments in the 2025 OBBB that impact the economics of EV penetration and use; and

6. Access to capital for all consumers due to differences in prices and the respective cost impacts on vehicles, given that the RIAs from 2024 assumed unlimited access to capital.

Changes in these assumptions impact all aspects of the 2024 RIAs and, thus, the EPA cannot rely upon those assessments to confidently and appropriately quantify or monetize many of the impacts from this proposed action. In the draft RIA for this proposal, the EPA presents estimated results from two analytical methods for projecting impacts on costs and benefits from removing the GHG standards for LD, MD and HD vehicles and HD engines.

The EPA presents five different modeled scenarios using one of the analytical methods in the draft RIA, which are summarized here in Tables 6 and 7. The first scenario contains all the same assumptions and inputs as presented in the 2024 RIAs. The second scenario estimates the impacts of removing the IRA and the California Advanced Clean Truck (ACT) rule, which the EPA included in the baseline for the 2024 RIAs assessments. Recognizing the significant uncertainties related to future gasoline and diesel prices, the third scenario considers lower fuel prices, in addition to the removal of IRA and the ACT rule. All other assumptions and inputs are the same as those used in the 2024 RIAs. The fourth and fifth scenarios build on the second and third scenarios respectively, accounting for only the first two and half years of fuel savings in estimating the net monetized impact of this proposed rule.

Table 6 and Table 7 show the net present value of the monetized savings, costs, and net savings of the five scenarios presented at 7 and 3 percent discount rates, respectively.

### TABLE 6—MONETIZED SAVINGS, COSTS, AND NET SAVINGS AT 7 PERCENT NET PRESENT VALUE

[Billions of 2022 dollars]*

|  | 2024 Light- & medium-duty vehicle multipollutant final rule (LMDV) and greenhouse gas emissions standards for heavy-duty vehicles-phase 3 (HDP3) rule analysis | 2024 LMDV and HDP3 rule analysis, no IRA and ACT | 2024 LMDV and HDP3 rule, no IRA and ACT; low liquid fuel prices | 2024 LMDV and HDP3 rule analysis, no IRA and ACT, 2.5 years of fuel savings | 2024 LMDV and HDP3 rule; no IRA and ACT, low liquid fuel prices, 2.5 years of fuel savings |
|---|---|---|---|---|---|
| Savings | $570 | $640 | $640 | $640 | $640 |
| Costs | 590 | 690 | 420 | 320 | 260 |
| Net Savings | (30) | (50) | 220 | 320 | 380 |

*Results may not sum due to rounding.

### TABLE 7—MONETIZED SAVINGS, COSTS AND NET SAVINGS AT 3 PERCENT NET PRESENT VALUE

[Billions of 2022 dollars]*

|  | 2024 LMDV and HDP3 rule analysis | 2024 LMDV and HDP3 rule analysis, no IRA and ACT | 2024 LMDV and HDP3 rule analysis; no IRA and ACT; low liquid fuel prices | 2024 LMDV and HDP3 rule analysis; no IRA and ACT, 2.5 years of fuel savings | 2024 LMDV and HDP3 rule; no IRA and ACT, low liquid fuel prices, 2.5 years of fuel savings |
|---|---|---|---|---|---|
| Savings | $950 | $1,030 | $1,030 | $1,030 | $1,030 |

[139] ''Reconsideration of 2009 Endangerment Finding and Greenhouse Gas vehicle Standards: Draft Regulatory Impact Analysis.'' EPA–420–D–25–002. July 2025.

[140] *See* ''Multi-Pollutant Emissions Standards for Model Years 2027 and Later Light-Duty and Medium-Duty Vehicles. Regulatory Impact Analysis.'' EPA–420–R–24–004. March 2024;

''Greenhouse Gas Emissions Standards for Heavy-Duty Vehicles: Phase 3. Regulatory Impact Analysis''. EPA–420–R–24–006. March 2024.

TABLE 7—MONETIZED SAVINGS, COSTS AND NET SAVINGS AT 3 PERCENT NET PRESENT VALUE—Continued

[Billions of 2022 dollars] *

|  | 2024 LMDV and HDP3 rule analysis | 2024 LMDV and HDP3 rule analysis, no IRA and ACT | 2024 LMDV and HDP3 rule, no IRA and ACT; low liquid fuel prices | 2024 LMDV and HDP3 rule analysis; no IRA and ACT, 2.5 years of fuel savings | 2024 LMDV and HDP3 rule; no IRA and ACT, low liquid fuel prices, 2.5 years of fuel savings |
|---|---|---|---|---|---|
| Costs ........................ | 1,210 | 1,390 | 870 | 660 | 550 |
| Net Savings ...... | (260) | (350) | 160 | 380 | 490 |

\* Results may not sum due to rounding.

The other analytical method which utilizes a revealed preference approach) can be found in the draft RIA.

The EPA requests comment on all aspects of the draft RIA, and on whether there are other approaches the EPA should consider for projecting the impacts of this proposed rule (C–20). We are requesting comment from stakeholders about what expected and modeled impacts would be from this proposal.

*B. Executive Order 14192: Unleashing Prosperity Through Deregulation*

This action is expected to be an Executive Order 14192 deregulatory action. A summary of the projected costs savings can be found in the draft RIA.

*C. Paperwork Reduction Act (PRA)*

An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a currently valid OMB control number. The OMB control numbers for the EPA's regulations in Title 40 of the CFR are listed in 40 CFR part 9.

Submit your comments on the Agency's description of the information that would no longer be required to be provided, the accuracy of the provided burden savings estimates and any suggested methods for minimizing respondent burden to the EPA using the docket identified at the beginning of this rule. The EPA will respond to any ICR-related comments in the final rule. You may also send your ICR-related comments to OMB's Office of Information and Regulatory Affairs using the interface at *www.reginfo.gov/ public/do/PRAMain.* Find the particular information collection by selecting ''Currently under Review—Open for Public Comments'' or by using the search function. OMB must receive comments no later than September 2, 2025.

The information collection activities in this proposed rule have been submitted for approval to the OMB under the PRA.

1. Light- and Medium-Duty Vehicle— 2024 Final Rule

The ICR document prepared by the EPA for removal of the light- and medium-duty vehicle GHG requirements has been assigned EPA ICR 2750.03, revising EPA ICR 2750.02 (OMB 2060–0764). You can find a copy of the ICR in the docket for this rule and it is briefly summarized here.

The EPA is proposing to remove all regulations that require light- and medium-duty vehicle manufacturers to measure, report, or comply with standards for GHG emissions. Information collected to assure compliance with those requirements is no longer needed under this proposal. All other requirements covered by 2750.02 remain in effect.

*Respondents/affected entities:* Light- and medium-duty vehicle manufacturers, alternative fuel converters, and independent commercial importers.

*Respondent's obligation to respond:* This proposal relieves manufacturers of the burden to provide certain information to the EPA as part of their annual model year vehicle certification under section 208(a) of the CAA, which is required prior to entering vehicles into commerce. Participation in some programs is voluntary; but once a manufacturer has elected to participate, it must submit the required information.

*Estimated number of respondents:* 35 affected entities.

*Frequency of response:* Annually or on occasion, depending on the type of response.

*Revised total estimated burden:* 138,443 hours (per year) for remaining regulatory requirements covered by this ICR. Burden is defined at 5 CFR 1320.3(b).

*Revised total estimated cost:* $26.3 million per year for remaining regulatory requirements covered by this ICR, which includes an estimated $14.2 million annualized capital or operation and maintenance costs.

2. Heavy-Duty Vehicle GHG Phase 3— 2024 Final Rule

The ICR document prepared by the EPA for removal of the heavy-duty GHG Phase 3 requirements has been assigned EPA ICR 2734.03, revising EPA ICR 2734.02 (OMB 2060–0753). You can find a copy of the ICR in the docket for this rule and it is briefly summarized here.

The EPA is proposing to remove all regulations that require heavy-duty motor vehicle and heavy-duty motor vehicle engine manufacturers to measure, report, or comply with the heavy-duty GHG Phase 3 standards. Information collected to assure compliance with those requirements is no longer needed under this proposal.

*Respondents/affected entities:* Manufacturers of heavy-duty onroad vehicles.

*Respondent's obligation to respond:* This proposal relieves manufacturers of the burden to provide certain information to the EPA as part of their annual model year engine and vehicle certification under section 203(a) of the CAA, which is required prior to entering vehicles into commerce.

*Estimated number of respondents:* 77 affected entities.

*Frequency of response:* Originally expected to be one-time burden; now, no requirement to report.

*Revised total estimated burden:* 0 hours. Burden is defined at 5 CFR 1320.03(b).

*Revised total estimated cost:* $0.

3. Nonroad Compression-Ignition Engines and On-Highway Heavy Duty Engines, Supporting Statement for Information Collection Request (March 2023 Revision)

The ICR document prepared by the EPA for removal of the existing Phase 2 and earlier GHG requirements for heavy-duty engines and vehicles has been assigned EPA ICR 1684.22, revising EPA ICR 1684.21 (OMB 2060–0287). You can find a copy of the ICR in the docket for this rule and it is briefly summarized here.

The EPA is proposing to remove all regulations that require heavy-duty motor vehicle and heavy-duty motor vehicle engine manufacturers to measure, report, or comply with standards for GHG emissions. Information collected to assure compliance with those requirements is no longer needed under this proposal. All other requirements covered by EPA ICR 1684.21 remain in effect.

*Respondents/affected entities:* Manufacturers of heavy-duty onroad vehicles and engines.

*Respondent's obligation to respond:* This proposal relieves manufacturers of the burden to provide certain information to the EPA as part of their annual model year engine and vehicle certification under CAA section 203(a), which is required prior to entering vehicles into commerce. Participation in some programs is voluntary; but once a manufacturer has elected to participate, it must submit the required information.

*Estimated number of respondents:* 568 affected entities.

*Frequency of response:* Annually or on occasion, depending on the type of response.

*Revised total estimated burden:* 137,824 hours for remaining regulatory requirements covered by this ICR. Burden is defined at 5 CFR 1320.03(b).

*Revised total estimated cost:* $30.3 million for remaining regulatory requirements covered by this ICR, which includes an estimated $17.9 million annualized capital or operation and maintenance costs.

## D. Regulatory Flexibility Act (RFA)

I certify that this proposed action would not have a significant economic impact on a substantial number of small entities under the Regulatory Flexibility Act (RFA). In making this determination, the EPA concludes that the impact of concern for this rule is any significant adverse economic impact on small entities, and that the agency is certifying that this rule will not have a significant economic impact on a substantial number of small entities because the rule relieves regulatory burden on the small entities subject to the rule.

The regulated entities that are subject to the regulations we are proposing to remove in this proposed rule are engine and vehicle manufacturers, alternative fuel converters, and independent commercial importers subject to GHG emissions standards for vehicles. The Agency is certifying that this proposed action would not have a significant economic impact on a substantial number of small entities because the proposed action would relieve

regulatory burden on all entities, including all small entities, subject to the current rules. This action proposes to remove portions of the regulations of the standard-setting parts directly related to GHG emission standards and compliance provisions for implementing the EPA's GHG engine and vehicle programs. We do not anticipate that there would be any significant adverse economic impact on directly regulated small entities as a result of these revisions. We have therefore concluded that this proposed action would, if finalized, relieve regulatory burden for all directly regulated small entities. The EPA provides additional information on the RFA in Section 7 of the Draft Regulatory Impact Analysis document for this proposal.

## E. Unfunded Mandates Reform Act (UMRA)

This proposed action does not contain an unfunded mandate of $100 million (adjusted annually for inflation) or more (in 1995 dollars) as described in UMRA, 2 U.S.C. 1531–1538, and does not significantly or uniquely affect small governments. The proposed action would, if finalized, impose no enforceable duty on any state, local, or tribal governments, and would relieve duties with respect to the private sector.

## F. Executive Order 13132: Federalism

This proposed action would not have federalism implications as specified in Executive Order 13132. If finalized, it would not have substantial direct effects on the states, on the relationship between the national government and the states, or on the distribution of power and responsibilities among the various levels of government.

## G. Executive Order 13175: Consultation and Coordination With Indian Tribal Governments

This proposed action would not have tribal implications as specified in Executive Order 13175. If finalized, it would not have substantial direct effects on tribal governments, on the relationship between the federal government and Indian tribes, or on the distribution of power and responsibilities between the federal government and Indian tribes, as specified in Executive Order 13175. Thus, Executive Order 13175 does not apply to this proposed action.

## H. Executive Order 13045: Protection of Children From Environmental Health Risks and Safety Risks

Executive Order 13045 directs federal agencies to include an evaluation of the

health and safety effects of the planned regulation on children in federal health and safety standards and explain why the regulation is preferable to potentially effective and reasonably feasible alternatives. This action is subject to Executive Order 13045 because it is a significant regulatory action under section 3(f)(1) of Executive Order 12866, and the EPA believes the environmental health or safety risks of the pollutants impacted by this action may have a disproportionate effect on children. The 2021 Policy on Children's Health also applies to this action.[141]

Although the GHG emissions at issue in this rulemaking do not have direct impacts on human health, we acknowledge the possibility that this proposal could marginally impact emissions of criteria pollutants and air toxics. Children are not expected to experience greater ambient concentrations of air pollutants than the general population. However, children are more susceptible than adults to air pollution, and children tend to spend increased time outdoors. Children make up a substantial fraction of the U.S. population, and often have unique factors that contribute to their increased risk of experiencing a health effect from exposures to ambient air pollutants because of their continuous growth and development. Children are more susceptible than adults to many air pollutants because they have (1) a developing respiratory system, (2) increased ventilation rates relative to body mass compared with adults, (3) an increased proportion of oral breathing, particularly in boys, relative to adults, and (4) behaviors that increase chances for exposure. Even before birth, the developing fetus may be exposed to air pollutants through the mother that affect development when the mother is exposed. We note that, as explained above, this proposed action would not impact separate regulatory controls for criteria pollutants or separate standards set by NHTSA. At this time, the EPA does not believe that the proposed action would have a material adverse impact on the health of individuals with respect to non-GHG air pollutants, including on children, because the EPA anticipates that the impacts of repealing GHG emission regulations would have only marginal and incidental impacts on the emission of non-GHG air pollutants. Potential health impacts of such air pollutants will continue to be controlled through direct emissions limits and a

---

[141] U.S. Environmental Protection Agency. (2021). 2021 Policy on Children's Health: *https://www.epa.gov/system/files/documents/2021-10/2021-policy-on-childrens-health.pdf.*

number of other programs that target regional and national air quality, including the NAAQS program.

*I. Executive Order 13211: Actions Concerning Regulations That Significantly Affect Energy Supply, Distribution, or Use*

This proposed action, which is a significant regulatory action under Executive Order 12866, would have a significant effect on the supply, distribution or use of energy. The EPA has prepared a Statement of Energy Effects for this proposed action as follows.

This action proposes to remove the GHG emission standards and related compliance provisions for light-, medium-, and heavy-duty engines and vehicles. This action would, if finalized, result in an estimated increase in the consumption of petroleum and an estimated reduction in the consumption of electricity.

*J. National Technology Transfer and Advancement Act (NTTAA) and 1 CFR Part 51*

This proposed action involves technical standards. However, the proposed changes to the regulation include removing GHG emission standards and the corresponding measurement and compliance procedures, some of which also involve removing existing references to voluntary consensus standards and other technical standards. This proposed action does not include any new requirements or new references to technical standards.

### List of Subjects

*40 CFR Part 85*

Confidential business information, Greenhouse gases, Imports, Labeling, Motor vehicle pollution, Reporting and recordkeeping requirements, Research Warranties.

*40 CFR Part 86*

Environmental protection, Administrative practice and procedure, Confidential business information, Incorporation by reference, Labeling, Motor vehicle pollution, Reporting and recordkeeping requirements.

*40 CFR Part 600*

Environmental protection, Administrative practice and procedure, Electric power, Fuel economy, Greenhouse gases, Labeling, Reporting and recordkeeping requirements.

*40 CFR Part 1036*

Environmental protection, Administrative practice and procedure,

Air pollution control, Confidential business information, Greenhouse gases, Incorporation by reference, Labeling, Motor vehicle pollution, Reporting and recordkeeping requirements, Warranties.

*40 CFR Part 1037*

Environmental protection, Administrative practice and procedure, Air pollution control, Confidential business information, Incorporation by reference, Labeling, Motor vehicle pollution, Reporting and recordkeeping requirements, Warranties.

*40 CFR Part 1039*

Administrative practice and procedure, Air pollution control, Confidential business information, Imports, Labeling, Penalties, Reporting and recordkeeping requirements, Warranties.

**Lee Zeldin,**
*Administrator.*

For the reasons set out in the preamble, we propose to amend title 40, Chapter I of the Code of Federal Regulations as set forth below.

## PART 85—CONTROL OF AIR POLLUTION FROM MOBILE SOURCES

■ 1. The authority citation for part 85 continues to read as follows:

**Authority:** 42 U.S.C. 7401–7671q.

### § 85.525 [Amended]

■ 2. Amend § 85.525 by removing and reserving paragraph (b).
■ 3. Amend § 85.1515 by revising paragraph (d) to read as follows:

### § 85.1515 Emission standards and test procedures applicable to imported nonconforming motor vehicles and motor vehicle engines.

\* \* \* \* \*

(d) An ICI may not certify using nonconformance penalties.

### § 85.1803 [Amended]

■ 4. Amend § 85.1803 by removing paragraph (e).

### § 85.1805 [Amended]

■ 5. Amend § 85.1805 by removing and reserving paragraph (b).
■ 6. Amend § 86.1902 by removing and reserving paragraph (b)(2) and revising paragraph (d). The revision reads as follows:

### § 85.1902 Definitions.

\* \* \* \* \*

(d) *Voluntary emissions recall* means a repair, adjustment, or modification program voluntarily initiated and conducted by a manufacturer to remedy

any emission-related defect for which direct notification of vehicle or engine owners has been provided.

\* \* \* \* \*

### § 85.2103 [Amended]

■ 7. Amend § 85.2103 by removing paragraphs (d)(1)(v) and (d)(3).

## PART 86—CONTROL OF EMISSIONS FROM NEW AND IN-USE HIGHWAY VEHICLES AND ENGINES

■ 8. The authority citation for part 86 continues to read as follows:

**Authority:** 42 U.S.C. 7401–7671q.

### § 86.1 [Amended]

■ 9. Amend § 86.1 by removing and reserving paragraphs (c)(2) and (3) and (f)(3), (17), (21), and (22) and removing paragraph (h).
■ 10. Amend § 86.007–11 by revising paragraphs (g)(1) and (6) to read as follows:

### § 86.007–11 Emission standards and supplemental requirements for 2007 and later model year diesel heavy-duty engines and vehicles.

\* \* \* \* \*

(g) \* \* \*
(1) The engines must be of a configuration that is identical to one that is certified under 40 CFR part 1039, and must be certified with a Family Emission Limit for PM of 0.020 g/kW-hr using the same duty cycles that apply under 40 CFR part 1039.

\* \* \* \* \*

(6) Engines certified under this paragraph (g) may not generate or use emission credits under this part or under 40 CFR part 1039.

\* \* \* \* \*

■ 11. Amend § 86.008–10 by revising paragraph (g)(6) to read as follows:

### § 86.008–10 Emission standards for 2008 and later model year Otto-cycle heavy-duty engines and vehicles.

\* \* \* \* \*

(g) \* \* \*
(6) Engines certified under this paragraph (g) may not generate or use emission credits under this part.

\* \* \* \* \*

■ 12. Amend § 86.1801–12 by:
■ a. Removing and reserving paragraph (a)(2)(ii)(B);
■ b. Revising paragraphs (a)(3), (b), and (i); and
■ c. Removing paragraphs (j) and (k).
The revisions read as follows:

### § 86.1801–12 Applicability.

(a) \* \* \*
(3) The provisions of this subpart do not apply to heavy-duty vehicles above 14,000 pounds GVWR (see § 86.016–1

and 40 CFR parts 1036 and 1037), except as follows:

(i) Heavy-duty vehicles above 14,000 pounds GVWR and at or below 19,500 pounds GVWR may be optionally certified to the exhaust emission standards in this subpart if they are properly included in a test group with similar vehicles at or below 14,000 pounds GVWR. Emission standards apply to these vehicles as if they were Class 3 medium-duty vehicles.

(ii) [Reserved]

(iii) Evaporative and refueling emission standards apply for heavy-duty vehicles above 14,000 pounds GVWR as specified in 40 CFR 1037.103.

\* \* \* \* \*

(b) *Relationship to 40 CFR parts 1036 and 1037.* If any heavy-duty vehicle is not subject to standards and certification requirements under this subpart, the vehicle and its installed engine are instead subject to standards and certification requirements under 40 CFR parts 1036 and 1037, as applicable. If you optionally certify engines or vehicles to standards under 40 CFR part 1036 or 40 CFR part 1037, respectively, those engines or vehicles are subject to all the regulatory requirements in 40 CFR parts 1036 and 1037 as if they were mandatory.

\* \* \* \* \*

(i) *Types of pollutants.* Criteria pollutant standards apply for $NO_X$, NMOG, HC, formaldehyde, PM, and CO, including exhaust, evaporative, and refueling emission standards. These pollutants are sometimes described collectively as "criteria pollutants" because they are either criteria pollutants under the Clean Air Act or precursors to the criteria pollutants ozone and PM.

■ 13. Amend § 86.1803–01 by:

■ a. Removing the definitions of "AC1", "AC2", "Air Conditioning Idle Test", "Base level", "Base tire", "Base vehicle", "Combined $CO_2$", "Combined CREE", and "Configuration";

■ b. Revising the definition of "Defeat device";

■ c. Removing and reserving paragraph (1) of the definition of "Emergency vehicle";

■ d. Revising the definition of "Engine code";

■ e. Removing the definition of "Footprint", "Full size pickup truck", "Mild hybrid electric vehicle", "Strong hybrid electric vehicle", "Subconfiguration", "Track width", and "Transmission class"; and

■ f. Adding a definition of "Work factor" in alphabetical order.

The revisions and addition read as follows:

**§ 86.1803–01  Definitions.**

\* \* \* \* \*

*Defeat device* means an auxiliary emission control device (AECD) that reduces the effectiveness of the emission control system under conditions which may reasonably be expected to be encountered in normal vehicle operation and use, unless:

(1) Such conditions are substantially included in driving cycles specified in this subpart or the fuel economy test procedures in 40 CFR part 600;

(2) The need for the AECD is justified in terms of protecting the vehicle against damage or accident;

(3) The AECD does not go beyond the requirements of engine starting; or

(4) The AECD applies only for emergency vehicles and the need is justified in terms of preventing the vehicle from losing speed, torque, or power due to abnormal conditions of the emission control system, or in terms of preventing such abnormal conditions from occurring, during operation related to emergency response. Examples of such abnormal conditions may include excessive exhaust backpressure from an overloaded particulate trap, and running out of diesel exhaust fluid for engines that rely on urea-based selective catalytic reduction.

\* \* \* \* \*

*Engine code* means a unique combination within a test group of displacement, fuel injection (or carburetor) calibration, choke calibration, distributor calibration, auxiliary emission control devices, and other engine and emission control system components specified by the Administrator. For electric vehicles, engine code means a unique combination of manufacturer, electric traction motor, motor configuration, motor controller, and energy storage device.\*

\* \* \* \* \*

*Work factor, WF, means the characteristic value representing a vehicle's work potential, calculated to the nearest pound using the following equation:*

$$WF = 0.75 \times (GVWR - Curb\ Weight + xwd) + 0.25 \times (GCWR - GVWR)$$

*Where:*

*xwd = 500 pounds if the vehicle has four-wheel drive or all-wheel drive; xwd = 0 pounds for all other vehicles.*

\* \* \* \* \*

■ 14. Amend § 86.1805–12 by revising paragraph (a) to read as follows:

**§ 86.1805–12  Useful life.**

(a) Except as permitted under paragraph (b) of this section or required under paragraphs (c) and (d) of this

section, the full useful life for all LDVs and LLDTs is a period of use of 10 years or 120,000 miles, whichever occurs first. The full useful life for all HLDTs, MDPVs, and complete heavy-duty vehicles is a period of 11 years or 120,000 miles, whichever occurs first. These full useful life values apply to all exhaust, evaporative and refueling emission requirements except for standards which are specified to only be applicable at the time of certification.

\* \* \* \* \*

■ 15. Revise § 86.1805–17 to read as follows:

**§ 86.1805–17  Useful life.**

(a) *General provisions.* The useful life values specified in this section apply for all exhaust, evaporative, refueling, and OBD emission requirements described in this subpart, except for standards that are specified to apply only at certification. Useful life values are specified as a given number of calendar years or miles of driving, whichever comes first.

(b) [Reserved]

(c) *Cold temperature emission standards.* The cold temperature NMHC emission standards in § 86.1811–17 apply for a useful life of 10 years or 120,000 miles for LDV and LLDT, and 11 years or 120,000 miles for HLDT and HDV. The cold temperature CO emission standards in § 86.1811–17 apply for a useful life of 5 years or 50,000 miles.

(d) *Criteria pollutants.* The useful life provisions of this paragraph (d) apply for all emission standards not covered by paragraph (c) of this section. This paragraph (d) applies for the cold temperature emission standards in § 86.1811–27(c). Except as specified in paragraph (f) of this section and in §§ 86.1811, 86.1813, and 86.1816, the useful life for LDT2, HLDT, MDPV, and HDV is 15 years or 150,000 miles. The useful life for LDV and LDT1 is 10 years or 120,000 miles. Manufacturers may optionally certify LDV and LDT1 to a useful life of 15 years or 150,000 miles, in which case the longer useful life would apply for all the standards and requirements covered by this paragraph (d).

(e) *Intermediate useful life.* Where exhaust emission standards are specified for an intermediate useful life, these standards apply for five years or 50,000 miles.

**§ 86.1807–01  [Amended]**

■ 16. Amend § 86.1807–01 by removing and reserving paragraph (a)(3)(iv).

■ 17. Amend § 86.1809–12 by revising paragraph (d)(1) to read as follows:

### § 86.1809–12  Prohibition of defeat devices.

\*   \*   \*   \*   \*

(d) \* \* \*

(1) The manufacturer must show to EPA's satisfaction that the vehicle design does not incorporate strategies that unnecessarily reduce emission control effectiveness exhibited over the driving cycles specified in this subpart or the fuel economy test procedures in 40 CFR part 600 when the vehicle is operated under conditions that may reasonably be expected to be encountered in normal operation and use.

\*   \*   \*   \*   \*

■ 18. Amend § 86.1810–09 by revising paragraph (f)(2) to read as follows:

### § 86.1810–09  General standards; increase in emissions; unsafe condition; waivers.

\*   \*   \*   \*   \*

(f) \* \* \*

(2) For vehicles that comply with the cold temperature NMHC standards described in § 86.1811–10(g), manufacturers must submit an engineering evaluation indicating that common calibration approaches are utilized at high altitudes (except when there are specific high altitude calibration needs to deviate from low altitude emission control practices). Any deviation from low altitude emission control practices must be included in the auxiliary emission control device (AECD) descriptions submitted at certification. Any AECD specific to high altitude must require engineering emission data for EPA evaluation to quantify any emission impact and validity of the AECD.

\*   \*   \*   \*   \*

■ 19. Amend § 86.1810–17 by revising paragraph (j) to read as follows:

### § 86.1810–17  General requirements.

\*   \*   \*   \*   \*

(j) Small-volume manufacturers that modify a vehicle already certified by a different company may recertify that vehicle under this subpart S based on the vehicle supplier's compliance with fleet average standards for criteria exhaust emissions and evaporative emissions as follows:

(1) The recertifying manufacturer must certify the vehicle at bin levels and family emission limits that are the same as or more stringent than the corresponding bin levels and family emission limits for the vehicle supplier.

(2) The recertifying manufacturer must meet all the standards and requirements described in this subpart S, except for the fleet average standards for criteria exhaust emissions and evaporative emissions.

(3) The vehicle supplier must send the small-volume manufacturer a written statement accepting responsibility to include the subject vehicles in the vehicle supplier's exhaust and evaporative fleet average calculations in §§ 86.1860–17 and 86.1864–10.

(4) The small-volume manufacturer must describe in the application for certification how the two companies are working together to demonstrate compliance for the subject vehicles. The application must include the statement from the vehicle supplier described in paragraph (j)(3) of this section.

(5) The vehicle supplier must include a statement that the vehicle supplier is including the small volume manufacturer's sales volume and emissions levels in the vehicle supplier's fleet average reports under §§ 86.1860–17 and 86.1864–10.

\*   \*   \*   \*   \*

■ 20. Amend § 86.1805–12 by revising paragraph (a) to read as follows:

### § 86.1811–17  Exhaust emission standards for light-duty vehicles, light-duty trucks and medium-duty passenger vehicles.

(a) *Applicability and general provisions.* This section describes exhaust emission standards that apply for model year 2017 and later light-duty vehicles, light-duty trucks, and medium-duty passenger vehicles. MDPVs are subject to all the same emission standards and certification provisions that apply to LDT4. Some of the provisions of this section also apply to heavy-duty vehicles as specified in § 86.1816. See § 86.1813 for evaporative and refueling emission standards. This section may apply to vehicles from model years earlier than 2017 as specified in paragraph (b)(11) of this section.

\*   \*   \*   \*   \*

### § 86.1811–27  [Amended]

■ 21. Amend § 86.1811–27 by removing paragraph (a)(4).

### § 86.1815–27  [Removed]

■ 22. Remove § 86.1815–27.
■ 23. Amend § 86.1816–18 by revising paragraph (a) to read as follows:

### § 86.1816–18  Emission standards for heavy-duty vehicles.

(a) *Applicability and general provisions.* This section describes Tier 3 exhaust emission standards for complete heavy-duty vehicles. These standards are optional for incomplete heavy-duty vehicles and for heavy-duty vehicles above 14,000 pounds GVWR as described in § 86.1801. See § 86.1813 for evaporative and refueling emission

standards. This section starts to apply in model year 2018, except that the provisions may apply to vehicles before model year 2018 as specified in paragraph (b)(11) of this section. This section applies for model year 2027 and later vehicles only as specified in § 86.1811–27. Separate requirements apply for MDPV as specified in § 86.1811. See subpart A of this part for requirements that apply for incomplete heavy-duty vehicles and for heavy-duty engines certified independent of the chassis. The following general provisions apply:

(1) Test all vehicles as described in this section using a chassis dynamometer; establish appropriate load settings based on adjusted loaded vehicle weight (see § 86.1803).

(2) Some provisions apply differently depending on the vehicle's power-to-weight ratio. Determine a vehicle's power-to-weight ratio by dividing the engine's rated power by the vehicle's GVWR (in hp/pound). For purposes of this section, if a test group includes multiple vehicle configurations, use the vehicle with the highest power-to-weight ratio to characterize the test group.

(3) Use E10 test fuel as required in § 86.113, except as specified in this section.

(4) Measure emissions from hybrid electric vehicles (including plug-in hybrid electric vehicles) as described in 40 CFR part 1066, subpart F, except that these procedures do not apply for plug-in hybrid electric vehicles during charge-depleting operation.

\*   \*   \*   \*   \*

### §§ 86.1818–12 and 86.1819–14  [Removed]

■ 24. Remove §§ 86.1818–12 and 86.1819–14.
■ 25. Amend § 86.1822–01 by revising paragraph (b) to read as follows:

### § 86.1822–01  Durability data vehicle selection.

\*   \*   \*   \*   \*

(b) The manufacturer may select, using good engineering judgment, an equivalent or worst-case vehicle configuration in lieu of testing the vehicle selected in paragraph (a) of this section. Carryover data satisfying the provisions of § 86.1839–01 may also be used in lieu of testing the vehicle configuration selected in paragraph (a) of this section.

### § 86.1823–08  [Amended]

■ 26. Amend § 86.1823–08 by removing and reserving paragraph (m).
■ 27. Amend § 86.1827–01 by revising paragraph (a)(5) to read as follows:

**§ 86.1827–01 Test group determination.**

\* \* \* \* \*

(a) \* \* \*

(5) Subject to the same emission standards, or FEL in the case of cold temperature NMHC or NMOG+NO$_X$ standards, except that a manufacturer may request to group vehicles into the same test group as vehicles subject to more stringent standards, so long as all the vehicles within the test group are certified to the most stringent standards applicable to any vehicle within that test group. For example, manufacturers may include medium-duty vehicles at or below 22,000 pounds GCWR in the same test group with medium-duty vehicles above 22,000 pounds GCWR, but all vehicles included in the test group are then subject to the off-cycle emission standards and testing requirements described in § 86.1811–27(e). Light-duty trucks and light-duty vehicles may be included in the same test group if all vehicles in the test group are subject to the same criteria exhaust emission standards.

\* \* \* \* \*

■ 28. Amend § 86.1828–01 by revising paragraph (e) to read as follows:

**§ 86.1828–01 Emission data vehicle selection.**

\* \* \* \* \*

(e) *Alternative vehicle configurations.* The manufacturer may use good engineering judgment to select an equivalent or worst-case vehicle configuration in lieu of testing the vehicle selected in paragraphs (a) through (c) of this section. Carryover data satisfying the provisions of § 86.1839 may also be used in lieu of testing the vehicle configuration selected in paragraphs (a) through (c) of this section.

\* \* \* \* \*

■ 29. Amend § 86.1829–15 by:
■ a. Revising paragraph (d)(3);
■ b. Removing and reserving paragraph (d)(6); and
■ c. Revising paragraph (d)(8).
The revisions read as follows:

**§ 86.1829–15 Durability and emission testing requirements; waivers.**

\* \* \* \* \*

(d) \* \* \*

(3) Manufacturers may omit PM measurements for fuel economy testing conducted in addition to the testing needed to demonstrate compliance with the PM emission standards.

\* \* \* \* \*

(8) Manufacturers may provide a statement in the application for certification that medium-duty vehicles above 22,000 pounds GCWR comply with the off-cycle emission standards in

§ 86.1811–27(e) for all normal operation and use when tested as specified. Describe in the application for certification under § 86.1844–01(d)(8) any relevant testing, engineering analysis, or other information in sufficient detail to support the statement. We may direct you to include emission measurements representing typical engine in-use operation at a range of ambient conditions. For example, we may specify certain transient and steady-state engine operation that is typical for your vehicles. Also describe the procedure you used to determine a reference brake-specific $CO_2$ emission rate, e$_{CO2FTP}$, under § 86.1845–04(h)(6).

\* \* \* \* \*

■ 30. Amend § 86.1831–01 by revising paragraphs (a)(3) and (c)(2) to read as follows:

**§ 86.1830–01 Acceptance of vehicles for emission testing.**

(a) \* \* \*

(3) Test vehicles must have air conditioning installed and operational if that vehicle configuration is available with air conditioning. Optional equipment must be installed or represented on test vehicles according to the provisions of § 86.1832–01.

\* \* \* \* \*

(c) \* \* \*

(2) Within a durability group, the manufacturer may alter any emission data vehicle (or other vehicles such as current or previous model year emission data vehicles, running change vehicles, fuel economy data vehicles, and development vehicles) in lieu of building a new test vehicle providing that the modification will not impact the representativeness of the vehicle's test results. Manufacturers shall use good engineering judgment in making such determinations. Development vehicles which were used to develop the calibration selected for emission data testing may not be used as the EDV for that vehicle configuration. Vehicles from outside the durability group may be altered with advance approval of the Administrator.

\* \* \* \* \*

■ 31. Amend § 86.1835–01 by revising paragraphs (a)(4), (b)(3), and (c) to read as follows:

**§ 86.1835–01 Confirmatory certification testing.**

(a) \* \* \*

(4) Retesting for fuel economy may be conducted under the provisions of 40 CFR 600.008–08.

(b) \* \* \*

(3) For light-duty vehicles, light-duty trucks, and medium-duty passenger

vehicles the manufacturer shall conduct a retest of the FTP or highway test if the difference between the fuel economy of the confirmatory test and the original manufacturer's test equals or exceeds three percent (or such lower percentage to be applied consistently to all manufacturer conducted confirmatory testing as requested by the manufacturer and approved by the Administrator).

(i) For use in the fuel economy program described in 40 CFR part 600, the manufacturer may, in lieu of conducting a retest, accept as official the lower of the original and confirmatory test fuel economy results.

(ii) The manufacturer shall conduct a second retest of the FTP or highway test if the fuel economy difference between the second confirmatory test and the original manufacturer test equals or exceeds three percent (or such lower percentage as requested by the manufacturer and approved by the Administrator) and the fuel economy difference between the second confirmatory test and the first confirmatory test equals or exceeds three percent (or such lower percentage as requested by the manufacturer and approved by the Administrator). In lieu of conducting a second retest, the manufacturer may accept as official (for use in the fuel economy program) the lowest fuel economy of the original test, the first confirmatory test, and the second confirmatory test fuel economy results.

(c) *Official test determination.* (1) Whenever the Administrator or the manufacturer conducts a confirmatory test segment on a test vehicle, the results of that test segment, unless subsequently invalidated by the Administrator, shall comprise the official data for that test segment for the vehicle at the prescribed test point and the manufacturer's original test data for that test segment for that prescribed test point shall not be used in determining compliance with emission standards.

(i) If the Administrator or the manufacturer conducts more than one passing, valid, confirmatory test, the results from the first passing, valid confirmatory test shall be considered official and used in determining compliance with emission standards.

(ii) Official test results for fuel economy are determined in accordance with the provisions of § 600.008–08 of this chapter.

(iii) The Administrator may stop a test after any evaporative test segment and use as official data any valid results obtained up to that point in the test, as described in subpart B of this part.

(2) Whenever the Administrator or the manufacturer does not conduct a

confirmatory test on a test vehicle at a test point, the manufacturer's original test data will be accepted as the official data for that point.

(i) If the Administrator makes a determination based on testing under paragraph (a) of this section (or other appropriate correlation test data), that there is a lack of correlation between the manufacturer's test equipment or procedures and the test equipment or procedures used by the Administrator, no manufacturer's test data will be accepted for purposes of certification until the reasons for the lack of correlation are determined and the validity of the data is established by the manufacturer.

(ii) If the Administrator has reasonable basis to believe that any test data submitted by the manufacturer is not accurate or has been obtained in violation of any provisions of this subpart, the Administrator may refuse to accept that data as the official data pending retesting or submission of further information.

(iii) If the manufacturer conducts more than one test on an emission data vehicle in the same vehicle configuration (excluding confirmatory tests run under paragraph (b) of this section), the data from the last test in that series of tests on that vehicle, will constitute the official data.

\* \* \* \* \*

§ 86.1838–01 [Amended]

■ 32. Amend § 86.1838–01 by removing and reserving paragraph (b)(1)(i)(B).
■ 33. Revise § 86.1839–01 to read as follows:

§ 86.1839–01 Carryover of certification and battery monitoring data.

(a) In lieu of testing an emission-data or durability vehicle selected under § 86.1822, § 86.1828, or § 86.1829, and submitting data therefrom, a manufacturer may submit exhaust emission data, evaporative emission data and/or refueling emission data, as applicable, on a similar vehicle for which certification has been obtained or for which all applicable data required under § 86.1845 has previously been submitted. To be eligible for this provision, the manufacturer must use good engineering judgment and meet the following criteria:

(1) In the case of durability data, the manufacturer must determine that the previously generated durability data represent a worst case or equivalent rate of deterioration for all applicable emission constituents compared to the vehicle configuration selected for durability demonstration. Prior to certification, the Administrator may

require the manufacturer to provide data showing that the distribution of catalyst temperatures of the selected durability vehicle configuration is effectively equivalent or lower than the distribution of catalyst temperatures of the vehicle configuration which is the source of the previously generated data.

(2) In the case of emission data, the manufacturer must determine that the previously generated emissions data represent a worst case or equivalent level of emissions for all applicable emission constituents compared to the vehicle configuration selected for emission compliance demonstration.

(b) In lieu of using newly aged hardware on an EDV as allowed under the provisions of § 86.1823–08(f)(2), a manufacturer may use similar hardware aged for an EDV previously submitted, provided that the manufacturer determines that the previously aged hardware represents a worst case or equivalent rate of deterioration for all applicable emission constituents for durability demonstration.

§ 86.1841–01 [Amended]

■ 34. Amend § 86.1841–01 by removing and reserving paragraph (a)(3).
■ 35. Amend § 86.1844–01 by:
■ a. Removing and reserving paragraph (d)(7)(iv);
■ b. Revising paragraph (d)(15);
■ c. Removing and reserving paragraph (d)(20); and
■ d. Revising paragraphs (e)(1) and (3). The revisions read as follows:

§ 86.1844–01 Information requirements: Application for certification and submittal of information upon request.

\* \* \* \* \*

(d) \* \* \*

(15) For vehicles with fuel-fired heaters, describe the control system logic of the fuel-fired heater, including an evaluation of the conditions under which it can be operated and an evaluation of the possible operational modes and conditions under which evaporative emissions can exist. Use good engineering judgment to establish an estimated exhaust emission rate from the fuel-fired heater in grams per mile for each pollutant subject to a fleet average standard. Adjust fleet average compliance calculations in §§ 86.1861 and 86.1864 as appropriate to account for emissions from fuel-fired heaters. Describe the testing used to establish the exhaust emission rate.

\* \* \* \* \*

(e) \* \* \*

(1) Identify all emission-related components. Also identify software, AECDs, and other elements of design that are used to control exhaust or

evaporative/refueling emissions. Identify the emission-related components by part number. Identify software by part number or other convention, as appropriate. Organize part numbers by engine code or other similar classification scheme.

\* \* \* \* \*

(3) Identification and description of all vehicles covered by each certificate of conformity to be produced and sold within the U.S. The description must be sufficient to identify whether any given in-use vehicle is, or is not, covered by a given certificate of conformity, the test group and the evaporative/refueling family to which it belongs and the standards that are applicable to it, by matching readily observable vehicle characteristics and information given in the emission control information label (and other permanently attached labels) to indicators in the Part 1 Application. For example, the description must include any components or features that contribute to measured or demonstrated control of emissions for meeting exhaust or evaporative/refueling standards under this subpart. In addition, the description must be sufficient to determine for each vehicle covered by the certificate, all appropriate test parameters and any special test procedures necessary to conduct an official certification exhaust or evaporative emission test as was required by this subpart to demonstrate compliance with applicable emission standards. The description shall include, but is not limited to, information such as model name, vehicle classification (light-duty vehicle, light-duty truck, or complete heavy-duty vehicle), sales area, engine displacement, engine code, transmission type, tire size and parameters necessary to conduct exhaust emission tests such as equivalent test weight, curb and gross vehicle weight, test horsepower (with and without air conditioning adjustment), coast down time, shift schedules, cooling fan configuration, etc. and evaporative tests such as canister working capacity, canister bed volume, and fuel temperature profile. Actual values must be provided for all parameters.

\* \* \* \* \*

■ 36. Amend § 86.1845–04 by:
■ a. Revising paragraphs (b)(5)(i) and (c)(5)(i);
■ b. Removing and reserving paragraph (g); and
■ d. Revising paragraph (h)(6). The revisions read as follows:

§ 86.1845–04 Manufacturer in-use verification testing requirements.

\* \* \* \* \*

(b) * * *

(5) *Testing.* (i) Each test vehicle of a test group shall be tested in accordance with the FTP and the US06 as described in subpart B of this part, when such test vehicle is tested for compliance with applicable exhaust emission standards under this subpart.

\* \* \* \* \*

(c) * * *

(5) *Testing.* (i) Each test vehicle shall be tested in accordance with the FTP and the US06 as described in subpart B of this part when such test vehicle is tested for compliance with applicable exhaust emission standards under this subpart. One test vehicle from each test group shall be tested over the FTP at high altitude. The test vehicle tested at high altitude is not required to be one of the same test vehicles tested at low altitude. The test vehicle tested at high altitude is counted when determining the compliance with the requirements shown in Table S04–06 and Table S04–07 (tables 1 and 2 to paragraph (b)(3) of this section) or the expanded sample size as provided for in this paragraph (c).

\* \* \* \* \*

(h) * * *

(6) Determine a reference $CO_2$ emission rate, $e_{CO2FTP}$, as described in 40 CFR 1036.235(b) or based on measured values from any chassis FTP driving cycles under 40 CFR part 1066, subpart I, that is used for reporting data from an emission data vehicle or a fuel economy data vehicle, as follows:

Equation 1 to Paragraph (h)(6)

$$e_{CO2FTP} = \frac{m_{CO2FTP}}{W_{FTP}}$$

Where:

$m_{CO2FTP}$ = $CO_2$ emission mass in grams emitted over the FTP driving cycle.
$d_{FTP}$ = measured driving distance in miles.
$W_{FTP}$ = work performed over the FTP.

$$W_{FTP} = \sum_{i=1}^{N} f_{ni} \cdot T_i \cdot \Delta t$$

$i$ = an indexing variable that represents a 1 Hz OBD time counter over the course of the FTP drive.
$N$ = total number of measurements over the FTP duty cycle = 1874.
$f_n$ = engine speed for each point, $i,$ starting from the start of the FTP drive at $i = 1$, collected from OBD PID $0C.
$T$ = engine torque in N·m for each point, $i,$ starting from $i = 1$. Calculate $T$ by subtracting Friction Torque (PID $8E) from Indicated Torque (PID $62) (both PIDs are percentages) and then multiplying by the reference torque (PID $63). Set torque to zero if friction torque is greater than indicated torque.
$\Delta t = 1/f_{record}$.
$f_{record}$ = the data recording frequency.

*Example*

$m_{CO2FTP}$ = 10,961 g
$N$ = 1874
$f_1$ = 687.3 r/min = 71.97 rad/s
$f_2$ = 689.7 r/min = 72.23 rad/s
$T_1$ = 37.1 ft·lbf = 50.3 N·m
$T_2$ = 37.2 ft·lbf = 50.4 N·m
$f_{record}$ = 1 Hz
$\Delta t = 1/1 = 1$ s = 0.000277 hr
$W_{FTP} = 71.97 \cdot 50.3 \cdot 1.0 + 72.23 \cdot 50.4 \cdot 1.0 + \cdots f_{n1874} \cdot T_{1874} \cdot \Delta t_{1874}$
$W_{FTP}$ = 53,958,852 W·s = 20.1 hp·hr

$$e_{CO2FTP} = \frac{10{,}961}{20.1}$$

$e_{CO2FTP}$ = 545.3 g/hp·hr

\* \* \* \* \*

■ 37. Amend § 86.1846–01 by:

■ a. Revising paragraph (a); and

■ b. Removing and reserving paragraph (b)(2).

The revision read as follows:

## § 86.1846–01  Manufacturer in-use confirmatory testing requirements.

(a) *General requirements.*

(1) Manufacturers must test, or cause testing to be conducted, under this section when the emission levels shown by a test group sample from testing under § 86.1845 exceeds the criteria specified in paragraph (b) of this section. The testing required under this section applies separately to each test group and at each test point (low and high mileage) that meets the specified criteria. The testing requirements apply separately for each model year.

(2) The provisions of § 86.1845–04(a)(3) regarding fuel sulfur effects apply equally to testing under this section.

\* \* \* \* \*

## § 86.1848–10  [Amended]

■ 38. Amend § 86.1848–10 by removing and reserving paragraph (c)(9).

■ 39. Amend § 86.1854–12 by revising paragraph (a)(2)(iv) to read as follows:

## § 86.1854–12  Prohibited acts.

(a) * * *

(2) * * *

(iv) For a person to fail to establish or maintain records as required under §§ 86.1844, 86.1862, and 86.1864 with regard to vehicles.

\* \* \* \* \*

■ 40. Revise and republish § 86.1861–17 to read as follows:

## § 86.1861–17  How do the NMOG + NO$_X$ and evaporative emission credit programs work?

You may use emission credits for purposes of certification to show compliance with the applicable fleet average NMOG+NO$_X$ standards from §§ 86.1811 and 86.1816 and the fleet average evaporative emission standards from § 86.1813 as described in 40 CFR part 1036, subpart H, with certain exceptions and clarifications as specified in this section. MDPVs are subject to the same provisions of this section that apply to LDT4.

(a) Calculate emission credits as described in this paragraph (a) instead of using the provisions of 40 CFR 1036.705. Calculate positive or negative emission credits relative to the applicable fleet average standard. Calculate positive emission credits if your fleet average level is below the standard. Calculate negative emission credits if your fleet average value is above the standard. Calculate credits separately for each applicable fleet average standard and calculate total credits for each averaging set as specified in paragraph (b) of this section. Convert units from mg/mile to g/mile as needed for performing calculations. Calculate emission credits using the following equation, rounded to the nearest whole number:

Equation 1 to Paragraph (a)

*Emission credit = Volume · [Fleet average standard − Fleet average value]*

Where:

*Emission credit* = The positive or negative credit for each discrete fleet average standard, in units of vehicle-grams per mile for NMOG+NO$_X$ and vehicle-grams per test for evaporative emissions.

*Volume* = Sales volume in a given model year from the collection of test groups or evaporative families covered by the fleet average value, as described in § 86.1860.

(b) The following restrictions apply instead of those specified in 40 CFR 1036.740:

(1) Except as specified in paragraph (b)(2) of this section, emission credits may be exchanged only within an averaging set, as follows:

(i) HDV represent a separate averaging set with respect to all emission standards.

(ii) Except as specified in paragraph (b)(1)(iii) of this section, light-duty program vehicles represent a single averaging set with respect to all emission standards. Note that FTP and SFTP credits for Tier 3 vehicles are not interchangeable.

(iii) LDV and LDT1 certified to standards based on a useful life of 120,000 miles and 10 years together represent a single averaging set with respect to NMOG+NO$_X$ emission standards. Note that FTP and SFTP credits for Tier 3 vehicles are not interchangeable.

(iv) The following separate averaging sets apply for evaporative emission standards:

(A) LDV and LDT1 together represent a single averaging set.

(B) LDT2 represents a single averaging set.

(C) HLDT represents a single averaging set.

(D) HDV represents a single averaging set.

(2) You may exchange evaporative emission credits across averaging sets as follows if you need additional credits to offset a deficit after the final year of maintaining deficit credits as allowed under paragraph (c) of this section:

(i) You may exchange LDV/LDT1 and LDT2 emission credits.

(ii) You may exchange HLDT and HDV emission credits.

(3) Except as specified in paragraph (b)(4) of this section, credits expire after five years. For example, credits you

generate in model year 2018 may be used only through model year 2023.

(4) For the Tier 3 declining fleet average FTP and SFTP emission standards for NMOG+NO$_X$ described in § 86.1811–17(b)(8), credits generated in model years 2017 through 2024 expire after eight years, or after model year 2030, whichever comes first; however, these credits may not be traded after five years. This extended credit life also applies for small-volume manufacturers generating credits under § 86.1811–17(h)(1) in model years 2022 through 2024. Note that the longer credit life does not apply for heavy-duty vehicles, for vehicles certified under the alternate phase-in described in § 86.1811–17(b)(9), or for vehicles generating early Tier 3 credits under § 86.1811–17(b)(11) in model year 2017.

(5) Tier 3 credits for NMOG+NO$_X$ may be used to demonstrate compliance with Tier 4 standards without adjustment, except as specified in § 86.1811–27(b)(6)(ii).

(6) A manufacturer may generate NMOG+NO$_X$ credits from model year 2027 through 2032 electric vehicles that qualify as MDPV and use those credits for certifying medium-duty vehicles, as follows:

(i) Calculate generated credits separately for qualifying vehicles. Calculate generated credits by multiplying the applicable standard for light-duty program vehicles by the sales volume of qualifying vehicles in a given model year.

(ii) Apply generated credits to eliminate any deficit for light-duty program vehicles before using them to certify medium-duty vehicles.

(iii) Apply the credit provisions of this section as specified, except that you may not buy or sell credits generated under this paragraph (b)(6).

(iv) Describe in annual credit reports how you are generating certain credit quantities under this paragraph (b)(6). Also describe in your end of year credit report how you will use those credits for certifying light-duty program vehicles or medium-duty vehicles in a given model year.

(c) The credit-deficit provisions 40 CFR 1036.745 apply to the NMOG+NO$_X$ and evaporative emission standards for

Tier 3 and Tier 4 vehicles. Credit-deficit provisions are not affected by the transition from Tier 3 to Tier 4 standards.

(d) The reporting and recordkeeping provisions of § 86.1862 apply instead of those specified in 40 CFR 1036.730 and 1036.735.

(e) The provisions of 40 CFR 1036.625 do not apply.

## §§ 86.1865–12, 86.1866–12, 86.1867–12, and 86.1867–31 [Removed]

■ 41. Remove §§ 86.1865–12, 86.1866–12, 86.1867–12, and 86.1867–31.

■ 42. Amend § 86.1868–12 by:

■ a. Revising the introductory text and paragraph (c);

■ b. Removing and reserving paragraph (d); and

■ c. Revising paragraphs (g) introductory text and (g)(3) introductory text.

to read as follows:

## § 86.1868–12 CO$_2$ credits for improving the efficiency of air conditioning systems.

The regulation at 40 CFR 600.510 describes how manufacturers may calculate fuel consumption improvement values based on improvements to air conditioning efficiency. This section describes how to calculate credits to determine the average fuel economy for comparing to the Corporate Average Fuel Economy standard. The provisions of this section do not apply for medium-duty vehicles. Credits shall be calculated according to this section for each air conditioning system that the manufacturer is using to generate credits. Manufacturers must validate credits under this section based on testing as described in paragraph (g) of this section. Starting in model year 2027, manufacturers may generate credits under this section only for vehicles propelled by internal combustion engines.

\* \* \* \* \*

(c) The total efficiency credits generated by an air conditioning system shall be calculated in megagrams separately for passenger automobiles and light trucks according to the following formula:

Equation 1 to Paragraph (c)

$$Total\ Credits = \frac{Credit \cdot Production \cdot VLM}{1,000,000}$$

Where:

*Credit* = the air conditioning efficiency credit in grams per mile determined in

paragraph (b) of this section. Starting in

model year 2027, multiply the credit value for PHEV by (1−UF), where

$UF$ = the fleet utility factor established under 40 CFR 600.116–12(c)(1) or (c)(10)(iii) (weighted 55 percent city, 45 percent highway).

$Production$ = The total number of passenger automobiles or light trucks, whichever is applicable, produced with the air conditioning system to which to the efficiency credit value from paragraph (b) of this section applies.

$VLM$ = vehicle lifetime miles, which for passenger automobiles shall be 195,264 and for light trucks shall be 225,865.

\* \* \* \* \*

(g) For AC17 validation testing and reporting requirements, manufacturers must validate air conditioning efficiency credits by using the AC17 Test Procedure in 40 CFR 1066.845 as follows:

\* \* \* \* \*

(3) For the first model year for which an air conditioning system is expected to generate credits, the manufacturer must select for testing the projected highest-selling vehicle configuration within each combination of vehicle platform and air conditioning system (as those terms are defined in § 86.1803). The manufacturer must test at least one unique air conditioning system within each vehicle platform in a model year, unless all unique air conditioning systems within a vehicle platform have been previously tested. A unique air conditioning system design is a system with unique or substantially different component designs or types and/or system control strategies (*e.g.,* fixed-displacement vs. variable displacement compressors, orifice tube vs. thermostatic expansion valve, single vs. dual evaporator, etc.). In the first year of such testing, the tested vehicle configuration shall be the highest production vehicle configuration within each platform. In subsequent model years the manufacturer must test other unique air conditioning systems within the vehicle platform, proceeding from the highest production untested system until all unique air conditioning systems within the platform have been tested, or until the vehicle platform experiences a major redesign. Whenever a new unique air conditioning system is tested, the highest production vehicle configuration using that system shall be the vehicle selected for testing. Credits may continue to be generated by the air conditioning system installed in a vehicle platform provided that:

\* \* \* \* \*

■ 43. Amend § 86.1869–12 by revising the introductory text and paragraphs (a), (b)(1) introductory text, (b)(2) introductory text, (b)(2)(v), (c)

introductory text, and (e)(2)(i) to read as follows:

### § 86.1869–12 CO₂ credits for off-cycle CO₂ reducing technologies.

The regulation at 40 CFR 600.510 describes how manufacturers may calculate fuel consumption improvement values based on vehicle improvements that are not reflected in testing to demonstrate compliance with exhaust emission standards. This section describes how to calculate credits to determine the average fuel economy for comparing to the Corporate Average Fuel Economy standard through model year 2032. The provisions of this section do not apply for medium-duty vehicles. Manufacturers may no longer generate credits under this section starting in model year 2027 for vehicles deemed to have zero tailpipe emissions and in model year 2033 for all other vehicles. Manufacturers may no longer generate credits under paragraphs (c) and (d) of this section for any type of vehicle starting in model year 2027.

(a) Manufacturers may generate credits for CO₂-reducing technologies where the CO₂ reduction benefit of the technology is not adequately captured on the Federal Test Procedure and/or the Highway Fuel Economy Test such that the technology would not be otherwise installed for purposes of meeting Corporate Average Fuel Economy standards. These technologies must have a measurable, demonstrable, and verifiable real-world CO₂ reduction that occurs outside the conditions of the Federal Test Procedure and the Highway Fuel Economy Test. These optional credits are referred to as "off-cycle" credits. The technologies must not be integral or inherent to the basic vehicle design, such as engine, transmission, mass reduction, passive aerodynamic design, and tire technologies. Technologies installed for non-off-cycle emissions related reasons are also not eligible as they would be considered part of the baseline vehicle design. The technology must not be inherent to the design of occupant comfort and entertainment features except for technologies related to reducing passenger air conditioning demand and improving air conditioning system efficiency. Notwithstanding the provisions of this paragraph (a), off-cycle menu technologies included in paragraph (b) of this section remain eligible for credits. Off-cycle technologies used to generate emission credits are considered emission-related components subject to applicable requirements and must be demonstrated to be effective for the full useful life of

the vehicle. Unless the manufacturer demonstrates that the technology is not subject to in-use deterioration, the manufacturer must account for the deterioration in their analysis. Durability evaluations of off-cycle technologies may occur at any time throughout a model year, provided that the results can be factored into the data provided in the model year report. Off-cycle credits may not be approved for crash-avoidance technologies, safety critical systems or systems affecting safety-critical functions, or technologies designed for the purpose of reducing the frequency of vehicle crashes. Off-cycle credits may not be earned for technologies installed on a motor vehicle to attain compliance with any vehicle safety standard or any regulation set forth in Title 49 of the Code of Federal Regulations. The manufacturer must use one of the three options specified in this section to establish off-cycle credits under this section.

(b) \* \* \*

(1) The manufacturer may generate off-cycle credits for certain technologies as specified in this paragraph (b)(1). Technology definitions are in paragraph (b)(4) of this section. Calculated credit values shall be rounded to the nearest 0.1 grams/mile.

\* \* \* \* \*

(2) The maximum allowable off-cycle credit for the combined passenger automobile and light truck fleet attributable to use of the default credit values in paragraph (b)(1) of this section is specified in paragraph (b)(2)(v) of this section. If the total of the off-cycle credit values from paragraph (b)(1) of this section does not exceed the specified off-cycle credit cap for any passenger automobile or light truck in a manufacturer's fleet, then the total off-cycle credits may be calculated according to paragraph (f) of this section. If the total of the off-cycle credit values from paragraph (b)(1) of this section exceeds the specified off-cycle credit cap for any passenger automobile or light truck in a manufacturer's fleet, then the gram per mile decrease for the combined passenger automobile and light truck fleet must be determined according to paragraph (b)(2)(ii) of this section to determine whether the applicable limitation has been exceeded.

\* \* \* \* \*

(v) The manufacturer's combined passenger automobile and light truck fleet average off-cycle credits attributable to use of the default credit values in paragraph (b)(1) of this section may not exceed the following specific values:

| Model year | Off-cycle credit cap (g/mile) |
|---|---|
| (A) 2023–2026 .......................... | 15 |
| (B) 2027–2030 .......................... | 10 |
| (C) 2031 .................................. | 8.0 |
| (D) 2032 .................................. | 6.0 |

\* \* \* \* \*

(c) *Technology demonstration using EPA 5-cycle methodology.* To demonstrate an off-cycle technology and to determine off-cycle credits using the EPA 5-cycle methodology, the manufacturer shall determine the off-cycle city/highway combined carbon-related exhaust emissions benefit by using the EPA 5-cycle methodology described in 40 CFR part 600. This method may not be used for technologies that include elements (*e.g.,* driver-selectable systems) that require additional analyses, data collection, projections, or modeling, or other assessments to determine a national average benefit of the technology. Testing shall be performed on a representative vehicle, selected using good engineering judgment, for each model type for which the credit is being demonstrated. The emission benefit of a technology is determined by testing both with and without the off-cycle technology operating. If a specific technology is not expected to change emissions on one of the five test procedures, the manufacturer may submit an engineering analysis to the EPA that demonstrates that the technology has no effect. If EPA concurs with the analysis, then multiple tests are not required using that test procedure; instead, only one of that test procedure shall be required—either with or without the technology installed and operating—and that single value will be used for all of the 5-cycle weighting calculations. Multiple off-cycle technologies may be demonstrated on a test vehicle. The manufacturer shall conduct the following steps and submit all test data to the EPA.

\* \* \* \* \*

(e) \* \* \*

(2) \* \* \*

(i) A detailed description of the off-cycle technology and how it functions to improve fuel economy under conditions not represented on the FTP and HFET.

\* \* \* \* \*

## § 86.1870–12 [Removed]

■ 44. Remove § 86.1870–12.

## PART 600—FUEL ECONOMY AND GREENHOUSE GAS EXHAUST EMISSIONS OF MOTOR VEHICLES

■ 45. The authority citation for part 600 continues to read as follows:

**Authority:** 49 U.S.C. 32901—23919q, Pub. L. 109–58.

### § 600.001 [Amended]

■ 46. Amend § 600.001 by removing the last sentence in paragraph (a) and the last two sentences in paragraph (c).
■ 47. Amend § 600.002 by:
■ a. Revising the definitions of "Carbon-related exhaust emissions (CREE)" and "Engine code";
■ b. Removing the definition of "Footprint"; and
■ c. Revising the definitions of "Medium-duty passenger vehicle (MDPV$_{FE}$)", "Subconfiguration", and "Vehicle configuration".
The revisions read as follows:

### § 600.002 Definitions.

\* \* \* \* \*

*Carbon-related exhaust emissions (CREE)* means the summation of the carbon-containing constituents of the exhaust emissions, with each constituent adjusted by a coefficient representing the carbon weight fraction of each constituent relative to the $CO_2$ carbon weight fraction, as specified in § 600.113.

\* \* \* \* \*

*Engine code* means a unique combination, within a test group (as defined in § 86.1803 of this chapter), of displacement, fuel injection (or carburetion or other fuel delivery system), calibration, distributor calibration, choke calibration, auxiliary emission control devices, and other engine and emission control system components specified by the Administrator. For electric vehicles, *engine code* means a unique combination of manufacturer, electric traction motor, motor configuration, motor controller, and energy storage device.

\* \* \* \* \*

*Medium-duty passenger vehicle (MDPV$_{FE}$)* means any motor vehicle rated at more than 8,500 pounds GVWR and less than 10,000 pounds GVWR that is designed primarily to transport passengers, but does not include a vehicle that—

(1) Is an "incomplete truck," meaning any truck which does not have the primary load carrying device or container attached when it is first sold as a vehicle; or

(2) Has a seating capacity of more than 12 persons; or

(3) Is designed for more than 9 persons in seating rearward of the driver's seat; or

(4) Is equipped with an open cargo area (for example, a pick-up truck box or bed) of 72.0 inches in interior length or more. A covered box not readily accessible from the passenger compartment will be considered an open cargo area for purposes of this definition. (See paragraph (1) of the definition of medium-duty passenger vehicle at 40 CFR 86.1803–01).

\* \* \* \* \*

*Subconfiguration* means a unique combination within a vehicle configuration of equivalent test weight, road-load horsepower, and any other operational characteristics or parameters which the Administrator determines may significantly affect fuel economy or $CO_2$ emissions within a vehicle configuration.

\* \* \* \* \*

*Vehicle configuration* means a unique combination of basic engine, engine code, inertia weight class, transmission configuration, and axle ratio within a base level.

\* \* \* \* \*

■ 48. Amend § 600.006 by revising paragraphs (c)(5), (e), and (g)(3)(ii) to read as follows:

### § 600.006 Data and information requirements for fuel economy data vehicles.

\* \* \* \* \*

(c) \* \* \*

(5) Starting with the 2012 model year, the data submitted according to paragraphs (c)(1) through (4) of this section shall include total HC, CO, $CO_2$, and, where applicable for alternative fuel vehicles, $CH_3OH$, $C_2H_5OH$, $C_2H_4O$, HCHO, NMHC and $CH_4$.

\* \* \* \* \*

(e) In lieu of submitting actual data from a test vehicle, a manufacturer may provide fuel economy and $CO_2$ emission values derived from a previously tested vehicle, where the fuel economy and $CO_2$ emissions are expected to be equivalent (or less fuel-efficient and with higher $CO_2$ emissions). Additionally, in lieu of submitting actual data from a test vehicle, a manufacturer may provide fuel economy and $CO_2$ emission values derived from an analytical expression, *e.g.,* regression analysis. In order for fuel economy and $CO_2$ emission values derived from analytical methods to be accepted, the expression (form and coefficients) must have been approved by the Administrator.

\* \* \* \* \*

(g) \* \* \*

(3) * * *

(ii)(A) The manufacturer shall adjust all $CO_2$ test data generated by vehicles with engine-drive system combinations with more than 6,200 miles by using the following equation:

$$ADJ_{4,000mi} = TEST[0.979 + 5.25 \cdot 10^{-6} \cdot (mi)]$$

Where:

$ADJ_{4,000mi}$ = $CO_2$ emission data adjusted to 4,000-mile test point.
TEST = Tested emissions value of $CO_2$ in grams per mile.
mi = System miles accumulated at the start of the test rounded to the nearest whole mile.

(B) Emissions test values and results used and determined in the calculations in this paragraph (g)(3)(ii) shall be rounded in accordance with § 86.1837 of this chapter as applicable. Round results to the nearest gram per mile.

* * * * *

■ 49. Amend § 600.007 by revising paragraphs (b)(5) and (6), (c), and (f) introductory text to read as follows:

### § 600.007 Vehicle acceptability.

* * * * *

(b) * * *

(5) The calibration information submitted under § 600.006(b) must be representative of the vehicle configuration for which the fuel economy and $CO_2$ emission data were submitted.

(6) Any vehicle tested for fuel economy or $CO_2$ emissions must be representative of a vehicle which the manufacturer intends to produce under the provisions of a certificate of conformity.

* * * * *

(c) If, based on review of the information submitted under § 600.006(b), the Administrator determines that a fuel economy data vehicle meets the requirements of this section, the fuel economy data vehicle will be judged to be acceptable and fuel economy data from that fuel economy data vehicle will be reviewed pursuant to § 600.008.

* * * * *

(f) All vehicles used to generate fuel economy data, and for which emission standards apply, must be covered by a certificate of conformity under part 86 of this chapter before:

* * * * *

■ 50. Amend § 600.008 by revising the section heading and paragraph (a)(1)(ii) to read as follows:

### § 600.008 Review of fuel economy and $CO_2$ emission data, testing by the Administrator.

(a) * * *

(1) * * *

(ii) The evaluations, testing, and test data described in this section pertaining to fuel economy shall also be performed for $CO_2$ emissions, except that $CO_2$ emissions shall be arithmetically averaged instead of harmonically averaged, and in cases where the manufacturer selects the lowest of several fuel economy results to represent the vehicle, the manufacturer shall select the $CO_2$ emission value from the test results associated with the lowest selected fuel economy results.

* * * * *

■ 51. Amend § 600.010 by revising paragraphs (c)(1)(ii) and (d) to read as follows:

### § 600.010 Vehicle test requirements and minimum data requirements.

* * * * *

(c) * * *

(1) * * *

(ii)(A) FTP and HFET data from the highest projected model year sales subconfiguration within the highest projected model year sales vehicle configuration for each base level, and

(B) If required under § 600.115, for 2011 and later model year vehicles, US06, SC03 and cold temperature FTP data from the highest projected model year sales subconfiguration within the highest projected model year sales vehicle configuration for each base level. Manufacturers may optionally generate this data for any 2008 through 2010 model years, and, 2011 and later model year vehicles, if not otherwise required.

* * * * *

(d) *Minimum data requirements for the manufacturer's average fuel economy.* For the purpose of calculating the manufacturer's average fuel economy under § 600.510, the manufacturer shall submit FTP (city) and HFET (highway) test data representing at least 90 percent of the manufacturer's actual model year production, by vehicle configuration, for each category identified for calculation under § 600.510–08(a) or § 600.510–12(a)(1).

■ 52. Revise the heading of subpart B as set forth above.

■ 53. Amend § 600.101 by revising paragraph (a)(2) and removing and reserving paragraph (b)(2). The revision reads as follows:

### § 600.101 Testing overview.

* * * * *

(a) * * *

(2) Calculate fuel economy values for vehicle subconfigurations, configurations, base levels, and model types as described in §§ 600.206 and 600.208. Calculate fleet average values

for fuel economy as described in § 600.510. Note that § 600.510(c) describes how to use CREE to determine fuel consumption improvement values for specific cases.

* * * * *

■ 54. Amend § 600.111–08 by revising paragraph (h) to read as follows:

### § 600.111–08 Test procedures.

* * * * *

(h) *Special test procedures.* We may allow or require you to use procedures other than those specified in this section as described in 40 CFR 1066.10(c). For example, special test procedures may be used for advanced technology vehicles, including, but not limited to fuel cell vehicles, hybrid electric vehicles using hydraulic energy storage, and vehicles equipped with hydrogen internal combustion engines. Additionally, we may conduct fuel economy and exhaust emission testing using the special test procedures approved for a specific vehicle.

■ 55. Amend § 600.113–12 by:

■ a. Revising the section heading, introductory text, and paragraph (g);

■ b. Removing and reserving paragraphs (h)(2), (i)(2), (j)(2), (k)(2), (l)(2), (m)(2);

■ c. Revising paragraph (n);

■ d. Removing and reserving paragraph (o)(2); and

■ e. Revising paragraph (p).

The revisions read as follows:

### § 600.113–12 Fuel economy and $CO_2$ emission calculations for FTP, HFET, US06, SC03 and cold temperature FTP tests.

The Administrator will use the calculation procedure set forth in this section for all official EPA testing of vehicles fueled with gasoline, diesel, alcohol-based or natural gas fuel. The calculations of the weighted fuel economy values require input of the weighted grams/mile values for total hydrocarbons (HC), carbon monoxide (CO), and carbon dioxide ($CO_2$); and, additionally for methanol-fueled automobiles, methanol ($CH_3OH$) and formaldehyde (HCHO); and, additionally for ethanol-fueled automobiles, methanol ($CH_3OH$), ethanol ($C_2H_5OH$), acetaldehyde ($C_2H_4O$), and formaldehyde (HCHO); and additionally for natural gas-fueled vehicles, non-methane hydrocarbons (NMHC) and methane ($CH_4$). Emissions shall be determined for the FTP, HFET, US06, SC03, and cold temperature FTP tests. Additionally, the specific gravity, carbon weight fraction and net heating value of the test fuel must be determined. The FTP, HFET, US06, SC03, and cold temperature FTP fuel economy values shall be calculated as specified in this section. An example

fuel economy calculation appears in appendix II to this part.

\* \* \* \* \*

(g) Calculate separate FTP, highway, US06, SC03 and Cold temperature FTP fuel economy values from the grams/mile values for total HC, CO, $CO_2$ and, where applicable, $CH_3OH$, $C_2H_5OH$, $C_2H_4O$, HCHO, NMHC, $N_2O$, and $CH_4$, and the test fuel's specific gravity, carbon weight fraction, net heating value, and additionally for natural gas, the test fuel's composition.

(1) *Emission values for fuel economy calculations.* The emission values (obtained per paragraph (a) through (e) of this section, as applicable) used in the calculations of fuel economy in this section shall be rounded in accordance with § 86.1837 of this chapter. The $CO_2$ values (obtained per this section, as applicable) used in each calculation of fuel economy in this section shall be rounded to the nearest gram/mile.

(2) [Reserved]

(h)

(1) For gasoline-fueled automobiles tested on a test fuel specified in § 86.113 of this chapter, the fuel economy in miles per gallon is to be calculated using the following equation and rounded to the nearest 0.1 miles per gallon:

$mpg = (5174 \times 10^4 \times CWF \times SG)/[((CWF \times HC) + (0.429 \times CO) + (0.273 \times CO_2)) \times ((0.6 \times SG \times NHV) + 5471)]$

Where:

HC = Grams/mile HC as obtained in paragraph (g)(1) of this section.

CO = Grams/mile CO as obtained in paragraph (g)(1) of this section.

$CO_2$ = Grams/mile $CO_2$ as obtained in paragraph (g)(1) of this section.

CWF = Carbon weight fraction of test fuel as obtained in paragraph (f)(1) of this section and rounded according to paragraph (g)(3) of this section.

NHV = Net heating value by mass of test fuel as obtained in paragraph (f)(1) of this section and rounded according to paragraph (g)(3) of this section.

SG = Specific gravity of test fuel as obtained in paragraph (f)(1) of this section and rounded according to paragraph (g)(3) of this section.

(2) [Reserved]

(i)

(1) For diesel-fueled automobiles, calculate the fuel economy in miles per gallon of diesel fuel by dividing 2778 by the sum of three terms and rounding the quotient to the nearest 0.1 mile per gallon:

(i) (A) 0.866 multiplied by HC (in grams/miles as obtained in paragraph (g)(1) of this section), or

(B) Zero, in the case of cold FTP diesel tests for which HC was not collected, as permitted in § 600.113–08(c);

(ii) 0.429 multiplied by CO (in grams/mile as obtained in paragraph (g)(1) of this section); and

(iii) 0.273 multiplied by $CO_2$ (in grams/mile as obtained in paragraph (g)(1) of this section).

(2) [Reserved](j)

(1) For methanol-fueled automobiles and automobiles designed to operate on mixtures of gasoline and methanol, the fuel economy in miles per gallon of methanol is to be calculated using the following equation:

$mpg = (CWF \times SG \times 3781.8)/((CWF_{exHC} \times HC) + (0.429 \times CO) + (0.273 \times CO_2) + (0.375 \times CH_3OH) + (0.400 \times HCHO))$

Where:

CWF = Carbon weight fraction of the fuel as determined in paragraph (f)(2)(ii) of this section and rounded according to paragraph (g)(3) of this section.

SG = Specific gravity of the fuel as determined in paragraph (f)(2)(i) of this section and rounded according to paragraph (g)(3) of this section.

$CWF_{exHC}$ = Carbon weight fraction of exhaust hydrocarbons = CWF as determined in paragraph (f)(2)(ii) of this section and rounded according to paragraph (g)(3) of this section (for M100 fuel, $CWF_{exHC}$ = 0.866).

HC = Grams/mile HC as obtained in paragraph (g)(1) of this section.

CO = Grams/mile CO as obtained in paragraph (g)(1) of this section.

$CO_2$ = Grams/mile $CO_2$ as obtained in paragraph (g)(1) of this section.

$CH_3OH$ = Grams/mile $CH_3OH$ (methanol) as obtained in paragraph (g)(1) of this section.

HCHO = Grams/mile HCHO (formaldehyde) as obtained in paragraph (g)(1) of this section.

(2) [Reserved]

(k)

(1) For automobiles fueled with natural gas and automobiles designed to operate on gasoline and natural gas, the fuel economy in miles per gallon of natural gas is to be calculated using the following equation:

$$mpg_e = \frac{CWF_{HC/NG} \times D_{NG} \times 121.5}{(0.749 \times CH_4) + (CWF_{NMHC} \times NMHC) + (0.429 \times CO) + (0.273 \times (CO_2 - CO_{2NG}))}$$

Where:

$mpg_e$ = miles per gasoline gallon equivalent of natural gas.

$CWF_{HC/NG}$ = carbon weight fraction based on the hydrocarbon constituents in the natural gas fuel as obtained in paragraph (f)(3) of this section and rounded according to paragraph (g)(3) of this section.

$D_{NG}$ = density of the natural gas fuel [grams/ft$^3$ at 68 °F (20 °C) and 760 mm Hg (101.3 kPa)] pressure as obtained in paragraph (g)(3) of this section.

$CH_4$, NMHC, CO, and $CO_2$ = weighted mass exhaust emissions [grams/mile] for methane, non-methane HC, carbon monoxide, and carbon dioxide as obtained in paragraph (g)(2) of this section.

$CWF_{NMHC}$ = carbon weight fraction of the non-methane HC constituents in the fuel as determined from the speciated fuel composition per paragraph (f)(3) of this section and rounded according to paragraph (g)(3) of this section.

$CO_{2NG}$ = grams of carbon dioxide in the natural gas fuel consumed per mile of travel.

$CO_{2NG} = FC_{NG} \times D_{NG} \times WF_{CO2}$

Where:

$$FC_{NG} = \frac{(0.749 \times CH_4) + (CWF_{NMHC} \times NMHC) + (0.429 \times CO) + (0.273 \times CO_2)}{CWF_{NG} \times D_{NG}}$$

= cubic feet of natural gas fuel consumed per mile

Where:

$CWF_{NG}$ = the carbon weight fraction of the natural gas fuel as calculated in paragraph (f)(3) of this section.

$WF_{CO2}$ = weight fraction carbon dioxide of the natural gas fuel calculated using the mole fractions and molecular weights of the natural gas fuel constituents per

ASTM D 1945 (incorporated by reference in § 600.011).

(2) [Reserved]

(l)

(1) For ethanol-fueled automobiles and automobiles designed to operate on mixtures of gasoline and ethanol, the fuel economy in miles per gallon of ethanol is to be calculated using the following equation:

mpg = (CWF × SG × 3781.8)/((CWF$_{exHC}$ × HC) + (0.429 × CO) + (0.273 × CO$_2$) + (0.375 × CH$_3$OH) + (0.400 × HCHO) + (0.521 × C$_2$H$_5$OH) + (0.545 × C$_2$H$_4$O))

Where:

CWF = Carbon weight fraction of the fuel as determined in paragraph (f)(4) of this section and rounded according to paragraph (f)(3) of this section.

SG = Specific gravity of the fuel as determined in paragraph (f)(4) of this section and rounded according to paragraph (f)(3) of this section.

CWF$_{exHC}$ = Carbon weight fraction of exhaust hydrocarbons = CWF as determined in paragraph (f)(4) of this section and rounded according to paragraph (f)(3) of this section.

HC = Grams/mile HC as obtained in paragraph (g)(1) of this section.

CO = Grams/mile CO as obtained in paragraph (g)(1) of this section.

CO$_2$ = Grams/mile CO$_2$ as obtained in paragraph (g)(1) of this section.

CH$_3$OH = Grams/mile CH$_3$OH (methanol) as obtained in paragraph (g)(1) of this section.

HCHO = Grams/mile HCHO (formaldehyde) as obtained in paragraph (g)(1) of this section.

C$_2$H$_5$OH = Grams/mile C$_2$H$_5$OH (ethanol) as obtained in paragraph (g)(1) of this section.

C$_2$H$_4$O = Grams/mile C$_2$H$_4$O (acetaldehyde) as obtained in paragraph (g)(1) of this section.

(2) [Reserved]

(m)

(1) For automobiles fueled with liquefied petroleum gas and automobiles designed to operate on gasoline and liquefied petroleum gas, the fuel economy in miles per gallon of liquefied petroleum gas is to be calculated using the following equation:

$$mpg_e = \frac{CWF_{fuel} \cdot SG_{fuel} \cdot 3781.8}{CWF_{HC} \cdot HC + 0.429 \cdot CO + 0.273 \cdot CO_2}$$

Where:

mpg$_e$ = miles per gasoline gallon equivalent of liquefied petroleum gas.

CWF$_{fuel}$ = carbon weight fraction based on the hydrocarbon constituents in the liquefied petroleum gas fuel as obtained in paragraph (f)(5) of this section and rounded according to paragraph (g)(3) of this section.

SG = Specific gravity of the fuel as determined in paragraph (f)(5) of this section and rounded according to paragraph (g)(3) of this section.

3781.8 = Grams of H$_2$O per gallon conversion factor.

CWF$_{HC}$ = Carbon weight fraction of exhaust hydrocarbon = CWF$_{fuel}$ as determined in paragraph (f)(4) of this section and rounded according to paragraph (f)(3) of this section.

HC = Grams/mile HC as obtained in paragraph (g)(2) of this section.

CO = Grams/mile CO as obtained in paragraph (g)(2) of this section.

CO$_2$ = Grams/mile CO$_2$ as obtained in paragraph (g)(2) of this section.

(2) [Reserved]

(n) Manufacturers may use a value of 0 grams CO$_2$ per mile to represent the emissions of electric vehicles and the electric operation of plug-in hybrid electric vehicles derived from electricity generated from sources that are not onboard the vehicle.

(o)

(1) For testing with E10, calculate fuel economy using the following equation, rounded to the nearest 0.1 miles per gallon:

$$FE_{[interval]} = \frac{(CMF_{testfuel} \cdot SG_{testfuel}) \cdot (\rho_{H2O} \cdot SG_{basefuel} \cdot NHC_{basefuel})}{[(CMF_{testfuel} \cdot NMOG) + (0.749 \cdot CH_4) + (0.429 \cdot CO) + (0.273 \cdot CO_2)] \cdot [(R_a \cdot SG_{testfuel} \cdot NHC_{testfuel}) + (SG_{basefuel} \cdot NHC_{basefuel} \cdot (1 - R_a))]}$$

Where:

$CMF_{testfuel}$ = carbon mass fraction of the test fuel, expressed to three decimal places.

$SG_{testfuel}$ = the specific gravity of the test fuel as obtained in paragraph (f)(1) of this section, expressed to three decimal places.

$\rho_{H2O}$ = the density of pure water at 60 °F. Use $\rho_{H2O}$ = 3781.69 g/gal.

$SG_{basefuel}$ = the specific gravity of the 1975 base fuel. Use $SG_{basefuel}$ = 0.7394.

$NHC_{basefuel}$ = net heat of combustion of the 1975 base fuel. Use $NHC_{basefuel}$ = 43.047 MJ/kg.

$NMOG$ = NMOG emission rate over the test interval or duty cycle in grams/mile.

$CH_4$ = CH$_4$ emission rate over the test interval or duty cycle in grams/mile.

$CO$ = CO emission rate over the test interval or duty cycle in grams/mile.

$CO_2$ = measured tailpipe CO$_2$ emission rate over the test interval or duty cycle in grams/mile.

$R_a$ = sensitivity factor that represents the response of a typical vehicle's fuel economy to changes in fuel properties, such as volumetric energy content. Use $R_a$ = 0.81.

$NHC_{testfuel}$ = net heat of combustion by mass of test fuel as obtained in paragraph (f)(1) of this section, expressed to three decimal places.

(2) [Reserved]

(p) Equations for fuels other than those specified in this section may be used with advance EPA approval. Alternate calculation methods for fuel economy may be used in lieu of the methods described in this section if shown to yield equivalent or superior results and if approved in advance by the Administrator.

■ 56. Amend § 600.114–12 by revising the section heading and introductory text to read as follows:

**§ 600.114–12 Vehicle-specific 5-cycle fuel economy CO₂ emission calculations.**

Paragraphs (a) through (f) of this section apply to data used for fuel economy labeling under subpart D of this part. Paragraphs (d) through (f) of this section are used to calculate 5-cycle carbon-related exhaust emission values for the purpose of determining optional credits for CO$_2$-reducing technologies under § 86.1869–12 of this chapter and to calculate 5-cycle CO$_2$ values for the purpose of fuel economy labeling under subpart D of this part.

\* \* \* \* \*

■ 57. Amend § 600.116–12 by revising paragraphs (a)(11)(iii)(E), (c)(1) introductory text, and (c)(6)(iii) to read as follows:

**§ 600.116–12 Special procedures related to electric vehicles and hybrid electric vehicles.**

(a) * * *

(11) * * *

(iii) * * *

(E) A description of each test group and vehicle configuration that will use the 5-cycle adjustment factor, including the battery capacity of the vehicle used to generate the 5-cycle adjustment factor and the battery capacity of all the vehicle configurations to which it will be applied.

\* \* \* \* \*

(c) Determine performance values for hybrid electric vehicles that have plug-in capability as specified in §§ 600.210 and 600.311 using the procedures of SAE J1711 (incorporated by reference in § 600.011), with the following clarifications and modifications:

(1) Calculate fuel economy values representing combined operation during charge-depleting and charge-sustaining operation using the following utility factors, except as otherwise specified in this paragraph (c):

\* \* \* \* \*

(6) * * *

(iii) For charge-sustaining tests, we may approve alternate Net Energy Change/Fuel Ratio tolerances as specified in Appendix C of SAE J1711 to correct final fuel economy values and $CO_2$ emissions. For charge-sustaining tests, do not use alternate Net Energy Change/Fuel Ratio tolerances to correct emissions of criteria pollutants. Additionally, if we approve an alternate End-of-Test criterion or Net Energy Change/Fuel Ratio tolerances for a specific vehicle, we may use the alternate criterion or tolerances for any testing we conduct on that vehicle.

\* \* \* \* \*

■ 58. Amend § 600.117 by removing and reserving paragraph (a)(5) and revising paragraphs (a)(6) and (b) to read as follows:

**§ 600.117 Interim provisions.**

(a) * * *

(6) Manufacturers may alternatively determine fuel economy values using E10 gasoline test fuel as specified in 40 CFR 1065.710(b). Calculate fuel economy using the equation specified in § 600.113–12(o)(1) based on measured $CO_2$ results without adjusting to account for fuel effects.

\* \* \* \* \*

(b) For model years 2027 through 2029, manufacturers may determine fuel economy values using data with E0 test fuel from testing for earlier model years, subject to the carryover provisions of 40 CFR 86.1839 and § 600.006. Calculate

fuel economy using the equation specified in § 600.113–12(h)(1) based on measured $CO_2$ results without adjusting to account for fuel effects.

\* \* \* \* \*

■ 59. Amend § 600.206–12 by revising paragraphs (a) introductory text, (a)(4) introductory text, (b), and (c) to read as follows:

**§ 600.206–12 Calculation and use of FTP-based and HFET-based fuel economy, $CO_2$ emissions, and carbon-related exhaust emission values for vehicle configurations.**

(a) Fuel economy, $CO_2$ emissions, and carbon-related exhaust emissions values determined for each vehicle under § 600.113–12(a) and (b) and as approved in § 600.008(c), are used to determine FTP-based city, HFET-based highway, and combined FTP/Highway-based fuel economy, $CO_2$ emissions, and carbon-related exhaust emission values for each vehicle configuration for which data are available. Note that fuel economy for some alternative fuel vehicles may mean miles per gasoline gallon equivalent and/or miles per unit of fuel consumed. For example, electric vehicles will determine miles per kilowatt-hour in addition to miles per gasoline gallon equivalent, and fuel cell vehicles will determine miles per kilogram of hydrogen.

\* \* \* \* \*

(4) For alcohol dual fuel automobiles and natural gas dual fuel automobiles the procedures of paragraphs (a)(1) or (2) of this section, as applicable, shall be used to calculate two separate sets of FTP-based city, HFET-based highway, and combined values for fuel economy, $CO_2$ emissions, and carbon-related exhaust emissions for each vehicle configuration.

\* \* \* \* \*

(b) If only one equivalent petroleum-based fuel economy value exists for an electric vehicle configuration, that value, rounded to the nearest tenth of a mile per gallon, will comprise the petroleum-based fuel economy for that vehicle configuration.

(c) If more than one equivalent petroleum-based fuel economy value exists for an electric vehicle configuration, all values for that vehicle configuration are harmonically averaged and rounded to the nearest 0.0001 mile per gallon for that vehicle configuration.

■ 60. Amend § 600.207–12 by revising paragraphs (a)(1), (a)(4) introductory text, (b), and (c) to read as follows:

**§ 600.207–12 Calculation and use of vehicle-specific 5-cycle-based fuel economy and $CO_2$ emission values for vehicle configurations.**

(a) * * *

(1) If only one set of 5-cycle city and highway fuel economy and $CO_2$ emission values is accepted for a vehicle configuration, these values, where fuel economy is rounded to the nearest 0.0001 of a mile per gallon and the $CO_2$ emission value in grams per mile is rounded to the nearest tenth of a gram per mile, comprise the city and highway fuel economy and $CO_2$ emission values for that vehicle configuration. Note that the appropriate vehicle-specific $CO_2$ values for fuel economy labels based on 5-cycle testing with E10 test fuel are adjusted as described in § 600.114–12.

\* \* \* \* \*

(4) For alcohol dual fuel automobiles and natural gas dual fuel automobiles, the procedures of paragraphs (a)(1) and (2) of this section shall be used to calculate two separate sets of 5-cycle city and highway fuel economy and $CO_2$ emission values for each vehicle configuration.

\* \* \* \* \*

(b) If only one equivalent petroleum-based fuel economy value exists for an electric vehicle configuration, that value, rounded to the nearest tenth of a mile per gallon, will comprise the petroleum-based 5-cycle fuel economy for that vehicle configuration.

(c) If more than one equivalent petroleum-based 5-cycle fuel economy value exists for an electric vehicle configuration, all values for that vehicle configuration are harmonically averaged and rounded to the nearest 0.0001 mile per gallon for that vehicle configuration.

■ 61. Amend § 600.210–12 by revising paragraph (b) to read as follows:

**§ 600.210–12 Calculation of fuel economy and $CO_2$ emission values for labeling.**

\* \* \* \* \*

(b) *Specific labels.* Except as specified in paragraphs (d) and (e) of this section, fuel economy and $CO_2$ emissions for specific labels may be determined by one of two methods. The first is based on vehicle-specific vehicle configuration 5-cycle data as determined in § 600.207. This method is available for all vehicles and is required for vehicles that do not qualify for the second method as described in § 600.115 (other than electric vehicles). The second method, the derived 5-cycle method, determines fuel economy and $CO_2$ emissions values from the FTP and HFET tests using equations that are derived from vehicle-specific 5-cycle vehicle configuration data, as determined in paragraph (b)(2) of this section. Manufacturers may voluntarily lower fuel economy values and raise $CO_2$ values if they determine that the label values from either method are not

representative of the fuel economy or $CO_2$ emissions for that model type.

(1) *Vehicle-specific 5-cycle labels.* The city and highway vehicle configuration fuel economy determined in § 600.207, rounded to the nearest mpg, and the city and highway vehicle configuration $CO_2$ emissions determined in § 600.207, rounded to the nearest gram per mile, comprise the fuel economy and $CO_2$ emission values for specific fuel economy labels, or, alternatively;

(2) *Derived 5-cycle labels.* Specific city and highway label values from derived 5-cycle are determined according to the following method:

(i)(A) Determine the derived five-cycle city fuel economy of the vehicle configuration using the equation below and coefficients determined by the Administrator:

$$Derived\ 5-cycle\ City\ Fuel\ Economy$$

$$= \frac{1}{(City\ Intercept) + \frac{(City\ Slope)}{Config\ FTP\ FE}}$$

Where:

City Intercept = Intercept determined by the Administrator based on historic vehicle-specific 5-cycle city fuel economy data.
City Slope = Slope determined by the Administrator based on historic vehicle-specific 5-cycle city fuel economy data.
Config FTP FE = the vehicle configuration FTP-based city fuel economy determined under § 600.206, rounded to the nearest 0.0001 mpg.

(B) Determine the derived five-cycle city $CO_2$ emissions of the vehicle configuration using the equation below and coefficients determined by the Administrator:

Derived 5-cycle City $CO_2$ = City Intercept + City Slope · Config FTP $CO_2$

Where:

City Intercept = Intercept determined by the Administrator based on historic vehicle-specific 5-cycle city fuel economy data.
City Slope = Slope determined by the Administrator based on historic vehicle-specific 5-cycle city fuel economy data.

Config FTP $CO_2$ = the vehicle configuration FTP-based city $CO_2$ emissions determined under § 600.206, rounded to the nearest 0.1 grams per mile. Note that the appropriate Config FTP $CO_2$ input values for fuel economy labels based on testing with E10 test fuel are adjusted as referenced in § 600.206–12(a)(2)(iii).

(ii)(A) Determine the derived five-cycle highway fuel economy of the vehicle configuration using the equation below and coefficients determined by the Administrator:

$$Derived\ 5-cycle\ Highway\ Fuel\ Economy$$

$$= \frac{1}{(Highway\ Intercept) + \frac{(Highway\ Slope)}{Config\ HFET\ FE}}$$

Where:

Highway Intercept = Intercept determined by the Administrator based on historic vehicle-specific 5-cycle highway fuel economy data.
Highway Slope = Slope determined by the Administrator based on historic vehicle-specific 5-cycle highway fuel economy data.
Config HFET FE = the vehicle configuration highway fuel economy determined under § 600.206, rounded to the nearest tenth.

(B) Determine the derived five-cycle highway $CO_2$ emissions of the vehicle configuration using the equation below and coefficients determined by the Administrator:

Derived 5-cycle city Highway $CO_2$ = Highway Intercept + Highway Slope · Config HFET $CO_2$

Where:

*Highway Intercept* = Intercept determined by the Administrator based on historic vehicle-specific 5-cycle highway fuel economy data.
*Highway Slope* = Slope determined by the Administrator based on historic vehicle-specific 5-cycle highway fuel economy data.
*Config HFET $CO_2$* = the vehicle configuration highway fuel economy determined under § 600.206, rounded to the nearest tenth. Note that the appropriate Config HFET $CO_2$ input values for fuel economy labels based on testing with E10 test fuel are

adjusted as referenced in § 600.206–12(a)(2)(iii).

(iii) The slopes and intercepts of paragraph (a)(2)(iii) of this section apply.

(3) *Specific alternative fuel economy and $CO_2$ emissions label values for dual fuel vehicles.*

(i) Determine an alternative fuel label value for dual fuel vehicles, rounded to the nearest whole number, as follows:

(A) Specific city and highway fuel economy label values for dual fuel alcohol-based and natural gas vehicles when using the alternative fuel are separately determined by the following calculation:

$$Derived\ FE_{alt} = FE_{alt} \times \frac{5\ cycle_{gas}}{FE_{gas}}$$

Where:

$FE_{alt}$ = The unrounded FTP-based vehicle configuration city or HFET-based vehicle configuration highway fuel economy

from the alternative fuel, as determined in § 600.206.
5cycle $FE_{gas}$ = The unrounded vehicle-specific or derived 5-cycle vehicle configuration city or highway fuel

economy as determined in paragraph (b)(1) or (2) of this section.
$FE_{gas}$ = The unrounded FTP-based city or HFET-based vehicle configuration

highway fuel economy from gasoline, as determined in § 600.206.

(B) Specific city and highway $CO_2$ emission label values for dual fuel alcohol-based and natural gas vehicles

when using the alternative fuel are separately determined by the following calculation:

$$Derived\ CO2_{alt} = CO2_{alt} \times \frac{5\ cycle\ CO2_{gas}}{CO2_{gas}}$$

Where:

$CO2_{alt}$ = The unrounded FTP-based vehicle configuration city or HFET-based vehicle configuration highway $CO_2$ emissions value from the alternative fuel, as determined in § 600.206.

$5cycle\ CO2_{gas}$ = The unrounded vehicle-specific or derived 5-cycle vehicle configuration city or highway $CO_2$ emissions value as determined in paragraph (b)(1) or (b)(2) of this section.

$CO2_{gas}$ = The unrounded FTP-based city or HFET-based vehicle configuration highway $CO_2$ emissions value from gasoline, as determined in § 600.206.

(ii) Optionally, if complete 5-cycle testing has been performed using the alternative fuel, the manufacturer may choose to use the alternative fuel label city or highway fuel economy and $CO_2$ emission values determined in § 600.207–12(a)(4)(ii), rounded to the nearest whole number.

(4) *Specific alternative fuel economy and $CO_2$ emissions label values for electric vehicles.* Determine FTP-based city and HFET-based highway fuel economy label values for electric vehicles as described in § 600.116. Determine these values by running the appropriate repeat test cycles. Convert W-hour/mile results to miles per kW-hr and miles per gasoline gallon equivalent. $CO_2$ label information is based on tailpipe emissions only, so $CO_2$ emissions from electric vehicles are assumed to be zero.

(5) *Specific alternate fuel economy and $CO_2$ emissions label values for fuel cell vehicles.* Determine FTP-based city and HFET-based highway fuel economy label values for fuel cell vehicles using procedures specified by the Administrator. Convert kilograms of hydrogen/mile results to miles per kilogram of hydrogen and miles per gasoline gallon equivalent. $CO_2$ label information is based on tailpipe emissions only, so $CO_2$ emissions from fuel cell vehicles are assumed to be zero.

\* \* \* \* \*

■ 62. Revise the heading of subpart F as set forth above.

■ 63. Amend § 600.507–12 by revising paragraphs (a) introductory text, (b), and (d) to read as follows:

**§ 600.507–12 Running change data requirements.**

(a) Except as specified in paragraph (d) of this section, the manufacturer shall submit additional running change fuel economy data as specified in paragraph (b) of this section for any running change approved or implemented under § 86.1842 of this chapter, which:

\* \* \* \* \*

(b)(1) The additional running change fuel economy data requirement in paragraph (a) of this section will be determined based on the sales of the vehicle configurations in the created or affected base level(s) as updated at the time of running change approval.

(2) Within each newly created base level as specified in paragraph (a)(1) of this section, the manufacturer shall submit data from the highest projected total model year sales subconfiguration within the highest projected total model year sales vehicle configuration in the base level.

(3) Within each base level affected by a running change as specified in paragraph (a)(2) of this section, fuel economy data shall be submitted for the vehicle configuration created or affected by the running change which has the highest total model year projected sales. The test vehicle shall be of the subconfiguration created by the running change which has the highest projected total model year sales within the applicable vehicle configuration.

\* \* \* \* \*

(d) For those model types created under § 600.208–12(a)(2), the manufacturer shall submit fuel economy data for each subconfiguration added by a running change.

■ 64. Revise § 600.509–12 to read as follows:

**§ 600.509–12 Voluntary submission of additional data.**

(a) The manufacturer may optionally submit data in addition to the data required by the Administrator.

(b) Additional fuel economy data may be submitted by the manufacturer for any vehicle configuration which is to be tested as required in § 600.507 or for which fuel economy data were previously submitted under paragraph (c) of this section.

(c) Within a base level, additional fuel economy data may be submitted by the manufacturer for any vehicle configuration which is not required to be tested by § 600.507.

■ 65. Amend § 600.510–12 by:
■ a. Revising the section heading;
■ b. Removing and reserving paragraph (a)(2);
■ c. Revising paragraphs (b) and (g)(1) introductory text; and
■ d. Removing paragraphs (i), (j), and (k).

The revisions read as follows:

**§ 600.510–12 Calculation of average fuel economy.**

\* \* \* \* \*

(b) For the purpose of calculating average fuel economy under paragraph (c) of this section:

(1) All fuel economy data submitted in accordance with § 600.006(e) or § 600.512(c) shall be used.

(2) The combined city/highway fuel economy values will be calculated for each model type in accordance with § 600.208 except that:

(i) Separate fuel economy values will be calculated for model types and base levels associated with car lines for each category of passenger automobiles and light trucks as determined by the Secretary of Transportation pursuant to paragraph (a)(1) of this section.

(ii) Total model year production data, as required by this subpart, will be used instead of sales projections;

(iii) [Reserved]

(iv) The fuel economy value will be rounded to the nearest 0.1 mpg; and

(v) [Reserved]

(vi) At the manufacturer's option, those vehicle configurations that are self-compensating to altitude changes may be separated by sales into high-altitude sales categories and low-altitude sales categories. These separate sales categories may then be treated (only for the purpose of this section) as separate vehicle configurations in accordance with the procedure of § 600.208–12(a)(4)(ii).

(3) The fuel economy values for each vehicle configuration are the combined fuel economy calculated according to § 600.206–12(a)(3) except that:

(i) Separate fuel economy values will be calculated for vehicle configurations

associated with car lines for each category of passenger automobiles and light trucks as determined by the Secretary of Transportation pursuant to paragraph (a)(1) of this section; and

(ii) Total model year production data, as required by this subpart will be used instead of sales projections.

\* \* \* \* \*

(g)(1) Dual fuel automobiles must provide equal or greater energy efficiency while operating on the alternative fuel as while operating on gasoline or diesel fuel to obtain the CAFE credit determined in paragraphs (c)(2)(iv) and (v) of this section. The following equation must hold true:

\* \* \* \* \*

■ 66. Amend § 600.512–12 by:
■ a. Revising paragraph (a) introductory text;
■ b. Removing and reserving paragraph (a)(2), (c)(1)(ii), and (c)(2)(ii);
■ c. Revising paragraphs (c)(3);
■ d. Removing and reserving paragraphs (c)(4)(ii), and (c)(5)(ii); and
■ e. Removing paragraph (c)(11).
The revisions read as follows:

§ 600.512–12 Model year report.

(a) For each model year, the manufacturer shall submit to the Administrator a report, known as the model year report, containing all information necessary for the calculation of the manufacturer's average fuel economy.

(c) \* \* \*

(3)(i) For manufacturers calculating air conditioning efficiency credits in support of fuel consumption improvement values under § 600.510(c), a description of the air conditioning system and the total credits earned for each averaging set, model year, and region, as applicable.

(ii) Any additional fuel economy data submitted by the manufacturer under § 600.509;

\* \* \* \* \*

§ 600.514–12 [Removed]

■ 67. Remove § 600.514–12.

## PART 1036—CONTROL OF EMISSIONS FROM NEW AND IN-USE HEAVY-DUTY HIGHWAY ENGINES

■ 68. The authority citation for part 1036 continues to read as follows:

**Authority:** 42 U.S.C. 7401—7671q.

■ 69. Amend § 1036.1 by revising paragraph (a) introductory text to read as follows:

§ 1036.1 Applicability.

(a) Except as specified in § 1036.5, the provisions of this part apply for engines that will be installed in heavy-duty

vehicles (including glider vehicles). Heavy-duty engines produced before December 20, 2026 are subject to exhaust emission standards for $NO_X$, HC, PM, and CO, and related provisions under 40 CFR part 86, subpart A and subpart N, instead of this part, except as follows:

\* \* \* \* \*

■ 70. Amend § 1036.5 by revising paragraph (a) and removing paragraph (e). The revision reads as follows:

§ 1036.5 Excluded engines.

(a) The provisions of this part do not apply to engines used in medium-duty passenger vehicles or other heavy-duty vehicles that are subject to regulation under 40 CFR part 86, subpart S, except as specified in 40 CFR part 86, subpart S. For example, this exclusion may apply for engines used in incomplete vehicles or high-GCWR vehicles as specified in 40 CFR 86.1801–12.

\* \* \* \* \*

■ 71. Amend § 1036.15 by revising paragraph (b) to read as follows:

§ 1036.15 Other applicable regulations.

\* \* \* \* \*

(b) Part 1037 of this chapter describes emission standards and other requirements for heavy-duty vehicles, whether or not they use engines certified under this part.

\* \* \* \* \*

■ 72. Amend § 1036.101 by revising paragraph (a) to read as follows:

§ 1036.101 Overview of exhaust emission standards.

(a) You must show that engines meet the criteria pollutant standards for $NO_X$, HC, PM, and CO as described in § 1036.104. These pollutants are sometimes described collectively as "criteria pollutants" because they are either criteria pollutants under the Clean Air Act or precursors to the criteria pollutants ozone and PM.

\* \* \* \* \*

§ 1036.108 [Removed]

■ 73. Remove § 1036.108.

§ 1036.115 [Amended]

■ 74. Amend § 1036.115 by removing and reserving paragraph (b).
■ 75. Amend § 1036.130 by revising paragraph (b)(5) and removing and reserving paragraph (c). The revision reads as follows:

§ 1036.130 Installation instructions for vehicle manufacturers.

\* \* \* \* \*

(b) \* \* \*

(5) Describe how your certification is limited for any type of application. For

example, if you certify engines only for use in emergency vehicles, you must make clear that the engine may only be installed in emergency vehicles.

\* \* \* \* \*

■ 76. Amend § 1036.135 by revising paragraphs (c)(9) and (e) to read as follows:

§ 1036.135 Labeling.

\* \* \* \* \*

(c) \* \* \*

(9) Identify any limitations on your certification. For example, if you certify engines with one or more approved AECDs for emergency vehicle applications under § 1036.115(h)(4), include the statement: "THIS ENGINE IS FOR INSTALLATION IN EMERGENCY VEHICLES ONLY".

\* \* \* \* \*

(e) You may ask us to approve modified labeling requirements in this part if you show that it is necessary or appropriate. We will approve your request if your alternate label is consistent with the requirements of this part.

\* \* \* \* \*

■ 77. Amend § 1036.150 by:
■ a. Removing and reserving paragraphs (b), (d), and (e);
■ b. Revising paragraph (f);
■ c. Removing and reserving paragraphs (g) through (j), (l) through (n), (p) through (s), and (w); and
■ d. Removing paragraph (aa).
The revision reads as follows:

§ 1036.150 Interim provisions.

\* \* \* \* \*

(f) *Testing exemption for hydrogen engines.* Tailpipe HC, and CO emissions from engines fueled with neat hydrogen are deemed to comply with the applicable standard. Testing for HC or CO is optional under this part for these engines.

\* \* \* \* \*

■ 78. Amend § 1036.205 by revising paragraphs (b) introductory text, (l), (m), (o)(2), and (t) and removing paragraph (aa). The revisions read as follows:

§ 1036.205 Requirements for an application for certification.

\* \* \* \* \*

(b) Explain how the emission control system operates. Describe in detail all system components for controlling criteria pollutant emissions, including all auxiliary emission control devices (AECDs) and all fuel-system components you will install on any production or test engine. Identify the part number of each component you describe. For this paragraph (b), treat as separate AECDs any devices that

modulate or activate differently from each other. Include all the following:

\* \* \* \* \*

(l) Identify the duty-cycle emission standards from § 1036.104(a) and (b) that apply for the engine family. Also identify the $NO_X$ FEL over the FTP for the engine family.

(m) Identify the engine family's deterioration factors and describe how you developed them (see § 1036.240). Present any test data you used for this. For engines designed to discharge crankcase emissions to the ambient atmosphere, use the deterioration factors for crankcase emission to determine deteriorated crankcase emission levels of $NO_X$, HC, PM, and CO as specified in § 1036.240(e).

\* \* \* \* \*

(o) \* \* \*

(2) Identify the value of $e_{CO2FTP}$ from § 1036.235(b).

\* \* \* \* \*

(t) State whether your certification is limited for certain engines. For example, you might certify engines only for use in emergency vehicles or in vehicles with hybrid powertrains. If this is the case, describe how you will prevent use of these engines in vehicles for which they are not certified.

\* \* \* \* \*

■ 79. Amend § 1036.225 by removing paragraph (a)(3) and revising paragraph (f). The revision reads as follows:

### § 1036.225 Amending applications for certification.

\* \* \* \* \*

(f) You may ask us to approve a change to your FEL in certain cases after the start of production, but before the end of the model year. The changed FEL may not apply to engines you have already introduced into U.S. commerce, except as described in this paragraph (f). You may ask us to approve a change to your FEL in the following cases:

(1) You may ask to raise your FEL for your engine family at any time. In your request, you must show that you will still be able to meet the emission standards as specified in subparts B and H of this part. Use the appropriate FELs with corresponding production volumes to calculate emission credits for the model year, as described in subpart H of this part.

(2) You may ask to lower the FEL for your engine family only if you have test data from production engines showing that emissions are below the proposed lower FEL. The lower FEL applies only to engines you produce after we approve the new FEL. Use the appropriate FEL with corresponding production volumes to calculate emission credits for the

model year, as described in subpart H of this part.

\* \* \* \* \*

### § 1036.230 [Amended]

■ 80. Amend § 1036.230 by removing paragraph (f).
■ 81. Add § 1036.231 to subpart C to read as follows:

### § 1036.231 Powertrain families.

(a) If you choose to perform powertrain testing as specified in § 1036.545, use good engineering judgment to divide your product line into powertrain families that are expected to have similar criteria emissions throughout the useful life as described in this section. Your powertrain family is limited to a single model year.

(b) Except as specified in paragraph (c) of this section, group powertrains in the same powertrain family if they share all the following attributes:

(1) Have the same engine design aspects as specified in § 1036.230.

(2) [Reserved]

(3) Number of clutches.

(4) Type of clutch (*e.g.,* wet or dry).

(5) Presence and location of a fluid coupling such as a torque converter.

(6) Gear configuration, as follows:

(i) Planetary (*e.g.,* simple, compound, meshed-planet, stepped-planet, multi-stage).

(ii) Countershaft (*e.g.,* single, double, triple).

(iii) Continuously variable (*e.g.,* pulley, magnetic, toroidal).

(7) Number of available forward gears, and transmission gear ratio for each available forward gear, if applicable. Count forward gears as being available only if the vehicle has the hardware and software to allow operation in those gears.

(8) Transmission oil sump configuration (*e.g.,* conventional or dry).

(9) The power transfer configuration of any hybrid technology (*e.g.,* series or parallel).

(10) The type of any RESS (*e.g.,* hydraulic accumulator, Lithium-ion battery pack, ultracapacitor bank).

(c) For powertrains that share all the attributes described in paragraph (b) of this section, divide them further into separate powertrain families based on common calibration attributes. Group powertrains in the same powertrain family to the extent that powertrain test results and corresponding emission levels are expected to be similar throughout the useful life.

(d) You may subdivide a group of powertrains with shared attributes under paragraph (b) of this section into different powertrain families.

(e) In unusual circumstances, you may group powertrains into the same powertrain family even if they do not have shared attributes under in paragraph (b) of this section if you show that their emission characteristics throughout the useful life will be similar.

(f) If you include the axle when performing powertrain testing for the family, you must limit the family to include only those axles represented by the test results. You may include multiple axle ratios in the family if you test with the axle expected to produce the highest emission results.

■ 82. Amend § 1036.235 by revising the introductory text and paragraphs (a) and (b) and removing and reserving paragraph (c)(5). The revisions read as follows:

### § 1036.235 Testing requirements for certification.

This section describes the emission testing you must perform to show compliance with the emission standards in § 1036.104.

(a) Select and configure one or two emission-data engines from each engine family.

(1) For criteria pollutant emission testing, select the engine configuration with the highest volume of fuel injected per cylinder per combustion cycle at the point of maximum torque—unless good engineering judgment indicates that a different engine configuration is more likely to exceed (or have emissions nearer to) an applicable emission standard or FEL. If two or more engines have the same fueling rate at maximum torque, select the one with the highest fueling rate at rated speed. In making this selection, consider all factors expected to affect emission-control performance and compliance with the standards, including emission levels of all exhaust constituents, especially $NO_X$ and PM. To the extent we allow it for establishing deterioration factors, select for testing those engine components or subsystems whose deterioration best represents the deterioration of in-use engines.

(2) In the case of powertrain testing under § 1036.545, select a test engine, test hybrid components, test axle and test transmission as applicable, by considering the whole range of vehicle models covered by the powertrain family. If the powertrain has more than one transmission calibration, for example economy vs. performance, you may weight the results from the powertrain testing in § 1036.545 by the percentage of vehicles in the family by prior model year for each configuration. This can be done, for example, through

the use of survey data or based on the previous model year's sales volume. Weight the results of $M_{fuel[cycle]}$, $f_{npowertrain}/v_{powertrain}$, and $W_{[cycle]}$ from table 5 to paragraph (o)(8)(i) of § 1036.545 according to the percentage of vehicles in the family that use each transmission calibration.

(b) Test your emission-data engines using the procedures and equipment specified in subpart F of this part. In the case of dual-fuel and flexible-fuel engines, measure emissions when operating with each type of fuel for which you intend to certify the engine. For criteria pollutant emission testing, measure $NO_X$, PM, CO, and NMHC emissions using each duty cycle specified in § 1036.104. Determine brake-specific $CO_2$ emissions over the FTP, $e_{CO2FTP}$, as a reference value for calculating emission rates from in-use engines under § 1036.530, as applicable. You may alternatively determine $e_{CO2FTP}$, based on brake-specific $CO_2$ emissions over the SET, with our advance approval, if you demonstrate that engines from the engine family will be used only with tractors.

\* \* \* \* \*

### § 1036.241 [Removed]

■ 83. Remove § 1036.241.
■ 84. Amend § 1036.245 by revising paragraph (c)(3) to read as follows:

### § 1036.245 Deterioration factors for exhaust emission standards.

\* \* \* \* \*

(c) \* \* \*
(3) Perform service accumulation in the laboratory by operating the engine or hybrid powertrain repeatedly over one of the following test sequence, or a different test sequence that we approve in advance:

(i) Operate at idle for 2 hours.
(ii) Operate for 105 ± 1 hours over a repeat sequence of one FTP followed by one RMC.
(iii) Operate over one LLC.
(iv) Operate at idle for 2 hours.
(v) Shut down the engine for cooldown to ambient temperature.

\* \* \* \* \*

■ 85. Revise § 1036.301 to read as follows:

### § 1036.301 Selective enforcement audits.

Selective enforcement audits apply for engines and powertrains as specified in 40 CFR part 1068, subpart E.
■ 86. Amend § 1036.415 by revising paragraph (g) to read as follows:

### § 1036.415 Preparing and testing engines.

\* \* \* \* \*

(g) For stop-start and automatic engine shutdown systems, override idle-reduction features if they are adjustable. If those systems are not adjustable,, set the 1-Hz emission rate to zero for all regulated pollutants when the idle-reduction feature is active. Do not exclude these data points under § 1036.530(c)(3)(ii). Note that systems are considered "adjustable" if vehicle owners, dealers, or other service outlets can override the idle-reduction features.
■ 87. Amend § 1036.501 by revising paragraphs (a), (d), and (h) to read as follows:

### § 1036.501 General testing provisions.

(a) Use the equipment and procedures specified in this subpart and 40 CFR part 1065 to determine whether engines meet the emission standards in § 1036.104.

\* \* \* \* \*

(d) If your engine is intended for installation in a vehicle equipped with nonadjustable stop-start technology as described in § 1036.415(g), you may shut the engine down during idle portions of the duty cycle to represent in-use operation. We recommend installing a production engine starter motor and letting the engine's ECM manipulate the starter motor to control the engine stop and start events. Use good engineering judgment to address the effects of dynamometer inertia on restarting the engine by, for example, using a larger starter motor or declutching the engine from the dynamometer during restart.

\* \* \* \* \*

(h) For testing engines that use regenerative braking through the crankshaft only to power an electric heater for aftertreatment devices, you may use the nonhybrid engine testing procedures in §§ 1036.510, 1036.512, and 1036.514 only if the recovered energy is less than 10 percent of the total positive work for each applicable test interval. Otherwise, use powertrain testing procedures specified for hybrid powertrains to measure emissions. For engines that power an electric heater with a battery, you must meet the requirements related to charge-sustaining operation as described in 40 CFR 1066.501(a)(3).

### § 1036.505 [Removed]

■ 88. Remove § 1036.505.
■ 89. Amend § 1036.510 by:
■ a. Revising paragraphs (b)(2) introductory text and (b)(2)(vii) and (viii); and
■ b. Removing and reserving paragraph (e).
The revisions read as follows:

### § 1036.510 Supplemental Emission Test.

\* \* \* \* \*

(b) \* \* \*
(2) Test hybrid powertrains as described in § 1036.545, except as specified in this paragraph (b)(2). Do not compensate the duty cycle for the distance driven as described in § 1036.545(g)(4). For hybrid engines, select the transmission model parameters as described in § 1036.510(b)(viii), . Disregard duty cycles in § 1036.545(j). For cycles that begin with idle, leave the transmission in neutral or park for the full initial idle segment. Place the transmission into drive no earlier than 5 seconds before the first nonzero vehicle speed setpoint. For SET testing only, place the transmission into park or neutral when the cycle reaches the final idle segment. Use the following vehicle parameters instead of those in § 1036.545 to define the vehicle model in § 1036.545(a)(3):

\* \* \* \* \*

(vii) Select a combination of drive axle ratio, $k_a$, and a tire radius, $r$, that represents the worst-case combination of top gear ratio, drive axle ratio, and tire size for emissions expected for vehicles in which the hybrid engine or hybrid powertrain will be installed. This is typically the highest axle ratio and smallest tire radius. Disregard configurations or settings corresponding to a maximum vehicle speed below 60 mi/hr in selecting a drive axle ratio and tire radius, unless you can demonstrate that in-use vehicles will not exceed that speed. You may request preliminary approval for selected drive axle ratio and tire radius consistent with the provisions of § 1036.210. If the hybrid engine or hybrid powertrain is used exclusively in vehicles not capable of reaching 60 mi/hr, you may request that we approve an alternate test cycle and cycle-validation criteria as described in 40 CFR 1066.425(b)(5). Note that hybrid engines rely on a specified transmission that is different for each duty cycle; the transmission's top gear ratio therefore depends on the duty cycle, which will in turn change the selection of the drive axle ratio and tire size. For example, § 1036.520 prescribes a different top gear ratio than this paragraph (b)(2).

(viii) If you are certifying a hybrid engine, use a default transmission efficiency of 0.95 and create the vehicle model along with its default transmission shift strategy as described in § 1036.545(a)(3)(ii). Specify the transmission type as Automatic Transmission for all engines and for all duty cycles, except that the transmission type is Automated Manual Transmission for Heavy HDE operating over the SET duty cycle. For automatic transmissions set neutral idle to "Y" in

the vehicle file. Select gear ratios for

each gear as shown in the following table:

TABLE 1 TO PARAGRAPH (b)(2)(vii) OF § 1036.510—GEM HIL INPUT FOR GEAR RATIO

| Gear number | Spark-ignition HDE, light HDE, and medium HDE— all duty cycles | Heavy HDE— LLC and FTP duty cycles | Heavy HDE— SET duty cycle |
|---|---|---|---|
| 1 | 3.10 | 3.51 | 12.8 |
| 2 | 1.81 | 1.91 | 9.25 |
| 3 | 1.41 | 1.43 | 6.76 |
| 4 | 1.00 | 1.00 | 4.90 |
| 5 | 0.71 | 0.74 | 3.58 |
| 6 | 0.61 | 0.64 | 2.61 |
| 7 | | | 1.89 |
| 8 | | | 1.38 |
| 9 | | | 1.00 |
| 10 | | | 0.73 |
| Lockup Gear | 3 | 3 | |

\* \* \* \* \*

■ 90. Amend § 1036.512 by revising paragraphs (b)(2)(iv) and removing and reserving paragraph (e). The revision reads as follows:

### § 1036.512 Federal Test Procedure.

\* \* \* \* \*

(b) \* \* \*

(2) \* \* \*

(iv) For plug-in hybrid powertrains, test over the FTP in both charge-sustaining and charge-depleting operation for criteria pollutant determination.

\* \* \* \* \*

■ 91. Amend § 1036.514 by revising paragraph (b)(4) to read as follows:

### § 1036.514 Low Load Cycle.

\* \* \* \* \*

(b) \* \* \*

(4) Adjust procedures in this section as described in § 1036.510(d) and (e) for plug-in hybrid powertrains to determine criteria pollutant emissions, replacing "SET" with "LLC". Note that the LLC is therefore the preconditioning duty cycle for plug-in hybrid powertrains.

\* \* \* \* \*

■ 92. Amend § 1036.520 by revising paragraph (b)(1) to read as follows:

### § 1036.520 Determining power and vehicle speed values for powertrain testing.

\* \* \* \* \*

(b) \* \* \*

(1) Use vehicle parameters, other than power, as specified in § 1036.510(b)(2).

Use the applicable automatic transmission as specified in § 1036.510(b)(2)(vii).

\* \* \* \* \*

■ 93. Amend § 1036.530 by revising paragraphs (e) and (g) to read as follows:

### § 1036.530 Test procedures for off-cycle testing.

\* \* \* \* \*

(e) *Normalized $CO_2$ emission mass over a 300 second test interval.* For engines subject to compression-ignition standards, determine the normalized $CO_2$ emission mass over each 300 second test interval, $m_{CO2,norm,testinterval,}$ to the nearest 0.01% using the following equation:

$$m_{CO2,norm,testinterval} = \frac{m_{CO2,testinterval}}{e_{CO2FTP} \cdot P_{max} \cdot t_{testinterval}}$$

Eq. 1036.530–2

Where:

$m_{CO2,testinterval}$ = total $CO_2$ emission mass over the test interval.

$e_{CO2FTP}$ = the engine's brake-specific $CO_2$ over the FTP duty cycle, as described in § 1036.235(b).

$P_{max}$ = the highest value of rated power for all the configurations included in the engine family.

$t_{testinterval}$ = duration of the test interval. Note that the nominal value is 300 seconds.

*Example*

$m_{CO2,testinterval}$ = 3948 g
$e_{CO2FTP}$ = 428.2 g/hp·hr
$P_{max}$ = 406.5 hp
$t_{testinterval}$ = 300.01 s = 0.08 hr

$$m_{CO2,norm,testinterval} = \frac{3948}{428.2 \cdot 406.5 \cdot 0.08}$$

$m_{CO2,norm,testinterval}$ = 0.2722 = 27.22%

\* \* \* \* \*

(g) *Off-cycle emissions quantities.* Determine the off-cycle emissions quantities as follows:

(1) *Spark-ignition.* For engines subject to spark-ignition standards, the off-cycle emission quantity, $e_{[emission],offcycle,}$ is the value for $CO_2$-specific emission mass for a given pollutant over the test interval

representing the shift-day converted to a brake-specific value, as calculated for each measured pollutant using the following equation:

$$e_{[emissions],offcycle} = \frac{m_{[emission]}}{m_{CO2}} \cdot e_{CO2,FTP}$$

Eq. 1036.530–3

Where:

$m_{[emission]}$ = total emission mass for a given pollutant over the test interval as determined in paragraph (d)(2) of this section.

$m_{CO2}$ = total $CO_2$ emission mass over the test interval as determined in paragraph (d)(2) of this section.

$e_{CO2,FTP}$ = the engine's brake-specific $CO_2$ over the FTP duty cycle.

*Example*

$m_{NOx}$ = 1.337 g
$m_{CO2}$ = 18778 g
$e_{CO2,FTP}$ = 505.1 g/hp·hr

$$e_{NOx,offcycle} = \frac{1.337}{18778} \cdot 505.1$$

$e$NO$_{X, offcycle}$ = 0.035 g/hp·hr = 35 mg/hp·hr

(2) *Compression-ignition.* For engines subject to compression-ignition standards, determine the off-cycle emission quantity for each bin. When

calculating mean bin emissions from ten engines to apply the pass criteria for engine families in § 1036.425(c), set any negative off-cycle emissions quantity to zero before calculating mean bin emissions.

(i) *Off-cycle emissions quantity for bin 1.* The off-cycle emission quantity for bin 1, is the mean $NO_X$ mass emission rate from all test intervals associated with bin 1 as calculated using the following equation:

$$\bar{\bar{m}}_{NOx,offcycle,bin1} = \frac{\sum_{i=1}^{N} m_{NOx,testinterval,i}}{\sum_{i=1}^{N} t_{testinterval,i}}$$

Eq. 1036.530–4

Where:

$i$ = an indexing variable that represents one 300 second test interval.

$N$ = total number of 300 second test intervals in bin 1.

$m_{NOxtestinterval,i}$ = total $NO_X$ emission mass over the test interval $i$ in bin 1 as

determined in paragraph (d)(2) of this section.

$t_{testinterval,i}$ = total time of test interval $i$ in bin 1 as determined in paragraph (d)(1) of this section. Note that the nominal value is 300 seconds.

*Example*

$N$ = 10114
$m_{NOx,testinterval,1}$ = 0.021 g
$m_{NOx,testinterval,2}$ = 0.025 g
$m_{NOx,testinterval,3}$ = 0.031 g
$t_{testinterval,1}$ = 299.99 s
$t_{testinterval,2}$ = 299.98 s
$t_{testinterval,3}$ = 300.04 s

$$\bar{\bar{m}}_{NOx,offcycle,bin1} = \frac{\left(0.021 + 0.025 + 0.031\ldots + m_{NOx,testinterval,10114}\right)}{\left(299.99 + 299.98 + 300.04\ldots + t_{testinterval,10114}\right)}$$

$\bar{\bar{m}}$ = 0.000285 g/s = 1.026 g/hr

(ii) *Off-cycle emissions quantity for bin 2.* The off-cycle emission quantity

for bin 2, $e_{[emission],offcycle,bin2}$, is the value for $CO_2$-specific emission mass for a given pollutant of all the 300 second test intervals in bin 2 combined and

converted to a brake-specific value, as calculated for each measured pollutant using the following equation:

$$e_{[emissions],offcycle,bin2} = \frac{\sum_{i=1}^{N} m_{[emission],testinterval,i}}{\sum_{i=1}^{N} m_{CO2,testinterval,i}} \cdot e_{CO2,FTP}$$

Eq. 1036.530–5

Where:

$i$ = an indexing variable that represents one 300 second test interval.

$N$ = total number of 300 second test intervals in bin 2.

$m_{[emission],testinterval,i}$ = total emission mass for a given pollutant over the test interval $i$

in bin 2 as determined in paragraph (d)(2) of this section.

$m_{CO2,testinterval,i}$ = total $CO_2$ emission mass over the test interval $i$ in bin 2 as determined in paragraph (d)(2) of this section.

$e_{CO2,FTP}$ = the engine's brake-specific $CO_2$ over the FTP duty cycle.

*Example*

$N$ = 15439
$m_{NOx1}$ = 0.546 g
$m_{NOx2}$ = 0.549 g
$m_{NOx3}$ = 0.556 g
$m_{CO2,1}$ = 10950.2 g
$m_{CO2,2}$ = 10961.3 g
$m_{CO2,3}$ = 10965.3 g
$e_{CO2,FTP}$ = 428.1 g/hp·hr

$$e_{NOx,offcycle,bin2} = \frac{\left(0.546 + 0.549 + 0.556\ldots + m_{NOx,testinterval,15439}\right)}{\left(10950.2 + 10961.3 + 10965.3\ldots + m_{CO2,testinterval,15439}\right)} \cdot 428.1$$

$e_{\text{NOx,offcycle,bin2}}$ = 0.026 g/hp·hr = 26 mg/hp·hr

\* \* \* \* \*

### §§ 1036.535, 1036.540, and 1036.543 [Removed]

■ 94. Remove §§ 1036.535, 1036.540, and 1036.543.

■ 95. Revise and republish § 1036.545 to read as follows:

### § 1036.545 Powertrain testing.

This section describes the procedure to test a powertrain that includes an engine coupled with a transmission, drive axle, and hybrid components or any assembly with one or more of those hardware elements. The powertrain test procedure is one option for certifying hybrid powertrains to the engine standards in § 1036.104.

(a) *General test provisions.* The following provisions apply broadly for testing under this section:

(1) [Reserved]

(2) The procedures of 40 CFR part 1065 apply for testing in this section except as specified. This section uses engine parameters and variables that are consistent with 40 CFR part 1065.

(3) Powertrain testing depends on models to calculate certain parameters. You can use the detailed equations in this section to create your own models, or use the GEM HIL model contained within GEM Phase 2, Version 4.0 (incorporated by reference, see § 1036.810) to simulate vehicle hardware elements as follows:

(i) Create driveline and vehicle models that calculate the angular speed setpoint for the test cell dynamometer, $f_{\text{nref,dyno}}$, based on the torque measurement location. Use the detailed equations in paragraph (f) of this section, the GEM HIL model's driveline and vehicle submodels, or a combination of the equations and the submodels. You may use the GEM HIL model's transmission submodel in paragraph (f) to simulate a transmission only if testing hybrid engines. For hybrid engines intended for vehicles with automatic transmissions, update the driver_in_gear signal within the driver interface block in the GEM HIL model with the transmission state (in-gear or idle) as a function of time as defined by the duty cycles in this part.

(ii) Create a driver model or use the GEM HIL model's driver submodel to simulate a human driver modulating the throttle and brake pedals to follow the test cycle as closely as possible.

(iii) Create a cycle-interpolation model or use the GEM HIL model's cycle submodel to interpolate the duty-cycles and feed the driver model the duty-cycle reference vehicle speed for each point in the duty-cycle.

(4) The powertrain test procedure in this section is designed to simulate operation of different vehicle configurations over specific duty cycles. See paragraph (j) of this section.

(5) [Reserved]

(6) For hybrid powertrains with no plug-in capability, correct for the net energy change of the energy storage device as described in 40 CFR 1066.501(a)(3). For plug-in hybrid electric powertrains, follow 40 CFR 1066.501(a)(3) to determine End-of-Test for charge-depleting operation.

(7) through (8) [Reserved]

(9) If you test a powertrain over the Low Load Cycle specified in § 1036.514, control and apply the electrical accessory loads. We recommend using a load bank connected directly to the powertrain's electrical system. You may instead use an alternator with dynamic electrical load control. Use good engineering judgment to account for the efficiency of the alternator or the efficiency of the powertrain to convert the mechanical energy to electrical energy.

(10) The following instruments are required with plug-in hybrid systems to determine required voltages and currents during testing and must be installed on the powertrain to measure these values during testing:

(i) Measure the voltage and current of the battery pack directly with a DC wideband power analyzer to determine power. Measure all current entering and leaving the battery pack. Do not measure voltage upstream of this measurement point. The maximum integration period for determining amp-hours is 0.05 seconds. The power analyzer must have an accuracy for measuring current and voltage of 1% of point or 0.3% of maximum, whichever is greater. The power analyzer must not be susceptible to offset errors while measuring current.

(ii) If safety considerations do not allow for measuring voltage, you may determine the voltage directly from the powertrain ECM.

(11) The following figure provides an overview of testing under this section:

**BILLING CODE 6560–50–P**

FIGURE 1 TO PARAGRAPH (a)(11) OF § 1036.545—OVERVIEW OF POWERTRAIN TESTING



BILLING CODE 6560–50–C

(b) *Test configuration.* Select a powertrain for testing as described in § 1036.235. Set up the engine according to 40 CFR 1065.110 and 1065.405(b). Set the engine's idle speed to warm idle speed defined in 40 CFR 1065.1001.

(1) The default test configuration consists of a powertrain with all components upstream of the axle. This involves connecting the powertrain's output shaft directly to the dynamometer or to a gear box with a fixed gear ratio and measuring torque at the axle input shaft. You may instead set up the dynamometer to connect at the wheel hubs and measure torque at that location. The preceding sentence may apply if your powertrain configuration requires it, such as for hybrid powertrains or if you want to represent the axle performance with powertrain test results. You may alternatively test the powertrain with a chassis dynamometer if you measure speed and torque at the powertrain's output shaft or wheel hubs.

(2) For testing hybrid engines, connect the engine's crankshaft directly to the dynamometer and measure torque at that location.

(c) *Powertrain temperatures during testing.* Cool the powertrain during testing so temperatures for oil, coolant, block, head, transmission, battery, and power electronics are within the manufacturer's expected ranges for normal operation. You may use electronic control module outputs to comply with this paragraph (c). You may use auxiliary coolers and fans.

(d) *Powertrain break in.* Break in the powertrain as a complete system using the engine break-in procedure in 40 CFR 1065.405(c), or take the following steps to break in the engine, axle assembly, and transmission separately as applicable: (1) Break in the engine according to 40 CFR 1065.405(c).

(2) Break in the axle assembly using good engineering judgment. Maintain gear oil temperature at or below 100 °C throughout the break-in period.

(3) Break in the transmission using good engineering judgment. Maintain transmission oil temperature at (87 to 93) °C for automatic transmissions and transmissions having more than two friction clutches, and at (77 to 83) °C for all other transmissions. You may ask us to approve a different range of transmission oil temperatures if you have data showing that it better represents in-use operation.

(e) *Dynamometer setup.* Set the dynamometer to operate in speed-control mode (or torque-control mode for hybrid engine testing at idle, including idle portions of transient duty cycles). Record data as described in 40 CFR 1065.202. Command and control the dynamometer speed at a minimum of 5 Hz, or 10 Hz for testing hybrid engines. Run the vehicle model to calculate the dynamometer setpoints at a rate of at least 100 Hz. If the dynamometer's command frequency is less than the vehicle model dynamometer setpoint frequency, subsample the calculated setpoints for commanding the dynamometer setpoints.

(f) *Driveline and vehicle model.* Use the GEM HIL model's driveline and vehicle submodels or the equations in this paragraph (f) to calculate the dynamometer speed setpoint, $f_{\text{nref,dyno}}$, based on the torque measurement location. For all powertrains, configure GEM with the accessory load set to zero. For hybrid engines, configure GEM with the applicable accessory load as specified in §§ 1036.514 and 1036.525. For all powertrains and hybrid engines, configure GEM with the tire slip model disabled.

(1) *Driveline model with a transmission in hardware.* For testing with torque measurement at the axle input shaft or wheel hubs, calculate, $f_{\text{nref,dyno}}$, using the GEM HIL model's driveline submodel or the following equation:

$$f_{nrefi,dyno} = \frac{k_{a[speed]} \cdot v_{refi}}{2 \cdot \pi \cdot r_{[speed]}}$$

Eq. 1036.545–1

Where:

$k_{a[speed]}$ = drive axle ratio as determined in paragraph (h) of this section. Set $k_{a[speed]}$ equal to 1.0 if torque is measured at the wheel hubs.
$v_{refi}$ = simulated vehicle reference speed as calculated in paragraph (f)(3) of this section.
$r_{[speed]}$ = tire radius as determined in paragraph (h) of this section.

(2) *Driveline model with a simulated transmission.* For testing with the torque measurement at the engine's crankshaft, $f_{\text{nref,dyno}}$ is the dynamometer target speed from the GEM HIL model's transmission submodel. You may request our approval to change the transmission submodel, as long as the changes do not affect the gear selection logic. Before testing, initialize the transmission model with the engine's measured torque curve and the applicable steady-state fuel map from the GEM HIL model. Configure the torque converter to simulate neutral idle when using this procedure to perform the Supplemental

Emission Test (SET) testing under § 1036.510. You may change engine commanded torque at idle to better represent CITT for transient testing under § 1036.512. You may change the simulated engine inertia to match the inertia of the engine under test. We will evaluate your requests under this paragraph (f)(2) based on your demonstration that the adjusted testing better represents in-use operation.

(i) The transmission submodel needs the following model inputs:

(A) Torque measured at the engine's crankshaft.

(B) Engine estimated torque determined from the electronic control module or by converting the instantaneous operator demand to an instantaneous torque in N·m.

(C) Dynamometer mode when idling (speed-control or torque-control).

(D) Measured engine speed when idling.

(E) Transmission output angular speed, $f_{\text{ni,transmission}}$, calculated as follows:

$$f_{ni,transmission} = \frac{k_{a[speed]} \cdot v_{refi}}{2 \cdot \pi \cdot r_{[speed]}}$$

Eq. 1036.545–2

Where:

$k_{a[speed]}$ = drive axle ratio as determined in paragraph (h) of this section.
$v_{refi}$ = simulated vehicle reference speed as calculated in paragraph (f)(3) of this section.
$r_{[speed]}$ = tire radius as determined in paragraph (h) of this section.

(ii) The transmission submodel generates the following model outputs:

(A) Dynamometer target speed.

(B) Dynamometer idle load.

(C) Transmission engine load limit.

(D) Engine speed target.

(3) *Vehicle model.* Calculate the simulated vehicle reference speed, $v_{\text{refi}}$, using the GEM HIL model's vehicle submodel or the equations in this paragraph (f)(3):

$$v_{\text{refi}} = \left( \frac{\frac{k_a \cdot T_{i\text{-}1}}{r} \cdot (Eff_{\text{axle}}) -}{\left( M \cdot g \cdot C_{\text{rr}} \cdot cos(atan(G_{i\text{-}1})) + \frac{\rho \cdot C_d A}{2} \cdot v_{\text{ref},i\text{-}1}^2 \right) - F_{\text{brake},i\text{-}1} - F_{\text{grade},i\text{-}1}} \right)$$

$$\cdot \frac{\Delta t_{i\text{-}1}}{M + M_{\text{rotating}}} + v_{\text{ref},i\text{-}1}$$

Eq. 1036.545–3

Where:

$i$ = a time-based counter corresponding to each measurement during the sampling

period. Let $v_{\text{ref1}} = 0$; start calculations at

$i$ = 2. A 10-minute sampling period will generally involve 60,000 measurements.

$T$ = instantaneous measured torque at the axle input, measured at the wheel hubs, or simulated by the GEM HIL model's transmission submodel. For configurations with multiple torque measurements, such as when measuring torque at the wheel hubs, $T$ is the sum of all torque measurements.

$Eff_{axle}$ = axle efficiency. Use $Eff_{axle}$ = 0.955 for $T \geq 0$, and use $Eff_{axle}$ = 1/0.955 for $T <$ 0. Use $Eff_{axle}$ = 1.0 if torque is measured at the wheel hubs.

$M$ = vehicle mass for a vehicle class as determined in paragraph (h) of this section.

$g$ = gravitational constant = 9.80665 m/s².

$C_{rr}$ = coefficient of rolling resistance for a vehicle class as determined in paragraph (h) of this section.

$G_{i-1}$ = the percent grade interpolated at distance, $D_{i-1}$, from the duty cycle in § 1036.510 and appendix B to this part, corresponding to measurement ($i$-1).

$$D_{i-1} = \sum_{i=1}^{N} \left( v_{ref,i-1} \cdot \Delta t_{i-1} \right)$$

Eq. 1036.545–4

$\rho$ = air density at reference conditions. Use $\rho$ = 1.1845 kg/m³.

$C_{dA}$ = drag area for a vehicle class as determined in paragraph (h) of this section.

$F_{brake,i-1}$ = instantaneous braking force applied by the driver model.

$$F_{grade,i-1} = M \cdot g \cdot sin(atan(G_{i-1}))$$

Eq. 1036.545–5

$\Delta t$ = the time interval between measurements. For example, at 100 Hz, $\Delta t$ = 0.0100 seconds.

$M_{rotating}$ = inertial mass of rotating components. Let $M_{rotating}$ = 340 kg for Light HDE or Medium HDE, and 1,021 kg for Heavy HDE.

(g) *Driver model.* Use the GEM HIL model's driver submodel or design a driver model to simulate a human driver modulating the throttle and brake pedals. In either case, tune the model to follow the test cycle as closely as possible meeting the following specifications:

(1) The driver model must meet the following speed requirements:

(i) [Reserved]

(ii) For operation over the SET as defined § 1036.510, the Federal Test Procedure (FTP) as defined in § 1036.512, and the Low Load Cycle (LLC) as defined in § 1036.514, the speed requirements described in 40 CFR 1066.425(b) and (c).

(iii) The exceptions in 40 CFR 1066.425(b)(4) apply to the SET, FTP, and LLC.

(iv) If the speeds do not conform to these criteria, the test is not valid and must be repeated.

(2) Send a brake signal when operator demand is zero and vehicle speed is greater than the reference vehicle speed from the test cycle. Include a delay before changing the brake signal to prevent dithering, consistent with good engineering judgment.

(3) Allow braking only if operator demand is zero.

(h)–(i) [Reserved]

(j) *Duty cycles to evaluate.* Operate the powertrain over each of the duty cycles specified in §§ 1036.510, 1036.512, and 1036.514 as applicable.

(k)–(l) [Reserved]

(m) *Measured output speed validation.* For each test point, validate the measured output speed with the corresponding reference values. If speed is measured at more than one location, the measurements at each location must meet validation requirements. If the range of reference speed is less than 10 percent of the mean reference speed, you need to meet only the standard error of the estimate in table 4 to this paragraph (m). You may delete points when the vehicle is stopped. If your speed measurement is not at the location of $f_{nref,}$ correct your measured speed using the constant speed ratio between the two locations. Apply cycle-validation criteria for each separate transient or highway cruise cycle based on the following parameters:

### TABLE 4 TO PARAGRAPH (m) OF § 1036.545—CYCLE-VALIDATION CRITERIA

| Parameter [a] | Speed control |
|---|---|
| Slope, $a_1$ | $0.990 \leq a_1 \leq 1.010$. |
| Absolute value of intercept, $\vert a_0 \vert$ | $\leq 2.0\%$ of maximum $f_{nref}$ speed. |
| Standard error of the estimate, *SEE* | $\leq 2.0\%$ of maximum $f_{nref}$ speed. |
| Coefficient of determination, $r^2$ | $\geq 0.990$. |

[a] Determine values for specified parameters as described in 40 CFR 1065.514(e) by comparing measured and reference values for $f_{nref,dyno}$.

## § 1036.550 [Removed]

■ 96. Remove § 1036.550.

■ 97. Amend § 1036.580 by revising the introductory text and paragraph (c) to read as follows:

### § 1036.580 Infrequently regenerating aftertreatment devices.

For engines using aftertreatment technology with infrequent regeneration events that may occur during testing, take one of the following approaches to account for the emission impact of regeneration on criteria pollutant emissions:

\* \* \* \* \*

(c) You may choose to make no adjustments to measured emission results if you determine that regeneration does not significantly affect emission levels for an engine family (or configuration) or if it is not practical to identify when regeneration occurs. You may omit adjustment factors under this paragraph (c) individual pollutants under this paragraph (c) as appropriate. If you choose not to make adjustments under paragraph (a) or (b) of this section, your engines must meet emission standards for all testing, without regard to regeneration.

\* \* \* \* \*

■ 98. Amend § 1036.605 by revising paragraphs (b) and (g) to read as follows:

### § 1036.605 Alternate emission standards for engines used in specialty vehicles.

\* \* \* \* \*

(b) Compression-ignition engines must be of a configuration that is identical to one that is certified under 40 CFR part 1039, and must be certified with a family emission limit for PM of 0.020 g/kW-hr using the same duty cycles that apply under 40 CFR part 1039.

\* \* \* \* \*

(g) Engines certified under this section may not generate or use emission credits under this part or under 40 CFR part 1039.

### §§ 1036.610, 1036.615, 1036.620, 1036.625, 1036.630, and 1036.635 [Removed]

■ 99. Remove §§ 1036.610, 1036.615, 1036.620, 1036.625, 1036.630, 1036.635.

■ 100. Revise and republish § 1036.701 to read as follows:

### § 1036.701 General provisions.

(a) You may average, bank, and trade (ABT) emission credits for purposes of certification as described in this subpart and in subpart B of this part to show compliance with the standards of §§ 1036.104. Participation in this

program is voluntary. Note that certification to $NO_X$ standards in § 1036.104 is based on a family emission limit (FEL).

(b) The definitions of subpart I of this part apply to this subpart in addition to the following definitions:

(1) *Actual emission credits* means emission credits you have generated that we have verified by reviewing your final report.

(2) *Averaging set* means a set of engines in which emission credits may be exchanged. See § 1036.740.

(3) *Broker* means any entity that facilitates a trade of emission credits between a buyer and seller.

(4) *Buyer* means the entity that receives emission credits as a result of a trade.

(5) *Reserved emission credits* means emission credits you have generated that we have not yet verified by reviewing your final report.

(6) *Seller* means the entity that provides emission credits during a trade.

(7) *Standard* means the emission standard that applies under subpart B of this part for engines not participating in the ABT program of this subpart.

(8) *Trade* means to exchange emission credits, either as a buyer or seller.

(c) Emission credits may be exchanged only within an averaging set, except as specified in § 1036.740.

(d) You may not use emission credits generated under this subpart to offset any emissions that exceed an FEL or standard. This paragraph (d) applies for all testing, including certification testing, in-use testing, selective enforcement audits, and other production-line testing. However, if emissions from an engine exceed an FEL or standard (for example, during a selective enforcement audit), you may use emission credits to recertify the engine family with a higher FEL that applies only to future production.

(e) You may use either of the following approaches to retire or forego emission credits:

(1) You may retire emission credits generated from any number of your engines. This may be considered donating emission credits to the environment. Identify any such credits in the reports described in § 1036.730. Engines must comply with the applicable FELs even if you donate or sell the corresponding emission credits. Donated credits may no longer be used by anyone to demonstrate compliance with any EPA emission standards.

(2) You may certify an engine family using an FEL below the emission standard as described in this part and choose not to generate emission credits

for that family. If you do this, you do not need to calculate emission credits for those engine families, and you do not need to submit or keep the associated records described in this subpart for that family.

(f) Emission credits may be used in the model year they are generated. Surplus emission credits may be banked for future model years.

(g) You may increase or decrease an FEL during the model year by amending your application for certification under § 1036.225. The new FEL may apply only to engines you have not already introduced into commerce.

(h)–(j) [Reserved]

(k) Engine families you certify with a nonconformance penalty under 40 CFR part 86, subpart L, may not generate emission credits.

■ 101. Revise and republish § 1036.705 to read as follows:

### § 1036.705  Generating and calculating emission credits.

(a) The provisions of this section apply separately for calculating $NO_X$ emission credits.

(b) For each participating family, calculate positive or negative emission credits relative to the otherwise applicable emission standard. Calculate positive emission credits for a family that has an FEL below the standard. Calculate negative emission credits for a family that has an FEL above the standard. Sum your positive and negative credits for the model year before rounding. Calculate emission credits to the nearest megagram (Mg) for each family using the following equation:

$$\text{Emission credits (Mg)} = (Std - FL) \cdot CF \cdot Volume \cdot UL \cdot c$$

Eq. 1036.705–1

Where:

$Std$ = the emission standard, in (mg $NO_X$)/ hp·hr that applies under subpart B of this part for engines not participating in the ABT program of this subpart (the ''otherwise applicable standard'').

$FL$ = the engine family's FEL, in mg/hp·hr, rounded to the same number of decimal places as the emission standard.

$CF$ = a transient cycle conversion factor (hp·hr/mile), calculated by dividing the total (integrated) horsepower-hour over the applicable duty cycle by 6.3 miles for engines subject to spark-ignition standards and 6.5 miles for engines subject to compression-ignition standards. This represents the average work performed over the duty cycle.

$Volume$ = the number of engines eligible to participate in the averaging, banking, and trading program within the given engine family during the model year, as described in paragraph (c) of this section.

$UL$ = the useful life for the standard that applies for a given primary intended service class, in miles.

$c = 10^{-9}$.

*Example for Model Year 2028 Heavy HDE Generating $NO_X$ credits*

$Std$ = 35 mg/hp·hr
$FEL$ = 20 mg/hp·hr
$CF$ = 9.78 hp·hr/mile
$Volume$ = 15,342
$UL$ = 650,000 miles
$c = 10^{-6}$
$Emission\ credits = (35 - 20) \cdot 9.78 \cdot 15,342 \cdot 650,000 \cdot 10^{-9}$
$Emission\ credits = 1,463$ Mg

(c) Compliance with the requirements of this subpart is determined at the end of the model year by calculating emission credits based on actual production volumes, excluding the following engines:

(1) Engines that you do not certify to the standards of this part because they are permanently exempted under subpart G of this part or under 40 CFR part 1068.

(2) Exported engines.

(3) Engines not subject to the requirements of this part, such as those excluded under § 1036.5.

(4) Engines certified to state emission standards that are different than the emission standards referenced in this section, and intended for sale in a state that has adopted those emission standards.

(5) Any other engines if we indicate elsewhere in this part that they are not to be included in the calculations of this subpart.

■ 102. Revise § 1036.710 to read as follows:

### § 1036.710  Averaging.

(a) Averaging is the exchange of emission credits among your engine families. You may average emission credits only within the same averaging set, except as specified in § 1036.740.

(b) You may certify one or more engine families to an FEL above the applicable standard, subject to any applicable FEL caps and other the provisions in subpart B of this part, if you show in your application for certification that your projected balance of all emission-credit transactions in that model year is greater than or equal to zero.

(c) If you certify an engine family to an FEL that exceeds the otherwise applicable standard, you must obtain enough emission credits to offset the engine family's deficit by the due date for the final report required in § 1036.730. The emission credits used to address the deficit may come from your other engine families that generate emission credits in the same model

year, from emission credits you have banked, or from emission credits you obtain through trading.

■ 103. Amend § 1036.720 by revising paragraph (c) to read as follows:

### § 1036.720 Trading.

\* \* \* \* \*

(c) If a negative emission credit balance results from a transaction, both the buyer and seller are liable, except in cases we deem to involve fraud. See § 1036.255(e) for cases involving fraud. We may void the certificates of all engine families participating in a trade that results in a manufacturer having a negative balance of emission credits.

■ 104. Revise § 1036.725 to read as follows:

### § 1036.725 Required information for certification.

(a) You must declare in your application for certification your intent to use the provisions of this subpart for each engine family that will be certified using the ABT program. You must also declare the FEL you select for the engine family for each pollutant for which you are using the ABT program. Your FELs must comply with the specifications of subpart B of this part, including the FEL caps.

(b) Include the following in your application for certification:

(1) A statement that, to the best of your belief, you will not have a negative balance of emission credits for any averaging set when all emission credits are calculated at the end of the year.

(2) Calculations of projected emission credits (positive or negative) based on projected production volumes as described in § 1036.705(c). We may require you to include similar calculations from your other engine families to project your net credit balances for the model year. If you project negative emission credits for a family, state the source of positive emission credits you expect to use to offset the negative emission credits.

■ 105. Amend § 1036.730 by revising paragraphs (b)(3) and (4), (c)(1), and (f)(1) to read as follows:

### § 1036.730 ABT reports.

\* \* \* \* \*

(b) \* \* \*

(3) The FEL for each pollutant. If you change the FEL after the start of production, identify the date that you started using the new FEL and/or give the engine identification number for the first engine covered by the new FEL. In this case, identify each applicable FEL and calculate the positive or negative emission credits as specified in § 1036.225(f).

(4) The projected and actual production volumes for calculating emission credits for the model year. If you changed an FEL during the model year, identify the actual production volume associated with each FEL.

\* \* \* \* \*

(c) \* \* \*

(1) Show that your net balance of emission credits from all your participating engine families in each averaging set in the applicable model year is not negative. Your credit tracking must account for the limitation on credit life under § 1036.740(d).

\* \* \* \* \*

(f) \* \* \*

(1) If you notify us by the deadline for submitting the final report that errors mistakenly decreased your balance of emission credits, you may correct the errors and recalculate the balance of emission credits.

\* \* \* \* \*

■ 106. Amend § 1036.735 by revising paragraph (d) to read as follows:

### § 1036.735 Recordkeeping.

\* \* \* \* \*

(d) Keep appropriate records to document production volumes of engines that generate or use emission credits under the ABT program. For example, keep available records of the engine identification number (usually the serial number) for each engine you produce that generates or uses emission credits. You may identify these numbers as a range. If you change the FEL after the start of production, identify the date you started using each FEL and the range of engine identification numbers associated with each FEL. You must also identify the purchaser and destination for each engine you produce to the extent this information is available.

\* \* \* \* \*

■ 107. Amend § 1036.740 by removing and reserving paragraphs (b) and (c) and revising paragraph (d) to read as follows:

### § 1036.740 Restrictions for using emission credits.

\* \* \* \* \*

(d) $NO_X$ credit life. $NO_X$ credits may be used only for five model years after the year in which they are generated. For example, credits you generate in model year 2027 may be used to demonstrate compliance with emission standards only through model year 2032.

\* \* \* \* \*

### § 1036.745 [Removed]

■ 108. Remove § 1036.745.

■ 109. Amend § 1036.750 by revising paragraph (b) to read as follows:

### § 1036.750 Consequences for noncompliance.

\* \* \* \* \*

(b) You may certify your engine family to an FEL above an applicable standard based on a projection that you will have enough emission credits to offset the deficit for the engine family.

\* \* \* \* \*

### § 1036.755 [Removed]

■ 110. Remove § 1036.755.

■ 111. Revise and republish § 1036.801 to read as follows:

### § 1036.801 Definitions.

The following definitions apply to this part. The definitions apply to all subparts unless we note otherwise. All undefined terms have the meaning the Act gives to them. The definitions follow:

*Act* means the Clean Air Act, as amended, 42 U.S.C. 7401–7671q.

*Adjustable parameter* has the meaning given in 40 CFR 1068.50.

*Aftertreatment* means relating to a catalytic converter, particulate filter, or any other system, component, or technology mounted downstream of the exhaust valve (or exhaust port) whose design function is to decrease emissions in the engine exhaust before it is exhausted to the environment. Exhaust gas recirculation (EGR) and turbochargers are not aftertreatment.

*Aircraft* means any vehicle capable of sustained air travel more than 100 feet above the ground.

*Alcohol-fueled engine* mean an engine that is designed to run using an alcohol fuel. For purposes of this definition, alcohol fuels do not include fuels with a nominal alcohol content below 25 percent by volume.

*Automated manual transmission (AMT)* means a transmission that operates mechanically similar to a manual transmission, except that an automated clutch actuator controlled by the onboard computer disengages and engages the drivetrain instead of a human driver. An automated manual transmission does not include a torque converter or a clutch pedal controllable by the driver.

*Automatic transmission (AT)* means a transmission with a torque converter (or equivalent) that uses computerize or other internal controls to shift gears in response to a single driver input for controlling vehicle speed. Note that automatic manual transmissions are not automatic transmissions because they do not include torque converters.

*Auxiliary emission control device* means any element of design that senses

temperature, motive speed, engine speed (r/min), transmission gear, or any other parameter for the purpose of activating, modulating, delaying, or deactivating the operation of any part of the emission control system.

*Averaging set* has the meaning given in § 1036.740.

*Axle ratio or Drive axle ratio, k*$_a$*,* means the dimensionless number representing the angular speed of the transmission output shaft divided by the angular speed of the drive axle.

*Calibration* means the set of specifications and tolerances specific to a particular design, version, or application of a component or assembly capable of functionally describing its operation over its working range.

*Carbon-containing fuel* has the meaning given in 40 CFR 1065.1001.

*Carryover* means relating to certification based on emission data generated from an earlier model year as described in § 1036.235(d).

*Certification* means relating to the process of obtaining a certificate of conformity for an engine family that complies with the emission standards and requirements in this part.

*Certified emission level* means the highest deteriorated emission level in an engine family for a given pollutant from the applicable transient and/or steady-state testing, rounded to the same number of decimal places as the applicable standard.

*Charge-depleting* has the meaning given in 40 CFR 1066.1001.

*Charge-sustaining* has the meaning given in 40 CFR 1066.1001.

*Complete vehicle* means a vehicle meeting the definition of complete vehicle in 40 CFR 1037.801 when it is first sold as a vehicle. For example, where a vehicle manufacturer sells an incomplete vehicle to a secondary vehicle manufacturer, the vehicle is not a complete vehicle under this part, even after its final assembly.

*Compression-ignition* means relating to a type of reciprocating, internal-combustion engine that is not a spark-ignition engine. Note that § 1036.1 also deems gas turbine engines and other engines to be compression-ignition engines.

*Crankcase emissions* means airborne substances emitted to the atmosphere from any part of the engine crankcase's ventilation or lubrication systems. The crankcase is the housing for the crankshaft and other related internal parts.

*Critical emission-related component* has the meaning given in 40 CFR 1068.30.

*Defeat device* has the meaning given in § 1036.115(h).

*Designated Compliance Officer* means one of the following:

(1) For engines subject to compression-ignition standards, *Designated Compliance Officer* means Director, Diesel Engine Compliance Center, U.S. Environmental Protection Agency, 2000 Traverwood Drive, Ann Arbor, MI 48105; *complianceinfo@epa.gov; www.epa.gov/ve-certification.*

(2) For engines subject to spark-ignition standards, *Designated Compliance Officer* means Director, Gasoline Engine Compliance Center, U.S. Environmental Protection Agency, 2000 Traverwood Drive, Ann Arbor, MI 48105; *complianceinfo@epa.gov; www.epa.gov/ve-certification.*

*Deteriorated emission level* means the emission level that results from applying the appropriate deterioration factor to the official emission result of the emission-data engine. Note that where no deterioration factor applies, references in this part to the *deteriorated emission level* mean the official emission result.

*Deterioration factor* means the relationship between emissions at the end of useful life (or point of highest emissions if it occurs before the end of useful life) and emissions at the low-hour/low-mileage point, expressed in one of the following ways:

(1) For multiplicative deterioration factors, the ratio of emissions at the end of useful life (or point of highest emissions) to emissions at the low-hour point.

(2) For additive deterioration factors, the difference between emissions at the end of useful life (or point of highest emissions) and emissions at the low-hour point.

*Diesel exhaust fluid (DEF)* means a liquid reducing agent (other than the engine fuel) used in conjunction with selective catalytic reduction to reduce $NO_X$ emissions. *Diesel exhaust fluid* is generally understood to be an aqueous solution of urea conforming to the specifications of ISO 22241.

*Drive idle* means idle operation during which the vehicle operator remains in the vehicle cab, as evidenced by engaging the brake or clutch pedals, or by other indicators we approve.

*Dual-fuel* means relating to an engine designed for operation on two different types of fuel but not on a continuous mixture of those fuels (see § 1036.601(d)). For purposes of this part, such an engine remains a dual-fuel engine even if it is designed for operation on three or more different fuels.

*Electronic control module (ECM)* means an engine's electronic device that uses data from engine sensors to control engine parameters.

*Emergency vehicle* means a vehicle that meets one of the following criteria:

(1) It is an ambulance or a fire truck.

(2) It is a vehicle that we have determined will likely be used in emergency situations where emission control function or malfunction may cause a significant risk to human life. For example, we would consider a truck that is certain to be retrofitted with a slip-on firefighting module to become an emergency vehicle, even though it was not initially designed to be a fire truck. Also, a mobile command center that is unable to manually regenerate its DPF while on duty could be an emergency vehicle. In making this determination, we may consider any factor that has an effect on the totality of the actual risk to human life. For example, we may consider how frequently a vehicle will be used in emergency situations or how likely it is that the emission controls will cause a significant risk to human life when the vehicle is used in emergency situations. We would not consider the truck in the example above to be an emergency vehicle if there is merely a possibility (rather than a certainty) that it will be retrofitted with a slip-on firefighting module.

*Emission control system* means any device, system, or element of design that controls or reduces the emissions of regulated pollutants from an engine.

*Emission-data engine* means an engine that is tested for certification. This includes engines tested to establish deterioration factors.

*Emission-related component* has the meaning given in 40 CFR part 1068, appendix A.

*Emission-related maintenance* means maintenance that substantially affects emissions or is likely to substantially affect emission deterioration.

*Engine configuration* means a unique combination of engine hardware and calibration (related to the emission standards) within an engine family, which would include hybrid components for engines certified as hybrid engines and hybrid powertrains. Engines within a single engine configuration differ only with respect to normal production variability or factors unrelated to compliance with emission standards.

*Engine family* has the meaning given in § 1036.230.

*Excluded* means relating to engines that are not subject to some or all of the requirements of this part as follows:

(1) An engine that has been determined not to be a heavy-duty engine is excluded from this part.

(2) Certain heavy-duty engines are excluded from the requirements of this part under § 1036.5.

(3) Specific regulatory provisions of this part may exclude a heavy-duty engine generally subject to this part from one or more specific standards or requirements of this part.

*Exempted* has the meaning given in 40 CFR 1068.30.

*Exhaust gas recirculation* means a technology that reduces emissions by routing exhaust gases that had been exhausted from the combustion chamber(s) back into the engine to be mixed with incoming air before or during combustion. The use of valve timing to increase the amount of residual exhaust gas in the combustion chamber(s) that is mixed with incoming air before or during combustion is not considered exhaust gas recirculation for the purposes of this part.

*Family emission limit (FEL)* means a $NO_X$ emission level declared by the manufacturer to serve in place of an otherwise applicable emission standard under the ABT program in subpart H of this part. The FEL serves as the emission standard for the engine family with respect to all required testing.

*Federal Test Procedure (FTP)* means the applicable transient duty cycle described in § 1036.512 designed to measure exhaust emissions during urban driving.

*Final drive ratio, $k_d$,* means the dimensionless number representing the angular speed of the transmission input shaft divided by the angular speed of the drive axle when the vehicle is operating in its highest available gear. The *final drive ratio* is the transmission gear ratio (in the highest available gear) multiplied by the drive axle ratio.

*Flexible-fuel* means relating to an engine designed for operation on any mixture of two or more different types of fuels (see § 1036.601(d)).

*Fuel type* means a general category of fuels such as diesel fuel, gasoline, or natural gas. There can be multiple grades within a single fuel type, such as premium gasoline, regular gasoline, or gasoline with 10 percent ethanol.

*Gear ratio or Transmission gear ratio, $k_g$,* means the dimensionless number representing the angular speed of the transmission's input shaft divided by the angular speed of the transmission's output shaft when the transmission is operating in a specific gear.

*Good engineering judgment* has the meaning given in 40 CFR 1068.30. See 40 CFR 1068.5 for the administrative process we use to evaluate good engineering judgment.

*Greenhouse gas Emissions Model (GEM)* means the GEM simulation tool referenced in § 1036.810.

*Gross vehicle weight rating (GVWR)* means the value specified by the vehicle manufacturer as the maximum design loaded weight of a single vehicle, consistent with good engineering judgment.

*Heavy-duty engine* means any engine which the engine manufacturer could reasonably expect to be used for motive power in a heavy-duty vehicle. For purposes of this definition in this part, the term "engine" includes internal combustion engines and other devices that convert chemical fuel into motive power. For example, a gas turbine used in a heavy-duty vehicle is a heavy-duty engine.

*Heavy-duty vehicle* means any motor vehicle above 8,500 pounds GVWR. An incomplete vehicle is also a heavy-duty vehicle if it has a curb weight above 6,000 pounds or a basic vehicle frontal area greater than 45 square feet. *Curb weight* and *basic vehicle frontal area* have the meaning given in 40 CFR 86.1803–01.

*Hybrid* means relating to an engine or powertrain that includes a Rechargeable Energy Storage System. Hybrid engines store and recover energy in a way that is integral to the engine or otherwise upstream of the vehicle's transmission. Examples of hybrid engines include engines with hybrid components connected to the front end of the engine (P0), connected to the crankshaft before the clutch (P1), or connected between the clutch and the transmission where the clutch upstream of the hybrid feature is in addition to the transmission clutch or clutches (P2). Engine-based systems that recover kinetic energy to power an electric heater in the aftertreatment are themselves not sufficient to qualify as a hybrid engine. The provisions in this part that apply for hybrid powertrains apply equally for hybrid engines, except as specified. Note that certain provisions in this part treat hybrid powertrains intended for vehicles that include regenerative braking different than those intended for vehicles that do not include regenerative braking. The definition of hybrid includes plug-in hybrid electric powertrains.

*Hydrocarbon (HC)* has the meaning given in 40 CFR 1065.1001.

*Identification number* means a unique specification (for example, a model number/serial number combination) that allows someone to distinguish a particular engine from other similar engines.

*Incomplete vehicle* means a vehicle meeting the definition of incomplete

vehicle in 40 CFR 1037.801 when it is first sold (or otherwise delivered to another entity) as a vehicle.

*Liquefied petroleum gas (LPG)* means a liquid hydrocarbon fuel that is stored under pressure and is composed primarily of nonmethane compounds that are gases at atmospheric conditions. Note that, although this commercial term includes the word "petroleum", LPG is not considered to be a petroleum fuel under the definitions of this section.

*Low-hour* means relating to an engine that has stabilized emissions and represents the undeteriorated emission level. This would generally involve less than 300 hours of operation for engines with $NO_X$ aftertreatment and 125 hours of operation for other engines.

*Manual transmission (MT)* means a transmission that requires the driver to shift the gears and manually engage and disengage the clutch.

*Manufacture* means the physical and engineering process of designing, constructing, and/or assembling a heavy-duty engine or a heavy-duty vehicle.

*Manufacturer* has the meaning given in 40 CFR 1068.30.

*Medium-duty passenger vehicle* has the meaning given in 40 CFR 86.1803.

*Model year* means the manufacturer's annual new model production period, except as restricted under this definition. It must include January 1 of the calendar year for which the model year is named, may not begin before January 2 of the previous calendar year, and it must end by December 31 of the named calendar year. Manufacturers may not adjust model years to circumvent or delay compliance with emission standards or to avoid the obligation to certify annually.

*Motorcoach* means a heavy-duty vehicle designed for carrying 30 or more passengers over long distances. Such vehicles are characterized by row seating, rest rooms, and large luggage compartments, and facilities for stowing carry-on luggage.

*Motor vehicle* has the meaning given in 40 CFR 85.1703.

*Natural gas* means a fuel whose primary constituent is methane.

*Neat* has the meaning given in 40 CFR 1065.1001.

*New motor vehicle engine* has the meaning given in the Act. This generally means a motor vehicle engine meeting any of the following:

(1) A motor vehicle engine for which the ultimate purchaser has never received the equitable or legal title is a *new motor vehicle engine.* This kind of engine might commonly be thought of as "brand new" although a *new motor*

*vehicle engine* may include previously used parts. Under this definition, the engine is new from the time it is produced until the ultimate purchaser receives the title or places it into service, whichever comes first.

(2) An imported motor vehicle engine is a *new motor vehicle engine* if it was originally built on or after January 1, 1970.

(3) Any motor vehicle engine installed in a new motor vehicle.

*Noncompliant engine* means an engine that was originally covered by a certificate of conformity, but is not in the certified configuration or otherwise does not comply with the conditions of the certificate.

*Nonconforming engine* means an engine not covered by a certificate of conformity that would otherwise be subject to emission standards.

*Nonmethane hydrocarbon (NMHC)* means the sum of all hydrocarbon species except methane, as measured according to 40 CFR part 1065.

*Nonmethane hydrocarbon equivalent (NMHCE)* has the meaning given in 40 CFR 1065.1001.

*Nonmethane nonethane hydrocarbon equivalent (NMNEHC)* has the meaning given in 40 CFR 1065.1001.

*Official emission result* means the measured emission rate for an emission-data engine on a given duty cycle before the application of any deterioration factor, but after the applicability of any required regeneration or other adjustment factors.

*Owners manual* means a document or collection of documents prepared by the engine or vehicle manufacturer for the owner or operator to describe appropriate engine maintenance, applicable warranties, and any other information related to operating or keeping the engine. The owners manual is typically provided to the ultimate purchaser at the time of sale. The owners manual may be in paper or electronic format.

*Oxides of nitrogen* has the meaning given in 40 CFR 1065.1001.

*Percent* has the meaning given in 40 CFR 1065.1001. Note that this means percentages identified in this part are assumed to be infinitely precise without regard to the number of significant figures. For example, one percent of 1,493 is 14.93.

*Placed into service* means put into initial use for its intended purpose, excluding incidental use by the manufacturer or a dealer.

*Preliminary approval* means approval granted by an authorized EPA representative prior to submission of an application for certification, consistent with the provisions of § 1036.210.

*Primary intended service class* has the meaning given in § 1036.140.

*Rechargeable Energy Storage System (RESS)* has the meaning given in 40 CFR 1065.1001.

*Relating to* as used in this section means relating to something in a specific, direct manner. This expression is used in this section only to define terms as adjectives and not to broaden the meaning of the terms.

*Revoke* has the meaning given in 40 CFR 1068.30.

*Round* has the meaning given in 40 CFR 1065.1001.

*Sample* means the collection of engines selected from the population of an engine family for emission testing. This may include testing for certification, production-line testing, or in-use testing.

*Scheduled maintenance* means adjusting, removing, disassembling, cleaning, or replacing components or systems periodically to keep a part or system from failing, malfunctioning, or wearing prematurely.

*Small manufacturer* means a manufacturer meeting the criteria specified in 13 CFR 121.201. The employee and revenue limits apply to the total number of employees and total revenue together for all affiliated companies (as defined in 40 CFR 1068.30). Note that manufacturers with low production volumes may or may not be ''small manufacturers''.

*Spark-ignition* means relating to a gasoline-fueled engine or any other type of engine with a spark plug (or other sparking device) and with operating characteristics significantly similar to the theoretical Otto combustion cycle. Spark-ignition engines usually use a throttle to regulate intake air flow to control power during normal operation.

*Stop-start* means a vehicle technology that automatically turns the engine off when the vehicle is stopped.

*Steady-state* has the meaning given in 40 CFR 1065.1001. This includes idle testing where engine speed and load are held at a finite set of nominally constant values.

*Suspend* has the meaning given in 40 CFR 1068.30.

*Test engine* means an engine in a sample.

*Ultimate purchaser* means, with respect to any new engine or vehicle, the first person who in good faith purchases such new engine or vehicle for purposes other than resale.

*United States* has the meaning given in 40 CFR 1068.30.

*Upcoming model year* means for an engine family the model year after the one currently in production.

*U.S.-directed production volume* means the number of engines, subject to

the requirements of this part, produced by a manufacturer for which the manufacturer has a reasonable assurance that sale was or will be made to ultimate purchasers in the United States.

*Vehicle* has the meaning given in 40 CFR 1037.801.

*Void* has the meaning given in 40 CFR 1068.30.

*We (us, our)* means the Administrator of the Environmental Protection Agency and any authorized representatives.

### § 1036.805   [Amended]

■ 112. Amend § 1036.805 by revising Table 5 to Paragraph (e) to remove entries for ''FCL'', ''Heavy HDV'', ''Light HDV'', and ''Medium HDV''.

### § 1036.810   [Amended]

■ 113. Amend § 1036.810 by removing and reserving paragraphs (a)(2) and (3).

■ 114. Amend § 1036.815 by revising paragraph (b) to read as follows:

### § 1036.815   Confidential information.

\* \* \* \* \*

(b) Emission data or information that is publicly available cannot be treated as confidential business information as described in 40 CFR 1068.11.

### Appendix C to Part 1036 [Removed]

■ 115. Remove appendix C to part 1036.

## PART 1037—CONTROL OF EMISSIONS FROM NEW HEAVY-DUTY MOTOR VEHICLES

■ 116. The authority citation for part 1036 continues to read as follows:

**Authority:** 42 U.S.C. 7401–7671q.

### § 1037.5   [Amended]

■ 117. Amend § 1037.5 by removing and reserving paragraphs (c) and (d).

■ 118. Amend § 1037.10 by revising paragraph (b) and removing and reserving paragraphs (d) through (f) and (h). The revision reads as follows:

### § 1037.10   How is this part organized?

\* \* \* \* \*

(b) Subpart B of this part describes the emission standards and other requirements that must be met to certify vehicles under this part.

\* \* \* \* \*

■ 119. Amend § 1037.15 by revising paragraph (a) to read as follows:

### § 1037.15   Do any other regulation parts apply to me?

(a) Parts 1065 and 1066 of this chapter describe procedures and equipment specifications for testing engines and vehicles to measure exhaust emissions.

\* \* \* \* \*

### § 1037.101 [Amended]

■ 120. Amend § 1037.101 by removing and reserving paragraphs (a)(2) and (b)(2).

■ 121. Revise and republish § 1037.102 to read as follows:

### § 1037.102 Criteria pollutant exhaust emission standards—NO$_X$, HC, PM, and CO.

(a) Engines installed in heavy-duty vehicles are subject to criteria pollutant standards for NO$_X$, HC, PM, and CO under 40 CFR part 86 through model year 2026 and 40 CFR part 1036 for model years 2027 and later.

(1) The following vehicles are deemed to meet the criteria pollutant exhaust emission standards of this part and you may state in the application for certification that your vehicles comply with all the requirements of this part related to criteria pollutant exhaust emission standards instead of submitting test data:

(i) Model year 2026 and earlier vehicles with installed engines certified to the standards specified in 40 CFR 86.007–11 or 86.008–10.

(ii) Model year 2027 and later vehicles with installed engines certified to the standards specified in 40 CFR part 1036.

(iii) Specialty vehicles with installed engines certified as specified in § 1037.605.

(iv) Glider kits and glider vehicles with installed engines certified as specified in § 1037.635.

(2) This part includes additional specific requirements for the following types of vehicles:

(i) New tractors that include auxiliary power units. See paragraph (c) of this section.

(ii) Vehicles subject to evaporative or refueling standards under § 1037.103.

(b) Heavy-duty vehicles with no installed propulsion engine, such as battery electric vehicles, are subject to criteria pollutant standards under this part. The emission standards that apply are the same as the standards that apply for compression-ignition engines under 40 CFR 86.007–11 or 1036.104 for a given model year.

(1) You may state in the application for certification that vehicles with no installed propulsion engine comply with all the requirements of this part related to criteria emission standards instead of submitting test data. Tailpipe emissions of criteria pollutants from vehicles with no installed propulsion engine are deemed to be zero.

(2) Vehicles with no installed propulsion engines may not generate NO$_X$ credits.

(c) Starting in model year 2024, auxiliary power units installed on new tractors, including tractors that are glider vehicles or tractors with no installed propulsion engine, must be certified to the PM emission standard specified in 40 CFR 1039.699. For model years 2021 through 2023, the APU engine must be certified under 40 CFR part 1039 with a deteriorated emission level for PM at or below 0.15 g/kW-hr. Selling, offering for sale, or introducing or delivering into commerce in the United States or importing into the United States a new tractor subject to this standard is a violation of 40 CFR 1068.101(a)(1) unless the auxiliary power unit has a valid certificate of conformity and the required label showing that it meets the PM standard specified in 40 CFR 1039.699 as described in this paragraph (c).

### §§ 1037.105 and 1037.106 [Removed]

■ 122. Remove §§ 1037.105 and 1037.106.

### § 1037.115 [Amended]

■ 123. Amend § 1037.115 by removing paragraphs (e) and (f).

■ 124. Amend § 1037.120 by revising paragraphs (a), (b), and (c) to read as follows:

### § 1037.120 Emission-related warranty requirements.

(a) *General requirements.* You must warrant to the ultimate purchaser and each subsequent purchaser that each new vehicle, including all parts of its emission control system, meets two conditions:

(1) It is designed, built, and equipped so it conforms at the time of sale to the ultimate purchaser with the requirements of this part.

(2) It is free from defects in materials and workmanship that cause the vehicle to fail to conform to the requirements of this part during the applicable warranty period.

(b) *Warranty period.* (1) Your emission-related warranty must be valid for at least:

(i) 5 years or 50,000 miles for heavy-duty vehicles at or below 19,500 pounds GVWR.

(ii) 5 years or 100,000 miles for heavy-duty vehicles above 19,500 pounds GVWR.

(2) You may offer an emission-related warranty more generous than we require. The emission-related warranty for the vehicle may not be shorter than any basic mechanical warranty you provide to that owner without charge for the vehicle. Similarly, the emission-related warranty for any component may not be shorter than any warranty you provide to that owner without charge for that component. This means that your warranty for a given vehicle may not treat emission-related and nonemission-related defects differently for any component. The warranty period begins when the vehicle is placed into service.

(c) *Components covered.* The emission-related warranty covers fuel cell stacks, RESS, and other components used with battery electric vehicles and fuel cell electric vehicles. The emission-related warranty covers all components whose failure would increase a vehicle's evaporative and refueling emissions (for vehicles subject to evaporative and refueling emission standards). The emission-related warranty covers components that are part of your certified configuration even if another company produces the component.

* * * * *

■ 125. Revise § 1037.125 to read as follows:

### § 1037.125 Maintenance instructions and allowable maintenance.

Give the ultimate purchaser of each new vehicle written instructions for properly maintaining and using the vehicle with respect to evaporative and refueling emission control system, as applicable.

■ 126. Amend § 1037.135 by removing and reserving paragraphs (c)(6) and (7) and revising paragraph (e). The revision reads as follows:

### § 1037.135 Labeling.

* * * * *

(e) You may ask us to approve modified labeling requirements in this part 1037 if you show that it is necessary or appropriate. For example, if you certify both the engine and vehicle, you may ask for approval to comply with labeling requirements with a single emission control information label. We will approve your request if your alternate label is consistent with the requirements of this part.

### §§ 1037.140 and 1037.150 [Removed]

■ 127. Remove §§ 1037.140 and 1037.150.

■ 128. Amend § 1037.201 by removing and reserving paragraph (g) and revising paragraph (i). The revision reads as follows:

### § 1037.201 General requirements for obtaining a certificate of conformity.

* * * * *

(i) Vehicles and installed engines must meet exhaust, evaporative, and refueling emission standards and certification requirements as described in §§ 1037.102 and 1037.103, as applicable. Include the information described in 40 CFR part 86, subpart S, or 40 CFR 1036.205 in your application

for certification in addition to what we specify in § 1037.205 so we can issue a single certificate of conformity for all the requirements that apply for your vehicle and the installed engine.

■ 129. Revise § 1037.205 to read as follows:

### § 1037.205 What must I include in my application?

This section specifies the information that must be in your application, unless we ask you to include less information under § 1037.201(c). We may require you to provide additional information to evaluate your application.

(a) List the fuel type on which your vehicles are designed to operate (for example, diesel fuel or gasoline).

(b) For vehicles with propulsion engines, name all the engine families associated with the vehicle family.

(c) For any new tractors with auxiliary power units, name all the engine families associated with those auxiliary power units.

(d) For any vehicle using RESS (such as hybrid vehicles, fuel cell electric vehicles and battery electric vehicles), describe in detail all components needed to charge the system, store energy, and transmit power to move the vehicle.

(e) For vehicles subject to evaporative and refueling emission standards, include the following information:

(1) Describe the vehicle family's specifications and other basic parameters of the vehicle's design and emission controls. Explain how the emission control system operates. As applicable, describe in detail all system components for controlling emissions, including all auxiliary emission control devices (AECDs) and all fuel-system components you will install on any production vehicle. Identify the part number of each component you describe. For this paragraph (e), treat as separate AECDs any devices that modulate or activate differently from each other.

(2) Where applicable, describe all adjustable operating parameters (see § 1037.115), including production tolerances. For any operating parameters that do not qualify as adjustable parameters, include a description supporting your conclusion (see 40 CFR 1068.50(c)). Include the following in your description of each adjustable parameter:

(i) The nominal or recommended setting.

(ii) The intended practically adjustable range.

(iii) The limits or stops used to establish adjustable ranges.

(iv) Information showing why the limits, stops, or other means of

inhibiting adjustment are effective in preventing adjustment of parameters on in-use engines to settings outside your intended practically adjustable ranges.

(3) Identify the vehicle family's useful life.

(4) Describe your engineering analysis to demonstrate compliance with standards as described in § 1037.103(c), or include the following testing information:

(i) Describe any vehicles or components you selected for testing and the reasons for selecting them.

(ii) Describe any test equipment and procedures that you used, including any special or alternate test procedures you used.

(iii) Describe how you operated any emission-data vehicle before testing, including the duty cycle and the number of vehicle operating miles used to stabilize emission-related performance. Explain why you selected the method of service accumulation. Describe any scheduled maintenance you did, and any practices or specifications that should apply for our testing.

(iv) List the specifications of any test fuel to show that it falls within the required ranges we specify in 40 CFR part 1065.

(v) Identify the emission standards or FELs to which you are certifying vehicles in the vehicle family.

(vi) Where applicable, identify the vehicle family's deterioration factors and describe how you developed them. Present any emission test data you used for this.

(vii) Where applicable, state that you operated your emission-data vehicles as described in the application (including the test procedures, test parameters, and test fuels) to show you meet the requirements of this part.

(f) Include any maintenance instructions and warranty statements you will give to the ultimate purchaser of each new vehicle (see §§ 1037.120 and 1037.125).

(g) Describe your emission control information label (see § 1037.135).

(h) Unconditionally certify that all the vehicles in the vehicle family comply with the requirements of this part, other referenced parts of the CFR, and the Clean Air Act.

(i) Include good-faith estimates of U.S.-directed production volumes. We may require you to describe the basis of your estimates.

(j) Include other applicable information, such as information specified in this part or 40 CFR part 1068 related to requests for exemptions.

(k) Name an agent for service located in the United States. Service on this

agent constitutes service on you or any of your officers or employees for any action by EPA or otherwise by the United States related to the requirements of this part.

■ 130. Amend § 1037.225 by revising paragraphs (a)(1) and (f) to read as follows:

### § 1037.225 Amending applications for certification.

\* \* \* \* \*

(a) \* \* \*

(1) Add any vehicle configurations to a vehicle family that are not already covered by your application. For example, if your application identifies three possible engine models, and you plan to produce vehicles using an additional engine model, then you must amend your application before producing vehicles with the fourth engine model.

\* \* \* \* \*

(f) You may ask us to approve a change to your FEL in certain cases after the start of production. The changed FEL may not apply to vehicles you have already introduced into U.S. commerce, except as described in this paragraph (f). You may ask us to approve a change to your FEL in the following cases:

(1) You may ask to raise your FEL for your vehicle family at any time. In your request, you must show that you will still be able to meet the emission standards as specified in subparts B and H of this part. Use the appropriate FELs with corresponding production volumes to calculate emission credits for the model year, as described in subpart H of this part.

(2) Where testing applies, you may ask to lower the FEL for your vehicle family only if you have test data from production vehicles showing that emissions are below the proposed lower FEL. Otherwise, you may ask to lower your FEL for your vehicle family at any time. The lower FEL applies only to vehicles you produce after we approve the new FEL. Use the appropriate FELs with corresponding production volumes to calculate emission credits for the model year, as described in subpart H of this part.

(3) You may ask to add an FEL for your vehicle family at any time.

\* \* \* \* \*

■ 131. Revise § 1037.230 to read as follows:

### § 1037.230 Vehicle families.

For purposes of certifying your vehicles, divide your product line into vehicle families as follows:

(a) All vehicles identified in § 1037.102(a)(1)(i) and (ii) for a given

model year may be in a single vehicle family, except as follows:

(1) New tractors with auxiliary power units need to be in a separate vehicle family.

(2) Divide vehicles subject to evaporative or refueling standards into vehicle families as described in 40 CFR 86.1821.

(b) All specialty vehicles identified in § 1037.102(a)(1)(iii) for a given model year may be in a single vehicle family.

(c) All glider kits and glider vehicles in § 1037.102(a)(1)(iv) for a given model year may be in a single vehicle family.

(d) All vehicles with no installed propulsion engine for a given model year may be in a single vehicle family, except that new tractors with auxiliary power units must be in a separate vehicle family.

### §§ 1037.231 and 1036.232 [Removed]

■ 132. Remove §§ 1037.231 and 1037.232.

■ 133. Revise and republish § 1037.235 to read as follows:

### § 1037.235 Testing requirements for certification.

This section describes the emission testing you must perform to show compliance with respect to the standards in subpart B of this part, and to determine any input values.

(a) Select emission-data vehicles that represent production vehicles and components for the vehicle family. Where the test results will represent multiple vehicles or components with different emission performance, use good engineering judgment to select worst-case emission data vehicles or components.

(b) Test your emission-data vehicles (including emission-data components) using the procedures and equipment referenced in subpart B of this part. Measure emissions (or other parameters, as applicable) using the specified procedures.

(c) We may perform confirmatory testing by measuring emissions (or other parameters, as applicable) from any of your emission-data vehicles.

(1) We may decide to do the testing at your plant or any other facility. If we do this, you must deliver the vehicle or component to a test facility we designate. The vehicle or component you provide must be in a configuration that is suitable for testing. If we do the testing at your plant, you must schedule it as soon as possible and make available the instruments, personnel, and equipment we need (see paragraph (g) of this section for provisions that apply specifically for testing a tractor's aerodynamic performance).

(2) If we measure emissions (or other parameters, as applicable) from your vehicle or component, the results of that testing become the official emission results for the vehicle or component. Note that changing the official emission result does not necessarily require a change in the declared modeling input value. Unless we later invalidate these data, we may decide not to consider your data in determining if your vehicle family meets applicable requirements in this part.

(3) Before we test one of your vehicles or components, we may set its adjustable parameters to any point within the practically adjustable ranges, if applicable.

(4) Before we test one of your vehicles or components, we may calibrate it within normal production tolerances for anything we do not consider an adjustable parameter. For example, this would apply for a vehicle parameter that is subject to production variability because it is adjustable during production, but is not considered an adjustable parameter (as defined in § 1037.801) because it is permanently sealed. For parameters that relate to a level of performance that is itself subject to a specified range (such as maximum power output), we will generally perform any calibration under this paragraph (c)(4) in a way that keeps performance within the specified range. Note that this paragraph (c)(4) does not allow us to test your vehicles in a condition that would be unrepresentative of production vehicles.

(d) You may ask to use carryover data for a vehicle or component from a previous model year instead of doing new tests if the applicable emission-data vehicle from the previous model year remains the appropriate emission-data vehicle under paragraph (b) of this section.

(e) We may require you to test a second vehicle or component of the same configuration in addition to the vehicle or component tested under paragraph (a) of this section.

(f) If you use an alternate test procedure under 40 CFR 1065.10 and later testing shows that such testing does not produce results that are equivalent to the procedures referenced in subpart B of this part, we may reject data you generated using the alternate procedure.

### § 1037.241 [Removed]

■ 134. Remove § 1037.241.

■ 135. Amend § 1037.250 by revising paragraph (a) to read as follows:

### § 1037.250 Reporting and recordkeeping.

(a) By September 30 following the end of the model year, send the Designated Compliance Officer a report including the total U.S.-directed production volume of vehicles you produced in each vehicle family during the model year (based on information available at the time of the report) by engine family. Report uncertified vehicles sold to secondary vehicle manufacturers. We may waive the reporting requirements of this paragraph (a) for small manufacturers.

\* \* \* \* \*

### Subparts D through F [Reserved]

■ 136. Remove and reserve:
■ a. Subpart D, consisting of §§ 1037.301 through 1037.320;
■ b. Subpart E, consisting of § 1037.401; and
■ c. Subpart F, consisting of §§ 1037.501 through 1037.570.
■ 137. Amend § 1037.601 by revising paragraph (a)(1) to read as follows:

### § 1037.601 General compliance provisions.

(a) \* \* \*

(1) Except as specifically allowed by this part or 40 CFR part 1068, it is a violation of 40 CFR 1068.101(a)(1) to introduce into U.S. commerce a vehicle containing an engine that is not certified to the applicable requirements of 40 CFR part 86 or 1036.

\* \* \* \* \*

■ 138. Amend § 1037.605 by revising paragraph (d) to read as follows:

### § 1037.605 Installing engines certified to alternate standards for specialty vehicles.

\* \* \* \* \*

(d) *Vehicle standards.* Vehicles qualifying under this section are subject to evaporative emission standards as specified in § 1037.103, but are exempt from the other requirements of this part, except as specified in this section and in § 1037.601. These vehicles must include a label as specified in § 1037.135.

### §§ 1037.610 and 1037.615 [Removed]

■ 139. Remove §§ 1037.610 and 1037.615.
■ 140. Amend § 1037.620 by revising paragraph (c) introductory text to read as follows:

### § 1037.620 Responsibilities for multiple manufacturers.

\* \* \* \* \*

(c) Component manufacturers providing test data to certifying vehicle manufacturers are responsible as follows for test components and emission test results provided to vehicle

manufacturers for the purpose of certification under this part:

\* \* \* \* \*

■ 141. Amend § 1037.621 by revising paragraphs (b) and (d) introductory text and removing paragraph (g). The revisions read as follows:

### § 1037.621 Delegated assembly.

\* \* \* \* \*

(b) You do not need an exemption to ship a vehicle that does not include installation or assembly of certain emission-related components if those components are shipped along with the vehicle. For example, you may generally ship fuel tanks along with vehicles rather than installing them on the vehicle before shipment. We may require you to describe how you plan to use this provision.

\* \* \* \* \*

(d) Delegated-assembly provisions apply as specified in this paragraph (d) if the certifying vehicle manufacturer relies on a secondary vehicle manufacturer to procure and install auxiliary power units or natural gas fuel tanks. Apply the provisions of 40 CFR 1068.261, with the following exceptions and clarifications:

\* \* \* \* \*

■ 142. Amend § 1037.622 by revising the introductory text and paragraph (a) and removing paragraph (d). The revisions read as follows:

### § 1037.622 Shipment of partially complete vehicles to secondary vehicle manufacturers.

This section specifies how manufacturers may introduce partially complete vehicles into U.S. commerce (or in the case of certain custom vehicles, introduce complete vehicles into U.S. commerce for modification by a small manufacturer). The provisions of this section are intended to accommodate normal business practices without compromising the effectiveness of certified emission controls. You may not use the provisions of this section to circumvent the intent of this part.

(a) The provisions of this section allow manufacturers to ship partially complete vehicles to secondary vehicle manufacturers or otherwise introduce them into U.S. commerce in the following circumstances:

(1) *Certified vehicles.* Manufacturers may introduce partially complete tractors into U.S. commerce if they are covered by certificates of conformity and are in certified configurations. See § 1037.621 for vehicles not yet in a certified configuration when introduced into U.S. commerce.

(2) *Uncertified vehicles that will be certified by secondary vehicle manufacturers.* Manufacturers may introduce into U.S. commerce partially complete vehicles for which they do not hold the required certificate of conformity only as allowed by paragraph (b) of this section.

(3) *Exempted vehicles.* Manufacturers may introduce into U.S. commerce partially complete vehicles without a certificate of conformity if the vehicles are exempt under this part or under 40 CFR part 1068. This may involve the secondary vehicle manufacturer qualifying for the exemption.

\* \* \* \* \*

### §§ 1037.630 and 1037.631 [Removed]

■ 143. Remove §§ 1037.630 and 1037.631.

■ 144. Amend § 1037.635 by removing the introductory text and revising paragraphs (a) and (b). The revision reads as follows:

### § 1037.635 Glider kits and glider vehicles.

(a) Vehicles produced from glider kits and other glider vehicles are subject to the same standards as other new vehicles. For example, APUs installed on new glider tractors are subject to the certification requirement described in § 1037.102.

(b) Section 1037.601(a)(1) disallows the introduction into U.S. commerce of a new vehicle (including a vehicle assembled from a glider kit) unless it has an engine that is certified to the applicable standards in 40 CFR parts 86 and 1036. Except as specified otherwise in this part, the standards apply for engines used in glider vehicles as follows:

(1) [Reserved]

(2) The engine must meet the criteria pollutant standards of 40 CFR part 86 or 1036 that apply for the engine model year corresponding to the vehicle's date of manufacture.

(3) The engine may be from an earlier model year if the standards were identical to the currently applicable engine standards.

\* \* \* \* \*

### §§ 1037.640, 1037.645, 1037.655, 1037.660, 1037.665, and 1037.670 [Removed]

■ 145. Remove §§ 1037.640, 1037.645, 1037.655, 1037.660, 1037.665, and 1037.670.

### Subpart H [Reserved]

■ 146. Remove and reserve subpart H, consisting of §§ 1037.701 through 1037.755.

■ 147. Revise and republish § 1037.801 to read as follows:

### § 1037.801 Definitions.

The following definitions apply to this part. The definitions apply to all subparts unless we note otherwise. All undefined terms have the meaning the Act gives to them. The definitions follow:

*Act* means the Clean Air Act, as amended, 42 U.S.C. 7401–7671q.

*Adjustable parameter* has the meaning given in 40 CFR 1068.30.

*Adjusted Loaded Vehicle Weight* means the numerical average of vehicle curb weight and GVWR.

*Aftertreatment* means relating to a catalytic converter, particulate filter, or any other system, component, or technology mounted downstream of the exhaust valve (or exhaust port) whose design function is to decrease emissions in the vehicle exhaust before it is exhausted to the environment. Exhaust gas recirculation (EGR) and turbochargers are not aftertreatment.

*Aircraft* means any vehicle capable of sustained air travel more than 100 feet off the ground.

*Alcohol-fueled vehicle* means a vehicle that is designed to run using an alcohol fuel. For purposes of this definition, alcohol fuels do not include fuels with a nominal alcohol content below 25 percent by volume.

*Alternative fuel conversion* has the meaning given for clean alternative fuel conversion in 40 CFR 85.502.

*Amphibious vehicle* means a motor vehicle that is also designed for operation on water. Note that high ground clearance that enables a vehicle to drive through water rather than floating on the water does not make a vehicle amphibious.

*Auxiliary emission control device* means any element of design that senses temperature, motive speed, engine speed (r/min), transmission gear, or any other parameter for the purpose of activating, modulating, delaying, or deactivating the operation of any part of the emission control system.

*Auxiliary power unit* means a device installed on a vehicle that uses an engine to provide power for purposes other than to (directly or indirectly) propel the vehicle.

*Battery electric vehicle* means a motor vehicle powered solely by an electric motor where energy for the motor is supplied by one or more batteries that receive power from an external source of electricity. Note that this definition does not include hybrid vehicles or plug-in hybrid electric vehicles.

*Calibration* means the set of specifications and tolerances specific to a particular design, version, or application of a component or assembly

capable of functionally describing its operation over its working range.

*Carryover* means relating to certification based on emission data generated from an earlier model year.

*Certification* means relating to the process of obtaining a certificate of conformity for a vehicle family that complies with the emission standards and requirements in this part.

*Certified emission level* means the highest deteriorated emission level in a vehicle family for a given pollutant from either transient or steady-state testing.

*Class* means relating to GVWR classes, as follows:

(1) *Class 2b* means relating to heavy-duty motor vehicles at or below 10,000 pounds GVWR.

(2) *Class 3* means relating to heavy-duty motor vehicles above 10,000 pounds GVWR but at or below 14,000 pounds GVWR.

(3) *Class 4* means relating to heavy-duty motor vehicles above 14,000 pounds GVWR but at or below 16,000 pounds GVWR.

(4) *Class 5* means relating to heavy-duty motor vehicles above 16,000 pounds GVWR but at or below 19,500 pounds GVWR.

(5) *Class 6* means relating to heavy-duty motor vehicles above 19,500 pounds GVWR but at or below 26,000 pounds GVWR.

(6) *Class 7* means relating to heavy-duty motor vehicles above 26,000 pounds GVWR but at or below 33,000 pounds GVWR.

(7) *Class 8* means relating to heavy-duty motor vehicles above 33,000 pounds GVWR.

*Complete vehicle* has the meaning given in the definition for *vehicle* in this section.

*Compression-ignition* has the meaning given in § 1037.101.

*Date of manufacture* means the date on which the certifying vehicle manufacturer completes its manufacturing operations, except as follows:

(1) Where the certificate holder is an engine manufacturer that does not manufacture the chassis, the date of manufacture of the vehicle is based on the date assembly of the vehicle is completed.

(2) We may approve an alternate date of manufacture based on the date on which the certifying (or primary) manufacturer completes assembly at the place of main assembly, consistent with the provisions of § 1037.601 and 49 CFR 567.4.

*Designated Compliance Officer* means one of the following:

(1) For compression-ignition engines, *Designated Compliance Officer* means

Director, Diesel Engine Compliance Center, U.S. Environmental Protection Agency, 2000 Traverwood Drive, Ann Arbor, MI 48105; *complianceinfo@ epa.gov; www.epa.gov/ve-certification.*

(2) For spark-ignition engines, *Designated Compliance Officer* means Director, Gasoline Engine Compliance Center, U.S. Environmental Protection Agency, 2000 Traverwood Drive, Ann Arbor, MI 48105; *complianceinfo@ epa.gov; www.epa.gov/ve-certification.*

*Deteriorated emission level* means the emission level that results from applying the appropriate deterioration factor to the official emission result of the emission-data vehicle. Note that where no deterioration factor applies, references in this part to the *deteriorated emission level* mean the official emission result.

*Deterioration factor* means the relationship between the highest emissions during the useful life and emissions at the low-hour test point, expressed in one of the following ways:

(1) For multiplicative deterioration factors, the ratio of the highest emissions to emissions at the low-hour test point.

(2) For additive deterioration factors, the difference between the highest emissions and emissions at the low-hour test point.

*Diesel exhaust fluid (DEF)* means a liquid reducing agent (other than the engine fuel) used in conjunction with selective catalytic reduction to reduce $NO_X$ emissions. *Diesel exhaust fluid* is generally understood to be an aqueous solution of urea conforming to the specifications of ISO 22241.

*Dual-fuel* means relating to a vehicle or engine designed for operation on two different fuels but not on a continuous mixture of those fuels. For purposes of this part, such a vehicle or engine remains a dual-fuel vehicle or engine even if it is designed for operation on three or more different fuels.

*Electronic control module* has the meaning given in 40 CFR 1065.1001.

*Emission control system* means any device, system, or element of design that controls or reduces the emissions of regulated pollutants from a vehicle.

*Emission-data component* means a vehicle component that is tested for certification. This includes vehicle components tested to establish deterioration factors.

*Emission-data vehicle* means a vehicle (or vehicle component) that is tested for certification. This includes vehicles tested to establish deterioration factors.

*Emission-related component* has the meaning given in 40 CFR part 1068, appendix A.

*Emission-related maintenance* means maintenance that substantially affects emissions or is likely to substantially affect emission deterioration.

*Excluded* means relating to vehicles that are not subject to some or all of the requirements of this part as follows:

(1) A vehicle that has been determined not to be a ''motor vehicle'' is excluded from this part.

(2) Certain vehicles are excluded from the requirements of this part under § 1037.5.

(3) Specific regulatory provisions of this part may exclude a vehicle generally subject to this part from one or more specific standards or requirements of this part.

*Exempted* has the meaning given in 40 CFR 1068.30. Note that exempted vehicles are not considered to be excluded.

*Extended idle* means tractor idle operation during which the engine is operating to power accessories for a sleeper compartment or other passenger compartment. Although the vehicle is generally parked during extended idle, the term ''parked idle'' generally refers to something different than extended idle.

*Family emission limit (FEL)* means an emission level declared by the manufacturer to serve in place of an otherwise applicable emission standard under the ABT program in subpart H of this part. The *family emission limit* must be expressed to the same number of decimal places as the emission standard it replaces.

*Flexible-fuel* means relating to an engine designed for operation on any mixture of two or more different fuels.

*Fuel cell electric vehicle* means a motor vehicle powered solely by an electric motor where energy for the motor is supplied by hydrogen fuel cells. Fuel cell electric vehicles may include energy storage from the fuel cells or from regenerative braking in a battery.

*Fuel system* means all components involved in transporting, metering, and mixing the fuel from the fuel tank to the combustion chamber(s), including the fuel tank, fuel pump, fuel filters, fuel lines, carburetor or fuel-injection components, and all fuel-system vents. It also includes components for controlling evaporative emissions, such as fuel caps, purge valves, and carbon canisters.

*Fuel type* means a general category of fuels such as diesel fuel or natural gas. There can be multiple grades within a single fuel type, such as high-sulfur or low-sulfur diesel fuel.

*Gaseous fuel* means a fuel that has a boiling point below 20 °C.

*Glider kit* means either of the following:

(1) A new vehicle that is incomplete because it lacks an engine, transmission, and/or axle(s).

(2) Any other new equipment that is substantially similar to a complete motor vehicle and is intended to become a complete motor vehicle with a previously used engine (including a rebuilt or remanufactured engine). For example, incomplete heavy-duty tractor assemblies that are produced on the same assembly lines as complete tractors and that are made available to secondary vehicle manufacturers to complete assembly by installing used/ remanufactured engines, transmissions and axles are glider kits.

*Glider vehicle* means a new motor vehicle produced from a glider kit, or otherwise produced as a new motor vehicle with a with a used/ remanufactured engine.

*Good engineering judgment* has the meaning given in 40 CFR 1068.30. See 40 CFR 1068.5 for the administrative process we use to evaluate good engineering judgment.

*Gross combination weight rating (GCWR)* means the value specified by the vehicle manufacturer as the maximum weight of a loaded vehicle and trailer, consistent with good engineering judgment. For example, compliance with SAE J2807 is generally considered to be consistent with good engineering judgment, especially for Class 3 and smaller vehicles.

*Gross vehicle weight rating (GVWR)* means the value specified by the vehicle manufacturer as the maximum design loaded weight of a single vehicle, consistent with good engineering judgment.

*Heavy-duty engine* means any engine used for (or for which the engine manufacturer could reasonably expect to be used for) motive power in a heavy-duty vehicle.

*Heavy-duty vehicle* means any motor vehicle that has a GVWR above 8,500 pounds. An incomplete vehicle is also a heavy-duty vehicle if it has a curb weight above 6,000 pounds or a basic vehicle frontal area greater than 45 square feet.

*Hybrid* has the meaning given in 40 CFR 1036.801. Note that a hybrid vehicle is a vehicle with a hybrid engine or other hybrid powertrain. This includes plug-in hybrid electric vehicles.

*Hydrocarbon (HC)* means the hydrocarbon group on which the emission standards are based for each fuel type. For alcohol-fueled vehicles, HC means nonmethane hydrocarbon equivalent (NMHCE) for exhaust emissions and total hydrocarbon equivalent (THCE) for evaporative emissions. For all other vehicles, HC means nonmethane hydrocarbon (NMHC) for exhaust emissions and total hydrocarbon (THC) for evaporative emissions.

*Identification number* means a unique specification (for example, a model number/serial number combination) that allows someone to distinguish a particular vehicle from other similar vehicles.

*Incomplete vehicle* has the meaning given in the definition of *vehicle* in this section.

*Light-duty truck* has the meaning given in 40 CFR 86.1803–01.

*Light-duty vehicle* has the meaning given in 40 CFR 86.1803–01.

*Low-mileage* means relating to a vehicle with stabilized emissions and represents the undeteriorated emission level. This would generally involve approximately 4000 miles of operation.

*Manufacture* means the physical and engineering process of designing, constructing, and/or assembling a vehicle.

*Manufacturer* has the meaning given in section 216(1) of the Act. In general, this term includes any person who manufactures or assembles a vehicle (including an incomplete vehicle) for sale in the United States or otherwise introduces a new motor vehicle into commerce in the United States. This includes importers who import vehicles for resale, entities that manufacture glider kits, and entities that assemble glider vehicles.

*Medium-duty passenger vehicle (MDPV)* has the meaning given in 40 CFR 86.1803.

*Model year* means one of the following for compliance with this part. Note that manufacturers may have other model year designations for the same vehicle for compliance with other requirements or for other purposes:

(1) For vehicles with a date of manufacture on or after January 1, 2021, *model year* means the manufacturer's annual new model production period based on the vehicle's date of manufacture, where the model year is the calendar year corresponding to the date of manufacture, except as follows:

(i) The vehicle's model year may be designated as the year before the calendar year corresponding to the date of manufacture if the engine's model year is also from an earlier year. You may ask us to extend your prior model year certificate to include such vehicles. Note that § 1037.601(a)(2) limits the extent to which vehicle manufacturers may install engines built in earlier calendar years.

(ii) The vehicle's model year may be designated as the year after the calendar year corresponding to the vehicle's date of manufacture. For example, a manufacturer may produce a new vehicle by installing the engine in December 2023 and designating it as a model year 2024 vehicle.

(2) For Phase 1 vehicles with a date of manufacture before January 1, 2021, *model year* means the manufacturer's annual new model production period, except as restricted under this definition and 40 CFR part 85, subpart X. It must include January 1 of the calendar year for which the model year is named, may not begin before January 2 of the previous calendar year, and it must end by December 31 of the named calendar year. The model year may be set to match the calendar year corresponding to the date of manufacture.

(i) The manufacturer who holds the certificate of conformity for the vehicle must assign the model year based on the date when its manufacturing operations are completed relative to its annual model year period. In unusual circumstances where completion of your assembly is delayed, we may allow you to assign a model year one year earlier, provided it does not affect which regulatory requirements will apply.

(ii) Unless a vehicle is being shipped to a secondary vehicle manufacturer that will hold the certificate of conformity, the model year must be assigned prior to introduction of the vehicle into U.S. commerce. The certifying manufacturer must redesignate the model year if it does not complete its manufacturing operations within the originally identified model year. A vehicle introduced into U.S. commerce without a model year is deemed to have a model year equal to the calendar year of its introduction into U.S. commerce unless the certifying manufacturer assigns a later date.

*Motor vehicle* has the meaning given in 40 CFR 85.1703.

*New motor vehicle* has the meaning given in the Act. It generally means a motor vehicle meeting the criteria of either paragraph (1) or (2) of this definition. *New motor vehicles* may be complete or incomplete.

(1) A motor vehicle for which the ultimate purchaser has never received the equitable or legal title is a *new motor vehicle.* This kind of vehicle might commonly be thought of as "brand new" although a *new motor vehicle* may include previously used parts. For example, vehicles commonly known as "glider kits," "glider vehicles," or "gliders" are new motor vehicles. Under this definition, the vehicle is new from

the time it is produced until the ultimate purchaser receives the title or places it into service, whichever comes first.

(2) An imported heavy-duty motor vehicle originally produced after the 1969 model year is a *new motor vehicle.*

*Noncompliant vehicle* means a vehicle that was originally covered by a certificate of conformity, but is not in the certified configuration or otherwise does not comply with the conditions of the certificate.

*Nonconforming vehicle* means a vehicle not covered by a certificate of conformity that would otherwise be subject to emission standards.

*Nonmethane hydrocarbon (NMHC)* means the sum of all hydrocarbon species except methane, as measured according to 40 CFR part 1065.

*Nonmethane hydrocarbon equivalent (NMHCE)* has the meaning given in 40 CFR 1065.1001.

*Official emission result* means the measured emission rate for an emission-data vehicle on a given duty cycle before the application of any required deterioration factor, but after the applicability of regeneration adjustment factors.

*Owners manual* means a document or collection of documents prepared by the vehicle manufacturer for the owners or operators to describe appropriate vehicle maintenance, applicable warranties, and any other information related to operating or keeping the vehicle. The owners manual is typically provided to the ultimate purchaser at the time of sale. The owners manual may be in paper or electronic format.

*Oxides of nitrogen* has the meaning given in 40 CFR 1065.1001.

*Particulate trap* means a filtering device that is designed to physically trap all particulate matter above a certain size.

*Percent (%)* has the meaning given in 40 CFR 1065.1001. Note that this means percentages identified in this part are assumed to be infinitely precise without regard to the number of significant figures. For example, one percent of 1,493 is 14.93.

*Petroleum* means gasoline or diesel fuel or other fuels normally derived from crude oil. This does not include methane or liquefied petroleum gas.

*Placed into service* means put into initial use for its intended purpose, excluding incidental use by the manufacturer or a dealer.

*Plug-in hybrid electric vehicle* means a hybrid vehicle that has the capability to charge one or more batteries from an external source of electricity while the vehicle is parked.

*Preliminary approval* means approval granted by an authorized EPA representative prior to submission of an application for certification, consistent with the provisions of § 1037.210.

*Rechargeable Energy Storage System (RESS)* has the meaning given in 40 CFR 1065.1001.

*Relating to* as used in this section means relating to something in a specific, direct manner. This expression is used in this section only to define terms as adjectives and not to broaden the meaning of the terms.

*Revoke* has the meaning given in 40 CFR 1068.30.

*Round* has the meaning given in 40 CFR 1065.1001.

*Scheduled maintenance* means adjusting, repairing, removing, disassembling, cleaning, or replacing components or systems periodically to keep a part or system from failing, malfunctioning, or wearing prematurely. It also may mean actions you expect are necessary to correct an overt indication of failure or malfunction for which periodic maintenance is not appropriate.

*Secondary vehicle manufacturer* anyone that produces a vehicle by modifying a complete vehicle or completing the assembly of a partially complete vehicle. For the purpose of this definition, "modifying" generally does not include making changes that do not remove a vehicle from its original certified configuration. However, custom sleeper modifications and alternative fuel conversions that change actual vehicle aerodynamics are considered to be modifications, even if they are permitted without recertification. This definition applies whether the production involves a complete or partially complete vehicle and whether the vehicle was previously certified to emission standards or not. Manufacturers controlled by the manufacturer of the base vehicle (or by an entity that also controls the manufacturer of the base vehicle) are not secondary vehicle manufacturers; rather, both entities are considered to be one manufacturer for purposes of this part.

*Spark-ignition* has the meaning given in § 1037.101.

*Suspend* has the meaning given in 40 CFR 1068.30.

*Test sample* means the collection of vehicles or components selected from the population of a vehicle family for emission testing. This may include testing for certification, production-line testing, or in-use testing.

*Test vehicle* means a vehicle in a test sample.

*Test weight* means the vehicle weight used or represented during testing.

*Total hydrocarbon* has the meaning given in 40 CFR 1065.1001. This generally means the combined mass of organic compounds measured by the specified procedure for measuring total hydrocarbon, expressed as a hydrocarbon with an atomic hydrogen-to-carbon ratio of 1.85:1.

*Total hydrocarbon equivalent* has the meaning given in 40 CFR 1065.1001. This generally means the sum of the carbon mass contributions of non-oxygenated hydrocarbon, alcohols and aldehydes, or other organic compounds that are measured separately as contained in a gas sample, expressed as exhaust hydrocarbon from petroleum-fueled vehicles. The atomic hydrogen-to-carbon ratio of the equivalent hydrocarbon is 1.85:1.

*Tractor* means a truck designed primarily for drawing other motor vehicles and not so constructed as to carry a load other than a part of the weight of the vehicle and the load so drawn. This includes most heavy-duty vehicles specifically designed for the primary purpose of pulling trailers, but does not include vehicles designed to carry other loads. For purposes of this definition "other loads" would not include loads carried in the cab, sleeper compartment, or toolboxes. Examples of vehicles that are similar to tractors but that are not *tractors* under this part include dromedary tractors, automobile haulers, straight trucks with trailers hitches, and tow trucks. *Ultimate purchaser* means, with respect to any new vehicle, the first person who in good faith purchases such new vehicle for purposes other than resale.

*United States* has the meaning given in 40 CFR 1068.30.

*Upcoming model year* means for a vehicle family the model year after the one currently in production.

*U.S.-directed production volume* means the number of vehicle units, subject to the requirements of this part, produced by a manufacturer for which the manufacturer has a reasonable assurance that sale was or will be made to ultimate purchasers in the United States.

*Useful life* means the period during which a vehicle is required to comply with all applicable emission standards.

*Vehicle* means equipment intended for use on highways that meets at least one of the criteria of paragraph (1) of this definition, as follows:

(1) The following equipment are vehicles:

(i) A piece of equipment that is intended for self-propelled use on highways becomes a vehicle when it

includes at least an engine, a transmission, and a frame. (*Note:* For purposes of this definition, any electrical, mechanical, and/or hydraulic devices attached to engines for the purpose of powering wheels are considered to be transmissions.)

(ii) A piece of equipment that is intended for self-propelled use on highways becomes a vehicle when it includes a passenger compartment attached to a frame with one or more axles.

(2) Vehicles may be complete or incomplete vehicles as follows:

(i) A *complete vehicle* is a functioning vehicle that has the primary load carrying device or container (or equivalent equipment) attached when it is first sold as a vehicle. Examples of equivalent equipment would include fifth wheel trailer hitches, firefighting equipment, and utility booms.

(ii) An *incomplete vehicle* is a vehicle that is not a complete vehicle.

Incomplete vehicles may also be cab-complete vehicles. This may include vehicles sold to secondary vehicle manufacturers.

(iii) You may ask us to allow you to certify a vehicle as incomplete if you manufacture the engines and sell the unassembled chassis components, as long as you do not produce and sell the body components necessary to complete the vehicle.

*Vehicle configuration* means a unique combination of vehicle hardware and calibration (related to measured or modeled emissions) within a vehicle family. Vehicles with hardware or software differences, but that have no hardware or software differences related to measured or modeled emissions may be included in the same vehicle configuration. Vehicles within a vehicle configuration differ only with respect to normal production variability or factors unrelated to measured or modeled emissions.

*Vehicle family* has the meaning given in § 1037.230.

*Void* has the meaning given in 40 CFR 1068.30.

*Volatile liquid fuel* means any fuel other than diesel or biodiesel that is a liquid at atmospheric pressure and has a Reid Vapor Pressure higher than 2.0 pounds per square inch.

*We (us, our)* means the Administrator of the Environmental Protection Agency and any authorized representatives.

■ 148. Amend § 1037.805 by removing ''CO2DEF'' and ''CO2PTO'' from table 4 to paragraph (d) and revise paragraph (e). The revision reads as follows:

### § 1037.805 Symbols, abbreviations, and acronyms.

\* \* \* \* \*

(e) *Other acronyms and abbreviations.* This part uses the following additional abbreviations and acronyms:

TABLE 5 TO PARAGRAPH (e) OF § 1037.805—OTHER ACRONYMS AND ABBREVIATIONS

| Acronym | Meaning |
|---|---|
| AECD | auxiliary emission control device. |
| AES | automatic engine shutdown. |
| APU | auxiliary power unit. |
| CD | charge-depleting. |
| CFR | Code of Federal Regulations. |
| CITT | curb idle transmission torque. |
| CS | charge-sustaining. |
| DOT | Department of Transportation. |
| EPA | Environmental Protection Agency. |
| FEL | Family Emission Limit. |
| GAWR | gross axle weight rating. |
| GCWR | gross combination weight rating. |
| GVWR | gross vehicle weight rating. |
| HVAC | heating, ventilating, and air conditioning. |
| ISO | International Organization for Standardization. |
| NARA | National Archives and Records Administration. |
| NHTSA | National Highway Traffic Safety Administration. |
| RESS | rechargeable energy storage system. |
| SAE | SAE International. |
| SEE | standard error of the estimate. |
| SKU | stock-keeping unit. |
| U.S.C. | United States Code. |

\* \* \* \* \*

### § 1037.810 [Removed]

■ 149. Remove § 1037.810.

### § 1037.825 [Amended]

■ 150. Amend § 1037.825 by removing and reserving paragraph (e)(1)(i) and removing paragraph (e)(1)(iv).

### Appendices A Through E to Part 1037 [Removed]

■ 151. Remove appendices A through E to part 1037.

### PART 1039—CONTROL OF EMISSIONS FROM NEW AND IN-USE NONROAD COMPRESSION-IGNITION ENGINES

■ 152. The authority citation for part 1039 continues to read as follows:

**Authority:** 42 U.S.C. 7401–7671q.

■ 153. Amend § 1039.699 by revising paragraphs (a) and (n) to read as follows:

### § 1039.699 Emission standards and certification requirements for auxiliary power units for highway tractors.

(a) This section describes emission standards and certification requirements for auxiliary power units (APU) installed on highway tractors subject to standards under 40 CFR 1037.102 starting in model year 2024.

\* \* \* \* \*

(n) If a highway tractor manufacturer violates 40 CFR 1037.102 by installing an APU from you that is not properly certified and labeled, you are presumed to have caused the violation (see 40 CFR 1068.101(c)).

[FR Doc. 2025–14572 Filed 7–31–25; 8:45 am]

**BILLING CODE 6560–50–P**

# EXHIBIT 8



May 5, 2025

M-25-27

| | |
|---|---|
| MEMORANDUM FOR: | REGULATORY POLICY OFFICERS AT DEPARTMENTS AND AGENCIES AND MANAGING AND EXECUTIVE DIRECTORS OF COMMISSIONS AND BOARDS |
| FROM: | Jeffrey Bossert Clark, Sr., Acting Administrator Office of Information and Regulatory Affairs |
| SUBJECT: | Guidance Implementing Section 6 of Executive Order 14154, Entitled "Unleashing American Energy" |

## Summary

This guidance is being issued in consultation with the Environmental Protection Agency (EPA), and fulfills the President's directive to issue guidance under Section 6 of Executive Order 14154, "Unleashing American Energy."

It is the policy of this Administration that, pursuant to the conclusions stated in Executive Order 14154, the calculation of the social cost of carbon "is marked by logical deficiencies, a poor basis in empirical science, politicization, and the absence of a foundation in legislation." Agencies should review their various statutory, regulatory, and other policy requirements that govern regulatory and permitting decisions, and limit their analysis and consideration of greenhouse gas emissions only to that plainly required in their governing statutes subject to an exception detailed below related to consultation with the Department of Justice.

## Executive Order 14154 Overview

Executive Order (EO) 14154, "Unleashing American Energy," explicitly charges the Administration to unleash America's affordable and reliable energy. It is incumbent upon executive departments and agencies (collectively, agencies) to remove any barriers put in place by previous Administrations that unduly restrict the ability of the United States to maximize the benefits Americans enjoy from our abundant natural resources. EO 14154 also charges agencies to ensure that all regulatory requirements related to energy are grounded in clearly applicable law. That charge requires limiting the use of considerations not required by an agency's governing statutes.

Specifically, EO 14154 states that, among other things, "[t]he calculation of the 'social cost of carbon' is marked by logical deficiencies, a poor basis in empirical science, politicization, and

the absence of a foundation in legislation." It also charges the EPA with issuing guidance to address the inadequacies of social cost of carbon analyses and to consider eliminating the social cost of carbon calculation from any Federal regulatory and permitting decisions.

EO 14154 accordingly disbanded the Interagency Working Group on the Social Cost of Greenhouse Gases (IWG), which was established pursuant to EO 13990, and withdrew any guidance, instruction, recommendation, or document issued by the IWG. As such, it is no longer Federal government policy to maintain a uniform estimate of the monetized impacts of greenhouse gas emissions.

The Office of Information and Regulatory Affairs (OIRA) has now consulted with the EPA and the two agencies have collaborated to produce the guidance required by Section 6 of EO 14154. Agencies charged with implementing regulations and issuing permits where greenhouse gas emissions have in the past been a factor (erroneously, in many instances) should consider this guidance when engaging in their regulatory activities.

Under this guidance, the circumstances where agencies will need to engage in monetized greenhouse gas emission analysis will be few to none. In those limited circumstances, Section 6(d) of EO 14154 charges the agencies to "ensure estimates to assess the value of changes in greenhouse gas emissions resulting from agency actions, including with respect to the consideration of domestic versus international effects and evaluating appropriate discount rates, are, to the extent permitted by law, consistent with the guidance contained in OMB Circular A-4 of September 17, 2003."

The following additional guidance pursuant to Section 6 of EO 14154 is also provided:

**Guidance for Agencies**

1. Agencies should review their existing policies, guidance, regulations, and governing statutes to determine whether the consideration of greenhouse gas emissions is required, and in what manner, in agency regulatory and permitting decisionmaking.

2. If the consideration of greenhouse gas emissions is not required by statute, but has been established as a decisionmaking factor in agency guidance or regulations governing either regulatory or permitting decisions (or both), agencies should, consistent with the policy of EO 14154, modify their regulations (or rescind/modify their guidance), as appropriate, to reestablish the proper, limited role of such emissions in agency decisionmaking. Such regulations or changes to guidance should be issued as quickly as feasible, consistent with law.

3. If the consideration of greenhouse gas emissions is required by statute, agencies should limit their analysis to the minimum consideration required to meet such a statutory requirement. Agencies may consult with the EPA on how to conduct such an analysis.

Notwithstanding such analysis, it is the policy of this Administration as set forth in EO 14154 that any consideration of greenhouse gas emissions should be limited to domestic effects, unless an analysis of extraterritorial impacts is required, "in order to promote sound regulatory decision making and prioritize the interests of the American people."

4. Agencies should ensure that any permitting decisions issued are consistent with the conclusions of this agency review, and provide the minimal greenhouse gas analysis and consideration necessary for agencies to comply with statutory requirements.

5. Agencies should ensure that any regulations, including any significant regulations submitted to OIRA under Executive Order 12866, "Regulatory Review," as amended, are consistent with the conclusions of this agency review, and provide the minimal greenhouse gas analysis and consideration necessary for agencies to comply with statutory requirements.

6. No Supreme Court case law of which OIRA or the EPA is aware provides that greenhouse gas emissions must be quantified or that agencies must monetize the impact of such quantifications in connection with any particular statutory regime or as a general matter. Should precedents of Federal Courts of Appeals (the Circuits) conclude that such quantifications/monetized impact calculations are required by a statute, then the agencies affected by such a decision should consult with the Department of Justice to consider the agency's options under the nonacquiescence doctrine.

7. Agencies engaging in quantification of greenhouse gas emissions consistent with case law issued by the Circuits, respectively, should not monetize the impacts from such emissions. This is because the uncertainties in performing monetized impacts quantifications are too great. Use of monetized impact quantifications would simply mislead the American public, reduce confidence in the Federal government, and result in flawed decisionmaking due to overreliance on balancing highly uncertain dollar figures against more concrete costs and benefits that can be appropriately quantified. Numerous uncertainties afflicting attempts to monetize impacts of greenhouse gas emissions include, but are not limited, to the following:

    a. Whether and to what degree any supposed changes in the climate are actually occurring as a consequence of anthropogenic greenhouse gas emissions;

    b. How to assess the relationship between verified anthropogenic changes in climate and the resulting environmental and economic impacts;

    c. How to assess climate-economic interactions;

    d. How to predict future economic growth across all countries of the world;

    e. How to predict future world population growth;

f. How to account for technological advancements that may either mitigate greenhouse gas emissions or facilitate human adaptation;

g. How to account for the impact of emissions on the regulated entities in the United States; and

h. What appropriate discount rates to use.

8. This Memorandum should be implemented consistent with applicable law, and is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

# EXHIBIT 9

The Environmental Protection Agency has stopped estimating the dollar value of lives saved in the cost-benefit analyses for new pollution rules.

 ▶  Listen · 9:25 min



**By Maxine Joselow**
Reporting from Washington

Jan. 21, 2026

Government officials have long grappled with a question that seems like the purview of philosophers: What is the value of a human life?

Under both Democratic and Republican administrations, the answer has been in the millions of dollars. The higher the value, the more the government has required businesses to spend on their operations to prevent a single death.

But for the first time ever, at the Environmental Protection Agency the answer is effectively zero dollars.

Last week, the E.P.A. stopped estimating the monetary value of lives saved when setting limits on two of the most widespread deadly air pollutants, fine particulate matter and ozone. Instead, the agency is calculating only the costs to companies of complying with pollution regulations.

"The Trump administration is saying, literally, that they put zero value on human life," Marshall Burke, an environmental economist at Stanford University, said in an email. "If your kid breathes in air pollution from a power plant or industrial source, E.P.A. is saying that they care only insofar as cleaning up that pollution would cost the emitter."

It's a drastic change to the way the government weighs the costs of curbing air pollution against the benefits to public health and the environment. It could lead to looser controls on pollutants from coal-burning power plants, oil refineries, steel mills and other industrial sites across the country, resulting in dirtier air.

And it appears to shelve a powerful tool, known as the value of a statistical life, that agencies have used for decades in the cost-benefit analyses that justify new regulations.

The E.P.A. has used the tool to assign a dollar value to the lives saved by clean-air rules, causing the benefits of these rules to dwarf the costs by at least a 30-to-1 ratio. That has allowed it to defend pollution controls that companies would otherwise challenge as too costly.

Other federal agencies have used the metric to justify regulations affecting everything from safety features on cars to cancer warning labels on cigarette packs.

Brigit Hirsch, an E.P.A. spokeswoman, said in an email that the agency was still considering the health effects of fine particulate matter and ozone, but was no longer assigning them a dollar value in cost-benefit analyses. "We're not putting a dollar value on those impacts right now," she said. "That does not mean E.P.A. is ignoring or undervaluing them."

Ms. Hirsch did not comment on whether the agency would stop using the value of a statistical life for all regulations beyond clean-air rules. But in general, she said, "saying we aren't attaching a dollar figure to health effects is like saying we aren't putting a price tag on clean air or safe drinking water. Dollars and cents don't define their worth."

For the past 30 years, the E.P.A. has pegged the value of a statistical life at around $11.7 million. Although experts have recommended increasing the value, the agency has updated the metric only to account for inflation and wage growth.

The value of a statistical life is a sensitive subject in Washington. Lower values have led to outcry from public interest groups, while higher values have drawn complaints from a range of industries, including oil and gas drillers, truck drivers and toy manufacturers.

Some critics have raised moral objections to using the tool at all, saying a human life is priceless. But supporters say its use has helped prevent hundreds of thousands of premature deaths from air pollution, which kills more Americans each year than vehicle crashes.



A robust body of research has linked long-term exposure to fine particulate matter and ozone to premature death as well as asthma, dementia, and heart and lung disease.  Mette Lampcov for The New York Times

The biggest driver of those deaths is fine particulate matter, or PM2.5, which refers to particles less than 2.5 micrometers in diameter, small enough to enter the bloodstream. Another silent killer is ozone, a smog-causing gas that forms when emissions from power plants, factories and vehicles mix in the air on hot, sunny days.

A robust body of research has linked long-term exposure to both pollutants to premature death as well as asthma, dementia, and heart and lung disease. Even moderate exposure to PM2.5 can damage the lungs about as much as smoking, studies show.

But in a document posted online on Monday, the E.P.A. claimed that the economic benefits of reducing PM2.5 and ozone were too uncertain. The E.P.A. said that it would stop tabulating these benefits "until the agency is confident enough in the modeling to properly monetize those impacts."

Some regulatory experts had mixed reactions to the move.

"On one hand, the administration does make some valid points that E.P.A. statements have implied a false precision in the past," said Susan Dudley, who led the White House Office of Information and Regulatory Affairs during President George W. Bush's second term and now teaches at George Washington University. "On the other hand, the way to rectify that is not to stop quantifying the health effects altogether."

Others were less circumspect in their criticism.

"If the rationale is that benefits are uncertain, well, costs are uncertain, too," said Alan Krupnick, a senior fellow at Resources for the Future, a nonprofit research group. "Considering costs without considering benefits is like trying to cut a piece of cloth with one blade of the scissors: The cut is likely going to be inaccurate and rough."

Michael Greenstone, an environmental economist at the University of Chicago, said the change could result in dirtier air, undercutting the gains made since Congress strengthened the Clean Air Act in 1970. Steep reductions in PM2.5 pollution have added 1.4 years to the average American's life expectancy since 1970, according to research by the University of Chicago's Air Quality Life Index project.

"Clean air is one of the great success stories of government policy in the last half-century," Dr. Greenstone said. "And at the heart of the Clean Air Act is the idea that when you allow people to lead longer and healthier lives, that has value that can be measured in dollars."

Dr. Greenstone and other economists said the value of a statistical life has often been misinterpreted as the value that the government assigns to a single person's life. But it is actually the value that the government assigns to slightly reducing the risk of death for a large group of people.

To determine this value, government economists have turned to studies on the labor market, which show that workers demand higher wages before agreeing to perform jobs with greater risks of workplace fatalities.

Say that employers must pay lumberjacks an additional $1,000 a year to perform work that generally kills one in 1,000 workers. It follows that most Americans would forgo $1,000 a year to avoid that risk and that 1,000 Americans would collectively forgo $1 million to avoid the same risk entirely. Therefore, in this example, the value of a statistical life would be $1 million.



Steep reductions in PM2.5 pollution have added 1.4 years to the average American's life expectancy since 1970, one study found.   Bryan Tarnowski for The New York Times

Tweaking the tool raises thorny ethical and philosophical questions, said W. Kip Viscusi, an economist at Vanderbilt University whose research on the value of a statistical life has been cited by many agencies.

"Should the government place the same dollar value on everybody's life?" Dr. Viscusi asked. "Should rich people's lives be valued more? Should old people's lives be valued less?"

The American Petroleum Institute, a trade group for major oil and gas companies, has urged the E.P.A. to consider using a lower value for older people. In a 2018 public comment, the group wrote that most of the lives saved by stronger ozone standards would be "among the elderly population — not individuals in their highest earning years."

Scott Lauermann, a spokesman for the institute, said in an email that the group was still reviewing the E.P.A.'s new approach but that it appreciated the agency's focus on "sound science."

In 2003, during George W. Bush's first term, the White House proposed that the E.P.A. use a 37 percent lower value of a statistical life for people older than 70. But the backlash was intense: Older Americans and environmentalists protested what they called a "senior death discount" at E.P.A. hearings. The AARP, a nonprofit group that advocates on behalf of older Americans, ran ads featuring an older woman with a "37 percent off!" tag hanging from her glasses.

The Bush administration ultimately abandoned the idea, and the "environmental critics won the P.R. battle," said John D. Graham, who led the White House Office of Information and Regulatory Affairs at the time and now teaches at Indiana University Bloomington.

"My students tell me I should have started by pushing a premium on the value of saving the lives of children, since they have so many high-quality years of life ahead of them," Dr. Graham said in an email. "In hindsight, that might have been a better approach."

Dr. Viscusi said that if other agencies followed the E.P.A.'s latest approach, they would leave Americans more vulnerable to a range of threats to their lives and livelihoods.

"Whether it's highway safety, job safety or consumer product safety, the biggest benefits of regulations are from saving lives," he said. "If saving lives is made irrelevant, it will undermine the justification for all forms of protective policies."

**Maxine Joselow** covers climate change and the environment for The Times from Washington.

A version of this article appears in print on , Section A, Page 14 of the New York edition with the headline: Trump's E.P.A. Has Put A Value on Human Life: $0

# EXHIBIT 10

## ENVIRONMENTAL PROTECTION AGENCY

### 40 CFR Chapter I

[EPA–HQ–OAR–2009–0171; FRL–9091–8]

RIN 2060–ZA14

### Endangerment and Cause or Contribute Findings for Greenhouse Gases Under Section 202(a) of the Clean Air Act

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Final rule.

**SUMMARY:** The Administrator finds that six greenhouse gases taken in combination endanger both the public health and the public welfare of current and future generations. The Administrator also finds that the combined emissions of these greenhouse gases from new motor vehicles and new motor vehicle engines contribute to the greenhouse gas air pollution that endangers public health and welfare under CAA section 202(a). These Findings are based on careful consideration of the full weight of scientific evidence and a thorough review of numerous public comments received on the Proposed Findings published April 24, 2009.

**DATES:** These Findings are effective on January 14, 2010.

**ADDRESSES:** EPA has established a docket for this action under Docket ID No. EPA–HQ–OAR–2009–0171. All documents in the docket are listed on the *www.regulations.gov* Web site. Although listed in the index, some information is not publicly available, *e.g.,* confidential business information (CBI) or other information whose disclosure is restricted by statute. Certain other material, such as copyrighted material, is not placed on the Internet and will be publicly available only in hard copy form. Publicly available docket materials are available either electronically through *www.regulations.gov* or in hard copy at EPA's Docket Center, Public Reading Room, EPA West Building, Room 3334, 1301 Constitution Avenue, NW., Washington, DC 20004. This Docket Facility is open from 8:30 a.m. to 4:30 p.m., Monday through Friday, excluding legal holidays. The telephone number for the Public Reading Room is (202) 566–1744, and the telephone number for the Air Docket is (202) 566–1742.

**FOR FURTHER INFORMATION CONTACT:** Jeremy Martinich, Climate Change Division, Office of Atmospheric Programs (MC–6207J), Environmental Protection Agency, 1200 Pennsylvania Ave., NW., Washington, DC 20460; telephone number: (202) 343–9927; fax number: (202) 343–2202; e-mail address: *ghgendangerment@epa.gov.* For additional information regarding these Findings, please go to the Web site *http://www.epa.gov/climatechange/ endangerment.html.*

**SUPPLEMENTARY INFORMATION:**

### Judicial Review

Under CAA section 307(b)(1), judicial review of this final action is available only by filing a petition for review in the U.S. Court of Appeals for the District of Columbia Circuit by February 16, 2010. Under CAA section 307(d)(7)(B), only an objection to this final action that was raised with reasonable specificity during the period for public comment can be raised during judicial review. This section also provides a mechanism for us to convene a proceeding for reconsideration, " '[i]f the person raising an objection can demonstrate to EPA that it was impracticable to raise such objection within [the period for public comment] or if the grounds for such objection arose after the period for public comment (but within the time specified for judicial review) and if such objection is of central relevance to the outcome of this rule.' " Any person seeking to make such a demonstration to us should submit a Petition for Reconsideration to the Office of the Administrator, Environmental Protection Agency, Room 3000, Ariel Rios Building, 1200 Pennsylvania Ave., NW., Washington, DC 20004, with a copy to the person listed in the preceding **FOR FURTHER INFORMATION CONTACT** section, and the Associate General Counsel for the Air and Radiation Law Office, Office of General Counsel (Mail Code 2344A), Environmental Protection Agency, 1200 Pennsylvania Ave., NW., Washington, DC 20004.

*Acronyms and Abbreviations.* The following acronyms and abbreviations are used in this document.

ACUS   Administrative Conference of the United States
ANPR   Advance Notice of Proposed Rulemaking
APA   Administrative Procedure Act
CAA   Clean Air Act
CAFE   Corporate Average Fuel Economy
CAIT   Climate Analysis Indicators Tool
CASAC   Clean Air Scientific Advisory Committee
CBI   Confidential Business Information
CCSP   Climate Change Science Program
CFCs   chlorofluorocarbons
CFR   Code of Federal Regulations
$CH_4$   methane
$CO_2$   carbon dioxide
$CO_2e$   $CO_2$-equivalent
CRU   Climate Research Unit

DOT   U.S. Department of Transportation
EO   Executive Order
EPA   U.S. Environmental Protection Agency
FR   **Federal Register**
GHG   greenhouse gas
GWP   global warming potential
HadCRUT   Hadley Centre/Climate Research Unit (CRU) temperature record
HCFCs   hydrochlorofluorocarbons
HFCs   hydrofluorocarbons
IA   Interim Assessment report
IPCC   Intergovernmental Panel on Climate Change
MPG   miles per gallon
MWP   Medieval Warm Period
$N_2O$   nitrous oxide
NAAQS   National Ambient Air Quality Standards
NAICS   North American Industry Classification System
NASA   National Aeronautics and Space Administration
$NF_3$   nitrogen trifluoride
NHTSA   National Highway Traffic Safety Administration
NOAA   National Oceanic and Atmospheric Administration
NOI   Notice of Intent
$NO_X$   nitrogen oxides
NRC   National Research Council
NSPS   new source performance standards
NTTAA   National Technology Transfer and Advancement Act of 1995
OMB   Office of Management and Budget
PFCs   perfluorocarbons
PM   particulate matter
PSD   Prevention of Significant Deterioration
RFA   Regulatory Flexibility Act
$SF_6$   sulfur hexafluoride
SIP   State Implementation Plan
TSD   technical support document
U.S.   United States
UMRA   Unfunded Mandates Reform Act of 1995
UNFCCC   United Nations Framework Convention on Climate Change
USGCRP   U.S. Global Climate Research Program
VOC   volatile organic compound(s)
WCI   Western Climate Initiative
WRI   World Resources Institute

### TABLE OF CONTENTS

I. Introduction
  A. Overview
  B. Background Information Helpful To Understand These Findings
  1. Greenhouse Gases and Transportation Sources Under CAA Section 202(a)
  2. Joint EPA and Department of Transportation Proposed Greenhouse Gas Rule
  C. Public Involvement
  1. EPA's Initial Work on Endangerment
  2. Public Involvement Since the April 2009 Proposed Endangerment Finding
  3. Issues Raised Regarding the Rulemaking Process
II. Legal Framework for This Action
  A. Section 202(a) of the CAA— Endangerment and Cause or Contribute
  1. The Statutory Framework
  2. Summary of Response to Key Legal Comments on the Interpretation of the CAA Section 202(a) Endangerment and Cause or Contribute Test

B. Air Pollutant, Public Health and Welfare
III. EPA's Approach for Evaluating the Evidence Before It
  A. The Science on Which the Decisions Are Based
  B. The Law on Which the Decisions Are Based
  C. Adaptation and Mitigation
  D. Geographic Scope of Impacts
  E. Temporal Scope of Impacts
  F. Impacts of Potential Future Regulations and Processes that Generate Greenhouse Gas Emissions
IV. The Administrator's Finding That Emissions of Greenhouse Gases Endanger Public Health and Welfare
  A. The Air Pollution Consists of Six Key Greenhouse Gases
  1. Common Physical Properties of the Six Greenhouse Gases
  2. Evidence That the Six Greenhouse Gases Are the Primary Driver of Current and Projected Climate Change
  3. The Six Greenhouse Gases Are Currently the Common Focus of the Climate Change Science and Policy Communities
  4. Defining Air Pollution as the Aggregate Group of Six Greenhouse Gases Is Consistent With Evaluation of Risks and Impacts Due to Human-Induced Climate Change
  5. Defining the Air Pollution as the Aggregate Group of Six Greenhouse Gases Is Consistent With Past EPA Practice
  6. Other Climate Forcers Not Being Included in the Definition of Air Pollution for This Finding
  7. Summary of Key Comments on Definition of Air Pollution
  B. The Air Pollution Is Reasonably Anticipated To Endanger Both Public Health and Welfare
  1. The Air Pollution Is Reasonably Anticipated To Endanger Public Health
  2. The Air Pollution Is Reasonably Anticipated To Endanger Public Welfare
V. The Administrator's Finding That Greenhouse Gases From CAA Section 202(a) Sources Cause or Contribute to the Endangerment of Public Health and Welfare
  A. The Administrator's Definition of the "Air Pollutant"
  B. The Administrator's Finding Whether Emissions of the Air Pollutant From Section 202(a) Source Categories Cause or Contribute to the Air Pollution That May Be Reasonably Anticipated To Endanger Public Health and Welfare
  C. Response to Key Comments on the Administrator's Cause or Contribute Finding
  1. The Administrator Reasonably Defined the "Air Pollutant" for the Cause or Contribute Analysis
  2. The Administrator's Cause or Contribute Analysis Was Reasonable
VI. Statutory and Executive Reviews
  A. Executive Order 12866: Regulatory Planning and Review
  B. Paperwork Reduction Act
  C. Regulatory Flexibility Act
  D. Unfunded Mandates Reform Act
  E. Executive Order 13132: Federalism
  F. Executive Order 13175: Consultation and Coordination With Indian Tribal Governments
  G. Executive Order 13045: Protection of Children From Environmental Health Risks and Safety Risks
  H. Executive Order 13211: Actions Concerning Regulations That Significantly Affect Energy Supply, Distribution, or Use
  I. National Technology Transfer and Advancement Act
  J. Executive Order 12898: Federal Actions To Address Environmental Justice in Minority Populations and Low-Income Populations
  K. Congressional Review Act

# I. Introduction

## A. Overview

Pursuant to CAA section 202(a), the Administrator finds that greenhouse gases in the atmosphere may reasonably be anticipated both to endanger public health and to endanger public welfare. Specifically, the Administrator is defining the "air pollution" referred to in CAA section 202(a) to be the mix of six long-lived and directly-emitted greenhouse gases: carbon dioxide ($CO_2$), methane ($CH_4$), nitrous oxide ($N_2O$), hydrofluorocarbons (HFCs), perfluorocarbons (PFCs), and sulfur hexafluoride ($SF_6$). In this document, these six greenhouse gases are referred to as "well-mixed greenhouse gases" in this document (with more precise meanings of "long lived" and "well mixed" provided in Section IV.A).

The Administrator has determined that the body of scientific evidence compellingly supports this finding. The major assessments by the U.S. Global Climate Research Program (USGCRP), the Intergovernmental Panel on Climate Change (IPCC), and the National Research Council (NRC) serve as the primary scientific basis supporting the Administrator's endangerment finding.[1] The Administrator reached her determination by considering both observed and projected effects of greenhouse gases in the atmosphere, their effect on climate, and the public health and welfare risks and impacts associated with such climate change. The Administrator's assessment focused on public health and public welfare impacts within the United States. She also examined the evidence with respect to impacts in other world regions, and she concluded that these impacts strengthen the case for endangerment to public health and welfare because

impacts in other world regions can in turn adversely affect the United States.

The Administrator recognizes that human-induced climate change has the potential to be far-reaching and multidimensional, and in light of existing knowledge, that not all risks and potential impacts can be quantified or characterized with uniform metrics. There is variety not only in the nature and potential magnitude of risks and impacts, but also in our ability to characterize, quantify and project such impacts into the future. The Administrator is using her judgment, based on existing science, to weigh the threat for each of the identifiable risks, to weigh the potential benefits where relevant, and ultimately to assess whether these risks and effects, when viewed in total, endanger public health or welfare.

The Administrator has considered how elevated concentrations of the well-mixed greenhouse gases and associated climate change affect public health by evaluating the risks associated with changes in air quality, increases in temperatures, changes in extreme weather events, increases in food- and water-borne pathogens, and changes in aeroallergens. The evidence concerning adverse air quality impacts provides strong and clear support for an endangerment finding. Increases in ambient ozone are expected to occur over broad areas of the country, and they are expected to increase serious adverse health effects in large population areas that are and may continue to be in nonattainment. The evaluation of the potential risks associated with increases in ozone in attainment areas also supports such a finding.

The impact on mortality and morbidity associated with increases in average temperatures, which increase the likelihood of heat waves, also provides support for a public health endangerment finding. There are uncertainties over the net health impacts of a temperature increase due to decreases in cold-related mortality, but some recent evidence suggests that the net impact on mortality is more likely to be adverse, in a context where heat is already the leading cause of weather-related deaths in the United States.

The evidence concerning how human-induced climate change may alter extreme weather events also clearly supports a finding of endangerment, given the serious adverse impacts that can result from such events and the increase in risk, even if small, of the occurrence and intensity of events such as hurricanes and floods. Additionally, public health is expected to be

---

[1] Section III of these Findings discusses the science on which these Findings are based. In addition, the Technical Support Document (TSD) accompanying these Findings summarizes the major assessments from the USGCRP, IPCC, and NRC.

adversely affected by an increase in the severity of coastal storm events due to rising sea levels.

There is some evidence that elevated carbon dioxide concentrations and climate changes can lead to changes in aeroallergens that could increase the potential for allergenic illnesses. The evidence on pathogen borne disease vectors provides directional support for an endangerment finding. The Administrator acknowledges the many uncertainties in these areas. Although these adverse effects provide some support for an endangerment finding, the Administrator is not placing primary weight on these factors.

Finally, the Administrator places weight on the fact that certain groups, including children, the elderly, and the poor, are most vulnerable to these climate-related health effects.

The Administrator has considered how elevated concentrations of the well-mixed greenhouse gases and associated climate change affect public welfare by evaluating numerous and far-ranging risks to food production and agriculture, forestry, water resources, sea level rise and coastal areas, energy, infrastructure, and settlements, and ecosystems and wildlife. For each of these sectors, the evidence provides support for a finding of endangerment to public welfare. The evidence concerning adverse impacts in the areas of water resources and sea level rise and coastal areas provides the clearest and strongest support for an endangerment finding, both for current and future generations. Strong support is also found in the evidence concerning infrastructure and settlements, as well ecosystems and wildlife. Across the sectors, the potential serious adverse impacts of extreme events, such as wildfires, flooding, drought, and extreme weather conditions, provide strong support for such a finding.

Water resources across large areas of the country are at serious risk from climate change, with effects on water supplies, water quality, and adverse effects from extreme events such as floods and droughts. Even areas of the country where an increase in water flow is projected could face water resource problems from the supply and water quality problems associated with temperature increases and precipitation variability, as well as the increased risk of serious adverse effects from extreme events, such as floods and drought. The severity of risks and impacts is likely to increase over time with accumulating greenhouse gas concentrations and associated temperature increases and precipitation changes.

Overall, the evidence on risk of adverse impacts for coastal areas provides clear support for a finding that greenhouse gas air pollution endangers the welfare of current and future generations. The most serious potential adverse effects are the increased risk of storm surge and flooding in coastal areas from sea level rise and more intense storms. Observed sea level rise is already increasing the risk of storm surge and flooding in some coastal areas. The conclusion in the assessment literature that there is the potential for hurricanes to become more intense (and even some evidence that Atlantic hurricanes have already become more intense) reinforces the judgment that coastal communities are now endangered by human-induced climate change, and may face substantially greater risk in the future. Even if there is a low probability of raising the destructive power of hurricanes, this threat is enough to support a finding that coastal communities are endangered by greenhouse gas air pollution. In addition, coastal areas face other adverse impacts from sea level rise such as land loss due to inundation, erosion, wetland submergence, and habitat loss. The increased risk associated with these adverse impacts also endangers public welfare, with an increasing risk of greater adverse impacts in the future.

Strong support for an endangerment finding is also found in the evidence concerning energy, infrastructure, and settlements, as well ecosystems and wildlife. While the impacts on net energy demand may be viewed as generally neutral for purposes of making an endangerment determination, climate change is expected to result in an increase in electricity production, especially supply for peak demand. This may be exacerbated by the potential for adverse impacts from climate change on hydropower resources as well as the potential risk of serious adverse effects on energy infrastructure from extreme events. Changes in extreme weather events threaten energy, transportation, and water resource infrastructure. Vulnerabilities of industry, infrastructure, and settlements to climate change are generally greater in high-risk locations, particularly coastal and riverine areas, and areas whose economies are closely linked with climate-sensitive resources. Climate change will likely interact with and possibly exacerbate ongoing environmental change and environmental pressures in settlements, particularly in Alaska where indigenous communities are facing major environmental and cultural impacts on their historic lifestyles. Over the 21st century, changes in climate will cause some species to shift north and to higher elevations and fundamentally rearrange U.S. ecosystems. Differential capacities for range shifts and constraints from development, habitat fragmentation, invasive species, and broken ecological connections will likely alter ecosystem structure, function, and services, leading to predominantly negative consequences for biodiversity and the provision of ecosystem goods and services.

There is a potential for a net benefit in the near term [2] for certain crops, but there is significant uncertainty about whether this benefit will be achieved given the various potential adverse impacts of climate change on crop yield, such as the increasing risk of extreme weather events. Other aspects of this sector may be adversely affected by climate change, including livestock management and irrigation requirements, and there is a risk of adverse effect on a large segment of the total crop market. For the near term, the concern over the potential for adverse effects in certain parts of the agriculture sector appears generally comparable to the potential for benefits for certain crops. However, The body of evidence points towards increasing risk of net adverse impacts on U.S. food production and agriculture over time, with the potential for significant disruptions and crop failure in the future.

For the near term, the Administrator finds the beneficial impact on forest growth and productivity in certain parts of the country from elevated carbon dioxide concentrations and temperature increases to date is offset by the clear risk from the observed increases in wildfires, combined with risks from the spread of destructive pests and disease. For the longer term, the risk from adverse effects increases over time, such that overall climate change presents serious adverse risks for forest productivity. There is compelling reason to find that the support for a positive endangerment finding increases as one considers expected future conditions where temperatures continue to rise.

Looking across all of the sectors discussed above, the evidence provides compelling support for finding that greenhouse gas air pollution endangers the public welfare of both current and

---

[2] The temporal scope of impacts is discussed in more detail in Section III.C. The phrase ''near term'' as used in this document generally refers to the current time period from and the next few decades. The phrase ''long term'' generally refers to a time frame extending beyond that to approximately the middle to the end of this century.

final finding, for the following reasons: (1) These six greenhouse gas share common properties regarding their climate effects; (2) these six greenhouse gases have been estimated to be the primary cause of human-induced climate change, are the best understood drivers of climate change, and are expected to remain the key driver of future climate change; (3) these six greenhouse gases are the common focus of climate change science research and policy analyses and discussions; (4) using the combined mix of these gases as the definition (versus an individual gas-by-gas approach) is consistent with the science, because risks and impacts associated with greenhouse gas-induced climate change are not assessed on an individual gas approach; and (5) using the combined mix of these gases is consistent with past EPA practice, where separate substances from different sources, but with common properties, may be treated as a class (*e.g.,* oxides of nitrogen).

1. Common Physical Properties of the Six Greenhouse Gases

The common physical properties relevant to the climate change problem shared by the six greenhouse gases include the fact that they are long-lived in the atmosphere. ''Long-lived'' is used here to mean that the gas has a lifetime in the atmosphere sufficient to become globally well mixed throughout the entire atmosphere, which requires a minimum atmospheric lifetime of about one year.[18] Thus, this definition of air pollution is global in nature because the greenhouse gas emissions emitted from the United States (or from any other region of the world) become globally well mixed, such that it would not be meaningful to define the air pollution as the greenhouse gas concentrations over the United States as somehow being distinct from the greenhouse gas concentrations over other regions of the world.

It is also well established that each of these gases can exert a warming effect on the climate by trapping in heat that would otherwise escape to space. These

six gases are directly emitted as greenhouse gases rather than forming as a greenhouse gas in the atmosphere after emission of a pre-cursor gas. Given these properties, the magnitude of the warming effect of each of these gases is generally better understood than other climate forcing agents that do not share these same properties (addressed in more detail below). The ozone-depleting substances that include chlorofluorocarbons (CFCs) and hydrochlorofluorocarbons (HFCs) also share the same physical attributes discussed here, but for reasons discussed throughout the remainder of this section are not being included in the Administrator's definition of air pollution for this finding.

2. Evidence That the Six Greenhouse Gases Are the Primary Driver of Current and Projected Climate Change

a. Key Observations Driven Primarily by the Six Greenhouse Gases

The latest assessment of the USGCRP, as summarized in EPA's TSD, confirms the evidence presented in the Proposed Findings that current atmospheric greenhouse gas concentrations are now at elevated and essentially unprecedented levels as a result of both historic and current anthropogenic emissions. The global atmospheric carbon dioxide concentration has increased about 38 percent from pre-industrial levels to 2009, and almost all of the increase is due to anthropogenic emissions. The global atmospheric concentration of methane has increased by 149 percent since pre-industrial levels (through 2007); and the nitrous oxide concentration has increased 23 percent (through 2007). The observed concentration increase in these gases can also be attributed primarily to anthropogenic emissions. The industrial fluorinated gases have relatively low concentrations, but these concentrations have also been increasing and are almost entirely anthropogenic in origin.

Historic data show that current atmospheric concentrations of the two most important directly emitted, long-lived greenhouse gases (carbon dioxide and methane) are well above the natural range of atmospheric concentrations compared to at least the last 650,000 years. Atmospheric greenhouse gas concentrations have been increasing because anthropogenic emissions are outpacing the rate at which greenhouse gases are removed from the atmosphere by natural processes over timescales of decades to centuries. It also remains clear that these high atmospheric concentrations of greenhouse gases are

the unambiguous result of human activities.

Together the six well-mixed greenhouse gases constitute the largest anthropogenic driver of climate change.[19] Of the total anthropogenic heating effect caused by the accumulation of the six well-mixed greenhouse gases plus other warming agents (that do not meet all of the Administrator's criteria that pertain to the six greenhouse gases) since pre-industrial times, the combined heating effect of the six well-mixed greenhouses is responsible for roughly 75 percent, and it is expected that this share may grow larger over time, as discussed below.

Warming of the climate system is unequivocal, as is now evident from observations of increases in global average air and ocean temperatures, widespread melting of snow and ice, and rising global average sea level. Global mean surface temperatures have risen by 0.74 °C (1.3 °F) (±0.18 °C) over the last 100 years. Eight of the 10 warmest years on record have occurred since 2001. Global mean surface temperature was higher during the last few decades of the 20th century than during any comparable period during the preceding four centuries.

The global surface temperature record relies on three major global temperature datasets, developed by NOAA, NASA, and the United Kingdom's Hadley Center. All three show an unambiguous warming trend over the last 100 years, with the greatest warming occurring over the past 30 years.[20] Furthermore, all three datasets show that eight of the 10 warmest years on record have occurred since 2001; that the 10 warmest years have all occurred in the past 12 years; and that the 20 warmest years have all occurred since 1981. Though most of the warmest years on record have occurred in the last decade in all available datasets, the rate of warming has, for a short time in the

---

[18] The IPCC also refers to these six GHGs as long-lived. Methane has an atmospheric lifetime of roughly a decade. One of the most commonly used hydrofluorocarbons (HFC–134a) has a lifetime of 14 years. Nitrous oxide has a lifetime of 114 years; sulfur hexafluoride over 3,000 years; and some PFCs up to 10,000 to 50,000 years. Carbon dioxide in the atmosphere is sometimes approximated as having a lifetime of roughly 100 years, but for a given amount of carbon dioxide emitted a better description is that some fraction of the atmospheric increase in concentration is quickly absorbed by the oceans and terrestrial vegetation, some fraction of the atmospheric increase will only slowly decrease over a number of years, and a small portion of the increase will remain for many centuries or more.

[19] As summarized in EPA's TSD, the global average net effect of the increase in atmospheric greenhouse gas concentrations, plus other human activities (*e.g.,* land use change and aerosol emissions), on the global energy balance since 1750 has been one of warming. This total net heating effect, referred to as forcing, is estimated to be +1.6 (+0.6 to +2.4) Watts per square meter (W/m²), with much of the range surrounding this estimate due to uncertainties about the cooling and warming effects of aerosols. The combined radiative forcing due to the cumulative (*i.e.,* 1750 to 2005) increase in atmospheric concentrations of $CO_2$, $CH_4$, and $N_2O$ is estimated to be +2.30 (+2.07 to +2.53) W/m². The rate of increase in positive radiative forcing due to these three GHGs during the industrial era is very likely to have been unprecedented in more than 10,000 years.

[20] *See* section 4 of the TSD for more detailed information about the three global temperature datasets.

morbidity, especially among the elderly, young and frail. The populations most sensitive to hot temperatures are older adults, the chronically sick, the very young, city-dwellers, those taking medications that disrupt thermoregulation, the mentally ill, those lacking access to air conditioning, those working or playing outdoors, and socially isolated persons. As warming increases over time, these adverse effects would be expected to increase as the serious heat events become more serious.

Increases in temperature are also expected to lead to some reduction in the risk of death related to extreme cold. Cold waves continue to pose health risks in northern latitudes in temperature regions where very low temperatures can be reached in a few hours and extend over long periods. Globally, the IPCC projects reduced human mortality from cold exposure through 2100. It is not clear whether reduced mortality in the United States from cold would be greater or less than increased heat-related mortality in the United States due to climate change. However, there is a risk that projections of cold-related deaths, and the potential for decreasing their numbers due to warmer winters, can be overestimated unless they take into account the effects of season and influenza, which is not strongly associated with monthly winter temperature. In addition, the latest USGCRP report refers to a study that analyzed daily mortality and weather data in 50 U.S. cities from 1989 to 2000 and found that, on average, cold snaps in the United States increased death rates by 1.6 percent, while heat waves triggered a 5.7 percent increase in death rates. The study concludes that increases in heat-related mortality due to global warming in the United States are unlikely to be compensated for by decreases in cold-related mortality.

b. Air Quality Effects

Increases in regional ozone pollution relative to ozone levels without climate change are expected due to higher temperatures and weaker circulation in the United States relative to air quality levels without climate change. Climate change is expected to increase regional ozone pollution, with associated risks in respiratory illnesses and premature death. In addition to human health effects, tropospheric ozone has significant adverse effects on crop yields, pasture and forest growth, and species composition. The directional effect of climate change on ambient particulate matter levels remains less certain.

Climate change can affect ozone by modifying emissions of precursors, atmospheric chemistry, and transport and removal. There is now consistent evidence from models and observations that 21st century climate change will worsen summertime surface ozone in polluted regions of North America compared to a future with no climate change.

Modeling studies discussed in EPA's Interim Assessment [28] show that simulated climate change causes increases in summertime ozone concentrations over substantial regions of the country, though this was not uniform, and some areas showed little change or decreases, though the decreases tend to be less pronounced than the increases. For those regions that showed climate-induced increases, the increase in maximum daily 8-hour average ozone concentration, a key metric for regulating U.S. air quality, was in the range of 2 to 8 ppb, averaged over the summer season. The increases were substantially greater than this during the peak pollution episodes that tend to occur over a number of days each summer. The overall effect of climate change was projected to increase ozone levels, compared to what would occur without this climate change, over broad areas of the country, especially on the highest ozone days and in the largest metropolitan areas with the worst ozone problems. Ozone decreases are projected to be less pronounced, and generally to be limited to some regions of the country with smaller population.

c. Effects on Extreme Weather Events

In addition to the direct effects of temperature on heat- and cold-related mortality, the Administrator considers the potential for increased deaths, injuries, infectious diseases, and stress-related disorders and other adverse effects associated with social disruption and migration from more frequent extreme weather. The Administrator notes that the vulnerability to weather disasters depends on the attributes of the people at risk (including where they live, age, income, education, and disability) and on broader social and environmental factors (level of disaster preparedness, health sector responses, and environmental degradation). The IPCC finds the following with regard to extreme events and human health:

[28] U.S. EPA (2009) *Assessment of the Impacts of Global Change on Regional U.S. Air Quality: A Synthesis of Climate Change Impacts on Ground-Level Ozone.* An Interim Report of the U.S. EPA Global Change Research Program. U.S. Environmental Protection Agency, Washington, DC, EPA/600/R–07/094.

Increases in the frequency of heavy precipitation events are associated with increased risk of deaths and injuries as well as infectious, respiratory, and skin diseases. Floods are low-probability, high-impact events that can overwhelm physical infrastructure, human resilience, and social organization. Flood health impacts include deaths, injuries, infectious diseases, intoxications, and mental health problems.

Increases in tropical cyclone intensity are linked to increases in the risk of deaths, injuries, waterborne and food borne diseases, as well as post-traumatic stress disorders. Drowning by storm surge, heightened by rising sea levels and more intense storms (as projected by IPCC), is the major killer in coastal storms where there are large numbers of deaths. Flooding can cause health impacts including direct injuries as well as increased incidence of waterborne diseases due to pathogens such as *Cryptosporidium and Giardia.*

d. Effects on Climate-Sensitive Diseases and Aeroallergens

According to the assessment literature, there will likely be an increase in the spread of several food and water-borne pathogens among susceptible populations depending on the pathogens' survival, persistence, habitat range and transmission under changing climate and environmental conditions. Food borne diseases show some relationship with temperature, and the range of some zoonotic disease carriers such as the Lyme disease carrying tick may increase with temperature.

Climate change, including changes in carbon dioxide concentrations, could impact the production, distribution, dispersion and allergenicity of aeroallergens and the growth and distribution of weeds, grasses, and trees that produce them. These changes in aeroallergens and subsequent human exposures could affect the prevalence and severity of allergy symptoms. However, the scientific literature does not provide definitive data or conclusions on how climate change might impact aeroallergens and subsequently the prevalence of allergenic illnesses in the United States.

It has generally been observed that the presence of elevated carbon dioxide concentrations and temperatures stimulate plants to increase photosynthesis, biomass, water use efficiency, and reproductive effort. The IPCC concluded that pollens are likely to increase with elevated temperature and carbon dioxide.

e. Summary of the Administrator's Finding of Endangerment to Public Health

The Administrator has considered how elevated concentrations of the well-mixed greenhouse gases and associated climate change affect public health by evaluating the risks associated with changes in air quality, increases in temperatures, changes in extreme weather events, increases in food and water borne pathogens, and changes in aeroallergens. The evidence concerning adverse air quality impacts provides strong and clear support for an endangerment finding. Increases in ambient ozone are expected to occur over broad areas of the country, and they are expected to increase serious adverse health effects in large population areas that are and may continue to be in nonattainment. The evaluation of the potential risks associated with increases in ozone in attainment areas also supports such a finding.

The impact on mortality and morbidity associated with increases in average temperatures which increase the likelihood of heat waves also provides support for a public health endangerment finding. There are uncertainties over the net health impacts of a temperature increase due to decreases in cold-related mortality, but there is some recent evidence that suggests that the net impact on mortality is more likely to be adverse, in a context where heat is already the leading cause of weather-related deaths in the United States.

The evidence concerning how human-induced climate change may alter extreme weather events also clearly supports a finding of endangerment, given the serious adverse impacts that can result from such events and the increase in risk, even if small, of the occurrence and intensity of events such as hurricanes and floods. Additionally, public health is expected to be adversely affected by an increase in the severity of coastal storm events due to rising sea levels.

There is some evidence that elevated carbon dioxide concentrations and climate changes can lead to changes in aeroallergens that could increase the potential for allergenic illnesses. The evidence on pathogen borne disease vectors provides directional support for an endangerment finding. The Administrator acknowledges the many uncertainties in these areas. Although these adverse effects, provide some support for an endangerment finding, the Administrator is not placing primary weight on these factors.

Finally, the Administrator places weight on the fact that certain groups, including children, the elderly, and the poor, are most vulnerable to these climate-related health effects.

f. Key Comments on the Finding of Endangerment to Public Health

EPA received many comments on public health issues and the proposed finding of endangerment to public health.

i. EPA's Consideration of the Climate Impacts as Public Health Issues Is Reasonable

Several commenters argue that EPA may only consider the health effects from direct exposure to pollutants in determining whether a pollutant endangers public health. The commenters state that EPA's proposal acknowledges that there is no evidence that greenhouse gases directly cause health effects, citing 74 FR 18901. To support their claim that EPA can only consider health effects that result from direct exposure to a pollutant, commenters cite several sources, discussed below.

*Clean Air Act and Legislative History.* Several commenters argue that the text of the CAA and the legislative history of the 1977 amendments demonstrate that Congress intended public health effects to relate to risks from direct exposure to a pollutant. They also argue that by considering health effects that result from welfare effects, EPA was essentially combining the two categories into one, contrary to the statute and Congressional intent.

Commenters state that the CAA, including CAA section 202(a)(1), requires EPA to consider endangerment of public health separately from endangerment of public welfare. Commenters note that while the CAA does not provide a definition of public health, CAA section 302(h) addresses the meaning of ''welfare,'' which includes weather and climate. Thus, they argue, Congress has instructed that effects on weather and climate are to be considered as potentially endangering welfare—not human health. They continue that Congress surely knew that weather and climatic events such as flooding and heat waves could affect human health, but Congress nonetheless classified air pollutants' effects on weather and climate as effects on welfare.

Commenters also argue that the legislative history confirms that Congress intended for the definition of ''public health'' to only include the consequences of direct human exposure to ambient air pollutants. They note an early version of section 109(b) would have required only a single NAAQS standard to protect ''public health,'' with the protection of ''welfare'' being a co-benefit of the single standard. Commenters note that the proponents of this early bill explained, ''[i]n many cases, a level of protection of health would take care of the welfare situation'' Sen. Hearing, Subcommittee on Air and Water Pollution, Comm. On Public Works (Mar. 17, 1970) (statement of Dr. Middleton, Comm'r, Nat'l Air Pollution Control Admin., HEW), 1970 Leg. Hist. 1194. Commenters state that the Senate bill that ultimately passed rejected this combined standard, requiring separate national ambient air quality standards and national ambient air quality goals. Commenters contend that Congress intended that the national ambient air quality goals be set ''to protect the public health and welfare from any known or anticipated effects associated with'' air pollution, including the list of ''welfare'' effects currently found in CAA section 302(h), such as effects on water, vegetation, animals, wildlife, weather and climate. Commenters note the Senate Committee Report stated that the national ambient air quality *standards* were created to protect public health, while the national ambient air quality *goals* were intended to address broader issues because ''the Committee also recognizes that man's natural and man-made environment must be preserved and protected. Therefore, the bill provides for the setting of national ambient air quality goals at levels necessary to protect public health and welfare from any known or anticipated adverse effects of air pollution—including effects on soils, water, vegetation, man-made materials, animals, wildlife, visibility, climate, and economic values.'' Commenters argue this statement is clearly the source of the current definition of welfare effects in CAA section 302(h), which also includes ''personal comfort and well being.'' They argue the Senate bill contemplated the NAAQS would include only direct health effects, while the *goals* would encompass effects on both the public health and welfare. Commenters continue that considering both public health effects and welfare effects under a combined standard, as the Administrator attempts to do in the proposed endangerment finding, would resurrect the combined approach to NAAQS that the Senate emphatically rejected.

The commenters also cite language from the House Report in support of their view that Congress only intended that EPA consider direct health effects

iii. EPA Was Reasonable To Find That the Air Quality Impacts of Climate Change Contribute to the Endangerment of Public Health

Several commenters suggest that air quality effects of climate change will be addressed through the CAA's NAAQS process, as implemented by the State Implementation Plans (SIP) and national regulatory programs. According to these commenters, these programs will ensure no adverse impact on public health due to climate change. Though climate change may cause certain air pollutant ambient concentrations to increase, States will continue to be compelled to meet the standards. So, while additional measures may be necessary, and result in increased costs, these commenters assert that, ultimately, public health will be protected by the continued existence of the NAAQS and therefore no endangerment with respect to this particular climate change-related impact will occur. One commenter states that EPA inappropriately assigns air quality risk to climate change that will be addressed through other programs. The CAA provides a mechanism to meet the standards and additional control measures consistent with the CAA will be adopted in the future, keeping pollution below unhealthy levels. The commenters state that the fact that NAAQS are in place that require EPA to fulfill its legal obligation to prevent this particular form of endangerment to public health.

EPA does have in place NAAQS for ozone, which are premised on the harmfulness of ozone to public health and welfare. These standards and their accompanying regulatory regime have helped to reduce the dangers from ozone in the United States. However, substantial challenges remain with respect to achieving the air quality protection promised by the NAAQS for ozone. It is the Administrator's view that these challenges will be exacerbated by climate change.

In addition, the control measures to achieve attainment with a NAAQS are a mitigation measure aimed at reducing emissions of ozone precursors. As discussed in Section III.C of these Findings, EPA is not considering the impacts of mitigation with respect to future reductions in emissions of greenhouse gases. For the same reasons, EPA is reasonably not considering mitigation in the form of the control measures that will need to be adopted in the future to reduce emissions of ozone precursors and thereby address the increased ambient ozone levels that can occur because of climate change.

It is important to note that controls to meet the NAAQS are typically put in place only *after* air quality concentrations exceeding the standard are detected. Furthermore, implementation of controls to reduce ambient concentrations of pollutants occurs over an extended time period, ranging from three years to more than twenty years depending on the pollutant and the seriousness of the nonattainment problem. Thus, while the CAA provides mechanisms for addressing adverse health effects and the underlying air quality exacerbation over time, it will not prevent the adverse impacts in the interim. Given the serious nature of the health effects at issue—including respiratory and cardiovascular disease leading to hospital admissions, emergency department visits, and premature mortality—this increase in adverse impacts during the time before additional controls can be implemented is a serious public health concern. Historically, a large segment of the U.S. population has lived in areas exceeding the NAAQS, despite the CAA and its implementation efforts. Half of all Americans, 158 million people, live in counties where air pollution exceeds national health standards.[31] Where attainment of the NAAQS is especially difficult, leading to delays in meeting attainment deadlines, the health effects of increased ozone due to climate change may be substantial.

It is also important to note that it may not be possible for States and Tribes to plan accurately for the impacts of climate change in developing control strategies for nonattainment areas. As noted in the TSD and EPA's 2009 Interim Assessment report (IA), climate change is projected to lead to an increase in the variability of weather, and this may increase peak pollution events including increases in ozone exceedances. While the modeling studies in the IA all show significant future changes in meteorological quantities, there is also significant variability across the simulations in the spatial patterns of these future changes, making it difficult to select a set of future meteorological data for planning purposes. At this time, models used to develop plans to attain the NAAQS do not take potential changes in future meteorology into consideration. Inability to predict the frequency and magnitude of such events could lead to an underestimation of the controls needed to bring areas into attainment,

and a prolonged period during which adverse health impacts continue to occur.

Even in areas that meet the NAAQS currently, air quality may deteriorate sufficiently to cause adverse health effects for some individuals. Some at-risk individuals, for example those with preexisting health conditions or other characteristics which increase their risk for adverse effects upon exposure to PM or ozone, may experience health effects at levels below the standard. Current evidence suggests that there is no threshold for PM or ozone concentrations below which no effects can be observed. Therefore, increases in ozone or PM in locations that currently meet the standards would likely result in additional adverse health effects for some individuals, even though the pollution increase might not be sufficient to cause the area to be designated nonattainment. While the NAAQS is set to protect public health with an adequate margin of safety, it is recognized that in attainment areas there may be individuals who remain at greater risk from an increase in ozone levels. The clear risk to the public from ozone increases in nonattainment areas, in combination with the risk to some individuals in attainment areas, supports the finding that overall the public health is endangered by increases in ozone resulting from climate change.

Finally, it is also important to note that not all air pollution events are subject to CAA controls under the NAAQS implementation provisions. "Exceptional events" are events for which the normal planning and regulatory process established by the CAA is not appropriate (72 FR 13561). Emissions from some events, including some wildfires, are not reasonably controllable or preventable. Such emissions, however, can adversely impact public health and welfare and are expected to increase due to climate change. As described in the TSD, PM emissions from wildfires can contribute to acute and chronic illnesses of the respiratory system, particularly in children, including pneumonia, upper respiratory diseases, asthma and chronic obstructive pulmonary disease. The IPCC (Field et al., 2007) reported with very high confidence that in North America, disturbances like wildfires are increasing and are likely to intensify in a warmer future with drier soils and longer growing seasons.

2. The Air Pollution Is Reasonably Anticipated to Endanger Public Welfare

The Administrator also finds that the well-mixed greenhouse gas air pollution may reasonably be anticipated to

---

[31] U.S. EPA (2008) National Air Quality: Status and Trends Through 2007. EPA–454/R–08–006, November 2008.

# EXHIBIT 11-A

From: ████████████████████████
To: A-AND-R-DOCKET <a-and-r-Docket@epa.gov>
Date: 9/16/2025 5:29:20 PM
Subject: RE: Docket ID No. EPA-HQ-OAR-2025-0194
--------------------------------------------------

[You don't often get email from emma@everyactioncustom.com. Learn why this is important at https://aka.ms/LearnAboutSenderIdentification ]

Caution: This email originated from outside EPA, please exercise additional caution when deciding whether to open attachments or click on provided links.

Dear Regulations.gov EPA Public Comment,

Hello, my name is Emma Weibel, and I am a 17 year old from San Diego California. I am writing in strong opposition to the administration's attempts to repeal the EPA's endangerment findings.

The endangerment findings are not a statement of political opinion, they are a statement of scientific fact. Thus, this action by the Trump administration is not a policy decision, it is a deliberate attack against truth, that showcases the administration's disregard for the sanctity of our democratic system.
There is simply no denying that climate change is real, the fossil fuel industry's own scientists knew it as early as the 1970s, and it is one of the biggest problems facing our world today. Without working to actively fight it, this administration cannot claim to have the best interest of Americans in mind.

Let's take a look at how this decision aligns with the Trump administration's priorities…

So you want to make America healthy again? I dare the administration to look at the families of the 350,000 Americans whose premature deaths in 2018 were linked to fossil fuel related pollution, and tell them the EPA isn't going to fight climate change.

So you want to protect children?  The biggest threat to children isn't drag queens, hormone therapy, or vaccines: it is the more extreme conditions and climate disasters from emission they didn't cause that will most impact their lives.
I dare the administration to look the families of the 35 children who lost their lives in the recent climate-fueled flooding in central texas in the eyes and tell them the EPA isn't going to fight climate change.'

So you want to cut government spending? According to Bloomberg Law, the current yearly cost of climate disaster nears $1 trillion per year, 4 times higher than all of the spending cuts brought forth by the department of government efficiency since inauguration. I dare the administration to look at the yearly cost in infrastructure damage, healthcare costs, and lost revenue from climate disasters, and tell me again why the United States isn't going to fight climate change.

I think it's time that this administration rethink its priorities, and actually take the action necessary to keep Americans safe and healthy.

Air pollution, more wildfires, catastrophic torrential storms, heat waves, food shortages, droughts, and more diseases. If this is what "making America great again" entails, then we don't want it.

I hope the Trump administration reconsiders this dangerous, hypocritical, and unjust decision. If you won't listen to professionals with years of relevant experience about why this decision is so harmful, then maybe my lack of life experience, at 17, will make you listen: I, and all the other young Americans who are watching as their future is being sold to the highest bidder, deserve to grow up with a safe and stable climate. We need the EPA to fight for us, and we hope you can find the courage to do so.

Sincerely,
Emma Weibel
La Jolla, CA

# EXHIBIT 11-B

← Back to Document Comments (/document/EPA-HQ-OAR-2025-0194-0093/comment)

Share ▾

 **PUBLIC SUBMISSION**

# Comment submitted by Jewish Youth Climate Movement

Posted by the **Environmental Protection Agency** on Oct 9, 2025

---

Docket (/docket/EPA-HQ-OAR-2025-0194)
/ Document (EPA-HQ-OAR-2025-0194-0093) (/document/EPA-HQ-OAR-2025-0194-0093)  / Comment

| Comment |
| --- |

We are the Jewish Youth Climate Movement, a Gen-Z-led Jewish environmental movement dedicated to fighting climate change, and we vehemently oppose rescinding the EPA's "Endangerment Finding." As a community, our sacred texts, traditions, and history compel us to care for people and the planet in a manner diametrically opposed to actions such as repealing this landmark environmental precedent. By establishing chapters in schools, synagogues, and community centers all over North America, the Jewish Youth Climate Movement endeavors to make concern for climate and environmental action a core part of what it means to be Jewish. We are the next generation of our people, and in our advocacy, we have reached thousands with our cries for justice and a livable future.

The "Endangerment Finding" forms the basis for the EPA's legal responsibility to protect Americans from climate harm. Not only would nixing it impede the government's ability to predict and warn people about extreme weather, undercutting knowledge on public health and safety surrounding the climate crisis, but on a regulatory level, the "Endangerment Finding" allows for limits on CO2 in agriculture and establishes federal rules to curb greenhouse gas emission from vehicles and other sources. Because the transport industry leads the country in greenhouse gas emissions, the end of the "Endangerment Finding" and efforts to regulate these emissions could increase greenhouse gas outputs to even higher quantities. All of this deregulation would further warm the atmosphere and create weather conditions not conducive to human welfare on this planet.

The Jewish Youth Climate Movement releases this public comment out of concern for our future and because we believe that we can influence the EPA's approach to this proposal. We hope that the EPA will add revisions that guarantee our safety by acknowledging the scientific consensus that greenhouse gases cause climate change. Furthermore, we hope to build an administrative record, helping attorneys litigating against this proposal to build their case, and to demonstrate that Americans, including Jewish youth, would like to see greater regulation of greenhouse gas emissions.

**Give Feedback**

| **Comment ID** |
| --- |

EPA-HQ-OAR-2025-0194-6533

 **Tracking Number**

mfv-izue-ykci

## Comment Details

**Document Subtype**

Company/Organization Comment

**Received Date**

Sep 22, 2025

**Postmark Date**

Sep 22, 2025

**Page Count**

1



*Your Voice in Federal Decision Making*

| About (/about) | Bulk Data Download (/bulkdownload) | Agencies (/agencies) | Learn (/learn) | Reports (/dotreports) | FAQ (/faq) |

**Commenting Guidance** (/commenting-guidance)

Give Feedback

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |
Accessibility Statement (/accessibility)   |   API Requests (https://open.gsa.gov/api/regulationsgov/)   |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)

# EXHIBIT 11-C



United States
Conference of
Catholic Bishops

Office of the
General Counsel

3211 Fourth Street, NE        202.541.3000
Washington, DC               usccb.org
20017

*Submitted Electronically*

September 22, 2025

U.S. Environmental Protection Agency
Administrator Lee Zeldin
1200 Pennsylvania Ave NW
Washington, DC 20004

Dear Mr. Zeldin:

On behalf of the United States Conference of Catholic Bishops (USCCB) we respectfully submit the following comments on the U.S. Environmental Protection Agency (EPA) Reconsideration of 2009 Endangerment Finding and Greenhouse Gas Vehicle Standards, issued August 1, 2025 ("Proposed Rule" or "Reconsideration").[1]

The Reconsideration repeals the 2009 Endangerment Finding,[2] which effectively eliminates all greenhouse gas (GHG) emission standards for motor vehicles and engines under Section 202(a) of the Clean Air Act (CAA). The EPA primarily relies upon *Loper Bright* to argue that the EPA used unreasonable authority under the CAA to implement the Endangerment Finding. It also asserts the 2009 Finding runs afoul of the major questions doctrine, relying on *West Virginia v. E.P.A*. The EPA offers further statutory and policy reasons for unreliable science and economic welfare considerations to inform its change in course.

But these legal rationales do not flow from the best reading of the statute. USCCB disagrees that EPA's interpretation is the best reading and respectfully requests EPA to rescind its Proposed Rule. Our concerns with the Reconsideration are founded on the Catholic Church's commitment to environmental justice and care for creation, as it is an integral component of Catholic faith. As Sacred Scripture states, reflecting on His creation, "God looked at everything he had made, and found it very good."[3] He gave us the gift of clean air and the breath of life.[4] In this same vein, Pope Francis instructed, "[l]iving our vocation to be protectors of God's handiwork is essential to a life of virtue; it is not an optional or a secondary aspect of our Christian experience."[5] Pope Leo XIV has also emphasized the importance of environmental justice "[i]n a world where the most vulnerable of our brothers and sisters are the first to suffer the devastating effects of climate change… care for creation becomes an expression of our faith and humanity."[6]

---

[1] *Reconsideration of 2009 Endangerment Finding and Greenhouse Gas Vehicle Standards*, 90 FR 36,288-01 (Aug. 1, 2025).
[2] *Endangerment and Cause or Contribute Findings for Greenhouse Gases Under Section 202(a) of the Clean Air Act*, 74 FR 66,496-01 (Dec. 15, 2009).
[3] *Genesis* 1:31
[4] *Genesis* 2:7
[5] *Laudato Si'*, Encyclical of Pope Francis (Vatican, May 24, 2015) at § 217, available online: https://tinyurl.com/339b39wz.
[6] *Message of His Holiness Pope Leo XIV for the 10th World Day of Prayer for the Care of Creation 2025* (Vatican, Jun. 30, 2025), available online: https://tinyurl.com/us2z22fj.

United States Conference of Catholic Bishops    Office of the General Counsel

**Background**

In 2007, the United States Supreme Court ruled in *Massachusetts v. E.P.A.*, 549 U.S. 497 (2007) ("*Massachusetts*") that the EPA has the authority to regulate GHGs as they fall under the definition of air pollutants under the CAA. Importantly, the Court's reading of the CAA authorized the EPA regulating GHGs if it determines such emissions contribute to climate change.[7] After this landmark decision, the EPA issued the 2009 Endangerment Finding, which identified six GHGs endangering public health and welfare because of their contributions to air pollution and climate change.[8] These GHGs "endanger the health and environment for future generations."[9] Beginning in 2010, the EPA began to regulate GHG emissions from motor vehicles and engines.[10]

Recently, the Supreme Court restricted the scope of the EPA's authority to regulate GHG emissions from existing power plants, relying on the major questions doctrine.[11] Under the doctrine, courts "expect Congress to speak clearly if it wishes to assign to an agency decisions of vast economic and political significance."[12]

But neither *Loper Bright* nor *West Virginia* change the ruling in *Massachusetts*, which is the foundation for the 2009 Endangerment Finding. USCCB continues to lend its support for regulating greenhouse gas emissions, including motor vehicles to combat climate change, as its effects are felt both in the United States and globally.[13] We have a moral responsibility and opportunity to reduce the impacts of climate change on our sisters and brothers around the world who are already struggling with increased frequency and severity of droughts, floods, and heat waves.[14]

The USCCB continues to advocate for policy that addresses climate change and curbs sources of greenhouse gases. The USCCB submitted previous comments in 2018 and 2023 in favor of GHG emissions regulations for light-, medium-, and heavy-duty motor vehicles. As

---

[7] *Massachusetts*, 549 U.S. 497, 528 (2007).

[8] *See generally Endangerment and Cause or Contribute Findings for Greenhouse Gases Under Section 202(a) of the Clean Air Act*, 74 FR 66,496-01 (Dec. 15, 2009).

[9] *Endangerment and Cause or Contribute Findings for Greenhouse Gases Under Section 202(a) of the Clean Air Act*, 74 FR 66,496-01 at 66,498-99 (Dec. 15, 2009).

[10] *Final Rule for Model Year 2012 - 2016 Light-Duty Vehicle Greenhouse Gas Emission Standards and Corporate Average Fuel Economy Standards*, 75 FR 25324 (May 7, 2010).

[11] *West Virginia v. E.P.A.*, 597 U.S. 697 (2022) ("*West Virginia*")

[12] *Id.* at 716 (quoting *Utility Air Regulatory Group v. EPA*, 573 U.S. 302, 324, (2014) ("*UARG*").

[13] A.R. Crimmins *et al*. USGCRP, 2023: *Fifth National Climate Assessment.* U.S. Global Change Research Program, Washington, DC, USA (2023) Available online: https://tinyurl.com/mttzdp7r; *See also* Hoesung Lee, *et al.*, *Summary for Policymakers. Climate Change 2023: Synthesis Report. Contribution of Working Groups I, II and III to the Sixth Assessment Report of the Intergovernmental Panel on Climate Change.* IPCC (2023). Available online: https://tinyurl.com/yc2ycbeu

[14] Hans-O. Pörtner, et al., *Summary for Policymakers: Contribution of Working Group II to the Sixth Assessment Report of the Intergovernmental Panel on Climate Change, Climate Change 2022: Impacts, Adaptation and Vulnerability.* Cambridge University Press, Cambridge, UK and New York, NY, USA, pp. 3–33, available online: https://tinyurl.com/sx99d5y6



Pope Francis said, "[t]he climate is a common good belonging to all and meant for all."[15] He encouraged that lifestyle changes, combined with indispensable political decisions, can have a significant impact on combating climate change.[16] The Catholic faith calls us to protect God's creation for future generations, similar to the rationale behind the Endangerment Finding. Pope Francis warned, "[i]ntergenerational solidarity is not optional, but rather a basic question of justice, since the world we have received also belongs to those who will follow us."[17]

**Argument**

The EPA's action may be set aside if found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law."[18] Rescission of an agency rule is arbitrary and capricious under the Administrative Procedure Act "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."[19] In the Proposed Rule, the EPA completely ignores the unambiguous plain language and congressional intent of the CAA, science evidence, and adverse health impacts of climate change, establishing this Proposed Rule as arbitrary and capricious. Neither *Loper Bright* nor *West Virginia* changes this.

For the reasons set forth below, USCCB respectfully requests EPA rescind the Proposed Rule and reissue any reconsideration after reevaluating the CAA statutory framework, impacts to health and welfare, reliance interests, and reviewing public comments.

I.    **The best reading of Section 202(a) allows the EPA to regulate GHGs through the reasonable exercise of authority, as it did in the 2009 Endangerment Finding, even if based on global climate change concerns.**

The EPA is authorized to regulate GHG emissions to address the effects of climate change, whether local, regional, or global. Routine statutory interpretation, as consistent with *Massachusetts*, demonstrates that the best reading of the statute allows EPA to regulate GHG emissions even when based on global climate change concerns.

a.    **The best reading of the CAA plain language renders the 2009 Endangerment Finding as a reasonable exercise of authority.**

---

[15] *Laudato Si'*, Encyclical of Pope Francis (Vatican, May 24, 2015) at § 23, available online: https://tinyurl.com/339b39wz.

[16] *Laudate Deum*, Apostolic Exhortation of Pope Francis (Vatican, Oct. 4, 2023) at § 72, available online: https://tinyurl.com/bdcsd857.

[17] *Laudato Si'*, Encyclical of Pope Francis (Vatican, May 24, 2015) at § 159, available online: https://tinyurl.com/339b39wz.

[18] 5 U.S.C. § 706(2)(A).

[19] *Motor Vehicle Manufacturers Association of the United States, Inc. v. State Farm Mutual Automobile Insurance Company*, 463 U.S. 29, 43 (1983).


Courts utilize "every tool at their disposal to determine the best reading of the statute" to resolve statutory ambiguities.[20] However, because CAA is not silent or ambiguous here,[21] and the plain language of the statute provides the best reading of the statute.

Under the CAA, the Administrator is authorized to prescribe such regulations as are necessary to carry out his functions.[22] Prior to initiating any regulation of emissions, the EPA must first find that emissions will "cause, contribute to, air pollution which may reasonably be anticipated to endanger the public health or welfare."[23] Section 202(a)(1) sets forth the authority of the EPA Administrator as follows:

> The Administrator shall by regulation prescribe (and from time to time revise) in accordance with the provisions of this section, standards applicable to the emission of *any* air pollutant from *any* class or classes of new motor vehicles or new motor vehicle engines, ***which in his judgment cause, or contribute to, air pollution which may reasonably be anticipated to endanger public health or welfare***. Such standards shall be applicable to such vehicles and engines for their useful life (as determined under subsection (d), relating to useful life of vehicles for purposes of certification), whether such vehicles and engines are designed as complete systems or incorporate devices to prevent or control such pollution.

The statute defines air pollution as "***any*** air pollution agent or combination of such agents, including ***any*** physical, chemical, biological, radioactive (including source material, special nuclear material, and byproduct material) substance or matter which is emitted into or otherwise enters the ambient air."[24] It broadens the definition further to include "precursors," or parts/components to "the formation of any ***air*** pollutant, to the extent the Administrator has identified such precursor or precursors for the particular purpose for which the term "air pollutant" is used.[25]

Public health is not defined in the CAA, but the EPA properly defined the term "with its most natural meaning [which is] 'the health of the public.'"[26] The statute establishes that

> "[a]ll language referring to effects on ***welfare includes, but is not limited to,*** effects on soils, water, crops, vegetation, manmade materials, animals, wildlife, weather, visibility, and climate, damage to and deterioration of property, and

[20] *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400 (2024).

[21] *Massachusetts* holding did not rest on *Chevron* deference but the unambiguous, plain language of the statute; the dissent did, however, utilize Chevron. *Massachusetts*, 549 U.S. at 529 ("The statute is unambiguous[,]" so *Chevron* deference is not warranted.) *cf. Massachusetts*, 549 U.S. at 560 (Scalia, J. dissenting) ("the Court utterly fails to explain why [the EPA's] interpretation is incorrect, let alone so unreasonable as to be unworthy of *Chevron* deference.")

[22] 42 U.S.C. § 7601.

[23] 42 U.S.C. § 7521(a)(1).

[24] 42 U.S.C. § 7602(g).

[25] *Id.*

[26] *Endangerment and Cause or Contribute Findings for Greenhouse Gases Under Section 202(a) of the Clean Air Act*, 74 FR 66,496-01 at 66,510 (Dec. 15, 2009) (*citing Whitman v. American Trucking Ass'n,* 531 U.S. 457, 466 (2001)).



hazards to transportation, ***as well as effects on economic values and on personal comfort and well-being***, whether caused by transformation, conversion, or combination with other air pollutants.[27]

This plain language reflects the explicit deference afforded to the Administrator in determining cause or contribution to air pollution and in regulating what is broadly defined as air pollution. The statute gives deference to the Administrator to regulate within "his ***judgment*** to cause, or contribute to, air pollution which may reasonably be anticipated to endanger public health or welfare."[28] The statute also qualifies "cause" or "contribute" in relation to the Administrator's judgment rather than setting any requirements for legal causation as the EPA interprets. The plain meaning of "cause" and "contribute" is sufficient when qualified with the Administrator's judgment.[29] Further, the repeated use of "any" to qualify air pollution agents, combinations of agents, substance, or matter expands the scope of the definition.[30] The statute goes even further to broaden the definition, for instance, even if a substance alone, a precursor, does not meet the definition, but has the potential to form or become an air pollutant, the Administrator still has authority to regulate such substances. "Because greenhouse gases fit well within the Act's ***capacious definition*** of 'air pollutant,' EPA has statutory authority to regulate emission of such gases from new motor vehicles."[31]

Lastly, "[a]ll language referring to effects on welfare" encompasses a wide breadth of effects to the environment and to the public.[32] The plain and sweeping text of the statute reasonably and unambiguously provides for the Administrator to regulate the six GHGs set forth in the 2009 Endangerment Finding.

      b. **Congress clearly intended the CAA to encompass regulating emissions even if based on global concerns as the realities of climate change inextricably link global, regional, and local air quality.**

"It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme."[33] The plain language analysis is further supported in the context of congressional intent and purpose.

There were four primary purposes the CAA's enactment in 1970: "(1) to protect and enhance the quality of the Nation's air resources to promote public health and welfare; (2) to initiate and accelerate a national research and development program for air pollution prevention and control; (3) to provide technical and financial assistance to state and local

---

[27] 42 U.S.C. § 7602(h) (emphasis added).

[28] 42 U.S.C. § 7521(a)(1) (emphasis added).

[29] *See Cause*, BLACK'S LAW DICTIONARY (12th ed. 2024) ("[s]omething that produces an effect or result"); *Contribute*, MERRIAM-WEBSTER DICTIONARY ("to play a significant part in making something happen").

[30] *Massachusetts*, 549 U.S. 497, 529 (2007).

[31] *Id.* at 500.

[32] 42 U.S.C. § 7602(h).

[33] *Davis v. Michigan Dept. of Treasury*, 489 U.S. 803, 809 (1989).



governments; and (4) to encourage regional air pollution prevention and control programs."[34] The legislative history shows that Congress intended the statute to be "technology forcing."[35] Congress's original intent was to enact a comprehensive approach to combating the dangers of air pollution (from urbanization, industry, and increasing use of motor vehicles) to public health and welfare.[36] Because of this intentional, comprehensive approach set forth in the findings and purpose, Congress intentionally utilized broad statutory language and a cooperative federalism statutory framework.

First, Congress intended the statutory language to be flexible. The Supreme Court recognized the broad statutory language as crucial to understanding Congress's intent and for the statute's functionality, as changing circumstances and scientific developments would "render the Clean Air Act obsolete."[37] Instead, using broad language "reflect[ed] an intentional effort to confer the flexibility necessary to forestall such obsolescence."[38] The EPA cannot identify "any congressional action that conflicts in any way with the regulation of greenhouse gases from new motor vehicles."[39] The CAA explicitly delegated to the Administrator's judgment, and this delegation is consistent with Congress's intent the statue be broad, flexible, and comprehensive.[40] In fact, the Court recognized that since 1998, the EPA has affirmed such authority to regulate and has never disavowed it.[41]

Second, the statute's use of a cooperative federalism model reflects the understanding that while states and localities hold the primary responsibility for conditions and capabilities, air pollution can cross boundaries and requires federal coordination.[42] Notably, the first finding listed in the CAA states, "that the predominant part of the Nation's population is located in its rapidly expanding metropolitan and other urban areas, which generally ***cross the boundary lines of local jurisdictions and often extend into two or more States***."[43] This acknowledges that the scope of the CAA can extend beyond just local and regional areas.

Importantly, Congress also found "Federal financial ***assistance and leadership*** is ***essential*** for the development of cooperative Federal, State, regional, and local programs ***to prevent and control*** air pollution.[44] This emphasis on cooperative federalism demonstrates that Congress did not intend for the statute to merely apply to local and regional air pollution, as the Proposed Rule offers now. Rather, the stress on federal coordination efforts and the

---

[34] 42 U.S.C. § 7401(b)(1)-(4).

[35] *Whitman v. American Trucking Associations, Inc.*, 531 U.S. 457, 490 (2001) (Breyer, J. concurring in part and concurring in judgment).

[36] 42 U.S.C. § 7401.

[37] *Massachusetts,* 549 U.S. 497, 532 (2007).

[38] *Id.* at 532.

[39] *Id.* at 531.

[40] *Loper Bright Enterprises. v. Raimondo*, 603 U.S. 369, 395 (2024) (stating "[w]hen the best reading of a statute is that it delegates discretionary authority to an agency, the role of the reviewing court under the APA is, as always, to independently interpret the statute and effectuate the will of Congress subject to constitutional limits.")

[41] *Massachusetts*, 549 U.S. 497, 531 (2007).

[42] *State v. United States Environmental Protection Agency*, 983 F.3d 826, 836 (5th Cir. 2020).

[43] 42 U.S.C. § 7401(a)(1) (emphasis added).

[44] *Id.* (emphasis added).


United States Conference of Catholic Bishops — Office of the General Counsel

recognition that air pollution often has no boundaries supports regulation based on national and global concerns within the framework of the statute's structure. Further, it functions as Congress intended to allow for changing circumstances and scientific developments, as recent events attributed to climate change prove to be beyond local in impact (i.e. increase in wildfires).

By a routine statutory interpretation analysis, consistent with that in *Massachusetts*, and examining Congressional intent, the EPA was reasonably exercised its authority issuing the 2009 Endangerment Finding. The plain language and congressional intent are clear, and therefore the best reading of the statute.

**II.** **The Endangerment Finding does not implicate the major questions doctrine because it was already considered in *Massachusetts*, has withstood subsequent judicial challenges, and *West Virginia* is not persuasive here.**

The Proposed Rule zeroes in on *West Virginia*, but neglects *Massachusetts* still as good law and fails to consider additional case law. But *West Virginia* is distinguishable and has less bearing on the Proposed Rule at hand.

> ***a.*** ***Massachusetts*** **already rejected EPA's major questions doctrine concerns with regulating emissions of motor vehicles and engines.**

In its Proposed Rule, the EPA "propose[s] that the major questions doctrine applies and precludes the EPA from asserting authority to regulate in response to global climate change concerns under CAA section 202(a)."[45] However, this proposal is misguided and misapplies precedent. The reasoning the EPA relies upon to reach this conclusion was previously considered and rejected by the Supreme Court *Massachusetts.*

The major questions doctrine establishes that questions of major political or economic significance may not be delegated by Congress to executive agencies absent sufficiently clear and explicit authorization, originally articulated in *Brown & Williamson*.[46] In essence, Congress should not be presumed to have deferred to agencies on questions of great significance more properly resolved by the legislature.[47] In the words of Justice Scalia, "Congress[] does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions-it does not, one might say, hide elephants in mouseholes."[48] In *Brown & Williamson*, the Court decided that, when interpreting regulations, it "must be guided to a degree by common sense as to the manner in which Congress is likely to delegate a policy decision of such economic and political magnitude to an administrative agency."[49]

---

[45] *Reconsideration of 2009 Endangerment Finding and Greenhouse Gas Vehicle Standards*, 90 FR 36,288-01 at 36,299 (Aug. 1, 2025).

[46] *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 161 (2000).

[47] *Coal. for Responsible Regulation, Inc. v. E.P.A.*, 09-1322, 2012 WL 6621785, at *9 (D.C. Cir. Dec. 20, 2012) (Brown, J. dissenting).

[48] *Whitman v. American Trucking Associations, Inc.*, 531 U.S. 457, 468 (2001).

[49] *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 121 (2000).


In *Massachusetts*, the Supreme Court applied a *proto*-major question analysis to the regulation at issue. The EPA had argued that "[b]ecause of th[e] political history of [air regulation], and because imposing emission limitations on greenhouse gases would have even greater economic and political repercussions than regulating tobacco, [the] EPA was persuaded that it lacked the power to [regulate clean air based on concentration of gases in the *world's* atmosphere]."[50] But the Court was not convinced. In rejecting this argument and the EPA's reliance on *Brown & Williamson*, the Supreme Court stated that "there is nothing counterintuitive to the notion that EPA can curtail the emission of substances that are putting the global climate out of kilter."[51] The Supreme Court said that the statutory text forecloses the EPA's reading and reliance on *Brown & Williamson*. The Court further explained the "reliance on *Brown & Williamson* to support that argument was misplaced because unlike the ban on tobacco products at issue in that case, 'EPA jurisdiction would lead to no such extreme measures.'"[52] The Court held that the statute was unambiguous,[53] and, while the "Congresses that drafted § 202(a)(1) might not have appreciated the possibility that burning fossil fuels could lead to global warming, [Congress] did understand that without regulatory flexibility, changing circumstances and scientific developments would soon render the Clean Air Act obsolete."[54]

The Court's examination of *Brown & Williamson* is telling. It rejected the EPA's reliance on *Brown & Williamson*, declining to entertain the major questions doctrine for regulating GHG emissions under CAA section 202(a)(1).[55] The Court was convinced on the face of the statute's unambiguous language, which prevails as the best reading of the statute.

### b. *Massachusetts* and The Endangerment Finding withstood subsequent judicial challenge with respect to the EPA regulating motor vehicle emissions.

After the Endangerment Finding was issued, the Supreme Court considered *Utility Air Regulator Group v. E.P.A.* which restricted the EPA's authority in regulating stationary sources (i.e. factories or power plants) subject to "Prevention of Significant Deterioration" (PSD) provisions in the CAA.[56]

---

[50] *Massachusetts*, 549 U.S. 497, 512 (2007).

[51] *Id.* at 531.

[52] *Id.*

[53] *Id.* at 532 n.26.

[54] *Id.* at 532.

[55] *Coal. for Responsible Regulation, Inc. v. E.P.A.*, 09-1322, 2012 WL 6621785, at *1 (D.C. Cir. Dec. 20, 2012) (Sentelle, CJ, concurring in denial of rehearing en banc) ("the Court [in *Massachusetts*] expressly held that the Clean Air Act's "sweeping definition of air pollutant" unambiguously includes greenhouse gases." Moreover, it rebuffed EPA's attempt to use post enactment congressional actions and deliberations to obscure the meaning of an otherwise-unambiguous statute, and found EPA's reliance on *Brown & Williamson* similarly misplaced,) (Cleaned up); *see also Util. Air Regulatory Group v. E.P.A.*, 573 U.S. 302 (2014) (leaving undisturbed the Court of Appeal's opinion that the *Endangerment Finding* was not arbitrary or capricious.)

[56] *See generally*, *UARG*, 573 U.S. 302 (2014).


This case originated as a challenge to the PSD, Title V, and Endangerment Finding. In this case, the EPA used the *Massachusetts* holding and Endangerment Finding to regulate stationary sources subject to PSD and Title V permitting programs. The Court of Appeals for the DC Circuit upheld the EPA's regulations for PSF and Title V as valid grants of authority under *Chevron*, and upheld the Endangerment Finding based on the plain reading of the statute.[57] While the Supreme Court disagreed with the EPA's extending its regulatory authority over stationary sources solely on their potential to emit greenhouse gases, it affirmed the DC Circuit Court's ruling that the Endangerment Finding was not arbitrary or capricious without relying on *Chevron* deference. The Court found the EPA's interpretation unreasonable vis-a-vis the PSD and Title V programs because they would lead to "an enormous and transformative expansion of the EPA's regulatory authority without clear congressional authorization," relying on *Brown & Williamson*.[58]

Importantly, the Court distinguished the EPA's regulation under PSD and Title V provisions from that of the Act-wide definitions the Act-wide interpreted in *Massachusetts*. definitions *regulated* air pollutants, a narrower and context-appropriate definition supported by as interpreted in *Massachusetts*. PSD and Title V are limited to *regulated* air pollutants, a narrower and context-appropriate definition. "Although these limitations are nowhere to be found in the Act-wide definition, in each instance EPA has concluded—as it has in the PSD and Title V context—that the statute is not using 'air pollutant' in *Massachusetts'* broad sense to mean any airborne substance whatsoever supported by prior agency interpretations of the statute."[59] Discussing how the EPA has "inferred statutory context" in certain areas of the CAA, the Court listed specific examples of limitations more akin to PSD and Title V regulated air pollutants. The distinction *UARG* provides is that "*Massachusetts* does not foreclose the Agency's use of statutory context to infer that certain of the Act's provisions use "air pollutant" to denote not every conceivable airborne substance, but only those that may sensibly be encompassed within the particular regulatory program."[60] To the Court, these interpretations specific to PSD and Title V (and other examples relating to stationary sources) were appropriate: "[i]t is plain as day that the Act does not envision an elaborate, burdensome permitting process for major emitters of steam, oxygen, or other harmless airborne substances. It takes some cheek for EPA to insist that it cannot possibly give 'air pollutant' a reasonable, context-appropriate meaning in the PSD and Title V contexts when it has been doing precisely that for decades."[61]

Despite restricting the EPA's authority in the PSD and Title V context, the Court preserved the analysis of *Massachusetts*: the "EPA must 'ground its reasons for action or inaction in the statute,'"[62] In *Massachusetts*, the "EPA's inaction with regard to Title II was not sufficiently grounded in the statute….because nothing in the Act suggested that

---

[57] *Coal. for Responsible Regulation, Inc. v. E.P.A.*, 684 F.3d 102, 116-27 (D.C. Cir. 2012), aff'd in part, rev'd in part sub nom. *UARG*, 573 U.S. 302 (2014), and amended sub nom. *Coal. for Responsible Regulation, Inc. v. Envtl. Prot. Agency*, 606 Fed. Appx. 6 (D.C. Cir. 2015).

[58] *UARG*, 573 U.S. 302, 306 (2014) (*citing FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000))

[59] *Id.* at 318.

[60] *Id.* at 319.

[61] *Id.* at 317.

[62] *Id.* at 318.



regulating greenhouse gases under that Title would conflict with the statutory design*. Title II would not compel EPA to regulate in any way that would be 'extreme,' 'counterintuitive,' or contrary to 'common sense*.'"[63] The Court did not see the same expansion in regulatory authority, rather the text "[a]t most, it would require EPA to take the *modest* step of adding greenhouse-gas standards to the roster of new-motor-vehicle emission regulations."[64] The Court's distinction and preservation of *Massachusetts* thus maintain the EPA's reasonable authority in issuing the Endangerment Finding.

> ### c. *West Virginia* is not on point because it only limits a mode of regulating power plants that was intended to implement a "generation shift."

The Court's examination of *Brown & Williamson* in *Massachusetts* and *UARG* is informative and can be read now with *West Virginia*. Understanding the *West Virginia* decision begins with the macro-level statutory scheme of the CAA. It consists of three programs to control air pollution from stationary sources (such as power plants): New Source Performance Standards, National Ambient Air Quality Standards (NAAQS), and Hazardous Air Pollutants (HAP).[65] At issue in *West Virginia* was the New Source Performance Standards set in Section 111, within which the EPA sets federal standards of performance for new sources, and once established, then addresses emissions of the same pollutant by existing sources (and only if they are not already regulated by NAAQS or HAP).[66] A standard of performance "reflects the degree of emission limitation achievable through the application of the best system of emission reduction" (BSER).[67] The two regulations at issue relied in part on the 2009 Endangerment Finding, incorporating a summary of the Finding's impacts to public health and welfare.[68]

The question of *West Virginia* was "whether a *'system of emission reduction' can consist of generation-shifting measures*.'"[69] The Court held no and restricted the EPA's authority in using this specific regulatory mechanism to effectuate a "generation shifting" from higher-emitting to lower-emitting producers of energy.[70] When the EPA set stricter BSERs for the existing coal-fired and natural-gas-fired power plants, it aimed to "implement a sector-wide shift in electricity from coal to natural gas and renewables."[71] This implicated the major questions doctrine, as the Court did not see clear congressional authorization for the EPA to "substantially restructure the American energy market," an action of vast economic and political significance.[72]

---

[63] *UARG*, 573 U.S. 302, 318 (2014) (emphasis added).

[64] *Id.* at 318–19 (emphasis added).

[65] *West Virginia*, 597 U.S. 697, 707 (2022) (citing Clean Air Amendments of 1970, 84 Stat. 1676, 42 U. S. C. § 7401 et seq.).

[66] *Id.* at 709.

[67] *Id.* at 707.

[68] *Standards of Performance for Greenhouse Gas Emissions From New, Modified, and Reconstructed Stationary Sources: Electric Utility Generating Units,* 80 FR 64,510-01 at 64,517 (Oct. 23, 2015).

[69] *West Virginia*, 597 U.S. 697, 716 (2022).

[70] *Id.* at 716.

[71] *Id.* at 714.

[72] *Id.* at 724.



But *West Virginia* did not touch the Endangerment Finding itself, overrule the statutory interpretation of *Massachusetts*, or alter the *Massachusetts* evaluation of *Brown & Williamson*. Indeed, the regulations at issue relied in part on the 2009 Finding but did so for 1) a different section of the CAA applying to new and existing power plants, and 2) using a regulatory *mechanism* that exceeded the EPA's authority. West Virginia considered the same arguments that EPA relied on in *Massachusetts*, citing *Brown & Williamson*[73] and the major questions doctrine. Unlike *West Virginia*, *Massachusetts* and the Endangerment Finding afford *regulation*, not a seismic market shift or an attempted shift in the transportation market from motor vehicles to another mode of transportation.

At bottom, the 2009 Endangerment Finding and *Massachusetts* is about pollution control and regulation. Both hardly compare in impact to that of the generation-shift of the entire American energy market as issue in *West Virginia*. The system of emission reduction here is not of "generation-shifting measures." Emissions regulations still allow for new gas vehicles but with reduced emissions. The regulatory mechanism, emissions standards, does not effectively overhaul the marketplace or eliminate an energy source as in *West Virginia*. If it had, the Court in Massachusetts would have agreed with the EPA's reliance on *Brown & Williamson*.

Moreover, the EPA proffered an alternative argument in *Massachusetts*, that even if it did have the authority to regulate emissions, ***it would decline to do so because regulation would conflict with other administration priorities.***[74] Perhaps this is the most telling – that when administrative priorities change, so does an agency's propensity and incentive to act pursuant to certain statutory authority. But the Court warned the EPA: "the use of the word 'judgment' is not a roving license to ignore the statutory text. It is but a direction to exercise discretion within defined statutory limits."[75] The Court continued, "[u]nder the clear terms of the Clean Air Act, EPA can avoid taking further action only if it determines that greenhouse gases do not contribute to climate change …. To the extent that this constrains agency discretion to pursue other priorities of the Administrator or the President, ***this is the congressional design***."[76] Though the Court did not evaluate the EPA's policy judgments it asserted, it still saw "it is evident they have nothing to do with whether greenhouse gas emissions contribute to climate change."[77]

This is precisely what is happening here with the Proposed Rule – it is using the judgment afforded the Administrator to ignore the statutory text and congressional intent (under the guise of a "better" interpretation effectively evading the EPA's statutory obligation to regulate emissions), which is arbitrary and capricious.

---

[73] *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000).

[74] *Massachusetts*, 549 U.S. 497, 528 (2007).

[75] *Id. at* 533 (2007) (emphasis added).

[76] *Id.* (emphasis added).

[77] *Id.* (emphasis added).



**III.    The Endangerment Finding rests on sound science and the greater harm to the public is that of health and well-being, not consumer prices and choice.**

Despite unambiguous plain language and clear and unequivocal intent from Congress, the EPA now argues in the Proposed Rule that the CAA does not authorize the agency to make the Endangerment Finding if the resulting regulations would be "futile as a means to address the identified dangers."[78] But the Endangerment Finding reasonably relied upon well-founded scientific record. In fact, the scientific record today supports the statutory standard for regulation even more than it did in 2009. The EPA is further misguided in arguing that the harm to public health and welfare should be balanced with economic consumer interests. These two additional statutory and policy rationales for repealing emissions standards are not persuasive.

a.    **The science behind the 2009 Endangerment Finding is still sound.**

The science informing the 2009 Endangerment Finding is sound. The 2009 Finding is based on the body of compelling scientific evidence from major assessments by the U.S. Global Climate Research Program (USGCRP), the Intergovernmental Panel on Climate Change (IPCC), and the National Research Council (NRC). The 2009 Endangerment Finding determined that as a result of increasing global temperatures attributed to climate change, there are indirect health risks driven by "(1) more frequent heat waves; (2) air quality effects, including increased formation of ozone, and (3) broader societal impacts related to increased frequency and severity of certain extreme weather events."[79] The Administrator also found that GHG emissions could lead to welfare effects related to "(1) food production and agriculture; (2) forestry; (3) water resources; (4) sea level rise; and (5) energy infrastructure and settlements, although the evidence was uncertain for several categories that may see near-term benefits."[80] This is exactly what local communities, states, the US, and the world are experiencing right now.

If anything, science supports the Endangerment Finding even more than it did in 2009.  We are seeing evidence supporting this body of science play out now in real time. Last year was the hottest year on record followed by 2023. When the Finding was published, 2009 was the second hottest year on record after 2005. Now neither of those years are in the top ten.[81] The science is irrefutable that human activities, principally through emissions of greenhouse gases, have unequivocally caused global warming.[82] By the EPA's own data, as of 2022, transportation followed by electricity generation, is the top source of U.S.

---

[78] *Reconsideration of 2009 Endangerment Finding and Greenhouse Gas Vehicle Standards*, 90 FR 36,288-01 at 36,312 (Aug. 1, 2025).

[79] *Endangerment and Cause or Contribute Findings for Greenhouse Gases Under Section 202(a) of the Clean Air Act*, 74 FR 66,496-01 at 66,525 (Dec. 15, 2009).

[80] *Id.* at 66,531-35.

[81] *Global Temperature, Vital Signs.* NASA (2025), available at: https://tinyurl.com/47z563mh.

[82] Hoesung Lee, *et al.*, *Summary for Policymakers. Climate Change 2023: Synthesis Report. Contribution of Working Groups I, II and III to the Sixth Assessment Report of the Intergovernmental Panel on Climate Change.*  IPCC (2023). Available online: https://tinyurl.com/yc2ycbeu


United States Conference of Catholic Bishops   Office of the General Counsel

emissions.[83] The science demonstrates clear evidence that these emissions cause extreme temperatures and weather events.[84] The sheer costs of responding to disasters must also be considered. According to the U.S. Fifth National Climate Assessment, the U.S. experiences a $1 billion disaster every three weeks.[85]

Even states with lower emissions contributions or lower levels of urbanization still experience extreme weather and natural disasters.[86] The rising air temperatures and impacts of climate change do not necessarily discriminate against the geographic location in which air pollutants were first emitted, as air and weather cannot be contained. Simply put, the impacts of GHG emissions and the subsequent extreme temperatures are felt everywhere. The EPA now rests its repeal on allegations that this body of science acknowledged uncertainties in the impacts of climate changes and relied on "unduly pessimistic"[87] data for global temperature, extreme weather events, and adverse health impact predictions.

While uncertain in the scope of its effects, climate change is a certain reality now and in the future.[88] Nor can EPA avoid its statutory obligation by noting the uncertainty surrounding various features of climate change and concluding that it would therefore be better not to regulate at this time.[89]

> b. **Adverse Impacts to Health and Well-Being Outweigh Economic Considerations.**

Finally, and most importantly, the EPA's assertion that the 2009 Endangerment Finding's impact on consumer prices and choice is wrongly prioritized over considerations of human health and well-being. The CAA statutory language qualifies the Administrator's regulatory power to be related to or in anticipation of endangering the public health or welfare. Again, the statute broadly construes:

> [a]ll language referring to effects on welfare includes, but is not limited to, effects on soils, water, crops, vegetation, manmade materials, animals, wildlife, weather, visibility, and climate, damage to and deterioration of property, and hazards to transportation, ***as well as effects on economic values and on personal***

---

[83] *Climate Change Indicators: Greenhouse Gases*. EPA (Aug. 1, 2025) Available online: https://tinyurl.com/p974rp5h

[84] *Extreme Weather and Climate Change*. NASA (Oct 23, 2024). Available online: https://tinyurl.com/5fzt7mts

[85] A.R. Crimmins *et al. USGCRP, 2023: Fifth National Climate Assessment.* U.S. Global Change Research Program, Washington, DC, USA (2023) Available online: https://tinyurl.com/mttzdp7r

[86] After Disaster Hits, Rural Communities Face Unique Challenges in Recovering. GAO (Jan. 28, 2025) Available online: https://tinyurl.com/44jkd4m6; see also *Extreme Heat & Public Health Report*, Southern California Association of Governments (Sept. 30, 2020), Available online: https://tinyurl.com/bde76e9w

[87] *Reconsideration of 2009 Endangerment Finding and Greenhouse Gas Vehicle Standards*, 90 FR 36,288-01 at 36,308 (Aug. 1, 2025) (*citing Climate Working Group: A Critical Review of Impacts of Greenhouse Gas Emissions on the U.S. Climate*, Department of Energy (July 23, 2025) available online: https://tinyurl.com/2p9wa5nk.

[88] *Climate Change: Scientific Consensus*. NASA (Oct 21, 2024) Available online: https://tinyurl.com/3pke5ctf

[89] *Massachusetts*, 549 U.S. 497, 534 (2007).



***comfort and well-being***, whether caused by transformation, conversion, or combination with other air pollutants.[90]

In tandem, looking at Congress's intent, statutory purpose, and legislative history of the original 1970 Act, it deliberately prioritized public health protection over economic considerations. Courts have recognized Congress's intent to address emerging environmental problems with strict health protection standards. In *Union Elec. Co. v. EPA*, the Supreme Court determined that Congress deliberately chose to prioritize health protection over economic feasibility, noting in the CAA legislative history that Senator Muskie, the Senate bill manager, explained "The first responsibility of Congress is not the making of technological or economic judgments or even to be limited by what is or appears to be technologically or economically feasible. Our responsibility is to establish what the public interest requires to protect the health of persons."[91]

While Congress intended the CAA to consider both economic values and personal comfort and well-being, it placed an emphasis on the latter. Yet the EPA argues the more compelling arguments are for incentivizing consumer choices, prices of vehicles, and economic welfare. The consequences of this action are serious, and the adverse health impacts both now and in the future outweigh any detriment to economic values.

Climate change is already impacting vital human conditions such as food and water security, livelihoods, air quality, and exposure to vector borne diseases.[92] Low-income communities and communities of color in the United States often lack the resources and infrastructure to withstand and recover from climate events.[93] Their vulnerabilities are compounded by other social inequities such as access to secure housing, food, and healthcare.[94]

Climate change is and will impact the ability of children, especially girls, and the unborn to survive and thrive. Children aged ten or younger in the year 2020 are projected to experience a nearly four-fold increase in extreme weather events under 1.5° C of global warming by 2100, and a five-fold increase under 3° C warming.[95] Extreme weather events disrupt access to education, food security, water, and safety. The Catholic episcopal conferences and councils of Africa, Latin America, and Asia wrote jointly before the November UNFCCC COP30 gathering, "The science is clear: we must limit global warming to 1.5° C to avoid catastrophic effects. We must never abandon this goal. It is the Global South and future generations who are already suffering the consequences.[96] And all the

---

[90] 42 U.S.C. § 7602(h) (emphasis added).

[91] *Union Elec. Co. v. E.P.A.*, 427 U.S. 246, 259 (1976).

[92] A.R. Crimmins *et al*. *USGCRP, 2023: Fifth National Climate Assessment.* U.S. Global Change Research Program, Washington, DC, USA (2023) Available online: https://tinyurl.com/mttzdp7r

[93] *Id.*

[94] *Id.*

[95] Hoesung Lee, *et al.*, *Summary for Policymakers. Climate Change 2023: Synthesis Report. Contribution of Working Groups I, II and III to the Sixth Assessment Report of the Intergovernmental Panel on Climate Change.* IPCC (2023). Available online: https://tinyurl.com/yc2ycbeu

[96] *A Message from the Catholic Episcopal Conferences and Councils of Africa, Asia, Latin America and the*



examples of climate change effects above are encompassed by the full statutory definition of welfare – "climate events have and continue to impact soils, water, crops, vegetation, manmade materials, animals, wildlife, weather, visibility, and climate, damage to and deterioration of property, and hazards to transportation."[97] The very infrastructure and natural resources our food production relies upon is at stake, cancelling out the EPA's argument now for unregulated emissions to assist in food production. If there are no natural resources in the first place, there is no way to increase production.

Even still, the EPA has not analyzed the full extent of the economic impacts it relies upon, as it has yet to account for the investments companies have already made in reliance on emissions regulations – companies have already bore the brunt of costs and will continue for at least a few more years, as regulations impact the research and development phases instead of manufacturing.[98]

**Conclusion**

In summary, the EPA attempts to manipulate the unambiguous plain language and congressional intent of the CAA, is distracted by the major questions doctrine from unpersuasive precedent in *West Virginia*, and ignores science evidence and adverse health impacts of climate change, all of which is demonstrably arbitrary and capricious. The EPA now aims to rewind any progress the nation has made in combating the dangerous effects of climate change from new motor vehicles and engines emitting GHG. Consistent with Sacred Scripture and Church teaching, USCCB opposes this Proposed Rule, and respectfully requests the EPA rescind it.

Respectfully submitted,

William Quinn
General Counsel

Shannon Eckman
Solicitor & Assistant General Counsel

Carlos Cisneros-Vilchis
Assistant General Counsel

---

*Carribean on the Occasion of COP30: A Call for climate justice and our common home* (June 12, 2025). Available online: https://tinyurl.com/2k3v3x6v
[97] 42 U.S.C. § 7602(h).
[98] *Reconsideration of 2009 Endangerment Finding and Greenhouse Gas Vehicle Standards*, 90 FR 36,288-01 at 36,297 (Aug. 1, 2025).

# EXHIBIT 11-D

An official website of the United States Government.  🇺🇸

‹  Back to Document Comments (/document/EPA-HQ-OAR-2025-0194-0093/comment)

Share ▾

  **PUBLIC SUBMISSION**

# Comment submitted by Massachusetts Interfaith Power and Light

Posted by the **Environmental Protection Agency** on Sep 5, 2025

Docket (/docket/EPA-HQ-OAR-2025-0194)
 / Document (EPA-HQ-OAR-2025-0194-0093) (/document/EPA-HQ-OAR-2025-0194-0093)  / Comment

| Comment |
| --- |

I am writing on behalf of Massachusetts Interfaith Power and Light, www.massIPL.org, a faith-based group which is part of the national network of Interfaith Power &amp; Light. We accept the conclusions of the US National Academy of Sciences and the national science academies of every other nation in the world, that climate change is real, it's bad, and it's caused by human activity. We believe reducing the emission of Greenhouse Gasses, GG, is critically important to reducing climate change. Therefore, we urge you to leave the Endangerment Finding in place, and to reduce GG emissions in the US with strong regulation and enforcement.

Every major faith tradition in the world teaches that the earth's environment is precious and that it is our religious and moral duty to preserve it for the sake of our neighbors and future generations, not to mention ourselves. That is why Massachusetts Interfaith Power and Light works with more than 250 faith organizations in Massachusetts, of many denominations, to encourage prayer, action and mobilization to fight climate change. Leaders of all faiths have spoken out on the climate crisis. To quote just one, Pope Francis said in Laudate Deum:

"Yet, with the passage of time, I have realized that our responses have not been adequate, while the world in which we live is collapsing and may be nearing the breaking point. In addition to this possibility, it is indubitable that the impact of climate change will increasingly prejudice the lives and families of many persons. We will feel its effects in the areas of healthcare, sources of employment, access to resources, housing, forced migrations, etc."

The complete text of Laudate Deum is attached.
In conclusion, we urge you to NOT RESCIND the Endangerment Finding.

Sincerely yours,

Give Feedback

Rev. Michael Reed,

Executive Director
Massachusetts Interfaith Power and Light

Attachments  1

 **20231004-Laudate Deum**

Restricted: Copyrighted

More Information ▾

**Comment ID**

EPA-HQ-OAR-2025-0194-0593

**Tracking Number**

mf4-4tiy-g1b1

**Comment Details**

**Document Subtype**

Company/Organization Comment

**Received Date**

Sep 3, 2025

**Postmark Date**

Sep 3, 2025

**Page Count**

1

*Your Voice in Federal Decision Making*

**About** **Bulk Data Download** **Agencies** **Learn** **Reports** **FAQ**

(/about) (/bulkdownload) (/agencies) (/learn) (/dotreports) (/faq)

**Commenting Guidance**

(/commenting-guidance)

Privacy & Security Notice (/privacy-notice) | User Notice (/user-notice) | Accessibility Statement (/accessibility) | API Requests (https://open.gsa.gov/api/regulationsgov/) | FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)

Give Feedback

# EXHIBIT 11-E

An official website of the United States Government. 🇺🇸

‹  Back to Document Comments (/document/EPA-HQ-OAR-2025-0093/comment)

Share ▾

 **PUBLIC SUBMISSION**

# Mass Comment Campaign sponsored by National Religious Partnership for the Environment

Posted by the **Environmental Protection Agency** on Sep 3, 2025

---

Docket (/docket/EPA-HQ-OAR-2025-0194)
/ Document (EPA-HQ-OAR-2025-0194-0093) (/document/EPA-HQ-OAR-2025-0194-0093)  / Comment

| Comment |
| --- |

Please see attached file with 1010 unique comments from the U.S. Catholic community, as collected by a coalition of faith-based organizations. These unique comments are submitted as additional individual comments to the following shared statement:

Dear Administrator Zeldin,

As a Christian mandated by my faith to defend the sanctity of human life, care for God's creation, and stand in solidarity with the most vulnerable, I am writing to urge you to reconsider the proposed Environmental Protection Agency (EPA) rule to repeal the Endangerment Finding and dismantle greenhouse gas standards for cars and trucks.

The science is unequivocal: climate change is real and has adverse effects on human health. As the late Pope Francis stated, climate change is "one of the principal challenges facing humanity today."1 The United States has a moral – and, according to the International Court of Justice, a legal 2 – obligation to confront the reality of climate change, reduce death-dealing emissions, and protect vulnerable communities from the harmful impacts of climate change. This proposal from the EPA is a complete abdication of our moral and legal obligation, and is a callous attempt to turn away from both the "cry of the earth and the cry of the poor."

A key tenet within Catholic teaching is to uphold the preferential option for the poor, which instructs us to always prioritize the needs of the poor and vulnerable in our actions and decision-making. It is the poor and vulnerable who would be harmed the most by an abandonment of federal regulations of greenhouse gas emissions: the unborn children at risk of preterm birth and developmental delays, the elementary students missing school because of asthma symptoms, the grandparents developing lung or heart disease, the day-laborers suffering in extreme heat, and the Black and Brown communities who disproportionately bear these burdens due to redlining and systemic racism. These are the communities that the EPA will be abandoning through this rule.

Give Feedback

I urge you to do what is right and just – do not repeal the Endangerment Finding and do not strip away the life-saving greenhouse gas standards for cars and trucks. Let us work towards a future where all people, all generations, and all of God's creation can truly flourish.

Attachments  1

 **Mass Mail**

Less Information ▲

**Abstract**

Catholic Individual Comments_Bundled Mass Mail Campaign Docket ID No. EPA-HQ-OAR-2025-0194. The PDF version of this document may be an incomplete rendering of the original MS Excel file. Please open the Excel file to view the document in its entirety.

 Download  (https://downloads.regulations.gov/EPA-HQ-OAR-2025-0194-0465/attachment_1.xlsx)

**Comment ID**

EPA-HQ-OAR-2025-0194-0465

**Tracking Number**

mf2-yc5i-1ld9

**Comment Details**

**Document Subtype**

Mass Mail Campaign

**Received Date**

Sep 2, 2025

**Postmark Date**

Sep 2, 2025

**Page Count**

1

Give Feedback

 This agency received **1010** duplicate or significantly similar comments.



*Your Voice in Federal Decision Making*

About    Bulk Data Download    Agencies    Learn        Reports    FAQ    Commenting Guidance

(/about)        (/bulkdownload)   (/agencies)   (/learn)   (/dotreports)   (/faq)   (/commenting-guidance)

Privacy & Security Notice (/privacy-notice)    |    User Notice (/user-notice)    |
Accessibility Statement (/accessibility)    |    API Requests (https://open.gsa.gov/api/regulationsgov/)    |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)

Give Feedback

# EXHIBIT 11-F

Addressing Adverse Mental Health and Brain Impacts in Reconsideration of Endangerment Finding and Greenhouse Gas Vehicle Standards

Docket ID No. EPA-HQ-OAR-2025-0194

Submitted by Robin Cooper, MD
robincooper@climatepsychiatry.org

I am writing on behalf of Climate Psychiatry Alliance, an organization of psychiatrists and mental health professionals focused on the profound mental health impacts of climate change. We span academic, administrative, and clinical settings, are experts in the rapidly emerging field of climate mental health and see the impacts directly in the patients we treat.

We strongly oppose the Reconsideration of the 2009 Endangerment finding and Greenhouse Gas Vehicle Standards *(thereafter referred to as "the Reconsideration")*.

Such action has far-reaching consequences which would severely impact the health of our communities and substantially set back efforts to control greenhouse gas emissions-a major threat to health and mental health.

As you are aware, for decades The Clean Air Act (CAA) has required the EPA to regulate six criteria air pollutants (carbon monoxide, lead, nitrogen dioxide, ozone, particulate matter, and sulfur dioxide) because of their direct and serious impact on health. The Supreme Court landmark decision in Massachusetts vs EPA, 2007 expanded the inclusion of greenhouse gas emission as air pollutants and extended the EPA duty and authority to regulate these emissions from new motor vehicles. This led to the 2009 Endangerment Finding which extended EPA authority to regulate the greenhouse gases including (GHG) including Carbon Dioxide (CO2) and methane (CH4) after having found them, based on extensive body of scientific evidence, to pose a severe threat to public health and welfare. Regulating these GHG emissions in addition to criteria pollutants has major benefits for public health and mental health. *

The Endangerment Finding established in 2009 was founded on the most up-to-date, reputable science at the time. The current effort to reconsider asserts that the original finding "unreasonably analyzed the scientific record and ...developments cast significant doubt on the reliability of the findings." This is not true. There was and continues to be broad consensus from reputable scientists and health professionals that greenhouse gas emissions are a major threat to public health, contribute to the rapid pace of climate change multiplying the health risks of humans and planetary life. This "Reconsideration" interpretation is contrary to CAA directives and represents a distortion of the intent to protect public health. Implementing the Reconsideration will severely impact the physical and mental health of our communities.

Additionally, at the time that the Endangerment Finding was codified, the scientific evidence regarding the specific impacts on brain and mental health was just beginning. Since then, the peer-reviewed literature on the topic has rapidly expanded. We now have extensive scientific evidence that greenhouse gas emissions result in adverse psychological and direct brain effects. For example, there is consensus and a wide body of peer-reviewed literature that

substantiates the significant and broad range of climate change mental health impacts (Haase 2025). Mental health impacts are complex, direct, and indirect, occur over short- and long-term time frames, and encompass acute and delayed impacts. (Cianconi, 2020, Charlston, 2021, Haase, 2025, Hayes, 2018, 2020, Lawrence, 2021). This new and growing information serves to strengthen the scientific basis for the endangerment finding.

Additionally, the Reconsideration specifically proposes repealing all GHG emission standards for light-, medium-, and heavy-duty vehicles . The Reconsideration claims that "CAA section 202(a) does not authorize the EPA to prescribe emission standards to address global climate change concerns" suggesting EPA's authority is limited to regulation of pollutants to those that are near the source.   This is contradictory to CAA Section 2(a) requiring the EPA to regulate air pollution and emissions from motor vehicles that endanger health and wellbeing.

In addition, there is substantial and extensive scientific evidence that the downstream impacts of GHG emissions contribute to severe and widespread health and mental health impacts from many sources including vehicular sources.  Even if the indirect, downstream impacts of GHG emissions are temporarily set aside for purposes of consideration of local air pollutant impacts, there remain substantial concerns about vehicular emissions impacts on local regions and associated health and mental health impacts.
Emissions from transportation represent the largest source of direct GHG emissions in the US.

Furthermore, these emissions have direct health effects on communities near transportation corridors.  An EPA document, Near Roadway Air Pollution and Health: Frequently Asked Questions specifically states, "People who live, work or attend school near major roads appear to have an increased incidence and severity of health problems associated with air pollution exposures related to roadway traffic…." and "Pollutants directly emitted from cars, trucks and other motor vehicles are found in higher concentrations near major roads".  The report indicates that 45 million people in the US live within 300 feet of transportation corridors.

Additionally, there is clear and conclusive evidence that transportation sector air pollution has enormous impacts on brain functioning (Calderón-Garcidueñas, 2016, 2012, Underwood, 2017). Reversing regulations on these vehicular emissions will reverse previous gains and profoundly impact the health and mental health of the American population
(Alzheimer's Association International Conference; 2021, Columbia University, 2023, Choma,2021).

Comments included in the air pollution section below will highlight some of the profound brain impacts of these exposures in areas of heavy vehicular traffic.

In the rest of this document, I will specifically address the primary effects of greenhouse gas emissions, as well as the secondary impacts on mental health, human behavior, cognition, emotions, and brain function in the expanding field of climate mental health/psychology and explain the need to preserve the Endangerment Finding.

# Impacts of Climate Change on Mental Health-GHG emissions and Heat Impacts

GHG EMISSIONS/AIR POLLUTION:

In addition to the broad awareness that GHG emissions and fine particulate matter have significant impacts on pulmonary and cardiovascular health and are leading causes of illness worldwide, there is also recognition of the significant impacts on brain, neuropsychiatric functioning, and mental health (Calderón-Garcidueñas 2016,2012, Van Susteren, 2024, Underwood, 2017, American Psychiatric Association, 2023)

Evidence conclusively shows that fine particulate matter (PM 2.5 and smaller) can have direct access to the brain through the olfactory apparatus as well as through the blood supply and breakdown of the blood-brain barrier.  Although understanding the specific biological mechanisms is a subject of ongoing research, recent publications have shed light on the various physiologic contributors to the damage to the brain. Reactions of inflammation and oxidative stress are triggered by AP exposure.  (Hahad, 2020, Underwood, 2017). Neurotransmitters, dopamine, serotonin, and norepinephrine play crucial roles in a wide range of brain functions, including but not limited to mood regulation, motivation, sleep, stress response, and thermoregulation. Additionally, the activation of the sympathetic nervous system during extreme heat increases stress hormone production and contributes to anxiety, agitation, and mood instability.  Structural and functional impacts have also been identified (Calderón-Garcidueñas, 2016,2012). Underlying pathological impacts contribute to a wide range of neurodevelopmental and neurodegenerative illnesses across the entire lifespan (Fu, 2019).

Particularly concerning is the impact of fine particulate matter on the developing fetus and children. These impacts at the crucial early stages of development have long lasting implications for life-long functioning often showing as latent diseases appearing in later life. (Perrara,2017). Prenatal exposures to fine particulate matter are also linked to intra-uterine growth retardation, pre-term birth, and lower birth weights.  Research investigating the association between toxic exposures and increased incidence of autistic spectrum disorder (ASD) is growing and shows alarming concerns. A significant association between air pollution exposure during fetal development and autism has been found (Amnuaylojaroen, 2024, Flanagan, 2023,) with exposure in third trimester of pregnancy particularly concerning (Weisskopf, 2015). A systematic review which included a large number of neonates (total of 758 997 in 28 studies) indicated exposure to pollutants, notably PM2.5 during pregnancy, was associated with an increased risk of ASD in newborns. Pregnancy and postnatal periods are most vulnerable at-risk periods (Dutheil,2021).
An earlier systematic review indicated an increased risk of ASD for exposures to particulate matter (PM2.5 and PM10) with greatest association during exposure in prenatal period. (Lam, 2016).

Childhood exposures to wide range of air pollutants are linked to a wide range of neurodevelopmental disorders with developmental delay, reduced IQ, disorders of attention, autism, anxiety, and depression (Perrara, 2017). Autopsies of children's brains have detected a wide range of pathological findings including but not limited to the presence of Alzheimer 's markers (Tau particles and amyloid deposits) in children living in areas with high concentration

of air pollution vs. children living in areas of less exposure.  Air pollutants were specified to be particulate matter, sulfur dioxide, nitrogen oxides and carbon monoxide (Calderón-Garcidueñas, 2016,2012).

For adolescents, one urban study found exposure to NO2, NOx, and PM2.5 was found to be associated with increases in psychotic experiences (Newberry,2019).

Both these studies differentiate exposure in areas of dense traffic compared with areas of minimal traffic and reflect greater exposure to vehicular emissions.

Health impacts are not limited to children but have wide impacts on adult and aging populations.

A meta-analysis review has indicated association with exposure to particulate matter and poor mental health for a variety of mental health difficulties with long-term exposure to PM2.5 associated with depression and anxiety and short-term exposure to PM10 associated with increase suicide (Braithwaite, 2019).

Long-term exposures to pollutants (strong association to PM2.5 and weaker association to nitrogen dioxide) are associated with significant higher rates of psychiatric conditions, particularly depression (Borroni, 2022) with estimates of 10% increase in depression in areas of high AP exposure (Fan, 2020), anxiety (Yang, 2023) and bipolar disorder (Khan,2019).  Another meta-analysis showed suicide risk increases with $PM_{2.5}$, $PM_{10}$, $NO_2$, and $NO_2$, exposure (Heo, 2021). Suicide rates increase by 1-2% on days with poor air quality and can lag from 1-3 days post exposure. (Dumont, 2020).  Acute exposures to PM 2.5 and ozone are associated with increases in violent crimes (Berman, 2019).

Air pollution exposure, specifically PM2.5, substantially contributes to neurodegenerative disorders of aging with significant increased risks for dementia, stroke, Parkinson's disease and autistic spectrum disorder (Fu, 2019, Yuan, 2019). The largest meta-analysis to date indicates exposure to outdoor air pollution is a significant risk for the onset of dementia with estimates for every 10 $\mu g/m^3$ of $PM_{2.5}$, relative risk of dementia increases by 17% with similar data on NO2 and Black Carbon/soot exposure. (Rogowski, 2025, Univ of Cambridge, 2025). Another meta-analysis showed a 3% increase in risk of dementia per 1 $\mu g/m^3$ increment in $PM_{2.5}$ (Albohasani, 2023).  A recent study evaluating functioning of dementia patients and post- mortem autopsy found that higher exposure to PM2.5 found to be associated with more severe cognitive and functional impairment during life and increased odds of more severe Alzheimer's disease neuropathic changes found at autopsy(Kim, 2025).  The 2024 Lancet Commission on dementia reported air pollution  (PM2.5 NO2, and Black carbon/soot)  accounts for 2% worldwide cases and added reducing air pollution as one of the top modifiable risk factors for dementia and  strongly recommend policies reducing air pollution to improve cognition and reduce dementia risk (Livingston, 2024).

Increase of stroke with exposures to air pollution is a significant risk for neuropsychological health.  Meta-analysis of long-term exposure to PM2.5 indicates significant ischemic stroke increase (13% for each 10 $\mu g/m^3$ PM2.5) (Alexeeff, 2021).  Another meta-analysis showed

increase of ischemic stroke with short-term (within 5 days) exposure of air pollution (specifically, $NO_2$ , $O_3$,, $SO_2$, $PM_{2.5}$,, $PM_{100)}$ ) (Toubas, 2023)

An experimental study, assessing the impact of in-door air quality on work performance exposed office workers to various levels of CO2. They found that elevated CO2 levels were correlated with impairments in cognitive functioning and decision making (Satish, 2012).  A recent longitudinal study that built on this initial study, explored indoor air quality and creativity, a high-level cognitive function, in four countries (China, India, the United Kingdom, United States). Researchers evaluated young adults working in office buildings over a six-month period.  They found that higher in-door CO2 and PM2.5 concentrations were associated with lower creative thinking supporting the argument that in-door air quality impacts work performance and wellbeing for workers and economic impacts for businesses (Dedesko, 2025).

HEAT:

It is well established fact that greenhouse gas (GHG) emissions from human activities are the primary driver of increasing global temperatures and extreme weather events, particularly heat waves. Globally and domestically, heat waves are becoming more frequent, lasting longer, more severe, more deadly and are a profound threat to health.

Heat Waves/Extreme Heat are known as the "silent killer". Additionally, extreme heat has a wide range of severe impacts on brain, human behavior, and wellbeing.

The underlying biologic mechanism of extreme heat on mental and brain functioning is extremely complex and multifactorial. Extreme heat impairs the body's ability to maintain adequate thermoregulation with potential to cause damage to brain structure and function.  As blood is shunted away from vital organs, including the brain, to the skin to facilitate cooling thru sweating and evaporative processes, needed oxygen is diverted away from the brain and blood-brain barrier becomes permeable.  A host of processes can be impacted. Neurotransmitters, including dopamine, serotonin, noradrenaline play crucial roles in a wide range of brain functions, including but not limited to mood regulation, sleep, stress responses, motivation, reward systems and thermoregulation.  Additionally, the activation of the sympathetic nervous system during extreme heat increases stress hormone production and contributes to anxiety, agitation, and mood instability.   Extreme heat can significantly impact neurotransmitter functioning (Löhmus, 2018).

The biological mechanisms impacting human physiology help to explain the finding that mental health impacts of extreme heat are found globally.

Extreme heat events(heatwaves) are associated with significant adverse mental health impacts (Cianconi, 2020, Liu, 2021, Thompson, 2021, Hayes, 2018) including increased violence, suicides, sleep disorders, and impaired cognition:

- Aggression/violence/conflict: Climate change and increasing temperatures influence conflict in multiple ways.  However, one authoritative study found that one standard deviation of temperature increase over baseline norm increased interpersonal violence

by 4%. Interpersonal violence is particularly significant for domestic partner aggression with severe traumatic impacts for women and children. Intergroup violence increased by 11.3% for the same temperature increase.  The authors conclude "anthropogenic climate change has the potential to substantially increase global violent crime, civil conflict and political instability" (Burke, 2015).

These researchers have replicated their early reports with much larger sample size and found consistent and statistically significant results of inter-group conflict, personal conflict, and self-harm (Burke, 2024).

- Increases in suicide.  Numerous studies show increase in suicide: (Burke, 2018, Gao, 2019, Frangione, 2022, Cheng, 2021, Thompson,2018)

One study controlling for confounding variables found a significant increase in suicide associated with heat: a 0.7% increase and a 2.1% in Mexico (Burke, 2018).   The study authors estimate that by 2050, assuming no reduction in green-house gas emissions, there will be 14,020 excess suicides in the US and 7,460 excess suicides in Mexico. They suggest these rates are comparable to the effects on suicide incidence due to economic recessions and unemployment, celebrity suicides, gun restriction laws and suicide prevention programs.

Another British study showed that for each 1°C increase in mean temperature above 18 °C, was associated with a 3.8 and 5.0% rise in suicide and violent suicide respectively (Page, 2007). Another study found 1°C increase in mean daily temperature was associated with a 1.7% increase in suicides worldwide (Thompson, 2023).

- Sleep: Adequate and sound sleep is essential for both physical health and many aspects of human functioning. Sleep disruptions are increasing as temperatures increase.  High temperatures at night have the most severe health impacts since the body needs to cool down to initiate and maintain sleep. One large population study reported that for each 10 °C increase in ambient temperature, the odds of sleep insufficiency increased by 20.1%, total sleep time decreased by 9.67 minutes, and deep sleep declined significantly (Li, 2025).

Sleep dysfunction has wide ranging impacts on many aspects of mental wellbeing and functioning. REM sleep is instrumental for memory consolidation, emotional processing, and psychological restoration.  Climate change is driving increases in daytime and nighttime temperatures and setting the stage for disrupted sleep with delayed sleep onset, interruptions in sleep, shorter sleep duration and poorer quality sleep (Chevance, 2024).  Elevated nighttime temperatures interfere with adequate thermoregulation required for healthy initiation and maintenance of sleep and healthy sleep architecture with balance of slow-wave and RME sleep.   Poor sleep has a wide range of negative impacts functioning and wellbeing including increased anxiety, irritability, depressive symptoms, impaired emotional regulation, and reduced cognitive functioning. Some researchers have suggested that disrupted sleep may be an ofunderlying contributor to many of the adverse mental health outcomes (Chevance, 2024).

- Impairments in cognition, attention, problem solving.
  There are significant impacts on cognition and behavior attributable to the impacts of climate change including impacts of excessive heat and air pollution.
  There is overwhelming evidence that extreme heat significantly impairs cognitive functioning, including reduced concentration, attention, memory—particularly working memory—as well as diminished information processing, retention, and executive functioning (Löhmus, 2018, Liu, 2021, Yin, 2024).

  Studies have shown impaired learning for children (Dong, 2023), reduced academic performance (Park, 2022) and reduced exam performance (Cedeño Laurent, 2018). Reduced cognitive function during heat waves is a particular concern for occupational safety and productivity with increased workplace errors, accidents (De Sario, 2023) Older adults and those with underlying cognitive impairments are particularly impacted (Zhou, 2023).

Vulnerable populations:

Although all humans are vulnerable to heat impacts, certain groups are at higher risk for mental health impacts from climate change.   These include children, older adults, pregnant and post-partum women, people with low incomes, outdoor workers, emergency response workers, and people with pre-existing mental health conditions.

Impacts on those with pre-existing psychiatric disorders:
Recognition of the increased mortality and morbidity of psychiatric patients to heat goes back to the mid 20th century and was documented even before the wide-spread use of psychiatric medications (Bark, 1998).

Recent studies have built on these early observations.

Recent systematic review has shown the increase of morbidity and mortality for people with pre-existing psychosis, dementia and substance use disorders.  (Meadows, 2024)

Some potential underlying mechanisms include reduced thermoregulatory function in patients with schizophrenia, medication use, reduced awareness of environmental risks, maladaptive behavior, social isolation and higher rates of poverty (Lömus, 2018, Page, 2012).

A recent meta-analysis spanning 30 years examined the effects of rising ambient temperatures and heatwaves on mental health, finding that for every 1 °C increase in temperature, mental health-related mortality and morbidity also increased; a 2.2% increase in mental health related mortality and a 0.9% increase in mental health related morbidity with significant increases primarily in mood disorders, organic mental disorders, schizophrenia, neurotic, and anxiety disorders.  Because definition of

heatwaves was more inconsistent across studies, evaluating the magnitude of effects was more variable but also indicated significant impacts on adverse mental health (Liu, 2021).

Several reports reviewing deaths during a severe heatwave ("heat dome" in Canada in 2021) for those with chronic illnesses found patients with schizophrenia had the highest rates of mortality. Deaths during this "heat dome" for schizophrenics were three times higher than a comparable period with normal temperatures. During this heatwave, patients with depression ranked 11th out of 21 chronic diseases in terms of heat-related mortality (Lee, 2023, Chen, 2023).

This adds to a substantial number of studies reporting increased risk of death for mentally ill during extreme heat conditions (Bouchama, 2007, Liu, 2021, Löhmus, 2018, Page, 20212, Hansen, 2008).

Several studies have found that people with preexisting mental health conditions have more emergency room visits (Nori-Sarmam, 2022) and hospitalizations.

General impacts of Climate Change:

Numerous well researched studies highlight the wide-range adverse impacts on psychological wellbeing and worsened mental health outcomes from climate change-related events. (Cianconi, 2020, Liu, 2021, Charlson, 2021, Thompson, 2021, Hayes, 2018). Beyond the specific impact of heat and toxic air pollution addressed above, there are a wide range of both direct and indirect climate related events that impact mental health/wellbeing.

Acute extreme weather events such as disasters, associated superstorms, floods, wildfires increase the prevalence of significant mental health disruptions. Acute stress reactions, depression, anxiety, increase in substance use (alcohol, drugs), stress related interpersonal conflict and post-traumatic stress disorder are all sequela of exposure to these climate associate disasters.

Droughts, deforestation, desertification, sea level rise, and changes to the natural environment also have far-reaching impacts on psychological wellbeing. Climate change can create disruption to food and water, changes to agriculture, land use and occupational conditions contributing to financial and relationship stresses (Hayes, 2018). Experiences of despair, hopelessness and climate grief, the mourning of lost places, landscapes, familiar ways of living and being attached to place can be profound (Comtesse, 2021).

Both slow moving and acute disasters contribute to pressures on forced displacement. Displacements can be either internal (within a country) or external (across borders) and may be temporary or permanent in nature. The psychosocial/cultural impacts of displacement are wide ranging from acute stress responses to more serious and sustaining psychiatric difficulties that are intensified by fragmented social cohesion, weakened political institutions, violence, and potential threat to national and community security.

Eco-distress/climate distress is becoming a growing concern.

As climate change impacts mount, there is emerging new literature about the increased prevalence of eco-anxiety. One meta-analysis reported adverse mental health outcomes associated with eco-distress (Cosh, 2024).

Solastalgia is a term recognizing existential grief and psychic distress when one's home has been impacted by environmental change. It is described as the loss of solace, comfort from familiar places which causes pain, grief, sadness as one experiences changes in the familiar places (Albrecht, 2007, Takver, 2024).

Emotional distress is particularly concerning for youth who are aware of impacts of climate change impacts and worried about the world they live in and anticipate inheriting. A recent scoping review found significant high levels of distress (63% of studies) in the pediatric population (less than 18 years old) (Wortzel, 2024). Several survey studies underscore the serious impact of climate distress; One global study of 10,000 youth ages 16–25-year-old in 10 countries found that 59% were worried or extremely worried about climate change, over 50% believed "humanity is doomed," and nearly half said it impaired their daily functioning (Hickman, 2021).

A similar study looking at U.S. youth had very similar findings indicating a high level of distress for this demographic with a report of 85% moderately worried, 57.95% very or extremely worried, 42.8% impact on self-reported mental health and 38.3% worries impact daily functioning (Lewindowski, 2024).

Conclusion:

There is substantial evidence of a serious and grave direct impact on mental health and brain function caused by GHG and associated fine particulate matter and air pollution. In addition, GHG emissions result in extreme heat and other events that have been shown to cause serious harm to mental health. The scientific evidence is conclusive and should not be ignored.  We urge the Administration to withdraw the proposed repeal of the 2009 Endangerment Finding and uphold its responsibility to protect the physical health and mental health of the American people.

*\* Greenhouse gas emissions and, criteria pollutants including particulate matter are often and commonly referred to as air pollution in the medical and scientific literature.  I will, therefore, use refer to air pollution as well as GHG emissions in these comments.*

REFERENCES:

Abolhasani, E., Hachinski, V., Ghazaleh, N., Azarpazhooh, M. R., Mokhber, N., & Martin, J. (2023). Air pollution and incidence of dementia. *Neurology, 100*(2), e242-254. https://doi.org/10.1212/wnl.0000000000201419

Albrecht, G., Sartore, G.-M., Connor, L., Higginbotham, N., Freeman, S., Kelly, B., Stain, H., Tonna, A., & Pollard, G. (2007). Solastalgia: The distress caused by environmental change. *Australasian Psychiatry*, *15*(1_suppl), S95–98. https://doi.org/10.1080/10398560701701288

Albrecht, G. (2011).  Chronic Environmental Change: Emerging 'Psychoterratic' Syndromes. In *Climate Change and Human Well-Being.* (pp. 43–56). Springer.

Alexeeff, S. E., Liao, N. S., Liu, X., Van Den Eeden, S. K., & Sidney, S. (2020). Long-term $PM_{2.5}$ exposure and risks of ischemic heart disease and stroke events: Review and meta-analysis. *Journal of the American Heart Association, 10*(1). https://doi.org/10.1161/jaha.120.016890

Alzheimer's Association International Conference (2021,July 26). Improving air quality reduces dementia risk, multiple sources suggest. https://aaic.alz.org/releases_2021/air-pollution-dementia-risk.asp#

American Psychiatric Association (2023, April 12). *Air pollution's impact on mental health.* Psychiatry.org. https://www.psychiatry.org/news-room/apa-blogs/air-pollutions-impact-on-mental-health

Amnuaylojaroen T., Parasin N., Saokaew S. (2024). Exploring the association between early-life air pollution exposure and autism spectrum disorders in children: A systematic review and meta-analysis. *Reprod Toxicol (125):*108582. doi: 10.1016/j.reprotox.2024.108582

Bark, N. (1998). Deaths of psychiatric patients during heat waves. *Psychiatric Services, 49*(8), 1088–1090. https://doi.org/10.1176/ps.49.8.1088

Berman, J. D., Burkhardt, J., Bayham, J., Carter, E., & Wilson, A. (2019). Acute air pollution exposure and the risk of violent behavior in the United States. Epidemiology, 30(6), 799–806. https://doi.org/10.1097/ede.0000000000001085

Borroni, E., Pesatori, A. C., Bollati, V., Buoli, M., & Carugno, M. (2022). Air pollution exposure and depression: A comprehensive updated systematic review and meta-analysis. *Environmental Pollution*, *292*(Pt A), 118245. https://doi.org/10.1016/j.envpol.2021.118245

Bouchama, A., Dehbi, M., Mohamed, G., Matthies, F., Shoukri, M., & Menne, B. (2007). Prognostic factors in heat wave related deaths: A meta-analysis. *Archives of Internal Medicine, 167*(20), 2170–2176. https://doi.org/10.1001/archinte.167.20.ira70009

Braithwaite, I., Zhang, S., Kirkbride, J. B., Osborn, D. P., & Hayes, J. F. (2019). Air pollution (particulate matter) exposure and associations with depression, anxiety, bipolar, psychosis and suicide risk: A systematic review and meta-analysis. *Environmental Health Perspectives*, *127*(12). https://doi.org/10.1289/ehp4595

Burke, M., Ferguson, J., Hsiang, S., & Miguel, E. (2024). New evidence on the economics of climate and Conflict. Handbook of the Economics of Conflict, 1, 249–305. https://doi.org/10.1016/bs.hoec.2024.10.008

Burke, M., González, F., Baylis, P., Heft-Neal, S., Baysan, C., Basu, S., & Hsiang, S. (2018). Higher temperatures increase suicide rates in the United States and Mexico. Nature Climate Change, 8, 723–729. https://doi.org/10.1038/s41558-018-0222-x

Burke, M., Hsiang, S. M., & Miguel, E. (2015). Climate and conflict. Annual Review of Economics, 7(1), 577–617. https://doi.org/10.1146/annurev-economics-080614-115430

Calderón-Garcidueñas, L., Kavanaugh, M., Block, M., D'Angiulli, A., Delgado-Chávez, R., Torres-Jardón, R., González-Maciel, A., Reynoso-Robles, R., Osnaya, N., Villarreal-Calderon, R., Guo, R., Hua, Z., Zhu, H., Perry, G., & Diaz, P. (2012). Neuroinflammation, hyperphosphorylated tau, diffuse amyloid plaques, and down-regulation of the cellular prion protein in air pollution exposed children and young adults. *Journal of Alzheimer's Disease, 28*(1), 93–107. https://doi.org/10.3233/jad-2011-110722

Calderón-Garcidueñas, L., Reynoso-Robles, R., Vargas- Martínez, J., Gómez-Maqueo-Chew, A., Pérez-Guillé, B., Mukherjee, P. S., Torres-Jardón, R., Perry, G., & Gónzalez-Maciel, A. (2016). Prefrontal white matter pathology in air pollution exposed Mexico City young urbanites and their potential impact on neurovascular unit dysfunction and the development of Alzheimer's disease. *Environmental Research, 146*, 404–417. https://doi.org/10.1016/j.envres.2015.12.031

Cedeño Laurent, J. G., Williams, A., Oulhote, Y., Zanobetti, A., Allen, J. G., & Spengler, J. D. (2018). Reduced cognitive function during a heat wave among residents of non-air-conditioned buildings: An observational study of young adults in the summer of 2016. *PLOS Medicine, 15*(7). https://doi.org/10.1371/journal.pmed.1002605

Center for Climate and Energy Solutions. (2023, July 14). *Heat waves and climate change.* C2ES. https://www.c2es.org/content/heat-waves-and-climate-change/

Charlson, F., Ali, S., Benmarhnia, T., Pearl, M., Massazza, A., Augustinavicius, J., & Scott, J. G. (2021). Climate change and mental health: A scoping review. *International Journal of Environmental Research and Public Health, 18*(9), 4486. https://doi.org/10.3390/ijerph18094486

Chen, S. X., Lee, M. J., McVea, D. A., & Henderson, S. B. (2023, June 1). *Risk of mortality among people with schizophrenia during the 2021 Heat Dome.* British Columbia Medical Journal. https://bcmj.org/bc-centre-disease-control/risk-mortality-among-people-schizophrenia-during-2021-heat-dome

Cheng, S., Jin, Y., Dou, Y., Zhao, Y., Duan, Y., Pei, H., & Lyu, P. (2022). Long-term particulate matter 2.5 exposure and dementia: A systematic review and meta-analysis. *Public Health, 212*, 33–41. https://doi.org/10.1016/j.puhe.2022.08.006

Cheng, S., Plouffe, R., Nanos, S. M., Qamar, M., Fisman, D. N., & Soucy, J.-P. R. (2021). The effect of average temperature on suicide rates in five urban California counties, 1999–2019: An ecological time series analysis. *BMC Public Health, 21*(1), 974. https://doi.org/10.1186/s12889-021-11001-6

Chevance, G., Minor, K., Vielma, C., Campi, E., O'Callaghan-Gordo, C., Basagaña, X., Ballester, J., & Bernard, P. (2024). A systematic review of ambient heat and sleep in a warming climate. *Sleep Medicine Reviews, 75*, 101915. https://doi.org/10.1016/j.smrv.2024.101915

Choma, E.F., Evans J.S., Gómez-Ibáñez, J.A., Di ,Q., Schwartz, J.D., Hammitt, J.K., & Spengler, J.D. (2021) Health benefits of decreases in on-road transportation emissions in the United States from 2008 to 2017. *Proc Natl Acad Sci U S A. 118*(51):e2107402118. https://doi.org/10.1073/pnas.2107402118

Cianconi, P., Betrò, S., & Janiri, L. (2020). The impact of climate change on mental health: A Systematic descriptive review. *Frontiers in Psychiatry, 11*, 74. https://doi.org/10.3389/fpsyt.2020.00074

Clayton, S., Manning, C. M., Krygsman, K., & Speiser, M. (2017). *Mental Health and Our Changing Climate: Impacts, Implications, and Guidance.* Washington, D.C.: American Psychological Association, and ecoAmerica.

Comtesse, H., Ertl, V., Hengst, S. M., Rosner, R., & Smid, G. E. (2021). Ecological grief as a response to environmental change: A mental health risk or functional response? *International Journal of Environmental Research and Public Health, 18*(2), 734. https://doi.org/10.3390/ijerph18020734

Cosh, S. M., Ryan, R., Fallander, K., Robinson, K., Tognela, J., Tully, P. J., & Lykins, A. D. (2024). The relationship between climate change and mental health: A systematic review of the association between eco-anxiety, psychological distress, and symptoms of major affective disorders. *BMC Psychiatry, 24*, 833. https://doi.org/10.1186/s12888-024-06274-1

Columbia University Mailman School of Public Health (2024, March 13). *Climate Policies to Reduce Motor Vehicle Emissions Can Improve Children's Health.* https://www.publichealth.columbia.edu/news/climate-policies-reduce-motor-vehicle-emissions-can-improve-childrens-health#

De Sario, M., de'Donato, F. K., Bonafede, M., Marinaccio, A., Levi, M., Ariani, F., Morabito, M., & Michelozzi, P. (2023). Occupational heat stress, heat-related effects and the related social and economic loss: A Scoping Literature Review. *Frontiers in Public Health, 11.* https://doi.org/10.3389/fpubh.2023.1173553

Dedesko, S., Pendleton, J., Petrov, J., Coull, B. A., Spengler, J. D., & Allen, J. G. (2025). Associations between indoor environmental conditions and divergent creative thinking scores in the COGFX Global Buildings Study. *Building and Environment, 270*, 112531. https://doi.org/10.1016/j.buildenv.2025.112531

Dong, J, Schwartz, Y, Korolija, I, Mumovic, D. (2023). The impact of climate change on cognitive performance of children in English school stock: A simulation study. *Building and Environment, 243*, 110607. https://doi.org/10.1016/j.buildenv.2023.110607.

Dumont, C., Haase, E., Dolber, T., Lewis, J., & Coverdale, J. (2020). Climate change and risk of completed suicide. *Journal of Nervous and Mental Disease, 208*(7), 559–565. https://doi.org/10.1097/nmd.0000000000001162

Dutheil F., Comptour A., Morlon R., Mermillod M., Pereira B., Baker J.S., Charkhabi M., Clinchamps M., Bourdel N..(2021). Autism spectrum disorder and air pollution: A systematic review and meta-analysis. *Environ Pollut.;*278:116856. doi: 10.1016/j.envpol.2021.116856

Environmental Protection Agency. (2024, June). *Climate change indicators: Heat waves.* EPA. https://www.epa.gov/climate-indicators/climate-change-indicators-heat-waves

Fan, S.-J., Heinrich, J., Bloom, M. S., Zhao, T.-Y., Shi, T.-X., Feng, W.-R., Sun, Y., Shen, J.-C., Yang, Z.-C., Yang, B.-Y., & Dong, G.-H. (2020). Ambient air pollution and depression: A systematic review with meta-analysis up to 2019. *Science of The Total Environment, 701*, 134721. https://doi.org/10.1016/j.scitotenv.2019.134721

Flanagan, E., Malmqvist, E., Rittner, R., Gustafsson, P., Källén, & Oudin, A. (2023) Exposure to local, source-specific ambient air pollution during pregnancy and autism in children: a cohort study from southern Sweden. *Sci Rep* 13, 3848. https://doi.org/10.1038/s41598-023-30877-5

Frangione, B., Rodríguez Villamizar, L. A., Lang, J. J., Colman, I., Lavigne, E., Peters, C., Anisman, H., & Villeneuve, P. J. (2022). Short-term changes in meteorological conditions and suicide: A systematic review and meta-analysis. *Environmental Research, 207*, Article 112230. https://doi.org/10.1016/j.envres.2021.112230

Fu, P., Guo, X., Cheung, F. M., & Yung, K. K. (2019). The association between $PM_{2.5}$ exposure and neurological disorders: A systematic review and meta-analysis. *Science of The Total Environment, 655*, 1240–1248. https://doi.org/10.1016/j.scitotenv.2018.11.218

Gao, J., Cheng, Q., Duan, J., Xu, Z., Bai, L., Zhang, Y., Zhang, H., Wang, S., Zhang, Z., & Su, H. (2019). Ambient temperature, Sunlight Duration, and suicide: A systematic review and meta-analysis. *Science of The Total Environment, 646*, 1021–1029. https://doi.org/10.1016/j.scitotenv.2018.07.098

Haase, E. (2025). *Handbook of Climate Psychiatry and psychotherapy: A manual for clinicians.* American Psychiatric Association Publishing.

Hahad, O., Lelieveld, J., Birklein, F., Lieb, K., Daiber, A., & Münzel, T. (2020). Ambient air pollution increases the risk of cerebrovascular and neuropsychiatric disorders through induction of inflammation and oxidative stress. *International Journal of Molecular Sciences, 21*(12), 4306. https://doi.org/10.3390/ijms21124306

Hansen, A. Bi,P.,Nitschke, P., Ryan, P., Pisaniello, D., Tucker, G. (2008) The effect of heat waves on mental health in a temperate Australian city. *Environmental Health Perspectives, 116*(10), 1369-1374. https://doi.org/10.1289/ehp.1133

Hayes, K., Blashki, G., Wiseman, J., Burke, S., & Reifels, L. (2018). Climate change and mental health: Risks, impacts and priority actions. *International Journal of Mental Health Systems, 12*, 28. https://doi.org/10.1186/s13033-018-0210-6

Heo, S., Lee, W., & Bell, M. L. (2021). Suicide and associations with air pollution and ambient temperature: A systematic review and meta-analysis. *International Journal of Environmental Research and Public Health, 18*(14), 7699. https://doi.org/10.3390/ijerph18147699

Khan, A., Plana-Ripoll, O., Antonsen, S., Brandt, J., Geels, C., Landecker, H., Sullivan, P. F., Pedersen, C. B., & Rzhetsky, A. (2019). Environmental pollution is associated with increased risk of psychiatric disorders in the US and Denmark. *PLOS Biology, 17*(8), e3000353. https://doi.org/10.1371/journal.pbio.3000353

Kim B., Blam K., Elser H., Xie, S.H., Van Deerlin, V.M., Penning, T.M., Weintraub, D., Irwin, D.J., Massimo, L.M., McMillan, C.T., Mechanic-Hamilton, D., Wolk, D.A., Lee, E.B. (2025). Ambient Air Pollution and the Severity of Alzheimer Disease Neuropathology. *JAMA Neurol.* doi:10.1001/jamaneurol.2025.3316

Lam,J., Sutton, P., Kalkbrenner, A., Windham, G., Halladay, A., Koustas, E., Lawler, C., Davidson, L., Daniels, N., Newschaffer, C., Woodruff, T. (2016). A Systematic Review and Meta-Analysis of Multiple Airborne Pollutants and Autism Spectrum Disorder . *Plos One.* doi.org/10.1371/journal.pone.0161851

Lan, L., Tang, J., Wargocki, P., Wyon, D. P., & Lian, Z. (2022). Cognitive performance was reduced by higher air temperature even when thermal comfort was maintained over the 24-28°C range. *Indoor air, 32*(1), e12916. https://doi.org/10.1111/ina.12916

Lawrance, E. L., Thompson, R., Fontana, G. & Jennings, N. (2021). The impact of climate change on mental health and emotional wellbeing: current evidence and implications for policy and practice.*Grantham Institute Briefing Paper*. https://doi.org/10.1080/09540261.2022.2128725

Lee, M. J., McLean, K. E., Kuo, M., Richardson, G. R., & Henderson, S. B. (2023). Chronic diseases associated with mortality in British Columbia, Canada during the 2021 Western North America Extreme Heat Event. *GeoHealth, 7*(3). https://doi.org/10.1029/2022gh000729

Lewandowski, R. E., Clayton, S. D., Olbrich, L., Sakshaug, J. W., Wray, B., Schwartz, S. E. O., Augustinavicius, J., Howe, P. D., Parnes, M., Wright, S., Carpenter, C., Wiśniowski, A., Ruiz, D. P., & Van Susteren, L. (2024). Climate emotions, thoughts, and plans among US adolescents and young adults: A cross-sectional descriptive survey and analysis by political party identification and self-reported exposure to severe weather events. *The Lancet Planetary health, 8*(11), e879–e893. https://doi.org/10.1016/S2542-5196(24)00229-8

Li, A., Luo, H., Zhu, Y., Zhang, Z., Liu, B., Kan, H., Jia, H., Wu, Z., Guo, Y., & Chen, R. (2025). Climate warming may undermine sleep duration and quality in repeated-measure study of 23 million records. *Nature Communications, 16*, 2609. https://doi.org/10.1038/s41467-025-57781-y

Liu, J., Varghese, B. M., Hansen, A., Xiang, J., Zhang, Y., Dear, K., Gourley, M., Driscoll, T., Morgan, G., Capon, A., & Bi, P. (2021). Is there an association between hot weather and poor mental health outcomes? A systematic review and meta-analysis. *Environment International, 153*, 106533. https://doi.org/10.1016/j.envint.2021.106533

Livingston, G., Huntley, J., Liu, K. Y., Costafreda, S. G., Selbæk, G., Alladi, S., Ames, D., Banerjee, S., Burns, A., Brayne, C., Fox, N. C., Ferri, C. P., Gitlin, L. N., Howard, R., Kales, H. C., Kivimäki, M., Larson, E. B., Nakasujja, N., Rockwood, K., ... Mukadam, N. (2024). Dementia prevention, intervention, and care: 2024 report of The Lancet Standing Commission. *The Lancet, 404*(10452), 572–628. https://doi.org/10.1016/s0140-6736(24)01296-0

Lõhmus, M. (2018). Possible biological mechanisms linking mental health and heat—A contemplative review. *International Journal of Environmental Research and Public Health, 15*(7), 1515. https://doi.org/10.3390/ijerph15071515

Meadows, J., Mansour, A., Gatto, M.R., Li, A., Howard, A., & Bentley, R.(2024). Mental illness and increased vulnerability to negative health effects from extreme heat events: a systematic review. *Psychiatry Research, 332*(115678). https://doi.org/10.1016/j.psychres.2023.115678Get rights and content

Newbury, J. B., Arseneault, L., Beevers, S., Kitwiroon, N., Roberts, S., Pariante, C. M., Kelly, F. J., & Fisher, H. L. (2019). Association of air pollution exposure with psychotic experiences during adolescence. *JAMA Psychiatry, 76*(6), 614–623. https://doi.org/10.1001/jamapsychiatry.2019.0056

Nori-Sarma, A., Sun, S., Sun, Y., Spangler, K. R., Oblath, R., Galea, S., Gradus, J. L., & Wellenius, G. A. (2022). Association between ambient heat and risk of emergency department visits for mental health among US adults, 2010 to 2019. *JAMA Psychiatry, 79*(4), 341–349. https://doi.org/10.1001/jamapsychiatry.2021.4369

Okamoto-Mizuno, K., & Mizuno, K. (2012). Effects of thermal environment on sleep and circadian rhythm. *Journal of Physiological Anthropology, 31*, 14. https://doi.org/10.1186/1880-6805-31-14

Page, L. A., Hajat, S., & Kovats, R. S. (2007). Relationship between daily suicide counts and temperature in England and Wales. *British Journal of Psychiatry, 191*(2), 106–112. https://doi.org/10.1192/bjp.bp.106.031948

Page, L. A., et.al. (2012). Temperature-related deaths in people with psychosis, dementia and substance misuse. *British Journal of Psychiatry. 200*(6),485-490. https://doi.org/10.1192/bjp.bp.111.100404

Park, R. J. (2020). Hot temperature and high-stakes performance. *Journal of Human Resources, 57*(2), 400–434. https://doi.org/10.3368/jhr.57.2.0618-9535r3

Perera, F. P. (2017). Multiple threats to child health from fossil fuel combustion: Impacts of air pollution and climate change. *Environmental Health Perspectives, 125*(2), 141–148. https://doi.org/10.1289/ehp299

Ranson, M. (2014). Crime, weather, and climate change. *Journal of Environmental Economics and Management, 67*(3), 274–302. https://doi.org/10.1016/j.jeem.2013.11.008

Rogowski, C. B. B., Bredell, C., Shi, Y., Tien-Smith, A., Szybka, M., Fung, K. W., Hong, L., Phillips, V., Jovanovic Andersen, Z., Sharp, S. J., Woodcock, J., Brayne, C., Navaratnam, A., & Khreis, H. (2025). Long-term air pollution exposure and incident dementia: A systematic review and meta-analysis. *The Lancet Planetary Health, 9*(7), 101266. https://doi.org/10.1016/s2542-5196(25)00118-4

Satish, U., Mendell, M. J., Shekhar, K., Hotchi, T., Sullivan, D., Streufert, S., & Fisk, W. J. (2012a). Is $CO_2$ an indoor pollutant? Direct effects of low-to-moderate $CO_2$ concentrations on human decision-making performance. *Environmental Health Perspectives, 120*(12), 1671–1677. https://doi.org/10.1289/ehp.1104789

Takver, R. (2024, February 28). *Solastalgia*. Ecopsychepedia. https://ecopsychepedia.org/glossary/solastalgia/

Toubasi, A., & Al-Sayegh, T. N. (2023). Short-term exposure to air pollution and ischemic stroke: A systematic review and meta-analysis. *Neurology, 101*(19), e1922-1932. https://doi.org/10.1212/wnl.0000000000207856

Thompson, R., Hornigold, R., Page, L., & Waite, T. (2018). Associations between high ambient temperatures and heat waves with mental health outcomes: A systematic review. *Public Health, 161*, 171–191. https://doi.org/10.1016/j.puhe.2018.06.008

Thompson, R., Lawrance, E. L., Roberts, L. F., Grailey, K., Ashrafian, H., Maheswaran, H., Toledano, M. B., & Darzi, A. (2023). Ambient temperature and mental health: A systematic review and meta-analysis. *The Lancet Planetary Health, 7*(7), e580-589. https://doi.org/10.1016/s2542-5196(23)00104-3

Underwood, E. (2017). The Polluted Brain. *Science, 355*(6323), 342–345. https://doi.org/10.1126/science.355.6323.342

University of Cambridge. (2025, August 4). *Scientists just found a shocking link between dirty air and dementia*. SciTechDaily. https://scitechdaily.com/scientists-just-found-a-shocking-link-between-dirty-air-and-dementia/

Van Susteran, L., & Cooper, R. (2023, December 19). *Air Pollution and Climate Mental Health*. Ecopsychepedia. https://ecopsychepedia.org/glossary/air-pollution-and-climate-mental-health/

Weisskoph, M.G., Kioumourtzoglou, M.A., Roberts, A.L. (2015). Air Pollution and autism spectrum disorders: Causal or confounded? *Curr Environ Health Rep.(4)*:430-439. doi: 10.1007/s40572-015-0073-9

Wortzel, J. D., Denga, V.-S., Angrish, J., Dooley, L., Manjón, I., Shabdar, S., Lykins, A. D., Cosh, S., Bain, P. A., Olagunju, A. T., & McKowen, J. (2024). Pediatric climate distress: A scoping review and clinical resource. *The Journal of Climate Change and Health, 20*, 100349. https://doi.org/10.1016/j.joclim.2024.100349

Yang, T., Wang, J., Huang, J., Kelly, F. J., & Li, G. (2023). Long-term exposure to multiple ambient air pollutants and association with incident depression and anxiety. *JAMA Psychiatry, 80*(4), 305–313. https://doi.org/10.1001/jamapsychiatry.2022.4812

Yin, B., Fang, W., Liu, L., Guo, Y., Ma, X., & Di, Q. (2024). Effect of extreme high temperature on cognitive function at different time scales: A national difference-in-differences analysis. *Ecotoxicology and Environmental Safety*, *275*, 116238. https://doi.org/10.1016/j.ecoenv.2024.116238

Yuan, S., Wang, J., Jiang, Q., He, Z., Huang, Y., Li, Z., Cai, L., & Cao, S. (2019). Long-term exposure to $PM_{2.5}$ and stroke: A systematic review and meta-analysis of cohort studies. *Environmental Research, 177*, 108587. https://doi.org/10.1016/j.envres.2019.108587

Zhou, W., Wang, Q., Li, R., Zhang, Z., Wang, W., Zhou, F., & Ling, L. (2023). The effects of heatwave on cognitive impairment among older adults: Exploring the combined effects of air pollution and green space. *Science of The Total Environment, 904*, 166534. https://doi.org/10.1016/j.scitotenv.2023.166534

# EXHIBIT 11-G



September 22, 2025

<u>Submitted electronically via regulations.gov</u>

U.S. Environmental Protection Agency
EPA Docket Center, Air Docket
Docket ID No. EPA-HQ-OAR-2025-0194
Mail Code 28221T
1200 Pennsylvania Avenue NW,
Washington, DC 20460

> ***Reconsideration of 2009 Endangerment Finding and Greenhouse Gas Vehicle Standards, Docket ID No. EPA-HQ-OAR-2025-0194, 90 Fed. Reg. 36,288 (Aug. 1, 2025)***

To Whom It May Concern:

Tesla submits these comments in response to the Environmental Protection Agency's ("EPA") request for comment on its proposed rule entitled *Reconsideration of 2009 Endangerment Finding and Greenhouse Gas Vehicle Standards* (the "Proposal").[1]  Tesla appreciates the opportunity to file these comments and notes that we welcome, in principle, the ongoing efforts being made by the administration to reduce or simplify burdensome regulations.  While Tesla believes that the current regulation establishing the standards is overly complex and could be streamlined to make it less burdensome**,** we do, nonetheless, recognize EPA's authority and obligation to establish greenhouse gas standards for motor vehicles.[2]  However, Tesla's comments that follow focus specifically on the Proposal as presented.  Regardless, the company remains open to discussing mechanisms to streamline the standards – which must, as described below, be maintained.

## I. Introduction and Executive Summary

Tesla's mission is to accelerate the world's transition to sustainable energy.[3] We make physical products at scale and at a low cost with the goal of making life better for everyone. [4]  To accomplish its mission, Tesla designs, develops, manufactures, and sells high-performance fully electric vehicles and energy generation and storage systems, installs and maintains such systems, and sells solar electricity.

Tesla currently produces and sells several fully electric, zero emissions light-duty vehicle (ZEV) models, including Model Y, a sport utility vehicle (SUV) that has been ranked the best-selling car in the world (EV or otherwise, 2023).[5]  Along with the Model Y, Tesla manufactures the Model 3 mid-sized sedan, Model S sedan, the Model X

---

[1] 90 Fed. Reg. 36,288 (Aug. 1, 2025).

[2] For example, Tesla has previously advocated to streamline the standards by advocating to eliminate clean technology vehicle "multipliers" despite the fact this provision delivered additional regulatory compliance credits to Tesla which it could have traded in the credits market.  *See, e.g.,* Tesla Comment on Environmental Protection Agency (EPA), Multi-Pollutant Emissions Standards for Model Years 2027 and Later Light-Duty and Medium-Duty Vehicles, Docket ID No EPA-HQ-OAR-2022-0829, 88 Fed. Reg. 29184 (May 5, 2023), submitted July 5, 2023, at 26.

[3] For details on the intersection between emissions and Tesla's mission statement *see* TESLA, MASTER PLAN PART 3 (Apr. 5, 2023), https://www.tesla.com/ns_videos/Tesla-Master-Plan-Part-3.pdf, and  MASTER PLAN PART 4 (SEPT. 1, 2025), https://www.tesla.com/en_ca/master-plan-part-4.

[4] For details on Tesla's latest master plan, see MASTER PLAN PART 4 (Sept. 1, 2025), https://www.tesla.com/master-plan-part-4.

[5] Green Car Reports, *The Bestselling Vehicle on the Planet is an EV* (Jan. 25, 2024), https://www.greencarreports.com/news/1142104_tesla-the-bestselling-vehicle-on-the-planet-is-an-ev.

SUV, and the Cybertruck full-sized pickup.[6] As EPA recognized in its *2024 Automotive Trends Report*, Tesla had by far the lowest carbon dioxide emissions (0 g/mi) and highest fuel economy (120.6 miles per gallon) of all large vehicle manufacturers in MY 2023.[7] Additionally, in December 2022, Tesla initiated delivery of its fully electric Class 8, day cab heavy duty truck – the Semi.

In 2024, our customers avoided releasing nearly 32 million metric tons of CO2e into the atmosphere. The combined global fleet of Tesla vehicles and solar panels paired with energy storage enabled our customers to avoid emitting nearly 32 million metric tons of Co2e in 2024. That's the same as driving an internal combustion engine (ICE) vehicle about 78 billion miles.[8]

Tesla is deeply committed to ensuring the United States remains a leader in advanced manufacturing. All Tesla vehicles sold in the United States are domestically manufactured. In 2025, for the second time, Tesla's light-duty vehicles swept the top four rankings for the most American-made car, based on overall contributions to the U.S. economy.[9] Tesla's U.S. supply chain spans across more than 40 states and continues to expand, serving Tesla's factory locations in Texas, Nevada, New York, and California.[10] Figure 1 illustrates Tesla retail, service and charging sites across America. Today, Tesla's U.S.-based total direct employment headcount is about 70,000.



*Figure 1. Truly National: Map of Tesla retail, service and charging locations across America.*

Importantly, Tesla is not only a manufacturer but is also continuing to grow its large network of retail stores, vehicle service centers, collision centers, and electric vehicle charging stations to accelerate and support the widespread adoption of electric vehicles. Tesla also operates the country's largest and most reliable public EV charging network, coming soon for use by all EV brands that have adopted the NACS charging standard. Since 2012, Tesla has invested heavily in siting, building, operating, and maintaining charging infrastructure. In 2013, Tesla had just eight Supercharger Stations in North America. Today, Tesla owns and operates the largest Direct

---

[6] Cybertruck has been or will be produced in light, medium and heavy-duty variants.

[7] EPA, THE 2024 EPA AUTOMOTIVE TRENDS REPORT: GREENHOUSE GAS EMISSIONS, FUEL ECONOMY, AND TECHNOLOGY SINCE 1975 at 12–13 (Nov. 2024), https://nepis.epa.gov/Exe/ZyPDF.cgi?Dockey=P101CUU6.pdf.

[8] See TESLA, IMPACT REPORT: EXTENDED VERSION at 20 (2024), https://www.tesla.com/ns_videos/2024-extended-version-tesla-impact-report.pdf.

[9] Cars.com, *2025 Cars.com American-Made Index: Which Cars Are the Most American?* (June 17, 2025), https://www.cars.com/american-made-index/#article-top.

[10] Tesla continues to invest in the upstream supply chain and in 2023 announced that it would commence in-house lithium refining at an additional location in Texas. *See* Tesla, *Tesla Lithium Refinery Groundbreaking* (May 8, 2023), https://www.tesla.com/blog/tesla-lithium-refinery-groundbreaking.

Current Fast Charger ("DCFC") network in the world, known as the Tesla Supercharging network.[11]  Over 33,000 Supercharging stalls are deployed across America.[12]

Tesla welcomes the opportunity to comment on the Proposal, as it has been our standard practice to respond to such consultations over the past decade.  Tesla respectfully encourages EPA not to rescind the Endangerment Finding, as that finding is lawful, based on a robust factual and scientific record, and has been an established part of federal law for more than fifteen years.  Tesla also encourages EPA not to repeal the greenhouse gas vehicle standards, which are a lawful exercise of authority Congress provided to EPA to regulate greenhouse gases from new motor vehicles.

The Endangerment Finding – and the vehicle emissions standards which flow from it – have provided a stable regulatory platform for Tesla's extensive investments in product development and production. This clear regulatory structure has provided incentives for continued innovation in motor vehicle technology and is vital to continued global competitiveness by companies based in the United States.   International jurisdictions explicitly adopt by reference and benchmark their own vehicle greenhouse gas reduction efforts against the U.S. vehicle emissions standards. Reversing the Endangerment Finding would also deprive consumers of choice and extensive economic benefits, have negative effects on human health, and further impact the integrated North American automotive sector.

Tesla provides the following summary of its comments:

1.  Vehicle manufacturers, including Tesla, have for nearly two decades made investment decisions informed by the stable understanding of EPA's authority to regulate greenhouse gases and adopt innovation-promoting emissions standards reflecting the capabilities of advancing technology.  This regulatory structure – core to the Clean Air Act – that incentivizes innovative technology to address motor vehicle air pollution has contributed to and motivated Tesla's investment decisions.  EPA's greenhouse gas ("GHG") standards are also central to maintaining global competitiveness among U.S. vehicle manufacturers.

2.  EPA's primary rationale to rescind the Endangerment Finding is contrary to long-standing judicially settled authority Congress provided to EPA to regulate GHG emissions under the Clean Air Act.  Each of the bases EPA now forwards for rescinding the Endangerment Finding has been considered and rejected by the courts.  Recent Supreme Court precedent does not call into question EPA's authority to regulate in this area or necessitate the proposal.

3.  EPA's alternative science-based rationale for repealing the Endangerment Finding does not provide a sound basis for the Proposal.  As the recent assessment from the National Academy of Sciences makes clear, the Proposal does not sufficiently evaluate the voluminous and rigorously established science, as well as the additionally developed scientific record since the 2009 Endangerment Finding that further solidifies the level of concern from climate change and the level of confidence that the established scientific community has over these findings.

4.  EPA has not articulated a sufficient legal or factual basis for reversing its long-standing vehicle emissions standards.  The Proposal would give a pass to engine and vehicle manufacturers for all measurement, control, and reporting of GHG emissions for any highway engine and vehicle, including for model years

---

[11] Tesla, *Supercharger*, https://www.tesla.com/supercharger (last visited Sept. 4, 2025).
[12] See U.S. Department of Energy, *Electric Vehicle Charging Station Locations Map* at: https://afdc.energy.gov/fuels/electricity-locations#/find/nearest?fuel=ELEC.

manufactured prior to this Proposal. The Proposal would have a highly disruptive and unlawful retroactive result.

5. Any prejudgment of the outcome of the reconsideration would not satisfy Due Process and notice and comment requirements under the Administrative Procedure Act.

6. EPA's Draft Regulatory Impact Analysis (RIA) does not reflect relevant data on consumer preference for EVs or the savings from owning an EV as reflected in the total cost of ownership – all of which demonstrate the extensive consumer cost savings that would be sacrificed by this Proposal. Similarly, the RIA does not consider other key pollution reduction benefits from a transition to EVs.

Tesla offers these comments based on its experience as a leader in vehicle manufacturing over the past two decades and consistent with the themes and practice we have shared with the agency in our regular approach to commenting on EPA motor vehicle emissions rulemakings over many years. EPA should withdraw this Proposal and continue with responsible and sound regulatory and scientific efforts that promote business stability and innovative solutions to environmental challenges. Tesla looks forward to continuing to engage with EPA on this rulemaking.

II. Vehicle manufacturers, including Tesla, have for nearly two decades made investment decisions informed by EPA's authority to regulate greenhouse gases and adopt innovation-promoting standards for vehicles that reflect the capabilities of advancing technology. These standards are central to maintaining global competitiveness among vehicle manufacturers.

EPA's regulations of greenhouse gases from motor vehicles, premised on the 2009 Endangerment Finding, have created stability and a business environment that have helped to spur Tesla's long-term investments in innovation and technology and in expanding manufacturing for both the U.S. and foreign EV markets. Under this stable regulatory framework, Tesla and other manufacturers have collectively invested billions of dollars in building the infrastructure, supply chain, technology, and capabilities to support increased deployment of electric vehicles.

Moreover, Tesla believes that maintaining the stringency of vehicle standards is essential to ensuring U.S. manufacturers' ability to compete abroad, continue U.S. technological leadership, and build greater export markets. Consumers are adopting electric vehicles worldwide at increasingly rapid rates: in 2025, global passenger EV sales are projected to increase 25% from 2024 levels.[13] Other countries, and China in particular, are rapidly increasing their efforts in EV production.[14] EPA's Proposal would reverse the market stability that has encouraged vehicle manufacturers to invest in the technologies that are required to continue to compete in the global vehicles market and would create a regulatory environment that is inconsistent with the Administration's policy goals of fostering U.S. global leadership in vehicle manufacturing,[15] reducing trade deficits, and maintaining global competitiveness.[16]

---

[13] BloombergNEF, *Electric Vehicle Outlook 2025*, https://about.bnef.com/insights/clean-transport/electric-vehicle-outlook/.

[14] AM. SEC. PROJECT, CHARGING AHEAD: HOW THE U.S. CAN CLOSE THE GAP IN THE EV RACE (Aug. 2025), https://www.americansecurityproject.org/wp-content/uploads/2025/08/Ref-0305-Charging-Ahead-How-the-U.S.-Can-Close-the-Gap-in-the-EV-Race.pdf.

[15] The White House, *Fact Sheet: President Donald J. Trump Incentivizes Domestic Automobile Production* (Apr. 29, 2025), https://www.whitehouse.gov/fact-sheets/2025/04/fact-sheet-president-donald-j-trump-incentivizes-domestic-automobile-production/

[16] The White House, *Fact Sheet: President Donald J. Trump Declares National Emergency to Increase our Competitive Edge, Protect our Sovereignty, and Strengthen our National and Economic Security* (Apr. 2, 2025),

EPA's Proposal also creates substantial uncertainty and risk for the vehicle sector as the reversal in its legal position would likely provoke a range of lengthy legal challenges that could further delay a stable regulatory framework. Moreover, the flawed procedures surrounding EPA's proposed reversal of its well-established and carefully developed scientific record on endangerment further exposes any finalized rule to significant risk of legal challenges. Vehicle manufacturers plan production volumes and their associated investments well in advance. The legal uncertainty of EPA's Proposal would undermine manufacturers' confidence in making long-term decisions to support research, product development, and deployment of the innovative vehicle technologies that are necessary to maintain the United States' competitiveness in the global vehicle market.

As EPA has repeatedly recognized, fostering emissions credit trading has been long-standing, and serves multiple laudatory goals – including incentivizing companies to invest in pollution-reducing technologies, improving environmental outcomes, and enhancing compliance flexibilities for all vehicle manufacturers:

> "ABT [Averaging, Banking, and Trading] has also been a key feature of all GHG rules for both light duty and heavy-duty vehicles. ABT can help to address issues of technological feasibility and lead time, as well as considerations of cost. In many cases, ABT supports the ability of automakers to comply with standards in a manner that is more economically efficient and possibly with less lead time. This provides important environmental benefits and at the same time it increases flexibility and reduces costs for the regulated industry. Furthermore, by encouraging automakers to exceed minimum requirements where possible, the ABT program encourages technological innovation, which makes further reductions in fleetwide emissions possible. The light-duty ABT program for GHG standards includes existing provisions initially established in the 2010 rule for how credits may be generated and used within the program."[17]

Tesla designs, develops, manufactures, and sells high-performance, fully electric vehicles that generate zero emissions, and so the stability, predictability, and enforceability of the emissions performance standards have facilitated Tesla's significant investments and business planning. EPA's proposed action undermines the stability of this program, diminishes the value of performance-based incentives that electric vehicle manufacturers accrue under the standards, and creates an uneven playing field—reducing the inducement for investment in vehicle innovation and penalizing automakers who, like Tesla, have led the industry in investing in and deploying technological innovation that reduces emissions through superior performing vehicles.

Tesla's business strategy has reflected the influence of stable standards on the product design and deployment decisions faced by other companies as well. Tesla understood that customers of other manufacturers would need battery electric vehicle charging capabilities as other manufacturers increasingly invest in battery electric vehicles as the most cost-effective control for reducing pollution from light duty vehicles to meet the more stringent emissions standards. To support the expansion of the BEV fleet, Tesla invested $20M to retrofit its supercharger network and at least $100M to build additional supercharging capacity to accommodate the growth of non-Tesla BEVs operating in the United States. These retrofits and expansions were an investment in both the industry's BEV transition as well as a business investment to sell accessible, reliable, and fast EV charging infrastructure at a competitive rate. EPA's sudden reversal would undermine this investment.

---

https://www.whitehouse.gov/fact-sheets/2025/04/fact-sheet-president-donald-j-trump-declares-national-emergency-to-increase-our-competitive-edge-protect-our-sovereignty-and-strengthen-our-national-and-economic-security/.

[17] Multi-Pollutant Emissions Standards for Model Years 2027 and Later Light-Duty and Medium-Duty Vehicles, 89 Fed. Reg. 27,842, 27,916 (Apr. 18, 2024).

Similarly, Tesla's investment in environmentally friendly refrigerants has been spurred by the emissions reductions goals and compliance flexibility embodied in the current standards. Until 2019, Tesla vehicle's air conditioning system utilized a refrigerant known as HFC-134a.  In 2019, Tesla determined it could generate incremental GHG credits under EPA's Light Duty GHG Emissions Standard by equipping its vehicles with a lower global warming potential refrigerant, HFO-1234yf, and it could utilize those additional credits to offset additional supply chain costs to procure HFO-1234yf compared to the less expensive and higher global warming potential refrigerants it had been using. On the basis of the standard created by the EPA to encourage automakers to reduce the carbon footprint of its vehicles, Tesla invested an incremental ~$25 of cost per vehicle to deliver a more environmentally friendly air conditioning system, knowing this investment could be offset by incremental value of GHGs credits generated. This investment ultimately amounted to tens of millions of dollars when scaled over millions of vehicles produced for North America since this time and would be undermined by a change in the standards.

More generally, given the exceedance of the underlying standards that comes from the sale of a battery electric EV, Tesla has expected to continue to generate compliance credits that it can market to other companies – companies that, based on their own business strategies, opt to purchase compliance credits rather than comply with the performance standard.  Such credit revenue has facilitated Tesla's expansion and continued investment in innovation.  Tesla would be adversely affected by the proposed change in these standards that would curtail the value and continued marketability of such long-established credits

These proposed changes have the potential to be all the more disruptive when combined with several shifts in the Corporate Average Fuel Economy standards and the status of California's and the 177 opt-in states' emissions standards that Congress and the administration have advanced.  The proposal itself asserts that. "Because new motor vehicles and engines currently subject to GHG emission standards would remain subject to Title II of the CAA, the statute would continue to preempt ''any'' State or local ''standard relating to the control of emissions.''[18]  This claim has the potential to exacerbate uncertainty as it seeks to undermine the future ability of California and the 177 states to regulate greenhouse gas emissions, especially where EPA is declining such regulation itself.  And to the extent foreign vehicle standards, such as in Canada and Mexico, reference EPA's standards, revoking the standards will only sow further confusion for manufacturers and potentially impact active initiatives to reduce GHGs in those jurisdictions.

Further, revoking the federal light-duty GHG program will not free U.S. automakers from the need to continue to build clean cars.[19]  Rather, such a change has the potential to add cost, risk, and fragmentation for companies that sell into other countries where GHG standards are likely to persist.  Under EPA's Proposal, automakers would face a global patchwork of regulation, requiring complex product-planning and homologation complexity. This also may shift buyers to foreign models optimized for local regulations, ultimately weakening demand for domestic manufacturers.

---

[18] Proposal at 36,315,

[19] ICCT, *Global electric vehicle market monitor for light-duty vehicles in key markets, 2025 H1* (Sept. 5, 2025), available at https://theicct.org/wp-content/uploads/2025/09/ID-448-%E2%80%93-EV-Market-Monitor-H1-2025_research-brief_final.pdf.

III.    EPA's primary rationale to rescind the Endangerment Finding is contrary to long-standing judicially settled authority Congress provided to EPA to regulate GHG emissions under the Clean Air Act.

EPA's primary rationale to rescind the Endangerment Finding is that the best reading of Section 202(a) of the CAA does not give EPA authority to regulate GHG emissions.[20]  This reading of the statute, however, is contrary to the text of the statute and courts' longstanding interpretation of the statute described in *Massachusetts v. EPA* and subsequent cases.  Indeed, each of EPA's arguments for its proposed interpretation has been considered and rejected by the Supreme Court and the D.C. Circuit.  Moreover, intervening Supreme Court precedent such as *UARG*, *West Virginia*, and *Loper Bright* does not cast doubt on EPA's authority to regulate GHGs under Section 202(a); rather, these cases confirm that authority.  Congress has also confirmed this authority by not amending Section 202(a) after courts interpreted it to authorize EPA to regulate GHGs from new motor vehicles.  If Congress had intended another result under the statute, it could have made that clear at any point over the last fifteen-plus years.

A.    The proposed interpretation of Section 202(a) is contrary to the text of the statute and was expressly rejected by Massachusetts v. EPA and subsequent cases.

Although EPA proposes that the best reading of the statute does not authorize the agency to regulate GHGs under Section 202(a), this interpretation is contrary to the text and judicial interpretation of the statute.  Based on the statute's text, the Supreme Court held in *Massachusetts v. EPA* that it was "unambiguous" that EPA "has the statutory authority to regulate the emission of [greenhouse] gases from new motor vehicles."[21]  The Court's interpretation has been reaffirmed in litigation challenging EPA's 2009 Endangerment Finding and subsequent GHG vehicle regulations.  The Supreme Court and D.C. Circuit have already considered and rejected many of the arguments against EPA's authority to regulate that are raised anew in the Proposal.[22]

1.    *Massachusetts v. EPA* interpreted Section 202(a) to grant EPA authority to regulate GHG emissions from motor vehicles.

EPA proposes that "*Massachusetts* did not consider or have reason to interpret the scope of the EPA's authority under CAA section 202(a)" and that the case merely "rejected [EPA's] position that GHGs are 'categorically' excluded from the CAA."[23]  However, this misinterprets the holding of *Massachusetts* on its own terms and as affirmed by subsequent cases.

The Court in *Massachusetts* considered and rejected both the broad argument that CO2 is never an "air pollutant" under the Act-wide definition in Section 302(g) as well as the narrower argument that it is not an "air pollutant" for purposes of motor vehicle regulation under Section 202(a).  The Court first analyzed the Act-wide definition of "air pollutant" in Section 302(a) and held that it is "unambiguous" in including GHGs.[24]  The Court then evaluated EPA's narrower argument that, even if GHGs were an "air pollutant" under the Act as a whole, Section 202(a) could be read to exclude GHGs.  In doing so, the Court asked "whether § 202(a)(1) of the Clean Air Act authorizes EPA to regulate greenhouse gas emissions from new motor vehicles in the event that it forms

---

[20] Proposal at 36,299.

[21] *Massachusetts v. EPA*, 549 U.S. 497, 532 (2007).

[22] *See Coal. for Responsible Regul., Inc. v. EPA*, 684 F.3d 102 (D.C. Cir. 2012), *aff'd in part, rev'd in part sub nom. Util. Air Regul. Grp. v. EPA*, 573 U.S. 302 (2014).

[23] Proposal at 36,307; *accord id.* at 36,300 (stating that *Massachusetts* "addressed distinct issues" from those in the Proposal).

[24] 549 U.S. 497, 528 (2007).

a 'judgment' that such emissions contribute to climate change" and answered that "[w]e have little trouble concluding that it does."[25]

Since *Massachusetts*, both the Supreme Court and D.C. Circuit have reiterated that *Massachusetts* directly addressed EPA's authority under Section 202(a) and affirmed that Congress granted EPA authority to regulate GHG emissions from motor vehicles.  EPA's Endangerment Finding and GHG motor vehicle standards implementing the Court's instructions in *Massachusetts* were then thoroughly litigated.  In C*oalition for Responsible Regulation, Inc. v. EPA*, 684 F.3d 102, 114 (D.C. Cir. 2012), the D.C. Circuit said that "because the CAA requires EPA to establish motor-vehicle emission standards for '*any* air pollutant . . . which may reasonably be anticipated to endanger public health or welfare,' . . . [*Massachusetts*] held that EPA had a 'statutory obligation' to regulate harmful greenhouse gases."[26]  That court carefully considered and rejected challenges to several aspects of the 2009 Endangerment Finding, "including (1) EPA's interpretation of CAA § 202(a)(1), which sets out the endangerment-finding standard; (2) the adequacy of the scientific record supporting the Endangerment Finding; (3) EPA's decision not to 'quantify' the risk of endangerment to public health or welfare created by climate change; (4) EPA's choice to define the 'air pollutant' at issue as an aggregate of six greenhouse gases; (5) EPA's failure to consult its Science Advisory Board before issuing the Endangerment Finding; and (6) EPA's denial of all petitions for reconsideration of the Endangerment Finding."[27]  As the D.C. Circuit recognized, the petitioners' arguments simply re-aired the "laundry list" of arguments against regulating that EPA made in *Massachusetts*:

> "As in *Massachusetts v. EPA*, a 'laundry list of reasons not to regulate' simply has 'nothing to do with whether greenhouse gas emissions contribute to climate change.'  The additional exercises State and Industry Petitioners would have EPA undertake—e.g., performing a cost-benefit analysis for greenhouse gases, gauging the effectiveness of whatever emission standards EPA would enact to limit greenhouse gases, and predicting society's adaptive response to the dangers or harms caused by climate change—do not inform the 'scientific judgment' that § 202(a)(1) requires of EPA. Instead of focusing on the question whether greenhouse gas emissions may reasonably be anticipated to endanger public health or welfare, the factors State and Industry Petitioners put forth only address what might happen were EPA to answer that question in the affirmative. As EPA stated in the Endangerment Finding, such inquiries 'muddle the rather straightforward scientific judgment about whether there may be endangerment by throwing the potential impact of responding to the danger into the initial question.'"[28]

Petitioners in *Coalition for Responsible Regulation* petitioned the Supreme Court for certiorari.[29]  Although the Court took the case, it left the D.C. Circuit's opinion on the legitimacy of the Endangerment Finding and the tailpipe emissions rules in place, instead only addressing EPA's application of the Finding to regulate GHGs from stationary sources.  In that case, *Utility Air Regulatory Group v. EPA* (*UARG*), 573 U.S. 302, 310 (2014), the Court, in reversing the resulting stationary source rules, nonetheless recognized that *Massachusetts* held "that Title II

---

[25] *Id.*

[26] *Coal. for Responsible Regul., Inc. v. EPA*, 684 F.3d 102, 114 (D.C. Cir. 2012), *aff'd in part, rev'd in part sub nom. Util. Air Regul. Grp. v. EPA*, 573 U.S. 302 (2014) (quoting *Massachusetts*, 549 U.S. at 534); see also *Delta Const. Co. v. EPA*, 783 F.3d 1291, 1294 (D.C. Cir. 2015) (noting that "Section 202(a) of the Clean Air Act ('CAA') requires EPA to regulate air pollutants, including greenhouse gases" (citing *Massachusetts*, 549 U.S. at 532)).

[27] 684 F.3d at 117.

[28] *Id.* at 118.

[29] Petition for Writ of Certiorari, *Util. Air Regul. Grp. v. EPA*, 571 U.S. 951 (2013) (No. 12-1146).

of the Act 'authorize[d] EPA to regulate greenhouse gas emissions from new motor vehicles' if the Agency 'form[ed] a 'judgment' that such emissions contribute to climate change.'"[30]  *Massachusetts*, on its own terms, and as understood by courts since, addressed not just the meaning of the Act-wide definition of "air pollutant," but also ratified EPA's authority to regulate GHG emissions from new motor vehicles as air pollutants under Section 202(a).

2.  The Clean Air Act does not require that the term "air pollutant" include only substances producing direct or localized effects.

EPA asserts that "the text, structure, and history of CAA section 202(a) and related provisions" demonstrate that Section 202(a) only covers "air pollution that threatens public health or welfare *through local or regional exposure*," and that an "air pollutant" within Section 202(a) includes only substances that "cause or contribute to air pollution for which the air pollution itself . . . endangers public health or welfare."[31]  This argument, however, was raised by EPA and rejected by the Court in *Massachusetts*.  EPA also considered and rejected similar concerns in its 2009 rulemaking, and subsequent cases have affirmed that the Clean Air Act was intended to address a broad range of harms from air pollution.

As noted above, *Massachusetts* interpreted Section 202(a) to include GHG emissions.  In doing so, the Court specifically noted that it was irrelevant that GHGs "permeate the world's atmosphere rather than a limited area near the earth's surface" because this distinction had no basis in the statutory text.[32]  As the Court noted, the statute uses the phrase "the ambient air" "without distinguishing between atmospheric layers."[33]

In *Coalition for Responsible Regulation*, the D.C. Circuit also addressed petitioners' argument that GHGs do not qualify as an "air pollutant" under the Act because they do not produce directly harmful effects.  Petitioners argued that because GHGs do not "cause elevated ground-level concentrations in ambient air people breathe," EPA should have excluded GHGs from its interpretation of "any air pollutant."[34]  The court held that *Massachusetts* forecloses this argument.[35]

These interpretations are compelled by the text of the statute.  Section 202(a) authorizes regulation of air pollutants that "cause, or contribute to, air pollution which may reasonably be anticipated to endanger public health or welfare."[36]  The Act defines "welfare" as including, but not limited to, "effects on soils, water, crops, vegetation, manmade materials, animals, wildlife, *weather*, visibility, *and climate*, damage to and deterioration of property, and hazards to transportation, as well as effects on economic values and on personal comfort and well-being, whether caused by transformation, conversion, or combination with other air pollutants (emphasis added)."[37]  By the plain language of this definition, EPA has authority to regulate air pollutants with impacts on weather and climate.  Moreover, these air pollutants do not need to cause impacts directly – rather, they may cause impacts by "transformation, conversion, or combination" with other air pollutants, as do many other air pollutants that EPA so regulates.[38]

---

[30] *UARG*, 573 U.S. at 310 (quoting *Massachusetts*, 549 U.S. at 528).

[31] Proposal at 36,299–300.

[32] *Massachusetts*, 549 U.S. at 529 n.26.

[33] *Id.*

[34] *Coal. for Responsible Regul., Inc. v. EPA*, 684 F.3d 102, 138 (D.C. Cir. 2012) (quotations omitted).

[35] *Id.*

[36] 42 U.S.C. § 7521(a).

[37] *Id.* § 7602(h).

[38] *Id.* § 7602(g).

EPA proposes that a "limiting construction" on Section 202(a) is necessary to "avoid absurd results and potential conflict with the nondelegation doctrine," asserting that otherwise the agency would have to regulate water vapor as an "air pollutant" emitted from motor vehicles.[39]  However, Congress provided an appropriate limiting principle by specifying in section 202(a) that the pollutant must cause or contribute to air pollution that is reasonably anticipated to endanger public health or welfare.   This is a clear intelligible limiting standard similar to that found by the Supreme Court not to present a nondelegation problem – the "requisite to protect public health" "with an adequate margin of safety" language of the Clean Air Act section 109 NAAQS provision – in *Whitman v. American Trucking Ass'n*, 531 US 457, 473–76 (2001).  As the Supreme Court explained in *Massachusetts v. EPA*, EPA is authorized and compelled to act when regulation will achieve some measure of noticeable improvement in the degree of harm presented, even where its action may not completely solve the problem.

3.       EPA was on firm scientific and legal ground in defining the "air pollutant" at issue as the six well-mixed gases.

EPA says that the Administrator "questions the decision in the Endangerment Finding to consider together all six 'well-mixed' GHGs."[40]  However, the text of the statute establishes that EPA was on firm scientific and factual ground in defining the "air pollutant" at issue as an aggregate of well-mixed greenhouse gases in its 2009 Endangerment Finding.  As mentioned above, the statute supports looking at sources and emissions in combination.  Section 202(a)(1), for example, refers to contributions from "any class or classes of new motor vehicles," and section 302(g) defines "air pollutant" to include a "combination of" "air pollution agent[s]."[41]

Moreover, as EPA explained in its thorough consideration of this issue in its 2009 Endangerment Finding, considering the six gases in aggregate "is consistent with other provisions of the CAA and previous EPA practice under the CAA."[42]  For example, EPA treats the pollutant mix of Particulate Matter (PM) as a common class of air pollution, even though PM is in fact a "complex mixture" "made up of a number of components, including acids . . . organic chemicals, metals, and soil or dust particles."[43]

EPA carefully considered and dismissed this concern in 2009.  As EPA pointed out, the agency regulates Volatile Organic Compounds (VOCs) and PM from heavy duty trucks, but it is "highly unlikely that heavy duty trucks emit *every* substance that is included in the group defined as VOC or PM."[44]  EPA also found that, even if the agency defined the air pollutant as the group of four compounds emitted by motor vehicles, "it would have no material effect" on the EPA's analysis of endangerment.[45]  These issues too were thoroughly considered by EPA in its careful reconsiderations of the Endangerment Finding in 2010 and 2022.[46]  Moreover, while EPA now criticizes the focus on a pollutant mix (not all of which are emitted by motor vehicles), the agency's Proposal does not evaluate the degree of change that would come from only looking at the four pollutants emitted by vehicles.

---

[39] Proposal at 36,301.

[40] Proposal at 36,310.

[41] 42 U.S.C. §§ 7521(a)(1), 7602(g).

[42] Reconsideration of 2009 Endangerment Finding and Greenhouse Gas Vehicle Standards, 74 Fed. Reg. 66,496, 66,519 (Dec. 15, 2009).

[43] *Id.*

[44] *Id*. at 66,541.

[45] *Id.*

[46] EPA's Denial of Petitions Relating to the Endangerment and Cause or Contribute Findings for Greenhouse Gases Under Section 202(a) of the Clean Air Act (Apr. 2022)  https://www.epa.gov/system/files/documents/2022-04/decision_document.pdf.

4. The Clean Air Act does not impose a requirement that EPA identify a threshold level of contribution from a single pollutant when determining whether emissions "cause[] or contribute[]" to air pollution.

EPA proposes that "emissions from new motor vehicles and new motor vehicle engines in the United States do not have a sufficiently close connection to the adverse impacts identified in the Endangerment Finding to fit within the legal meaning of 'cause' or 'contribute.'"[47]  EPA further proposes that "global climate change concerns involve analyzing causal relationships that are too uncertain, too remote, and too confounded by intervening and confounding factors to fit within the terms 'cause' and 'contribute' as used in CAA section 202(a)."[48]  However, this proposed interpretation of "cause" and "contribute" conflicts with the plain language of the statute and courts' longstanding interpretations of these terms.

EPA cannot override Congress's express direction to regulate emissions that not only "cause" pollution, but also those emissions that "contribute to" air pollution that endangers public health or welfare.[49]  EPA's proposed interpretation would read the word "contribute" out of the statute. Indeed, the CAA elsewhere requires EPA to find that certain sources "cause, or *significantly* contribute to, air pollution."[50]  Congress was thus well aware of how to impose a "significance" requirement and declined to do so in section 202(a).  In the absence of such a qualifier, "'contribute' means simply 'to have a share in any act or effect,' Webster's Third New International Dictionary 496 (1993), or 'to have a part or share in producing,' 3 Oxford English Dictionary 849 (2d ed. 1989). Standing alone, the term has no inherent connotation as to the magnitude or importance of the relevant 'share' in the effect; certainly it does not incorporate any 'significance' requirement."[51] This problem with the Proposal's interpretation is driven home by the National Academy of Sciences new evaluation of the climate science, where it confirmed that "[c]ontinued emissions of greenhouse gases from human activities will lead to more climate changes in the United States, with the severity of expected change increasing with every ton of greenhouse gases emitted."[52]

The statute also supports evaluating sources and emissions in combination.  Section 202(a)(1), for example, refers to contributions from "any class or classes of new motor vehicles," and section 302(g) defines "air pollutant" to include a "combination of" "air pollution agent[s]."[53]

*Massachusetts* interpreted this text to mean that EPA cannot "avoid its statutory obligation by noting the uncertainty surrounding various features of climate change."[54]  Further, in upholding the state petitioners' standing, *Massachusetts* rejected EPA's argument that its "decision not to regulate greenhouse gas emissions from new motor vehicles contributes so insignificantly to petitioners' injuries" that there was no causation.[55]  Further, the D.C. Circuit in *Coalition for Responsible Regulation* thoroughly considered and rejected these same arguments in its review of the 2009 Endangerment Finding, relying on the long-standing precedent in *Ethyl Corp. v. EPA,* 541 F.2d 1, 15–16, 18 (D.C. Cir. 1976), that the Act does not require a threshold.[56]

---

[47] Proposal at 36,301.

[48] *Id.*

[49] 42 U.S.C. § 7521(a)(1).

[50] *Id.* § 7547(a)(1).

[51] *Bluewater Network v. EPA*, 370 F.3d 1, 13 (D.C. Cir. 2004).

[52] National Academies of Sciences, Engineering, and Medicine. 2025. Effects of Human-Caused Greenhouse Gas Emissions on U.S. Climate, Health, and Welfare. Washington, DC: National Academies Press at 2, https://doi.org/10.17226/29239.

[53] 42 U.S.C. §§ 7521(a)(1), 7602(g).

[54] *Massachusetts*, 549 U.S. at 534.

[55] *Id.* at 513.

[56] 684 F.3d at 122–24.

Finally, while the statute does not impose a threshold level of contribution, if *any* source of GHG emissions in the United States "contributes" to climate change, then motor vehicles certainly do. As of 2022, the transportation sector was the largest source of GHG emissions in the country. The sector accounted for a third of all U.S. GHG emissions, with half of those emissions coming from light-duty vehicles.[57] As the Court held in *Massachusetts*, agencies do not solve problems in "one fell regulatory swoop."[58] Rather, they "whittle away at them over time, refining their preferred approach as circumstances change and as they develop a more nuanced understanding of how best to proceed." The Court noted that "regulating motor-vehicle emissions will not by itself reverse global warming" but held that EPA nonetheless had "a duty to take steps to *slow* or *reduce* it."[59] Here, as in *Massachusetts*, EPA cannot avoid that duty by pointing to uncertainty surrounding climate change or the agency's inability to address all of the harms caused by GHGs.

5.       EPA's authority to regulate GHG emissions does not depend on cost or efficacy of any resultant regulations.

EPA states that considerations such as "the cost, effectiveness, and continued propriety of [EPA]'s GHG regulatory program" should have been taken into account when EPA made the Endangerment Finding*s*.[60] However, the text of the statute itself, *Massachusetts*, and later D.C. Circuit precedent all establish that these factors are to be considered only *after* an Endangerment Finding is made.[61]

The text of the statute makes clear that issuing the endangerment finding and developing regulations are two distinct steps. In step one, governed by Section 202(a)(1), EPA must determine whether an air pollutant causes or contributes to air pollution which may reasonably be anticipated to endanger public health or welfare.[62] If so, then the Administrator must regulate the pollutant. In step 2, governed by Section 202(a)(2), the Administrator must evaluate the time period necessary "to permit the development and application of the requisite technology," given consideration to the cost of compliance.[63] In short, cost and feasibility are to be considered when EPA determines which standard to prescribe and when, not when determining whether a pollutant contributes to air pollution that may be reasonably anticipated to endanger public health or welfare.

*Massachusetts* also makes clear that the policy considerations such as cost and effectiveness of regulation the Proposal is seeking to revive are not to be part of the analysis of whether EPA has the authority to regulate a pollutant. The Court held that this analysis must be a "scientific judgment."[64] And in *Coalition for Responsible Regulation*, the D.C. Circuit also rejected petitioners' argument that Section 202(a) requires EPA to consider

---

[57] U.S. Dep't of Transp., DOT Report to Congress: Decarbonizing U.S. Transportation (July 2024), https://www.transportation.gov/sites/dot.gov/files/2024-07/DOT%20Report%20to%20Congress%20Decarbonizing%20US%20Transportation%20072924%20final.pdf.

[58] *Massachusetts*, 549 U.S. at 524.

[59] *Id.* at 525 (emphasis added). EPA further proposes that to qualify as a "requisite technology" under Section 202, an engine design or device "would need to *remove* GHGs already present in the atmosphere." Proposal at 36,311. EPA does not explain the basis for its view that a "requisite technology" must "remove" emissions from the air, which is inconsistent with the text and with longstanding agency practice. *Cf. West Virginia*, 597 U.S. at 701 (endorsing EPA's longstanding regulatory approach of setting standards "based on the application of measures that would *reduce* pollution" (emphasis added)).

[60] Proposal at 36,303.

[61] 549 U.S. at 533–34 (stating that EPA must "form a *scientific judgment*"); *see Coal. for Responsible Regul.*, 684 F.3d at 118 ("To be sure, the subsection following § 202(a)(1), § 202(a)(2), requires that EPA address limited questions about the cost of compliance with new emission standards and the availability of technology for meeting those standards, . . . *but these judgments are not part of the § 202(a)(1) endangerment inquiry*." (emphasis added)).

[62] 42 U.S.C. § 7521(a)(1).

[63] *Id.* § 7521(a)(2).

[64] 549 U.S. at 534.

policy concerns and regulatory consequences, such as "the benefits of activities that require greenhouse gas emissions, the effectiveness of emissions regulation . . . and the potential for societal adaptation to or mitigation of climate change."[65] The court reaffirmed that the statute "require[s] a 'scientific judgment' about the potential risks greenhouse gas emissions pose to public health or welfare—not policy discussions."[66]

> B. Intervening Supreme Court precedent, including *UARG*, *West Virginia v. EPA*, and *Loper Bright*, affirms EPA's authority to regulate GHGs under Section 202(a) and does not justify reopening the Endangerment Finding.

Supreme Court cases subsequent to *Massachusetts* do not undermine, but rather confirm EPA's Clean Air Act authority. EPA proposes that its interpretation of Section 202(a) is supported by *UARG*, "in which the Supreme Court distinguished between 'the Act-wide definition' of air pollutant and the application of that definition to the Act's regulatory provisions."[67] However, while *UARG* held that EPA's authority to regulate "air pollutants" turns on the particular statutory provision at issue, its holding did not apply to Section 202(a). Rather, the Court declined to grant certiorari on those issues,[68] and instead explicitly affirmed that Section 202 authorizes EPA to regulate GHGs from motor vehicles: Justice Scalia's opinion for the Court in *UARG* reiterated that "Title II of the Act 'authorize[d] EPA to regulate greenhouse gas emissions from new motor vehicles' if the Agency 'form[ed] a 'judgment' that such emissions contribute to climate change'" and cited Section 202(a).[69]

EPA also proposes that the major questions doctrine, as announced in *West Virginia*, "applies to the Endangerment Finding because the global climate change concerns addressed in that action . . . present a major question of undeniable political and economic significance" and the statute does not "clearly authorize" regulation of GHG emissions.[70] But the major questions doctrine applies only where the statutory text is ambiguous.[71] In *Massachusetts*, the Court held that the Act is in fact "unambiguous" and that EPA "has the statutory authority to regulate the emission of [greenhouse] gases from new motor vehicles."[72] Moreover, while the Court in *Massachusetts* did not use the term "major questions doctrine," one of EPA's main arguments in the case was a major-questions argument: that "air pollutant" should not be read to include GHGs because the statute is not sufficiently clear and GHG regulation would have "vast economic and political consequences."[73] The Court in *Massachusetts* considered EPA's major-questions argument based on *Brown & Williamson* and rejected it because the statute was "clear" and there was no comparable indication that Congress had sought to constrain agency action.[74]

---

[65] *Coal. for Responsible Regul.*, 684 F.3d at 117.

[66] *Id.* at 117–18 (quoting *Massachusetts*, 549 U.S. at 534).

[67] Proposal at 36,302 (citing *UARG*, 573 U.S. 302, 320 (2014)).

[68] *Util. Air Regul. Grp. v. EPA*, 571 U.S. 951 (2013) (granting one of the six petitions for writ of certiorari, "limited to" a single question).

[69] *UARG*, 573 U.S. 302, 310 (2014); *accord Am. Elec. Power Co. v. Connecticut*, 564 U.S. 410, 416 (2011) ("*Massachusetts* held that the Environmental Protection Agency (EPA or Agency) had misread the Clean Air Act when it denied a rulemaking petition seeking controls on greenhouse gas emissions from new motor vehicles.").

[70] Proposal at 36,305, 36,307; *id.* at 36,307 ("As in *West Virginia*, our statutory authority and the findings required to invoke that authority do not clearly authorize the approach taken in the Endangerment Finding and subsequent regulations. And as in *UARG*, our statutory authority to "prescribe . . . standards" for emissions of certain air pollutants does not clearly authorize using the CAA's vehicle-emission control scheme to address global climate change.").

[71] *West Virginia v. EPA*, 597 U.S. 697, 723 (2022).

[72] *Massachusetts*, 549 U.S. at 529, 532.

[73] Brief for the Federal Respondent at 31–32, *Massachusetts v. EPA*, 549 U.S. 497 (2007) (No. 05-1120), 2006 WL 3043970.

[74] *Massachusetts*, 549 U.S. at 531 (distinguishing *Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000)).

Finally, EPA proposes that *Loper Bright* supports its proposed interpretation because that case held that the EPA "can no longer rely on statutory silence or ambiguity to expand [its] regulatory power."[75]  However, as the Court in *Massachusetts* held, Section 202(a) is neither silent nor ambiguous as to EPA's authority to regulate GHG emissions from new motor vehicles.  The majority in *Massachusetts* did not defer to EPA's interpretation under *Chevron* deference.  Rather, it *rejected* EPA's interpretation and held that because the statute was unambiguous in its grant of authority, the "statutory text foreclose[d] EPA's reading."[76]  Moreover, under *Loper Bright*, there is one fixed, "best reading" of every statute and courts must exercise their "independent judgment" to determine that reading without deferring to an agency.[77]  In *Massachusetts*, the Court held that the plain text of Section 202(a) is unambiguous that EPA has authority to regulate GHGs from motor vehicles.  Accordingly, the Supreme Court has already determined the "best reading" of the statute and set out the "boundaries of [EPA's] delegated authority."[78]  EPA should adhere to that "best reading" of the statute as determined by the Supreme Court.[79]

*Loper Bright* also could not supply the Proposal's supposed rationale for reopening the Endangerment Finding, for a separate reason: the Supreme Court made clear that that case is not intended to have retroactive effect and to undermine already settled interpretations.  As the Supreme Court made clear in *Loper Bright,* "we do not call into question prior cases that relied on the *Chevron* framework. The holdings of those cases that specific agency actions are lawful— including the Clean Air Act holding of *Chevron* itself—are still subject to statutory stare decisis despite our change in interpretive methodology."[80]  *Loper Bright*, then, does not provide a basis for revisiting the Endangerment Finding.

EPA's proposed contrary interpretation is not only foreclosed by the best reading of the statute as articulated in *Massachusetts* and subsequent cases but it is at odds with Congress's repeated decision not to amend the Clean Air Act in the wake of *Massachusetts* and the 2009 Endangerment Finding.  While Congress has amended the Clean Air Act on numerous occasions since 2009 (providing new authority to address refrigerants, clarifying definitions as part of the IRA, etc.), it has not circumscribed EPA's authority in this area.  Had Congress wanted to weigh in on EPA and the courts' interpretation of the statute, it had ample opportunity to do so.[81]   To the contrary, Congress reaffirmed in its 2022 amendments to the Clean Air Act that pollutants include the greenhouse gases identified in EPA's Endangerment Finding.[82]

## IV.  EPA's alternative science-based rationale for rescinding the Endangerment Finding is legally and scientifically flawed.

As an alternative basis for rescinding the Endangerment Finding, EPA proposes to find that there is "insufficient reliable information" to conclude that "GHG emissions from new motor vehicles and engines in the United States cause or contribute to endangerment to public health and welfare in the form of global climate change."[83]  There are several flaws with this Proposal:  First, EPA relies on a scientific report that will not be

---

[75] Proposal at 36,290 (citing *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024)).

[76] 549 U.S. at 528.

[77] *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400 (2024)

[78] *Id.* at 395.

[79] *Id.* at 400.

[80] *Id.* at 412.

[81] *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 382 n.66 (1982) (quoting *Lorillard v. Pons*, 434 U.S. 575, 580 (1978)) ("Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change.").

[82] Inflation Reduction Act, Pub. L. No. 117-169, 136 Stat. 1818 (2022); *see* Greg Dotson & Dustin J. Maghamfar, *The Clean Air Act Amendments of 2022: Clean Air, Climate Change, and the Inflation Reduction Act*, 53 Env't L. Rep. 10017, 10026–28 (2023).

[83] Proposal at 36,310.

finalized in time for stakeholders to review during the Endangerment Finding comment period and that was not prepared in accordance with the procedural requirements of the Federal Advisory Committee Act (FACA) or federal Information Quality Guidelines, as well as with a range of applicable EPA science policies. Second, the report and EPA's analysis of the science do not consider the overwhelming weight of scientific information supporting a finding of endangerment. The unfinalized report does not provide a sufficient basis to controvert the deliberatively analyzed massive body of scientific data developed by the credible scientific community and evaluated through years of rigorous scientific process, much less the newly identified evidence that reaffirms the science behind the 2009 Endangerment Finding.[84] Finally, even if the science supporting an endangerment finding still harbors some measure of uncertainty, this does not provide a sufficient reason to decline to regulate under the statute.

> A. EPA's reliance on the DOE Climate Report as a basis for its alternative rationale for rescission is improper.

As a basis for its proposed conclusion that GHG emissions do not cause or contribute to endangerment of public health or welfare, EPA relies on the draft report submitted by the DOE Climate Working Group titled "Impacts of Carbon Dioxide Emissions on the U.S. Climate'' ("CWG Draft Report") and sources cited in that report.[85] The comment period for the CWG Draft Report concluded on September 2, 2025, just 20 days before comments are due for EPA's proposed rescission of the Endangerment Finding.[86] EPA is relying on DOE's draft climate report as authoritative, in advance of the Working Group's consideration of any comments. DOE has now received more than 59,000 comments on the draft report, many of which identify fundamental flaws in the report's methodology.

It is improper for EPA to rely on the draft report in this proceeding. First, the report is merely a draft and subject to change, as is reflected by the fact that DOE is seeking public comment on the report. It is arbitrary and capricious for EPA to rely on a draft report as its basis for the actions it proposes here. Second, even if the report is finalized before any final action is taken on this proposed rule, EPA would need to reopen the public comment period to allow for stakeholders to comment on EPA's proposed reliance on that version of the report.

To meaningfully comment on EPA's reliance of the report, stakeholders will need to review the comments submitted on the draft report, as well as the final DOE report and DOE's response to comments. Because there are only three weeks between the close of each comment period, any finalized DOE report may not even be available by September 22. This process and timing will not allow for meaningful notice and comment on a key consideration in EPA's rulemaking.

Moreover, it is not clear what role, if any, comments on the DOE draft report itself will play, as DOE's Secretary has now indicated that its Climate Working Group has been disbanded.[87] While the members of the disbanded group have said that they will respond to comments on the draft via a non-government website,[88] it is still not clear whether the report will be finalized or how the members' evaluation of any comments and their responses could be incorporated into the DOE's work or EPA's Proposal. This undermines the ability of members of the

---

[84] *See* National Academies, Effects of Human-Caused Greenhouse Gas Emissions at 2-3.

[85] Proposal at 36,292.

[86] Notice of Availability: A Critical Review of Impacts of Greenhouse Gas Emissions on the U.S. Climate, 90 Fed. Reg. 36,150 (Aug. 1, 2025).

[87] Defs.' Mem. in Supp. of Opp'n to Pls.' Mot. for a Prelim. Inj. at 11, *Env't Defense Fund v. Wright*, No. 1:25-cv-12249-WGY (D. Mass. Sept. 4, 2025).

[88] Scott Waldman, *Disbanded DOE climate group vows to continue work*, ClimateWire (Sept. 11, 2025), https://subscriber.politicopro.com/article/eenews/2025/09/11/disbanded-doe-climate-group-vows-to-continue-work-00556267.

public to comment on these important matters and understand that which may inform the agency's decision making.

In addition, there are serious problems with the report itself:  It was produced by five people in less than two months based upon narrowly selected materials.[89]  This is simply not sufficient time or resources to complete the type of comprehensive review of the scientific record that would be necessary for EPA to reverse its longstanding position on the impacts of GHGs.  By the Climate Working Group's own admission, "the short timeline and the technical nature of the material meant that [they] could not comprehensively review all topics."[90]  In contrast, EPA's original factual record in support of the Endangerment Finding was massive – synthesizing thousands of peer reviewed reports through years' worth of analysis.[91]  To change course on such a consequential finding would require a similarly extensive and thorough assessment of the scientific record.

Moreover, the CWG Draft Report and the committee that produced the report likely did not comport with the balance and transparency requirements of the Federal Advisory Committee Act (FACA) or DOE's Information Quality Guidelines, or the recommendations in the Administration's recent "Restoring Gold Standard Science" Executive Order.

FACA and its implementing regulations impose requirements for the establishment, membership, and operations of federal advisory committees.  For instance, an agency then "must" publish a notice in the Federal Register announcing that an advisory committee is being established, "describ[ing] the nature and purpose of the advisory committee and affirm[ing] that the advisory committee is necessary and in the public interest."[92]  Every advisory committee must also have a charter, which must contain certain information.[93]

There are also specific requirements for the membership of any advisory committee.  Committee membership must be "fairly balanced in terms of the points of view represented and the functions to be performed by the advisory committee."[94]  The agency forming an advisory committee must make "appropriate provisions to assure that the advice and recommendations of the advisory committee will not be inappropriately influenced by the appointing authority or by any special interest, but will instead be the result of the advisory committee's independent judgment."[95]  Agencies must provide GSA a "Membership Balance Plan" describing how the agency will "attain fairly balanced membership, as appropriate based on the nature and functions of the advisory committee."[96]  Once the agency "identifie[s] the points of view that would promote a fairly balanced advisory committee membership," agencies must "conduct broad outreach, using a variety of means and methods, to

---

[89] CLIMATE WORKING GROUP, A CRITICAL REVIEW OF IMPACTS OF GREENHOUSE GAS EMISSIONS ON THE U.S. CLIMATE at x (July 23, 2025), https://www.energy.gov/sites/default/files/2025-07/DOE_Critical_Review_of_Impacts_of_GHG_Emissions_on_the_US_Climate_July_2025.pdf ("The group began working in early April with a May 28 deadline.").

[90] *Id.*

[91] Endangerment and Cause or Contribute Findings for Greenhouse Gases Under Section 202(a) of the Clean Air Act, 74 Fed. Reg. 66,496, 66,510–11 (relying on assessments by the US Global Change Research Program ("USGCRP"), the Intergovernmental Panel on Climate Change ("IPCC"), and the National Research Council ("NRC"), which it stated "provides a comprehensive and in-depth analysis across such a large body of scientific studies, adheres to such a high and exacting standard of peer review, and synthesizes the resulting consensus view of a large body of scientific experts across the world").

[92] *Id.* § 102-3.65(a).

[93] 5 U.S.C. § 1008(c)(1).

[94] *Id.* § 1004(b)(2).

[95] *Id.* § 1004(b)(3).

[96] 41 C.F.R. § 102-3.60(b)(3).

ensure that the call for nominees reaches the interested parties and stakeholder groups likely to possess those points of view."[97]

Once a committee is established and its members selected, there are also requirements for ensuring transparency of its operations. With limited exceptions, all "meetings" of the advisory committee members must be open to the public.[98] All meetings must be timely noticed in the Federal Register, at least fifteen days before the meeting is to be held.[99] FACA also imposes open records requirements for committees, requiring that all "records, reports, transcripts, minutes, appendixes, working papers, drafts, studies, agenda, or other documents which were made available to or prepared for or by each advisory committee" be made available for public inspection and copying.[100]

These requirements apply to any "advisory committee," which is defined as any "committee, board, commission, council, conference, panel, task force, or other similar group . . . established or utilized to obtain advice or recommendations for the President or one or more agencies or officers of the Federal Government and that is . . . established or utilized by one or more agencies."[101] Under this definition, the DOE Climate Working Group qualifies and would be subject to these requirements. However, none of the requirements were met in the establishment or operations of the Climate Working Group. Secretary Wright did not consult with the GSA before establishing the committee, the committee was not announced in the Federal Register, and it did not have a charter. All of its members appear to have been selected because they have expressed skepticism of the scientific consensus on climate change. Finally, none of its meetings or records were made public—the existence of the group was not disclosed until its climate report was released with the proposed Endangerment Finding repeal at the end of July.

The CWG Draft Report also does not appear to conform with DOE's Information Quality Guidelines, promulgated pursuant to the Information Quality Act.[102] DOE's guidelines state that the agency should comply with OMB's *Final Information Quality Bulletin for Peer Review*. This bulletin emphasizes the importance of "meaningful peer review of science disseminated by the Federal Government."[103] The bulletin requires that agencies subject "influential scientific information" to peer review before dissemination.[104] "Influential scientific information" includes "scientific information the agency reasonably can determine will have or does have a clear and substantial impact on important public policies or private sector decisions."[105] While the bulletin provides agencies some discretion to choose the peer review process used, it requires agencies to ensure their peer review practices are "characterized by both scientific integrity and process integrity."[106] For "highly influential scientific information," the bulletin requires an especially rigorous peer review.[107] A scientific assessment is considered ''highly influential'' if the agency or the OIRA Administrator "determines that the dissemination

---

[97] *Id.* § 103.360(b)(3)(ii).

[98] 5 U.S.C. § 1009(a); 41 C.F.R. § 102-3.150(a).

[99] 5 U.S.C. § 1009(a); 41 C.F.R. § 102-3.150(a).

[100] 5 U.S.C. § 1009(b).

[101] 5 U.S.C. §§ 1001(2)(A)(iii), 1003(a).

[102] U.S. Dep't of Energy, Final Report Implementing Updates to the Department of Energy's Information Quality Act Guidelines (2019), available at https://www.energy.gov/cio/articles/2019-final-updated-version-doe-information-quality-guidelines ("DOE Information Quality Guidelines").

[103] Final Information Quality Bulletin for Peer Review 70 Fed. Reg. 2,664, 2,664 (Jan. 14, 2005).

[104] *Id.* at 2,667.

[105] *Id.*

[106] *Id.* at 2,668.

[107] *Id.* at 2,671.

could have a potential impact of more than $500 million in any one year on either the public or private sector or that the dissemination is novel, controversial, or precedent-setting, or has significant interagency interest."[108]

DOE's guidelines apply to "any public dissemination of information under the control of DOE."[109] "Dissemination" includes any "agency initiated or sponsored distribution of information to the public."[110]  Under this definition, the DOE's guidelines apply to the CWG Draft Report.  Because the report is being used as a basis to repeal the Endangerment Finding, it likely qualifies as "highly influential."  The dissemination is controversial and will have significant economic impacts.  DOE says that the report underwent an "internal peer-review period amongst DOE's scientific research community."[111]  However, external experts have raised strong criticisms regarding the adequacy of this review process, particularly for a document of such purported influence and scope.  A member of the CWG described the review as an "internal review from eight scientists/administrators employed by the DOE."[112]  This internal review does not comport with the peer review requirements for highly influential scientific information. Nor does it meet EPA's own procedures and standards for scientific integrity or credibility, including EPA's Peer Review Policy.  Indeed, the CWG Draft report is now subject to a formal Request for Correction that has been submitted to DOE's Chief Information Officer that should call into question EPA's reliance on this draft.[113]

> B.     The DOE report and EPA's Proposal do not consider important scientific information.

EPA's alternative rationale for rescinding the Endangerment Finding is also arbitrary and capricious because it relies on incomplete scientific information and fails to consider the large body of compelling and carefully developed evidence about climate change.  An agency rule is arbitrary and capricious if the agency "failed to consider an important aspect of the problem [or] . . . runs counter to the evidence before the agency."[114]

EPA's 2009 Endangerment Finding carefully addressed each of a series of scientific findings that formed the predicate for the overall conclusion, and reaffirmed these in a careful review during its denial of petitions for reconsideration, finding:

> "That current and historic anthropogenic emissions of greenhouse gases are causing concentrations of greenhouse gases in our atmosphere to rise to elevated levels essentially unprecedented in human history; (2) that the accumulation of greenhouse gases in our atmosphere is exerting a warming effect on the global climate; (3) that warming of the climate system is unequivocal, as is evident from multiple types of observations, including increasing average global surface temperatures, rising ocean temperatures and sea levels, and shrinking Arctic sea ice, and that the observed rate of climate change stands out as significant

---

[108] *Id.*

[109] DOE Information Quality Guidelines at 13.

[110] *Id.*

[111] U.S. Dep't of Energy, *Department of Energy Issues Report Evaluating Impact of Greenhouse Gasses on U.S. Climate, Invites Public Comment* (July 29, 2025), https://www.energy.gov/articles/department-energy-issues-report-evaluating-impact-greenhouse-gasses-us-climate-invites.

[112] Judith Curry, *Judith Curry's Take: New Climate Assessment Report from US DOE*, Watts Up With That? (July 30, 2025), https://wattsupwiththat.com/2025/07/30/judith-currys-take-new-climate-assessment-report-from-us-doe/.

[113] H. Christopher Frey, Ph.D., REQUEST FOR CORRECTION:"A Critical Review of Impacts of Greenhouse Gas Emissions on the U.S. Climate," Disseminated by the U.S. Department of Energy on July 29, 2025, Submitted August 15, 2025, available at https://frey.wordpress.ncsu.edu/files/2025/08/DOE-Report-Correction-Request-250815-Submitted-personal-info-redacted.pdf.

[114] *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 43 (1983).

> compared to recent historical rates of climate change; (4) that there is compelling evidence that anthropogenic emissions of greenhouse gases are the primary driver of recent observed increases in average global temperature; (5) that without substantial efforts to reduce emissions, greenhouse gas concentrations are expected to continue to climb, leading to greater rates of future climate change relative to historic rates; and (6) that the threat to public health will likely mount over time as greenhouse gases continue to accumulate in the atmosphere and result in ever greater rates of climate change."[115]

EPA's proposed recission of that finding does not engage in a systematic analysis of each of these issues, or of the competing information that supports those conclusions. EPA's 2010 Response to the Petitions for Reconsideration is newly apropos:

"The petitioners' arguments amount to a request that EPA ignore the deep body of science that has been built up over several decades and the direction it points in, and to do so based not on a careful and comprehensive analysis of the science, but instead on what amount to assertions and leaps in logic, unsupported by a rigorous examination of the science itself.  The petitioners do not provide any substantial support for the argument that the Endangerment Finding should be revised. Therefore, none of the petitioners' objections are of central relevance to the considerations that led to the final Endangerment Finding."[116] Rather, EPA's Proposal presents an incomplete picture of the current science on GHGs and climate change and runs counter to overwhelming evidence of the harms of climate change.

Comments submitted by more than 85 climate experts criticized the Draft Climate Working Group Report as "biased, full of errors, and not fit to inform policymaking."[117]  In a carefully documented 453-page response, this large group of experts highlights DOE's reliance on discredited research, failure to follow the peer review processes expected of credible scientific assessments, and other flaws.  The Expert Review found that, "the Draft Report does not meet standards of quality, utility, objectivity and integrity appropriate for use in supporting policy making.  In assessing the science of climate change, the U.S. government should follow standards appropriate for a Highly Influential Scientific Assessment, including an unbiased, robust, and transparent peer review process. Rigorously reviewed assessments, like the Intergovernmental Panel on Climate Change and National Climate Assessment reports, provide much more accurate representations of the scientific understanding of climate change."[118] Tesla incorporates the content of that comment by reference here.

Further, a new Report from the National Academies of Sciences, Engineering, and Medicine provides a comprehensive assessment of the evidence gathered by the scientific community since EPA's original 2009 Endangerment Finding.  After evaluating hundreds of new peer reviewed studies, the Report concludes that "the evidence for current and future harm to human health and welfare created by human-caused greenhouse gases is beyond scientific dispute. . . .  The report says EPA's 2009 finding was accurate, has stood the test of time, and

---

[115] EPA's 2022 Denial of Petitions Relating to the Endangerment and Cause or Contribute Findings for Greenhouse Gases Under Section 202(a) of the Clean Air Act at 4, https://www.epa.gov/system/files/documents/2022-04/decision_document.pdf.

[116] EPA's Denial of the Petitions To Reconsider the Endangerment and Cause or Contribute Findings for Greenhouse Gases Under Section202(a) of the Clean Air Act, 79 Fed. Reg. 45,556 (Aug. 13, 2010), https://www.epa.gov/sites/default/files/202105/documents/response-decision.pdf.

[117] *See* Press Release, Leading Scientists Conclude DOE's New Climate Report is "Not Scientifically Credible," available at https://drive.google.com/file/d/1r3-lNf45sTIuurKYpFUHla5oKrSc3nxV/view, announcing Comment: Climate Experts' Review of the DOE Climate Working Group Report, Aug. 30, 2025, on DOE-HQ-2025-0207.

[118] Climate Experts' Review of the DOE Climate Working Group Report at 1, available at https://tinyurl.com/DOE-comment.

is now reinforced by even stronger evidence."[119]  It is incumbent upon EPA to evaluate this expert scientific assessment carefully before finalizing its Proposal.

      C.        **EPA's finding of some scientific uncertainty underlying the Endangerment Finding does not provide a sufficient reason to decline to regulate under the statute.**

EPA proposes to conclude that there is insufficient evidence that "GHG emissions from new motor vehicles and engines in the United States cause or contribute to endangerment to public health and welfare in the form of global climate change."[120]  However, the statute does not require a definitive finding that a pollutant causes or contributes to endangerment; rather, Congress instructed EPA to prescribe standards for motor vehicles for any air pollutant "which may *reasonably be anticipated* to endanger public health or welfare."[121]  EPA's insistence on scientific certainty is inconsistent with the plain text of the statute.

Courts have affirmed that an endangerment finding is warranted even in the face of some uncertainty in the scientific record.  EPA should follow the judicial determination from the D.C. Circuit that adjudicated the challenge to the 2009 Endangerment Finding, that "the existence of some uncertainty does not, without more, warrant invalidation of an endangerment finding."[122]  The court, in considering these precise issues, reasoned that, "Congress did not restrict EPA to remedial regulation when it enacted CAA § 202(a). That section mandates that EPA promulgate new emission standards if it determines that the air pollution at issue 'may reasonably be anticipated to endanger public health or welfare.'"[123]  The language of Section 202(a) requires a "precautionary, forward-looking scientific judgment . . . consistent with the CAA's 'precautionary and preventive orientation.'"[124]  The D.C. Circuit also pointed to the Court's decision in *Massachusetts*, which "confirmed that EPA may make an endangerment finding despite lingering scientific uncertainty."[125]  This conclusion is consistent with longstanding D.C. Circuit precedent interpreting the Clean Air Act, which holds that "the statutes and common sense demand regulatory action to prevent harm, even if the regulator is less than certain that harm is otherwise inevitable."[126]  Following both the plain text of the statute and courts' interpretations of Section 202(a), the purported scientific uncertainty fails to provide a sound or compelling basis for reopening the Endangerment Finding.

V.       **EPA has not articulated a sufficient legal or factual basis for reversing its long-standing vehicle emissions standards.**

In addition to proposing to rescind the 2009 Endangerment Finding, EPA proposes repealing all of the existing GHG emission standards for new motor vehicles.  However, none of the independent bases on which EPA rests

---

[119] News Release, National Academies Publish New Report Reviewing Evidence for Greenhouse Gas Emissions and U.S. Climate, Health, and Welfare, September 17, 2025, available at https://www.nationalacademies.org/news/2025/09/national-academies-publish-new-report-reviewing-evidence-for-greenhouse-gas-emissions-and-u-s-climate-health-and-welfare.

[120] Proposal at 36,310.

[121] 42 U.S.C. § 7521(a)(1) (emphasis added).

[122] *Coal. for Responsible Regul., Inc. v. EPA*, 684 F.3d 102, 121 (D.C. Cir. 2012).

[123] *Id.* at 122 (quoting *Lead Indus. Ass'n, Inc. v. EPA*, 647 F.2d 1130, 1155 (D.C. Cir. 1980) ("[R]equiring EPA to wait until it can conclusively demonstrate that a particular effect is adverse to health before it acts is inconsistent with both the [CAA]'s precautionary and preventive orientation and the nature of the Administrator's statutory responsibilities. Congress provided that the Administrator is to use his judgment in setting air quality standards precisely to permit him to act in the face of uncertainty.").

[124] *Id.*

[125] 684 F.3d at 122, citing *Massachusetts*, 549 U.S. at 534.

[126] *Ethyl Corp.*, 541 F.2d at 25.

its Proposal are sufficient to reverse the standards.  Moreover, rescinding all standards, as EPA proposes, would constitute retroactive rulemaking for which EPA lacks authority.

### A.      The standards are not an "EV mandate" and do not implicate the major questions doctrine.

EPA implies that the GHG emission standards are an "EV mandate" and subject to the major questions doctrine. The agency proposes that "mandating a shift in the national vehicle fleet from one type of vehicle to another is indistinguishable from the emission guidelines at issue in *West Virginia*, which were calculated to force a shift from one means of electricity generation to another."[127]  However, the standards do not impose any  mandate and are not akin to the impermissible generation shifting at issue in *West Virginia*.  Rather, they fall squarely within EPA's authority under Section 202(a).

Congress intended the Clean Air Act to be "technology-forcing" and authorized EPA to reduce emissions by adopting innovation-promoting standards.  When setting standards under Section 202(a), EPA must allow time for the "development and application of the requisite technology" and give "appropriate consideration to the cost of compliance within such period."[128]  In designing Section 202, "Congress intended the agency to project future advances in pollution control capability" and "press for the development and application of improved technology rather than be limited by that which exists today."[129]  That is precisely the approach EPA followed in setting these vehicle emissions standards.

The Clean Air Act also has long been understood to promote the application of a range of possible approaches to controlling emissions, "whether such vehicles and engines are designed as complete systems or incorporate devices to prevent or control such pollution."[130]  EPA's consideration of electric vehicles in the standards was rooted in a long-standing approach that looked beyond end-of-tailpipe controls.  Clean Air Act motor vehicle emissions controls have long recognized that reductions may come from the means of propulsion as well. Indeed, EPA has considered electric vehicles in every Section 202(a) rulemaking since 2000. Prior standards, like these, acknowledge technological developments such as increasing vehicle hybridization—incorporating some portion of electric propulsion—as well as techniques such as engine or cylinder shut down while idling as potential compliance solutions.[131]

Moreover, while the standards may motivate automakers to increase their production of electric vehicles, this is a performance standard where manufacturers retain substantial flexibility in how to comply.  As EPA found when adopting the rule, "it would be technologically feasible to meet [the] standards without additional zero emission vehicles beyond the volumes already sold today."[132]   While that would not be the lowest-cost compliance alternative, the standards offer flexibility for manufacturers to continue to offer vehicles with a diverse range of technologies.  It is therefore wrong to characterize the standards as an "EV mandate."[133]

---

[127] Proposal at 36,306.

[128] 42 U.S.C. § 7521(a)(2).

[129] *NRDC v. EPA*, 655 F.2d 318, 328 (D.C. Cir. 1981) (internal quotations omitted).

[130] 42 U.S.C. § 7521(a)(1).

[131] Multi-Pollutant Emissions Standards for Model Years 2027 and Later Light-Duty and Medium-Duty Vehicles, 89 Fed. Reg. 27,842, 27,845–46 (Apr. 18, 2024).

[132] 89 Fed. Reg. at 27,845.

[133] It is hard to square EPA's proposed approach that a standard that would admit of the use of ZEVs to meet it is not a legitimate "emissions standard" within the meaning of 202(a) with cases holding that state ZEV purchasing requirements are an "emissions standard" within 202(a).  *See Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*, 541 U.S. 246, 252 (2004).  That would mean that states cannot have ZEV requirements because they are preempted "emission standards," but simultaneously EPA would lack authority to impose an "emission standard" that has the same requirement.

These standards do not represent EPA's exercise of an "unheralded power representing a transformative expansion in its regulatory authority," and they do not effect a "radical or fundamental change to a statutory scheme.[134]  In short, they do not raise major questions concerns.  Rather, the standards merely enhance the stringency of vehicle emissions control requirements to reflect new developments in technology, exactly as Congress intended and as EPA has done for decades.

### B.  Complete repeal of the vehicle standards would constitute impermissible retroactive rulemaking.

In EPA's summary of the Proposal, EPA specifies that "[a]s a result of these proposed changes, engine and vehicle manufacturers would no longer have any future obligations for the measurement, control, and reporting of GHG emissions for any highway engine and vehicle, *including model years manufactured prior to this proposal*."[135]  Not only would such an action disrupt industry's ability to rely on EPA regulations to make investment decisions about what types of technologies to develop and deploy in vehicles, but it would also be impermissible retroactive rulemaking.

Even where a statute grants an agency authority to regulate, that grant of authority does not "encompass the power to promulgate retroactive rules unless that power is conveyed by Congress in express terms."[136]  Here, the Clean Air Act contains no such express conveyance.  Where agencies regulate retroactively without authorization, courts hold that the regulation is invalid.[137]  EPA's action would give a pass to manufacturers on compliance obligations that have existed for years based upon a new interpretation of relevant legal requirements.  This rewards the laggards and penalizes companies, such as Tesla, who have invested in compliance with the existing legal requirements.

### C.  EPA's Proposal misunderstands what is required for a "requisite technology" under Section 202(a).

EPA proposes that no "requisite technology" exists for GHG emissions from vehicles because even eliminating all GHG emissions from vehicles would not measurably impact climate change.[138]  However, EPA's understanding of what is required for a "requisite technology" conflicts with the text of the statute, Supreme Court precedent, and prior EPA regulations.  A "requisite technology" need only feasibly reduce the emissions, not entirely stop them or remove already-emitted pollutants from the atmosphere.

EPA's argument conflicts with the text of the statute, which states that "any regulation . . . shall take effect after such period as the Administrator finds necessary to permit the development and application of the requisite technology, giving appropriate consideration to the cost of compliance within such period."[139]  This plain language only requires that EPA consider whether the technology required by the emissions standards is available and cost-reasonable, *not* whether the technology can fully remedy the harms caused by an air pollutant.  In other words, "requisite" refers to technology requisite *to meet that standard*, not necessarily requisite *to address all emissions and resolve all pollution concerns*.  This reading is consistent with the structure of the section 202(a), which requires EPA to evaluate whether a pollutant may "cause" or "contribute" to endangering public health and welfare.  Congress would not have EPA address mere contribution to

---

[134] *West Virginia v. EPA*, 597 U.S. 697, 721, 723 (2022) (cleaned up).

[135] EPA, Proposed Rule: Reconsideration of 2009 Endangerment Finding and Greenhouse Gas Vehicle Standards, https://www.epa.gov/regulations-emissions-vehicles-and-engines/proposed-rule-reconsideration-2009-endangerment-finding (emphasis added).

[136] *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 205 (1988).

[137] *Id.* at 216.

[138] Proposal at 36,311.

[139] 42 U.S.C. § 7521(a)(2).

endangerment if it also intended to require that any emissions controls completely — or even substantially — solve an identified pollution problem.  In keeping with this, EPA has never to our knowledge set motor vehicle emission standards based on their ability to fully resolve the harms posed by a pollutant.

EPA's argument is also in tension with *Massachusetts v. EPA*, which confirmed that agencies do not solve problems in "one fell regulatory swoop."[140]  *Massachusetts* rejected EPA's argument that EPA's regulation would need to materially remedy climate change, saying that, although "regulating motor-vehicle emissions will not by itself *reverse* global warming," EPA nonetheless has "a duty to take steps to *slow* or *reduce* it."[141]  This ruling from the Supreme Court is binding upon EPA.  In short, the mere fact that reducing or even eliminating GHG emissions from new motor vehicles would not on its own stop or reverse global warming provides no basis for repealing all regulations of such emissions and is at odds with the National Academies science findings as well.[142] Further, the logic EPA has forwarded to justify this reversal may only exacerbate the stated concerns.  EPA's contention in the Proposal that U.S. motor vehicle emissions are only a small portion of global GHG emissions and thus regulation here would not remedy any endangerment is likely to only become worse with finalizing the Proposal, as many other countries – such as the United Kingdom, the European Union, Canada, New Zealand, Australia, and Mexico -- have tailored their GHG motor vehicle standards to reflect U.S. requirements. Canada for example explicitly references the US Code of Federal Regulations in setting its own standard and in assessing U.S.-made vehicles for compliance with Canadian regulations.[143]

> D.    Because EV technology is cost effective and has been widely adopted, the standards would not have negative health and safety effects.

EPA proposes that the current vehicle emissions standards may "harm, rather than advance, public welfare by reducing fleet turnover," thereby reducing air quality and safety.[144]  However, this Proposal does not consider important information about the costs of EVs and consumer preferences, as well as the negative impacts on other air pollution from vehicles that may result from repeal of the standards.  Moreover, EPA does not take into account the significant health and welfare benefits that come from reducing GHG emissions from motor vehicles.

EPA reasons that the standards will result in an increase in the price of new vehicles, which in turn "disincentivizes consumers from purchasing new vehicles and keeps less efficient vehicles on the road for longer."[145]  However, this reasoning fails to consider the carefully established and voluminous record that EPA developed as part of its rulemaking promulgating the standards.  In the rulemaking, EPA found that "the standards would be beneficial for consumers because the lower operating costs would offset increases in vehicle technology costs, even *without* consideration of . . . incentives in the IRA."[146]  EPA also considered the impacts of

---

[140] *Massachusetts*, 549 U.S. at 524.

[141] 549 U.S. at 525.  *Massachusetts* also rejected the argument that anticipated growth of sources of pollution in other countries would render regulation futile.  Even though other countries "such as China and India are poised to increase greenhouse gas emissions substantially," "[a] reduction in domestic emissions would slow the pace of global emissions increases, no matter what happens elsewhere."  *Id.* at 525–26.

[142] National Academies, Effects of Human-Caused Greenhouse Gas Emissions at 2 ("Continued emissions of greenhouse gases from human activities will lead to more climate changes in the United States, with the severity of expected change increasing with every ton of greenhouse gases emitted.").

[143] See Government of Canada, Passenger Automobile and Light Truck Greenhouse Gas Emission Regulations (SOR/2010-201) as amended December 15, 2023, at:
https://laws-lois.justice.gc.ca/eng/regulations/SOR-2010-201/FullText.html.

[144] Proposal at 36,311.

[145] Proposal at 36,312.

[146] 89 Fed. Reg. at 28,092.

the standards on low-income consumers when setting the standards and concluded that low-income household would experience "significant savings on vehicle operating costs" as a result of the standards.[147]  In the Regulatory Impact Analysis (RIA) for the standards, EPA also analyzed how consumers respond to costs and consumer choice impacts of the standards.[148]

EPA's Proposal does not consider the factual record established for the existing standards nor the most current information about consumer preferences and the costs of EVs.  There is strong consumer demand for EVs because of their advantages over ICE vehicles, such as a quieter ride and faster acceleration.  The market share of EVs continued to expand in the United States throughout 2024.[149]  In addition, the price of EVs continues to fall due to decreasing manufacturing costs,[150] and the total cost of ownership of EVs is already lower than comparable ICE vehicles when fuel and maintenance are accounted for.[151]  Furthermore, as demonstrated in Tesla's Comments on EPA's Proposed Light Duty Vehicle Standards, incorporated by reference here,[152] Tesla's experience over many years has demonstrated that battery electric vehicle cost reductions accompany scale.  Tesla has further outlined a pathway to reducing the production cost of its next generation vehicle by 50 percent.  As evidenced by the popularity of its Model Y and Model 3 vehicles, Tesla has also demonstrated that increases in production volumes can reduce battery electric vehicle costs to levels favoring them in the marketplace and facilitating broad consumer acceptance. Moreover, decreasing battery costs and improved efficiency will further lower the cost of owning an EV.  A range of battery technology innovations coming to market are predicted to improve further performance and costs, achieving even more favorable initial and total cost of ownership comparisons with conventionally powered vehicles.  In addition to failing to consider the decreasing costs of EVs, EPA does not demonstrate any decrease in vehicle demand as its GHG emissions standards have grown more stringent over time.  Indeed, to the contrary, sales in the United States exceeded 1.5 million Electric Vehicles in 2024, and that was 10% of all new Light Duty Vehicles sold.[153]

EPA's assessment also does not consider the potential negative effects that would result from revocation of the standards.  Revocation of the standards may have negative impacts on other air pollution from vehicles and will pose significant compliance complexities for manufacturers.  While EPA only proposes to repeal the GHG standards and not the standards for criteria pollutants, EVs reduce both criteria pollutants and GHG emissions by a large margin.[154]  This linkage was part of the original rationale for promulgating GHG regulations as part and parcel of EPA's multi-pollutant standards.  In fact, EVs are among the most effective technology for meeting criteria pollutant standards.  Because additional gains in reduction of conventional pollutant emissions from

[147] *Id.*

[148] Multi-Pollutant Emissions Standards for Model Years 2027 and Later Light-Duty and Medium-Duty Vehicles: Regulatory Impact Analysis 4-1 to 4-22 (March 2024).

[149] IEA, Global EV Outlook 2025 at 18 (July 2025), https://iea.blob.core.windows.net/assets/7ea38b60-3033-42a6-9589-71134f4229f4/GlobalEVOutlook2025.pdf.

[150] *Id*. at 47–49.

[151] *Id.;* Dan Wilkins & Nick Nigro, Comparing the Cost of Owning the Most Popular Vehicles in the United States: 2025 Update, ATLAS PUBLIC POLICY (June 2025), https://atlaspolicy.com/wp-content/uploads/2025/07/Comparing-the-Cost-of-Owning-the-Most-Popular-Vehicles-in-the-United-States-2025-Update.pdf. *Accord* ICCT, Assessment of light-duty electric vehicle costs and consumer benefits in the United States in the 2022–2035 time frame (Oct. 18, 2022), https://theicct.org/publication/ev-cost-benefits-2035-oct22/; MIT, Carbon Counter.com, https://www.carboncounter.com/#!/explore (finding a 2020 Tesla Model 3 has among the lowest lifecycle emissions and, on a Total Cost of Ownership basis is more affordable many other comparable cars).

[152] Tesla Comments, Environmental Protection Agency (EPA), Multi-Pollutant Emissions Standards for Model Years 2027 and Later Light-Duty and Medium-Duty Vehicles, 88 Fed. Reg. 29184 (May 5, 2023), Docket ID No EPA-HQ-OAR-2022-0829 (July 5, 2023) at 13-15.

[153] ICCT, RESEARCH BRIEF: GLOBAL ELECTRIC VEHICLE MARKET MONITOR FOR LIGHT-DUTY VEHICLES, 2024 (June 2025) at 2, available at https://theicct.org/wp-content/uploads/2025/06/ID-366-%E2%80%93-Global-monitor-cars_brief_final.pdf.

[154] 89 Fed. Reg. at 27,846.

internal combustion will come at ever greater costs per gram of pollutant reduction, EVs are an increasingly cost-effective technology for meeting these criteria standards. By discouraging the development and deployment of EVs, EPA makes it more difficult for manufacturers to address air pollution from pollutants other than GHGs.

Finally, EPA's Proposal also does not consider the significant health and welfare benefits that derive from meeting GHG standards. As EPA found when promulgating the standards, GHG emissions have "significant impacts on public health and welfare as evidenced by the well-documented scientific record."[155] As greenhouse gases in the atmosphere warm the planet, rising temperatures produce changes in sea level and precipitation patterns, for example.[156] Sea levels along the contiguous United States are expected to rise 10-12 inches between 2020 and 2050, putting infrastructure in coastal cities at great risk.[157] By 2050, up to $106 billion worth of coastal property in the United States will likely be below sea level.[158]

Greenhouse gas emissions are also causing extreme weather events such as heat waves, wildfires, hurricanes, and floods to become more frequent and intense.[159] These weather events cause significant injury and death in the United States.[160] They also have immense economic costs, with the National Oceanic and Atmospheric Administration finding that the U.S.'s largest weather and climate disasters from 1980-2024 cost over $2.915 trillion (inflation adjusted), with nearly 60% of that cost incurred since 2010.[161] As EPA acknowledges on its website, rising temperatures can increase heatstroke, kidney and heart disease, and pregnancy complications.[162] EPA's website also notes that rising temperatures can also threaten water availability through droughts, and diminish air quality by increasing wildfire smoke and ground-level ozone,[163] and lead to higher rates of insect-related diseases.[164] The recent National Academies of Sciences assessment validates many of these concerns[165]. The proposed rule does not consider any of these harms and thereby the significant health and welfare benefits that derive from decreasing GHG emissions through GHG standards.

VI.     Prejudging the outcome of the reconsideration of the Endangerment Finding and the GHG standards for motor vehicles would not satisfy notice and comment requirements and Due Process.

---

[155] 89 Fed. Reg. at 27,844.

[156] ENERGY INFO. ADMIN., *Energy and the Environment Explained: Greenhouse Gases and the Climate* (June 18, 2024), https://www.eia.gov/energyexplained/energy-and-the-environment/greenhouse-gases-and-the-climate.php.

[157] Rebecca Lindsey, *Climate Change: Global Sea Level*, NOAA (Aug. 22, 2023), https://www.climate.gov/news-features/understanding-climate/climate-change-global-sea-level.

[158] NOAA, *Climate Change Predictions*, https://coast.noaa.gov/states/fast-facts/climate-change.html (last visited Sept. 13, 2025).

[159] NASA, *Extreme Weather and Climate Change*, https://science.nasa.gov/climate-change/extreme-weather/ (last visited Sept 22, 2025). .

[160] *E.g.*, Yan Zhuang, Pooja Salhotra & Mark Walker, *What We Know About the Floods in Central Texas*, NEW YORK TIMES (July 20, 2025), https://www.nytimes.com/article/texas-floods-kerr-county.html.

[161] NOAA, Billion-Dollar Weather and Climate Disasters, https://www.ncei.noaa.gov/access/billions/ (last visited Sept. 22, 2025); NOAA, United States Summary, https://www.ncei.noaa.gov/access/billions/state-summary/US (last visited Sept. 13, 2025).

[162] EPA, *Climate Change Impacts on Health* (March 25, 2025), https://www.epa.gov/climateimpacts/climate-change-impacts-health.

[163] *Id.*

[164] *Id.*; *see also* Nadine A. Yehya, *Experts warn climate change will fuel spread of infectious diseases*, UC DAVIS HEALTH (March 20, 2024), https://health.ucdavis.edu/news/headlines/experts-warn-climate-change-will-fuel-spread-of-infectious-diseases-/2024/03.

[165] National Academies, Effects of Human-Caused Greenhouse Gas Emissions at 40-70.

Just as an agency does not fulfill APA notice and comment requirements where a notice is not "sufficiently descriptive of the 'subjects and issues involved' so that interested parties may offer informed criticism and comments,"[166] so too would parties be prejudiced where they "lost the opportunity to dissuade" an agency.[167] And agency rulemaking violates Procedural Due Process when a decisionmaker "has an unalterably closed mind on matters critical to the disposition of the proceeding."[168] Because of statements indicating that EPA has already determined to withdraw the Endangerment Finding, EPA should grapple with comments by Tesla and others raising important scientific and legal questions in order to avoid concerns of prejudgment.

### VII. EPA's Draft Regulatory Impact Analysis does not reflect relevant data on consumer preference for EVs or the cost of owning an EV.

EPA's Draft Regulatory Impact Analysis (RIA) for its Proposal cites several studies purporting to show that "consumer/purchaser demand for LD, MD, and HD EVs has decreased below the levels projected in the 2024 vehicle rulemakings."[169] The RIA also claims that consumers are only willing to pay a limited amount for increased fuel economy, such that "the value of 2.5 years of fuel savings approximates consumers' willingness to pay for the increase in fuel economy adjusted for potentially missing costs or consumer preferences."[170]

However, these statements do not reflect relevant data on consumer preference for EVs or the cost of owning an EV, including data demonstrating that vehicle sales did not decrease after implementation of the most recent motor vehicle greenhouse gas emissions standards. Research shows that average battery prices are likely to fall nearly 50 percent from 2023 to 2026, continuing to lower the cost of owning an EV.[171] In part as a result of these decreasing costs, consumer demand for EVs has remained steady in 2025 even as some charging infrastructure concerns persist.[172] Moreover, the RIA primarily cites older studies, such as from 2014 and 2016, not those which would warrant a review of the current rules.[173] Most fundamentally, EPA does not sufficiently consider the significant benefits resulting from the existing rule, which would provide annualized emissions benefits of about $85 billion, including: $13 billion in health benefits from reducing criteria pollutants of PM2.5 that are associated with premature death and hospitalization from respiratory and cardiovascular illness, heart attacks, asthma, and reduced lung functionality; annualized savings on maintenance and repair costs are estimated at $16 billion; and significant fuel savings that are estimated at an annualized value of $46 billion.[174]

In closing, Tesla recognizes EPA's authority to establish and maintain greenhouse gas standards for motor vehicles for the reasons presented above in our response to the Proposal. We also recognize that the standards,

---

[166] *Citizens Telecomms. Co. v. FCC*, 901 F.3d 991, 1005 (8th Cir. 2018).

[167] *Custom Commun'cs, Inc.*, 142 F.4th 1060, 1073 (8th Cir. 2005); *see State of Iowa v. Wright,* No. 24-1721 (8th Cir. 2025).

[168] *Mississippi Comm'n on Env't Quality v. E.P.A.*, 790 F.3d 138, 183 (D.C. Cir. 2015).

[169] Reconsideration of 2009 Endangerment Finding and Greenhouse Gas Vehicle Standards: Draft Regulatory Impact Analysis at 5 (July 2025).

[170] *Id.* at 19.

[171] Goldman Sachs, *Electric vehicle battery prices are expected to fall almost 50% by 2026* (Oct. 7, 2024), https://www.goldmansachs.com/insights/articles/electric-vehicle-battery-prices-are-expected-to-fall-almost-50-percent-by-2025?utm_source=ts2.tech.

[172] J.D. Power, EV Purchase Consideration Holds Steady amid Market Uncertainty, J.D. Power Finds (May 15, 2025), https://www.jdpower.com/business/press-releases/2025-us-electric-vehicle-consideration-evc-study.

[173] Reconsideration of 2009 Endangerment Finding and Greenhouse Gas Vehicle Standards: Draft Regulatory Impact Analysis at 14-18 (July 2025).

[174] ICCT, Policy Update: U.S. MULTI-POLLUTANT EMISSIONS STANDARDS FOR MY 2027 AND LATER LDVS AND MDVS (March 2025) at 15, available at https://theicct.org/wp-content/uploads/2025/03/ID-308-%E2%80%93-EPA-LDV-standards_policy-update_final.pdf.

while maintained, could be simplified to reduce complexity and burden.  While Tesla's comments have focused specifically on the Proposal, Tesla would be pleased to work with EPA to simplify the standards.

# EXHIBIT 11-H

# RIVIAN



Lee Zeldin, Administrator
September 22, 2025
U.S. Environmental Protection Agency
1200 Pennsylvania Ave NW Washington, DC 20460
Attn: Docket ID No. EPA-HQ-OAR-2025-0194

September 22, 2025

**Re:** Reconsideration of 2009 Endangerment Finding and Greenhouse Gas Vehicle Standards, EPA-HQ-OAR-2025-0194

Rivian appreciates the opportunity to comment on EPA's proposal to reconsider the 2009 Endangerment Finding and greenhouse gas ("GHG") vehicle standards (EPAHQ-OAR-2025-0194).

Founded in 2009, Rivian is an independent American company with over 14,000 employees. As an automaker and charging network operator, Rivian's expertise lies primarily in engineering, software development, and manufacturing. We currently assemble all our vehicles at our manufacturing site in Normal, Illinois. We also broke ground on a second manufacturing site in Georgia on September 16, 2025. Beyond our vehicle lineup, Rivian is also building a network of DC fast chargers across the country known as the Rivian Adventure Network ("RAN").

Rivian welcomes interest in right-sizing regulations and implementing strategic policy frameworks that support the continued growth and competitiveness of the American auto industry. We stand ready to work with policymakers and partners in designing smart public policies that support our shared goals.

As an American automotive company, we have a compelling interest in commenting on aspects of this proposal. We recognize that EPA intends for this proposal to reduce the regulatory burden on the auto industry. Yet we have concerns that EPA's proposed actions could introduce new headwinds for the American vehicle manufacturing sector and its competitive position globally.



We appreciate EPA's specific request for comment on industry reliance interests. As a manufacturer of all-electric vehicles, Rivian generates compliance credits under EPA's GHG standards. Rivian has entered agreements to sell those credits. Changes to the law that prevent Rivian from earning or trading credits would therefore limit Rivian's ability to fulfill those agreements moving forward, resulting in a loss of anticipated revenue.

Additionally, Rivian is a public charging network operator. The utilization of a charging network's chargers has a direct impact on the revenue realized by the network. Insofar as GHG standards incentivize manufacturers to build and sell EVs as one potential compliance pathway, they inform the business case for investment in charging networks. EPA's current proposal is reasonably expected to reduce the manufacture and sale of electric vehicles nationwide. It is well understood that reduced EV sales would negatively impact the expected utilization of charging networks and therefore the associated adverse impacts on charging network-derived earnings.[1][2] This could also disrupt further investment in network expansions.

We have additional questions about the proposal's real-world impact on our industry's compliance obligations. For example, the rescission of vehicle GHG standards could make regulatory compliance within North American more complex. EPA's leadership has historically formed the foundation of efforts to pursue regulatory harmonization across the key regulatory jurisdictions of State Governments, federal agencies, and Canada. But one likely result of EPA's proposal is a tripartite regulatory landscape in which those three jurisdictions could each impose substantially different standards requiring automakers to plan for, certify to, and satisfy three parallel requirements within North America alone.

We also face uncertainty regarding fulfillment of ongoing test data reporting obligations and certain fuel economy labeling requirements. For instance, while EPA indicates that test data should be reported directly to NHTSA upon finalization of the proposal, we note that testing and reporting for Model Year 2026 is already underway

---

[1] *New data reveals how EV charger usage and pricing impacts profits*, STABLE AUTO RESOURCES (May 13, 2024), https://stable.auto/resources/new-data-reveals-how-ev-charger-usage-and-pricing-impact-profits.

[2] Kyle Stock, *EV Charging Stations Are Now Busy Enough to Make Money in the US*, Bloomberg (Mar. 6, 2024), https://www.bloomberg.com/news/articles/2024-03-06/ev-charging-stations-in-the-us-are-finally-getting-busy?srnd=homepage-middle-east



and the practicability of an immediate switch to a new reporting flow upon finalization of this proposal is unclear. We also question whether NHTSA is appropriately resourced to assume this new responsibility on a compressed timeframe or if this proposal would lead to a duplication of effort as EPA already interacts with manufacturers on compliance testing and the data used for fuel economy labelling.

For these reasons, we respectfully request that EPA reconsider its proposal. With more time for dialogue and public feedback, Rivian believes another path forward is possible—one that creates less uncertainty for our industry, fosters healthy competition and innovation, and allows American automakers to focus on what we do best: designing and building cars and trucks that inspire.

# EXHIBIT 11-I



**Cynthia Williams**
Global Director
Sustainability, Homologation and Compliance

**Ford Motor Company**
One American Road
Dearborn, MI 48126-2701

September 22, 2025

U.S. Environmental Protection Agency
EPA Docket Center
OAR Docket
Mail Code 28221T
1200 Pennsylvania Avenue NW, Washington, DC 20460
*via* https://www.regulations.gov/docket/EPA-HQ-OAR-2025-0194

        Subject:    Comments on Proposed Reconsideration of 2009 Endangerment Finding and Greenhouse Gas Vehicle Standards

        Ford Motor Company (Ford) hereby submits our comments on the Environmental Protection Agency's (EPA) Notice of Proposed Rulemaking, Proposed Reconsideration of 2009 Endangerment Finding and Greenhouse Gas Vehicle Standards, 90 Fed. Reg. 36,288 (August 1, 2025) ("EPA Proposal").  We appreciate the opportunity to comment as well as EPA's time and consideration.

        At Ford, our purpose has always been bigger than building vehicles; we are driven by a desire to build a better world. Sustainability drives our progress and guides our aspirations for the future.  This commitment, built upon a 122-year legacy of caring for our customers, our people, and the communities we call home, fundamentally shapes our perspective on the policies and regulations essential for achieving a sustainable future.

*     *     *

        For decades, America has debated whether and how to regulate greenhouse gases (GHG) from vehicles.  For our part, and for the reasons outlined below, Ford continues to believe that there should be a single, stable GHG standard to foster business planning.  That standard should align with science and customer choice, reduce carbon emissions gradually over time, and prioritize American manufacturing.  Indeed, winning the global race against China requires a stable American plan.

        At Ford, the customer gets to choose what to drive.  That's fundamental.  This includes attributes including vehicle size, utility, styling, and a software-driven in-vehicle experience. When it comes to how the vehicle is powered, most customers continue to choose gasoline and



diesel vehicles, and we are delighted to provide them with a range of fantastic options, including America's best-selling pickup trucks and vans. At the same time, more customers are choosing to purchase plug-in vehicles. As Ford plans for the next 120 years in this business, it's clear that we need to offer compelling and competitive plug-in vehicles for those customers. If we don't, our competitors will.

We at Ford are confident we can create this exciting next generation of vehicles right here in America. For customers who want plug-in vehicles, let's make them here at home, like Ford is already doing in Kentucky, Michigan, Missouri, Ohio, and Tennessee. Ford leads all automakers in U.S. production volume, we employ more hourly workers in the U.S. than any other automaker, and we export more vehicles made in the U.S. than any other automaker.

The automotive industry is capital intensive, however, and the deployment of that capital takes time. A single, stable GHG standard would help maintain a level playing field, spur innovation, and manage risks as industry invests in research, development, and manufacturing of new cars, trucks, and vans.

Ours is also a global business. And today, the U.S. automotive industry has only one true competitor—China. The ascendancy of Chinese automakers in the global market is perhaps the most significant business trend in the world, and they are especially strong on plug-in vehicles. America needs to meet this moment—to find common ground, work like we're on the same team, and focus on winning global markets. Stable emissions standards are an essential element of a portfolio of policy that America sorely needs to compete.

But we don't have a single or stable standard today. Instead, over many decades, federal GHG emissions standards have been written, reversed, revised, repealed, rewritten, and litigated ad nauseum, with one administration overcorrecting for its predecessor. We also have a second federal agency, the National Highway Traffic and Safety Administration, writing fuel economy standards that are wholly duplicative of GHG standards and add needless complexity and cost. With emission standards swinging from extreme to extreme, American manufacturers have been unable to allocate efficiently the capital needed to compete. It's been messy, and bad for business, especially for domestic auto companies that are most tied to the regulatory seesaw. Meanwhile, our global competitors grow stronger.

EPA proposes to eliminate all vehicle GHG emissions standards. To be sure, current standards are not aligned with customer choice and market realities. They need to be eased, and we therefore welcome the EPA's important efforts in this direction. But pragmatically, eliminating standards altogether is not likely to provide the industry with the long-term stability we need to make historic investments in America and compete globally.



That is, by eliminating GHG standards as proposed, the U.S. auto industry will not be able to safely assume that the elimination will remain in effect indefinitely.  First, there will be legal challenges, and it may be years before those reach a definitive conclusion.  During the pendency of the litigation, courts may stay the elimination and require EPA to implement and enforce the GHG standards that are currently in effect.  In other words, for the current and next few model years, automakers would be required to plan for a scenario in which there are no GHG standards, and another scenario in which there are GHG standards that can be met only by selling more electric vehicles than there is demand in the market.

Second, a future administration may take swift action to re-establish GHG standards.  Automakers operate with years of necessary lead time.  Today Ford is already planning our product lineup for the early 2030s; our investments for the next few years mostly have been made.  Given the nature of our business and investment cycle, regulatory change and uncertainty, industry must hedge all its decisions and is deprived of the ability to run an optimized business.  That has been our industry's story.

For all these reasons, Ford respectfully requests that the EPA consider a rulemaking process to establish a modest GHG emissions standard, to take effect no later than 2025 model year, which steadily becomes more stringent over time.  Ford would support a standard aligned with the industry's rate of GHG reductions in recent years and does not include any technology mandate.  Such a GHG standard would account for long-term industry trends—not seek to transform the industry as existing standards seek to do—and provide automakers with a reliable basis on which to plan our businesses and focus on serving our customers to lead the global industry.

Stability and predictability—that's truly good for business, good for customers, and good for America's global competitive position.

While we hope EPA's rulemaking effort here achieves the stability we need, ultimately the Nation may need federal legislation to end the regulatory whiplash.  Ford would welcome the opportunity to provide input on a comprehensive legislative fresh start, and recommends exploring an approach whereby Congress eliminates fuel economy standards, and requires a market-oriented, achievable GHG standard with clear criteria for regulatory implementation and that works in conjunction with criteria pollutant emissions standards that otherwise impose parallel regulatory constraints.



Enclosed are Ford's technical comments on the EPA proposal, which focus on the feasibility of the current GHG and criteria emissions standards, the need to alleviate testing requirements regarding particulate matter, and the need to retain certain EPA regulations because those are used for compliance with fuel economy requirements.  If you have any questions, please contact Mark Polster, Vehicle Regulatory Strategy & Planning (mpolster@ford.com), or Evan Belser, Associate General Counsel (ebelser1@ford.com). Thank you for your attention to these comments.

Sincerely,

Cynthia Williams

In Ford's July 2023 comments on the "EPA Proposed Multi-Pollutant Emissions Standards for Model Years 2027 and Later Light-Duty and Medium-Duty Vehicles" ("Multi-Pollutant Rule") and June 2023 comments on the "Proposed Greenhouse Gas Emissions Standards for Heavy-Duty Vehicles – Phase 3" ("HD GHG Phase 3") we noted that one or more of the following factors could prevent the expected EV growth necessary to meet the proposed greenhouse gas (GHG) and criteria emissions standards:

- Consumer Preference, especially beyond early adopters
- Vehicle purchase price
- Consumer incentives
- Critical minerals for EV manufacturing
- Charging infrastructure
- Finite automaker resources to manage EV programs along with emissions reductions from internal combustion engines (ICE) vehicles.
- Economic turbulence and geopolitical events

Since that time, we've seen a cooling EV market, consumer incentives being removed completely or significantly reduced, little improvement on utility grid and EV charger availability, and turbulence in the broader economy.

The GHG and criteria emissions standards EPA finalized in 2024 with the Multi-Pollutant Rule and HD GHG Phase 3 would have been difficult to achieve with ideal conditions for EV growth. The past two years have been anything but ideal and, we no longer believe the finalized standards represent a feasible or appropriate pathway for the U.S. light-, medium-, or heavy-duty vehicle markets.

Ford fully supports the Alliance for Automotive Innovation's (AAI) comments regarding the feasibility of the existing EPA GHG standards.

## Greenhouse Gas Standards

EPA finalized GHG standards across the full range of light-, medium-, and heavy-duty vehicles in 2024 with the MPR and HD GHG Phase 3 rules. In finalizing these rules, EPA provided a variety of scenarios showing how the standards might be met, but battery electric vehicles (BEVs) and zero emission vehicles (ZEVs) generating 0 g $CO_2$/mi (or 0 g/ton-mi, for heavy-duty vehicles) played a significant role in all cases. In 2027MY, the first year of the new standards, EPA projected 26% light-duty BEV sales, 3% medium-duty BEV sales, and 17% light

heavy-duty vocational vehicle BEV sales, increasing to 56%, 32%, and 60%, respectively by 2032MY.

Since publication of the final rules, several of the underlying EV-supporting policies used to justify the rates of electrification assumed in the standards have been modified or entirely removed. California withdrew its waiver request for its Advanced Clean Fleets regulation, which would have added a significant demand side driver for EV purchases. In June 2025, Congress and the President passed legislation that limits California's ability to enforce ZEV sales requirements and other EV-forcing state requirements. The National Electric Vehicle Infrastructure (NEVI) funding has become uncertain, and various tax credits established in the Inflation Reduction Act of 2022, including sections 30C, 30D, 45W, and 45X of the tax code were eliminated or limited in July 2025 in the One Big Beautiful Bill Act. Market demand for EVs also appears to have begun cooling in 2024 and 2025, even before the sunsetting of these tax incentives.

Leading up to the 2027MY and beyond GHG programs, EPA's 2023-2026 standards were themselves already very challenging, with year-over-year stringency increases of 5-10%, far outstripping the historical trend of roughly 1-2% improvement in internal combustion engine vehicle GHG emissions. This is creating a large compliance shortfall for the industry even before reaching 2027MY, and Ford supports stringency relief for these earlier model years. Given the current state of the EV market, Ford also believes the 2027MY and beyond GHG standards are infeasible and inappropriate across the light-, medium-, and heavy-duty vehicle classes and supports a reduction in the stringency of the standards finalized in the MPR and HD GHG Phase 3 rules.

Finally, we strongly recommend that any future regulations be completely harmonized among regulatory agencies (EPA, NHTSA, CARB) with no differences in standards, definitions, procedures, or credit accounting. Alternatively, one agency might lead a GHG or fuel economy program with no duplicative efforts from other agencies. The existing GHG plus fuel economy framework with overlapping but not identical requirements creates needless cost and complexity for manufacturers.

## Criteria Emissions Standards

While not part of this NPRM, several aspects of the Tier 4 criteria emission standards promulgated in the Multi-Pollutant Rule should be reconsidered, including the NMOG+NOx fleet average and particulate matter (PM) standards.

<u>NMOG+NOx Fleet Standards</u>

The EV-forcing nature of the GHG standards is well-understood, but the NMOG+NOx Fleet Average requirements for both light- and medium-duty serve as secondary EV-forcing mechanisms in the existing EPA regulations. Even if GHG standards are removed—or revised to a level that does not require EVs in order to comply—meeting the NMOG+NOx fleet average will still necessitate that manufacturers force electrified products into their fleet at a level far beyond market demand. Ford welcomes the opportunity to demonstrate to EPA why these standards are not feasible with advanced ICE technology alone, particularly for a full-line manufacturer.

<u>Particulate Matter (PM) Requirements</u>

In the Multi-Pollutant Rule, EPA finalized a new particulate matter standard (0.5mg/mi vs. the 3mg/mi Tier 3 level) that was explicitly designed to force gasoline particulate filter (GPF) hardware on all ICE vehicles in the light- and medium-duty fleet. This hardware adds significant cost and packaging design challenges even though light- and medium-vehicles contribute only a small fraction of the total PM2.5 emissions. We request that EPA revisit its cost-benefit assessment of a GPF-forcing requirement in a future rulemaking.

Additionally, Ford supported AAI's comments to the Multi-Pollutant Rule proposal expressing concern with the feasibility of making accurate and repeatable PM measurements at the 0.5 mg/mi level, and questioning whether the additional testing burden associated with the -7 °C FTP cold testing requirement was warranted. We continue to encounter challenges with low-level PM measurements in a certification environment and believe that refinements to EPA's PM testing and measurement specifications are needed.

Should the EPA retain the existing GPF-forcing PM standards, we recommend the following:

- Work with industry to update the PM test procedures to reflect current best practices (filter face velocity, dilution factor, etc.).

- Allow the option to re-test and replace anomalous PM tests for Official Certification and/or Confirmation testing if vehicle development data indicates PM compliance.

- Eliminate the -7 °C FTP PM standard for GPF-equipped vehicles.

## <u>**Other Technical Concerns**</u>

### <u>On-Board Measurements for Electrified Testing</u>

Ford requests that On-Board Measurement of Current (along with Voltage) be allowed for all electrified powertrain testing as requested in the AAI Multi-Pollutant Rule comments.

### <u>Robot Drivers</u>

Ford requests the option of robot drivers for all regulatory emissions testing, including those under two hours.

### <u>C-17 – Impact on NHTSA Medium- and Heavy-Duty Fuel Efficiency Programs</u>

Ford does not support the proposal to entirely remove or modify sections of 40 CFR parts 86, 1036, and 1037 that NHTSA relies upon or references in 49 CFR part 535 for its medium- and heavy-duty fuel efficiency programs. Until such time as NHTSA decides to make similar changes to its medium- and heavy-duty fuel efficiency programs, we encourage EPA to retain these sections. The addition of notations indicating that these sections are applicable only to NHTSA's fuel efficiency programs and no longer required as part of any EPA GHG standards would also be appropriate.

# EXHIBIT 11-J



**Alliance for Automotive Innovation**

**Comments on Reconsideration of 2009 Endangerment Finding and Greenhouse Gas Vehicle Standards**

**EPA-HQ-OAR-2025-0194**

**September 22, 2025**

Alliance for Automotive Innovation ("Auto Innovators") submits these comments in response to the U.S. Environmental Protection Agency ("EPA") proposed rule "Reconsideration of 2009 Endangerment Finding and Greenhouse Gas Vehicle Standards"[1] (the "Proposed Rule"). We appreciate the opportunity to comment on the Proposed Rule.

Auto Innovators represents the full auto industry, including the manufacturers producing most vehicles sold in the U.S., equipment suppliers, battery producers, semiconductor makers, technology companies, and autonomous vehicle developers. Our mission is to work with policymakers to realize a cleaner, safer, and smarter transportation future and to ensure a healthy and competitive auto industry that supports U.S. economic and national security. Representing over 5 percent of the country's GDP, responsible for supporting nearly 11 million jobs, and driving $1.5 trillion in annual economic activity, the automotive industry is the nation's largest manufacturing sector.

Auto Innovators' member companies are focused on ensuring the health and competitiveness of the auto industry in the U.S. In furtherance of this goal, the association has long promoted a stable regulatory environment coordinated across the whole of government and reasonable, achievable standards that preserve consumer choice and support innovation. In addition, the association has supported continued progress in emissions reductions and improved fuel economy. We've also supported standards that capture the benefits of advanced, lower-carbon liquid fuels, especially for the gasoline-powered legacy vehicles that will remain in operation for years to come.

Automakers have taken significant actions to reduce new vehicle greenhouse gas ("GHG") emissions. In model year ("MY") 2023, the average new light-duty vehicle emitted 18% lower tailpipe GHG emissions per mile than it did in MY 2012.[2] Additional improvements in off-cycle

---

[1] U.S. Environmental Protection Agency, Reconsideration of 2009 Endangerment Finding and Greenhouse Gas Vehicle Standards, 90 *Fed. Reg.* 36288 (Aug. 1, 2025) (hereinafter "NPRM").

[2] U.S. Environmental Protection Agency, *The 2024 EPA Automotive Trends Report*, EPA-420-R-022 (Nov. 2024) (hereinafter "EPA Trends Report") at 122, Table 5.6. Calculation of 2-Cycle Tailpipe and Performance percentage improvements from model year 2012 to 2023 by Auto Innovators.

and air conditioning-related emissions have resulted in a net improvement of 25%.[3] The real-world carbon dioxide ($CO_2$) emission rate from new light-duty vehicles sold in the U.S. has declined from 399 g/mile in MY 2011 to a projected 305 g/mile in MY 2024.[4] Since 2004, total light-duty vehicle GHG emissions, inclusive of all vehicles in use, have declined in the U.S.[5]

To date, Auto Innovators has advocated for the EPA to revise the existing MY 2027-2032 light- and medium-duty vehicle GHG standards. The 2027 and later standards are simply not achievable in light of significant market, charging infrastructure, supply chain, affordability, and other challenges as well as recent policy changes enacted since they were finalized. Additionally, standards from preceding model years are creating significant near-term compliance challenges for many automakers. We describe these challenges and the justification for revised standards in Appendix I.

Rather than revise the standards, however, the Proposed Rule considers rescinding all motor vehicle GHG emission standards, either through a rescission of the 2009 GHG endangerment finding ("Endangerment Finding")[6] or separately under various legal and policy rationales. We understand that by eliminating the standards, this proposed approach would resolve concerns with the feasibility of MY 2027 and later GHG standards and would result in a single federal program for the regulation of GHG emissions and fuel economy under the statutorily-mandated Corporate Average Fuel Economy ("CAFE") program. However, as explained below, the GHG standards set in the Multi-Pollutant Rule[7] still need to be revised to feasible levels to provide certainty for the industry.

Automakers and suppliers in the U.S. are increasingly being forced to navigate rapid and dramatic swings in vehicle emissions policy from one administration to another administration. Since years-long design, development, and production cadences necessitate investments in technology and production capacity years in advance, each such change puts billions of dollars of capital investment at risk. The Proposed Rule represents yet another significant change in

---

[3] *Ibid.*

[4] *Id.* at 14, Table 2.1. Calculation of Real-World CO2 percentage improvement from MY 2011 to projected MY 2024 by Auto Innovators.

[5] U.S. Environmental Protection Agency, *Inventory of U.S. Greenhouse Gas Emissions and Sinks: 1990-2022* (2024), EPA 430-R-24-004 at 2-38, Figure 2-15.

[6] U.S. Environmental Protection Agency, Endangerment and Cause or Contribute Findings for Greenhouse Gases Under Section 202(a) of the Clean Air Act; Final rule, 74 Fed. Reg. 66496 (Dec. 15, 2009).

[7] U.S. Environmental Protection Agency, Revised 2023 and Later Model Year Light-Duty Vehicle Greenhouse Gas Emissions Standards: Final Rule, 86 *Fed. Reg.* 74434 (Dec. 30, 2021). (Hereinafter "MY 2023-2026 LDV GHG Rule.")

approach that the industry will have to navigate. The approach also has the potential to further amplify the severity of policy swings in future administrations.

To help address this reality, we strongly urge EPA to: (a) document in the record why the present standards are not appropriate; and (b) develop and implement revised GHG standards as an alternative or backstop to the Proposed Rule. Such a contingency plan will be critical if motor vehicle GHG standards are retained or reinstated in some way. Revised standards could be issued through an interim final rule or other rulemaking instrument pending a final action on the Proposed Rule. EPA should consider a rule that maintains the standard from a recent model year until such time that a full notice and comment rulemaking could be conducted to replace the standards with ones that produce reasonable and achievable reductions in GHG emissions and that can be reasonably achieved by manufacturers offering a broad range of vehicle powertrain technologies, including internal combustion engine vehicles. As EPA evaluates how to proceed, we believe the concerns we raise in Appendix I should be addressed in a manner that is legally durable and that can provide near-term certainty.

EPA raises a number of legal issues that could have implications beyond EPA's proposed actions. We take the following positions and address them in greater depth in Appendix II. First, EPA's proposed actions would not in and of themselves impact preemption of state GHG emission standards and fuel economy standards under the Clean Air Act and the Energy Policy & Conservation Act ("EPCA"), respectively. We agree that emission standards must be tied to an endangerment finding unless otherwise explicitly required by statute. We support the consideration of policy issues when EPA sets standards. We believe the term "requisite technology" refers to the technology required to meet the specific motor vehicle and engine emission standards set by EPA that are at issue, not that a technology must be able to fully address the specific issues identified in an endangerment finding. Finally, we believe the Major Questions Doctrine may be a consideration when EPA sets standards, particularly if such standards would effectively result in a significant limitation on the products available for customers to purchase.

EPA requests comment on proposed regulatory text to implement a rescission of motor vehicle GHG standards. Notwithstanding our view on the importance of revised standards, there are several issues that should be addressed if EPA finalizes a rescission of the standards. We provide comments on specific regulatory provisions in Appendix III.

If GHG emission standards are retained or reinstated, we recommend that EPA address other issues related to GHG certification and compliance. These include clarifying that a GHG deficit from a given model year may be carried forward for up to three years without regard to prior or subsequent deficits (consistent with the Department of Transportation's CAFE program); clarifying that manufacturers may revise model year reports to apply different credits to a deficit than those originally applied; allowing GHG compliance tests to be conducted on E0 fuel while EPA develops and finalizes E10 test procedures for CAFE; reconsidering the MY 2031 and later changes to plug-in hybrid utility factors; and establishing a reasonable enforcement policy coordinated with the CAFE program. For small volume manufacturers, EPA should reinstate,

for MY 2027 and later, alternative GHG targets consistent with the GHG improvement required of large volume manufacturers.  Auto Innovators also supports the continuation of the off-cycle and air conditioning credit programs and EPA's consideration of removing GHG and criteria emission credit expiration.  The maintenance and expansion of these programs would provide much-needed certainty and flexibility to manufacturers in their compliance planning. Additionally, we recommend that EPA make certain technical clarifications and corrections in the regulatory text related to motor vehicle GHG emission certification, compliance, and testing as described in Appendix IV.

As a separate, but related matter to the need for revised standards, compliance with EPA's "Tier 4" light- and medium-duty vehicle criteria emission standards is similarly unachievable without significant increases in EV market share, while at the same time adding hundreds of dollars of additional costs to all internal combustion engine vehicles.  Several changes should be made to these regulations to produce a more appropriate, cost-effective criteria emission standard.

As a final matter, there are clarifications and technical corrections related to other emission and fuel economy test procedures that we recommend EPA address regardless of EPA's final action on the Proposed Rule.  These are described in Appendix V.

# Content of Appendices

**Appendix I: The Need to Revise GHG Standards** ................................................................. **8**

MY 2023-2026 Light-Duty Vehicle GHG Compliance Challenges .......................................... 8

Need for Revision of MY 2027-2032 GHG Standards ............................................................. 12

Compliance With the Multi-Pollutant Rule Is Based on Rapid Growth of the U.S. EV
Market ............................................................................................................................................ 13

U.S. Light-Duty EV Market Growth Is Flattening ................................................................... 14

EPA Did Not Demonstrate an Alternative ICE-Based Pathway for Compliance with the
GHG Standards Set in the Multi-Pollutant Rule ....................................................................... 15

Independent Analysts Project EV Market Demand Will Be Lower as a Result of
Eliminating IRA EV Policies ..................................................................................................... 20

Following Passage of the OBBBA, Third Party Projections of EV Market Share Are
Significantly Lower Than EPA Projections in the Multi-Pollutant Rule ............................ 21

Manufacturers of Medium-Duty Vehicles Face Similar Challenges .................................... 23

EV Charging Infrastructure Growth Is Also Needed ............................................................... 23

EPA Should Document in the Record Why the Present Standards are not Appropriate ......... 24

EPA Should Develop and Implement Revised GHG standards as an Alternative or Backstop to
the Proposed Rule ....................................................................................................................... 25

An Interim Final Rule Would Meet Administrative Procedures Act Requirements ............ 26

**Appendix II: Legal Matters** ..................................................................................................... **27**

Severability of Endangerment Finding and Standard Setting .................................................. 27

Whether the Proposal Would Impact Federal Preemption of State Regulation (C-10) ............ 27

Rescinding the Endangerment Finding Would Not Limit the Scope of Preemption of State
GHG Emission Standards Under the Clean Air Act ............................................................... 27

Rescinding the Endangerment Finding Would Not Limit the Scope of Preemption under
EPCA .......................................................................................................................................... 29

Comments on V.A. "Requisite Technology" Rationale for Rescinding Motor Vehicle
Greenhouse Gas Standards (C-12) ............................................................................................. 30

Comments on the Application of the Major Questions Doctrine .............................................. 31

Comments on Consideration of Policy Issues When Setting Standards (C-13) ....................... 32

Need for a Severability Clause .................................................................................................. 33

**Appendix III: Comments on Regulatory Text If EPA Finalizes Its Proposal to Rescind
Motor Vehicle GHG Emission Standards (C-16)** ................................................................... **34**

40 CFR 85.2104 Owners' compliance with instructions for proper maintenance and use. ...... 34

40 CFR 86.1803-01 Definitions. .................................................................................................. 34

40 CFR 86.1806-27 Onboard Diagnostics; 40 CFR 1036.110 Diagnostic Controls. ............... 34

40 CFR 86.1829-15 Durability and emission testing requirements; waivers. .......................... 35

40 CFR 86.1839-01 Carryover of certification and battery monitoring data. .......................... 35

40 CFR 86.1844-01 Information requirements: Application for certification and submittal of information upon request. ......................................................................................................... 35

40 CFR 86.1847-01 Manufacturer in-use verification and in-use confirmatory testing; submittal of information and maintenance of records. ............................................................. 35

40 CFR 86.1848-10 Compliance with emission standards for the purpose of certification. ..... 36

40 CFR 600.113-12 Fuel economy, CO2 emissions, and carbon-related exhaust emission calculations for FTP, HFET, US06, SC03 and cold temperature FTP tests. ........................... 36

40 CFR 600.116-12 Special procedures related to electric vehicles and hybrid electric vehicles. ................................................................................................................................... 36

40 CFR 600.117 Interim provisions. ........................................................................................ 36

40 CFR 1036.115 Other requirements. ..................................................................................... 37

**Appendix IV: Recommended Clarifications and Technical Corrections to Regulatory Text if Motor Vehicle GHG Standards are Retained ....................................................................... 38**

40 CFR 86.1 Incorporation by reference. ................................................................................. 38

40 CFR 86.1815-27 Battery-related requirements for battery electric vehicles and plug-in hybrid electric vehicles. ........................................................................................................... 38

40 CFR 86.1847-01 Manufacturer in-use verification and in-use confirmatory testing; submittal of information and maintenance of records. ............................................................. 39

40 CFR 600.113-12 Fuel Economy, CO2 emissions, and carbon-related exhaust emission calculations for FTP, HFET, US06, SC03 and cold temperature FTP tests. ........................... 39

**Appendix V: Recommended Clarifications and Technical Corrections That Should Be Made Regardless of the Rescission or Retention of Motor Vehicle GHG Standards ........... 40**

40 CFR 86.113-15 Fuel specifications. ..................................................................................... 40

40 CFR 86.113-27 Fuel specifications. ..................................................................................... 40

40 CFR 86.1811-27 Criteria exhaust emission standards. ........................................................ 40

40 CFR 86.1829-15 Durability and emission testing requirements; waivers. .......................... 41

40 CFR 86.1839-01 Carryover of certification and battery monitoring data. .......................... 41

40 CFR 86.1844-01 Information requirements: Application for certification and submittal of Information upon request. ......................................................................................................... 41

40 CFR 86.1846-01 Manufacturer in-use confirmatory testing requirements. ........................ 41

40 CFR 86.1868-12 CO2 credits for improving the efficiency of air conditioning systems.... 42

40 CFR 86.1869-12 CO2 credits for off-cycle CO2 reducing technologies............................ 42

40 CFR 600.010 Vehicle test requirements and minimum data requirements. ........................ 42

40 CFR 600.113-12 Fuel Economy, CO2 emissions, and carbon-related exhaust emission calculations for FTP, HFET, US06, SC03 and cold temperature FTP tests. ........................... 43

40 CFR 600.117 Interim provisions.................................................................................. 44

40 CFR 1066.815 Exhaust emission test procedures for FTP testing. .................................... 44

## Appendix I: The Need to Revise GHG Standards

Under the Biden Administration, EPA increased the stringency of model year ("MY") 2023-2026 light-duty vehicle greenhouse gas ("GHG") standards[8] and established stringent new light-duty vehicle ("LDV") and medium-duty vehicle ("MDV") GHG emission standards for MYs 2027 and later.[9] These standards have created significant compliance challenges for many automakers and are no longer achievable in the timeframe provided given recent market trends and policy changes.

### MY 2023-2026 Light-Duty Vehicle GHG Compliance Challenges

In 2021, EPA revised light-duty vehicle GHG emission standards for MYs 2023-2026, increasing the required pace of GHG emission improvements to unprecedented levels in each of the four model years. Prior to these standards, the maximum rate of improvement required in any model year was about 4.4%.[10] The standards set by EPA in 2021 required improvements of 10% in model year 2023, followed by 5% in MY 2024, 6.6% in MY 2025, and culminated with an additional 10% stringency increase in MY 2026.[11]

The required annual improvement rates far exceed those previously achieved by automakers. The historical rate of improvement in GHG performance for all automakers on average, between 2013 and 2023, was 2.5% per year, including increased application of air conditioning, off-cycle, and advanced technology credits.[12] Tailpipe GHG emissions alone improved at an average rate of 1.6% per year.[13]

---

[8] U.S. Environmental Protection Agency, Revised 2023 and Later Model Year Light-Duty Vehicle Greenhouse Gas Emissions Standards: Final Rule, 86 *Fed. Reg.* 74434 (Dec. 30, 2021). (Hereinafter "MY 2023-2026 LDV GHG Rule.")

[9] Multi-Pollutant Rule *supra* note 7.

[10] Estimate by Auto Innovators using footprint target coefficients from 40 CFR 86.1818-12 and assuming an average passenger car footprint of 47.7 ft2, average light truck footprint of 54.2 ft2, and a passenger car / light truck sales mix of 40%/60%.

[11] MY 2023-2026 LDV GHG Rule (*supra* note 8) at 74438.

[12] EPA Trends Report (*supra* note 2) at 122, Table 5.6 Industry Performance by Model Year, All (g/mi). Calculation of compound average rate of improvement of "Performance Value" for model years 2013 to 2023 by Auto Innovators.

[13] *Ibid.* Calculation of compound average rate of improvement of "2-Cycle Tailpipe" for model years 2013 to 2023 by Auto Innovators.

Excluding manufacturers that sell only electric vehicles ("EVs")[14] (i.e., "EV-only" automakers), the contrast between the required rates of improvement in MYs 2023-2026 and historically demonstrated rates are even greater. Including air conditioning and off-cycle credits, automakers with ICE vehicle sales improved GHG performance at an average rate of 1.9% per year.[15] Tailpipe GHG emissions improved at an average rate of 0.8% per year between 2013 and 2023.[16]

Whether with or without additional credits, the industry-demonstrated practical rates of GHG improvement are far below what EPA required for MYs 2023-2026, calling into question whether those standards provide the period "necessary to permit the development and application of the requisite technology."[17]

As shown in Figure 1, automakers excluding EV-only manufacturers and small volume manufacturers with alternative standards ("Full Line Automakers") have trailed annual GHG standards since 2016. The blue line shows Full Line Automakers' average GHG performance. The orange line indicates Full Line Automaker's average GHG standard. When the performance is higher than the standard, Full Line Automakers are on average worse than target. In these years, manufacturers have generally relied on previously banked and purchased credits to remain compliant, with a few occasionally carrying forward deficits to be resolved later.

---

[14] We use the terms "electric vehicles" or "EVs" as generally inclusive of battery electric vehicles and plug-in hybrid electric vehicles. Some data sets herein may also include fuel cell electric vehicles, which are only a very small portion of total electric vehicles sales or market share.

[15] U.S. Environmental Protection Agency, Explore the Automotive Trends Data, https://www.epa.gov/automotive-trends/explore-automotive-trends-data (Mar. 27, 2025), *Explore Trends Detailed Data* (hereinafter "EPA Trends Data") at Table F. Calculation of compound average rate of improvement of production and lifetime mileage weighted fleet performance for automakers excluding BYD, BYD Motors, Coda, Fisker, Karma, Karma Automotive LLC, Lucid, Rivian, Rivian Automotive LLC, and Tesla by Auto Innovators.

[16] *Ibid.* Calculation of compound average rate of improvement of production and lifetime mileage weighted "Fleet Average (g/mi)" for automakers excluding BYD, BYD Motors, Coda, Fisker, Karma, Karma Automotive LLC, Lucid, Rivian, Rivian Automotive LLC, and Tesla by Auto Innovators.

[17] *See* 42 U.S.C. § 7521(a)(2).



Figure 1: GHG performance vs. standard by model year (average of Full Line Automakers)[18]

In MY 2023, the first year of the standards that were revised in 2021, 15 of 23 automakers generated deficits, failing to meet the standard in the year.[19] Of the eight manufacturers that generated credits (meeting the standard in the year) four were manufacturers that only built EVs and two were small volume manufacturers with alternative standards. In other words, only two of the 16 manufacturers that build internal combustion engine ("ICE") vehicles and that are subject to the primary standards produced fleets compliant with the MY 2023 standard. Most relied on previously banked credits or credits purchased from EV-only automakers to demonstrate compliance while three carried their deficit forward to be resolved in a later model year.[20]

Starting in 2016, Full Line Automakers in aggregate have incurred GHG deficits in each model year (Figure 2). In MY 2023, nearly 50 million metric tons ("MMT") of deficits were incurred

---

[18] EPA Trends Data (*supra* note 15) at Table F. Calculation of production and lifetime travel weighted average performance and standards for automakers excluding BYD, BYD Motors, Coda, Fisker, Karma, Karma Automotive LLC, Lucid, Rivian, Rivian Automotive LLC, and Tesla by Auto Innovators.

[19] EPA Trends Report (*supra* note 2) at 130, Table 5.11.

[20] *Id.* at 143, Figure 5.14.

by Full Line Automakers,[21] exceeding the 37 MMT of credits generated by EV-only automakers.[22]



Figure 2: GHG credit / (deficit) generation by model year (Full Line Automakers)

Although such deficits may be offset with previously banked and/or purchased credits, there are signs that credit trading may not provide the same degree of flexibility that it once did. Over 25% of the currently banked credits are owned by a single Full Line Automaker, and another 50% by four others.[23] EV-only automakers have already sold most of the 37 MMT of credit they generated in 2023, leaving only 3.2 MMT of credit in their collective banks. Three manufacturers carried deficits forward after MY 2023.[24] After reaching a high of 345 MMT

---

[21] EPA Trends Data (*supra* note 15) at Table F. Sum of "Total Credits (Mg)" without BYD, BYD Motors, Coda, Fisker, Karma, Karma Automotive LLC, Lucid, Rivian, Rivian Automotive LLC, and Tesla by Auto Innovators.

[22] *Ibid.* Sum of "Total Credits (Mg)" generated by BYD, BYD Motors, Coda, Fisker, Karma, Karma Automotive LLC, Lucid, Rivian, Rivian Automotive LLC, and Tesla by Auto Innovators.

[23] *Id.* at Table I. Compliance Data: Manufacturer Credit Balances as of October 2024. Calculations by Auto Innovators based on "Final 2023 Credit Balance."

[24] EPA Trends Report (*supra* note 2) at 143, Figure 5.14. Manufacturer Credit Balance After Model Year 2023.

banked credits in 2014, the aggregate bank of credits has dropped every year, reaching a record low in 2023 at 123 MMT.[25]

It is clear that recent light-duty vehicle GHG standards have outpaced Full Line Automakers' efforts to reduce GHG emissions and that the MY 2023-2026 standards have created imminent compliance challenges and are likely to continue to do so.

If GHG standards are retained or reinstated, these issues will need to be addressed.

## Need for Revision of MY 2027-2032 GHG Standards

In 2024, EPA finalized light- and medium-duty vehicle GHG standards for MYs 2027-2032 in its "Multi-Pollutant Rule."[26]  The rule was premised on rapid growth in the U.S. market for electric vehicles, supported in part by government investments in the EV supply chain, charging infrastructure, and consumer incentives.  Projections included optimistic assessments for the development of U.S. critical mineral and battery supply chains, charging infrastructure, and customer demand for EVs.

Auto Innovators commented extensively on EPA's proposal.[27]  Our comments warned that compliance predicated on a stacking of best-case scenarios related to market factors beyond the control of OEMs was unrealistic and did not meet the criteria under Clean Air Act § 202(a).

Following changes made between the proposal and final rule, we stated the GHG standards were "on the ragged edge of achievable…if everything…goes just right."[28]

However, everything did not go "just right."  Growth in consumer demand for EVs has stalled, and changes in government policy are expected to further depress EV market potential.  The 2027 and subsequent model year GHG standards are no longer feasible.  We therefore recommend that they be revised in order to address these fundamental feasibility issues and to ensure that reasonable, achievable rules are in place if GHG emission standards are retained or reinstated.

---

[25] *Id.* at 147, Figure 5.15.

[26] *Supra* note 7.

[27] *See* Regulations.gov, Docket ID EPA-HQ-OAR-2022-0829-0701.  Comments incorporated by reference and attached.

[28] Bozzella, J., "EPA's Final EV Plan: The Ragged Edge of Achievable?" Alliance for Automotive Innovation (Mar. 20, 2024).  Available at https://www.autosinnovate.org/posts/blog/ragged-edge-of-achievable.  (Accessed Sep. 12, 2025.)

Below, we review the foundation upon which the EPA built its Multi-Pollutant Rule, what has changed over the last year to dramatically erode that foundation, and the projected impact of those changes.

*Compliance With the Multi-Pollutant Rule Is Based on Rapid Growth of the U.S. EV Market*

The Multi-Pollutant Rule claimed to set performance-based GHG standards that do not require any specific technology to meet the standards. This is akin to a requirement to travel from Los Angeles to Boston in 18 hours and claiming it is a performance-based requirement that does not require any specific travel mode, like flying. There's simply no way to get from Los Angeles to Boston in 18 hours without jets for a substantial part of the trip. Likewise, there's no way to meet the GHG standards without EVs for a substantial part of the new vehicle fleet.

In fact, every GHG compliance pathway modeled by EPA as enabling compliance with the MY 2027-2032 LDV standards requires EVs to surpass 50% market share no later than 2030.[29] Figure 3 shows the EV penetration rates for the three GHG compliance pathways presented in the Multi-Pollutant Rule along with the actual EV market share in the first half of 2025. The 9.6 percent market share of EVs in the first half of 2025[30] would need to triple in about a year to reach any of these pathways and then continue to substantially increase. Note that Pathway A is the central case used to support the feasibility of the LDV GHG standards.

---

[29] Multi-Pollutant Rule (*supra* note 7) at 27856, Table 3.

[30] Compiled by Alliance for Automotive Innovation with new registrations for retail and fleet data provided by S&P Global Mobility covering January 1, 2024 – June 30, 2024 and January 1, 2025 – June 30, 2025.



Figure 3: EPA-projected U.S. light-duty vehicle EV market share for compliance with MY 2023-2032 standards and calendar year 2025 EV market share through 1H 2025.[31,32,33]

*U.S. Light-Duty EV Market Growth Is Flattening*

In contrast to the rapid growth in EV market share projected by EPA, EV market growth generally flattened from mid-2023 to mid-2025 (Figure 4).  Nearly 761,000 EVs were sold in the first half of 2025, 9.6 percent of all light vehicle sales and a decreased market share of 0.1 percentage points from the first half of 2024.[34]  The uptick in sales in August 2025 is likely related to customers pulling ahead EV purchase plans in advance of the end of IRS 30D and

---

[31] Multi-Pollutant Rule (*supra* note 7) at 27856, Table 3.

[32] Model year 2023-2026 EPA projections calculated by Auto Innovators from U.S. Environmental Protection Agency, Optimization Model for reducing Emissions of Greenhouse Gases from Automobiles, OMEGA 2.5.0 Downloadable Materials, Light-duty central case (March 2024) (zip), Light-duty lower BEV production sensitivity (March 2024) (zip), Light-duty no additional BEVs beyond no-action sensitivity (March 2024) (zip).  Available at https://www.epa.gov/regulations-emissions-vehicles-and-engines/optimization-model-reducing-emissions-greenhouse-gases.  (Accessed Sep. 12, 2025.)

[33] 1H, 2025 EV market share compiled by Alliance for Automotive Innovation with new registrations for retail and fleet data provided by S&P Global Mobility covering January 1, 2024 – June 30, 2024 and January 1, 2025 – June 30, 2025.

[34] Figures compiled by Alliance for Automotive Innovation with new registrations for retail and fleet data provided by S&P Global Mobility covering January 1, 2024 – June 30, 2024 and January 1, 2025 – June 30, 2025.

45W incentives after September 2025.  Even so, August market share of EVs was only 11.5 percent.



Figure 4: U.S. Light-Duty EV Sales and Market Share (Aug. 2018 through Aug. 2025)[35]

Auto Innovators sees no feasible pathway to meet the MY 2027-2032 EPA-projected LDV EV market share without major market disruptions given current U.S. market conditions and policies.

*EPA Did Not Demonstrate an Alternative ICE-Based Pathway for Compliance with the GHG Standards Set in the Multi-Pollutant Rule*

Our assessment is that there is no ICE-based pathway to meeting the MY 2027-2032 standards. In the early years of the program, there is insufficient time to deploy sufficient strong hybridization to meet the standards without significant increases in EV market share.  In the latter years of the program, the only vehicles likely to comply with the standards are EVs, which would have to be used to balance out the emissions of remaining ICE vehicles.  An analysis from S&P Global that assessed MY 2024 vehicles against future standards found that by 2030 the only MY 2024 vehicles that meet the future standards are EVs (Figure 5).  Even conventional strong

---

[35] Alliance for Automotive Innovation, *Reading the Meter* (Sep. 5, 2025) at 8.  Available at https://www.autosinnovate.org/posts/papers-reports/reading-the-meter-state-of-industry-2025-09-05.  (Accessed Sep. 12, 2025.)

hybrid electric vehicles would generally not meet their MY 2030 and later targets, requiring EVs to offset them for compliance.



Figure 5: MY 2024 vehicles achieving future GHG targets (Source: S&P Global)[36]

### The One Big Beautiful Bill Act Invalidates Estimates Used by EPA in the Multi-Pollutant Rule

In the Multi Pollutant Rule, EPA explicitly and repeatedly acknowledged that the feasibility of the GHG standards was directly tied to increased EV market share, the estimates for which, in turn, were tied to the continuation of policies in the Inflation Reduction Act of 2022 ("IRA") and

---

[36] S&P Global Mobility, *Model Years 2012 to 2024 Baseline Study* (Jan. 20, 2025, version 1.2) at 87.  Funded by Auto Innovators.  Full study incorporated by reference and attached to these comments.  Includes content supplied by S&P Global Mobility; Copyright © S&P Global Mobility, 2025.  All rights reserved.  The S&P reports, data and information referenced herein (the "S&P Materials") are the copyrighted property of S&P and its affiliates and represent data, research, opinions or viewpoints published by S&P, and are not representations of fact.  The S&P Materials speak as of the original publication date thereof and not as of the date of this document. The information and opinions expressed in the S&P Materials are subject to change without notice.  While the S&P Materials reproduced herein are from sources considered reliable, the accuracy and completeness thereof are not warranted, nor are the opinions and analyses which are based upon it.  S&P and S&P Global Mobility are trademarks of S&P. Other trademarks appearing in the S&P Materials are the property of S&P or their respective owners.

Infrastructure Investment and Jobs Act, otherwise known as the Bipartisan Infrastructure Law ("BIL"). Below are just a few examples from the Multi-Pollutant Rule:

> *A particular consideration with regard to the increased penetration of zero emission vehicle technology is Congress' passage of the Bipartisan Infrastructure Law (BIL) in 2021 and the Inflation Reduction Act (IRA) in 2022.* These measures represent significant Congressional support for investment in *expanding the manufacture, sale, and use of zero emission vehicles* by addressing elements critical to the advancement of clean transportation and clean electricity generation in ways that will *facilitate and accelerate the development, production and adoption of zero-emission technology during the time frame of this rule.* Congressional passage of the *BIL and IRA represent pivotal milestones* in the creation of a broad-based infrastructure instrumental to the expansion of clean transportation, including light- and medium-duty zero emission vehicles, and *we have taken these developments into account in assessing the feasibility of the standards.*[37] (*Emphasis* added.)

> [Plug-in electric vehicle,[38] "PEV"] purchase incentives have led to more PEV purchases, *a trend we expect will continue given the substantial additional incentives offered through the IRA.*[39] (*Emphasis* added.)

> The combination of economic incentives provided in the IRA and the auto manufacturers' stated plans for producing significant volumes of zero and near-zero emission vehicles in the timeframe of this rule *supports EPA's ability to finalize standards at a level of stringency greater than was feasible in past rules.*[40] (*Emphasis* added.)

In evaluating regulatory impacts, including projected technology outcomes, EPA incorporated the IRA into its baseline assumptions, scenario modeling, and economic impact assessments, including:

- Modeling the effects of IRA tax credits (*e.g.*, Sections 30D, 45X, and 45W)
- Estimating vehicle adoption rates and technology costs with IRA incentives
- Quantifying economic transfers and fuel savings enabled by IRA-driven electrification

---

[37] Multi-Pollutant Rule (*supra* note 7) at 27851.

[38] Battery electric and plug-in hybrid electric vehicles.

[39] Multi-Pollutant Rule (*supra* note 7) at 28027.

[40] *Id.* at 27907.

For example, the regulatory impact analysis ("RIA") for the Multi-Pollutant Rule states:

> Federal Purchase Incentive – The maximum potential consumer purchase incentive provided via the Inflation Reduction Act is $7,500. The actual purchase incentive any given consumer might receive is based on several eligibility requirements for the consumer and the actual vehicle. We included estimates of the average consumer purchase incentives as well, consistent with the values applied within OMEGA as presented in RIA Chapter 2.6.8. *As with producer incentives, we assume consumers receive the full purchase incentive for which they are eligible.*[41] (*Emphasis* added.)

EPA's modeling overestimated the impact of IRA incentives and could not account for their later revocation in 2025. The Multi-Pollutant Rule assumed manufacturers would increasingly produce vehicles eligible for the $7,500 30D credit. However, this expectation did not account for new eligibility constraints—such as critical mineral and manufacturing content requirements—or the long lead times needed to build facilities and restructure supply chains.

Additionally, EPA identified the IRA as a key enabler of EV market growth, citing its incentives for EV purchases and domestic battery production. This assessment was overly optimistic, as many current EV models are excluded from IRA benefits, and the assessment largely overlooked the global supply chain essential to supporting the U.S. EV market. Moreover, EPA did not anticipate the termination of the IRA clean vehicle tax credits (30D/45W/25E) as of September 30, 2025, following passage of the One Big Beautiful Bill Act ("OBBBA") on July 4, 2025.

The Multi-Pollutant Rule RIA included projections for the availability and use of IRA battery production tax credits, shown in Table 1. EPA assumed most EV batteries would be U.S.-made and qualify for approximately $29 - $32/kWh in battery tax credits between MYs 2027–2029. However, OBBBA established new domestic content and prohibited foreign entity rules which take effect in 2026. Depending on how the new rules are implemented and how quickly U.S. supply chains can be established, a significant portion of EV batteries may no longer qualify for the 45X battery production tax credits after 2025. To put the loss of a $29-$32/kWh incentive into perspective, an EV with a 100 kWh battery pack would cost an additional ~$3,000.

---

[41] U.S. Environmental Protection Agency, *Multi-Pollutant Emissions Standards for Model Years 2027 and Later Light-Duty and Medium-Duty Vehicles, Regulatory Impact Analysis*, EPA-420-R-24-004 (Mar. 2024) (hereinafter "Multi-Pollutant Final Rule RIA") at 4-28.

| Year | Tax credit value in EPA modeling |
|------|----------------------------------|
| 2023 | $22.50 |
| 2024 | $24.11 |
| 2025 | $25.71 |
| 2026 | $27.32 |
| 2027 | $28.93 |
| 2028 | $30.54 |
| 2029 | $32.14 |
| 2030 | $25.31 |
| 2031 | $19.69 |
| 2032 | $11.25 |
| 2033 | $0.00 |

Table 1: Battery production tax credits assumed in OMEGA ($/kWh)[42]

Similarly, Table 2 shows that EPA projected $3,600–$3,900 in average vehicle price reductions from 30D and 45W incentives, which are also nullified by OBBBA. This 30D/45W incentive loss will certainly influence a customer's purchase decision on an EV.

| Year | Tax credit value in EPA modeling[43] | Maximum available credit after OBBBA |
|------|--------------------------------------|--------------------------------------|
| 2023 | $2925 | $7500 |
| 2024 | $3225 | $7500 |
| 2025 | $3300 | $7500* |
| 2026 | $3300 | $0 |
| 2027 | $3600 | $0 |
| 2028 | $3750 | $0 |
| 2029 | $3900 | $0 |
| 2030 | $4125 | $0 |
| 2031 | $5075 | $0 |
| 2032 | $6000 | $0 |
| 2033 | $0 | $0 |

* Tax credit expires after September 30, 2025.

Table 2: Vehicle purchase tax credits assumed in OMEGA vs. maximum credit available following passage of OBBBA ($/vehicle)

---

[42] U.S. Environmental Protection Agency, *Multi-Pollutant Emissions Standards for Model Years 2027 and Later Light-Duty and Medium-Duty Vehicles; Regulatory Impact Analysis*, EPA-420-R-24-004 (Mar. 2024) at 2-95, Table 2-49.

[43] *Id.* at 2-95, Table 2-50.

The end of 30D/45W/25E clean vehicle tax credits on September 30, 2025, will increase the effective price of EVs to consumers, likely further impairing market growth or potentially leading to a near-term decline in EV market share. This harms not only the automotive manufacturers that have spent hundreds of millions of dollars investing in electric vehicle technology, but also the entire supply chain that has supported these initiatives.

*Independent Analysts Project EV Market Demand Will Be Lower as a Result of Eliminating IRA EV Policies*

EV market share growth has already flattened over the past year as described above. The OBBBA, signed into law just two months ago, is also expected to significantly alter the EV market. OBBBA eliminates the IRA's new EV incentive of up to $7,500 for new EVs, used EV incentive of up to $4,000, and substantially modifies the advanced manufacturing tax credit for EV batteries of up to $45 per kilowatt-hour. High upfront cost is already one of the top reasons consumers cite in deciding to not purchase EVs, and changes made by OBBBA will likely decrease the affordability of EVs.

Various independent research groups are projecting EV market share drops of 20 to 45 percent below business-as-usual EV projections. Energy Innovation predicts that 2030 EV market share will drop from 55 percent to 31 percent (a 44 percent reduction) when the IRA incentives are eliminated.[44] The International Council on Clean Transportation ("ICCT") predicts that 2030 EV market share of 40 percent in 2030 with the IRA and about 32 percent without it (a 20 percent drop).[45] The Princeton University ZERO Lab suggests that EV sales could drop 30 percent in 2027 and 40 percent in 2030 relative to a scenario where previous policies are continued.[46] The National Bureau of Economic Research ("NBER") found that EV market share penetration would drop from 11.2 percent to 8.33 percent (a 25 percent drop).[47]

---

[44] Energy Innovation Policy and Technology LLC, *Impacts of the One Big Beautiful Bill on U.S. energy costs, jobs, health and emissions* (Jun. 2025. Available at https://energyinnovation.org/wp-content/uploads/Impacts-Of-The-One-Big-Beautiful-Bill-On-U.S.-Energy-Costs-Jobs-Health-And-Emissions_FINAL.pdf. (Accessed Aug. 29, 2025.)

[45] Anh, B., Pierce, L., Slowik, P., & Searle, S., *How the Inflation Reduction Act is driving U.S. job growth across the electric vehicle industry*. International Council on Clean Transportation (Apr. 2025). Available at https://theicct.org/wp-content/uploads/2025/04/ID-344-%E2%80%93-IRA-jobs_report_final.pdf. (Accessed Aug. 29, 2025.)

[46] Jenkins, J., *Potential impacts of electric vehicle tax credit repeal on US vehicle market and manufacturing* (v2), Zenodo (2025). Available at https://doi.org/10.5281/zenodo.15047921. (Accessed Aug. 29, 2025.)

[47] Allcott, H., Kane, R., Maydanchik, M. S., Shapiro, J. S., & Tintelnot, F., *The effects of "buy American": Electric vehicles and the Inflation Reduction Act* (Working Paper No. 33032), National Bureau of Economic Research (2024), Table 6: Counterfactual Simulation Results. Available at https://www.nber.org/system/files/working_papers/w33032/w33032.pdf. (Accessed Aug. 29, 2025.)

*Following Passage of the OBBBA, Third Party Projections of EV Market Share Are Significantly Lower Than EPA Projections in the Multi-Pollutant Rule*

Figure 6 shows recent U.S. light-duty EV market share, the market share used in the Multi-Pollutant Rule's central analysis, a recent projection from BloombergNEF, and an ICCT study of the impacts of IRA incentives and California's ACC II ZEV mandate. The EPA projection includes EPA's IRA assumptions. The ICCT projection removes IRA incentives and the EPA Multi-Pollutant Rule, and excludes the ACC II ZEV Mandate, the waiver for which was rejected by Congress under the Congressional Review Act. The BloombergNEF projection assumes EPA and NHTSA deregulatory actions and lower IRA incentives, but assumes continuation of the California ACC II ZEV Mandate. Even as early as 2025, clear differences appear. Through H1, 2025, actual EV market share was approximately 9.6% in contrast to EPA's projection of 20%. In 2030, the ICCT and BloombergNEF projections are approximately 34% and 27%, respectively, whereas EPA projected 53% EV market share for compliance with the 2030 light-duty vehicle GHG standard. It is clear that EPA's projections were optimistic, especially with developments in U.S. policy that occurred following issuance of the Multi-Pollutant Rule.



Figure 6: U.S. EV Market Share – Historical[48] and Projections by EPA,[49] ICCT,[50] and BloombergNEF[51]

The GHG standards in the Multi-Pollutant Final Rule are no longer feasible. EV market share is well below the share estimated as needed for compliance even in the near-term, and various third party projections imply that this divide is likely to continue and grow in the coming years. EPA should act immediately to revise the 2027 and later GHG standards.

---

[48] Alliance for Automotive Innovation, *Electric Vehicle Sales Dashboard* (May 22, 2025). Available at https://www.autosinnovate.org/EVDashboard (paywall) (accessed Aug. 29, 2025). Data compiled by the Alliance for Automotive Innovation using information provided by S&P Global Mobility and Hedges & Co. Data for 2025 represents year-to-date through Q2 2025, compiled by Alliance for Automotive Innovation with new registrations for retail and fleet data provided by S&P Global Mobility covering January 1, 2024 – June 30, 2024 and January 1, 2025 – June 30, 2025.

[49] Multi-Pollutant Rule (*supra* note 7) at 27856, Table 3. Pre-2027 projected EV share calculated by Auto Innovators from associated OMEGA 2.5.0 output files.

[50] International Council on Clean Transportation, *Analyzing the Impact of the Inflation Reduction Act on Electric Vehicle Uptake in the United States* (Jan. 2023) at 13, Table 2.

[51] BloombergNEF, *Electric Vehicle Outlook 2025* (Jun. 2025) at 3, Figure 3.

*Manufacturers of Medium-Duty Vehicles Face Similar Challenges*

Manufacturers of medium-duty vehicles face similar challenges with a projected need for 43% EV market share by 2032.[52]

Medium-duty vehicle electrification has made minimal progress over the past five years, with EV sales consistently hovering around 2%, despite substantial government incentives. MDVs serve distinct operational roles that differ from light-duty vehicle classes, making electrification more complex. MDV EV adoption has not gained traction, even with financial support.

The Multi-Pollutant Rule projected MDV EV sales to jump from 3% in 2027 to 43% by 2032—a 20-fold increase from today's 2%. These projections are unrealistic due to current market challenges and the phase-out of federal incentives. Such assumptions don't reflect industry realities, making the standards hard to meet. With low MDV EV sales today and elimination of incentives, reaching these aggressive targets is unlikely. Regulations based on these assumptions risk limiting consumer options and putting excessive pressure on manufacturers to fundamentally alter markets without commensurate consumer interest.

*EV Charging Infrastructure Growth Is Also Needed*

The availability of EV charging infrastructure is widely recognized as an impediment to reaching the market EV volumes necessary to comply with the GHG standards in the Multi-Pollutant Rule. Slower than needed progress in deploying EV charging infrastructure by both private and government entities coupled with mixed messaging on National Electric Vehicle Infrastructure ("NEVI") funding[53] will only further hinder growth.

Assuming the California Energy Commission's recommended ratio of a maximum ~6.9 EVs per public charge point to support market acceptance,[54] an estimated 3.8 million public EV chargers are needed to support a growth to roughly 26 million EVs on the road in 2030.[55]

---

[52] Calculated by Auto Innovators from U.S. Environmental Protection Agency, Optimization Model for reducing Emissions of Greenhouse Gases from Automobiles, OMEGA 2.5.0 Downloadable Materials, Medium-duty central case (March 2024) (zip). Available at https://www.epa.gov/regulations-emissions-vehicles-and-engines/optimization-model-reducing-emissions-greenhouse-gases. (Accessed Sep. 12, 2025.)

[53] Trump just canceled the federal NEVI EV charger program | Electrek - February 6, 2025 - https://electrek.co/2025/02/06/trump-just-canceled-the-federal-nevi-ev-charger-program/ and https://www.fhwa.dot.gov/environment/nevi/resources/state-plan-approval-suspension.pdf and Trump administration pledges to keep, streamline EV charger program

[54] Electric Vehicle Charging Infrastructure Assessment - AB 2127 – CA.GOV https://www.energy.ca.gov/data-reports/reports/electric-vehicle-charging-infrastructure-assessment-ab-2127

[55] EEI Projects 26 Million Electric Vehicles Will Be on US Roads in 2030 - https://www.eei.org/en/news/news/all/eei-projects-26-million-electric-vehicles-will-be-on-us-roads-in-2030

An assessment by the U.S. National Renewable Energy Laboratory ("NREL") released in June 2023 estimated that a public network of 1.248 million charging ports would be necessary to support 50 percent EV sales by 2030 (and 33 million EVs on the road).[56]  At the end of Q2 2025, there were about 218,000 public charging ports across the country.[57]  Meeting the projected charging network need for 50% EV sales in 2030 would require installing 513 chargers every day for the next 5.5 years.

Establishing the necessary charging network to support compliance with EPA's Multi-Pollutant Rule is not realistic in light of installation trends and the possible reduction in governmental funding.  The estimates above indicate the magnitude of the disparity between EV infrastructure growth and the necessary EV sales to meet the current GHG regulation.

The following facts further demonstrate other inadequacies of U.S. public charging infrastructure in light of the ambitious EV volumes required by the GHG regulation.[58]

- 27% of counties had no access to public charging.
- 41% of counties had five or fewer charging ports.
- One-third of all charging is located in just 25 counties.
- 44% of counties had no DC fast charging available.
- 6% of counties had access to only one DC fast charger.

## EPA Should Document in the Record Why the Present Standards are not Appropriate

Clean Air Act § 202(a)(2) requires that "[a]ny regulation prescribed under paragraph (1) of this subsection (and any revision thereof) shall take effect after such period as the Administrator finds necessary to permit the development and application of the requisite technology, giving appropriate consideration to the cost of compliance within such period."[59]

---

[56] National Renewable Energy Laboratory, *The 2030 National Charging Network: Estimating U.S. Light-Duty Demand for Electric Vehicle Charging Infrastructure*, (June 2023) at 36.  Available at https://docs.nrel.gov/docs/fy23osti/85654.pdf.  (Accessed Sep. 17, 2025.)

[57] U.S. Department of Energy, *Alternative Fuels Data Center* (data as of 6/30/2025).

[58] Alliance for Automotive Innovation, "Alliance for Automotive Innovation Reports New U.S. Electric Vehicle Data" (Mar. 28, 2025).  Available at https://www.autosinnovate.org/posts/press-release/2024-q4-get-connected-press-release.  (Accessed Sep. 17, 2025.)

Based on the above and for other good reasons, it is clear that the time provided to apply the requisite technology (electric vehicles) at the levels needed to meet the MY 2027-2032 GHG (and Tier 4 NMOG+NOx) standards is not sufficient and therefore the standards are infeasible.

We request that EPA, as part of a final rule for the Reconsideration of 2009 Endangerment Finding and Greenhouse Gas Vehicle Standards, document and thoroughly explain how more recent information, reduced supportive policies, and updated projections demonstrate that the standards as currently promulgated are not achievable and to explicitly state that if GHG standards were to be retained or reinstated, they would need to be revised to meet the requirements of Clean Air Act ("CAA") § 202(a)(2).

In such an analysis, EPA should also consider factors beyond automakers' direct control. These include, but are not limited to, current and anticipated charging infrastructure and the readiness of U.S. and global EV supply chains needed to support any EV production projected as necessary for compliance (including the mining, processing, active material, and cell manufacturing production capacity). Consideration of EV supply chains must be done in the context of total global demand for critical minerals and other supply chain limitations. U.S. customer interest and purchase trends for EVs relative to other technologies should also be assessed; for example, through the use of a consumer choice model that includes convenience and other factors in addition to up front purchase cost.

An accurate and fulsome rulemaking record will be critical for navigating potential legal challenges and/or future changes in political direction. Auto Innovators' previous comments on the Multi- Pollutant Rule's proposal provide much of the detail we recommend for further inclusion.[60]

## EPA Should Develop and Implement Revised GHG standards as an Alternative or Backstop to the Proposed Rule

Auto Innovators recommends that EPA issue an interim final rule ("IFR") to revise GHG standards pending a final decision on the Proposed Rule. Automakers are facing imminent compliance challenges and infeasible standards that are already underway.

A backstop is needed. We suggest that EPA set temporary standards based on a recent model year. The temporary action should also reinstate, for MY 2027 and later, alternative GHG targets for small volume manufacturers, consistent with the GHG improvements required of large volume manufacturers. If the Proposed Rule is finalized, it would replace the IFR standards and if standards were retained or otherwise reinstated, the IFR could temporarily address Auto Innovators' concerns while EPA develops a proposal for more reasonable and achievable standards.

---

[60] *See supra* note 27.

*An Interim Final Rule Would Meet Administrative Procedures Act Requirements*

It is clear from the analysis above that compliance with EPA's Multi-Pollutant Final Rule requires a massive market shift from internal combustion to electric vehicles that could only happen with severe disruption to the U.S. automotive market and commensurate economic damages. These compelling and imminent circumstances justify an interim final rule.

# Appendix II: Legal Matters

## Severability of Endangerment Finding and Standard Setting

EPA proposes to find that the Agency cannot sever the endangerment finding from the action of setting standards under Section 202(a) of the Clean Air Act.[61]  We think EPA's interpretation of the statute and its process for implementing Section 202(a) is correct.  First, and most importantly, there is no basis in the statute to sever the analysis of endangerment from the analysis of contribution.  There is one issue for EPA to determine, and that is whether emissions of a given pollutant from new motor vehicles or engines cause or contribute to air pollution which may reasonably be anticipated to endanger public health or welfare—in other words, EPA must find that emissions from the regulated vehicles are the ones that specifically cause or contribute to endangerment of health or welfare.

Second, the structure of the statute combines this question with the Agency's standard setting.  As EPA correctly points out, Congress speaks clearly when it requires a multi-step inquiry, like when it authorized the NAAQS and water quality standards programs, and such a multi-step inquiry is absent from Section 202(a).[62]

## Whether the Proposal Would Impact Federal Preemption of State Regulation (C-10)

*Rescinding the Endangerment Finding Would Not Limit the Scope of Preemption of State GHG Emission Standards Under the Clean Air Act*

EPA proposes to find that repealing the Endangerment Finding "would not impact Federal preemption of emission standards for new motor vehicle and engine emission standards."[63]  This is a correct reading of the law because the preemption provision in Section 209(a) is broader than the authority-to-regulate provision in Section 202(a).

Section 209(a) of the Clean Air Act is broad and unequivocal.  It provides:

> No State or any political subdivision thereof shall adopt or attempt to enforce any standard relating to the control of emissions from new motor vehicles or new motor vehicle engines subject to this part.  No State shall require certification, inspection, or any other approval relating to the control of emissions from any new motor vehicle or new motor vehicle engine as condition precedent to the initial

---

[61] 90 *Fed. Reg.* at 36302

[62] 90 *Fed. Reg.* at 36303

[63] 90 *Fed. Reg.* at 36315

retail sale, titling (if any), or registration of such motor vehicle, motor vehicle engine, or equipment.[64]

Notably, there is no limitation on the types of "emissions" states are preempted from regulating. The scope of Section 209's preemption provision is therefore clear: Once a vehicle or engine is subject to Part A of Title II, no state can issue emissions standards for that vehicle or engine.[65]

By way of contrast, Section 202(a) contains important limitations and qualifiers. It provides, in relevant part:

> The Administrator shall by regulation prescribe (and from time to time revise) in accordance with the provisions of this section, standards applicable to the emission of any air pollutant from any class or classes of new motor vehicles or new motor vehicle engines, which in his judgment cause, or contribute to, air pollution which may reasonably be anticipated to endanger public health or welfare.[66]

As the statute makes clear, EPA cannot regulate any and all emissions from new motor vehicles (similar to how states are preempted from regulating any and all emissions from new motor vehicles). The agency can only regulate emissions of "pollutants," and only those pollutants that EPA determines "cause, or contribute to, air pollution which may reasonably be anticipated to endanger public health or welfare." It is therefore clear that Congress intended that the preemptive scope of Section 209(a) be much broader and categorical than the authority to regulate conferred under Section 202(a).

This reading keeps with the underlying intent of Section 209(a)'s preemption provision, which was to protect the automotive industry from multiple and potentially inconsistent state standards which would increase economic strain on the industry.[67] Cabining in the scope of preemption such that it corresponds to EPA's regulations would undermine this purpose. Any emission that EPA is not regulating would then become fair game for the states to regulate, thus raising the risk that automakers would be subject to multiple inconsistent regulatory regimes.

---

[64] 42 U.S.C. § 7543(a).

[65] The phrase "subject to this part" in Section 209(a) is best read as modifying "new motor vehicles or new motor vehicle engines," not "emissions." See Barnhart v. Thomas, 540 U.S. 20, 26 (2003) ("a limiting clause or phrase . . . should ordinarily be read as modifying only the noun or phrase that it immediately follows").

[66] 42 U.S.C. § 7521(a)(1).

[67] See S. Rep. No. 403, 90th Cong., 1st Sess., 33 (1967) ("The auto industry [] was adamant that the nature of their manufacturing mechanism required a single national standard in order to eliminate undue economic strain on the industry. . . . The industry, confronted with only one potential variation, will be able to minimize economic disruption and therefore provide emission control systems at lower costs to the people of the Nation.")

Precedent on Clean Air Act ("CAA") Title I displacement also supports the view that the Endangerment Finding will not alter federal common law preemption. In *American Electric Power v. Connecticut*, states sued owners of fossil-fuel-fired power plants seeking GHG emissions abatement under nuisance laws.[68] The Supreme Court held that the Clean Air Act displaces any federal common law right to seek carbon emissions abatement, and that displacement did not depend on EPA exercising its authority under the CAA. The Court asked only whether the statute "speaks directly to the question" at issue and concluded that Section 111 of the CAA did speak to limits on carbon emissions after *Massachusetts v. EPA*.[69] Importantly, the Court "disagree[d]" that "federal common law is not displaced until EPA actually exercises its regulatory authority."[70]

Consequently, EPA is correct that finalizing the proposal would not limit the scope of preemption under Section 209(a) of the Clean Air Act.

*Rescinding the Endangerment Finding Would Not Limit the Scope of Preemption under EPCA*
EPA also proposes to find that "the proposed repeal would not impact Federal preemption under EPCA, as amended by EISA, related to fuel economy standards."[71] This too is a correct reading of the law. EPCA provides, in relevant part:

> When an average fuel economy standard prescribed under this chapter is in effect, a State or a political subdivision of a State may not adopt or enforce a law or regulation related to fuel economy standards or average fuel economy standards for automobiles covered by an average fuel economy standard under this chapter."[72]

There is nothing in the text of EPCA's preemption provision that limits its scope in the event that EPA fails to regulate GHG emissions. And as discussed above, EPA's failure to regulate GHG emissions under Section 202(a) of the Clean Air Act does not limit the scope of preemption

---

[68] 564 U.S. 410, 418 (2011) ("AEP")

[69] *Id.* at 423-24.

[70] *Id.*

[71] 90 *Fed. Reg.* 36314.

[72] 49 U.S.C. § 32919(a).

under that Act, nor would the waiver provision in Section 209(b), which by its terms only "waive application of this section."[73]

Similar to the Clean Air Act, EPCA's preemption provision was designed to provide for nationwide regulation of fuel economy and to protect the auto industry from having to comply with a multitude of state standards.[74] Construing EPCA preemption to depend on an Endangerment Finding under Section 202 would undermine this fundamental purpose of EPCA.

Consequently, the scope of EPCA preemption would not be impacted by the finalization of this rule.

## Comments on V.A. "Requisite Technology" Rationale for Rescinding Motor Vehicle Greenhouse Gas Standards (C-12)

EPA proposes to repeal the GHG emission standards based on the conclusion that "there is no 'requisite technology' for vehicle emission control capable of having a measurable impact on the dangers identified in the Endangerment Finding," *i.e.,* global climate change.[75] Auto Innovators agrees that consideration of Section 209(a)(2) would support reconsidering and revising the existing light-duty GHG standards. However, we caution against relying on this rationale as a basis for rescinding the standards altogether without replacing them, in light of the command in Section 202(a) that EPA "shall" prescribe emission standards regulating any pollutant from motor vehicles that cause, or contribute to, air pollution which endangers the public health or welfare.[76]

Subsection (a)(2) provides:

> Any regulation prescribed under paragraph (1) of this subsection (and any revision thereof) shall take effect after such period as the Administrator finds necessary to permit the development and application of the requisite technology, giving appropriate consideration to the cost of compliance within such period.[77]

---

[73] 42 USC § 7543(b).

[74] *See* S. 1883, 94th Cong., 1st Sess., Section 509; 3 H.R. 7014, 94th Cong., 1st Sess., Section 507 as introduced, Section 509 as reported (seeking to preempt State laws only if they were not "identical to" a Federal requirement).

[75] 90 *Fed. Reg.* at 36296-97.

[76] *See Coalition for Responsible Regulation v EPA*, 684 F.3d 102, 126 (D.C. Cir. 2012) ("By employing the verb 'shall,' Congress vested a non-discretionary duty in EPA.")

[77] 42 USCS § 7521(a)(2).

By its very terms, then, the requirement to provide time "necessary to permit the development and application of the requisite technology" is tied to the "regulations prescribed under paragraph (1)." In other words, EPA cannot prescribe standards that are so stringent on such a fast timeline that automakers are unable to develop and deploy the technology needed to comply with the standards.

For the reasons discussed above, Section 202(a)(2) weighs strongly in favor of reconsidering and revising the GHG standards that were finalized by the prior administration in 2024. The vehicle "technology" relied on most heavily by that administration to achieve compliance with the standards is vehicle electrification. While electrification is now a maturing technology, the question is whether the prior standards provided enough time for the "application" of electrification over a sufficient portion of automaker fleets to comply with those stringent standards. As discussed above, the answer is clearly no, and on that basis, EPA should revise the existing GHG standards.

## Comments on the Application of the Major Questions Doctrine

EPA proposes to find that "the major questions doctrine applies and precludes the EPA from asserting authority to regulate in response to global climate change concerns under CAA section 202(a)."[78] While Auto Innovators agrees that it is important to consider the application of the major questions doctrine to EPA actions, we think that the doctrine is more appropriately assessed with respect to *both* the Endangerment Finding and the specific set of standards that result from the Endangerment Finding, as opposed to applying the doctrine to the Endangerment Finding in isolation. Indeed, assessing the question in that context is consistent with EPA's proposed conclusion that the agency cannot sever the Endangerment Finding from the standard setting, which, as discussed above, we agree with. In other words, the proper inquiry is whether EPA's unified action--i.e., a finding of endangerment along with the resulting emission standards--implicates the major questions doctrine.

This conclusion is supported by the two-prong framework the Supreme Court has articulated to analyze the major questions doctrine. First, courts ask whether the agency action is "unheralded," *i.e.* whether it represents a "transformative expansion" in the agency's authority in the vague language of a long-extant, but rarely used, statute.[79] Second, courts ask if the regulation is of "vast economic and political significance" and "extraordinary" enough to trigger the doctrine.[80] In light of this framework, it seems appropriate for EPA to consider whether the

---

[78] 90 *Fed. Reg.* at 36299.

[79] *West Virginia v. EPA*, 597 U.S. 697, 724-25 (2022).

[80] *Id.* at 716, 721 (citations omitted).

*specific standards* the Agency is considering (or in this case reconsidering) implicate the major questions doctrine because of the expansive power the Agency is wielding in promulgating the standards and because of their economic and political significance.

We therefore think it is appropriate for EPA to consider whether specific emission standards the agency is setting (or revising) as a result of an endangerment finding implicate the major questions doctrine, especially to the extent that the standards are aimed at bringing about a fundamental shift in the new vehicle market that does not align with the relative market demand for internal combustion engine vehicles and electric vehicles.

## Comments on Consideration of Policy Issues When Setting Standards (C-13)

EPA proposes to find that "policy considerations may be taken into account, at a minimum, when setting standards in response to an endangerment finding or, as here, when determining whether to maintain standards already established."[81]  This is an entirely correct reading of the law and statement of EPA's discretion in setting standards.  As pointed out in the preamble, the *Massachusetts* court did not "reach the question . . . whether policy concerns can inform EPA's actions in the event that it makes such a[n endangerment] finding."[82]  The Court also noted that "EPA no doubt has significant latitude as to the manner, timing, content, and coordination of its regulations with those of other agencies."[83]  Moreover, EPA has consistently maintained that the agency has considerable discretion concerning the appropriate emission standard for a given pollutant in light of the various policy considerations it must weigh. EPA has stated that:

> EPA also has significant discretion in considering a range of stringency.  Section 202(a)(2) of the Clean Air Act requires only that the standards "take effect after such period as the Administrator finds necessary to permit the development and application of the requisite technology, giving appropriate consideration to the cost of compliance within such period."  This language affords EPA considerable discretion in how to weight the critical statutory factors of emission reductions, cost, and lead time.[84]

Auto Innovators therefore supports EPA's conclusion that the Agency may take policy considerations into account in setting or revising GHG emission standards.

---

[81] 90 *Fed. Reg.* at 36311.

[82] Massachusetts, 549 U.S. at 534-35.

[83] *Id.* at 533.

[84] *See* 2017 and Later Model Year Light-Duty Vehicle Greenhouse Gas Emissions and Corporate Average Fuel Economy Standards, 77 *Fed. Reg.* 62624, 62670 (Oct. 15, 2012) (quoting *Center for Auto Safety v. NHTSA*, 793 F.2d 1322, 1341 (D.C. Cir. 1986) and *Ctr. for Biological Diversity v. NHTSA*, 538 F.3d 1172, 1195 (9th Cir. 2008).

## Need for a Severability Clause

As a final matter, we recommend that EPA include a severability clause clarifying that even if the repeal of the Endangerment Finding or the revision of other GHG emissions standards is invalided by a court, it does not impact the reconsideration of the GHG emissions standards in this rulemaking. Similarly, EPA should include a severability clause for each section of its rulemaking so that if a court invalidates one section, the balance of the final rule remains in effect.[85] The severability clause is a clear logical outgrowth of the proposed rule. A final rule satisfies the doctrine if it is a "logical outgrowth" of the proposed rule—meaning that interested parties/commenters could reasonably have anticipated the substance of the final rule from the proposed rule and thus had a meaningful opportunity to comment.[86] EPA included a variety of arguments and justifications for its proposed reconsideration and other actions. Because some of the justifications apply to only some portions of the proposed rule, it should not come as a surprise to any commenter that EPA would want to insulate provisions with a severability clause.

---

[85] *See, e.g., Iowa, et al. v. Wright et al.*, 2025 U.S. App. LEXIS 23013, No. 24-1721 at 36 (8th Cir. Sept. 5, 2025).

[86] *See Mid Continent Nail Corp. v. United States*, 846 F.3d 1364 (Fed. Cir. 2017); *First Am. Discount Corp. v. CFTC*, 222 F.3d 1008 (D.C. Cir. 2000); *Northeast Md. Waste Disposal Auth. v. EPA*, 358 F.3d 936 (D.C. Cir. 2004).

## Appendix III: Comments on Regulatory Text If EPA Finalizes Its Proposal to Rescind Motor Vehicle GHG Emission Standards (C-16)

If EPA finalizes its proposal to repeal all regulatory provisions relating to GHG emission programs, we recommend the following additional or modified revisions.

### 40 CFR 85.2104 Owners' compliance with instructions for proper maintenance and use.

EPA proposes to remove battery-related requirements for battery electric and plug-in hybrid electric vehicles (40 CFR 86.1815-27). Paragraph (f) of 40 CFR 85.2104 is related to electric vehicle battery durability and should be removed.

### 40 CFR 86.1803-01 Definitions.

In the definition of *medium-duty passenger vehicle* ("MDPV"), remove paragraph (2) of the definition for MY 2027 and later to ensure the Tier 4 criteria emission MDPV definition is aligned with NHTSA CAFE MDPV definition. This will also avoid medium-duty vehicles becoming subject to light-duty vehicle standards.

### 40 CFR 86.1806-27 Onboard Diagnostics; 40 CFR 1036.110 Diagnostic Controls.

EPA did not propose deleting the GHG monitoring and tracking requirements in its LDV, MDV, HDE, and HDV OBD regulations. These requirements are embedded in the California OBD regulations, which EPA incorporates by reference. EPA should exclude these GHG-related requirements, in the same manner as they previously excluded specific California OBD requirements.

We recommend that EPA amend 40 CFR 86.1806-27(a) to add:

- (9) The definition of "Active Off-Cycle Credit Technology" in 13 CCR 1968.2(c) does not apply.
- (10) The vehicle operations and control strategies standardization requirements in 13 CCR 1968.2 (g)(6.3), (6.4), (6.5), (6.8), (6.9), (6.10), and (6.11) do not apply.
- (11) The data reporting and storage requirements in 13 CCR 1968.2(h)(6.1) related to the standardization requirements in 13 CCR 1968.2(g)(8.1) do not apply.
- (12) The certification documentation requirement related to "Active Off-Cycle Credit Technologies" in 13 CCR 1968.2(i)(2.28) does not apply.
- (13) The monitoring system demonstration requirements in 13 CCR 1968.2(h)(5.3.1)(D) and (5.3.2)(A)(iii) related to $CO_2$ emissions data does not apply.

And amend 40 CFR 1036.110(b) to add:

- (14) The definition of "Active Technology" in 13 CCR 1971.1(c) does not apply.
- (15) The standardization requirements in 13 CCR 1971.1(h)(5.4) do not apply.
- (16) The data storage requirements in 13 CCR 1971.1(h)(6.1) related to the standardization requirements in 13 CCR 1971.1(h)(5.4) do not apply.
- (17) The certification documentation requirement related to "Active Technology" in 13 CCR 1971.1(j)(2.32) does not apply.
- (18) The monitoring system demonstration requirements in 13 CCR 1971.1(i)(4.3.2)(C) related to $CO_2$ emissions data does not apply.

## 40 CFR 86.1829-15 Durability and emission testing requirements; waivers.

EPA proposes to remove battery-related requirements for battery electric and plug-in hybrid electric vehicles (40 CFR 86.1815-27). Paragraph (a)(2) of 40 CFR 86.1829-15 refers to 40 CFR 86.1815-27 and should be removed.

## 40 CFR 86.1839-01 Carryover of certification and battery monitoring data.

For the avoidance of any future confusion, strike "and battery monitoring data" from the section title.

## 40 CFR 86.1844-01 Information requirements: Application for certification and submittal of information upon request.

EPA proposes to remove battery-related requirements for battery electric and plug-in hybrid electric vehicles (40 CFR 86.1815-27). Paragraph (d)(19) of 40 CFR 86.1844-01 refers to 40 CFR 86.1815-27 and should be removed.

In paragraph (e)(1) as proposed to be amended, it may be helpful to clarify that "exhaust" emissions are criteria emissions and do not include greenhouse gas emissions.

## 40 CFR 86.1847-01 Manufacturer in-use verification and in-use confirmatory testing; submittal of information and maintenance of records.

Paragraph (g) refers to requirements under 40 CFR 86.1815-27, which would be deleted under EPA's proposal. Paragraph (g) of 40 CFR 86.1847-01 should likewise be deleted.

## 40 CFR 86.1848-10 Compliance with emission standards for the purpose of certification.

EPA proposes to remove battery-related requirements for battery electric and plug-in hybrid electric vehicles (40 CFR 86.1815-27). Paragraphs (c)(2), (5), and (10) refer to the requirements of 40 CFR 86.1815-27 and should be removed.

## 40 CFR 600.113-12 Fuel economy, CO2 emissions, and carbon-related exhaust emission calculations for FTP, HFET, US06, SC03 and cold temperature FTP tests.

Paragraph (g)(3) should be retained. This paragraph pertains to the number of decimal places and units for specific gravity, carbon weight fraction, and net heating value.

If paragraph (g)(3) is retained, additional technical corrections should be made. Paragraph (g)(3) requires carbon weight fraction to be recorded. However, paragraph (f)(1) specifies carbon mass fraction for gasoline and E10. This should be corrected. Paragraph (g)(3) requires net heating value to be recorded. However, (f)(1) uses the term net heat of combustion for gasoline and E10. Also, (f)(1) specifies the units for net heat of combustion as MJ/km, but (g)(3) specifies Btu/lb. These should be corrected. Related to units, consider whether significant precision affecting verification of calculations would be lost (or inadvertently gained) in the conversion from MJ/km to Btu/lb and the subsequent rounding.

## 40 CFR 600.116-12 Special procedures related to electric vehicles and hybrid electric vehicles.

Equation 3 to paragraph (c)(2)(iii) related to the calculation of fuel economy for dual fueled automobiles specifies the use of the "appropriate utility factor for city or highway driving specified in paragraph (c)(1) of this section for model year 2030 and earlier vehicles." Given EPA's proposal to retain only CAFE-related provisions, Table 1 to paragraph (c)(1) should be modified to retain only the utility factors labeled as "Model year 2030 and earlier", deleting those labeled as "Model year 2031 and later" and removing the labels related to model year applicability. This revision would simplify and clarify the section by retaining only the utility factors specified for use in CAFE-related calculations. The action would also clarify and remove any potential source of confusion related to the appropriate utility factors for calculation of air conditioning efficiency and off-cycle credits for the CAFE program under 40 CFR 86.1868-12 and 40 CFR 86.1869-12.

## 40 CFR 600.117 Interim provisions.

Paragraph (a)(1) requires manufacturers to "demonstrate compliance with greenhouse gas emission standards[…]" This portion of the sentence should be deleted if motor vehicle GHG emission standards are rescinded.

## 40 CFR 1036.115 Other requirements.

EPA proposes to delete paragraph (b) of 40 CFR 1036.115. We believe this change is in error.

# Appendix IV: Recommended Clarifications and Technical Corrections to Regulatory Text if Motor Vehicle GHG Standards are Retained

If EPA decides to not finalize its proposal to repeal all regulatory provisions relating to GHG emission programs, we recommend the following technical corrections and clarifications.

## 40 CFR 86.1 Incorporation by reference.

Paragraph (h)(1) incorporates United Nations Global Technical Regulation, No. 22 as adopted April 14, 2022. An updated version was adopted in 2024. We recommend that EPA allow the latest version of United Nations Global Technical Regulation, No. 22 as an alternative to the version originally incorporated by reference.

## 40 CFR 86.1815-27 Battery-related requirements for battery electric vehicles and plug-in hybrid electric vehicles.

For the optional CARB path included in § 86.1815-27(h) for battery electric vehicles, it is our understanding that CARB ACC II 13 CCR 1962.5 data standardization shall apply, which would require the CARB State-of-Health ("SOH") battery monitor instead of state-of-certified energy ("SOCE") monitor. As such section § 86.1815-27 section (h)(8)(ii) should be revised to reference SOH or generically say battery state of health instead of SOCE regarding the attestation for meeting the monitor accuracy. Additionally, EPA should clarify that the accuracy should be held to 13 CCR 1962.5(c) (4)(A)(4)(c) accuracy requirements.

We further recommend that EPA clarify that evaluating SOCE based on a declared useable battery energy is acceptable. For example, by implementing the following change.

> 40 CFR 86.1815-27(c)
>
> Evaluate SOCE based on measured Usable Battery Energy (UBE) values. Use the Multi-Cycle Range and Energy Consumption Test described in 40 CFR 600.116-12(a) for battery electric vehicles and either the UDDS Full Charge Test (FCT) or the HFET FCT as described in 40 CFR 600.116-12(c)(11) for plug-in hybrid electric vehicles. Manufacturers may evaluate SOCE based on a declared UBE. If using a declared UBE, manufacturers must use Good Engineering Judgment to ensure that the declared UBE reasonably reflects the expected UBE value for that battery durability family. If a manufacturer voluntarily lowers UBE using a declared value, they must use this declared value in calculations described in 40 CFR 600.210-12 and 40 CFR 600.311-12. For medium-duty vehicles, perform testing with test weight set to Adjusted Loaded Vehicle Weight.

## 40 CFR 86.1847-01 Manufacturer in-use verification and in-use confirmatory testing; submittal of information and maintenance of records.

Paragraph (g)(1) requires manufacturers to submit records after completing low-, intermediate-, and high-mileage tests. However, 40 CFR 86.1845-04(g) only requires testing at low- and high-mileage, without an intermediate-mileage requirement. Paragraph (g)(1) should be corrected to only apply at low- and high-mileage.

## 40 CFR 600.113-12 Fuel Economy, CO2 emissions, and carbon-related exhaust emission calculations for FTP, HFET, US06, SC03 and cold temperature FTP tests.

Paragraph (g)(2) can be deleted even if EPA decides to not proceed with its proposal to rescind GHG-related standards. This paragraph is only applicable to 2012-2016 model years.

Paragraph (g)(3) requires carbon weight fraction to be recorded. However, paragraph (f)(1) specifies carbon mass fraction for gasoline and E10.

Paragraph (g)(3) requires net heating value to be recorded. However, (f)(1) uses the term net heat of combustion for gasoline and E10. Also, (f)(1) specifies the units for net heat of combustion as MJ/km, but (g)(3) specifies Btu/lb. Related to units, consider whether significant precision affecting verification of calculations would be lost (or inadvertently gained) in the conversion from MJ/km to Btu/lb and the subsequent rounding.

# Appendix V: Recommended Clarifications and Technical Corrections That Should Be Made Regardless of the Rescission or Retention of Motor Vehicle GHG Standards

Regardless of whether or not EPA finalizes its proposal to repeal all regulatory provisions related to GHG emission programs, we recommend the following technical corrections and clarifications.

## 40 CFR 86.113-15 Fuel specifications.

Paragraph (a)(2)(i) allows use of California Phase 3 gasoline (E10 LEV III) for vehicles certified for 50-state sale. CARB has also adopted a LEV IV E10 fuel that we believe should also be treated as equivalent. See California 2026 and Subsequent Model Year Criteria Pollutant Exhaust Emission Standards and Test Procedures for Passenger Cars, Light-Duty Trucks, and Medium-Duty Vehicles I.A.3.1.

## 40 CFR 86.113-27 Fuel specifications.

Paragraph (c)(2) allows use of California Phase III (LEV III) fuel for vehicles certified for 50-state sale. CARB has also adopted a LEV IV E10 fuel that we believe should also be treated as equivalent. See California 2026 and Subsequent Model Year Criteria Pollutant Exhaust Emission Standards and Test Procedures for Passenger Cars, Light-Duty Trucks, and Medium-Duty Vehicles I.A.3.1. Paragraph (c)(2)(i) would then refer to LEV III or LEV IV gasoline as adopted in California's LEV III and LEV IV programs. Similarly, the reference to California Phase 3 gasoline in (c)(2)(ii) would instead reference California LEV III or LEV IV fuel.

## 40 CFR 86.1811-27 Criteria exhaust emission standards.

Notwithstanding our support for reconsideration of certain Tier 4 requirements in a separate rulemaking, we recommend the following technical corrections be made in the interim.

Paragraph (b)(3) states, "FTP standards specified in this paragraph (b) apply equally for testing at low-altitude conditions and high-altitude conditions. The US06, SC03, and HFET standards apply only for testing at low-altitude conditions." No specific mention is made of including or excluding the ACC II mid-temperature intermediate soak, ACC II early driveaway, or ACC II high-load PHEV engine start standards. Given the lack of discussion in the preamble of applying these cycles at high-altitude, and the approach taken by CARB in its LEV IV program to only apply these standards at low-altitude, we believe EPA's intent is to exclude the ACC II cycles from application at high-altitude conditions. However, this is not clear from the regulatory text and may be interpreted differently given that a number of the ACC II cycles are based on the FTP. We recommend that EPA clarify that the ACC II cycles only apply at low altitude.

Paragraph (b)(6)(iv) includes an explanatory note on interim Tier 4 light-duty vehicles above 6,000 lbs. GVWR. As currently written, the explanatory note could be interpreted as requiring such vehicles to meet both the Tier 3 and Tier 4 fleet average requirements. EPA should clarify what fleet average requirement interim Tier 4 light-duty vehicles above 6,000 lbs. GVWR must meet.

## 40 CFR 86.1829-15 Durability and emission testing requirements; waivers.

Notwithstanding our support for reconsideration of certain Tier 4 requirements in a separate rulemaking, paragraph (b)(3) requires testing of one EDV in each test group to each of the three discrete mid-temperature soak standards. However, the preamble clearly describes that EPA is only requiring testing for the 40-minute soak requirement and allowing manufacturers to attest to meeting standards at all other soak times.[87] The preamble is also consistent with EPA's response to comments at 1224. Paragraph (d)(7) is consistent with the preamble and response to comments stating, "Manufacturers may provide a statement in the application for certification that vehicles comply with the mid-temperature intermediate soak standards for soak times not covered by testing." Therefore, we believe paragraph (b)(3) should be corrected to only require testing for the 40-minute soak requirement.

## 40 CFR 86.1839-01 Carryover of certification and battery monitoring data.

Paragraph (c) references monitor accuracy under § 86.1822-01(a); we believe it should reference § 86.1845-04(g).

## 40 CFR 86.1844-01 Information requirements: Application for certification and submittal of Information upon request.

The attestation under paragraph (d)(7)(v) will require an engineering analysis. EPA should clarify what data is acceptable.

EPA should clarify that data using the California LEV IV approach is sufficient for Tier 4 compliance.

## 40 CFR 86.1846-01 Manufacturer in-use confirmatory testing requirements.

In paragraph (b) EPA describes that, "For vehicles tested in the IUVP to qualify for IUCP, there is a threshold of 1.30 times the certification emission standard for criteria emissions (e.g., NMOG+NOX, CO) and an additional requirement that at least 50 percent of the test vehicles for the test group fail for the same substance." 89 Fed. Reg. 27977. The revised language appears to be an attempt to clarify the existing requirements without a change in procedures. EPA should

---

[87] 49 *Fed. Reg.* 27956.

clarify that no change to IUCP requirements is intended, other than adding interim provisions for particulate matter ("PM").

Paragraph (b) adds an interim approach for PM emissions, requiring additional testing ". . . if 80 percent of vehicles from the test group exceed 1.30 times the in-use standard . . ." In contrast, the preamble describes that, "The temporary criteria consist of a mean test group PM equal to or greater than 1.30 times the standard and the failure rate among vehicles in that test group of 80% or higher. These are fundamentally different approaches despite the similarity of the numerical values. EPA should clarify that no change to IUCP requirements is intended, other than adding interim provisions for PM.

## 40 CFR 86.1868-12 CO2 credits for improving the efficiency of air conditioning systems.

Regardless of whether GHG standards are rescinded or not, EPA should clarify how the provisions apply to PHEVs starting in MY 2027 given their applicability to the CAFE program. We believe the intended process is: (1) Sum the applicable credits from Table 1 to paragraph (a). Total credit for the system may not exceed 5.0 g/mile for a passenger car or 7.2 g/mile for a light truck. (2) Adjust the summed credits for the PHEV air conditioning system with the appropriate combined city/highway fleet utility factor.

## 40 CFR 86.1869-12 CO2 credits for off-cycle CO2 reducing technologies.

Regardless of whether GHG standards are rescinded or not, EPA should clarify how the provisions apply to PHEVs starting in MY 2027 given their applicability to the CAFE program. We believe the intended process is: (1) Adjust credits with the appropriate combined utility factor when total credits are calculated under paragraph (f). (2) There is no further adjustment for PHEV utility factor in the calculation of "Decrease" under paragraph (b)(2)(i), which is then compared to the applicable cap under paragraph (b)(2)(v). (3) There is no adjustment to credit values for PHEVs under paragraph (b)(1)(viii)(A) through (E) (thermal control technologies) before determining whether the total credit under (b)(1)(viii) exceeds the cap described in the introductory text of that paragraph. The lesser of the total credit or allowed capped credit under (b)(1)(viii) is carried to the calculation under paragraph (f) prior to adjustment by the utility factor.

EPA should also clarify whether previously approved alternative and 5-cycle method credits can be claimed for carry-over vehicles in MY 2027 and later.

## 40 CFR 600.010 Vehicle test requirements and minimum data requirements.

Paragraph (d) references 40 CFR 600.510-08(a), which no longer exists. The reference should be deleted.

## 40 CFR 600.113-12 Fuel Economy, CO2 emissions, and carbon-related exhaust emission calculations for FTP, HFET, US06, SC03 and cold temperature FTP tests.

The introductory text specifies that carbon weight fraction and net heating value of the test fuel must be determined. However, the revised (f)(1) for gasoline and E10 specifies the terms carbon mass fraction and net heat of combustion.

Under paragraph (f)(1)(ii)(B), for E10, the determination of carbon mass fraction of the hydrocarbon mass fraction (CMFh) relies on the average volatility of either Tier 3 or LEV III fuel, which are adjusted by a given constant. EPA should allow use of LEV IV E10 fuel with the same average volatility adjustment as LEV III. We believe LEV III E10 and LEV IV E10 should be treated as equivalent.

In paragraph (f)(1)(iii)(B) the text specifies the net heat of combustion of pure ethanol (NHCe) in terms of Btu/lb, but the equation for net heat of combustion of the test fuel (NHCf) is specified in terms of MJ/kg.

In paragraph (f)(1)(iii)(B), for E10, the net heat of combustion should be in BTU/lb, not MJ/kg based on the units provided for $NHC_e$. We also recommend that EPA specify BTU/lb for E0 fuel in paragraph (f)(1)(iii)(A).

In paragraph (h) multiple references are made to 40 CFR 86.113. However, there is no standalone 86.113. All sections 86.113 are specified as 86.113-XX, where XX refers to a model year of first applicability. This also leads to a lack of specificity in what is meant by the term "gasoline", although the distinction between Tier 3 E10 and earlier "gasoline" is implied by paragraph (o).

In paragraph (h) the equations all refer to carbon weight fraction from paragraph (f)(1). However, (f)(1) specifies carbon mass fraction.

In paragraph (h)(1) the fuel economy equation is written as a function of net heating value, referring to (f)(1). However (f)(1) determines net heat of combustion. Furthermore, the net heat of combustion from (f)(1) is expressed in terms of MJ/kg, but no revisions were made to (h)(1) to convert from MJ/kg to Btu/lb.

In paragraph (l) consider clarifying that this is not for E10, but is for ethanol-based fuels at higher concentrations.

In paragraph (o), the product of the density of water, specific gravity of the base fuel and net heat of combustion of base fuel in the numerator of the fuel economy equation using E10 calculates to 51,748,933 versus 51,740,000 used for E0. These values should be equal.

In paragraph (o), the value given for $NHC_{basefuel}$ should be 18,507 BTU/lb, not 43.047 MJ/kg.

In paragraph (o), the $NHC_{testfuel}$ should be in BTU/lb and report to the nearest whole number (not three decimal places).

Paragraph (o) uses the term $CMF_{testfuel}$. Presumably, this is intended to be $CMF_f$ from (f)(1)(ii)(B), but this should be clarified.

Under paragraph (o), EPA should clarify that NMHC can be measured in lieu of NMOG per 40 CFR 1066.635(c) for use in paragraphs (o)(1) and (o)(2).

## 40 CFR 600.117 Interim provisions.

The regulations in this section mention the use of equivalent CARB LEV III E10 test fuel in multiple locations. We believe CARB LEV IV E10 test fuel should also be allowed as equivalent.

## 40 CFR 1066.815 Exhaust emission test procedures for FTP testing.

EPA should clarify that a full 4-bag FTP is allowed for measurement of PM regardless of powertrain type, provided that the provisions of 40 CFR 1066.815(c)(5) are met. There are provisions in 40 CFR 1066.820 for composite calculations using a full hot start UDDS (4-bag) as well as defining the FTP as potentially including a full hot-start UDDS instead of just the first 505 seconds.[88] The text of 40 CFR 1066.815(c)(5) could be clarified to read, in part, "You may collect PM on a single filter over the cold-start UDDS and the full hot-start UDDS, regardless of powertrain, using one of the following methods:"

---

[88] 40 CFR 1066.801(c)(1)(i).

# EXHIBIT 12

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| ELENA VENNER, *et al.*, <br>        *Petitioners*, <br><br>     v. <br><br> UNITED STATES <br> ENVIRONMENTAL PROTECTION <br> AGENCY, *et al.*, <br>        *Respondents*. | Case No. 26-1038 <br> Lead Case No. 26-1037 <br> (and consolidated cases) |

**DECLARATION OF DANIEL SPERLING, PhD,
IN SUPPORT OF PETITIONERS' MOTION TO STAY
THE FINAL RULE PENDING REVIEW**

I, Daniel Sperling, hereby declare and if called upon would testify as follows:

1.  I am the Distinguished Blue Planet Prize Professor Emeritus of Civil Engineering and Environmental Science and Policy and Founding Director of the Institute of Transportation Studies ("ITS-Davis") at the University of California, Davis. I am offering this testimony in my personal capacity, and I have personal knowledge of the facts stated herein.

2.  I am submitting this Declaration in support of Petitioners' Motion to Stay the Repeal Rule pending review. I offer the following expert opinions about the impact of the Environmental Protection Agency's ("EPA") rule rescinding the

1

Endangerment Finding and greenhouse gas ("GHG") emissions standards for motor vehicles. Specifically, the Endangerment Finding rule rescission is causing an immediate and predictable shift in producer and consumer behavior, resulting in car manufacturers decreasing the number of new electric vehicles ("EVs") produced and sold, and correspondingly increasing the number of internal combustion engine ("ICE") vehicles manufactured and sold in the United States. The rescission has also caused the freezing of auto manufacturers' investments in fuel efficiency improvements. These effects from the rule rescission are occurring now and will continue during the pendency of this litigation. Importantly, these effects **lock in** increasing GHG emissions during that period and will continue to do so for three to four more years after the date of any final ruling in this case due to the length of time it takes for manufacturers to re-tool to bring new vehicle models to market. The resulting increases in GHG emissions are significant because transportation emissions are the largest source of GHG emissions in the United States, and the primary pollutant produced by ICE vehicles—carbon dioxide ($CO_2$)—is by far the most climate-altering emission of the GHGs in the atmosphere. On average, most ICE vehicles have a 15-year lifespan. Therefore, the emissions that arise from having more ICE vehicles on the road in the next 18-24 months locks in emissions not just during this period, but for their 15-year lifetime on the roads. These effects will exacerbate the injuries the Young Petitioners have already sustained from localized

air pollution from ICE motor vehicle, as well as from anthropogenic climate change in the United States.

**Background & Qualifications**

3.      I am the Distinguished Blue Planet Prize Professor Emeritus of Civil Engineering and Environmental Science and Policy, founding Director of ITS-Davis. I was also Interim Director of the UC Davis Energy Efficiency Center from 2008-10, and the UC Davis Energy Institute from 2013-15.

4.      In February 2007, Governor Schwarzenegger appointed me to the "automotive engineering" seat on the California Air Resources Board, which I held until January 2023, through the Brown and now Newsom administrations. In that position I oversaw policies and regulations on climate change, low carbon fuels and vehicles, and sustainable cities. In 2013, I served as Chair of the California Fuel Cell Partnership, and in 2015 as Chair of the Transportation Research Board (National Academies).

5.      I have led ITS-Davis to international prominence by building strong partnerships with industry, government, and the environmental community, integrating interdisciplinary research and education programs, and connecting research with public outreach and education. Under my leadership, ITS-Davis won the 2006 Robert M. Zweig Public Education Award of the National Hydrogen Association, 2005 TRANNY award for Organization of the Year by the California

3

Transportation Foundation, and 1998 Employer of the Year Award of the Women's Transportation Seminar of Sacramento. ITS-Davis is recognized as the world's leading university center in sustainable transportation. ITS-Davis has centers in China, Europe, the Global South, and India, and has been leading the U.S. Department of Transportation National Center for Sustainable Transportation since 2013 (with USC, Georgia Tech, UC Riverside, University of Vermont, Texas Southern University, and Cal-State LA as consortium partners).

6. I am recognized as a leading international expert on transportation technology assessment, energy and environmental aspects of transportation, and transportation policy. I was co-director of the 2007 study that designed California's landmark low-carbon fuel standard, and co-director of a follow-up 2010 national study. I have testified eight times before the United States Congress and in 2008 was appointed the first chair of the "Future of Transportation" Council of the Davos World Economic Forum. I have presented almost 1,000 talks in my career, including 10-15 keynote and "distinguished speaker" presentations per year in recent years. In the past 40 years, I have authored or co-authored over 250 technical papers and 13 books, including *Two Billion Cars* (Oxford University Press, 2009) and *Three Revolutions: Steering Automated, Shared and Electric Vehicles to a Better Future* (Island Press, 2018).

7.     I was a lead author of the transportation chapter on the United Nations' Intergovernmental Panel on Climate Change, which was a shared recipient of the 2007 Nobel Peace Prize. I was a recent member of 16 National Academies study committees on Climate Change, Energy Efficiency, Gasoline Taxes, Hydrogen, Transport in China, Biomass Fuels R&D, Sustainable Transportation, and Innovative Mobility Services. I was the founding chair of standing committees for the U.S. Transportation Research Board on Alternative Transportation Fuels (1989-96), and Sustainability and Transportation (2006-08). I am the founding organizer of the premier conference on transportation and energy policy (at Asilomar Conference Center), bringing together leaders and experts from industry, government, academia, and the environmental community every two years since 1988. I have served on many advisory committees and advised senior executives of many automotive and energy companies, environmental groups, and national governments, including review committees at three DOE national laboratories.

8.     In 2022, I was elected to the National Academy of Engineers, considered one of the highest honors for engineers. In 2019, I received the Roy Crum award, the most prestigious research award by the Transportation Research Board of the National Academies. In 2013, I received the Blue Planet Prize for being "a pioneer in opening up new fields of study to create more efficient, low-carbon, and environmentally beneficial transportation systems." In 2010, I received a *Heinz*

*Award* for my "achievements in the research of alternative transportation fuels and [my] responsibility for the adoption of cleaner transportation policies in California and across the United States." Other recent awards include the 2026 National Clean Air Award from Manufacturers of Emission Control Association (MECA), 2024 S.S. Steinberg Award for Lifetime Achievement in Research and Education from the American Road and Transportation Builders Association (ARTBA), 2024 Lifetime Achievement Award for Research and Education from the Council of University Transportation Centers, 2009 Robert Zweig Public Education Award of the National Hydrogen Association, the 2008 Barry McNutt TRB Award for Best Paper in Energy, and the 2002 Carl Moyer Memorial Award for Scientific Leadership and Technical Excellence by the Coalition for Clean Air.

9. Prior to obtaining my Ph.D. in Transportation Engineering from the University of California, Berkeley (with minors in Economics and Energy & Resources), I worked for two years as an environmental planner for the U.S. Environmental Protection Agency and two years as an urban planner in the Peace Corps in Honduras. I have an undergraduate degree in engineering and urban planning from Cornell University.

10. My current research focuses on sustainable transportation policy, with an emphasis on vehicles and fuels, and the transition to low-carbon transportation. A true and correct copy of my curriculum vitae is attached as Exhibit A.

**The Repeal Rule Has Immediate Real-World Effects**

11. EPA's rescission of the 2009 Endangerment Finding and GHG emission standards for vehicles (the "Repeal Rule"), versions of which have been in place since 2012, has caused an immediate and predictable shift in consumer and producer behavior by increasing ICE vehicle sales, decreasing EV sales, and freezing automakers' investments in fuel efficiency improvements. Unless reversed, these shifts "lock in" increasing GHG emissions over the next 18 months and beyond. Those increased emissions cannot be recaptured.

12. The Repeal Rule is causing permanent increases in GHG emissions in three ways. **First**, because the Repeal Rule removes automakers' regulatory requirements to make zero- and low-emission vehicles, it is causing auto manufacturers to cancel EV models and decrease EV production they had already planned for, and correspondingly increase ICE vehicle production instead. These cuts to EV models and production and increases of ICE vehicle production will imminently and permanently increase GHG and local air pollution affecting the Young Petitioners if the Repeal Rule is not halted. **Second**, without imposing any costs on auto manufacturers to limit pollution from ICE vehicles (or otherwise pay the environmental, health, and social costs to society of GHG pollution), EV-centric manufacturers that do not produce ICE vehicles and do not impose those same air pollution costs on society (known as externalities), do not compete on a level playing

field with ICE manufacturers. The overall sales of EVs in the U.S. new vehicle market is becoming far lower than they would be with the 2009 Endangerment Finding rule in place. **Third**, the Repeal Rule also rescinds off-cycle technology requirements that required anti-idling features on vehicles and other efficiency measures, which results in a permanent increase in GHG emissions and more localized, ambient air pollution. I explain each of these findings in greater detail below.

**Eliminating the GHG Emission Standards Causes Automakers to Sell Vehicles that will Permanently Increase GHG Emissions in the United States**

13. The rescinded standards required each vehicle manufacturer to reduce GHG emissions across all classes of new vehicle fleets starting with model year ("MY") 2027 and becoming increasingly stringent through MY 2032.

14. Because ICE vehicles emit large quantities of GHGs, and because EVs are currently the most practicable and economically feasible alternative to greatly reduce emissions, the rescinded GHG emission standards will now result in manufacturers offering fewer EVs and more ICE vehicle models for sale to consumers starting in MY 2027. The prior rule in effect caused manufacturers to account for the pollution costs of ICE vehicles that they otherwise did not pay for, thereby leveling the market.

15. Vehicle manufacturers make significantly more profit on ICE vehicles than on EVs, in part because they do not pay for the fossil fuel pollution costs to

society of selling an ICE vehicle. This profitability strongly incentivizes vehicle manufacturers to continue to focus mainly or entirely on making ICE vehicles instead of substituting them with EVs, if left to their own devices. The rescinded standards required vehicle manufacturers to change their behavior leading up to MY 2027 and onwards by producing more EVs and fewer ICE vehicles than they would produce otherwise. Over the last few years, vehicle manufacturers had been working on new model EVs and more efficient ICE vehicles to be ready to meet the MY 2027 standards. It is worth noting that marketing and advertising by American ICE vehicle manufacturers helps shape consumer demand, and in anticipation of and since the Repeal Rule, American ICE vehicle manufacturers have mostly stopped advertising EV models in favor of ICE models.

16. Timing plays an unusual role in regulations of automakers' vehicle models because it takes about three years for vehicle manufacturers to make necessary preparations to offer a particular vehicle model for sale. Necessary preparations include research, development, and contracting with suppliers, labor, and production facilities. Due to this three-year "runway," vehicle manufacturers began preparing to meet the rescinded vehicle emission standards for MY 2027 in 2024. For a major vehicle model update the runway would be approximately five to six years.

17. Vehicle manufacturers are currently finalizing production details and marketing for MY 2027, and most manufacturers will begin physically producing their MY 2027 fleets in July or August 2026. Because production of MY 2027 will begin imminently, what happens in the coming weeks will irretrievably lock in the physical production of vehicles, which will in turn lock in the associated pollution from those vehicles for their useful life, which is 15 years on average.

18. Because of that three-year runway, today—in May 2026—vehicle manufacturers are negotiating and finalizing necessary contracts for MYs 2028 and 2029—including contracts that lock in choices regarding the number and identity of ICE versus EV models that will be offered in those model years. Because many of those important decisions are being made today, during the pendency of this litigation increased GHG emissions from MY 2028 and 2029 vehicles will be irretrievably locked in, even though production of those vehicles will not begin until spring or summer 2027 and 2028, respectively. Similarly, by the summer of 2028, the MY 2029-2031 fleets will also largely be locked in with minimal flexibility to shift.

19. Twenty-four months from now, in May 2028, when I have been told this litigation is anticipated to be concluded, vehicle manufacturers will have already produced their MY 2027 fleet and will be midway through ongoing production of their 2028 fleets. Production of MYs 2027-28 will thus be a fait accompli, water

10

under the bridge. Each of the ICE vehicles produced in those MYs will not only be causing increased GHG emissions in May 2028, but will continue to pollute for the entirety of their 15-year-average lifespans. EPA and vehicle manufacturers will be powerless to snap their fingers and turn already-produced ICE vehicles on the roads into EVs or otherwise rule-compliant ICE vehicles with GHG emission control technology. There will be no do-over. Decisions that automakers make while this litigation is pending will determine and irretrievably lock in the amount of pollution that will be emitted from tailpipes for years to come.

20. Well before May 2028, vehicle manufacturers will be physically preparing to produce the (by-then-long-planned) MY 2029 fleet. The manufacturers will also already have largely planned and entered into contracts to produce the MY 2030 fleet. Moreover, they will have made big-picture decisions about the ICE and EV makeup of the MY 2031 fleet.

21. By April 2029, only the MY 2032 fleet will still remain to be planned.

22. It is my expert opinion that, for the following reasons, the auto manufacturers will continue to produce and sell more ICE vehicles than otherwise allowed by the rescinded standards, leading to more transportation pollution than would have otherwise occurred through the MY 2031 fleets—pollution that will then carry forward for the average 15-year life span of ICE vehicles. This will happen because they have a profit incentive to sell more ICE vehicles, without having to pay

for the health and other costs imposed on society by their pollution. And also because we are already witnessing the industry respond to the rescinding of regulations by cancelling EV models and investments and removing EV advertising in favor of ICE vehicle advertising.

23. The structure of the rescinded standards is designed to shape vehicle manufacturers' critical decisions throughout the three-year runway period. The rescinded standards were set in 2024 to apply to new vehicles sold starting in MY 2027. The standards "built in" the three-year time delay to enable vehicle manufacturers time to plan the most economic means available to meet the standards.

24. Although vehicle manufacturers have been preparing since 2024 to meet the MY 2027 standards, on January 20, 2025, the President ordered EPA to begin the process of rescinding the standards and the Endangerment Finding that underpins them.[1] EPA repeatedly signaled its promise to follow the President's order, and issued its proposed rule on July 29, 2025. Vehicle manufacturers universally expected the rule, once finalized, to be vigorously challenged in court and potentially stayed. Fully aware of that risk, most ICE vehicle manufacturers nevertheless made the conscious, calculated choice to cancel EV models anyway

---

[1] Exec. Order No. 14154, Unleashing American Energy, 90 Fed. Reg. 8353 §§ 6(f), 3(a), 2(e) (Jan. 29, 2025).

because, as noted above, ICE vehicles earn companies more profits than EVs and thus they wanted to take advantage of the additional time afforded to them to sell ICE vehicles instead of EVs. In the aftermath of this calculated choice, auto manufacturers are announcing billions of dollars in write-offs as they cancel EV models and manufacturing contracts that they had already committed to, in anticipation of and response to the Repeal Rule.

25. As of this declaration, the total write-offs for losses due to auto manufacturers cancelling EVs to be sold in the U.S. by MY 2027 is north of $50 billion across the industry. These write-offs include contracts with suppliers, manufacturing, and research and development.

26. The Repeal Rule has resulted in car manufacturers increasing the planning and build-out of less efficient ICE vehicles and freezing investments in fuel efficiency improvements that they were developing to comply with the GHG standards. For example, both in anticipation of the Repeal Rule and in response to it, General Motors repeatedly cut production of EV trucks at its Factory Zero in Detroit.[2] Shortly after EPA issued the Final Repeal Rule, General Motors pivoted its Ultium EV battery factory in Tennessee to instead produce batteries for energy grids.[3] Other ICE vehicle manufacturers are behaving similarly. This means that in

---

[2] https://insideevs.com/news/791616/gm-factory-zero-production-pause-evs/
[3] https://subscriber.politicopro.com/article/eenews/2026/03/18/gm-pivots-tennessee-battery-plant-to-tap-energy-storage-boom-00832293

the short-term manufacturers will concentrate their marketing and advertising on ICE vehicles, shaping the vehicles available and visible to consumers in the near term, and locking in emissions in the near and long term, in a way that results in higher GHG emissions and other fossil fuel pollutants.

27. If the Endangerment Finding and GHG emission standards are reinstated immediately, it would still be possible for automakers that have canceled EV models to meet the MY 2027 standards by purchasing GHG emission credits from EV manufacturers. The revenue from the credit sales would finance EV manufacturers to increase physical production of EVs in MY 2027 and thereafter. Moreover, General Motors recently admitted it could relatively quickly "resurrect" killed EV models such as the Chevrolet Bolt that have already gone through the development and production process.[4] Other vehicle manufacturers are similarly situated. Thus, if the standards were reinstated immediately, the industry would quickly be able to get back on track to meet the standards, and certainly by MY 2028, avoiding the additional expenses that would result years from now having to ramp back up.

28. If the standards are not reinstated until two years from now, vehicle manufacturers will have locked in decisions this year that will inevitably and

---

[4] https://www.thedrive.com/news/gm-admits-its-possible-to-extend-bolt-production-past-18-months-but-will-it

irretrievably ensure that there will be considerably more ICE vehicles compared to EVs rolling off the assembly lines and being driven next year and for years to come. Those ICE vehicles will permanently and irretrievably emit GHGs into the air which would otherwise not be emitted at all had the standards still been in effect. Substantial amounts of these GHGs will remain in the air for a century or more.

**Destroying the GHG Emission Credit Program Hobbles EV Makers' Competitiveness and Survivability by Eliminating an Important Revenue Stream**

29. The repealed GHG emission standards established a system of GHG emission credits tradeable between manufacturers. The credit program worked by assigning credits to automakers that produce more EVs than necessary and thus well exceed the GHG-emission limits. Those automakers could then sell their credits to automakers who need the credits to meet their GHG-emission obligations.

30. The credit system gave automakers the flexibility to choose among three paths to meet the GHG emission standards, in addition to reducing the fuel consumption of ICE vehicles. They could (1) focus production and marketing on highly-profitable ICE vehicles, and meet the GHG emission standards by purchasing emission credits from manufacturers who have credits to sell; (2) produce more EVs and low-emission ICE vehicles than necessary to meet the GHG emission standards, financing the production of (less-profitable) EVs by selling their emission credits; or (3) produce just enough EVs to meet the emission standards, and not participate

15

in the credit system at all. Under the rescinded regulations, manufacturers who failed to meet the emission standards through any of these channels were penalized with civil fines, which in effect serve as the price ceiling of the tradeable credits.

31. The sale price of emission credits was privately negotiated between buyers and sellers. This price naturally rose or fell in proportion to the share of EV models available across manufacturers' fleets. If too many companies produced only ICE vehicles and corresponding GHG pollution across the fleet, the market price of credits would increase, providing more incentive to manufacture and sell EVs—thus guaranteeing a growing supply of EVs in the market, and a corresponding reduction in emissions fleetwide year after year.

32. The credit system made it financially feasible for a small group of regulated entities to do the heavy lifting to reduce air pollution. For many EV-centric manufacturers, proceeds from sales of emissions credits are an important portion of their revenue. The credit system thus financially enables EV-centric companies to invest in research and innovation necessary to make future EVs even better and more affordable for American consumers. It also incentivizes the legacy ICE manufacturers to increase their investment and commitment to EVs.

33. The credit system also leveled the playing field in the new vehicle market because it forced ICE manufacturers to internalize costs of pollution that they would otherwise externalize onto the public, and financed EV-centric companies to

further develop a technology that benefits the public by reducing pollution. A pollution externality, as mentioned earlier, is a side effect that an industrial actor foists upon society at large, and for which society—not the industrial actor—is forced to bear the cost. An industrial actor internalizes its externalized costs when it, instead of society, is made to bear those costs. Air pollution is an externality from ICE vehicles because when ICE vehicles burn fuel, the byproduct—air pollution— enters people's lungs where it injures their health, or lingers in the atmosphere to cause changes with the climate.

34. In the absence of the repealed standards, the public—not ICE vehicle manufacturers—bears the costs of vehicle emissions. It is partly because of this externalization of the cost of air pollution that selling ICE vehicles is so profitable. The GHG emission standards forced ICE vehicle manufacturers to internalize that cost going forward, incentivizing them to invest in EVs or pay EV manufacturers for emission credits to meet the GHG emission standards. The credit system thus leveled the playing field by shifting the cost of vehicle emissions onto the companies making high-emitting vehicles, thereby creating a competitive playing field for automakers investing in technology that does not pollute the air. For example, companies that are solely EV manufacturers received credit benefits for leading the way to develop EVs and clean America's air.

35. By eliminating the GHG emission standards, the Repeal Rule destroyed the emission credit trading market. It eliminated supply and demand for emission credits because the rescinded emission standards were both the basis on which EPA awarded credits to EV makers, and the sole reason ICE manufacturers bought them. In one fell swoop, the Repeal Rule thus eliminated the above-quantified emissions reductions that result from the credit system.

36. EPA destroyed the EV credit market after 14 years of continuous operation. Many EV automakers developed and built their business model in reliance on the emission credits' continued availability. The EPA's elimination of the emission credit market puts immediate financial pressure on EV makers to scale back and undermines profitability. While one EV manufacturer has reached a market share that can probably remain profitable, it nevertheless reduces their incentive to expand production and sales. Early-stage EV makers benefit substantially from the emissions credit market to level the playing field with ICE auto manufacturers that are able to externalize their pollution costs and profit off of not paying for it. It is my expert opinion that sales of EVs will be greatly reduced and EV companies will be financially harmed if the Repeal Rule remains in place during the pendency of this litigation.

37. In contrast to EV makers, it is important to note that none of the automakers who produce ICE vehicles face existential threats to their companies due

18

to the rescinded emission standards. In fact, traditional U.S. ICE automakers like Ford Motors supported the emission standards. In its 2023 *Climate Change Report*, Ford Motors wrote[5]:

> Globally, we are dedicating more than $50 billion from 2022 through 2026 to accelerate our zero-emission vehicle plan and create an ultra-efficient manufacturing system for our vehicles and the batteries that power them. We are on the path to reach our targeted annual production run rate of 600,000 EVs by late 2023 and more than 2 million by the end of 2026. By 2030, we expect half of our global sales volume will be electric. . . .

38. In February 2024, Ford Motors issued a statement alongside heavy-duty vehicle industry leaders like BorgWarner, Cummins, and Eaton, stating[6]:

> The HDLG [Heavy-Duty Leadership Group] Companies support EPA's ongoing efforts to achieve further de-carbonization in the transportation sector through a sound, achievable HD Phase 3 GHG rule that starts in MY 2027. The HDLG companies do not support proposals to delay the start of EPA Phase 3 HD GHG until MY 2030 or later.

39. Ford later intervened in a case to defend EPA's standards, again supporting EPA's regulation of GHGs and saying it has "taken steps to transform its business to ensure compliance with stricter emissions standards."[7]

---

[5] Ford, *Climate Change Report: Task Force on Climate-Related Financial Disclosures (TCFD) Report 2023*, at 10-11, https://corporate.ford.com/content/dam/na/ford/en_us/documents/corporate/reports/2023-climate-change-report.pdf .
[6] https://www.borgwarner.com/newsroom/press-releases/2024/02/06/borgwarner--cummins--eaton-and-ford-support-stronger-national-heavy-duty-pollution-standards
[7] *Nebraska v. EPA*, No. 24-1129, Motion of Ford Motor Company to Intervene in Support of Respondents (D.C. Cir. June 12, 2024) (Exhibit B). In its motion to intervene Ford said: "Ford is committed to reducing emissions in its own fleet and

40. General Motors (GM) issued similar statements of support to EPA, and, like many automakers in the industry, invested heavily towards transitioning the transportation sector toward EVs for the sake of protecting the climate and reducing harmful fossil fuel pollution[8]:

> GM supports the goals of the EPA's final rule and its intention to significantly reduce emissions. Although challenging, we believe our commitments and investments in an all-electric future place GM in an excellent position to contribute to the goals of the final rule. While we review the details, we encourage continued coordination across the U.S. federal government and with the California Air Resources Board to ensure the auto industry can successfully transition to electrification.

**Turning Off or Removing Off-Cycle Technology**

41. From 2012 until the Final Repeal Rule was issued, the rescinded standards awarded automakers "off-cycle" credits for installing technology in new ICE vehicles that reduces fuel use and therefore emissions. For example, one technology stops the vehicle while idling and restarts it when the vehicle moves. Other technologies for reducing fuel use and emissions that lost off-cycle credits include the following: Active aerodynamics (grill shutters, ride height adjustment);

---

scaling up its production of electric vehicles and hybrids to satisfy growing customer demand and provide customers with choices in addition to vehicles that use internal combustion engines. Ford is investing billions in electrification efforts and creating jobs, including building new electric vehicle and battery assembly plants in Kentucky, Michigan, and Tennessee, transitioning existing facilities in Missouri and Ohio to produce electric vehicles, and expanding capacity for hybrid vehicles."
[8] https://www.epa.gov/newsreleases/what-they-are-saying-strongest-ever-pollution-standards-cars-will-reduce-pollution

Thermal control (passive cabin ventilation, active cabin ventilation, glass or glazing, active seat ventilation, solar reflective surface coating); Powertrain warm-up (active engine warm-up and active transmission warm-up); and a variety of others including high efficiency exterior lights, waste heat recovery, solar panels, electric heater circulation pumps, and variable crankcase suction compressors.

42. Off-cycle credits provide real emissions reductions at low cost, but the incentive to include their use in vehicles comes from the rescinded emissions standards.

43. The Final Repeal Rule rescinded the off-cycle emission credits. This means that automakers are much less likely to install these kinds of technologies, thereby leading to even more emissions and consumer fuel costs than under the previous rule.

**Greenhouse Gas Emissions Impacts**

44. When the GHG emission standards for MY 2027 and beyond were originally promulgated in 2024 to move car manufacturers away from producing ICE vehicles and towards EVs as a means to reduce GHG pollution and protect public health and welfare, EPA itself calculated the GHG emission reductions that would result from compliance with the standards. Using EPA's own numbers, one can compare projected emission reductions with those that were in place with the standards for MY 2023 to 2026. Thus, we can ascertain the increased GHG

emissions from the Repeal Rule that would have otherwise been avoided had the Rule been left in place.

45. My colleague at the UC Davis Institute of Transportation Studies, Alan Jenn, Associate Professor in Civil and Environmental Engineering and member of our EV Center, and an affiliate at Lawrence Berkeley National Laboratory, reviewed EPA's own numbers to conduct an analysis of the estimated GHG emissions from the Repeal Rule, as described below. I am familiar with Professor Jenn's experience and expertise and have relied upon his work and opinions during his tenure at UC Davis.

46. These estimated emissions are conservative because it assumes automakers will not eliminate existing technologies that allowed the industry to meet the past standards that have existed since MY 2012. The Repeal Rule, however, eliminated *all* GHG emission standards, all the way back to 2012, meaning auto manufacturers need not meet any of the federal GHG emission standards across vehicle fleets that have been in place for the prior 14 years. Federal standards for smog-forming pollutants like $NO_x$ and PM still apply.

47. With my colleague, Professor Alan Jenn, we calculated the estimated increase in GHG emissions that will occur in the next 18-24 months because of the rescission of the Endangerment Finding and GHG emission standards. Our methodology for making the calculation relies on EPA's own analysis of the GHG

22

emission reductions that would have been achieved starting with MY 2027 and beyond under the rescinded standards.[9] We then assume under the Repeal Rule that manufacturers will continue to comply with the GHG emission technology and standards in vehicles produced from MY 2026 (even though those are also repealed and no longer required), that EV sales maintain their same rate of growth as they would have under the 2022 standards and do not decrease, and that there is little to no efficiency reductions or improvements in ICE vehicles beyond what was in place for MY 2026. We do not account for the increase in GHG emissions from the elimination of the off-cycle credits and the President's direction to the industry to eliminate the engine idle stop feature. Thus, the calculations below are a conservative estimate of the GHG emissions that will increase annually and beyond with the Repeal Rule across the 15-year average life of the vehicles sold. In my expert opinion, they will likely be higher, and perhaps substantially higher, showing the urgency of the situation.

48. Even if the Petitioners succeed in vacating the Final Repeal Rule within 24 months of it being issued, there will still be locked-in emissions entering the air beyond the 24-month period as the industry again shifts to plan for and produce new

---

[9] EPA-HQ-OAR-2025-0194-0002 (EPA, *Multi-Pollutant Emissions Standards for Model Years 2027 and Later Light-Duty and Medium-Duty Vehicles, Regulatory Impact Analysis* (2024)); EPA-HQ-OAR-2025-0194-0003 (EPA, *Greenhouse Gas Emissions Standards for Heavy-Duty Vehicles: Phase 3, Regulatory Impact Analysis* (2024)).

vehicles with lower emissions profiles, including EVs. That will take an additional 2-3 years to bring new models to the market. If the Repeal Rule is not stayed during the course of this litigation, it will lead to unavoidable and permanent increases in $CO_2$ emissions in the United States. These locked-in emission increases are beginning right now,[10] and will continue to grow to hundreds of megatons as more vehicles that do not comply with any GHG standards are placed into commerce.

49. We estimate the amount of $CO_2$ emissions from the Repeal Rule will increase to 111.2 million tons of carbon dioxide over the next five years that it would take for the auto industry and related manufacturers to respond to any court decision vacating of the Repeal Rule and reinstatement of the Endangerment Finding. It will also lock in vehicle emissions from each MY fleet for 15 years beyond the year the vehicles are sold (because those polluting vehicles cannot be recovered, and their emissions are irretrievably lost), in the amount of 831.0 million tons of carbon

---

[10] Our conservative estimate is that the Repeal Rule is already causing 2.9 to 5.7 million additional tons of carbon dioxide from medium to light-duty vehicles and 1.1 to 1.7 million additional tons of carbon dioxide from heavy-duty vehicles, and that these unavoidable emissions will accrue during the course of this litigation (18-24 months). If the Repeal Rule is not stayed, however, auto manufacturers will not be able to instantly re-tool to produce rule-compliant vehicles. As discussed herein, the nature of automobile manufacturing means that decisions about MY2028 and MY2029 vehicles are being made right now, and those decisions cannot be undone once vehicles are manufactured and sold. Thus, without a stay, the amount of increased emissions is substantial.

dioxide. In total, the additional carbon dioxide emissions from the Repeal Rule if not stayed will be 942.2 million metric tons.

50. At the point in time the Repeal Rule may be declared illegal, the U.S. auto industry will be in a severe disadvantage compared to the rest of the automotive industry globally that has moved forward to innovate in the EV arena, with economic harm to both the auto industry and to consumers, notwithstanding the pollution harm.

51. In my expert opinion, if a reduction in GHG emissions and related pollution is important to protect children and public health and welfare, there is no question that this Repeal Rule disrupts in profoundly harmful ways the 14-year-old regulatory scheme to reduce GHG pollution and electrify transportation. The Petitioners in this case will pay the steep price throughout their lives, as will the EV automakers and our nation, while a handful of automakers will make more profits selling a greater number of ICE vehicles without paying for the externalities associated with their now-unregulated pollution.

52. In conclusion and because this declaration involves children and fossil fuels, I will turn to a lesson that U.S. children understand and is given to us from Earth's fossil record. Some dinosaurs evolved into what we call birds today over the course of the Cretaceous. Other dinosaurs stayed dinosaurs and did not take flight. Then a giant asteroid struck the Earth, ending the Cretaceous period. We have many birds still on the planet today but no dinosaurs. This is a lesson for the federal

government and U.S. auto industry. Right now, two asteroids are hitting the auto industry in the form of economic pressure for cheaper and more secure energy than fossil fuels and in the form of climate damages and pollution caused by fossil fuels. While the rest of the world is embracing clean and increasingly less expensive EVs, the Repeal Rule is cutting the wings off U.S. automakers as they were just trying to get off the ground. Earth's fossil record tells us who survives and then thrives.

In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on May 12, 2026 in Davis, California.

_____
Daniel Sperling

26

# Exhibit A

# Daniel Sperling

Institute of Transportation Studies
University of California, Davis
Davis, CA 95616

530-752-7434 (office)
dsperling@ucdavis.edu

## EDUCATION

Ph.D.  University of California, Berkeley, 1982.  Transport Engineering;
Minors in Economics, Energy and Resources
B.S.  Cornell University, 1973. Systems Analysis/Urban Planning (Environmental Engineering)
Certificate   Peace Corps Training Center, Puerto Rico, 1973.  Intensive two-month program in Spanish.

## PROFESSIONAL EMPLOYMENT

2025-          Distinguished Blue Planet Prize Professor Emeritus, UC Davis
2017-2025     Distinguished Blue Planet Prize Professor, UC Davis
2013-2015     Interim Director, Energy Institute, UC Davis
2007-2023     Board member, California Air Resources Board
2006-2007     Co-Director, Energy Initiative, University of California, Davis
2006-2010     Associate and Interim Director, Energy Efficiency Center, UC Davis
2004-2007     Associate Director, Road Ecology Center, UC Davis
1991-2025     Director, Institute of Transportation Studies, UC Davis
1982-2025     Assistant, Associate, and Full Professor, University of California, Davis.  Joint appointment in
Department of Civil & Environmental Engineering and Department of Environmental Science & Policy.
Teaching responsibilities include transportation planning and policy analysis, and energy and
environmental planning and policy.
1976-1977     Environmental Planner, U.S. Environmental Protection Agency
1973-1975     Planning Advisor, Ministry of Urban Affairs, Republic of Honduras (Peace Corps)

## MAJOR NON-UNIVERSITY LEADERSHIP POSITIONS

Secretary General, World Conference on Transportation Research, 2024-2029
Chair, TRB Executive Committee, 2015-16 (and Vice Chair, 2014-15)
Chair, California Fuel Cell Partnership, 2013
Board Member, California Air Resources Board, 2007-2023 (appointed by Governors Schwarzenegger, Brown, and Newson)

## AWARDS and HONORS

National Clean Air Award, Manufacturers of Emission Control Association, 2026
Chair Professor, Tongji University, 2025+
S.S. Steinberg Award for Lifetime Achievement in Research and Education, American Road and Transportation
Builders Association (ARTBA), 2024
Lifetime Achievement Award for Research and Education, Council of University Transportation Centers, 2024
Distinguished Scholarly Public Service Award, UC Davis, 2023
Member, National Academy of Engineering, 2022+
Senior Fellow, California Council on Science and Technology, 2020-2022
Forth's 2019 Roadmap Award for Research to ITS-Davis for "an individual or an organization that has produced
compelling research that will significantly advance electric, smart and shared mobility"
Roy W. Crum 2018 award, Transportation Research Board, its highest research award
Thomas B. Deen Distinguished Lectureship, Transportation Research Board, 2015
Council Member, California Council on Science and Technology, 2014+
Blue Planet Prize for being "a pioneer in opening up new fields of study to create more efficient, low-carbon, and
environmentally beneficial transportation systems," (two per year internationally), 2013
Heinz Award for research and policy contributions, 2010
Robert M. Zweig Public Education Award of the National Hydrogen Association, 2009
Barry McNutt TRB Award for Best Paper in Energy, 2008 (Jonathan Hughes, Chris Knittel, and D. Sperling)
Nobel Peace Prize (as one of ~300 lead authors for IPCC), 2007
TRANNY 2005 Organization of the Year Award by California Transportation Foundation (on behalf of ITS-Davis)
Lifetime National Associate, National Academies, 2004
Finalist, 2003 World Technology Award for Energy (corporate category for ITS-Davis)

Carl Moyer Memorial Award for Scientific Leadership and Technical Excellence, Coalition for Clean Air, 2002
Member Emeritus (lifetime), Transportation Research Board, Committee on Alternative Transport Fuels, 1998+
Clean Air Award, American Lung Association, Sacramento, California, 1997
Distinguished Public Service Award, University of California, Davis, 1996
Gilbert F. White Fellowship, Resources for the Future, 1993-94
Faculty Fellow, UC Davis Washington Center, 1993
Juror, Electric Vehicle and the American Community: National Planning and Design Competition, 1993
Faculty Fellow, ENO Foundation, 1993

**EDITORIAL BOARDS OF JOURNALS:**
Associate Editor, *Transportation Research D (Transport and Environment), 1996+*
North American Editor, *Transport Policy Journal,* 1993-96
*Frontiers in Energy* (Springer), 2012-17
*Mitigation and Adaptation Strategies for Global Change* (Springer), 2003-2020
*Advances in Environmental Research,* 2000-19
*Transport Policy*, 1993+
*Energy Policy*, 1992-94
*Utilities Policies Journal*, 1990-93
*Transportation Research A*, 1988-93

**GOVERNMENT & NON-PROFIT BOARDS AND COMMITTEES**
Arizona Transportation Institute, Advisory Board, 2025+
SWEEP (Southwest Energy Efficiency Project), NGO, Board of Directors, 2019+
LA Metro, Office of Extraordinary Innovation, Advisory Committee, 2018-2022
World Economic Forum, Global Future Council on Urban Mobility, 2018-2022
IPCC (Intergovernmental Panel on Climate Change), Lead author, transportation chapter, WG III, 2006-07 (4th Assessment), 2011-14 (5th Assessment)
Transportation Research Board Committees (National Academies of Science, Engineering, and Medicine):
 International Subcommittee of Executive Committee, TRB, 2018(?)-2025
 Executive Committee, 2010-2019
 Subcommittee for NRC Oversight, 2014-2019
 Transportation and Sustainability, 2006-09
 Transportation Energy, 1985(?)+
 Alternative Transportation Energy, 1989+
 New Transportation Systems and Technology, TRB, 2004-06
 Task Force on Transportation and Sustainability, TRB, 1999-2005
Brunei National Energy Research Institute, International Advisory Committee, 2013-16
King Abdullah Petroleum Research Center (KAPSARC, Saudi Arabia), International Advisory Committee, 2010-20
California Fuel Cell Partnership, chair, 2013 (member of Executive Committee, 2012-14)
Plug-in Vehicle Advisory Council, California, 2010-11
X Prize Automotive Advisory Board, 2010
California Council on Science and Technology, Council Member, 2014+
California Council on Science and Technology, Committee on California's Energy Future (CEF), 2009-11
State of California Climate Adaptation Advisory Panel, 2009-10
Pacific Council Task Force on Climate Adaptation, 2009-10
Council on Future of Transportation, Davos World Economic Forum, 2008-10
Council on Future of Transportation, Davos, World Economic Forum, chair, 2008-09
California Air Resources Board, Board member, 2007-2023
Northeast States Advisory Committee on Low Carbon Fuel Standard, 2007-08
Western Governors' Association, Transportation Fuels Advisory Committee, 2007
Innovation Center for Energy and Transportation (Beijing) (non-profit NGO), 2007+
American Physical Society Energy Efficiency Committee, 2007-08
National Petroleum Council, Global Oil and Gas Study, Energy Efficiency Sub-committee, 2006-07
GoCalifornia Research and Technology Expert Review Panel (reports to California Secretary of Business, Transportation, and Housing), 2005-06
Research Technology and Advisory Panel, California Secretary of Business, Transportation, and Housing, member, 2006-09(?)

Transportation and Sustainability Committee, Co-chair, Transportation Research Board, 2005-08
Ride Now, Secretary and Board member(non-profit), 2003-07
World Conference on Transportation Research, Vice chair, 2002-07
Electric Vehicle Association of the Americas, International Sub-committee, 2002-03
Bus Rapid Transit Design Competition, Technical Advisory Committee (FTA and others), 2001
Health Effects Institute, Committee on Emerging Technologies, 2000-06
San Diego Environmental Foundation, Board of Directors, 1999-03
World Energy Council, Work Group Member for Transport Study, 1997-98
Rand, Project Advisory Committee, "California's Ozone Reduction Strategy", 1995-96
Electric Vehicle and the American Community: A National Planning and Design Competition, Technical Advisory Committee, 1992-93
American Academy of Arts and Sciences Committee, "Future of the Auto," 1992-93
Calstart, Policy Advisory Board, 1994-1996
Houston Advanced Research Center, Alternative Fuels Advisory Board, 1992-94
U.S. Department of Energy, Energy Security Working Group, 1992
Chair, Alternative Transportation Fuels Committee, Transportation Research Board, 1989-1996
Vice Chair, Energy and Environmental Aspects of Transportation Committee, American Society of Civil Engineers, 1988-90

## INDUSTRY ADVISORY BOARDS
Royal Dutch Shell External Review Committee for Sustainability, member, 2010-13
Nissan Environmental Advisory Committee, member, 2005-09
EV Global Motors Company (Lee Iacocca, CEO), Board of Directors, 1997-99 (Board of Advisors, 99-01)
Clean Air Vehicle Test and Evaluation Center (CAVTC), Hayward, California, Advisory Board, 1991-96
Encyclopedia of Science and Technology, McGraw-Hill, Board of Consulting Editors (responsible for Transportation Engineering), 1997-2005

## UNIVERSITY AND US DOE LAB BOARDS AND COMMITTEES
Argonne National Laboratory, External Advisory Committee for Advanced Energy Technologies Directorate, 2022-25
University of California, Riverside, C-CERT, Advisory Board, 2014-16, 2017-24(?)
University of Michigan, Energy Institute, Advisory Board, 2010-2021(?)
University of California Energy Institute, Chair, Steering Committee, 1999-2006
China Automotive Energy Research Center (CAERC), Tsinghua University, Beijing, Advisory Board, 2009+.
Stanford University, California Climate Change Project Advisory Council, 2006
Tsinghua University (and BP), Review of "Sustainable Development" Research Program at Tsinghua, 2005
University of Chicago, Argonne National Lab, Review Committee for Energy, 2000-03, 2005
University of Tennessee-Battelle (Board of Governors), Oak Ridge National Laboratory Transportation Science and Technology Program, Review Committee, 2004
National Renewable Energy Laboratory, Alternative Fuels Division, Advisory Committee, 1993-96
University of California Energy Institute, Steering Committee, 1998-2006 (chair, 1999-2006)
University of Sydney, Key Center of Transportation, Advisory Board, 1996-1998
University of Tennessee (Knoxville), Energy and Resource Center, Advisory Board, 1996-1997
University of California and California Department of Transportation, Coordinating Council, 1990-92
University of California Transportation Center, Executive Committee, 1988-2006
Program for Advanced Transportation and Highways (PATH), Executive Committee, 1998-2001

## US NATIONAL ACADEMIES STUDY (CONSENSUS) COMMITTEES
NRC/TRB Innovative Urban Mobility Services Committee, 2014-15
NRC/TRB Research Perspectives on Sustainable Energy and Transportation: A Conference, 2012-13 (chair)
NRC/NAS Subcommittee on Electric Drive Battery Research and Development, 2010-11
NRC/NAS/TRB Committee on Transportation and Climate, 2008-11
NRC/NAS Sub-Committee on Energy Efficiency, 2007-09
NRC/NAE Committee, "Grainger Challenger Prize," 2004
NRC/TRB/NAS Committee, "Viability of Fuel Taxes for Highway Finance," 2003-2005
NRC/TRB/NAS Committee, "Sustainable Transportation," 2003-04
NRC/NAE Committee, "Future Hydrogen Production and Use," 2002-04
NRC/NAS Committee (joint with China Academy of Sciences), "Personal Transport in China," 2001-02

NRC/TRB/NAS Committee, Surface Transportation Environmental Cooperative Research Advisory Board, 1999-02
NRC/NAS Committee, "Biofuels R&D Strategy," 1998-1999
NRC/NAS Committee, "Enabling Transportation Research," 1998
NRC/NAS Panel, "Transport Options for Megacities," 1996
NRC/NAS Committee, "Transportation and a Sustainable Environment," 1994-97
NRC/NAS Committee, "Liquid Fuel Options," 1989-90

**CO9NFERENCE ORGANIZER and/or Director (or co-director)**

Asilomar Transportation and Energy Biennial Conferences (Pacific Grove, CA), 1988-2025. Themes were: *Future Mobility*, *Climate Policy, Hydrogen Transition*, *Managing Transitions in the Transport Sector, Transportation Energy and Environmental Policies, Sustainable Transportation and Energy, Alternative Fuels, and Climate Change Strategies.* Sponsored by US DOE, US FTA, US DOT, US EPA, Natural Resources Canada, California DOT, California EPA, Energy Foundation, William & Flora Hewlett Foundation, UC Transportation Center, Honda, Toyota, Chevron, ExxonMobil, and many others. (Co-directors included Barry McNutt, David Greene, and Tom Turrentine.)

California-Germany Transportation Decarbonization Conference, Berlin, Germany, Jan 30-31, 2018

TRB/DOT University Spotlight Conference, 2010?

NRC/TRB Research Perspectives on Sustainable Energy and Transportation, 2012

Council of University Transportation Centers, Summer Meeting, UC Davis, June 4-5, 1998 (with G. Griffin)

*Transportation in Developing Countries*, UC Berkeley, April 17-18, 1998 (with Robert Cervero).

*Toward a Fuel Cell Future: Planning for the Commercialization of Fuel Cells*, Sacramento, California, Sept. 2-3, 1993. Co-hosted by Sacramento Municipal Utility District (with Marshall Miller)

*IVHS Policy: A Workshop on Institutional and Environmental Issues*, Asilomar Conference Center, April 26-28, 1992. Co-hosted by George Mason University (with Jonathan Gifford and Thomas Horan)

**Ph.D. DISSERTATION COMMITTEES (Chair and/or research sponsor)**

Aditya Ramji, Transportation Technology and Policy, 2024
Rosaria (Aria) Berliner, Civil Engineering, 2018
Sydney Vergis, Transportation Technology and Policy, 2016
Eric Cahill, Transportation Technology and Policy, 2015
Jeff Kessler, Transportation Technology and Policy, 2015
Zheng (Marco) Wan, Transportation Technology and Policy, 2011
Zhenhong Lin, Transportation Technology and Policy, 2008
Jason Ni, Transportation Technology and Policy, 2008
Nic Lutsey, Transportation Technology and Policy, 2008
Guihua Wang, Civil and Environmental Engineering, 2008
Jonathan Weinert, Transportation Technology and Policy, 2008
Rusty Heffner, Transportation Technology and Policy, 2007
Brett Williams, Transportation Technology and Policy, 2007
Gustavo Collantes, Transportation Technology and Policy, 2006
Charles Rivasplata, Transportation Technology and Policy, 2006
Ling Li, Transportation Technology and Policy, 2004
Meena Sundaresan, Mechanical Engineering and Transportation Technology and Policy, 2004
J. Fernando Contadini, Civil and Environmental Engineering, 2002
Karl-Heinz Hauer, Transportation Technology and Policy, 2001
C.J. Brodrick, Transportation Technology and Policy, 2001
Timothy Lipman, Ecology and Transport Technology & Policy, 1999
Susan Shaheen, Ecology, 1999
Kevin Nesbitt, Civil and Environmental Engineering, 1996
Molly Espey, Agricultural and Resource Economics, 1994
Simon Washington, Civil and Environmental Engineering, 1994
Thomas Turrentine, Anthropology, 1994
Randall Guensler, Civil and Environmental Engineering, 1993
Jonathan Rubin, Agricultural and Resource Economics, 1993
Michael Quanlu Wang, Ecology, 1992

Max Rothe, Civil and Environmental Engineering, 1992
Kenneth Kurani, Civil and Environmental Engineering, 1991
Mark Delucchi, Ecology, 1990

## CONGRESSIONAL AND LEGISLATIVE TESTIMONY AND BRIEFINGS

Testimony on "Realigning Federal Infrastructure Policy to Mitigate Climate Change," Transportation and Infrastructure Committee, US House of Representatives, Wash DC, Feb 26, 2019,

Testimony on "California Leadership on 3Rs," California Senate Committee on Transportation, Sacramento, Feb 20, 2018

Testimony on Spending of Cap-and-Trade Revenue, California Senate Budget and Fiscal Review Committee, Sacramento, CA, Feb 13, 2014

Testimony on Low Carbon Fuel Standards, US Congress, House Subcommittee on Energy and Environment, House Committee on Energy and Commerce, Hearing on "The American Clean Energy and Security Act of 2009," April 25, 2009

Testimony, Massachusetts Legislature Committee on Advanced Biofuels, Boston, January 17, 2008

Testimony, House Transportation and Infrastructure Committee, Highway and Transit Subcommittee, March 27, 2007

Briefing, US Congress, Capitol Building, January 23, 2007

Briefing, US Congress, Rayburn Building, January 24, 2007

Testimony, California Senate Select Committee on Alternative Energy Strategies. Sacramento, May 24, 2006

Testimony, House Government Reform Subcommittee on Energy and Resources, Rayburn Building, Washington, DC, July 27, 2005

Briefing, Senate Hydrogen and Fuel Cell Caucus, Dirksen Building, Washington, DC, July 20, 2005

Keynote briefing, Congressional Retreat, Council on Competitiveness, Baltimore, MD, January 14, 2005

Briefing, Congressional Hydrogen Caucus, Senate Dirksen Building, Washington, DC, January 11, 2005

Testimony, Select Committee on Air and Water Quality, Assembly, California Legislature, Sacramento, CA, Feb 25, 2004

Testimony, US Congress, House Science Committee, Washington, DC, February 7, 2002

Testimony, Committee on Science, Subcommittee on Energy and Environment, Washington, DC, July 30, 1996

Testimony on AB2495 (Richter Bill), California Assembly, Sacramento, CA, March 21, 1994

Testimony, California Assembly Subcommittee on International Trade and Business Development, Los Angeles, CA, Dec 16, 1991

Testimony, US House of Representatives, Committee on Energy and Commerce, Subcommittee on Energy and Power, Washington, DC, February 27, 1991

Testimony, House Committee on Science, Space and Technology, Subcommittee on International Scientific Cooperation, Encinitas, CA, February 16, 1990

## KEYNOTE AND "DISTINGUISHED SCHOLAR" PRESENTATIONS (of 200+ since 2008)

**Universities**: Arizona State University; City College of NY; MIT; North Carolina State University; Pace University; Peking University (Shenzhen); Tsinghua University (Bejing); Swarthmore College; University of Monash (Australia); UC Berkeley; UC Riverside; Rutgers, University of Calgary; University of Illinois, Chicago; University of Kansas; University of South Florida; University of Texas, Austin; University of Vermont; Yale University

**Others**: Asian-American Architects and Engineers (California); Chevron; Deutsch Bank; IBM Almaden Institute; Lawrence Berkeley National Laboratory; Lyft; National Academy of Engineering (Cambridge, MA); National Institute for Environmental Studies (Japan); SAE (various); Society of Automotive Manufacturers (India); TRB (Thomas Deen Lecture); US Department of Energy; US Department of Transportation; Uber; Women's Transportation Seminar (California);

**Other unique and special lectures and interviews**: World Economic Forum in Davos, Switzerland; World Affairs Council in Wash. DC; Fresh Air (NPR); Jon Stewart Daily Show; Commonwealth Club in San Francisco; Los Angeles Book Festival; World Bank; Royal Society of London; White House; Copenhagen COP15 Climate Summit; TEDx (Leeds, England and Sacramento, CA),

## SELECTED PRESENTATIONS (of ~1,000))

### Corporations and Industry Groups

3M, American Petroleum Institute, Aramco, BMW, BP, California Hydrogen Business Council, ConocoPhillips, DaimlerChrysler, ExxonMobil, Honda, GM/Opel, International Petroleum Industry Environmental Conservation Association, Lyft, Michelin Bibendum Challenge, Mitsubishi, Natural Gas Vehicle

Coalition, Nissan, Renault, Samsung, Saudi Aramco, Shell, Silicon Valley Manufacturing Group, Toyota, Uber, US Fuel Cell Council, Volkswagen, Western States Petroleum Association

**Government**

OECD, European Commission of Ministers of Transport, International Energy Agency; Swedish Transport & Communications Research Board, US Congress, Legislatures of California, Vermont, and Massachusetts, US EPA, US Department of Transportation, US Department of Energy, California Air Resources Board, California Energy Commission; California EPA, California Department of Transportation, National Park Service, National Association of Regional Councils

**Universities**

University of Michigan (Ann Arbor), UC Berkeley, UC Irvine, UCLA, UC Santa Barbara, University of South Florida, Stanford, University of Stuttgart, Technion (Israel), Tsinghua, Tongji, Royal Institute of Technology (Stockholm), MIT, Aston (UK), Baruch College (NY), University of Delaware, Hebrew University, North Dakota State University, Portland State University, University of Illinois (Chicago, Urbana Champaign), University of Calgary

**Conferences and Others**

Alliance to Save Energy, American Institute of Chemical Engineers, American Society of Civil Engineers, Aspen Institute, California Council on Science and Technology, SAE International, Transportation Research Board, Clean Cities Conference, NSF, Consultative Group on Biological Diversity, Health Effects Institute, China Academy of Sciences, North American Car Sharing Conference, Pew Center on Global Climate Change, Natural Resources Defense Council, Ecological Society of America, President's Council on Sustainable Development, European Conference on Clean Cars, Goddard Space Center, International Electric Vehicle Symposium, Lawrence Livermore National Laboratory, Council of Parties (Kyoto Protocol) (Bonn), International Conference on Ecology and Transportation, California Fuel Cell Partnership, National Hydrogen Association, Gordon Conference on Industrial Ecology, Electric Drive Transportation Association, Foundation for American Communications and Society of Professional Journalists, World Hydrogen Energy Conference

**TEDx**

- Creating the Green Car, University of Leeds
- Transforming Mobility, Sacramento, CA

**PODCASTS (2018+)**

- 10th anniversary of Agora Verkehrswende: What Have We Learned About Achieving Zero Carbon Transportation, Interviewed by Christian Hochfeld, March 5, 2026.  Watch the episode here
- Automated Vehicles, SmartDrivingCars ZoomCast 336/PodCast 336, Princeton University, 26 September 2023.
- "Driving Net Zero: What Can UK Learn from California's Zero Emissions Vehicle Mandate," The Green Alliance," October 13, 2022.
- "Powered By How: Moving the World Forward – the Future of Transport". Reuters, August??
- "Planes, trains, and automobiles (but mostly automobiles),", Roger Kranenburg, Daniel Sperling, and Samantha Gross, Brookings Institution, November 16, 2022
- "xxxx AAA Motorland, August??
- "EVs for Retirement Communities," Concerned Citizens, https://www.youtube.com/watch?v=58aiepEg4MM&list=PL42xcltr8DpMMp3UIClu-wen3JXzSjaVv&index=1
- "Reforming Transportation Through Electrification, Ride Sharing and Automation," Episode #72, Part 2", hosted by Tami Klein, August 1, 2022 https://www.transportenergystrategies.com/2022/08/01/72-reforming-transportation-part-2/
- "Reforming Transportation Through Electrification, Ride Sharing and Automation," Episode #71, Part 1", hosted by Tami Klein https://www.transportenergystrategies.com/2022/07/13/71-reforming-transportation-part-1, July 18, 2022
- "Reforming Transportation Through Electrification, Ride Sharing and Automation," Episode #7x, Part 2", hosted by Tami Klein, August 1, 2022

- Intelligent Vehicle Briefs Webinar: Dan Sperling on Low Carbon Fuel Standard and New Mobility, hosted by Steve Rooney, Jan 13, 2021
- EV Hub Live, Hosted by Nick Nigro, Nov 12, 2020
- UC Davis, Unfold Season 2, Episode 8, https://www.ucdavis.edu/climate/news/unfold-podcast-episode-8-transitioning-low-carbon-transportation, 2020
- Ridesharing, Smart Driving Car Episode 167, Princeton University, July 29, 2020
- SmartDrivingCars Zoom-Cast Episode 154- Dan Sperling. Video version: Watch Zoom-Cast 154, Princeton University, April 29, 2020.  *Also* … https://youtu.be/LmvKan80GOE
- The Three Revolutions of Transportation: Streetsblog USA: Talking Headways podcast
- Three Revolutions – The Future of Cars: Infinite Earth Academy podcast
- "We're on the Verge of a Transportation Revolution. If We're Not Careful, We Could Screw It Up: GreenTech Media/Energy Gang podcast
- U.S. Green Chamber of Commerce (Michelle Thatcher, CEO) podcast
- Revolution on the Road: The Shift to EVs and Self-Driving Cars, Union of Concerned Scientists
- Car-free Cities, The GreenPreneur Show, iHeart Radio & Chicago-based WVON, July 29, 2018

**WEBINARS (2018-2020)**
- "Interview with Dan Sperling on the Three Transportation Revolutions," NPR Utah, 4 March 2026
- "Zero Carbon Transportation Action Plan", SSDN USA, Oct 29, 2020
- "Interview with Dan Sperling: the 3 Revolutions", UC Davis Campaign Launch Event, Sept 9, 2020
- "How to Leverage the 3 Revolutions to Achieve Sustainable Transportation", Rhode Island Mobility Innovation Working Group, Sept 3, 2020
- "China-US Opportunities to Leverage New Mobility Services", TRB-China Mobility Innovation Working Group, Aug 26, 2020
- "Decarbonizing Global Transport", CSIS, May 27, 2020
- EVs in the Age of Cheap Oil, SPUR, July 22, 2020
- ECE Department Heads Workshop, "ECE Department Heads Workshop on "Combating Climate Crisis: Can it also help the ECE Renaissance?", June 5, 2020
- Partially automated vehicles change the way we drive, ITS-Davis, June 4, 2020
- Decarbonizing Global Transport, CSIS, May 27, 2020
- How will COVID19 change the direction of the 3 Revolutions? With Susan Shaheen (UC ITS) and Seleta Reynolds (LA DOT), ITS-Davis, April 27, 2020.
- With Coleen Clementson, Susan Freedman, and Kyle Whatley, SANDAG; October 23, 2019.
- Deep Decarbonization of the Transportation Sector, US Climate Alliance (and WRI), October 22, 2019
- Three Revolutions and What It Means for Vehicle Emissions, TRB Webinar on Technology Changes Influencing the Decline of Vehicle Emissions, 25 April 2018
- Three Revolutions: Transforming Transportation, Security and Sustainability Forum, June 25, 2018

**OP-EDs and BLOGS**
D. Sperling has been a transportation columnist for Forbes and Energy Expert for Wall Street Journal. A list of blogs and op-eds is below:
- Colin Murphy and D. Sperling, "How a California climate win could end up destroying rainforests — and what to do about it," *LA Times*, March 14, 2024
- D. Sperling and Mollie D'Agostino, "Don't fall prey to the current panic over automated vehicles," The Hill, September 16, 2023
- D. Sperling, "How California's ambitious new climate plan could help speed energy transformation around the world," *The Conversation*, January 26, 2023
- D. Sperling, Lew Fulton, Marshall Miller, Miguel Jaller, "Beyond passenger cars and pickups: 5 questions answered about electrifying trucks," *The Conversation*, November 1, 2022.
- Scott Hardman, Daniel Sperling, and Gil Tal, "Australia is failing on electric vehicles. California shows it's possible to pick up the pace," *The Conversation*, September 12, 2022
- Christina E. Hoicka, D. Sperling, et al, "COP26: experts react to the UN climate summit and Glasgow Pact," *The Conversation*, November 13, 2021
- Mollie D'Agostino, Susan Shaheen, and D. Sperling, Top Ten California Automated Vehicle Policy Strategies, *Streetsblog California*, Sept 24, 2021

- Dan Sperling, Lew Fulton, and Vicki Arroyo, A National Zero Carbon Transportation Plan for the US, *UC Davis Transportation and Climate blog*, October 30, 2020.
- Mollie D'Agostino, Giovanni Circella, and D. Sperling, What the present pandemic means for the future of transportation, *ITS-Davis Greenlight Blog*, April 27, 2020.
- Austin Brown and D. Sperling, Electric vehicle fees won't fix the transportation funding gap, *CalMatters*, December 12, 2019.
- Lew Fulton and D Sperling, "Oil companies are thinking about a low-carbon future, but aren't making big investments in it yet," *Conversation*, October 23, 2019
- Scott Hardman, Gil Tal, and Dan Sperling, Will Tesla's Autopilot System Change Vehicle Use? *Forbes*, Sep 25, 2019.
- Hannah Safford and D. Sperling, The Business Case for Mobility Data Sharing, *Forbes*, August 19, 2019.
- Scott Hardman and D. Sperling, Resurrecting Plug-in Hybrid Cars, *Forbes,* April 10, 2019.
- D. Sperling, The three revolutions: our best hope for a sustainable transportation future? *Automotive World*, 27 February 2019.
- Mollie D'Agostino and D. Sperling, Why AV Policy Is a Necessary—But Not Sufficient Step, *Forbes* 18 December 2018.
- D. Sperling and Gil Tal, What electric vehicle sales say about transition off fossil fuels, *The Hill*, 14 November 2018
- D. Sperling and Colin Murphy, How (Almost) Everyone Came to Love Low Carbon Fuels in California, *Forbes*, 17 October 2018
- D. Sperling, My turn: CA's transportation is broken. The next governor can fix it, *CalMatters*, 30 September 2018
- Scott Hardman and D. Sperling, How Partially Automated Vehicles Could Lead to More Driving, *Axio*s, 19 September 2018
- Austin Brown and D. Sperling, Long Live Batteries, *Forbes,* August 30, 2018
- Nic Lutsey and D. Sperling, By Freezing Vehicle Standards, The Trump Administration Will Grind Auto Innovation To A Halt, *Forbes*, August 20, 2018
- D. Sperling and Nic Lutsey, "Trying To Make Sense Of Trump's Rollback Of Vehicle Standards," *Forbes*, August 2, 2018
- D. Sperling, "Tesla's Struggles Are A Threat To The Future Of Electric Cars," *Forbes*, 19 July 2018.
- D. Sperling, "New Mobility Companies For A New Future," *Forbes*, 12 July 2018
- D. Sperling, Austin Brown, and Mollie D'Agostino, "How ride-hailing could improve public transportation instead of undercutting it," *The Conversation*, July 5, 2018 (reprinted in Scientific American and elsewhere). Later reprinted as https://www.greenbiz.com/article/could-ride-hailing-improve-public-transportation-instead-undercutting-it
- D. Sperling, "Why Pooling is Crucial to Our Transportation Future," *Wall Street Journal*, June 28, 2018
- D. Sperling and Thomas Turrentine, "Tipping Point for Electric Vehicles," CALmatters.org (published in several newspapers and many electronic newsletters), July 19, 2015
- Yunshi Wang, D. Sperling, and Alberto Ayala, "California wins by collaborating with China on electric vehicle market," *Sacramento Bee*, March 11, 2015 (print version)
- D. Sperling, "The Secret to Saving the Automotive Revolution," *Wall Street Journal* on-line, Energy Experts, May 23, 2014
- D. Sperling, "The Secret News About Vehicle Emissions," *Wall Street Journal* on-line, Energy Experts, May 22, 2014
- D. Sperling, "This Crisis Shouldn't Be Wasted," *Wall Street Journal* on-line, Energy Experts, July 18, 2013
- D. Sperling, "Four New Wheels for India, Economic Times (India), May 18, 2013
- D. Sperling, "This Crisis Shouldn't Be Wasted," *Wall Street Journal* on-line, Energy Experts, April 18, 2013
- Amy Myer Jaffe and D. Sperling, "An Idea Whose Time Has Come: It's not just Obama -- the entire world is ready to get serious about climate change," *Foreign Policy*. January 24, 2013
- D. Sperling and Madhu Khanna, "How to Fix America's Fuel Future," *AOL*, July 19, 2012
- D. Sperling, "Bringing Science Back to the Keystone Pipeline Decision," *The Hill*, April 19, 2012.
- D. Sperling, "Electric Dreams," *Technology Review* (MIT), January/February 2011, pp.10-11.
- Deborah Gordon and D. Sperling, "Big Oil Can't Get Beyond Petroleum," *Washington Post*, June 13, 2010, B01
- D. Sperling, "Can the Automotive Industry Change its Stripes?" *Harvard Business Review, May 3,* 2010

- Deborah Gordon and D. Sperling, "Road to Copenhagen," *Oxford University Press Blog*, 2009,
- Deborah Gordon and D. Sperling, "Surviving Two Billion Cars: China Must Lead the Way**,**" *Yale 360* (publication of Yale School of Forestry and Environmental Studies, March 5, 2009.
- D. Sperling and Deborah Gordon, "How High Gas Prices Can Save the Car Industry," *New York Times*, November 16, 2008
- D. Sperling, "A new carbon standard: taxes on CO2 emissions alone won't get us where we need to go," *Los Angeles Times,* June 21, 2007.
- Alex Farrell and D. Sperling, "Getting the Carbon Out," *San Francisco Chronicle*, May 18, 2007

**BOOKS (edited, authored, or co-authored by Sperling)**

1. Schafer, Andreas and D Sperling, eds, *Handbook on Transportation and Energy*, Edward Elgar Publishing, 2027.
2. Sperling, D., with contributions from Anne Brown, Robin Chase, Michael J. Dunne, Susan Pike, Steven E. Polzin, Susan Shaheen, Brian D. Taylor, Levi Tillemann, and Ellen van der Meer. *Three Revolutions: Steering Automated, Shared, and Electric Vehicles to a Better Future,* Island Press, 2018. Reprinted in Mandarin.
3. Sperling, D. and James Cannon, eds, *Climate and Transportation Solutions*, University of California, Davis, 2010.
4. Sperling, D. and Deborah Gordon, *Two Billion Cars*, Oxford University Press, 2009. Paperback issued April 2010. Reprinted in Mandarin (Shanghai Jiaotong University Press, 2010).
5. Sperling, D. and James Cannon, eds,, *Reducing Climate Impacts in the Transportation Sector,* Springer, 2009.
6. Sperling, D. and James Cannon, eds, *Driving Climate Change: Cutting Carbon from Transportation,* Elsevier Press, 2006.
7. Sperling, D. and James Cannon, eds, *The Hydrogen Energy Transition*, Elsevier Press, 2004.
8. Forman, Richard, D. Sperling, J.A. Bissonette, A.P. Clevenger, C.D. Cutshall, V.H. Dale, L. Fahrig, R. France, C.R. Goldman, K. Heanue, J.A. Jones, F.J. Swanson, T. Turrentine, T.C. Winter, *Road Ecology: Science and Solutions*, Island Press, Wash, D.C., 2003. Reprinted in Mandarin (China Higher Education Press), Polish (xx), and xx
9. Sperling, D. and K. Kurani, eds, *Transportation, Energy, and Environment.* National Academy Press, 2003.
10. Sperling, D. *Future Drive: Electric Vehicles and Sustainable Transportation,* Island Press, Wash D.C., 1995.
11. Sperling, D. and Susan Shaheen, eds. *Transportation and Energy: Strategies for a Sustainable Transportation System*, ACEEE, Washington D.C., 1995.
12. Sperling, D., ed. *Alternative Transportation Fuels: An Energy and Environmental Solution*, Greenwood Press Quorum Books, Westport, Connecticut, 1989.
13. Sperling, D. *New Transportation Fuels: A Strategic Approach to Technological Change,* University of California Press, Berkeley, California, 1988, reissued 1990 in soft cover.
14. Kanafani, Adib and D. Sperling. *National Transportation Planning*, Martinus Nijhoff, The Hague, Netherlands, 1982. Reprinted in Chinese, Peoples Republic of China, 1987.

Member of National Academies committees that authored the following books:
1. *Between Public and Private Mobility: Examining the Rise of Technology-Enabled Transportation Services,* Transportation Research Board, Special Report 319, 2015 (Chair: Brian Taylor)
2. *Policy Options for Reducing Energy Use and Greenhouse Gas Emissions from U.S. Transportation*, Transportation Research Board, Special Report 307, 2011 (Chair: Emil Frankel)
3. *Real Prospects for Energy Efficiency in the United States,* America's Energy Future Panel on Energy Efficiency Technologies, National Academy Press, 2009 (Chair: Lester Lave)
4. *The Fuel Tax and Alternatives for Transportation Funding,* TRB Special Report 285, National Academy Press, 2006 (Chair: Rudolph Penner) http://trb.org/publications/sr/sr285.pdf
5. *The Hydrogen Economy: Opportunities, Costs, Barriers, and R&D Needs,* National Academy Press, 2004 (Chair: Mike Ramage) www.nap.edu/books/0309091632/html
6. *Personal Cars and China,* National Academy Press, 2003 (co-chairs: Dale Compton, GUO Kong Hui)
7. *Surface Transportation Environmental Research A Long-Term Strategy,* National Academy Press, 2002 (Chair: Elizabeth Deakin)
8. *Toward a Sustainable Transportation Future*, National Academy Press, 1997 (Chair: James Ebert)
9. *Fuels to Drive Our Future*, National Academy Press, 1990 (Chair: John Longwell)

Principal author of following OECD books:
- *Electric Vehicles: Technology, Performance, and Potential*, 1996 (with Mark Delucchi and H. Hasuike)
- *Choosing an Alternative Fuel*, 1993 (with Mark Delucchi)

Study committee member and co-author of:
- Burton Richer, David Goldston, George Crabtree, Leon Glicksman, David Goldstein, David Greene, Dan Kammen, Mark Levine, Michael Lubell, Maxine Savitz, and Daniel Sperling, Energy Future: Think Efficiency. American Physical Society, Washington, DC, September 2008, 107pp.

## PAPERS, BOOK CHAPTERS, AND REPORTS

Jingyuan Zhao, Yan Hong, Yuejiu Zheng, Yuqi Li, Xuning Feng, Michael Fowler, Minggao Ouyang, Andrew F. Burke, and Daniel Sperling (2026), Battery system integration for electric mobility, *Joule* https://doi.org/10.1016/j.joule.2026.102445

Daniel Sperling, Lessons Learned by an Expanding University Transportation Center: Insights from the Institute of Transportation Studies at University of California, Davis, *Transportation Research Today* 1 (2026) 100005 https://doi.org/10.1016/j.trt.2026.100005

Xiaobo Qu, Daniel Sperling, Hui Li, 2025. Carbon Trade-Offs of Autonomous Vehicles in Transportation Systems, *Engineering* (2025), https://doi.org/10.1016/j.eng.2025.10.036

Ramji, Aditya; Fulton, Lew; Sperling, D, Sustainable EV Market Incentives: Lessons Learned from European Feebates for a Zero Emissions Future. ITS-Davis, white paper, August 2024, https://escholarship.org/uc/item/73z6j5v1

Ramji, Aditya; Fulton, Lew; Sperling, D, Sustainable EV Market Incentives: Equitable Revenue-Neutral Incentives for Zero-emission Vehicles in the United States, ITS-Davis, white paper, August 2024 https://escholarship.org/uc/item/6qx2x5zz

Fulton, L., Schäfer, A.W., Sperling, D., 2024. Transitions to deeply decarbonized transportation and energy systems around the world: challenges and solutions. *Transportation Research Part D: Transport and Environment* 134, 104219. https://doi.org/10.1016/j.trd.2024.104219

Jaime Soza-Parra, Giovanni Circella, and D Sperling, "Changes in activity organization and travel behavior choices in the United States," Chapter 15 in Junyi Zhang and Yoshitsugu Hayashi (eds), *Transportation Amid Pandemics: Lessons Learned from COVID-19.* Elsevier, 2023.

Venkataram, Prashanth S., Justin Flynn, Giovanni Circella, Daniel Sperling (2023) Challenges Faced by People with Disabilities in Public and Active Transportation Systems in the United States of America. Institute of Transportation Studies, University of California, Davis, Research Report UCD-ITS-RR-23-14

Venkataram, Prashanth S., Justin Flynn, Giovanni Circella, Daniel Sperling (2023) Challenges Facing People with Disabilities in Private Vehicular Transportation in the United States of America. Institute of Transportation Studies, University of California, Davis, Research Report UCD-ITS-RR-23-13

Yunshi Wang, Xiuli Zhang, Hui He, and D. Sperling, "Accelerating the ZEV Market in the US and China," ITS-Davis, November 2022 and California-China Climate Institute, 2023.

D. Sperling, Gil Tal, Scott Hardman, Glacer Niño Vasquez, and Emmanuel A. San Andres. Policy Options for Decarbonising Transportation in APEC. APEC Policy Support Unit, Policy Brief No. 48, September 2022, 10 pp.

Vijayakumar, Vishnu, Lewis Fulton, Mahdi Shams, D Sperling (2022) Creating a Global Hydrogen Economy: Review of International Strategies, Targets, and Policies with a Focus on Japan, Germany, South Korea, and California. ITS-Davis, Research Report UCD-ITS-RR-22-100

D Sperling, "Carbon-Free Transportation Saves Money," The World Financial Review, Nov/Dec 2021, pp. 54-55.

Zheng Wan, Likun Wang, Jihong Chen, Daniel Sperling, Ship scrappage records reveal disturbing environmental injustice, Marine Policy, Volume 130, August 2021, 104542 https://www.sciencedirect.com/science/article/abs/pii/S0308597X21001536

Ka Ho Tsoi, Becky P.Y. Loo, Gil Tal, Daniel Sperling, "Pioneers of electric mobility: Lessons about transport decarbonisation from two bay areas," Journal of Cleaner Production, November 2021. DOI: https://doi.org/10.1016/j.jclepro.2021.129866

Mollie Cohen D'Agostino, Jerel Francisco, Susan A. Shaheen, and Daniel Sperling. California Automated Vehicle Policy Strategies, Issue Paper, Institute of Transportation Studies and Policy Institute, August 2021.

Austin L. Brown, Daniel Sperling, Bernadette Austin, JR DeShazo, Lew Fulton, Timothy Lipman, Colin Murphy, Jean Daniel Saphores, Gil Tal, Carolyn Abrams, Daniel Coffee, Sina Dabag, Mark A Delucchi, Kelly L. Fleming, Kate Forest, Juan Carlos Garcia Sanchez, Susan Handy, Michael Hyland, Alan Jenn, Seth Karten, Blake Lane, Michael Mackinnon, Elliot Martin, Marshall Miller, Monica Ramirez-Ibarra, Stephen Ritchie, Sara Schremmer, Joshua Segui, Susan Shaheen, Andre Tok, Aditya Voleti, Julie Witcover, Allison Yang, Driving California's Transportation Emissions to Zero, University of California Institute of Transportation Studies, UC-ITS-2020-65, February 2021, 444 pp.

D Sperling, Lew Fulton, and Vicki Arroyo, "Accelerating Deep Decarbonization in the U.S. Transportation Sector", pp 216-241, in America's Zero-Carbon Action Plan (ZCAP): Roadmap to Achieving Net Zero Emissions by 2050, SDSN USA, October 2020, pp. 216-241.

Evaldo Costa, Ana Horta, Augusta Correia, Julia Seixas, Gustavo Costa & Daniel Sperling (2020). "Diffusion of electric vehicles in Brazil from the stakeholders' perspective," International Journal of Sustainable Transportation.

Scott Hardman and D. Sperling, "The Need for Sustainable and Persistent Incentives for Electric Vehicles," Oxford Energy Forum, July 2020, Issue 122, pp. 3-6.

Stephen Polzin and D. Sperling, "Positioning Transit for the 21st Century," Transfers, Fall 2019, 1-6

Matthew Barth and D. Sperling, "Environmentally Sustainable Transportation," Chapter 14 in Ramanathan, Veerabhadran, et al., Bending the Curve: Climate Change Solutions (2019)

D. Sperling, Austin Brown, "How Lyft and Uber Can Fix — Not Cause — Congestion," Transfers, UCLA, Spring 2019, 4 pp.

Austin Brown, Hannah Safford, D. Sperling, "Historical perspectives on managing automation and other disruptions in transportation," Chapter 1 in Empowering the New Mobility Workforce, Tyler Reeb (ed.), Elsevier, 2019.

D. Sperling, The three revolutions: our best hope for a sustainable transportation future? Mobility Magazine, Q1, Automotive World, 2019, pp. 56-59.

D. Sperling, Austin Brown, and Mollie D'Agostino, "Can Ride-Hailing Improve Public Transportation Instead of Undercutting It? Scientific American, July 2018.

D. Sperling and Austin Brown, "Three Revolutions in Transportation," EM Magazine, A&WMA, July 2018.

Yizheng Wu and Daniel Sperling, Using On-Board Diagnostic and Global Positioning System to Price Emissions from On-Road Heavy-Duty Vehicles, Journal of Transportation Engineering, Part A: Systems, 2018, 144(8): 04018041

Steven J. Davis, Nathan S. Lewis, Matthew Shaner, Sonia Aggarwal, Doug Arent, Inês L. Azevedo, Sally M. Benson, Thomas Bradley, Jack Brouwer, Yet-Ming Chiang, Christopher T. M. Clack, Armond Cohen, Stephen Doig, Jae Edmonds, Paul Fennell, Christopher B. Field, Bryan Hannegan, Bri Mathias Hodge, Martin I. Hoffert, Eric Ingersoll, Paulina Jaramillo, Klaus S. Lackner, Katharine J. Mach, Michael Mastrandrea, Joan Ogden, Per F. Peterson, Daniel L. Sanchez, Daniel Sperling, Joseph Stagner, Jessika E. Trancik, Chi-Jen Yang, and Ken Caldeira, Providing energy services without net addition of carbon dioxide to the atmosphere, Science, 360, 1419 (2018) 29 June 2018.

D. Sperling, Electric vehicles: Approaching the tipping point, Bulletin of the Atomic Scientists, 74:1, 11-18, 2018

Yunshi Wang, D Sperling, Gil Tal, Haifeng Fang, "China's electric car surge," Energy Policy 102 (2017) 486–490.

Kammen, Daniel, Doug Rotman, Magali Delmas, David Feldman, Mike Mielke‖, Ramamoorthy Ramesh and Daniel Sperling (2017). Chapter 6. Scaling Up Solutions to State, National and Global Levels, in Bending the Curve: Ten Scalable Solutions for Carbon Neutrality and Climate Stability. Collabra 2 (1), 20, pp. 1–11.

Sonia Yeh, Julie Witcover, Gabriel E. Lade, Daniel Sperling, "A review of low carbon fuel policies: Principles, program status and future directions," Energy Policy, 97 (2016) 220–234.

Jeff Kessler and D. Sperling, "Tracking U.S. biofuel innovation through patents," Energy Policy, 98 (2016) 97–107.

Zheng Wan, Jihong Chen, Abdel El Makhloufi, Daniel Sperling, Yang Chen, "Four routes to better maritime governance," Nature 540, 27–29, 2016.

Zheng Wan, Mo Zhu, Shun Chen, and D. Sperling, "Three steps to a green shipping industry," 18 February 2016, Vol 530, Nature, 275-277

Noel Melton, Jonn Axsen, and D. Sperling, "Moving beyond alternative fuel hype to decarbonize transportation," *Nature Energy*, February 22, 2016

Ogden, Joan M., Lewis Fulton, Daniel Sperling (2016) Making the Transition to Light-duty Electric-drive Vehicles in the U.S.: Costs in Perspective to 2035. Institute of Transportation Studies, University of California, Davis, Research Report UCD-ITS-RR-16-21.

Zheng Wan, D. Sperling, and Yunshi Wang, "China's Electric Car Frustrations, *Transportation Research Part D*, 34 (2015) 116–121.

D. Sperling and Anthony Eggert, "California's climate and energy policy for transportation," *Energy Strategy Reviews* 5 (2014) 88-94.

J.H. Wesseling, J.C.M. Farla, D. Sperling, M.P. Hekkert, "Car manufacturers' changing political strategies on the ZEV mandate," *Transportation Research Part D* 33 (2014) 196–209.

Sims R., R. Schaeffer, F. Creutzig, X. Cruz-Núñez, M. D'Agosto, D. Dimitriu, M. J. Figueroa Meza, L. Fulton, S. Kobayashi, O. Lah, A. McKinnon, P. Newman, M. Ouyang, J. J. Schauer, D. Sperling, and G. Tiwari, "Transport," Chapter 8 in Edenhofer, O., R. Pichs-Madruga, Y. Sokona, E. Farahani, S. Kadner, K. Seyboth, A. Adler, I. Baum, S. Brunner, P. Eickemeier, B. Kriemann, J. Savolainen, S. Schlömer, C. von Stechow, T. Zwickel and J. C. Minx (eds.), *Climate Change 2014: Mitigation of Climate Change*. (Working Group III contribution to the Fifth Assessment Report of the Intergovernmental Panel on Climate Change). Cambridge University Press, Cambridge, United Kingdom and New York, NY, USA.

Delucchi, Mark A., Christopher Yang, Andrew F. Burke, Joan M. Ogden, Kenneth S. Kurani, Jeff Kessler, Daniel Sperling, "An Assessment of Electric Vehicles: Technology, Infrastructure Requirements, Greenhouse-Gas Emissions, Petroleum Use, Material Use, Lifetime Cost, Consumer Acceptance, and Policy Initiatives." *Philosophical Transactions of the Royal Society A* 372. 20120325. 2014

Cahill, E.C., Taylor, B., Sperling, D. (2013). "Low-Mass Urban Microcars for the Emerging Vehicle Markets of Megacities," *Transportation Research Record*, No. 2394, Washington, DC, pp. 30–37.

Zheng Wan, Xuefeng Wang, Daniel Sperling, "Policy and politics behind the public transportation systems of China's medium-sized cities: Evidence from the Huizhou reform," *Utilities Policy*, 27 (2013) 1-8

Sonia Yeh and D. Sperling (editors), Low Carbon Fuel Standards, Special Issue, *Energy Policy,* Vol 56, May 2013, xx pp.

Sonia Yeh and Dan Sperling, "Low carbon fuel policy and analysis," *Energy Policy,* Vol 56, May 2013, pp 1–4.

Julie Witcover, Sonia Yeh, and D. Sperling, "Policy Options to Address Global Land Use Change from Biofuels," *Energy Policy*, Vol 56, pp. 63-74, 2013

Deborah Gordon, D. Sperling, and David Livingston, *Policy Priorities for Advancing the U.S. Electric Vehicle Market*, Carnegie Endowment for International Peace, Carnegie Papers, September 2012

Cindy Burbank, Joyce Wenger, D. Sperling, Climate Change and Transportation: Summary of Key Information, Transportation Research Circular, E-C164, Transportation Research Board (National Academies), July 2012, 9 pp.

Yeh, Sonia, Daniel Sperling, Miroslav Batka, Michael Griffin, David R. Heres, Haixiao Hung, Madhu Khanna, Mathew Kocoloski, Paul Leiby, Gouri Shanker Mishra, Siwa Msang, Kimberly Mullins, Hayri Onal, Nathan Parker, James Rhodes, Jonathan Rubin, Aranya Venkatesh, Julie Witcover, and Christopher Yang. 2012. National Low Carbon Fuel Standard: Technical Analysis Report. Institute of Transportation Studies, University of California, Davis, Research Report UCD-ITS-RR-12-11. http://ssrn.com/abstract=2102817

Yeh, Sonia, Daniel Sperling, M. Griffin, Madhu Khanna, Paul Leiby, Siwa Msangi, James Rhodes, and Jonathan Rubin. 2012. National Low Carbon Fuel Standard: Policy Design Recommendations. Institute of Transportation Studies, University of California, Davis, Research Report UCD-ITS-RR-12-10. http://ssrn.com/abstract=2105897

Nicholas Lutsey and D. Sperling, "Regulatory Adaptation: Accommodating Electric Vehicles in a Petroleum World," *Energy Policy.* Volume 45, June 2012, pp 308-316.

D. Sperling and Mary Nichols. "Cooling the Sky: Creating Climate Policy in California," *Boom: A Journal of California,* Vol. 2, Number 1 (Spring 2012), pp 17–32.

D. Sperling and Mary Nichols, "California's Pioneering Transportation Strategy," *Issues in Science and Technology,* Winter 2012, pp. 59-66.

Chris Yang, J. Ogden, D. Sperling, and R. Hwang (2011) Transportation energy use in California (December) A California's Energy Future Report. California Council on Science and Technology.

Deborah Gordon and Daniel Sperling, "Critical Crossroad: Advancing Global Opportunities to Transform Transportation," *European Financial Review* October- November 2011, 71-75.

D. Sperling and Sonia Yeh, "Toward a Universal Low Carbon Fuel Standard", Chapter 11 in Joan Ogden and Lorraine Anderson (eds), *Sustainable Transportation Energy Pathways*, University of California, Davis, 2011, pp. 251-262.

Richard T. T. Forman and Daniel Sperling, "The Future of Roads: No Driving, No Emissions, Nature Reconnected," *Solutions*, September-October 2011, pp 10-23. Reprinted in Robert Costanza and Ida Kubiszewski (Editors), E*nvisioning a Sustainable and Desirable Future.* World Scientific (Singapore), 2014.

Yunshi Wang, Jacob Teter, and D. Sperling, "China's soaring vehicle population: even greater than forecasted?" *Energy Policy* 39:3296-3306, 2011. Published in abridged form as Yunshi Wang, Jacob Teter, and D. Sperling, "Will China's vehicle population grow even faster than forecasted?" Access, Fall 2012, Issue 41

Sonia Yeh and D. Sperling, "Low Carbon Fuel Standards: Implementation Scenarios and Challenges," *Energy Policy*, 38:11, 2010, pp 6955-6965.

D. Sperling, "Policies to Promote Low-Carbon Transportation Fuels: What Works? *TR News* (Transportation Research Board), May-June 2010, pp. 29-31.

D. Sperling. "Evolution of the Motor Car", Book review in *Nature* **464**, 163 (11 March 2010): *Reinventing the Automobile: Personal Urban Mobility for the 21st Century*, by William J. Mitchell, Christopher Borroni-Bird and Lawrence D. Burns. MIT Press: 2010. 240 pp.

Deborah Salon, D. Sperling, Alan Meier, Sinnott Murphy, Roger Gorham, and James Barrett, City carbon budgets: A proposal to align incentives for climate-friendly communities *Energy Policy*, 38:4, 2010, pp. 2032 – 2041.

Ni, Meng-Cheng (Jason), Kenneth S. Kurani, Daniel Sperling (2010) Motorization in China: Case Study of Shanghai. *Transportation Research Record: Journal of the Transportation Research Board* 2193, 68 – 75.

D. Sperling and Sonia Yeh, "Toward a Global Low Carbon Fuel Standard," *Transport Policy,* 17 (2010) 47–49.

D. Sperling and Yunshi Wang, "Sustainable Transport," pp. 158-163, in Belle Wei, Mike Zhang, Ni Weidou, Dongming Ren (eds), *US-China Cooperation: 2008 US-China Energy Conference Highlights*, 2009, Published in China, ISBN: 978-7-302-20869-3,

D. Sperling and Sonia Yeh, "Transforming the Oil Industry into the Energy Industry," *Access* (University of California Transportation Center), No. 34, Spring 2009, pp. 20-28.

D. Sperling and Nic Lutsey, "Energy Efficiency in Passenger Transportation," *The Bridge: Linking Engineering and Society* (National Academy of Engineering), Summer 2009, 39:2, pp. 22-30.

D. Sperling and Sonia Yeh, "Low Carbon Fuel Standard," *Issues in Science and Technology*, Winter 2009, pp. 57-66.

Nic Lutsey and D. Sperling, "Greenhouse gas mitigation supply curve for the United States for transport versus other sectors," *Transportation Research Part D (Environment)* 14:3, 2009, pp.222-229.

Ni Weidou, Bai Quan, and D. Sperling, "Prospects for Vehicle-used Alternative Fuels in China," Chapter 5, pp. 256-289 in *Sustainable Urban Transportation: Context, Challenges, and Solutions*, China Communications Press, 2008 (English and Chinese).

Guihua Wang, Joan M. Ogden, and Daniel Sperling, "Comparing air quality impacts of hydrogen and gasoline," *Transportation Research* Part D 13 (2008) 436–448.

Sperling, D and Deborah Gordon, "*Advanced Passenger Transport Technologies*," *Annual Review of Environment and Resources*. 2008. 33:63–84 .

Collantes, Gustavo and D. Sperling, "The Origin of California's Zero Emission Vehicle Mandate," *Transportation Research* A 42 (2008) 1302–1313.

Jonathan Weinert, Joan Ogden, A.F. Burke, and D. Sperling, "The Future of Electric Two-wheelers and Electric Vehicles in China," *Energy Policy* (2008) 36: 7, 2544-2555.

Salon, Deborah, Daniel Sperling, Alan Meier, Sinnott Murphy, Roger Gorham, James Barrett. City carbon budgets: Aligning incentives for climate-friendly communities . Institute of Transportation Studies, University of California, Davis, Research Report UCD-ITS-RR-08-17 (2008).

Lutsey, Nic and D. Sperling, "America's Bottom-Up Climate Change Mitigation Policy," *Energy Policy*, 36: 673-685 (2008).

Hughes, Jonathan, Chris Knittel, and D. Sperling, "Evidence of a Shift in the Short-Run Price Elasticity of Gasoline Demand," *Energy Journal*, 29:1, 113-134 (2008).

Lutsey, Nic and D. Sperling, "Transportation and Greenhouse Gas Mitigation," in *Climate Action*, United Nations Environmental Program, pp. 191-194 (2007).
http://www.climateactionprogramme.org/features/article/transportation_and_greenhouse_gas_mitigation

Kahn Ribeiro, S., S. Kobayashi, M. Beuthe, J. Gasca, D. Greene, D. S. Lee, Y. Muromachi, P. J. Newton, S. Plotkin, D. Sperling, R. Wit, P. J. Zhou, 2007. "Transport and Its Infrastructure." In *Climate Change 2007: Mitigation. Contribution of Working Group III to the Fourth Assessment Report of the Intergovernmental Panel on Climate Change*, Cambridge University Press, Cambridge, United Kingdom and New York, NY, USA.

Lutsey, Nic and D. Sperling. "Canada's Voluntary Agreement on Vehicle Greenhouse Gas Emissions: When the Details Matter." *Transportation Research Part D* 12: 474-487, 2007.

Farrell, Alex, D. Sperling, and others. A Low-Carbon Fuel Standard for California, Part 2: Policy Analysis. Institute of Transportation Studies, University of California, Davis, Research Report UCD-ITS-RR-07-08, 2007.

Farrell, Alex, D. Sperling, and others. A Low-Carbon Fuel Standard for California, Part 1: Technical Analysis. Institute of Transportation Studies, University of California, Davis, Research Report UCD-ITS-RR-07-07, 2007.

Sperling, D., "Beyond ITS and the Transportation Monoculture," *Access* (University of California Transportation Center), Special Issue, Winter 2006-2007, pp. 35-37.

Sperling, D., review of *Beyond Oil and Gas: The Methanol Economy*, by George A. Olah, Alain Goeppert, G.K. Surya Prakash (Wiley-VCH, 2005), in *Energy Journal*, 28(1) 2007:178-179.

McCarthy, Ryan, Joan Ogden, and D. Sperling, "Assessing Reliability in Energy Supply Systems," *Energy Policy,* 35 (2007) 2151–2162

Sperling, D., "Asilomar Declaration on Climate Policy," *Access* (University of California Transportation Center), Fall 2006, pp.11-21.

Lin, Zhenhong; Ogden, Joan; Fan, Yueyue; Sperling, Dan. "The Hydrogen Infrastructure Transition (HIT) Model and Its Application in Optimizing a 50-year Hydrogen Infrastructure for Urban Beijing." Proceedings of the Transportation Research Board Annual Meeting, Washington D.C. February 2006. UCD-ITS-RR-06-05.

Sperling, D. and Joan Ogden, "The Bumpy Road to Hydrogen," *Proceedings, World Hydrogen Energy Conference*, Lyon, France, June 2006.

Lutsey, Nicholas and D. Sperling, "Energy Efficiency, Fuel Economy, and Policy Implications," *Transportation Research Record 1941,* 2005, pp. 8-25.

Lin, Z., J. Ogden, Y. Fan and D. Sperling, "Optimal Dynamic Strategy of Building a Hydrogen Infrastructure in Beijing," Proceedings of the Fourth Asia Pacific Conference on Transportation and the Environment, November 2005.

Ma, J., L. Sun, and D. Sperling, "Societal and Economic Implications in implementing Electronic Road Pricing (ERP) in Shanghai, China," *Proceedings of IEEE Intelligent Transportation System Conference (ITSC)*, 2005

Sperling, D., Zhenhong Lin, and Peter Hamilton, "Rural Vehicles in China: Appropriate Policy for Appropriate Technology," *Transport Policy* Volume 12, Issue 2 , March 2005, Pages 105-119

Sperling, D. and Zhenhong Lin, "Energy and Environmental Impacts of Rural Vehicles in China," In *Urbanization, Energy, and Air Pollution in China: The Challenges Ahead.* National Academies Press, 2004, pp. 95-105.

Sperling, D., "The Price of Regulation," *Access* (University of California Transportation Center), Number 25, Fall 2004, pp. 9-18.

Ogden, Joan, D. Sperling, and Anthony Eggert, "Is there hope for hydrogen," Review of *Hydrogen Hype* by Joseph Romm, *Chemical and Engineering News,* Volume 82, Number 41, pp. 48-49, October 2004.

Nakamura, Hideo et al, *Urban Transport and the Environment: An International Perspective,* Elsevier, 2004 (contributing co-author and lead author of Chapter 3).

Lipman, Timothy, D. Kammen, D. Sperling, and J. Ogden, "An Integrated Hydrogen Strategy for California," Report to the Kirsch Foundation, *ITS-Davis,* RR-ITS-RR-04-43, August 2004.

Chen, Belinda and D. Sperling, *Effect of Emissions Regulation on Vehicle Attributes, Cost, and Price.* Prepared for the California Air Resources Board and the California Environmental Protection Agency, June 2004, Institute of Transportation Studies, University of California, Davis UCD-ITS-RR-04-38.

Chen, Belinda and D. Sperling, *Case Study of Light-Duty Diesel Vehicles in Europe.* Prepared for the California Air Resources Board and the California Environmental Protection Agency, June 2004, Institute of Transportation Studies, University of California, Davis UCD-ITS-RR-04-14.

Sperling, D., David Bunch, Andrew Burke, Ethan Abeles, Belinda Chen, Kenneth Kurani and Thomas Turrentine, *Analysis of Auto Industry and Consumer Response to Regulations and Technological Change, and Customization of Consumer Response Models in Support of AB 1493 Rulemaking.* Prepared for the California Air Resources Board and the California Environmental Protection Agency. June 2004. Institute of Transportation Studies, University of California, Davis UCD-ITS-RR-04-17 http://www.its.ucdavis.edu/publications/2004/UCD-ITS-RR-04-17.pdf

Lutsey, Nicholas, Christie-Joy Brodrick, Daniel Sperling, and Carollyn Oglesby, "Heavy-Duty Truck Idling Characteristics – Results from a Nationwide Truck Survey," *Transportation Research Record 1880*, 2004, pp. 29-38. http://www.its.ucdavis.edu/publications/2004/UCD-ITS-RP-04-38.pdf

Nicholas, Michael A, Susan L. Handy, and Daniel Sperling, "Siting and Network Analysis Methods for Hydrogen Stations Using Geographical Information Systems," *Transportation Research Record 1880*, 2004, pp. 126-134.

Sperling, D. and James Cannon, "Hydrogen Hype and Hope," *Procs., National Hydrogen Association*, 2004.

Sperling, D. and Joan Ogden, "The Hope for Hydrogen," *Issues in Science and Technology*, Spring 2004, pp. 82-86.

Sperling, D. and Eileen Claussen, "Motorization in the Developing World," *Access*, no. 24, Spring 2004, pp. 10-15. Reprinted in Chinese in 发展中国家机动化讨论, *Urban Transportation of China*, Vol.9, No.6 (Nov 2011).

Sperling, D., "Hydrogen for Transportation: Hope or Hype?" *Northeast Sun* (Greenfield, MA), Vol. 22, No. 2, Spring 2004, pp. 4-9.

Sperling, D., "California's Hydrogen Highway: The Case for a Clean Energy Science and Technology Initiative," Testimony, Select Committee on Air and Water Quality, California Assembly, February 2004, Institute of Transportation Studies, University of California, Davis, UCD-ITS-RR-04-03.

Sperling, D., Zhenhong Lin, and Peter Hamilton, *Rural Vehicles in China: An Exploratory Analysis of Technology, Economics, Industrial Organization, Energy Use, Emissions, and Policy.* Institute of Transportation Studies, University of California, Davis, UCD-ITS-RR-04-01, 2004.

Shaheen, Susan, John Wright, and D. Sperling, "California's Zero Emission Vehicles Mandate — Linking Clean Fuel Cars, Carsharing, and Station Car Strategies," *Transportation Research Record* 1791, pp. 113-120, 2002.

Lutsey, Nic, C.J. Brodrick, D. Sperling, and H. Dwyer, "Markets for Fuel Cell Auxiliary Power Units in Vehicles: A Preliminary Assessment," *Transportation Research Record 1842*, Paper 03-3443, 2003, pp. 118-126.
Sperling, D., "Cleaner Vehicles," in David Hensher and Kenneth Button, (eds), *Handbook of Transport and the Environment*, Elsevier, 2003, Chapter 10, pp. 185-199.

Bose, Ranjan and D. Sperling, "Transport in Delhi, India: Environmental Problems and Opportunities," *Transportation Research Record*, Number 1815, pp. xx, 2003. Also published in modified form in R. Bose, D. Sperling, Geetam Tiwari, Lee Schipper, and Mark Delucchi, *Greenhouse Gas Scenarios for Delhi, India*, Pew Center for Climate Change, Arlington, Virginia, and in Bose and Sperling, "Implications of transport policies on local environment and greenhouse gas scenarios in Delhi," Workshop on Best Policies and Measures, Copenhagen, Denmark, 8-10 October 2001.

Sperling, D. and Eileen Clausen, "The Developing World's Motorization Challenge," *Issues in Science and Technology*, Fall 2002, pp. 59-66.

O'Ryan, Raul, D. Sperling, T. Turrentine, and M.A. Delucchi, *Greenhouse Gas Scenarios for Chile,* Pew Center on Global Climate Change, Arlington, Virginia, 2002.

Sperling, D., and Deborah Salon, *Transportation in Developing Countries: An Overview of Greenhouse Gas Reduction Strategies,* Pew Center for Climate Change, Arlington, Virginia, 2002.

Prozzi, Jolanda, C. Naude, D. Sperling, and M.A. Delucchi, *Greenhouse Gas Scenarios for South Africa*, Pew Center for Climate Change, Arlington, Virginia, 2002. http://www.its.ucdavis.edu/publications/2002/RP-02-10.pdf

Zhou, Hongchang, D. Salon, D. Sperling, and M.A. Delucchi, *Greenhouse Gas Scenarios for Shanghai, China*, Pew Center for Climate Change, Arlington, Virginia, 2001. http://www.its.ucdavis.edu/publications/2001/RP-01-14.pdf Also published in modified form as Appendix B in *Personal Transport in China*, National Academy of Science Press, Washington, DC, 2002, pp. 223-256.

Sperling, D., "Sustainability, Including Climate Change: Causes and Effects," *Procs., Environmental Research Needs in Transportation. Transportation Research Board Conference Proceeding 28, 2002, pp. 221-41*. http://trb.org/publications/conf/reports/cp_28.pdf

Sperling, D., "Updating Automotive Research," *Issues in Science and Technology*, Spring 2002, 85-89. http://www.issues.org/issues/18.3/sperling.html

Sperling, D., "Transitioning from PNGV to FreedomCAR," Written testimony for US Congress, House Science Committee, Washington, DC, 2002 (Congressional Record).

Lipman, Timothy and D. Sperling, "Fuel Cell Commercialization Perspectives – Market Concepts, Competing Technologies, and Cost Challenges for Automotive and Stationary Applications," in Wolf Vielstich, Arnold Lamm, and Hubert A. Gasteiger (eds.), *Handbook of Fuel Cells: Fundamentals, Technology, and Applications*, Wiley, Volume 4, Part 13, Chapter 95, pp 1318–1328, 2003.

Burke, A., E. Abeles; L. Zhou; D. Sperling; C.J. Brodrick. *The Future of Hybrid-Electric ICE Vehicles and Fuels Implications. ITS-Davis. October 2002. Publication* No. UCD-ITS-RR-02-09. http://its.ucdavis.edu/Publications/2002/RR-02-09.pdf

Brodrick, C.J., D. Sperling, and Harry Dwyer, "Clean Diesel: Overcoming Noxious Fumes," *Access,* 2002. (Abridged version published as "Will Diesel Engines Make a Comeback?" *Consumers' Research* 85:1, 18-21, January 2002.)

Brodrick, Christie-Joy, Timothy Lipman, Mohammad Farshchi, Nic Lutsey, Harry A. Dwyer, Daniel Sperling, S. William Gouse, III, D. Bruce Harris, and Foy G. King, Jr, "Evaluation of Fuel Cell Auxiliary Power Units for Heavy-Duty Diesel Trucks*," Transportation Research* D (Environment), 7:4, pp. 303-315, 2002.

Sperling, D., "Public-Private Technology R&D Partnerships: Lessons from U.S. Partnership for a New Generation of Vehicles," *Transport Policy* 8:4, 2001, pp. 247-256.

Quinet, E. and D. Sperling, "Environment Protection," in Hensher, D.A. and Button, K. (eds.) *Handbook of Transport Systems and Traffic Control*, Pergamon Press, Oxford, 2001, pp. 241-254.

Sperling, D., "R&D Partnership for the Next Cars," *Access*, 18: 2-9, Spring 2001.

Zhou, Hongchang, and D. Sperling, "Traffic Emission Pollution Sampling and Analysis on Urban Streets with High-Rise Buildings," *Transportation Research D* (Environment) 6:4, 269-281, 2001.

Sperling, D., Review of *Transportation for Livable Cities* by V.R. Vuchic, *Urban Studies*, vol. 38:1, 2001 (January).

Nesbitt, Kevin, and D. Sperling, "Fleet Purchase Behavior: Decision Processes and Implications for New Vehicle Technologies and Fuels," *Transportation Research* C (Emerging Technologies), Vol 9: 5, 2001, 297-318.

Sperling, D., T. Lipman, and M. Lundberg, "An Electric-Drive Vehicle Strategy for Sweden," *Procs., EVS-17*, Montreal, October 15-18, 2000.

Sperling, D. and T. Lipman, *International Assessment of Electric-Drive Vehicles: Policies, Markets, and Technologies,* KFB, Rapport 2000-30, Stockholm, Sweden, 2000.

Sperling, D., *Energy and Environmental Challenges for the Japanese Automotive Industry,* Institute of Transportation Studies, University of California, Davis, RR-00-5, July 2000.

Lipman, Timothy, and D. Sperling, "Forecasting the Costs of Automotive PEM Fuel Cell Systems Using Bounded Manufacturing Progress Functions," *Proceedings, Experience Curves for Policy Making -- The Case of Energy Technologies*, C.-O. Wene, A. Vob, T. Fried (eds.), IEA/OECD International Workshop, 10-11 May 1999. Published by Universitat Stuttgart, Institut fur Energiewirtshaft und Rationelle Energieanwendung, April 2000.

Sperling, D. and S. Shaheen, "Carsharing: Niche Market or New Pathway?" *Procs., OECD/ECMT Conference on Managing Car Use for Sustainable Urban Travel*, Dublin, Ireland, Dec. 1-2, 1999. (Reprinted by Swedish Transport and Communications Research Board as KFB-Rapport 2000:15.)

Contadini, J. F., D. Sperling and R. M. Moore, "Life-Cycle Emissions of Alternative Fuels for Transportation: Dealing with Uncertainties," *SAE* (2000-01-0597), Dec 1999.

Brodrick, C.J., M. Farsh-chi, H. Dwyer, D. Sperling, et al, "Urea-SCR System Demonstration and Evaluation for Heavy-Duty Diesel Trucks," *SAE* (99C-87), Nov 1999.

Salon, Deborah, D. Sperling, D. Friedman*, California's Partial ZEV Credits and LEV II Program.* Institute of Transportation Studies, University of California, Davis, RR-99-14, August 1999, 17 pp. (update of RR-98-5)

Salon, Deborah, D. Sperling, S. Shaheen, and D. Sturges, *New Mobility: Using Technology and Partnerships to Create More Sustainable Transportation*. Institute of Transportation Studies, University of California, Davis, RR-99-1, March 1999, 19 pp. (abridged version published as "New Millenium White Paper" by TRB Committee on New Technology and Systems).

Shaheen, Susan, D. Sperling, and Conrad Wagner, "Car Sharing and Partnership Management" An International Perspective," *Transportation Research Record*, 1666, 1999, pp. 118-124.

Shaheen, Susan, D. Sperling, and Conrad Wagner, "Car Sharing in Europe and North America: Past and Future," *Transportation Quarterly*, 52:3, 35-52, 1998. (updated summary version published as "A Short History of CarSharing in the '90s, in *The Journal of World Transport Policy and Practice*, 5:3, September 1999, 18-40).

Washington, Simon, John Leonard, Craig Roberts, Troy Young, D Sperling, and Jan Botha, "Forecasting Vehicle Modes of Operation Needed as Input to 'Modal' Emissions Models," *International Journal of Vehicle Design,* Vol. 20, Nos. 1-4, 1998, pp. 351-359.

Sperling, D., "Toward a Neighborhood Vehicle Vision," *Procs., Conference on The Future of Urban Travel*, 11th Entretiens Jacques Cartier, Lyon, France, December 7, 1998.

Nesbitt, Kevin and D. Sperling, "Myths Regarding Alternative Fuel Vehicle Demand by Light-Duty Vehicle Fleets." *Transportation Research* D. Vol 3, No. 4, pp. 259-269, 1998. (Also in abridged form in *Tech Transfer* Spring 1998, p.1+, Berkeley, CA)

D. Sperling, "Hybrid Electric Vehicles," *Oxford Energy Forum*, 33, Oxford Institute for Energy Studies, Oxford, England, May 1998, pp. 18-19.

Shaheen, Susan, D. Sperling, V. Nerenberg. "Smart Car Linking in the San Francisco Bay Area: A Market Evaluation." ITS America Eighth Annual Meeting. May 1998.

Friedman, D., J. Wright, D. Sperling, A. Burke, and R. Moore*, Partial ZEV Credits: An Analysis of CARB's LEV II Proposal to Allow Non-ZEVs to Earn Credit Toward the 10% ZEV Requirement of 2003.* Institute of Transportation Studies, University of California, Davis, RR-98-5, April 1998, 30 pp.

Sperling, D. "Forecasting Vehicle and Fuel Technologies to 2020," Appendix E *in The Future Highway Transportation System and Society: Suggested Research on Impacts and Interactions*, National Research Council, National Academy Press, Washington DC. 1997. pp. 150-163.

Sperling, D., "A New Agenda." *Access*. No. 11, Fall 1997, pp. 2-9.

Lipman, Timothy E., and D. Sperling, "Forecasting Electric Vehicle Costs with Experience Curves," *Transportation Research Record,* 1997. (Abridged version in *Procs., 13th International Electric Vehicle Symposium*. October 13-16, 1996, Japan, pp. 477-483.)

Sperling, D., "Rethinking the Car of the Future," *Issues in Science and Technology*, Winter 1996-97, pp. 29-34, National Academy of Sciences.

Young, Troy, S. Washington, J.L. Botha, and D. Sperling, "Modal Activity Under Varying Traffic Conditions on California Freeways: Experimental Design and Data Collection Procedures*." Procs., TRB Transportation and Air Quality Committee Summer Conference*, Irvine, CA, 10-12 July 1996.

Sperling, Daniel, "The Case for Electric Vehicles," *Scientific American*, November 1996, pp. 54-59. Reprinted in Collected Readings in Science (Hunt Publishing Co.) and Taking Sides: Clashing Views on Controversial Environmental Issues (McGraw-Hill).

Sperling, Daniel. "Prospects for Electric Vehicles," *TIDE* (TERI Information Digest on Energy). Vol. VI, No. 2., June 1996, pp. 87-95.

Sperling, Daniel, "Rethinking PNGV," Testimony to US House of Representatives, House Science Committee, Subcommittee on Energy and Environment, Washington, DC, July 30, 1996. Congressional Record.

Kurani, Kenneth. T. Turrentine and D. Sperling, "Testing Electric Vehicle Demand in 'Hybrid Households' Using a Reflexive Survey," *Transportation Research* D. Vol 1, No. 2, 1996.

Sperling, Daniel, "Grounding the Electric Vehicle Debate," *TR News* 183, March-April 1996, p.21.

Kurani, Kenneth, D. Sperling, T. Lipman, D. Stanger, T. Turrentine and A. Stein*, Household Markets for Neighborhood Electric Vehicles in California*, Institute of Transportation Studies, University of California, Davis, RR-95-6, May 1995, 200 pp.

Turrentine, Thomas, K. Kurani and D. Sperling, *The Household Market for Electric Vehicles: Testing the Hybrid Household Hypothesis -- A Reflexively Designed Survey of New-car-buying, Multi-Vehicle California Households*, Institute of Transportation Studies, University of California, Davis, RR-95-5, May 1995, 165 pp.

Sperling, Daniel, and M. Replogle. "Intelligent and Environmentally-Sensitive Transportation System: An Alternative Vision," *National Conference on Intelligent Transportation Systems and the Environment: Conference Proceedings*, *June 1994.* Summer 1995.

Sperling, Daniel. "Towards Electric Vehicles," *Chemistry & Industry*, No. 15, August 1995.

Sperling, Daniel. "Bringing Electric Cars to Market," *Access*, 6:12-17, Spring 1995.

Sperling, Daniel. "Gearing Up for Electric Cars," *Issues in Science and Technology,* Vol No. X1, Number 2, Winter 1994-95, National Academy of Sciences.

Sperling, Daniel. "Prospects for Neighborhood Vehicles," *Transportation Research Record* 1444:16-22, 1994.

Lipman, Timothy, K. Kurani and D. Sperling. "Regulatory Impediments to Neighborhood Electric Vehicles: Safety Standards and Zero-Emission Vehicle Rules," *Transportation Research Record* 1444:10-15, 1994.

Stein, Aram, K. Kurani and D. Sperling. "Roadway Infrastructure for Low Speed, Mini-Vehicles: Processes and Design Concepts," *Transportation Research Record* 1444:23-27, 1994.

Hsu, Shi-Ling and D. Sperling. "Uncertain Air Quality Impacts of Automobile Retirement Programs," *Transportation Research Record* 1444:90-98, 1994.

Sperling, Daniel, W. Setiawan and D. Hungerford. "The Target Market for Methanol Fuel," *Transportation Research -A,* Vol. 29A, No. 1, 33-45, 1994.

Kurani, Kenneth, T. Turrentine and D. Sperling. "Demand for Electric Vehicles in Hybrid Households: An Exploratory Analysis," *Transport Policy*, Vol. 1, Number 4, 244-256, October 1994.

Sperling, Daniel. "On the Cusp of a Technological Revolution," *Transport Policy*, Vol. 1, Number 4, 211-212, October 1994.

Lipman, Timothy, K. Kurani and D. Sperling. "Incentive Policies for Neighborhood Electric Vehicles," University of California, Davis, Institute of Transportation Studies, Research Report 94-20, August 1994.

Washington, Simon, R. Guensler and D. Sperling. "Modeling IVHS Emission Impacts, Volume II: Assessment of the CALINE4 Line Source Dispersion Model," University of California, Davis, Institute of Transportation Studies, Research Report 94-18, August 1994.

Washington, Simon, R. Guensler and D. Sperling. "Modeling IVHS Emission Impacts, Volume I: Background Issues and Modeling Capabilities," University of California, Davis, Institute of Transportation Studies, Research Report 94-17, August 1994.

Sperling, Daniel and A. Burke. "Hybrid Electric Vehicles: Always Second Best?" Electric Power Research Institute, EPRI TR-104156, July 1994.

Guensler, Randall and D. Sperling. "Congestion Pricing and Motor Vehicle Emissions: An Initial Review," In *Curbing Gridlock: Peak-Period Fees to Relieve Traffic Congestion,* TRB Special Report Vol. 2, pp. 356-379, National Academy Press, Washington D.C., 1994.

Sperling, Daniel. "Electric Cars and the Future," *ITS Review* 17:3:1-3 and 8, May 1994.

Bonanno, Nirupa, D. Sperling and K. Kurani. "Consumer Demand for Automated Private Travel: Extrapolations from Vanpool User Experiences," University of California, Davis, Institute of Transportation Studies, Research Report 93-22, November 1993.

Setiawan, Winardi and D. Sperling. "Premium Gasoline Overbuying in the U.S: Consumer-Based Choice Analysis," University of California, Davis, Institute of Transportation Studies, Research Report 93-25, October 1993.

Washington, Simon, R. Guensler and D. Sperling. "Assessing the Emission Impacts of IVHS in an Uncertain Future," *Proceedings, World Car 2001 Conference,* pp. 403-414, Riverside CA, June 1993.

Wang, Quanlu, C. Kling and D. Sperling. "Light-Duty Vehicle Exhaust Emission Control Cost Estimates Using a Part-Pricing Approach," *Journal of Air and Waste Management,* 43:1461-1471, 1993.

Kling, Catherine, Q. Wang and D. Sperling. "Marketable Permits for Mobile Source Emissions," University of California, Davis, Institute of Transportation Studies, Research Report 93-13 July 1993.

Guensler, Randall, S. Washington and D. Sperling. "A Weighted Disaggregate Approach to Modeling Speed Correction Factors," University of California, Davis, Institute of Transportation Studies, Research Report 93-6, April 1993.

Guensler, Randall, D. Sperling and S. Washington. "IVHS Technologies and Motor Vehicle Emissions," *Proceedings, IVHS America Third Annual Meeting*, Washington D.C., April 1993.

Sperling, Daniel. "Marketable Credits for Vehicle Emissions in California," *Proceedings, Toward Clean and Fuel-Efficient Automobiles*, OECD/IEA, Paris, France, pp. 193-205, 1993.

Sperling, Daniel and M. Delucchi. "Alternative Transportation Energy," pp. 85-141. In Richard J. Gilbert, ed. *The Environment of Oil,* Kluwer Academic Publishers, Boston/ Dordrecht/London, 1993.

Wang, Quanlu, D. Sperling and J. Olmstead. "Emission Control Cost-Effectiveness of Alternative-Fuel Vehicles," *Alternative Fuels: Alcohols, Hydrogen, Natural Gas and Propane,* SAE SP-982, pp. 91-122, 1993.

Wang, Quanlu, C. Kling and D. Sperling. "Emission Control Cost-Effectiveness of Alternative-fuel Vehicles," *Fuel Reformulation* 4:3:52-58, May/June 1994.

Gifford, Jonathan, T. Horan and D. Sperling, eds. *Transportation, Information Technology and Public Policy: Institutional and Environmental Issues in IVHS*, George Mason University and University of California, Davis, 1992.

Sperling, Daniel, L. Schipper, M. Delucchi and Q. Wang. "Environmentally Benign Automobiles," *Access*, 1:21-25, Fall 1992, University of California Transportation Center, Berkeley, California, 1992.

Guensler, Randall and D. Sperling. "A Transportation Control Measure Taxonomy and Review of Recent TCM Effectiveness Studies," University of California, Davis, Institute of Transportation Studies, Research Report 92-17, October 1992.

Gifford, Jonathan, T. Horan and D. Sperling. "IVHS/RTI Institutional & Environmental Issues: A Policy Research & Outreach Agenda for the United States," *Proceedings, 3rd International Conference on Vehicle Navigation and Information Systems,* Oslo, Norway, September 24, 1992.

Kling, Catherine, Q. Wang and D. Sperling. "Economic Incentives to Introduce Electric and Natural Gas Vehicles and Reduce Mobile Source Emissions," University of California, Davis, Institute of Transportation Studies, Research Report 92-6, June 1992.

Wang, Quanlu and D. Sperling. "Energy Impacts of Using Electric Vehicles in Southern California," University of California, Davis, Institute of Transportation Studies, Research Report 92-13, May 1992.

Sperling, Daniel, R. Guensler, D. Page and S. Washington. "Air Quality Impacts of IVHS: An Initial Review." In Gifford, Jonathan, T. Horan and D. Sperling, eds. *Transportation, Information Technology and Public Policy: Institutional and Environmental Issues in IVHS*, George Mason University and University of California, Davis, 1992.

Turrentine, Thomas, D. Sperling and K. Kurani. "Market Potential of Electric and Natural Gas Vehicles," University of California, Davis, Institute of Transportation Studies, Research Report 92-8, April 1992.

Guensler, Randall, D. Sperling and P. Jovanis. "A Research Plan Designed to Reduce Uncertainty in the Emission Inventory for Heavy-Duty Diesel Powered Trucks," University of California, Davis, Institute of Transportation Studies, Research Report 92-1, 1992.

Wang, Quanlu, C. Kling and D. Sperling. "Marketable Credits for Light-Duty Vehicle Emission Control in California," *Proceedings, Air and Waste Management Association*, 92-117.03, June 21-26, 1992.

Turrentine, Thomas and Daniel Sperling. "How Far Can the Electric Vehicle Go on 100 Miles (162Km)?" *Proceedings, Urban Electric Vehicle*s, OECD/IEA, Stockholm, Sweden, May 25-27, 1992.

Turrentine, Thomas, M. Lee-Gosselin, K. Kurani and D. Sperling. "A Study of Adaptive and Optimizing Behavior for Electric Vehicles Based on Interactive Simulation Games and Revealed Behavior of Electric Vehicle Owners," *Proceedings, World Conference on Transport Research*, Lyon, France, May 1992.

Sperling, Daniel. "From Free Riders to Moral Buyers-The Market for Tomorrow's 'Green' Fuels and Vehicles," *Proceedings, Tomorrow's Clean and Fuel Efficient Automobile: Opportunities for East-West Cooperation Conference*, OECD/IEA, Paris, France, 1992.

Sperling, Daniel. "The Future of Motor Vehicles in OECD Countries," *Proceedings, World Motor Conference*, Frankfurt, Germany, Sept 11-12, 1991. Modified version published in Proceedings*, The Urban Electric Vehicle,* Stockholm, Sweden May 25-27, 1992, and *Proceedings, Motor Vehicle of Tomorrow and Environment Protection*, Courmayeur, Italy, January 23-24, 1992.

Sperling, Daniel. "Incentive-Based Transition to Clean Fuels and Vehicles," In *Energy and the Environment in the Twenty-First Century*, 251-264, MIT Press, J. W. Tester, D.O. Wood and N.A. Ferrari, eds., 1991.

Sperling, Daniel, M. Delucchi and Q. Wang. "Toward Alternative Transportation Fuels: A Proposal for Regulatory Reform," California Policy Seminar, University of California, Berkeley, California, 1991.

Turrentine, Thomas, D. Sperling and D. Hungerford. "Consumer Acceptance of Adaptive Cruise Control and Collision Avoidance Systems," *Transportation Research Record* 1318:118-121, 1991.

Johnston, Robert, M. Delucchi, D. Sperling and P. Craig. "Automating Urban Freeways: Policy Research Agenda," *Journal of Transportation Engineering,* ASCE 116:4, 442-460, 1990.

Nesbitt, Kevin, D. Sperling and M. Delucchi. "Initial Assessment of Roadway-Powered Electric Vehicles," *Transportation Research Record* 1267:41-55, 1990.

Sperling, Daniel. "Toward Alternative Fuels," *Issues in Science and Technology,* National Academy of Science, pp. 31-34, 1990.

Sperling, Daniel, D. Hungerford and K. Kurani. "Consumer Demand for Methanol," W.L. Kohl, ed. *Methanol as an Alternative Fuel Choice*, International Energy Program, Johns Hopkins University, Washington D.C., 1990.

Wang, Quanlu, M. Delucchi and D. Sperling. "Emission Impacts of Electric Vehicles," *Journal of Air and Water Management Association* 40:9, 1275-1284, 1990.

Delucchi, Mark, Q. Wang and D. Sperling. "Electric Vehicles: Performance, Life Cycle Costs, Emissions, and Recharging Requirements," *Transportation Research* 23A:3, 255-278, 1989.

Sperling, Daniel, guest editor for issue on Alternative Fuels*, Transportation Research* 23A:3, 1989.

Sperling, Daniel and M. Delucchi. "Is Methanol the Transportation Fuel of the Future?" *Energy-the International Journal,* 14:8, 469-482, 1989.

Sperling, Daniel and M. Delucchi. "Transportation Energy Futures," *Annual Review of Energy* 14, pp. 375-424, 1989.

Delucchi, Mark, R. Johnston and D. Sperling. "Methanol vs. Natural Gas Vehicles: A Comparison of Resource Supply Performance, Fuel Storage, Emissions, Cost, Safety and Transition Issues," SAE Paper #881656, 1988.

Delucchi, Mark, R. Johnston and D. Sperling. "Transportation Fuels and the Greenhouse Effect," *Transportation Research Record* 1175:33-44, 1988.

Greene, David, D. Sperling and B. McNutt. "Transportation Energy to the Year 2020," In *A Look Ahead: Year 2020, Transportation Research Board* Special Report 220, pp. 207-231, 1988.

Johnston, Robert, D. Sperling, P. Craig and J. Lund. "Automating Urban Freeways," *ITS Review* 11:4, University of California, Berkeley, 1988.

Johnston, Robert, D. Sperling, M. Delucchi and S. Tracy. "Politics and Technical Uncertainty in Transportation Investment Analysis," *Transportation Research* 21A:6, 459-475, 1988.

Kurani, Kenneth and D. Sperling. "The Rise and Fall of Diesel Cars: A Consumer Choice Analysis," *Transportation Research Record* 1175, pp. 23-32, 1988.

Sperling, Daniel. "Consumer Demand for Alcohol Fuel Vehicles," *Proceedings, International Symposium for Alcohol Fuels,* 1219-1226, Tokyo, Japan, 1988.

Sperling, Daniel and J. Dill. "Unleaded Gasoline in the United States; A Successful Model of System Innovation," *Transportation Research Record* 1175, pp. 45-52, 1988.

Sperling, Daniel and R. Goralka. "Demand for Intercity Bus by the Rural Elderly," *Transportation Research Record* 1202:106-112, 1988.

Delucchi, Mark, D. Sperling and R. Johnston. "A Comparative Analysis of Future Transportation Fuels," University of California, Institute of Transportation Studies, Berkeley, California, UCB-ITS-RR-87-13, 1987.

Gomes, Luis, and D. Sperling. "Transferring Transportation Planning Technology: Reflections and an Agenda," *Ciencia e Cultra* 39:5/6, 548-550, 1987.

Kitamura, Ryuichi and D. Sperling. "Refueling Behavior of Automobile Drivers," *Transportation Research* 21A3:235-245, 1987.

Sperling, Daniel. "Brazil, Ethanol, and the Process of System Change," *Energy* 12:1, 11-23, 1987.

Sperling, Daniel. "Conference Summary and Agenda for Action: A Transportation Fuels Perspective," *Proceedings, 2nd. Pacific Basin Biofuel Workshop*, Kasuai, Hawaii, 1987.

Sperling, Daniel and K. Kurani. "Refueling and the Vehicle Purchase Decision: The Diesel Car Case," *Society for Automotive Engineers International Congress and Exposition*, Detroit MI, SAE #870644, 1987.

Wang, Quanlu and D. Sperling. "Highway Electrification: An Exploration of Energy Supply Implications," University of California, Institute of Transportation Studies, Berkeley, California, UCB-ITS-PWP-87-4, 1987.

Dingemans, Dennis, D. Sperling and R. Kitamura. "Mental Maps and the Refueling Behavior of Private Vehicle Drivers," *Transportation Research Record* 1092:1-10, 1986.

Sperling, Daniel and R. Kitamura. "Refueling and New Fuels," *Transportation Research* 20A:1, 15-23, 1986. http://www.sciencedirect.com/science/article/B6X3B-466DFMC-1W/2/19ebd3171caf2b870a1e2d0d81deec87

Sperling, Daniel. "An Analytical Framework for Siting and Sizing Biomass Fuel Plants," *Energy* 9:1033-1040, 1985.

Sperling, Daniel. "Testing the Validity of the Hard/Soft Energy Framework: Biomass Fuels for Transportation," *Transportation Research* 19A 3:227-242, 1985.

Sperling, Daniel. "Transportation Technology Strategies for Developing Regions," *ITS Review,* Vol. 8 No. 2, pp. 4,5 and 8, Institute of Transportation Studies, University of California, Berkeley, California, 1985.

Sperling, Daniel. "Assessment of Technological Choices Using a Pathway Methodology," *Transportation Research* 18A4:343-353, 1985.

Sperling, Daniel. "Alcohol Fuels and the Chicken and Egg Syndrome," *Proceedings, Sixth International Symposium on Alcohol Fuel Technology,* 2:393-399, Ottawa, Canada, May 21-25, 1984.

Sperling, Daniel. "Alcohol Fuel Distribution Systems: An Analysis of Cost, Performance, and Scale Factors," Institute of Transportation Studies, University of California, Berkeley, UCB-ITS-WP-83-2, 1983.

Sperling, Daniel. "Introducing Change into Energy and Transportation Systems: The Case of Alcohol Fuels," *Transportation Planning and Technology* 7:153-165, 1983.

Sperling, Daniel. "Distribution Dilemmas in the Introduction of Alcohol Fuels," *Proceedings, Fifth International Symposium on Alcohol Fuel Technology,* pp. 83-390, Auckland, New Zealand, May 13-18, 1982, reprint: Institute of Transportation Studies, University of California, Berkeley, UCB-ITS-WO-82-8, 1982.

Sperling, Daniel, "Alcohol Fuel Pathways: Integrated Technological Systems for Production, Transportation and End Use," Ph.D. Dissertation Series, Institute of Transportation Studies, University of California, Berkeley, UCB-ITS-DS-82-2, 1982.

Sperling, Daniel. "National Methanol Fuel Systems, A Transportation Fuel Pathway," *Transportation Research Record* 870:71-77, 1982.

Sperling, Daniel. "Transportation Fuel Pathways," *Engineering Progress* 8:2:1-3, UC Davis, Spring 1982.

Sperling, Daniel. "Caracas Metro: A Luxury?" *Transportation Research Record* 797:27-31, 1981.

# Exhibit B

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

|  |  |  |
|---|---|---|
| State of Nebraska, et al., | ) | |
| | ) | |
| Petitioners, | ) | |
| | ) | |
| v. | ) | Case No. 24-1129 (consolidated |
| | ) | with Nos. 24-1133, 24-1157) |
| United States Environmental Protection | ) | |
| Agency, et al., | ) | **NOT YET SCHEDULED FOR** |
| | ) | **ORAL ARGUMENT** |
| Respondents. | ) | |
| | ) | |

**MOTION OF FORD MOTOR COMPANY TO INTERVENE IN SUPPORT
OF RESPONDENTS**

Pursuant to Federal Rule of Appellate Procedure 15(d) and D.C. Circuit Rule 15(b), Ford Motor Company ("Ford") moves to intervene in support of respondents in these consolidated cases seeking review of the Environmental Protection Agency (EPA) action titled "Greenhouse Gas Emissions Standards for Heavy-Duty Vehicles—Phase 3," 89 Fed. Reg. 29,440 (April 22, 2024) ("Final Rule").

Ford is a market leader in commercial vehicles, including in classes of heavy-duty vehicles and engines subject to the Final Rule. Ford supports EPA's efforts to regulate greenhouse gases and other emissions from heavy-duty motor vehicles. Ford is committed to reducing emissions in its own fleet and scaling up its production of electric vehicles and hybrids to satisfy growing customer demand

and provide customers with choices in addition to vehicles that use internal combustion engines. Ford is investing billions in electrification efforts and creating jobs, including building new electric vehicle and battery assembly plants in Kentucky, Michigan, and Tennessee, transitioning existing facilities in Missouri and Ohio to produce electric vehicles, and expanding production capacity for hybrid vehicles.

The Final Rule sets standards for reducing greenhouse gas emissions from heavy-duty vehicles for model year ("MY") 2027 to MY 2032, and selling electric and hybrid vehicles is a primary way by which Ford plans to comply. As a company directly regulated by the Final Rule that seeks a stable regulatory landscape for corporate planning, Ford has an obvious and substantial interest in this litigation, including in defending the EPA's authority to establish emissions standards and aspects of the Rule that establish how automakers demonstrate compliance with those standards. The Court should grant intervention.

## BACKGROUND

Section 202(a) of the Clean Air Act requires EPA to establish standards for emissions of pollutants from new motor vehicles that cause or contribute to air pollution that may reasonably be anticipated to endanger public health or welfare. *See* 42 U.S.C. § 7521(a). EPA began regulating greenhouse gas emissions under this authority in 2010. 75 Fed. Reg. 24,324 (May 7, 2010). It subsequently

2

promulgated Phase One and Phase Two rules setting greenhouse gas emissions standards for heavy-duty vehicles in 2011 and 2016; the Phase Two rule established standards for vehicles for model years 2021 through 2027.

The Final Rule that is the subject of the petitions for review establishes emissions standards for greenhouse gas emissions for new heavy-duty vehicles produced in 2027 and subsequent years.

Petitioners in Nos. 24-1129 and 24-1133 take no position on this motion. Petitioners in No. 24-1157 and respondents have not yet provided a position on the motion.

## ARGUMENT

Ford seeks to intervene in support of respondents and will urge the Court to affirm aspects of the Final Rule.  As a company that is directly regulated by the Final Rule and that supports EPA's efforts to reduce emissions, Ford has a substantial interest in this litigation.

### I.    Ford Satisfies the Standards for Intervention as of Right

Federal Rule of Appellate Procedure 15(d) allows a party to intervene in a proceeding to review agency action if a motion for leave to intervene is timely and "contain[s] a concise statement of the interest of the moving party and the grounds for intervention."  Fed. R. App. P. 15(d).  All of the requirements for intervention as of right are satisfied in this case.

A.    This Court has held that "intervention in the court of appeals is governed by the same standards as in the district court." *Mass. Sch. of Law at Andover, Inc. v. United States*, 118 F.3d 776, 779 (D.C. Cir. 1997) (emphasis omitted).  Under Federal Rule of Civil Procedure 24(a), a party has a right to intervene if it "claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest."  Fed. R. Civ. P. 24(a)(2); *see Deutsche Bank Nat'l Trust Co. v. FDIC*, 717 F.3d 189, 192 (D.C. Cir. 2013).  These requirements are satisfied here.  Indeed, because Ford is directly regulated by the Final Rule, it is self-evident that it has the requisite interest in this litigation.

Ford seeks to intervene in these consolidated cases to protect its substantial interests in the emissions regulations that govern production and sale of all heavy-duty vehicles sold in the United States.  Complying with emissions regulations requires lengthy advance planning, and Ford has taken steps to transform its business to ensure compliance with stricter emissions standards.  Ford has a significant interest in securing the regulatory stability that the Final Rule will provide and preventing the possibility of flip-flopping or changing standards.  And Ford has a critical interest in ensuring that a level regulatory playing field applies to the entire industry.

4

Ford's interests are not adequately represented by any other party in this case. This Court has held that adequate representation is not an onerous standard; rather, "a movant ordinarily should be allowed to intervene unless it is clear that [an existing] party will provide adequate representation." *See Crossroads Grassroots Pol'y Strategies v. FEC*, 788 F.3d 312, 321 (D.C. Cir. 2015) (quotation marks omitted). While EPA will defend the Final Rule, it cannot, as a government agency, adequately represent the interests of private, commercial entities. Indeed, this Court "look[s] skeptically on government entities serving as adequate advocates for private parties." *Id.* (citing *Fund for Animals, Inc. v. Norton*, 322 F.3d 728, 736 (D.C. Cir. 2003)). As a manufacturer selling vehicles in the United States and regulated by EPA's emission standards and related compliance provisions, Ford can articulate the impact that the petitioners' challenge, if successful, would have on the auto industry in a manner that EPA cannot. *See Nat. Res. Def. Council v. Costle*, 561 F.2d 904, 912 (D.C. Cir. 1977) (finding regulated parties' interests more "focus[]ed" than the government interest).

Accordingly, this Court has repeatedly allowed manufacturers to intervene in analogous cases, including recently allowing Ford to intervene in litigation challenging EPA's emissions standards for light- and medium-duty vehicles; allowing Ford to intervene in litigation challenging EPA's decision to enable California to regulate greenhouse gas emissions; allowing several manufacturers to

intervene in the litigation challenging EPA's SAFE Rule Part 2; and allowing a group of manufacturers to intervene in the litigation challenging EPA's 2021 federal emissions standards.  *See* Order, *Kentucky v. EPA*, No. 24-1087 (June 4, 2024); Order, *Ohio v. EPA*, No. 22-1081 (June 30, 2022); Order, *Texas v. EPA*, No. 22-1031 (April 20, 2022); Order, *Competitive Enter. Inst., et al. v. NHTSA*, No. 20-1145 (Oct. 19, 2020); *see also* Order, *California v. EPA*, No. 18-1114 (D.C. Cir. Oct. 18, 2018) (granting intervention motion by group of automobile manufacturers in a challenge to federal emissions standards); Order, *California v. EPA*, No. 08-1063 (D.C. Cir. Apr. 3, 2008) (granting intervention motion by various automobile manufacturers in challenge to EPA Clean Air Act § 209(b) waiver decision).

B.    Ford has Article III standing because it has substantial interests that could be adversely affected by this litigation.  Because Ford "satisfies Rule 24(a)," it "also meet[s] Article III's standing requirement."  *Roeder v. Islamic Republic of Iran*, 333 F.3d 228, 233 (D.C. Cir. 2003).  And as noted, because Ford is regulated by the Rule at issue, its standing is "self-evident."  *Fund For Animals*, 322 F.3d at 733-34; *see Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (explaining that "there is ordinarily little question" that person has standing where he "is himself an object of" a challenged governmental regulation).  The Final Rule directly regulates Ford and its competitors, and vacatur of the emissions standards or

6

related compliance provisions in the Rule would undermine Ford's interest in a level playing field. *Crossroads Grassroots Pol'y Strategies*, 788 F.3d at 317 (injury-in-fact exists "where a party benefits from agency action, the action is then challenged in court, and an unfavorable decision would remove the party's benefit"); *see Fund for Animals*, 322 F.3d at 733-34 (same); *Military Toxics Project v. EPA*, 146 F.3d 948, 954 (D.C. Cir. 1998) (same).

C.    The motion to intervene is timely. It has been filed within 30 days of the first petition for review. *See* Fed. R. App. P. 15(d). This motion qualifies as a timely motion to intervene in all previously and subsequently filed cases in this Court also involving challenges to the Final Rule. *See* D.C. Circuit Rule 15(b) ("A motion to intervene in a case before this court concerning direct review of an agency action will be deemed a motion to intervene in all cases before this court involving the same agency action or order, including later filed cases . . . .").

## II.    Alternatively, Ford Has Satisfied the Standards for Permissive Intervention

Although Ford is entitled to intervene as of right, it at minimum satisfies the requirements for permissive intervention under Rule 24(b), which requires only that a proposed intervenor have "a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b)(1)(B). "Rule 24(b) . . . provides basically that anyone may be permitted to intervene if his claim

7

and the main action have a common question of law or fact," *Nuesse v. Camp*, 385 F.2d 694, 704 (D.C. Cir. 1967), absent any indication of prejudice or delay.

The intervention here is timely; Ford seeks to intervene to defend EPA's authority to establish emissions standards and adopt the related compliance provisions of the Final Rule, thus necessarily presenting a defense that shares common questions of law and fact with the main action; and intervention will not prejudice or delay any party.

## CONCLUSION

For the foregoing reasons, the Court should grant the motion to intervene.

Dated: June 12, 2024

Steven Croley
Chief Policy Officer and General Counsel
FORD MOTOR COMPANY
One American Road
Dearborn, MI 48126-2798
(313) 480-8803
scroley@ford.com

Evan Belser
Policy Strategist and Managing Counsel
Office of General Counsel
FORD MOTOR COMPANY
801 Pennsylvania Ave NW, Suite 400
Washington, DC 20004
(202) 997-0217
ebelser1@ford.com

Respectfully submitted,

By: /s/ Elisabeth S. Theodore
Jonathan S. Martel
Elisabeth S. Theodore
Samuel I. Ferenc
ARNOLD & PORTER KAYE SCHOLER
  LLP
601 Massachusetts Ave. NW
Washington, DC 20001-3743
(202) 942-5000
jonathan.martel@arnoldporter.com
elisabeth.theodore@arnoldporter.com
sam.ferenc@arnoldporter.com

*Counsel for Ford Motor Company*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1, the proposed intervenor makes the following disclosures:

Ford Motor Company states that it has no parent corporation.  As of December 31, 2023, no publicly-traded companies have disclosed that they own 10% or more of Ford's common stock.

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rules 27(a)(4) and 28(a)(1)(A), Ford submits this certificate.

Petitioners: Commonwealth of Kentucky; Commonwealth of Virginia; State of Alabama; State of Alaska; State of Arkansas; State of Florida; State of Georgia; State of Idaho; State of Indiana; State of Iowa; State of Kansas; State of Louisiana; State of Mississippi; State of Missouri; State of Montana; State of Nebraska; State of Oklahoma; State of South Carolina; State of South Dakota; State of Tennessee; State of Texas; State of Utah; State of West Virginia; and State of Wyoming (No. 24-1129); Arizona Trucking Association, Warren Petersen, and Ben Toma (No. 24-1133); Western States Trucking Association, Inc. and Construction Industry Air Quality Coalition, Inc. (No. 24-1157).

Respondents: United States Environmental Protection Agency and Michael S. Regan, Administrator of the Environmental Protection Agency.

Proposed Intervenors: Ford Motor Company; the States of California, Arizona, Colorado, Connecticut, Delaware, Hawaii, Illinois, Maine, Maryland, Michigan, Minnesota, New Mexico, New Jersey, New York, North Carolina, Oregon, Rhode Island, Vermont, Washington, and Wisconsin, the Commonwealths of Massachusetts and Pennsylvania, the District of Columbia, the City and County of Denver, and the Cities of Chicago, Los Angeles, and New York; Alliance of Nurses for Healthy Environments, American Lung Association, American Public Health Association, Appalachian Mountain Club, Clean Air Council, Environmental Defense Fund, Environmental Law & Policy Center, Natural Resources Defense Council, Public Citizen, and Sierra Club; Center for Community Action and Environmental Justice, Rio Grande International Study Center.

Amici Curiae: None appear on the Court's dockets.

**Ruling under Review**.  The decision under review is "Greenhouse Gas Emissions Standards for Heavy-Duty Vehicles—Phase 3," 89 Fed. Reg. 29,440 (April 22, 2024).

**Related Cases**.  Movant-intervenor is aware of no related cases other than the ones that this Court has already consolidated.

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g)(1), the undersigned hereby certifies:

1. The foregoing motion complies with the type-volume limitation of Fed. R. App. P. 27(d)(2)(A) because it contains 1,608 words, excluding the parts of the motion exempted by Fed. R. App. P. 32(f). As permitted by Fed. R. App. P. 32(g)(1), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.

2. This foregoing motion complies with the typeface and type style requirements of Fed. R. App. P. 27(a)(5)-(6) because it was prepared in proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Times New Roman font.

/s/ Elisabeth S. Theodore
Elisabeth S. Theodore

**CERTIFICATE OF SERVICE**

I certify that, on June 12, 2024, I caused the foregoing motion to be electronically filed with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit using the CM/ECF system. All participants in the consolidated cases are registered CM/ECF users and will be served by the CM/ECF system.

/s/ Elisabeth S. Theodore
Elisabeth S. Theodore

# EXHIBIT 13

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

| | |
|---|---|
| ELENA VENNER, *et al.*,<br>        *Petitioners*,<br><br>        v.<br><br>UNITED STATES<br>ENVIRONMENTAL PROTECTION<br>AGENCY, *et al.*,<br>        *Respondents*. | Case No. 26-1038<br>Lead Case No. 26-1037<br>(and consolidated cases) |

**DECLARATION OF ANDREW WILSON, PhD
IN SUPPORT OF PETITIONERS' MOTION TO STAY
THE FINAL RULE PENDING REVIEW**

I, Andrew Wilson, hereby declare and if called upon would testify as follows:

1. I am an assistant professor in the Batten School of Leadership & Public Policy at the University of Virginia. My professional training and work focuses on Earth system science and economics. I am offering this testimony in my personal capacity, and I have personal knowledge of the facts stated herein.

2. I am submitting this Declaration in support of Petitioners' Motion to Stay the Endangerment Finding rescission and repeal of vehicle emission standards (the "Repeal Rule") pending review. In this declaration, I describe how the increased

1

emissions from the Repeal Rule warm the climate and increase extreme weather events, harming and killing Americans.

3. My research addresses the health, economic, and social consequences of anthropogenic climate change, using methods from both physical climate science and quantitative social science. I have studied the sensitivity of human health and welfare to environmental conditions, how that sensitivity varies over time and space, and whether and how society is adapting to climate change. My research has been published in prominent peer-reviewed journals including Proceedings of the National Academy of Sciences, the Journal of Public Economics, and the Journal of Human Resources. I have provided peer review for a range of scientific journals and funding agencies, coordinated expert comments on federal regulatory actions, and served on the White House Council of Economic Advisers during my Ph.D. I previously worked as a Postdoctoral Scholar at Stanford University and received my Ph.D. from Columbia University. Additional details can be found in my curriculum vitae, a true and correct copy of which is attached as Exhibit A.

**The globe warms and many classes of harmful weather events grow more frequent and severe as $CO_2$ emissions increase: U.S. vehicle emissions matter**

4. One of the clearest conclusions of the Intergovernmental Panel on Climate Change (IPCC) Sixth Assessment Report (AR6) is that "every ton of $CO_2$ adds to global warming" (IPCC 2023). Over a decade ago, the EPA confirmed its agreement that "every ton matters." 77 Fed. Reg. 22392, 22395 (Apr. 13, 2012). That

is, each additional ton of $CO_2$ emitted from the tailpipes of U.S. automobiles due to the Repeal Rule will increase global temperatures. I show this clear relationship between the emission of $CO_2$ and the change in temperature below in Figure 1, taken from the Sixth Assessment Report of the IPCC (IPCC AR6).



*Figure 1. Cumulative past, projected, and committed emissions, and associated global temperature changes (IPCC 2023).*

5.      The IPCC AR6 also made this statement that reflects the scientific consensus: "with every increment of global warming, regional changes in mean climate and extremes become more widespread and pronounced" (IPCC 2023). Consequently, increased $CO_2$ emitted as an outcome of the Repeal Rule will increase regional warmth and extreme weather, endangering the residents of particular regions to varying extremes. I show this influence in Figure 2 below, which indicates

the change in the probability of the most extreme heat event since 2020 due to the

$CO_2$ emissions from the U.S.



Effect of U.S. emissions on local extreme heat

Change in probability of most extreme heat in the last five years

*Figure 2. Change in probability of the most extreme recent heat event due to emissions from the U.S. alone. Calculated based on the proportionality of extreme heat distributions to cumulative $CO_2$ emissions (Callahan 2026, in prep).*

6.      Placing the lifespans of the petitioner declarants in the context of human-caused climate change to date, all petitioners have been born into and are living in a hotter world than their parents. Since 2003, when the oldest petitioner was born, these youth have experienced the hottest 23-year average and 22 of the 24 individual hottest years in recorded Earth history (NOAA 2026) that extends back at least 2,000 years (the end of annual reconstructed Earth global temperatures)

(Neukom et al. 2019, PAGES 2k Consortium 2019). Since 2010, the year three of the petitioners were born, human-caused greenhouse gas emissions have made the median heatwave 200 times more likely to occur, with one quarter of these heatwaves only possible due to human-caused emissions (Quilcaille et al. 2025). The Repeal Rule certainly did not cause petitioners' past heat or climate harm exposure, but it will undoubtedly cause them more. More pollution will indisputably expose these youth petitioners to more heat than they are already experiencing, and there are harmful consequences to that.

7. Humans exhibit a remarkable ability to adapt to different environments, including to changes in the range of environmental conditions that they face, but these adaptations are not costless and often require tradeoffs between physical health and other forms of well-being. Sometimes these costs are monetary: petitioner mother S.A., for example, mentions that they "purchased a treadmill [to] run at home instead of outside in the heat." Other times, these costs are social or cultural: petitioner mother L.K. describes how "the heat and extreme weather from fossil-fuel driven climate change have become a hurdle for [their] family in observing [their] faith and keeping God's laws" and that, as a result, their "son may never attain full mastery of [Shabbat] prayers, something that could impact both his ability to enjoy the service as well as his ability to transmit this essential knowledge to his future children." Americans will bear hundreds of billions of dollars of costs per year

adapting to changing weather conditions in order to avoid deaths that would otherwise occur (Carleton et al. 2022), which inevitably alters liberties and lives. Petitioners in this case provide a window into some of those costs.

8. The basics of how emissions from ICE vehicles harm the public health and welfare of these Petitioners are straightforward and follow from three well-established scientific facts.

9. First, *warming due to climate change is linear in cumulative emissions*. Put simply, the more $CO_2$ we emit, the more warming we get (Figure 1). This is perhaps the key insight from decades of climate science and was understood more than a century ago and most recently was a core conclusion of the IPCC reports, the U.S. National Climate Assessments, and leading U.S. federal agencies like NOAA, EPA, and the Department of Energy. Each additional ton of $CO_2$ emitted causes more global warming, by about the same amount.

10. Second, *local warming is proportional to global warming*. Or, put more simply, more global warming generates more local warming. Some places will warm faster than others, but the more the planet warms, the more each location on the planet warms. This is not only true for local average temperature, but for local extreme temperature and heavy rainfall as well (Seneviratne et al. 2016).

11. Third, *climate impacts in a particular location are proportional to local warming*. Or again, put simply, more local warming generates more climate impacts.

For most impacts to public health and welfare, there are not important non-linearities or thresholds in the relationship between the magnitude of warming and the magnitude of impact. For nearly all impacts, the more warming you get, the larger the impact. The outcomes that are affected by climate tend to have a straightforward, overall relationship with warming. That being said, children often face larger incremental health harms than adults. Specific evidence from health data is addressed below.

12.     The combination of these three simple facts has clear and profound implications. They tell us that each additional unit of $CO_2$ emitted has about the same effect on warming and, consequently, harms public health and welfare by about the same amount. They tell us that the harm to society from more $CO_2$ emitted from one location does not depend on what is happening with emissions elsewhere, such as in a different country.

13.     The Repeal Rule notes that greenhouse gases do not endanger public health because the authors incorrectly state that these greenhouse gases, of which $CO_2$ is the most important in terms of trapping heat, do not have an influence through local or regional exposure. That is wrong. Emitted greenhouse gases interact with outgoing longwave radiation to cause health damage through warming. The damage is only "indirect", in that the directly emitted chemical does not cause damage without other interactions in the environment, which is true of many pollutants. But

the notion that an indirect action can cause demonstrable harm is common sense and understood by anyone: rolling up the car windows on a hot day can kill a child left inside the car, but no reasonable person would complain that rolling up the windows is too "indirect" to be considered a cause of the harm to the child.

14. At the most basic level of this connection, it is possible to demonstrate the impact that increased $CO_2$ emissions have on the planet by looking at the number of additional deaths caused by those increased emissions. The emission of about 9,350 tons of $CO_2$ will cause the death of one more person on the planet (Bressler 2021).

**Two Trillion Additional Pounds of $CO_2$ if the Repeal Rule is Not Stayed is Substantial**

15. Based on my review of EPA data, I am aware that if the Repeal Rule is not stayed, it will result in the emission of an additional 111.16 million tons of $CO_2$ between 2027 and 2031 (EPA 2024a, 2024b). In preparing this declaration, I reviewed the separate declaration of Dan Sperling and concur with the elements of his analysis of emissions from "locked-in" vehicles. In particular: "the additional carbon dioxide emissions from the Repeal Rule if not stayed will be 942.2 million metric tons." That is almost a gigaton. To put this into perspective, one ton of $CO_2$ at room temperature and sea level pressure occupies a volume about the size of a one-bedroom home; 111 million tons of $CO_2$ occupies about the combined volume of every home in America; 942 million tons of $CO_2$ occupies approximately the

combined volume of every dwelling on our planet. While this is only a fraction of global greenhouse gas emissions, it is by no means trivial or minimal in the common sense meaning of those terms. It has significant impact.

16. The increased cumulative and functionally irreversible emissions of $CO_2$ between 2027 and 2031 brought about if the Repeal Rule is not stayed will result in about 11,900 additional deaths worldwide. The cumulative irreversible $CO_2$ emissions through 2046 from not staying the Repeal Rule today while the litigation proceeds may result in about 100,000 additional deaths that did not have to occur. In the absence of adaptation, even more deaths would occur; instead, people affected by rising temperatures will make costly investments and engage in behavioral changes (e.g., some petitioners have noted modifying religious practices). In my expert opinion, it is also highly likely that substantially more individuals, separate from the death figures above, will face mounting health harms stopping short of death.

17. As explained above, increments of $CO_2$ emissions have a roughly linear impact on warming and on resulting injury to human health. This means that a reduction in U.S. emissions from emissions standards on new vehicles (or any other source) has the same benefit for Americans *no matter what China or India or anyone else does*: the benefit, in terms of reduced damage from climate change, that we get

9

in the U.S. from reducing U.S. emissions is about the same no matter what happens elsewhere.

18.     It is important to evaluate the aggregate impacts of potentially avoided emissions given how long $CO_2$ that is emitted persists in the atmosphere and is thus "locked in." Such aggregate impacts are very large, as discussed below. Furthermore, the additional $CO_2$ emissions accruing from the Repeal Rule just in the near term while the litigation proceeds will eventually reach nearly 1 billion tons (1 gigaton), an amount greater than the total annual fossil fuel emissions of every country on the planet (from all energy sectors, not just transportation) except China, the United States, India, or Russia. It is a substantial amount of pollution that in the absence of prohibitively costly removal will persist in the atmosphere for thousands of years, outlasting petitioners' lives.

19.     Remediating the additional $CO_2$ emitted from the Repeal Rule requires capturing and permanently sequestering one gigaton of $CO_2$; this sequestration tests the limits of available technology, but is technically feasible at some of the world's largest carbon capture facilities, such as Mammoth in Iceland, at a per-ton cost of around $1000.[1] This implies that permanently reversing the $CO_2$ emissions resulting

---

[1] Adrienne Murray, *Is Carbon Capture an Efficient Way to Tackle CO₂?*, BBC (Aug. 5, 2024), https://www.bbc.com/news/articles/clmydee2grno.

from allowing the Repeal Rule to stand pending litigation would cost at least hundreds of billions of dollars.

20. I note that the cumulative emission of 942.2 million tons of $CO_2$ is likely locked-in by not staying the Repeal Rule during the course of litigation. Vacating the Repeal Rule in two years still means these 942.2 million tons of $CO_2$ are going to be emitted. I also note that if the Repeal Rule stays in place permanently, absent alternate countervailing regulation or law, then the total $CO_2$ that will be emitted from America's tailpipes through model year 2055 vehicles may be on the order of 8,810.36 million tons of $CO_2$ (about 8.81 gigatons of $CO_2$). Consequently, the harms I discuss here stem from the emission of 942.2 million tons of $CO_2$, just under one gigaton, but this is only about 11% of the total $CO_2$ emissions that may occur just from vehicles (not including other sources of greenhouse gases) if the Repeal Rule stands in perpetuity.

21. Below is a table synthesizing how climate change impacts health outcomes in the United States from the emissions of one additional gigaton of $CO_2$ ($GtCO_2$). It is key to note that for each of these metrics, this is just a summary of one year of impacts associated with the long-lived $CO_2$ resulting from not staying the Repeal Rule. Because a significant fraction of emitted $CO_2$ remains in the atmosphere for centuries to millennia, these deaths and hospitalizations will continue long after the additional gigaton of $CO_2$ is emitted. The more emissions allowed to

enter the atmosphere by the Repeal Rule will worsen these health effects and increase the risk of these young Petitioners experiencing these health effects. I am not aware of any credible scientific evidence to suggest that the emission of more greenhouse gases will improve the health of Americans in any way.

**Table 1. Synthesis of impacts of climate change on health outcomes in the US.**

| Impact category | How impacts occur | Estimated effect of one gigaton of GHG ($CO_2$-equivalent) emissions in the U.S. | Direction of impact: worsen, improve, or no net change to health | Key citations |
|---|---|---|---|---|
| Temperature-related mortality | Exposure to both cold and hot temperatures increases mortality, relative to mild temperatures | Uncertain net change. Central estimate of -0.002 deaths per 100k per year per GtCO2, but a 17-83 percentile range of -0.007 – 0.002. | **No net change.** Declining cold-related deaths will roughly cancel increasing heat related deaths in aggregate in the US throughout the 21st century | Heutel, Miller, and Molitor, *REStat*, 2021; Carleton et al., *QJE*, 2022; Gasparrini et al., *Lancet Planet. Health*, 2017 |
| Temperature-related hospitalizations and ED visits | Exposure to cold temperatures tends to reduce morbidity; exposure to heat increases it | 24 emergency department visits *in California alone* per year per GtCO2 | **Worsen.** Rising temperatures will increase hospitalizations and emergency department visits. | Gould et al.,, *Science Advances*, 2025 |
| Temperature-related violence | Direct effect of temperature exposure on violence | Increase in homicides and other violent crime per GtCO2 | **Worsen.** Rising temperatures will increase homicides and violent crime. | Ranson, *JEEM*, 2014; Burke et al., *Handbook Econ. Conf*, 2024b |
| Temperature-related mental health impacts | Direct effect of temperature exposure on mental health outcomes | 0.144 suicides per year per GtCO2 | **Worsen.** Rising temperatures will worsen mental-health related emergency department visits and suicides. | Burke et al., *Nature Climate Change*, 2018; Belova et al., *GeoHealth*, 2022 |
| Preterm birth from temperature exposure | High temperatures directly alter oxytocin regulation and increase cardiovascular stress, increasing premature deliveries. | 36 lost gestation days per year per GtCO2 | **Worsen.** Rising temperature will increase the risk of pre-term birth. | Barreca and Schaller, *Nature Climate Change*, 2020 |

12

| | | | | |
|---|---|---|---|---|
| Wildfire smoke-related mortality | A warming climate increases fuel aridity, fueling larger and more severe wildfires that generate more smoke | 13.5 deaths per year per GtCO2 | **Worsen.** Rising temperatures will increase wildfire activity and associated smoke, and this will increase mortality across the US. | Qiu et al., *Nature*, 2025; Ma et al., *PNAS*, 2024 |
| Wildfire smoke-related morbidity | A warming climate increases fuel aridity, fueling larger and more severe wildfires that generate more smoke | Increase in emergency department visits and hospitalizations for respiratory ailments per GtCO2, increase in pre-term births per GtCO2 | **Worsen.** Rising temperatures will increase wildfire activity and associated smoke, and this will increase a range of morbidity outcomes across the US, including emergency department visits and pre-term births. | Heft-Neal et al., *Env Res*, 2022; Heft-Neal et al., *PNAS*, 2023 |
| Dust-related morbidity and mortality | Aridity and increasing climate variability increase dust emission and health impacts | In the U.S. Southwest, 0.25 hospital visits and 0.185 deaths per year per GtCO2 | **No net change or worsen.** Regionally, strong evidence that dust impacts will worsen (U.S. West and SW); may improve in northern Great Plains.<br><br>Strong evidence that dust emissions increase after wildfires. | Achakulwisut et a,, *GeoHealth*, 2019; Yu et al., *Nature Geoscience*, 2022 |
| Ozone-related morbidity and mortality | Higher temperatures directly contribute to ozone formation, which harms health, but also cause greater emissions of volatile organic compounds, which react with nitrogen oxides to form ozone | Increase in mortality per GtCO2 | **Worsen.** Rising temperatures will increase overall ozone formation and ozone-related mortality. | Fann et al., *JAMA Open*, 2021 |
| Non-dust and non-wildfire fine particulate matter- ($PM_{2.5}$-) related mortality | Higher temperatures directly contribute to secondary particulate matter formation | Increase in mortality per GtCO2 | **Worsen.** Rising temperatures will increase overall secondary $PM_{2.5}$ formation, although the magnitude of harms will depend on trends in emission of PM precursors | Fann et al., *JAMA Open*, 2021 |
| Valley Fever- (Coccidioidomycosis-) related morbidity and mortality | Warming temperatures and changes in precipitation cause the area affected by this fungal illness to expand northward, putting more people at risk | Projected 50% increase in Valley Fever cases under a high warming scenario, mostly in the US west. | **Worsen.** A warming climate and increasing precipitation variability will increase the number of cases of valley fever and their associated economic costs. | Gorris et al., *Weather, Climate, and Society*, 2021; Gorris et al., *GeoHealth*, 2019 |

22. The U.S. is not projected to suffer a large, direct, aggregate mortality burden from climate change on account of substantial spending on adaptation—on the order of 1% of all U.S. economic output each year (Carleton et al. 2022). But this aggregate figure obscures the reality that climate change will alter the distribution of temperature-related health risks—away from adults and the elderly, who tend to be more sensitive to cold weather, and toward the young, who face escalating risks at much lower ambient temperatures (Wilson et al. 2024). Petitioner mother A.F., aware of this dynamic, explains how "hot outdoor temperatures, exposure to wildfire smoke, tick-borne diseases, and high-pollen days are especially bad for my baby's present and future health, as compared to an adult, due to her early stage of development." Children are particularly sensitive to heat and air pollution. Climate change resulting from the Repeal Rule will cause young Americans disproportionate harm.

**The Repeal Rule will make wildfire smoke more prevalent and widespread**

23. The predominance of the literature now clearly documents that trends in wildfire burned area and resulting smoke exposure in the U.S. (Figure 3) are rapidly increasing (Abatzoglu and Williams 2016, Burke et al. 2021, Burke et al. 2023), that anthropogenic climate change from the emission of greenhouse gases is a leading cause of this recent growth (Abatzoglu and Williams 2016), and that future climate change caused by continued or increased emissions of greenhouse gases will

14

likely lead to substantial further increases in burned area and resulting smoke (Qiu et al. 2025). The increasing prevalence of wildfire smoke particulate matter since 2006 and through 2020 is shown in Figure 3 below (Childs et al. 2022). Note the much higher particulate matter in more recent years like 2017, 2018 and 2020. As discussed below, exposure to increasing amounts of smoke due to a warming climate is likely one of the largest sources of climate-related health endangerment in the U.S., and thus the more emissions, the more health injuries.



*Figure 3. Daily average PM$_{2.5}$ from smoke by year (Childs et al. 2022).*

24.     The impacts of climate change on wildfire activity—and the resulting changes in smoke exposure and health impacts—are perhaps the area of climate impacts where scientific evidence has expanded most since the Endangerment Finding of 2009, validating that greenhouse gases do endanger public health and welfare. The scientific understanding is straightforward. Wildfire activity is growing rapidly across the U.S. West and much of Canada, with burned area growing at least

15

three-fold over the last 40 years in the U.S. (Burke et al. 2021), and this growth is driven by a warming climate that makes forest fuels (vegetation) more flammable, which works on top of a long-term U.S. policy of fire suppression that has left abundant fuel in the forests. Benchmark studies attribute about half of the increase in wildfire activity to a warming climate (Abatzoglou and Williams 2016) versus other factors, such as forest management practices.

25.     Given this dramatic increase in wildfire activity, a growing literature has sought to quantify what this increase means for smoke exposure and health outcomes across the country. Studies that comprehensively measure smoke exposure across the U.S. similarly find very large increases in smoke exposure over the last two decades (Childs et al. 2022) and find that these increases are rapidly undoing decades of progress in improving air quality in the U.S. (Figure 4) (Burke et al. 2023). I show this in Figure 4 below. Here you can see the average annual observed particulate matter concentration for each state and then what it would be in the absence of fire smoke particulate matter. Twenty-two states have air quality improvements halted by fire smoke particulate matter, five states have their air quality influenced by fire smoke particulates, another five states have their air quality partially reversed by fire smoke particulate matter, and three states have their air quality reversed (to worsening) by fire smoke particulate matter. That is, 35 out

of 48 states are having their air quality at least influenced by fire smoke fine particulate matter.



*Figure 4. The influence of wildfire smoke on recent trends in average PM2.5 is largest in the western states, but extends to the Great Plains, mid-west and parts of the southeast and northeast (Burke et al. 2023).*

26.     A large body of work measures the impacts of these exposures on health outcomes. A recent meta-analysis shows clear and consistent evidence that exposure to wildfire smoke increases all-cause mortality, respiratory hospitalizations, and respiratory ED visits (Gould et al. 2024). Separate studies have found impacts of smoke exposure on pre-term birth (Heft-Neal et al. 2022). Multiple follow-up studies

17

have again shown clear evidence that all-cause mortality increases when individuals are exposed to smoke (Ma et al. 2024, Qiu et al. 2025), and important sources of cause-specific mortality are also affected, *e.g.,* recent findings that exposure to wildfire smoke substantially increases suicide rates in rural America (Molitor et al. 2023).

27.     Using models that relate smoke exposure to changes in climate, recent work highlights the large health burden from climate change-driven increases in wildfire activity and resulting smoke in the U.S. Qiu et al. (2025) estimate that exposure to wildfire smoke is responsible for 40,000 deaths annually in the current climate from fine particulates and could be responsible for 70,000 deaths annually by 2050 if emissions continue as they are today. I emphasize that this approach isolates the impact of climate from the large number of other factors that affect wildfire and smoke, such as forest management practices. This is demonstrated below in Figure 5 that shows the number of additional annual deaths that will occur in the contiguous United States from fire smoke particulates at global warming levels of 1.5 °C to 4 °C, with the color shading at the county level. The Repeal Rule will cause more wildfire smoke related deaths; a stay of the Repeal Rule will reduce the number of wildfire smoke deaths. Petitioner J.K., who lives in New York, describes a time in 2023 when "there was really bad wildfire smoke blowing down from Canada." The Repeal Rule will make such conditions more common.

18



*Figure 5. Projected annual deaths from wildfire smoke PM$_{2.5}$ at the county level for four different global warming levels (Qui et al. 2025).*

28. When monetized using the U.S. Department of Transportation's VSL (value of a statistical life)[2], these mortality damages from wildfire smoke alone represent around $600 billion in annual losses—or, as the study estimates, about twice as large as EPA's Framework for Evaluating Damages and Impacts (FrEDI) estimates of overall damages from climate change by 2050 in the U.S. (which did not include wildfire impacts). Put simply, additional mortality from climate change-

[2] U.S. Department of Transportation, *Departmental Guidance on Valuation of a Statistical Life in Economic Analysis*, last visited May 14, 2026, https://www.transportation.gov/office-policy/transportation-policy/revised-departmental-guidance-on-valuation-of-a-statistical-life-in-economic-analysis. This estimate is similar—and based on—values derived in basic economic research.

driven wildfire smoke alone (not including all the other costs of wildfires, from morbidity effects to structure loss) accounts for half of the total documented harm of climate change to public health and welfare in the U.S.

**Climate change is increasing harmful ozone**

29. Climate change will directly affect the production of ozone. A large body of scientific literature identifies negative short- and long-run health impacts of exposure to ground-level ozone, a criteria air pollutant under the CAA (Clean Air Act), and recent scientific research confirms a warming climate will further increase ground-level concentrations in the future (Fann et al. 2021, Domingo et al. 2024), as higher temperatures are one factor in ozone production and higher temperatures can also increase emission of volatile organic compounds, an ozone precursor. Estimated increases in annual deaths due to ozone increases are around 2000 per year by 2050 if greenhouse gas emissions continue on current trajectories (Domingo et al. 2024)—which included the status quo of EPA's regulation of greenhouse gases, or more than a 50% increase relative to today. The precise magnitude of the increase in ozone, and the resulting health damages, due to climate change will depend on the emission of ozone precursors, but even if these precursors decline substantially, existing scientific evidence suggests that a warming climate is expected to increase ozone-related mortality (Fann et al. 2021).

30. Separately, wildfire is itself a source of volatile organic compounds (ozone precursors). In recent years, wildfire-induced ozone has killed 5–10,000 Americans annually, a figure that has, at times, reached more than half the mortality burden of wildfire particulate matter (Li et al. 2026). Climate change, by making wildfire more likely, will increase ambient concentrations of wildfire-related ozone, further harming human health.

**Summary**

31. Petitioners in this case point to their lived experience of climate change, emphasizing the costs—economic, health, and spiritual—they have borne to adapt to the more frequent and more intense heat and air pollution faced by their families and communities at least in part as a result of anthropogenic climate change. The science linking the increase in $CO_2$ emissions resulting from the Repeal Rule to their increasing injuries is straightforward.

32. The cumulative emission of 942.2 million tons of $CO_2$ that might be emitted if the Repeal Rule is not stayed reflects about 11% of the pollution the Repeal Rule will cause and is functionally irreversible in these youths' lifetime. It will cause substantial amounts of harm across the U.S. and to these youth petitioners.

33. If the youth petitioners do not prevail in their case and the Repeal Rule stays in place permanently, the total $CO_2$ that will be emitted from America's

tailpipes alone through 2055 that did not have to occur may be on the order of 8.8 billion tons of $CO_2$.

34. It is my expert opinion that the amount of pollution that could be avoided by a stay of the Repeal Rule is scientifically significant and meaningful for the health of the American public and also for these young petitioners.

35. Direct costs would be even higher if not for substantial anticipated private costs of countervailing adaptation; such costs represent money lost and spent, freedoms curtailed, and lives adversely altered or lost.

In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on May 19, 2026 in Menlo Park, California.

_Andrew Wilson_

Andrew Wilson

# References

Abatzoglou, J. T., & Williams, A. P. (2016). Impact of anthropogenic climate change on wildfire across western US forests. *PNAS*, *113*(42), 11770-11775.

Bressler, R. D. (2021). The mortality cost of carbon. *Nature communications*, *12*(1), 4467. https://www.nature.com/articles/s41467-021-24487-w

Burke, M., Childs, M. L., de la Cuesta, B., Qiu, M., Li, J., Gould, C. F., ... & Wara, M. (2023). The contribution of wildfire to $PM_{2.5}$ trends in the USA. *Nature*, *622*(7984), 761-766.

Burke, M., Driscoll, A., Heft-Neal, S., Xue, J., Burney, J., & Wara, M. (2021). The changing risk and burden of wildfire in the United States. *Proceedings of the National Academy of Sciences*, *118*(2), e2011048118.

Callahan, C.W. (2026). Extreme Heat and Rainfall Risk Attributed to Cumulative $CO_2$ emission from Countries and Firm. *In Revision Earth's Future*.

Carleton, T., Jina, A., Delgado, M., Greenstone, M., Houser, T., Hsiang, S., ... & Zhang, A. T. (2022). Valuing the global mortality consequences of climate change accounting for adaptation costs and benefits. *The Quarterly Journal of Economics*, *137*(4), 2037-2105.

Childs, M. L., Li, J., Wen, J., Heft-Neal, S., Driscoll, A., Wang, S., ... & Burke, M. (2022). Daily local-level estimates of ambient wildfire smoke $PM_{2.5}$ for the contiguous US. *Environmental Science & Technology*, *56*(19), 13607-13621.

Domingo, N. G., Fiore, A. M., Lamarque, J. F., Kinney, P. L., Jiang, L., Gasparrini, A., ... & Chen, K. (2024). Ozone-related acute excess mortality projected to increase in the absence of climate and air quality controls consistent with the Paris Agreement. *One Earth*, *7*(2), 325-335.

EPA, Multi-Pollutant Emissions Standards for Model Years 2027 and Later Light-Duty and Medium-Duty Vehicles, Regulatory Impact Analysis, Table 8-22 (2024a)

EPA, Greenhouse Gas Emissions Standards for Heavy-Duty Vehicles: Phase 3, Regulatory Impact Analysis, Table 4-19 (2024b).

Fann, N. L., Nolte, C. G., Sarofim, M. C., Martinich, J., & Nassikas, N. J. (2021). Associations between simulated future changes in climate, air quality, and human health. *JAMA Network Open*, *4*(1), e2032064-e2032064.

Gould, C. F., Heft-Neal, S., Johnson, M., Aguilera, J., Burke, M., & Nadeau, K. (2024). Health effects of wildfire smoke exposure. *Annual Review of Medicine*, *75*(1), 277-292.

Heft-Neal, S., Gould, C. F., Childs, M. L., Kiang, M. V., Nadeau, K. C., Duggan, M., ... & Burke, M. (2023). Emergency department visits respond nonlinearly to wildfire smoke. *Proceedings of the National Academy of Sciences*, *120*(39), e2302409120.

IPCC. (2023). *Climate Change 2023: Synthesis Report*. Contribution of Working Groups I, II and III to the Sixth Assessment Report of the Intergovernmental Panel on Climate Change. https://www.ipcc.ch/report/ar6/syr/downloads/report/IPCC_AR6_SYR_LongerReport.pdf

Li, Y., Jin, X., Kelp, M., Sun, H. Z., & Qiu, M. (2026). Growing impacts of fire smoke on ozone pollution and associated mortality burden in the United States. *Science Advances*, *12*(18).

Ma, Y., Zang, E., Liu, Y., Wei, J., Lu, Y., Krumholz, H. M., ... & Chen, K. (2024). Long-term exposure to wildland fire smoke $PM_{2.5}$ and mortality in the contiguous United States. *Proceedings of the National Academy of Sciences*, *121*(40), e2403960121.

Molitor, D., Mullins, J. T., & White, C. (2023). Air pollution and suicide in rural and urban America: Evidence from wildfire smoke. *Proceedings of the National Academy of Sciences*, *120*(38), e2221621120.

Neukom, R, et al. (2019). No Evidence for Globally Coherent Warm and Cold Periods over the Preindustrial Common Era. *Nature, 571*, 550-554.

NOAA (2026) Global Time Series. *Climate at a Glance*, https://www.ncei.noaa.gov/access/monitoring/climate-at-a-glance/global/time-series/globe/land_ocean/tavg/12/12/1850-2025, last accessed May 11, 2026.

PAGES 2k Consortium. Consistent Multidecadal Variability in Global Temperature Reconstructions and Simulations over the Common Era. *Nature Geoscience, 12*, 643-649.

Qiu, M., Li, J., Gould, C. F., Jing, R., Kelp, M., Childs, M. L., ... & Burke, M. (2025). Wildfire smoke exposure and mortality burden in the USA under climate change. *Nature*, *647*(8091), 935-943.

Quilcaille, Y., Gudmundsson, L., Schumacher, D.L., Gasser, T., Heede, R., Heri, C., Lejeune, Q., Nath, S., Naveau, P., Thiery, W., & Schleussner, C.F. (2025). Systematic attribution of heatwaves to the emissions of carbon majors. *Nature*, *645*(8080), 392-398.

Seneviratne, S., et al. (2016). Allowable $CO_2$ Emissions Based on Regional and Impact-Related Climate Targets. *Nature, 529*, 477-483.

Wilson, A. J., Bressler, R. D., Ivanovich, C., Tuholske, C., Raymond, C., Horton, R. M., Sobel, A., Kinney, P., Cavazos, T., & Shrader, J. G. (2024). Heat disproportionately kills young people: Evidence from wet-bulb temperature in Mexico. *Science Advances*, *10*(49).

# Exhibit A

# Andrew J. Wilson

https://ajsw.info
andrewjordanwilson@gmail.com

## Appointments

| | |
|---|---|
| 2025– | *Assistant Professor of Public Policy and Economics*<br>Batten School of Leadership and Public Policy, University of Virginia |
| 2024–2025 | *Postdoctoral Scholar*<br>Center on Food Security and the Environment, Stanford University |
| 2018–2026 | *Associate Fellow*<br>Global Policy Laboratory, UC Berkeley/Stanford University |

## Education

*Ph.D., M.Phil., M.A. in Sustainable Development*
School of International and Public Affairs & the Earth Institute, Columbia University

*Master of Public Policy*
University of California, Berkeley

*B.A. in Political Economy*
University of California, Berkeley

## Publications

8. Xinming Du and Andrew J. Wilson. 2026. *Weather and U.S. railways: risk, adaptation, and congestion.* Journal of Public Economics. (link)

7. Danny Bressler, Anna Papp, Luis Sarmiento, Jeff Shrader, Andrew J. Wilson. 2026. *Occupation and temperature-related mortality in Mexico.* Journal of Human Resources. (link)

6. Chris Callahan, Jared Trok, Andrew J. Wilson, Carlos Gould, Sam Heft-Neal, Noah Diffenbaugh, and Marshall Burke. 2025. *Quantifying the contributions of climate change and adaptation to mortality from unprecedented extreme heat events.* PNAS. (link)

5. Chris Callahan, Jared Trok, Andrew J. Wilson, Carlos Gould, Sam Heft-Neal, Noah Diffenbaugh, and Marshall Burke. 2025. *Intensifying risk of mass human heat mortality if historical weather patterns recur.* Nature Climate Change. (link)

4. Andrew J. Wilson, R. Daniel Bressler, Jeffrey Shrader, Radley Horton, Casey Ivanovich, Patrick Kinney, Colin Raymond, and Adam Sobel. 2024. *Heat disproportionately kills young people: Evidence from wet-bulb temperature in Mexico.* Science Advances. (link)

3. Andrew B. Martinez and Andrew J. Wilson. 2024. *The Macroeconomic Effects of Physical Climate Risks*, in Handbook of Research Methods and Applications in Macroeconomic Forecasting. Eds. Michael P. Clements and Ana Beatriz Galvão. (link)

2. Ben Orlove, Pasang Sherpa, Neil Dawson, Ibidun O. Adelekan, Wilfredo Alangui, Rosario Carmona, Deborah Coen, Melissa Nelson, Victoria Reyes-García, Jennifer Rubis, Gideon Sanago, and Andrew J. Wilson. 2023. *Placing diverse knowledge systems at the core of transformative climate research.* Ambio. (link)

1. Andrew J. Wilson and Ben Orlove. 2021. *Climate urgency: evidence of its effects on decision making in the laboratory and the field.* Current Opinion in Environmental Sustainability. (link)

## Under review

- Marshall Burke, Mustafa Zahid, Mariana Martins, Christopher Callahan, Khusel Avirmed, Jonas Wallstein, Richard Lee, Jay Amgalan, Renzhi Jing, Sam Heft-Neal, Rachel Young, Andrew J. Wilson, Sandra Aguilar-Gomez, Mathew V. Kiang, Solomon Hsiang, and David B. Lobell. *No clear evidence society is becoming less sensitive to climate.* (link)

- Marissa Childs, Mariana Martins, Andrew J. Wilson, Sam Heft-Neal, Minghao Qiu, and Marshall Burke. *Estimates of wildfire-derived $PM_{2.5}$ for the contiguous U.S. and implications for air quality regulation.* (link)

- Marshall Burke*, Andrew Wilson*, Tumenkhusel Avirmed, Jonas Wallstein, Mariana C. M. Martins, Patrick Behrer, Christopher W. Callahan, Marissa Childs, June Choi, Karina French, Carlos F. Gould, Sam Heft-Neal, Renzhi Jing, Minghao Qiu, Lisa Rennels, and Emma Krasovich Southworth. *Understanding and addressing temperature impacts on mortality.* (link)

- Jaecheol Lee Ⓡ Andrew J. Wilson, and Solomon Hsiang. *Health damage from transboundary and domestic air pollution in mixture.* (link)

## Non-academic work

| | |
|---|---|
| 2025 | *Fellow*, Rising Environmental Leaders Program, Stanford Woods Institute |
| AY 2022/2023 | *Staff economist*, Council of Economic Advisers, The White House |
| Spring 2017 | *Consultant*, NextGen Policy |
| Summer 2016 | *Summer fellow*, Global Development Lab, U.S. Agency for International Development |
| Spring 2016 | *Consultant*, Secretariat of Environment and Natural Resources, Gov't of Mexico |

### Habitat for Humanity Greater San Francisco

| | |
|---|---|
| 2014–2015 | *Policy Analyst* |
| 2013–2014 | *AmeriCorps Community Engagement Coordinator* |
| 2012–2013 | *AmeriCorps Construction Crew Leader* |

## Teaching

### Columbia University

*Undergraduate-level course TA*: Environmental science (fall 2023); Challenges of sustainable development (spring 2021)

*Graduate-level course TA*: COVID-19: Policymaking in the throes of a global crisis (fall 2020); Economics of energy (spring 2024); Environmental chemistry (summer 2019 and 2020); Risk and toxicology (summer 2019 and 2020); Climate change policy (spring 2019); Environmental economics (fall 2018)

*Center for Teaching and Learning*: Lead teaching fellow (AY 2021/2022)

### UC Berkeley

*Undergraduate-level course TA*: Wealth and poverty (spring 2016 and 2017); Global poverty and practice (fall 2015 and 2016)

## Service

- Refereeing: *The Review of Economics and Statistics, PNAS, Journal of Public Economics, Journal of Human Resources, Journal of Environmental Economics and Management, Population and Environment, Southern Economic Journal, Environment International, JAMA, Econometrics Journal, Environmental Research Letters*

- *Mentor*, AEA Committee on the Status of Queer Individuals in the Economic Profession

- *Chapter scientist*, UNESCO/IPCC/ICOMOS White Paper: Intangible cultural heritage, diverse knowledge systems, and climate change

- *Contributing author*, Sixth Assessment Report of the Intergovernmental Panel on Climate Change, Working Group II, Chapter 17

- *Founding organizer*, Seminar on Planetary Management

- *President, Vice President* (AY 2017–2020), Sustainable Development Doctoral Society

- *Organizer* (2018, 2019), Interdisciplinary PhD Workshop on Sustainable Development (IPWSD)

- *Organizer* (2019), Sustainable Development Research Symposium (SusDeveR)

- *Board member* (2016), Larkin Street Youth Services

## Presentations

| | |
|---|---|
| 2026 | University of Cambridge, UCSD |
| 2025 | Southern Economic Association, Environmental Defense Fund, American Society of Health Economists (ASHEcon), European Association of Agricultural and Resource Economists (EAARE), TWEEDS, University of San Francisco (Economics), NBER (Determinants of Mortality), ASSA |
| 2024 | Heartland Workshop (UIUC) , Occasional Workshop (UCSB), Preparing for a Changing Climate (Stanford), ASSA, University of Melbourne (Econ), Environmental Protection Agency National Center on Environmental Economics, NYU Institute on Policy Integrity, UKNEE envecon |
| 2023 | Institute of Latin American Studies monthly seminar, Columbia Sustainable Development Seminar, Heartland Workshop (UIUC), TWEEDS, Camp Resources, Occasional Workshop (UCSB), OSWEET |
| 2022 | Interdisciplinary PhD Workshop in Sustainable Development, Northeast Workshop on Energy Policy and Environmental Economics, American Geophysical Union |

## Miscellanea

- **Human languages**: conversational Spanish and Mandarin Chinese; intermediate Japanese; basic Malay

- **Machine languages**: R, Python, MATLAB, STATA, Javascript

- **Certifications**: Special Sworn Status, U.S. Census Bureau, 2023 to present; NIH Human Subjects Research certification; PADI Open Water Diver; American Red Cross CPR and First Aid certification; ABC certified bartender

Updated 8 May 2026; current version

# EXHIBIT 14

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

ELENA VENNER, *et al.*,
            *Petitioners*,

        v.

UNITED STATES
ENVIRONMENTAL PROTECTION
AGENCY, *et al.*,
            *Respondents*.

Case No. 26-1038
Lead Case No. 26-1037
(and consolidated cases)

## DECLARATION OF STEVEN RUNNING, PhD,
## IN SUPPORT OF PETITIONERS' MOTION TO STAY
## THE FINAL RULE PENDING REVIEW

I, Steven W. Running, hereby declare and if called upon would testify as follows:

1.      I am a University Regents Professor Emeritus of Global Ecology in the College of Forestry and Conservation with the University of Montana and have actively been engaged in climate change science research since the early 1980s. I am offering this testimony in my personal capacity, and I have personal knowledge of the facts stated herein.

2.      I am submitting this Declaration in support of Petitioners' Motion to Stay the Endangerment Finding rescission and repeal of vehicle emission standards (the "Repeal Rule") pending review. I offer the following expert opinions about how

1

greenhouse gas (GHG) emissions, mainly the accumulation of carbon dioxide ($CO_2$) in the atmosphere, from the burning of fossil fuels, are causing ongoing climate change that is dangerously warming the surface of the Earth in ways that are harming, and will increasingly harm, the Youth Petitioners in this case, and how every reduction in GHGs and especially $CO_2$ will prevent additional warming and alleviate the growing harm.

3. In my expert opinion, after over 40 years of being on the front lines of studying how our climate is changing in response to the pollution from the burning of fossil fuels across several presidential administrations, I have never seen such a blatant assault on science by agency decisionmakers as I have witnessed from this administration. Nationwide $CO_2$ emissions, mainly from fossil fuel combustion, including from internal combustion engine (ICE) vehicles, have caused national climate impacts in the form of heatwaves, droughts, fires and smoke, storms and floods, and rising sea level. More emissions from ICE fossil fuel combustion as a consequence of the Rule Repeal will warm the planet further and make heatwaves, droughts, fires and smoke, storms and floods, and sea level rise worse, directly harming the young Petitioners who are forced to grow up exposed to these conditions. They will unjustly bear the hardship of a worsening climate for many more decades. Every amount of ICE vehicle pollution avoided through regulation will prevent locking in more harm because $CO_2$ molecules trap heat for hundreds of

years. As the old maxim goes: "If you find yourself in a hole, quit digging."

**Background & Qualifications**

4.      In 1979, I received my Ph.D. in Forest Ecology from Colorado State University. Since 1979, I have been with the University of Montana, where I retired in 2017. In 1983, I founded the Numerical Terradynamic Simulation Group (NTSG), my global research team of graduate students and staff, at the University of Montana. I have published over 300 scientific articles and two books and have been honored with several awards. I have served on the Standing Committee for Earth Studies of the National Research Council and on the Federal Interagency Carbon Cycle Science Committee. I have also served as a Co-Chair of the National Center for Atmospheric Research Community Climate System Model Land Working Group, a Member of the International Geosphere-Biosphere Program Executive Committee, and a Member of the World Climate Research Program, Global Terrestrial Observing System. I recently completed serving on the advisory National Aeronautics and Space Administration (NASA) Earth Science Subcommittee, and the National Oceanic and Atmospheric Administration (NOAA) Science Advisory Board Climate Working Group. I also recently retired as co-Chair of the National Academy of Sciences Standing Committee on Earth Science and Applications from Space. In 2007, the Intergovernmental Panel on Climate Change (IPCC) was a recipient of the Nobel Peace Prize; I contributed as a chapter Lead Author for that 4th Assessment

of the IPCC. I am an elected Fellow of the American Geophysical Union and have for years been designated a Highly Cited Researcher by the Institute for Scientific Information. A true and correct copy of my curriculum vitae is attached as Exhibit A.

**The Burning of Fossil Fuels Causes Climate Change**

5. Industrialization led to unprecedented amounts of human-caused $CO_2$ emissions to the atmosphere and 96.67% of that $CO_2$ pollution came from the combustion of fossil fuels, with half the total emitted fossil fuel $CO_2$ being emitted since 1995.[1] This has resulted in the global atmospheric concentration of $CO_2$ climbing from around 280 parts per million (ppm) in the late 1700s to 427.35 ppm in 2025. Because $CO_2$ is a GHG that warms the planet, Earth reached an annual average temperature of about 1.44°C (2.59°F) warmer than preindustrial temperatures in 2025.[2] That temperature increase has fundamentally changed Earth's climate system. In science, small numbers and percentages can have profound results. Consider the human body. Changing the body's natural baseline temperature by that same amount of warming from an average of 98.6°F to over 101°F gives us a fever and makes us feel sick. The solution is to cool the body down, not add more

---

[1] The remaining 3.33% of fossil-source $CO_2$ is from industry, mainly from cement and the production of steel.
[2] https://wmo.int/news/media-centre/wmo-confirms-2025-was-one-of-warmest-years-record.

of the substance that made it warmer in the first place. Changing the amount of heat trapped on Earth is causing an analogous type of illness to the way natural systems function, and it is harming young people especially. The only solution is to stop feeding the warming with more $CO_2$ and other GHGs. The Repeal Rule does the opposite.

6. The upper-most limit of atmospheric $CO_2$ concentration that is found to be scientifically acceptable for humanity to continue to live as it has since time immemorial is 350 ppm.[3]

7. Eliminating additional GHG pollution is the only way to limit the amount of harm the young Petitioners will experience, both from a warming United States and from the localized air pollution the Petitioners are forced to breathe. At minimum, we should be on a pathway towards zero $CO_2$ emissions no later than

---

[3] James Hansen et al., *Target Atmospheric CO₂: Where Should Humanity Aim?*, 2 Open Atmospheric Sci. J. 217 (2008); James Hansen et al., *Assessing "Dangerous Climate Change": Required Reduction of Carbon Emissions to Protect Young People, Future Generations and Nature*, 8 PloS one e81648 (2013); James Hansen et al., *Young People's Burden: Requirement of Negative CO₂ Emissions*, 8 Earth Syst. Dynam. 577 (2017); Johan Rockström et al. *A Safe Operating Space for Humanity*, 461 Nature 472 (2009); Will Steffen et al., *Planetary Boundaries: Guiding Human Development on a Changing Planet*, 347 Science 736 (2015); Katherine Richardson et al., *Earth Beyond Six of Nine Planetary Boundaries*, 9 Science Advances eadh2458 (2023); Johan Rockström et al., *Safe and Just Earth System Boundaries*, 619 Nature 102 (2023); Johan Rockström et al., *Planetary Boundaries Guide Humanity's Future on Earth*, 5 Nature Reviews Earth Env't 773 (2024); Planetary Boundaries Science, *Planetary Health Check 2025*, Potsdam Institute for Climate Impact Research, https://www.planetaryhealthcheck.org/ (2025).

2050 with efforts to remove even more $CO_2$ from the atmosphere by protecting and restoring our carbon sinks and by direct anthropogenic removal. Allowing additional GHG emissions to enter the atmosphere from the Repeal Rule worsens the already dangerous planetary conditions that threaten Petitioners' lives. Locking in these increased GHG emissions, as the Repeal Rule sale of new ICE vehicles causes (by virtue of their estimated 15-year lifespan), makes climate conditions worse for Petitioners with heat-trapping gases that will outlive them.

8.      Transportation emissions, including from ICE vehicles that were subject to the GHG emission regulations done away with by the Repeal Rule, are the largest source of emissions in the United States, constituting 38.7% of U.S. $CO_2$ emissions for energy in 2024. Thus, it made sense for EPA to originally regulate GHG emissions from this sector, as it would have the largest net benefit to our society.



*Figure 1: U.S. energy-related carbon dioxide emissions by sector, 1990-2024. https://www.eia.gov/environment/emissions/carbon/*

9.      The rise in atmospheric $CO_2$ is closely followed by the warming of the planet from its stable pre-industrial climate to its upward trend in the 20th and 21st centuries.



*Figure 2. Atmospheric $CO_2$ concentration (bottom, red).[4] Change in average global temperature relative to 1850-1900 mean (top) with observed changes averaged from three groups (dark blue)[5] and reconstructed from geological archives (blue).[6]*

---

[4] https://gml.noaa.gov/webdata/ccgg/trends/co2/co2_annmean_mlo.txt; Mauro Rubino et al., *Revised Records of Atmospheric Trace Gases $CO_2$, $CH_4$, $N_2O$, and $\delta^{13}C$-$CO_2$ over the last 2000 Years from Law Dome, Antarctica*, 11 Earth System Science Data 473 (2019).

[5] https://berkeleyearth.org/global-temperature-report-for-2025/; https://www.metoffice.gov.uk/hadobs/hadcrut5/data/HadCRUT.5.1.0.0/download.html; https://www.ncei.noaa.gov/access/monitoring/climate-at-a-glance/global/time-series/globe/land_ocean/tavg/12/12/1850-2025.

[6] PAGES 2k Consortium, *Consistent Multidecadal Variability in Global Temperature Reconstructions and Simulations over the Common Era*, 12 Nature Geoscience 643 (2019).

10. Due to the concern about global warming from burning fossil fuels, in 1958, Dr. Charles David Keeling began the modern monitoring of atmospheric $CO_2$ at Mauna Loa, Hawai'i, a remote location not near any local $CO_2$ sources. Dr. Keeling's monitoring data proved that $CO_2$ has continued to rise every year from 1958 to the present from an initial concentration of 316 ppm in 1958, to an annual average level of 427.35 ppm in 2025 (see Figure 3).

11. The U.S. Energy Information Agency documented that the U.S. emitted about 4.772 gigatons of $CO_2$ into the atmosphere from the combustion of fossil fuels for energy in 2024, of which 1.475 gigatons of $CO_2$ (30.9%) was from combustion of gasoline and diesel fuels for transportation.[7] For context, only three countries, China, India, and Russia, emitted across their entire economies more fossil $CO_2$ in 2024[8] than the U.S.'s combustion of gasoline and diesel for transportation alone. Even modest decreases in pollution from the U.S. transportation sector will have a significant effect because every ton of $CO_2$ not emitted avoids additional harms to the planet, the United States, and these Petitioners.

---

[7] https://www.eia.gov/environment/emissions/carbon/.
[8] https://ourworldindata.org/co2-and-greenhouse-gas-emissions#explore-data-on-co2-and-greenhouse-gas-emissions.



*Figure 3. Atmospheric $CO_2$ concentration measured at Mauna Loa observatory from 1958 to March 5, 2026.*[9]

12.     There is a strong scientific consensus that the rising levels of atmospheric $CO_2$ documented by the Keeling Curve are due to the burning of fossil fuels. Analysis of carbon isotopes in the atmosphere has left no doubt that the source of the increasing $CO_2$ is the combustion of fossil fuels. Reports by the IPCC and congressionally mandated National Climate Assessments (NCAs) have been unwavering in their conclusion that the planet is warming because of anthropogenic emissions of greenhouse gases from the burning of fossil fuels and the result is

---

[9] https://gml.noaa.gov/ccgg/trends/.

harmful to humans.[10]

13.    Dr. Keeling's curve is the keystone of climate change research. Humanity did not know our impact on planet Earth until this curve was developed. When you go into the lobby of the Keck Center of the National Academy of Sciences in Washington D.C., the DNA helix is on one side of door and the Keeling curve is on the other. This shows that the Keeling Curve is one of the most iconic and important scientific findings in American history. Those two scientific discoveries have helped us understand who we are perhaps more than any other discovery: who we are on the inside and the outside—our role in either harming or caretaking our only Earth.

14.    I am aware that in 2025, the Trump Administration proposed to defund the collection of the data used to create the Keeling Curve. This is just one example of how this Administration is attacking climate change science and data collection to eliminate any regulatory constraints on the burning of fossil fuels. This attack on science is unlike anything I have ever seen during my decades as a government scientist. It is as profound for the human condition as ending research on life-saving cancer treatments or ways to prevent diseases like Alzheimer's, Parkinson's, or Type 1 Diabetes.

---

[10] The current administration has removed all National Climate Assessments from the globalchange.gov website, so it is now only available at https://toolkit.climate.gov/NCA5; https://www.ipcc.ch/report/ar6/syr/.

**Every Ton of Increased Anthropogenic $CO_2$ Emissions Adds to Local and National Warming**

15. It is incontrovertible that, if additional $CO_2$ is emitted as a result of the Repeal Rule that otherwise would not be emitted, the atmospheric $CO_2$ concentration will climb higher than it would otherwise as a result, worsening the harms these young Petitioners are already experiencing, and increasing the risk that they will be harmed in other ways as well through the inevitable exposure to more heat events, smoke, and more extreme weather caused by climate change.

16. The IPCC, which was founded at the end of the Reagan administration with former President George H.W. Bush's support, as the leading global commission to summarize the consensus climate science research from across the world, has said: "*Every ton of $CO_2$ adds to global warming*".[11] I show in Figure 4 this crystal-clear finding of the IPCC that any further emission of $CO_2$ that is allowed to occur will make climate change worse. This then drives Earth's global temperature higher. The colors show different potential future GHG emission pathways. The x-axis represents not time, but the total quantity of $CO_2$ emitted in gigatons, and the y-axis represents global temperature change relative to the 1850-1900 average. Keeping cumulative emissions lower (the "SSP1-1.9" pathway) leads to less

---

[11] IPCC, *Climate Change 2023: Synthesis Report*, 83 (2023), https://www.ipcc.ch/report/ar6/syr/downloads/report/IPCC_AR6_SYR_LongerReport.pdf.

11

warming, and safer conditions for children, whereas allowing cumulative emissions to reach higher levels (the "SSP1-2.6" pathway) causes more warming. While there is a range temperature increases scientists project, depending primarily on how much fossil fuel we burn, Figure 4 shows that how warm the planet becomes depends on how much $CO_2$ is emitted because no matter how you cut it, increased $CO_2$ emissions further warms the planet.



## Every tonne of CO₂ emissions adds to global warming

Global surface temperature increase since 1850–1900 (°C) as a function of cumulative CO₂ emissions (GtCO₂)

*Figure 4. Relationship between cumulative $CO_2$ emissions (in billions of tons or gigatons: Gt) since 1850 and global mean temperature relative to 1850-1900. Also shown are future projected emissions for different scenarios through 2050.[12]*

---

[12] IPCC, *Summary for Policymakers, in* Climate Change 2021: The Physical Science Basis (2021), https://www.ipcc.ch/report/ar6/wg1/downloads/report/IPCC_AR6_WGI_SPM.pdf.

17. Every additional ton of $CO_2$ worsens the likelihood and severity of climate change impacts wherever it is emitted because it goes up, mixes in the same atmosphere, and can stay there for centuries, continuing to drive warming. The IPCC clearly stated that "With every increment of global warming, regional changes in mean climate and extremes become more widespread and pronounced".[13]

18. I understand the emissions from ICE vehicles that EPA said would have been stopped by the vehicle emissions rule that was rescinded are about 942 millions of metric tons of additional $CO_2$. This is a big number and is similar to the annual fossil $CO_2$ emissions of Japan, which is the fifth largest emitter in the world. The EPA's decision to rescind the GHG standards for vehicles would thus cause and lock in additional harms to these Petitioners from these additional emissions if the GHG emissions rule were not otherwise in place. Every year of delay in reducing or eliminating emissions from the transportation sector locks in more heating. Conversely, every additional EV or Rule-compliant vehicle produced helps reduce harm and the risk of harm to Petitioners.

**$CO_2$ Emissions Heat the Planet which Harms Petitioners**

19. In terms of global warming, 2024 was the warmest year ever recorded on Earth, surpassing the prior record set in 2023, and 2025 was one of the three

---

[13] IPCC, *Climate Change 2023: Synthesis Report*, 14 (2023) https://www.ipcc.ch/report/ar6/syr/downloads/report/IPCC_AR6_SYR_SPM.pdf.

13

warmest years on record (Figure 5).[14] In fact, the eleven warmest years ever recorded on Earth were the last eleven years (2015-2025). For the period 2015-2024, the globe averaged about 1.24°C (2.23°F) warmer than the 1850-1900 mean.[15] The climate science community is projecting that 2026 will break more records as it already has begun to do.



*Figure 5. Global mean temperature changes relative to the 1850-1900 average for eight global temperature datasets from science agencies of the United States, United Kingdom, European Union, Japan, China, and a non-profit in the United States.[16]*

20.    The rising concentration of $CO_2$ in the atmosphere has trapped much more energy on Earth than is detectable by the change in global mean atmospheric

---

[14] https://wmo.int/news/media-centre/wmo-confirms-2025-was-one-of-warmest-years-record.

[15] Piers M. Forster et al., *Indicators of Global Climate Change 2024: Annual Update of Key Indicators of the State of the Climate System and Human Influence*, 17 Earth System Science Data 2641 (2025).

[16] https://wmo.int/news/media-centre/wmo-confirms-2025-was-one-of-warmest-years-record.

temperature (Figure 6).[17] This is because only 1% of the trapped energy is trapped in the atmosphere; 91% is absorbed by the ocean, with the remaining 8% taken up by warming and melting ice and heating the land itself.[18]



*Figure 6. Earth's excess radiation/energy/heat and where it is absorbed since 1960.[19]*

21.     When Earth is in energy balance, the amount of incoming energy from the Sun is equal to the outgoing energy from the Earth.[20] However, fossil fuel GHG emissions, mainly $CO_2$, have ended this balance because excess atmospheric $CO_2$ is

[17] IPCC, *The Earth's Energy Budget, Climate Feedbacks and Climate Sensitivity* in Climate Change 2021: The Physical Science Basis (2021); Forster et al. (2025).
[18] https://wmo.int/publication-series/state-of-global-climate/state-of-global-climate-2025.
[19] https://wmo.int/publication-series/state-of-global-climate/state-of-global-climate-2025.
[20] https://www.noaa.gov/jetstream/atmosphere/energy.

trapping more energy on the planet, causing the heat to accumulate, with disastrous consequences.[21]

22. Between 1971 and 2020, the planet retained an extra 381 zeta joules of heat.[22] A joule is a unit of energy or heat, while "zeta" is a term to indicate 10 to the 21st power, i.e., followed by 21 zeroes. 381 zeta joules is 381,000,000,000,000,000,000,000 joules.

23. It is this excess heat, or energy imbalance, that is causing rising atmospheric temperatures and stronger heatwaves, extreme rainfall and floods, earlier snowmelt, more intense droughts, greater fire risk, and mass loss from glaciers and ice sheets with attendant sea level rise. The Earth's energy imbalance is the most vital metric for measuring the heating of the planet and understanding the impacts that are happening from this heating.

24. To restore Earth's energy balance and release this heat to outer space so that temperatures stabilize at below 1°C (1.8ºF) of warming, the atmospheric $CO_2$ concentration must be reduced to below 350 ppm.[23] Conversely, increasing $CO_2$

---

[21] James Hansen et al., *Earth's Energy Imbalance: Confirmation and Implications*, 308 Science 1431 (2005).

[22] Karina von Schuckmann et al. *Heat Stored in the Earth System 1960-2020: Where Does the Energy Go?*, 15 Earth System Science Data 1675 (2023).

[23] Hansen et al. (2008); Hansen et al. (2013); Hansen et al. (2017); Karina von Schuckmann et al., *Heat Stored in the Earth System: Where Does the Energy Go?*, 12 Earth Sys. Sci. Data 2013 (2020).

emissions from fossil fuels into the atmosphere makes this energy imbalance worse and thus every one of these climate impacts worse for Petitioners.

**Much of The United States is Warming Fast**

25. In addition to monitoring global temperature back to 1850, NOAA also maintains temperature data for the contiguous U.S. and its individual states back to 1895, with the exceptions of Hawaiʻi (only back to 1991) and Alaska (back to 1925). In Figure 7, I show the change in temperature relative to the 1895-1914 average for the globe, the contiguous U.S. (CONUS), New York, Wisconsin, Washington, Pennsylvania, Colorado, California, Tennessee, and Montana. The last 10 years (2016-2025) for the contiguous U.S. were about 2.74°F warmer than the 1895-1914 average whereas New York was about 3.07°F, Wisconsin was 2.81°F, Washington was 2.34°F, Pennsylvania was 2.88°F, Colorado was 3.03°F, California was 3.21°F, Tennessee was 1.93°F, and Montana was about 2.79°F warmer than their 1895-1914 averages. These are states where Petitioners live. For comparison, the globe was about 2.27°F[24] warmer over the same timeframe and relative to 1895-1914 average. This means the contiguous U.S. warmed more than the global average and New

_____

[24] The reason this number is different than what is presented in ¶ 5, above, is because this level of warming is based on NOAA's temperature record which is referenced to 1895-1914, while the numbers in ¶ 5, above, are from many more temperature records and referenced to 1850-1900.

York, Wisconsin, Pennsylvania, Colorado, California, and Montana warmed more than the lower 48 average.



*Figure 7. Change in 10-year average temperature relative to the 1895-1914 mean for the globe, the contiguous United States (CONUS), Tennessee, Washington, Montana, Wisconsin, Pennsylvania, Colorado, New York, and California.[25]*

26.     Climate change is directly harming the Petitioners in many ways that are well-documented and described in IPCC reports, which come out roughly every six years, and National Climate Assessments, which Congress has directed be produced for the American people every four years.

---

[25] https://www.ncei.noaa.gov/access/monitoring/climate-at-a-glance/global/time-series; https://www.ncei.noaa.gov/access/monitoring/climate-at-a-glance/national/time-series; https://www.ncei.noaa.gov/access/monitoring/climate-at-a-glance/statewide/time-series.

27. The Fifth National Climate Assessment, published in 2023, is the most recent version. It unequivocally and correctly states: "Stopping global warming would require both reducing emissions of $CO_2$ to net zero and rapid and deep reductions in other greenhouse gases." There are no peer-reviewed scientific publications that disagree with this statement from the Fifth National Climate Assessment.

28. I will point out, however, that the Trump Administration has dismissed all federal government scientists who were supposed to be writing the Sixth National Climate Assessment, making its timely completion unlikely. This is another example of how the current administration is attacking the development of climate science, the availability of which is vital for our economy and health of U.S. citizens.

29. Below I will not describe all of the climate change impacts plaguing the Petitioners, and instead will focus on heatwaves, drought, and wildfire, given my understanding of Petitioners' direct experiences with these kinds of events.

**Climate Change and Heatwaves**

30. Fossil fuel emissions of $CO_2$ have increased the frequency and duration of heatwaves in the western U.S.[26] The Repeal Rule will allow for an increase in heatwave frequency and duration. Even if the Rule is eventually reversed by the

---

[26] S. E. Perkins-Kirkpatrick and S. C. Lewis, *Increasing Trends in Regional Heatwaves*, 11 Nature Communications 3357 (2020); https://www.un.org/en/climatechange/science/causes-effects-climate-change.

19

courts, additional unavoided GHGs that result during those years it was not in place, from cars that continue to operate for years to come, will continue to increase the risks of severe heatwave exposure for Petitioners. For instance, the frequency of deadly heatwaves has increased in the western U.S. where what would be a 1-in-100-year event now occurs about every 15-20 years and about every 30 years in Alaska.[27] Deadly heatwave frequency also increased in Hawai'i, to where 1-in-100-year events now occur about every 10 years, the largest increase in frequency for any state that has a Pacific coastline.[28] Farther east, 1-in-100-year heatwaves are now occurring about 20 years in Tennessee and Wisconsin, 10 to 20 years in Pennsylvania, and about 15 years in New York.[29] About 35% of heat-related deaths in the U.S. as a whole over the last 30 years are attributable to human-caused climate change.[30] However, 82% of heat-related deaths in Honolulu, Hawai'i are due to human-caused climate change.[31] These risks increase as more GHG emissions are allowed.

---

[27] Samuel Lüthi et al., *Rapid Increase in the Risk of Heat-Related Mortality*, 14 Nature Communications 4894 (2023).
[28] Lüthi et al. (2023).
[29] Lüthi et al. (2023).
[30] A. M. Vicedo-Cabrera et al., *The Burden of Heat-Related Mortality Attributable to Recent Human-Induced Climate Change*, 11 Nature Climate Change 492 (2021).
[31] USGCRP, *Ch. 30. Hawai'i and US-Affiliated Pacific Islands, in* Fifth National Climate Assessment (2023), https://nca2023.globalchange.gov/chapter/30/.

31. The June 2021 Pacific Northwest (Figure 8) heatwave was the 6th-most-extreme heatwave ever recorded on the planet[32] and was one of the deadliest heatwaves globally this century.[33] The heatwave, known as the "heat dome," caused widespread human death, health impacts, and harm to ecosystems, including mass die-offs of marine life, reduced crop and fruit yields, flooding of rivers from snow and glacier melt, and increased fire risk.[34] While this heatwave was centered on Oregon, Washington, and southern British Columbia, it impacted California and Montana, where new all-time maximum temperature records were also set.[35]

---

[32] Vikki Thompson et al., *The 2021 Western North America Heat Wave Among the Most Extreme Events Ever Recorded Globally*, 8 Science Advances eabm6860 (2022).

[33] Tom Matthews et al., *Mortality Impacts of the Most Extreme Heat Events*, 6 Nature Reviews Earth Env't 193 (2025).

[34] Rachel H. White et al., *The Unprecedented Pacific Northwest Heat-Wave of June 2021*, 14 Nature Communications 727 (2023); Brendon Haggerty et al., *Health Impacts of Excessive Heat in Multnomah County, OR, 2021*, 2 Env't Rsch. Health 045005 (2024).

[35] https://www.climate.gov/news-features/event-tracker/record-breaking-june-2021-heatwave-impacts-us-west.



2-meter Air Temperature Anomaly (°C)

-15 -10 -5 0 5 10 15

500 km

*Figure 8. Map of the June 2, 20217 air temperature anomalies in Celsius relative to the 2014-2020 average.[36]*

32. The 2021 Pacific Northwest heat dome would not have occurred if not for anthropogenic global warming that itself is mainly due to the emission of $CO_2$ from fossil fuel combustion.[37] Anthropogenic climate change made the event 1.4-3.6°F (0.8-2°C) warmer and at least 8 to more than 500,000 times more likely.[38] If we continue to burn fossil fuels instead of replacing them with zero-emission alternatives like EVs, then a heatwave of this magnitude will occur on average once

---

[36] https://earthobservatory.nasa.gov/images/148506/exceptional-heat-hits-pacific-northwest.

[37] Samuel Bartusek et al., *2021 North American Heatwave Amplified by Climate Change-Driven Nonlinear Interactions*, 12 Nature Climate Change 1143 (2022); Sjoukje Y. Philip et al., *Rapid Attribution Analysis of the Extraordinary Heat Wave on the Pacific Coast of the US and Canada in June 2021*, 13 Earth System Dynamics 1689 (2022); White et al. (2023).

[38] Bartusek et al. (2022); Emily Bercos-Hickey et al., *Anthropogenic Contributions to the 2021 Pacific Northwest Heatwave*, 49 Geophysical Rsch. Letters e2022GL099396; Philip et al. (2022).

every 10 years at 2°C (3.2°F) of global warming rather than once in 200 years in today's climate.[39]

33. In general, this rise in the frequency of heatwaves and of heatwaves reaching ever higher absolute magnitudes is not surprising, and is actually expected, given the rise in concentration of $CO_2$ in the atmosphere due to the continued combustion of fossil fuels.

34. A heatwave of this magnitude is not the only kind of heat that harms children, however. And hotter temperatures that do not get classified by scientists as a "heat wave" are also inevitable with more GHG emissions. Every decrease in GHGs keeps temperatures from rising even more.

**The Heat is Drying out the West**

35. A dishwasher dries the dishes with heat, evaporating off the water, with some models using a fan to move the air and increase the rate of evaporation. The overall warming and rising heatwaves are doing the same thing in the western U.S., increasing the frequency, intensity, and duration of droughts.[40] That is, recent droughts are due to unprecedented hot, dry, evaporative air rather than reductions in

---

[39] Bartusek et al. (2022).

[40] Benjamin I. Cook et al., *Megadroughts in the Common Era and the Anthropocene*, 3 Nature Reviews Earth Env't 741 (2022); Karen E. King et al., *Increasing Prevalence of Hot Drought Across Western North America Since the 16th Century*, 10 Science Advances eadj4289 (2024).

precipitation.[41] Between 2000 and 2021, the western U.S. experienced the most extreme 22-year drought in over 1,200 years, with that statement only limited by the length of the drought record.[42] Climate warming caused by the anthropogenic emission of GHGs that are mainly $CO_2$ from the combustion of fossil fuels drove about 42% of the moisture deficit that made this unprecedented drought.[43] If not for these GHG emissions, a drought of this extent, magnitude, and duration would not have occurred.

36.     On the other side of the year, snow season length and snowpack depth in the western U.S. have also declined. According to the U.S. Environmental Protection Agency (EPA), the amount of snow on April 1 has declined between 1955 and 2023 at almost all of the weather stations in Montana and Washington, and at more than half of the stations in California and Colorado (Figure 9).[44] Likewise, the EPA documents reductions in the length of snow cover season at most snowpack weather stations in Montana, Colorado, Washington and California (Figure 9).[45] This means that the volume of water stored in western U.S. mountain snow is declining. There is now less spring-through-summer snow melt to feed streams, and thus the

---

[41] King et al. (2024).

[42] A. Park Williams et al., *Rapid Intensification of the Emerging Southwestern North American Megadrought in 2020-2021*, 12 Nature Climate Change 232 (2022).

[43] Williams et al. (2022).

[44] https://www.epa.gov/climate-indicators/climate-change-indicators-snowpack.

[45] https://www.epa.gov/climate-indicators/climate-change-indicators-snowpack.

24

west becomes drier as summers grow hotter. Western U.S. snowpack is declining because snow-season temperature is warming in response to rising atmospheric GHG concentrations, making snow fall as rain and melting already fallen snow.[46]

37. The government hyperlinks to EPA's and other agencies' science that I would normally point to are no longer available because this administration has been scrubbing climate science and resources from its websites, including EPA.



*Figure 9. EPA documented trends in snow depth at western United States stations on April (left) and change in the length of snow cover at western United States stations (right).*[47] No longer available on EPA website.

---

[46] Alexander R. Gottlieb & Justin S. Mankin, *Evidence of Human Influence on Northern Hemisphere Snow Loss*, 625 Nature 293 (2024).
[47] https://www.epa.gov/climate-indicators/climate-change-indicators-snowpack.

38. Earlier spring snow melt and more rain-on-snow events will increase the likelihood of spring flooding. The earlier snow melt, rain-on-snow events, and spring floods also remove water earlier in the year from storage in the mountains, leaving less water stored come summertime. The implications for water availability in the western U.S. is stark. Water shortages and restrictions will only increase with more GHG emissions not avoided from the transportation sector. As GHG emissions continue, these drought conditions and rapid transitions to wet conditions with flooding will worsen, with ever more severe impacts in the immediate future.

39. Hotter air temperatures are drying out the summers, increasing drought, while warmer winters are reducing snowpack, decreasing the water available to counteract the drier summers in the western U.S. A hotter, drier climate is the perfect mixture of variables to increase the frequency and severity of wildfires in the western U.S.[48]

40. In this vein, in March 2026, the contiguous United States just experienced its warmest March on record (back to 1895 when records begin), as did California and Colorado (Figure 10).[49] This warmth was in part due to an unprecedented mid-March heatwave in the western U.S. that was "virtually

---

[48] https://www.epa.gov/climate-indicators/climate-change-indicators-wildfires.
[49] https://www.ncei.noaa.gov/news/national-climate-202603.

impossible" to occur without human-caused climate change.[50] Spring heatwaves such as these decimate western U.S. snowpack, and such events are doubling in frequency and intensity since the mid 1990s.[51] Following this record-setting March, many western U.S. states have their lowest snowpack recorded ever for early April, which is supposed to be the peak in snowpack (Figure 10).[52] California was only slightly above its record low set in 2015[53] and 98% of its snow stations are in drought; Colorado is far below its record low[54] and 97% of its snow stations are in drought; Montana rivals its record low set in 2015[55] and 55% of its snow stations are in drought; and Washington is in the bottom 10% of its years[56] and 88% of its snow stations are in drought.

---

[50] https://www.worldweatherattribution.org/record-shattering-march-temperatures-in-western-north-america-virtually-impossible-without-climate-change/.

[51] Luke Reyes and Marc G. Kramer, *High-Elevation Snowpack Loss During the 2021 Pacific Northwest Heat Dome Amplified by Successive Spring Heatwaves*, 6 npj Climate Atmospheric Science 208 (2023).

[52] https://www.drought.gov/drought-status-updates/snow-drought-current-conditions-and-impacts-west-2026-04-09.

[53] https://nwcc-apps.sc.egov.usda.gov/awdb/basin-plots/POR/WTEQ/assocHUCca3/state_of_california.html.

[54] https://nwcc-apps.sc.egov.usda.gov/awdb/basin-plots/POR/WTEQ/assocHUCco3/state_of_colorado.html.

[55] https://nwcc-apps.sc.egov.usda.gov/awdb/basin-plots/POR/WTEQ/assocHUCmt3/state_of_montana.html.

[56] https://nwcc-apps.sc.egov.usda.gov/awdb/basin-plots/POR/WTEQ/assocHUCwa3/state_of_washington.html.



*Figure 10. March 2026 temperature rankings (left) and historic percentile of snow stations as of April 5, 2026 (right). Dark red for 0-2 percentile indicates record low snowpack.*[57]

41.    This record low snowpack is now preconditioning the western U.S. for an early onset to the wildfire season with continued projected warmth increasing fire concerns for the summer of 2026.[58] This unprecedented snow drought follows 2025 when the contiguous United States (including glaciers in Washington, Montana, Colorado, and California) and western Canada lost the highest percentage of their glacier mass, another illustration of the changing hydroclimate because of human-caused climate change mainly from the burning of fossil fuels.[59] The Repeal Rule

---

[57] https://www.drought.gov/drought-status-updates/snow-drought-current-conditions-and-impacts-west-2026-04-09.

[58] https://www.drought.gov/drought-status-updates/snow-drought-current-conditions-and-impacts-west-2026-04-09.

[59] The WGMS Network, *Global Glacier Mass Change in 2025*, 7 Nature Reviews Earth Env't 213 (2026).

will worsen these already dire conditions. The longer it takes to bring GHG emissions down, the worse conditions will be for Petitioners.

**A Drier West Increases Wildfires**

42. Anthropogenic climate change, mainly from the burning of fossil fuels,[60] has led to the length of the fire season in Pacific U.S. forests (California, Washington, extending eastward to Montana) increasing by 37 days, or 43%, between 1979 and 2019, the fire season in Alaskan forests to increase by 7 days or 69%, and in, temperate North America in general, to increase by 20 days or 45%.[61] The number of severe fire weather (hot, dry, windy days) days also increased by 37 days[62], also in response to anthropogenic climate change.[63] In addition, fires are growing faster in the western U.S. Between 2001 and 2020, the average growth rate of fires in the western U.S. increased by 249%.[64]

43. The area burned in Colorado, Washington, California, Montana, and Hawai'i has risen since 1996 (when records began for these different regions).[65]

---

[60] John T. Abatzoglou & A. Park Williams, *Impact of Anthropogenic Climate Change on Wildfire Across Western US Forests*, 113 Proceed. Nat'l Acad. Sciences 11770 (2016).

[61] Matthew W. Jones et al., *Global and Regional Trends and Drivers of Fire Under Climate Change*, 60 Reviews Geophysics e2020RG000726 (2022).

[62] Jones et al. (2022).

[63] Marco Turco et al., *The Emerging Human Fingerprint on Global Extreme Fire Weather*, 12 Science Advances eadx9845 (2026).

[64] Jennifer K. Balch et al., *The Fastest-Growing and Most Destructive Fires in the US (2001 to 2020)*, 386 Science 425 (2024).

[65] https://www.nifc.gov/nicc/predictive-services/intelligence.

From 1996 through 2025, the annual area burned in the combined Northwest, North Ops (northern California and Hawai'i), South Ops (southern California), Northern Rockies, and Rocky Mountains areas (collectively, Hawai'i, California, Oregon, Washington, northern Idaho, Montana, North Dakota, South Dakota, Wyoming, Nebraska, Kansas and Colorado) increased at a statistically significant 83,600 more acres per year. From 1996 to 1999, the average annual burn area was about 894,000 acres. For the 2000s, the average annual burn area was about 1,972,500 acres, increasing to about 2,553,700 acres in the 2010s. For the first six years of the 2020s, the average annual burn area has been about 3,564,200 acres, which is 4 times greater than the 1996-1999 average.

44. The amount of acreage burned each year has also increased when individual states where some of the Petitioners live are examined (Figure 11).[66]



**Change in Annual Burned Acreage by State Between 1984–2002 and 2003–2021**

Change in annual burned acres per square mile of land area:

-4  -3  -2  -1  -0.2  0.2  1  2  3  4

[66] https://www.epa.gov/climate-indicators/climate-change-indicators-wildfires.

*Figure 11. Change in the annual area burned per square mile between 1984-2002 average and 2003-2021 average.[67] No longer available on EPA website.*

45.     Between 1979 and 2015, anthropogenic climate change caused about 55% of the fire season fuel dryness and caused an additional 16.2 thousand square miles to burn in the western U.S.[68] Expanding to 1979 to 2020, 68% of the fire season dryness increase in the western U.S. was due to anthropogenic climate change, with Colorado experiencing a 72% increase while California experienced a 65% increase.[69] In California, the increase in burn area since 1971 was entirely due to human-caused climate change.[70] Farther north, the hot-dry conditions for the pan-Arctic fires of 2019, which included Alaska, were made nearly ten times more likely by human-caused climate change while the 2021 pan-Arctic fires that also included Alaska had a less than 1% probability of naturally occurring and human-caused climate change made the extreme fire weather 200 times more likely.[71]

---

[67] https://www.epa.gov/climate-indicators/climate-change-indicators-wildfires.
[68] Abatzoglou & Williams (2016).
[69] Yizhou Zhuang et al. *Quantifying Contributions of Natural Variability and Anthropogenic Forcings on Increased Fire Weather Risk over the Western United States*, 118 Proceedings Nat'l Acad. Sciences e2111875118 (2021).
[70] Marco Turco et al., *Anthropogenic Climate Change Impacts Exacerbate Summer Forest Fires in California*, 120 Proceedings Nat'l Acad. Sciences e2213815120 (2023).
[71] Lukas Fiedler et al., *Attribution of Observed Pan-Arctic Extreme Fire Events to Anthropogenic Forcings*, 21 Env't Rsch. Letters 064001 (2026).

46. Anthropogenic climate change has also led to increased fire risk and burn area in Hawaiʻi (Figure 12).[72] In August of 2023, eight fires burned simultaneously on Maui and the Big Island, with the destruction of Lahaina town, the death of over 100 people, and the displacement of over 10,000 people. The Hawaii Wildfire Prevention Working Group[73] concluded that the annual burn area in Hawaiʻi had increased by 300% between 1904 and 2022. About 0.5% of Hawaiʻi now burns a year, which is above the U.S.'s average of 0.30% and 0.46% for western U.S. fire-prone states. Hawaiʻi now experiences fires that burn more than 1,000 acres on all islands multiple times per year. Since 2006, there have been nearly 1,000 fires each year that burn more than 20,000 acres per year that reach close to 40,000 acres in some years (Figure 12). And notably, the Working Group concluded that the warming and drying climate of Hawaiʻi was the determining factor behind these changes in Hawaiʻi's fire activity.

---

[72] Abby G. Frazier et al., *A Century of Drought in Hawaiʻi: Geospatial Analysis and Synthesis Across Hydrological, Ecological, and Socioeconomic Scales*, 14 Sustainability 12023 (2022).

[73] Wildfire Prevention Working Group, Draft Report (Nov. 1, 2023), https://www.capitol.hawaii.gov/CommitteeFiles/Special/WFPWG/Documents/WFPWG%20Draft%20Report.pdf.



*Figure 12. Annual burn area in Hawaiʻi from 1904 through 2022.[74]*

47. While it is a conservative estimate because it does not include the lingering impacts of wildfire smoke exposure, the NOAA billion-dollar disaster records report that 23 billion-dollar fires directly cost taxpayers a total $150.1 billion from 1980 through 2024.[75]

48. The Repeal Rule will result in more wildfire exposure, and therefore smoke exposure, for Petitioners.

49. The smoke from these fires has caused reversal in air quality gains for Washington and California, helped reverse improvements in Colorado, halted air quality improvements in New York, Pennsylvania, and Tennessee, and influenced the air quality in Montana.[76] The fires, their smoke, and their damages in the western

---

[74] Wildfire Prevention Working Group, Draft Report (Nov. 1, 2023).
[75] https://www.ncei.noaa.gov/access/billions/events/US/1980-2025/?disasters[]=wildfire.
[76] Marshall Burke et al., *The Contribution of Wildfire to $PM_{2.5}$ Trends in the USA*, 622 Nature 761 (2023).

U.S. will only grow worse as more GHGs are emitted from more ICE vehicles put into commerce than otherwise would enter the market.[77]

50.     Because every increment of $CO_2$ emissions makes global warming worse, and because the Repeal Rule will cause many increments of emissions that would not occur without it, the Repeal Rule will make global warming worse. Because about half of emitted fossil $CO_2$[78] stays in the atmosphere for centuries or longer,[79] the effects of these emissions will last for centuries. Within any timescale relevant to these Petitioners, the harm will be irreparable.

**Endangerment Finding**

51.     I am familiar with the Endangerment Finding made by EPA in 2009, and EPA relied on some of my research in support of its conclusion that the emission of GHGs endangered public health and welfare. Specifically, I co-wrote the chapter on the effects of climate change on water resources, in *The Effects of Climate Change on Agriculture, Land Resources, Water Resources, and Biodiversity* (2008), which provided support for the Endangerment Finding and was relied upon by EPA.

---

[77] Jones et al. (2022); Chunyu Dong et al., *The Season for Large Fires in Southern California Is Projected to Lengthen in a Changing Climate*, 3 Communications Earth Env't 22 (2022); Yuanyu Xie et al., *Tripling of Western US Particulate Pollution from Wildfires in a Warming Climate*, 119 Proceedings Nat'l Acad. Sciences e2111372119 (2022); Burke et al. (2023).

[78] Pierre Friedlingstein et al., *Global Carbon Budget 2024*, 17 Earth System Science Data 965 (2025).

[79] Christine Kaufhold et al., *Assessing the Lifetime of Anthropogenic $CO_2$ and Its Sensitivity to Different Carbon Cycle Processes*, 22 Biogeosciences 2767 (2025).

52.     Since 2009, there is **NO new credible peer-reviewed evidence** that GHG emissions have become harmless. Quite the opposite is true. A number of scientists who were involved in EPA's preparation of the Endangerment Finding back in 2009 wrote a paper making it clear that the scientific justification for the Endangerment Finding has only gotten stronger in the sixteen years since.[80]

53.     I have reviewed the U.S. Department of Energy's *Critical Review of Impacts of GHG Emissions on the U.S. Climate* issued in 2025 that was used, in part, to justify rescission of the Endangerment Finding (the "DOE report"). This report is not a reliable source of information on the effect of GHG emissions on the climate system. This is a report written by five people over two months. The five authors are not experts in most of the areas they talk about in the report. I have served with three of the authors on various committees and know them and am familiar with their actual areas of expertise. Unlike the IPCC reports and National Climate Assessments, the DOE report is not peer reviewed. Although this DOE report was used to initiate the rescission of the Endangerment finding, it was not written by EPA scientists or based on any credible science.

54.     The DOE report does not reflect the scientific consensus about the significance of the climate change impacts documented in the IPCC reports and

---

[80] Scott R. Saleska et al., *What Is Endangered Now? Climate Science at the Crossroads*, 6 AGU Advances e2025AV001808 (2025).

National Climate Assessments. I agree with an assessment of the DOE report from the American Meteorological Society, of which I am a member, that identified five "foundational flaws" in the DOE report including: (1) its lack of breadth across scientific fields; (2) its lack of depth within scientific fields and specific topics; (3) its authors are an unrepresentative group of subject matter experts; (4) its selective emphasis on a small set of unrepresentative findings; and (5) its extrapolation from a limited subset of findings to reach conclusions that do not follow from comprehensive consideration of the scientific evidence.

55. Many of the scientist authors whose papers were cited in the DOE report were contacted to give their opinions on whether their work was described accurately. What followed was a 400+ page document detailing, in most cases, that what the authors' papers said was factually misrepresented in the DOE report, and that the report "currently fails to adequately represent the scientific understanding of climate change." I agree.

**Summary and Closing Thoughts**

56. Now, when the federal government should be leading the charge into a brave new world of clean energy that is healthy for these Petitioners and for all Americans, the Trump Administration is attacking the U.S. scientific engine that warns us of danger, while simultaneously fueling the climate fire.

57.     As someone who has dedicated my career to gathering climate change data, much of which has been relied upon by the federal government throughout the years, it is disheartening to see regulatory action like the Repeal Rule that are guaranteed to accelerate the warming trend and the warming-related impacts that these Petitioners are already experiencing. It is my expert opinion that these young Petitioners will be harmed if the courts do not stop the Repeal Rule. Every vehicle fleet that pollutes less will help stave off more heat and more harm to children across their entire lives. There is no question that any delay makes the conditions of heat, drought, lost snowpack, fire, smoke, and extreme weather that they must live in worse.

In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on May 12, 2026 in Melbourne, Australia.

_____
Steven W. Running

# Exhibit A

# Steven W. Running

Regents Professor/Director Emeritus, Numerical Terradynamic Simulation Group (NTSG)
College of Forestry & Conservation, University of Montana, Missoula, MT  59812

## Education:
Ph.D.   Forest Ecophysiology; Colorado State University, Fort Collins, 1979
M.S.    Forest Management; Oregon State University, Corvallis, 1973
B.S.     Botany; Oregon State University, Corvallis, 1972

## Experience:
2017 -      Regents Professor Emeritus
2007-2017 Regents Professor, University of Montana
2008        Visiting Professor, Universitat de Bodenkultur, Vienna, Austria
1988-2007 Professor, Forest Ecology, College of Forestry & Conservation, University of Montana
2005        Visiting Professor, University of Firenze, Florence, Italy
2003        Professor, Visiting McMaster Fellow, CSIRO Land and Water, Canberra, ACT Australia
1993        Visiting Sabbatical Scientist, Dept of Plant Ecology, Lund University, Sweden
1986-87     Visiting Sabbatical Scientist, CSIRO Division of Forest Research, Canberra, Australia
1983-1988 Associate Professor, Forest Ecophysiology, School of Forestry, University of Montana
1979-1983 Assistant Professor, Forest Ecophysiology, School of Forestry, University of Montana
1979        Senior Research Associate, Natural Resource Ecology Laboratory, Colorado State University
1976-1979 Research Forester, Forest, and Mtn Meteorology Project, Rocky Mtn Forest and Range Experiment Station, Fort Collins, Colorado
1976-1979 Graduate Research Assistant, Dept. of Forest and Wood Sciences, Colorado State University
1974-1976 Research Assistant, Coniferous Forest Biome, Oregon State University
1973-1974 Forest Ecologist, Environmental Associates Inc., Corvallis, Oregon

## Society Affiliations:
American Geophysical Union
American Meteorological Society
Ecological Society of America

**Awards, Honors:**

Personal Audience Her Royal Highness Princess Maha Chakri Sirindhorn, Bangkok, Thailand

NASA-USGS 2015 William T. Pecora Award

ISI World's Most Influential Minds, Geosciences 2014, 2015, 2017

Montana Environmental Information Center Conservationist of the Year 2012

Doctor Honoris Causa University of Natural Resources and Life Sciences, Vienna Austria 2012

Honorary Professor, Environment Institute and Dept. of Geography, University College London 2009

Oregon State University Distinguished Alumni Fellow 2009

E. O. Wilson Biodiversity Technology Pioneer Award 2009

Chapter lead author of IPCC 2007 report, awarded the Nobel Peace Prize 2007

Univ. Of Montana Presidential Scholar 2008

University of Montana, Lud Browman Award for scientific writing, 2007

Oregon State Univ. College of Forestry, Distinguished Alumni, 2006

Burk-Brandenburg Montana Conservation Award, 2006

ISI Highly Cited Scientist Designation 2004-2013

Fellow of the American Geophysical Union, 2002

University of Montana BN Faculty Achievement Award, 1991

University of Montana, Distinguished Scholar, 1990

**Nat'l/Int'l Committee Appointments:**

NASA Science Committee  2013 - 2017

NASA Earth Science Subcommittee 2009 – 2015, Chair 2013- 2017

NOAA Climate Working Group, 2009 - 2014

National Academy of Sciences, NRC Committee on Ecological Impacts of Climate Change, 2008.

NCAR CCSM Land Model Working Group (LMWG) Co-Chair, 2006-2008.

AGU Committee of Fellows 2006-2008.

Dept of Energy, Terrestrial Carbon Science Research Program, Co-Chair, 2005-2006. National Research Council, NASA Earth Science Decadal Survey, 2005-2006.

NRC Committee on Environmental Satellite Data Utilization 2002-2005.

Intergovernmental Panel on Climate Change, Chapter Lead Author 2004-2007.

International Geosphere-Biosphere Programme Science Executive Committee 2004-2007. National Research Council: Committee on Earth Studies 2004-2006.

NCAR CCSM Land Model Working Group (LMWG) Co-Chair, 2002-2004.

Interagency Carbon Cycle Science Committee 2002 – 2005.

NAS-NRC Review of NASA Earth Science Enterprise Science Plan for 2000-2010.

NASA - Earth Observing System MODIS Science Team Member, 1989-2007.

NCAR Climate System Model (CSM) Advisory Board, 1996-2000.

NASA Mission to Planet Earth Biennial Review Panel, 1997.

Terrestrial Observation Panel for Climate of the World Meteorological Organization, 1995-2001.

National Academy of Sciences, NRC, Climate Research Committee, 1995-2001.

NRC Panel on Climate Observing System Status, 1998.

NSF - National Center for Ecological Analysis and Synthesis, Science Advisor Board, 1994-1997.

NASA Earth Observing System, Land Science Panel, Chair 1994-2000.

World Climate Research Program, International Land Surface Climatology Science Panel, 1994-1996.

World Climate Research Program, Global Terrestrial Observing System Committee, 1994-1995.

International Geosphere-Biosphere Program, Biospheric Aspects of the Hydrologic Cycle, Vice-Chair, 1991-1996.

National Science Foundation, Ecosystem Studies Program panel member 1991-1993.

World Climate Research Program - WCRP/IGBP Land Surface Experiments, 1990-1994.

NASA Earth Science and Applications Advisory Subcommittee, 1990-1993.

NASA Boreal Forest Ecosystem-Atmosphere Study (BOREAS) Steering Committee, 1989-1991.

International Geosphere-Biosphere Program - Committee on Global Hydrology, 1988-1990.

NASA - Terrestrial Ecosystems Program Advisory Group, 1988-1990.

NASA - Management Operations Working Group, 1988-1990.

NASA - Interdisciplinary Studies Review Panel, 1986.

NASA - MODIS Instrument Panel, 1984-1986.

NASA - Global Biology Review Panel, 1983-1984.

National Academy of Sciences, Space Science Board participant, 1982-1984.

NASA - Land Related Global Habitability Program Planning, 1982-1983.

**Proposal Reviewer:**

American Institute of Biological Sciences

California Space Institute

Canada Foundation for Innovation

National Aeronautics and Space Administration

National Oceanic and Atmospheric Administration

National Environmental Research Council of the United Kingdom

National Science Foundation

Natural Sciences and Engineering Research Council of Canada

U.S. Dept. of Energy

U.S. Environmental Protection Agency

U.S. Geological Survey

U.S.D.A. Cooperative Research Program
Western Regional Center of the National Institute for Global Environmental change

**Journal Referee:**
Agricultural and Forest Meteorology
Agronomy Journal
AI Applications in Natural Resource Management
American Naturalist
Australian Journal of Forest Research
Bioscience
Canadian Journal of Botany
Canadian Journal of Forest Research
Canadian Journal of Remote Sensing
Climatic Change
Climate Research
Ecological Applications
Ecology
Forest Science
Global Change Biology
Int'l Journal of Hydrological Processes
Int'l Journal of Remote Sensing
Journal of Applied Meteorology
Journal of Climate
Journal of Environmental Quality
Journal of Geophysical Research
Journal of Hydrology
Journal of Range Management
National Geographic Research and Exploration
Nature
Northwest Science
Remote Sensing of Environment
Science
Tellus
The National Academies
Tree Physiology
USFS Intermountain Forest and Range Experiment Station
USFS Pacific Northwest Forest and Range Experiment Station
USFS Rocky Mountain Forest and Range Experiment Station
Water, Air and Soil Pollution
Water Resources Research

# EXHIBIT 15

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

ELENA VENNER, *et al.*,
      *Petitioners*,

      v.

UNITED STATES
ENVIRONMENTAL PROTECTION
AGENCY, *et al.*,
      *Respondents*.

Case No. 26-1038
Lead Case No. 26-1037
(and consolidated cases)

### DECLARATION OF MARK Z. JACOBSON, PhD,
### IN SUPPORT OF PETITIONERS' MOTION TO STAY
### THE FINAL RULE PENDING REVIEW

I, Mark Z. Jacobson, hereby declare and if called upon would testify as follows:

1.      I am a Professor of Civil and Environmental Engineering at Stanford University. I am offering this testimony in my personal capacity, and I have personal knowledge of the facts stated herein.

2.      I am submitting this Declaration in support of Petitioners' Motion to Stay the Endangerment Finding rescission and repeal of vehicle emission standards (the "Repeal Rule") pending review. I offer the following expert opinions that the additional carbon dioxide ($CO_2$) that is emitted as a result of the Repeal Rule that otherwise would not be emitted will increase unhealthful local air pollution even

1

more in cities that are already polluted, separately from and in addition to causing global climate damage (such as enhancing coastal flooding, extreme weather events, agricultural loss and famine in some regions, ocean acidification, wildfires, and other impacts). As such, allowing such emissions, thereby slowing the vital transition toward the renewable energy that eliminates those emissions, at this pivotal time would be highly damaging to the health and economic wellbeing of the youth Petitioners in this case.

3.      I served as an expert who was invited by the State of California to testify on May 18, 2009 at the U.S. Environmental Protection Agency Hearing in Arlington, Virginia, on the "Proposed Endangerment and Cause or Contribute Findings for Greenhouse Gases Under the Clean Air Act".[1] The second part of my testimony summarizes the direct health impacts of carbon dioxide through its increase in the chemical pollutants ozone and particulate matter (PM) in urban areas. My conclusion stated in the testimony is, "As such, reducing locally-emitted $CO_2$ reduces local air pollution deaths even if $CO_2$ in adjacent regions is not controlled." This is a scientific result based on two peer-reviewed scientific studies I performed.[2]

---

[1] My oral and written testimony is provided here:
https://web.stanford.edu/group/efmh/jacobson/PDFfiles/EPAEndang0509.pdf.
[2] Mark Z. Jacobson, *On the Causal Link between Carbon Dioxide and Air Pollution Mortality*, 35 Geophysical Rsch. Letters L03809 (2008), https://web.stanford.edu/group/efmh/jacobson/Articles/V/2007GL031101.pdf; Mark Z. Jacobson, *Enhancement of Local Air Pollution by Urban $CO_2$ Domes*, 44

4.      I similarly testified at another EPA hearing (AMS-FRL-8772-7), on March 5, 2009 in Washington D.C., called "California State Motor Vehicle Control Standards: Greenhouse Gas Regulations: Reconsideration of Previous Denial of a Waiver of Preemption," in which I presented even more details on the impacts of local and global carbon dioxide emissions on air pollution health.[3]

5.      Based on my previous testimony and my 37 years of experience studying air pollution and climate and their interactions, I can confidently say that there is no scientific basis to repeal EPA's Endangerment Finding for GHGs. In fact, the opposite is true: the scientific basis for the Finding has only become more extensive in the past 17 years as climate-change damage has worsened.

**Background & Qualifications**

6.      I have two Bachelor's Degrees with Distinction from Stanford University, one in Civil Engineering and the other in Economics, both conferred in 1988. I earned a Master's Degree in Environmental Engineering from Stanford University, also conferred in 1988. I earned a second Master's Degree (1991) and then a Ph.D. (1994) in Atmospheric Sciences from UCLA. A true and correct copy of my curriculum vitae is attached as Exhibit A.

---

Env't Sci. Technology 2497 (2010), https://web.stanford.edu/group/efmh/jacobson/Articles/V/es903018m.pdf.
[3] The slides that I presented to EPA are located here: https://web.stanford.edu/group/efmh/jacobson/PDFfiles/0903EPACalif.pdf.

7.     Since 1989, I have been researching the impacts of human emissions of gases (among them $CO_2$ and other greenhouse gases) and particles (including black and brown carbon) from fossil fuels on air pollution, human health, weather, and climate. Starting in 1999 and given the gravity of the health concerns associated with pollution from fossil fuels, I began examining in detail clean, renewable energy solutions to these problems. I have since developed roadmaps to transition the all-sector energy infrastructures of each of the 50 United States, including Alaska, California, Colorado, Hawai'i, Montana, New York, Pennsylvania, Tennessee, Washington, and Wisconsin (states where Petitioners live), and 150 countries to 100% clean, renewable energy by 2050. My peer reviewed research has demonstrated that fossil fuel energy is no longer needed to power all energy sectors of the 50 U.S. states and the 150 countries we examined. Instead, a complete transition away from fossil fuels is technically feasible by 2050 or earlier and economically beneficial. It will also reduce about 90 percent of the 7.4 million air pollution deaths per year worldwide (and over 100,000 per year in the U.S.), slow global warming, and increase net jobs. The cost savings, both in terms of energy costs and health and climate costs, are substantial, due in large part to the efficiencies gained in electrifying all-purpose energy, including transportation, and ending the perpetual mining, refining, transport and combustion of fossil fuels.

8. I served as an expert for the youth plaintiffs in the *Navahine v. Hawai`i Department of Transportation* case where the parties entered a settlement agreement designed to decarbonize the state transportation system.[4] I, along with other expert transportation expert witnesses, opined that it is both technically and economically feasible to transition from a predominantly fossil fuel-based energy system in the state of Hawai`i to a 100% clean, renewable energy system for all sectors, including transportation ideally by 2035 but no later than 2045. My research shows that there is no technical or economic impediment to transitioning Hawaii's transportation system off of fossil fuels, even though Hawai`i has been called "the most petroleum-dependent state in the Union."[5]

**Carbon Dioxide Domes Increase Ozone and Particles, Thus Mortality**

9. The Repeal Rule will increase $CO_2$ emissions from vehicle tailpipes.[6] Locally-emitted $CO_2$ from internal combustion engine (ICE) vehicles creates urban "$CO_2$ domes", or regions with $CO_2$ levels much higher than background levels. These $CO_2$ domes enhance local temperatures. Higher temperatures in cities, in turn,

---

[4] *Navahine v. Dep't of Transp.*, No. ICCV-22-0000631, Joint Stipulation and Order re: Settlement; Exhibit "A" (Haw. Cir. Ct. June 20, 2024).
[5] Hawai'i State Energy Office, State of Hawai'i Proposed Beneficiary Mitigation Plan Per Volkswagen Settlement Environmental Mitigation Trust Agreement. (2019). https://energy.hawaii.gov/wpcontent/uploads/2022/05/Hawaiis-Proposed-Beneficiary-Mitigation-Plan-for-the-VWEnvironmental-Mitigation-Trust-January-2019.pdf.
[6] EPA-HQ-OAR-2025-0194-0002; EPA-HQ-OAR-2025-0194-0003.

evaporate more water from the soil.[7] Both higher temperatures and higher water vapor independently increase local ozone concentrations[8] where ozone is already elevated and unhealthy or hazardous (i.e., in polluted air), inflaming and damaging respiratory airways, aggravating chronic lung disease, and increasing asthma attacks.[9] Higher temperatures and water vapor also increase particulate matter concentrations. The Repeal Rule will likely thus increase ozone and particulate matter in the cities[10] where some Petitioners reside, including C.E in Beloit, WI, Elena in San Luis Obispo, CA and Lakewood, CO, E.S. in Memphis, TN, Emma in La Jolla, CA, J.K. in Westchester County, NY, M.B in Madison, WI, M.D. in Garden Grove, CA, and Maya in Los Angeles (and Berkeley), CA. Such ozone increases will increase their risk of further respiratory harm up to and including premature death. Each of these Petitioners already resides in a town or city with an "F" (the worst) grade for ozone air quality according to the American Lung Association.[11]

---

[7] Mark Z. Jacobson, *Enhancement of Local Air Pollution by Urban $CO_2$ Domes*, 44 Env't Sci. Technology 2497 (2010), https://web.stanford.edu/group/efmh/jacobson/Articles/V/es903018m.pdf; Mark Z. Jacobson, *On the Causal Link Between Carbon Dioxide and Air Pollution Mortality*, 35 Geophysical Rsch. Letters L03809 (2008), https://web.stanford.edu/group/efmh/jacobson/Articles/V/2007GL031101.pdf.
[8] *Id.*
[9] EPA, *Health Effects of Ozone Pollution*, https://www.epa.gov/ground-level-ozone-pollution/health-effects-ozone-pollution (last visited May 5, 2026).
[10] EPA-HQ-OAR-2025-0194-0002.
[11] American Lung Association, *State of the Air*, https://www.lung.org/research/sota (last visited May 5, 2026).

Katherine in Bethlehem, PA, lives in a "D" grade for particulate matter air quality, along with Emma, while M.B. and Maya have "F" grades for their residencies. Because these Petitioners already live in extremely unhealthy and harmful air, any further increase in ozone and particulate matter will only cause further harm. Indeed, according to the EPA's own projections of air quality changes[12], these regions will experience a disproportionate increase in ozone and particulate matter from the Repeal Rule.

10. In the United States, ambient air pollution (including $PM_{2.5}$, or particles smaller than 2.5 micrometers in diameter) from the production, processing, transport and end-use (e.g., combustion) of oil and gas alone kills about 91,000 people each year.[13] Coal mining, processing, and combustion increases the death rate to well beyond 100,000 per year.

11. It is important to recognize that vehicle emissions are not equivalent to power plant emissions in terms of health impacts. The intake fraction—how much emitted pollution is inhaled from a particular source—is 20-30 times higher for motor vehicles than power plants.[14] Thus, smaller amounts of pollutants that people

---

[12] EPA-HQ-OAR-2025-0194-0002.
[13] Karn Vohra et al., *The Health Burden and Racial-Ethnic Disparities of Air Pollution from the Major Oil and Gas Lifecycle Stages in the United States*, 11 Science Advances eadu2241 (2025).
[14] Piotr Holnicki et al., *Intra-urban Variability of the Intake Fraction from Multiple Emission Sources*, 9 Atmospheric Pollution Research 1184 (2018).

breathe in directly (e.g., $PM_{2.5}$, oxides of nitrogen-$NO_x$, reactive organic gases-ROG, and carbon monoxide-CO) from vehicles is more harmful to human health than the same amount of pollution emitted from power plants, because humans are far more likely to be exposed to the pollution from the motor vehicles that are ubiquitous with modern life.

12.     The Repeal Rule will also increase $PM_{2.5}$, $NO_x$, ROG, and CO emissions from vehicle tail pipes over what would have otherwise occurred because of the decreased number of battery-electric vehicles (BEVs) and increased number of ICE vehicles on the roads because of the rescission of the GHG emission standards.[15] $NO_x$ and ROGs can react with other atmospheric chemicals to create particulate matter and ozone.[16] $PM_{2.5}$, ozone, $NO_x$, and ROGs result in premature deaths, imposing health care costs as well as a financial burden on the country. The U.S. government statistically values a life at up to $14.2 million per person as of 2025, so even a small contribution to the death rate from fossil fuels can cost hundreds of millions of dollars in lost human life.[17]

---

[15] EPA-HQ-OAR-2025-0194-0002; EPA-HQ-OAR-2025-0194-0003.

[16] EPA, *Basic Information about $NO_2$*, https://www.epa.gov/no2-pollution/basic-information-about-no2 (last visited May 5, 2026).

[17] US DOT, *Departmental Guidance on Valuation of a Statistical Life in Economic Analysis*, https://www.transportation.gov/office-policy/transportation-policy/revised-departmental-guidance-on-valuation-of-a-statistical-life-in-economic-analysis (last visited May 5, 2026); Aaron Kearsley, *HHS Standard Values for Regulatory Analysis*, 2025 (Feb. 13, 2025),

13. Every new ICE vehicle increases demand for oil extraction. The average passenger vehicle car uses 509 gallons of gasoline per year, and over its fifteen-year life, a light-duty vehicle will use approximately 7,635 gallons of gasoline. The combustion of 7,635 gallons of gasoline over the life of one passenger car releases about 68 tons of $CO_2$ into the atmosphere.[18] It is not even possible to capture the $CO_2$ from the air (Direct Air Capture) without emitting even more $CO_2$ than was captured, because even in the best case of using renewable energy to capture $CO_2$, that renewable energy can then no longer replace a fossil source that emits more $CO_2$ than the amount being captured. As such, trying to capture $CO_2$ from the air is not a viable option since it only increases $CO_2$ in the air.[19]

14. EPA's analysis of these repealed GHG rules for vehicles looked at air quality improvement out to 2055 from the implementation of these rules beginning in 2027. Even if the repealed rules are reinstated five years in the future, the delay will damage air quality for five additional years, worsening air quality in the United

https://aspe.hhs.gov/sites/default/files/documents/639756a60fbe7e51786bcec176ad 52f1/Standard-RIA-Values-2025.pdf (U.S. Department of Health & Human Services values life at $13.6 million per person).

[18] EPA, *Greenhouse Gas Emissions from a Typical Passenger Vehicle*, https://www.epa.gov/greenvehicles/greenhouse-gas-emissions-typical-passenger-vehicle (last visited May 5, 2026).

[19] Mark Z. Jacobson et al., *Energy, Health, and Climate Costs of Carbon-Capture and Direct-Air-Capture versus 100%-Wind-Water-Solar Climate Policies in 149 Countries*, 59 Env't Science & Technology 3034 (2025), https://web.stanford.edu/group/efmh/jacobson/Articles/I/149Country/149-Countries.pdf.

States compared with what it otherwise would be through 2060, with substantial costs to these Petitioners, society at large, and the government.

15. Allowing the Repeal Rule to go into effect for two years will lock in the emission of 942 million tons of additional $CO_2$ from vehicle tailpipes that otherwise would not have occurred. Even if the Rule goes back into effect in 2028, these 942 million tons will still have been emitted, and will stay in the atmosphere, due to the 15-year average lifespan of an ICE vehicle.

16. It would be virtually impossible to remove this amount of $CO_2$ from the atmosphere once it is emitted because, as stated, removing $CO_2$ from the air (Direct Air Capture) only increases the net $CO_2$ added to the air when the whole system is considered due to the large amount of energy needed to remove $CO_2$ from the air and the fact that using renewables for this energy prevents them from removing even more $CO_2$ by replacing a fossil-fuel source.[20] By far the best and fastest way to remove $CO_2$ from the air is to prevent it from getting into the air in the first place, which is why it is so vital the GHG emission standards for motor vehicles remain in place.

17. The additional fossil-fuel-powered vehicles that will be on the road because of the Repeal Rule will result in more lives lost, in illnesses, and in health costs, before even accounting for climate change damages, which are significant.

---

[20] *Id.*

**Electric Vehicles Reduce Pollution and Energy Needs**

18.     One benefit of the GHG emission standards that EPA eliminated is that they were leading to more battery-electric vehicles (BEVs) on the roads in the U.S. BEVs are crucial to reducing pollution and energy consumption. At the most basic level, this is because BEVs are much more efficient in their use of energy than are fossil-fuel powered vehicles with an internal combustion engine. BEVs use about 80% of the energy in their battery-stored electricity to move the vehicle, losing only 20% of the energy as heat. In an ICE vehicle, only about 17-20% of the energy in the fuel goes toward vehicle movement, whereas more than 80% of the energy is lost as heat. Overall, it takes an ICE car 3.2 to 5.3 times more energy in gasoline than a BEV needs in electricity from the plug to travel the same distance.

19.     I provide above a concrete example of the much higher BEV efficiency over a comparable ICE vehicle from the U.S. Department of Energy. For example, a comparison of the 2023 all-electric Ford F-150 Lightning extended range, 4WD (480 Wh/mi = 578.7 miles per gigajoule)[21] with the 2023 Ford F-150 8-cylinder 4WD flex-fuel truck running on gasoline (18 mpg = 139.1 miles per gigajoule),[22] indicates that the electric vehicle can go 4.2 times the distance as the gasoline version.

---

[21] https://www.fueleconomy.gov/feg/noframes/46327.shtml
[22] https://www.fueleconomy.gov/feg/byfuel/FFV2023.shtml

Therefore, it is my expert opinion that the Repeal Rule will increase energy consumption enormously in the U.S.

**Rapid Transition to Renewable Energy and Electric Vehicles is Possible**

20.     In 2025, China entered a $CO_2$ emission plateau owing to large-scale deployment of renewable energy generation and EVs, whereas the U.S. saw increased $CO_2$ emissions following policy reversals, clean energy stagnation, and EV suppression.[23] BEVs are a central component to any energy transition away from fossil fuel reliance and reducing $CO_2$ emissions because transportation is the largest source of $CO_2$ emissions in the United States.[24] Transitioning to BEVs over ICE vehicles also aids in energy storage and grid stability, because EVs act as household batteries that can store electricity during high production and re-release during periods of high demand.[25] Such vehicle-to-home charging, in the limit, can cut American's energy costs by 61% and reduce their GHG emissions by 89%.

21.     As of 2024, 11% of Chinese vehicles were EVs, while 2.7% of U.S. vehicles were EVs.[26] In 2024, 48% of new car sales in China were EVs, while the

---

[23] Zhu Deng et al., *Global Carbon Emissions and Decarbonization in 2025*, Nature Reviews Earth & Env't (2026), https://doi.org/10.1038/s43017-026-00780-4.

[24] US EIA, *U.S. Energy-Related Carbon Dioxide Emissions, 2024*, https://www.eia.gov/environment/emissions/carbon/ (last visited May 5, 2026).

[25] Jiahui Chen et al., *Vehicle-to-home Charging can cut Costs and Greenhouse Gas Emissions Across the USA*, 10 Nature Energy 1458 (2025), https://www.nature.com/articles/s41560-025-01894-7.

[26] Share of cars currently in use that are electric, 2010 to 2024, https://ourworldindata.org/grapher/share-car-stocks-electric.

U.S. number was 10%.[27] In Norway, EVs made up 98% of new car sales in 2025; only 12 petrol-only and 67 diesel-only cars were sold in Norway in February 2026, meaning "the fossil car has thus practically been phased out of the new car market in Norway."[28]

22.    ICE vehicles are not needed to meet the transportation needs in the United States or abroad and can be replaced by clean light to even heavy duty EVs that are already available to the United States and its citizens, provided the GHG emission standards for vehicles remain in place. More pollution from ICE vehicles means more health harms, including deaths. The Repeal Rule will cause serious and unnecessary harm to these Petitioners by significantly increasing local air pollution in areas where they live, climate change impacts on regional and global scales, and energy costs, with serious consequences for the young Americans, who will suffer the most adverse consequences from actions taken to lock-in the use of fossil fuels.

In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

---

[27] Share of new cars sold that are electric, 2010 to 2024, https://ourworldindata.org/grapher/electric-car-sales-share?facet=none.

[28] Joshua Hill, *Fossil Cars all but Phased out in Norway as EV Sales Hit 98 pct, and Just 12 Petrol Cars Sold* (Mar. 4, 2026), https://thedriven.io/2026/03/04/fossil-cars-phased-out-as-norway-ev-sales-hit-98-pct-and-just-12-petrol-cars-sold/.

Executed on May 13, 2026 in Stanford, California.

Mark Z. Jacobson
_____
Mark Z. Jacobson

# Exhibit A

**Mark Z. Jacobson Curriculum Vitae June 9, 2025**

Department of Civil & Environmental Engineering
Stanford University, Stanford, CA 94305-4020, USA

**Academic Degrees**
Stanford University, Stanford, CA; Civil Engineering B.S., with distinction, 1988
Stanford University, Stanford, CA; Economics B.A., with distinction, 1988
Stanford University, Stanford, CA; Environmental Engineering M.S., 1988
UCLA, Los Angeles, CA; Atmospheric Sciences M.S., 1991
UCLA, Los Angeles, CA; Atmospheric Sciences Ph.D., 1994

**Professional Appointments**
Stanford University Civil & Environmental Engineering Professor, 2007-present
Stanford University Civil & Environmental Engineering Associate Professor, 2001-2007
Stanford University Civil & Environmental Engineering Assistant Professor, 1994-2001
Stanford University Atmosphere/Energy Program Director/co-founder, 2004-present

**Teaching, Mentoring, and Research**
Mark Z. Jacobson's career has focused on better understanding air pollution and climate problems and developing clean, renewable energy solutions to them. Toward that end, he has developed and applied three-dimensional (3-D) atmosphere-biosphere-ocean computer models and solvers to simulate and understand air pollution, weather, climate, and renewable energy resources. He has also developed a computer model to simulate grid stability in the presence of 100% renewable energy and roadmaps to transition countries, states, and cities to 100% clean, renewable energy for all energy purposes.

Jacobson has been a professor at Stanford University since 1994. His research and teaching cross two fields: Atmospheric Sciences and Energy. In his 31 years at Stanford, Jacobson has developed five courses that he has taught among 85 academic quarters to 4,000 undergraduate and graduate students. He also developed two online courses (XEIET 100 and 200) reached by thousands of distance learners. In 2004, Jacobson founded and has ever since directed the Atmosphere/Energy Program at Stanford, which has graduated about 600 MS, BS, and PhD students. Jacobson himself has advised 25 Ph.D. students, hundreds of M.S. students, and dozens of undergraduate students. For four of Jacobson's five courses, he has written textbooks to guide student learning. His first book was *Fundamentals of Atmospheric Modeling* (1999) (second edition in 2005) used in two courses: Numerical Weather Prediction and Air Pollution Modeling. For a third more general course, Air Pollution and Global Warming, he wrote *Atmospheric Pollution: History, Science, and Regulation* (2002) (second edition in 2012). In 2020, he wrote *100% Clean, Renewable Energy and Storage for Everything* for a course of the same name. Since then, he has written two more energy-related layman's books, *No Miracles Needed* (2023) and *Still No Miracles Needed* (2025). Thus, he has written seven books/editions, all geared toward educating students and/or the public.

Jacobson has published 187 peer-reviewed journal articles (47,683 citations as of 6/9/25 from Google Scholar) and given ~750 invited talks. Based on the impact of his research through citations, in 2022, he was ranked the most impactful scientist in the world in the field of Meteorology & Atmospheric Sciences among those first publishing past 1985 (Ioannidis, J.P.A., Elsevier Data Repository, V5, Nov. 3, 2022, doi: 10.17632/btchxktzyw.5). In Energy, he was ranked #6 among those first publishing past 1980. His work in both fields is summarized next.

**Atmospheric Sciences**
Jacobson started computer modeling in 1990. He developed over 85% of the computer code for the world's first 3-D urban air pollution model coupled, with feedback, to meteorology. He then developed the first coupled 3-D global air pollution-weather-climate model and first unified nested global-through-urban air pollution-weather-climate model, GATOR-GCMOM. Zhang (2008) calls Jacobson's unified model "*the first fully-coupled online model in the history that accounts for all major feedbacks among major atmospheric processes based on first principles*." Many features in GATOR-GCMOM are now mainstream in other models worldwide. For his models, he coded the world's fastest (at the time) ordinary differential equation solver in a 3-D model for a given level of accuracy (SMVGEAR). He also

1

developed solvers for aerosol particle and cloud particle coagulation, condensation/evaporation, freezing, dissolution, chemical equilibrium, breakup, and lightning; air-sea exchange; ocean chemistry; greenhouse gas radiation absorption; and land-surface processes. Thousands of researchers have used his computer codes.

In 2000 and 2001, Jacobson applied his model to discover that black carbon, the main component of soot air pollution particles, may be the second-leading cause of global warming in terms of radiative forcing, after carbon dioxide. Several subsequent studies, including the highly-cited review by Bond et al. (2013), confirmed his finding. Jacobson's finding about black carbon's climate effects resulted in his invitation to testify to the U.S. House of Representatives in 2007 and formed the original scientific basis for several proposed laws and policies. These included U.S. Senate Report 110-489 (Black Carbon Research Bill of 2008), U.S. House Bill 7250 (Arctic Climate Preservation Act of 2008), U.S. House Bill 1760 (Black Carbon Emissions Reduction Act of 2009), U.S. Senate Bill 849 (2009 Bill for the U.S. EPA to research black carbon), U.S. Senate Bill 3973 (Diesel Emission Reduction Act of 2010), European Parliament Resolution B7-0474/2011 (Resolution calling for black carbon controls on climate grounds), the 2012 multi-country Climate and Clean Air Coalition to Reduce Short-Lived Climate Pollutants, California Senate Bill 1383 (2016 Bill to reduce black carbon), and California's 2002 rule to not allow diesel vehicles to have higher particle emissions than gasoline vehicles.

For his black carbon discovery and modeling, Jacobson received the 2005 American Meteorological Society Henry G. Houghton Award, given for his "*significant contributions to modeling aerosol chemistry and to understanding the role of soot and other carbon particles on climate*" and a 2013 American Geophysical Union Ascent Award for "*his dominating role in the development of models to identify the role of black carbon in climate change*."

Jacobson's 2008 and 2010 findings that carbon dioxide domes over cities have enhanced air pollution mortality through its feedback to particles and ozone resulted in another invitation for him to testify in the U.S. House of Representatives in 2008 and to testify twice in U.S. Environmental Protection Agency (EPA) hearings. In the first EPA hearing he was called as the State of California's only expert witness to testify on how carbon dioxide can damage health locally by increasing temperatures and water vapor. This testimony served as a direct scientific basis for the EPA's 2009 approval of the first regulation in U.S. history of carbon dioxide (the California waiver). The U.S. Supreme Court refused to hear a challenge by several states to the waiver in December, 2024.

**Energy**
With respect to energy, in 2001 Jacobson published a paper in *Science* examining the ability of the U.S. to convert a large fraction of its energy to wind. In 2005, his group developed the first world wind map based on data alone. His students and he subsequently published on the impacts of hydrogen fuel cell vehicles on air quality and climate, on reducing the variability of wind energy by interconnecting wind farms; on integrating solar, wind, geothermal, and hydroelectric power into the grid; on integrating offshore wind and wave power; on comparing ethanol with gasoline; and on mapping U.S. offshore wind resources.

In 2008, he carried out a review of proposed energy technologies to address air pollution, global warming, and energy security, concluding that wind-water-solar (WWS) technologies resulted in the greatest benefits. In 2009, he coauthored a plan, featured on the cover of *Scientific American*, to determine if powering the world for all purposes with WWS was possible. In 2010, he was invited to participate in a TED debate. From 2010-2012, he served on the Energy Efficiency and Renewables advisory committee to the U.S. Secretary of Energy. In 2011, he co-founded The Solutions Project non-profit, which combined science, business, culture, and community, to educate people of all ages about science-based 100% clean, renewable energy roadmaps for 100% of the people.

In 2013, 2014, and 2016, he and his students and colleagues developed roadmaps to transition New York, California, and Washington State, respectively, to 100% WWS. Jacobson's New York energy roadmap resulted in an invitation for him to appear on the Late Show with David Letterman on October 9, 2013. Jacobson was then asked by the New York governor's office to provide more information about a possible transition of New York to 100% WWS. In 2016, the governor proposed and passed a 50% renewable law (the New York Clean Energy Standard). Also in 2016, and in 2018, the New York Senate proposed New York Senate Bills S5527 and S5908A, respectively, for the state to go to 100% renewable electricity. The texts of both bills state, "*This bill builds upon the Jacobson wind, water and solar (WWS) study.*" In 2019, New York State implemented Jacobson's goal for the electricity sector by passing a law to go

to 100% renewable electricity. Similarly, on October 27, 2014, after the publication of Jacobson's California WWS roadmap, the California governor's office invited Jacobson to meet with the governor's policy advisors to discuss the roadmap. In January, 2015, the governor proposed and, shortly after, obtained passage of a law (SB 350) for California to move to 50% renewable electricity. In 2018, this law was updated for the state to go to 100% renewable electricity (SB 100).

In 2015, Jacobson and his group published WWS plans for all 50 states and a continental-U.S.-wide grid study assuming 100% WWS. The grid paper earned Jacobson and his coauthors a 2016 Cozzarelli Prize from the *Proceedings of the National Academy of Sciences*, given for "*outstanding scientific excellence and originality*." The plans and grid study were updated for the 50 U.S. states and individual U.S. regions in 2022. The publication of these roadmaps, together with their dissemination by the Solutions Project and dozens of other nonprofits, resulted in the widespread awareness of Jacobson's plans and the growth of the 100% renewable energy movement. Jacobson's science-based plans resulted in all three Democratic presidential candidates for the 2016 election making 100% renewable energy part of their platforms. Senator Sanders included Jacobson's roadmaps on his web site and, after the election, wrote an op-ed with Jacobson in the Guardian calling for a transition to 100% renewables.

People inspired by Jacobson's plans encouraged 19 U.S. states (CA, CT, HI, IL, ME, MI, MN, NC, NE, NJ, NM, NV, NY, OR, RI, VA, VT, WA, WI), the District of Columbia, and Puerto Rico to pass laws or Executive Orders requiring up to 100% clean, renewable electricity. Eight U.S. federal laws or resolutions were also proposed calling the U.S. to move to 100% renewable electricity or all energy. These included House Resolution 540 (2015), House Bill 3314 (2017), House Bill 3671 (2017), House Bill 330 (2019); Senate Resolution 632 (2019), Senate Bill 987 (2019), House Resolution 109 (2019), and Senate Resolution 59 (2019). All were inspired by Jacobson's plans. For example, the first, House Resolution 540, states: "*Whereas a Stanford University study concludes that the United States energy supply could be based entirely on renewable energy by the year 2050 using current technologies*."

House Resolution 109 and Senate Resolution 59 are the proposed U.S. *Green New Deal*. As stated by Dr. Marshall Shepherd, "*Professor Mark Jacobson at Stanford University has been a longtime leader in climate science and renewable energy transition. Many of the assumptions in the Green New Deal seem to be anchored in his scholarship*." The main goals of the Green New Deal, to transition the U.S. to 100% renewable energy by 2030, came from Jacobson and Delucchi's 2009 *Scientific American* paper.

In 2009 and 2011, Jacobson developed plans to transition the world to 100% WWS. In 2017-2018, he developed more detailed plans and grid studies for 139 countries. These were updated for 143 countries in 2019, 145 countries in 2022, and 149 countries in 2024. Jacobson has also published 100% WWS plans for 53 towns and cities (2018) and 74 metropolitan areas (2020). The Sierra Club used these and his state plans to encourage cities to adopt 100% renewable laws. Ultimately 200 U.S. cities and counties enacted policies to transition to 100% renewable electricity. Also, 442 international companies have committed to 100% renewables in their global operations.

In 2023, Jacobson served as an expert witness on behalf of 16 youth plaintiffs in the first climate case in U.S. history, *Held v. Montana*, to discuss Montana's ability to transition to WWS. The plaintiffs prevailed, and the Montana Supreme Court upheld the ruling on December 18, 2024. In 2024, Jacobson served as an expert witness on behalf of 13 youth plaintiffs in *Navahine v. State of Hawai'i*, which was the world's first climate case to reach a settlement, in this case requiring the state effectively to electrify most land, sea, and inter-island air transportation.

For his research and leadership in Energy, Jacobson received the 2013 Global Green Policy Design Award for the "*design of analysis and policy framework to envision a future powered by renewable energy*." In 2016, he received a Cozzarelli Prize. In 2018, he received the Judi Friedman Lifetime Achievement Award "For a distinguished career dedicated to finding solutions to large-scale air pollution and climate problems." In 2019 and 2022, he was selected as "one of the world's 100 most influential people in climate policy" by *Apolitical*. In 2022, he was recognized as "World Visionary CleanTech Influencer of the Year" by the *CleanTech Business Club*. In 2023, he was named by *Worth Magazine* as one of the top 100 people globally "who have made an impact on the world this year" among "innovators across various industries, including art, entertainment, business, and philanthropy. In 2025, he was named one of 10 "clean energy leaders to know and follow" worldwide by *Climate Insider*.

# Peer-Reviewed Journal Articles and Books

**Peer-Reviewed Papers Since 1990 (187 Total)**

**2025**

1. Jacobson, M.Z., D. Fu, D.J. Sambor, and A. Mühlbauer, Energy, health, and climate costs of carbon-capture and direct-air-capture versus 100%-wind-water-solar climate policies in 149 countries, *Environmental Science & Technology, 59,* 3034-3045 doi:10.1021/acs.est.4c10686, 2025. https://web.stanford.edu/group/efmh/jacobson/Articles/I/149Country/149-Countries.pdf

2. Jacobson, M.Z., D.J. Sambor, Y.F. Fan, A. Mühlbauer, and M.A. Delucchi, No blackouts or cost increases due to 100% clean, renewable electricity powering California for parts of 98 days, *Renewable Energy, 240*, 122262, doi:10.1016/j.renene.2024.122262, 2025. https://web.stanford.edu/group/efmh/jacobson/Articles/Others/25-CaliforniaWWS.pdf

**2024**

3. Jacobson, M.Z., D.J. Sambor, Y.F. Fan, and A. Mühlbauer, Effects of firebricks for industrial process heat on the cost of matching all-sector energy demand with 100% wind-water-solar supply in 149 countries, *PNAS Nexus*, *3*, pgae274, doi:10.1093/pnasnexus/pgae274, 2024. https://academic.oup.com/pnasnexus/advance-article/doi/10.1093/pnasnexus/pgae274/7710221

4. Jacobson, M.Z., Batteries or hydrogen or both for grid electricity storage upon full electrification of 145 countries with wind-water solar? *iScience*, *27*, 108988, doi:10.1016/j.isci.2024.108988, 2024. https://web.stanford.edu/group/efmh/jacobson/Articles/Others/24-GridH2.pdf

5. Mayer, A.C.R., J. Mayer, M. Wyser, F. Legerer, J. Czerwinski, T.W. Lutz, T.V. Johnson, and M.Z. Jacobson, Particulate filters for combustion engines to mitigate global warming. Estimating the effects of a highly efficient but underutilized tool, *Emission Control Science and Technology*, *10*, 10-21, doi:10.1007/s40825-023-00236-x, 2024. https://web.stanford.edu/group/efmh/jacobson/Articles/Others/24-Mayer-Filters.pdf

6. Von Krauland, A.K., P. Enevoldsen, and M.Z. Jacobson, India onshore wind energy atlas accounting for altitude, land use restrictions, and co-located solar, *Cell Reports Sustainability*, 1, 100083, doi:10.1016/j,crsus.2024.100083, 2024. https://web.stanford.edu/group/efmh/jacobson/Articles/Others/24-IndiaWind.pdf

**2023**

7. Jacobson, M.Z., Should transportation be transitioned to ethanol with carbon capture and pipelines or electricity? A case study, *Environmental Science and Technology*, 57, 16,843-16,850, doi:10.1021/acs.est.3c05054, 2023. https://web.stanford.edu/group/efmh/jacobson/Articles/Others/23-E85vBEVs.pdf

8. Jacobson, M.Z., A.-K. von Krauland, K. Song, and A.N. Krull, Impacts of green hydrogen for steel, ammonia, and long-distance transport on the cost of meeting electricity, heat, cold, and hydrogen demand in 145 countries running on 100% wind-water-solar, *Smart Energy*, *11*, 100106, doi:10.1016/j.segy.2023.100106, 2023. https://web.stanford.edu/group/efmh/jacobson/Articles/Others/23-NonEnergyH2.pdf

9. Sambor, D.J., H. Penn, and M.Z. Jacobson, Energy optimization of a food-energy-water microgrid living laboratory in Yukon, Canada, *Energy Nexus Journal*, 10, 100200, doi.org/10.1016/j.nexus.2023.100200, 2023. https://web.stanford.edu/group/efmh/jacobson/Articles/Others/23-YukonMicrogrid.pdf

10. Von Krauland, A.K., Q. Long, P. Enevoldsen, and M.Z. Jacobson, United States offshore wind energy atlas: availability, potential, and economic insights based on wind speeds at different altitudes and thresholds and policy-informed exclusions, *Energy Conversion and Management*, 20, 100410, doi:10.1016/j.ecmx.2023.100410, 2023. https://web.stanford.edu/group/efmh/jacobson/Articles/Others/23-USOffshoreAtlas.pdf

**2022**

11. Jacobson, M.Z., A.-K. von Krauland, S.J. Coughlin, E. Dukas, A.J.H. Nelson, F.C. Palmer, and K.R. Rasmussen, Low-cost solutions to global warming, air pollution, and energy insecurity for 145 countries, *Energy and Environmental Sciences*, *15*, 3343-3359, doi:10.1039/d2ee00722c, 2022. https://web.stanford.edu/group/efmh/jacobson/Articles/I/145Country/22-145Countries.pdf

12. Jacobson, M.Z., A.-K. von Krauland, S.J. Coughlin, F.C. Palmer, and M.M. Smith, Zero air pollution and zero carbon from all energy at low cost and without blackouts in variable weather throughout the U.S. with 100% wind-water-solar and storage, *Renewable Energy*, *184*, 430-444, doi:10.1016/j.renene.2021.11.067, 2022. https://web.stanford.edu/group/efmh/jacobson/Articles/I/21-USStates-PDFs/21-USStatesPaper.pdf

13. Breyer, C., S. Khalili, D. Bogdanov, M. Ram, A.S. Oyewo, A. Aghahosseini[1], A. Gulagi[1], A.A. Solomon, D. Keiner, G. Lopez, P.A. Østergaard, H. Lund, B.V. Mathiesen, M.Z. Jacobson, M. Victoria, S. Teske, T. Pregger, V. Fthenakis, M. Raugei, H. Holttinen, U. Bardi, A. Hoekstra, and B.K. Sovacool, On the history and future of 100% renewable energy systems research, *IEEE Access*, 10, 78,176-78,218, doi: 10.1109/ACCESS.2022.3193402, 2022. https://web.stanford.edu/group/efmh/jacobson/Articles/Others/22-100PctRE-History.pdf

14. Katalenich, S.M., and M.Z. Jacobson, Toward battery electric and hydrogen fuel cell military vehicles for land, air, and sea, *Energy*, 254, 124355, doi:10.1016/j.energy.2022.124355, 2022. https://web.stanford.edu/group/efmh/jacobson/Articles/Others/22-BEH2Vehicles.pdf

15. Sambor, D.J., S.C.M. Bishop, A. Dotson, S. Aggarwal, and M.Z. Jacobson, Optimizing demand response of a modular water reuse system in a remote Arctic microgrid, *J. Cleaner Production*, 346, 131110, doi.org/10.1016/j.jclepro.2022.131110, 2022. https://web.stanford.edu/group/efmh/jacobson/Articles/Others/22-WaterReuseArctic.pdf

**2021**

16. Jacobson, M.Z., The cost of grid stability with 100% clean, renewable energy for all purposes when countries are isolated versus interconnected, *Renewable Energy*, 179, 1065-1075, doi:10.1016/j.renene.2021.07.115, 2021. https://web.stanford.edu/group/efmh/jacobson/Articles/Others/21-CountriesVRegions.pdf

17. Jacobson, M.Z., On the correlation between building heat demand and wind energy supply and how it helps to avoid blackouts, *Smart Energy, 1,* 100009*, doi:10.1016/j.segy.2021.100009, 2021. https://web.stanford.edu/group/efmh/jacobson/Articles/Others/21-Wind-Heat.pdf

18. Enevoldsen, P., and M.Z. Jacobson, Data investigation of installed and output power densities of onshore and offshore wind turbines worldwide, *Energy for Sustainable Development*, 60, 40-51, 2021. https://web.stanford.edu/group/efmh/jacobson/Articles/I/WindSpacing.pdf

19. Howarth, R.W., and M.Z. Jacobson, How green is blue hydrogen? *Energy Science and Engineering*, 9, 1676-1687, https://doi.org/10.1002/ese3.956, 2021. https://web.stanford.edu/group/efmh/jacobson/Articles/Others/21-GreenVsBlueH2.pdf

20. Katalenich, S.M., and M.Z. Jacobson, Renewable energy and energy storage to offset diesel generators at expeditionary contingency bases, *Journal of Defense Modeling and Simulation,* 1-15, doi:10.1177/15485129211051377, 2021. https://web.stanford.edu/group/efmh/jacobson/Articles/Others/21-REforFOBs.pdf

21. von Krauland, A.-K., F.-H. Permien, P. Enevoldsen, and M.Z. Jacobson, Onshore wind energy atlas for the United States accounting for land use restrictions and wind speed thresholds, *Smart Energy*, 3, 100046, doi:10.1016/j.segy.2021.100046, 2021. https://web.stanford.edu/group/efmh/jacobson/Articles/Others/21-USWindAtlas.pdf

**2020**

22. Jacobson, M.Z., A.-K. von Krauland, Z.F.M. Burton, S.J. Coughlin, C. Jaeggli, D. Nelli, A.J.H. Nelson, Y. Shu, M. Smith, C. Tan, C.D. Wood, and K.D. Wood, Transitioning all energy in 74 metropolitan areas, including 30 megacities, to 100% clean and renewable wind, water, and sunlight, *Energies*, 13, 4934, doi:10.3390/en13184934, 2020. https://web.stanford.edu/group/efmh/jacobson/Articles/I/Megacities.pdf

23. Sambor, D.J., M. Wilber, E. Whitney, and M.Z. Jacobson, Development of a tool for optimizing solar and battery storage for container farming in a remote Arctic microgrid, *Energies*, 13, 5143, doi:10.3390/en13195143, 2020. https://web.stanford.edu/group/efmh/jacobson/Articles/Others/20-ArcticMicrogrid.pdf

24. Wu, Xiawei, W. Hu, Q. Huang, C. Chen, M.Z. Jacobson, and Z. Chen, Optimizing the layout of onshore wind farms to minimize noise, *Applied Energy*, 267, 114896, doi:10.1016/j.apenergy.2020.114896, 2020. https://web.stanford.edu/group/efmh/jacobson/Articles/Others/20-Wu-AppliedEnergy

25. Xu, X., W. Hu , D. Cao, Q Huang, W. Liu, M. Z. Jacobson, and Z. Chen, Optimal operational strategy for an offgrid hybrid hydrogen/electricity refueling station powered by solar photovoltaics, *J. Power Sources*, 451, 227810, doi:10.1016/j.jpowsour.2020.227810, 2020. https://web.stanford.edu/group/efmh/jacobson/Articles/Others/20-Xu-JPowSour.pdf

26. Zhan, S., P. Hou, P. Enevoldsen, G. Yang, J. Zhu, J. Eichman, and M.Z. Jacobson, Co-optimized trading of hybrid wind power plant with retired EV batteries in energy and reserve markets under uncertainties, *Elec. Power and Energy Systems*, *117*, 105631, doi:10.1016/j.ijepes.2019.105631, 2020. https://web.stanford.edu/group/efmh/jacobson/Articles/Others/19-Hou-JEPES.pdf

**2019**

27. Jacobson, M.Z., M.A. Delucchi, M.A. Cameron, S.J. Coughlin, C. Hay, I.P. Manogaran, Y. Shu, and A.-K. von Krauland, Impacts of Green New Deal energy plans on grid stability, costs, jobs, health, and climate in 143 countries, *One Earth,* 1, 449-463, doi:10.1016/j.oneear.2019.12.003, 2019. https://web.stanford.edu/group/efmh/jacobson/Articles/I/143WWSCountries.pdf

28. Jacobson, M.Z., S.V. Nghiem, A. Sorichetta, Short-term impacts of the mega-urbanizations of New Delhi and Los Angeles between 2000 and 2009, *J. Geophys Res*., *124*, 35-56, doi:10.1029/2018JD029310, 2019, https://web.stanford.edu/group/efmh/jacobson/Articles/Others/19-NewDelhiLA.pdf

29. Jacobson, M.Z., The health and climate impacts of carbon capture and direct air capture, *Energy and Environmental Sciences*, *12*, 3567-3574, doi:10.1039/C9EE02709B, 2019. https://web.stanford.edu/group/efmh/jacobson/Articles/Others/19-CCS-DAC.pdf

30. Jacobson, M.Z., Short-term impacts of the Aliso Canyon natural gas blowout on weather, climate, air quality, and health in California and Los Angeles, *Environmental Science & Technology*, *53*, 6081-6093, doi:10.1021/acs.est.9b01495, 2019. https://web.stanford.edu/group/efmh/jacobson/Articles/Others/19-Aliso.pdf

31. Enevoldsen, P., F.-H. Permien, I. Bakhtaoui, A.-K. von Krauland, M.Z. Jacobson, G. Xydis, B.K. Sovacool, S.V. Valentine, D. Luecht, and G. Oxley, How much wind power potential does Europe have? Examining European wind power potential with an enhanced socio-technical Atlas, *Energy Policy*, *132*, 1092-1100, doi:10.1016/j.enpol.2019.06.064, 2019. https://web.stanford.edu/group/efmh/jacobson/Articles/Others/19-EuropeWind.pdf

**2018**

32. Jacobson, M.Z., M.A. Delucchi, M.A. Cameron, and B.V, Mathiesen, Matching demand with supply at low cost among 139 countries within 20 world regions with 100% intermittent wind, water, and sunlight (WWS) for all purposes, *Renewable Energy*, 123, 236-248, 2018. https://web.stanford.edu/group/efmh/jacobson/Articles/I/CombiningRenew/WorldGridIntegration.pdf

33. Jacobson, M.Z., M.A. Cameron, E.M. Hennessy, I. Petkov, C.B. Meyer, T.K. Gambhir, A.T. Maki, K. Pfleeger, H. Clonts, A.L. McEvoy, M.L. Miccioli, A.-K. von Krauland, R.W. Fang, and M.A. Delucchi, 100% clean and renewable wind, water, and sunlight (WWS) all-sector energy roadmaps for 53 towns and cities in North America, *Sustainable Cities and Society*, *42*, 22-37, doi:10.1016/j.scs.2018.06.031, 2018. https://web.stanford.edu/group/efmh/jacobson/Articles/I/TownsCities.pdf

34. Jacobson, M.Z., V. Jadhav, World estimates of PV optimal tilt angles and ratios of sunlight incident upon tilted and tracked PV panels relative to horizontal panels, *Solar Energy*, 169, 55-66, 2018. https://web.stanford.edu/group/efmh/jacobson/Articles/I/TiltAngles.pdf

35. Cebulla, F., and M.Z. Jacobson, Alternative renewable energy scenarios for New York, *Journal of Cleaner Production*, *205*, 884-894, 2018. https://web.stanford.edu/group/efmh/jacobson/Articles/I/NYNuclearVsRenewables.pdf

**2017**

36. Jacobson, M.Z., M.A. Delucchi, Z.A.F. Bauer, S.C. Goodman, W.E. Chapman, M.A. Cameron, Alphabetical: C. Bozonnat, L. Chobadi, H.A. Clonts, P. Enevoldsen, J.R. Erwin, S.N. Fobi, O.K. Goldstrom, E.M. Hennessy, J. Liu, J. Lo, C.B. Meyer, S.B. Morris, K.R. Moy, P.L. O'Neill, I. Petkov, S. Redfern, R. Schucker, M.A. Sontag, J. Wang, E. Weiner, A.S. Yachanin, 100% clean and renewable wind, water, and sunlight (WWS) all-sector energy roadmaps for 139 countries of the world, *Joule, 1*, 108-121, doi:10.1016/j.joule.2017.07.005, 2017. https://web.stanford.edu/group/efmh/jacobson/Articles/I/CountriesWWS.pdf

37. Cameron, M.A., M.Z. Jacobson, S. R. H. Barrett, H. Bian, C.-C. Chen, S. D. Eastham, A. Gettelman, A. Khodayari, Q. Liang, H. B. Selkirk, N. Unger, D. J. Wuebbles, and X. Yue, An inter-comparative study of the effects of aircraft emissions on surface air quality, *J. Geophys. Res. Atmos., 122*, 8325-8344, doi:10.1002/2016JD025594, 2017. https://web.stanford.edu/group/efmh/jacobson/Articles/VIII/17CameronJGR.pdf

38. Hou, P., P. Enevoldsen, J. Eichman, W. Hu, M.Z. Jacobson, and Z. Chen, Optimizing investments in coupled offshore wind-electrolytic hydrogen storage systems in Denmark, *J. Power Sources, 359*, 186-197,

doi:10.1016/j.jpowsour.2017.05.048, 2017. https://web.stanford.edu/group/efmh/jacobson/Articles/Others/17-Hou-JPowSources.pdf

**2016**

39. Jacobson, M.Z., M.A. Delucchi, G. Bazouin, M.J. Dvorak, R. Arghandeh, Z. A.F. Bauer, A. Cotte, G.M.T.H. de Moor, E.G. Goldner, C. Heier, R.T. Holmes, S.A. Hughes, L. Jin, M. Kapadia, C. Menon, S.A. Mullendore, E.M. Paris, G.A. Provost, A.R. Romano, C. Srivastava, T.A. Vencill, N.S. Whitney, and T.W. Yeskoo, A 100% wind, water, sunlight (WWS) all-sector energy plan for Washington State, *Renewable Energy*, *86*, 75-88 2016. https://web.stanford.edu/group/efmh/jacobson/Articles/I/WashStateWWS.pdf

40. Brasseur, G.P., M. Gupta, B.E. Anderson, S. Balasubramanian, S. Barrett, D. Duda, G. Fleming, P.M. Forster, J. Fluglestvedt, A. Gettelman, R.N. Halthore, S.D. Jacob, M.Z. Jacobson, A. Khodayari, K.-N. Liou, M.T. Lund, R.C. Miake-Lye, P. Minnis, S. Olsen, J.E. Penner, R. Prinn, U. Schumann, H.B. Selkirk, A. Sokolov, N. Unger, P. Wolfe, H.-W. Wong, D.W. Wuebbles, B. Yi, P. Yang, C. Zhou, Impact of aviation on climate: FAA's Aviation Climate Change Research Initiative, *Bulletin of the American Meteorological Society*, 561-583, doi:10.1175/BAMS-D-13-00089.1, April 2016. https://web.stanford.edu/group/efmh/jacobson/Articles/Others/ACCRI-BAMS-15.pdf

41. Frew, B.A., S. Becker, M.J. Dvorak, G.B. Andresen, and M.Z. Jacobson, Flexibility mechanisms and pathways to a highly renewable U.S. electricity future, *Energy*, *101*, 65-78, 2016. https://web.stanford.edu/group/efmh/jacobson/Articles/Others/16-Frew-Energy.pdf

42. Frew, B.A., and M.Z. Jacobson, Temporal and spatial tradeoffs in power system modeling with assumptions about storage: An application of the POWER model, *Energy*, 117, 198-213, 2016. https://web.stanford.edu/group/efmh/jacobson/Articles/Others/16-Frew-Energy-B.pdf

**2015**

43. Jacobson, M.Z., M.A. Delucchi, G. Bazouin, Z.A.F. Bauer, C.C. Heavey, E. Fisher, S. B. Morris, D.J.Y. Piekutowski, T.A. Vencill, T.W. Yeskoo, 100% clean and renewable wind, water, sunlight (WWS) all-sector energy roadmaps for the 50 United States, *Energy and Environmental Sciences*, *8*, 2093-2117, doi:10.1039/C5EE01283J, 2015. https://web.stanford.edu/group/efmh/jacobson/Articles/I/USStatesWWS.pdf

44. Jacobson, M.Z., M.A. Delucchi, M.A. Cameron, and B.A. Frew, A low-cost solution to the grid reliability problem with 100% penetration of intermittent wind, water, and solar for all purposes, *Proc. Nat. Acad. Sci.*, *112* (*49*), 15,060-15,065 doi: 10.1073/pnas.1510028112, 2015. https://web.stanford.edu/group/efmh/jacobson/Articles/I/CombiningRenew/CONUSGridIntegration.pdf

45. Jacobson, M.Z., S.V. Nghiem, A. Sorichetta, and N. Whitney, *Ring of impact* from the mega-urbanization of Beijing between 2000 and 2009, *J. Geophys. Res*., *120*, 5740-5756, doi:10.1002/2014JD023008, 2015. https://web.stanford.edu/group/efmh/jacobson/Articles/IV/15-Beijing-Paper-JGR.pdf

46. Becker, S., B.A. Frew, G.B. Andresen, M.Z. Jacobson, S. Schramm, and M. Greiner, Renewable build-up pathways for the U.S.: Generation costs are not system costs, *Energy*, *81*, 437-445, 2015. https://web.stanford.edu/group/efmh/jacobson/Articles/Others/BeckerEnergy15.pdf

47. Boehm, A.B., M.Z. Jacobson, M.J. O'Donnell, M. Sutula, W. Wakefield, and S.B. Weisberg, Ocean acidification science needs for resource managers and users of the North American Pacific coast, *Oceanography*, 28, 170-181, doi:/10.5670/oceanog.2015.40 2015. https://web.stanford.edu/group/efmh/jacobson/Articles/Others/BoehmOceanography15.pdf

48. Morrison, G.M., S. Yeh, A.R. Eggert, C. Yang, J.H. Nelson, Alphabetic: J.B. Greenblatt, R. Isaac, M.Z. Jacobson, J Johnston, D.M. Kammen, A. Mileva, J. Moore, D. Roland-Holst, M. Wei, J.P. Weyant, J.H. Williams, R. Williams, C.B. Zapata, Comparison of low-carbon pathways for California, *Climatic Change*, *131*, 540-557, doi:10.1007/s10584-015-1403-5, 2015. https://web.stanford.edu/group/efmh/jacobson/Articles/Others/15-04-ClimaticChangeLowCarb.pdf

**2014**

49. Jacobson, M.Z., M.A. Delucchi, A.R. Ingraffea, R.W. Howarth, G. Bazouin, B. Bridgeland, K. Burkhart, M. Chang, N. Chowdhury, R. Cook, G. Escher, M. Galka, L. Han, C. Heavey, A. Hernandez, D.F. Jacobson, D.S. Jacobson, B. Miranda, G. Novotny, M. Pellat, P. Quach, A. Romano, D. Stewart, L. Vogel, S. Wang, H. Wang, L. Willman, T. Yeskoo, A roadmap for repowering California for all purposes with wind, water, and sunlight, *Energy,* *73,* 875-889, doi:10.1016/j.energy.2014.06.099, 2014. https://web.stanford.edu/group/efmh/jacobson/Articles/I/CaliforniaWWS.pdf

50. Jacobson, M.Z., Effects of biomass burning on climate, accounting for heat and moisture fluxes, black and brown carbon, and cloud absorption effects, *J. Geophys. Res.*, *119*, 8980-9002, doi:10.1002/2014JD021861, 2014. https://web.stanford.edu/group/efmh/jacobson/Articles/VIII/bioburn/14BburnJGR.pdf

51. Jacobson, M.Z., C.L. Archer, and W. Kempton, Taming hurricanes with arrays of offshore wind turbines, *Nature Climate Change*, *4*, 195-200, doi: 10.1038/NCLIMATE2120, 2014. https://web.stanford.edu/group/efmh/jacobson/Articles/I/WindHurricane/HurricTurbPaperNatCC.pdf

52. Becker, S., B.A. Frew, G.B. Andresen, T. Zeyer, S. Schramm, M Greiner, and M.Z. Jacobson, Features of a fully renewable U.S. electricity-system: Optimized mixes of wind and solar PV and transmission grid extensions, *Energy*, *72*, 443-458, doi:10.1016/j.energy.2014.05.067, 2014. https://web.stanford.edu/group/efmh/jacobson/Articles/Others/BeckerEnergy14.pdf

53. Stoutenburg, E.D., N. Jenkins, and M.Z. Jacobson, Variability and uncertainty of wind power in the California electric power system, *Wind Energy*, *17*, 1411-1424, doi:10.1002/we.1640, 2014. https://web.stanford.edu/group/efmh/jacobson/Articles/I/CombiningRenew/EStoutWindEn13.pdf

**2013**

54. Jacobson, M.Z., R.W. Howarth, M.A. Delucchi, S.R. Scobies, J.M. Barth, M.J. Dvorak, M. Klevze, H. Katkhuda, B. Miranda, N.A. Chowdhury, R. Jones, L. Plano, and A.R. Ingraffea, Examining the feasibility of converting New York State's all-purpose energy infrastructure to one using wind, water, and sunlight, *Energy Policy*, 57, 585-601, 2013. https://web.stanford.edu/group/efmh/jacobson/Articles/I/NewYorkWWSEnPolicy.pdf

55. Jacobson, M.Z., J.T. Wilkerson, A.D. Naiman, and S.K. Lele, The effects of aircraft on climate and pollution. Part II: 20-year impacts of exhaust from all commercial aircraft worldwide treated individually at the subgrid scale, *Faraday Discussions*, *165,* 369-382*,* doi:10.1039/C3FD00034F, 2013. https://web.stanford.edu/group/efmh/jacobson/Articles/VIII/ContrailPaperPt2.pdf

56. Archer, C.L., and M.Z. Jacobson, Geographical and seasonal variability of the global "practical" wind resources, *Applied Geography,* *45*, 119-130, 2013. https://web.stanford.edu/group/efmh/winds/Applied_Geography_practical_wind_2013.pdf

57. Bond, T.C., S.J. Doherty, D.W. Fahey, P.M. Forster, T. Berntsen, O. Boucher, B.J. DeAngelo, M.G. Flanner, S. Ghan, B. Karcher, D. Koch, S. Kinne, Y. Kondo, P.K. Quinn, M.C. Sarofim, M.G. Schultz, M. Schulz, C. Venkataraman, H. Zhang, S. Zhang, N. Bellouin, S.K. Guttikunda, P.K. Hopke, M.Z. Jacobson, J.W. Kaiser, Z. Klimont, U. Lohmann, J.P. Schwarz, D. Shindell, T. Storelvmo, S.G. Warren and C.S. Zender, Bounding the role of black carbon in the climate system: A scientific assessment, *J. Geophys. Res.*, *118*, 5380-5552, doi: 10.1002/jgrd.50171, 2013. https://web.stanford.edu/group/efmh/jacobson/Articles/Others/bondJGR2013.pdf

58. Cameron, M.A., M.Z. Jacobson, A.D. Naiman, and S.K. Lele, Effects of plume-scale versus grid-scale treatment of aircraft exhaust photochemistry, *Geophys. Res. Lett., 40*, 5815-5820, 2013. https://web.stanford.edu/group/efmh/jacobson/Articles/VIII/13CameronGRL.pdf

59. Olsen, S.C., G.P. Brasseur, D.J. Wuebbles, S.R.H. Barrett, H. Dang, S.D. Eastham, M.Z. Jacobson, A. Khodayari, H. Selkirk, A. Sokolov, N. Unger, Comparison of model estimates of the effects of aviation emissions on atmospheric ozone and methane, *Geophys. Res. Lett.*, *40*, 6004-6009, 2013. https://web.stanford.edu/group/efmh/jacobson/Articles/Others/13OlsenGRL.pdf

60. Zamora, I.R., and M.Z. Jacobson, Measuring and modeling the hygroscopic growth of two humic substances in mixed aerosol particles of atmospheric relevance, *Atmos. Chem. Phys., 13*, 8973-8989, doi:10.5194/acp-13-8973-2013, 2013. https://acp.copernicus.org/articles/13/8973/2013/

**2012**

61. Jacobson, M.Z., and C.L. Archer, Saturation wind power potential and its implications for wind energy, *Proc. Nat. Acad. Sci.*, *109*, 15,679-15,684, doi:10.1073/pnas.1208993109, 2012. https://web.stanford.edu/group/efmh/jacobson/Articles/I/SatWindPot2012.pdf

62. Jacobson, M.Z., J.T. Wilkerson, S. Balasubramanian, W.W. Cooper, Jr., and N. Mohleji, The effects of rerouting aircraft around the Arctic Circle on Arctic and global climate, *Climatic Change*, 115, 709-724, doi:10.1007/s10584-012-0462-0, 2012. https://web.stanford.edu/group/efmh/jacobson/Articles/VIII/PolarReroutingClimChang12.pdf

63. Jacobson, M.Z., Investigating cloud absorption effects: Global absorption properties of black carbon, tar balls, and soil dust in clouds and aerosols, *J. Geophys. Res.*, *117*, D06205, doi:10.1029/2011JD017218, 2012. https://web.stanford.edu/group/efmh/jacobson/Articles/VII/CloudAbsorpJGR12.pdf

64. Jacobson, M.Z., and J.E. Ten Hoeve, Effects of urban surfaces and white roofs on global and regional climate, *J. Climate*, *25*, 1028-1044, doi:10.1175/JCLI-D-11-00032.1, 2012. https://web.stanford.edu/group/efmh/jacobson/Articles/IV/HeatIsWhitRoofJClim12.pdf

65. Bahadur, R., L.M. Russell, M.Z. Jacobson, K.A. Prather, A. Nenes, P.J. Adams, and J.H. Seinfeld, Importance of composition and hygroscopicity of BC particles to the effect of BC mitigation on cloud properties: application to California conditions, *J. Geophys. Res.*, *117*, D09204, doi:10.1029/2011JD017265, 2012. https://web.stanford.edu/group/efmh/jacobson/Articles/Others/2012JGRBahadur.pdf

66. Corcoran, B.A., N. Jenkins, and M.Z. Jacobson, Effects of aggregating electric load in the United States, *Energy Policy*, 46, 399-416, doi:10.1016/j.enpol.2012.03.079, 2012. https://web.stanford.edu/group/efmh/jacobson/Articles/I/CombiningRenew/CorcoranEnPol12.pdf

67. Dvorak, M.J., B.A. Corcoran, J.E. Ten Hoeve, N.G. McIntyre, and M.Z. Jacobson, U.S. East Coast offshore wind energy resources and their relationship to peak-time electricity demand, *Wind Energy*, 16, 977-997, doi:10.1002/we.1524, 2012. https://web.stanford.edu/group/efmh/jacobson/Articles/I/Offshore/12DvorakEastCoastWindEn.pdf

68. Dvorak, M.J., E.D. Stoutenburg, C.L. Archer, W. Kempton, and M.Z. Jacobson, Where is the ideal location for a U.S. East Coast offshore grid, *Geophys. Res. Lett.*, *39*, L06804, doi:10.1029/2011GL050659, 2012. https://web.stanford.edu/group/efmh/jacobson/Articles/I/Offshore/DvorakGRL12.pdf

69. Ginnebaugh, D.L., and M.Z. Jacobson, Coupling of highly explicit gas and aqueous chemistry mechanisms for use in 3-D, *Atmos. Environ.*, *62*, 408-415 2012. https://web.stanford.edu/group/efmh/jacobson/Articles/I/GinnebaughAE2012.pdf

70. Ginnebaugh, D.L., and M.Z. Jacobson, Examining the impacts of ethanol (E85) versus gasoline photochemical production of smog in a fog using near-explicit gas- and aqueous-chemistry mechanisms, *Environmental Research Letters*, 7, 045901, doi:10.1088/1748-9326/7/4/045901, 2012. https://web.stanford.edu/group/efmh/jacobson/Articles/I/Ginnebaugh2010.pdf

71. Hart, E.K., E.D. Stoutenburg, and M.Z. Jacobson, The potential of intermittent renewables to meet electric power demand: A review of current analytical techniques, *Proceedings of the IEEE*, *100*, 322-334, doi:10.1109/JPROC.2011.2144951, 2012. https://web.stanford.edu/group/efmh/jacobson/Articles/I/CombiningRenew/HartIEEE2012.pdf

72. Hart, E.K., and M.Z. Jacobson, The carbon abatement potential of high penetration intermittent renewables, *Energy and Environmental Science*, *5*, 6592-6601, doi:10.1039/C2EE03490E, 2012. https://web.stanford.edu/group/efmh/jacobson/Articles/I/CombiningRenew/HartEES12Online.pdf

73. Ten Hoeve, J.E., M.Z. Jacobson, and L. Remer, Comparing results from a physical model with satellite and in situ observations to determine whether biomass burning aerosols over the Amazon brighten or burn off clouds, *J. Geophys. Res.*, *117*, D08203, doi:10.1029/2011JD016856, 2012. https://web.stanford.edu/group/efmh/jacobson/Articles/VII/ModMeasAmazonCldJGR12.pdf

74. Ten Hoeve, J.E., L.A. Remer, A.L. Correia, and M.Z. Jacobson, Recent shift from forest to savanna burning in the Amazon basin observed from satellite, *Environmental Research Letters*, *7,* 024020, doi:10.1088/1748-9326/7/2/024020, 2012. https://web.stanford.edu/group/efmh/jacobson/Articles/VIII/bioburn/TenHoeveERL12.pdf

75. Ten Hoeve, J.E., and M.Z. Jacobson, Worldwide health effects of the Fukushima Daiichi nuclear accident, *Energy and Environmental Sciences*, *5*, 8743-8757, doi:10.1039/c2ee22019a, 2012. https://web.stanford.edu/group/efmh/jacobson/TenHoeveEES12.pdf

**2011**

76. Jacobson, M.Z., J.T. Wilkerson, A.D. Naiman, and S.K. Lele, The effects of aircraft on climate and pollution. Part I: Numerical methods for treating the subgrid evolution of discrete size- and composition-resolved contrails from all commercial flights worldwide, *J. Comp. Phys.*, 230, 5115-5132, doi:10.1016/j.jcp.2011.03.031, 2011. https://web.stanford.edu/group/efmh/jacobson/Articles/VIII/JCompPhysPt1.pdf

77. Jacobson, M.Z., and M.A. Delucchi, Providing all global energy with wind, water, and solar power, Part I: Technologies, energy resources, quantities and areas of infrastructure, and materials, *Energy Policy*, 39, 1154-1169, doi:10.1016/j.enpol.2010.11.040, 2011. https://web.stanford.edu/group/efmh/jacobson/Articles/I/susenergy2030.html

78. Jacobson, M.Z., Numerical Solution to Drop Coalescence/Breakup With a Volume-Conserving, Positive-Definite, and Unconditionally-Stable Scheme, *J. Atmos. Sci.*, *68*, 334-346, doi:10.1175/2010JAS3605.1, 2011. https://web.stanford.edu/group/efmh/jacobson/Articles/IX/JASBreakupMZJ2010.pdf

79. Creamean, J.M., A.P. Ault, J.E. Ten Hoeve, M.Z. Jacobson, G.C. Roberts, and K.A. Prather, Measurements of aerosol chemistry during new particle formation events at a remote rural mountain site, *Environ. Sci. Technol.*, *45*, 8208-8216, doi:10.1021/es103692f, 2011. https://web.stanford.edu/group/efmh/jacobson/Articles/Others/CreameanEST.pdf

80. Delucchi, M.Z., and M.Z. Jacobson, Providing all global energy with wind, water, and solar power, Part II: Reliability, System and Transmission Costs, and Policies, *Energy Policy*, 39, 1170-1190, doi:10.1016/j.enpol.2010.11.045, 2011. https://web.stanford.edu/group/efmh/jacobson/Articles/I/DJEnPolicyPt2.pdf

81. Hart, E.K., and M.Z. Jacobson, A Monte Carlo approach to generator portfolio planning and carbon emissions assessments of systems with large penetrations of variable renewables, *Renewable Energy*, *36*, 2278-2286, doi:10.1016/j.renene.2011.01.015, 2011. https://web.stanford.edu/group/efmh/jacobson/Articles/I/CombiningRenew/HartJacRenEnMar11.pdf

82. Ketefian, G.S., and M.Z. Jacobson, A mass, energy, vorticity, and potential enstrophy conserving lateral boundary scheme for the shallow water equations using piecewise linear boundary approximations, *J. Comp. Phys.*, *230*, 2751-2793, doi:10.1016/j.jcp2010.11.008, 2011. https://web.stanford.edu/group/efmh/jacobson/Articles/Others/Ketefian_Jacobson_2011.pdf

83. Liang, J., and M.Z. Jacobson, CVPS: An operator solving complex chemical and vertical processes simultaneously with sparse-matrix techniques, *Atmos. Environ.*, *45*, 6820-6827, doi:10.1016/j.atmosenv.2010.12.035, 2011. https://web.stanford.edu/group/efmh/jacobson/Articles/Others/OpSparsMat2011.pdf

84. Naiman, A.D., S.K. Lele, and M.Z. Jacobson, Large eddy simulations of contrail development: Sensitivity to initial and ambient conditions over first twenty minutes, *J. Geophys. Res.*, *116*, D21208, doi:10.1029/2011JD015806, 2011. https://web.stanford.edu/group/efmh/jacobson/Articles/VIII/NaimanJGR2011JD015806.pdf

85. Stoutenburg, E.K., and M.Z. Jacobson, Reducing offshore transmission requirements by combining offshore wind and wave farms, *IEEE Journal of Oceanic Engineering*, *36*, 552-561, doi:10.1109/JOE.2011.2167198, 2011. https://web.stanford.edu/group/efmh/jacobson/Articles/I/Wind&wave/StoutenburgIEEE11.pdf

86. Ten Hoeve, J.E, L.A. Remer, and M.Z. Jacobson, Microphysical and radiative effects of aerosols on warm clouds during the Amazon biomass burning season as observed by MODIS: impacts of water vapor and land cover, *Atmos. Chem. Phys. 11*, 3021-3036, 2011. https://acp.copernicus.org/articles/11/3021/2011/acp-11-3021-2011.html

87. Whitt, D.B., J.T. Wilkerson, M.Z. Jacobson, A.D. Naiman, and S.K. Lele, Vertical mixing of commercial aviation emissions from cruise altitude to the surface, *Journal of Geophysical Research*, *116*, D14109, doi:1029/2010JD015532, 2011. https://web.stanford.edu/group/efmh/jacobson/Articles/VIII/Whitt2010JD015532.pdf

88. Zamora, I.R., A. Tabazadeh, D.M. Golden, and M.Z. Jacobson, Hygroscopic growth of common organic aerosol solutes, including humic substances, as derived from water activity measurements, *J. Geophys. Res.*, *116,* D23207, doi:10.1029/2011JD016067, 2011. https://web.stanford.edu/group/efmh/jacobson/Articles/Others/ZamoraJGR11.pdf

**2010**

89. Jacobson, M.Z., and D.L. Ginnebaugh, Global-through-urban nested three-dimensional simulation of air pollution with a 13,600-reaction photochemical mechanism, *J. Geophys. Res.*, *115*, D14304, doi:10.1029/2009JD013289, 2010. https://web.stanford.edu/group/efmh/jacobson/Articles/V/MCMJacGinnJGR10.pdf

90. Jacobson, M.Z., Short-term effects of controlling fossil-fuel soot, biofuel soot and gases, and methane on climate, Arctic ice, and air pollution health, *J. Geophys. Res., 115*, D14209, doi:10.1029/2009JD013795, 2010. https://web.stanford.edu/group/efmh/jacobson/Articles/VIII/BCClimRespJGR0710.pdf

91. Jacobson, M.Z., The enhancement of local air pollution by urban $CO_2$ domes, *Environ. Sci. Technol., 44*, 2497-2502, doi:10.1021/es903018m, 2010. https://web.stanford.edu/group/efmh/jacobson/Articles/V/es903018m.pdf

92. Dvorak, M., C.L. Archer, and M.Z. Jacobson, California offshore wind energy potential, *Renewable Energy*, 35, 1244-1254, doi:10.1016/j.renene.2009.11.022, 2010. https://web.stanford.edu/group/efmh/jacobson/Articles/I/Offshore/DvorakRenewEn2010.pdf

93. Ginnebaugh, D.L., J. Liang, and M.Z. Jacobson, Examining the temperature dependence of ethanol (E85) versus gasoline emissions on air pollution with a largely-explicit chemical mechanism**,** *Atmos. Environ., 44,* 1192-1199, doi:10.1016/j.atmosenv.2009.12.024, 2010. https://web.stanford.edu/group/efmh/jacobson/Articles/I/GinnebaughERL2012.pdf

94. Naiman, A.D., S.K. Lele, J.T. Wilkerson, and M.Z. Jacobson, Parameterization of subgrid plume dilution for use in large-scale atmospheric simulations, *Atmos. Chem. Phys*., 10, 2551-2560, 2010. https://acp.copernicus.org/articles/10/2551/2010/acp-10-2551-2010.html

95. Stoutenburg, E.D., N. Jenkins, and M.Z. Jacobson, Power output variations of co-located offshore wind turbines and wave energy converters in California, *Renewable Energy*, 35, 2781-2791, doi:10.1016/j.renene.2010.04.033, 2010. https://web.stanford.edu/group/efmh/jacobson/Articles/I/Wind&wave/WindWaveStoutenburgRenEn2010.pdf

96. Wilkerson, J.T., M.Z. Jacobson, A. Malwitz, S. Balasubramanian, R. Wayson, G. Fleming, A.D. Naiman, and S.K. Lele, Analysis of emission data from global commercial aviation: 2004 and 2006, *Atmos. Chem. Phys., 10*, 6391-6408, 2010. https://acp.copernicus.org/articles/10/6391/2010/acp-10-6391-2010.html

97. Zhang, Y., P. Liu, X.-H. Liu, B. Pun, C. Seigneur, M.Z. Jacobson, W. Wang, Fine scale modeling of wintertime aerosol mass, number, and size distributions in Central California, *J. Geophys. Res*., 115, D15207, doi:10.1029/2009JD012950, 2010. https://web.stanford.edu/group/efmh/jacobson/Articles/Others/2009JD012950.pdf

98. Zhang, Y., P. Liu, X.-H. Liu, M.Z. Jacobson, P.H. McMurry, F. Yu, S. Yu, and K.L. Schere, A comparative study of homogeneous nucleation parameterizations: 2. Three-dimensional model application and evaluation, *J. Geophys. Res*., 115, D20213, doi:10.1029/2010JD014151, 2010. https://web.stanford.edu/group/efmh/jacobson/Articles/Others/2010JD014151.pdf

99. Zhang, Y., P.H. McMurry, F. Yu, and M.Z. Jacobson, A comparative study of nucleation parameterizations: 1. Examination and evaluation of the formulations, *J. Geophys. Res*., 115, D20212, doi:10.1029/2010JD014150, 2010. https://web.stanford.edu/group/efmh/jacobson/Articles/Others/2010JD014150.pdf

**2009**

100. Jacobson, M.Z., and M.A. Delucchi, A path to sustainable energy by 2030, *Scientific American*, November 2009. https://web.stanford.edu/group/efmh/jacobson/Articles/I/sad1109Jaco5p.indd.pdf

101. Jacobson, M.Z., Effects of biofuels vs. other new vehicle technologies on air pollution, global warming, land use, and water, *Int. J. Biotechnology*, 11, 14-59, 2009. https://web.stanford.edu/group/efmh/jacobson/Articles/Others/BiofuelFinPapMZJIntJBiotechnol08.pdf

102. Jacobson, M.Z., and D.G. Streets, The influence of future anthropogenic emissions on climate, natural emissions, and air quality, *J. Geophys. Res*., 114, D08118, doi:10.1029/2008JD011476, 2009. https://web.stanford.edu/group/efmh/jacobson/Articles/VII/2009JGRJacStreets.pdf

103. Jacobson, M.Z., Review of solutions to global warming, air pollution, and energy security, *Energy & Environmental Science*, 2, 148-173, doi:10.1039/b809990c, 2009. https://web.stanford.edu/group/efmh/jacobson/Articles/I/ReviewSolGW09.pdf

104. Ketefian, G.S., and M.Z. Jacobson, A mass, energy, vorticity, and potential enstrophy conserving lateral fluid-land boundary scheme for the shallow water equations, *J. Comp. Phys*., 228, 1-32, doi:10.1016/j.jcp.2008.08.009, 2009. https://web.stanford.edu/group/efmh/jacobson/Articles/Others/Ketefian_Jacobson_2009.pdf

105. Sta. Maria, M.R.V., and M.Z. Jacobson, Investigating the effect of large wind farms on energy in the atmosphere, *Energies*, 2, 816-836, doi:10.3390/en20400816, 2009. https://web.stanford.edu/group/efmh/jacobson/Articles/I/mdpi-1996-1073.2.4.816.pdf

106. Zhang, Y., K. Vijayaraghavan, X. Wen, H.E. Snell, and M.Z. Jacobson, Probing into regional ozone and particulate matter pollution in the United States: Part I. A 1-year CMAQ simulation and evaluation using surface and satellite data, *J. Geophys. Res*., 114, D22304, doi:10.1029/2009JD011898, 2009. https://web.stanford.edu/group/efmh/jacobson/Articles/Others/2009JD011898.pdf

107. Zhang, Y., X. Wen, K. Wang, K. Vijayaraghavan, and M.Z. Jacobson, Probing into regional $O_3$ and particulate matter pollution in the United States: 2. An examination of formation mechanisms through a process analysis technique and sensitivity study, *J. Geophys. Res*., 114, D22305, doi:1029/2009JD011900, 2009. https://web.stanford.edu/group/efmh/jacobson/Articles/Others/2009JD011900.pdf

**2008**

108. Jacobson, M.Z, On the causal link between carbon dioxide and air pollution mortality, *Geophysical Research Letters*, 35, L03809, doi:10.1029/2007GL031101, 2008. https://web.stanford.edu/group/efmh/jacobson/Articles/V/2007GL031101.pdf

109. Jacobson, M.Z., Effects of wind-powered hydrogen fuel cell vehicles on stratospheric ozone and global climate, *Geophys. Res. Lett*., 35, L19803, doi:10.1029/2008GL035102, 2008. https://web.stanford.edu/group/efmh/jacobson/Articles/I/2008GL035102.pdf

11

110. Jacobson, M.Z., The short-term effects of agriculture on air pollution and climate in California, *J. Geophys. Res.*, 113, D23101, doi:10.1029/2008JD010689, 2008. https://web.stanford.edu/group/efmh/jacobson/Articles/IV/2008JD010689Ag.pdf

111. Edgerton, S.A, M.C. MacCracken, M.Z. Jacobson, A. Ayala, C.E. Whitman, and M.C. Trexler, Critical review discussion: Prospects for future climate change and the reasons for early action, *Journal of the Air & Waste Management Association,* *58*, 1386-1400, 2008. https://web.stanford.edu/group/efmh/jacobson/Articles/Others/10.3155-1047-3289.58.11.1386.pdf

112. Hu, X.-M, Y. Zhang, M.Z. Jacobson, and C.K. Chan, Coupling and evaluating gas/particle mass transfer treatments for aerosol simulation and forecast, *J. Geophys. Res.*, 113, D11208, doi:10.1029/2007JD009588, 2008. https://web.stanford.edu/group/efmh/jacobson/Articles/Others/2007JD009588.pdf

113. Jiang, Q., J.D. Doyle, T. Haack, M.J. Dvorak, *C.L. Archer*, and M.Z. Jacobson, Exploring wind energy potential off the California coast, *Geophys. Res. Lett.*, 35, L20819, doi:10.1029/2008GL034674, 2008. https://web.stanford.edu/group/efmh/jacobson/Articles/Others/2008GL034674.pdf

**2007**

114. Jacobson, M.Z., Effects of ethanol (E85) versus gasoline vehicles on cancer and mortality in the United States, *Environ. Sci. Technol.*, *41* (11), 4150-4157, doi:10.1021/es062085v, 2007. https://web.stanford.edu/group/efmh/jacobson/Articles/I/es062085v.pdf

115. Jacobson, M.Z., Y.J. Kaufmann, Y. Rudich, Examining feedbacks of aerosols to urban climate with a model that treats 3-D clouds with aerosol inclusions, *J. Geophys. Res.*, 112, D24205, doi:10.1029/2007JD008922, 2007. https://web.stanford.edu/group/efmh/jacobson/Articles/III/2007JD008922.pdf

116. Archer, C.L., and M.Z. Jacobson, Supplying baseload power and reducing transmission requirements by interconnecting wind farms*, J. Applied Meteorol. and Climatology*, 46, 1701-1717, doi:10.1175/2007JAMC1538.1, 2007. https://web.stanford.edu/group/efmh/winds/aj07_jamc.pdf

117. Chen, Y., S. Mills, J. Street, D. Golan, A. Post, M.Z. Jacobson, A. Paytan, Estimates of atmospheric dry deposition and associated input of nutrients to Gulf of Aqaba seawater, *J. Geophys. Res.*, *112*, D04309, doi:10.1029/2006JD007858, 2007. https://web.stanford.edu/group/efmh/jacobson/Articles/Others/2006JD007858.pdf

118. Kempton, W., C.L. Archer, A. Dhanju, R.W. Garvine, and M.Z. Jacobson, Large $CO_2$ reductions via offshore wind power matched to inherent storage in energy end-uses, *Geophys. Res. Lett.*, 34, L02817, doi:10.1029/2006GL028016, 2007. https://web.stanford.edu/group/efmh/jacobson/Articles/Others/2006GL028016.pdf

**2006**

119. Jacobson, M.Z., Effects of externally-through-internally-mixed soot inclusions within clouds and precipitation on global climate, *J. Phys. Chem.*, *110*, 6860-6873, 2006. https://web.stanford.edu/group/efmh/jacobson/Articles/VII/CloudSootJPChem.pdf

120. Jacobson, M.Z., and Y.J. Kaufmann, Wind reduction by aerosol particles, *Geophys. Res. Lett.*, *33*, L24814, doi:10.1029/2006GL027838, 2006. https://web.stanford.edu/group/efmh/jacobson/Articles/III/2006GL027838%201.pdf

**2005**

121. Jacobson, M.Z., A solution to the problem of nonequilibrium acid/base gas-particle transfer at long time step, *Aerosol Sci. Technol,* *39*, 92-103, 2005. https://web.stanford.edu/group/efmh/jacobson/Articles/IX/ASTNoneq.pdf

122. Jacobson, M.Z., A refined method of parameterizing absorption coefficients among multiple gases simultaneously from line-by-line data, *J. Atmos. Sci.,* *62*, 506-517, 2005. https://web.stanford.edu/group/efmh/jacobson/Articles/IX/JASJacobson05.pdf

123. Jacobson, M.Z., Studying ocean acidification with conservative, stable numerical schemes for nonequilibrium air-ocean exchange and ocean equilibrium chemistry*, J. Geophys. Res., 110,* D07302, doi:10.1029/2004JD005220, 2005. https://web.stanford.edu/group/efmh/jacobson/Articles/IX/2004JD005220.pdf

124. Jacobson, M.Z., *W.G. Colella*, and D.M. Golden, Cleaning the air and improving health with hydrogen fuel cell vehicles, *Science*, *308*, 1901-1905, 2005. https://web.stanford.edu/group/efmh/jacobson/Articles/I/SciencePubHyd.pdf

125. Jacobson, M.Z., D.B. Kittelson, and W.F. Watts, Enhanced coagulation due to evaporation and its effect on nanoparticle evolution, *Environmental Science and Technology*, 39, 9486-9492, 2005. https://web.stanford.edu/group/efmh/jacobson/Articles/II/es0500299.pdf

126. Archer, C.L. M.Z. Jacobson, and F.L. Ludwig, The Santa Cruz eddy. Part I: Observations and statistics, *Mon. Wea. Rev., 133*, 767-782, 2005. https://web.stanford.edu/group/efmh/jacobson/Articles/Others/SCEPart1.pdf

127. Archer, C.L. and M.Z. Jacobson, The Santa Cruz eddy. Part II: Mechanisms of formation, *Mon. Wea. Rev.*, 133, 2387-2405, 2005. https://web.stanford.edu/group/efmh/jacobson/Articles/Others/SCEPart2.pdf

128. Archer, C.L. and M.Z. Jacobson, Evaluation of global wind power, *J. Geophys. Res*., 110, D12110, doi:10.1029/2004JD005462, 2005. https://web.stanford.edu/group/efmh/winds/2004jd005462.pdf

129. Colella, W.G., M.Z. Jacobson, and D.M. Golden, Switching to a U.S. hydrogen fuel cell vehicle fleet: The resultant change in emissions, energy use, and global warming gases, *J. Power Sources*, *150*, 150-181, 2005. https://web.stanford.edu/group/efmh/jacobson/Articles/I/JPowerSources2005.pdf

130. Stuart, A.L., and M.Z. Jacobson, A numerical model of the partitioning of trace chemical solutes during drop freezing, *J. Atmos. Chem*., *53*, 13-42, doi:10.1007/s10874-006-0948-0, 2005. https://web.stanford.edu/group/efmh/jacobson/Articles/Others/NumModel2006.pdf

**2004**

131. Jacobson, M. Z., J. H. Seinfeld, G. R. Carmichael, and D.G. Streets, The effect on photochemical smog of converting the U.S. fleet of gasoline vehicles to modern diesel vehicles, *Geophys. Res. Lett., 31,* L02116, doi:10.1029/2003GL018448, 2004. https://web.stanford.edu/group/efmh/jacobson/Articles/I/DiesNOxTextnew.pdf

132. Jacobson, M.Z., and J.H. Seinfeld, Evolution of nanoparticle size and mixing state near the point of emission, *Atmos. Environ., 38*, 1839-1850, 2004. https://web.stanford.edu/group/efmh/jacobson/Articles/II/HiResAer.pdf

133. Jacobson, M. Z., The short-term cooling but long-term global warming due to biomass burning, *J. Clim., 17* (15), 2909-2926, 2004. https://web.stanford.edu/group/efmh/jacobson/Articles/VIII/bioburn/BburnJClim.pdf

134. Jacobson, M.Z., The climate response of fossil-fuel and biofuel soot, accounting for soot's feedback to snow and sea ice albedo and emissivity, *J. Geophys. Res., 109*, D21201, doi:10.1029/2004JD004945, 2004. https://web.stanford.edu/group/efmh/jacobson/Articles/VIII/SootAlb.pdf

135. Stuart, A. L., and M. Z. Jacobson, Chemical retention during dry-growth riming: A model. *J. Geophys. Res, 109*, D07305, doi:10.1029/2003JD004197, 2004. https://web.stanford.edu/group/efmh/jacobson/Articles/Others/2003JD004197

136. Zhang, Y., B. Pun, K. Vijayaraghavan, S.-Y. Wu, C. Seigneur, S. Pandis, M. Jacobson, A. Nenes, and J. H. Seinfeld, Development and application of the model of aerosol dynamics, reaction, ionization, and dissolution (MADRID), *J. Geophys. Res., 109* (D1), D01202, doi:10.1029/2003JD003501, 2004. https://web.stanford.edu/group/efmh/jacobson/Articles/Others/2003JD003501.pdf

**2003**

137. Jacobson, M. Z., Development of mixed-phase clouds from multiple aerosol size distributions and the effect of the clouds on aerosol removal, *J. Geophys. Res., 108* (D8), 4245, doi:10.1029/2002JD002691, 2003. https://web.stanford.edu/group/efmh/jacobson/Articles/IX/cloudaer/CloudAerPap.pdf

138. Archer, C.L. and M. Z. Jacobson, Spatial and temporal distributions of U.S. winds and wind power at 80 m derived from measurements, *J. Geophys. Res., 108* (D9) 4289, doi:10.1029/2002JD002076, 2003. https://web.stanford.edu/group/efmh/winds/2002JD002076.pdf

139. Barth, M. C., S. Sillman, R. Hudman, M. Z. Jacobson, C.-H. Kim, A. Monod, and J. Liang, Summary of the cloud chemistry modeling intercomparison: Photochemical box model simulation, *J. Geophys. Res., 108* (D7) 4214, doi: 10.1029/2002JD002673, 2003. https://web.stanford.edu/group/efmh/jacobson/Articles/Others/2002JD002673.pdf

140. Freedman, F., and M. Z. Jacobson, Modification of the standard ε-equation for the stable ABL through enforced consistency with Monin-Obukhov similarity theory, *Bound.-Lay. Meteorol., 106*, 383-410, 2003. https://web.stanford.edu/group/efmh/jacobson/Articles/Others/mzj_blm_final.pdf

141. Fridlind, A. M., and M. Z. Jacobson, Point and column aerosol radiative closure during ACE 1: Effects of particle shape and size, *J. Geophys. Res., 108* (D3) 4094, doi:10.1029/2001JD001553, 2003. https://web.stanford.edu/group/efmh/jacobson/Articles/Others/2003_Fridlind_Jacobson.pdf

142. Kreidenweis, S. M., C. Walcek, G. Feingold, W. Gong, M. Z. Jacobson, C.-H. Kim, X. Liu, J. E. Penner, A. Nenes and J. H. Seinfeld, Modification of aerosol mass and size distribution due to aqueous-phase $SO_2$ oxidation

in clouds: Comparisons of several models, *J. Geophys. Res.*, *108* (D7) 4213, doi:10.1029/2002JD002697, 2003. https://web.stanford.edu/group/efmh/jacobson/Articles/Others/2002JD002697.pdf

143. Ma, Jianzhong, J. Tang, S.-M. Li, and M. Z. Jacobson, Size distributions of ionic aerosols measured at Waliguan Observatory: Implication for nitrate gas-to-particle transfer processes in the free troposphere, *J. Geophys. Res.*, *108*, (D17) 4541, doi:10.1029/2002JD003356, 2003. https://web.stanford.edu/group/efmh/jacobson/Articles/Others/2002JD003356.pdf

144. Stuart, A. L., and M. Z. Jacobson, A timescale investigation of volatile chemical retention during hydrometeor freezing: Nonrime freezing and dry growth riming without spreading, *J. Geophys. Res.*, *108* (D6), 4178, doi:10.1029/2001JD001408, 2003. https://web.stanford.edu/group/efmh/jacobson/Articles/Others/2001JD001408.pdf

**2002**

145. Jacobson, M. Z., Analysis of aerosol interactions with numerical techniques for solving coagulation, nucleation, condensation, dissolution, and reversible chemistry among multiple size distributions, *J. Geophys. Res., 107* (D19), 4366, doi:10.1029/ 2001JD002044, 2002. https://web.stanford.edu/group/efmh/jacobson/Articles/IX/multdist/multdist.pdf

146. Jacobson, M. Z., Control of fossil-fuel particulate black carbon plus organic matter, possibly the most effective method of slowing global warming, *J. Geophys. Res., 107* (D19), 4410, doi:10.1029/ 2001JD001376, 2002. https://web.stanford.edu/group/efmh/jacobson/Articles/VIII/fossil/fossil.pdf

147. Carmichael, G. R., D. Streets, G. Calori, H. Ueda, M. Amann, M. Z. Jacobson and J. E. Hansen, Changing trends in sulfur emissions in Asia: Implications for acid deposition, air pollution, and climate, *Environmental Sci. Technol., 36*, 4707-4713, 2002. https://web.stanford.edu/group/efmh/jacobson/Articles/Others/es011509c.pdf

148. Freedman, F. R., and M. Z. Jacobson, Transport-dissipation analytical solutions to the E-ε turbulence model and their role in predictions of the neutral ABL, *Bound.-Lay. Meteorol., 102*, 117-138, 2002. https://web.stanford.edu/group/efmh/jacobson/Articles/Others/mzj_blm_final.pdf

149. Moya, M., S. N. Pandis, and M. Z. Jacobson, Is the size distribution of urban aerosols determined by thermodynamic equilibrium? An application to Southern California, *Atmos. Environ.*, *36*, 2349-2365, 2002. https://web.stanford.edu/group/efmh/jacobson/Articles/Others/SizeDistAer2001.pdf

**2001**

150. Jacobson, M.Z., Global direct radiative forcing due to multicomponent anthropogenic and natural aerosols, *J. Geophys. Res., 106*, 1551-1568, 2001. https://web.stanford.edu/group/efmh/jacobson/Articles/VI/GlobForc01.pdf

151. Jacobson, M. Z., Strong radiative heating due to the mixing state of black carbon in atmospheric aerosols, *Nature, 409*, 695-697, 2001. https://web.stanford.edu/group/efmh/jacobson/Articles/VI/nature.pdf

152. Jacobson, M. Z., GATOR-GCMM: A global through urban scale air pollution and weather forecast model. 1. Model design and treatment of subgrid soil, vegetation, roads, rooftops, water, sea ice, and snow, *J. Geophys. Res., 106*, 5385-5401, 2001. https://web.stanford.edu/group/efmh/jacobson/Articles/IX/GATORGCMM101.pdf

153. Jacobson, M. Z., GATOR-GCMM: 2. A study of day- and nighttime ozone layers aloft, ozone in national parks, and weather during the SARMAP field campaign, *J. Geophys. Res., 106*, 5403-5420, 2001. https://web.stanford.edu/group/efmh/jacobson/Articles/V/GATORGCMM201.pdf

154. Jacobson, M. Z., and G. M. Masters, Exploiting wind versus coal, *Science, 293*, 1438-1438, 2001. https://web.stanford.edu/group/efmh/jacobson/Articles/I/energy.pdf

155. Streets, D. G., K. Jiang, X. Hu, J. E. Sinton, X.-Q. Zhang, D. Xu, M. Z. Jacobson, and J. E. Hansen, Recent reductions in China's greenhouse gas emissions, *Science, 294*, 1835-1836, 2001. https://web.stanford.edu/group/efmh/jacobson/Articles/Others/Science-2001-Streets-1835-7.pdf

**2000**

156. Jacobson, M. Z., A physically-based treatment of elemental carbon optics: Implications for global direct forcing of aerosols, *Geophys. Res. Lett., 27*, 217-220, 2000. https://web.stanford.edu/group/efmh/jacobson/Articles/VI/GlobDirForc.pdf

157. Fridlind, A. M., and M. Z. Jacobson, A study of gas-aerosol equilibrium and aerosol pH in the remote marine boundary layer during the First Aerosol Characterization Experiment (ACE 1), *J. Geophys. Res., 105*, 17,325-17,340, 2000. https://web.stanford.edu/group/efmh/jacobson/Articles/Others/2000_Fridlind_Jacobson.pdf

158. Fridlind, A. M., M. Z. Jacobson, V. -M. Kerminen, R. E. Hillamo, V. Ricard, and J.-L Jaffrezo, Analysis of gas-aerosol partitioning in the Arctic: Comparison of size-resolved equilibrium model results with field data, *J.*

*Geophys. Res., 105*, 19,891-19,904, 2000. https://web.stanford.edu/group/efmh/jacobson/Articles/Others/2000_Fridlind_etal.pdf

159. Liang, J., and M. Z. Jacobson, Comparison of a 4000-reaction chemical mechanism with the Carbon Bond IV and an adjusted Carbon Bond IV-EX mechanism using SMVGEAR II, *Atmos. Environ., 34*, 3015-3026, 2000. https://web.stanford.edu/group/efmh/jacobson/Articles/Others/CompReac2000.pdf

160. Liang, J., and M. Z. Jacobson, Effects of subgrid segregation on ozone production efficiency a chemical model, *Atmos. Environ., 34*, 2975-2982, 2000. https://web.stanford.edu/group/efmh/jacobson/Articles/Others/EffSubGrid2000.pdf

161. Zhang, Y., C. Seigneur, J. H. Seinfeld, M. Jacobson, S. L. Clegg, and F. Binkowski, A comparative review of inorganic aerosol thermodynamic equilibrium modules: Similarities, differences, and their likely causes, *Atmos. Environ., 34*, 117-137, 2000. https://web.stanford.edu/group/efmh/jacobson/Articles/Others/CompRevAer2000.pdf

**1999**

162. Jacobson, M. Z., Isolating nitrated and aromatic aerosols and nitrated aromatic gases as sources of ultraviolet light absorption, *J. Geophys. Res., 104*, 3527-3542, 1999. https://web.stanford.edu/group/efmh/jacobson/Articles/III/NitArom99.pdf

163. Jacobson, M. Z., Effects of soil moisture on temperatures, winds, and pollutant concentrations in Los Angeles, *J. Appl. Meteorol., 38*, 607-616, 1999. https://web.stanford.edu/group/efmh/jacobson/Articles/IV/SoilMoist99.pdf

164. Jacobson, M. Z., Studying The effects of calcium and magnesium on size-distributed nitrate and ammonium with EQUISOLV II, *Atmos. Environ., 33*, 3635-3649, 1999. https://web.stanford.edu/group/efmh/jacobson/Articles/IX/EquisolvII.pdf

165. Liang, J., and M. Z. Jacobson, A study of sulfur dioxide oxidation pathways over a range of liquid water contents, pHs, and temperatures, *J. Geophys. Res., 104*, 13,749-13,769, 1999. https://web.stanford.edu/group/efmh/jacobson/Articles/Others/1999JD900097.pdf

166. Zhang, Y., C. Seigneur, J. H. Seinfeld, M. Z. Jacobson, and F. Binkowski, Simulation of aerosol dynamics: A comparative review of algorithms used in air quality models, *Aerosol Sci. Technol., 31*, 487-514, 1999. https://web.stanford.edu/group/efmh/jacobson/Articles/Others/3972920.pdf

**1998**

167. Jacobson, M. Z., Improvement of SMVGEAR II on vector and scalar machines through absolute error tolerance control. *Atmos. Environ., 32*, 791–796, 1998. https://web.stanford.edu/group/efmh/jacobson/Articles/IX/TechNote.SMVGEAR.pdf

168. Jacobson, M. Z., Studying the effects of aerosols on vertical photolysis rate coefficient and temperature profiles over an urban airshed, *J. Geophys. Res., 103*, 10,593-10,604, 1998. https://web.stanford.edu/group/efmh/jacobson/Articles/III/VertPhotJGR98.pdf

169. Tabazadeh, A., M. Z. Jacobson, H. B. Singh, O. B. Toon, J. S. Lin, B. Chatfield, A. N. Thakur, R. W. Talbot, and J. E. Dibb Nitric acid scavenging by mineral and biomass burning aerosols, *Geophys. Res. Lett., 25*, 4185-4188, 1998. https://web.stanford.edu/group/efmh/jacobson/Articles/Others/1998GL900062.pdf

**1997**

170. Jacobson, M. Z., Development and application of a new air pollution modeling system. Part II: Aerosol module structure and design, *Atmos. Environ., 31A*, 131–144, 1997. https://web.stanford.edu/group/efmh/jacobson/Articles/III/DevAppModII.pdf

171. Jacobson, M. Z., Development and application of a new air pollution modeling system. Part III: Aerosol-phase simulations, *Atmos. Environ., 31A*, 587–608, 1997. https://web.stanford.edu/group/efmh/jacobson/Articles/III/AerSimAE97.pdf

172. Jacobson, M. Z., Numerical techniques to solve condensational and dissolutional growth equations when growth is coupled to reversible reactions, *Aerosol Sci. Technol., 27*, 491–498, 1997. https://web.stanford.edu/group/efmh/jacobson/Articles/IX/NumTech.pdf

173. Lu, R., R. P. Turco, and M. Z. Jacobson, An integrated air pollution modeling system for urban and regional scales. Part I: Structure and performance, *J. Geophys. Res., 102*, 6063 – 6080, 1997. https://web.stanford.edu/group/efmh/jacobson/Articles/Others/96JD03501.pdf

174. Lu, R., R. P. Turco, and M. Z. Jacobson, An integrated air pollution modeling system for urban and regional scales. Part II: Simulations for SCAQS 1987, *J. Geophys. Res.*, *102*, 6081 – 6098, 1997. https://web.stanford.edu/group/efmh/jacobson/Articles/Others/96JD03502.pdf

**1996**

175. Jacobson, M. Z., R. Lu, R. P. Turco, and O. B. Toon, Development and application of a new air pollution modeling system. Part I: Gas-phase simulations, *Atmos. Environ.*, *30B*, 1939–1963, 1996. https://web.stanford.edu/group/efmh/jacobson/Articles/V/DevApAirPol1.pdf

176. Jacobson, M. Z., A. Tabazadeh, and R. P. Turco, Simulating equilibrium within aerosols and non-equilibrium between gases and aerosols, *J. Geophys. Res.,* *101*, 9079–9091, 1996. https://web.stanford.edu/group/efmh/jacobson/Articles/IX/EquilibPap96.pdf

177. Elliott, S., M. Shen, C. Y. J. Kao, R. P. Turco, and M. Z. Jacobson, A streamlined family photochemistry module reproduces major nonlinearities in the global tropospheric ozone system, *Computers Chem., 20*, 235–259, 1996. https://web.stanford.edu/group/efmh/jacobson/Articles/Others/96-Elliott-ComputChem.pdf

178. Elliott , S., C.-Y. J. Kao, F. Gifford, S. Barr, M. Shen, R. P. Turco, and M. Z. Jacobson, Free tropospheric ozone production after deep convection of dispersing tropical urban plumes, *Atmos. Environ., 30A*, 4263 – 4274, 1996. https://web.stanford.edu/group/efmh/jacobson/Articles/Others/OzProd1996.pdf

**1995**

179. Jacobson, M. Z., and R. P. Turco, Simulating condensational growth, evaporation, and coagulation of aerosols using a combined moving and stationary size grid, *Aerosol Sci. and Technol., 22*, 73–92, 1995. https://web.stanford.edu/group/efmh/jacobson/Articles/IX/SimConGrid.pdf

180. Jacobson, M. Z., Computation of global photochemistry with SMVGEAR II. *Atmos. Environ., 29A*, 2541-2546, 1995. https://web.stanford.edu/group/efmh/jacobson/Articles/IX/TechNCompGlobSMVGEARII.pdf

**1994**

181. Jacobson, M. Z., and R. P. Turco, SMVGEAR: A sparse-matrix, vectorized Gear code for atmospheric models, *Atmos. Environ., 28A*, 273-284, 1994. https://web.stanford.edu/group/efmh/jacobson/Articles/IX/SMVGEARgearcode.pdf

182. Jacobson, M. Z., R. P. Turco, E. J. Jensen, and O. B. Toon, Modeling coagulation among particles of different composition and size, *Atmos. Environ., 28A*, 1327–1338, 1994. https://web.stanford.edu/group/efmh/jacobson/Articles/VII/ModCoag.pdf

183. Drdla, K., A. Tabazadeh, R. P. Turco, M. Z. Jacobson, J. E. Dye, C. Twohy, and D. Baumgardner, Analysis of the physical state of one Arctic polar stratospheric cloud based on observations*, Geophys. Res. Lett., 21*, 2475 – 2478, 1994. https://web.stanford.edu/group/efmh/jacobson/Articles/Others/94GL02405.pdf

184. Tabazadeh, A., R. P. Turco, and M. Z. Jacobson, A model for studying the composition and chemical effects of stratospheric aerosols, *J. Geophys. Res., 99*, 12,897 - 12,914, 1994. https://web.stanford.edu/group/efmh/jacobson/Articles/Others/94JD00820.pdf

185. Tabazadeh, A., R. P. Turco, K. Drdla, and M. Z. Jacobson, A study of Type I polar stratospheric cloud formation, *Geophys. Res. Let., 21*, 1619-1622, 1994. https://web.stanford.edu/group/efmh/jacobson/Articles/Others/94GL01368.pdf

**1993**

186. Elliott, S., R. P. Turco, and M. Z. Jacobson, Tests on combined projection / forward differencing integration for stiff photochemical family systems at long time step, *Computers Chem., 17*, 91–102, 1993. https://web.stanford.edu/group/efmh/jacobson/Articles/Others/TestComp1993.pdf

**1990**

187. Delitsky, M. L., R. P. Turco, and M. Z. Jacobson, Nitrogen ion clusters in Triton's atmosphere, *Geophys. Res. Lett., 17*, 1725-1728, 1990. https://web.stanford.edu/group/efmh/jacobson/Articles/Others/GL017i010p01725.pdf


**Books (7)**

Jacobson, M.Z., *Fundamentals of Atmospheric Modeling,* Cambridge University Press, New York, 656 pp., 1999; reprint, 2000. https://web.stanford.edu/group/efmh/jacobson/FAMbook/FAMbook.html

Jacobson, M. Z., *Atmospheric Pollution: History, Science, and Regulation*, Cambridge University Press, New York, 399 pp., 2002. https://web.stanford.edu/group/efmh/jacobson/POLbook/POLbook.html

Jacobson, M.Z., *Fundamentals of Atmospheric Modeling, Second Edition*, Cambridge University Press, New York, 813 pp., 2005. https://web.stanford.edu/group/efmh/jacobson/FAMbook2dEd/index.html

Jacobson, M. Z., *Air Pollution and Global Warming: History, Science, and Solutions*, Cambridge University Press, New York, 375 pp., 2012. https://web.stanford.edu/group/efmh/jacobson/POLbook2/index.html

Jacobson, M.Z., *100% Clean, Renewable Energy and Storage for Everything*, Cambridge University Press, New York, 427 pp., 2020. https://web.stanford.edu/group/efmh/jacobson/WWSBook/WWSBook.html

Jacobson, M.Z., *No Miracles Needed: How Today's Technology can Save our Climate and Clean our Air*, Cambridge University Press, New York, 437 pp., 2023. https://web.stanford.edu/group/efmh/jacobson/WWSNoMN/NoMiracles.html

Jacobson, M.Z., *Still No Miracles Needed: How Today's Technology can Save our Climate and Clean our Air*, Cambridge University Press, New York, in press, 2025. https://web.stanford.edu/group/efmh/jacobson/WWSStillNMN/StillNMN.html

# EXHIBIT 16

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| ELENA VENNER, *et al.*,<br>　　　　　　*Petitioners*,<br><br>　　　v.<br><br>UNITED STATES<br>ENVIRONMENTAL PROTECTION<br>AGENCY, *et al.*,<br>　　　　　　*Respondents*. | Case No. 26-1038<br>Lead Case No. 26-1037<br>(and consolidated cases) |

## DECLARATION OF ELIZABETH PINSKY, MD,
## IN SUPPORT OF PETITIONERS' MOTION TO STAY
## THE FINAL RULE PENDING REVIEW

I, Elizabeth Pinsky, hereby declare and if called upon would testify as follows:

1.　　I am a child and adolescent psychiatrist and pediatrician at Massachusetts General Hospital and Associate Director at the Massachusetts General Center for Environment and Health. I am offering this testimony in my personal capacity, and I have personal knowledge of the facts stated herein.

2.　　I received my medical degree from Harvard Medical School and completed consecutive residencies in pediatrics and psychiatry followed by a child psychiatry fellowship at Massachusetts General Hospital. My clinical interests focus on the intersection of child mental and physical health, including childhood trauma

1

associated with climate change. I have deep expertise in the psychiatric care of medically complex children, in the psychiatric complications of pediatric medical illness, and in care for young people who have experienced severe trauma.

3. I am board certified in both pediatric medicine and psychiatry and am an Assistant Professor in Psychiatry at Harvard Medical School. I lecture nationally on climate change and mental health, am the author of numerous related journal articles and textbook chapters, and serve as Chair of the Climate Change Committee at the American Academy of Child and Adolescent Psychiatry.

4. My decades of research, practice, and public service have demonstrated that emissions from fossil fuel powered vehicles of greenhouse gases (GHG) and other pollutants cause and exacerbate respiratory, allergic, cardiovascular, gastrointestinal, neuropsychiatric, endocrinologic, and infectious diseases in children and youth, leading to suffering and endangering the quality and length of their lives.

5. Additional details on my education, research, and public service can be found in my curriculum vitae, a true and correct copy of which is attached as Exhibit A.

6. I am submitting this Declaration in support of Petitioners' Motion to Stay the Endangerment Finding recission and repeal of vehicle emission standards (the "Repeal Rule") pending review. In this declaration, I describe how children and

youth including the Petitioners are already being harmed by increasing temperatures and air pollution, how they are at increased risk of these harms compared to adults because of their immature physiology and other factors, and how repealing the Endangerment Finding and GHG emission standards for vehicles will immediately increase their risk of further health harms. Some of these current and future harms have life-long consequences, and some have no known treatment. The emergent harms to children's health, and specific harms to the youth Petitioners here, will worsen if EPA is allowed to rescind the Endangerment Finding and GHG emission standards for vehicles.

7. Because childhood exposures to fossil fuel pollution and other climate hazards have harmful life-long consequences, it is critical that EPA's Repeal Rule is stopped immediately. The only intervention to fully protect children from the health harms associated with pollution from fossil fuel-powered vehicles, and to avoid new ones, is to limit exposure to that pollution. EPA's decision to repeal GHG emission standards for vehicles does the opposite: it increases and prolongs duration of exposure to the pollution and heat that directly harm children. This increases the risk that children and youth, like the Petitioners, will experience life-long injuries to their physical health. It also increases the risk to their mental health and wellbeing, both through direct negative neuropsychiatric effects of air pollution and excess heat and

3

through deprivation of physical security, time outdoors in nature, and continuity of spiritual, cultural, and recreational practices.

8. In forming my opinions in this case, I have reviewed the declarations of Petitioners Elena Venner, Maya Williams, J.K., C.E., E.S., M.D., and N.N., and parents of minor Petitioners L.K., S.A., A.F., B.K., and accept their sworn statements to be true.

9. The increased risk of harm from the additional pollution that will result from the repeal of the GHG emission standards for vehicles is particularly important given many of the Petitioners' specific existing health issues and the fact that many live in communities with air already deemed unhealthy because of air pollution and increased exposure to heat or other climate hazards.

**Increases in Fossil Fuel Air Pollution Harm Children the Most**

10. From a medical perspective, it is extremely salient that the Petitioners asking the Court to stay EPA's Repeal Rule are children and youth. Young people have unique behavioral and physiologic vulnerabilities that put them at increased risk of health harm from fossil fuel related air pollution.

11. Compared to adults, children have disproportionate exposure to many of the pathways through which climate change and air pollution harm human health. Children spend more time outdoors and are physically closer to the ground where harmful particulate matter, ozone, and other pollutants are measurably more

concentrated. Children's outdoor activities increase their risk of contact with arthropods that transmit climate-driven infectious diseases including Lyme disease, dengue, and viral encephalitides. Children breathe at a faster rate and require more calories and water per pound of body weight than adults, exposing them to proportionately higher levels of pollutants.

12. Beyond increased exposure routes, once exposed, children are then also more susceptible to the health harms associated with fossil fuel pollution, with a range of negative outcomes that are more frequent and/or more severe when compared to adults. There are many examples. Children's airways are narrower and more vulnerable to constriction caused by chemical air pollution and airborne allergens like pollen and mold (both of which are increasing due to climate change). Infants have immature heat regulation and kidney function and are more vulnerable to both extreme heat and to dehydration. Diarrheal illnesses, driven by climate-related decrements in water quality, disproportionately kill infants and young children. Specifically, when experienced in childhood, trauma related to extreme weather events inflicts outsized harm to mental and physical health, both acutely and then across the lifespan.

13. Children are at additional and uniquely increased risk because their bodies are actively developing, and even minor injuries or disruptions during critical early windows can have lifelong, sometimes irreversible consequences in multiple

different organ systems. The respiratory system is one important example, as the lungs have a period of rapid growth in childhood and early adolescence. In a study of 1759 California school children (average age of 10), exposure to air pollution during the eight-year-long study period was associated with a clinically significant degree of decreased lung function once children reached adulthood.[1] Petitioner C.E. is eight years old; her current lung development, and therefore her lifelong respiratory health, are directly threatened by the additional pollution that would result from the repeal of the GHG emission standards for vehicles.

14.     Impaired brain development is another significant example. Exposure to a range of traffic-related pollutants both prenatally and in early childhood has been linked to adverse neurodevelopmental and neurocognitive outcomes, including lower academic achievement, lower IQ, and increased risk of attention-deficit hyperactivity disorder (ADHD) and autistic traits in childhood.[2] Exposure to $PM_{2.5}$ has been associated with white matter microstructural changes in children's brains

---

[1] Gauderman JW, Avol E, Gilliland F, et al. The Effect of Air Pollution on Lung Development from 10 to 18 Years of Age. *New England Journal of Medicine*. 2004;351:1057-1067.
[2] Clifford A, Lang L, Chen R, et al. Exposure to air pollution and cognitive functioning across the life course - A systematic literature review. *Environ Res*. 2016 May 1;147:383-98.

that are visible on MRI, demonstrating measurable neuroanatomical effects even at pollution levels within EPA standards.[3]

15.     The evidence that fossil fuel pollution impairs neurodevelopment in early life underscores the fact that the harms of childhood and prenatal exposure to these pollutants are lifelong. Petitioner L.R.F. is one year old; the additional pollution that will result from the repeal of the GHG emission standards for vehicles is a direct threat to the development of the scaffolding that supports all of her future learning and achievement. It is critical to limit her exposure to these pollutants now, while her brain is actively maturing. There is no mitigation or after-the-fact treatment that can undo the harm caused by exposing her brain to pollution in this critical window: even modest changes in her intelligence, attention, processing speed or working memory will cascade into lower achievement and opportunity, and even into a shorter lifespan.[4]

16.     There is ample evidence in the scientific literature that exposure to air pollutants and increased temperatures specifically from the burning of fossil fuels are already harming children's physical health and mental well-being. Pollution

---

[3] Burnor E et al. Association of Outdoor Ambient Fine Particulate Matter with Intracellular White Matter Microstructural Properties among Children. *JAMA Netw Open*. 2021;4(12).

[4] Yu J er al. Adverse Childhood Experiences, Neurocognitive Functions, and Long-Term Mortality Risk. *JAMA Netw Open*. 2025;8(9):e2531283.

from fossil fuels is associated with premature birth, impaired fetal growth, infant death, childhood asthma, childhood respiratory infections, other infectious diseases, impaired lung growth, neurodevelopmental disorders, IQ loss, pediatric cancers, and worsened mental health.[5,6] As an example, recent peer-reviewed research shows that in the year 2017 alone, air pollution (fine particulates, nitrogen dioxide, resultant ozone, and hazardous air pollutants) from the oil and gas industry in the United States caused an estimated 216,000 incidences of childhood-onset asthma and 10,350 pre-term births.[7]

**The Repeal Rule Increases Petitioners' Direct Exposure to Vehicle Tailpipe Pollution**

17. Types of fossil fuel vehicle pollution that are significantly harmful to children's health include $PM_{2.5}$, nitrogen oxides ($NO_x$), sulfur dioxide, polycyclic aromatic hydrocarbons, and volatile chemicals that are the precursors to ground-level ozone. Taken separately, even moderate exposure to these pollutants cause harm through multiple broad and intersecting mechanisms: increased inflammation, constriction of small airways, derangement in immune system responses including

---

[5] Perera F, Nadeau K. Climate Change, Fossil-Fuel Pollution, and Children's Health. *New England Journal of Medicine*. 2022;386(24):2303-2314.

[6] Brumberg HL, Karr CJ. Ambient air pollution: Health hazards to children. *Pediatrics. American Academy of Pediatrics*. 2021;147(6). doi:10.1542/peds.2021-051484

[7] Vohra K, et al. The Health Burden and Racial-Ethnic Disparities of Air Pollution from the Major Oil and Gas Lifecycle Stages in the United States. *Science Advances*. 2025;11(34) eadu2241.

both impaired defenses and hyperresponsiveness, carcinogenicity, and dysfunction of the cells that line and regulate the vascular system (i.e. endothelial dysfunction).

18. The Repeal Rule will increase the Petitioners' exposure to fine particulate matter ($PM_{2.5}$). EPA agrees with the substantial medical literature that the adverse health effects of exposure to $PM_{2.5}$ are significant, and include premature death, heart attacks, irregular heartbeat, asthma aggravation, decreased lung function, and increased respiratory symptoms such as airway irritation, coughing, and difficulty breathing.[8] These harms begin prenatally, as exposure to even low levels of $PM_{2.5}$ in utero has been associated with reduced lung function in young children.[9] Early exposure to $PM_{2.5}$ is also associated with increased risk of asthma in childhood.[10]

19. The Repeal Rule will increase the Petitioners' exposure to nitrogen oxides ($NO_x$), major components of diesel and gasoline vehicle exhaust. EPA agrees with the medical literature that $NO_x$ inhalation causes irritation to the human respiratory system, aggravates respiratory diseases and particularly asthma, causes

---

[8] EPA, *Health and Environmental Effects of Particulate Matter (PM)*, https://www.epa.gov/pm-pollution/health-and-environmental-effects-particulate-matter-pm (last accessed May 4, 2026).

[9] Usemann J, Mozun R, Kuehni CE, et al. Air pollution exposure during pregnancy and lung function in childhood: The LUIS study. *Pediatr Pulmonol*. 2024;59(12):3178-3189. doi:10.1002/ppul.27169.

[10] Carlsten C, Dybuncio A, Becker A, et al. Traffic-related air pollution and incident asthma in a high-risk birth cohort. *Occup. Environ. Med*. 2011;68(4):291-95.

coughing, wheezing, and difficulty breathing, and leads to hospital admission and emergency department visits.[11] Exposure to traffic-related air pollution including $NO_x$ increases the risk that children will develop asthma, and once developed, $NO_x$ is then a known trigger of attacks in children who have the disease.[12,13]

20. Living, going to school, or otherwise spending time close to roads where fossil fuel burning vehicles travel is currently a demonstrable threat for many of the Petitioners. For example, Petitioner N.N. declares that his high school is adjacent to a "densely trafficked 4-lane highway." Petitioner C.E. also goes to a school close to a "busy road" where numerous children already have asthma diagnoses. C.E. describes symptoms of respiratory inflammation that require the use of an inhaler. More exposure to tailpipe pollution will increase the chance that C.E. develops childhood asthma. Protecting her lungs requires eliminating as much fossil fuel pollution exposure as possible.

21. Petitioner E.S. (17 years old) lives on a 6-lane highway in Memphis and is therefore regularly exposed to pollution from fossil-fuel powered vehicles. He

---

[11] EPA, *Basic Information about NO2*, https://www.epa.gov/no2-pollution/basic-information-about-no2 (last accessed May 4, 2026).

[12] Thurston GD, Balmes JR, Garcia E, et al. Outdoor air pollution and new-onset airway disease: an official American Thoracic Society Workshop report. *Ann Am Thorac Soc* 2020;17:387-398.

[13] Urman R., McConnell R, Islam T, et al. Associations of children's lung function with ambient air pollution: Joint effects of regional and near-roadway pollutants. *Thorax*. 2014;69(6):540-47.

walks at least two miles along that highway every week to attend his synagogue, leading to at least 40-50 minutes of close-proximity exposure to motor vehicle pollution every week. Petitioner Elena already reports an asthma diagnosis and significant history of sinus inflammation and infection, which puts her at heightened risk of further adverse health outcomes from exposure to tailpipe pollution that would otherwise have been avoided under the prior GHG emissions standards. She declares that she hears the constant stream of traffic on Highway 101 out her bedroom window each night due to her apartment's proximity. Maya, also diagnosed with asthma, lives in dense traffic areas of California, like Los Angeles, and is subject to the same increased risk.

22. This proximity of Petitioners to tailpipe emissions is strongly associated with higher exposure to harmful air pollutants, which as described above are known to impair lung development during critical periods of growth and to exacerbate already present respiratory illness. Higher numbers of fossil fuel powered vehicles on the road increases the risk that these Petitioners will be exposed to harmful air pollutants emitted by these vehicles.

23. School buses powered by fossil fuels are also harmful for children and pollute the air they breathe. As the EPA has said: "Older, more polluting school

11

buses can lead to significant health risks for students who typically ride these buses for one-half to two hours a day."[14]

24.    A comprehensive systematic review and meta-analysis by Khreis et al. (2017) found exposure to black carbon, nitrogen dioxide ($NO_2$), $PM_{2.5}$, and $PM_{10}$, all of which are emitted from fossil fuel vehicles, was associated with increased childhood asthma risk.[15] By keeping more internal combustion vehicles on the roads longer, Petitioners are exposed to more harmful air pollution than they would otherwise would be if the Repeal Rule was stayed.

**Reduced Exposure to Fossil Fuel Air Pollution Protects Children's Health**

25.    Even modest reductions in air pollution from fossil fuels are associated with better lung health among children. These improvements are measurable and clinically significant within the timeline of an individual childhood – underscoring the immediacy of both harm and benefit related to levels of air pollution. Over a 13-year period in Southern California, children living in communities with reductions in $NO_2$ and $PM_{2.5}$ levels had clinically significant improvements in their lung development, providing strong evidence that reducing fossil fuel emissions leads to

---

[14] EPA, *Making School Buses Cleaner,* https://www.epa.gov/dera/making-school-buses-cleaner (last accessed May 4, 2026).
[15] Khreis K, Kelly C, Tate J, et al. Exposure to traffic-related air pollution and risk of development of childhood asthma: A systematic review and meta-analysis. *Environ Int*. 2017 Mar;100:1-31.

tangible pediatric health benefits.[16] Reductions in air pollution have also been shown to lower incidence of lung disease: improvements in $NO_2$ and $PM_{2.5}$ levels between 1993 and 2014 were associated with decreased asthma incidence in children in California, and communities that experienced greater air quality improvements saw the greatest reductions in new asthma cases. [17]

26. Adoption of clean air and fuel technologies on school buses in the Seattle and Tacoma, Washington school districts reduced $PM_{2.5}$ and was associated with improved lung function and lung growth, reduced pulmonary inflammation, and lower absenteeism among riders age 6-12. Extrapolated to the U.S. population, adoption of these practices with improvements in air quality were estimated to reduce school absences by 14 million per year.[18]

27. Several additional natural experiments have demonstrated that reducing air contaminants improves respiratory and other health outcomes for children over meaningfully brief timeframes. A study of newborns demonstrated significant reductions in cord-blood polycyclic aromatic hydrocarbons (PAH) between infants

---

[16] Gauderman WJ, Urman R, Avol E, et al. Association of improved air quality with lung development in children. *N Engl J Med*. 2015;372:905-13.

[17] Garcia E, Berhane KT, Islam T, et al. Association of Changes in Air Quality with Incident Asthma in Children in California, 1993-2014. *JAMA - Journal of the American Medical Association*. 2019;321(19):1906-1915.

[18] Adar SD, D'Souza J, Sheppard L, et al. Adopting clean fuels and technologies on school buses. Pollution and health impacts in children. *Am J Respir Crit Care Med*. 2015 Jun 15;191(12):1413-21.

born the year before and the year after closure of a coal-fired power plant. When both groups of toddlers were evaluated at two years of age, PAH exposure was associated with developmental decrements in the older cohort, but were resolved in the younger cohort – indicating that improved air quality rapidly yields measurable neuropsychiatric benefits.[19]

28.    In another example, childhood asthma exacerbations were significantly reduced during the 1996 Olympics in Atlanta, when increased public transportation and telecommuting resulted in significantly less traffic-related air pollution.[20] Similarly, as a result of pollution control measures during the 2008 Olympics in Beijing, reduced air pollution during the eighth month of gestation was associated with birth weights that were measurably higher (totaling 23 grams on average) compared to infants born during periods with dirtier air before or after the games.[21]

29.    Petitioner Maya lives in Los Angeles and Alameda Counties and Petitioner M.D lives in Orange County, all of which are already in nonattainment of

---

[19] Perera F, Li TY, Zhou ZJ, et al. Benefits of reducing prenatal exposure to coal-burning pollutants to children's neurodevelopment in China. *Environ Health Perspect*. 2008;116(10):1396-1400. doi:10.1289/ehp.11480

[20] Friedman MS et al. Impact of Changes in Transportation and Commuting Behaviors During the 1996 Summer Olympic Games in Atlanta on Air Quality and Childhood Asthma. *JAMA*. 2001;285:897-905.

[21] Rich DQ, Liu K, Zhang J, et al. Differences in birth weight associated with the 2008 Beijing olympics air pollution reduction: Results from a natural experiment. *Environ Health Perspect*. 2015;123(9):880-887.

EPA air quality standards for $PM_{2.5}$.[22] Maya reports that she lives in a county with an "F" grade for 24-hr particle pollution according to the American Lung Association State of the Air Report.[23] Three petitioners (Emma in La Jolla, M.D. in Garden Grove, and Maya in Los Angeles) also report living in counties with a "F" grade for annual particle pollution.

30.     Even small additional contributions to particle pollution from the Repeal Rule add to the unhealthy and often hazardous air these Petitioners are forced to breathe. As demonstrated by the literature, these additional incremental exposures are associated with measurable and clinically relevant harm.

**The Repeal Rule Increases Petitioners' Exposure to Ozone due to Increased $CO_2$ and Heat**

31.     Air pollution is particularly harmful to Petitioners in combination with heat, which is increasing because of GHG pollution. Extreme heat traps air in place, concentrating both particulate and chemical air pollutants, and accelerating the formation of ground-level ozone. These multiple pathways work additively (and in some cases multiplicatively) to expose children's developing respiratory and circulatory systems to higher rates of oxidative stress, inflammation, and endothelial dysfunction.

---

[22] https://www3.epa.gov/airquality/greenbook/ancl.html
[23] https://www.lung.org/getmedia/32f0646d-c5de-4501-b0ac-07cd63c974d4/State-of-the-Air-2026-Report.pdf

32. Even small amounts of ozone pollution, and short durations of exposure, can have significant long-term impacts on children's health. A 2025 systemic review of 85 epidemiological studies found consistent evidence that ozone is a risk factor for low birth weight, asthma, respiratory disease, and obesity in children, even at concentrations below World Health Organization standards.[24] A 2022 systemic review found consistent evidence of decreases in children's lung function that were associated with even very short-term exposures to ozone pollution.[25] These findings reinforce that increases in exposure to ozone – regardless of duration and concentration – are harmful to children's lungs.

33. Ultimately ozone exposure increases risks of development of asthma and then exacerbations of the disease (or "asthma attacks") in young people such as Petitioners E.S. (in Memphis, TN, who has not been diagnosed with asthma), Maya (Los Angeles, CA, who has asthma), and Elena (front range of Denver, CO and San Luis Obispo, CA, who has asthma), all of whom live in cities with incidents of high heat and high ozone levels. Those Petitioners who do not report having been diagnosed with asthma are similarly at risk of increased health harms since they are already living with poor air quality. Petitioners Maya in Los Angeles and Berkeley,

---

[24] Zhou Y at al. Ambient Ozone Exposure and Global Child Health: A Systematic Review of Epidemiological Studies. *Acta Paediatr*. 2025 Dec;114(12):3122-3135.
[25] Holm SM, Balmes JR. Systematic Review of Ozone Effects on Human Lung Function, 2013 Through 2020. *Chest*. 2022 Jan;161(1):190-201.

CA, M.D in Garden Grove, CA, Emma in La Jolla, CA, Elena in San Luis Obispo, CA and Lakewood, CO, and J.K. in Westchester County, NY all live in counties that are in nonattainment of EPA air quality standards for 8-hour ozone.[26] Eight Petitioners (C.E., Elena, E.S., Emma, J.K., M.B., M.D., and Maya) all say they live in counties with "F" grades for ozone, according to the American Lung Association State of the Air Report.

34. The Repeal Rule will add even more ozone pollution to already-polluted air conditions, which is significantly harmful for these Petitioners. The pathway to healthier lungs for these young people is less pollution, not more.

**The Repeal Rule Increases Petitioners' Exposure to Wildfire Smoke Pollution from Climate Change**

35. Of additional and enormous significance for children's respiratory health are the harms associated with exposure to wildfire smoke. Climate-driven wildfires increase air pollution to extraordinary levels, with smoke containing a range of highly toxic air pollutants including $PM_{2.5}$, $NO_2$, ozone, PAH, lead, and mercury. Unabated GHG emissions will expose Petitioners to even more frequent and higher concentrations of wildfire smoke as temperatures increase both globally and locally and as drought conditions worsen.

---

[26] https://www3.epa.gov/airquality/greenbook/ancl.html

36.     Many of the Petitioners report already being exposed to wildfire smoke. Petitioner Elena, who describes a history of asthma and ear, nose, and throat infections, has experienced wildfires in her home state of Colorado. Petitioner Maya also has asthma and states that she has felt her lungs hurt when forced to breathe in wildfire smoke. Petitioner L.R.F., who is only one year old, had to be kept indoors on smoky days in Pennsylvania when she was a young infant and too small to wear a mask. Petitioner C.E. has also said she had to stay inside to try to escape wildfire smoke. Petitioner J.K. breathes in heavy wildfire smoke at his home in New York and has also had vacations disrupted due to unhealthy air conditions from wildfire smoke.

37.     A study on the West Coast of the United States looking at respiratory and cardiovascular hospital admissions during wildfire smoke events demonstrated a 25% higher rate of asthma-related hospitalizations in five- to nineteen-year-olds with a 56% higher rate that persisted even *after* the fires were extinguished.[27] Another study of 170,000 emergency and urgent care visits in Southern California showed that wildfire smoke was uniquely toxic to children's lungs, with increases

---

[27] Delfino RJ, Brummel S, Wu J, et al. The relationship of respiratory and cardiovascular hospital admissions to the southern California wildfires of 2003. *Occup Environ Med*. 2009;66(3):189-197.

in emergency health care visits that were 10 times higher for air pollution from wildfire smoke compared to other air pollution from other sources.[28]

38.　There is no "safe" level of exposure to wildfire smoke, as even the smallest measurable levels of this type of pollution have been associated with harm. As stated by the EPA in 2026 in *Wildland Fires and Public Health Effects*, "there is clear evidence that there is no $PM_{2.5}$ concentration below which health effects have not been observed." [29] I agree with the EPA assessment, and furthermore note that the health consequences for children are even worse than for adults. It is vital to reduce, not increase, air pollution from fossil fuel combustion that will worsen the conditions that result in exposure to wildfire smoke.

39.　To provide an analogy from another branch of medicine, there is no known safe level of exposure to lead: each additional microgram of exposure represents lost cognitive ability and lower academic achievement. A microgram of lead is far too small to see with the human eye and may seem like a small amount. Virtually all Americans born before 1980 were exposed to lead levels that would demand urgent action if detected in a child today. With abatement measures, especially from limits on lead in gasoline, average blood lead level of children in the

---

[28] Aguilera R, Corringham T, Gershunov A, Leibel S, Benmarhnia T. Fine particles in wildfire smoke and pediatric respiratory health in California. *Pediatrics*. 2021;147(4).

[29] EPA, Wildland Fires and Public Health Effects, https://www.epa.gov/wildfires/ wildland-fires-and-public-health-effects. Accessed May 12, 2026.

19

U.S. has steadily declined over the past 40 years from 15 µg/dL to 0.6 µg/dL, a change that represents millions—and possibly billions—of preserved IQ points and associated savings over time. These then-children also experienced *individual* benefits from abatement measures. If regulators had not fully accounted for the specific developmental nature of children's vulnerability to that pollutant, it would have presented a significant hurdle to children's ultimate protection. Health effects on children must be considered separately from adult populations because they face different and significant risks compared to fully developed adults.

40. Even health benefits that are incremental to children in the short term have profound long-term benefits to those children's lives and to society at large.

**The Repeal Rule Increases Petitioners' Exposure to Harmful Heat**

41. As more greenhouse gases enter the atmosphere the severity and frequency of extreme heat events increase, and so do the many associated health harms. Many of the Petitioners already report experiences with extreme heat, and they are at risk of health injuries that are more severe and more frequent as extreme heat events worsen. For example, Petitioner C.E. describes suffering heat illness after biking on a hot day. Petitioner E.S. experienced heat illness and visual migraines triggered by heat. Petitioner M.D., who is Muslim and wears hijab, avoids outdoor physical activity outside on hot days. The heat also limits her ability to fast during Ramadan. Petitioner J.K. and his family face the choice of either walking a

mile each way in heat conditions that could harm J.K.'s health, or not attending Shabbat services as demanded by his faith. Petitioner Maya finds it hard to concentrate in school when it's too hot and describes asthma symptoms and headaches induced by the heat.

42.    The health injuries related to heat begin to accrue in utero: both higher average ambient temperatures and episodic heatwaves experienced prenatally are associated with increased risk of adverse pregnancy outcomes that include preterm births, stillbirths, low birth weight, and congenital heart defects.[30] Petitioner Elena was born in 2004: during her lifetime she has experienced 21 of the 24 hottest years in recorded Earth history.[31] Hot days have been associated with increased risk of pediatric emergency department visits for any cause, as well as visits specifically for heat-related illness, bacterial intestinal infections, ear infections, and nervous system diseases.[32] These harms for Elena and other Petitioners will mount and get worse the more pollution and warming continue. Conversely, every avoided fraction of a degree of warming confers enormous health benefits for them.

---

[30] Chersich MF, Pham MD, Area A, et al. Associations between high temperatures in pregnancy and risk of preterm birth, low birth weight, and stillbirths: Systematic review and meta-analysis. *BMJ*. 2020;371; Lakhoo DP, et al. A systematic review and meta-analysis of heat exposure impacts on maternal, fetal and neonatal health. *Nat Med*. 2025;31(2):684-694.

[31] https://www.ncei.noaa.gov/access/monitoring/climate-at-a-glance/global/time-series/globe/land_ocean/tavg/12/12/1850-2025

[32] Bernstein AS, et al. Warm Season and Emergency Department Visits to U.S. Children's Hospitals. *Environ Health Perspect*. 2022;130(1).

43.     Extreme heat is also an independent predictor of asthma exacerbation across the lifespan, even after accounting for air pollution.[33] Petitioner Maya, for example, has been diagnosed with asthma and is therefore particularly at risk of increasing episodes of asthma attacks during heat events. Unsurprisingly, Maya reports worsening asthma symptoms on hot days. More heat-trapping greenhouse gas pollution will predictably increase Maya's exposure to conditions that worsen her asthma.

44.     Beyond asthma, excess heat causes increased risk of illness and death via exacerbation of multiple other secondary disease pathways including cardiovascular events (e.g. acute myocardial infarction or heart attack, arrhythmias or abnormalities in the rhythm of the heart, exacerbations of congestive heart failure, and stroke), other respiratory conditions (e.g. chronic obstructive pulmonary disease), and kidney disease.[34]

45.     The dangers of exposure to heat in and of *itself* should also not be minimized. Acute heat-related illnesses range from non-life threatening (e.g. heat rash, heat cramps), to potentially severe contact burns from hot pavement and other surfaces (e.g. playground equipment), to heat exhaustion and finally heat stroke –

---

[33] Han A, et al. Asthma triggered by extreme temperatures: From epidemiological evidence to biological plausibility. *Environ Res. Academic Press Inc*. 2023;216(Pt 2):114489.
[34] Bell ML, Gasparrini A, Benjamin GC. Climate Change, Extreme Heat, and Health. *NEJM*. 2024;390(19):1793-1801.

the latter of which can progress to multiorgan failure and death. Petitioners C.E., at age 8, and E.S., a teenager, report having experienced heat-related illness and will be at increased risk of more heat-related illness if more GHG emissions from vehicles are allowed without limits under the Repeal Rule.

46.     There is also an extensive medical literature demonstrating associations between heat and poor emotional well-being, cognition, and behavior. High ambient temperatures are associated with deterioration in sleep, cognition, and mood. There is a linear association between high heat and worse subjective mental health.[35] There are well-established links between heat and aggression and violence, with negative outcomes that range in severity from higher rates of online hate-speech to higher rates of death from assault.[36] The Repeal Rule will increase the Petitioners' risk of experiencing these significant physical and mental health harms associated with exposure to increased heat.

---

[35] Liu J, Varghese BM, Hansen A, et al. Is there an association between hot weather and poor mental health outcomes? A systematic review and meta-analysis. *Environ Int*. 2021;153:106533; Thompson R, et al. Associations between high ambient temperatures and heat waves with mental health outcomes: a systematic review. *Public Health*. 2018;161:171-191; Obradovich N, et al. Empirical evidence of mental health risks posed by climate change. *Proc Natl Acad Sci*. 2018;115(43):10953-10958.

[36] Wenz L, et al. Temperature impacts on hate speech online: evidence from 4 billion geolocated tweets from the USA. *Articles Lancet Planet Health*. Published online 2022. Accessed March 26, 2025; Kim SE, Kim Y, Hashizume M, et al. Positive Association of Aggression with Ambient Temperature. *Yale J Biol Med*. 2023;96:189-196.

**The Compounding Effects of Increased PM, NO2, Ozone, Smoke, and Heat Put Petitioners at Significant Risk of More Harm**

47. The wide-ranging injuries caused by pollution and heat that are discussed above, and that will be worsened by the Repeal Rule, do not only harm children's bodies through individual mechanisms or at a single moment in time. They are also not simply additive. Rather, they act multiplicatively over the entire course of development, through multiple intersecting pathways and positive feedback loops, and exacerbate individual negative health outcomes starting in utero with escalating harms mounting throughout infancy, childhood, adolescence, and into adulthood.

48. Petitioners are certainly already experiencing harm from traffic-related air pollution and warming, but additional harm matters and should not be ignored or minimized. For a child who already has asthma, increased exposure risks another exacerbation, emergency department visit or hospitalization, associated suffering, loss of school days, medical complications (which, at the extreme, include death), and financial costs on families. For a child whose cognitive function is already being impaired, increased exposure risks loss of additional IQ points and associated loss of academic achievement and vocational opportunity. Any argument that the additional pollution or heat caused by the Repeal Rule will be too small to notice or cause harm about is medically inaccurate: "small" is relative to a child's body. Similar to the effects of lead exposure described above, even small amounts of

pollution and even short-term exposures cause harms that are measurable and often irrevocable once they have occurred, such as structural changes to organs and lost cognitive ability that will impact an individual child's achievement for the rest of their lives.

**The Repeal Rule Increases the Risk of Petitioner L.R.F. Contracting Tick-Borne Diseases**

49. Rising global temperatures have altered the ecology, geographic range, and numbers of insects in North America, increasing the threat of infectious diseases borne by mosquitoes and ticks including Lyme disease, dengue, and encephalitides such as West Nile virus, Powassan virus, and the virus that causes Eastern Equine Encephalitis.

50. Lyme disease is the most common insect borne illness in the United States, with symptoms that range from early-stage rash and flu-like symptoms to late-stage arthritis, neurologic symptoms, and disturbances in cardiac rhythm. One-year-old Petitioner L.R.F. lives in an area (Bolivar, PA) where the incidence of ticks has increased dramatically; in her mother's words, the tick population has "exploded." Her mother reports that she has already found six ticks on L.R.F. after being outside. The ticks around her home carry Lyme disease, with an incidence of Lyme disease that has grown more than five-fold from 2020 to 2025; both of L.R.F's

parents report having been infected.[37]

51. Beyond physical effects on individuals who contract Lyme disease, prevention efforts and worry can impact behavior and experiences as vigilance about ticks causes individuals to limit time outdoors, or to experience that time as less restorative and pleasurable. A 2025 qualitative study of individuals living in Lyme endemic regions identified many participants who experienced anxiety, grief, loss, and/or an altered relationship to nature because of ticks and Lyme disease. Of particular relevance to L.R.F. is the fact that some participants were reluctant to let their children experience nature due to perceived risk of tickborne disease.[38] The physical, cognitive, emotional, and spiritual benefits of time outdoors are well-established: lower cardiovascular and all-cause mortality, lower stress and improved self-reported health, lower anxiety and depression.[39] The harms of losing this access are not theoretical.

52. Consistent with the medical literature, L.R.F.'s mother describes how time outdoors is essential for her daughter's emotional regulation and well-being,

---

[37] https://www.pa.gov/agencies/health/diseases-conditions/infectious-disease/vectorborne-diseases/tick-diseases Accessed May 16, 2026

[38] Bowser N, et al. 'You adapt, and you try not to resent it': a qualitative study exploring impacts of living with ticks and barriers to adopting preventive measures in Canada. *BMC Public Health*. 2025;25(1).

[39] Twohig-Bennett C, Jones A. The health benefits of the great outdoors: A systematic review and meta-analysis of greenspace exposure and health outcomes. *Environ Res*. 2018;166:628-637.

and how outdoors is "the place where she is happiest." She also reports that she has altered their behavior based on well-founded worry about ticks, describing that "tick awareness education (and fear) is rampant" and that the risk of L.R.F. contracting Lyme disease "is alarming and scary." The limitations on L.R.F.'s time in nature because of ticks are in addition to the protections A.F. already established in response to days with extreme heat and/or poor air quality. For L.R.F. and her mother A.F., this harms their family's eight-generation-long traditions living in a particular region of Pennsylvania, hunting and growing food, engaging in spiritual and cultural practices rooted in the land and their way of life. The Repeal Rule increases the likelihood of further deprivations of L.R.F. and mother A.F.'s time outside while she reasonably attempts to protect L.R.F.'s physical health.

**The Repeal Rule is Psychologically Harming Petitioners and their Families.**

53. Physical and mental health are closely intertwined. Increases in fossil pollution under the Repeal Rule will threaten the youth Petitioners' mental health. Nearly a decade ago, the federal government commissioned a review of the scientific literature on the impacts of climate change on mental health. The review concluded that climate change causes "serious mental health consequences."[40] This conclusion was reached with "very high confidence," the maximum level of certainty in the

---

[40] Dodgen, D, et al. Ch. 8: Mental health and well-being. The impacts of climate change on human health in the United States: A scientific assessment. U.S. Global Change Research Program, Washington, DC. 2016:217–246.

scale utilized by the authors.[41] This conclusion has only gotten stronger scientific support in the decade since.

54. In 2018, the Fourth National Climate Assessment ("NCA4"), stated: "People exposed to weather- or climate-related disasters have been shown to experience mental health impacts including depression, post-traumatic stress disorder, and anxiety, all of which often occur simultaneously; furthermore, among those most likely to suffer these impacts are some of society's most vulnerable populations, including children[.]"[42]

55. The mental health risks of air pollution and excess heat are greater for youth like the Petitioners when compared to adults for the same physiologic and developmental reasons that put them at increased risk of physical health harms and that are described above. Excess heat has many well-studied negative effects, including worsened sleep, poorer cognition, lower mood, increased rates of aggression and violence, and lower academic achievement.

56. Likewise, air pollution has direct negative neuropsychiatric impacts on youth like the Petitioners. Chronic air pollution exposure has been associated with increased rates of autistic traits, anxiety and depression in children, and episodic

---

[41] *Id.*

[42] USSCRP. Ch. 8 Coastal Effects, Impacts, Risks, and Adaptation in the United States: Fourth National Climate Assessment, Volume II. U.S. Global Change Research Program. 2018:326-327.

poor air quality has been associated with increased pediatric psychiatric crisis presentations.[43,44] Additionally, many children and youth experience impairing psychological distress related to awareness of climate change, which may manifest as fear, dread, despair, disaffection, rage, or grief. In a 2025 study of American youth ages 16 – 25, 85% of respondents endorsed feeling at least moderately worried, 57.9% endorsed feeling very or extremely worried, and 38.3% indicated that feelings about climate change negatively affected their daily life.[45]

57.    Petitioner Elena reports feeling both a "physical and mental toll" from her respiratory and sinus illnesses that worsen with poor air quality. She also describes wrestling with the decision on whether or not to have children as fossil fuel pollution accelerates, a choice that she says is in tension with her religious beliefs which emphasize openness to conceiving children.

58.    Petitioner C.E. describes feeling "trapped" in her house when she cannot leave due to heat and wildfire smoke. She cannot play outside or play with

---

[43] Yolton K, et al. Lifetime exposure to traffic-related air pollution and symptoms of depression and anxiety at age 12 years. *Environ Res*. 2019;173:199-206.

[44] Brokamp C, et al. Pediatric Psychiatric Emergency Department Utilization and Fine Particulate Matter: A Case-Crossover Study. *Environ Health Perspect*. 2019;127(9).

[45] Lewandowski RE et al. Climate emotions, thoughts, and plans among US adolescents and young adults: a cross-sectional descriptive survey and analysis by political party identification and self-reported exposure to severe weather events. *Lancet Planet Health*. 2024;8(11):e879-e893.

her friends. Petitioner Maya, who enjoys outside exercise, explains that when she is unable to exercise it negatively impacts both her mental health and her studies. Petitioners M.D. and J.K., supported by declarations from their mothers, declare that they must choose between their physical health and wellbeing and the religious practices that are central to their identities, a choice well understood to have negative mental health implications.

59. These psychological harms, compounded by harms to the practice of one's faith, are likely to worsen as these Petitioners' experience more physical harm caused by pollution from the Repeal Rule, more emotional trauma related to extreme weather events, and have ongoing awareness that their government is stripping protections away that would have limited their exposure to harmful pollution and heat. I have seen in my practice with my pediatric population that these multiple levels of harm and feelings of betrayal by adults have a significant and adverse effect on children's and youths' wellbeing.

**Conclusion**

60. The medical evidence is unambiguous and conclusive[46]—rescinding the Endangerment Finding and all vehicle GHG emission standards will cause an

---

[46] *See also* public comment submitted by Medical Society Consortium on Climate and Health, Academic Pediatric Association et al. (EPA-HQ-OAR-2025-0194-1472) (attached as Exhibit B) at 1 (rescinding the Endangerment Finding "disregards the near-daily health impacts Americans are already experiencing, and places our nation on a dangerous path towards greater illness, suffering, and

immediate increased risk of harm to the health of children, including these 18 youth Petitioners. It will cause or exacerbate various diseases, increase the risk of premature death, and cause significant mental health injuries. On the other hand, maintaining the GHG emission standards for vehicles that have been on the books in some form since 2012 will result in healthier children with longer lifespans. I agree with the EPA's statement when it promulgated the GHG standards in 2024:

> Changes in ambient concentrations of ozone, PM2.5, and air toxics that will result from the standards are expected to improve human health by reducing premature deaths and other serious human health effects, and they are also expected to result in other important improvements in public health and welfare (see Chapters 6.2 and 6.3). **Children, especially, benefit from reduced exposures to criteria and toxic pollutants because they tend to be more sensitive to the effects of these respiratory pollutants. Ozone and particulate matter have been associated with increased incidence of asthma and other respiratory effects in children, and particulate matter has been associated with a decrease in lung maturation**.[47]

61. It is my expert opinion as a child and adolescent psychiatrist and pediatrician that halting the repeal of the EPA's Endangerment Finding and GHG emissions standards is unquestionably meaningful for the health and wellbeing of these young Petitioners. Any reduction in GHG emissions and localized pollution

---

environmental and economic harm."); *id.* at 3 ("Climate change threatens children's health at every stage of development." "Young people are at additional risk if the Endangerment Finding is abandoned.").

[47] EPA, *Multi-Pollutant Emissions Standards for Model Years 2027 and Later Light-Duty and Medium-Duty Vehicles, Regulatory Impact Analysis* 6-48 (2024) (EPA-HQ-OAR-2025-0194-0002) (emphasis added).

resulting from a stay will reduce the health risks of youth Petitioners experiencing worsening harms to their health in the coming months and years.

62. Childhood is a narrow window. These harms will be immediate, and include derangements to the physical structure of organs including the lungs and brain. Their significance and irreparability cannot be ignored. There will be more children diagnosed with asthma, more asthma exacerbations, and more children experiencing breathlessness. A small number of these children will die.[48] More babies will be born early or at low weight, and as a result more will have lifelong respiratory and neurologic disabilities. A small number of these babies will also die.[49] Some harms may be ameliorated in the future, but damage done in the meantime by air pollution to the brains of young children, infants, and developing fetuses is not repairable. Damage to the scaffolding of the adult body compounds over time for youth like the older Petitioners, who are also still in development, cascading into lost academic achievement, opportunity, earnings, and even years of life. These irreparable harms are in addition to their meaningful suffering associated with increased rates of pollution and heat related illness.

---

[48] https://www.cdc.gov/asthma/most_recent_national_asthma_data.htm Accessed May 16, 2026

[49] Ely DM, Driscoll AK. Infant mortality in the United States, 2021: Data from the period linked birth/infant death file. National Vital Statistics Reports; vol 72 no 11. Hyattsville, MD: National Center for Health Statistics. 2023.

In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on May 18, 2026 in Somerville, Massachusetts.

Elizabeth Pinsky

# Exhibit A

**The Faculty of Medicine of Harvard University**
**Curriculum Vitae**

**Date Prepared:**   May 17, 2026

**Name:**   Elizabeth Grace Pinsky

**Office Address:**   55 Fruit Street, YAW 6A
Boston, MA
02114

**Work Phone:**   (617) 724-5600

**Work Email:**   EPINSKY@MGH.HARVARD.EDU

**Education:**

| 08/1996 - 02/2001 | BA | English | Columbia University |
|---|---|---|---|
| 08/2001 - 06/2006 | MD | Medicine | Harvard Medical School (HMS) |

**Postdoctoral Training:**

| 07/2006 - 06/2007 | Intern | Pediatrics | Massachusetts General Hospital (MGH) |
|---|---|---|---|
| 07/2007 - 06/2008 | Resident | Pediatrics | MGH |
| 07/2008 - 06/2010 | Resident | Psychiatry | MGH/McLean Hospital |
| 07/2010 - 06/2012 | Fellow | Child and Adolescent Psychiatry | MGH/McLean Hospital |

**Faculty Academic Appointments:**

| 2012 - 2023 | Instructor | Psychiatry | HMS |
|---|---|---|---|
| 2023 - Present | Assistant Professor | Psychiatry | HMS |

**Appointments at Hospitals/Affiliated Institutions:**

| 2012 - Present | Psychiatrist | Psychiatry | MGH |
|---|---|---|---|
| 2025 - Present | Affiliated Faculty Member | Harvard Chan C-CHANGE (Center for Climate, Health, and the Global Environment) | Harvard T.H. Chan School of Public Health |

**Other Professional Positions:**

| | | |
|---|---|---|
| 2019 - Present | Psychiatrist | Private Practice |
| 2024 - Present | Staff Lead | Boston Green Ribbon Commission, Health Care Working Group |

**Major Administrative Leadership Positions:**

**Local**

| | | |
|---|---|---|
| 2012 - 2021 | Director, Child and Adolescent Medical Psychiatry Clinic | MGH |
| 2012 - Present | Associate Director, Pediatric Psychiatry Consult-Liaison Service | MGH |
| 2021 - Present | Associate Director for Advocacy, Center for Environment and Health | MGH |
| 2024 - Present | Co-Director, Climate Mental Health Initiative | Mass General Brigham (MGB) |

**Professional Societies**

| | | |
|---|---|---|
| 2012 - Present | American Academy of Child and Adolescent Psychiatry | |
| | 2023 - 2024 | Chair, Resource Group on Climate Change and Mental Health |
| | 2024 - Present | Co-chair, Climate Change Committee |
| 2019 - Present | Climate Psychiatry Alliance | |
| | 2022 - Present | Child and Adolescent Working Group Lead |
| 2023 - Present | Medical Society Consortium on Climate and Health | |
| | | Steering Committee Member, AACAP Representative |

**Editorial Activities:**

**Ad hoc Reviewer**

*Academic Psychiatry*
*Journal of the American Medical Association*
*Psychosomatics*
*The Journal of Climate Change and Health*

**Honors and Prizes:**

| | | | |
|---|---|---|---|
| 2005 | Paul Dudley White Award for International Community Service | HMS | |
| 2006 | Presidential Scholars Public Service Award | Harvard University | |
| 2006 | New England Pediatric Society Award | HMS | |
| 2009 | Center for Organizational Excellence Award for International Travel | Partners Healthcare | |
| 2013 | Partners in Excellence Award | Partners Healthcare/ Spaulding Hospital | |
| 2020 | Jedi Award | MGH Division of Child and Adolescent Psychiatry Fellowship | Teaching Award for Professional Enthusiasm and Effective Leadership |
| 2024 | Jedi Award | MGH Division of Child and Adolescent Psychiatry Fellowship | Teaching Award for Professional Enthusiasm and Effective Leadership |
| 2025 | Gold Bear Mentor Award | MGH Division of Child and Adolescent Psychiatry Fellowship | Teaching Award for Dedicated Mentorship and Unfailing Inspiration |

## Report of Local Teaching and Training

**Formal Teaching of Residents, Clinical Fellows and Research Fellows (post-docs):**

| | | |
|---|---|---|
| 2022 - 2024 | Climate Change and Mental Health Psychology Intern Proseminar | MGH, Boston, MA |
| 2023 - 2026 | Climate Change and Mental Health Child Psychiatry Fellows | Cambridge Health Alliance and Children's Hospital Boston, Cambridge, MA |
| 2023 – 2026 | Climate Change and Mental Health Third Year Psychiatry Residents | MGH, Boston, MA |

**Clinical Supervisory and Training Responsibilities:**

| | | |
|---|---|---|
| 2012 - Present | Clinical Supervision Child psychiatry fellows on pediatric Consultation-Liaison service | MGH inpatient pediatric wards and ICU |
| 2012 - Present | Weekly clinical supervision PGY 4-6 Child psychiatry fellows | MGH |
| 2013 - Present | Provide psychiatric consultation and supervision to nurses, social workers, and pediatricians managing pediatric patients with complex medical and psychiatric illness | MGB Pediatric Intensive Care Management Program |

**Formal Teaching of Peers (e.g., CME and other continuing education courses):**

| | | |
|---|---|---|
| 2024 | "Mental Health and Climate Change" Climate Change, Planetary Health, and Medicine Harvard Chan Center for Climate, Health, and the Global Environment | Online |
| 2025, 2026 | "Heat and Behavioral Health" Heat Emergencies: Prevention, Diagnosis, and Management Harvard Chan Center for Climate, Health, and the Global Environment | Online |
| 2025 | "Climate Anxiety" Assessment and Treatment of Anxiety Cambridge Health Alliance, Harvard Medical School | Boston, MA |
| 2025 | Pediatricians as Climate Advocates Mass General for Children Pediatric Primary Care Mass General Brigham for Children | Somerville, MA |

**Local Invited Presentations:**

2011    Clinical Pathology Conference: A girl with irritability, hypersomnia, and somatic symptoms / Grand Rounds
Departments of Pathology and Psychiatry, MGH, Boston, MA

2020    Climate Change in the Time of COVID / Panel
Students for Environmental Awareness, HMS, Boston, MA

2023    Climate Change, Child Mental Health, and Child Psychiatry / Grand Rounds

Cambridge Health Alliance, Virtual

2023    Climate Change, Child Health, and Pediatric Medicine / Grand Rounds
        Department of Pediatrics, Massachusetts General Hospital, Boston, MA

2024    Mental Health, Climate Distress, and the Climate Crisis / Invited Lecture
        Harvard University Center for the Environment, Cambridge, MA

2024    Flourishing Amidst Climate Change: Promoting Well-Being and Social Justice /
        Panel
        Lee Kum Sheung Center for Health and Happiness Inaugural Chet Pierce
        Symposium, Boston, MA

2026    Children and the Climate Crisis / Invited Lecture
        Chan Center for Climate, Health, and the Global Environment, Boston, MA

## Report of Regional, National and International Invited Teaching and Presentations

### Regional

2019    Health Professionals as Climate Advocates:
        How to Shape Climate Policy in the Commonwealth / Panelist
        Tufts University School of Medicine, Boston, MA

2021    Climate Change: A Child Health Emergency / Invited Lecture
        Tufts University School of Medicine, Med Students for a Sustainable Future,
        Boston, MA

2022    Earth Day Climate Change Physician Panel / Panelist
        Tufts University School of Medicine, Medical Students for a Sustainable
        Future, Virtual

2022    Youth Mental Health and Climate Change / Invited Lecture
        New Hampshire Healthcare Workers for Climate Action, Virtual

2023    Youth Mental Health and the Climate Crisis / Invited Lecture
        Vermont Medical Society Collaborative Meeting, Stowe, VT

2024    Child and Adolescent Psychiatrists as Climate Activists and Advocates /
        Invited Lecture
        The New England Council of Child and Adolescent Psychiatry, Virtual

2025    Climate Change and Mental Health / Grand Rounds
        Berkshire Medical Center Department of Psychiatry, Pittsfield, MA (virtual)

### National

2020    JAACAP: The Earth Can Never Die, Right Mama? / Invited Lecture
        American Academy of Child and Adolescent Psychiatry Annual Meeting,
        Virtual meeting

2020    Child and Adolescent Psychiatrists in the Climate Crisis: State of Affairs
        and a Call to Action / Symposium
        American Academy of Child and Adolescent Psychiatry Annual Meeting,
        Virtual meeting

| | |
|---|---|
| 2021 | The Global Climate Crisis and Child Mental Health: Known Consequences, Current Research, and Preparing for the Future / Symposium/ Chair<br>American Academy of Child and Adolescent Psychiatry Annual Meeting, Virtual meeting |
| 2021 | "The Climate Crisis and Mental Health: What Will You Do?" / Discussant<br>American Psychiatric Association Annual Meeting, Virtual meeting |
| 2022 | A Conversation about the Impact of Climate Change Concerns on Youth Mental Health / Invited Lecture<br>New York University Silver School of Social Work., New York, NY (virtual) |
| 2022 | Clinical Aspects of Climate Change and Youth Mental Health: Therapeutic and Educational Approaches / Symposium/ Chair<br>American Academy of Child and Adolescent Psychiatry Annual Meeting, Toronto |
| 2022 | Strategies for Addressing Eco-Anxiety in Children and Teens / Workshop<br>Clinical Climate Change Conference, Mount Sinai School of Medicine., New York, NY (virtual). |
| 2023 | Youth Mental Health and Climate Change / Grand Rounds<br>Center for Medicare and Medicaid Services, Baltimore, MD (virtual) |
| 2023 | Child and Adolescent Psychiatrists as Climate Activists: Using Our Trusted Voices to Foster Hope and Galvanize Action / Invited Lecture<br>American Academy of Child and Adolescent Psychiatry Annual Meeting, New York, NY |
| 2023 | Youth Mental Health and the Climate Crisis / Grand Rounds<br>Rush Children's Hospital, Chicago, IL (virtual) |
| 2023 | Climate Change and Mental Health / Webinar / Speaker<br>University of California Center for Climate, Health, and Equity, San Francisco, CA (virtual) |
| 2023 | Climate Change and Mental Health / Invited Lecture<br>Louisiana State University, Psychology Training Program, Baton Rouge, LA |
| 2023 | Youth Mental Health and the Climate Crisis / Invited Lecture<br>American Public Health Association Annual Meeting, Atlanta, GA |
| 2024 | Mental Health and the Climate Crisis / Grand Rounds<br>St. Lukes Health System, Bosie, ID (virtual) |
| 2024 | Climate Change and Youth Mental Health / Invited Lecture<br>Medical Society Consortium on Climate and Health Annual Meeting, Washington, DC |
| 2025 | Climate Change and Mental Health / Grand Rounds<br>Jefferson University Hospital Department of Psychiatry, Philadelphia, PA (virtual) |

| 2025 | Climate Change and Mental Health / Symposium |
| | St Alphonsus Health Treasure Valley Symposium, Boise Idaho (virtual) |
| 2025 | Youth Mental Health and the Climate Crisis / Webinar / Speaker |
| | Emory University Climate and Health Actionable Research and Translation Center, Atlanta, Georgia (virtual) |
| 2025 | Green Space Therapeutics: Current Research on Innovative Nature-Based Mental Health Interventions / Symposium |
| | American Academy Child and Adolescent Psychiatry Annual Meeting, Chicago, IL |

## Report of Clinical Activities and Innovations

### Past and Current Licensure and Board Certification:

| 2009 – Present | Massachusetts Medical License |
| 2011 – Present | Diplomate in Psychiatry, American Board of Psychiatry and Neurology |
| 2012 – Present | Diplomate in Pediatrics, American Board of Pediatrics |
| 2022 – Present | National Board of Physicians and Surgeons, Psychiatry and Pediatrics |

### Practice Activities:

| 2012 - 2013 | Ambulatory Pediatrics | MGH Pediatric Group Practice, Boston, MA |
| 2012 - 2014 | Inpatient Consult-Liaison Pediatric Psychiatry | Spaulding Rehabilitation Hospital, Boston, MA |
| 2012 - 2015 | Psychiatric consultation and evaluation for regional pediatricians | Massachusetts Child Psychiatry Access Project, Boston, MA |
| 2012 - 2020 | Outpatient medical psychiatry | MGH Child and Adolescent Medical Psychiatry Clinic (founder), Boston, MA |
| 2012 - Present | Inpatient Consult-Liaison Pediatric Psychiatry | Mass General Hospital for Children (MGHfC), Boston, MA |
| 2014 - 2021 | Inpatient Consult-Liaison and Emergency Pediatric Psychiatry | Newton-Wellesley Hospital, Newton, MA |
| 2015 - Present | Inpatient Consult-Liaison Pediatric Psychiatry | Shriner's Hospital for Children, Boston, MA |
| 2019 - Present | Outpatient child and adult psychiatry | Private Practice, Cambridge, MA |

**Clinical Innovations:**

| | |
|---|---|
| Founded Child and Adolescent Medical Psychiatry Clinic at MGH (2012) | Established and staffed the MGH Child and Adolescent Medical Psychiatry Clinic, a consultation clinic serving medically complex children referred from pediatric sub-specialists, both within MGH and throughout the region. |
| Shriner's Hospital for Children Delirium Initiative (2019) | Developed and implemented standardized pathway for prevention, screening, and treatment of pediatric delirium on inpatient burn unit. |
| MGH Pediatric Intensive Care Unit Delirium Protocol (2021, 2025) | Developed, implemented, and provided ongoing updates to standardized pathway for prevention, screening, and treatment of pediatric delirium in general pediatric intensive care unit. |

## Report of Education of Patients and Service to the Community

**Activities**

| | |
|---|---|
| 2013 - 2020 | Commonwealth Children's Center / Health Care Consultant (volunteer) Advisor for non-profit early childhood education center |
| 2018 - 2022 | Open Center for Children / Health Care Consultant (volunteer) Advisor for non-profit early childhood education center |
| 2019 - Present | Climate Code Blue / Founding member Founded and led action group for physicians and other health professionals engaged in climate change advocacy |
| 2022 - 2024 | Communities Responding to Extreme Weather / Speaker Presenter as part of Climate Preparedness Week, "Mental Health In a Changing Climate" |
| 2023 - Present | Climate and Health Initiative for Children of Kearsarge & Sunapee / Advisory Board Member |

**Educational Material for Patients and the Lay Community:**

| | | | |
|---|---|---|---|
| 2020 | We Flattened the Curve. Our Kids Belong in School. | Article | The Atlantic, August 14, 2020. |
| 2020 | Climate Anxiety and Kids | Podcast | Clay Center for Young Healthy Minds "Shrinking It Down," May 13, 2020. |

| | | | |
|---|---|---|---|
| 2021 | What We Learned From the School Reopening Debate | Article | Bloomberg News City Lab, May 20, 2021. |
| 2021 | Your Parenting is Showing, Episode 3 | Podcast | |
| 2023 | A Recipe for Climate Advocacy in the Healthcare System | Podcast | Mass General Center for Environment and Health "Healthcare SOS: Sharing our Sustainability" November 7, 2023. |
| 2025 | Extreme Heat and Health Effects | Presentation | PowerCorps Boston |
| 2025 | Health Effects of Plastics and PFAS | Webinar | Blum Center for Patient and Family Education, MGH |

## Report of Scholarship

### Peer-Reviewed Scholarship in print or other media:

1. Bender SL, **Pinsky E**, Sherry NA. Case 16-2013: A girl with irritability, hypersomnia, and somatic symptoms. *NEJM*. 2013 Sep 19;369(12):1174. PMID: 24047074. https://doi.org/10.1056/NEJMc1307922

2. Shekunov J, Wozniak J, Conroy K, **Pinsky E**, Fitzgerald M, de Leon MF, Belser A, Biederman J, Joshi G. Prescribing Patterns in a Psychiatrically Referred Sample of Youth With Autism Spectrum Disorder. *J Clin Psychiatry*. 2017;78(9):e1276-e1283. PMID: 29188907. https://doi.org/10.4088/JCP.16m11406

3. Wortzel JR, Lee J, Benoit L, Rubano A, **Pinsky EG**. Perspectives on Climate Change and Pediatric Mental Health: a Qualitative Analysis of Interviews with Researchers in the Field. *Acad Psychiatry*. 2022 Oct;46(5):562-568. PMID: 36149577. PMCID: PMC10954300. https://doi.org/10.1007/s40596-022-01707-z. Epub 2022 Sep 23

4. Luccarelli J, Kalluri AS, Thom RP, Hazen EP, **Pinsky E**, McCoy TH Jr. The occurrence of delirium diagnosis among youth hospitalizations in the United States: A Kids' Inpatient Database analysis. *Acta Psychiatr Scand*. 2023 May;147(5):481-492. PMID: 35794791. PMCID: PMC9816352. https://doi.org/10.1111/acps.13473. Epub 2022 Jul 15

5. Armand W, Padget M, **Pinsky E**, Wasfy JH, Slutzman JE, Duhaime AC. Clinician Knowledge and Attitudes About Climate Change and Health After a Quality Incentive Program. *JAMA Netw Open*. 2024 Aug 01; 7(8):e2426790. PMID: 39115843

**Non-peer reviewed scholarship in print or other media:**

1. **Pinsky E**. Book review of When a Child Dies: How Pediatric Physicians and Nurses Cope, by Robert S. McKelvey. J Am Acad Child Adolesc Psychiatry. 2010;49: 1084-1085.

2. **Pinsky E**, Abrams A. Psychopharmacology in Pediatric Oncology. In: Kreitler S, Ben Arush M, Martin A, editors. Pediatric Oncology: Psychosocial Aspects and Clinical Interventions, Second Edition. West Sussex UK; Wiley-Blackwell, 2012: 118-134.

3. Tang MH, **Pinsky EG**. Mood and affect disorders. Pediatr Rev. 2015 Feb;36(2):52-60; quiz 61. PMID: 25646309. https://doi.org/10.1542/pir.36-2-52

4. **Pinsky E**, Abrams A. Pediatric Consultation and Psychiatric Aspects of Somatic Disease. In: Thapar A, Pine D, Leckman J, Scott S, Snowling MJ, Taylor E, editors. Rutter's Child and Adolescent Psychiatry, 6th Edition. West Sussex UK; Wiley, 2015: 586 - 598.

5. Sagor RS, Worden L, **Pinsky E**. Psychiatry/Development. In: Carter LP, Eicken MGA, Madhavan VL. Pediatric Evidence: The Practice-Changing Studies. Philadelphia, PA; Lippincott Williams & Wilkins, 2016: 192 - 203.

6. **Pinsky E**, Guerrero APS, Livingston R. Our house is on fire: Child and adolescent psychiatrists in the era of the climate crisis. J Am Acad Child Adolesc Psychiatry. 2020 May;59(5):580-582. PMID: 32340687. https://doi.org/10.1016/j.jaac.2020.01.016

7. Rabin AS, **Pinsky EG**. Reducing Health Care's Climate Impact - Mission Critical or Extra Credit? *NEJM*. 2023 Aug 17;389(7):583-585. PMID: 37530795. https://doi.org/10.1056/NEJMp2305709. Epub 2023 Aug 12

8. **Pinsky E**. The Interface of Climate and Psychiatry. In: Stern T, Wilens T, Fava M, editors. Massachusetts General Hospital Comprehensive Clinical Psychiatry, Third Edition. Elsevier, 2024.

## Prior Experience as Expert in Litigation

2024    Declaration in Support of Plaintiffs' Memorandum of Points and Authorities in Opposition to Defendants' Motion to Dismiss in the matter of Genesis, et al., Case No. 2:23-cv-10345-MWF-AGR (C.D. Cal.)

# Exhibit B

The Honorable Lee Zeldin, Administrator                                      September 22, 2025
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Mail code 1101A
Washington, DC 20460


Administrator Zeldin:

The undersigned medical and health organizations are united in our opposition to the Environmental Protection Agency's (EPA) proposed rule "Reconsideration of 2009 Endangerment Finding and Greenhouse Gas Vehicle Standards." Rescinding the greenhouse gas emissions endangerment finding contradicts the overwhelming scientific consensus on climate change, disregards the near-daily health impacts Americans are already experiencing, and places our nation on a dangerous path towards greater illness, suffering, and environmental and economic harm.

As health professionals, we urge the Trump Administration to recognize and respond to the urgent health and economic crisis that global climate change poses for our nation and the world. The science is clear: Climate change is real, driven primarily by human-caused emissions, and harming both our health and the economy today. Contrary to the EPA's claim that "the projections relied upon in the Endangerment Finding appear unduly pessimistic in light of empirical observations made after it was finalized in 2009 through 2024," the potential climate impacts of increased greenhouse gas emissions were well understood as early as the 1950s and 1960s, based on research conducted by the fossil fuel industry. Since that time, predictive models have only improved, and recent research notes that climate models published over the past five decades have generally been quite accurate in predicting global warming trends.[1] Without rapid action, health threats will escalate—condemning future generations to a crisis that will jeopardize their well-being and economic stability.

The health harms of climate change caused by greenhouse gas (GHG) emissions are well understood and acknowledged by the American medical and scientific communities. At least 32 medical societies and 18 national nursing organizations from across the United States, plus the International Council of Nurses, have adopted or published position papers, statements, or policies recognizing the health threat of climate change. In 2023, 42 national, state, and academic nursing organizations and institutions signed on to a joint commitment on climate change and health.[2] That same year, over 200 health journals coordinated the release of an editorial declaring climate change a global health emergency, warning that vulnerable communities will bear the greatest burdens.[3,4]

Adverse health impacts from climate change are already here. Between 2014 and 2023, infants and adults over 65 experienced more than twice as many annual heatwave days as between 1986 and 2005, each facing roughly nine heatwave days per year. Americans endured nearly 600 hours annually under conditions posing moderate or greater heat stress.[5]

In 2023 alone, extreme heat drove the loss of 3.4 billion labor hours, costing a record $103 billion in potential income.6 In 2024, 156 million Americans, or 46% of the population, lived in counties with failing grades in ozone and particulate matter pollution—25 million higher than last year and driven in part by extreme heat and wildfire events.7 Warmer conditions are also expanding the opportunities for the spread of infectious diseases. Coastal areas where conditions favorable for harmful Vibrio bacteria to proliferate have expanded by 50% since 2000-2004.8 The geographic range for the Aedes mosquito species, which transmits dengue virus, Zika virus and chikungunya, has increased making local spread of these viruses possible in the United Sates.9

These health threats are straining our care systems, with evidence showing that climate change is already worsening mental health (anxiety, depression, and other mental health conditions) and over 40% of physicians citing disruptions to healthcare services from extreme weather and poor air quality.10,11

Healthcare systems and their supply chains are also negatively impacted by climate change. Escalating extreme weather events affect healthcare systems in several ways, including direct impacts on healthcare workers, emergency evacuation of hospitals, damage to physical infrastructure, and disruption of critical supply chains. For example, in 2012, when Hurricane Sandy struck New York City, Bellevue Hospital, which serves nearly half a million patients annually, was forced to close temporarily and move patients elsewhere. In July 2023, a tornado damaged a pharmaceutical plant in North Carolina, destroying medications and raw materials used in pharmaceuticals, and it took nearly three months for the facility to reopen. Hurricane Helene in North Carolina and Hurricane Maria in Puerto Rico damaged intravenous (IV) fluid production facilities, resulting in critical IV fluid shortages nationwide, and the Los Angeles wildfires destroyed one community health clinic and forced the evacuation of at least five others.12

Major weather events often make national headlines; however, as health professionals, we frequently see the health harms of climate change in our day-to-day interactions with patients and communities. While everyone will be adversely affected by climate change, children, older adults, people with chronic illnesses, pregnant individuals, and historically underserved communities face the greatest risks.

**Climate Threats to Maternal-Child Health**
**Climate change is already harming U.S. pregnancies.** Biological and behavioral changes during pregnancy and postpartum increase susceptibility to illnesses related to insects, food, and water—many of which are rising with climate change and can affect both maternal and fetal health. Extreme weather events also increase the risk of extreme stress, post-traumatic stress disorder (PTSD), and depression during this sensitive time, compounding risks for mother and baby.13

Over the past two decades, a growing body of research from the U.S. and abroad has shown that the continued burning of fossil fuels is driving climate change and endangering pregnant women and their children. Elevated temperatures are linked to reduced fertility, birth defects, increased risks of gestational diabetes, and hypertensive disorders—serious complications of pregnancy that often lead to lifelong harm.14-16

Heat exposure and air pollution from fossil fuel combustion and climate change are increasingly associated with premature birth, low birth weight, and even stillbirth.17-29 Encouragingly, a 2018 U.S. study found that the  retirement of gas and oil-powered electricity plants significantly reduced preterm birth rates nearby.30 Still, the science is clear: Without a major reduction in greenhouse gas emissions, we risk bringing this and future generations into the world already "weakened from birth."

**Children's Health**
**Climate change threatens children's health at every stage of development.** A child born today can expect to experience twice as many wildfires, three times as many flooding events, and 36 times as many heat waves compared to someone born in 1960.31 Hotter, drier conditions are projected to increase dust levels by 38%, driving a 210% rise in dust-attributable cardiovascular deaths.32

Children's developing lungs, brains, and immune systems make them more susceptible to harm from extreme heat, air pollution, and vector-borne disease.33 Infants cannot effectively regulate their body temperature, increasing their risk of serious illness or disease, particularly in the first week of life if born during a heat wave.34 Children under the age of five are at greater risk for asthma exacerbations during wildfires due to their smaller airways, where inflammation poses a greater risk. Children and young athletes are at risk of thermal burns, heat illness, and heat stroke when outside on a hot day, while spending more time indoors carries a greater risk of obesity and chronic disease.35 Drier and dustier conditions place children, particularly in rural areas, at higher risk for respiratory conditions and dangerous diseases like coccidiomycosis ("Valley fever").36

These health effects can be profound and lifelong. Exposure to wildfire smoke or extreme heat during pregnancy increases the risk of preterm birth and low birthweight, outcomes associated with long-term risks for chronic disease and neurodevelopmental disorders.37-39 Asthma, the most common chronic disease in childhood, is already being exacerbated by climate change. Rising levels of air pollution from wildfires, longer and more intense pollen seasons, and increased ground-level ozone on hotter days are driving more emergency room visits and hospitalizations.40-43 These exposures translate into higher healthcare costs, poorer educational outcomes, and reduced lifetime earnings for affected children.44-45

Extreme weather events compound these risks. Hurricanes, floods, droughts, and wildfires lead to displacement, loss of housing and caregivers, disrupted access to medical and mental health care, and prolonged school absences.46 These events can increase a child's exposure to Adverse Childhood Experiences (ACEs), which are strongly linked to elevated risks for chronic conditions later in life—including heart disease, diabetes, and even cancer.47 An analysis of disasters such as Hurricanes Katrina and Maria and the toll that hurricanes take long after the floodwaters recede shows lasting impacts from these events. Infants faced the highest increase in mortality months after the event, 48 likely due to a combination of disrupted access to healthcare, caregivers with financial and mental health struggles, and shredded social support networks. While all children are at risk, those in historically underserved and overburdened communities are disproportionately affected, further deepening health inequities.

Young people are at additional risk if the Endangerment Finding is abandoned. The EPA proposal's suggestion that increased greenhouse gas emissions could be "beneficial" because they may stimulate plant growth ignores the broader and well-documented harms of such changes. Any short-term gains in biomass are potentially outweighed by the negative consequences. Elevated $CO_2$ levels can actually reduce the nutritional quality of food crops, lowering essential protein, zinc, and iron content and worsening the risk of malnutrition—especially for children and vulnerable populations.[49] Increased plant growth also means greater pollen production and longer pollen seasons, which risk driving up rates of severe asthma cases in children.[50-51]

**Climate Impact on Mental Health Conditions**
**Patients with mental illness are especially vulnerable to climate change.** Mental illness is one of the major causes of suffering in the United States, with one in five Americans living with a mental health condition. Climate change affects mental health in a variety of ways, with the elderly, pregnant and post-partum women, people with low income, those with pre-existing mental health conditions, and emergency response workers at higher risk. Extreme weather events driven by climate change are linked to higher rates of PTSD, depression, anxiety, suicidality, and substance use disorders—affecting both those with and without prior mental illness.[52-54]

Heat events are associated with increased domestic and group violence, suicides, sleep disorders, and impaired cognition and decision making, leading to more work-related accidents. [55]Many medications, including but not limited to psychiatric medications, can affect temperature regulation, leading to life-threatening hyperthermia. Several studies have found that people with preexisting mental health conditions are at increased risk for death during heat events, with one study demonstrating a three-fold risk of death for people with schizophrenia.[56-57] Those with cognitive impairments, such as dementia, are also at an elevated risk for hospitalization and death during heat waves.[58]

Climate distress, especially among youth, is pervasive. A global survey of 16–25-year-olds found that 59% were worried or extremely worried about climate change, over 50% believed "humanity is doomed," and nearly half said it impaired their daily functioning. [59] A similar study looking at U.S. youth had very similar findings, indicating a high level of distress for this demographic.[60]

**Climate Impact on Patients With Chronic Diseases**
People with chronic conditions such as heart disease, diabetes, and respiratory illnesses are especially vulnerable to climate change. Heat, extreme weather events, waterborne illnesses, and air pollution can all exacerbate these conditions, increasing the risk of severe illness or death.[61-64] People with chronic health conditions depend on medications or medical services that may be disrupted by climate emergencies involving evacuations, transportation breakdowns, power outages, and damage to healthcare infrastructure.[65] Common medications, such as diuretics and antihypertensives, can impair the body's ability to regulate temperature, compounding heat-related risks.[66] Additionally, individuals with compromised immune systems are more susceptible to climate-sensitive vector-borne diseases, including those spread by water or insects.[67-68]

Climate change is also driving more frequent and intense wildfires, exposing patients to toxic smoke that can travel hundreds of miles beyond the fire zone. This smoke contains fine particulate matter (PM2.5) that, when inhaled, triggers inflammation and places individuals with cardiovascular and respiratory disease at elevated risk for strokes, heart attacks, asthma attacks, COPD exacerbations, and premature death.[69-71] The expanding reach of wildfire smoke means that even those far from fire lines are increasingly affected, further burdening already strained healthcare systems.[72]

**Climate Change Impacts on Older Adults**
**The health and safety of older Americans are increasingly threatened by climate-related hazards.**
Approximately one-fifth of the U.S. population is 60 years or older.[73] As people age, they are less able to adjust to environmental stresses like heat and air pollution.[74] Many older adults live with chronic health conditions like heart disease and COPD, which can be exacerbated by climate stressors like extreme heat and air pollution.[75] Limited mobility can make it harder to evacuate during emergencies and recover afterwards.[76] Age-related declines in the ability to regulate body temperature—often compounded by medications such as diuretics and antihypertensives—further increase the danger during heat waves. In addition, many seniors depend on caregivers for daily needs and medical care, support systems that can be severely disrupted during climate-related disasters.[77]

**Conclusion**
Climate change threatens the health of every American, but the impacts are disproportionately severe for vulnerable populations. As health professionals, we are already seeing these harms in our patients. Without decisive action, climate-driven heat waves, air pollution, severe storms, flooding, droughts, and vector-borne disease will only intensify. The scientific evidence is unequivocal: Greenhouse gas pollution endangers public health. The EPA has a clear obligation under the Clean Air Act to regulate these pollutants.

We urge the Administration to withdraw the proposed rescission of the 2009 Endangerment Finding and uphold its responsibility to protect the health of the American people.

Signed,

**National Organizations**

Academic Pediatric Association
Academy of Emergency Medicine Pharmacists
American Academy of Allergy, Asthma, & Immunology
American Academy of Child and Adolescent Psychiatry
American Academy of Family Physicians
American Academy of Pediatrics
American Association of Occupational Health Nurses
American College of Chest Physicians
American College of Osteopathic Internists
American College of Physicians
American Medical Association

American Medical Women's Association
American Psychiatric Association
American Psychological Association Services, Inc.
American Public Health Association
American Thoracic Society
Association of Community Health Nursing Educators
Association of Medical School Pediatric Department Chairs
Climate Psychiatry Alliance
Climate Psychology Alliance – North America

College of Urgent Care Medicine
Council of Public Health Nursing Organizations
DNPs of Color
Doctors for America
Endocrine Society
Health Care Without Harm
Infectious Diseases Society of America
The Medical Society Consortium on Climate and Health
National Association of Neonatal Nurses
National Association of Pediatric Nurse Practitioners
National League for Nursing
National Medical Association
Nurse Heroes for Zero

Occupational Therapists for Environmental Action
Orthodox Jewish Nurses Association
Oncology Advocates United for Climate and Change – International
Philippine Nurses Association of America
Physicians for Social Responsibility
Rural Nurse Organization
Society of Behavioral Medicine
Society of Emergency Medicine Pharmacists
Society of General Internal Medicine
Society of Latinx Nurses
Veterinary Sustainability Alliance
Wilderness Medical Society

## Organizations By State

**Arizona**
American Academy of Pediatrics, Arizona Chapter
Arizona Health Professionals for Climate Action

**California**
California Nurses for Environmental Health and Justice
California Thoracic Society
Climate Health Now
National Association of Pediatric Nurse Practitioners, Orange County Chapter
National Association of Pediatric Nurse Practitioners, San Francisco Chapter
Physicians for Social Responsibility, San Francisco Bay Area
Santa Clara County Medical Association

**Colorado**
Colorado Academy of Family Physicians
Healthy Air and Water Colorado
Physicians for Social Responsibility, Colorado

**Delaware**
Delaware Nurses Association
Progressive Health of Delaware
Mid-Atlantic Alliance for Climate and Health

**District of Columbia**
American Academy of Pediatrics, DC Chapter

**Florida**
Florida Clinicians for Climate Action
Florida Thoracic Society

**Georgia**
Georgia Clinicians for Climate Action

**Hawaii**
National Association of Pediatric Nurse Practitioners, Hawaii Chapter
Washington, Hawaii, Alaska Thoracic Society

**Idaho**
Idaho Clinicians for Climate and Health

**Illinois**
American Academy of Pediatrics, Illinois Chapter
Illinois Clinicians for Climate Action
National Association of Pediatric Nurse Practitioners, Illinois Chapter

**Iowa**
National Association of Pediatric Nurse Practitioners, Iowa Chapter

**Maine**
Alliance of Maine Health Professionals for Climate Action
Physicians for Social Responsibility, Maine

**Maryland**
Healthy Climate Maryland
National Association of Pediatric Nurse Practitioners, Maryland Chapter
Physicians for Social Responsibility, Chesapeake

**Massachusetts**
American Academy of Pediatrics, Massachusetts Chapter
Greater Boston Physicians for Social Responsibility

**Michigan**
The Climate Justice Nurse
Michigan Clinicians for Climate Action
Michigan State Medical Society
Michigan Thoracic Society

**Minnesota**
Advocates for Better Health (Minnesota)
Minnesota Organization of Registered Nurses (MNORN)
Health Professionals for a Healthy Climate (Minnesota)

**Mississippi**
Mississippi Health Professionals for Climate and Health Equity

**Montana**
American Academy of Pediatrics, Montana Chapter
Montana Health Professionals for a Healthy Climate

**Nebraska**
American Academy of Pediatrics, Nebraska Chapter

**Nevada**
Nevada Clinicians for Climate Action

**New Hampshire**
American Academy of Pediatrics, New Hampshire Chapter
New Hampshire Healthy Climate

**New Jersey**
Clinicians for Climate Action New Jersey
National Association of Pediatric Nurse Practitioners, Pennsylvania Delaware Valley Chapter
New Jersey State Nurses Association
New Jersey Thoracic Society

**New Mexico**
Healthy Climate New Mexico

**New York**
National Association of Pediatric Nurse Practitioners, Greater New York State Chapter
National Association of Pediatric Nurse Practitioners, Long Island Chapter
New York State Thoracic Society

**North Carolina**
Carolina Advocates for Climate, Health, and Equity
North Carolina Thoracic Society

**Ohio**
American Academy of Pediatrics, Ohio Chapter
Ohio Association of Occupational Health Nurses

**Oklahoma**
Oklahoma Thoracic Society

**Oregon**
Oregon Pediatric Society
Oregon Thoracic Society

**Pennsylvania**
Concerned Health Professionals of Pennsylvania
National Association of Pediatric Nurse Practitioners, Pennsylvania Delaware Valley Chapter
Physicians for Social Responsibility, Pennsylvania

**Puerto Rico**
Puerto Rico Clinicians for Climate Action

**South Carolina**
National Association of Pediatric Nurse Practitioners, South Carolina Chapter
South Carolina Thoracic Society

**Texas**
National Association of Pediatric Nurse Practitioners, South Texas Alamo Chapter
Physicians for Social Responsibility, Texas

**Utah**
National Association of Pediatric Nurse Practitioners, Utah Chapter
Utah Physicians for a Healthy Environment

**Vermont**
Vermont Climate and Health Alliance

**Virginia**
American Academy of Pediatrics, Virginia Chapter
Virginia Clinicians for Climate Action

**Washington**
American Academy of Pediatrics, Washington Chapter
Washington Physicians for Social Responsibility
Washington, Hawaii, Alaska Thoracic Society

**Wisconsin**
Healthy Climate Wisconsin

   

   

   

    

   

   

   

  

   

   

   

   

   

   

   

    

   

    
   
   
   
    
   
   
     

   

   

**Citations**

1. Defense, Denial, and Disinformation: Uncovering the oil industry's early knowledge of climate change - Common Home. Accessed August 18, 2025. **https://commonhome.georgetown.edu/topics/climateenergy/defense-denial-and-disinformation-uncovering-the-oil-industrys-early-knowledge-of-climate-change/**

2. Nurses from Forty-Two National Nursing Organizations Issue List of Climate Demands to 118th Congress - ANHE. Accessed August 4, 2025. https://envirn.org/nursing-organizations-issue-climate-demands-to-118th-congress/

3. Abbasi K, Ali P, Barbour V, et al. Time to Treat the Climate and Nature Crisis as One Indivisible Global Health Emergency. JAMA. Published online October 25, 2023. doi:10.1001/JAMA.2023.20840

4. Full list of authors and-signatories to climate emergency editorial October 2023 | The BMJ. Accessed August 4, 2025. https://www.bmj.com/content/full-list-authors-and-signatories-climate-nature-emergency-editorial-october-2023

5. 2024 Lancet Countdown Brief for the United States. Lancet Countdown. Published online November 15, 2024. https://www.lancetcountdownus.org/2024-lancet-countdown-u-s-brief/

6. 2024 Lancet Countdown Brief for the United States. Lancet Countdown. Published online November 15, 2024. https://www.lancetcountdownus.org/2024-lancet-countdown-u-s-brief/

7. New Report: Nearly Half of People in the U.S. Exposed to Dangerous Air Pollution Levels. American Lung Assocation. Published online April, 23, 2025. https://www.lung.org/media/press-releases/state-of-the-air-2025

8. 2024 Lancet Countdown Brief for the United States. Lancet Countdown. Published online November 15, 2024. https://www.lancetcountdownus.org/2024-lancet-countdown-u-s-brief/

9. Gorris, M. E., Bartlow, A. W., Pitts, T., & Manore, C. A. (2024). Projections of Aedes and Culex mosquitoes across North and South America in response to climate change. The Journal of Climate Change and Health, 17, 100317.

10. Charlson, F., Ali, S., Benmarhnia, T. et al. Climate Change and Mental Health: A Scoping Review. International Journal of Environmental Research and Public Health. 2021; 8(9), 4486. https://doi.org/10.3390/ijerph18094486.

11. Lawrance, E., Thompson, R., Fontana, G. et al. The impact of climate change on mental health and emotional wellbeing: current evidence and implications for policy and practice. Imperial. Published May 2021. https://www.imperial.ac.uk/grantham/publications/all-publications/the-impact-of-climate-change-on-mental-health-and-emotional-wellbeing-current-evidence-and-implications-for-policy-and-practice.php

12. FDA works to help relieve the IV shortages in the wake of Hurricane Maria. FDA.gov. Published online November 14, 2017. https://www.fda.gov/drugs/drug-safety-and-availability/fda-works-help-relieve-iv-fluid-shortages-wake-hurricane-maria

13. Martínez-González, K. G., Morou-Bermúdez, E., & Buxó, C. J. (2023). Perinatal mental health outcomes following natural disasters. JAMA psychiatry, 80(12), 1185-1186.

14. Barreca A, Deschenes O, Guldi M. Maybe Next Month? Temperature Shocks and Dynamic Adjustments in Birth Rates. Demography. 2018;55(4):1269. doi:10.1007/S13524-018-0690-7

15. Lakhoo DP, Brink N, Radebe L, et al. A systematic review and meta-analysis of heat exposure impacts on maternal, fetal and neonatal health. Nat Med. 2024;31(2):684. doi:10.1038/S41591-024-03395-8

16. Dalugoda Y, Kuppa J, Phung H, Rutherford S, Phung D. Effect of Elevated Ambient Temperature on Maternal, Foetal, and Neonatal Outcomes: A Scoping Review. International Journal of Environmental Research and Public Health 2022, Vol 19, Page 1771. 2022;19(3):1771. doi:10.3390/IJERPH19031771

17. Chersich MF, Pham MD, Areal A, et al. Associations between high temperatures in pregnancy and risk of preterm birth, low birth weight, and stillbirths: systematic review and meta-analysis. BMJ. 2020;371. doi:10.1136/BMJ.M3811

18. Darrow LA, Huang M, Warren JL, et al. Preterm and Early-Term Delivery After Heat Waves in 50 US Metropolitan Areas. JAMA Netw Open. 2024;7(5):e2412055-e2412055. doi:10.1001/JAMANETWORKOPEN.2024.12055

19. Qiu X, Fong KC, Shi L, et al. Prenatal exposure to particulate air pollution and gestational age at delivery in Massachusetts neonates 2001–2015: A perspective of causal modeling and health disparities. Environmental Epidemiology. 2020;4(5):e113. doi:10.1097/EE9.0000000000000113

20. Rappazzo KM, Nichols JL, Rice RB, Luben TJ. Ozone exposure during early pregnancy and preterm birth: A systematic review and meta-analysis. Environ Res. 2021;198:111317. doi:10.1016/j.envres.2021.111317

21. Cushing LJ, Vavra-Musser K, Chau K, Franklin M, Johnston JE. Flaring from unconventional oil and gas development and birth outcomes in the eagle ford shale in South Texas. Environ Health Perspect. 2020;128(7):077003-1-077003-077009. doi:10.1289/EHP6394/SUPPL_FILE/EHP6394.S001.ACCO.PDF

22. Heft-Neal S, Driscoll A, Yang W, Shaw G, Burke M. Associations between wildfire smoke exposure during pregnancy and risk of preterm birth in California. Environ Res. 2022;203:111872. doi:10.1016/J.ENVRES.2021.111872

23. Leung M, Weisskopf MG, Laden F, et al. Exposure to PM2:5 during Pregnancy and Fetal Growth in Eastern Massachusetts, USA. Environ Health Perspect. 2022;130(1). doi:10.1289/EHP9824/SUPPL_FILE/EHP9824.S001.ACCO.PDF

24. Abdo M, Ward I, O'dell K, et al. Impact of Wildfire Smoke on Adverse Pregnancy Outcomes in Colorado, 2007-2015. Published online 2019. doi:10.3390/ijerph16193720

25. Wang Q, Miao H, Warren JL, et al. Association of maternal ozone exposure with term low birth weight and susceptible window identification. Environ Int. 2021;146:106208. doi:10.1016/J.ENVINT.2020.106208

26. Bravo MA, Miranda ML. A longitudinal study of exposure to fine particulate matter during pregnancy, small-for-gestational age births, and birthweight percentile for gestational age in a statewide birth cohort. Environ Health. 2022;21(1):1-11. doi:10.1186/S12940-021-00823-X/TABLES/4

27. Sexton J, Andrews C, Carruthers S, Kumar S, Flenady V, Lieske S. Systematic review of ambient temperature exposure during pregnancy and stillbirth: Methods and evidence. Environ Res. 2021;197:111037. doi:10.1016/J.ENVRES.2021.111037

28. Ebisu K, Malig B, Hasheminassab S, Sioutas C, Basu R. Cause-specific stillbirth and exposure to chemical constituents and sources of fine particulate matter. Environ Res. 2018;160:358-364. doi:10.1016/J.ENVRES.2017.10.015

29. DeFranco E, Hall E, Hossain M, et al. Air Pollution and Stillbirth Risk: Exposure to Airborne Particulate Matter during Pregnancy Is Associated with Fetal Death. PLoS One. 2015;10(3):e0120594. doi:10.1371/JOURNAL.PONE.0120594

30. Casey JA, Karasek D, Ogburn EL, et al. Retirements of Coal and Oil Power Plants in California: Association With Reduced Preterm Birth Among Populations Nearby. Am J Epidemiol. 2018;187(8):1586-1594. doi:10.1093/AJE/KWY110

31. Thiery W, Lange S, Rogelj J, et al. Intergenerational inequities in exposure to climate extremes. Science (1979). 2021;374(6564):158-160. doi:10.1126/SCIENCE.ABI7339/SUPPL_FILE/SCIENCE.ABI7339_SM.PDF

32. Pearson D. Drought, desiccation, dust, and aridity in the American West: A California overview of climate change exposures, regional factors, and social conditions on maternal and child health. Hygiene and Environmental Health Advances. 2025;15:100122. doi:10.1016/J.HEHA.2025.100122

33. Ahdoot S, Baum CR, Cataletto MB, et al. Climate Change and Children's Health: Building a Healthy Future for Every Child. Pediatrics. 2024;153(3). doi:10.1542/PEDS.2023-065504/196647

34. Basagaña X, Sartini C, Barrera-Gómez J, et al. Heat waves and cause-specific mortality at all ages. Epidemiology. 2011;22(6):765-772. doi:10.1097/EDE.0B013E31823031C5

35. Azan A, Nyimbili S, Babayode OO, Bershteyn A. Exceeding the limits of paediatric heat stress tolerance: the risk of losing a generation to climate inaction. BMJ Paediatr Open. 2025;9(1):2883. doi:10.1136/BMJPO-2024-002883

36. Pearson D. Drought, desiccation, dust, and aridity in the American West: A California overview of climate change exposures, regional factors, and social conditions on maternal and child health. Hygiene and Environmental Health Advances. 2025;15:100122. doi:10.1016/J.HEHA.2025.100122

37. Jiang P, Li Y, Tong MK, et al. Wildfire particulate exposure and risks of preterm birth and low birth weight in the Southwestern United States. Published online 2024. doi:10.1016/j.puhe.2024.02.016

38. Yoshida-Montezuma Y, Sivapathasundaram B, Brown HK, et al. Association of Late Preterm Birth and Size for Gestational Age with Cardiometabolic Risk in Childhood. JAMA Netw Open. 2022;5(5):E2214379. doi:10.1001/JAMANETWORKOPEN.2022.14379

39. Schieve LA, Tian LH, Rankin K, et al. Population impact of preterm birth and low birth weight on developmental disabilities in US children. Ann Epidemiol. 2016;26(4):267-274. doi:10.1016/J.ANNEPIDEM.2016.02.012

40. Anderegg WRL, Abatzoglou JT, Anderegg LDL, Bielory L, Kinney PL, Ziska L. Anthropogenic climate change is worsening North American pollen seasons. Proc Natl Acad Sci U S A. 2021;118(7):e2013284118. doi:10.1073/PNAS.2013284118/SUPPL_FILE/PNAS.2013284118.SAPP.PDF

41. Henry S, Ospina MB, Dennett L, Hicks A. Assessing the risk of respiratory-related healthcare visits associated with wildfire smoke exposure in children 0–18 years old: A systematic review. Int J Environ Res Public Health. 2021;18(16):8799. doi:10.3390/IJERPH18168799/S1

42. Zu K, Liu X, Shi L, et al. Concentration-response of short-term ozone exposure and hospital admissions for asthma in Texas. Environ Int. 2017;104:139-145. doi:10.1016/J.ENVINT.2017.04.006

43. Sapkota A, Dong Y, Li L, et al. Association Between Changes in Timing of Spring Onset and Asthma Hospitalization in Maryland. JAMA Netw Open. 2020;3(7):e207551-e207551. doi:10.1001/JAMANETWORKOPEN.2020.7551

44. Senter JP, Smith BM, Prichett LM, Connor KA, Johnson SB. Pediatric Asthma Is Associated With Poorer 3-Year Academic Achievement in Urban Elementary and Middle-School Students. Acad Pediatr. 2021;21(6):1009-1017. doi:10.1016/J.ACAP.2020.11.006

45. Belova A, Fann N, Haskell J, Hubbell B, Narayan T. Estimating lifetime cost of illness: An application to asthma. Ann Am Thorac Soc. 2020;17(12):1558-1569. doi:10.1513/ANNALSATS.201910-729OC/SUPPL_FILE/DISCLOSURES.PDF

46. Proulx K, Daelmans B, Baltag V, Banati P. Climate change impacts on child and adolescent health and well-being: A narrative review. J Glob Health. 2024;14:04061. doi:10.7189/JOGH.14.04061

47. Thapa, S., Giri, S., & Ross, A. G. Extreme weather and climate-related adverse childhood experiences are a humanitarian crisis during the 21st century. Nature. Communications Medicine, 2025, 5(1), 357.

48. Bhutta ZA, Bhavnani S, Betancourt TS, Tomlinson M, Patel V. Adverse childhood experiences and lifelong health. Nature Medicine 2023 29:7. 2023;29(7):1639-1648. doi:10.1038/s41591-023-02426-0

49. Beach, R. H., Sulser, T. B., Crimmins, A. et al. Combining the effects of increased atmospheric carbon dioxide on protein, iron, and zinc availability and projected climate change on global diets: a modelling study. The Lancet Planetary Health. 2018; (7), e307-e317.

50. Singh, A. B., & Kumar, P. Climate change and allergic diseases: an overview. Frontiers in Allergy. 2022; 3, 964987.

51. Annesi-Maesano, I., Cecchi, L., Biagioni, B., et al. Is exposure to pollen a risk factor for moderate and severe asthma exacerbations?. Allergy. 2023; 78(8), 2121-2147.

52. Cianconi, P., Betrò, S., & Janiri, L. The impact of climate change on mental health: a systematic descriptive review. Frontiers in psychiatry. 2022; 11, 490206.

53. Conte Keivabu, R., Zagheni, E., & Fink, A. Dementia and risks of temperature-related mortality and hospitalizations in Germany. The Journals of Gerontology, Series A: Biological Sciences and Medical Sciences 2025; 80(4), glae292.

54. Delaney, S. W., Stegmuller, A., Mork, D. Extreme heat and hospitalization among older persons with Alzheimer disease and related dementias. JAMA Internal Medicine. 2025; 185(4), 412-421.

55. Rizzotto, J. S., Sims, K. M., & Gibbs, H. K. (2025). Hot tempers: Differential effects of heat and drought on domestic violence. Review of Economics of the Household. 2025;1-26.

56. Lee MJ, McLean KE, Kuo M, Richardson GRA, Henderson SB. Chronic Diseases Associated With Mortality in British Columbia, Canada During the 2021 Western North America Extreme Heat Event. Geohealth. 2023;7(3). doi:10.1029/2022GH000729

57. Bouchama A, Dehbi M, Mohamed G, Matthies F, Shoukri M, Menne B. Prognostic Factors in Heat Wave–Related Deaths: A Meta-analysis. Arch Intern Med. 2007;167(20):2170-2176. doi:10.1001/ARCHINTE.167.20.IRA70009

58. Delaney, S. W., Stegmuller, A., Mork, D. Extreme heat and hospitalization among older persons with Alzheimer disease and related dementias. JAMA Internal Medicine. 2025; 185(4), 412-421.

59. Hickman C, Marks E, Pihkala P, et al. Climate anxiety in children and young people and their beliefs about government responses to climate change: a global survey. Lancet Planet Health. 2021;5(12):e863-e873. doi:10.1016/S2542-5196(21)00278-3/ATTACHMENT/E39369B3-7B14-4A18-83B1-0AB368A65F77/MMC1.PDF

60. Lewandowski RE, Clayton SD, Olbrich L, et al. Climate emotions, thoughts, and plans among US adolescents and young adults: a cross-sectional descriptive survey and analysis by political party identification and self-reported exposure to severe weather events. Lancet Planet Health. 2024;8(11):e879-e893. doi:10.1016/S2542-5196(24)00229-8

61. (PDF) Ch. 9: Populations of Concern. Accessed August 6, 2025. https://www.researchgate.net/publication/313891886_Ch_9_Populations_of_Concern

62. Bell JE, Herring SC, Jantarasami L, et al. Ch. 4: Impacts of Extreme Events on Human Health. The Impacts of Climate Change on Human Health in the United States: A Scientific Assessment. Published online 2016. doi:10.7930/J0BZ63ZV

63. Fann, N, Brennan T, Dolwick P, et al. Ch. 3: Air Quality Impacts. The Impacts of Climate Change on Human Health in the United States: A Scientific Assessment. Published online 2016. doi:10.7930/J0GQ6VP6

64. Trtanj J, Jantarasami L, Brunkard J, et al. Ch. 6: Climate Impacts on Water-Related Illness. The Impacts of Climate Change on Human Health in the United States: A Scientific Assessment. Published online 2016. doi:10.7930/J03F4MH4

65. Fifth National Cimate Assessment Ch. 15 Human Health | Enhanced Reader.

66. Fifth National Cimate Assessment Ch. 15 Human Health | Enhanced Reader.

67. Trtanj J, Jantarasami L, Brunkard J, et al. Ch. 6: Climate Impacts on Water-Related Illness. The Impacts of Climate Change on Human Health in the United States: A Scientific Assessment. Published online 2016. doi:10.7930/J03F4MH4

68. Beard CB, Eisen RJ, Barker CM, et al. Ch. 5: Vectorborne Diseases. The Impacts of Climate Change on Human Health in the United States: A Scientific Assessment. Published online 2016. doi:10.7930/J0765C7V

69. Reid, C. E., Brauer, M., Johnston, F. H., Jerrett, M., Balmes, J. R., & Elliott, C. T. (2016). Critical review of health impacts of wildfire smoke exposure. Environmental health perspectives, 124(9), 1334-1343.

70. Rizzo, L. V., & Rizzo, M. C. F. (2025). Wildfire smoke and health impacts: a narrative review. Jornal de Pediatria, 101, S56-S64.

71. Which Populations Experience Greater Risks of Adverse Health Effects Resulting from Wildfire Smoke Exposure? United States Environmental Protection Agency. Published online January 30, 2025.

72. Qi Q, Yu F, Nair AA, et al. Hidden danger: The long-term effect of ultrafine particles on mortality and its sociodemographic disparities in New York State. J Hazard Mater. 2024;471:134317. doi:10.1016/J.JHAZMAT.2024.134317

73. S0102: Population 60 Years and Over ... - Census Bureau Table. Accessed August 5, 2025. https://data.census.gov/table/ACSST1Y2023.S0102?q=older+adults

74. Older Adults | AirNow.gov. Accessed August 5, 2025. https://www.airnow.gov/air-quality-and-health/older-adults/ Health. 2024;8(11):e879-e893. doi:10.1016/S2542-5196(24)00229-8

75. (PDF) Ch. 9: Populations of Concern. Accessed August 6, 2025. https://www.researchgate.net/publication/313891886_Ch_9_Populations_of_Concern

76. (PDF) Ch. 9: Populations of Concern. Accessed August 6, 2025. https://www.researchgate.net/publication/313891886_Ch_9_Populations_of_Concern

77. (PDF) Ch. 9: Populations of Concern. Accessed August 6, 2025. https://www.researchgate.net/publication/313891886_Ch_9_Populations_of_Concern

# EXHIBIT 17

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

| | |
|---|---|
| ELENA VENNER, *et al.*,<br>         *Petitioners*,<br><br>     v.<br><br>UNITED STATES<br>ENVIRONMENTAL PROTECTION<br>AGENCY, *et al.*,<br>         *Respondents*. | Case No. 26-1038<br>Lead Case No. 26-1037<br>(and consolidated cases) |

**DECLARATION OF JAMES GUSTAVE SPETH
IN SUPPORT OF PETITIONERS' MOTION TO STAY
THE FINAL RULE PENDING REVIEW**

I, James Gustave Speth, hereby declare and if called upon would testify as follows:

1.     I am a retired Professor of Law at the Vermont Law and Graduate School and a senior fellow at Vermont Law and Graduate School, the Democracy Collaborative, and the Tellus Institute. In the late 1970s, I served as member and chairman of the U.S. Council on Environmental Quality and am familiar with the government's long-standing knowledge that greenhouse gas pollution from burning fossil fuels would cause climate change. I am offering this testimony in my personal capacity, and I have personal knowledge of the facts stated herein.

1

2. I am submitting this Declaration in support of Petitioners' Motion to Stay the Endangerment Finding rescission and repeal of vehicle emission standards (the "Repeal Rule") pending review. I offer the following expert opinions on the historical awareness of the U.S. federal government of climate change, climate science, alternative pathways to power the nation's energy systems other than fossil fuels, and its understanding of $CO_2$ as an air pollutant. After leaving government, I founded and for a decade was president of the World Resources Institute. I also taught environmental and constitutional law at Georgetown University Law Center. From 1993 to 1999, I was Administrator of the United Nations Development Programme and served as chair of the UN Development Group. I served as Dean of the Yale School of Forestry and Environmental Studies from 1999 to 2009.

3. I have a long career of working at the intersection of government and environmental protection, including providing leadership to many governmental task forces and committees whose roles have been to combat environmental degradation, including the President's Task Force on Global Resources and Environment, the Western Hemisphere Dialogue on Environment and Development, and the National Commission on the Environment. Among my awards are the National Wildlife Federation's Resources Defense Award, the Natural Resources Council of America's Barbara Swain Award of Honor, a 1997 Special Recognition Award from the Society for International Development, Lifetime Achievement

Awards from the Environmental Law Institute and the League of Conservation Voters, and the Blue Planet Prize. I hold honorary degrees from Clark University, the College of the Atlantic, the Vermont Law School, Middlebury College, the University of South Carolina, Unity College, and the University of Massachusetts/Boston. A true and correct copy of my CV is attached as Exhibit A.

**The U.S. Government Has Long Known About Climate Change**

4. The scientific roots of understanding humans' role in causing climate change dates to the nineteenth century when scientists such as Eunice Newton Foote[1] (an American), Joseph Fourier, John Tyndall, and Svante Arrhenius discovered that certain gases trap heat in the atmosphere and thus warm Earth's surface.

5. As that scientific understanding continued to advance, the 1930s through the early 1970s were a period of growing concern for scientists studying climate change. Particularly by the 1960s, with the advance of computer modeling, scientists were able to verify the changes that were happening and project what could happen in the future as the atmospheric $CO_2$ concentration increased. This period was marked by the work of scientists such as Guy S. Callendar, Roger Revelle, Gilbert Plass, and Charles D. Keeling.

---

[1] https://www.climate.gov/news-features/features/happy-200th-birthday-eunice-foote-hidden-climate-science-pioneer

6. By the late 1950s and early 1960s, these scientists started sounding alarm bells. With federally-funded monitoring of the growing atmospheric $CO_2$ concentration beginning in 1958 at the Mauna Loa Observatory in Hawai'i, it was then possible to produce detailed charts showing Earth's atmospheric $CO_2$ concentration. Early on, Keeling showed the seasonal variation in the concentration of atmospheric $CO_2$ in the Northern Hemisphere and that the $CO_2$ concentration in the late 1950s was around 315 ppm.[2] As the data were collected and charted year after year, the now famous "Keeling Curve" would become apparent, showing conclusively that the $CO_2$ concentration was on the rise.

7. In 1955, the U.S. established the first major climate modeling center, the Geophysical Fluid Dynamic Laboratory (GFDL) of the National Oceanic and Atmospheric Administration (NOAA), now located at Princeton University (but still a NOAA lab). In 1960, another center was established by the National Science Foundation: the National Center for Atmospheric Research (NCAR) in Boulder, Colorado. Besides these government laboratories, UCLA established a modeling laboratory, as did the RAND Corporation, focused on possible military applications of climate modification. The RAND center was ultimately funded by the Defense Advanced Research Projects Agency (DARPA), which had been created in 1958 in

---

[2] Rob Monroe, The History of the Keeling Curve, April 3, 2013, https://keelingcurve.ucsd.edu/2013/04/03/the-history-of-the-keeling-curve/

response to the Soviet launching of Sputnik, with the mission of keeping U.S. military technology ahead of any potential enemy. These centers were focused on better understanding and developing atmosphere-ocean climate models and the response of the climate system to an increased concentration of $CO_2$.

8.　Based on this growing body of scientific research, on November 1965, the White House issued the Report of the Environmental Pollution Panel of the President's Science Advisory Committee, "Restoring the Quality of Our Environment," accompanied by Appendix Y4, Roger Revelle et al.'s work entitled "Atmospheric Carbon Dioxide."[3] The 1965 White House Report devoted a chapter on the problem of climate change and found that increasing $CO_2$ levels would be deleterious to humans by the year 2000, would cause ocean warming, sea level rise, and other adverse impacts. The White House created a task force and ordered responses to the issues raised.

9.　On December 20, 1965, the National Science Foundation published the "Weather and Climate Modification: Report of the Special Commission on Weather Modification."[4] This report estimated that the $CO_2$ concentration in the atmosphere had increased 10-15% in the twentieth century, causing significant changes in

---

[3] The White House, Restoring the Quality of Our Environment: Report of the Environmental Pollution Panel President's Science Advisory Committee, November 1965.
[4] National Science Foundation, Weather and Climate Modification, Report of the Special Commission on Weather Modification, Washington, D.C., 1965.

Earth's heat balance.[5] The report states that "the implications of this upon tropospheric stability cannot be ignored" and that there is a need for continuous monitoring of $CO_2$ content and of simulation of $CO_2$ effects "using the most sophisticated atmospheric models and numerical computers available" to assess the consequences.[6]

10.     In a 1966 National Academy of Sciences (NAS) Report on "Weather and Climate Modification Problems and Prospects, Vol. I, Summary and Recommendations," the NAS generally agreed that warming was occurring and stated that "to embark on any vast experiment in the atmosphere would amount to *gross irresponsibility*."[7] In 1967, the U.S. Department of Commerce released a report of the Panel on Electrically Powered Vehicles, "The Automobile & Air Pollution: A Program for Progress" which included a recommendation that emissions standards be set for vehicles.[8]

---

[5] *Id.* at 42.

[6] *Id.*

[7] National Academy of Sciences, Weather and Climate Modification—Problems and Prospects, Vol. I: Summary and Recommendations, Final report of the Panel on Weather and Climate Modification to the Committee on Atmospheric Sciences, Washington, 1966, p. 8 (emphasis added).

[8] U.S. Department of Commerce, Panel on Electrically Powered Vehicles, Commerce Technical Advisory Board, The Automobile and Air Pollution: A Program for Progress. Report to the Commerce Technical Advisory Board, 1967, p. 5.

11.     During the late 1960s and early 1970s, along with the enactment of the nation's seminal environmental statutes, Congress established the Council on Environmental Quality (CEQ), in part to develop and recommend policies that would promote environmental quality and meet the conservation, economic, health and environmental needs of the nation.[9] In its hearings to establish the CEQ, Congress heard testimony that scientific predictions about the effects of "the worldwide accumulation of carbon dioxide in the atmosphere through the combustion of hydrocarbon fuels … are absolutely hairy-scary."[10]

12.     Around this same time, in September 1969, President Nixon was advised that New York and Washington could be lost to sea level rise if climate change was not addressed.[11] Two months later, President Nixon wrote to his Director of the Office and Science Technology (OST) regarding the UNESCO Conference on the Environment, "Man and his Environment: A View Toward Survival," on the obligation and responsibility of government to protect future generations from global climate change and polluted oceans.[12] Director DuBridge subsequently directed John

---

[9] 42 U.S.C. §§ 4342, 4343.

[10] Ralph MacMullan, hearings on the formation of the Council on Environmental Quality, United States House Committee on Merchant Marine and Fisheries, Subcommittee on Fisheries and Wildlife Conservation, June 13, 1969. https://babel.hathitrust.org/cgi/pt?id=umn.31951p00795384f&seq=164

[11] Daniel Moynihan, Memorandum to John Ehrlichman, September 17, 1969.

[12] Richard Nixon, Letter to Lee DuBridge, November 20, 1969.

Erlichman to pursue the development of non-internal combustion engine (ICE) vehicles so that they would be available when they were needed.[13]

13. The late 1960s and early 1970s were a period where the federal government acknowledged that climate policy is energy policy and what the nation did with fossil fuels and the energy system, including transportation, would impact the state of the climate system and the health and wellbeing of its citizens. CEQ called for worldwide recognition of the long-term significance of human alterations of the climate system.[14] In June 1970, the President Nixon-appointed Task Force on Air Pollution transmitted to him a report entitled "Cleaner Air for the Nation," that recognized "the greatest consequences of air pollution for man's continued life on earth are its effects on the earth's climate."[15] On July 16, 1970, CEQ sent President Nixon a report entitled "Man's Inadvertent Modification of Weather and Climate," explaining that humans were causing heat to be trapped in the atmosphere.[16]

---

[13] Lee DuBridge, Memorandum to John Erhlichman, Recommendation to Pursue Non-conventional Vehicle Development, December 19, 1969.

[14] Council on Environmental Quality, The First Annual Report of the Council on Environmental Quality, August 1970, p. 104.

[15] President's Task Force on Air Pollution, Cleaner Air for the Nation, August 1970, p. 34.

[16] Naomi Oreskes et al., Climate Change and the Clean Air Act of 1970 Part I: the Scientific Basis, Ecology Law Quarterly, 2023, p. 813-14 (citing Correspondence from John C. Whitaker to William M. Magruder, July 20, 1970 (on file at the Richard Nixon Presidential Library)).

President Nixon set the tone for CEQ's first report in his 1970 State of the Union

Address, saying:

> Restoring nature to its natural state is a cause beyond party and beyond factions. It has become a common cause of all the people of this country. It is a cause of particular concern to young Americans, because they more than we will reap the grim consequences of our failure to act on programs which are needed now if we are to prevent disaster later.
>
> Clean air, clean water, open spaces-these should once again be the **birthright** of every American. If we act now, they can be.[17]

14.     President Nixon's administration similarly emphasized, in the United

States' second Annual Plan for participation in the World Weather Program, that: "In

the longer term, *the quality of the atmosphere may well determine whether man

survives or perishes*."[18]

15.     NOAA and EPA were also established during this period. In his

message on the environment to the House and Senate, President Nixon specifically

asked for "national air quality standards and stringent guidelines to lower motor

vehicle emissions," and "federally-funded research to reduce automobile

pollution."[19]

---

[17] Richard Nixon, Annual Message to the Congress on the State of the Union, January 22, 1970.

[18] U.S. Department of Commerce et al., World Weather Program, Plan for Fiscal Year 1971, April 1970, p. 4 (emphasis added).

[19] https://www.epa.gov/history/origins-epa

16.     Dr. Edward E. David, Jr., who later became the President of Research and Engineering at Exxon, was director of the OST under President Nixon, and helped draft the Administration's proposals on alternative energy and pollution control. On October 20, 1970, he wrote the following proposal to the White House: "The federal government must play a leadership role because these efforts are so large and so long-term that the fragmented power industry cannot be expected to do the job itself."[20] An OST memorandum made more detailed recommendations for research and development funding for new energy technology and stated: "[A]t present the funding and direction of most new pollution control technology and new methods of power generation must come from the Federal Government or not at all."[21]

17.     In the latter months of 1970, Ehrlichman created the National Energy Subcommittee of the Domestic Council and the Council of Economic Advisors, together with the OST, "began to formulate a national energy policy."[22]

---

[20] Edward W. David, Jr., Memorandum for Peter Flanigan, October 20, 1970, p. 2. *See also*, Sam Roberts, Edward E. David Jr., Who Elevated Science Under Nixon, Dies at 92, https://www.nytimes.com/2017/02/28/science/edward-david-dead-science-adviser-to-nixon.html.
[21] Office of Science and Technology, Energy Policy Staff, Funding Energy Research and Development, August 26, 1970, p. 1.
[22] Edward F. Hammel, Los Alamos Scientific Laboratory Energy-Related History, Research, Managerial Reorganization Proposals, Actions Taken, and Results, 1945-1979, http://www.iaea.org/inis/collection/NCLCollectionStore/_Public/28/077/28077313.pdf.

18.     Throughout this time, in the lead up to the Clean Air Act Amendments of 1970, the impacts of $CO_2$ and other air pollutants from motor vehicles specifically was very much a part of the discussion as to how to address air pollution.[23] For example, John Middleton, who served as EPA's first deputy assistant administrator for the Air Program said this at a conference in 1966:

> The array of pollutant chemical compounds emitted by motor vehicles is extensive and includes *carbon dioxide*, carbon monoxide, gasoline, hydrocarbons, oxygenated hydrocarbons, nitrogen oxides, nitrogen-containing organics, sulfur oxides, aldehydes and acids, phenols, polynuclear hydrocarbons, particulate matter, and lead salts. These materials are air pollutants as emitted into the atmosphere or participate in the atmospheric photochemical reactions which lead to the production of other pollutants, such as nitrogen dioxide, ozone, and the peroxyacyl nitrates.[24]

19.     Maine Senator Edmund Muskie, a key architect of the Clean Air Act Amendments of 1970, spoke at the same conference and discussed plans for congressional hearings related to the "battery-driven electric car" and said that "no narrow personal or private motive can be allowed to outweigh the importance of the public health and welfare of the people of the United States."[25] In Congress, Senator Muskie introduced amendments to the Clean Air Act in 1970, warning that

---

[23] *See generally* Naomi Oreskes et al., Climate Change and the Clean Air Act of 1970 Part I: The Scientific Basis, Ecological Law Quarterly, 2023, p. 811.
[24] John T. Middleton, Future Air Quality Standards and Motor Vehicle Emission Restrictions, 1967 PHS Proceedings 45, 46 (emphasis added).
[25] Edmund S. Muskie, Setting Goals for Clean Air, in 1967 PHS Proceedings 596, 599.

unchecked air pollution would "threaten irreversible atmospheric and climactic changes."[26]

20.     By the time the Clean Air Act Amendments of 1970 were enacted into law, there was a well-developed understanding of the causes and implications of climate change, largely driven by the federal government's research. The Clean Air Act Amendments of 1970 resulted in a unanimous vote in the Senate, and were enacted into law. Thus, the Congress that adopted the Amendments understood human-caused climate change to be one of the problems the Amendments were intended to address.

21.     In the period after President Carter took office in 1977, I observed a growing sense of concern and indeed urgency within the federal government that fossil fuel burning was heating the planet and causing the climate to change in many ways that could be catastrophic, and that such climatic changes posed dangers to the lives and property of Americans, particularly its young people and future generations. This sense of concern deepened throughout my time in government.

22.     By the late 1970s, it was well understood by the President, DOE, and the Executive Office of the President that to reduce $CO_2$ emissions to respond to the threat of climate change would require a new energy policy from the federal government. For example, in March 1977, a climate science workshop was

---

[26] 116 Cong. Rec. 32,901 (1970) (statement of Sen. Edmund Muskie).

sponsored by what would subsequently become the newly formed DOE, where the participants documented their understanding of how rising $CO_2$ levels were linked to the burning of fossil fuels.[27]

23. The President's science advisor during the Carter Administration was Frank Press, the Director of the Office of Science and Technology Policy. Press wrote the President about the climate threat on July 7, 1977, in a memorandum copied to James Schlesinger, who would soon become the first Secretary of Energy. Press' memorandum summarized the threat: "The urgency of the problem derives from our inability to shift rapidly to non-fossil fuel sources once the climatic effects become evident not long after the year 2000; the situation could grow out of control before alternate energy sources and other remedial actions become effective."[28]

24. It was during this time that Congress enacted the 1977 Amendments to the Clean Air Act, which, among other things, prioritized the compliance with National Ambient Air Quality Standards in non-attainment areas.

25. In May 1979, Frank Press asked the National Academy of Sciences to investigate this and related issues. The NAS convened a panel under the chair of

---

[27] The Department of Energy became an official executive agency in August 1977. Department of Energy Organization Act of 1977, Pub. L. 95–91, 91 Stat. 565, enacted August 4, 1977. The report from these early conferences was ultimately published by DOE in May 1979.

[28] Frank Press, Memorandum to the President, Release of Fossil $CO_2$ and the Possibility of a Catastrophic Climate Change, July 7, 1977.

MIT professor Jule Charney, and the panel met in July 1979. The result was the famous Charney Report. The Charney Report was made widely available at the time both within and outside the Administration and used government sponsored and government produced scientific research to support its findings.[29] The Report concluded that even moderate amounts of warming "will be accompanied by significant changes in regional climate patterns" and that "[a] wait-and-see policy may mean waiting until it is too late."[30]

26. Also in 1979 top atmospheric scientists from the U.S. provided CEQ with a report predicting "a warming that will probably be conspicuous within the next twenty years."[31] The report stated: "If we wait to prove that the climate is warming before we take steps to alleviate the $CO_2$ buildup, the effects will be well underway and still more difficult to control . . . . The potential disruptions are sufficiently great to warrant the incorporation of the $CO_2$ problem into all considerations of policy in the development of energy."[32]

---

[29] Philip Shabecoff, "Scientists Warn U.S. of Carbon Dioxide Peril," The New York Times, July 10, 1979, https://www.nytimes.com/1979/07/11/archives/scientists-warn-us-of-carbondioxide-peril-advice-on-energy.html.

[30] Climate Research Board, National Research Council, Carbon Dioxide and Climate: A Scientific Assessment, Washington, D.C., 1979, p. 16-17, viii.

[31] George M. Woodwell, Gordon J. MacDonald, Roger Revelle, and C. David Keeling, The Carbon Dioxide Problem: Implications for Policy in the Management of Energy and Other Resources, A Report to the Council on Environmental Quality, July 1979.

[32] *Id*. at 11.

14

27.     On Leap Day in 1980, President Carter's last full year in office, the President gave an important address at the Second Environmental Decade Celebration in the White House. Before the celebration, I had an opportunity to brief the President on the forthcoming "Global 2000 Report," which would be released later, in July of that year. In his remarks at the celebration, President Carter noted: "Just before lunch, Gus and I were discussing the long-term threats which just a few years ago were not even considered."[33] The first threat on Carter's list was "the build-up of carbon dioxide." Later in his address, President Carter listed eight "preeminent environmental challenges of the next decade" and included on that list "that we face squarely such worldwide problems as the destruction of forests, acid rain, carbon dioxide buildup, and nuclear proliferation." President Carter also stressed the need for new energy directions. On his list of preeminent environmental challenges was "that we put this nation on a path to a sustainable energy future, one based increasingly on renewable resources and on energy conservation."

28.     In July 1980, DOE released a report on its "Summary of the Carbon Dioxide Effects Research and Assessment Program," which reflected an understanding of the dangerous impacts of increasing $CO_2$ pollution and said that "[i]t is the sense of the scientific community that carbon dioxide from the

_____

[33] President Jimmy Carter, Second Environmental Decade Remarks at the 10th Anniversary Observance of the National Environmental Policy Act, Earth Day, and Several Federal Agencies, February 29, 1980.

unrestrained combustion of fossil fuels is potentially the most important environmental issue facing mankind."[34]

29.    When I led the Council on Environmental Quality, we were mandated by the National Environmental Policy Act of 1969 to provide annual reports to Congress on environmental conditions, trends, and policy actions and results. We issued four such reports during my tenure leading CEQ. In CEQ's Eleventh Annual Report to Congress in 1980, we strengthened our findings that the ongoing rising concentration of $CO_2$ from fossil fuel burning would be disastrous for our natural systems and for humanity, particularly young people and future generations. Based on my personal experience in the White House, the CEQ reports that we issued, and other historical evidence during this era, the U.S. government was both well aware of the scientific findings that anthropogenic buildup of greenhouse gases in the atmosphere, principally $CO_2$ from the burning of fossil fuels, was occurring and that the projected and possible consequences of this buildup, if unabated, would be catastrophic.

30.    In 1983, President Reagan's EPA issued two seminal reports. In the first, "Can We Delay a Greenhouse Warming?", EPA projected an increase in temperatures of 2°C by 2040 in response to the continued burning of fossil fuels, a

---

[34] U.S. Department of Energy, Summary of the Carbon Dioxide Effects Research and Assessment Program, July 1980, p. 1.

temperature increase that, in EPA's assessment, was guaranteed to produce substantial climatic consequences, including disastrous flooding.[35] The report found that fossil fuels were responsible for most of the growth in the atmospheric concentration of $CO_2$ and thus stated that eliminating coal combustion by 2000 and banning shale oil as the best policy options for averting a 2°C temperature increase. EPA made clear that the risks are high with a "wait and see" policy[36] which could "produce substantial climatic consequences."[37]

31. The second EPA report, "Projecting Future Sea Level Rise: Methodology, Estimates to the Year 2100, and Research Needs", predicted 4.8 to 7 feet of global sea level rise by 2100, but said 11 feet could not be ruled out.[38] It found that $CO_2$ emissions were primarily caused by the combustion of oil, gas, and coal and that those emissions were consistently increasing.[39] EPA found that "[f]uture energy use and fuel selection will thus be the primary determinants of the rate of $CO_2$ emissions."[40] EPA also rejected a "wait and see" approach and found that

---

[35] U.S. Environmental Protection Agency, Can We Delay a Greenhouse Warming? September 1983, p. 1-16 to 1-17.
[36] *Id.* at i, 1-2, 2-8.
[37] *Id.* at 1-16 to 1-17.
[38] U.S. Environmental Protection Agency, Projecting Future Sea Level Rise: Methodology, Estimates to the Year 2100, and Research Needs, October 1983, p. vi.
[39] *Id.* at 8.
[40] *Id.*

"forthcoming decisions cannot be postponed the several decades" that a transition away from fossil fuels would require.[41]

32. In 1984, William Ruckelshaus, then-EPA Administrator, made a powerful speech in Paris at the Organization for Economic Cooperation and Development. He acknowledged that the combustion of fossil fuels "has the potential for creating major climate changes," and that the failure to make a long-term commitment to address climate change and other environmental threats would lead to "a succession of unexpected and shattering crises."[42] In another 1984 speech, Ruckelshaus referred to "the need to preserve our life support systems," and said

> I don't think our liberties are threatened in the next 90 days, but if we fail to improve our record in the realm of risk management, both within our societies and in the world as a whole, we will at least waste precious time and resources and at worst threaten all we hold dear.[43]

33. Throughout the 1980s, the DOE continued its research on the consequences of accumulating $CO_2$ in the atmosphere. In 1985, scientists at DOE's Lawrence Livermore National Laboratory edited and published a major four-volume series for the Carbon Dioxide Research Division on the current state of carbon dioxide research. This series included volumes on "Projecting the Climatic Effects

---

[41] *Id.* at 51.

[42] William D. Ruckelshaus, Remarks at Organization for Economic Cooperation and Development, June 21, 1984, p. 6-7.

[43] William D. Ruckelshaus, The Role of the Private Sector in Environmental Action, November 14, 1984, p. 4, 24.

of Increasing Carbon Dioxide" and "Detecting the Climatic Effects of Increasing Carbon Dioxide," and was described by the editors as "an accounting" of what had been learned over the past eight years since the 1977 workshop. One of the volumes, "Atmospheric Carbon Dioxide and the Global Carbon Cycle," noted that $CO_2$ levels had varied in the last million years with a *high* point, during warm, interglacial phases, of 350 ppm.[44]

34.    By the mid-1980s, an enormous amount had been learned; the first volume alone was over 400 pages long, documenting how much the federal government knew about the impacts of burning fossil fuels. For instance, in the preface of "Projecting the Climatic Effects of Increasing Carbon Dioxide," Michael R. Riches, Program Manager for the Carbon Dioxide Research Division at DOE, wrote:

> There is little doubt that the increasing concentration of atmospheric carbon dioxide ($CO_2$) has the potential to modify the Earth's climate. Increased global surface temperatures, altered precipitation patterns, and changes in other climatic variables could have substantial economic and social consequences. . . . Virtually all studies suggest that the increasing $CO_2$ concentration will significantly increase the global average temperature.[45]

---

[44] U.S. Department of Energy, Atmospheric Carbon Dioxide and the Global Carbon Cycle, December 1985, p. xvi.

[45] U.S. Department of Energy, Michael C. MacCracken and Frederick M. Luther, eds., Projecting the Climatic Effects of Increasing Carbon Dioxide, December 1985, p. ix.

35. Later in the volume, T. Webb III and T.M.L. Wigley, in their article, "What Past Climates Can Indicate About a Warmer World," wrote:

> The most significant effects of increased atmospheric $CO_2$ on climate will be manifest in regional changes of moisture and temperature patterns. . . . Changes in pressure patterns, both geographical and seasonal, will in turn affect rainfall, temperatures, and winds: all the meteorological variables that contribute to the overall climate at a given place.[46]

36. In 1986, NOAA published a report for the White House's Domestic Policy Council, the opening sentence of which read: "We have become involved in a global climate experiment in which human activities . . . act as agents of inadvertent global change. . . . Recent and continuing increases in atmospheric carbon dioxide ($CO_2$) due to burning of fossil fuels can be thought of as a global climate experiment."[47] The report added, "We are reaching a technological threshold from which progress in understanding can be proportional to the investment of effort. This conclusion, combined with the need to formulate policy regarding current climate modification activities, deserves the attention of scientific and *governmental leaders who must determine and muster the needed resources*."[48]

---

[46] *Id*. at 241.

[47] NOAA, Global Climate, A Variable and Vulnerable Natural Resource, October 1, 1986, p. 1.

[48] *Id.* at 36 (emphasis added).

37. It was also in 1986 that eight senators sent a letter to Lee Thomas, administrator of the EPA, asking the EPA to conduct two studies on climate change.[49] The first study would examine the health and environmental impacts of climate change. The second study "should include an examination of the policy options that, if implemented, would *stabilize current levels of atmospheric greenhouse gas emissions*. This study should address the need for and implications of significant changes in energy policy, including energy efficiency and development of alternatives to fossil fuels."[50] Continuing into the 1980s, it was well understood by members of Congress that EPA had a role to play in studying and addressing climate change.

38. In a separate letter, also in 1986, a bipartisan group of Senators asked the Office of Technology Assessment to come up with policy options that would stabilize and minimize GHGs in the atmosphere adding that they were "deeply troubled by the prospect of such a rapid and unprecedented change in the composition of the atmosphere and its implications for the human and natural worlds."[51]

---

[49] Senators George J. Mitchell at el., Letter to Lee Thomas, September 12, 1986.
[50] *Id.* at 2 (emphasis added).
[51] Senators Stafford et al., Letter to John Gibbons, Executive Director of U.S. Congress Office of Technology Assessment, December 23, 1986.

39.     It is noteworthy that the atmospheric concentration of $CO_2$ at the time these senators were asking the EPA and OTA to come up with concrete policy options to stabilize $CO_2$ at current levels was 347 ppm, just below the level where observations indicate that such significant impacts as loss of mass from ice sheets started accelerating. All three reports (two by EPA and one by OTA) were eventually prepared and submitted to Congress during the George H.W. Bush presidency.

40.     DOE, EPA, NOAA, and other agencies had delivered an exhaustive, comprehensive accounting of the contemporary understanding of climate science during President Reagan's time in office. They had also explained that $CO_2$ wasn't the only greenhouse gas, but that other trace gas concentrations could contribute to the greenhouse effect and create a unified Greenhouse Gas Index.[52] DOE's Carbon Dioxide Research Division would add to this body of knowledge, officially publishing a new Master Index in 1987 that again included dire warnings about the constantly-updated state of climate science. The reports were conclusive that humans caused climate change and temperature increases would be beyond anything seen in recent geological times.[53]

---

[52] U.S. Environmental Protection Agency, Climate Change Indicators: Climate Forcing.
[53] U.S. Department of Energy, Michael P. Farrell, ed., Master Index for the Carbon Dioxide Research State-of-the-Art Report Series, March 1987.

41.     The EPA under the first Bush administration, with William Reilly as agency head, was in the process of recognizing and evaluating the great advances in climate modeling that had occurred in previous years, which introduced a new level of clarity as to the specific potential physical impacts of the greenhouse effect. Following Congressional hearings on climate science in 1986, the Subcommittee on Pollution of the Senate Environment and Public Works Committee requested the EPA to conduct a study examining the potential health and environmental impacts of greenhouse gas-induced global warming. The EPA's resulting "The Potential Effects of Global Climate Change on the United States" report, published in 1989, provided an unprecedented and comprehensive evaluation of anticipated climate impacts, including on water resources, sea-level rise, agriculture, aquatic resources, air quality, and more.[54]

42.     The language of the "Potential Effects" report regarding the broad climate situation was unequivocal:

> Recently, we have come to realize that human activity may, in the near future, produce effects powerful enough to overwhelm [] natural mechanisms and dominate the changes of climate. By early in the next century, the planet's temperature may rise to a range never before experienced by our species, at a rate faster and to temperatures warmer than the Earth has experienced in the past million years. This

---

[54] U.S. Environmental Protection Agency, The Potential Effects of Global Climate Change on the United States, December 1989.

23

anticipated temperature increase would be caused by an enhancement of the greenhouse effect.[55]

43.     The projections from the science of the last century has been borne out this century. Based on my personal experience inside government, my long career working on these issues, along with my historical research and study, it is my opinion that we have not seen this level of climate change, pollution, or technology denial at any other time in our government's history. What is truly remarkable is that this denial is happening while the impacts are unfolding right before our eyes.

44.     Based on my personal observations while working in government and my professional expertise and experience, it is clear that the federal government has long understood the basic science of climate change and that the continued burning of high levels of fossil fuel would result in harmful climate change impacts. During the 1970s, air pollution from motor vehicles, including $CO_2$, was seen as part of the air pollution problem. The Clean Air Act Amendments of 1970 and 1977, and EPA as an agency, was originally envisioned as having a significant role to play in solving the air pollution problem to protect human health and wellbeing. That central purpose of EPA continued for over half a century, until the Executive Orders of 2025 directing every agency, including EPA, to unleash fossil fuels and reconsider its foundational regulatory programs that control pollution.

---

[55] *Id.* at 9.

In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on May 18, 2026 in Stafford, Vermont.

James Gustave Speth

# Exhibit A

**JAMES GUSTAVE SPETH**

Gus Speth
Email: gus@speth.com
Website: www.gusspeth.org
Complete poems: www.gusspeth.org/complete-poems
Ambassador, Wellbeing Economy Alliance: www.WEAll.org
Fellow, Next System Project: https://thenextsystem.org

Distinguished Next System Fellow, The Democracy Collaborative
Ambassador, The Wellbeing Economy Alliance

89 Jordan Road
Strafford, VT 05072

Senior Fellow, Vermont Law School
Associate Fellow, Tellus Institute

gus@speth.com

## PAST PROFESSIONAL EXPERIENCE

PROFESSOR OF LAW, VERMONT LAW SCHOOL, SOUTH ROYALTON, VT 2010 TO 2015.

DEAN, Carl W. Knobloch, Jr. DEAN and Sara Shallenberger Brown PROFESSOR in the Practice of Environmental Policy, Yale School of Forestry and Environmental Studies, now Yale School of the Environment,  New Haven, CT.
The school is a graduate and professional school of the environment. July 1999 to July 2009.

ADMINISTRATOR, United Nations Development Programme, New York, N.Y.
Chief executive officer of the principal arm of the United Nations for funding and coordination of international assistance for development. 1993–1999. Also served as first chair of the United Nations Development Group (UNDG), the coordinating body for all United Nations development activities.

SENIOR ADVISOR, President-Elect Bill Clinton's Transition Team. Washington, D.C.
Headed group on natural resources, energy and the environment. 1992.

PRESIDENT and FOUNDER, World Resources Institute. Washington, D.C.
President of WRI, a center for policy development and international assistance on environmental and sustainable development issues.  1982 to 1992.

PROFESSOR, Georgetown University Law Center. Washington, D.C.
Taught environmental and constitutional law. 1980–1981.

MEMBER and CHAIR, President's Council on Environmental Quality, Executive Office of the President.
Washington, D.C.  Principal White House advisor to President Carter on environmental affairs with over all responsibility for development and coordination of the Administration's environmental program.  Member 1977–1978; Chair 1979–1980.

Sᴇɴɪᴏʀ Aᴛᴛᴏʀɴᴇʏ *and* Cᴏꜰᴏᴜɴᴅᴇʀ, Natural Resources Defense Council.  New York, NY, and Washington, D.C.
     Responsibilities included leadership of NRDC programs in energy and water.  1970–1977.

Lᴀᴡ Cʟᴇʀᴋ ᴛᴏ Sᴜᴘʀᴇᴍᴇ Cᴏᴜʀᴛ Jᴜꜱᴛɪᴄᴇ, Hugo L. Black.  Washington, D.C. 1969–1970.


## EDUCATION

J.D.  Yale Law School.  New Haven, CT. 1969.  Member of the *Yale Law Journal* and awarded Peres
     Prize for the best contribution to the *Journal* in 1969 (with others)*.*
M.Litt, Economics, Rhodes Scholar. Balliol College, Oxford University, Oxford, England.  1966.
B.A. *summa cum laude.* Yale College. New Haven, CT. 1964.
     Honors with Exceptional Distinction in Political Science


## HONORS and AWARDS

Honorary Doctor of Laws, University of Massachusetts Boston, Boston, MA, 2013.
Honorary Doctor of Sustainability Science, Unity College, Unity, ME, 2013.
Honorary Doctor of Humane Letters, Green Mountain College, Poultney, VT. 2012.
Honorary Doctor of Humane Letters, University of South Carolina, Columbia, SC. 2008.
Honorary Doctor of Science, Middlebury College, Middlebury, VT. 2007.
Honorary Doctor of Laws, Vermont Law School, South Royalton, VT. 2005.
Honorary Master of Philosophy. College of the Atlantic. Bar Harbor, ME. 2001.
Honorary Doctor of Laws.  Clark University. Worcester, MA.  1995.

Resource Defense Award.  National Wildlife Federation.  1975.
Global 500 Honor Role.  UN Environment Programme.  1988.
National Leadership Award.  Keystone Center.  1991.
Barbara Swain Award.  National Resources Council of America.  1992.
Keystone Center Creative Environmental Leadership Award, 1994.
Special Recognition Award.  Society for International Development.  1997.
Special Leadership Award.  Alliance for United Nations Sustainable Development Programs.  1998.
Ordre National du Lion of Senegal.  1998.
Grand Cordon du Wissam Alaouite of Morocco.  1999.
Lifetime Achievement Award.  Environmental Law Institute.  1999.
Blue Planet Prize, 2002.
Global Environmental Award.  International Association for Impact Assessment. 2005.
Connecticut Book Award, Best Nonfiction Book, 2005 (for *Red Sky at Morning*).
Yale Anglers' Journal Hall of Fame, 2006.
DeVane Lecturer, Yale University, 2007.
Straus Innovator Award, 2008.
Hutchinson Medal, The Horticultural Society of Chicago, 2008.
Lifetime Achievement Award, League of Conservation Voters, 2008.
A "Best Book" of the Year, Washington Post Book World, 2008 (for *The Bridge at the Edge of the World*).
Yale Law School Association Award of Merit, 2010.
Thomas Berry Great Work Award. Environmental Consortium of Colleges and Universities, 2013.
Thomas Berry Award, Forum on Religion and Ecology, 2014.


## MEMBERSHIPS AND BOARDS

Honorary Trustee, Natural Resources Defense Council
Honorary Director, World Resources Institute

**PERSONAL**

Born Orangeburg, S.C. in 1942. Son of Gus and Amelia Albergotti Speth. Attended Orangeburg High School. Husband of Cameron Council since 1965. Father of Catherine McCullough, Jim Speth and Charles Speth. Grandfather of Cameron McCullough, Rodgers McCullough, Lilla Speth, Charlotte Speth, Grace Speth, and James Speth.

**PUBLICATIONS**

**BOOKS**

*Let Your Tears Water the Earth: Poems (*Watershed Publications, 2023).

*The Blessings: Poems (*Watershed Publications, 2022).

*They Knew: The US Federal Government's Fifty-Year Role in Causing the Climate Crisis* (Cambridge: MIT Press, 2021).

*What Will Last: New and Collected Poems* (Manchester Center, VT: Shires Press, 2021).

*The New Systems Reader: Alternatives to a Failed Economy* (New York: Routledge, 2021) (Ed., with Kathleen Courrier).

*It's Already Tomorrow: Poems* (Manchester Center, VT: Shires Press, 2020).

*What We Have Instead: Poems* (Manchester Center, VT: Shires Press, 2019).

*Getting to the Next System: Guideposts on the Way to a New Political Economy,* The Democracy Collaborative, 2015.

*Angels by the River: A Memoir* (Chelsea Green Publishing: White River Junction, VT, 2014).

*America the Possible: Manifesto for a New Economy* (New Haven, CT: Yale University Press, 2012; paperback, 2013). Translated: German.

*Climate Change Law: Mitigation and Adaptation* (St. Paul: Thomson Reuters, 2009) (with others).

*The Coming Transformation: Values To Sustain Human and Natural Communities* (Yale School of Forestry and Environmental Studies, 2009) (Ed. with Stephen Kellert).

*The Bridge at the Edge of the World: Capitalism, the Environment, and Crossing from Crisis to Sustainability* (New Haven, CT: Yale University Press, 2008; paperback, 2009). Translated: Japanese, Chinese, Arabic, Korean.

*Global Environmental Governance* (Washington, D.C.: Island Press, 2006) (with Peter Haas).

*Red Sky at Morning: America and the Crisis of the Global Environment* (New Haven, CT: Yale University Press, 2004).  Translated: German, Japanese, Korean, Chinese, Turkish.  Paperback with new "Afterword" (2005).

*Worlds Apart: Globalization and the Environment* (Washington, D.C.: Island Press, 2003) (Ed).

**OTHER – ARTICLES, CHAPTERS, ADDRESSES**

13 "Essays from the Edge," August-December, 2024, reprinted
at https://www.democracycollaborative.org/blogs/category/Essays+from+the+Edge,
https://www.resilience.org/resilience-author/gus-speth, spethessaysfromtheedge.blogspot.com

"Climate: Facing Reality and Fighting Back in 2025," December 2024
https://www.democracycollaborative.org/blogs/climate-facing-reality-and-fighting-back-in-2025

"New Hope in an Old Fight," November 27, 2024, https://www.democracycollaborative.org/blogs/new-hope-in-an-old-fight

"Underlying the Democrats' Defeat," November 7, 2024,
https://www.democracycollaborative.org/blogs/essays-from-the-edge/underlying-democrats-defeat

"The Space Beyond Both Despair and Hopium," address at UMass/Amherst, November 2023.
https://peri.umass.edu/images/GusSpethRemarks.pdf

"You Say You Want a Revolution," *Orion*, November 2023.
https://orionmagazine.org/article/you-say-you-want-a-revolution

"Clearing Skies: Opening a New Path on Climate and the Future," *Yale Environment 360*, November 2023.
https://e360.yale.edu/features/systemic-adaptation

"5 Steps to Climate Sanity: Beyond Both Despair and Hopium," *Resilience*, October 2023.
https://www.resilience.org/stories/2023-10-25/five-steps-to-climate-sanity-beyond-both-despair-and-hopium/?mc_cid=e5a2060d71&mc_eid=015a5e19c7

"Is There a Way Forward?", *Resilience*, June 2, 2023
https://www.resilience.org/stories/2023-06-02/is-there-a-way-forward

"Through a Glass, Darkly," *Resilience*, March 10, 2023
https://www.resilience.org/stories/2023-03-10/through-a-glass-darkly

"A Progressive's Bookshelf: Little Boats and Big Currents," *Orion*, December 2022
https://orionmagazine.org/article/6-progressive-books-climate-politics/

"Can Transformational Change Come to America?" *Common Dreams*, August 16, 2022.
commondreams.org/views/2022/08/16/can-transformative-change-come-america.

"The Counsel of Despair," *Orion*, August 2022.
orionmagazine.org/article/counsel-despair-climate-catastrophe.

Among the 2021-22 interviews for *They Knew,* see *Orion*, https://orionmagazine.org/2021/10/they-knew,  and Yale Environment 360, https://e360.yale.edu/features/they-knew-how-the-u-s-government-helped-cause-the-climate-crisis.

"This Must Be the Year of Climate Action," *The Hill*, January 19, 2022, https://thehill.com/opinion/energy-environment/590502-this-must-be-the-year-of-climate-action-weve-wasted-so-many/

"The New Environmentalism Must Demand Systemic Change," *Truthout*, February 7, 2021, https://truthout.org/articles/the-new-environmentalism-must-demand-systemic-change/?utm_source=Truthout&utm_medium=email&utm_campaign=Truthout+Share+Buttons

"Ten Books for Every Transformational Change Bookshelf," *Orion*, December 10, 2021. orionmagazine.org/2021/12/ten-books-for-every-transformational-change-bookshelf.

"Through the Kitchen Window: A Vision of a New America," *Solutions*, vol. 11, issue 1, Winter 2020, p. 85 (and elsewhere).

"A People's State of the Nation," at the Next System Project, thenextsystem.org/learn/stories/peoples-state-nation. April 2, 2019. See also *Common Dreams*, March 29, 2019, commondreams.org/views/2019/3/29.

"Taking Climate Action to the Next Level," at the Next System Project, thenextsystem.org/climateaction, August 29, 2018 (with others). See also thenextsystem.org/learn/stories/system-change-magazine-highlights-year-bold-ideas.

"A Radical Alliance of Black and Green," *The Environmental Forum*, May-June 2018, 46 (with J. Phillip Thompson III).

Essays Editor, "New Systems: Possibilities and Proposals," Next System Project, 2016-18, https://thenextsystem.org/learn/collections/new-systems-possibilities-and-proposals.

"Stress Test: Democracy Confronts Climate Change," Next System Project, 2018, https://thenextsystem.org/learn/stories/stress-test-democracy-confronts-climate-change.

"The Joyful Economy: Rising Up from the Devastation of People and Nature," in Melissa K. Scanlan, ed., *Law and Policy for a New Economy* (Northampton, MA: Edward Elgar, 2017), 31.

"Powered by Radical Roots: A Natural Alliance of Black and Green Could Save the World, If We Claim It," *The Nation*, May 9/16, 2016, 22 (with J. Phillip Thompson III), http://www.thenation.com/article/a-radical-alliance-of-black-and-green-could-save-the-world/.

"System Change and Non-Reformist Reforms," *Truthout*, 15 October 2015, http://www.truth-out.org/speakout/item/33255-system-change-and-non-reformist-reforms.

"Change Agent: Evolution of a Systems Champion," Great Transition Initiative, The Tellus Institute, August, 2015, http://www.greattransition.org/publication/change-agent.

"Systemic Problems Require Systemic Solutions," *Common Dreams*, June 5, 2015, http://www.commondreams.org/views/2015/06/05/systemic-problems-require-systemic-solutions-time-talk-about-next-system.

"Am I a 'Radical?'," *The Nation*, January 27, 2015, http://www.thenation.com/article/how-i-became-radical.

"The Next System Project: New Political-Economic Possibilities for the 21st Century," The Democracy Collaborative, March, 2015 (with others).

"New Economy Transformation: The Eight-Fold Way," in Falk Schmidt and Nick Nuttall eds., *Contributions Towards a Sustainable World* (Oekom: Munich, Germany, 2014), 257-262.

"How Environmentalists Lost Their Way," *American Oxonian*, Fall, 2014, 301-310.

"An Environmentalist's Story," *The Environmental Forum*, September/October 2014, p. 40.

"Searching for Radicalism in a Corporate Age," Great Transition Initiative, Tellus Institute, 2014, online at www.greattransition.org/publication/searching-for-radicalism-in-a-corporate-age.

"Vermonters in the New South," *The Valley News*, September 10, 2014, p. A7.

"Climate Change: Prophets and Deniers," *New York Times*, May 14, 2014, (Letter to the Editor).

"The Case for a New American Environmentalism," in Richard A. Houghton and Allison B. White eds., *Ecology and the Common Good* (Woods Hole Research Center, 2014), p. 111.

"Growth Fetish: Five Reasons Why Prioritizing Growth Is Bad Policy," found at http://www.huffingtonpost.com/james-gustave-speth/growth-fetish-five-reason_b_4018166.html, www.alternet.org/print/environment/5-reasons-why-prioritizing-growth-bad-policy, and https://www.commondreams.org/view/2013/10/08-7.

"A Vision of America the Possible," *Solutions*, vol. 4, issue 1, April 2013, at www.thesolutionsjournal.com/node/6611.

"Will Branding Help?," *Earth Island Journal*, Spring, 2013, p. 40.

Wen Stephenson, "Gus Speth: 'Ultimate insider' goes radical," Interview, September 17, 2012 www.grist.org/climate-energy/gus-speth-ultimate-insider-goes-radical.

"Conversation," in *Visions of a Living Earth*, A Joint Book Project of Shumei and Navdanya (Koka City Japan: Shumei International Press, 2012), p. 71.

"For Rio+20: A Charter for a New Economy," *Solutions*, May/June 2012, p. 24. www.thesolutionsjournal.com/node/1106.

"How Can We Create a Successful Economy Without Continuous Economic Growth," Center for Humans and Nature, June 13, 2012, http://center.mighty-site.com/how-can-we-create-a-successful-economy-without-continuous-economic-growth-question-3.php.

"A New American Dream," www.otherwords.org/articles/a_new_american_dream, October 3, 2012.

"Building the New Economy: Ten Steps We Can Take Now," New Economics Institute, June 8, 2012, at www.yesmagazine.org/new-economy/building-the-new-economy-ten-steps-we-can-take-now and www.alternet.org/visions/155965/10_steps_we_can_take_right_now_to_build_the_new_economy.

"America the Possible—A Manifesto; Part I—From Decline to Rebirth," *Orion*, March/April, 2012 www.orionmagazine.org/index.php/articles/article/6681.

"America the Possible—A Manifesto; Part II—A New Politics for a New Dream," *Orion*, May/June, 2012 www.orionmagazine.org/index.php/articles/article/6810.

"Manifesto for a Post-Growth Economy," *Yes! Magazine*, September 19, 2012.

"American Passage: Towards a New Economy and a New Politics," *Ecological Economics*, Vol. 84, December 2012, p. 181.

"Letter to Liberals: Liberalism, Environmentalism, and Economic Growth," 2010 Schumacher Lecture, published at Vermont Law Review, vol. 35, No. 3, Spring, 2011, p. 547; *Ethics, Policy and Environment*, vol. 14, No. 1 (March 2011), p. 43; and *Commondreams.org*, September 12, 2011.

"American Prospect: Decline and Rebirth," *Solutions*, vol. 2, No. 4 (July-August 2011, 1, online at www.thesolutionsjournal.com/node/951.

"Communicating environmental risks in an age of disinformation," *Bulletin of the Atomic Scientists*, at http://bos.sagepub.com/content/67/4/1 (2011).

"Beyond the Growth Paradigm: Creating a Unified Progressive Politics," *Great Transition Initiative Perspectives*, Tellus Institute, March, 2011.

"What Is the American Dream? Dueling Dualities in the American Tradition," online at www.grist.org/politics/2011-06-24-what-is-the-american-dream-dueling-dualities-in-the-american-tra, and elsewhere, e.g. www.ourfuture.org/blog-entry/2011062628/what-american-dream-dueling-dualities-american-tradition.

"Off the Pedestal: Creating a New Vision of Economic Growth," *Yale Environment 360*, http://e360.yale.edu/feature/off_the_pedestal_creating_a_new_vision_of_economic_growth/2409/.

"Pursuing Happiness the American Way," *Valley News*, July 3, 2011, p. F3.

"From Crisis to Sustainability," in Laurie Mazur ed., *A Pivotal Moment* (Washington, D.C.: Island Press, 2010), p. 329.

"The Limits of Growth," in Kathleen Dean Moore and Michael P. Nelson eds., *Moral Ground* (San Antonio: Trinity University Press, 2010), p. 3.

"Towards a New Economy and a New Politics," *Solutions*, May, 2010, online at www.thesolutionsjournal.com/node/619.

"A New American Environmentalism and the New Economy," 10th Annual John H. Chafee Memorial Lecture, National Council for Science and the Environment, January 21, 2010, online at http://ncseonline.org/CMS400Example/uploadedFiles/01_NEW_SITE/4_Conference/2010_Green_Economy/A_New_American_Environmentalism_and_the_New_Economy_final[1].pdf.

"Doing Business in a Post-Growth Society," *Harvard Business Review*, September, 2009, p. 18.

"Beyond Economic Recovery," www.ourfuture.org (print) 34573, February 11, 2009.

"Taking Stock: Rethinking Consumerism," Marketplace (interview) July 13, 2009 at http://marketplace.publicradio.org/display/web/2009/07/13/pm_speth.

"Toward a New Consciousness," *The Leopold Outlook*, Winter 2008, p.5-7.

"Change Everything Now," *Orion*, September/October, 2008, p.67.

"Environmental Failure: A Case for a New Green Politics," *Yale Environment 360*, October 20, 2008. http://e360.yale.edu/content/feature.msp?id=2075.

"Silver Linings: Seven Post-Financial Crisis Opportunities for Healthier Economics," online at http://gristmill.grist.org/story/2008/11/11/15036/525.

"Beyond Growth: Against the Tide," *New Scientist*, 18 October 2008, p. 48.

"Progressive Fusion," *The Nation*, October 6, 2008, p. 27; and "Global Warming and Modern Capitalism," *The Nation* online, September 17, 2008, www.thenation.com/article/global-warming-and-modern-capitalism.

"Time for Civic Unreasonableness," *Environment: Yale*, Spring, 2008, p.2.

"The Global 2000 Report and Its Aftermath," in Larry L. Rockwood et al. eds., *Foundations of Environmental Sustainability* (New York: Oxford University Press, 2008), p. 47.

"Changing the Object of Capitalism", *Barron's*, June. 2008.

"The Problem with Capitalism," *Yale Alumni Magazine*, March/April, 2008, p. 28.

"A Second Attempt at Global Environmental Governance?" *The Environmental Forum*, September/October, 2007, p. 29 (with Peter Haas).

"Scaling Back Our Energy-Hungry Lifestyles Means More of What Matters, Not Less," *Grist*, December 10, 2007, at http://grist.org/author/james-gustave-speth/ (with others).

"Groundswell" in Jonathan Isham and Sissel Waage, *Ignition* (Washington, D.C.: Island Press, 2007).

"Avoiding the Great Collision," *Reflections*, Yale Divinity School, Spring, 2007, p. 35.

"Beyond Reform," *Our Planet,* UN Environment Programme, February, 2007, p. 16.

"The Globe Is Warming—Why Aren't We Marching," *New York Times*, February 24, 2006.

"Foreword" to Robert Repetto, ed., *Punctuated Equilibrium and the Dynamics of U.S. Environmental Policy* (New Haven: Yale University Press, 2006).

"Foreword" to Daniel R. Abbasi, *Americans and Climate Change: Closing the Gap Between Science and Action* (New Haven, CT: Yale School of Forestry and Environmental Studies, 2006).

"A Civic Duty of the First Order," *Global Agenda 2006* (World Economic Forum, 2006), p.202.

"The Heart of the Matter," *Environment: Yale*, Fall 2005, p.2.

"The Single Greatest Threat:  The United States and Global Climate Disruption," *Harvard International Review*, Summer, 2005. p. 18.

"Why Business Needs Government Action on Climate Change," *World Watch*, July/August 2005. p. 30.

"A Credo To Serve Us Well for the Future," *Financial Times*, July 25, 2005.

"The Kyoto No-Show Can Still Go Green," *YaleGlobal Online*, February 16, 2005, at http://yaleglobal.yale.edu/article.print?id=5281.

"Creating a Sustainable Future: Are We Running Out of Time?" in Robert Olson and David Rejeski, *Environmentalism and the Technologies of Tomorrow* (Washington, D.C.: Island Press, 2005).

"Foreword" to James Rasband et al., *Natural Resources Law and Policy* (New York: Foundation Press, 2004).

"Business Must Back Sustainability," *Financial Times*, October 1, 2004.

"International Environmental Law:  Can It Deal with the Big Issues?" *Vermont Law Review*, Spring, 2004, p.779.

"Carbon Dioxide Won the Elections," *International Herald Tribune*, January 16, 2003.

"Green Republicans: Quo Vadis?" *Environment: Yale*, November, 2003, p. 2.

"Perspectives on the Johannesburg Summit," *Environment*, Vol. 45, No. 1, January/February 2003, p. 24.

"Dismissing Storm Clouds Not Too Sharp," *New Haven Register*, September 25, 2002.

"A New Green Regime: Attacking the Root Causes of Global Environmental Deterioration," *Environment*, Vol. 44, No. 7, September 2002, p. 16.

"American Congress Can Affect Global Warming," *Yale Global Online*, 27 December 2002.

"The Global Environment: A Program to Avoid Appalling Deterioration," *International Herald Tribune*, July 30, 2002.

"The Global Environmental Agenda: Origins and Prospects," in D. Esty and M. Ivanova, eds*., Global Environmental Governance: Options and Opportunities* (Yale School of Forestry and Environmental Studies, 2002).

"Recycling Environmentalism," *Foreign Policy*, July/August, 2002, p. 74.

"Development Assistance and Poverty," in J. Dernbach, ed., *Stumbling Toward Sustainability* (Environmental Law Institute, 2002).

"Development Neglected by U.S. Government," *Yale Daily News*, October 24, 2001.

"Making the World Safer Without Bombs," *Yale Daily News*, September 18, 2001.

"The United States and the Developing Countries in a Globalizing World: Reflections on Six Years in the United Nations*," International Review of Environmental Strategies*, Vol. 2, No. 1, 2001.

"Bush Sr. Obligated the U.S. To Act on Global Warming," *International Herald Tribune*, May 9, 2001.

"Foreword" to Ralph Schmidt, et al., eds., *Forests to Fight Poverty: Creating National Strategies* (New Haven: Yale University Press, 1999).

"The Plight of the Poor," *Foreign Affairs*, Volume 78, No. 3, May/June 1999.

"A New Deal - Development Assistance in a Global Economy," *Harvard International Review*, Winter 1998/1999.

"Debt Relief, Yes, but Development Aid as Well," *International Herald Tribune*, May 7, 1999.

"The Neglect of Growing Poverty Poses a Global Threat," *International Herald Tribune*, July 17 - 18, 1999.

"Unequal Human Impacts of Environmental Damage," in Ahmad K. Hegazy, ed., *Environment 2000 and Beyond* (Cairo, Egypt: Horus, 1999), p. 85.

"Poverty and Environment: Moving the Agenda," *Choices*, UNDP, Vol. 8, No. 1, 1999.

"Poverty: A Denial of Human Rights," *Journal of International Affairs*, 52, No.1, fall 1998.

"Keep the Focus on Promoting the People of Asia," *International Herald Tribune*, January 29, 1998.

"Economic Growth Is an Essential Part of Sustainable Human Development," *The Earth Times*, February 16 – 28, 1998.

"Reform, Restructuring, Re-engineering," *The Earth Times*, September 16 – 30, 1998.

"Common Interest, Common Sense," *Los Angeles Times*, November 10, 1998.

"Development Countries, Too, Are Fighting Global Warming," *International Herald Tribune*, November 13, 1998.

"The United Nations: From Crisis to Development," *Global Aid*, January 1997.

"A Leaner and More Efficient UNDP Aims To Fight Global Poverty," *Journal of the Group of 77 at the United Nations Headquarters*, Vol. 10, No. 3 & 4, March/April 1997.

"Europe Provides a Guide to Shrinking World's Rich-Poor Gap," *International Herald Tribune*, February 3, 1997.

"The Foreign Aid Mirage," *The Christian Science Monitor*, April 2, 1997.

"UNDP 2001 – Reform for Results," *Development Today*, July 23, 1997, Vol. VII, No. 11 – 12.

"Good for Ted Turner, and May He Be Imitated," *International Herald Tribune*, October 9, 1997.

"Keeping Promises Made at Rio…," *The Earth Times*, October 1 – 15, 1997.

"Listening to the Poor," *The Washington Times*, November 25, 1997.

"In Africa, Unattended Poverty Leads to Conflict*," International Herald Tribune,* March 21, 1996.

"Two Worlds in Counterflow, or 358 = 2.3 Billion and Counting," *International Herald Tribune*, August 23, 1996.

"Development and Security," *The Challenge of Peace*, UNRIST, Vol. 3, June 1996.

"The UN, the US, and Development Cooperation: Time for Reunion," *United Nations Chronicle*, Vol. XXXIII, No. 4, 1996.

"UNDP's Mandate Could be Hampered by Declining Resources," *Journal of the Group of 77, Vol. 9 No. 6/7(Special Edition)*, September 1996.

"Upheaval in Development," *World Development Aid & Joint Venture Finance,* 1995/1996.

"We Need a New, More Comprehensive Framework for Development Cooperation," *The Earth Times*, April 15 – 29, 1995.

"Wake Up, OECD: Concerted Development Assistance Isn't Optional," *International Herald Tribune,* May 19, 1995.

"Foreign Aid for the Price of Cat Food," *Washington Post*, August 6, 1995.

"Defining the Challenge," *United Nations Chronicle*, March 22, 1995.

"Climate Change & Development:  A Challenge of Commitment," *United Nations Climate Change Bulletin*, Issue 8, 3rd Quarter 1995.

"Development Cooperation in Peril:  Building New Capacities, Preventing Crises," *United Nations Chronicle*, June 1995.

"A New Age of Equity?," *Politiken*, March 12, 1995.

"The United Nations and International Development: Forging a New Post Cold War Role," Foundation Day Lecture, *Tata Energy Research Institute*, Feb. 3, 1994.

"Foreword" to Susan Holcombe, *Managing to Empower: Grameen Bank's Experience of Poverty Alleviation* (Zed Books, 1995).

"Towards Sustainable Food Security," Sir John Crawford Memorial Lecture, *Consultative Group on International Agricultural Research*, October 25, 1993.

"On the Road to Rio and to Sustainability," *Environmental Science and Technology*, Vol. 26, No. 6, 1992.

"A New U.S. Program for International Development and the Global Environment," *The American Oxonian*, Vol. LXXIX, No. 1, 1992.

"Double or Nothing: Linking U.S. Economic and Environmental Objectives," *World Resource Institute: Issues and Ideas*, November 1992.

"A Post-Rio Compact," *Foreign Policy*, No. 88, Fall 1992.

"A New U.S. Program for International Development and the Global Environment," *World Resources Institute, Issues and Ideas*, March 1992.

"The Transition to a Sustainable Society," *Proceedings of the National Academy of Sciences,* Vol. 89, February 1992.

"Transitions to a Sustainable Society," in *Human Impact on the Environment: Ancient Roots, Current Challenges* (Judith E. Jacobsen & John Firor eds.), 1992.

"Pollution vs. Payrolls: Going for the Gold, A National Strategy for Helping America Clean Up by Cleaning Up," *Washington Post*, October 4, 1992 (with Russell E. Train and Douglas M. Costle).

"Meeting the North-South Challenge," *Changing America: Blueprints for the New Administration*, (M.Green ed.), 1992.

"Partnership for Sustainable Development: A New U.S. Agenda for International Development and Environmental Security," *Report of an Environmental and Energy Study Institute Task Force* (chair), 1991.

"EPA Must Help Lead an Environmental Revolution in Technology," *Environmental Law*, Vol. 21, 1991.

"Compact for a New World," *Report of the New World Dialogue on Environment and Development in the Western Hemisphere*, 1991 (principal author).

"'Can the World Be Saved?'" in Anthony B. Wolbarst ed., *Environment in Peril* (Washington, D.C.: Smithsonian Press (1991), p. 64.

"An Environmental Revolution in Technology," *Environmental Science and Technology*, Vol. 24, No. 4, 1990.

"Environmental Security for the 1990s. . . In Six Not-So-Easy Steps," *World Resources Institute: Issues and Ideas*, January 1990.

"Six Steps Toward Environmental Security," *The Christian Science Monitor*, January 22, 1990.

"Coming to Terms: Toward a North-South Bargain for the Environment," *Environment*, Vol 32, No. 5, June 1990.

"We Must Pay Full Price for Energy," *Los Angeles Times*, August 19, 1990.

"Steps Toward Sustainability," *The Earth in Transition*, (G. Woodwell Ed.)1990.

"The Global Environmental Agenda," *Environmental Science and Technology*, Vol. 23, No. 7, July 1989.

"'Can the World Be Saved?'," *Ecological Economics*, Vol. 1, No. 4, 1989.

"EPA and the World Clean-up Puzzle," *EPA Journal*, July/August 1989.

"The Global Environmental Challenge," *International Agriculture*, Vol. 4, No 3, 1989.

"Turning Point for the Earth," *GAO Journal*, No. 6, Summer 1989.

"For North-South Cooperation To Save the Environment," *International Herald Tribune*, July 12, 1989.

"The Greening of the Summit: First-World Money and Third-World Ecology Can Prosper Together*," Washington Post*, July 9, 1989.

"Dedicate the 90's to the Environment: International Commitment Could Be Our Gift to New Century," *Los Angeles Times*, February 1989.

"The Greening of Technology," *Washington Post*, November 20, 1988.

"The Greening of Technology," *The Bridge*, National Academy of Engineering, Summer 1989.

"Environmental Pollution: A Long-Term Perspective," *Earth '88: Changing Geographic Perspectives*, 1988.

"Environmental Pollution: High and Rising," in Peter Borrelli ed., *Crossroads: Environmental Priorities for the Future* (Washington, D.C.: Island Press, 2008), p. 171.

"Introduction," in *Deserts on the March* (Paul B. Sears), Island Press, 1988.

"Now, for a Worldwide Phase-Out of CFCs," *Los Angeles Times*, March 29, 1988.

"The Environmental Dimension to the Debt Crisis: The Problem and Five Proposals," in *Latin America's Debt Crisis: Adjusting to the Past or Planning for the Future?* (Robert A. Pastor, ed.), 1987.

"A New Environmental Agenda," *Forum for Applied Research and Public Policy*, Summer, 1986.

"Sweltering in the Greenhouse," *Los Angeles Times*, August 1, 1986.

"Environment, Economy, Security: The Emerging Agenda," *Protecting Our Environment*, Center for National Policy, 1985.

"Questions for a Critical Decade," *Columbia Journal of World Business*, Vol. XIX, No. 1, Spring, 1984.

"A New Institute for World Resources," in *American Oxonian* Vol. LXX, No. 1, 1983.

"What To Expect in the Year 2000," *Bulletin of the Atomic Scientists*, March, 1981.

"Resources and Security: Perspectives from the Global 2000 Report," *World Future Society Bulletin*, September/October 1981.

"A Gus Speth Reader," in Huge Nash, ed., *Progress As If Survival Mattered* (San Francisco: Friends of the Earth, 1981).

"Environmental Regulation: The ImMOBILization of Truth," in *Business and the Environment: Toward Common Ground.* (Kent Gilbreath, ed.), 1980.

"Overview," *A Long-Range Environmental Outlook*, National Research Council, 1980.

"Corporate Responsibility and Toxic Chemicals," in *Life After '80: Environmental Choices We Can Live With* (K. Courrier, ed.) 1980.

"The Need for Federal Involvement," *Environmental Protection Agency Journal*, September, 1980.

"The Looming Test for Mankind," *The Living Wilderness*, September, 1980.

"Simplifying Compliance with the National Environmental Policy Act," *Sloan Management Review*, Summer, 1980 (with Nicholas Yost).

"Our Environmental Future: Four Choices for the 1980's," *National Journal*, January 26, 1980.

"Our Nation's Water: A Threatened Resource," *Catalyst*, Vol. VII, No. 2, 1980.

"The Sisyphus Syndrome: Acid Rain and Public Responsibility," *National Parks and Conservation Magazine*, February, 1980.

"A Small Price To Pay: Inflation and Environmental Controls," *Environment*, October, 1978.

"A Civil Servant of the Environment," *The Center Magazine*, May/June, 1978.

"The Nuclear Recession," *Bulletin of the Atomic Scientists*, April, 1978.

"Science—and Prudence—in Cancer Prevention," *New York Times*, March 9, 1978, p. 31.

"Waiting for a Philosopher King: Making Cancer Policy Until Certainty Arrives" *Sierra*, February/March, 1978.

"The Federal Water Pollution Control Act Amendments of 1972," in Elaine Moss ed., *Land Use Controls in the United States* (New York: Natural Resources Defense Council and Dial Press, 1977), p. 68.

"Against Plutonium Fuel," *New York Times*, September 27, 1976 (with Thomas B. Cochran).

"The Liquid Metal Fast Breeder Reactor: A Poor Buy," *Environment*, May/June, 1975 (with Thomas Cochran and Arthur Tamplin).

"Bypassing the Breeder," *Environmental Action* (April 12, 1975): pp. 10-13 (with Thomas Cochran and Arthur Tamplin).

"The Hazards of Plutonium," *Natural History*, January, 1975.

"Plutonium Recycle: The Fateful Step," *Bulletin of the Atomic Scientists*, November, 1974 (with Thomas Cochran and Arthur Tamplin).

"Plutonium Recycle," *Environmental Action*, November 23 and December 7, 1974 (with Arthur Tamplin

and Thomas Cochran).

"The 1972 Federal Water Pollution Control Act: Problems and Prospects After One Year," *Natural Resources Lawyer*, Spring, 1974. "The Federal Role in Technology Assessment and Control," *Federal Environmental Law*, (E. Dolgin and T. Guilbert, ed.), 1974.

"A Model Negative Income Tax Statute," *78 Yale Law Journal* 269, 1968 (with others).

"Judicial Review of Displacee Relocation in Urban Renewal," *77 Yale Law Journal* 966, 1968.

# EXHIBIT 18

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

| | |
|---|---|
| ELENA VENNER, *et al.*, <br>         *Petitioners*, <br><br>     v. <br><br> UNITED STATES <br> ENVIRONMENTAL PROTECTION <br> AGENCY, *et al.*, <br>         *Respondents*. | Case No. 26-1038 <br> Lead Case No. 26-1037 <br> (and consolidated cases) |

**DECLARATION OF ELENA VENNER IN SUPPORT OF PETITIONERS'
MOTION TO STAY THE REPEAL RULE PENDING REVIEW**

I, Elena Venner, hereby declare and if called upon would testify as follows:

1. I am a Petitioner in the above-entitled action. I am making this declaration in support of our Motion to Stay the Repeal Rule. I have personal knowledge of the facts I state herein and if called to testify, I would and could testify competently thereto.

2. I am 21 years old and live in Lakewood, Colorado, and am currently attending school in San Luis Obispo, California.

3. Worsening air quality from the rescission of the Endangerment Finding and vehicle emission standards poses a serious health issue for me. When I was in

1

elementary school, living along the Front Range of the Rockies near Denver, I was diagnosed with exercise-induced asthma, and I still use an inhaler to this day. My asthma makes respiratory illnesses more serious for me. When I get a cold, it often turns into bronchitis. Recently, I've also been plagued with sinus and throat problems related to my weaker respiratory system.

4. Starting in the winter of 2023, during my freshman year of college, I was placed on multiple courses of antibiotics over a six-month period for persistent ear, nose, and throat pain. During that time, I developed a peritonsillar abscess that did not resolve despite two emergency room visits and IV antibiotics. In May 2023, mid-quarter in my first year, I had an emergency tonsillectomy in California.

5. That summer, I had a CT scan with my ENT in Colorado, which showed an infected sphenoid sinus. At the time, I was feeling better, so I decided not to move forward with surgery. In the winter of 2024, I became severely ill again and developed multiple ear, sinus, and throat infections, requiring another four months of antibiotics. Things eventually improved, and I was healthy for about eight months, until I got sick again in February 2025. I was placed on a very high dose of antibiotics for another four months. In June 2025, I ultimately decided to have the sinus surgery.

6. Because of my history with asthma and ENT infections, avoiding respiratory illness triggers, like poor air quality, is necessary to protect my health. My doctors have confirmed that this should be a priority for me in order to stay

healthy. I have experience with the impacts that can follow exposure to bad air quality. Though I try to stay fit and well, even after my two surgeries, I tend to get sick easily and often develop secondary infections. I cannot safely exercise outdoors when the air quality is poor. On high-AQI days, I wear masks to protect my lungs and sinuses. These respiratory and sinus illnesses that may have originated from my childhood exposures to air pollution and are certainly made worse by that exposure have had a gigantic impact on my life thus far. I have experienced that poor air quality makes my health worse, and I understand that the more I am exposed to unhealthy or hazardous air, the more at risk I am for asthma attacks, sinus infections, and ultimately emergency room visits and hospital stays. The physical and mental toll of poor air quality and poor health are a heavy burden on my life and the choices I must make to protect my wellbeing. It also results in financial costs from the masks, inhalers, and air purifiers I need to buy along with the co-pays and medical treatments that insurance does not cover.

7. I grew up about 15 minutes outside Denver, and I can often see the air pollution from vehicles when driving down I-70 during temperature inversions. I entered my home address into the American Lung Association State of the Air Report Card[1] and it shows that I have grown up in a community that gets an F because it already has so much ozone pollution. My college is also adjacent to

---

[1] https://www.lung.org/research/sota

Highway 101, where I've lived the last two years, which is known for its dense and congested traffic and also gets an F for ozone pollution. I'm so close to the highway the noise keeps me up at night. The Repeal Rule will worsen this vehicle pollution around my home and school, which will increase rather than reduce my exposure to poor air quality (like that visible from the I-70 or Highway 101 corridors), which increases the risk of me experiencing future respiratory illnesses. There is only so much exposure to air pollution that my body can take and I don't think it is fair for someone who is just starting out in life to be forced to breathe pollution from fossil fuel vehicles and smoke from the additional fires they will cause when the rules that were repealed were reducing pollution and moving us in the right direction.

8. The air pollution I have been breathing in will be made worse by increasing wildfires. I've been directly affected by wildfire smoke in both Colorado and California. As I have grown up, both areas have become more prone to wildfires due to climate change, and as the Repeal Rule causes increased GHG emissions, these wildfires will occur more frequently than they already do, increasing the likelihood that I will breathe contaminated air and develop a severe respiratory illness.

9. The Repeal Rule limits my ability to practice my sincerely held Catholic faith, which requires me to care for and value all life and instills in me the

4

belief that I should bring life into this world and that life should be protected at all costs.

10. As the Repeal Rule causes more inescapable localized air pollution than is already in my area, I am forced to choose between creating future life or not. It would be unconscionable for me to bring life into a world that doesn't have healthy air to breathe. My Catholic faith requires the protection and nurturing of all children who are born into this world. Indispensable to my ability to bring life into this world is the fact that all communities, especially those with fewer advantages, need clean air to breathe.

11. The highest teaching of my faith is to "care for creation" (Genesis 2:15). I was deeply moved by the Pope's encyclical letter, Laudato Si` of the Holy Father Francis on Care for Our Common Home, which is attached to my declaration as Exhibit A. Laudato Si` emphasizes the importance of our responsibility as Catholics to care for our Earth in the specific circumstance of climate change. It says: "The destruction of the human environment is extremely serious, not only because God has entrusted the world to us men and women, but because human life is itself a gift which must be defended from various forms of debasement." "The climate is a common good, belonging to all and meant for all. At the global level, it is a complex system linked to many of the essential conditions for human life." My Catholic faith drives me to love thy neighbor, care for everyone—respect everyone—and make

sure everyone has access to life. Protecting my ability to bring life into the world and for future generations of my family to thrive and fulfill their filial duties necessarily requires protecting our natural resources and clean air.

12. The EPA's Repeal Rule undermines those core values of my religious belief, as it is explicitly anti-life. As it clearly states in Laudato Si`: "For human beings… to destroy the biological diversity of God's creation; for human beings to degrade the integrity of the earth by causing changes in its climate, by stripping the earth of its natural forests or destroying its wetlands; for human beings to contaminate the earth's waters, its land, its air, and its life – these are sins". For "to commit a crime against the natural world is a sin against ourselves and a sin against God." EPA's action is stripping away the biggest part of my belief as a Catholic, which is respect for human life and my ability to bring life into this world. Catholic doctrine and Social Teaching emphasizes the dignity of all life and care for all creation, and I understand this to apply to the well-being of the entire planet. Being pro-life is part of my identity and religious belief. Everyone should have access to what they need to live a good life, including safety, stability, food, healthcare, and a healthy environment – the church calls for the Universal Destination of Goods. This is part of being pro-life and valuing all life, including all people, animals, and the broader created world, and realizing how everything is interconnected.

6

13.    Despite my religious beliefs and traditions, which emphasize the importance of family and openness to conceiving children, the air quality pollution the government is imposing on us through the Repeal Rule, which will only lead to more climate disasters and less healthy air to breathe, and more nature lost to fire and drought and flood, prevents me from adhering to the practice of my faith to be open to bringing a child into this world. Catholicism emphasizes the importance of bringing life into this world and protecting and nurturing all children, but what about the environment that my future child will be born into? It violates my beliefs to bring someone into this world whose life would be burdened with hazardous air quality and increasing extreme and dangerous heat where my government's single federal agency charged with keeping our air and environment safe, EPA, has just told the country that greenhouse gases don't endanger our health and welfare and told car manufacturers that they can continue building internal combustion vehicles as long as they want to with no limits on greenhouse gas pollution. I cannot raise kids with air quality and climate conditions that do not support both my life and the lives of children I would bring into the world.

14.    My Catholic faith and orientation deeply value the gift of children and life and teach that we must protect them. EPA's decision to get rid of the Endangerment Finding and allow more air pollution interferes with me living out my faith's doctrine that I be open to having children. I see what is already

7

happening—faster even than scientific analysis has projected and I know that conditions that support life, in utero, for newborns, for growing children, and for mothers, will be made worse by my government's decisions in this case. EPA's Repeal Rule imperils life, my ability to bring life into this world, and my deepest faith values and practices. My life, my faith, and my future are harmed by the Repeal Rule.

In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on May 14, 2026 in San Luis Obispo, California.

*Elena Venner*

Elena Venner

# Exhibit A



ENCYCLICAL LETTER

# *LAUDATO SI'*

OF THE HOLY FATHER

## FRANCIS

ON CARE FOR OUR COMMON HOME

1.   "Laudato si', mi' Signore" – "Praise be to you, my Lord". In the words of this beautiful canticle, Saint Francis of Assisi reminds us that our common home is like a sister with whom we share our life and a beautiful mother who opens her arms to embrace us. "Praise be to you, my Lord, through our Sister, Mother Earth, who sustains and governs us, and who produces various fruit with coloured flowers and herbs".[1]

2.   This sister now cries out to us because of the harm we have inflicted on her by our irresponsible use and abuse of the goods with which God has endowed her. We have come to see ourselves as her lords and masters, entitled to plunder her at will. The violence present in our hearts, wounded by sin, is also reflected in the symptoms of sickness evident in the soil, in the water, in the air and in all forms of life. This is why the earth herself, burdened and laid waste, is among the most abandoned and maltreated of our poor; she "groans in travail" (*Rom* 8:22). We have forgotten that we ourselves are dust of the earth (cf. *Gen* 2:7); our very bodies are made up

---

[1] *Canticle of the Creatures*, in *Francis of Assisi: Early Documents*, vol. 1, New York-London-Manila, 1999, 113-114.

of her elements, we breathe her air and we receive life and refreshment from her waters.

*Nothing in this world is indifferent to us*

3.   More than fifty years ago, with the world teetering on the brink of nuclear crisis, Pope Saint John XXIII wrote an Encyclical which not only rejected war but offered a proposal for peace. He addressed his message *Pacem in Terris* to the entire "Catholic world" and indeed "to all men and women of good will". Now, faced as we are with global environmental deterioration, I wish to address every person living on this planet. In my Apostolic Exhortation *Evangelii Gaudium*, I wrote to all the members of the Church with the aim of encouraging ongoing missionary renewal. In this Encyclical, I would like to enter into dialogue with all people about our common home.

4.   In 1971, eight years after *Pacem in Terris*, Blessed Pope Paul VI referred to the ecological concern as "a tragic consequence" of unchecked human activity: "Due to an ill-considered exploitation of nature, humanity runs the risk of destroying it and becoming in turn a victim of this degradation".[2] He spoke in similar terms to the Food and Agriculture Organization of the United Nations about the potential for an "ecological catastrophe under the effective explosion of industrial civilization", and stressed "the urgent need for a radical change

[2]  Apostolic Letter *Octogesima Adveniens* (14 May 1971), 21: *AAS* 63 (1971), 416-417.

4

in the conduct of humanity", inasmuch as "the most extraordinary scientific advances, the most amazing technical abilities, the most astonishing economic growth, unless they are accompanied by authentic social and moral progress, will definitively turn against man".[3]

5. Saint John Paul II became increasingly concerned about this issue. In his first Encyclical he warned that human beings frequently seem "to see no other meaning in their natural environment than what serves for immediate use and consumption".[4] Subsequently, he would call for a global ecological *conversion*.[5] At the same time, he noted that little effort had been made to "safeguard the moral conditions for an authentic *human ecology*".[6] The destruction of the human environment is extremely serious, not only because God has entrusted the world to us men and women, but because human life is itself a gift which must be defended from various forms of debasement. Every effort to protect and improve our world entails profound changes in "lifestyles, models of production and consumption, and the established structures of power which today govern

---

[3] *Address to FAO on the 25th Anniversary of its Institution* (16 November 1970), 4: *AAS* 62 (1970), 833.
[4] Encyclical Letter *Redemptor Hominis* (4 March 1979), 15: *AAS* 71 (1979), 287.
[5] Cf. *Catechesis* (17 January 2001), 4: *Insegnamenti* 41/1 (2001), 179.
[6] Encyclical Letter *Centesimus Annus* (1 May 1991), 38: *AAS* 83 (1991), 841.

societies".[7] Authentic human development has a moral character. It presumes full respect for the human person, but it must also be concerned for the world around us and "take into account the nature of each being and of its mutual connection in an ordered system".[8] Accordingly, our human ability to transform reality must proceed in line with God's original gift of all that is.[9]

6.   My predecessor Benedict XVI likewise proposed "eliminating the structural causes of the dysfunctions of the world economy and correcting models of growth which have proved incapable of ensuring respect for the environment".[10] He observed that the world cannot be analyzed by isolating only one of its aspects, since "the book of nature is one and indivisible", and includes the environment, life, sexuality, the family, social relations, and so forth. It follows that "the deterioration of nature is closely connected to the culture which shapes human coexistence".[11] Pope Benedict asked us to recognize that the natural environment has been gravely damaged by our irresponsible behaviour. The social environment has also suffered damage. Both are ulti-

[7] *Ibid.*, 58: *AAS* 83 (1991), p. 863.
[8] JOHN PAUL II, Encyclical Letter *Sollicitudo Rei Socialis* (30 December 1987), 34: *AAS* 80 (1988), 559.
[9] Cf. ID., Encyclical Letter *Centesimus Annus* (1 May 1991), 37: *AAS* 83 (1991), 840.
[10] *Address to the Diplomatic Corps Accredited to the Holy See* (8 January 2007): *AAS* 99 (2007), 73.
[11] Encyclical Letter *Caritas in Veritate* (29 June 2009), 51: *AAS* 101 (2009), 687.

mately due to the same evil: the notion that there are no indisputable truths to guide our lives, and hence human freedom is limitless. We have forgotten that "man is not only a freedom which he creates for himself. Man does not create himself. He is spirit and will, but also nature".[12] With paternal concern, Benedict urged us to realize that creation is harmed "where we ourselves have the final word, where everything is simply our property and we use it for ourselves alone. The misuse of creation begins when we no longer recognize any higher instance than ourselves, when we see nothing else but ourselves".[13]

*United by the same concern*

7. These statements of the Popes echo the reflections of numerous scientists, philosophers, theologians and civic groups, all of which have enriched the Church's thinking on these questions. Outside the Catholic Church, other Churches and Christian communities – and other religions as well – have expressed deep concern and offered valuable reflections on issues which all of us find disturbing. To give just one striking example, I would mention the statements made by the beloved Ecumenical Patriarch Bartholomew, with whom we share the hope of full ecclesial communion.

[12] *Address to the Bundestag*, Berlin (22 September 2011): *AAS* 103 (2011), 664.
[13] *Address to the Clergy of the Diocese of Bolzano-Bressanone* (6 August 2008): *AAS* 100 (2008), 634.

8. Patriarch Bartholomew has spoken in particular of the need for each of us to repent of the ways we have harmed the planet, for "inasmuch as we all generate small ecological damage", we are called to acknowledge "our contribution, smaller or greater, to the disfigurement and destruction of creation".[14] He has repeatedly stated this firmly and persuasively, challenging us to acknowledge our sins against creation: "For human beings… to destroy the biological diversity of God's creation; for human beings to degrade the integrity of the earth by causing changes in its climate, by stripping the earth of its natural forests or destroying its wetlands; for human beings to contaminate the earth's waters, its land, its air, and its life – these are sins".[15] For "to commit a crime against the natural world is a sin against ourselves and a sin against God".[16]

9. At the same time, Bartholomew has drawn attention to the ethical and spiritual roots of environmental problems, which require that we look for solutions not only in technology but in a change of humanity; otherwise we would be dealing merely with symptoms. He asks us to replace consumption with sacrifice, greed with generosity, wastefulness with a spirit of sharing,

[14] *Message for the Day of Prayer for the Protection of Creation* (1 September 2012).

[15] *Address in Santa Barbara, California* (8 November 1997); cf. John Chryssavgis, *On Earth as in Heaven: Ecological Vision and Initiatives of Ecumenical Patriarch Bartholomew*, Bronx, New York, 2012.

[16] *Ibid.*

of organic waste which give rise to new generations of plants. But our industrial system, at the end of its cycle of production and consumption, has not developed the capacity to absorb and reuse waste and by-products. We have not yet managed to adopt a circular model of production capable of preserving resources for present and future generations, while limiting as much as possible the use of non-renewable resources, moderating their consumption, maximizing their efficient use, reusing and recycling them. A serious consideration of this issue would be one way of counteracting the throwaway culture which affects the entire planet, but it must be said that only limited progress has been made in this regard.

*Climate as a common good*

23. The climate is a common good, belonging to all and meant for all. At the global level, it is a complex system linked to many of the essential conditions for human life. A very solid scientific consensus indicates that we are presently witnessing a disturbing warming of the climatic system. In recent decades this warming has been accompanied by a constant rise in the sea level and, it would appear, by an increase of extreme weather events, even if a scientifically determinable cause cannot be assigned to each particular phenomenon. Humanity is called to recognize the need for changes of lifestyle, production and consumption, in order to combat this warming or at

least the human causes which produce or aggravate it. It is true that there are other factors (such as volcanic activity, variations in the earth's orbit and axis, the solar cycle), yet a number of scientific studies indicate that most global warming in recent decades is due to the great concentration of greenhouse gases (carbon dioxide, methane, nitrogen oxides and others) released mainly as a result of human activity. As these gases build up in the atmosphere, they hamper the escape of heat produced by sunlight at the earth's surface. The problem is aggravated by a model of development based on the intensive use of fossil fuels, which is at the heart of the worldwide energy system. Another determining factor has been an increase in changed uses of the soil, principally deforestation for agricultural purposes.

24. Warming has effects on the carbon cycle. It creates a vicious circle which aggravates the situation even more, affecting the availability of essential resources like drinking water, energy and agricultural production in warmer regions, and leading to the extinction of part of the planet's biodiversity. The melting in the polar ice caps and in high altitude plains can lead to the dangerous release of methane gas, while the decomposition of frozen organic material can further increase the emission of carbon dioxide. Things are made worse by the loss of tropical forests which would otherwise help to mitigate climate

19

change. Carbon dioxide pollution increases the acidification of the oceans and compromises the marine food chain. If present trends continue, this century may well witness extraordinary climate change and an unprecedented destruction of ecosystems, with serious consequences for all of us. A rise in the sea level, for example, can create extremely serious situations, if we consider that a quarter of the world's population lives on the coast or nearby, and that the majority of our megacities are situated in coastal areas.

25. Climate change is a global problem with grave implications: environmental, social, economic, political and for the distribution of goods. It represents one of the principal challenges facing humanity in our day. Its worst impact will probably be felt by developing countries in coming decades. Many of the poor live in areas particularly affected by phenomena related to warming, and their means of subsistence are largely dependent on natural reserves and ecosystemic services such as agriculture, fishing and forestry. They have no other financial activities or resources which can enable them to adapt to climate change or to face natural disasters, and their access to social services and protection is very limited. For example, changes in climate, to which animals and plants cannot adapt, lead them to migrate; this in turn affects the livelihood of the poor, who are then forced to leave their homes, with great uncertainty for their fu-

ture and that of their children. There has been a tragic rise in the number of migrants seeking to flee from the growing poverty caused by environmental degradation. They are not recognized by international conventions as refugees; they bear the loss of the lives they have left behind, without enjoying any legal protection whatsoever. Sadly, there is widespread indifference to such suffering, which is even now taking place throughout our world. Our lack of response to these tragedies involving our brothers and sisters points to the loss of that sense of responsibility for our fellow men and women upon which all civil society is founded.

26. Many of those who possess more resources and economic or political power seem mostly to be concerned with masking the problems or concealing their symptoms, simply making efforts to reduce some of the negative impacts of climate change. However, many of these symptoms indicate that such effects will continue to worsen if we continue with current models of production and consumption. There is an urgent need to develop policies so that, in the next few years, the emission of carbon dioxide and other highly polluting gases can be drastically reduced, for example, substituting for fossil fuels and developing sources of renewable energy. Worldwide there is minimal access to clean and renewable energy. There is still a need to develop adequate storage technologies. Some countries have made consid-

erable progress, although it is far from constituting a significant proportion. Investments have also been made in means of production and transportation which consume less energy and require fewer raw materials, as well as in methods of construction and renovating buildings which improve their energy efficiency. But these good practices are still far from widespread.

## II. THE ISSUE OF WATER

27.   Other indicators of the present situation have to do with the depletion of natural resources. We all know that it is not possible to sustain the present level of consumption in developed countries and wealthier sectors of society, where the habit of wasting and discarding has reached unprecedented levels. The exploitation of the planet has already exceeded acceptable limits and we still have not solved the problem of poverty.

28.   Fresh drinking water is an issue of primary importance, since it is indispensable for human life and for supporting terrestrial and aquatic ecosystems. Sources of fresh water are necessary for health care, agriculture and industry. Water supplies used to be relatively constant, but now in many places demand exceeds the sustainable supply, with dramatic consequences in the short and long term. Large cities dependent on significant supplies of water have experienced periods of shortage, and at critical moments these have not always been administered with sufficient

# EXHIBIT 19

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

| | |
|---|---|
| ELENA VENNER, *et al.*,<br>　　　　　　*Petitioners*,<br><br>　　　v.<br><br>UNITED STATES<br>ENVIRONMENTAL PROTECTION<br>AGENCY, *et al.*,<br>　　　　　　*Respondents*. | Case No. 26-1038<br>Lead Case No. 26-1037<br>(and consolidated cases) |

**DECLARATION OF E.S. IN SUPPORT OF PETITIONERS'
MOTION TO STAY THE FINAL RULE PENDING REVIEW**

I, E.S., hereby declare and if called upon would testify as follows:

1. I am a Petitioner in the above-entitled action. I am making this declaration in support of our Motion to Stay the Repeal Rule. I have personal knowledge of the facts I state herein and if called to testify, I would and could testify competently thereto.

2. I am a 17-year-old citizen of the United States and a resident of Memphis, Tennessee. I was born in 2008.

3. I breathe the air every day in Memphis. I also have to breathe vehicle emissions at close range because I walk a lot in Memphis, including along busy

1

roads. I live on a busy six-lane road where traffic typically goes between 45 and 60 mph. The traffic is primarily SUVs, sedans, pickup trucks, and heavy-duty trucks, including pickup trucks and work trucks doing lawn and gardening work.

4. I am aware that gas and diesel vehicles in Memphis emit a variety of air pollutants from their tailpipes that are harmful to my health, including particulate matter and the pollutants that form ground-level ozone. I am aware that particulate matter and ground-level ozone are harmful to breathe in.

5. I suffer from severe pollen allergies: my face feels on fire, my eyes are super itchy, my nose is blocked, and I sneeze often. I suffer proportionally to the intensity of the pollen-count and to the length of the pollen season. I take multiple medicines a day during pollen season to alleviate my symptoms. On high pollen-count days, I have to avoid going out or to wear a mask if I do go out. Memphis has one of the worst pollen rates in America. My understanding is that climate change makes the pollen season more intense and longer. And also, that particulate matter and ground-level ozone exacerbate allergies, making them more aggressive.

6. I work as a research assistant analyzing EPA pollution data for a professor. I am aware that particulate matter and ground-level ozone are more concentrated in urban areas like Memphis than they are in most other areas due in large part to the concentrated vehicle traffic in cities. I have used the American Lung

Association's State of the Air Report and learned that the air where I live gets an F for ozone pollution.[1]

7. I am aware that EVs do not have tailpipes and do not emit air pollution into the air I breathe when they drive on roads near me. I am aware that the more gas and diesel vehicles that are replaced with EVs, the cleaner the air I breathe will be, and the lower the risk that air pollution will pose to my health and lifespan.

8. The opposite is also true. If gas and diesel vehicles in Memphis are replaced not with EVs, but with new gas and diesel vehicles that are no longer subject to any greenhouse gas tailpipe emission standards, the air I breathe will be more polluted than it would be otherwise be. That in turn will force me to breathe in more air pollution, increasing my risk of getting sick and reducing my lifespan.

9. Because vehicles tend to be driven for many years after purchase, the effects that new vehicles will have on Memphis's air will be locked in for a long time to come.

10. Memphis is already considered to be a "heat island" that experiences about 10ºF hotter temperatures than the surrounding area.

11. I have noticed there are significantly more days above 100ºF in Memphis than there used to be even 10 years ago.

---

[1] https://www.lung.org/research/sota

12. I experience heat illness. When I was in fifth grade, I had my first visual migraine triggered by heat. I felt dazed and close to passing out, and had to be carried inside to cool off. That experience has caused me to be more careful about avoiding going outdoors in the heat in the summer. It is not uncommon to see other young people at football games in Memphis pass out from the heat. Because I have experienced heat illness myself, and have also witnessed other young people around me experiencing heat illness, on hot days I avoid activities that I would otherwise engage in to protect my health and safety.

13. I receive air quality alerts on my phone. Due to these alerts, I am aware that ground-level ozone levels in Memphis are exacerbated by heat. Each day in Memphis that is hotter than it has traditionally been causes me to breathe in more ground-level ozone than I would breathe in otherwise.

14. I am aware that vehicles that run on gas and diesel also emit greenhouse gases. I am aware that greenhouse gases absorb heat and persist in the atmosphere. The more greenhouse gases that are emitted, the more heat I will be exposed to in Memphis—and consequently, the greater my risk of heat illness, and also the greater the risk to my health and lifespan from breathing ground-level ozone.

15. By getting rid of the emission standards for vehicles, EPA just told car manufacturers they can make and sell cars that emit as much greenhouse gas pollution as they want. The same goes for other types of pollution that come with

4

burning gasoline and diesel, like particulate matter, which also harm my health. The EPA has thus made a choice that ensures my life in Memphis will be less healthy and safe as a result. EPA has chosen to allow quantifiably more air pollution, but I don't have the choice not to breathe in the pollution. I need EPA to stop allowing the pollution that harms me, not repeal rules designed to protect me from pollutants that EPA already found to threaten public health.

16. I am a practicing Jew. I believe Jewish Law was divinely given and is a force that sustains our people generationally. Observing Jewish Law is an important and sustaining part of my life. I believe Jewish Law is authoritative, and I take the practice of my religion seriously in my daily life. Jewish Law compels a whole-of-life practice. I keep kosher, pray regularly, and observe the Sabbath.

17. One seminal component of Jewish obligation is observing *Shabbos*, the Sabbath, when Jewish Law dictates we can't work and should rest. This means a prohibition on using electricity, carrying things for certain distances, turning lights on and off, and using electronics and vehicles. In accordance with the obligation not to drive, my Shabbos practice means walking to synagogue regularly on Saturday mornings, and semi-regularly for events and dinners on Friday nights. On these walks, I wear formal clothing, often suits and heavy sweaters, which are made out of unbreathable materials.

5

18.     Jewish Law requires, as a necessary component of my Shabbos practice, that I prioritize being in community and praying in a group of at least 10 Jewish adults, known as a *minyan*, as often as possible. This means going to synagogue. The prayer service on Saturdays is distinct from the prayer services at other times during the week. As such, being able to access the prayer service in full force through a minyan is integral. Prayer in a minyan allows me to recite a collection of core sanctified prayers, which according to my religion cannot be said alone. In addition, in my religion, praying in a minyan accentuates the living presence of the divine (*Shechinah*). Going to synagogue is a necessary and exciting component of my prayer practice that I look forward to all week.

19.     My hope is to continue this practice as an adult. If I raise kids, it's my intention and aspiration to transfer this practice to them. There is a phrase in the Talmud: "Just as my forefathers planted for me, I plant for the next generation." (Taanit 23a). This Talmudic instruction, which encourages generational resilience, is so important to me that I chose to write a paper about it in school.

20.     It is a 0.7-mile walk from my home to the synagogue. The walk takes between 20 and 25 minutes each way. The entire walk is on the same busy six-lane road I live on, so I breathe in vehicle pollution at close range for at least 40 minutes every week. Some stretches of the walk are unshaded, making those parts especially hot.

21. Walking to synagogue is made complicated by ozone from vehicle pollution and heat from the climate crisis. If the temperature is at or exceeds 100ºF, if I receive an air quality alert on my phone, or if there is too much pollen in the air, I abstain from walking to protect my health. Similarly, if there are severe storms, I do not walk to protect my safety.

22. If it's not safe for me to walk to synagogue, I'm unable to go to synagogue. The effect is immediate and impactful. I love going every Saturday, and there is an obligation to go. If I'm not in a minyan, there are some prayers I can't say. It cuts off my ability to exercise my religion as completely or effectively that day, making the Shabbos service inaccessible to me for an entire week. I also love going to synagogue for social reasons. It allows me to connect with my people. For both of these reasons—religious and social—it's frustrating when I'm not able to go.

23. Religious practice compounds, and each lost opportunity to practice also compounds. As a young person who is actively trying to develop my religious practice—I did not grow up with the Shabbos prayers in a regular reinforced way—losing a Shabbos service deprives me of an opportunity to learn the liturgy, learn Hebrew, and internalize Jewish Law. Internalizing Jewish Law is important because Jewish Law integrates reverence for—and celebration of—the divine into the details of daily life. But, learning Jewish Law requires a baseline knowledge of prayer, of

the Torah, and Hebrew. As such, each missed opportunity to attend synagogue on Shabbos causes me to be less capable of internalizing Jewish Law and integrating it into my life.

24. Massive quantities of greenhouse gas emissions added to the atmosphere from the Repeal Rule will worsen the number of extremely hot days, the high air-quality-index days from ground-level ozone, and the high-pollen count days in Memphis—all impacts that independently or in combination make it unsafe to walk to synagogue. Each Shabbos that is unsafe to walk to synagogue is a day I am prevented from fully practicing my religious obligations.

In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on May 13, 2026 in Memphis, Tennessee.

_____
E.S.

# EXHIBIT 20

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| ELENA VENNER, *et al.*,<br>        *Petitioners*,<br><br>    v.<br><br>UNITED STATES<br>ENVIRONMENTAL PROTECTION<br>AGENCY, *et al.*,<br>        *Respondents*. | Case No. 26-1038<br>Lead Case No. 26-1037<br>(and consolidated cases) |

## DECLARATION OF L.K. IN SUPPORT OF PETITIONERS' MOTION TO STAY THE FINAL RULE PENDING REVIEW

I, L.K., hereby declare and if called upon would testify as follows:

1. I am the mother and guardian of Petitioner J.K. in the above-entitled action. I am making this declaration in support of the Motion to Stay the Repeal Rule. I have personal knowledge of the facts I state herein and if called to testify, I would and could testify competently thereto.

2. I am over the age of 18, a citizen of the United States, and a resident of Westchester County, New York. I am using my initials to protect the identity of my minor child.

1

3.      My husband and I are Modern Orthodox Jews. My husband and I married based on our shared faith and commitment to raise our children as observant Jews. Our observance is rooted in the *Halachah*, the Jewish laws. We do our best to observe these laws, and they are the rules we base our lives on.

4.      Second only to the family, the synagogue is the center of Jewish religious observance.

5.      *Shabbat*, the Sabbath, starts at sunset on Friday and ends at sundown on Saturday. Although Modern Orthodox Jews often take it upon themselves to attend synagogue three times every day for services, many are not always able to make such a significant commitment, in which case they will usually prioritize synagogue attendance on Shabbat. Shabbat, therefore, is the time when large numbers of community members gather for services. Shortly after the service, there is typically a light reception called a *kiddush*. The kiddush is our opportunity as congregants to socialize and catch up on the events that have transpired since the previous Shabbat.

6.      We acknowledge the commandment to pray three times a day, preferably in a quorum of ten men over the age of 13—a quorum that cannot be met by staying home. Many in the Modern Orthodox community acknowledge that, when a quorum—also known as a *minyan*—is not possible, it is possible to pray on your own, but it is always preferable to pray in a minyan. This is because the

directive to pray in a minyan comes from halacha, Jewish Law. The *Shulchan Arukh*, one of the most widely used codes of Jewish Law, in the book Of Orach Chaim, 90:9, says: "A person should make every effort to pray in the synagogue with a congregation." We believe there is literally strength of prayer in numbers.

7. In addition, we believe that by insisting that people come to synagogue to pray, Jewish Law is effectively compelling individuals to leave the solitude of their homes and connect with others. Regular synagogue attendance is an expression of faith, a means to worship God, and a pathway to community. This community is the foundation of modern Jewish life: members of the community are consistently there for one another in times of happiness, providing meals to new parents and celebrating together at weddings and bar mitzvahs. Likewise, the community is there in times of sorrow, making "shiva calls" or consolation visits to those who have suffered a loss and bringing food to the mourners throughout the week of mourning, when mourners are directed by Jewish Law to focus solely on their healing process and not on mundane matters such as food preparation. One strengthens their connection to community in large part by showing up each week to synagogue. There, families who are committed to Jewish values connect with other families who are likewise leading their lives this way, and it reinforces everyone's collective commitment. Toddlers, school-aged children, teenagers, young adults, middle-agers, and seniors all gather in the synagogue building, first to pray together and then

(typically, when there is a kiddush), to socialize and to further strengthen their ties to the community. This practice provides the proverbial "village" to parents seeking to raise their children in a Jewish fashion: children become comfortable in such a setting and comfortable practicing Judaism, as they engage with it regularly and see those around them doing the same. Regular synagogue attendance, we believe, is a key component to inspiring the next generation of committed Jews and thus perpetuating the tradition for generations to come. The consistency of attending synagogue on Shabbat every week is vital to our religious community and an important spiritual practice for our family.

8. We also acknowledge the commandment to rest on Shabbat. Observing the Shabbat is one of the Ten Commandments. In addition, there are multiple other biblical imperatives to rest on Shabbat, including in Exodus 31:14, where it clearly states: "Six days shall work be done, but the seventh day is a Sabbath of solemn rest." This directive doesn't mean "rest" in the sense of resting in bed; it insists that we rest by abstaining from *melacha*, which, in biblical times, included any one of the 39 activities that were done in the course of worshipping in the Tabernacle. Such activities include igniting a fire, planting, harvesting, and even carrying items outside of one's private domain. In modern times, when the Tabernacle no longer exists and Jewish communities largely live in more urban and less agricultural areas, many of these 39 Sabbath-prohibited activities have been expanded to include

4

activities that are rooted in these original 39 but that have more relevance today. For example, in contemporary times, one is still prohibited from lighting a fire on Shabbat; however, this prohibition now includes turning on a light—which is a modern form of lighting a fire—and similarly includes turning on an oven or starting a car engine. This is the primary source for the Orthodox Jewish community's observance of not driving on Shabbat.

9.      Secondarily, not driving on Shabbat paves the way for an altogether more restful day, a day on which families do not have to stray far from the homestead to conduct errands, carpool, and other weekday activities, which allows them to spend more time with one another and with the wider community. The following reflection, cited from a post on an Orthodox website, captures the essence of Shabbat and its importance in contemporary Jewish life:

> If I had to explain Shabbat to someone who has never experienced it, I would say this: imagine that every single week, without fail, the entire world stops. No telephone or any other business interruptions. It's the whole family sitting together eating and singing Shabbat songs to Hashem [God] with warmth and love. That is Shabbat in my home, and in every Orthodox Jewish home I know.  Shabbat (the Sabbath) is the single most important institution in Orthodox Jewish life. Every week, from sunset on Friday to nightfall on Saturday, we enter a completely different mode of existence. The phones go off. The cars stay parked. The ovens are set in advance. And for about 25 hours, our family gathers, prays, eats, studies, and rests. If you only learn about one aspect of Orthodox Jewish life, let it be Shabbat. It is the heartbeat of everything.

(https://www.orthodox-jews.com/shabbat-observance)

10. Because Jewish Law directs us both to pray at our synagogue on the Sabbath and to refrain from driving there, we must walk.

11. On many *Shabbatot* (plural for Shabbat), when services and kiddush are over, we walk from the synagogue to another family's house for a festive Shabbat lunch, or they walk to our house and we host lunch there. This is a common practice on Shabbat: families further connect with other families by breaking bread together. We do this with both old friends that we see every week, as well as with families who have only recently moved to the community and who are seeking connection.

12. Most members of the community, including our family, choose to live close to the synagogue so that the weekly walk to synagogue is manageable and also so that these frequent Shabbat lunches are accessible to other members of the community who likewise do not drive on Shabbat. When choosing a home back in 2011, we limited ourselves to a house that was within a one-mile radius of the synagogue. Most members of our community do the same. All told, this weekly observance of the Sabbath is centered on walking to synagogue and frequently walking to the homes of community members afterwards. The ability to walk safely and comfortably on the Sabbath every week is vital to our religious practice.

13. My husband and I were both raised this way. He was raised in a Conservative home, and I was raised in an Orthodox home. Both of us, in our

respective communities, were raised attending and walking to synagogue every single week. It was not a question, and it should not have to be a question today.

14. God told the father of our people, Abraham: "You must keep My covenant, you and your descendants after you for the generations to come" (Genesis 17:7–9). As Jews, we believe we have a sacred duty to teach our children our faith, including deeply ingraining the habit and value of walking to synagogue every Saturday without fail. In terms of raising my son J.K. and our two other children, this religious observance was ingrained in me, and I want to be able to give the same values and opportunities to our children. I think it is extremely important for my son to develop that habit and value the practice of walking to synagogue every week.

15. Jews living in New York and Massachusetts have observed the Sabbath in the ways I have described our family does, by refraining from work—and certainly by walking—since long before the invention of the automobile. This ancient practice has been passed on for thousands of years.

16. My husband and I both grew up in the same geographic region that we live in now; my husband grew up in Albany, New York, and I in Boston, Massachusetts. When I was growing up, I do not remember there being a Saturday when the heat prevented us from going to synagogue. My husband growing up lived even further away from his synagogue than I did—and further away than we do now—and the heat never prevented his family from going to synagogue.

17. I believe from the scientific research that burning fossil fuels is having deleterious impacts on the planet. I understand these impacts include greater heat and more intense storms.

18. The heat and extreme weather from fossil-fuel driven climate change have become a hurdle for my family in observing our faith and keeping God's laws. Now that I am raising my own children, in the most recent handful of years, our ability to go to synagogue and enjoy our restful day of Sabbath religiously every week is inhibited by the increase of extremely hot weather.

19. It is approximately a one mile walk from our house to the synagogue. There have been many weekends each summer over the past several years when it has been too hot to go out. On very hot Saturdays, it is uncomfortable and unsafe to walk to synagogue, so we are forced to choose between praying in a quorum, as our faith commands, and staying inside to ensure that our children are safe from the heat. The heat has been increasing in recent years. This is unlike when my husband and I were growing up, and even unlike when our children were small. Now, every summer, we have to look at the forecast ahead of time, before we turn off our phones on Friday. If the forecast for Saturday is too hot, we do not wake in the morning to go to synagogue; we choose instead to protect our physical health. Other times we decide to try to bear the heat and we step outside Saturday morning and feel the humidity and temperature, and we decide it is not worth taking the risk of

heatstroke—or we realize that even if we could get there safely with hydrating, it is too uncomfortable and we will not be in the right frame of mind to pray and be in community. Our children would also not be in the right frame of mind to walk to synagogue under such circumstances. It would be a hardship and, we fear, a religious turnoff to them—something that would be counterproductive as we are actually trying to create a favorable experience for them that will inspire them to make similar life choices when they raise their own families in the future. On those Shabbatot when we do opt to venture out in the extreme heat, the synagogue feels emptier than it does on a typical week, presumably because other congregants are protecting themselves from the heat. When these families are forced to miss the Shabbat experience in synagogue, our own children tend to enjoy their experience less because fewer of their peers are there to keep them company.

20. Not having the ability to attend synagogue regularly is a net loss for our family. The extreme heat—which too often prevents us from walking to synagogue—denies us full access to our spirituality, our community, and to our children's social life.

21. A landmark study conducted in 2026 by Edgren and Inauen concluded that habits are weakened with non-performance.[1] That is, when a habit or routine is

---

[1] Edgren, R., Baretta, D. & Inauen, J. Habit degradation strategies promote faster early reductions in unhealthy snacking habit strength in intensive longitudinal

not practiced regularly, the strength of that habit begins to wane. Consistency matters. I am concerned that by being inconsistent with our synagogue attendance, it is becoming less and less routine, and therefore less ingrained in our family's value system. Even posing the question each week—"should we or shouldn't we go to synagogue?"—tacitly undermines that automatic nature of our synagogue attendance and thus introduces doubt and further inconsistency. The extreme heat has brought about this inconsistency and it worries me. Each additional hot Saturday diminishes the habit of attending synagogue regularly, thereby diminishing our closeness to God, our sense of community, and our ability to inspire our children to lead Jewish lives. I want my family to go to synagogue every week without question. On the days that we do not go, I feel a sense of emptiness. In addition, I often become fearful that this new habit of *not going* will take hold: it does, after all, take far less effort to acquiesce to the lazier habit of simply staying home on a Saturday morning, despite the fact that such solitude is ultimately far less rewarding than going to synagogue, praying and connecting with friends.

22. When we are unable to maintain consistency with synagogue attendance, particularly during the summer months when the heat becomes extreme, my son (and my other children) has less exposure to the special Shabbat prayers. For

---

randomised controlled trial. *Commun Psychol* **4**, 67 (2026). https://doi.org/10.1038/s44271-026-00432-9.

this reason, he has not been able to memorize all of the prayers in the way that my husband and I did growing up. My son is less comfortable reciting the prayers than either my husband or I. Without steady synagogue attendance and the accompanying recitation of the regular Shabbat prayers, my son may never attain full mastery of these prayers, something that could impact both his ability to enjoy the service as well as his ability to transmit this essential knowledge to his future children. Given the importance of passing on the Jewish tradition "*mi dor l'dor*," from generation to generation, this reality is profoundly distressing to me.

23. Growing up, my synagogue was the center of my life. If my son experiences walking to synagogue every week not as an automatic and healthy part of life, but as a choice that needs to be made—even if right now the choice is between protecting either his physical health or his religious practice—there is a greater risk that he might not choose to do this when he's out of my house and on his own, even if it were physically safe to do so. That is very troubling to me.

24. An increase in extremely hot days from greenhouse gas emissions would endanger our ability to observe the Sabbath as God commands us to do (by walking to Synagogue to pray in a quorum), depriving my children and me of a religious practice that is very important to our family's faith.

25. Heat is not the only way in which fossil fuel-driven climate change is interrupting our family's religious practices, and our ability to instill those practices

in our son. Our observance of *Sukkot*, one of the three "festival pilgrimages" in the Jewish year, is also impacted by increasingly extreme weather.

26. Sukkot falls in late September or early October. Sukkot revolves around the *sukkah*, an outdoor structure that we build each year. We eat every meal in the sukkah for seven days during Sukkot. The sukkah is meant to remind us of the tents Jewish people used during their 40 years in the desert, and our observance of Sukkot abides by the biblical law where God instructed: "In your sukkah, you should dwell for seven days." (Leviticus 23:42).

27. When my husband and I were children, and when our own children were small, we were free to observe Sukkot without interruption or hindrance from extreme weather. Ordinary fall rain and wind do not affect the sukkah, and can be tolerated.

28. In recent years, extreme storms have interfered with our observance of Sukkot. Two years ago, a storm with extreme wind blew our sukkah down, and once in the past five years we had to take our sukkah down in anticipation of an unusually severe storm. We received notice from the rabbis of our synagogue that Jewish Law allowed us to take down our sukkahs because flying debris can endanger life. But it is strongly, strongly preferred to keep it up and observe the holiday if there is no danger to life. This practice happens only once a year according to the Jewish

12

calendar. When a year's observance is lost, it is lost. This never, ever happened to us as children: we happily dwelled in the sukkah for a full week each year.

29. An increase in extreme storms from greenhouse gas emissions would endanger our ability to observe the holiday of Sukkot as God commands us to do (by dwelling in the sukkah for seven days), depriving my children and me of a religious practice that is very important to our family's faith.

30. Eating every meal in the structure for a week leaves an impression, and interrupting the regularity undermines the ability to observe what's supposed to be an unbroken seven-day holiday. It takes away from the religious holiday, and takes away from the impression it leaves on the next generation. Sukkot has less impact if not fully observed because of less time spent in that environment that changes one's perception after seven days.

31. I know the Endangerment Finding has for many years been guiding the EPA and requiring it to regulate vehicle emissions to protect our health and welfare. I know the Endangerment Finding has been repealed, which has undermined the regulations that rely upon it.

32. If companies are given free reign without greenhouse gas regulations, there will be more and more pollution because there will no longer be a check on what companies can do. I know companies' number one goal is profit, not the safety of my children and the next generation. Without the Endangerment Finding and

13

related greenhouse gas regulations, greenhouse gas pollution is only going to get worse, and my children are going to inherit a more dangerous environment to live in. That will affect my children's health and well-being, and my children's religious observance. It will not be as safe to be outdoors. If it's not safe to be outdoors, we will not be able to walk to synagogue to observe together. The strong ties we currently share with our community will be weakened. It will not be safe to put up our sukkah and keep it up, let alone spend time in it. This will be a tremendous loss for our family, as it will diminish our ability to observe the holiday (which we love) as intended. If it is not safe to dwell in the sukkah, we cannot dwell in the sukkah. If we cannot dwell in the sukkah, then we cannot carry on our religion in the ways God commands us to do.

33. Regarding the Sabbath, the heat trapped by greenhouse gases already harms our faith practices. More trapped heat due to the Repeal Rule will mean even more lost *Shabbat* services and our ancient way of observing the Sabbath. More heat means I will not be able to nurture and protect my son's religious observance the way God's law dictates.

34. The repeal of the Endangerment Finding and emissions standards for vehicles also threatens our practice of Sukkot. Greenhouse gases give us more severe storms. If the storms get any worse, we will go from taking down the sukkah in the middle of the holiday to discussing whether to put up a sukkah at all that year.

14

Without a sukkah, the beating heart of the holiday will vanish. The observance really is all about living in the sukkah all week. If we had to improvise and not even put a sukkah up, it would eliminate the foundation of this important religious holiday, preventing us from observing that commandment from God that year.

35. Incremental losses in the practice of our faith add up.

36. I affirm our right to practice our religion and for my husband and me to direct the upbringing of our children, including my son. I affirm our right to pass on to our son the observance of God's laws that our ancestors have passed on to us. Above all, I affirm our son's right to practice and receive our religion from us, while also growing up healthy in his body and mind and not having to choose between these rights. Each Saturday that is too hot to walk to synagogue physically interferes with his ability to do that. So, too, does each Sukkot that has storms too strong for the sukkah to stand safely.


In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on May 14, 2026 in Westchester County, New York.


_L.K._
_____
L.K.

# EXHIBIT 21

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

ELENA VENNER, *et al.*,
          *Petitioners*,

   v.

UNITED STATES
ENVIRONMENTAL PROTECTION
AGENCY, *et al.*,
          *Respondents*.

Case No. 26-1038
Lead Case No. 26-1037
(and consolidated cases)

## DECLARATION OF J.K. IN SUPPORT OF PETITIONERS' MOTION TO STAY THE FINAL RULE PENDING REVIEW

I, J.K., hereby declare and if called upon would testify as follows:

1.    I am a Petitioner in the above-entitled action. I am making this declaration in support of our Motion to Stay the Final Rule. I have personal knowledge of the facts I state herein and if called to testify, I would and could testify competently thereto.

2.    I am a 16-year-old citizen of the United States and a resident of Westchester County, New York. I was born in 2009.

3.    Every day I breathe the air in Westchester County, which is about 15 miles from New York City. I have looked at wind maps, and I am aware that on

1

some days, wind blows New York City's vehicle pollution toward Westchester County. The more vehicle pollution is emitted in New York City, the more of that pollution I breathe in. And the less pollution emitted, the less I breathe in. I know it's not good to breathe in vehicle pollution because I have learned from reading and from my dad, who is a doctor, that vehicle pollution causes respiratory issues and other health problems.

4. I have been involved in the Jewish Youth Climate Movement since my freshman year of high school. I am aware that greenhouse gases from fossil fuel combustion are heating the atmosphere and causing New York to experience more hot days than it would otherwise. I also remember learning in biology class about climate change. When carbon dioxide is produced, it gets trapped in our atmosphere and causes the heat coming from the sun to be trapped. In turn, that traps heat in my community among other places.

5. I am a Modern Orthodox Jew. I have become a *bar mitzvah*, meaning I am a full member of my community with the responsibilities that go with it.

6. On the Sabbath—Saturdays—I usually go to synagogue with my family. My family does not drive on the Sabbath, because driving is among the categories of prohibited work that are forbidden on the Sabbath, a day of rest. So, we walk. Almost everyone in my community walks to synagogue on Saturday. We are a *shomer Shabbat* family—a family that keeps the Sabbath—and I care about

adhering to the categories of prohibited work on the Sabbath. Observing these rules has been a large part of my upbringing.

7. Unfortunately, during the summer, sometimes it is too hot to walk to synagogue. When it is too hot, we don't go.

8. The walk from my house to the synagogue is about one mile. There are many segments of the walk that have no shade and are in full sun. On a hot day, the walk can get extremely hot.

9. When it is too hot to walk to synagogue, my family and I don't get to go and pray and be with the community, which is an integral part of the Sabbath. It prevents us from practicing our religion to the fullest.

10. I've been going to synagogue on the Sabbath all my life, and I've formed relationships with the people there. Going to synagogue feels very much like being a part of a like-minded community, which is nice. At the *kiddush*, which is held right after the service, there's food and people mingle and talk. I have friends at the synagogue, and the *kiddush* is a good time to catch up with them. I also connect with younger and older members of my community. I have sometimes done youth groups where I babysit the kids of adults who go and pray. Over time I've formed relationships with the kids. I also started a program called Kiddush To Go. The idea is, once every few months, some of us youth take food to elderly people who are unable to walk to synagogue, and we sit down and have a meal with them. It's a nice

3

way to connect with seniors. In general, it feels nice to have a group I'm comfortable with and can interact with at the synagogue. When we don't go, I can't be among the community to pray and talk to others.

11. My understanding is the Endangerment Finding was a landmark rule instituted in 2009 that set a standard for fossil fuels and pollution, and it led major contributors to greenhouse gas pollution to be restricted in what they could do because they were polluting the environment. By repealing the Endangerment Finding, the EPA is taking away that standard and allowing vehicle manufacturers and their vehicles to more freely pollute our air and cause more climate change. My understanding is that the Repeal Rule will allow unlimited amounts of greenhouse gas pollution from all cars and trucks sold in the United States, which will make climate change, and heat in my community, worse. More heat will mean more Sabbaths of not being able to walk to synagogue.

12. My family observes the Jewish holiday of Sukkot. It's a holiday to commemorate the harvest, where we build a structure called a *sukkah* that's like a square tent. For seven days, we try to eat all our meals in the sukkah. Two of those days are *yom tov*, days that are like the Sabbath where we can't work, can't drive, and have to eat in the structure. The other days are days where we can go to school and work but it's still the holiday. During the holiday you're supposed to spend as much time as possible in the sukkah.

4

13.     Sukkot is a joyous holiday. We get to spend time with our family and extended family. It's during September or October (the exact date varies from year to year due because it is based on the Jewish calendar), so usually it is a mild time of the year for decent weather. However, lately we have been starting to experience extreme weather during Sukkot. Now, during many recent Sukkots, there are instances where, due to severe storms, we're unable to eat inside the sukkah, thereby preventing us from celebrating the holiday. There is a safety risk because the *s'chach* we put at the top of the structure can fall down on us while we're inside during extreme winds. Parts of our sukkah blew down from a storm. When the weather is bad, it stops us from observing the holiday.

14.     If climate change worsens from more (instead of less) transportation pollution from the Repeal Rule, it will mean more extreme storms during Sukkot. The wind from the storms will stop us from observing the holiday even more often than it does now.

15.     Any worsening of climate change from the Repeal Rule will also make wildfire smoke, which has recently started to affect me, worse. For instance, the New York tri-state area is not supposed to be a wildfire-smoky area, but in 2023, there was really bad wildfire smoke blowing down from Canada. The sky was orange, and it felt like an apocalypse. That was the worst of the times I can remember; the air quality was in the 300s. I couldn't go outside, and if I had to go outside, I had to

5

wear an N-95 mask. Also, more recently there were wildfires in New Jersey that caused smoky days here. I know wildfire smoke is not good to inhale because it is toxic and causes respiratory issues, so any increase in the amount I'm exposed to due to the Repeal Rule will jeopardize my health and safety.

16. My family practices a tradition of taking a big road trip in an RV every year, usually in August. We always rent an RV, and we'd like to rent an electric one if it were available and affordable. When we travel, we observe the Sabbath by not driving on those days. Our road-trip tradition is important for my family and me because it's what makes us "us." It's a very big part of our family life. A lot of great memories have come from these trips. We've gone now every year for a decade, and it's a great time. My dad grew up doing it, and he passed it on to us. It's so much fun. It's not rustic camping, but it is more rugged than traveling in a hotel. Part of the goal of these trips is to spend time in nature. We've visited a lot of great places and had wonderful experiences. Highly recommend!

17. Last summer, in 2025, when we were planning our RV trip to California, the wildfires in California were so bad in July that at first we thought we might not go. While we ended up going, the air was smoky and hazy, and looked polluted. On our 2023 trip to Jasper in the Canadian Rockies, we were stuck and had to take a long detour because there were floods in one direction on the road, and a wildfire in the other direction. On that trip, too, there was wildfire smoke that made

the air hazy. Just like wildfire smoke at home, I know any increase in the amount of smoke I'm exposed to on our future trips due to the Repeal Rule will jeopardize my health and safety. Traveling around the country in the summer will also be harder if smoke and floods worsen from even more pollution.

In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on May 14, 2026 in Westchester County, New York.

J.K.

_____
J.K.

# EXHIBIT 22

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| ELENA VENNER, *et al.*,<br>            *Petitioners*,<br><br>      v.<br><br>UNITED STATES<br>ENVIRONMENTAL PROTECTION<br>AGENCY, *et al.*,<br>            *Respondents*. | Case No. 26-1038<br>Lead Case No. 26-1037<br>(and consolidated cases) |

## DECLARATION OF S.A. IN SUPPORT OF PETITIONERS'
## MOTION TO STAY THE FINAL RULE PENDING REVIEW

I, S.A., hereby declare and if called upon would testify as follows:

1.     I am the mother of Petitioner M.D. in the above-entitled action. I am making this declaration in support of the Motion to Stay the Repeal Rule. I have personal knowledge of the facts I state herein and if called to testify, I would and could testify competently thereto.

2.     I am over the age of 18, a citizen of the United States, and a resident of Garden Grove, California. I am using my initials to protect the identity of my minor child.

1

3.      For me and my family, Islam is both our religious tradition and way of life. Islam influences every aspect of my life, from diet, career options and sleep schedule, to way of dress, investment opportunities and family decisions; essentially every life choice, small or big, is decided within the context of my Islamic faith tradition.

4.      For example, when choosing our home, we purchased a home within walking distance of the local mosque, because it is very important for the men of our family to attend daily prayers in the morning before sunrise, and in the evenings after sunset.

5.      My husband and I married based on our shared faith and commitment to raise our children as adherent Muslims. I've always known I would only marry a Muslim, but it was additionally important for me that my husband have an activist, social justice-oriented mentality, because this was the example of Prophet Muhammad. In my career, my faith has also informed my decisions. I have worked in service of oppressed people and those who have been without means and faced eviction or incarceration. Before making my career choices, I consulted Muslim teachers who told me it would be halal to pursue these paths, but because of the nature of the work, I should increase my remembrance of God to protect my heart from growing hard.

6. Muslims are a tiny minority in the United States and have borne their share of bigotry and hate. In 1999, I joined an educational nonprofit group (ING) as a volunteer speaker in order to educate my fellow Americans about American Muslims and their faith, and to push back against anti-Muslim narratives and bigotry. It helped me navigate the anti-Muslim climate that ensued after September 11, 2001, and the hate I experienced in particular. I co-founded the Muslim Speakers Network in 2015 as a project of the Shura Council of Southern California. We train fellow Muslims on how to speak about Muslims and their faith, and have developed such presentations as "Introducing American Muslims and Islam," "Contributions of Islamic Civilization," and "Justice in Islam" (inspired by the original work of ING). We conduct cultural competency trainings, mosque tours for college students, and middle and high school presentations to supplement the curriculum, among other activities. I find this work to be very rewarding and much-needed, especially in a time where prominent elected US officials freely denounce Islam and Muslims.

7. Islam is a beautiful and empowering faith. Its central tenet is submission to God. Muslims cannot be oppressed through Islam, only in spite of Islam. Burdens on Islamic practices, like banning hijab in public schools in nations with secular governments such as France and Kazakhstan, interfere with our important religious practices.

8. While my daughters and I are free to wear hijab inside schools and other public places, increasing temperatures because of increasing greenhouse gas (GHG) emissions have become an ever-increasing hurdle for my family in adhering to our Islamic faith traditions.

9. Hijab is of course front and center. Modesty is key for Muslims, who believe they should behave, dress, and live a life that is modest. Prophet Muhammad said, "Modesty is part of faith." Muslim men and women should both act and dress modestly. Although the headscarf is the most obvious portion for women, it actually entails the entire outfit and manner of women and men. They should wear loose-fitting clothes that cover the shape of the body and interact with each other in a professional way that honors their dignity. Muslim women who choose to wear the hijab, as required Islamically, do so as an act of faith.

10. When you see a Muslim woman in hijab, what she is saying to you is, please respect me for my mind, my intellect, my personality, my sense of humor; please respect me as a person, and not for my physical or sexual characteristics. She has, literally, taken control of her sexuality and how it is defined. As a Muslim woman, hijab is part and parcel of my identity and one of the important practices I am passing down to my children.

11. With increasing heat, extreme heat conditions, and increasing smoke from climate change in Southern California, it has become more difficult for me and

4

my three girls to engage in our regular activities, like outdoor exercise, while wearing hijab. For example, we time our hikes to be early in the morning before heat sets in, and we purchased a treadmill so we can run at home instead of outside in the heat. All three of my girls are now in college, and I worry about their health being on campus when the weather is hot, or there is smoke from wildfires, especially when they are fasting.

12. For Muslims, fasting is a form of worship, and a pillar of Islam. In the month of Ramadan, adherent healthy adult Muslims all over the world, including our family, don't eat or drink anything from dawn until sunset for a period of 29 or 30 days. Ramadan is an intensively spiritual month where Muslims focus more on Qur'an, which is the Muslims' holy book, and prayer. The holiest nights of the year are in Ramadan, which we spend in the mosque in prayer, supplication and reflection. We also spend more time with friends and family, gathering for shared meals to breakfast together. Also, fasting is a test of self-control. If we can hold off from things that are otherwise allowed, like food and water, this helps us build the willpower to avoid doing things which are not allowed in Islam, like lying, stealing, using drugs, or drinking alcohol. While Ramadan is our most intense period of fasting, we fast at various time throughout the year.

13. Fasting has become more difficult with the heat. The Islamic lunar calendar is 11 days shorter than the Gregorian calendar; therefore, Ramadan moves

5

11 days earlier each year. Last year, in 2025, Ramadan started at the end of February, and this year, 2026, Ramadan started in mid-February. By 2028, Ramadan will start in January. In spite of the fact that Ramadan has been moving in recent years from the summer to the winter, we've still seen several unexpected heat waves while fasting that have made the fast significantly more difficult. M.D. began fasting when Ramadan fell over the summer. Even though she was not religiously required to participate for the whole fast, a requirement that begins at puberty, she wanted to do so. Because I was worried about her small, developing body fasting in the heat, I encouraged her to not to participate in the full fast. However, she chose to still observe the full fast.

14. Fasting during heat waves can lead to health effects like kidney stones, which I have experienced in the past, and which requires me to drink water each day. I worry about my children's health as they fast in these heat waves. Increasingly, as climate change worsens, my daughters will be forced to choose between their religious practices and their physical wellbeing.

15. My kids are old enough now to be interested in the Hajj pilgrimage, which is the fifth pillar of Islam. It is required of every Muslim adult who is able to make the pilgrimage. In a few years, when the Hajj has moved into the cooler months, my kids will hopefully be able to complete the pilgrimage. Climate change has made this journey much more difficult than in previous years, with increasing

global temperatures. Deaths are frequent, especially for pilgrims from poorer countries. In addition, the best days of the year for fasting, after Ramadan, are in the first 9 days of Dhul Hijja, with Eid al Adha being on the 10th. The day before Eid al Adha, which is the 9th day of Dhul Hijja, is the holiest day in the Islamic calendar. As the earth heats up, fasting on this day in particular becomes more difficult. So my husband and I have discussed sending our girls for umrah instead, which is the lesser pilgrimage but can be done at any time of year, and delaying their Hajj but I worry that temperatures will still be dangerously high due to increased climate pollution. If the climate continues to heat at the current rate, or an accelerated rate under the Repeal Rule, there is a real possibility that they will either delay their pilgrimage or undergo the pilgrimage at risk to their personal health and well-being.

16. Traveling for Eid al Fitr, a major Islamic holiday meant to be celebrated with family, has also become tenuous. This year we're considering a trip to the Bay Area to spend Eid (which will likely be May 27 this year) with my sister's family; however, I've been watching the pattern of rain followed by dry heat, which increases the chance of fires, since vegetation like mustard grows and then dries out along our travel route. Several times on past road trips to the Bay Area we've seen horrible fires, watching plumes of smoke from afar, and sometimes seeing the after-effects with black hillsides. The worst year was a visit in 2020 where the temperatures hit 106 F, and my sister didn't have air conditioning because it wasn't

really needed in the Bay Area before. That year, in the sweltering heat, we couldn't leave the windows open because of fires in the region that sent smoke to San Jose, and we couldn't run fans because the power went out. At one point we all tried sitting out on the lawn drinking ice water for relief. Since then, my sister has installed central A/C in her home and purchased several air filters. This year we will have to play it by ear and may not be able to celebrate the way we are called to do by our faith.

17. The Prophet Muhammad taught, "The world is beautiful and verdant, and verily God, the Exalted, has made you His stewards in it, and He sees how you acquit yourselves." Our family has tried to be good stewards of the earth and its resources, including leasing an electric vehicle for our family to reduce greenhouse gas emissions. However, the Repeal Rule reflects a governmental lack of stewardship that directly harms our family's ability to practice our faith at a crucial time in my children's religious development as they are entering adulthood.

18. I understand that the Repeal Rule will substantially increase the amount of greenhouse gas pollution released in my community because it removes all motor vehicle emission control requirements for the six pollutants that EPA previously determined threaten public health. For me and my family, this decision and repeal presents us with an unimaginable choice: knowingly expose ourselves to pollution

that EPA itself says is dangerous and threatens to cause us physical harm or take measures that substantially lessen our ability to practice our faith.

In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on May 13, 2026 in Garden Grove, California.

_____
S.A

# EXHIBIT 23

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| ELENA VENNER, *et al.*,<br>        *Petitioners*,<br><br>    v.<br><br>UNITED STATES<br>ENVIRONMENTAL PROTECTION<br>AGENCY, *et al.*,<br>        *Respondents*. | Case No. 26-1038<br>Lead Case No. 26-1037<br>(and consolidated cases) |

## DECLARATION OF M.D. IN SUPPORT OF PETITIONERS' MOTION TO STAY THE FINAL RULE PENDING REVIEW

I, M.D., hereby declare and if called upon would testify as follows:

1. I am a Petitioner in the above-entitled action. I am making this declaration in support of our Motion to Stay the Repeal Rule. I have personal knowledge of the facts I state herein and if called to testify, I would and could testify competently thereto.

2. At the time we filed our petition I was 17 years old, but I turned 18 in recent weeks. I am a citizen of the United States and a resident of Garden Grove, California. I am currently studying Physics at my local college and reside in my parents' home.

1

3.	My Islamic faith is a huge part of my life and affects everything I do. As I'm going through my day, I try to have the most genuine intention in everything I do. Every little decision I am thinking "what would God say?" I go to mosque, do my prayers, learn Arabic, and try to associate with other Muslims and build relationship with my community. My faith even informs how I structure my day, as I plan my sleep cycle around my morning prayer which changes with the sunrise. My parents, including my mother S.A., have raised me in the Islamic faith and tradition, and it is my personal desire to continue in that faith. Respecting my parents is part of my faith that I wish to practice.

4.	Rising heat from greenhouse gases is disrupting and burdening my religious beliefs and practices as a Muslim. As part of my religious devotion, I wear hijab, which includes a head covering, long pants, and sleeves. The material is rarely breathable. This means on very hot days I can overheat, so I avoid physical activity outside. Exercise is very important to me, and I try to run every week. I would prefer to run outside which improves both my mental and physical health, but because of heat combined with hijab I must run inside. I also participate in Taekwondo in full hijab which can get very hot. I am unable to attend during Ramadan because the heat, combined with the required fasting, is too unsafe.

5.	Having to endure more hot days significantly affects my ability to fast during the holy month of Ramadan. I started fasting for portions of the month when

I was seven years old. By age eight or nine, I began fasting the entire month, from dawn to dusk. Since then, I've done the full month every year, only skipping some days if I am religiously exempt. Because Ramadan follows the lunar calendar, sometimes it falls in the warmer times of the year when extreme heat that is growing from climate change is more likely to occur. In high heat, especially over multiple days, it is difficult to carry out my religious practice of fasting and abstain from food and water.

6.      This year, Ramadan was in late February and into March. This March was the hottest March on record where I live, and I understand that with more greenhouse gas pollution, more heat will be trapped resulting in warmer overall temperatures, but also more extreme heat events. The dehydration is the most difficult part of Ramadan, and with this year's heat I had very bad headaches. As part of Ramadan, we worship together at the mosque at night, with certain holy days, weekends, and special programs really packing us in. When we all gather in the mosque, it is very hot, so I had to be careful to wear clothing I won't overheat in. The high heat and fasting disrupted by ability to do my schoolwork and prepare college transfer applications, because I had trouble focusing. Though it was cooler at night, I was forced to juggle all my work and my prayers during that short window.

7.      My religious practices wearing hijab and fasting during times my faith calls me to fast are burdened by the EPA's decision to repeal the Endangerment

Finding and its related greenhouse gas vehicle emission standards. Without pollution limits on the transportation sector, one of the largest national contributors to climate change, my home in southern California will only get hotter. That heat is inescapable. Even a few years of having this rule repealed will cause significantly more carbon dioxide to be released, which will stay in the atmosphere longer than I will live, leading to heat that imposes burdens on my religious practices. EPA's rule rescission means I am left choosing between my wellbeing and practicing my religion.

8. In Islam, taking care of the earth and animals are very important. I believe that animals and the environment should be treated with respect, and that I must serve as a protector of the environment based on my Islamic faith. Having a government that promotes industries that rely on fossil fuel products to act without restraint, allowing them to degrade the climate and profit without paying the cost of their pollution, prevents me from carrying out my religious duty to protect the environment.

9. In southern California, wildfires are becoming more frequent near my home and places of worship. I've lost two campsites to fires where I celebrated family traditions, built community and developed my faith. One campsite was near where my mom grew up in northern California and where she also played in Redwoods as a child. The other campsite was where the Muslim American Society

4

hosted an annual 7-day camp for young Muslims. I attended this camp for 5-6 years with my parents who were speakers. These places of my childhood where I deepened my faith and practices are totally lost to climate change-induced fires. The rescission of the Endangerment Finding and greenhouse gas standards increases the risk that such losses will happen again.

10. Rescinding vehicle emission rules also directly harms me because, as a resident of Orange County, I live in a traffic dense area that has heavy localized air pollution. I have used the American Lung Association State of the Air Report to see that the air I breathe is graded "F" for ozone and annual particle pollution.[1] Daily, I am exposed to vehicle pollutants that compromise my healthy lung function. Decreasing the number of gas-burning vehicles and increasing electric vehicles, as the rescinded emissions standards would have done, would improve the immediate quality of the air I breathe in every day. Now, more pollution will harm me as I breathe, even while my body and brain are still growing.

11. I know that life will become more difficult for humans and animals if greenhouse gas pollution from motor vehicles is allowed to go unchecked under EPA's new rule. For me personally, it hurts the things I hold most dear, my Islamic practices, the health of my family, my community, and myself, and the animals and life that inhabit our earth for which we are stewards. I shouldn't have to spend my

---

[1] https://www.lung.org/research/sota

childhood fighting for my government to consider my life, my religious freedom, and my future in their decision-making, but these decisions by EPA harm me and my co-petitioners and we ask the Court to stop the harm so it can hear our claims.

In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on May 13, 2026 in Garden Grove, California.

_M.D._

M.D.

# EXHIBIT 24

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| ELENA VENNER, *et al.*,<br>　　　　　　　*Petitioners*,<br><br>　　　v.<br><br>UNITED STATES<br>ENVIRONMENTAL PROTECTION<br>AGENCY, *et al.*,<br>　　　　　　　*Respondents*. | Case No. 26-1038<br>Lead Case No. 26-1037<br>(and consolidated cases) |

## DECLARATION OF MAYA WILLIAMS IN SUPPORT OF PETITIONERS' MOTION TO STAY THE FINAL RULE PENDING REVIEW

I, Maya Williams, hereby declare and if called upon would testify as follows:

1. I am a Petitioner in the above-entitled action. I am making this declaration in support of our Motion to Stay the Repeal Rule. I have personal knowledge of the facts I state herein and if called to testify, I would and could testify competently thereto.

2. I am a 19-year-old citizen of the United States and a resident of Los Angeles, California, but currently attend college in Berkeley, California, where I study environmental sciences. Through my high school and college courses, I have learned that increasing GHG emissions—which will happen with EPA's decision to

1

repeal the Endangerment Finding and eliminate GHG emission standards for motor vehicles—mean more heat waves, more wildfires, and more air pollution.

3. EPA's Repeal Rule rescinding the Endangerment Finding, and the vehicle standards limiting GHG emissions, directly affects my health and safety. In middle school, I was diagnosed with bronchospasms due to my asthma. This requires me to regularly use a steroid inhaler to treat my symptoms, which are at their worst when I exercise outside. Exposure to extreme heat, air pollution, and wildfire smoke all worsen my symptoms, causing me to have chest pains related to my asthma and severe headaches.

4. These effects on my health are most evident when I exercise. For example, when I played soccer in high school, my performance was affected on very hot days which increased my fatigue and loss of breath. Even now, I get headaches when exercising in extreme heat. When I'm engaged in lighter exercise, like walking, I can quickly feel out of breath. Poor air quality hurts my lungs and sometimes I am forced to end my walks early. Exercise keeps me grounded as a person and as a student, and not being able to exercise negatively impacts my mental health and my studies.

5. In Los Angeles, where I grew up and still live during portions of the year including summer, it is difficult to escape the heat with limited shade in an urban environment. Very hot days have, at times, caused power outages that disabled

air conditioners in my area, leaving me to rely on fans to stay cool. Heat triggers headaches that make it difficult for me to focus in class. An increase in hot days from more greenhouse gas pollution stemming from the Repeal Rule harms me physically. Increases in heat combined with air pollution is doubly harmful to my health because it makes my asthma worse.

6.     Los Angeles also frequently has unsafe air quality days. Pollution from dense traffic and smoke from wildfires make the air quality worse. Breathing in poor air quality also gives me really bad headaches and my chest will hurt, indicating I'm having an asthma attack. Even when I do not have a full attack, bad air quality makes it hard for me to breathe. Any increase in vehicle pollution from the Repeal Rule will only make it harder for me to protect my health.

7.     Increasing wildfires threaten my physical safety. In high school, nearby wildfires left ash in my school gym and in my yard. In 2025, the LA wildfires destroyed nearby communities and threatened many places that I loved, including the elementary school I attended. Many of my friends were forced to leave their homes, and it was difficult witnessing the harm to my community knowing that it could have been prevented through more stringent policy. Even though I was lucky to not have to evacuate or lose my home, smoke permeated my home for two weeks and made it unsafe to go outside due to poor air quality.. There was nowhere safe

3

for me to breathe, and that is terrifying for someone who already has asthma and knows what it feels like not to get the oxygen I need to survive.

8. Along with my health vulnerabilities, my brother had childhood leukemia, and I worry about my younger sisters' developing bodies in the face of a rule EPA says will increase fossil fuel use, GHG emissions, and other air pollution, some of which are connected to an increased risk of cancer.

9. The level of air pollution where I live is already too high. I thought EPA was the agency charged with protecting us from that pollution, instead of allowing more to enter the air. Its decision to forego regulating GHG emissions from motor vehicles at all puts my health on the line, and that of my younger siblings. Every day, EPA is putting the lives of young people growing up in polluted air with worsening climate conditions in jeopardy. The Repeal Rule only makes the risk to our lives more dire and more immediate. I am asking the Court to stop EPA's dangerous rule and hear our case.

In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on May 14, 2026 in Berkeley, California.

Maya Williams
Maya Williams

4

# EXHIBIT 25

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| ELENA VENNER, *et al.*, | |
| *Petitioners*, | Case No. 26-1038 |
| | Lead Case No. 26-1037 |
| v. | (and consolidated cases) |
| | |
| UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, *et al.*, | |
| *Respondents*. | |

## DECLARATION OF A.F. IN SUPPORT OF PETITIONERS' MOTION TO STAY THE FINAL RULE PENDING REVIEW

I, A.F., hereby declare and if called upon would testify as follows:

1. I am the mother of Petitioner L.R.F. in the above-entitled action. I am making this declaration in support of our Motion to Stay the Final Rule. I have personal knowledge of the facts I state herein, and if called to testify, I would and could testify competently thereto.

2. L.R.F., who is my baby, is one year old and completely dependent on her dad and me for her healthy growth and wellbeing. We live in Bolivar, Pennsylvania in Pennsylvania's Laurel Highlands. My baby is the eighth generation in our family to live in the Highlands.

1

3.     Outside is where my baby wants to be. She loves being outdoors. Her favorite activities include walking and crawling in the grass, being out among the trees, and being taken out for walks in the woods. We live on 23 acres, which is primarily wooded. She has to go outside every day to be emotionally regulated. When she is outside, she explores and learns what different plants and animals are and she plays in the creek that runs by our property. I can see her learning, it's like the outdoors is her classroom, and the place where she is happiest. She loves butterflies and likes to point at them and follow them around. She gets very frustrated when she can't go outside and I see a dramatic shift in her behavior, with it hard for her to be able to sleep and get through her regular schedule. Going outside is a vital part of L.R.F's normal routine throughout the day.

4.     Because L.R.F. is a baby, I know it is developmentally important for her to be able to play outdoors, crawl in the grass, and cuddle with our family dog. I know these are positive activities that babies should be freely able to do at home.

5.     I know the natural rhythms and ecosystems of the Laurel Highlands because I have lived in these Highlands my whole life. Because we are at a higher elevation, our home is part of the Appalachian Mountain chain. We have the most freshwater streams in the U.S., behind Alaska. The cold-water stream ecosystem is a very special part of the Highlands, which has Hemlock trees, and different types of native wildflowers that are unique to the area. The seasonal shift is very distinct

in the Highlands, and each season brings unique elements, like wildflowers and cold meltwater flowing in the Spring, and colorful leaves in the Fall that bring in visitors from all over. It is important to me to raise my child surrounded by her family's roots and history, in safety and love, parented in the way that is meaningful to my partner and me.

6. Our family shares a nature-based spiritual practice. It's important for us to be in relationship with the natural world and feel connected to something larger. For example, when we harvest our food—through foraging, hunting, or gardening—we give thanks. Our primary protein source is venison, and anytime we eat it as a family, we start our meal by saying "Thank you, deer." That's something we regularly share with our daughter. As part of that gratitude practice, my partner also makes sure to use every part of the animal as possible: tanning hides, making candles from the fat. That's something we'll also teach our daughter.

7. I grew up in poverty, surrounded by nature, and around coal. Although recreating in nature was a tremendously important part of my childhood, I also often played in a nearby coal ash dump, unaware of the dangers of doing so. As a mother, I want to protect my child's health and safety from the harmful byproducts of fossil fuel combustion.

8. I have degrees in Environmental Studies and Design Engineering. In college, I studied the physics of how fossil fuel combustion releases greenhouse

gases, and how greenhouse gases cause climate change. Since 2017, I have worked at a local nonprofit whose mission is mission is to protect, preserve, and restore the local watershed. In my initial role there as a community organizer, I worked to protect local communities from environmental harms from the local coal, shale gas, and petrochemical industries. I have been the nonprofit's executive director since 2020. Through my work, I have learned about how climate change is impacting the Laurel Highlands. While I don't hold myself out as a climate scientist or expert, my education, studies and work experience give me the knowledge and understanding of all of my written testimony below.

9. I am concerned about the near- and long-term impacts to my baby's body from the EPA's rescission of the Endangerment Finding and vehicular greenhouse gas emission standards, which I will call the Repeal Rule. Because L.R.F. is a baby, her body is still in an early stage of development. Hot outdoor temperatures, exposure to wildfire smoke, tick-borne diseases, and high-pollen days are especially bad for my baby's present and future health, as compared to an adult, due to her early stage of development.

10. Unfortunately, the existing level of climate change is already limiting and constraining L.R.F.'s ability to play outdoors, crawl in the grass, and cuddle with our dog. Due to the current levels of greenhouse gases in the atmosphere, my baby is already being exposed to more very hot days, wildfire smoke, pollen, and

4

ticks than she would experience otherwise. Without standards limiting the amount of greenhouse gas pollution vehicles can emit, the conditions of life for my child will worsen with more immediate pollution in her environment and pollution in the atmosphere that will outlast her lifespan, causing the planet to heat even more.

11. When I was growing up, we would only have one 90- or 100-degree day every once in a while, and only very rarely have multiple hot days in a row. We didn't have air conditioning because we would cool the house by opening up the windows at night. Recently, however, it's been happening more frequently that we get multiple very hot days in a row. Due to greenhouse gas pollution, this past summer—2025, the first summer of my baby's life—we had strings of days in a row with temperatures near 100 degrees. There were heat advisories in place. We had to keep our baby inside for days at a time because it is dangerous for a baby to be outside in those temperatures. She was young at the time, but this will be very challenging to navigate with L.R.F. now that she is older. Because every molecule of greenhouse gas absorbs heat, I know that every bit more of greenhouse gas pollution will make the heat problem worse for my baby's health.

12. In the past, the Highlands did not experience smoky days from wildfire smoke. Due to the increasing fires resulting from greenhouse gas pollution caused climate change, the first smoky day in my lifetime was within the last few years. Since then, we've had smoky days almost every summer, usually blowing down

5

from Canada. The summer of 2023 was particularly bad. In the summer of 2024, when I was pregnant with my baby, L.R.F. was exposed to wildfire smoke in utero. In L.R.F.'s first summer of life, 2025, there were mornings when I woke up smelling the smoke of distant wildfires that I knew was coming from Canada, and the sky was white due to the smoke being socked in.

13. On smoky days, I keep my baby indoors as much as possible because I know smoke is bad for babies' immediate and lifelong health. Even inside our home, my baby is breathing in some smoke because our house was built in 1918, and it is impossible to seal out all smoke. If the smoke season worsens, we will have to incur a lot of financial expenses to upgrade our home to try and keep the wildfire smoke out, but I know it's impossible to entirely escape the smoke when it blows in.

14. Also, some days I have no choice but to take my baby outside, for example, to go to the doctor or to daycare. In those situations, a mask will not be an option because L.R.F. is too small to wear one and my baby will be forced to breathe the raw smoky air. She will inhale even more smoke than I do because babies breathe at faster rates than adults. Her little heart and lungs work hard in her first years of life to adapt to their new surroundings, and the smoke is an assault to her developing body, organs and brain. I read a lot of scientific literature, and I am aware that no amount of fine particulate matter is safe for anyone to breathe in, but is especially harmful for babies.

15. Because greenhouse gas pollution is driving an increase in wildfires, I know that more greenhouse gas pollution, such as what will come from the Repeal Rule, will make the smoke problem worse for my baby's health, and increase the risk of her contracting potentially life-long reparatory illness, like asthma or lung disease.

16. Throughout my entire childhood in these Highlands, I rarely encountered ticks, and I never had a tick attach to me. I don't remember anyone recommending we look out for ticks or take measures to prevent getting bitten when we went outside. I always had pets growing up (dogs and cats) and we never had to search or brush them for ticks. Recently, however, the tick population in the Highlands has exploded and tick awareness education (and fear) is rampant. The main driver of this increase in the tick population is warmer winter temperatures from climate change. Now, after my dog goes outside, she is not allowed to come out of the basement until she gets a thorough brush to make sure she doesn't bring them into the house.

17. The tick population here has gotten so bad that, in the summer of 2025, my baby had six ticks attached to her. In the spring of 2026, she had several more attached ticks. The ticks pose a serious health hazard because they often carry Lyme disease. I know the health hazard is real because I contracted Lyme disease from a tick bite as an adult, and L.R.F.'s dad has too, multiple times. Each time our baby

7

has a tick attached to her for an extended period of time, we pay to mail the ticks to a lab to test whether they were carrying Lyme disease. Although none of her first six tick bites carried Lyme disease, one of the ticks that attached in Spring 2026 tested positive. As a result, her pediatrician prescribed preventative antibiotics, which was the first medication prescribed to L.R.F. The prevalence of ticks in the Highlands today—and the corresponding risk of L.R.F. contracting Lyme disease during her childhood—is alarming and scary.

18. Due to the explosion in tick population, I cannot let L.R.F. crawl in the grass in the backyard as often as I would otherwise, because there are so many ticks and I do not want her to get bitten. When my baby does go outside, we have to make sure she is covered in long sleeves and pants, even when it is hot. We have to check her for ticks every night—even in the winter, because I have seen ticks on warm winter days, and even on days she has not left the house, because our pets could bring ticks into the house.

19. If the tick problem worsens due to greenhouse gas emissions that otherwise would not occur if the GHG emission standards for vehicles remain in place, it would be my worst nightmare—any mother's worst nightmare—because each new tick bite on my baby is a roll of the dice with Lyme disease. Each new tick bite also comes with more expenses for our family and intense worry while we wait for the result. EPA's Repeal Rule will add quantifiably significant amounts of

greenhouse gas pollution to my environment, increasing the likelihood that my baby will suffer more tick bites than she otherwise would and directly cause us additional expense. The Repeal Rule will increase the hazard to my baby's health over her entire life.

20. Alpha-Gal syndrome is a tick-borne allergy to meat from mammals, including venison. Although Alpha-Gal syndrome used to be limited mainly to the southeastern US and was unknown in Pennsylvania, in recent years the ticks carrying Alpha-Gal have started expanding into Pennsylvania, partly due to climate change. As far as I know Alpha-Gal is still rare in the Laurel Highlands, but any increase in Alpha-Gal would hugely increase the stakes of a tick bite because venison is our staple daily food. If any member of our household—I, my partner, or our baby— were to be infected, it would devastate our family's diet and livelihood because our meals could no longer be venison. An Alpha-Gal-infected tick bite would also threaten my baby's life because there is no known cure for Alpha-Gal, and allergic reactions from Alpha-Gal can be fatal. Even a small increase in tick-borne diseases is a real threat to my baby's diet, way of life, health, and life.

21. Because greenhouse gas pollution is one of the drivers of the increase in ticks in the Highlands, I know that more of greenhouse gas pollution, such as that caused by the Repeal Rule, will make the tick problem worse for my baby's health.

22. I have noticed the pollen season here growing more intense in recent

9

years. There is sometimes so much pollen in the air that I can see it. I have also noticed the pollen season lasting longer, which increases her risk of developing allergies, like me. These allergies and symptoms will also interfere with the amount of time my baby will be able to spend outside, and will cause increased expenses for our family in the form of allergy and medical treatment.

23. Because greenhouse gas pollution is driving an increase in pollen-count and high-pollen days, I know more greenhouse gas pollution, such as that caused by the Repeal Rule, will make the pollen problem worse for my baby's health.

24. For each day that I have to keep my baby inside to protect her from high temperatures during heatwaves, from wildfire smoke, from ticks, or from high pollen levels, she cannot play outside. This is a huge loss for her because high temperatures, wildfire smoke, and pollen occur in the spring and summer, times of year when she would otherwise be outdoors recreating.

25. Based on my science background, I understand that the additional greenhouse gas pollution that will be emitted into our air because of EPA's Repeal Rule will stay in the atmosphere for hundreds of years, trapping additional heat in our community while my baby is growing and developing into the fully formed person she will become. This will increase—rather than decrease—the number and intensity of very hot days, wildfire smoke days, ticks, and high-pollen days in the Highlands that my baby's growing body will be exposed to. Exposing her growing

body to an even greater quantity of heat, wildfire smoke, tick bites, and pollen than she would experience otherwise, will comparatively weaken her body's constitution and make her more susceptible to disease and poor health throughout her life.

26. While my partner and I take precautionary measures to protect my baby, such as keeping her indoors when it's too hot and smokey outside, those steps are not a permanent solution and harm her health and wellbeing. The increase in greenhouse gas pollution from EPA's Repeal Rule puts my baby at a higher risk of physical harm and hinders our ability to practice our form of spiritualism with my her.

27. The alternative of throwing caution to the wind would be an abdication of my parental responsibility because the dangers to her health outdoors are so much more numerous and severe than when I was her age. The other alternative, escaping these harms by leaving the place my family has lived in and cared for over seven generations, is simply unrealistic: it would impose an unacceptable financial and emotional burden on my family and divest my child of her connection to the Highlands. The increase in heat, smoke, ticks, and pollen from GHG pollution attributable to the Repeal Rule makes every option available to us terrible. Each one inflicts an incalculable loss to my baby.

28. I know that worsening of climate change due to the Repeal Rule will even further limit and constrain my baby's ability to play outdoors and grow up in a

11

safe place. As she grows, the additional greenhouse gas pollution locked in by the Repeal Rule today will affect my child's health, her bodily integrity, her freedom of movement, and her ability to continue practicing our family's traditions.

29. Since I was a teenager, I have committed my life's work to protecting the climate from the impact of greenhouse gas emissions. During that time, policies and practices have worked – albeit slowly – to reduce planet-warming emissions. Never did I imagine that in my adulthood, my government would seek to significantly increase greenhouse gas emissions through the rescission of the Endangerment Finding, threatening the health and safety of my own child. It is frustrating and disheartening to see the governmental agency tasked with protecting my daughter's health and welfare from air pollution doing the opposite by stripping away the protections that had been in place to bring the pollution down in the coming years.

In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on May 14, 2026 in Bolivar, Pennsylvania.

_____
A.F.

# EXHIBIT 26

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| ELENA VENNER, *et al.*,<br>　　　　　　*Petitioners*,<br><br>　　v.<br><br>UNITED STATES<br>ENVIRONMENTAL PROTECTION<br>AGENCY, *et al.*,<br>　　　　　　*Respondents*. | Case No. 26-1038<br>Lead Case No. 26-1037<br>(and consolidated cases) |

## DECLARATION OF B.K. IN SUPPORT OF PETITIONERS' MOTION TO STAY THE FINAL RULE PENDING REVIEW

I, B.K., hereby declare and if called upon would testify as follows:

1. I am the mother and legal guardian of one Petitioner in the above-entitled action: C.E. I am making this declaration in support of Plaintiffs' Motion to Stay the Repeal Rule. I have personal knowledge of the facts I state herein and if called to testify, I would and could testify competently thereto.

2. I am over the age of 18, a citizen of the United States, and a resident of Beloit, Wisconsin. I am using my initials to protect the identity of my minor child. My daughter, C.E., lives with me. C.E. is eight years old. I am making this declaration on her behalf. As their mother, I am competent to testify as to how my

1

children are being harmed by the EPA's Repeal Rule and the resulting increases in local and regional air and climate pollution.

3.     Our family lives in a community overburdened with air pollution. I understand that our county, Rock County, Wisconsin, has some of the highest asthma hospitalization rates in the state,[1] and our city, Beloit, Wisconsin, has some of the most vulnerable census tracts[2] when it comes to chronic disease burden. The School District of Beloit has some of the highest asthma rates in the state of Wisconsin, and my daughter's elementary school has the highest asthma rates in the district. I have observed how commonly C.E.'s classmates struggle with asthma. I know my child is at increased, rather than less, risk of developing childhood asthma if EPA's new rule stands.

4.     C.E. is in third grade, and she, along with twenty-one of her classmates, trained all fall with Girls on the Run to complete their first 5k together. The morning of the event was crisp, but the girls were buzzing with excitement. I ran with C.E., supporting her and her classmates the entire way. Each of them was so proud of their medal and the accomplishment they had trained so hard for. On the bus ride home, one of the little girls started to struggle to breathe. The lead teacher rushed to the

---

[1] https://www.dhs.wisconsin.gov/asthma/county-level-asthma-hospitalization-rates-2022-2024.pdf

[2] https://map.climatevulnerabilityindex.org/map/cvi_overall/tract-55105001600-beloit-wi?mapBoundaries=Tract&mapFilter=0&reportBoundaries=Tract&geoContext=State

back of the bus started bringing one asthma-inhaler bag out after another. The teacher set aside five inhalers for other children before pulling out the sixth inhaler bag which belonged to the little girl. There were at least six out of twenty-two girls who needed rescue inhalers with them for their first 5k road race. This is not normal, and it does not have to be this way.



Exposure to air pollution caused or made worse by fossil fuels is the largest problem. Study after study that I have reviewed shows that when you clean up the air, communities get healthier. These children, my child, should not carry the pollution burden with them in the form of preventable asthma disease. These children are not just numbers or externalities in a finance report spreadsheet. Regulators should be protecting them, but they are not.

5.      This screenshot depicts the high levels of asthma in our community, and the ones below are from EPA's Environmental Justice Screening and Mapping Tool (Version 2.3) that were taken before EPA removed this tool from its website in early 2025.[3] EPA has hidden this information about pollution harming our children on its website and in the Repeal Rule.

---

[3] https://envirodatagov.org/epa-removes-ejscreen-from-its-website/



*EPA SCREENING & MAPPING TOOL: Beloit, WI: Asthma Burden, 95-100%*

6. The air pollution in Beloit, Rock County, Wisconsin, comes from reported, but not monitored, hazardous air pollutants (HAPS), nitrogen oxides, ground-level ozone, and particulate matter ($PM_{2.5}$) from the combination of stationary sources and vehicle pollution.



*EPA SCREENING & MAPPING TOOL: Beloit, WI:*
*Toxic Releases to the Air, 95-100%*

4

7.      These emissions locally pollute our air, making our children sicker, and contribute to global climate change, which threatens the safety and future of all our children. Any increase in these emissions from the Repeal Rule makes those threats graver. While C.E has not yet received a formal diagnosis of asthma, she now requires the use of an inhaler when she develops upper respiratory infections or on high air pollution days. C.E. experiences fear and anxiety about her or her little brother developing asthma.

8.      Driven by the lack of regulatory air monitoring, the high air pollution burden, and concerning public health metrics, a group of community members and organizations started to monitor the air with community-grade Purple Air Monitors throughout the region. Initial data supported the concerning trends, and in 2024, IQ Air issued its annual report, which found the City of Beloit to be the most polluted regional city in the United States.[4] After repeatedly engaging with state and federal regulators regarding our community's air pollution concerns without any meaningful response or action, we founded the Stateline Clean Air Coalition. As a community, we are committed to working towards a collective future where we all have clean air to breathe, because we know, "clean air saves lives."

---

[4] https://www.wifr.com/2024/03/19/beloit-has-most-polluted-air-all-regional-cities-us-report-finds/

9. As a family, we prefer to walk the mile to school when the weather allows, but we have to walk on a sidewalk adjacent to a high-traffic, 4-laned highway to get to C.E.'s elementary school. The noise and pollution are acute concerns that have resulted in us avoiding walking commutes for the majority of the school year. As a health professional, I know that even small amounts of air pollution can be harmful to our children, including C.E. It's unfair to have to balance the benefits of walking to school with the risk of exposure to vehicle emissions. As a family, we would feel safer and more comfortable walking to school more often if we could be confident we were not increasing our exposure to zero-threshold air pollutants ($PM_{2.5}$). No matter where we live, we should all be guaranteed clean air to breathe.

10. Increasing temperatures from GHG pollution are also negatively impacting our children's health in Wisconsin. Despite me closely following the temperature and humidity and being a certified Athletic Trainer for over 15 years, C. E. has been impacted by two bouts of heat illness this year. Last summer, she was joyfully trying to break her neighborhood distance record with her dad. The temperatures were starting to go down in the evening, but the humidity remained high. When she came into the house, we could tell she did not feel well. She laid down on the couch and said she felt dizzy and funny. Her cheeks were pink, and she felt hot to touch. I immediately packed her in ice packs, provided some water to sip on, and then got her into a cool shower. She started to feel better after the cool

shower, but it was clear her immune system had taken a hit, because she caught a summer virus shortly after and was sick for two weeks afterward.

11.    This spring, the weather has been extra volatile. One day at soccer practice, she will have leggings, a sweatshirt, and a headband to keep warm, and the next practice she will be in shorts, a t-shirt, and the temperatures will be nearing 80 degrees Fahrenheit. This has repeatedly happened throughout her short, one-month season with YMCA soccer, and it is dangerous because our children's bodies are not able to properly acclimatize to these extreme changes in temperatures. One afternoon, C.E. had to sit out of practice due to signs of heat stress and the risk of heat illness given the sudden swing back toward 80 degrees. The volatile weather swings and unseasonal heat associated with climate change pose a significant risk to C.E.'s health. More pollution that traps heat caused by the Repeal Rule will pose more risk and more extreme heat to my daughter as she develops.

12.    I have observed an increased frequency of severe weather episodes, whether it be record-breaking rain events resulting in flash and basement flooding or repeated tornado warnings with numerous funnel clouds and large hail. Last summer, the Beloit area experienced 4-6 inches of rain on top of an already saturated ground, and our basement had water seep in. Despite our best efforts to dry it out, we had to contract flood remediation services to remediate our basement to eliminate mold and contaminated surfaces, which cost us money. The repeated severe weather

7

events are stressful on C.E. and her little brother.  This spring, Wisconsin repeatedly broke records for the number of severe weather warnings in April.

13.     Climate change is a children's health emergency, and the health of C.E., her little brother, their friends, and the greater Beloit, Wisconsin community depends on strong regulations that limit fossil fuels to clean the air and slow the acceleration of global climate change. My daughter will live with the greenhouse gas pollution from every car built and sold going forward for her entire life, which hopefully will last well into the next century. Repealing the Endangerment Finding puts already vulnerable communities and populations, like C.E. and her friends, at higher risk of health-related harms as they walk to school, train for Girls on the Run, and ride bikes in their neighborhoods. C.E. and children across the country need the judges to stay the Repeal Rule to ensure GHG regulations remain in place, preventable harms are avoided, and our children are afforded the chance at a safe and stable environment for decades to come.

In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on May 12, 2026 in Beloit, Wisconsin.

B.K.

_____

B.K.

# EXHIBIT 27

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

ELENA VENNER, *et al.*,

        *Petitioners*,

    v.

UNITED STATES
ENVIRONMENTAL PROTECTION
AGENCY, *et al.*,

        *Respondents*.

Case No. 26-1038
Lead Case No. 26-1037
(and consolidated cases)

## DECLARATION OF C.E. IN SUPPORT OF PETITIONERS' MOTION TO STAY THE FINAL RULE PENDING REVIEW

I, C.E., hereby declare and if called upon would testify as follows:

1. I am one of the Petitioners in this case against EPA. I want the court to stop EPA from getting rid of the rules that prevent pollution I breathe outside and that causes climate change. I understand the facts in my declaration and they are true.

2. I am an 8-year-old citizen of the United States and a resident of Beloit, Wisconsin.

3. I am involved in this case because the Government should be protecting me, my friends, and all of the other kids in the United States. They should be

1

listening to science, especially when it comes to how fossil fuels and air pollution harm my health. I am involved in this case because I want to help protect myself and everybody, even though I think this should be an adult job.

4.  My city, Beloit, Wisconsin, already has a lot of air pollution from factories, gas plants, and cars and trucks. The American Lung Association gave it an F for ozone.[1] My best friend's brother has asthma, and I am afraid that my little brother and I will get asthma. When I get sick with the flu, or when there is too much smoke, I already have to use an inhaler. A lot of kids in my school have to use inhalers. I don't understand why the government is letting it get this bad, even when I write to them and ask them to protect us.

5.  We already feel climate change in Wisconsin. Our winters are short with barely any snow compared to what my parents had, and summers are so hot and humid that sometimes I feel like I cannot breathe. We have had bigger rainstorms with roads and basements flooding. Last summer, we had water in our basement, and my parents had to pay a lot of money to have people clean it out so we wouldn't have mold in our house. This spring, we have had a lot of emergency warning sirens that made us go to the basement. One storm brought hail and tornadoes, and the hail damaged our roof. Climate change is also hurting some of the lakes I care about. A

---

[1] https://www.lung.org/research/sota

couple of my favorite lakes have dangerous algae, and we have to stay away from the water for parts of the summer, because it can make me sick.

6. Some of my favorite outdoor activities are stand-up paddleboarding and kayaking on the lake, riding my bicycle everywhere, and sledding - when there is snow - in the winter.

7. The heat hurt me last summer and this spring more than ever before. More fossil fuel pollution that causes more heat is bad for me. This spring, the temperatures have gone up and down a lot, and one day after school, I was so exhausted from the heat that I couldn't go to soccer practice. It was too warm, it was too hot out, and my mom didn't want to risk me getting sick again. I had to cool down in the house and drink a lot of water. When the days get too hot, I am stuck inside and unable to ride my bike or play with friends.

8. Last summer, I got sick because of the heat. Sometimes the sun and the heat make my skin feel like I'm burning, even when I have sunscreen on. One night, my dad and I rode our bikes around our neighborhood after dinner. We thought it was cooling down, but it still felt sticky outside. When I got home, I was feeling fuzzy and tired. My mom felt my forehead, said I was too hot, and she put ice packs in my armpits. This helped a little, but I still did not feel good. I sipped water, and then I had to take a cool shower. After that, I felt better, but within the next week, I was sick for about two weeks during the summer. If more heat gets trapped from

pollution, I will have to spend even more time inside my whole childhood when I would rather be outside in nature. Every bit of pollution and heat that my government stops is better for my life and for all the kids.

9. During the days of the big wildfires, you can see and taste the smoke. When this happens, my nose gets stuffed up, and it smells horrible. It's like you cannot get away from it. When the smoke is that bad, my mom does not let me go outside and play. She runs air cleaners in our bedrooms and in our living room. I don't like being trapped in my house.

10. Air pollution from cars, trucks, and buses is very bothersome when I am riding in the car, and when we try to walk to school. It is really hard when you have the air conditioner or heat on, getting the air from outside, and you're bringing the exhaust in. It smells bad, and it can give me a headache in the car. Sometimes when I am getting dropped off at school, I have to walk through a cloud of smoke coming from a gas car beside us. My brother and I hurry into the school, and we are relieved when we get inside, because we do not have to breathe the stinky pollution. Breathing the pollution from the gas cars and trucks can feel heavier, like I cannot take a full, deep breath. It can make me feel unsteady. There is a busy road between our school and the neighborhood, and when we try to walk to school with my mom, the noise is loud, and the exhaust smells bad. I know there is even more pollution I can't even see or smell that is heating our Earth.

11. I want the people making the decisions that affect my life to know that what I am doing in this case is an adult job, not a kid job. And as leaders, they should be leading by protecting us and thinking about the future and safety of all of us kids. We can have electric cars now, and they keep our air cleaner. There isn't any reason to keep having pollution from cars anymore. They should be thinking about the health and safety of everyone and everything - such as marine life, people living in other countries, and woodland creatures. I'm asking the court to make sure my government does that.

In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on May 12, 2026 in Beloit, Wisconsin.

C.E.

_____

C.E.

# EXHIBIT 28

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

ELENA VENNER, *et al.*,
                 *Petitioners*,

     v.

UNITED STATES
ENVIRONMENTAL PROTECTION
AGENCY, *et al.*,
                 *Respondents*.

Case No. 26-1038
Lead Case No. 26-1037
(and consolidated cases)

## DECLARATION OF N.N. IN SUPPORT OF PETITIONERS' MOTION TO STAY THE FINAL RULE PENDING REVIEW

I, N.N., hereby declare and if called upon would testify as follows:

1. I am a Petitioner in the above-entitled action. I am making this declaration in support of our Motion to Stay the Repeal Rule. I have personal knowledge of the facts I state herein and if called to testify, I would and could testify competently thereto.

2. I am a 16-year-old citizen of the United States and a resident of Waipahu, Hawaiʻi, which is on the island of Oʻahu. I am a junior in High School. I plan to go to law school after college.

1

3.      It was through my involvement with the Punahou Sustainability Fellowship that I first learned about the case, *Navahine F. v. Hawaiʻi Department of Transportation*. In *Navahine*, youth of Hawaiʻi sued the Hawaiʻi Department of Transportation (HDOT) over HDOT's policies and practices implementing the state's transportation system that caused greenhouse gas (GHG) emissions from transportation to increase. From the *Navahine* case I learned that the Hawaiʻi Constitution protects my right to a clean and healthful environment, which my state Supreme Court has declared includes a right to a life-sustaining climate system. I also learned that the Hawaiʻi Constitution protects all natural resources, including land, air, and water, for my benefit and the benefit of future generations. There are Hawaiʻi statutes that mandate a statewide target to reach net negative GHG emissions by 2045 and for zero GHG emissions across all transportation modes. My understanding is that this state statute mandates Hawaiʻi to fully decarbonize transportation within the state by 2045.

4.      I know that in 2024, the *Navahine* case settled. I am extremely familiar with the *Navahine* settlement agreement because I spent the summer of 2025 working at HDOT in the office tasked with implementing the settlement. My settlement-implementation work at HDOT focused on economic strategies for reducing emissions and sustainable aviation fuel. I haven't quite memorized the *Navahine* settlement agreement, but pretty close. The settlement agreement is

attached to my declaration as Exhibit A. My understanding is that the settlement agreement is binding under state law.

5. The *Navahine* settlement agreement recognized Hawaiʻi youths' rights under article XI, section 9 of the Hawaiʻi Constitution to a clean and healthful environment. This right includes me because I am a youth born and raised in Hawaiʻi.

6. The settlement agreement also recognized Hawaiʻi's public trust obligations under article XI, section 1 of the Hawaiʻi Constitution to conserve and protect "Hawaiʻi's natural beauty and all natural resources, including land, water, air, minerals and energy sources" "[f]or the benefit of present and future generations." The people who benefit from this include me because I am part of the present generation in Hawaiʻi.

7. Through the settlement, HDOT committed to replacing all GHG-emitting ground, marine, and inter-island air transportation with zero-emission alternatives by 2045. This is a huge goal because transportation is over 50% of Hawaiʻi's GHG emissions.

8. Fully decarbonizing transportation by 2045 was an ambitious goal even at the time HDOT committed to it in 2024. Decarbonizing ground transportation involves transitioning about a million privately-owned vehicles in Hawaiʻi from gas and diesel to electric vehicles (EVs). I learned from my work at HDOT that in order

to meet the 2045 goal, HDOT must make steady progress on the transition each year, including this year and next year. As ambitious as that is, I learned from HDOT that it was achievable in part because EPA's GHG emission standards issued pursuant to the Endangerment Finding required manufacturers to install emission control technologies and increase their EV production year after year.

9. Because the settlement's 2045 goal is so ambitious, anything that slows down the growth of EVs in favor of fossil fuel vehicles hurts it. The Repeal Rule is going to hurt us significantly. The Repeal Rule will make it harder for Hawai'i's transportation sector to decarbonize because it removes the requirement for car manufacturers to make EVs and otherwise control their GHG emissions from fossil fuel-powered vehicles. I have read news reports that car manufacturers are already reducing the number of EVs in production because of the Repeal Rule, reducing their research into EV technology, and increasing the pricing of EVs overall. Making EVs harder for people in Hawai'i to access makes it even harder for the state of Hawai'i to meet its goals that are mandated by law, committed to in the Settlement Agreement, and designed to protect my state constitutional rights. Based on my work on the settlement's implementation, I can say the Repeal Rule scares me a lot and harms me directly as a young person in Hawai'i who is supposed to be a direct beneficiary from the decarbonization of transportation required by the *Navahine* settlement agreement.

4

10. I am very involved in sports, especially judo and wrestling. My high school is located right on Farrington Highway, which is a densely trafficked 4-lane highway. Also, living on Oʻahu, I spend a lot of time in heavy traffic. It is not uncommon to be stuck in traffic for two hours, with vehicles stopped or idling all around.

11. I was diagnosed with pneumonia in 2024. Since then, I've had more difficulty breathing when I'm in an environment such as my school that has dense vehicle traffic and all of the pollution that comes with it from gas and diesel vehicles. The more fossil fuel vehicles that are on the road, the more pollution I will have to breathe. My personal health will be negatively impacted by EPA's Repeal Rule and elimination of GHG emission standards for vehicles. The increases in GHG emissions due to the Repeal Rule, means my body will be exposed to more, and not less, air pollution. My health will be worse off if the Repeal Rule stands and I have to breathe more pollution from gas and diesel vehicles into my lungs.

12. Although the Hawaiʻi Constitution and our courts recognize my right to a life-sustaining climate system, the Repeal Rule infringes upon that constitutional right because it exposes me to more air pollution from motor vehicles and makes it harder, if not impossible, for HDOT to comply with its commitments under the *Navahine* settlement agreement which are designed to protect my state constitutional rights.

13.     As climate change worsens, my island home and community are at greater risk. I have felt Hawai'i getting hotter over my lifetime. The increasing heat limits my ability to exercise outside, which is important for training for wrestling and judo. The heat has gotten so bad that I get heat rash more regularly now, causing my body to be itchy and break out in hives, which makes it difficult to participate in the contact sports that I love.

14.     More severe storms are now regularly occurring with extreme rain and winds. Just recently in March and April, we experienced Kona low storms that caused devastating rain and flooding across O'ahu. The roads were so dangerous to travel on that my school and schools across the state cancelled classes and school sports at least three times over a three-week period.

15.     The extreme weather has also impacted my family's ability to grow ti, a culturally important plant to Hawai'i for making leis, which symbolize good fortune and protection. It is a family tradition to make ti leis from our garden to give to others when there is a special event or celebration. More extreme weather from heavy rain and wind has torn our ti plants out of the ground and made it so the ti plants cannot grow well. As a result, rather than giving out ti leis at my judo and wrestling events, we have had to make ribbon and candy leis instead, which breaks an important family and cultural tradition.

16. There have also been increasing wildfires near my home, which climate change will only worsen. In recent years, wildfires have caused it to be so smoky around my house that we have had to shut all our windows and doors because the air was so bad to breathe.

17. If the EPA continues to allow more GHG pollution into the air, these impacts that I am experiencing will only get worse. This leaves me with a sense of guilt knowing that if I bring kids into this world their lives and happiness will be impacted even more.

18. I am proud to be from a state that values my constitutional rights to a clean and healthful environment and provides strong protections for the natural resources of the state. I plan to go away for college and then return to Hawai'i permanently to start my career and raise my future family here. My hope is that my children will grow up in a Hawai'i where we have achieved the zero-emissions target required by our state laws and the *Navahine* settlement agreement, and where the health of Hawai'i's people and precious natural resources will be thriving. That is the kind of state I want to raise my children in and the legacy I want to leave them and my grandchildren one day.

19. My federal Environmental Protection Agency should live up to its name and not take actions that make air pollution and climate change worse. The EPA should be protecting the environment and me. If it cannot do that, it should at least

avoid making it harder for my state to meet my state's legal obligations and commitments that are designed to protect me.

In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on May 16, 2026 in Waipahu, Hawai'i.

_____
N.N.

# Exhibit A

ISAAC H. MORIWAKE     #7141
KYLIE W. WAGER CRUZ  #10165
LEINĀʻALA L. LEY        #9710
EARTHJUSTICE
850 Richards Street, Suite 400
Honolulu, Hawaiʻi 96813
Telephone No.: (808) 599-2438
Email:  imoriwake@earthjustice.org
        kwager@earthjustice.org
        lley@earthjustice.org

JOANNA C. ZEIGLER        #10426       PHILIP L. GREGORY         #62851
ANDREA RODGERS           #62613       *(Admitted Pro Hac Vice)*
*(Admitted Pro Hac Vice)*              GREGORY LAW GROUP
JULIA A. OLSON                         1250 Godetia Drive
(Admitted *Pro Hac Vice*)             Woodside, California 94062
OUR CHILDREN'S TRUST                  Email: pgregory@pgregorylawgroup.com
P.O. Box 5181
Eugene, Oregon 97405
Telephone No.: (541) 375-0158
Email:  joanna@ourchildrenstrust.org
        andrea@ourchildrenstrust.org
        julia@ourchildrenstrust.org

Attorneys for Plaintiffs

Electronically Filed
FIRST CIRCUIT
1CCV-22-0000631
20-JUN-2024
10:31 AM
Dkt. 495 STIP

IN THE CIRCUIT COURT OF THE FIRST CIRCUIT

STATE OF HAWAIʻI

| | |
|---|---|
| NAVAHINE F., a Minor, by and through her natural guardian; et al., | ) CIVIL NO. 1CCV-22-0000631 |
| | ) (Environmental Court) |
| Plaintiffs, | ) |
| | ) JOINT STIPULATION AND ORDER |
| | ) RE: SETTLEMENT; EXHIBIT "A" |
| v. | ) |
| | ) Judge: The Honorable John M. Tonaki |
| DEPARTMENT OF TRANSPORTATION, STATE OF HAWAIʻI, et al., | ) |
| | ) Trial Date: June 24, 2024 |
| Defendants. | ) |
| | ) |
| | ) |
| | ) |

<u>JOINT STIPULATION AND ORDER RE: SETTLEMENT</u>

WHEREAS, Plaintiffs Navahine F., a Minor, by and through her natural guardian; Kaʻōnohi P.-G., a Minor, by and through his natural guardian; Kawahineʻilikea N., a Minor, by and through her natural guardian; Mesina D.-R., a Minor, by and through her natural guardian; Kawena F., a Minor, by and through her natural guardians; Tyler L., a Minor, by and through their natural guardian; Rylee K., a Minor, by and through her natural guardian; Kaliko T., a Minor, by and through her natural guardian; Charlotte M., a Minor, by and through her natural guardian; Taliya N., a Minor, by and through her natural guardian; Kalālapa W.; Pahonu C., a Minor, by and through his natural guardian; and Brianna K., a Minor, by and through her natural guardian (collectively, "Youth Plaintiffs") and Defendants the State of Hawaiʻi, Governor Josh Green, the Hawaiʻi Department of Transportation ("HDOT"), and Edwin Sniffen, in his official capacity as HDOT Director (collectively, "Defendants"), have executed a Settlement Agreement, which is filed herewith as Exhibit "A";

NOW, THEREFORE, pursuant to the Settlement Agreement, the parties hereby stipulate and agree, and the Court orders, as follows:

1. The terms of the Settlement Agreement are approved as in the best interests of and fair to the Youth Plaintiffs.

2. Except as set forth in the Settlement Agreement, this Order and Settlement Agreement fully and completely resolve the claims asserted by Plaintiffs against Defendants in the Youth Plaintiffs' Complaint (Dkt. 1).

3. In the event a dispute arises regarding compliance with the terms of the Settlement Agreement, any party, having complied with the dispute resolution provisions set forth in section 10 of the Settlement Agreement, may bring an appropriate motion in this Court

under Case Number 1CCV-22-0000631 to enforce the Agreement. Unless otherwise directed by this Court, the moving party shall not commence a separate lawsuit to seek judicial resolution of such a dispute.

4. This Court shall reserve continuing jurisdiction solely to enforce the Parties' obligations under the Agreement until December 31, 2045, or the date upon which the Zero Emissions Target, Haw. Rev. Stat. § 225P-5, has been achieved, whichever is earlier.

5. This case shall automatically be dismissed on December 31, 2045, or the date upon which the Zero Emissions Target, Haw. Rev. Stat. § 225P-5, has been achieved, whichever is earlier.

DATED: Honolulu, Hawaiʻi, May 17, 2024.

|  | ANNE LOPEZ |
|  | Attorney General of the State of Hawaiʻi |

/s/ Isaac H. Moriwake  
ISAAC H. MORIWAKE  
KYLIE W. WAGER CRUZ  
LEINĀʻALA L. LEY  
EARTHJUSTICE  

/s/ *Andrea Rodgers*  
ANDREA RODGERS (*Pro Hac Vice*)  
JOANNA C. ZEIGLER  
JULIA A. OLSON (*Pro Hac Vice*)  
OUR CHILDREN'S TRUST  

PHILIP L. GREGORY (*Pro Hac Vice*)  
GREGORY LAW GROUP  

Attorneys for Plaintiffs

/s/ Ciara W.K. Kahahane  
CIARA W.K. KAHAHANE  
JEEN H. KWAK  
Deputy Attorneys General  

CHARLENE S. SHIMADA  
BRYAN M. KILLIAN (*Pro Hac Vice*)  
DOUGLAS A. HASTINGS (*Pro Hac Vice*)  
R RAYMOND ROTHMAN (*Pro Hac Vice*)  
DEANNE L. MILLER (*Pro Hac Vice*)  
PEJMAN MOSHFEGH (*Pro Hac Vice*)  
MEGAN A SUEHIRO  
MORGAN, LEWIS, & BOCKIUS LLP  

Attorneys for Defendants

APPROVED AND SO ORDERED:

DATED: Honolulu, Hawaiʻi_____June 20, 2024_____

/s/ John M. Tonaki
_____
JOHN M. TONAKI
JUDGE OF THE ABOVE-ENTITLED COURT

_____

*Navahine F., et al. v. Dept. of Transportation, State of Hawaiʻi et al.*; Civil No. 1CCV-22-0000631; JOINT STIPULATION AND ORDER RE: SETTLEMENT; EXHIBIT "A"

3



EXHIBIT A

## <u>SETTLEMENT AGREEMENT AND RELEASE</u>

This Settlement Agreement and Release (the "Agreement") is made and entered into by and between **Plaintiffs** Navahine F., a Minor, by and through her natural guardian; Kaʻōnohi P.-G., a Minor, by and through his natural guardian; Kawahineʻilikea N., a Minor, by and through her natural guardian; Mesina D.-R., a Minor, by and through her natural guardian; Kawena F., a Minor, by and through her natural guardians; Tyler L., a Minor, by and through her natural guardian; Rylee K., a Minor, by and through her natural guardian; Kaliko T., a Minor, by and through her natural guardian; Charlotte M., a Minor, by and through her natural guardian; Taliya N., a Minor, by and through her natural guardian; Kalālapa W.; Pahonu C., a Minor, by and through his natural guardian; and Brianna K., a Minor, by and through her natural guardian (collectively, "Youth Plaintiffs"), and **Defendants** the State of Hawaiʻi, Governor Josh Green, the Hawaiʻi Department of Transportation ("HDOT"), and Edwin Sniffen, in his official capacity as HDOT Director (collectively, "Defendants").

Youth Plaintiffs and Defendants shall be referred to collectively as the "Parties" and individually as a "Party."

## <u>RECITALS</u>

WHEREAS, Youth Plaintiffs are thirteen youths represented by two non-profit, public interest law firms, Earthjustice and Our Children's Trust;

WHEREAS, Youth Plaintiffs filed a Complaint on June 1, 2022, captioned *Navahine F. et al. v. Hawaiʻi Department of Transportation et al.,* in the Circuit Court of the First Circuit, Case No. 1CCV-22-0000631, alleging violations of the constitutional public trust doctrine (Haw. Const. art. XI, § 1) and constitutional right to a clean and healthful environment (Haw. Const. art. XI, § 9) and seeking declaratory and injunctive relief;

WHEREAS, on April 17, 2023, Defendants filed an Answer denying liability;

WHEREAS, at the time the case commenced, Youth Plaintiffs were children, ages 9-18;

WHEREAS, Hawaiʻi jurisprudence recognizes that:

"There is scientific consensus: anthropogenic global warming threatens the world's climate system. It raises the seas; it sickens the planet. It harms present and future generations." *In re Maui Elec. Co.,* 150 Hawaiʻi 528, 538 n.15, 506 P.3d 192, 202 n.15 (2022) ("*MECO*") (citing *Summary for Policymakers* in *Climate Change 2021: The Physical Science Basis*, IPCC (Valérie Masson-Delmotte et al. eds., 2021), https://www.ipcc.ch/report/ar6/wg1/downloads/report/IPCC_AR6_WGI_SPM_final.pdf; *Summary for Policymakers* in *Climate Change 2022: Impacts, Adaptation and Vulnerability* at SPM-7-8, IPCC (Hans-O Pörtner et al., 2022), https://report.ipcc.ch/ar6wg2/pdf/IPCC_AR6_WGII_SummaryForPolicymakers.pdf);

"The people of Hawai'i have declared 'a climate emergency.'" *In re Haw. Elec. Light Co.*, 152 Hawai'i 352, 359, 526 P.3d 329, 336 (2023) ("*HELCO*") (quoting S. Con. Res. 44, 31st Leg., Reg. Sess. (2021) ("2021 S. Con. Res. 44"));

"Hawai'i faces immediate threats to our cultural and economic survival: sea level rise, eroding the coast and flooding the land; ocean warming and acidification, bleaching coral reefs and devastating marine life; more frequent and more extreme droughts and storms. For the human race as a whole, the threat is no less existential." *HELCO*, 152 Hawai'i at 359, 526 P.3d at 336 (citing 2021 S. Con. Res. 44);

"HRS § 225P-5 mandates that we reduce emissions now, before the damage done to the environment is irreversible—before action becomes impossible for future generations." *HELCO*, 152 Hawai'i at 358, 526 P.3d at 335;

"With each year, the impacts of climate change amplify and the chances to mitigate dwindle … 'A stepwise approach is no longer an option.'" *HELCO*, 152 Hawai'i at 359, 526 P.3d at 336 (internal citation omitted); and

WHEREAS, as a state agency, HDOT "must perform its statutory function in a manner that fulfills the State's affirmative constitutional obligations." *HELCO*, 152 Hawai'i at 359, 526 P.3d at 336;

WHEREAS, an array of laws enacted by the Hawai'i Legislature require the State to increase energy efficiency, develop an integrated multi-modal transportation system, and reduce greenhouse gas ("GHG") emissions, including transportation sector emissions specifically. *See, e.g.*, HRS §§ 196-9; 225P-5, -7, -8; 226-17, -18; 264-142, -143;

WHEREAS, Hawai'i's Legislature has recognized that:

"[C]limate change is the overriding challenge of the twenty-first century" and "poses immediate and long-term threats to Hawai'i's economy, public health, natural resources, environment, and way of life." 2022 Haw. Sess. Laws Act 238, § 1;

"[B]ased upon the scientific information and expertise available, Hawai'i remains particularly vulnerable to the dangers of disaster occurrences as a result of the effects of global warming, thereby endangering the health, safety, and welfare of the [State's] people, warranting preemptive and protective action[.]" 2021 S. Con. Res. 44; and

"In order to achieve the goal of a fully decarbonized economy, the State needs to plan ahead and understand the steps that need to be taken to create a carbon-negative economy by 2045[.]" 2022 Haw. Sess. Laws Act 238, § 1;

WHEREAS, Hawai'i's Legislature has further found that this "existential climate emergency threatens humanity and the natural world" and has requested "statewide collaboration toward an immediate just transition and emergency mobilization effort to restore a safe climate." 2021 S. Con. Res. 44;

WHEREAS, Defendants have taken efforts to make Hawaiʻi a leader in reducing GHG emissions in the transportation sector, and are committed to taking further, ambitious steps to meet the State's targets set forth in HRS §§ 225P-5, -7, and -8;

WHEREAS, a 2023 study by EPA found that children are uniquely vulnerable to the impacts of climate change because of the natural physiology of their developing and growing bodies, and that climate change impacts experienced during childhood can have lifelong consequences. U.S. Environmental Protection Agency, *Climate Change and Children's Health and Well-Being in the United States*, EPA 430-R-23-001 (2023);

WHEREAS, experts state that the best scientific evidence today shows that correcting Earth's energy imbalance requires reducing atmospheric carbon dioxide to less than 350 parts per million this century;

WHEREAS, the Parties have agreed to fully and finally resolve Youth Plaintiffs' Complaint in exchange for certain commitments by Defendants related to reducing GHG emissions in the transportation sector; and

WHEREAS, by entering this Agreement, Youth Plaintiffs do not admit to any legal or factual deficiencies in their claims and Defendants do not admit to any liability or wrongdoing and do not concede any factual or legal issue alleged in the Complaint.

NOW, THEREFORE, in the interests of the Parties and the public interest, and to promote judicial economy, the Parties hereby stipulate and agree as follows:

## <u>RECOGNITION OF RIGHTS</u>

1. Youth Plaintiffs have constitutional rights to a clean and healthful environment consistent with article XI, section 9 of the Hawaiʻi Constitution:

   > Each person has the right to a clean and healthful environment, as defined by laws relating to environmental quality, including control of pollution and conservation, protection and enhancement of natural resources. Any person may enforce this right against any party, public or private, through appropriate legal proceedings, subject to reasonable limitations and regulation as provided by law.

2. The State is committed to reducing GHG emissions from its statewide transportation system according to "the best available science" and the governing legal mandates to address climate change and protect the constitutional rights of Hawaiʻi citizens. 2018 Haw. Sess. Laws Act 15, § 4.

3. The right to a clean and healthful environment under article XI, section 9 of the Hawaiʻi Constitution as defined by laws relating to environmental quality "subsumes a right to a

life- sustaining climate system." *MECO*, 150 Hawai'i at 538 n. 15, 506 P.3d at 202 n. 15; *HELCO*, 152 Hawai'i at 359, 526 P.3d at 336.

4. The State has affirmative public trust obligations under article XI, section 1 of the Hawai'i Constitution to conserve and protect "Hawai'i's natural beauty and all natural resources, including land, water, air, minerals and energy sources" "[f]or the benefit of present and future generations."

5. The State's public trust considerations include "those related to protection of air and other trust resources affected by climate change[.]" *MECO*, 150 Hawai'i at 538, 506 P.3d at 202.

6. "As trustee, the State must take an active role in preserving trust property and may not passively allow it to fall into ruin." *Ching v. Case*, 145 Hawai'i 148, 177, 449 P.3d 1146, 1175 (2019) (citation omitted). "[A]n obligation to reasonably monitor trust property to ensure it is not harmed is a necessary component of this general duty[.]" *Id.*

7. Defendants, in establishing, maintaining, and operating the state transportation system, must preserve, protect, and maintain Hawai'i's public trust resources and all Hawai'i citizens' right to a clean and healthful environment.

8. 2018 Haw. Sess. Laws Act 15, section 4, requires Defendants to "expand strategies and mechanisms to reduce greenhouse gas emissions through the reduction of energy use, adoption of renewable energy, and control of air pollution among all agencies, departments, industries, and sectors, *including transportation*[,] . . . utiliz[ing] the best available science, technologies, and policies to reduce greenhouse gas emissions." (Emphasis added.)

## TERMS AND CONDITIONS

NOW, THEREFORE, the Parties hereby promise, covenant, agree, and exchange mutual general releases as follows:

### 1. GHG Emission Reductions.

As required by HRS § 225P-8, HDOT will "take any actions necessary to achieve the goals established" in that section, specifically, "zero [greenhouse gas] emissions across all transportation modes within the State, including across all sectors of:
    (1) Ground Transportation; and
    (2) Sea and air interisland transportation."

The Parties agree that Defendants will establish in the GHG Reduction Plan discussed below the interim greenhouse gas emission reduction targets for 2030, 2035, and 2040 to achieve the goals established in HRS § 225P-5 "no later than 2045" in accordance with that section.

**2. Greenhouse Gas Reduction Plan.**

Within the legal and legislative parameters of the government process, which Youth Plaintiffs acknowledge, HDOT, in consultation with other state and local agencies, will develop and implement a concrete and comprehensive statewide plan ("GHG Reduction Plan") to reduce GHG emissions from the statewide transportation system on a timeline that complies with HRS §§ 225P-5, 225P-7, and 225P-8.

a. HDOT will complete the GHG Reduction Plan as soon as possible, but no later than one (1) year from the date of the last signatory to the Agreement ("Agreement Date").

b. Youth Plaintiffs and the public shall have at least thirty (30) days to provide feedback and comments on the GHG Reduction Plan, prior to the Plan becoming final, and sufficiently in advance for HDOT to address the feedback and comments.

c. After entry of the Parties' Agreement, Youth Plaintiffs shall have the opportunity to have an in-person meeting with the Director of HDOT and the Climate Change Mitigation and Culture Manager to discuss their comments and feedback on HDOT's GHG reduction measures.

d. The GHG Reduction Plan will acknowledge and act upon the responsibilities of the State, and HDOT as the State's head transportation agency, to play a lead role in decarbonizing the statewide transportation system, in coordination and partnership with other related agencies and entities and the private sector.

e. The GHG Reduction Plan will include consideration of plans and investments for infrastructure that may be necessary at harbors and airports to accommodate the full decarbonization of international aviation and marine transportation to the Hawaiian Islands.

f. The GHG Reduction Plan will set interim five (5) year GHG emissions reduction targets in the transportation sector through 2045, for the years 2030, 2035, and 2040. The plan will include different benchmarks for ground, air, and marine transportation, as necessary to reflect different technologies economically and technically viable in the three sectors.

g. HDOT will provide an annual update to the public, with notice specifically provided to Youth Plaintiffs through their counsel, on its progress in implementing the GHG Reduction Plan, achieving GHG emission reductions, and moving toward the upcoming GHG reduction interim target.

h. The public and Youth Plaintiffs will have at least thirty (30) days after receipt of each annual update to provide comments and feedback to HDOT. Upon request by Youth Plaintiffs, they shall have the opportunity to have an in-person or virtual meeting with the Climate Change Mitigation and Culture Manager to discuss their comments and feedback.

i. The GHG Reduction Plan will be updated on an ongoing basis, with a comprehensive review and update approximately every five (5) years, under the principle of continual performance feedback and improvement. Specifically, HDOT will review and reassess actions and strategies for ground, air, and marine transportation based on the best scientific information available, the progress to date, and the necessary adjustments to meet the upcoming five-year interim target.

j. Specific benchmarks and performance metrics to incorporate in the GHG Reduction Plan will include but not be limited to the following:

   i. Interim targets to reduce vehicle miles traveled ("VMT") and the number of single occupancy vehicles in the state's mode share, HRS § 264-143(a)(3), (4);

   ii. Interim targets to expand multimodal transportation options such as public transit, pedestrian pathways, and bikeways, HRS §§ 264-20.5(a), -142;

   iii. Interim targets to improve safety for pedestrians and cyclists and meet the Vision Zero Policy, HRS §264-143(a)(6);

   iv. Interim targets to electrify transportation and support expansion of the public charging infrastructure across the state, HRS §§ 226-17, -18;

   v. Interim targets to reduce petroleum use from ground transportation and increase the use of zero-carbon alternative fuels and electric vehicles in the ground, air, and marine transportation sectors, HRS §§ 226-17, -18;

   vi. Interim targets to convert to zero-emission technologies (whether electric or otherwise) all ground equipment at airports and harbors in the state, HRS §§ 225P-5, P-8.

k. To meet the interim targets set in the GHG Reduction Plan, HDOT will need at a minimum:

   i. Sufficient appropriations of funds by the Legislature;

   ii. Support and adoption by private stakeholders of zero emissions vehicles, sustainable aviation fuel, and other technologies;

   iii. Support by the counties for zero emissions vehicles, public transit, electric vehicle ("EV") charging, and other measures designed to decarbonize the transportation sector;

   iv. Land use and other planning to increase public adoption of multimodal transportation options;

   v. Support, planning, and adoption by other State departments, agencies, and

commissions to achieve the State's renewable energy and zero emissions transportation goals;

  vi. Availability and delivery of new vehicles and technologies from private parties (such as medium- and heavy-duty electric vehicles);

  vii. Public support, advocacy, and assistance in spreading awareness and education about Hawai'i's clean energy initiatives; and

  viii. For the State's electrical energy to be generated using renewable energy sources according to the State's Renewable Portfolio Standards.

The GHG Reduction Plan will incorporate specific actions and strategies that HDOT will take in an effort to enable and support meeting the applicable needs set forth in sections k.i-viii above.

l. HDOT will develop and implement a program for public education, outreach and community engagement, and partnerships to support the GHG Reduction Plan and related transportation decarbonization work, emphasizing the role the public can play and maximizing awareness of clean transportation choices and opportunities. The Parties will partner in and contribute to the public education, outreach, and community engagement program.

3. **Revised Transportation Programming and Budgeting Process.**

a. To ensure funding is requested, available, and prioritized in alignment with decarbonizing the transportation system, HDOT will develop a process and criteria for evaluating, selecting, and prioritizing projects to include in the Mid-Range Transportation Plan ("MRTP"), Statewide Transportation Improvement Program ("STIP"), and multimodal plans, in accordance with the State's GHG mitigation and VMT reduction goals. HDOT will make information about this process and criteria readily available to the public.

b. The revised process and criteria for the MRTP and STIP will be in place and operational in time to apply to the next planning cycle beginning in April 2025.

c. HDOT will develop and implement an objective, scientifically-based methodology to assess and report the total, long-term GHG emission and VMT impacts of each infrastructure project ("the Methodology"). The Methodology will quantify these impacts where possible, using best estimates where necessary. HDOT will incorporate this Methodology into its planning process and into individual project and annual reports under HRS § 264-143.

d. HDOT will develop and implement the Methodology in no later than one year, in time for it to be incorporated in all proposals for the next planning cycle beginning in April 2025.

e. HDOT will also use this Methodology to assess GHG and VMT impacts in preparing environmental review documents for its transportation projects, and in commenting on environmental review documents for land use development projects.

f. HDOT will include climate change mitigation as a primary goal and objective within the MRTP and STIP process at the next planning cycle beginning in April 2025, to be implemented based on best available data from the GHG and VMT Methodology.

g. The revised process and criteria for the MRTP and STIP will make clear that the 2013 "Highways Division Project Prioritization Guideline" document is no longer valid, and Level of Service is discontinued as a criterion for project prioritization.

h. HDOT will produce an annual report compiling the individual project reports and detailing its progress in reducing GHG and VMT, including its quantitative analyses, as required by HRS § 264-143(c).

i. HDOT will incorporate the Complete Streets policy under HRS § 264-20.5 as a goal and prioritization criterion in the MRTP and STIP and require a documented Complete Streets assessment, including any exceptions to the Complete Streets policy, for each proposed project, starting from the upcoming MRTP and STIP planning cycle beginning in April 2025. HDOT will also implement policies and procedures to ensure that Complete Streets improvements remain part of the project throughout the planning and development process, and that information about Complete Streets improvements for each project is readily available to the public.

j. The GHG and VMT impact assessments, reports, and project scoring evaluations described above for each project and the MRTP and STIP as a whole will be publicly available in an easily accessible online format.

k. HDOT will include consideration of equity goals for each project at the planning stage and inclusion of an assessment of whether each project serves HDOT's equity goals in the reports prepared under HRS § 264-143. HDOT will mindfully prioritize the health and wellbeing of children, *see, e.g.*, HRS § 264-142(b)(1).

4. **HDOT Leadership.**

a. HDOT will create a lead unit, headed by a Climate Change Mitigation & Culture Manager, expressly charged with addressing climate change mitigation, within three months of this Agreement or as soon thereafter as the unit can be created. This lead unit will:

i. Work directly with HDOT Director, Deputy Directors, Climate Resiliency Managers from Airports, Highways, and Harbors to integrate and coordinate the mission of GHG reduction throughout HDOT.

ii. Lead and conduct a range of responsibilities intended to meet the goals and

targets set in HDOT's GHG Reduction Plan.

b. HDOT Highways will also create a position to oversee HDOT Highways' climate change mitigation and adaptation efforts at the program level. HDOT will also create a position to lead and coordinate efforts to ensure implementation of the Complete Streets policy, including the process improvements described above. HDOT will provide email notice to the Youth Plaintiffs, through their counsel, of the title of each position when the two positions described above are created.

c. HDOT will also establish a volunteer youth council to advise on HDOT's mitigation and adaptation commitments on a quarterly basis, with transparency about youth council recommendations and HDOT's responses. The inaugural volunteer youth council will be open to Youth Plaintiffs' participation through the regular application process and at least two of the youth council seats will be allocated to Youth Plaintiffs should they choose to apply. HDOT will provide email notice to the Youth Plaintiffs, through their counsel, when applications for the inaugural volunteer youth council open.

d. To promote decarbonization of transportation as a statewide priority, HDOT will develop, publish, and implement standards governing its external review requests. HDOT will apply the same standards used for internal HDOT projects in reviewing developer projects, including but not limited to: integration of multimodal transportation choices and connectivity of walkways and bikeways into new developments; assessment of the potential GHG and VMT impacts of proposed projects; and improvements for the construction of bikeways, pathways, transit stops, and public EV charging stations in new developments intended to mitigate the reasonably foreseeable impacts of the proposed project on the statewide transportation system, including GHG and VMT impacts.

5. **Immediate Commitments.**

a. To rapidly accelerate the expansion of the public EV charging network, Defendants will undertake an ambitious mobilization, including appropriate budgeting requests, in addition to implementation of HDOT's existing plan under the National Electric Vehicle Infrastructure (NEVI) Program, with an initial goal of investing a minimum of $40 million into public charging stations and charging infrastructure for state and county vehicles by 2030, subject to change as part of HDOT's GHG Reduction Plan.

b. To rapidly accelerate the expansion of multimodal transportation choices in line with the State's decarbonization goals and the accompanying co-benefits, Defendants will also undertake an ambitious mobilization, including budgeting requests, to complete the pedestrian, bicycle, and transit networks in coordination with the counties as contemplated under HRS § 264-142, with a goal of completing this work in five years.

c. HDOT will develop and implement policies intended to achieve zero emissions,

9

including policies designed to: (i) reduce VMT and the percentage of single occupancy vehicles on roads; (ii) electrify transportation, including all vehicles and facilities, and support expansion of charging infrastructure across the State; (iii) increase the use of zero-carbon alternative fuels and electric vehicles in the ground, air, and marine transportation sectors; (iv) expand multimodal transportation options by building the complete network of safe bicycle, pedestrian, and transit facilities; and (v) implement other strategies as needed to decarbonize the transportation sector in the timeframe set forth in HRS § 225P-5. HDOT will seek immediate opportunities to take actions to advance progress on these goals.

d.  HDOT will also increase efforts to sequester more carbon, including by planting additional trees and shrubs on an annual basis to generate additional carbon sinks to drawdown carbon in the atmosphere, with a starting goal of planting at least 1,000 trees per year. When planting, HDOT will use native plants whenever feasible, and will not use invasive species.

**6.  Attorneys' Fees and Costs.**

Each of the Parties shall bear and pay its own costs, attorneys' fees and any other expenses incurred or to be incurred in connection with this action, the released claims, the negotiation and preparation of this Agreement and/or the performance of this Agreement.

**7.  Notice.**

Any notices required or provided for by this Agreement shall be in writing, via email or other means, and sent to the following:

a.  for Defendants:

Ciara W.K. Kahahane
Deputy Attorney General
Department of the Attorney General
State of Hawai'i
425 Queen Street
Honolulu, Hawai'i 96813
Email: ciara.wk.kahahane@hawaii.gov

b.  for Plaintiffs:

Isaac H. Moriwake
Managing Attorney
Earthjustice
850 Richards Street, Suite 400
Honolulu, Hawai'i 96813
Email: imoriwake@earthjustice.org

Andrea K. Rodgers
Deputy Director, U.S. Strategy
Our Children's Trust
P.O. Box 5181
Eugene, Oregon 97405
Email: andrea@ourchildrenstrust.org

Any Party may, by written notice to the other Parties, change its designated notice recipient or notice addresses provided above.

## 8. No Admissions.

The Parties and their counsel understand that this Agreement does not constitute an admission by Defendants of any current or prior violation of the Hawai'i Constitution or other violation of any law, or of any wrongdoing of any kind. This Agreement is for the purposes of resolving and settling all actual and potential disputes among the Parties to avoid further controversy, litigation and expense; provided, however, that this Agreement may be used in an action by a Party to enforce its terms and provisions.

## 9. Jurisdiction and Dismissal.

The Parties will prepare and file a Proposed Order for signature and entry by the Court that (i) approves the terms of the Agreement as in the best interests of and fair to the Youth Plaintiffs, (ii) declares that Plaintiffs' Complaint is fully and finally resolved, and (iii) reserves jurisdiction solely to enforce the Agreement and provides for the automatic dismissal of the case as provided herein.

The Parties agree that the Court will retain continuing jurisdiction to enforce the Parties' obligations under the Agreement until December 31, 2045, or the date upon which the Zero Emissions Clean Economy Target (HRS § 225P-5) has been achieved, whichever is earlier. This case will be automatically dismissed the sooner of December 31, 2045, or the achievement of the Zero Emissions Clean Economy Target.

This Agreement shall not be amended, supplemented, or modified other than in a writing executed by both Parties and approved by the Court.

## 10. Dispute Resolution.

Unless otherwise expressly provided for in this Agreement, the dispute resolution procedures of this Section shall be the exclusive mechanism for resolving disputes arising under this Agreement. The Parties shall attempt to resolve any disagreements concerning this Agreement expeditiously and informally, pursuant to the following procedures:

a. A Party first must notify all other Parties in writing when a dispute or concern arises and request an opportunity to discuss the disputed issues or concerns; each Party agrees in good faith to make a concerted effort to resolve the dispute or concern through direct

11

negotiations without the need for judicial intervention or mediation;

b. If the Parties are unable to resolve the dispute within a two-week period of time, or longer upon agreement of the Parties, and upon written notice to all Parties, all Parties agree to select a mediator, or ask the court to appoint a mediator, and to notify the mediator and work cooperatively with the mediator to reach agreement; and

c. If no mutually agreeable resolution is reached within a 30-day period from the first mediation session, either Party may bring a motion in this Court under Case Number 1CCV-22-0000631 to enforce the Agreement.

Each side agrees to bear its own attorneys' fees and costs in connection with the dispute resolution process, including bringing a motion to enforce the Agreement.

## 11. Joint Press Conference.

On a mutually agreed upon date, HDOT, Defendant Sniffen, and Plaintiffs agree to hold a joint press conference at which a representative from the Office of Governor Green will be present, and the Parties agree to issue a joint press statement as the initial announcement of the successful resolution of this case by the Parties. The Parties agree not to disclose or speak to the media about the Agreement until such mutually agreed upon date.

## 12. Additional Terms.

a. The Parties recognize that HDOT's authority has limitations, and that HDOT cannot take any actions beyond the scope of the authority allocated to it under federal law and the laws and Constitution of the State of Hawai'i. Nothing in this Agreement is intended to or does obligate HDOT to perform any task outside of the law or the scope of its authority or take any action that infringes on the legislature's authority. Nor does this Agreement impose on Defendants any obligations to expend funds in furtherance of any action beyond those funds that are appropriated by the legislature, or otherwise available to HDOT, and are legally available for such action. HDOT will make best efforts to secure funding from the legislature and the federal government, and make rule and policy changes as it deems necessary to meet the terms of this Agreement.

b. Other than Defendants' obligation to perform the specific actions in this Agreement by the deadlines set forth herein, nothing in this Agreement shall be construed to limit or modify any discretion accorded to Defendants under the Hawai'i Constitution, Hawai'i law, the Hawai'i Administrative Procedure Act, or general principles of administrative law in taking the actions that are the subject of this Agreement.

## 13. Interpretation and Construction.

The Parties agree that this Agreement shall constitute a complete and final settlement of all claims in the Complaint, and all prior and contemporaneous negotiations and understandings between the Parties shall be deemed merged into this Agreement. The Parties treat this

Agreement as jointly drafted, and any rules of construction that construe any ambiguities against the drafting Party shall be inapplicable in any dispute concerning the interpretation of this Agreement.

## 14. Severability.

Each term and provision of this Agreement shall be considered severable and divisible from every other term and provision, and the invalidity or unenforceability of any one term or provision shall not limit the validity and enforceability, in whole or in part, of any other term or provision hereof.

## 15. Execution of Agreement.

This Agreement may be executed in counterparts, and electronic or facsimile signatures will be treated the same as original signatures. It shall become effective on the date of the last execution. The attorneys signing below represent that they have reviewed the full Agreement with their clients, have obtained the express written consent of their clients under HRS § 605-7, and are authorized to execute this Agreement.

IN WITNESS WHEREOF, the Parties agree to the terms set forth herein as evidenced by the signature of their authorized representatives below.


**ATTORNEYS FOR PLAINTIFFS**

Date: _____ May 16, 2024 _____

Isaac H. Moriwake
Managing Attorney
Earthjustice


Date: _____ May 15, 2024 _____

Andrea K. Rodgers (*Pro Hac Vice*)
Deputy Director, U.S. Strategy
Our Children's Trust

13

**ATTORNEY FOR DEFENDANTS**

*Anne E. Lopez*

Date: May 16, 2024

Anne E. Lopez
Attorney General
State of Hawaiʻi

# EXHIBIT 29

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| ELENA VENNER, *et al.*,<br><br>          *Petitioners*,<br><br>    v.<br><br>UNITED STATES<br>ENVIRONMENTAL PROTECTION<br>AGENCY, *et al.*,<br><br>          *Respondents*. | Case No. 26-1038<br>Lead Case No. 26-1037<br>(and consolidated cases) |

## DECLARATION OF TAYLIN NISHIDA IN SUPPORT OF PETITIONERS' MOTION TO STAY THE FINAL RULE PENDING REVIEW

I, Taylin Nishida, hereby declare and if called upon would testify as follows:

1. I am a Petitioner in the above-entitled action. I am making this declaration in support of our Motion to Stay the Repeal Rule. I have personal knowledge of the facts I state herein and if called to testify, I would and could testify competently thereto.

2. I am a 21-year-old Native Hawaiian citizen of the United States and a resident of Kamuela on the island of Hawaiʻi, also called the Big Island. I attend college at the University of Hawaiʻi at Mānoa on the island of Oʻahu. I am majoring in marketing. Through my study of business, I understand basic market principles.

1

3. I understand that the Hawaiʻi Constitution protects my right to a clean and healthful environment, which includes a right to a life-sustaining climate system as interpreted by our state courts. The Hawaiʻi Constitution also protects all natural resources of my state for my benefit and the benefit of future generations.

4. In 2024 the Hawaiʻi Department of Transportation (HDOT) entered a settlement agreement with youth (including my younger sister) who sued HDOT over its policies and practices in operating the transportation system that were causing greenhouse gases (GHGs) from transportation to increase as violating the youth's constitutional rights.

5. I understand that a key commitment HDOT made in the settlement agreement is to bring fossil fuel GHG emissions from ground, marine, and inter-island air transportation down to zero by 2045, mostly by electrifying transportation.

6. I understand the only way HDOT can meet its commitment in the settlement agreement is for new vehicles sold to very swiftly be electric so that all used vehicles for sale in Hawaiʻi in 2045 can be electric vehicles. For that to happen, the number and range of selection of new EVs offered for sale in Hawaiʻi needs to ramp up immediately.

7. My understanding is that won't happen if the Repeal Rule stands because EPA sets standards that affect cars sold in Hawaiʻi. I know from news reports that car companies have canceled EV models because of the Repeal Rule.

2

Fewer EVs available means that EVs will be more expensive and harder for people to buy. That will affect HDOT's ability to fulfill the terms of the settlement agreement.

8. As I have learned in school, it is a basic market principle that the prices of EVs would come down if there were a greater number and wider selection of EVs available. If the prices were lower, I would like to buy an EV as my next car because I want a car that does not pollute the air.

9. Gas is very expensive in Hawaiʻi. My understanding is that EVs are cheaper to operate than gas vehicles because electricity is cheaper than gas in Hawaiʻi, especially for people like me who have solar panels at home. My home is completely off-grid. Our solar panels are fueled by the sun, and the sun is free.

10. There is a lot of traffic on campus where I live, which means that the gas cars are sitting idle, which causes localized air pollution that I am forced to breathe. EVs do not emit any pollution when sitting idle. In addition, I understand the Repeal Rule eliminates a requirement for gas cars to turn off while idling. The Repeal Rule will result in more localized air pollution in and around where I live and breathe.

11. The Repeal Rule threatens my island home and my rights protected by my state constitution because it will cause more GHG emissions and worsen the climate crisis that has already caused me harm. For example, in 2021 because of

3

drought, I experienced water insecurity because our rainwater catchment system at home was so low it couldn't meet our daily water needs. At other times, flash floods prevented me from getting to school. I know that all of these experiences will just get worse the more GHG emissions EPA allows into the air from gas and diesel vehicles.

12. Severe weather events from climate change also threatens my ability to continue to practice Native Hawaiian cultural traditions. For example, kalo is essential to the lives of Native Hawaiians and is also part of the Native Hawaiian origin story. Kalo is used to make poi, a traditional food. Waipiʻo Valley, an ancient home for Hawaiian royalty, is an important place where kalo is farmed on the Big Island. Some of my most joyous and fulfilling moments in my life have been in Waipiʻo Valley helping my friend plant and harvest kalo on his land. However, with increasing extreme rain events and flooding, kalo patches are being swept out of the valley and into the ocean. Some patches are being inundated with salt water from rising seas. This harms my ability to take part in the cultural practices around this traditional food staple.

13. Increasing extreme weather has also impacted my ability to participate in an important cultural tradition called the Makahiki games, an ancient Hawaiian version of the Olympics that includes various exercises to develop physical, mental, and spiritual strength. Before the games start there is a ceremony to bring the gods

4

together. The Makahiki season was a time of peace throughout the Hawaiian islands. This was an integral part of my education from elementary through high school, and I am continuing the tradition through teaching the games while I am working at a youth program.

14. The Makahiki season is in the winter. Repealing the GHG emissions standards for motor vehicles will make the weather more extreme during the time of the Makahiki games with more extreme rain and wind events. EPA's decision to allow more GHG pollution into the air means that our Makahiki games will be regularly disrupted and cannot continue because of extreme weather.

15. I understand that the Hawai'i Constitution protects my right to a clean and healthful environment, which includes a stable climate system. I also understand that the laws and court orders in Hawai'i require greenhouse gas emissions within the state to go down to zero. The federal government should respect my state's constitution and the court ordered settlement requiring the state to decarbonize transportation, rather than making it harder for my state to comply with the state constitution, statutes, and the settlement agreement that are intended to protect our lives and the natural wonder of our home that provides so much.

In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

5

Executed on May 12, 2026 in Honolulu, Hawai'i.

_Taylin Nishida_

Taylin Nishida

# EXHIBIT 30-A

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA**

---

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) ) ) ) | |
| *Plaintiff,* | ) ) ) | |
| v. | ) ) | Civil Action No. |
| STATE OF MINNESOTA and KEITH ELLISON, in his official capacity as Minnesota Attorney General | ) ) ) ) | |
| *Defendants.* | ) ) ) ) ) ) ) | |

---

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

## INTRODUCTION

1.    This case "presents 'a clash over [who] regulat[es] worldwide greenhouse gas emissions.'" *Minnesota by Ellison v. Am. Petroleum Instit.*, 63 F.4th 703, 717 (8th Cir. 2023) (Stras, J., concurring). Minnesota unilaterally claimed such regulatory authority when it sued national energy producers in state court for alleged violations of state law. Through its lawsuit, "Minnesota does not even try" to "hid[e] the obvious": "it seeks a global remedy for a global issue" involving global "climate change." *Id*. And there is no mistaking that Minnesota is using its state-law lawsuit to "effectively regulate" that global issue. *City of New York v. Chevron Corp.*, 993 F.3d 81, 91–93 (2d Cir. 2021) (holding that the state-law lawsuit—a form of "regulation"—was preempted).

2.    But federal law, not state law, exclusively governs regulation of global greenhouse gas emissions. State law is preempted in this area due to the "'overriding need for a uniform rule of decision' on matters influencing national energy and environmental policy" and the "basic interests of federalism" enshrined in our Constitution. *Id*. at 91–92 (cleaned up). Minnesota's state-law claims are thus preempted, and its reactivated litigation in state court today is currently thwarting the United States' exclusive authority to regulate interstate air pollution, administer federal law, and conduct foreign affairs.

3.    The United States therefore sues Minnesota to vindicate the su-

premacy of federal law in matters concerning the regulation of global green-house gas emissions and to redress its irreparable injuries. By usurping exclusive federal authority to regulate global greenhouse gas emissions in a "clear" attempt to "change [national energy] companies' behavior on a global scale," Minnesota violates federal law in multiple ways. *Minnesota,* 63 F.4th at 719.

4.      First, the Constitution precludes Minnesota from regulating global greenhouse gas emissions through state-law claims, because such emissions implicate uniquely federal interests. Under our constitutional structure, federal law "reigns . . . supreme" in disputes over interstate (and international) pollution. *Minnesota,* 63 F.4th at 718. Minnesota's lawsuit is preempted because it seeks to use state law where federal law controls the rule of decision.

5.      Second, the Constitution's separation of powers prohibits Minnesota from imposing liability or projecting its law into other jurisdictions. *See, e.g., Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 376 & n.1 (2023); *Fuld v. Palestine Liberation Org.*, 606 U.S. 1, 14 (2025) ("State sovereign authority is bounded by the States' respective borders."). Yet Minnesota "has attempted, in essence, to unilaterally impose its moral and policy preferences for" energy production "on the rest of the Nation." *Pork Producers*, 598 U.S. at 407 (Kavanaugh, J., concurring in part and dissenting in part). Even worse, Minnesota's unconstitutional overreach to impose liability for out-of-state conduct and emissions has ignited a conflict among the States, prompting its neighbor

to pass a law to *limit* "civil or criminal liability for any alleged actual or potential effect on climate caused wholly or partly by a greenhouse gas emission." Iowa Code § 673B.2 (2026).[1] The Constitution does not tolerate such a conflict. Nor does it allow Minnesota to nationalize its regulatory powers.

6.      Third, the Clean Air Act forecloses the sprawling lawsuit that Minnesota is pursuing in state court. *See City of New York*, 993 F.3d at 90–100.

7.      Fourth, the lawsuit is preempted under the Foreign Affairs doctrine. The Constitution forbids actions by States that exceed their traditional areas of responsibility and interfere, even incidentally, with national foreign policy. *See Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396 (2003). Because Minnesota's lawsuit "seeks a global remedy for a global issue," it falls outside traditional state interests, *Minnesota*, 63 F.4th at 717, and it interferes with the United States' foreign policy described below.

8.      Finally, because the lawsuit discriminates against interstate commerce and regulates extraterritorial conduct, it violates the Commerce Clause.

9.      The President holds "the mandate of the people to exercise his executive power." *Myers v. United States*, 272 U.S. 52, 123 (1926). The Executive Branch exists to carry out his policies. Here, President Trump has issued significant policies to support an "affordable and reliable domestic energy supply,"

---

[1] *See* Iowa Governor Kim Reynolds Ltr (Apr. 30, 2026), *available at* https://www.legis.iowa.gov/legislation/BillBook?ga=91&ba=HF2527.

which is "essential to the national and economic security of the United States, as well as our foreign policy." *Protecting American Energy From State Overreach*, Exec. Order No. 14260, §§ 1–2, 90 Fed. Reg. 15513, 15513 (Apr. 8, 2025). "American energy dominance is threatened," however, when States "seek to regulate energy beyond their constitutional or statutory authorities," as with Minnesota's climate change lawsuit in state court challenged here. *Id*.

10.    At bottom, efforts by Minnesota to usurp exclusive federal authority to regulate global greenhouse gas emissions (in whatever form) and to obstruct the United States from administering a federal statute and conducting foreign affairs—so that Minnesota can brazenly "attempt to set national energy policy through its own consumer-protection laws," *Minnesota*, 63 F4th at 703—irreparably injures the United States. To prevent further irreparable injury, the United States will be seeking preliminary injunctive relief. This Court should preliminarily and permanently enjoin Minnesota from regulating global greenhouse gas emissions through its lawsuit—*Minnesota v. American Petroleum Inst., et al.*, No. 62-cv-20-3837 (Minn. Dist. Ct.), Index 1 ("Complaint") (Ex. A)—and declare its lawsuit preempted and unlawful.

## JURISDICTION AND VENUE

11.    This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1345.

12.    This Court has authority to provide the relief under the U.S. Con-

out-of-state greenhouse gas emissions, including through lawsuits involving state-law claims. *See City of New York*, 993 F.3d at 90–100. This is because the Clean Air Act is the standard governing any claims involving interstate greenhouse gas emissions. Thus, because the Clean Air Act "provides a means to seek limits on emissions," there is no other "room for a parallel track" of regulation. *AEP*, 564 U.S. at 425.

86.    To permit Minnesota's lawsuit to proceed under state law would upset the careful balance the federal government struck in the Clean Air Act "between the prevention of global warming, a project that necessarily requires national standards and global participation, on the one hand, and energy production, economic growth, foreign policy, and national security, on the other." *City of New York*, 993 F.3d at 93. The United States is injured when it cannot fulfil this careful balance, as reflected in its energy policy described above.

87.    Moreover, Minnesota's lawsuit conflicts with the Clean Air Act's purposes and objectives by undermining the Clean Air Act's carefully calibrated cooperative federalism scheme. The Clean Air Act grants EPA broad authority to promulgate regulations based on its expert judgment, including whether to impose emissions standards for stationary sources under 42 U.S.C. § 7411 and for mobile sources under 42 U.S.C. § 7521, and it works with States to enforce those regulations. By seeking to impose retroactive liability for law-

A.    Declare *Minnesota*, No. 62-cv-20-3837 (Minn. Dist. Ct.) (Ex. A), un-constitutional and unlawful under 28 U.S.C. § 2201;

B.    Preliminarily and permanently enjoin Defendants from taking any actions to implement, pursue, enforce, attempt to enforce, threaten to enforce, or prosecute *Minnesota*, No. 62-cv-20-3837 (Minn. Dist. Ct.) (Ex. A);

C.    Award the United States its costs and disbursements here; and

D.    Award any other relief that the Court may deem just and proper.


Date: May 4, 2026

DANIEL N. ROSEN
United States Attorney
600 U.S. Courthouse
300 South Fourth Street
Minneapolis, MN 55415

Respectfully submitted,

STANLEY E. WOODWARD JR.
United States Associate Attorney General

ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General

ROBERT N. STANDER
Deputy Assistant Attorney General

 /s/ John Adams
John K. Adams
Chief of Staff & Senior Counsel
Michael Weisbuch
Senior Counsel
Ian Swenson
Counsel
Environment and Natural Resources Division
U.S. Department of Justice
950 Pennsylvania Ave, NW
Washington, D.C. 20530
Telephone: (202) 514-2701
Email John.Adams3@usdoj.gov

# EXHIBIT 30-B

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF OREGON

| | | |
|---|---|---|
| KELSEY ROSE CASCADIA JULIANA, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil No. 6:15-cv-01517-TC |
| | ) | |
| UNITED STATES OF AMERICA, et al., | ) | |
| | ) | |
| Federal Defendants. | ) | |
| | ) | |

## FEDERAL DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THEIR MOTION TO DISMISS

JOHN C. CRUDEN
Assistant Attorney General
Environment and Natural Resources Division

JUSTIN A. TORRES
Trial Attorney, D.C. Bar No. 1003136
Environment and Natural Resources Division
Natural Resources Section
P.O. Box 7611
Washington, DC 20044-7611
Tel: (202) 305-0874
Fax: (202) 305-0506
justin.torres@usdoj.gov

*Attorneys for Federal Defendants*

i

economy that, although not parties to this litigation, are affected by a phenomenon that spans the globe. *See Am. Elec. Power Co. v. Connecticut,* --- U.S. ----, 131 S. Ct. 2527, 2539-40 (2011).

The establishment of appropriate targets for the reduction of $CO_2$ emissions in the United States would entail a host of policy judgments that should be made by decision makers who are politically accountable, have expertise, and are able to pursue a coherent national or international strategy. *Cf. Massachusetts,* 549 U.S. at 524 ("[Agencies] whittle away at [massive problems] over time, refining their preferred approach as circumstances change and as they develop a more nuanced understanding of how best to proceed."). Since the Supreme Court held in *Massachusetts v. EPA* in 2007 that $CO_2$ falls within delegated regulatory authority, federal agencies have undertaken substantial efforts to address climate change. *See, e.g., Am. Elec. Power,* 131 S. Ct. at 2533 (acknowledging EPA's post-*Massachusetts* regulatory initiatives limiting greenhouse gas emissions); Am. Compl. ¶ 148 (noting that Defendant Environmental Protection Agency commenced "regulation of greenhouse gases under the Clean Air Act from mobile and stationary sources of air pollution" in 2011); Carbon Pollution Emission Guidelines for Existing Stationary Sources: Electric Utility Generating Units, 80 Fed. Reg. 64,662 (Oct. 23, 2015); Standards of Performance for Greenhouse Gas Emissions From New, Modified, and Reconstructed Stationary Sources: Electric Utility Generating Units, 80 Fed. Reg. 64,510 (Oct. 23, 2015). The Court should decline Plaintiff's invitation to short-circuit this regulatory process.

## II.   Plaintiffs Fail To State A Claim Under The Constitution.

Assuming, *arguendo*, that Plaintiffs have standing to maintain this action, Counts One through Three of the Amended Complaint must be dismissed for failure to state a claim. No court anywhere has ever recognized a federal constitutional right to be free of $CO_2$ emissions (or any pollutant), and more generally have consistently rejected attempts to constitutionalize permissible levels of environmental contamination and environmental impacts. Plaintiffs—those

19

# EXHIBIT 30-C

JoAnn Jett Corson
Registered Diplomate Reporter
Certified Realtime Reporter
P. O. Box 8006
Missoula, Montana 59807-8006
406/829-7123 office
joann_corson@mtd.uscourts.gov

United States Court Reporter

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BUTTE DIVISION**

```
EVA LIGHTHISER et al.,           )
                      Plaintiffs,)  No. CV 25-54-BU-DLC
     vs.                         )
                                 )  VOLUME 2
DONALD J. TRUMP, in his          )  TRANSCRIPT OF HEARING ON
official capacity as President   )  PLAINTIFFS' MOTION FOR
of the United States et al.,     )  PRELIMINARY INJUNCTION,
                     Defendants,)   FEDERAL DEFENDANTS'
     and                         )  MOTION TO DISMISS, AND
                                 )  DEFENDANT-INTERVENORS'
STATE OF MONTANA et al.,         )  MOTION TO DISMISS
          Defendant-Intervenors.)
_____)
```

**BEFORE THE HONORABLE DANA L. CHRISTENSEN
UNITED STATES DISTRICT COURT JUDGE
FOR THE DISTRICT OF MONTANA**

Russell Smith United States Courthouse
201 East Broadway
Missoula, Montana 59802
Wednesday, September 17, 2025
08:33:19 to 15:39:20

Proceedings recorded by machine shorthand
Transcript produced by computer-assisted transcription

**APPEARANCES**

For the Plaintiffs:                  MS. JULIA A. OLSON
                                     MS. ANDREA K. RODGERS
                                     MR. NATHAN BELLINGER
                                     Attorneys at Law
                                     OUR CHILDREN'S TRUST
                                     1216 Lincoln Street
                                     Eugene, Oregon 97401

                                     MR. DANIEL C. SNYDER
                                     Attorney at Law
                                     PUBLIC JUSTICE
                                     1620 L Street NW
                                     Washington, D.C. 20036

                                     MR. ROGER SULLIVAN
                                     Attorney at Law
                                     McGARVEY LAW
                                     345 1st Avenue East
                                     Kalispell, Montana 59901

                                     MR. PHILIP L. GREGORY
                                     Attorney at Law
                                     GREGORY LAW GROUP
                                     1250 Godetia Drive
                                     Redwood City, California 94062

                                     MS. CARISA FISHER
                                     Document Technician
                                     442 East Mendenhall Street
                                     Bozeman, Montana 59715

For the Federal                      MR. MICHAEL S. SAWYER
Defendants:                          MR. ERIK VAN DE STOUWE
                                     Attorneys at Law
                                     U.S. DEPARTMENT OF JUSTICE
                                     NATURAL RESOURCES SECTION
                                     P.O. Box 7611
                                     Washington, D.C. 20044

                                     MS. MIRANDA JENSEN
                                     Attorney at Law
                                     U.S. DEPARTMENT OF JUSTICE
                                     ENVIRONMENTAL DEFENSE SECTION
                                     P.O. Box 7611
                                     Washington, D.C. 20044

APPEARANCES (Continued)

For Defendant-                      MR. JUSTIN D. SMITH
Intervenors:                        Attorneys at Law
                                    JAMES OTIS LAW GROUP
                                    530 Maryville Centre Drive
                                    St. Louis, Missouri 63141

                                    MR. CHRISTIAN B. CORRIGAN
                                    MR. MICHAEL D. RUSSELL
                                    Attorneys at Law
                                    OFFICE OF MONTANA ATTORNEY GENERAL
                                    215 North Sanders
                                    Helena, Montana 59601

CONTENTS

**Volume 1**
Proceedings .......................................... 8
Defendants' Motion to Invoke Rule 615 .................. 13
Court Order re: Defendants' Motion to Invoke Rule 615 .. 13
Opening Statement by Ms. Olson ........................ 14
Opening Statement by Mr. Sawyer ....................... 24
Volume 1 Reporter's Certificate ....................... 321

**Volume 2**
Proceedings .......................................... 329
Closing Argument by Ms. Olson ......................... 451
Closing Argument by Mr. Sawyer ........................ 492
Closing Argument by Mr. Van de Stouwe ................. 512
Closing Argument by Mr. Smith ......................... 516
Rebuttal Closing Argument by Ms. Olson ................ 528
Plaintiffs' Motion to Amend Complaint ................. 528
Rebuttal Closing Argument by Mr. Sawyer ............... 534
Court Order re: Plaintiffs' Motion to Amend Complaint .. 539
Volume 2 Reporter's Certificate ....................... 541

        REPORTER'S NOTE:   "Uh-huh" and "Um-hmm" indicate
affirmative responses.   "Huh-uh" and "Hm-umm" indicate
negative responses.

claim if the available statutory scheme forecloses all available paths for review.

Now, here, the Clean Air Act sets it out.  And in the case cited by Mr. Smith, *In Re: Murray Corp*., it clearly establishes if you want to challenge an agency action, an APA action under the Clean Air Act, you can't do it at the proposed rule stage.  You have to wait for a final rule.  The statutory scheme sets out what available paths of review there are.  The fact that it forecloses their attempt to challenge a proposed rule is not a basis for creating a new ultra vires, Hail Mary claim for circumventing the available statutory scheme for review.

And, finally, on the 82 injunctions cited by Ms. Olson, our position, Your Honor, is not that no district court has ever enjoined an executive order.  Of course that has happened.  Frequently, when it happens, it is an injunction that is highly scrutinized by the higher courts and often overturned, particularly lately.

What our position is is that the nature of their requested injunction against these specific executive orders is entirely without precedent, and that is what Mr. Podesta testified to.  They didn't provide one that I'm aware of, of an injunction that stops agencies from even reconsidering the prior administration's actions that is fundamentally, Your Honor, an injunction that would transform the previous

537

# EXHIBIT 30-D

No. 25-2473

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

---

G.B., a minor, by and through her Guardian, G.P., et al.,
*Plaintiffs-Appellants,*

v.

U.S. ENVIRONMENTAL PROTECTION AGENCY, et al.,
*Defendants-Appellees.*

---

Appeal from the United States District Court for the
Central District of California
No. 2:23-CV-10345 (Hon. Michael W. Fitzgerald)

---

**FEDERAL DEFENDANTS' ANSWERING BRIEF**

---

<table>
<tr><td></td><td>ADAM R.F. GUSTAFSON<br> *Principal Deputy Asst. Attorney General*</td></tr>
<tr><td>Of counsel:</td><td>ROBERT N. STANDER<br> *Deputy Assistant Attorney General*</td></tr>
<tr><td>DANIEL H. CONRAD<br> *Associate Deputy General Counsel*<br>Office of General Counsel<br>U.S. Environmental Protection<br>Agency</td><td>SEAN C. DUFFY<br>DANIEL HALAINEN<br>CHRISTOPHER ANDERSON<br> *Attorneys*<br>Environment and Natural Resources Div,<br>U.S. Department of Justice<br>Post Office Box 7415<br>Washington, D.C. 20044<br>(202) 353-1834<br>christopher.anderson3@usdoj.gov</td></tr>
</table>

*United States*, 523 U.S. 296, 300 (1998) (quotation omitted). As discussed above, pp. 34–36, it is uncertain whether EPA will even regulate GHGs in the future, much less that its regulatory decision will be meaningfully influenced by an RIA that discounted future impacts. But if EPA were to rely on an RIA that incorporated discounting in a future proposed rule, that proposal would be subject to notice and comment, providing Plaintiffs with an opportunity to persuade EPA that the application of discounting in that context would be unreasonable, contrary to record evidence, or inconsistent with applicable law, including their argument that discounting violates equal protection principles. In the event that EPA adopts the rule over such objections, Plaintiffs would "have ample opportunity later to bring [their] legal challenge at a time when [their] harm is more imminent and more certain," by challenging that particular rule. *Ohio Forestry Ass'n*, 523 U.S. at 734.

Plaintiffs no doubt would find it "easier, and certainly cheaper, to mount one legal challenge" than to wait and challenge individual final agency actions later. *Id.* at 734. But "this kind of litigation cost saving" is not "sufficient by itself to justify review in a case that would otherwise be unripe." *Id.* at 735.

# EXHIBIT 30-E

# Founders Online                    [Back to normal view]

## Address to the Agricultural Society of Albemarle, 12 May 1818

### Address to the Agricultural Society of Albemarle

12 May 1818

It[1] having pleased the Society to name me for their presiding member, I feel it a duty, on my first appearing among you, to repeat my acknowledgements, for that honorary distinction; with the assurances of my sincere desire to promote the success of an establishment, which has in view so valuable an object as that of improving the agriculture of our country.

The faculty of cultivating the earth, and of rearing animals, by which food is increased beyond the spontaneous supplies of nature, belongs to man alone. No other terrestrial being has received a higher gift, than an instinct, like that of the Beaver or the Ant, which merely hoards, for future use, the food spontaneously furnished by nature.

As this peculiar faculty gives to man a pre-eminence over irrational animals; so, it is the use made of it by some, and the neglect of it by other communities, that distinguish them from each other, in the most important features of the human character.

The contrast between the enlightened and refined nations on some parts of the earth, and the rude and wretched tribes on others, has its foundation in this distinction. Civilization is never seen without agriculture: nor has agriculture ever prevailed, where the civilized arts did not make their appearance.

But, closely as agriculture and civilization are allied, they do not keep pace with each other. There is probably, a much higher state of agriculture in China and Japan,[2] than in many other countries far more advanced in the improvements of civilized life. It is surely no small reproach to the latter, that with so great a superiority in science, and in the fuller possession of the auxiliary arts, they should suffer themselves to be outstripped in the very art by which both are essentially distinguished from the brute creation.

It must not be inferred, however, from the capacities and the motives of man, for an artificial increase of the productions of the earth, that the transition from the hunter, or even the herdsman state, to the agricultural, is a matter of course. The first steps in this transition, are attended with difficulty; and what is more, with disinclination.

Without a knowledge of the metals, and the implements made of them, the process of opening and stirring the soil, is not an easy operation; tho' one perhaps, not requiring more effort and contrivance, than produced the instruments used by Savages in war and in the chase.

And that there is a disinclination in human nature to exchange the savage for the civilized life, cannot be questioned. We need not look for proofs beyond our own neighbourhood. The Indian Tribes have ever shewn an aversion to the change. Neither the persuasive examples of plenty and comfort derived from the culture of the earth by their white brethren, nor the lessons and specimens of tillage placed in the midst of them, and seconded by actual sufferings from a deficient and precarious subsistence, have diverted them from their strong propensities and habitual pursuits. In the same spirit, they always betray an anxious disposition to return to their pristine life, after being weaned from it by time, and apparently moulded by intellectual and moral instruction, into the habits and tastes of an agricultural people. A still more conclusive evidence of the bias of human nature, is seen in the familiar fact, that our own people, nursed and reared in these habits and tastes, easily slide into those of the savage, and are rarely reclaimed to civilized society with their own consent.

Had the Europeans, on their arrival, found this continent destitute of human inhabitants, whose dangerous neighbourhood kept them in a compact and agricultural state, and had their communication with the countries they left, been discontinued, they might have spread themselves into the forests where game and fruits would have abounded; and gradually forgetting the arts no longer necessary to their immediate wants, have degenerated into savage tribes.

An admired historian,[*] in his enquiry into the origin of the American Savages,[3] represents any such degeneracy as impossible. He lays it down as a certain principle that the necessary arts of life, when once introduced among a people, can never be lost; that the dominion over inferior animals once enjoyed, will never be abandoned; and that America,

consequently, must have been peopled from a country as uncivilized as itself. Yet, [4] he derives the American Savages, generally, from the Tartars, whose example must have taught them the use of certain animals, for which a substitute might have been found in the Bison or Buffalo at least, (the same animal with the Cow,) if not in the Elk, the Moose, or the Caraboo: And he regards the Esquimaux, a tribe distinguished in several respects, for their rude condition, as descendants from the Greenlanders, (of the same modes of life with themselves,) who were a colony from Norway planted in the ninth century; an epoch prior to which the Norwegians had made such progress in the arts, as to be capable of formidable maritime expeditions. The Greenland Colony, therefore, must have undergone a degeneracy from the condition of its parent country. Without supposing the possibility of a transition from a better state of human society, to a savage state, how would the learned historian have accounted for the introduction of the savage state at all? [5]

The bent of human nature may be traced on the chart of our own country. The manufacturer readily exchanges the loom for the plough, in opposition often, to his own interest, as well as to that of his country. The cultivator, in situations presenting an option, prefers to the labours of the field, the more easy employment of rearing a herd. And as the game of the forest is approached, the hunting life displays the force of its attractions. Where do we behold a march in the opposite direction; the hunter becoming the herdsman; the latter a follower of the plough; and the last repairing to the manufactory or the workshop? [6]

Such indeed is the fascination of that personal independence which belongs to the uncivilized state, and such the disrelish and contempt of the monotonous labour of tillage, compared with the exciting occupations of the chace [*sic*], or with the indolence enjoyed by those who subsist chiefly on the mere bounties of nature, or on their migratory flocks, that a voluntary relinquishment of these latter modes of life, is little to be expected. We certainly perceive nothing in the character of our savage neighbours, from which it could be inferred that even the germs of agriculture observed in their spots of maize, and a few other cultivated plants, would ever be developed into the extent implied by an agricultural life. To that little resource combined with the game furnished by the forest and by the lake or the stream, their population and habits are adjusted. There may be said, in fact, to be a plenum of the former; because it is commensurate with their food; and this cannot be increased without a change of habits, which being founded in natural propensities, do not change of themselves.

The first introduction of agriculture among a savage people appears, accordingly, never to have taken place without some extraordinary interposition. Where it has not been obtruded by colonies transplanted from agricultural countries, as from Phœnicia and Egypt into Greece, and from Greece herself, among her savage neighbours, the revolution has proceeded from some individual whose singular endowments, and supernatural pretensions, had given him an ascendancy for the purpose. All these great reformers, in ancient times, were regarded as more than men, and ultimately worshipped as gods. A very remarkable example of modern date, is found in the revolution from the savage to the agricultural state, said to have been brought about by Manco Capac, [7] among the Peruvians, to whom he represented himself as the offspring of the sun.

Agriculture once effectually commenced, may proceed, of itself, under impulses of its own creation. The mouths fed by it increasing, and the supplies of nature decreasing, necessity becomes a spur to industry; which finds another spur, in the advantages incident to the acquisition of property in the civilized state. And thus a progressive agriculture, and a progressive population ensue.

But, although no determinate limit presents itself to the increase of food, and to a population commensurate with it, other than the limited productiveness of the earth itself, we can scarcely be warranted in supposing that all the productive powers of its surface can be made subservient to the use of man, in exclusion of all the plants and animals not entering into his stock of subsistence; that all the elements and combinations of elements in the earth, the atmosphere and the water, which now support such various and such numerous descriptions of created beings, animate and inanimate, could be withdrawn from that general destination, and appropriated to the exclusive support and increase of the human part of the creation; so that the whole habitable earth should be as full of people, as the spots most crowded now are or might be made, and as destitute as those spots, of the plants and animals not used by man.

The supposition cannot well be reconciled with that symmetry in the face of nature, which derives new beauty from every insight that can be gained into it. It is forbidden also, by the principles and laws which operate in various departments of her economy, falling within the scope of common observation, as well as within that of philosophic researches.

The earth contains not less than thirty or forty thousand kinds of plants; not less than six or seven hundred of birds; nor less than three or four hundred of quadrupeds; to say nothing of the thousand species of fishes. Of reptiles and insects, there are more than can be numbered. To all these must be added, the swarms and varieties of animalcules and minute vegetables not visible to the natural eye, but whose existence is probably connected with that of visible animals and plants.

On comparing this vast profusion and multiplicity of beings with the few grains and grasses, the few herbs and roots, and the few fowls and quadrupeds, which make up the short list adapted to the wants of man; it is difficult to believe that it lies with him, so to re-model the work of nature, as it would be re-modelled, by a destruction, not only of individuals, but of entire species; and not only of a few species, but of every species, with the very few exceptions which he might spare for his own accommodation.

Such a multiplication of the human race, at the expence of the rest of the organized creation, implies that the food of all plants is composed of elements equally and indiscriminately nourishing all; and which consequently may be wholly appropriated to the one or few plants best fitted for human use.

Whether the food or constituent matter of vegetables, be furnished from the earth, the air or water; and whether directly, or by either, through the medium of the others, no sufficient ground appears for the inference that the food for all is the same.

Different plants require different soils; some flourishing in sandy, some in clayey; some in moist, some in dry soils; some in warm, some in cold situations. Many grow only in water—and a few subsist in the atmosphere. The forms, the textures and the qualities of plants are still more diversified. That things so various and dissimilar in their organizations, their constitutions and their characters, should be wholly nourished by, and consist of precisely the same elements, requires more proof than has yet been offered. [8]

A case which has been relied on to prove that different foods are not necessary for different plants, is that of grafting or inoculating one kind of plant on another kind; the sap obtained by the stock for itself, being found to feed and perfect the graft. But, this operation has its limits. It does not extend beyond plants having a certain affinity. The Apple Tree may be planted on the Pear or the Quince. It will not succeed on the Peach or the Cherry. If the cases prove that the same food suffices for the Apple and the Pear, they equally prove that different foods are required for the Apple and the Peach. It is said even, that the fruit from the Peach Graft on the Almond, is not precisely the same with that from a Peach Graft on a Plum.

It may be offered as another argument to the same effect, that all animal and vegetable decompositions answer indiscriminately as manures. The fact is not precisely so. Certain manures succeed best with certain plants. [9] It is true, nevertheless, that animal and vegetable substances in a decomposed state, are, generally, manures for plants. Fish even, an animal from the water, is successfully used as a manure for Indian Corn and other crops. But this, and similar examples prove only, that some ingredients are the same in all animals and plants, not that all the ingredients in each are the same.

The chemist, though as yet a fellow student as much as a preceptor of the agriculturist, justly claims attention to the result of his processes. From that source we learn that the number of known elements, not yet decomposable, is between forty and fifty; that about seven or eight belong to the organs of plants; that different elements enter into the composition of the same plant; and that they are combined in different numbers and in different proportions, in different plants. [10] Supposing then, as must be supposed, that these different elements, in their actual quantities and proportions, are adapted to the quantities and the proportions of the existing varieties of plants; it would happen in so great a change as that in question, with respect to the number and variety of plants, that the quantities and the proportions of the elements, would not be adapted to the particular kinds and numbers of plants retained by man for his own use. Like the types of the Alphabet, apportioned to the words composing a particular book, when applied to another book materially different in its contents, there would be, of some a deficiency, of others, a useless surplus.

Were it less difficult to admit that all the sources of productiveness could be exclusively appropriated to the food of man, is it certain that an obstacle to his indefinite multiplication would not be encountered in one of the relations between the atmosphere and organized beings?

Animals, including man, and plants may be regarded as the most important part of the terrestrial creation. They are pre-eminent in their attributes; and all nature teems with their varieties and their multitudes, visible and invisible. To all of them, the atmosphere is the breath of life. Deprived of it, they all equally perish. But it answers this purpose by virtue of its appropriate constitution and character. What are these?

The atmosphere is not a simple but a compound body. In its least compound state, it is understood to contain, besides what is called vital air, others noxious in themselves, yet without a portion of which, the vital air becomes noxious. But the atmosphere in its natural state, and in its ordinary communication with the organized world, comprises various ingredients or modifications of ingredients derived from the use made of it, by the existing variety of animals and plants. The exhalations & perspirations, the effluvia and transpirations [11] of these, are continually charging the atmosphere with a heterogeneous variety and immense quantity of matter, which together must contribute to the character which fits it for its destined purpose, of supporting the life and health of organized beings. Is it unreasonable to suppose, that if, instead of the actual composition and character of the animal and vegetable creation, to which the atmosphere is now accommodated, such a composition and character of that creation, were substituted, as would result from a reduction of the whole to man and a few kinds of animals and plants; is the supposition unreasonable, that the change might essentially affect the aptitude of the atmosphere for the functions required of it; and that so great an innovation might be found, in this respect, not to accord with the order and economy of nature?

The relation of the animal part and the vegetable part of the creation to each other, through the medium of the atmosphere, comes in aid of the reflection suggested by the general relation between the atmosphere and both. It seems to be now well understood, that the atmosphere when respired by animals becomes unfitted for their further use, and fitted for the absorption of vegetables; and that when evolved by the latter, it is refitted for the respiration of the former: an interchange being thus kept up, by which this breath of life is received by each, in a wholesome state, in return for it in an unwholesome one.

May it not be concluded from this admirable arrangement and beautiful feature in the economy of nature, that if the whole class of animals were extinguished, the use of the atmosphere by the vegetable class alone, would exhaust it of its life-supporting power; that in like manner, if the whole class of vegetables were extinguished, the use of it by the animal class alone, would deprive it of its fitness for their support? And if such would be the effect of an entire destruction of either class, in relation to the other, the inference seems to press itself upon us, that so vast a change in the proportions of each class to the other, and in the species composing the respective classes, as that in question, might not be compatible with the continued existence and health of the remaining species of the two classes.

The [12] immensity of the atmosphere, compared with the mass of animals and vegetables, forms an apparent objection only to this view of the subject. The comparison could at most suggest questions as to the period of time necessary to exhaust the atmosphere of its unrenewed capacity to keep alive animal or vegetable nature, when deprived, either, of the support of the other. And this period contracts itself at once to the imagination, when it is recollected that the immensity of the atmosphere is the effect of its elasticity and rarefaction. We know from the barometer, that condensed to the specific gravity of Mercury, its rise above the surface of the earth would be but about thirty inches; and from the well pump, that condensed to the specific gravity only of water, which is nearly the same with that of the human body, its rise would be little more than as many feet; that is, a little more than five times the human stature. It is found that a single human person employs in respiration not less than sixteen or eighteen times his own weight of common air, in every twenty-four hours. In different degrees, some greater, some less, the case is the same with most other animals. Plants make a correspondent use of air for their purposes.

Other views of the economy of nature coincide with the preceding. There is a known tendency in all organized beings to multiply beyond the degree necessary to keep up their actual numbers. It is a wise provision of nature—1, to guard against the failure of the species: 2, to afford in the surplus, a food for animals whether subsisting on vegetables, or on other animals which subsist on vegetables. Nature has been equally provident in guarding against an excessive multiplication of any one species which might too far encroach on others, by subjecting each, when unduly multiplying itself, to be arrested in its progress by the effect of the multiplication—1, in producing a deficiency of food; and where that may not happen, 2, in producing a state of the atmosphere unfavourable to life and health. All animals, as well as plants, sicken and die in a state too much crowded. It is the case with our domestic animals of every sort, where no scarcity for food can be the cause. [13] To the same laws mankind are equally subject. An increase, not consisting with the general plan of nature, arrests itself. According to the degree in which the number thrown together exceeds the due proportion of space and air, disease and mortality ensue. It was the vitiated air alone which put out human life in the crowded hole of Calcutta. [14] In a space somewhat enlarged, the effect would have been slower, but not less certain. In all confined situations, from the dungeon, to

the crowded workhouses, and from these, to the compact population of overgrown cities, the atmosphere becomes in corresponding degrees, unfitted by re-iterated use, for sustaining human life and health. Were the atmosphere breathed in cities and not diluted and displaced by fresh supplies from the surrounding country, the mortality would soon become general. Were the surrounding country thickly peopled and not refreshed in like manner, the decay of health, though a later, would be a necessary consequence. And were the whole habitable earth covered with a dense population, [15] wasteful maladies might be looked for, that would thin the numbers into a healthy proportion.

Were the earth in every productive spot, and in every spot capable of being made productive, appropriated to the food of man; were the spade substituted for the plough, and all animals consuming the food of man, or food for which human food might be substituted, banished from existence, so as to produce the maximum of population on the earth, there would be more than an hundred individuals, for every one now upon it. [16] In the actual population of many countries, it brings on occasional epidemics to be traced to no other origin than the state of the atmosphere. Increase the numbers to ten or twenty fold, [17] and can it be supposed that they would, at any time, find the breath of life in a condition to support it; or if that supposition be admissible when limited to a single country, can it be admitted, when not only the contiguous countries, but the whole earth was equally crowded?

Must we then adopt the opinion entertained by some philosophers, that no variation whatever in the numbers and proportions of the organized beings belonging to our globe, is permitted by the system of nature; that the number of species and of individuals in the animal and vegetable empires, since they attained a destined complement, has been, and must always be the same; that the only change possible is in local augmentations and diminutions which balance each other, and thus maintain the established and unalterable order of things?

This would be the opposite extreme to that which has been rejected. Man, though so similar in his physical constitution to many other animals, is essentially distinguished from all other organized beings, by the intellectual and moral powers with which he is endowed. He possesses a reason and a will by which he can act on matter organized and unorganized. He can, by the exercise of these peculiar powers, increase his subsistence, by which his numbers may be increased beyond the spontaneous supplies of nature; and it would be a reasonable conclusion, that making as he does, in his capacity of an intelligent and voluntary agent, an integral part of the terrestrial system, the other parts of the system are so framed as not to be altogether unsusceptible of his agency, and unpliable to its effects.

This reasonable conclusion is confirmed by the fact, that the capacity of man, derived from his reason and his will, has effected an increase of particular plants and animals conducive to an increase of his own race; and a diminution of the numbers, if not of the species, of plants and animals displaced by that increase.

Most, if not all of our domesticated animals probably exceed the numbers which, without the intervention of man, would be their natural amount; whilst the animals preying on, or interfering with them, are proportionally reduced in their numbers.

The case is the same with cultivated plants. They are increased beyond their natural amount; and banish, or proportionally reduce such as interfere with them.

Nor can it be said, that these changes made by human art and industry in some regions, are balanced by corresponding changes made by nature, in other regions. Take for examples, the articles of wheat, rice, millet, and maize, which are the chief food of civilized man; and which are now spread over such immense spaces. It is not possible to regard them as occupying no more than their original and fixed proportions of the earth; and that in other parts of it, they have disappeared in the same degree in which they are thus artificially extended. These grains belong to the torrid and temperate zones only; and so great a proportion of these zones have been explored, that it is certain, they could not have been displaced from other parts of the globe, in the degree in which they abound where they are now cultivated, and where it is certain they owe their abundance to cultivation. There must consequently be an absolute increase of them produced by the agency of man.

Take more particularly for an example, the article of rice, which constitutes so large a portion of human food. The latitudes to which its growth is limited by the nature of the plant, are for the most part so well known, that it may be assumed for an unquestioned fact, that this grain cannot always have prevailed any where, in the extent in which it is now cultivated. And it is equally certain, that the vegetable productions belonging to the same climates, which must have been displaced by its cultivation, have not received an equivalent introduction and extension elsewhere.

It is remarkable that the vegetable productions most extensively used as human food, are but little, if at all found in their indigenous state; whether that state be the same as their present one, or a state from which they were improveable into their present state. They seem indeed not likely to flourish extensively in situations not prepared by the hand of man. The potato so recently brought into use, and now spreading itself over so great a surface, can barely be traced to a native state in the mountains of Chili, [18] nor can it be believed, that previous to its adoption by man, it ever existed in the extent to which cultivation is now carrying it.

These views of the subject seem to authorise the conclusion, that although there is a proportion between the animal and vegetable classes of beings on our globe, and between the species in each class, with respect to which, nature does not permit such a change as would result from a destruction of the animals and vegetables not used by man; and a multiplication of the human race, and of the several species of animals and vegetables used by it, sufficient to fill up the void; yet that there is a degree of change which the peculiar faculties of man enable him to make; and by making which, his fund of subsistence and his numbers may be augmented; there being at the same time, whenever his numbers, and the change, exceed the admitted degree, a tendency in that excess to correct itself.

Could it however be supposed that the established system and symmetry of nature, required the number of human beings on the globe to be always the same; that the only change permitted in relation to them, was in their distribution over it; still, as the blessing of existence to that number would materially depend on the parts of the globe on which they may be thrown; on the degree in which their situation may be convenient or crowded; and on the nature of their political and social institutions; motives would not be wanting to obtain for our portion of the earth, its fullest share, by improving the resources of human subsistence, according to the fair measure of its capacity. For, in what other portion of equal extent will be found climates more friendly to the health or congenial to the feelings of its inhabitants? In what other, a soil yielding more food with not more labour? And above all, where will be found institutions equally securing the blessings of personal independence, and of social enjoyments? The enviable condition of the people of the United States, is often too much ascribed to the physical advantages of their soil and climate, and to their uncrowded situation. Much is certainly due to these causes— but a just estimate of the happiness of our country, will never overlook what belongs to the fertile activity of a free people, and the benign influence of a responsible government.

In proportion as we relax the hypothesis which makes the aggregate number of mankind unsusceptible of change, and believe that the resources of our country may not only contribute to the greater happiness of a given number, but to the augmentation of the number enjoying a greater happiness, the motives become stronger for the improvement and extension of them.

But, whilst all are sensible that agriculture is the basis of population and prosperity, it cannot be denied that the study and practice of its true principles have hitherto been too generally neglected in the United States; and that this state has at least its full share of the blame. Now only for the first time, notwithstanding several meritorious examples of earlier date, a general attention seems to be awakened to the necessity of a reform. Patriotic societies, the best agents for effecting it, are pursuing the object with the animation and intelligence which characterize the efforts of a self-governed people, whatever be the objects to which they may be directed.

Among these promising institutions, I cannot glance at the names of those composing that of Albemarle, without being assured, that its full quota of information will be furnished to the general stock. I regret only, that my own competency bears so little proportion to my wishes to cooperate with them. That I may not be thought, however deficient in good will, as well as in other requisites, I shall venture on the task, a task the least difficult, of pointing out some of the most prevalent errors in our husbandry, and which appear to be among those which may merit the attention of the society, and the instructive examples of its members. [19]

I. The error first to be noticed is that of cultivating land, either naturally poor or impoverished by cultivation. This error, like many others, is the effect of habit, continued after the reason for it has failed. Whilst there was an abundance of fresh and fertile soil, it was the interest of the cultivator to spread his labour over as great a surface as he could. Land being cheap and labour dear, and the land co-operating powerfully with the labour, it was profitable to draw as much as possible from the land. Labour is now comparatively cheaper and land dearer. Where labour has risen in price fourfold, land has risen tenfold. It might be profitable, therefore, now to contract the surface over which labour is spread, even if the soil retained its freshness and fertility. But this is not the case. Much of the fertile soils is exhausted, and unfertile soils are brought into cultivation; and

both co-operating less with labour in producing the crop, it is necessary to consider how far labour can be profitably exerted on them; whether it ought not to be applied towards making them fertile rather than in further impoverishing them; or whether it might not be more profitably applied to mechanical occupations or to domestic manufactures.

In the old countries of Europe, where labour is cheap and land dear, the object is to augment labour and contract the space on which it is employed. In the new settlements taking place in this country, the original practice here may be rationally pursued. In the old settlements, the reason for the practice in Europe is becoming daily less inapplicable, and we ought to yield to the change of circumstances by forbearing to waste our labour on land, which, besides not paying for it, is still more impoverished and rendered more difficult to be made rich. The crop which is of least amount gives the blow most mortal to the soil. It has not been a very rare thing to see land under the plough not producing enough to feed the ploughman and his horse; and it is in such cases that the death blow is given. The goose is killed without even obtaining the coveted egg.

There cannot be a more rational principle in the code of agriculture, than that every farm which is in good heart should be kept so; that every one not in good heart should be made so; and that what is right as to the farm generally, is so as to every part of every farm. Any system therefore, or want of system, which tends to make a rich farm poor, or does not tend to make a poor farm rich, cannot be good for the owner, whatever it may be for the tenant or superintendant who has a transient interest only in it. The profit, where there is any, will not balance the loss of intrinsic value sustained by the land.

II. The evil of pressing too hard on the land, has also been much increased by the bad mode of ploughing it. Shallow ploughing, and ploughing up and down hilly land have, by exposing the loosened soil to be carried off by rains, hastened more than any thing else, the waste of its fertility. When the mere surface is pulverized, moderate rains on land but little uneven, if ploughed up and down, gradually wear it away. And heavy rains on hilly land ploughed in that manner, soon produce a like effect, notwithstanding the improved practice of deeper ploughing. How have the beauty and value of this red ridge of country suffered from this cause? and how much is due to the happy improvement introduced by a member of this Society, whom I need not name, * by a cultivation in horizontal drills, with a plough adapted to it? Had the practice prevailed from the first settlement of the country, the general fertility would have been more than the double of what the red hills, and indeed all other hilly lands now possess; and the scars and sores now defacing them would no where be seen. Happily, experience is proving that this remedy aided by a more rational management in other respects, is adequate to the purpose of healing what has been wounded, as well as of preserving the health of what has escaped the calamity. It is truly gratifying to observe how fast the improvement is spreading from the parent example. The value of our red hills, under a mode of cultivation which guards their fertility against wasting rains, is probably exceeded by that of no uplands whatever; and without that advantage, they are exceeded in value by almost all others. They are little more than a lease for years.

Besides the inestimable advantage from horizontal ploughing, in protecting the soil against the wasting effect of rains, there is a greater one, in its preventing the rains themselves from being lost to the crop. The Indian Corn is the crop which most exposes the soil to be carried off by the rains, and it is at the same time the crop which most needs them. Where the land is not only hilly, but the soil thirsty, (as is the case particularly throughout this mountainous range) the preservation of the rain as it falls, between the drilled ridges, is of peculiar importance; and its gradual settling downwards to the roots, is the best possible mode of supplying them with moisture. In the old method of ploughing shallow, with the furrows up and down, the rain, as well as the soil, was lost.

III. The neglect of manures is another error which claims particular notice. It may be traced to the same cause with our excessive cropping. In the early stages of our agriculture, it was more convenient and more profitable to bring new land into cultivation, than to improve exhausted land. The failure of new land, has long called for the improvement of old land; but habit has kept us deaf to the call.

Nothing is more certain than that continual cropping without manure deprives the soil of its fertility. It is equally certain, that fertility may be preserved or restored, by giving to the earth animal or vegetable manure equivalent to the matter taken from it; and that a perpetual fertility is not, in itself, incompatible, with an uninterrupted succession of crops. The Chinese, it is said, smile at the idea that land needs rest, as if, like animals, it had a sense of fatigue. Their soil does not need rest, because an industrious use is made of every fertilizing particle, that can contribute towards replacing what has been drawn from it. And this is the more practicable with them, as almost the whole of what is grown on their farms is consumed within them. That a restoration to the earth of all that annually grows on it, prevents its impoverishment, is sufficiently seen in our forests; where the annual exuviæ of the trees and plants, replace the fertility of which they deprive the earth. Where frequent fires

destroy the leaves and whatever else is annually dropped on the earth, it is well known that the land becomes poorer; this destruction of the natural crop having the same impoverishing effect as the removal of a cultivated crop. A still stronger proof that an annual restoration to the earth of all its annual product will perpetuate its productiveness, is seen where our fields are left uncultivated and unpastured. In this case, the soil, receiving from the decay of the spontaneous weeds and grasses, more fertility than they extract from it, is, for a time at least, improved, not impoverished. Its improvement may be explained, by the fertilizing matter which the weeds and grasses derive from water and the atmosphere, which forms a nett gain to the earth. At what point, or from what cause, the formation and accumulation of vegetable mould from this gain ceases, is not perhaps, very easy to be explained. That it does cease, is proved by the stationary condition of the surface of the earth in old forests; and that the amount of the accumulation varies with the nature of the subjacent earth, is equally certain. It seems to depend also on the species of trees and plants which happen to contribute the materials for the vegetable mould.

But, the most eligible mode of preserving the richness, and of enriching the poverty of a farm is, certainly that of applying to the soil a sufficiency of animal and vegetable matter in a putrified state, or a state ready for putrifaction, in order to procure which, too much care cannot be observed in saving every material furnished by the farm. This resource was among the earliest discoveries of men living by agriculture; and a proper use of it has been made a test of good husbandry in all countries, ancient and modern, where its principles and profits have been studied.

Some farmers of distinction, headed by Tull, [20] supposed that mere earth, in a pulverized state, was sufficient without manure for the growth of plants; and consequently, that continued pulverization would render the soil perpetually productive; a theory, which never would have occurred to a planter of tobacco or of Indian corn, who finds the soil annually producing less and less, under a constant pulverizing course. The known experiment of Van-Helmont [21] seemed to favour the opposite theory, that the earth parted with nothing towards the plants growing on it. If there were no illusion in the case, the earth used by him must, at least, have been destitute of vegetable mould. For, in an experiment by Woodhouse, [22] a garden mould was diminished in its weight by a plant which grew in it. And the latest chemical examination of the subject co-incide with the general opinion of practical husbandmen that the substance of plants, partakes of the substance of the soil.

The idea is, indeed, very natural that vegetable matter which springs from the earth, and of itself returns to the earth, should be one source at least of the earth's capacity to re-produce vegetable matter.

It has been asked how it happens that Egypt and Sicily, which have for ages been exporting their agricultural produce without a return of any equivalent produce, have not lost their re-productive capacity. One answer has been, that they have lost no small degree of it. If the fact be otherwise with regard to Egypt, it might be accounted for by the fertilizing inundations of the Nile. With regard to Sicily, there may be something in the system of husbandry, or some particular local circumstances, which countervail the continued asportation of the fruits of the soil. But it is far more probable, that the island is less productive than it once was. It is certainly less of a granary for other countries now, than it was when it received that title from the ancient Romans. And its population being diminished, the internal consumption must also be diminished. If a single farm is rendered less productive by a continued removal of its crops, without any adequate returns, no reason occurs why it should not happen to a number of farms multiplied to the extent of a whole country.

And that individual farms do lose their fertility in proportion as crops are taken from them, and returns of manure neglected, is a fact not likely to be questioned.

If it were, Virginia, unfortunately, is but too capable of furnishing the proofs. Her prevailing crops have been very exhausting, and the use of manures has been particularly neglected.

Tobacco and Indian Corn, which for a long time on the east side of the Blue Mountains were the articles almost exclusively cultivated, and which continue to be cultivated, the former extensively, the latter universally, are known to be great impoverishers of the soil. Wheat, which has for a number of years, formed a large portion of the general crop, is also an exhausting crop. So are Rye and Oats which enter occasionally into our farming system.

With so many consumers of the fertility of the earth, and so little attention to the means of repairing their ravages, no one can be surprised at the impoverished face of the country; whilst every one ought to be desirous of aiding in the work of reformation.

The first and main step towards it, is, to make the thieves restore as much as possible of the stolen fertility. On this, with other improvements which may be made in our husbandry, we must depend for the rescue of our farms from their present degraded condition.

Of Tobacco, not a great deal more than one half of the entire plant is carried to market. The residue is an item on the list of manures: and it is known to be in its quality a very rich one. The crop of Tobacco, however, though of great value, covers but a small proportion of our cultivated ground; and its offal can of course contribute but inconsiderably to the general stock of manure. It is probable also that what it does contribute, has been more carefully used as a manure, than any other article furnished by our crops.

The article which constitutes our principal manure is wheat straw. It is of much importance therefore to decide aright on the mode of using it. There are three modes: 1. Carrying it from the farm yard, after having passed through or being trodden and enriched by cattle. In that mode, the greater part of it must be used, if used at all; the straw going through that process, being a necessary part of the food allotted to the cattle. To derive the full advantage from it, it ought to be hauled out before the substance has been wasted by rain, by the sun, and by wind; and to be buried in the earth as soon after as possible. 2. Spreading the straw on the surface of the ground. Many respectable farmers are attached to this mode, as protecting the soil from the sun; and by keeping it moist, favoring the vegetation underneath, whether spontaneous or artificial; whilst the straw itself is gradually decomposed into a manure. The objection to this mode is the loss by evaporation, before this last effect is obtained. 3. Turning the straw at once under the surface of the earth. This would seem to be the best mode of managing manures generally; least of their substance being then lost. When the grain is trodden out from the straw, it is left in a state easily admitting this operation. Some difficulty may attend it, when the grain is threshed from the straw by the flail, or by the machines now in use, neither of which break the straw sufficiently to pieces.

It may be remarked with regard to this article of manure—1. That its weight is barely more than that of the grain. 2. That the grain is the part which makes the greatest draft on the fertility of the earth. 3. That the grain is for the most part not consumed within the farm. It is found on trial that a stalk of wheat, as generally cut, including the chaff, and the grains borne by the stalk, are pretty nearly of equal weight. The case is probably the same with rye; and not very different with oats. The proportion of fertilizing matter in the straw, to that in the grain, has not, as far as I know, been brought to any satisfactory test. It is doubtless much less in the straw, which alone in the case of wheat, is with us returnable in any form to the earth. This consideration, whilst it urges us to make the most of the article as a manure, warns us of its insufficiency.

The stubble and the roots of the small grains, not being taken from the earth, may be regarded as relapsing into a fertility equal to that of which they deprived the earth. This remark is applicable to all cultivated plants, the roots of which are not an esculent part.

An eminent citizen and celebrated agriculturist[*] of this state, has among other instructive lessons, called the public attention to the value of the corn stalk as a manure. [23] I am persuaded that he has not overrated it—And it is a subject of agreeable reflection, that an article which is so extensively cultivated as that of Indian corn, and which is so particularly exhausting, should be the one so capable of repairing the injury it does.

The corn stalk as a fodder is of great value. Not only the leaves, but the husk inclosing the ear, and the cob inclosed by it, are all more or less valuable food when duly preserved and dealt out to cattle. There is no better fodder than the leaves or blades for horses and oxen; nor any so much approved for sheep. The husk or shuck is a highly nourishing food for neat cattle. And the pickings of the stalk, even at a late season, and after much exposure to the weather, support them better than any of the straws. From the saccharine matter in the stalk, which is long retained about the joints, it cannot be doubted that if cut early, or before exposure to the weather, into parts small enough for mastication, it would well repay, as a food for cattle, the labor required for it.

The great value of the corn stalk, in all its parts as a fodder, was brought into full proof, by the use made of it during the late general failure of crops. It is to be hoped that the lesson will not be suffered to pass into oblivion.

But it is as a resource for re-fertilizing the soil, that the corn stalk finds the proper place here; and as such it merits particular notice; whether it be passed through animals; or be prepared by fermentation in the farm yard; or be merely spread on the surface of the earth, the mode in which its effect must be least considerable. The same qualities which render every part of it nutritious to animals, render it nutritious to the earth, and it is accompanied with the peculiar advantages: 1, that

the grain itself is mostly every where, and altogether, in places distant from navigation, consumed within the farms producing it; 2, that as the grain is in greater proportion to the space on which it grows, than most other grains, so the rest of the plant is in greater proportion to the grain, than the rest of any other grain plant. The straw and chaff of the smaller grains, as already remarked, is in weight but about one half the grain. The corn stalk with all its appurtenant offal is of not less than three times, and if taken early from the field, probably of not less than four or five times the weight of the grain belonging to it. 3, the fertilizing matter contained in the corn stalk is greater, in proportion to its weight, than that contained in the straw and offal of other grains is to the weight of the straw and offal.

Would it be hazarding too much to say, that where a level surface, or the mode of cultivating a hilly one, prevents the rains from carrying off the soil, a restoration of an entire crop of Indian corn, in the form of manure, to the space producing it (there being no other intervening crop not so restored) would replace the fertility consumed by the crop; and maintain a perpetual productiveness? Reason, the case of forest and fallow fields, where the spontaneous crop falls back of itself, to the earth, and the Chinese example, where the cultivated crop is restored to the earth, all pronounce that such would be the effect. And yet the fact stares us in the face, that our most impoverished fields, even the most level of them, owe their condition more to the crops of Indian corn, than to any other crops.

The articles of fodder which are least neglected as a fund of manure, are timothy and clover hays. But the average quantities on farms, is not as yet, very great; and seldom yield more than stable manure for gardens and culinary crops.

The cotton plant, which is so extensive a crop, in the more southern, and the South-Western States, is but little cultivated in Virginia, and scarcely at all in this part of it. I am not able to say how far it is comparatively an exhausting crop. But it would seem to be more capable than any crop, not wholly consumed within the farm, of preserving its fertility. The only part of the plant carried away is the cotton fibre or wooly part which bears an inconsiderable proportion to the other parts in weight, and as may be inferred, in fertilizing matter also. The seed alone, passing by the ball and the haulm, is of three times its weight, and contains the chief part of the oil in the plant. In the countries where cotton makes the principal part of the crop, the superfluous seed must deserve great attention as a manure. Where the fields are level or cultivated in horizontal drills, it might go far towards supporting a continued cropping without a diminished fertility.

The sum of these remarks on cultivating poor land, and neglecting the means of keeping or making land rich, is, that if every thing grown on a soil is carried from it, it must become unproductive; that if every thing grown on it be directly or indirectly restored to it, it would not cease to be productive; and, consequently, that according to the degree in which the one or the other practice takes place, a farm must be impoverished, or be permanently productive and profitable. Every acre made by an improved management to produce as much as two acres, is in effect, the addition of a new acre; with the great advantages, of contracting the space to be cultivated; and of shortening the distance of transportation between the fields, and the barn or the farm yard. One of the Roman writers,[*] on husbandry,[24] enforces the obligation to an improving management by a story of one Paridius who had two daughters and a vineyard: When the elder was married, he gave her a third part of the vineyard; notwithstanding which, he obtained from two thirds, the same crop as from the whole: when his other daughter was married, he portioned her with the half of what remained; and still, the produce of his vineyard was undiminished. The story, short as it is, contains a volume of instruction.

The plaster or gypsum, though not a manure within the farm itself, has been too long neglected as a fertilizing resource. It is now beginning to take a high and just rank as such. The proofs of its efficacy are as incontestible as the causes of it are obscure. The experiments of a very distinguished chemist,[‡] led him to the opinion, that its substance enters into the substance of the plant.[25] Without doubting the fact, it does not sufficiently account for the addition made to the size and weight of the plant, which greatly exceed the quantity of the plaster. It must, therefore, have some further mode of operating. Whether it be by neutralizing some noxious ingredient in the earth, one of the modes by which lime is supposed to operate, or by attracting and conveying to the plant, food from the earth, the air or water; or by exciting the plant to a more active use of its feeding powers, whatever they be; or by its accretion and assimilation to particular parts of plants on which these powers depend; thereby augmenting and strengthening those particular parts, and enabling the feeding powers to give proportional augmentation to every other part; whether by any one or more of these processes, or by some other or others distinct from them all, the growth of plants be promoted by this mineral, remains, it would seem, to be yet explained. In the mean time, a more extensive use of it, promises much advantage to our agriculture. I take it, however, that this advantage cannot be permanent without making the increased product of the soil, a source of manure to the soil. That the effect of the plaster will

be continued indefinitely, under a constant removal of the whole crop from the soil, surpasses belief. It can scarcely fail to exhaust at length, the productive powers of the earth. The period of time necessary for the purpose, may be uncertain; but that, as in the case of the other mineral manures, lime and marle, such must sooner or later, be the result, cannot well be so. The effect of pulverising the earth by tillage, as practised by Tull, is stated to have been uninterrupted crops of wheat, without manure for more than twenty years; which was regarded as a demonstration that tillage was a complete substitute for manure. Supposing the statement to be free from error, the inference is certainly not warranted by the fact. We know that some of our soils, not naturally richer than the highly manured soils on which Tull probably commenced his tillage, will bear a succession of crops for an equal period; and we know as well, that their fertility will not hold out forever. How long plaster, whatever be its mode of operation, will hold out, may not yet have been fully tried. But, to make it permanently successful, it will be wise to take for granted, that it must be made a source of future manure, as well as of immediate productiveness. If the crop, as augmented by the plaster, be given back to the soil, the soil may be benefitted more than it would be, by the return of a crop not augmented by the plaster. And in this way, fertility may be accelerated. The restoration of a crop increased by ordinary cultivation, to the soil on which it grew, would, I presume, fertilize it more than the restoration of a smaller crop spontaneously produced; although, in both cases, the whole taken from the soil, would return to it.

IV. Among the means of aiding the productiveness of the soil, which have not received merited attention, is irrigation. In scarcely any country does this resource abound more than in the United States; nor is there any where there is so little sensibility to its value. The inconsiderable use made of it is chiefly by emigrants, particularly Germans, or the immediate descendants of them. I have understood that the market of Baltimore has been much benefitted in dry seasons by the irrigation introduced by exiles from St. Domingo. For a distinguished proof of the importance of the practice, I may refer to the fact which has been stated, that in the neighbourhood of Barcelona in Spain, where a part of the land is under irrigation, and a part is not susceptible of it, both being otherwise of equal fertility, the part irrigated is of double price in the market. It is to be noted indeed that the climate is a dry one, and that the article cultivated is Lucerne. But this is a plant, which though much aided in its growth by moisture, is at the same time remarkable for the length of a tap-root, and fitted by that, as well as by the absorbent quality of its leaves, to flourish in a thirsty soil, and warm climate. Our particular district of country, abounding in springs, small streams, and suitable declivities, admits greatly of irrigation; and being generally of a thirsty nature, the more strongly invites the use of it.

V. I cannot but consider it as an error in our husbandry, that oxen are too little used in place of horses.

Every fair comparison of the expence of the two animals, favors a preference of the ox. But, the circumstance particularly recommending him is, that he can be supported when at work by grass and hay; whilst the horse requires grain, and much of it; and the grain generally given him is Indian corn, the crop which requires most labour and greatly exhausts the land.

From the best estimate I have been enabled to form, more than one half of the corn crop is consumed by horses, including the ungrown ones; and not less than one half, by other than pleasure horses. By getting free from this consumption, one half the labour and of the wear of the land would be saved, or rather more than one half; for on most farms, one half of the crop of corn grows on not more than two-fifths, and sometimes a smaller proportion of the cultivated fields; and the more fertile fields would of course be retained for cultivation. Every one can figure to himself the ease and conveniency of a revolution which would so much reduce the extent of his cornfields; and substitute for the labour bestowed on them, the more easy task of providing pasturage and hay.

But will not the ox himself when kept at labour require grain food as well as the horse? Certainly much less, if any. Judging from my own observation, I should say, that a plenty of good grass or good hay, will suffice without grain, where the labour is neither constant nor severe. But I feel entire confidence in saying, that a double set of oxen alternately at work, and therefore half the time at rest, might be kept in good plight without other food than a plenty of good grass or good hay. And as this double set would double the supply of beef tallow and leather, a set off is found in that consideration for a double consumption of that kind of food.

The objections generally made to the ox are—1. That he is less tractable than the horse. 2. That he does not bear heat as well. 3. That he does not answer for the single plough used in our cornfields. 4. That he is slower in his movements. 5. That he is less fit for carrying the produce of the farm to market.

The first objection is certainly founded in mistake. Of the two animals, the ox is the more docile. In all countries where the ox is the ordinary draught animal, his docility is proverbial. His intractability, where it exists, has arisen from an occasional use of him only, with long and irregular intervals; during which, the habit of discipline being broken, a new one is to be formed.

The second objection has as little foundation. The constitution of the ox accommodates itself, as readily as that of the horse, to different climates. Not only in ancient Greece and Italy, but throughout Asia, as presented to us in ancient history, the ox and the plough are associated. At this day, in the warm parts of India and China, the ox, not the horse, is in the draught service. In every part of India, the ox always appears, even in the train of her armies. And in the hottest parts of the West-Indies, the ox is employed in hauling the weighty produce to the sea ports. The mistake here, as in the former case, has arisen from the effect of an occasional employment only, with no other than green food. The fermentation of this in the animal heated by the weather, and fretted by the discipline, will readily account for his sinking under his exertions; when green food even, much less dry, with a sober habit of labour would have no such tendency.

The third objection also, is not a solid one. The ox can, by a proper harness, be used singly as well as the horse, between the rows of Indian corn; and equally so used for other purposes. Experience may be safely appealed to on this point.

In the fourth place, it is alledged that he is slower in his movements. This is true; but in a less degree than is often taken for granted. Oxen that are well chosen for their form are not worked after the age of about eight years, (the age at which they are best fitted for beef,) are not worked too many together, and are suitably matched, may be kept to nearly as quick a step as the horse. May I not say, a step quicker than that of many of the horses we see at work, who, on account of their age or the leanness occasioned by the costliness of the food they require, lose that advantage where they might have once had it?

The last objection has most weight. The ox is not as well adapted as the horse to the road service, especially for long trips. In common roads, which are often soft, and sometimes suddenly become so, the form of his foot and the shortness of his leg, are disadvantages; and on roads frozen or turnpiked, the roughness of the surface in the former case, and its hardness in both cases, are inconvenient to his cloven hoof. But where the distance to market is not great, where the varying state of the roads and of the weather, can be consulted; and where the road service is in less proportion to the farm service, the objection is almost deprived of its weight. In cases where it most applies, its weight is diminished by the consideration, that a much greater proportion of service on the farm may be done by oxen, than is now commonly done; and that the expence of shoeing them, is little different from that of keeping horses shod. It is observable that when oxen are worked on the farm, over rough frozen ground, they suffer so much from the want of shoes, however well fed they may be, that it is a proper subject for calculation, whether true economy does not require for them, that accommodation, even on the farm, as well as for the horses.

A more important calculation is, whether, in many situations, the general saving by substituting the ox for the horse would not balance the expence of hiring a carriage of the produce to market. In the same scale with the hire, is to be put the value of the grass and hay consumed by the oxen; and in the other scale, the value of the corn, amounting to one half of the crop, and of the grass and hay consumed by the horses. Where the market is not distant, the value of the corn saved, would certainly pay for the carriage of the market portion of the crop; and balance, moreover, any difference between the value of the grass and hay consumed by oxen, and the value of the oxen when slaughtered for beef. In all these calculations, it is doubtless proper not to lose sight of the rule, that farmers ought to avoid paying others for doing what they can do for themselves. But the rule has its exceptions; and the error, if it be committed, will not lie in departing from the rule, but in not selecting aright the cases which call for the departure. It may be remarked, that the rule ought to be more or less general, as there may, or may not be at hand, a market by which every produce of labour is convertible into money. In the old countries, this is much more the case, than in new; and in new, much more the case near towns, than at a distance from them. In this, as in most other parts of our country, a change of circumstances is taking place, which renders every thing raised on a farm more convertible into money than formerly; and as the change proceeds, it will be more and more a point for consideration, how far the labour in doing what might be bought, could earn more in another way, than the amount of the purchase. Still it will always be prudent, for reasons which every experienced farmer will understand, to lean to the side of doing, rather than hiring or buying what may be wanted.

The mule seems to be in point of economy, between the ox and the horse, preferable to the latter, inferior to the former, but so well adapted to particular services, that he may find a proper place on many farms. He is liable to the objection which weighs most against the ox. He is less fitted than the horse for road service.

VI. A more manifest error in the husbandry of the older settlements is that of keeping too many neat cattle on the farms. As a farm should not be cultivated farther than it can be continued in good heart; the stock of cattle should not be in greater number than the resources of food will keep in good plight. If a poor farm be unprofitable, so are poor cattle. It is particularly the case with the milch cows. When the whole of the food given them is necessary to support a lean existence, no part can be spared for the milk pail. The same food, given to the proper number, will not only keep them in a thrifty state, but enable them to supply the dairy. Even the manure from several poor cattle is worth less than that from a single fat one. The remark holds equally good with respect to the hide.

The misjudged practice in question, is another effect of inattention to the change of circumstances through which our country has passed. Originally the forest abounded in rich herbage which fed and fatted, without expence, all the cattle that could be brought through the winter into the spring. It was natural, at that time to keep as large a stock as could be preserved through the winter. For a long time past, the forest is scarcely any where, a resource for more than two or three months; and in many places, no resource at all. A greater difficulty is often felt in finding summer, than winter subsistence. And yet, where no inclosed pasturage is provided to take the place of the extinct one in the forest, the habit, founded in reasons which have entirely ceased, is but too generally retained. The same number of cattle is aimed at, as if the forest was as ready to receive and fatten them now, as formerly. The size and appearance of our neat cattle, compared with those for which nature or good husbandry has provided sufficient food, are proofs that their food is not in proportion to their number; and that, where the food cannot be increased, the number ought to be reduced.

VII. Of all the errors in our rural economy, none is perhaps, so much to be regretted, because none so difficult to be repaired, as the injudicious and excessive destruction of timber and fire wood. It seems never to have occurred that the fund was not inexhaustible, and that a crop of trees could not be raised as quickly as one of wheat or corn.

Here again, we are presented with a proof of the continuance of the practice for which the reasons have ceased. When our ancestors arrived, they found the trees of the forest the great obstacle to their settlement, and cultivation. The great effort was of course to destroy the trees. It would seem that they contracted and transmitted an antipathy to them; for the trees were not even spared around the dwellings, where their shade would have been a comfort and their beauty an ornament; and it is of late years only, that these advantages have been attended to. In fact, such has been the inconsiderate and indiscriminate use of the axe, that this country is beginning to feel the calamity as much as some of the old countries of Europe; and it will soon be forced to understand the difficulty of curing it. A vast proportion of the farms on the eastern side of the Blue Ridge, and some even, on the other side, have but a scanty fund for present use, and are without a fund for permanent use. And to increase the evil, the remnant of timber and fuel on many farms, inadequate as it is, is left in situations remote from the dwelling, and incapable of being divided, according to the divisions and sub-divisions, into which all the larger farms must be rapidly forced by the law of descents, the impulses of parental affection, and other causes.

It is high time for many farmers, even in this quarter, and still more so in the country below us, to take this subject into serious consideration. Prudence will no longer delay to economize what remains of wood land; to foster the second growths where taking place in convenient spots; and to commence, when necessary, plantations of the trees recommended by their utility and quickness of growth.

I wish I could more satisfactorily estimate the proportion of wood land which ought to belong to every farm, as a permanent fund of timber for building and repairing houses; for fences, where live or stone ones may not have been introduced; for wheel carriages, and the other apparatus needed on farms. The estimate is the more difficult, because it must be varied according to many circumstances: particularly, according to the nature of the soil, and the kind of trees at once suited to it, and to the uses to be made of them.

Estimating the crop of wood yielded by an acre at twenty cords, the period of re-production at twenty years, and the average number of cords annually consumed at a fire place, including the culinary consumption, at ten cords; every fire place on a farm will require ten acres for a permanent supply of fuel. For the other necessities of the farm, several acres more ought to be added.

An estimate in a very sensible publication, entitled "The New England Farmer," makes seventeen acres necessary for a fire place. [26] The winters there are longer, and the climate may be less favourable to the quick growth of trees. But their houses are generally closer than with us; to say nothing of a more judicious management than can be enforced on most of our farms.

To this catalogue of errors in our rural economy, considerable as it is, many, I fear, might be added. The task of pointing them out, I gladly leave to others, less incapable than I have shewn myself to be, by the very imperfect manner in which I have performed the one on which I ventured.

---

Printed copy (DLC: William C. Rives Papers); draft (NN). Draft 19 pp. Fragment; right half of last page is torn away; an unknown number of pages are missing. Copytext is taken from *An Address Delivered before the Agricultural Society of Albemarle, on Tuesday, May 12, 1818. By Mr. Madison, President of the Society* (Richmond, 1818; Shaw and Shoemaker 44668). Also printed as a series in issues 21–23 of the Baltimore *American Farmer* 1 (1819), 161–63, 169–71, 177–79, and in issues 1–4 of the Albany, N.Y. *Plough Boy* 1 (1819), 4–5, 12–13, 20–22, 27–28. First page of draft bears note in upper left corner in an unidentified hand: "'Address, by Mr. Madison, late President of the United States, Delivered before the Albemarle, Va., Agricultural Society. May 12, 1818.' Printed in: N.Y. Bd. of Agricultur. Memoirs, V. 1. (Albany, 1821); and also separately (1818)." Minor differences between the copytext and the draft have not been noted.

1. In the draft, JM noted in the top right margin of the first page: "See Encyclop. D A & D. [D'Alembert and Diderot] Foret, for facts showing succession of *different* trees &c instead of the same species occasioned by the failure of […] Tom. 15. p. 9."

2. In the draft, JM crossed out "& Japan."

3. William Robertson, *The History of America* (2 vols.; London, 1777). JM owned a copy of a later edition of this work, entitled *The History of the Discovery and Conquest of America* (London, 1835).

4. At this point in the draft, JM wrote: "with an inconsistency not a little strange."

5. In the draft JM wrote here then crossed out: "If it be not a degeneracy; it must be a distinct creation. If he could find the origin of the American savage, in a foreign people as savage as themselves, Where will he find the origin of the latter? He wd. at most have only obtained a tortoise for his elephant."

6. In the draft JM wrote here and crossed out: "The remarks which have been applied to the hunting Tribes are applicable also to those subsisting chiefly on fruits and other spontaneous productions, and to those of Herdsmen."

7. Manco Capac was the legendary founder of the Incan dynasty.

8. In the draft the next paragraph, enclosed in square brackets, reads: "Different animals require different foods. Why should not plants, which are not less different from each other in their organizations and characters: or are we to allow the food of different animals to be in essence the same; all animals being fed by vegitables [*sic*] or by animals which are fed by vegetables?"

9. In the draft, following this sentence JM wrote: "Some of them affect the flavor and colour of particular plants."

10. In the draft JM wrote here and crossed out: "Should this number of Elements, be reduced by future decompositions of some of them, into the other elements, a certain number of different elements must always remain."

11. In the draft JM interlined here: "the putrefactions and dissolutions."

12. This paragraph does not appear in the draft.

13. In the draft JM wrote here and crossed out: "In the case of certain insects which multiply with peculiar rapidity, and visit particular regions in such dense swarms, the destruction is almost instantaneous and altho."

14. In June 1756 forces under the Nawab of Bengal, Siraj-ud-daula took the city of Calcutta. A number of Englishmen were confined to a barely ventilated fourteen-by-eighteen-foot room in Fort William on the night of 20 June resulting in the deaths of many. Legend has it that 146 people were confined in the Black Hole of Calcutta and that 123 of them died. It has subsequently been proved that there were from 39 to 69 imprisoned, with between 18 and 43 deaths (Mark Bence-Jones, *Clive of India* [London, 1974], 88–91).

15. In the draft JM added here: "and without any other resource of a purer air than in the exhaustible one covering the acqueous parts of the globe."

16. In the draft this clause reads: "there would be not less than a thousand individuals, for every one now upon it."

17. In the draft this sentence begins: "Increase their numbers five or ten fold."

18. In the draft this clause reads: "can not be traced with certainty to its native district."

19. The fragment of draft ends here.

20. Jethro Tull (ca. 1674–1741) was an English agricultural writer and inventor of the seed drill.

21. For Jean Baptiste van Helmont and his experiment, see "Notes on Agriculture," ante–12 May 1818, and n. 6.

22. James Woodhouse (1770–1809) was born in Philadelphia and received his B.A. degree from the University of Pennsylvania in 1787, his M.A. in 1790. After receiving his medical degree under the supervision of Benjamin Rush, Woodhouse pursued his interest in chemistry and assumed the chair in that subject at his alma mater in 1795. His work on nitrous oxide, starch, coal, and bread-making had practical implications and he was a pioneer in plant chemistry.

23. JM referred here to John Taylor of Caroline's essay number 20 on manuring in *Arator; Being a Series of Agricultural Essays, Practical & Political: In Sixty-one Numbers* (2d ed., Georgetown, D.C., 1814; Shaw and Shoemaker 32909), 87–89.

24. This story is from book 4 of Lucius Junius Moderatus Columella's *De Re Rustica* (*On Agriculture*, 4.3, trans. Harrison Boyd Ash, Loeb Classical Library [3 vols.; Cambridge, Mass., 1941], 1:363).

25. Sir Humphry Davy's comments on gypsum as manure are found in his *Elements of Agricultural Chemistry* (Shaw and Shoemaker 34539), 296–99.

26. Samuel Deane, *The New-England Farmer; or, Georgical Dictionary* … (Worcester, Mass., 1790; Evans 22450), 105–6. Deane estimated that a woodlot of twenty acres or more would be necessary to supply firewood annually for a single fire.

---

## Authorial notes

[The following note(s) appeared in the margins or otherwise outside the text flow in the original source, and have been moved here for purposes of the digital edition.]

\* Dr. Robertson.

\* Col. T. M. Randolph.

\* Col. John Taylor.

\* Columella.

† Sr. H. Davy.

*Note:* The annotations to this document, and any other modern editorial content, are copyright © The Rector and Visitors of the University of Virginia. All rights reserved.

| | |
|---|---|
| SOURCE PROJECT | Madison Papers |
| TITLE | Address to the Agricultural Society of Albemarle, 12 May 1818 |
| AUTHOR | Madison, James |
| DATE | 12 May 1818 |
| CITE AS | "Address to the Agricultural Society of Albemarle, 12 May 1818," *Founders Online,* National Archives, https://founders.archives.gov/documents/Madison/04-01-02-0244. [Original source: *The Papers of James Madison*, Retirement Series, vol. 1, *4 March 1817–31 January 1820*, ed. David B. Mattern, J. C. A. Stagg, Mary Parke Johnson, and Anne Mandeville Colony. Charlottesville: University of Virginia Press, 2009, pp. 260–285.] |

The National Historical Publications and Records Commission (NHPRC) is part of the National Archives. Through its grants program, the NHPRC supports a wide range of activities to preserve, publish, and encourage the use of documentary sources, relating to the history of the United States, and research and development projects to bring historical records to the public.