ORAL ARGUMENT NOT YET SCHEDULED

**Lead Case No. 26-1037; Member Case No. 26-1038 (consolidated cases)**

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

AMERICAN PUBLIC HEALTH ASSOCIATION, et al.,
*Petitioners in No. 26-1037,*

and

ELENA VENNER, et al.,
*Petitioners in No. 26-1038,*
v.
ENVIRONMENTAL PROTECTION AGENCY and
LEE M. ZELDIN, Administrator,
U.S. Environmental Protection Agency,
*Respondents.*

AMERICAN FREE ENTERPRISE CHAMBER
OF COMMERCE, et al.,
*Intervenors.*

---

On Petitions for Review of a Final Rule of the Environmental Protection Agency
(No. EPA-91FR7686)

---

**BRIEF OF ANDREA WULF AS AMICUS CURIAE IN SUPPORT OF
PETITIONERS IN NO. 26-1038**

---

Gary DiBianco
LAWYERS FOR GOOD GOVERNMENT
1319 F St NW Ste 301, PMB 181; Washington, DC 20004
Tel. (404) 913-5529; gary@lawyersforgoodgovernment.org
*Counsel for Amicus Curiae*

## CORPORATE DISCLOSURE STATEMENT

Amicus certifies that she is not a corporation, association, joint venture, partnership, syndicate, or similar entity required to file a disclosure statement under Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1.

## CERTIFICATE REGARDING SEPARATE *AMICUS* BRIEF

Pursuant to D.C. Circuit Rule 29(d), Andrea Wulf certifies that a separate *amicus* brief is necessary to provide a unique perspective on the life and liberty interests that are impacted by the Environmental Protection Agency's ("EPA") final rule entitled *Rescission of the Greenhouse Gas Endangerment Finding and Motor Vehicle Greenhouse Gas Emission Standards Under the Clean Air Act*, 91 Fed. Reg. 7,686 (Feb. 18, 2026) ("Repeal Rule"). The life and liberty claims asserted by Petitioners are deeply rooted in the traditions of the Founding Fathers and the rich history of their relationship to nature on which they founded the new nation. Given her extensive scholarly research and analysis on the relationship the Founding Fathers had to their natural environment, *Amicus* is uniquely qualified to provide the significant historical context for life and liberty interests in clean air, water and land.

/s/ Gary DiBianco
Gary DiBianco (D.C. Bar No. 458669)
LAWYERS FOR GOOD GOVERNMENT
1319 F St NW Ste 301, PMB 181
Washington, DC 20004
Tel. (404) 913-5529
gary@lawyersforgoodgovernment.org

i

## CERTIFICATE AS TO PARTIES, RULINGS, & RELATED CASES

**A.     Parties.**

Petitioners in No. 26-1037: American Public Health Association; Alliance of Nurses for Healthy Environments; American Lung Association; Center for Biological Diversity; Center for Community Action and Environmental Justice; Clean Air Council; Clean Wisconsin; Conservation Law Foundation; Environmental Defense Fund; Environmental Law & Policy Center; Friends of the Earth; Natural Resources Defense Council, Inc.; Physicians for Social Responsibility; Public Citizen; Rio Grande International Study Center; Sierra Club; Union of Concerned Scientists.

Petitioners in No. 26-1038: Elena Venner; Ariela Lara; Emma Weibel; Katherine McIntosh; Lienna Lentfer; Maya Williams; Taylin Nishida; C.E., a minor, by and through her guardian B.K.; E.S., a minor, by and through his guardian K.S.; J.K., a minor, by and through his guardian L.K.; J.G., a minor, by and through her guardian T.L.; L.R.F., a minor, by and through her guardian A.F.; L.D. and R.D., minors, by and through their guardian S.D.; M.B., a minor, by and through her guardian G.M.; M.D., a minor, by and through her guardian S.A.; N.N., a minor, by and through his guardian K.S.N.; N.G., a minor, by and through her guardian E.G. ("*Venner* Petitioners").

ii

Petitioner in No. 26-1039: Business Climate Initiative Action d/b/a Zero Emission Transportation Association.

Petitioners in No. 26-1043: Metropolitan Congregations United for St. Louis and Missouri Coalition for the Environment.

Petitioner in No. 26-1051: Service Employees International Union.

Petitioners in No. 26-1061: Commonwealths of Massachusetts and Virginia; Josh Shapiro, in his official capacity as Governor of the Commonwealth of Pennsylvania; States of Arizona, California, Colorado, Connecticut, Delaware, Hawai'i, Illinois, Maine, Maryland, Michigan, Minnesota, Nevada, New Jersey, New Mexico, New York, North Carolina, Oregon, Rhode Island, Vermont, Washington, Wisconsin; District of Columbia; United States Virgin Islands; Cities of Albuquerque, New Mexico; Boston, Massachusetts; Chicago, Illinois; Cleveland, Ohio; Columbus, Ohio; Los Angeles, California; and New York, New York; Counties of Harris, Texas; Martin Luther King, Jr., Washington; and Santa Clara, California; and Cities and Counties of Denver, Colorado, and San Francisco, California.

Petitioners in No. 26-1083: Alaska Institute for Justice, Chesapeake Bay Foundation, Chinik Eskimo Community, Native Village of Kwinhagak, Native Village of Nunapitchuk, Northeast Organic Farming Association of New York, WE ACT, West Virginia Highlands Conservancy, Wyoming

iii

Outdoor Council, Hoosier Environmental Council, Illinois Environmental Council, Iowa Environmental Council, Minnesota Environmental Partnership, Ohio Environmental Council, and Food & Water Watch.

Petitioner in No. 26-1090: Bay Area Air Quality Management District.

Respondents in these consolidated cases: U.S. Environmental Protection Agency and Administrator Lee M. Zeldin, in his official capacity.

Intervenors at the time of this filing in these consolidated cases: State of West Virginia; Commonwealth of Kentucky; State of Alabama; State of Alaska; State of Arkansas; State of Florida; State of Georgia; State of Idaho; State of Indiana; State of Iowa; State of Kansas; State of Louisiana; State of Missouri; State of Mississippi; State of Montana; State of Nebraska; State of North Dakota; State of Ohio; State of Oklahoma; State of South Carolina; State of South Dakota; State of Tennessee; State of Texas; State of Utah; State of Wyoming; Domestic Energy Producers Alliance; Western States Trucking Association, Inc.; Construction Industry Air Quality Coalition, Inc.; Liberty Packing Company, LLC.; Nuckles Oil Company, Inc.; Truck and Engine Manufacturers Association; National Federation of Independent Business; American Free Enterprise Chamber of Commerce; Illinois  Corn Growers Association; Iowa  Corn Growers Association; Kentucky  Corn Growers Association; Missouri  Corn Growers Association; North Dakota

Corn Growers Association; Tennessee Corn Growers Association; NACCO

Natural Resources Corporation; CO2 Coalition; American Petroleum

Institute; American Fuel & Petrochemical Manufacturers; Energy Marketers

of America.

Amici Curiae at the time of this filing in these consolidated cases: Government

Accountability & Oversight and Government Oversight & Education, d/b/a

Protect the Public's Trust; Senators Ted Cruz and Cynthia M. Lummis; and

The Alliance for Automotive Innovation.

## B.    Rulings Under Review.

This is an original action in this Court. Petitioners in each consolidated case

seek review of the EPA's Repeal Rule, "*Rescission of the Greenhouse Gas

Endangerment Finding and Motor Vehicle Greenhouse Gas Emission Standards

Under the Clean Air Act,*" published at 91 Fed. Reg. 7686 (Feb. 18, 2026).

## C.    Related Cases.

*Venner* Petitioners' case has been consolidated with Nos. 26-1037, 26-1039,

26-1043, 26-1051, 26-1061, 26-1083, and 26-1090. Counsel is aware of no other

related cases within the meaning of Circuit Rule 28(a)(1)(C) that are currently

pending in this or any other court.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ......................................................... I

CERTIFICATE AS TO PARTIES, RULINGS, & RELATED CASES ................. II

TABLE OF AUTHORITIES ............................................................................... VII

STATEMENT OF IDENTITY, INTEREST IN THE CASE, AND STATEMENT OF AUTHORITY TO FILE ........................................................................................ 1

STATEMENT OF AUTHORSHIP AND FINANCIAL CONTRIBUTIONS ......... 3

   I.     INTRODUCTION AND SUMMARY OF ARGUMENT ............................. 3

   II.    ARGUMENT ............................................................................................. 6

      A.    *Legal Precedent Demands a Historical Review of the Right to Life and Liberty* ............................................................................................. 6

      B.    *The Founders and Nature's Balance* ....................................................... 8

      C.    *The Founding Fathers' View of the Atmosphere as Nature's Paramount Feature: James Madison's 1818 Environmental Speech* ....................... 15

      D.    *The Constitution's Invocation of Posterity Reflects the Founders' View of Nature's Fundamental Importance to the Property and Liberty Interests they Created the Constitution to Protect* ................................................ 18

   III.  CONCLUSION ....................................................................................... 20

CERTIFICATE OF COMPLIANCE ................................................................... 22

CERTIFICATE OF SERVICE ............................................................................. 23

## TABLE OF AUTHORITIES

**CASES**

*Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215, 237 (2022)..........6

*Guertin v. State*, 912 F.3d 907, 921-22 (6th Cir. 2019) ...........................................7

*Illinois Cent. R. Co. v. State of Illinois*, 146 U.S. 387, 13 S. Ct. 110, 36 L. Ed. 1018 (1892) .................................................................................................................8

*In re Flint Water Cases*, 496 F. Supp. 3d 1070, 1085-87 (E.D. Mich. 2020) ..........7

*Meyer v. Nebraska,* 262 U.S. 390 (1923) ...................................................................6

*Timbs v. Indiana*, 586 U.S. 146, 150 (2019) .............................................................6

*Washington v. Glucksberg*, 521 U.S. 702, 720–721 (1997) .....................................6

**OTHER AUTHORITIES**

2 William Blackstone, Commentaries on the Laws of England *14 (1766) ...........19

Andrea Wulf, *Founding Gardeners*, 127, 165 (2012)....9, 10, 11, 12, 13, 14, 16, 17, 18

*James Madison, Address to the Agricultural Society of Albemarle (May 12, 1818), in 1 The Papers of James Madison: Retirement Series 260 (David B. Mattern et al. eds., 2009)* .......................................................................................................16

James Madison, *Property* (Mar. 29, 1792), in 14 The Papers of James Madison 266, 266–68 (Robert A. Rutland et al. eds., 1983)............................................20

John Bouvier, *A Law Dictionary, Adapted to the Constitution and Laws of the United States* (1856)............................................................................................19

Letter from Thomas Jefferson to Isaac H. Tiffany, 4 April 1819, *Founders Online*, Nat'l Archives .................................................................................................20

Letter from Thomas Jefferson to James Madison, 6 Sept. 1789, *in* 15 *The Papers of Thomas Jefferson* 392 (Julian P. Boyd ed., 1958)..............................................19

**RULES**

D.C. Cir. R. 29(d) ............................................................................................. i

**REGULATIONS**

*Rescission of the Greenhouse Gas Endangerment Finding and Motor Vehicle Greenhouse Gas Emission Standards Under the Clean Air Act*, 91 Fed. Reg. 7,686 (Feb. 18, 2026) ..................................................................................... i

**CONSTITUTIONAL PROVISIONS**

U.S. Const. amend. V ....................................................................1, 3, 5, 6, 18, 20

**Statement of Identity, Interest in the Case, and Statement of Authority to File**

Pursuant to Federal Rule of Appellate Procedure 29(a), and D.C. Circuit Rule 29, *amicus curiae*, Andrea Wulf submits this brief in support of the Venner Petitioners in the above-captioned case. Petitioners in the consolidated cases and Respondent Environmental Protection Agency ("EPA") have not opposed the filing of this *amicus* brief. *Amicus Curiae* has sought leave to file this brief pursuant to a contemporaneously filed unopposed Motion for Leave to File as *Amicus Curiae*.

*Amicus curiae*, Andrea Wulf was trained as a design historian at the Royal College of Art in London and has studied, written and lectured across the world on the Founding Fathers of the United States of America and their relationship to nature. She has also written on the history of western people's evolved understanding of the science of nature and our deepening understanding of the natural world in our politics, art and literature. Her interest in this case is using her expertise to help ensure that the Founders' views on nature and its relationship with the preservation of life and liberty are properly understood as the Court considers Petitioners' claims under the Constitution's Fifth Amendment.

Andrea Wulf is a three-time fellow of the International Center for Jefferson Studies at Monticello, the 2013 Eccles British Library Writer in Residence, and since 2019 a Miller Scholar at the Santa Fe Institute in New Mexico. She is a member of

1

PEN American Center, a Fellow of the Linnean Society and a Fellow of the Royal Society of Literature.

Her book, *Founding Gardeners. How the Revolutionary Generation Created an American Eden*, on which much of this brief relies, was a *New York Times Best Seller*. The *New York Times* called it an 'illuminating and engrossing new book' and the *Washington Post* praised it as 'lively and deeply researched history'. *The Founding Gardeners* adds depth and nuance to our understanding of the American experiment and provides us with a portrait of the Founding Fathers as never seen before. It highlights the Founding Fathers' elemental passions as gardeners, agriculturalists and botanists, and how those passions were deeply ingrained in their belief in liberty for the nation they were creating.

Her book, *The Invention of Nature*, won fifteen international awards, including the Royal Society Science Book Award 2016 and the Costa Biography Award 2015. It was also the winner of the Inaugural James Wright Award for Nature Writing 2016 (Kenyon Review in association with the Nature Conservancy), Notable Book of Sigurd F. Olson Nature Writing Award (SONWA), the LA Times Book Prize 2016, the Ness Award 2016 from the Royal Geographical Society and the Acqui Storia Award 2017 (Italy).

The book was a finalist of the Kirkus Book Prize 2015 and was shortlisted for the Andrew Carnegie Medals for Excellence in Fiction & Nonfiction 2016, the

2

Cundill Prize for Historical Literature 2016 and the 2017 Smart Book Awards (Jagiellonian University & Euclid Foundation, Poland). It won the Bayerische Buchpreis 2016 in Germany where it was in the Top Ten bestseller list for 76 weeks. It was selected by *The New York Times'* "10 Best Books of 2015."

*The Invention of Nature* has been published in 27 countries and has sold around one million copies worldwide. It was republished as a John Murray Classic in 2025. In 2020 *New York Times* bestselling author Kathryn Aalto recognized Ms. Wulf in a chapter in Ms. Aalto's book *Writing Wild. Women, Poets, Ramblers, and Mavericks Who Shaped How We See the Natural World*. In 2023, Ms. Wulf was a judge at the Baillie Gifford Prize for Non–Fiction, the most prestigious non–fiction book prize in the UK.

### Statement of Authorship and Financial Contributions

No counsel for a party authored this brief in whole or in part, and no counsel or party made a monetary contribution intended to fund the preparation or submission of this brief. No person other than Amici Curiae or their counsel made a monetary contribution to the brief's preparation or submission.

## I.    INTRODUCTION AND SUMMARY OF ARGUMENT

Amicus Curiae files this brief in support of *Venner* Petitioners' argument that rescission and repeal of vehicle emission standards (the "Repeal Rule") threaten their life and liberty under the Fifth Amendment. Petitioners' claims to life and

liberty, including the freedom to engage in their familial, religious and cultural practices, are consistent with the traditions of the Founding Fathers and the rich history of their relationship to nature on which they founded the new nation.

The nation's Founding Fathers' attitudes towards, and their connection with, nature as well as the American landscape were integral to their creation of the United States of America and accordingly fundamental to their concepts of "life" and "liberty" in the Constitution. Many of the Founding Fathers were deeply connected with nature because they were farmers and gardeners. The first four presidents of the United States (Washington, Adams, Jefferson and Madison) all used, in one way or another, nature in their fight to establish the United States.

They imbued plants and trees with patriotic sentiments and invested America's landscape with a strong feeling of nationhood. They used their gardens and farms as a canvas upon which they created patriotic meaning. They planted native plant species as a political statement and used metaphors drawn from the natural world in their political writing and speeches. In fact, the most potent image of the American Revolution was the "Tree of Liberty." All four used nature symbolically, economically and ideologically.

The Founding Fathers' passion for the natural world is deeply woven into the fabric of America and very much aligned with their political thought and ideology. They didn't just create the United States in a political sense but also understood the

4

importance of nature as the foundation of the nation and the democracy they were creating. They understood the blessings of life and liberty depended on caring for the new nation's natural bounty, which included the clean air.

The first four presidents regarded themselves first and foremost as gardeners and farmers, not as politicians. Washington gave up the presidency after two terms so that he could farm his fields. He said, "Nothing in my opinion would contribute more to the welfare of these States, than the proper management of our Lands." That sentiment was repeated again and again by the first four presidents. They believed that an agrarian republic of small farms was the way to "national happiness, dignity and independence." They were also naturalists and philosophers of nature and science, and wielded their views of nature and man's connection to nature as a political tool and as integral to the founding of the republic. It was the Constitution that welded them together politically, legally and economically, but it was America's nature, soil and plants that provided a transcendent feeling of nationhood. Nature was, and remains, inextricably linked to guarding liberty.

The endangerment that additional greenhouse gases now pose to the climate system and its component parts of air, water, soils, and vegetation, are antithetical to any notion of protecting life and liberty, or the welfare of the nation, as understood by the founding generation and, in particular, the author of the Fifth Amendment, James Madison. The founders would have turned—and indeed did turn—to science,

5

scientists, and those who were deeply in tune with nature to protect the balanced climate system they understood to be foundational to liberty.

## II.    ARGUMENT

### A. Legal Precedent Demands a Historical Review of the Right to Life and Liberty

In assessing the scope of the rights of "life" and "liberty" protected by the Fifth Amendment, the Supreme Court turns to history to determine whether the right is "deeply rooted in [our] history and tradition" and whether it is essential to our Nation's "scheme of ordered liberty." *Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215, 237 (2022), *citing Timbs v. Indiana*, 586 U.S. 146, 150 (2019) and *Washington v. Glucksberg*, 521 U.S. 702, 720–721 (1997).

As the Supreme Court set out in *Meyer v. Nebraska,* 262 U.S. 390 (1923), the definition of "liberty" protected by the Due Process Clause is broad:

> Without doubt, it denotes not merely freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally **to enjoy those privileges long recognized at common law as essential to the orderly pursuit of happiness** by free men.

262 U.S. at 399 (emphasis added). *Venner* Petitioners seek to protect their right to a clean atmosphere and free enjoyment of the environment, which history shows is "essential to the orderly pursuit of happiness." Core to the Founders' notions of

6

life and liberty was the right to live in an environment of healthy air, clean water and robust nature.

The right to clean, breathable air, has been tethered logically and seamlessly to the right of life and liberty for centuries. The Founding Fathers' passions, actions, and political theories make clear that the right to life and liberty is inextricably linked to preserving and protecting clean air, and that notion was inherent in the creation of the Constitution.

By the same token, government actions that undermine clean air, water and land unquestionably infringe on the fundamental rights of life and liberty. A string of recent court decisions reiterates the interdependence between the right to life and a healthy environment, something that our Founding Fathers knew to be self-evident. When government actors knowingly introduce toxic substances into people's bodies—whether through contaminated water systems or toxic air—they violate the constitutionally protected liberty interest in bodily integrity. *Guertin v. State*, 912 F.3d 907, 921-22 (6th Cir. 2019) (a decision arising from the Flint water crisis, holding that government actors violate individuals' right to bodily integrity by "knowingly and intentionally introducing life-threatening substances into individuals without their consent, especially when such substances have zero therapeutic benefit."); *In re Flint Water Cases*, 496 F. Supp. 3d 1070, 1085-87 (E.D. Mich. 2020)(Confirming that the right to bodily integrity

7

is not limited to contexts of physical punishment and extends to government-caused toxic exposure).

The Public Trust Doctrine, rooted in Roman and English law, and recognized by the Supreme Court in *Illinois Cent. R. Co. v. State of Illinois*, 146 U.S. 387, 13 S. Ct. 110, 36 L. Ed. 1018 (1892), further evidences that land is held by the people for the common use. Thomas Jefferson and the Founding Fathers turned to the Public Trust Doctrine to inform their drafting of the Declaration of Independence and the Constitution. The Declaration of Independence and the Constitution did not *create* the rights to life, liberty, or the pursuit of happiness—the documents are, instead, vehicles for protecting and promoting those already-existing rights.

As set out in detail below, the Founders took seriously the notion of both public trust and intergenerational equity. They knew that freedom was defined by freedom from, not just freedom to. A historical analysis of the Founding Fathers' deep connection to the earth, water, and air, and their dedication to maintaining a world where the elements flourish demonstrates that the right to clean air is synonymous with the right to life and liberty.

## B. The Founders and Nature's Balance

"I am entirely a farmer, soul and body," Jefferson declared, and "no occupation is so delightful to me as the culture of the earth." During his time as the president, Jefferson would ride out every day into the surrounding countryside of

Washington, D.C., to escape from the tedium of governmental correspondence and meetings. The third president of the United States preferred to wade through swamps and climb rocks, and to pick up a leaf or a seed, rather than attend cabinet meetings. No plant, a friend said—"from the lowliest weed to the loftiest tree"—escaped his scrutiny. In his private study in the White House, Jefferson kept a set of garden tools to prune and tend his potted roses and geraniums. He had done the same when he was the secretary of state and lived in New York, where he was growing twenty-three precious plants of upland rice in pots on the windowsills. Jefferson's love for botany and gardening was so well known that American diplomats sent seeds to the White House from all over the world. Andrea Wulf, *Founding Gardeners*, 127, 165 (2012).

Jefferson was also an avid naturalist obsessed with taking measurements and recording species. For much of his life he kept a daily temperature and climate log (and convinced James Madison to do the same). He was a real polymath and with him as President, the White House had become the nexus of science, a control room of scientific inquiry. At dinner, botany, geography, meteorology and explorations joined farming and agriculture as the favorite topics of conversation. The range of Jefferson's interest was huge—from lunar observations to the close examination of worms that attacked Lombardy poplars.

At some stage Jefferson used the East Room, which has subsequently been used for lavish state dinners, for something he thought much more important: the storage of fossils. Where today foreign dignitaries sip cocktails on the lawn, Jefferson briefly kept two living grizzly bears that arrived from the West. Jefferson was so obsessed with nature that he (together with John Adams) had gone on a garden tour through England in 1786 when their trade negotiations with the British stalled.

Earlier, during the War of Independence, George Washington had famously dreamed of an agrarian society where "our Swords and Spears have given place to the plough share and pruning hook." When Washington had decided to retire after the second term of his presidency in order to return to farming and gardening, he knew that he would leave an enduring stamp on American politics. For the irony is that what we interpret as a necessary check on, and curtailment of, executive power––the two-term presidency that would become a cornerstone of America's democracy—had its seed in the president's refusal to brook any further delay in his return to his fields and forests at Mount Vernon. So many had expected Washington to be president for life but he refused power so that he could till his fields. "Nothing in my opinion," Washington said, "would contribute more to the welfare of these States, than the proper management of our Lands." That sentiment was repeated again and again by the first four presidents. *Id.* at 14, 34.

All four—Washington, Adams, Jefferson and Madison—agreed that agriculture should be the foundation of America. Madison was known as a man who believed that agriculture was "the surest basis of our national happiness, dignity, and independence." And they all saw themselves as model farmers and were experimenting with crop rotation and manure to improve the depleted soil. *Id.* at 230.

Jefferson famously designed the mould board of a plough, Washington invented a sixteen–sided treading barn, Adams investigated the piles of manure that he encountered during his travels and Madison wrote hundreds of letters about his fields, ploughs and forests. Jefferson tested new vegetables, crops and fruits at Monticello, using his fields and garden as an experimental laboratory. He believed that the "greatest service which can be rendered any country, is to add an [sic] useful plant to it's [sic] culture." In Monticello, he grew 125 different varieties of fruit trees and 330 varieties of vegetables and herbs. Jefferson never expected that all varieties would do well. He wanted to find the best, not the most. If only "one species in a hundred is found useful and succeeds," he said, it was worth the trial. "One service of this kind rendered to a nation," Jefferson said, "is worth more to them than all the victories of the most splendid pages of their history." *Id.* at 94, 208.

As long as a man had his own piece of land, Jefferson believed, he was independent. He had even argued that only farmers should be elected as congressmen because he regarded them as "the true representatives of the great

11

American interest," unlike the avaricious merchants who "have no country." Factory workers, merchants and stockbrokers would never feel bound to their country like farmers who worked the soil. *Id.* at 129.

At that time farming provided the livelihood for most Americans but the Founding Fathers also believed that free husbandmen with their small self-sufficient farms would be the foot soldiers of the infant nation. And with the elevation of the small farmer as something like the guardian of liberty, seemingly mundane tasks such as collecting manure, planting seeds and devising crop rotations became elemental parts of nation building. Ploughing, planting and vegetable gardening were more than profitable occupations, they became political acts that brought freedom and independence. The improvement of agriculture was therefore a republican endeavor because—as Madison said—the more prosperous farmers lived in the country "the more free, the more independent, and the more happy must be the society itself." Jefferson echoed this sentiment when he wrote "Cultivators of the earth are the most vigorous, the most independent, the most virtuous." *Id.* at 129-130.

Washington's agricultural methods were so innovative that many regarded him as "the first farmer in America." *Id.* at 34. Jefferson said that Madison was one of "the best farmers of all." *Id.* at 127. And an American scientist declared Jefferson to be "the enlightened philosopher—the distinguished naturalist—the first statesman

12

on earth, the friend, the ornament of science . . . the father of our Country, the faithful guardian of our liberties." In fact, Jefferson was said to be more proud about his election as the President of the American Philosophical Society (the foremost scientific society in the country), than as the President of the United States. *Id.* at 185.

At the same time, nature gave the thirteen states a national identity that still resonates today. After the War of Independence in 1783, the former colonies had to mature from being a war alliance to becoming a united nation. It was the Constitution that welded them together politically, legally and economically, but it was America's nature, soil and plants that provided a transcendent feeling of nationhood. Europe had antiquity and the ancient ruins, but Americans had to find something that made the New World better than the Old World and that bound them together as a country. They found it in America's spectacular landscape and imbued nature with patriotic significance. It was a perfect articulation of a distinct national identity—of a country that was young, strong and fertile.

America's wild, rugged mountains, vast plains and untamed forests became the embodiment of a nation that had freed itself from the shackles of tyranny. The New World's virgin landscape, fertile, imposing and wild, was untainted by history––by contrast, Europe's antiquity became synonymous in the American mind with despotism.

Already in the early 1780s Jefferson had celebrated American nature in his only published book *Notes on the State of Virginia*. He had written that the Potomac passage through the Blue Ridge Mountains was "one of the most stupendous scenes in nature" and that the Natural Bridge was "the most sublime of Nature's works." The Founding Fathers understood the potential of the beauty and vastness of America's natural scenery as a reflection of a strong nation. Washington wanted artists to paint the natural wonders of the continent and Jefferson had asked the artist John Trumbull to paint the Natural Bridge so that he could present "to the world this singular landscape, which otherwise some bungling European will misrepresent." *Id.* at 186-187.

Where previous generations had regarded America's untamed landscape as a hostile environment, which was an obstacle to farming and settlement, it now became an object of national pride—and American painters (such as those from the Hudson River School) began to paint America's natural scenery in all its glory.

One of the most telling incidents of the importance of nature for the creation of the nation is a letter that Washington wrote in August 1776, on the eve of the Battle of New York. More than 30,000 British troops had landed on America's shores and, as the city braced itself for the first and largest battle of the War of Independence, Washington wrote a letter to his estate manager in Mount Vernon, asking him to plant a new garden. With the chaos of cannons and of blood looming,

14

Washington asked his estate manager to rip out the old garden and to plant a new one—one that consisted of native American species only—soaring pines, tulip poplars, alabaster dogwood, stately red cedars, and pink red bud. As the young nation faced its first military confrontation in the name of liberty and independence, Washington decided that Mount Vernon was to be an all-American garden where English trees were not allowed to claw their roots in his soil. It was his horticultural Declaration of Independence.

### C. The Founding Fathers' View of the Atmosphere as Nature's Paramount Feature: James Madison's 1818 Environmental Speech

The Founding Fathers' ideas of nature remained a potent force through their lives and careers. Madison's widely circulated 1818 speech to the Agricultural Society in Albemarle, Virginia, a year after he retired from the presidency focuses on the atmosphere as an essential natural feature. The speech about deforestation highlighted the catastrophic effects of large-scale tobacco cultivation on Virginia's once fertile soil and highlighted the atmosphere's paramount role as a foundation to life.

To instill in his fellow Americans his perception of nature and put an end to the destruction of once fertile soil and the increasing exploitation of timber resources Madison sought to impart an understanding of the broader context of agriculture and its pivotal place within the delicate balance between man and nature. His message emphasized that nature was not "subservient" to man's use and that nature's balance

would collapse if everything was appropriated, in Madison's words, for the "increase of the human part of the creation." *Id.* at 232.

Madison's speech also explained in detail the climate system and the atmosphere's vital importance as foundations of life and country:

> Animals, including man, and plants may be regarded as the most important part of the terrestrial creation. They are pre-eminent in their attributes; and all nature teems with their varieties and their multitudes, visible and invisible. *To all of them, the atmosphere is the breath of life. Deprived of it, they all equally perish. . .*

After explaining that the atmosphere comprises "ingredients derived from the use made of it, by the existing variety of animals and plants," Madison concluded

> The immensity of the atmosphere, compared with the mass of animals and vegetables, forms an apparent objection only to this view of the subject. *The comparison could at most suggest questions as to the period of time necessary to exhaust the atmosphere of its unrenewed capacity to keep alive animal or vegetable nature*, when deprived, either, of the support of the other.

*Address to the Agricultural Society of Albemarle, 12 May 1818*, reproduced at *Venner* Petitioners' Motion to Stay Ex. 30(E) (Filed May 20, 2026).

In 1818, Madison's concern for the atmosphere related to deforestation, degradation of soil, and agricultural practices. There was no doubt for Madison that farmers should come together in what he called "Patriotic Societies" (like the Agricultural Society of Albemarle) to improve soils and protect the balance of nature. He accused those who relentlessly exploited the land: "The profit, where there is any, will not balance the loss of intrinsic value sustained by the land." *Id.*

16

Madison warned, and was concerned, about humankind's destructive force. The preservation of the environment was essential for the survival of humankind, Madison believed, not so much in order to live in romantic harmony with nature but to live off it without destroying it. The reasons were economic rather than idealistic, but the goal was the same.

Madison did not see nature through a romantic lens of transcendent beauty but as a fragile ecological system that could be easily destroyed by humankind. As such the origin of the notion of conservation lies with men such as Madison and the other Founding Fathers. Benjamin Franklin expressed the sentiment when he talked of the "loss for wood"—and as always he tried to tackle the problem with a practical solution, designing the fuel-efficient Pennsylvania fireplace in order to reduce timber consumption.

Similarly, Washington had complained that "the waste which has been committed on my timber and Wood hitherto, has really been shameful." Jefferson had written to his overseer that "we must use a good deal of economy in our wood" and John Adams had instructed on buying a forest plot: "Pray dont let a Single Tree be cutt. [sic]" Wulf, supra, at 236.

The biggest mistake, Madison said in his speech, was the "excessive destruction of timber." He then called for "plantations of the trees" (his friend William Thornton, the first architect of the Capitol, had four years previously also

17

feared that "by clearing Lands, whole Families of plants are likely to be lost"). Madison was also the first American, and certainly the first politician, who put aside a piece of forest to protect it—not on public land but rather on his plantation Montpelier in Virginia. No tree was allowed to be felled and today, his 200 acres are still protected as the James Madison Landmark Forest. *Id.* at 234, 237.

Thus, Madison's speech to the Agricultural Society is one of this nation's founding documents and is highly relevant today in interpreting the founders' meaning of life and liberty, which Madison added in the Fifth Amendment to the U.S. Constitution. This is especially true today in the face of the present climate crisis and pollution of the atmosphere wrought by excessive use of fossil fuels.

The EPA's Repeal Rule will only cause more pollution and further degradation of our Nation's atmosphere that for over 200 years has been understood to be the very foundation of life and deserving of protection. As discussed in Section D below, Madison's recognition of the atmosphere as essential finds its place in the concept of property and its intergenerational protection under the Fifth Amendment.

## D. The Constitution's Invocation of Posterity Reflects the Founders' View of Nature's Fundamental Importance to the Property and Liberty Interests they Created the Constitution to Protect

Madison's deep understanding of the atmosphere and the rest of nature as a component of "property" and its constitutional protection for future generations builds on the Founding Fathers' views of nature. Specifically, English common law

18

recognized as property necessarily of common ownership: "[s]uch (among others) are the elements of light, air, and water . . . also animals ferae naturae, or of untamable nature…" *See* William Blackstone, 2 *Commentaries on the Laws of England* *14 (1766).

Regarding these earthly resources Thomas Jefferson proclaimed it to be self-evident "*that the earth belongs in usufruct to the living[.]*" Letter from Thomas Jefferson to James Madison, 6 Sept. 1789, *in* 15 *The Papers of Thomas Jefferson* 392 (Julian P. Boyd ed., 1958) (emphasis in original).

To Jefferson and his peers, "usufruct" meant "the right of enjoying a thing, the property of which is vested in another, and to draw from the same all the profit, utility and advantage which it may produce, provided it be without altering the substance of the thing." John Bouvier, *A Law Dictionary, Adapted to the Constitution and Laws of the United States* (1856). The "excessive destruction of timber" decried by Madison and discussed above, is exactly the type of "altering the substance of the thing" that Jefferson saw as violating common rights to property.

Jefferson communicated just this point in his letter to Madison saying that, "the earth belongs to each of these generations, during its course, fully, and in their own right. The 2d. generation receives it clear of the debts and incumberances [sic] of the 1st. the 3d of the 2d. and so on." Letter from Jefferson to Madison, 6 Sept. 1789, *supra*.

The Founders' concept of "property" was expansive. Madison, for example, exclaimed that property "embraces every thing [sic] to which a man may attach a value and have a right; and which leaves to everyone else the like advantage." James Madison, *Property* (Mar. 29, 1792), in 14 The Papers of James Madison 266, 266–68 (Robert A. Rutland et al. eds., 1983). Given the Constitution's recognition of posterity's rights, Madison's concept of "just property"—contemplated leaving future generations "the like advantage" regarding everything to which we attach value.

The idea of "like advantage" similarly infuses the Founders' notion of liberty. As described by Jefferson, rightful liberty is the "unobstructed action according to our will, within the limits drawn around us by the equal rights of others." Letter from Thomas Jefferson to Isaac H. Tiffany, 4 April 1819, *Founders Online*, Nat'l Archives. Given property and liberty interests' similar attention to the importance of the limits of rights circumscribed by others' rights, including those of future generations, the Founders' views of nature as essential to both property and liberty ring clear.

## III.    CONCLUSION

On our country's 250th anniversary, the Founders' reverence for nature and its role in informing those most precious of rights protected by the Fifth Amendment is more important than ever. The Founders' recognition of the foundational importance

20

of a healthy atmosphere was as revolutionary in its own way as their concept of

governance in the Constitution they created. Amicus Curiae respectfully asks this

Court to rule in favor of the *Venner* Petitioners.

Dated: August 11, 2026

*/s/* Gary DiBianco
Gary DiBianco (D.C. Bar No. 458669)
LAWYERS FOR GOOD GOVERNMENT
1319 F St NW Ste 301, PMB 181
Washington, DC 20004
Tel. (404) 913-5529
gary@lawyersforgoodgovernment.org

*Counsel for Amicus Curiae*

21

## CERTIFICATE OF COMPLIANCE

In accordance with Fed. R. App. P. 32(g), I certify that this filing contains 4,923 words, excluding the parts exempted by Fed. R. App. P. 32(f). This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced serif typeface using Microsoft Word with 14-point Times New Roman font.

Dated: August 11, 2026

*/s/* Gary DiBianco
Gary DiBianco (D.C. Bar No. 458669)
LAWYERS FOR GOOD GOVERNMENT
1319 F St NW Ste 301, PMB 181
Washington, DC 20004
Tel. (404) 913-5529
gary@lawyersforgoodgovernment.org

22

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the D.C. Circuit by using the appellate CM/ECF system on August 11, 2026. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated: August 11, 2026

/s/ Gary DiBianco
Gary DiBianco (D.C. Bar No. 458669)
LAWYERS FOR GOOD GOVERNMENT
1319 F St NW Ste 301, PMB 181
Washington, DC 20004
Tel. (404) 913-5529
gary@lawyersforgoodgovernment.org

23